DAVID CHIU, SBN 189542
City Attorney
YVONNE R. MERÉ, SBN 175394
Chief Deputy City Attorney
MOLLIE M. LEE, SBN 251404
Chief of Strategic Advocacy
SARA J. EISENBERG, SBN 269303
Chief of Complex and Affirmative Litigation
NANCY E. HARRIS, SBN 197042
KARUN A. TILAK, SBN 323939
Deputy City Attorneys
Fox Plaza
1390 Market Street, 7th Floor
San Francisco, CA 94102-5408
Telephone:    (415) 355-3308
Facsimile:    (415) 437-4644
E-Mail:    karun.tilak@sfcityatty.org

Attorneys for Plaintiff
CITY AND COUNTY OF SAN FRANCISCO

TONY LOPRESTI, SBN 289269
County Counsel
KAVITA NARAYAN, SBN 264191
Chief Assistant County Counsel
MEREDITH A. JOHNSON, SBN 291018
Lead Deputy County Counsel
STEFANIE L. WILSON, SBN 314899
RAJIV NARAYAN, SBN 334511
Deputy County Counsels
BILL NGUYEN, SBN 333671
Litigation Fellow
70 W. Hedding Street, East Wing, 9th Floor
San José, CA 95110
Telephone:    (408) 299-5900
Facsimile:    (408) 292-7240
E-Mail:    tony.lopresti@cco.sccgov.org

Attorneys for Plaintiff
COUNTY OF SANTA CLARA

*[additional counsel on signature page]*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO, COUNTY OF SANTA CLARA, CITY OF PORTLAND, MARTIN LUTHER KING, JR. COUNTY, CITY OF NEW HAVEN, CITY OF OAKLAND, CITY OF EMERYVILLE, CITY OF SAN JOSÉ, CITY OF SAN DIEGO, CITY OF SACRAMENTO, CITY OF SANTA CRUZ, COUNTY OF MONTEREY, CITY OF SEATTLE, CITY OF MINNEAPOLIS, CITY OF ST. PAUL, CITY OF SANTA FE, <br><br>        Plaintiffs, <br><br>        vs. <br><br> DONALD J. TRUMP, President of the United States, UNITED STATES OF AMERICA, PAMELA BONDI, Attorney General of the United States, EMIL BOVE, Acting Deputy Attorney General, UNITED STATES DEPARTMENT OF JUSTICE, KRISTI NOEM, Secretary of United States Department of Homeland Security, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, DOES 1-100, <br><br>        Defendants. | Case No. 25-CV-01350-WHO <br><br> **FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

**INTRODUCTION**

1. Defendant President Donald J. Trump is intent on ignoring the rule of law and punishing all who would disagree with him. In his new Administration, the President is again trampling established law limiting the extent of federal power over state and local governments. He appears emboldened to do what the courts thwarted him from doing before and penalize "sanctuary jurisdictions" that do not bend to his will. This action seeks to check this abuse of power.

2. During his first term in office, President Trump sought to force local authorities to carry out federal civil immigration efforts. In January 2017, he issued Executive Order 13,768, which directed his Administration to withhold funds from and pursue enforcement actions against so-called "sanctuary jurisdictions" that limit local entanglement with federal immigration authorities. Federal courts, including this Court and the Ninth Circuit, roundly rejected these efforts as a blatantly unconstitutional usurpation of legislative authority. *See, e.g.*, *Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497 (N.D. Cal. Apr. 25, 2017); *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225 (9th Cir. 2018). President Trump's Department of Justice ("DOJ") also tried to condition various DOJ funds on local jurisdictions' agreement to enforce federal immigration law. Again, federal courts, including this Court and the Ninth Circuit, struck down these funding restrictions. *See City & Cnty. of S.F. v. Sessions*, 349 F. Supp. 3d 924 (N.D. Cal. 2018); *City & Cnty. of S.F. v. Barr*, 965 F.3d 753 (9th Cir. 2020).

3. Undaunted by court rulings holding these efforts blatantly illegal, President Trump renewed his assault on these jurisdictions immediately upon taking office for a second term. On the same day he was inaugurated, he issued an Executive Order that purports to reinstate Executive Order 13,768. He then underscored his intent to punish jurisdictions that do not enforce his immigration policy priorities by issuing a second Executive Order, No. 14,159. That order returns to his 2017 playbook by directing Defendant Attorney General Pam Bondi and Defendant Department of Homeland Security ("DHS") Secretary Kristi Noem to withhold all federal funds from jurisdictions that refuse to use their local resources to carry out his immigration agenda. Even since the filing of this lawsuit, President Trump has issued yet another Executive Order, No. 14,218, which targets such jurisdictions by directing all executive departments and agencies to ensure that "Federal payments to

States and localities do not . . . abet so-called 'sanctuary' policies."

4.      His administration has doubled down on these tactics, with Defendant Bondi issuing a memo on February 5, 2025 stating DOJ's position that "State and local jurisdictions must comply with applicable immigration-related federal laws" and "state and local actors may not . . . fail to comply with lawful immigration-related directives." The memo threatens not only termination of funding but also civil and criminal prosecution of any jurisdiction that refuses to comply.

5.      Bondi and DOJ have made good on these threats, filing lawsuits against states and localities with policies limiting local cooperation with federal immigration enforcement and asserting an unprecedented and unlawful interpretation of the federal government's authority to commandeer local government resources.

6.      In flagrant disregard of the law, President Trump seeks once again to punish those who disagree with him, coerce local authorities, and commandeer them into carrying out his agenda. President Trump is aided in these efforts by Defendants DOJ, DHS, Bondi, Bove, and Noem.

7.      His actions fly in the face of foundational constitutional principles. They violate plain statutory language and numerous court orders. And they force local governments that have made deliberate decisions about how to make their communities safer and where to spend their own resources into an impossible choice—to relinquish their autonomy and independence and abandon their valid laws and policies, or face the sudden and devastating loss of federal funding and civil and criminal enforcement actions.

8.      By this action, Plaintiffs challenge each of these related Executive actions. President Trump's Executive Orders 14,159 and 14,218 and DOJ's February 5 memo violate the Tenth Amendment, Separation of Powers, the Spending Clause, and the Due Process Clause. DOJ's memo is additionally unlawful because it is arbitrary and capricious, contrary to constitutional rights, and issued in excess of its statutory jurisdiction.

9.      Plaintiffs are cities and counties spread across the country that are collectively home to close to ten million residents. Plaintiffs have diverse populations and vibrant immigrant communities. Plaintiffs have each made the choice, protected by the Tenth Amendment to the United States Constitution, to ensure that their local resources are dedicated to serving all residents of their

communities, and that these services can be accessed by all residents without fear of immigration consequences. To achieve these goals, Plaintiffs have enacted laws and policies that limit the use of local resources to enforce or administer federal civil immigration law.

10.    Plaintiffs are not going to stand in the way of lawful federal immigration enforcement. But neither are they going to be bullied into abandoning their laws that have made their communities safer or doing what the federal government cannot compel them to do—actively assist the federal government in enforcing federal immigration laws.

11.    For all of these reasons, as detailed below, Plaintiffs respectfully request the court to declare that these Executive actions are unlawful and to enjoin Defendants from enforcing the challenged provisions of the Executive Orders and DOJ's memo.

## JURISDICTION AND VENUE

12.    The Court has jurisdiction under 28 U.S.C. §§ 1331 and 1346. This Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202 *et seq.*

13.    Venue properly lies within the Northern District of California because Plaintiffs City & County of San Francisco and County of Santa Clara reside in this judicial district and a substantial part of the events or omissions giving rise to this action occurred in this district. 28 U.S.C. §1391(e)(1).

## INTRA-DISTRICT ASSIGNMENT

14.    Assignment to the San Francisco Division of this District is proper pursuant to Civil Local Rule 3-2(c)-(d) because a substantial part of the acts or omissions that give rise to this action occurred in the City and County of San Francisco.

## PARTIES

15.    Plaintiff the City and County of San Francisco ("San Francisco") is a municipal corporation organized and existing under and by virtue of the laws of the State of California, and is a charter city and county.

16.    Plaintiff the County of Santa Clara ("Santa Clara") is a charter county and political subdivision of the State of California.

17.    Plaintiff the City of Portland ("Portland") is a municipal corporation of the State of Oregon duly organized and existing under the laws of the State of Oregon.

18.     Plaintiff Martin Luther King, Jr. County ("King County") is a home rule charter county organized and existing under and by virtue of the constitution and laws of the State of Washington.

19.     Plaintiff the City of New Haven ("New Haven") is a municipal corporation organized and existing under the laws of the State of Connecticut.

20.     Plaintiff the City of Oakland ("Oakland") is a municipal corporation organized and existing under and by virtue of the laws of the State of California, and is a charter city.

21.     Plaintiff the City of Emeryville ("Emeryville") is a municipal corporation organized and existing under and by virtue of the laws of the State of California. It is a general law city except for municipal revenue purposes, including taxation and assessment, for which it has charter city authority.

22.     Plaintiff the City of San José ("San José") is a municipal corporation organized and existing under and by virtue of the laws of the State of California, and is a charter city.

23.     Plaintiff the City of San Diego ("San Diego") is a municipal corporation organized and existing under and by virtue of the laws of the State of California, and is a charter city.

24.     Plaintiff the City of Sacramento ("Sacramento") is a municipal corporation organized and existing under and by virtue of the laws of the State of California, and is a charter city.

25.     Plaintiff the City of Santa Cruz ("Santa Cruz") is a municipal corporation organized and existing under and by virtue of the laws of the State of California, and is a charter city.

26.     Plaintiff the County of Monterey ("Monterey") is a general law county and political subdivision of the State of California.

27.     Plaintiff the City of Seattle ("Seattle") is a municipal corporation and first-class charter city organized and existing under the laws of the State of Washington.

28.     Plaintiff the City of Minneapolis ("Minneapolis") is a municipal corporation organized and existing under and by virtue of the laws of the State of Minnesota. It is a home rule charter city.

29.     Plaintiff the City of Saint Paul ("Saint Paul") is a municipal corporation organized and existing under and by virtue of the laws of the State of Minnesota. It is a charter city.

30.     Plaintiff the City of Santa Fe ("Santa Fe") is a municipal corporation and charter city organized under the laws of the State of New Mexico.

31.     Defendant Donald J. Trump is the President of the United States. He is sued in his official capacity.

32.     Defendant United States of America is sued under 28 U.S.C. § 1346.

33.     Defendant United States Department of Justice ("DOJ") is an executive department of the United States federal government. 28 U.S.C. § 501. DOJ is responsible for the governmental actions at issue in this lawsuit.

34.     Defendant Pamela Bondi is the Attorney General of the United States, the highest ranking official in DOJ, and is responsible for the decisions of DOJ. She is sued in her official capacity.

35.     Defendant Emil Bove is the Acting Deputy Attorney General, the second-ranking official within DOJ, and therefore responsible for the decisions of DOJ. He is sued in his official capacity.

36.     Defendant United States Department of Homeland Security ("DHS") is an executive department of the United States federal government. 6 U.S.C. § 111. DHS is responsible for enacting some of the governmental actions at issue in this lawsuit.

37.     Defendant Kristi Noem is the Secretary of Homeland Security, the highest ranking official in DHS, and responsible for the decisions of DHS. She is sued in her official capacity.

38.     Doe 1 through Doe 100 are sued under fictitious names. Plaintiffs do not now know the true names or capacities of said Defendants, who were responsible for the alleged violations, but pray that the same may be alleged in this complaint when ascertained.

## FACTUAL ALLEGATIONS

### I.     Plaintiffs' Laws and Policies

39.     Plaintiffs have each made the lawful decision to limit the use of their local resources to assist with federal civil immigration enforcement. In general, these laws and policies limit cooperation with U.S. Immigration & Customs Enforcement ("ICE") and other immigration enforcement authorities with respect to civil immigration detainer requests and administrative warrants, the sharing of confidential personal information (such as contact information) of individuals served by local officials, the sharing with ICE of release dates of individuals in local custody, and the collection of

immigration or citizenship information about communities served by local officials.

40.    These local policy choices are not designed to, and do not, interfere with federal law enforcement, but instead ensure that all residents of Plaintiffs' communities—regardless of immigration status—feel safe reporting crimes, going to schools, seeking medical care, and accessing critical public services.

41.    These local policies also preserve scarce local resources. For example, a civil immigration detainer request is distinct from a criminal warrant, which Plaintiffs honor. A detainer request is not issued by a judge based on a finding of probable cause. It is simply a request by ICE that a state or local law enforcement agency hold individuals after their release date to provide ICE agents extra time to decide whether to take those individuals into federal custody and then deport them. Complying with detainer requests requires municipalities to commit scarce law enforcement personnel and resources to track and respond to requests, detain individuals in holding cells, and supervise and feed individuals during the prolonged detention. And the federal government has made clear that the local agency bears the financial burden of the detention, providing that "[n]o detainer issued as a result of a determination made under this chapter . . . shall incur any fiscal obligation on the part of the Department." 8 C.F.R. § 287.7(e).

42.    Further, courts have held that complying with civil immigration detainer requests, in the absence of a probable cause determination, violates the Fourth Amendment to the United States Constitution and could subject Plaintiffs to civil liability. *See Hernandez v. United States*, 939 F.3d 191, 200–01 (2nd Cir. 2019); *Morales v. Chadbourne*, 793 F.3d 208, 217 (1st Cir. 2015); *Miranda-Olivares v. Clackamas Cnty.*, No. 12-cv-02317-ST, 2014 WL 1414305, at *9 (D. Or. Apr. 11, 2014); *see also Melendres v. Arpaio*, 695 F.3d 990, 1000–01 (9th Cir. 2012) (applying the Fourth Amendment to immigration arrests).

43.    While "sanctuary" is not a legally defined term—and several Plaintiffs do not use the term "sanctuary" to describe their policies or consider themselves to be "sanctuary jurisdictions"—Defendants have characterized all jurisdictions with policies like those adopted by Plaintiffs to be so-called "sanctuary jurisdictions."

**A.    San Francisco**

44.    San Francisco has designated itself a Sanctuary City since 1989. In the 1980s, thousands of Central American refugees fled their countries in the midst of violent civil wars to seek legal protection in the United States. Against the backdrop of this humanitarian crisis, San Francisco began enacting the ordinances that, as later amended, make up San Francisco's Sanctuary City laws.

45.    Today, San Francisco's body of Sanctuary City law is contained in two chapters of San Francisco's Administrative Code: Chapters 12H and 12I. Importantly, these chapters do not shield criminals or prevent individuals from being prosecuted for illegal acts. Instead, they protect children by ensuring that their parents feel safe taking them to playgrounds, to schools, and to hospitals. They support family stability and community engagement. And they protect the safety and health of all residents of San Francisco by helping to ensure that everyone, including undocumented immigrants, feels safe reporting crimes, cooperating with police investigations, and seeking medical care.

46.    San Francisco Administrative Code Chapter 12H prohibits San Francisco departments, agencies, commissions, officers, and employees from using San Francisco funds or resources to assist in the enforcement of Federal immigration law or to gather or disseminate information regarding the release status, or other confidential identifying information, of an individual unless such assistance is required by Federal or state law.

47.    San Francisco Administrative Code Chapter 12I prohibits San Francisco law enforcement officials from detaining an individual who is otherwise eligible for release from custody on the basis of a civil immigration detainer request issued by the Federal government.

48.    Chapter 12I also prohibits San Francisco law enforcement officials from responding to a federal immigration officer's request for advance notification of the date and time an individual in San Francisco's custody is being released, unless the individual in question meets certain criteria. *See* S.F. Admin. Code § 12I.3(c), (d).

49.    Finally, as relevant here, Chapter 12I provides that "[l]aw enforcement officials shall not arrest or detain an individual, or provide any individual's personal information to a federal immigration officer, on the basis of an administrative warrant, prior deportation order, or other civil immigration document based solely on alleged violations of the civil provisions of immigration laws."

*See* Section 12I.3(e). "Personal information" is defined as "any confidential, identifying information about an individual, including, but not limited to, home or work contact information, and family or emergency contact information." *See* Section 12I.2.

50.    San Francisco's Sanctuary City laws arise from San Francisco's commitment and responsibility to ensure public safety and welfare. The Board of Supervisors, as San Francisco's legislative body, found that public safety is "founded on trust and cooperation of community residents and local law enforcement." Section 12I.1. Citing a study by the University of Illinois, which found that at least 40% of Latinos surveyed were less likely to provide information to police because they feared exposing themselves, family, or friends to a risk of deportation, the Board stated that "civil immigration detainers and notifications regarding release undermine community trust of law enforcement by instilling fear in immigrant communities of coming forward to report crimes and cooperate with local law enforcement agencies." *Id.*; *see also id.* ("The City has enacted numerous laws and policies to strengthen communities and to build trust between communities and local law enforcement. Local cooperation and assistance with civil immigration enforcement undermines community policing strategies.").

51.    The legislative findings set forth in Chapter 12I evidence the legitimate local purpose of San Francisco's Sanctuary City laws. For example, the Board declared:

> Fostering a relationship of trust, respect, and open communication between City employees and City residents is essential to the City's core mission of ensuring public health, safety, and welfare, and serving the needs of everyone in the community, including immigrants. The purpose of this Chapter 12I, as well as of Administrative Code Chapter 12H, is to foster respect and trust between law enforcement and residents, to protect limited local resources, to encourage cooperation between residents and City officials, including especially law enforcement and public health officers and employees, and to ensure community security, and due process for all. (*See* Section 12I.2.)

52.    The Board of Supervisors also had a public health purpose for its decision to restrict disclosure of confidential information: "To carry out public health programs, the City must be able to reliably collect confidential information from all residents . . . . Information gathering and cooperation may be jeopardized if release of personal information results in a person being taken into immigration custody." Section 12I.1.

53. Finally, the Board of Supervisors determined that enforcing immigration detainer requests would require San Francisco to redirect scarce local law enforcement personnel and resources—noting that the costs of "responding to a civil immigration detainer can include, but [are] not limited to, extended detention time, the administrative costs of tracking and responding to detainers, and the legal liability for erroneously holding an individual who is not subject to a civil immigration detainer." Section 12I.1. In short, the Board of Supervisors concluded that "[c]ompliance with civil immigration detainers and involvement in civil immigration enforcement diverts limited local resources from programs that are beneficial to the City." *Id*.

54. San Francisco departments have adopted and implemented policies consistent with Chapters 12H and 12I.

**B.    Santa Clara**

55. Plaintiff Santa Clara is home to one of the largest and most diverse populations in the United States. With nearly two million residents, Santa Clara is the sixth largest county in California and more populous than twelve states. More than 40 percent—numbering upwards of 750,000—of Santa Clara's residents are foreign-born. This is the highest percentage of any county in California and one of the highest of any county nationally. Santa Clara's foreign-born population includes naturalized citizens; lawful permanent residents; refugees, asylees, student- and work-visa holders; victims of human trafficking or other crimes who have assisted law enforcement and hold T or U visas; and residents who lack lawful immigration status.

56. Santa Clara is governed by an elected Board of Supervisors, which has repeatedly expressed its position that fostering a relationship of trust, respect, and open communication between and among Santa Clara officials and community members is critical to successfully achieving Santa Clara's mission of protecting community health and wellbeing and ensuring public safety.

57. Santa Clara's elected Sheriff and District Attorney echo the same sentiment in their roles as Santa Clara's top law enforcement officials, expressing and instructing their employees that to encourage the reporting of crime and cooperation in criminal investigations, *all* community members, regardless of their immigration status, must feel safe and secure when contacting members of local public safety agencies; and must not fear that making contact will lead to an immigration inquiry or

proceeding against them or a loved one. Their leaders have stated publicly many times not only that their crime prevention, prosecution, and investigation services are available to all, but that the full participation of the community as victims and witnesses—buoyed by Santa Clara's policies of separation from federal civil immigration enforcement and the confidence and trust they engender— has been critical to solving specific crimes.

58.     Santa Clara employees do not impede or prevent ICE officials from carrying out their own enforcement activities relating to federal civil immigration laws. However, under Santa Clara's longstanding policies, employees do not use Santa Clara's *own* facilities, resources, or staff time to assist.

59.     Santa Clara's policy of not expending local law enforcement resources to assist with federal civil immigration enforcement is set forth in Board of Supervisors Policy 3.54 ("Board Policy 3.54"). Board Policy 3.54 prohibits jail administration from honoring ICE civil detainer requests; provides that the Sheriff may, in their discretion, facilitate transfers of incarcerated individuals to ICE custody *only* under the auspices of a signed judicial warrant or court order; and prohibits Santa Clara staff from using local resources or local facilities to support civil immigration enforcement activities, including by "communicating with ICE regarding individuals' incarceration status or release dates." Board Policy 3.54, by its express terms, does not in any way hamper local law enforcement officers' cooperation with other agencies in any *criminal* law enforcement activities. In full, Board Policy 3.54 states:

> It is the policy of the County of Santa Clara that County officials and employees may cooperate with United States Immigration and Customs Enforcement (ICE) only as follows:
>
> (A)     Consistent with longstanding County policy, the California Values Act (Gov. Code, §§ 7284-7284.12)[1], and the Fourth Amendment to the United States Constitution, the County does not, under any circumstances, honor civil detainer requests from ICE by holding inmates on ICE's behalf for additional time after they would otherwise be released from County custody.

---

[1] The California Values Act ("SB 54") defines narrow circumstances in which California state and local law enforcement agencies may take specific actions related to immigration enforcement. However, SB 54 does not restrict local jurisdictions from adopting their own policies further narrowing the scope of actions permitted within those local jurisdictions, and many California localities have enacted local laws and policies that govern their own employees' conduct.

(B)     It is the policy of the County that the Sheriff may exercise discretion to facilitate the transfer of an adult inmate to ICE custody if an ICE agent presents a valid arrest warrant signed by a federal or state judicial officer, or other signed writ or order from a federal or state judicial officer authorizing ICE's arrest of the inmate. An administrative warrant signed by an agent or official of ICE or of the Department of Homeland Security (such as a Form I-200) is not a judicial warrant and will not be honored. The Sheriff and Chief of Correction shall jointly develop transfer procedures to implement this paragraph.

(C)     Except as permitted by this Policy, the County shall not provide assistance or cooperation to ICE in its civil immigration enforcement efforts, including by giving ICE agents access to individuals or allowing them to use County facilities for investigative interviews or other purposes, expending County time or resources responding to ICE inquiries or communicating with ICE regarding individuals' incarceration status or release dates, or otherwise participating in any civil immigration enforcement activities. This Policy does not limit or prohibit giving assistance with the investigative activities of any local, state, or federal law enforcement agency relating to suspected violations of criminal laws.

60.     The requirements of subsections (A) and (C) of Board Policy 3.54 have been in place since 2011, and subsection (B) was added when the Board of Supervisors amended the policy in 2019.

**C.     Portland**

61.     In 1987, the Oregon State Legislature passed legislation prohibiting the use of state and local law enforcement resources to detect or apprehend persons whose only violation was being in the country without documentation. The bipartisan bill passed nearly unanimously and was codified in ORS 181A.820. In the years since, the state has added to the policy, and, in 2017, Portland adopted a resolution affirming its commitment to those state laws. These laws are instrumental in promoting a relationship of trust between law enforcement and immigrant communities, ensuring that victims report crimes to law enforcement so that perpetrators are apprehended before harming others.

62.     The current iteration of the Oregon Law is codified in ORS 180.805 and ORS 181A.820-829. ORS 180.805 provides, in relevant part, that:

a.     Except as required by state or federal law, a public body may not disclose, for the purpose of enforcement of federal immigration laws," a person's address, workplace or hours of work, school or school hours, contact information, known associates or relatives, or the date and time of a person's hearings or other proceedings with a public body.

b.     Except as required by state or federal law, or as necessary to determine eligibility for a benefit a person is seeking, a public body may not

inquire about or request information concerning a person's citizenship or immigration status.

c. If a public body collects information concerning a person's citizenship or immigration status, the public body shall decline to disclose the information unless disclosure is required by" State or federal law, a court order, or a warrant authorized by a court.

d. The above may be enforced through a civil action.

63. ORS 181A.820-829 provide, in relevant part, that:

a. Law enforcement agencies may not use agency money, equipment or personnel to enforce federal immigration law and may not enter into immigration-related detention agreements with federal immigration authorities.

b. Public facilities, property, moneys, equipment, technology or personnel may not be used for the purpose of investigating, detecting, apprehending, arresting, detaining or holding individuals for immigration enforcement.

c. Violations of these provisions may be reported through a formal reporting process and may be enforced through civil action.

64. Portland's Resolution No. 37277 expresses the city's commitment to adhering to federal and state law. As such, in relevant part, it prohibits the city from using city resources to enforce federal immigration law except where required to do so by state or federal law, prohibits the Portland Police Bureau from cooperating with ICE except as expressly required by federal law, and resolves to take other action that support the city's immigrant community.

65. In 2017 and 2018, the first Trump Administration attempted to require Oregon and Portland to cooperate with federal authorities on enforcement of federal immigration law as a condition of receiving funds awarded under the Byrne JAG formula grant program. A federal district court held that the Attorney General lacked the authority to impose these conditions and issued a permanent injunction, *Oregon v. Trump*, 406 F. Supp. 3d 940, 963 (D. Or. 2019). The Ninth Circuit affirmed this ruling. *City & Cnty. of S.F. v. Garland*, 42 F.4th 1078, 1084 (9th Cir. 2022).

### D.    King County

66. King County is the largest county in Washington and the twelfth most populous county in the nation. More than 25% of King County residents are foreign-born and contribute to making it a vibrant center for aerospace manufacturing, technological innovation, cutting-edge medical research, education, agriculture, and other industries.

67.     King County is subject to state and local laws that make the county a welcoming place for immigrants. Washington law prohibits discriminatory treatment by state and local government based on immigration or citizenship status unless specifically authorized by federal or state law, regulation, or government contract. Wash. Rev. Code §§ 49.60.010, .030, .215. The Washington State Legislature has determined that it is neither state nor local law enforcement's primary purpose to enforce civil federal immigration law, and that a person's immigration status, presence in the country, or employment alone "is not a matter for police action." *See* Wash. Rev. Code § 10.93.160. The Keep Washington Working Act (KWW) prohibits components of local governments in the state from voluntarily assisting or participating in federal civil immigration enforcement efforts. *Id.* KWW therefore furthers Washington's "compelling interest in ensuring the state of Washington remains a place where the rights and dignity of all residents are maintained and protected in order to keep Washington working." 2019 Wash. Sess. Laws, ch. 440, § 1(3).

68.     Under KWW, state and local law enforcement officers may not "[i]nquire into or collect information about an individual's immigration or citizenship status, or place of birth unless there is a connection between such information and an investigation into a violation of state or local criminal law," or take or hold individuals in custody solely for the purpose of determining immigration status or based solely on civil immigration warrants or detainers, unless accompanied by a judicial warrant. Wash. Rev. Code § 10.93.160(4)(a), (8). KWW also prohibits local law enforcement from providing "information pursuant to notification requests from federal immigration authorities for the purposes of civil immigration enforcement, except as required by law." RCW 10.93.160(4)(b). To that end, KWW expressly provides that such limitations do not apply to information requests for citizenship or immigration status made pursuant to 8 U.S.C. § 1373, and does not prevent state or local officials from "[c]omplying with any other state of federal law." 2019 Wash. Sess. Laws, ch. 440, § 8(1)-(2).

69.     Under King County Code (KCC) 2.15.010, county officials are generally precluded from inquiring about immigration status or using county resources to assist with enforcement of federal immigration laws. In particular, "[a]n agent of King County or a county employee shall not expend any time, moneys or other resources on facilitating the civil enforcement of federal

immigration law or participating in civil immigration enforcement operations, except where state or federal law, regulation, or court order shall so require." KCC 2.15.010.

70.    King County has remained steadfast in its compliance with KWW and KCC 2.15. The King County Executive, Dow Constantine, directed King County's 16,000+ work force on February 4, 2024 that "[w]e remain committed to enforcing state law and local ordinances protecting the rights of immigrants." Policies in effect from various King County Departments, including the King County Sheriff and the Department of Adult and Juvenile Detention, reflect the county's determination to follow state and local law.

**E.    New Haven**

71.    New Haven is a racially and ethnically diverse city. This diversity contributes to New Haven's economy and cultural richness.

72.    New Haven's Administration is committed to promoting the health and safety of all its residents, without regard to their immigration status.

73.    The Mayor of the City of New Haven issued a Welcoming City Executive Order on July 23, 2020. That Order limits the City's entanglement with federal civil immigration enforcement as part of New Haven's "commitment to promoting the safety of all who live here and in recognition of the fact that all persons need to feel comfortable in their interactions with City officials."

74.    Pursuant to the Order:

a.    New Haven City employees and local law enforcement may not ask about a person's immigration status unless required to do so by state or federal law;

b.    New Haven officers and City employees may not use public resources to assist in the enforcement of any federal program requiring registration of individuals on the basis of race, gender, sexual orientation, religion, or national or ethnic origin;

c.    New Haven officers and City employees may not disclose confidential information absent written consent or unless required by law, or if necessary to apprehend an individual suspected of terrorism or criminal activity. Confidential information is defined as a social security number and information relating to sexual orientation;

status as a victim of domestic violence, crime witness, or recipient of public

assistance; or immigration status; and

    d.   Local law enforcement may not detain a person solely on the belief that they have

committed a civil immigration violation nor detain or arrest a person based solely

on a civil detainer request or administrative warrant issued by ICE.

75.    The policies set out in the Order aim to build strong community relations and enhance public safety by facilitating trust between local law enforcement and the immigrant community.

**F.    Oakland**

76.    The City of Oakland is a multicultural city of more than 400,000 people. Roughly a quarter of Oakland's population was born outside of the United States. Over the years, Oakland has repeatedly reaffirmed its commitment to respecting the civil and human rights of all its residents, regardless of their immigration status.

77.    In 1986, in the face of thousands of individuals fleeing their countries of origin to avoid persecution, the Oakland City Council first declared Oakland to be a "City of Refuge" for immigrants.

78.    In January 2019, the City Council enacted Ordinance No. 13515, strengthening Oakland's longstanding commitment to remaining a sanctuary jurisdiction. Under that ordinance, Oakland Police Department employees are prohibited from providing "enforcement assistance, including traffic support, to ICE, including any subdivision of ICE, in any capacity except to respond to a public safety emergency related to an ICE action or where assistance is required by Federal or State statute, regulation or court decision."

79.    Ordinance No. 13515 remains in effect and governs the Oakland Police Department's relationship with ICE.

**G.    Emeryville**

80.    In 2017, the Emeryville City Council adopted Resolution No. 17-08, "Resolution of the City Council of the City of Emeryville Declaring the City of Emeryville a Welcoming and Sanctuary City" (the "Welcoming and Sanctuary Resolution"). The Welcoming and Sanctuary Resolution contains the following relevant provisions:

    a.   Emeryville is a Welcoming and Sanctuary City;

b.  Emeryville employees serve all residents, and city services are accessible to all residents regardless of immigration status;

c.  Emeryville employees do not inquire about a person's immigration status in either the provision of municipal services or in the course of law enforcement;

d.  Emeryville refuses any requests that are an extension of any federal immigration policy enforcement actions;

e.  Emeryville does not enter into any agreements to carry out such federal enforcement actions; and

f.  Emeryville does not dedicate any City time or resources to such enforcement, but leaves such actions to federal authorities.

81.     The Welcoming and Sanctuary Resolution does not shield anyone from criminal prosecution, nor does the Resolution interfere with the federal government's immigration enforcement role.

82.     The Resolution protects all Emeryville residents by fostering an environment of inclusion and ensuring local resources are reserved for local government functions. It also promotes public safety by reducing barriers to reporting crimes, cooperating with police investigations, and seeking medical care.

**H.     San José**

83.     San José is the third most populous city in California, and the largest city in Silicon Valley, a region in the Southern San Francisco Bay Area of Northern California. It is the oldest city in California, developing from a Spanish pueblo established in 1777.

84.     Silicon Valley is a global center of high technology, innovation, and social media; and home to many of the world's largest technology companies. Commercial, retail, professional, high-tech manufacturing, electronic assembly, and service businesses all have a presence in San José.

85.     San José is centrally located in a region that has attracted significant foreign investments from all over the world, and is a gateway for many immigrants who come to the United States to work and study here.

86.     San José is one of the most diverse cities in the United States, with nearly 410,000

residents who are foreign-born. Sixty percent of children residing in San José have at least one immigrant parent. San José's foreign-born population includes naturalized citizens; lawful permanent residents; refugees, asylees, student- and work-visa holders; victims of human trafficking or other crimes who hold T or U visas; and residents who lack lawful immigration status.

87.     In 2007, the City Council adopted Resolution No. 73677 to support public safety and immigrants by creating an environment where immigrants are not afraid to report crimes and interact with the police, fire department, or other City departments to obtain critical services.

88.     In September 2015, the City Council adopted Resolution No. 77517 identifying the City of San José as a "Welcoming City", and affirming its commitment to build a community that recognized the contributions of all residents to enhance its economic growth, global competitiveness and overall prosperity. San José was certified as a welcoming city by the nonprofit Welcoming America, a formal designation for local governments that have created policies and programs that demonstrate a commitment to immigrant inclusion in all areas of civic, social, and economic life.

89.     In February 2025, the City Council adopted Resolution No. 2025-19 and affirmed its commitment from 2007 to preserve the safety and integrity of all its residents, regardless of national origin or legal status.

90.     In 2018, San José updated the San José Police Duty Manual (L7911) to comply with state and federal law. The San José Police Duty Manual contains the policies, rules, and procedures for the Police Department and all its members, sets forth the Police Department structure, and how to conduct its various law enforcement duties. The manual acknowledged "the responsibility of enforcement of civil immigration law rests with the U.S. Immigration and Customs Enforcement."

91.     The San José Police Department can cooperate with the U.S. Immigration and Customs Enforcement in matters involving serious crimes, the protection of public safety, and as required by statute, federal regulations, or court decisions.

92.     Based on city policy and state law, San José does not detain or question people based solely on a person's citizenship or status under civil immigration laws, nor for the purpose of discovering that status or citizenship.

93.     It is the official policy of San José to ensure that residents do not fear arrest or

deportation for coming forward to report a crime as a victim or a witness.

94.    Consistent with state law, San José determined that it can best protect the public safety of the entire community by not eroding the trust of its residents, and thereby discouraging the reporting of crimes or cooperation in prosecution of these crimes.

95.    For this reason, San José's limited resources are directed to serve the local public safety priorities including the investigation and prosecution of state and local crimes.

**I.    San Diego**

96.    San Diego is home to roughly 1.4 million residents.

97.    The City's boundary in the south is the international border with Mexico, and as a result San Diego has a significant immigrant population. Approximately one in four San Diego residents is foreign-born, having arrived from one of at least 115 countries. And approximately 41% of the San Diego population speaks a language other than English. Immigration has been and continues to be a major contributor to San Diego's ethnic and cultural diversity. Being a multicultural melting pot positions San Diego's labor force for success in the global economy.

98.    San Diego adheres to federal and state law, including SB 54.

99.    San Diego has no provision in its Charter relating to immigration or citizenship status and City employees, including its police force, have no additional restrictions under its Charter or Municipal Code beyond that of state law.

100.    Resolution No. 313834, adopted December 17, 2017, declares that San Diego is a "welcoming city that respects the dignity of all people and promotes programs and policies to foster inclusion for all." It does not describe itself as a "sanctuary city" nor does it place any obstacles on federal officials seeking to enforce federal immigration laws within its boundaries.

101.    This resolution affirmed that it welcomes all persons, regardless of immigration status, race, ethnicity, place of origin, English language proficiency, religion, income, gender, sexual orientation, differing abilities, age, and other factors—to enhance San Diego's health, economic prosperity, and well-being for current and future generations.

**J.    Sacramento**

102.    Sacramento has a long history of welcoming individuals of diverse racial, ethnic, and religious backgrounds, making it one of the most integrated and diverse cities in the United States, a reputation it embraces.

103.    As one of the nation's most integrated and diverse cities, Sacramento prioritizes community trust in the delivery of government services as well as its use of law enforcement authority.

104.    Sacramento has long prioritized the inclusion and cooperation of all residents, including its immigration population, in every aspect of providing government services.

105.    The city encourages residents of all backgrounds to contact the city on all variety of matters, including code enforcement, building and fire safety concerns, and transportation and housing needs, and to participate in city-offered programs such as vocational training, internships and workforce development, and assistance for residents experiencing homelessness.

106.    In some of these situations, maintaining confidentiality or offering the option are essential to the delivery of services. For example, confidentiality protects code enforcement complainants from unwarranted retaliation that might otherwise be borne upon them by the subject code violator; it reduces the spread of stigma for people experiencing homelessness; and it reduces the risks associated with survivors of domestic violence being found by their aggressor. Similarly, assurance of confidentiality increases the likelihood that an immigrant contacts code enforcement, participates in housing programs that reduce homelessness, and otherwise engages with City services for problems that might otherwise persist in their neighborhoods.

107.    Elected by the residents of Sacramento, the City Council is authorized by law to make decisions and set policy regarding the deployment of city resources to try and meet all community needs.

108.    In full exercise of their authority, the Sacramento City Council passed Resolution 2017-0158 to clarify how and why the city declines to be entangled in federal civil immigration enforcement.

109.    As Resolution 2017-0158 states, "to carry out public housing programs, the City must be able to reliably collect confidential information from applicants" for temporary and permanent

housing. Release of such confidential information for "unintended purposes …. could hinder collection of information vital to those significant city programs. To solve code enforcement violations that can detrimentally impact families and neighborhoods, residents and community members must be encouraged to contact the City's Code Enforcement divisions." Resolution 2017-0158 further states that "to protect the public from crime and violence" requires "encouraging all persons who are victims of or witnesses to crimes, or who otherwise can give evidence in a criminal investigation, to cooperate with the criminal justice system" knowing that the City's employees are disentangled from immigration enforcement.

110.   To achieve these goals, Resolution 2017-058 provides in relevant part that city resources shall not be used to:

a.   Ask about or investigate immigration status, except as necessary to comply with 18 USC § 922(d)(5), to certify an individual who has been identified as a potential crime or trafficking victim, with consent, or as required by federal or state laws;

b.   Absent a judicial warrant, arrest or detain an individual solely on the basis of alleged violation of civil immigration law;

c.   Detain someone solely on the belief that they may be violating civil immigration law or on the basis of a detainer or administrative warrant based in civil immigration law;

d.   Notify the federal government about the release date of a person alleged to have violated civil immigration law;

e.   Absent consent, provide confidential information about an individual on the basis of alleged violation of civil immigration law, where "confidential information" is defined as "including, but not limited to, information about the individual's home address; work address; person's status as a victim of domestic abuse or sexual assault; sexual orientation; or disability.

111.   An express exemption for Sections 1373 and 1644 provides that city officials and employees may send to, or receive from, federal immigration authorities, information regarding the citizenship or immigration status, lawful or unlawful, of a person.

112.    Sacramento has a number of policies and systems aimed at promoting cooperation between local law enforcement and the diverse immigrant communities that have long flourished in Sacramento.

113.    One such policy is the Sacramento Police Department's General Order 523.07, which establishes procedures for contacts with foreign nationals, including as victims or suspects of crimes or infractions, witnesses in investigations, or subjects involved in accidents. The policy provides that SPD will provide equal enforcement of the law and equal service to all members of the public regardless of an individual's immigration status and will not initiate police action based solely on an individual's immigration status.

114.    Developing this trust is essential to ensuring that crimes are reported and that victims and witnesses participate in the process. This helps local police enforce the laws against serious offenders who threaten public safety.

115.    Consuming scarce city resources to assist federal civil immigration activities does not advance the interests or needs of the city, and could actually work to thwart other important work performed by law enforcement. This includes a recently formed cooperative partnership between the Sacramento Police Department and the Sacramento County District Attorney to address human trafficking.

116.    Sacramento officials and employees do not interfere with federal immigration enforcement officers carrying out their duties in Sacramento.

117.    The Sanctuary City Resolution is instead intended to direct and prevent Sacramento officials and employees from expending scarce local resources on federal civil immigration enforcement efforts to the detriment of Sacramento's core mission of ensuring public health, safety, and welfare for all those that live, work, and visit Sacramento.

**K.    Santa Cruz**

118.    The residents of Santa Cruz have a long history of and deep commitment to welcoming immigrants, refugees, and those in exile.

119.    In 1986, Santa Cruz established its first "Sanctuary City" policy, declaring itself a "refuge for Salvadoran and Guatemalan refugees until these refugees can safely return to their

homelands or until they are granted federally recognized residency status, temporary or permanent."

*See* City Council Resolution No. 16,876.

120.    Since then, the Santa Cruz City Council has taken legislative actions to expand its sanctuary policies in an effort to create a safe haven for all immigrants who live and work in the city.

121.    Pursuant to City Council Resolution No. NS-30,438, Santa Cruz restricts city agencies, departments, officers, employees, and agents from taking the following actions:

    a.  … enforc[ing] Federal civil immigration laws, request[ing] or maintain[ing] information concerning a person's immigration status, or us[ing] City monies, resources, or personnel to investigate, question, detect, apprehend, or question a person on the basis of his or her immigration status …;

    b.  … disclos[ing] information about a person's immigration status …; and

    c.  … us[ing] City funds, resources, facilities, property, equipment, or personnel … to assist in the enforcement of federal immigration law …

*See also* City Council Ordinance No. 2017-06; City Council Resolutions Nos. 27,504, 29,187.

122.    However, Santa Cruz provides exceptions to its restrictions on supporting federal immigration authorities when necessary to comply with and respond to a lawfully issued judicial warrant or subpoena; when information is provided consensually; when necessary to provide a city service or prevent an imminent threat to public health or safety; or as otherwise required by state or federal law or judicial decision. *See* City Council Resolution No. NS-30,438; *see also* City Council Ordinance No. 2017-06.

123.    In setting forth its restrictions on supporting federal immigration authorities, Santa Cruz declared its intent to abide by state and federal law. *See* City Council Resolution No. NS-30,438.

124.    Santa Cruz City Council created these policies after finding that, in the interest of promoting public safety, it is important to create an environment in which people feel comfortable interacting with law enforcement, and not erode that trust by permitting local police officers to assist federal immigration enforcement.

125.    Santa Cruz City Council also has found that these policies are supported by studies proving that jurisdictions that provide protections for immigrants are safer and economically more prosperous compared to other jurisdictions – including a 2017 report by the Center for American Progress, which shows that, on average, there are 35.5 fewer crimes committed per 10,000 people

annually in these jurisdictions, the average annual income is $4,353 higher, the poverty rate is 2.3%

lower, and unemployment is 1.1% lower. *See* City Council Resolution No. NS-30,438.

### L.    Monterey

126.    Monterey was built largely by immigrants. Like many other political subdivisions of

California, Monterey boasts rich demographic and cultural diversity that reflects its tradition of

attracting people from all over the world who come to the county in search of employment

opportunities and a better life. An estimated 29% of Monterey County residents were born in a

different country.

127.    The County's democratically elected officials necessarily serve the interests of these

and all other residents, who share a common interest in maintaining a community built on

quintessentially American ideals of diversity, tolerance, and inclusion.

128.    In both 2017 and 2025, the Monterey Board of Supervisors acted swiftly to establish

and re-establish the locality as a "Welcoming County for Immigrants and Refugees" and to declare the

"County a Place of Trust and Safety for Immigrants." Board of Supervisors Res. No. 17-042, 25-004.

Among other things, the Board's legislative actions recognized that:

> a. A relationship of trust between California's immigrant residents and our
> local agencies, including law enforcement, schools and hospitals, is
> essential to carrying out basic local functions; and that trust is threatened
> when local agencies are involved in immigration enforcement; and
> b. [N]o County resources shall be used to assist in the enforcement of
> federal immigration law, participate in any immigration enforcement
> operation or joint operation involving any federal immigration agent for
> the purpose of enforcing federal immigration law, unless such
> assistance is required by federal or state statute, regulation or court
> decision.

129.    Monterey County recently issued guidance regarding county employees' legal

obligations when responding to federal immigration enforcement activity. The guidance dutifully

balanced local directives, state law, and federal law. It advises that "county employees may not in the

course of their employment give their consent to federal immigration enforcement activities," subject

to the requirements of 8 U.S.C. § 1373 and the Fourth Amendment of the U.S. Constitution.

130.    The Monterey County Sheriff's Office likewise maintains policies limiting inquiry into immigration status and limiting immigration detainers in a manner that explicitly honors federal legal requirements while adhering to state law.

131.    Monterey's policies reflect local prerogatives, and afford every measure of respect and deference to federal immigration prerogatives that is required by long-established principles of federalism.

### M.    Seattle

132.    Seattle's laws, policies, and programs make it a Welcoming City that serves all residents.

133.    In 2003, the Seattle City Council unanimously adopted Ordinance 121063, which provides that, unless otherwise required by law or by court order, "no Seattle City officer or employee shall inquire into the immigration status of any person, or engage in activities designed to ascertain the immigration status of any person." Seattle Mun. Code § 4.08.015(A).

134.    Ordinance 121063 includes one exemption for police officers where officers have a reason to believe that a person: (1) has previously been deported from the United States; (2) is again present in the United States; and (3) is committing or has committed a felony criminal-law violation. Seattle Mun. Code § 4.18.015(B).

135.    Ordinance 121063 recognized that Seattle is home to immigrants from around the world who contribute to the city's cultural richness and economic vitality. Seattle enacted Ordinance 121063 with the intent to "guide city officials and employees to adhere to federal law while helping to protect the safety and health of all members of [the] community."

136.    Alongside its commitment to protect all members of the community, Seattle complies with 8 U.S.C. § 1373 and other federal laws. Ordinance 121063 directs that it shall not "be construed to prohibit any Seattle City officer or employee from cooperating with federal immigration authorities as required by law." Seattle Mun. Code § 4.18.035. Another longstanding provision of the Municipal Code, which has been in effect since 1986, provides that "[c]ity officers and employees are directed to cooperate with, and not hinder, enforcement of federal immigration laws." Seattle Mun. Code § 4.18.010.

137.    Consistent with the Municipal Code, the Seattle Police Department Manual provides:

It is the Seattle Police Department's intent to foster trust and cooperation with all people served by the Department, including immigrant and refugee residents. The Department encourages any person who wishes to communicate with Seattle Police officers to do so without fear of inquiry regarding their immigration status. . . .

The Department recognizes that local law enforcement has no role in immigration enforcement. "Unlawful presence" in the country is a civil matter and not within the department's jurisdiction.

Employees Will Not Inquire About Any Person's Citizenship or Immigration Status. . . . Employees Will Not Request Specific Documents for the Sole Purpose of Determining a Person's Immigration Status . . . Employees Will Not Initiate, Maintain, or Participate in any Police Action Based on an Individual's Immigration Status.

Seattle Police Department Manual, Sect. 6.020, https://public.powerdms.com/Sea4550/tree/documents/2042882.

138.    Seattle's Resolution 31730 reaffirms its commitment to being a Welcoming City. It states that the City will not withhold services based on ancestry, race, ethnicity, national origin, color, age, sex, sexual orientation, gender identity, marital status, physical or mental disability, religion, or immigration status. *See also* Seattle Resolution 30672 (2004), Seattle Resolution 31775 (2017).

139.    Seattle coordinates programs and services for immigrants and refugees through the Office of Immigrant and Refugee Affairs ("OIRA"). *See* Seattle Mun. Code § 3.14.505. The mission of OIRA is to improve the lives of Seattle's immigrant and refugee communities through policies, programs, services, and community engagement. Examples of OIRA programs include: assistance with the naturalization process (including workshops, clinics, legal support, and outreach to people with disabilities); public safety interventions for children of immigrants and young immigrants; victim and family support services; job training and English language skills; and translating City services into more languages to broaden access.

140.    In 2017 Seattle and Portland filed a joint lawsuit against the first Trump Administration challenging Executive Order 13,768. A federal district court determined that the Administration would likely consider Seattle to be a "sanctuary city" and issued declaratory relief, holding that it would be unconstitutional for Executive Branch agencies to withhold funds that Congress had not tied to

compliance with 8 U.S.C.§ 1373 from Seattle and Portland. *City of Seattle v. Trump, et al.*, Civil Case No. C17-497-RAJ (W.D. Wash. Oct. 24, 2018); *City of Seattle v. Trump*, No. 17-497-RAJ, 2017 WL 4700144, at *8 (W.D. Wash. Oct. 19, 2017).

### N.    Minneapolis

141.    Minneapolis is the largest city in Minnesota and one of its most diverse. Minneapolis is home to immigrants and refugee residents with varying immigration statuses, from naturalized citizens to those without lawful immigration status.

142.    Minneapolis's immigrant community is a valued and important part of the City's social milieu.

143.    Minneapolis's immigrant community is also a critical piece of the City's crime prevention efforts. The Minneapolis Chief of Police, Brian O'Hara, has stated that "[t]he police department can only be effective when community tells us what's going on, when community is willing to tell us when they've been victimized, when they need help…."

144.    For over two decades, Minneapolis has formally prioritized using its finite resources to advance the health and safety of all of the Minneapolis community.

145.    In 2003, the City of Minneapolis enacted an ordinance in Chapter 19 of its Code of Ordinances, entitled "Employee Authority in Immigration Matters." This ordinance, commonly referred to as the "Separation Ordinance," "clarifies the communication and enforcement relationship between the city and the United States Department of Homeland Security and other federal agencies with respect to the enforcement of civil immigration laws." Minneapolis Municipal Code of Ordinances ("M.C.O.") § 19.10.

146.    Section 19.10 further provides that "[t]he city works cooperatively with the Homeland Security [Department], as it does with all state and federal agencies, but the city does not operate its programs for the purpose of enforcing federal immigration laws. The Homeland Security [Department] has the legal authority to enforce immigration laws in the United States, in Minnesota and in the city."

147.    If Minneapolis personnel were to enforce federal immigration laws for the federal government, it would squander limited municipal resources, have deleterious effects on public safety,

and have a chilling effect on immigrant populations' willingness to report crime and cooperate with the City's public safety efforts.

148.    Minneapolis's Separation Ordinance states that to the extent permitted by law, public safety officials may "not undertake any law enforcement action for the purpose of detecting the presence of undocumented persons, or to verify immigration status." M.C.O. § 19.30(1).

149.    In addition, Minneapolis public safety officials may not "question, arrest or detain any person for violations of federal civil immigration laws except when immigration status is an element of a crime." M.C.O. § 19.30(3).

150.    Nothing in the Separation Ordinance, however, "prohibits public safety personnel from assisting federal law enforcement officers in the investigation of criminal activity involving individuals present in the United States who may also be in violation of federal civil immigration laws. M.C.O. § 19.30(4).

151.    The Minneapolis Separation Ordinance makes an exemption to the prohibition on the use of City resources for immigration-related investigation and enforcement when City personnel are complying with "lawful subpoenas" or "any properly issued subpoena." M.C.O. §§ 19.20 & 19.50.

152.    Under the Separation Ordinance, City employees generally may "only solicit immigration information or inquire about immigration status when specifically required to do so by law or program guidelines as a condition of eligibility for the service sought." M.C.O. § 19.20(a)(2).

153.    City of Minneapolis departments and staff do not operate for the purpose of enforcing federal immigration law, but rather to provide municipal services to the Minneapolis community, regardless of immigration status.

### O.    St. Paul

154.    Saint Paul is the county seat of Ramsey County, and the second most populous city in Minnesota. The City is highly racially diverse, with a population which is only about 51% White (non-Hispanic). 18.6% of the residents of Saint Paul are foreign-born, a much higher percentage than the State of Minnesota (8.4%) or United States (13.6%) as a whole. Non-U.S. citizens represent 8.1% of the population of the City, again a larger percentage than the state (6.5%) or the nation (6.5%) as a whole.

155.     Saint Paul has the largest Hmong population of any city in the United States.

156.     Given the diversity of its population, the City has a longstanding commitment to serving and welcoming immigrants in the community. Among other things, the City offers immigrants access to a host of public and private assistance programs, many of which are operated by the City itself, on its website at https://www.stpaul.gov/immigration-resources. The Saint Paul City Attorney's office employs a full-time attorney dedicated to assisting with immigration-related issues, and operates an Immigrant and Refugee Program which assists immigrants within the City.

157.     In 2004, Saint Paul enacted a separation ordinance at Chapter 44 of its Administrative Code, entitled "Employee Authority in Immigration Matters." The ordinance was intended to allow all residents full access to city services, regardless of their immigration status.

158.     The ordinance provides, among other things, that:

    a.  City employees cannot ask residents about their immigration status, except when required by law;

    b.  the City does not use its programs to enforce federal immigration laws; and

    c.  City public safety officials cannot use law enforcement authority solely to find undocumented persons or check immigration status.

159.     Chapter 44 is not intended as a sanctuary policy, but is likely to be interpreted by the Trump Administration as rendering Saint Paul a "sanctuary" jurisdiction within the meaning of the Executive Orders and the Bondi Memo.

**P.     Santa Fe**

160.     Santa Fe is an over 400-year-old-city and is the capital city of New Mexico. It is home to approximately 90,000 residents and annually hosts approximately 4,000,000 tourists. The city has long been renowned for its rich cultures, traditions, arts, and history. UNESCO designated Santa Fe as the United States' first "Creative City" twenty years ago. Approximately fifteen percent of the City's population are foreign-born and over thirty percent of the population speaks a language other than English at home.

161.     Santa Fe adopted Welcoming Community resolutions in 1999 and 2017.

162.     In 1999, Santa Fe adopted Resolution 1999-6, which declared a policy of non-

discrimination based on a person's national origin and equal treatment for all persons, with respect and dignity, regardless of immigration status. It prohibited use of municipal resources to identify or apprehend non-citizen residents on the sole basis of immigration status, unless otherwise lawfully required to do so.

163.    In 2017, Santa Fe adopted Resolution 2017-19, reaffirming its immigrant-friendly status and commitment to the established rule of law. The resolution:

    a.  Prohibits employees of the City of Santa Fe from making or initiating any inquiry regarding the immigration status of any person, except as required by law, including, without limitation, to determine eligibility for City employment or for a federal benefit or program administered by the City.

    b.  Generally prohibits employees of the City of Santa Fe from disclosing to any person or agency outside city government any sensitive information about any person that comes into the employee's possession during the course and scope of that employee's work for the City of Santa Fe, subject to certain exceptions. Sensitive information includes confidential identifying information such as social security numbers or individual tax identification numbers, a person's place and date of birth, a person's status as a recipient of public assistance or as a crime victim, and a person's sexual orientation, physical or mental disability, immigration status or national origin.

    c.  Requires City elected and appointed officials and employees to refuse access to all non-public areas of City property by federal immigration agents for the purposes of enforcing federal immigration laws unless they present a warrant issued by a federal court specifically requiring such access.

    d.  Requires City departments and employees to accept driving authorization cards and non Real-ID compliant identification cards issued by the New Mexico Motor Vehicle Division (MVD) for all of the purposes for which they would accept Real-ID-compliant drivers' licenses and identification cards issued by the MVD.

    e.  Prohibits City departments' use of the voluntary federal e-verify system to investigate or determine the work eligibility of applicants for city employment

1    unless required by law for the purposes of administering a federal benefit or

2    program.

3    164.    Santa Fe departments and employees operate to deliver city services to Sante Fe

4    residents. Diverting limited municipal resources to enforce federal immigration law would limit the

5    City's ability to deliver public safety resources, including but not limited to traffic safety, response to

6    emergency calls, services to the unhoused population, criminal investigations, criminal prosecutions,

7    animal services, and code enforcement.

8    **II.    Defendants' Efforts to Defund and Threaten Sanctuary Jurisdictions**

9    **A.    President Trump's Executive Orders**

10    **1.    The First Trump Administration's Unsuccessful Efforts to Defund Sanctuary Jurisdictions**

11    165.    President Trump's efforts to threaten and coerce municipalities like Plaintiffs that limit

12    cooperation with federal civil immigration enforcement is not new. Days into his first term in January

13    2017, he issued Executive Order 13,768. 82 Fed. Reg. 8799 (Jan. 25, 2017). That Executive Order

14    declared that sanctuary jurisdictions were jurisdictions that "willfully violate Federal law in an attempt

15    to shield aliens from removal from the United States," and declared it the policy of the executive

16    branch to ensure that sanctuary jurisdictions "that fail to comply with applicable Federal law do not

17    receive Federal funds, except as mandated by law." *Id.*

18    166.    To effectuate this policy, the Executive Order directed the Attorney General and

19    Secretary of Homeland Security that any jurisdictions "that willfully refuse to comply with 8 U.S.C. §

20    1373 (sanctuary jurisdictions) are not eligible to receive Federal grants, except as deemed necessary

21    for law enforcement purposes by the Attorney General or the Secretary." 82 Fed. Reg. at 8801.

22    167.    The Attorney General was further directed to "take appropriate enforcement action

23    against any entity that violates 8 U.S.C. § 1373, or which has in effect a statute, policy, or practice that

24    prevents or hinders the enforcement of Federal law." *Id.*

25    168.    With Executive Order 13,768, President Trump and his administration sought to coerce

26    states, counties, and cities to go against their considered judgments about how best to use their own

27    law enforcement resources to serve their communities, and abandon their policies of non-cooperation

28    with federal civil immigration enforcement. In some cases, the threat had its desired effect, with local

governments like Miami-Dade County quickly announcing they were letting go of their policies in order to keep their federally funded programs and services.

169.    Plaintiffs City and County of San Francisco and County of Santa Clara challenged Executive Order 13,768 as unconstitutional. This Court granted San Francisco and Santa Clara's motion for preliminary injunction, *Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497 (N.D. Cal. 2017), and later granted their motion for summary judgment, issuing a permanent injunction enjoining enforcement of Executive Order 13,768, *Cnty. of Santa Clara v. Trump*, 267 F. Supp. 3d 1201 (N.D. Cal. 2017). The Ninth Circuit affirmed this Court's ruling that the Executive Order was unconstitutional. *City & Cnty. of S.F.,* 897 F.3d at 1235. This Court then entered a final judgment and order enjoining the Trump Administration from enforcing the relevant section of Executive Order No. 13,768 within the State of California. *See* Stipulation and Final Judgment and Order, ECF No. 235, *City & Cnty. of S.F. v. Trump*, No. 17-cv-00485 (N.D. Cal. Aug. 15, 2019).

170.    The first Trump Administration then tried another approach to cut funds to jurisdictions that the administration considered "sanctuary jurisdictions." DOJ tried to condition funding under the Edward Byrne Memorial Justice Assistance Grant Program ("Byrne JAG") on local cooperation with federal civil immigration enforcement priorities. Those conditions too were swiftly and successfully challenged, including before this Court and the Ninth Circuit. *See, e.g.*, *City & Cnty. of S.F. v. Sessions*, 349 F. Supp. 3d 924 (N.D. Cal. 2018); *City & Cnty. of S.F. v. Sessions*, 372 F. Supp. 3d 928 (N.D. Cal. 2019); *Oregon v. Trump*, 406 F. Supp. 3d 940, 963 (D. Or. 2019); *City and Cnty. of S.F. v. Barr*, 965 F.3d 753, 757 (9th Cir. 2020); *City & Cnty. of S.F. v. Garland*, 42 F.4th 1078, 1084 (9th Cir. 2022). Those lawsuits resulted in injunctions here and elsewhere prohibiting DOJ from withholding Byrne JAG funds based on the challenged immigration-related conditions. Notably, the United States District Court for the Northern District of Illinois issued an order that "applie[d] to the Attorney General's imposition of the Challenged Conditions *and any materially identical conditions on the Byrne JAG grant program in FY 2018 and all future grant years*." Am. Final Judgment & Order at 3, ECF No. 183, *City of Chicago v. Garland*, No. 18-cv-06859 (N.D. Ill. Mar. 8, 2022) (emphasis added). The court also specified that the order's "effects run to the benefit of all Byrne JAG applicants and recipients and are not limited to the City of Chicago and its sub-grantees." *Id.*

171. Ultimately, when President Joseph R. Biden took office, he issued Executive Order 13,993, which rescinded President Trump's Executive Order 13,768. *See* 86 Fed. Reg. 7051 (Jan. 20, 2021).

**2.    The Current Trump Administration Renews Efforts to Unlawfully Target Sanctuary Jurisdictions**

**a.    President Trump Issues Executive Orders 14,159 and 14,218 Targeting Sanctuary Jurisdictions**

172. Immediately upon taking office for his second term on January 20, 2025, President Trump issued a slew of Executive Orders vilifying immigrants and renewing his efforts to target sanctuary jurisdictions.

173. First, the President issued Executive Order 14,148, entitled "Initial Rescissions of Harmful Executive Orders and Actions." 90 Fed. Reg. 8237 (Jan. 20, 2025). In relevant part, Executive Order 14,148 revoked Executive Order 13,993—and purported to reverse the revocation of President Trump's Executive Order 13,768. 90 Fed. Reg. at 8237.

174. Second, the President doubled down on his efforts to compel sanctuary jurisdictions to do his bidding by issuing Executive Order 14,159, entitled "Protecting the American People Against Invasion." 90 Fed. Reg. 8443 (Jan. 20, 2025) (Exhibit A). Executive Order 14,159 repeats the xenophobic rhetoric common to this Administration, asserting without factual basis that "[m]any . . . aliens unlawfully within the United States present significant threats to national security and public safety, committing vile and heinous acts against innocent Americans," are "engaged in hostile activities, including espionage, economic espionage, and preparations for terror-related activities," and "have abused the generosity of the American people." 90 Fed. Reg. at 8443.

175. Section 17 of Executive Order 14,159 provides as follows:

> *Sanctuary Jurisdictions*. The Attorney General and the Secretary of Homeland Security shall, to the maximum extent possible under law, evaluate and undertake any lawful actions to ensure that so-called "sanctuary" jurisdictions, which seek to interfere with the lawful exercise of Federal law enforcement operations, do not receive access to Federal funds. Further, the Attorney General and the Secretary of Homeland Security shall evaluate and undertake any other lawful actions, criminal or civil, that they deem warranted based on any such jurisdiction's practices that interfere with the enforcement of Federal law. 90 Fed. Reg. at 8446.

176. Like Executive Order 13,768 before it, Executive Order 14,159 contains both a restriction on funding (contained in sentence one) and an enforcement directive (contained in sentence two) against jurisdictions they deem "sanctuary jurisdictions."

177. The funding restriction in the Order requires the Attorney General and DHS Secretary to withhold all "Federal funds" from sanctuary jurisdictions "to the maximum extent permissible by law." 90 Fed. Reg. at 8446.

178. The enforcement directive in the Executive Order directs the Attorney General and DHS Secretary to evaluate and pursue "criminal or civil" legal action against any sanctuary jurisdiction based on any practices deemed to "interfere with the enforcement of Federal law." *Id.*

179. Notably, the Administration's definition of "sanctuary jurisdictions" is even broader than under Executive Order 13,768. Where Executive Order 13,768 defined sanctuary jurisdictions by reference to compliance with 8 U.S.C. § 1373, Executive Order 14,159 simply defines sanctuary jurisdictions as those "seek[ing] to interfere with the lawful exercise of Federal law enforcement operations" in the Administration's view. *Id.*

180. Executive Order 14,159 is an attempt to circumvent this Court's permanent injunction entered against Section 9 of Executive Order 13,768. In substance, both orders are the same—each directs the Attorney General or the Secretary of Homeland Security to withhold federal funds from sanctuary jurisdictions. Executive Order 14,159 fails to cabin its reach to any subset of federal funds, and so, on its face, it is as expansive as Executive Order 13,768. Neither order attempts to advance a clear definition of what constitutes a sanctuary jurisdiction, nor is there any semblance of congressional authority to support either order.

181. In an interview on January 22, 2025—two days after issuing Executive Order 14,159—President Trump publicly expressed his intent to "get rid of" and "end" sanctuary jurisdictions, and confirmed that withholding federal funds is one of the ways the Administration aims to achieve this goal.[2]

---

[2] Tr. of Interview Between President Donald J. Trump and Sean Hannity (Fox News broadcast Jan. 22, 2025), available at https://rollcall.com/factbase/trump/transcript/donald-trump-interview-sean-hannity-fox-news-january-22-2025/.

182.    In a further effort to weaponize federal funding to coerce local jurisdictions, on February 19, 2025, President Trump issued Executive Order 14,218, entitled "Ending Taxpayer Subsidization of Open Borders." 90 Fed. Reg. 10581 (Exhibit B). Section 2(a)(ii) of that Executive Order directs every federal agency to "ensure, consistent with applicable law, that Federal payments to States and localities do not, by design or effect, facilitate the subsidization or promotion of illegal immigration, or abet so-called 'sanctuary' policies that seek to shield illegal aliens from deportation." 90 Fed. Reg. at 10581. The asserted purpose of this directive is to "prevent taxpayer resources from acting as a magnet and fueling illegal immigration to the United States" and to ensure that "no taxpayer-funded benefits go to unqualified aliens." *Id.*

183.    Executive Order 14,218 does not define "sanctuary" policies or "Federal payments," or clarify what it means for federal payments to "abet" sanctuary policies. Nor does the Executive Order provide an explanation for why funding to localities with "sanctuary" policies "fuel[s] illegal immigration" or results in taxpayer-benefits to "unqualified aliens."

### b.    DOJ Implements Executive Order 14,159

184.    On January 21, 2025, a day after Executive Order 14,159 was issued, Defendant Acting Deputy Attorney General Bove issued a memorandum to all DOJ employees entitled "Interim Policy Changes Regarding Charging, Sentencing, And Immigration Enforcement" ("Bove Memo") (Exhibit C).

185.    The Bove Memo implements Executive Order 14,159, including the enforcement directive related to sanctuary jurisdictions. Ex. C at p.3. The memo states the position of DOJ that "[t]he Supremacy Clause and other authorities require state and local actors to comply with the Executive Branch's immigration enforcement initiatives." *Id.* Immigration enforcement initiatives are not defined. On information and belief, Defendants seek to unlawfully compel localities across the country, including Plaintiffs, and in contravention of court orders and precedent, to participate and assist with aggressive immigration enforcement measures announced by the Trump Administration.

186.    The Bove Memo further states DOJ's view that state and local actors violate federal law if they "fail[] to comply with lawful immigration-related commands and requests" pursuant to a non-exhaustive and vague list of authorities, including the President's "extensive Article II authority

with respect to foreign affairs and national security, the Immigration and Nationality Act, and the Alien Enemies Act." *Id.*

187.    The Bove Memo also concludes that jurisdictions with laws that "prohibit[] disclosures of information to federal authorities engaged in immigration-enforcement activities" "threaten to impede Executive Branch immigration initiatives" and "threaten public safety and national security." *Id.*

188.    The scope of immigration-related "commands" and "requests" is not defined, nor does the Bove Memo describe what information must be disclosed to immigration authorities. In fact, Defendants appear to interpret federal law to require that local jurisdictions comply with civil detainer requests, notification requests, civil administrative warrants, and request for personal information (including contact information and release dates) about undocumented residents in Plaintiffs' jurisdictions, despite court orders and precedent foreclosing Defendants' understanding of federal law. See Part II.C, infra.

189.    The Bove Memo directs U.S. Attorney's Offices to investigate incidents of local actors failing to comply with immigration enforcement initiatives, commands, or requests for prosecution under 18 U.S.C. § 371, 8 U.S.C. § 1324, and 8 U.S.C. § 1373.

190.    Plaintiffs' decision to decline to participate in federal immigration enforcement efforts is not a crime under any of the cited statutes. 8 U.S.C. § 1324 makes it a felony to, *inter alia*, knowingly or recklessly conceal, harbor, or shield an undocumented immigrant from detection or encourage or induce an undocumented immigrant to come to, enter, or reside in the United States. *See* 8 U.S.C. § 1324(a)(1)(A)(iii), (iv). A violation of these provisions, without any aggravating circumstances, is subject to fines and a sentence of up to five years in prison for each person involved. *Id.* § 1324(a)(1)(B).

191.    Declining to provide local resources to assist with all federal immigration initiatives, commands, and requests does not constitute a violation of § 1324. As discussed above, and consistent with Ninth Circuit precedent, Plaintiffs' laws do not and are not intended to interfere with federal law enforcement or shield or conceal undocumented immigrants from federal immigration authorities, but

are instead a lawful exercise of authority to preserve scarce local resources to address matters of local concern and to build trust between government and the local community.

192.    8 U.S.C. § 1373 makes it unlawful for any jurisdiction to "prohibit, or in any way restrict," any government entity or official from sending "citizenship or immigration status" information about an individual to federal immigration authorities, or receiving such information from immigration authorities.

193.    This Court and the Ninth Circuit have held that § 1373 does not require jurisdictions to share non-immigration-status information (such as custody status, release date, and contact information) with immigration authorities. *See City & Cnty. of S.F. v. Sessions*, 349 F. Supp. 3d 924, 969 (N.D. Cal. 2018); *United States v. California*, 921 F.3d 865, 891–93 (9th Cir. 2019); *City & Cnty. of S.F. v. Barr*, 965 F.3d 753 (9th Cir. 2020). Any interpretation of § 1373 that would require assistance more broadly squarely conflicts with this precedent.

194.    18 U.S.C. § 371 makes it a crime to conspire to commit an offense against or defraud the United States. If the underlying offense is a felony, a violation of this provision is subject to financial penalties and/or a sentence of up to five years in prison. For the reasons stated above, Plaintiffs do not believe that their policies violate federal law or constitute an offense against the United States.

195.    In addition to threatening prosecution under these statutes, the Bove Memo announces that a newly established "Sanctuary Cities Enforcement Working Group" will "identify state and local laws, policies, and activities that are inconsistent with Executive Branch immigration initiatives" and take legal action to challenge these laws. Ex. C at p.3.

196.    In the context of other contemporaneous actions taken by the Administration, Defendants' directive that local actors must "comply" with immigration-related "initiatives" and "requests" under threat of prosecution is extraordinarily vague and could effectively require local jurisdictions in every state to administer federal immigration laws, in contravention of the text of federal statutes, constitutional principles, and precedent foreclosing such a view.

197.    For example, on January 23, 2025 the then-acting DHS Secretary issued an order entitled "Finding of Mass Influx of Aliens" ("DHS Order"). In that Order, the acting Secretary

invoked his authority under the INA and 28 C.F.R. § 65.83 to "request assistance from a State or local government in the administration of the immigration laws of the United States," *inter alia*, when "there exist circumstances involving the administration of the immigration laws of the United States that endanger the lives, property, safety, or welfare of the residents of a State or locality," including an "actual or imminent mass influx of aliens" arriving at the border. 28 C.F.R. § 65.83(b), (d)(1).

198.    Citing various statistics about the number of undocumented immigrants crossing the southern border, the acting DHS Secretary concluded there was "an actual or imminent mass influx of aliens" at the southern border and that this "influx" threatens all 50 states.

199.    On this account, the acting DHS Secretary formally invoked his authority under the INA and implementing regulations to "request the assistance of State and local governments in all 50 States" to administer federal immigration law.

200.    While the DHS Order is phrased as a "request," the Bove Memo provides that states and local jurisdictions are *required* to comply with the Executive Branch's "initiatives" and "requests."

**B.    DOJ Freezes Federal Funding for Sanctuary Jurisdictions and Orders Investigations and Prosecutions of These Jurisdictions**

**1.    The Funding Restriction in Executive Order 14,159 is Paused**

201.    On January 27, 2025, the Office of Management and Budget ("OMB") issued Memo 25-13 ("OMB Memo") announcing a pause on "all Federal financial assistance" in order to review and implement the funding conditions in several of President Trump's Executive Orders, including the Funding Restriction in Executive Order 14,159.

202.    The OMB Memo was immediately challenged in at least two cases. *See Nat'l Council of Nonprofits v. Office of Mgmt. & Budget*, No. 25-239 (D.D.C. filed Jan. 28, 2025); *New York v. Trump*, No. 25-CV-39 (D.R.I. filed Jan. 28, 2025). DOJ and the then Acting Attorney General were named in the *New York* lawsuit. The federal court in that case issued a Temporary Restraining Order directing that the defendants (including DOJ) may not "pause, freeze, impede, block, cancel, or terminate" federal financial assistance to the States as directed by the OMB Memo "except on the basis of the applicable authorizing statutes, regulations, and terms." TRO at 11, ECF No. 50, *New York* (Jan. 31, 2025). Defendants were further enjoined from "giving effect to the OMB Directive under any

other name or title or through any other Defendants." *Id.* at 12.

### 2. DOJ Issues its Own Freeze on Funding

203. On February 5, 2025, Defendant Attorney General Bondi issued a memo to all DOJ employees entitled "Sanctuary Jurisdiction Directives" ("Bondi Memo") (Exhibit D).

204. Consistent with the direction of Executive Order 14,159, the Bondi Memo states that DOJ announced its own funding restriction to "ensure that, consistent with law, 'sanctuary jurisdictions' do not receive access to Federal funds from the Department." Ex. D at p.1.

205. The Attorney General also proscribes that "[s]anctuary jurisdictions should not receive access to federal grants administered by the Department of Justice." Ex. D at p.1. Rather than relying on the (enjoined) Funding Restriction in Executive Order 14,159, the Attorney General purports to invoke DOJ's "own authority to impose any conditions of funding that do not violate applicable constitutional or statutory limitations." *Id.* The memo further states that certain DOJ grants will be conditioned on compliance with 8 U.S.C. § 1373, and that future grants may be tailored "to promote a lawful system of immigration" and to "reduce efforts by state or local jurisdictions to undermine a lawful system of immigration." *Id.* at 2.

206. To effectuate this unlawful order, the Attorney General directs that the Department of Justice "shall pause the distribution of all funds until a review has been completed, terminate any agreements that are in violation of law or are the source of waste, fraud, or abuse, and initiate clawback or recoupment procedures, where appropriate." Ex. D at p.1. The Attorney General purports to justify this measure as "[c]onsistent with applicable statutes, regulations, court orders, and terms." *Id.*

207. The Bondi Memo defines a "sanctuary jurisdiction" as "includ[ing]" any jurisdiction that refuses to comply with 8 U.S.C. § 1373 or "willfully fail[s] to comply with other applicable federal immigration laws." *Id.* at p.2.

208. Contrary to law and express precedent, Defendants interpret § 1373 to preclude local jurisdictions from preventing their employees from asking individuals about citizenship or immigration status information or limiting sharing of non-immigration status information (such as custody status, release date, and contact information) with immigration authorities.

209.    Consistent with the enforcement directive in Executive Order 14,159 and the Bove Memo, the Bondi Memo provides that state and local actors "may not" "fail to comply with lawful immigration-related directives." Ex. D at p.3. It also states that jurisdictions with policies that "impede lawful federal immigration operations" will be challenged. efforts to enforce immigration law." *Id.*

210.    The Memo then repeats the instruction to DOJ staff to investigate and prosecute such conduct under 18 U.S.C. § 371 and 8 U.S.C. §§ 1324 and 1373, and for the Sanctuary Cities Enforcement Working Group to bring legal actions challenging sanctuary policies. *Id.*

**C.    DOJ Takes Enforcement Action Against Sanctuary Jurisdictions**

211.    The enforcement directive in Executive Order 14,159, and the Bove and Bondi Memos, are not idle threats.

212.    On February 6, 2025 the United States filed a lawsuit against the State of Illinois, the City of Chicago, Cook County, and various local officials alleging that these jurisdictions' laws violated federal law. Compl., *United States v. State of Illinois*, ECF No. 1, No. 25-cv-01285 (N.D. Ill.) (*Illinois* Compl.). The lawsuit explicitly invokes Executive Order 14,159. *Illinois* Compl. ¶ 1.

213.    The lawsuit reveals the sheer breadth of power that Defendants claim they can assert over state and local policies, despite court orders and precedent to the contrary.

214.    The federal government's complaint challenges provisions of the Illinois jurisdictions' laws that prohibit state and local officials from (1) detaining an individual on the basis of a detainer or civil administrative warrant, *Illinois* Compl. ¶ 42, 48, 54; (2) assisting with federal civil immigration enforcement or detaining individual for federal civil immigration violations, *id.* ¶ 43; (3) inquiring about the citizenship or immigration status of any individual, *id.* ¶ 44; (4) providing immigration authorities access to individuals in local custody for investigative interviews, *id.* ¶ 48; and (5) providing immigration authorities with information regarding an individual's release date, *id.* ¶ 48; *see generally id.* ¶¶ 8–10.

215.    The federal government asserts that such provisions violate 8 U.S.C. § 1373 because, *inter alia*, they (1) prevent state and local actors from expending resources to respond to immigration enforcement inquiries about "custody status, release date, or contact information," and (2) preclude local officials from requesting or maintaining the immigration status of any individual. *Id.* ¶ 66.

216.    The government further asserts that provisions of these jurisdictions' laws violate federal law, including the Supremacy Clause, by limiting compliance with immigration detainers or civil administrative warrants, limiting access to individuals in local custody, and limiting the sharing of personal and release date information with immigration authorities. *Id.* ¶¶ 68–70.

217.    Less than a week after filing the *Illinois* lawsuit, DOJ then filed a second lawsuit against the State of New York and New York state officials. *See* Compl., ECF No. 1, *United States v. New York et al.*, No. 1:25-cv-00205 (N.D.N.Y, filed Feb. 12, 2025) ("*New York* Compl.").

218.    In the *New York* lawsuit, DOJ doubled down on its unprecedented and illegal interpretation of federal law, asserting that the Supremacy Clause and 8 U.S.C. § 1373 prevent the State of New York from, *inter alia*, limiting the sharing of records—including home and work addresses—with immigration authorities simply because the federal government deems this information "relevant" to immigration-related determinations. *See, e.g.*, *New York* Compl. ¶¶ 37–38, 44–45.

219.    In announcing the *New York* lawsuit, Defendant Bondi reiterated DOJ's intent to pursue enforcement actions against any jurisdiction that fails to fall in line with Defendants' sweeping assertion of power over local authorities, stating: "If you don't comply with federal law, we will hold you accountable . . . We did it to Illinois, strike one. Strike two is New York. And if you are a state not complying with federal law, you're next. Get ready."[3]

220.    Other Trump administration officials have also publicly confirmed the Administration's intent to go after localities they deem to be "sanctuary" jurisdictions. For example:

      a.    On January 22, 2025, Stephen Miller, President Trump's Deputy Chief of Staff for Policy claimed that the Administration would pursue "civil and, if necessary, criminal charges against anybody who shelters or harbors criminal aliens," including individuals in sanctuary cities who he claimed were "harboring violent

---

[3] Andrew Goudsward and Sarah N. Lynch, *US sues New York officials over immigration enforcement*, Reuters (Feb. 12, 2025), https://www.reuters.com/world/us/us-sues-new-york-state-officials-over-immigration-enforcement-attorney-general-2025-02-12/.

and dangerous criminals from federal law enforcement."[4]

b. On January 31, 2025, Defendant Noem appeared for an interview on Fox News during which she was asked whether the Administration would take action against sanctuary city officials. She confirmed that "of course we will," and stated that she would follow President Trump's direction on "how we are going to go after these individuals."[5]

c. On February 3, 2025, Tom Homan, the acting director of ICE told Fox News that President Trump "will end sanctuary cities" and that "we're going to sue 'em."[6]

d. On February 6, 2025, Homan confirmed to reporters at the White House that the Administration plans to "hold [sanctuary cities] accountable and take them to court."[7]

221.    As discussed above, Plaintiffs have many of the same policies that the federal government claims to be illegal or unconstitutional. *See* Part I, *supra*.

## III.    Defendants' Actions are Blatantly Unconstitutional and Violate Federal Law

### A.    Tenth Amendment

222.    The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

223.    This provision prohibits the federal government from "commandeering" state and local officials to help enforce federal law. *See Printz v. United States*, 521 U.S. 898 (1997); *New York v. United States*, 505 U.S. 144 (1992). This doctrine recognizes that the federal government has limited

---

[4] Adam Shaw, *Trump's ICE racks up hundreds of arrests, including illegal immigrants arrested for horror crimes*, Fox News (Jan. 22, 2025), https://www.foxnews.com/politics/trumps-ice-racks-up-hundreds-arrests-including-illegal-immigrants-arrested-horror-crimes

[5] "Trump is 'restoring law and sovereignty' with mass deportations, Stephen Miller says," Fox News (Jan. 22, 2025), available at https://www.foxnews.com/video/6368025256112.

[6] "Trump 'border czar' Tom Homan: We have a great team and 'will not fail this president,'" Fox News (Feb. 3, 2025), available at https://www.foxnews.com/video/6368227422112.

[7] Bernd Debusmann Jr., *Trump administration sues Chicago over 'sanctuary city' laws*, BBC News (Feb. 6, 2025), https://www.bbc.com/news/articles/c8r585ndey4o.

enumerated powers, and does not have "the power to issue direct orders to the governments of the States." *N.J. Thoroughbred Horsemen's Ass'n v. NCAA*, 584 U.S. 453, 471 (2018).

224.    Under the anti-commandeering doctrine, "the Federal Government may not compel the States to implement, by legislation or executive action, federal regulatory programs." *Printz*, 521 U.S. at 925. Otherwise, the federal government could invade the sovereign power reserved to the states and simply "shift[] the costs of regulation to the States." *N.J. Thoroughbred Horsemen's Ass'n*, 584 U.S. at 474.

225.    Executive Orders 14,159 and 14,218 and the Bondi Memo's restrictions on federal funding and threats of civil and criminal enforcement violate the anti-commandeering principle inherent in the Tenth Amendment by effectively coercing state and local governments to administer and enforce federal law.

226.    First, as discussed further below, Executive Orders 14,159 and 14,218 and the Bondi Memo commandeer state and local governments by attempting to use the Spending Power to coerce them into acting as arms of the federal government.

227.    Second, Executive Order 14,159 and the Bondi Memo compel state and local jurisdictions to administer federal immigration law, on penalty of civil and criminal enforcement.

228.    Executive Order 14,159 directs the Attorney General and DHS to undertake civil and criminal enforcement actions against any jurisdiction for practices that they deem, in their discretion, to "interfere with the enforcement of Federal law."

229.     The Bove Memo, which implements Executive Order 14,159, states that "prohibiting disclosures of information to federal authorities engaged in immigration-enforcement activities" "impede[s] Executive Branch immigration initiatives" and directs the Sanctuary Cities Enforcement Working Group to take legal action to challenge "state and local laws, policies, and activities that are inconsistent with Executive Branch immigration initiatives." It also states that local officials who fail to comply with "lawful immigration related commands and requests" violate federal law. The memo directs that DOJ employees investigate "incidents involving such misconduct" for criminal prosecution under 8 U.S.C. § 371 and 18 U.S.C. §§ 1324 and 1373.

230.    The Bondi Memo further affirms Defendants' view that local jurisdictions that fail to

respond to immigration-related "directives" violate federal law and impede federal immigration operations and reiterates Defendants' commitment to seek criminal and civil legal sanction against such jurisdictions.

231.    As the federal government's *Illinois* and *New York* lawsuits demonstrate, Defendants seek to compel localities, including Plaintiffs, to enforce federal immigration laws—including using local resources to hold individuals pursuant to civil immigration detainers and administrative warrants and to share confidential personal information, such as contact information and release dates for individuals in custody, with immigration authorities.

232.    By limiting the use of local resources in aiding the execution of federal civil immigration enforcement, Plaintiffs have exercised lawful authority reserved to them under the Tenth Amendment. Defendants' actions—compelling state and local governments to enforce and administer federal immigration law at the behest of the federal government under threat of civil and criminal punishment and the withholding of critical funding—violates the Tenth Amendment.

233.    The Ninth Circuit has held that nothing in the Supremacy Clause or in any federal statute imposes an obligation on state or local governments to enforce federal immigration laws, and that to hold otherwise would violate the Tenth Amendment. *See United States v. California*, 921 F.3d at 890–91 (involving a challenge to SB 54, a California law that limits cooperation with immigration enforcement). In direct response to Defendants' assertions that limiting local cooperation with immigration enforcement may frustrate the federal government's immigration enforcement, the Ninth Circuit held:

> SB 54 may well frustrate the federal government's immigration enforcement efforts. However, whatever the wisdom of the underlying policy adopted by California, that frustration is permissible, because California has the right, pursuant to the anticommandeering rule, to refrain from assisting with federal efforts. The United States stresses that, in crafting the INA, Congress expected cooperation between states and federal immigration authorities. That is likely the case. But when questions of federalism are involved, we must distinguish between expectations and requirements. In this context, the federal government was free to expect as much as it wanted, but it could not *require* California's cooperation without running afoul of the Tenth Amendment. *Id.*

**B.    Separation of Powers**

234.    By purporting to restrict funds to sanctuary jurisdictions, Executive Orders 14,159 and 14,218 and the Bondi Memo seek to exercise spending power that Article I, Section 8 of the Constitution grants exclusively to Congress.

235.    The Executive Orders violate the separation of powers by creating a penalty for limiting cooperation with immigration enforcement that Congress did not authorize, without regard to statutory rules on grant programs put in place by Congress.

236.    The Bondi Memo likewise violates the separation of powers by conditioning federal funding administered by DOJ on compliance with "applicable federal immigration law," without regard to statutory rules on DOJ grant programs enacted by Congress.

237.    Through the Executive Orders and the Bondi Memo, Defendants also effectively legislate a new sanction for failing to comply with the Executive Branch's immigration enforcement priorities. The unilateral imposition of this new sanction and condition on spending is not supported by the INA, or any other act of Congress, or by the Constitution.

238.    Defendants may not unilaterally impose new restrictions on jurisdictions' eligibility for federal funding. Any restriction on eligibility for federal funds must be imposed—clearly, unambiguously, and in advance—by Congress. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). When Congress has not imposed such a restriction by statute, the President may not do so by fiat. The President does not have "unilateral power to change the text of duly enacted statutes." *Clinton v. City of New York*, 524 U.S. 417, 447 (1998).

239.    Congress has consistently and repeatedly rejected the imposition of funding restrictions for sanctuary jurisdictions that limit cooperation with federal civil immigration enforcement. *See City & Cnty. of S.F.*, 897 F.3d at 1234 n.4 (listing numerous failed Congressional bills to withhold funds from sanctuary jurisdictions); *see also* No Bailout for Sanctuary Cities Act, H.R. 5717, 118th Cong. (2024); Stop Dangerous Sanctuary Cities Act, S. 3452, 117th Cong. (2021); Mobilizing Against Sanctuary Cities Act, H.R. 94, 117th Cong. (2021); No Tax Breaks for Sanctuary Cities Act, H.R. 894, 117th Cong. (2021); Ending Sanctuary Cities Act of 2021, H.R. 3195, 117th Cong. (2021). Where the President "takes measures incompatible with the expressed or implied will of Congress, his power is at

its lowest ebb." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring).

240.     By imposing conditions or limitations on federal spending without express statutory authority, the Executive Orders and the Bondi Memo also unlawfully exceed the President's powers under other provisions of the Constitution that establish the separation of powers among the branches of our government, including: (i) the President's obligation to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, cl. 5 (Take Care Clause), (ii) the limitation that Congressional enactments must "be presented to the President of the United States," who then may sign that enactment or veto it, but has no power to merely revise it, either upon presentment or after enactment, U.S. Const. art. I, § 7, cls. 2-3 (Presentment Clause); and (iii) Congress's authority to levy taxes, to finance government operations through appropriations, and to set the terms and conditions on the use of those appropriations. U.S. Const. art. I, § 9, cl. 7 (Appropriations Clause).

241.     The Ninth Circuit has held that the President violates the constitutional separation of powers by attempting to withhold federal funds from jurisdictions that limit cooperation with ICE where Congress has not tied such funding to compliance with immigration enforcement or delegated authority to the Executive to impose such conditions. *See City & Cnty. of S.F.*, 897 F.3d at 1234–35 (upholding injunction against Executive Order 13,768 on separation-of-powers grounds).

### C.     Spending Clause

242.     Further, Executive Orders 14,159 and 14,218 and the Bondi Memo purport to exercise spending power in ways that even Congress could not.

243.     First, Defendants' actions violate the Spending Clause by imposing vague new funding conditions on existing appropriations of federal funds. "[I]f Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously," in advance. *Pennhurst*, 451 U.S. at 17. "The legitimacy of Congress' power to legislate under the spending power . . . rests on whether the State voluntarily and knowingly accepts" Congress's conditions. *Id.* "There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it." *Id.* Once a State has accepted funds pursuant to a federal spending program, the Federal government cannot alter the conditions attached to those funds so significantly as to "accomplish[ ] a

shift in kind, not merely degree." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 584 (2012).

244.    Defendants' actions also violate the Spending Clause by imposing funding conditions that are not germane to the purpose of the funds. "[T]he imposition of conditions under the spending power" must be "germane" or "related" to the purpose of federal funding. *South Dakota v. Dole*, 483 U.S. 203, 208-09 & n.3 (1987); *see also Massachusetts v. United States*, 435 U.S. 444, 461 (1978). Here, Defendants have conditioned eligibility for federal funding on compliance with Defendants' immigration enforcement priorities and efforts, without regard to whether that purpose is germane to any federal funds at issue.

245.    In addition, Defendants' actions impose conditions so severe that they "cross[] the line distinguishing encouragement from coercion." *Sebelius*, 567 U.S. at 579 (opinion of Roberts, C.J.); *New York*, 505 U.S. at 175. Executive Order 14,159's conditioning of all funding on compliance with the federal government's demands regarding cooperation with its civil immigration enforcement efforts "is much more than 'relatively mild encouragement'—it is a gun to the head." *Sebelius*, 567 U.S. at 581 (opinion of Roberts, C.J.). *See* Part IV.B, *infra*. Executive Order 14,218 does not define "Federal payments," creating the potential risk that the Executive Branch will interpret the provision broadly to encompass large swathes of federal funds. Threats of this magnitude, and to such critical programs, constitute "economic dragooning that leaves the States with no real option but to acquiesce" to federal dictates. *Id*. at 582.

246.    Finally, by compelling state and local jurisdictions to enforce immigration laws, Defendants seek to impose conditions that would require Plaintiffs to act unconstitutionally. Under the Fourth Amendment, generally, detention of an individual must be supported by a determination of probable cause. *See Morales*, 793 F.3d at 215–17; *Miranda-Olivares*, 2014 WL 1414305. Requiring state and local governments to establish blanket policies of compliance with immigration detainers could thus cause them to violate the Fourth Amendment. But Congress's spending power "may not be used to induce the States to engage in activities that would themselves be unconstitutional." *Dole*, 483 U.S. at 210. And state and local governments generally lack authority to make warrantless arrests under the Federal government's civil immigration laws. *See Arizona v. United States*, 567 U.S. 387, 408 (2012).

### D.    Due Process

247.    The Fifth Amendment protects against federal laws that are so vague they fail to provide fair notice of what is prohibited or so standardless that they permit discriminatory enforcement. *United States v. Williams*, 553 U.S. 285, 304 (2008).

248.    Under the Fifth Amendment, the federal government may not work a deprivation of money or property without due process of law.

249.    Executive Orders 14,159 and 14,218 and the Bondi Memo fail to meaningfully define key terms underlying their enforcement, including "sanctuary jurisdictions," "'sanctuary' policies" "Federal funds," "Federal payments," "practices that interfere with the lawful exercise of Federal law," or "abet[ting] sanctuary policies." Having such a "practice" subjects a jurisdiction to "criminal or civil" enforcement action, yet what such a practice might be is left undefined, and therefore subject to executive whim.

250.    Similarly, Executive Orders 14,159 and 14,218 and the Bondi Memo deny procedural due process because they grant the Executive Branch unfettered, undefined, and standardless discretion to withhold funds from "sanctuary jurisdictions" in which those jurisdictions have a cognizable property interest.

251.    The lack of definition, notice, or procedures associated with designation as a "sanctuary jurisdiction" and the withholding of funding pose obvious constitutional infirmities, especially in an environment in which DOJ is now prosecuting jurisdictions for their non-cooperation ordinances and policies.

### E.    Administrative Procedure Act

252.    The Administrative Procedure Act ("APA") governs the process of federal agency decision-making. Defendant DOJ is an "agency" as defined in the APA, 5 U.S.C. § 551(1), and the Bondi Memo is therefore an agency action subject to review under the APA. Defendant DOJ's action in promulgating the Bondi Memo violates the APA in numerous respects.

253.    As discussed above, Defendant DOJ's action is in excess of statutory authority and contrary to fundamental constitutional principles. *See* 5 U.S.C. § 706(2)(B), (C).

254.    In addition, the APA prohibits agency actions that are "arbitrary, capricious, an abuse

of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The Bondi Memo is an abuse of discretion and not in accordance with law because it is unsupported by constitutional or statutory authority.

255.    In addition, the Bondi Memo is arbitrary and capricious because it fails entirely to offer a reasonable explanation for the breadth of funding withheld and the basis for withholding funds already appropriated, and fails entirely to consider the reasonable and inevitable reliance by Plaintiffs on now-suddenly frozen funding, the expectation of reimbursement from already appropriated funds, and the need for clarity by local governments about funding streams to provide day-to-day services relied on by their citizens.

### F.    Appropriations Law

256.    A framework of statutes structures how Congress utilizes its appropriation power to authorize federal funding. To start, Congress acts through legislation to make funds available for financial obligations that will result in immediate or future disbursements of federal funds from the United States Treasury. *See* 2 U.S.C. § 622(2)(A)(i). An "obligation" is a "definite commitment that creates a legal liability of the government for the payment of goods and services ordered or received, or a legal duty on the part of the United States that could mature into" such a liability; an "expenditure," also known as a "disbursement," is the actual spending of federal funds. U.S. Gov't Accountability Off., *A Glossary of Terms Used in the Federal Budget Process*, GAO-05-734SP, at 45, 48, 70 (Sept. 2005), https://www.gao.gov/assets/gao-05-734sp.pdf ("Budget Glossary").

257.    Further, "[a]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law," 31 U.S.C. § 1301(a)—in other words, appropriations may only be used for those purposes which *Congress* has designated. Federal officers and employees cannot obligate or spend funds absent congressional appropriation. 31 U.S.C. § 1341(a)(1)(A).

258.    Because the Constitution limits the authority of the Executive Branch to impound funds on its own initiative absent congressional authorization, the President must seek approval from Congress before deferring or rescinding federal funds.

259.    The Impoundment Control Act of 1974, 2 U.S.C. §§ 681 *et seq*. ("ICA"), requires the

President to transmit to both houses of Congress a message indicating his request to rescind budget authority (i.e., cancel a federal payment) or defer budget authority (i.e., pause a federal payment). The President can request to defer budget authority in only three circumstances: "(1) to provide for contingencies; (2) to achieve savings made possible by or through changes in requirements or greater efficiency of operations; or (3) as specifically provided by law." 2 U.S.C. § 684(b). Beyond these three reasons, "[n]o officer or employee of the United States may defer any budget authority for any other purpose." *Id.*

260.    Among other requirements, the President's message to Congress must indicate the amount of the budget authority, the likely impact of the rescission or deferral, and the justification for the rescission or deferral. 2 U.S.C. §§ 683, 684. This message must be delivered to both houses of Congress, to the Comptroller General, and to the Federal Register. 2. U.S.C. §§ 685. Upon receipt, both houses of Congress are given an opportunity to act on the proposed rescission or deferral. 2 U.S.C. § 688. If both houses of Congress do not approve a rescission proposal within 45 days, the withheld funds must be made available for obligation. 2 U.S.C. § 683(b).

## IV.    Plaintiffs Face Serious Harm from Defendants' Unconstitutional and Unlawful Actions

### A.    Plaintiffs Each Have Laws and Policies That Defendants Consider "Sanctuary" Policies

261.    Executive Order 14,159 defines sanctuary jurisdictions as any jurisdiction that "seek[s] to interfere with the lawful exercise of Federal law enforcement operations."

262.    The Bove Memo concludes that limiting compliance with federal "immigration enforcement initiatives" and "requests," and "prohibiting disclosures of information" to immigration authorities, impedes federal civil immigration enforcement and violates federal law.

263.    The Bondi Memo defines sanctuary jurisdictions as any jurisdictions that "refuse to comply with 8 U.S.C. § 1373" or other "applicable federal immigration laws." It concludes that jurisdictions must comply with applicable "immigration-related directives."

264.    The *Illinois* lawsuit makes clear that for purposes of Executive Order 14,159, and consistent with the Bove and Bondi Memos, Defendants have concluded that jurisdictions violate federal law, including 8 U.S.C. § 1373, and interfere with federal immigration enforcement operations, if they limit or prohibit officials from: (1) detaining an individual on the basis of a detainer or civil

administrative warrant, *Illinois* Compl. ¶¶ 42, 48, 54; (2) assisting with federal civil immigration enforcement or detaining an individual for federal civil immigration violations, *id.* ¶ 43; (3) inquiring about the citizenship or immigration status of any individual, *id.* ¶ 44; (4) providing immigration authorities access to individuals in local custody for investigative interviews, *id.* ¶ 48; and (5) providing immigration authorities with information, including contact information or an individual's release date, *id.* ¶ 48; *see generally id.* ¶¶ 8-10.

265.    The *New York* lawsuit likewise suggests that Defendants take the position, contrary to existing precedent, that the Supremacy Clause and 8 U.S.C. § 1373 require that local jurisdictions share broad, undefined categories of sensitive information—including home and work addresses—as long as the federal government deems this information "relevant" to immigration-related determinations. *New York* Compl. ¶ 37; *see also id.* ¶¶ 38, 44–45.

266.    Executive Order 14,218 refers to "sanctuary policies" "that seek to shield illegal aliens from deportation." Based on Defendants' public statements, the Bove and Bondi Memos, and DOJ's position in the *Illinois* and *New York* lawsuit, it appears that Defendants view jurisdictions that limit cooperation with civil immigration efforts as somehow shielding undocumented immigrants from deportation—even where these policies are actually aimed at improving public safety and public services for all residents and are not intended to shield or harbor undocumented immigrants.

267.    Plaintiffs have the kinds of laws and policies that Defendants have deemed unlawful "sanctuary" policies.

268.    For example, Plaintiffs generally prohibit the use of their localities' resources to assist in federal civil immigration enforcement and limit the ability of local law enforcement to inquire about immigration status or detain individuals for purely civil immigration violations. Many of Plaintiffs laws and policies also limit compliance with civil immigration detainer requests or administrative warrants, restrict the disclosure to immigration authorities of personal information (including contact information) about any individual, and/or limit compliance with a notification request for the release date of someone in custody, subject to certain exceptions—such as for judicial warrants, lawful subpoenas, or as otherwise required by federal law.

**B.**    **Plaintiffs Face Devastating Budgetary Injury**

269.    The Bondi Memo expressly threatens Plaintiffs with the loss of federal funds that they use to provide essential services for supporting children and families, law enforcement activities and agencies and victims of violent crimes in their communities. The threatened cuts are unrelated to immigration enforcement and run counter to the goals of public safety sought to be advanced by the Administration and would have far reaching consequences. Plaintiffs face immediate injury from DOJ's freezing of federal funds and its withholding and condition of federal funding on local cooperation with federal immigration policies.

270.    Executive Order 14,159's threatened withholding of all federal funding—and Executive Order 14,218's threats with respect to an undefined category of federal payments—would have far reaching impacts on Plaintiffs, which rely on federal funding as a significant portion of their budgets, and would cripple Plaintiffs' ability to deliver critical services to their communities.

**1.**    **San Francisco**

271.    In Fiscal Year 2024-25, San Francisco received at least $8.7 million in funds administered by DOJ, either directly or through state pass-through funding. These funds support a myriad of critical public safety and other services, including:

a.    San Francisco's District Attorney's Office Victim Witness Program from the Department of Justice, Office for Victims of Crimes pursuant to the Victims of Crime Act of 1984, 34 U.S.C. § 20103(a) and (b), that supports San Francisco in providing comprehensive services to victims and survivors of all types of violent crime;

b.    The San Francisco Police Department Regional Vehicle Interdiction Desk Project, a multijurisdictional project to combat carjacking. The law enforcement activities funded by this grant include tactical casework in support of carjacking investigations and prosecutions and use of carjacking vehicles in organized crime;

c.    Law Enforcement Assisted Diversion, an innovative approach that seeks to accomplish the goals of reduced criminal behavior and improved public safety by connecting appropriate low-level drug offenders with services;

d.  Focused Drug Deterrence, short-and-long term proactive activities including targeted investigations and enforcement and social network analysis to increase the identification of individuals involved in high-level drug markets;

e.  Drug Court Prosecution, which seeks to connect criminal defendants who suffer from a substantial substance abuse problem to treatment services in the community in order to enhance public safety, reduce recidivism, and to find appropriate dispositions to the criminal charges;

f.  Targeted Drug Treatment for Underserved Populations, a treatment intervention conducted by the Sheriff's Department for individuals in custody;

g.  Intensive Probation Supervision, a targeted caseload of probationers with substance abuse and/or mental health issues;

h.  Reentry Social Work through the Public Defender's Office, which provides legal and wraparound support to help indigent clients charged with felony drug cases and other felony offenses successfully exit the criminal justice system;

i.  Citywide Justice-Involved Youth Planning, which examines current criminal justice trends impacting youth and young adults and strengthens partnerships and collaboration at various levels to create a continuum of support for youth and young adults.

272.  These programs are funded by grants that are statutorily authorized by Congress, which did not impose immigration-related conditions upon the award or use of the funds. See e.g., 42 U.S.C. § 3752(a)(5)(D) (Byrne JAG provisions directing that recipients simply must use funds for a program or  activity that falls within one of the several statutory purposes, and certify that they will "comply with all provisions of this [statutory] part and all other applicable Federal laws." ); see also Victims of Crime Act authorizing Victim Witness Program grants 34 U.S.C. § 20103 ("Subject to the availability of money in the Fund, the Director shall make an annual grant from any portion of the Fund made available...")

273.  San Francisco currently faces a significant budget deficit for FY 2026 and 2027 and the Mayor has directed City departments to propose ongoing cuts of 15% from their general fund budgets.

The federal funds frozen by the Bondi Memo and subject to unlawful immigration-related conditions are funds that are currently anticipated and relied upon by San Francisco. The expectation for these funds is part of San Francisco's currently approved budget and even if it were to immediately cease all activities by laying off staff and notifying contractors to stop work, San Francisco would still be obligated to pay for work done, adding to its current budget shortfall. If San Francisco were deprived of its DOJ funding, it would be forced to make difficult choices on sustaining the DOJ-funded programs that serve children, crime victims, and critical law enforcement services through local funding sources or cutting these or other critical services.

274.    The Executive Orders threaten an even greater impact on San Francisco's fiscal situation. San Francisco's current budget includes nearly $3.1 billion in federal funds for a myriad of critical services such as health care reimbursement, housing, capital projects, emergency services, and public infrastructure. Losing all, or even a fraction, of that amount would trigger a fiscal crisis that would require drastic reductions in critical municipal services.

### 2.    Santa Clara

275.    Upon information or belief, Santa Clara estimates that it receives $6 to $7 million in grants that originate with DOJ, either directly or passed through the State of California. This DOJ funding supports a range of important programs and services provided by Santa Clara's Office of the Sheriff, Office of the District Attorney, Probation Department, and other departments and agencies to crime victims, child abuse survivors, justice-involved youth, and the entire Santa Clara County community. These programs and services include, but are not limited to:

     a.  Direct services to trafficking survivors and other victims of crime;

     b.  The Psychiatric Emergency Response Team, which is a joint effort among Santa Clara's Behavioral Health Services Department and law enforcement agencies in which multidisciplinary law enforcement and clinician teams respond to 911 calls that involve both a mental health crisis and a law enforcement issue;

     c.  Data analysts for the Office of the District Attorney's Gun Related Intelligence Program, which uses ballistic evidence to link shootings and solve gun crimes, through DOJ's Crime Gun Intelligence Center grant;

d.   Services of Santa Clara's Crime Laboratory, an internationally accredited forensic laboratory that handles controlled substance analysis, firearms examination, latent fingerprint processing, digital evidence, fire debris and explosives analysis, DNA and toxicology analysis, and more, through DOJ's Paul Coverdell Forensic Science Improvement Grants Program, which supports improvements in forensic science; and DOJ's DNA Capacity Enhancement for Backlog Reduction Program, which aims to increase the capacity of government-run forensic laboratories to process DNA samples and reduce backlogs that delay justice;

e.   Through DOJ's Improving the Investigation and Prosecution of Child Abuse and the Regional and Local Children's Advocacy Centers Program, efforts to improve techniques for investigating and prosecuting child abuse; to enhance coordination among community-based providers and law enforcement, child welfare, and medical and mental health professionals involved in investigation, prosecution, intervention, and prevention work; and to serve child abuse victims and their non-offending family members through Santa Clara's Children's Advocacy Center; and

f.   Services to improve public safety and reach youth involved in serious violent or weapons-related crimes, as well as youth at risk of justice involvement—including a collaboration with the University of Cincinnati Corrections Institute to implement a phased process of youth-centered design and programming enhancements at the Probation Department's a rehabilitative youth facility, with associated training and coaching for Probation staff.

276.   Not a single one of these programs relates to immigration enforcement or any community member's immigration status. Instead, they relate more broadly to protecting the entire Santa Clara County community—including vulnerable children, trafficking victims, and sexual assault survivors—from harm; and enhancing the ability of local police agencies and prosecutors to do their core work of preventing and addressing crime.

277.   Santa Clara, like entities across California and the nation, is facing budget deficits. To meet Santa Clara's obligation to deliver a balanced budget, Santa Clara's departments, agencies, and

executive leadership made very difficult choices in the most recent fiscal year to close a $250 million budget deficit while maintaining critical services for the community. If Santa Clara were deprived of its DOJ funding, it would struggle to sustain its DOJ-funded programs that serve children, crime victims, and vitally important forensic and law enforcement services through local funding sources. It would be forced to make impossible choices about cutting either these programs, or the other safety-net programs that Santa Clara provides.

278. Beyond the millions of dollars of funding immediately threatened by the Bondi Memo, the Executive Orders, which are not expressly limited to DOJ grant dollars, threaten the approximately $3.5 billion in total federal funding that Santa Clara received or will receive in the current fiscal year. In total, federal funding comprises 31 percent of Santa Clara's revenue.

279. These funds support healthcare, safety-net programs and social services for children and families, and other essential government functions, such as public health, infrastructure, emergency response and public safety. Many of the program supported by federal funds require Santa Clara to advance the cost of services before seeking reimbursement from the federal government. Without these federal funds, Santa Clara would be forced to make extraordinary cuts to critical services—and in some cases totally eliminate key services and functions. The elimination, or even reduction, of federal funding would require Santa Clara to fundamentally and globally reallocate funds and services.

280. Because Santa Clara is continuing to operate federally-funded programs on a daily basis, it needs to know whether to (1) continue incurring hundreds of millions of dollars in costs that may never be reimbursed by the federal government, (2) discontinue basic safety-net services delivered to its most vulnerable residents, or (3) in an attempt to avoid either of these outcomes, be effectively conscripted into using local law enforcement and other resources to assist the federal government in its immigration enforcement efforts.

### 3. Portland

281. Today, the City of Portland has over $10 million in 12 active grants from different Department of Justice grant programs. This funding has already been awarded to Portland, but most of it has not yet been disbursed. Among these threatened grants are funding for essential services under

the Byrne JAG program and the National Sexual Assault Kit Initiative (SAKI) – which is supporting Portland's effort to tackle its backlog of rape kits for victims of sexual assault. This funding is critical to maintaining public safety.

282.    In total, Portland currently has over $340 million in awarded federal grants which may be implicated by the Executive Orders' broad sweeping scope.

283.    In addition, Portland faces a potential $100M budget shortfall for fiscal year 2025-2026. The Mayor and City Council are actively working to budget during these very difficult financial times. As city leaders and employees work to ensure essential services continue for its residents, even a temporary pause could cause untold harm. The federal government's threats to not only limit future funding, but to stop funding or renegotiate hundreds of millions of dollars in grants that the city has already been awarded only exacerbates the already serious budget crisis.

### 4.    King County

284.    The 2025 King County operating budget includes roughly $200 million in federal funding for operations. An additional $500 million is allocated to multi-year capital projects. Federal grants and appropriations fund numerous critical public safety projects and include ear-marked funds designated by congress for anti-terrorism counter measures related to the 2026 World Cup. The loss of this funding based on King County's decision to limit cooperation with federal civil immigration enforcement would have a devastating impact on public safety and emergency preparedness.

285.    Defendant Bondi's purported freeze on DOJ funds directly impacts King County. Currently, the county has approximately $20 million in direct and indirect funding from DOJ and DHS, including over $9 million in funding for local law enforcement initiatives and approximately $9.5 million in disaster planning and wildfire prevention funding. King County also has plans to seek future DOJ and DHS grants to enhance both public safety and officer safety. DOJ's actions in freezing existing grant funds and precluding King County from future grants is especially impactful in the current budget cycle, where King County is facing a substantial short fall in its general fund. DOJ's actions, if allowed to proceed, will directly and negatively impact public safety by decreasing resources precisely when they are needed the most.

**5.    New Haven**

286.    New Haven relies heavily on federal funding to deliver public services.

287.    Over the last few years, New Haven has received approximately $104,222,265 in direct federal grants.

288.    New Haven is scheduled to receive approximately $30,000,000 in federal funds in the fiscal year starting July 1, 2025. Loss of some or all of this funding would have a significant adverse impact on the finances of the City.

289.    New Haven currently has 85 employees in positions doing critical work, whose salaries are paid for by $6.5 million in federal grants.

290.    A $2.1 million federal grant provides services for overdose prevention and harm reduction.

291.    The city and 20 partner organizations use $20 million in federal funding designed to mitigate climate change, build resiliency, and reduce pollution in New Haven.

292.    New Haven also relies specifically on funding from DOJ, with $6,409,071 in DOJ federal grants awarded over the last few years. These funds support critical public safety needs, cover the costs of mental health professionals to work with police officers in crisis response, pay for the purchase and installation of public safety technology and safety gear for police protection, and financially support other public-safety related initiatives.

293.    New Haven's Office of Violence Prevention is funded with a $2 million DOJ grant.

294.    Another $2 million DOJ grant funds the Elm City C.O.M.P.A.S.S. program providing crisis intervention for individuals with mental illness or substance addiction problems.

295.    The freezing and withholding of these funds based on New Haven's decision to limit local involvement in federal civil immigration enforcement would have a significant impact on New Haven's ability to keep its residents safe.

296.    Should New Haven lose these federal funds, the City would be forced to choose between ending the programs or backfilling the lost funds through a combination of increased taxes and position eliminations.

297.    Given that 56.8% of property within New Haven is tax exempt, New Haven's property

tax rates are already well over state and national averages. Therefore, the loss of federal funding would very likely require cutting some of these programs.

298.     New Haven's budget planning process for FY25-FY26, beginning July 1, 2025, is underway. On March 1, 2025, New Haven's Mayor must submit a recommended budget and tax rate to the Board of Alders, New Haven's legislative body.

299.     The Board of Alders holds public hearings and department workshops on the proposed budget and must approve a balanced budget by June 30, 2025.

300.     The federal government's threat of loss of federal funding creates uncertainty for New Haven's budgeting process, making it extremely difficult to plan a budget that allows for continuing staffing levels, programs, and services that are dependent on federal grant funding. If these grant funds are cut after the budget is passed, the stability of the City's finances would be threatened by the need to deviate from the approved budget to either reallocate funds or terminate programs and staff positions. If the Federal Directives to freeze, deny or eliminate federal grants are put into effect after March 1, when the Mayor needs to submit the proposed budget to the legislative body, the City would likely need to consider cutting back services, or increasing the taxation rate, which would stress City residents who are already financially strapped by inflation and rising prices. Given that 56.8% of property within New Haven is tax exempt, homeowners would bear a significant burden in making up for lost grants by increased property taxes. Further, increased taxes also would adversely impact the rental housing market.

301.     In addition to significantly impacting existing grants, the loss of federal funds would have a grave impact on future public safety efforts. New Haven has relied heavily on federal funding over many years to implement important programs that keep the community safe. DOJ funds alone have been vital to the City's ability to provide critical support to a police department that already faces significant challenges. For example, over the last few years, New Haven has been awarded over $6,000,000 in DOJ federal grants. These funds support critical public safety needs, including various violence prevention programs, improved training and equipment for police officers, mental health professionals to work with police officers in crisis response, purchase and installation of public safety technology and safety gear for police protection, and other public-safety related initiatives. Should

New Haven lose the ability to apply for and receive federal grants such as these in the future, the City would be severely limited in its ability to support its police department with the many technological, staffing and other related public safety needs with the result being that the community would be less safe.

### 6. Oakland

302. As part of funding cycles including the 2025 calendar year, the City of Oakland was awarded approximately $8 million in grants from DOJ. That funding allows for critical public safety services including:

    a. The hiring of 15 additional police officers;

    b. Decreasing the backlog of biological evidence;

    c. Expanding Oakland Ceasefire Strategy efforts intended to address and reduce gun violence in Oakland;

    d. Funding training equipment and helicopter maintenance for the police department;

    e. Funding laboratory firearms work and training;

    f. Funding workshops to repair and strengthen the Oakland Police Department's relationship with the Oakland Community; and

    g. Enhancing school violence intervention and prevention teams for the Oakland Unified School District.

303. The City of Oakland is facing budget shortfalls. Already the City has had to initiate layoffs of several dozen employees in addition to cutting spending across the city. Oakland is continuing to work to ensure the long-term financial viability of its budget. Maintaining DOJ funding is thus essential for the Oakland Police Department. Without these funds, the Oakland Police Department would have to scale back critical initiatives and/or reduce staffing, thus undermining the city's public safety objectives.

304. Including the DOJ funding immediately under threat, Oakland received approximately $170 million in federal funds and awards for 2024. These federal funds go to support emergency services, housing within the city, outreach to homeless persons, early childhood development services, violence prevention, and ecological projects among other things.

305.    The threatened withdrawal of federal funding only makes the budgeting process for Oakland more daunting and puts Oakland at risk of having to guess as to whether it can afford to count on those funds or if it needs to cut programs, spending, and potentially staff to be able to withstand that loss of funding.

### 7.    Emeryville

306.    Federal grants have often supported the City's community services. For example, Emeryville has previously received Community Development Block Grant funds from HUD through Alameda County, as part of the Urban County program supporting Meals on Wheels and minor home repairs.

307.    Emeryville has also been granted two Community Project Funding grants, which it is scheduled to receive pending the execution of an agreement with HUD. Those grants total $500,000 and $2 million, respectively, and will support an intergenerational affordable housing project and the design of a new Corporation Yard.

308.    Emeryville has received a draft agreement from HUD for $850,000 in funding for construction of the 40th Street Multimodal Project to improve transportation safety, reduce congestion, and enhance multimodal access on 40th Street in Emeryville.

309.    Emeryville relies on federal funding from DOJ to support its police department. The Emeryville Police Department ("EPD") receives approximately $10,000 to $12,000 annually in DOJ funding through the Edward Byrne Memorial Justice Assistance Grant Program.

310.    EPD uses this funding to pay for police equipment, including body-worn cameras, computer monitors used for trainings, tasers, radio upgrades, and early intervention software. This equipment makes EPD more effective, responsive, and transparent. Radio upgrades, for example, have improved officers' ability to communicate with officers across the Bay Area during a crisis, and early intervention software enables EPD to remedy gaps in training causing officer errors.

311.    EPD receives, on average, approximately $10,000 annually in DOJ funding through the Patrick Leahy Bulletproof Vest Partnership Program. This funding allows for the regular replacement of outdated body armor. Newer body armor is lighter and stronger; it also distributes the weight of officers' equipment more evenly around their bodies to reduce injury and increase longevity in the

1 field.

2      312.    EPD also relies on federal funding passed through the California state government. For

3 example, it receives approximately $50,000 to $100,000 annually through the Highway Safety Grants

4 Program. EPD uses these funds to increase traffic enforcement and offer safe driving education to the

5 community. EPD also uses California's state-run 911 service, which is partially funded through federal

6 grants.

7      313.    The loss of federal funding would require Emeryville to either cut back on essential

8 equipment and services, which would put officers at risk and compromise public safety, or cover these

9 costs from its general fund.

10      314.    Emeryville currently faces an $11 million budget deficit following a downturn in

11 economic activity during the COVID pandemic and reduced development due to high interest rates.

12      315.    Emeryville will budget the anticipated federal funds as it does in the ordinary course of

13 preparing its annual budget. If these funds are not allocated by the federal government, the city's

14 budget would become out of balance and the city would then have to decide whether to backfill the

15 loss in revenue with General Fund money or not move forward with the project(s) the federal funds

16 were intended to support.

17          **8.    San José**

18      316.    The Fiscal Year 2024-2025 San José budget included nearly $187 million in federal

19 funding ($98.1 million for operations, and $88.6 million for capital projects).

20      317.    An additional $162 million is anticipated for the 2025-2029 adopted capital

21 improvement program. The City has budgeted and has or will expend in reliance on the funding

22 awarded. Most of these funds are disbursed on a reimbursement basis.

23      318.    The Executive Orders could impact funding that supports many critical programs

24 ranging from essential programs such as workforce development, low-income and interim housing,

25 law enforcement, the airport, and public safety services.

26      319.    In many instances, San José receives federal funding through formula grants (grants

27 that are noncompetitive and allocated to grantees based on distribution formulas) and has built

28 programs around the continuing nature of these funds.

320.     From DOJ, San José has been awarded $8.6 million, of which $6.4 million are claimed on reimbursement. The City relies on the DOJ funds to:

      a. Cover the costs of inventorying, DNA testing, tracking and reporting DNA analysis of sexual assault kits inclusive of training, investigation and victim engagement and support activities (National Sexual Assault Kit Initiative);

      b. Pay for addition and upgrading of police department equipment, police training, and community outreach (Edward Byrne Memorial Justice Assistance Grant); and

      c. Support the investigation of hate incidents and community education to prevent hate crimes.

321.     None of the programs or services funded by DOJ focuses on immigration or include any element of immigration enforcement. These funds are used for local law enforcement, criminal investigation, and harm reduction.

322.     As of December 2024, San José's preliminary ongoing budget shortfall is estimated at approximately $60 million for 2025-2026, followed by an additional $30 million shortfall in 2026-2027. These shortfalls do not reflect the full budget challenges including services currently funded on a one-time basis of approximately $8.5 million.

323.     The City is facing difficult decisions to cut costs and still maintain essential services to our residents. The loss of federal funds, even on a temporary basis, could lead to the elimination of programs that serve our most vulnerable residents.

324.     The City begins its budgeting process in February to identify priorities, followed by public study sessions and hearings in April and May, with the final adoption of the budget in June for the next fiscal year. Uncertainty about the loss of federal funds, including from DOJ, impacts how the City should plan and what services can reliably be funded in the coming year.

### 9.     San Diego

325.     San Diego has over $8 million in fifteen active grants from at least four different programs administered by DOJ, either directly or passed through the State of California. This federal funding was awarded to the City over the span of several years and generally funds critical law enforcement services to protect the health, safety, and welfare of the entire San Diego community.

326.    The grants at stake are the following:

a.    the Edward Byrne Justice Assistance Program, which funds the City's initiatives to control crime and strengthen the criminal justice system with respect to law enforcement and crime prevention programs;

b.    the DNA Capacity Enhancement for Backlog Reduction Program, which increases San Diego Police Department's (SDPD) capacity to process, record, and analyze forensic DNA at its crime labs;

c.    the Internet Crimes Against Children Task Force Program, which funds forensic and investigative components as well as training to develop an effective response to internet crimes targeting children and technology-facilitated child sexual exploitation; and

d.    the Paul Coverdell Forensic Science Improvement Grants Program, which provides funding to acquire and maintain accreditation for SDPD's crime labs, reduce backlogs, and improve the quality and timeliness of forensic science.

327.    These grants are critical for local law enforcement to maintain public safety in San Diego. And none of these grants relate to immigration enforcement or any community member's immigration status.

328.    All of the above-mentioned DOJ grant programs are set up to reimburse San Diego for eligible costs. In short, these grants require the expenditure of San Diego's own funds first with the expectation of federal reimbursement later. Already, San Diego has expended significant expenditures in eligible costs that have not yet been reimbursed.

329.    In total, San Diego has approximately $530 million in awarded federal grants. These federal grants and appropriations fund many essential services for San Diego's residents, including housing, emergency relief, infrastructure, public safety, and much more.

330.    Currently, San Diego faces a massive budget deficit of $258 million for fiscal year 2026 and a projected deficit of approximately $1 billion for the next five years.

331.    The Mayor has ordered a hiring freeze, along with restrictions on non-essential funding, a reassessment of San Diego's leases and contracts, and other potential cuts. With limited staff, money

and resources, the threat of prosecution further hinders the City's ability to provide essential services to its San Diego residents

332.    San Diego is making difficult decisions on cutting back essential services, projects and programs impacting the region. Losing federal funds now will cause irreparable harm, taking an enormous toll on a city that is already struggling to balance its budget sheet.

333.    The loss of federal funding would also have a detrimental impact on San Diego's ability to keep its residents safe, negatively impacting public safety and emergency preparedness. Thus, the federal government's directives to stop funding or pause millions of dollars in federal grants that the City has already been awarded harms public safety, public health, and local law enforcement's ability to protect all San Diego residents.

334.    Recent actions by the Trump Administration are impacting the budget outlook for San Diego.

335.    Due to the uncertainty involving a pause and/or termination of federal grants, San Diego has no choice but to use its own general fund, diverting money as well as resources from vital services and programs that residents depend upon. It also makes it nearly impossible for the City to maintain an accurate outlook in planning its future budgets.

### 10.    Sacramento

336.    Sacramento currently is expecting approximately $175 million in outstanding federal reimbursements that support public works, public safety, and medical services. For comparison, the City's annual budget is approximately $1.6 billion.

337.    Sacramento has more than $1.6 million in grants from DOJ grant programs. Active DOJ grant programs include the COPS hiring program, Byrne JAG, and National Public Safety Partnership Capacity Building. Sacramento uses these DOJ grants to fund:

      a.    Additional police officer positions;

      b.    An acoustic gunfire detection system for gun violence prevention and investigation efforts;

      c.    SPD's Digital Forensics Unit; and

      d.    Improving crime mapping.

338.    In addition, the Sacramento Police Department is also the grantee of the Urban Area Security Initiative (UASI) grant, a federal Department of Homeland Security grant program focused on preventing terrorism and improving the public safety infrastructure throughout the Sacramento region.

339.    Sacramento would suffer substantial harm if deprived of the funding it receives from the federal government or from DOJ.

340.    Sacramento would suffer significant harm if forced to alter its Sanctuary policy that preserves local resources for building "community safety and security, support for youth and education, economic development, and financial stability." Resolution 2017-0158, Sec. 1.

### 11.    Santa Cruz

341.    To build its 2024-25 fiscal year budget, the City of Santa Cruz anticipated receiving approximately $90.9 million from federal grants, including $26,813 from DOJ for its Bulletproof Vest Partnership Grant. Of the approximately $90.9 million in federal funds awarded, Santa Cruz has only received approximately $23.7 million. This leaves approximately $67.2 million in federal funds that have been awarded to Santa Cruz and yet remain uncollected.

342.    The remaining uncollected funds are intended to support programs across seven Santa Cruz departments: the Department of Economic Development and Housing; the City Manager's Office; the Police Department; the Fire Department; the Parks and Recreation Department; the Public Works Department; and the Water Department.

343.    If the federal government withholds Santa Cruz's nearly $70 million of awarded but uncollected federal funds, Santa Cruz faces a dire financial situation.

344.    Santa Cruz will struggle to provide essential public services, including emergency assistance, food, and shelter, which its residents rely on, and which Santa Cruz has already promised to deliver. In addition, Santa Cruz's ongoing projects, including critical water infrastructure, critical affordable housing development, and hazard mitigation construction, all risk significant delays or outright incompletion.

345.    The federal government's threats to withhold federal funds expose Santa Cruz to unprecedented budgetary uncertainty, making it nearly impossible to plan for and commit to future

projects and expenditures.

346.    The federal government's threats put Santa Cruz in a position where it may need to pause or cancel ongoing contracts, exposing the city to potential litigation from partners, contractors, and developers. Furthermore, the ongoing budgetary uncertainty may require Santa Cruz to reconsider its staffing, including by considering layoffs of employees across all departments. Losing these employees will drain Santa Cruz of a workforce full of faithful community members who have accumulated decades of crucial knowledge and experience as to how to serve and operate the city most effectively. Should Santa Cruz lose federal funding and later regain it, the city will struggle to rebuild this faithful, dedicated workforce because any employees let go will need to obtain new jobs to pay their rent, mortgages, utility bills, grocery bills, and support their families.

### 12.    Monterey

347.    Monterey County also depends on the ongoing and proper provision of federal funding. The County incorporates significant federal allocations and grants into its service provision efforts, including for the provision of basic public goods such as healthcare, disaster relief, and public safety. The County estimates that it has budgeted for some $480 million in direct federal funding over the last two years, representing roughly 13% of all money budgeted.

348.    Federal funding to Monterey County includes several million dollars in funding specifically from DOJ. Grants originating from DOJ supply funding to the Monterey County District Attorney and Sheriff's Offices. JustGrants and Edward Byrne Memorial Justice Assistance Grants are used by the County to reduce and solve violent crime; they provide for the prosecution of cold cases, the purchase of body worn cameras, and other tools to ensure that law enforcement officers, local officials, and the community can work together to keep Monterey safe.

349.    Monterey County is currently working through its annual budgeting process and operates federally funded programs on a daily basis. Threats from the federal executive to arbitrarily cut funding to localities such as Monterey cast doubt over the County's ongoing ability to provide basic services to its residents without significant disruption.

### 13.    Seattle

350.    Seattle relies heavily on federal funding. During the year beginning January 1, 2025,

Seattle has legal and appropriations authority to spend up to $370 million in federal grant funds. Among other priorities, these federal dollars provide services for vulnerable residents needing access to food, medical care, shelter, and other housing assistance. If that funding were eliminated, harms would be felt immediately.

351.    Seattle's federal funding also supports survivors of domestic violence and sexual assault in Seattle; without it, they would not receive important services.

352.    These grants will allow Seattle to make critical seismic upgrades in a high-risk earthquake-impact area. If that funding were lost, it would leave Seattle less protected from a potential earthquake.

353.    The Seattle Police Department is responsible for preventing crime, enforcing the law, and supporting quality public safety by delivering respectful, professional and dependable police services. In the coming year, the Police Department anticipates spending approximately $4 million in DOJ grant funds. The Seattle Police Department will use these funds to:

      a.    Employ a full-time investigator for domestic violence prosecutions;

      b.    Fund three Crime Prevention Coordinator police officer positions for 80% of each year;

      c.    Lead the Northwest Regional Internet Crimes Against Children Task Force;

      d.    Participate in a regional Human Trafficking Task Force through which the Seattle Police Department can seek justice and connect trafficking survivors to services; and

      e.    Fund investigative tools such as advanced DNA analysis to pursue unsolved sexual assault cases.

354.     Loss of DOJ funds would negatively impact not just Seattle, but the surrounding communities. For example, Seattle submits a joint application, on behalf of Seattle and more than 10 surrounding jurisdictions, for the DOJ Edward Byrne Memorial Justice Assistance Grant Program ("Byrne JAG"). These DOJ Byrne JAG grant funds allow participating jurisdictions to preserve and support a variety of law enforcement programs aimed at preventing and reducing crime, providing services to victims, purchasing much needed law enforcement and investigative equipment, enhancing

law enforcement training and officer safety, implementing community-based programs, providing law enforcement overtime, and improving technology systems.

355.    The Seattle Police Department also receives substantial federal funding from DHS that supports essential public safety initiatives and programs. These funds allow the Department to buy emergency response equipment and conduct preparedness activities that help it plan for, protect against, and respond to terrorist attacks and other hazards. The Seattle Police Department's 2025 Budget reflects $8 million in funds from the Department of Homeland Security, almost $4 million of which will likely be spent in 2025.

### 14.    Minneapolis

356.    Federal grants play an important role in funding the City's public safety and other operations. In 2024, direct and pass-through DOJ funds financed almost $1,800,000 of Minneapolis's expenditures. The City used DOJ funds to:

a. Fund recruitment of community members and college-aged candidates to pursue careers in the Minneapolis Police Department (Police Recruitment Through Pathways Encouraging Active Community Engagement);

b. Fund the inventorying, DNA testing, tracking and reporting DNA analysis of sexual assault kits inclusive of training, investigation and victim engagement and support activities (National Sexual Assault Kit Initiative);

c. Pay the salary and fringe benefits of an attorney who serves as a direct legal advisor to Minneapolis Police Department officers in police precincts, fund the addition and upgrading of police department equipment, and pay overtime costs for officers to address emerging or special enforcement (Edward Byrne Memorial Justice Assistance Grant); and

d. Fund an opioid addiction treatment program including medication, clinical care, and wrap-around services (Comprehensive Opioid, Stimulant, and Substance Abuse Program).

357.    None of the programs or services funded by DOJ dollars focus on immigration or include any element of immigration enforcement. These funds are used for local law enforcement, criminal investigation, harm reduction, and prosecution costs.

358.    The impact of the Executive Orders, which purports to impact not just DOJ funding but all federal funding, is even more significant.

359.    To date, in 2024, federal funding from many federal agencies including the Departments of Housing and Urban Development, Health and Human Services, Labor, and Transportation, financed approximately $54,360,000 of Minneapolis's programs and services, including essential programs like critical infrastructure improvements, creation and preservation of low-income housing, emergency shelter assistance for unhoused individuals, household radon, mold, lead, and pest mitigation, developing public health infrastructure and workforce, and provision of public safety services.

360.    In some cases, Minneapolis receives federal funding through formula grants (grants that are noncompetitive and allocated to grantees based on distribution formulas) and has built programs around the continuing nature of these funds. Final expenditures against 2024 grant funding will not be fully reconciled until later in 2025, so the 2024 total for federal funding may be higher. Minneapolis has largely obligated federal funding awarded to it in previous years. The City is relying on the federal government satisfying its contractual funding commitments to meet these obligations.

361.    Minneapolis is already facing difficult budgetary decisions and large projected tax levy increases because of decreasing commercial property values and the rising costs of providing municipal services. The loss of its anticipated federal grant funding would force the City to choose between cuts to municipal services or imposition of a historically large tax levy on its residents.

362.    The threat of loss of federal funds also creates confusion and uncertainty in the budget planning for Minneapolis.

363.    The City is currently planning its budget for 2026. Departments are now determining whether grant supported positions will be supported by grants in 2026. The Mayor must deliver a proposed budget to the City Council by August 2025. Without knowing whether certain federal funds

will be available for those positions will create significant uncertainty about those positions and the work those positions perform for the communities the City serves.

### 15. St. Paul

364.    The Executive Orders and the Bondi Memo threaten the City with the loss of federal funds. The threatened cuts are unrelated to immigration enforcement, and would have dramatic, far-reaching consequences for Saint Paul.

365.    Saint Paul has $192.2 million in federal funds currently under contract. The majority of these funds, roughly $139.4 million, is tied to one-time projects, largely capital investments. The remainder, approximately $52.7 million, consists of operational funding supporting ongoing programs and departments.

366.    In addition to the foregoing amounts, Saint Paul has been awarded $66.8 million in federal funds, and in the post-award phase of establishing work plans and executing contracts. The City has applied for additional amounts of federal grants totaling approximately $66.1 million.

367.    Last year, Saint Paul received $7,108,957 in funds from DOJ. These funds were used for, among other things, the partial funding of 15 full-time peace officer positions, a dedicated domestic violence investigator, overtime for community engagement and the investigation of serious crimes, and the Familiar Faces program, which engages frequent users of emergency and shelter services.

368.    If Saint Paul lost federal funding pursuant to the Executive Orders and/or the Bondi Memo, the impact would be substantial, put the full burden of infrastructure investments on local and state resources, and cause delays to pending projects. The ripple effect associated with this impact would last for decades.

369.    Examples of these effects include the following:

a.    Loss of 15 police officers the City plans to hire through the COPS Hiring Program.

b.    Loss of police academy training program and other pathways programs.

c.    Cuts to public safety programs supporting victims of violence and sexual assault, reduction in domestic violence, DWI enforcement, drug trafficking unit, traffic enforcement, and equipment for gathering evidence at crime scenes.

a. An indefinite interruption in the ten-year plan to replace the 26,000 lead service lines to households in the City, including, most immediately, low-income households in Saint Paul's East and North Side neighborhoods

370. The foregoing examples are not exclusive. Because Saint Paul relies on federal funds for its ongoing operations across many subject matter areas, and for many different purposes, it is not possible to identify each and every area in which the City would suffer significantly, were it to lose out on federal funds by operation of the Executive Orders. The effect of a complete loss of federal funds would be devastating for Saint Paul, its employees, and its residents.

### 16. Santa Fe

371. Santa Fe's budget relies on federal funding; in fiscal year 2024, it included over $14.5 million in federal funds. The federal funds included $5.9 million to support transit programs, $1.8 million for an airport capital improvement project, and $1.5 million to support affordable housing programming.

372. Federal grant revenue is the main funding source or a significant supplemental funding source for some city programs.

373. Santa Fe's budget for the current fiscal year includes $15.5 million in budgeted federal grant revenue. The impact of federal grants varies by program, with programs such as Transit, Seniors, and Affordable Housing particularly dependent on federal funding. In these programs, federal funding enables important projects that would not otherwise be possible. Interruptions in federal funding may cause disruptions to planned timelines and the delivery of essential services to the public.

374. Santa Fe is highly concerned about the implications of the federal funding directives. Santa Fe, and many of its nonprofit partners, relies on federal grants to support critical services and infrastructure projects. Any delays could disrupt operations and adversely impact the community.

375. In January 2025, Santa Fe entered into an agreement for $300,000 in DOJ funding from the Byrne Discretionary Grants Program. With this funding, Santa Fe will purchase needed equipment and training for the Fire Department's Mobile Integrated Health Team, a specialized unit that identifies, connects with, and provides case management to individuals in the community who

frequently require emergency services. The program allows Santa Fe to connect these individuals with resources to address their underlying needs and achieve healthier, more stable living situations.

376. Without DOJ funding, the Mobile Integrated Health Team would not be able to replace and improve the technology and vehicles it uses to serve the community. The team currently relies on laptop computers that are worn from several years of heavy use. Likewise, the vehicles the team currently uses are older models not conducive to the needs of the team. Without the funding, the team would have limited and delayed capacity to provide services, and it would serve fewer persons per day.

## C. Plaintiffs Face Operational Harms in Serving Their Communities

377. Despite court orders and precedent foreclosing Defendants' understanding of the law, Defendants' actions have fostered an atmosphere of fear and distrust between undocumented immigrants and local government officials in Plaintiffs' jurisdictions. The threats of criminal and civil prosecution leveled at local officials, combined with recent ICE activity in Plaintiffs' communities, and compounded by the Trump Administration's statements about immigration enforcement, have also generated a maelstrom of fear and confusion and have left local agencies unsure of whether efforts to serve the undocumented community will be treated as grounds for prosecution.

378. By heightening undocumented immigrants' concerns that any interaction with local officials will lead to their information being turned over to ICE, the Executive Order discourages undocumented immigrants from reporting crimes, seeking public health services, and otherwise engaging with programs and services provided by Plaintiffs. This threat harms public safety, public health, and Plaintiffs' ability to act in what they have determined to be the best interest of their residents, consistent with federal and state law.

379. The Executive Orders undermines Plaintiffs' ability to provide critical services not just to undocumented immigrants, but to all residents. When witnesses and crime victims will not talk to the police, law enforcement suffers and the entire community is less safe. When children are not vaccinated or the sick are not treated for communicable diseases, illness spreads throughout the community.

380.     At the same time, the repeated threats of criminal and civil prosecution, in Executive Order 14,159, the Bove and Bondi Memos, and in repeated statements from Trump Administration officials, has left local officials fearful that complying with Plaintiffs' laws and serving undocumented residents will subject them to civil or criminal prosecution.

381.     These threats and fears fall disproportionately on public servants on the front lines of providing critical public safety and public health needs for residents of Plaintiffs' jurisdictions. For example, the Executive Orders and the Bondi Memo have already started to cause confusion and harm to Portland. Portland and its employees are required to follow both Oregon and federal law. Threats of prosecution impact front-line workers—police officers, firefighters, front desk staff at community centers—who will be required to make decisions in an interaction with immigration-enforcement officers that is consistent with all those laws. Threats of prosecution by DOJ do nothing to resolve the legal and policy disputes between local leaders and the federal government. Instead, they instill fear and uncertainty in public servants—employees simply trying to do their jobs consistent with the laws.

382.     Portland has been forced to consider ways to protect and assist such employees, promulgate additional guidance, and manage confusion surrounding the Executive Orders and the Bondi Memo.

383.     Similarly, Defendants' threats to prosecute employees of so-called sanctuary jurisdictions has caused considerable distress and consternation within the King County work force. King County has been forced to dedicate resources toward creating and adopting new protocols to mitigate the federal threat to frontline workers while continuing to enforce KWW and KCC 2.15. King County has expended sums placing a federal criminal defense attorney on retainer in anticipation of a federal prosecution.

384.     In Minneapolis, the federal government's threats have generated significant fear and uncertainty and affected the City's ability to deliver critical information and connections to resources and services to immigrant and refugee communities. Despite consistent City efforts to communicate City policies, including that the Minneapolis Police Department does not enforce federal immigration law, members of the Minneapolis community have expressed confusion, uncertainty, and fear about interacting with government. For example, anecdotal reports indicate that residents are afraid to appear

at scheduled court hearings with City prosecutors due to fear of immigration detention at the county courthouse in Minneapolis. The dynamic of uncertainty created by the executive orders and announcements from the federal government that cities perceived as "sanctuary" cities will face enhanced enforcement also extends to City employees. Threats from the federal government have created concern among City employees and officials that they may face legal challenge including criminal prosecution for doing their jobs, despite the fact that their conduct is lawful.

385.     These operational concerns are further exacerbated by the federal government's *Illinois* and *New York* lawsuits challenging many of the very same requirements that officials in Plaintiffs' jurisdictions are required to comply with under applicable local laws.

## CAUSES OF ACTION
### COUNT ONE
### TENTH AMENDMENT

386.     Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs as if fully set forth herein.

387.     The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const., amend X. This provision prohibits the federal government from "commandeering" state and local officials to help enforce federal law. *See Printz*, 521 U.S. at 925 ("the Federal Government may not compel the States to implement, by legislation or executive action, federal regulatory programs.").

388.     Neither the Supremacy Clause, the INA, nor any federal statute displaces Plaintiffs' Tenth Amendment interest in refraining from deploying local resources to enforce federal immigration law. *United States v. California*, 921 F.3d at 890–91.

389.     As described above and in the Third Cause of Action below, Defendants violate the Tenth Amendment and seek to commandeer Plaintiffs because Executive Orders 14,159 and 14,218 and the Bondi Memo attempt to use the spending power to coerce them into acting as arms of the federal government.

390.     Executive Order 14,159 and the Bondi Memo also require Plaintiffs to enforce federal

immigration law—including using local resources to hold individuals pursuant to civil immigration detainers and administrative warrants and share confidential personal information, including release dates for individuals in custody, with immigration authorities—on penalty of civil or criminal prosecution.

391.    By restricting funding and directing enforcement against Plaintiffs for limiting cooperation with federal immigration authorities, Defendants seek to commandeer Plaintiffs in furtherance of a federal regulatory program in violation of the Tenth Amendment to the United States Constitution.

**COUNT TWO**

**SEPARATION OF POWERS**

392.    Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs as if fully set forth herein.

393.    The Constitution vests Congress with legislative powers, *see* U.S. Const. art. 1, § 1, the spending power, *see* U.S. Const. art. 1, § 8, cl. 1, and the appropriation power, *see* U.S. Const. art. 1, § 9, cl. 7. Absent a statutory provision or an express delegation, only Congress is entitled to attach conditions to federal funds.

394.    "The Framers viewed the legislative power as a special threat to individual liberty, so they divided that power to ensure that 'differences of opinion' and the 'jarrings of parties' would 'promote deliberation and circumspection' and 'check excesses in the majority.'" *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 223 (2020) (quoting The Federalist No. 70, at 475 (A. Hamilton) and citing *id.*, No. 51, at 350).

395.    "As Chief Justice Marshall put it, this means that 'important subjects . . . must be entirely regulated by the legislature itself,' even if Congress may leave the Executive 'to act under such general provisions to fill up the details.'" *West Virginia v. EPA*, 597 U.S. 697, 737 (2022) (Gorsuch, J., concurring) (quoting *Wayman v. Southard*, 10 Wheat. 1, 42–43, 6 L.Ed. 253 (1825)).

396.    The separation of powers doctrine thus represents perhaps the central tenet of our constitution, *see, e.g.*, *Trump v. United States*, 603 U.S. 593, 637–38 (2024); *West Virginia v. EPA*, 597 U.S. at 723–24, *Seila Law LLC*, 591 U.S. at 227, and consistent with these principles, the

executive acts at the lowest ebb of his constitutional authority and power when he acts contrary to the express or implied will of Congress. *Youngstown Sheet & Tube Co.*, 343 U.S. at 637 (Jackson, J., concurring).

397.    Pursuant to the separation of powers doctrine, the Executive Branch may not "claim[] for itself Congress's exclusive spending power, . . . [or] coopt Congress's power to legislate." *City & Cnty. of S.F.*, 897 F.3d at 1234.

398.    Congress has not conditioned the provision of federal funding on compliance with Defendants' immigration enforcement policies and requests.

399.    Congress has not delegated to Defendants the authority to impose immigration-enforcement conditions on federal funds.

400.    Through Executive Orders 14,159 and 14,218 and the Bondi Memo, Defendants are unilaterally imposing new conditions on federal funding without authorization from Congress.

401.    In addition, through these actions, Defendants are legislating new sanctions for failure to comply with immigration enforcement authorities that are unsupported by any act of Congress, including under the INA, or by the Constitution.

402.    For these reasons, Defendants' conditioning of federal funding on local governments' cooperation with immigration enforcement violates principles of separation of powers.

### COUNT THREE

### SPENDING CLAUSE

403.    Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs as if fully set forth herein.

404.    The Spending Clause of the U.S. Constitution provides that "Congress"—not the Executive—"shall have Power to lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States . . . ." U.S. Const. art. I,§ 8, cl. 1.

405.    As described above, Defendants violate separation of powers principles because the funding restrictions in Executive Orders 14,159 and 14,218 and the Bondi Memo are not authorized by Congress, expressly or impliedly, and therefore violate the Spending Clause as well.

406. Even if Congress had delegated its authority to impose conditions on federal funds, the funding restrictions in Executive Orders 14,159 and 14,218 and the Bondi Memo would violate the Spending Clause by:

a. imposing conditions that are ambiguous, *see Pennhurst*, 451 U.S. at 17 ("The legitimacy of Congress' power to legislate under the spending power…rests on whether the State voluntarily and knowingly accepts [Congress' conditions]… There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it…[I]f Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously.");

b. imposing conditions that are not germane to the stated purpose of the [program name] funds, *see Dole*, 483 U.S. at 207 ("[C]onditions on federal grants might be illegitimate if they are unrelated 'to the federal interest in particular national projects or programs.'");

c. imposing conditions that are so severe as to coerce Plaintiffs, *see Sebelius*, 567 U.S. at 579 (opinion of Roberts, C.J.) (Congress may not impose conditions so severe that they "cross[] the line distinguishing encouragement from coercion."); and

d. imposing conditions that would require Plaintiffs to act unconstitutionally by detaining individuals based on civil detainers without a finding of probable cause, *Dole*, 483 U.S. at 210 (Congress's spending power "may not be used to induce the States to engage in activities that would themselves be unconstitutional.").

COUNT FOUR

**FIFTH AMENDMENT DUE PROCESS: VOID FOR VAGUENESS**

407. Under the Fifth Amendment to the United States Constitution, a federal law is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Williams*, 553 U.S. at 304.

408. The constitutional vagueness standard applies with full force to executive orders. *See United States v. Soussi*, 316 F.3d 1095, 1101 (10th Cir. 2002). When an executive order contains terms

that are not "susceptible of a clear meaning," nor "mitigate the vagueness of the term by supplying any definition," then the provision "lends itself to subjective interpretation" and is unconstitutional. *Humanitarian Law Project v. U.S. Dep't of Treasury*, 463 F. Supp. 2d 1049, 1070 (C.D. Cal. 2006).

409. Section 17 of Executive Order 14,159, which refers to "sanctuary jurisdictions," fails to meaningfully define key terms, such as "sanctuary jurisdictions," "Federal funds," or "practices that interfere with the lawful exercise of Federal law." 90 Fed. Reg. at 8446. Nonetheless, having such a "practice" subjects a jurisdiction to "criminal or civil" actions, which could be draconian in nature. *Id.* What such a practice might be is left undefined, and subject to the Executive Branch's unbridled discretion.

410. Section 2(a)(ii) of Executive Order 14,218, which refers to "sanctuary" policies, fails to meaningfully define key terms, such as "sanctuary policies" or "Federal payments," or what constitutes "seek[ing] to shield illegal aliens from deportation" or "abet[ting] sanctuary policies," instead leaving these terms subject to the Executive Branch's unbridled discretion.

411. While court orders and precedent clearly define the limits of what the federal government can demand, the Executive Branch has already demonstrated its eagerness to exercise this unbridled discretion to reach into states and local jurisdictions to interfere with their ordinances, operations, and processes. Such a vast, standardless, and overbroad power invites arbitrary, subjective, and discriminatory enforcement.

412. Executive Order 14,159 purports to grant the Attorney General and the Secretary of Homeland Security unfettered discretion to decide which states or local governments are "sanctuary jurisdictions" that are now subject to criminal or civil action, and will have their funding paused, terminated, and/or clawed back.

413. Other portions of Executive Order 14,159 are equally vague. Section 8, for example, requires assessment of "fines and penalties" against "aliens unlawfully present in the United States" but also anyone who "facilitate[s] such aliens' presence in the United States." 90 Fed. Reg. at 8445. It is unclear what Defendants understand "facilitate" to mean in this context, and the Order could be read to apply to employees of Plaintiffs who provide undocumented persons with basic, safety-net services, or landlords, employers, friends, family, churches or non-profit organizations that assist undocumented

persons. Not only does this standardless provision exceed the President's authority by legislating through executive order, but it also encourages and sanctions arbitrary, subjective, and discriminatory enforcement.

414.    Executive Order 14,218 is likewise vague and leaves it to the Executive Branch's discretion to determine what constitutes a "sanctuary" policy, what "federal payments" may be withheld, and what it means for a federal payment to "abet" sanctuary policies.

415.    The DOJ memos are equally vague and lean into the unfettered discretion purportedly granted to them by the Executive Order. The Bove Memo directs "the newly established Sanctuary Cities Enforcement Working Group … to identify state and local laws, policies, and activities that are inconsistent with Executive Branch immigration initiatives," but does not define what would be encompassed within the expansive phrase "inconsistent with Executive Branch immigration initiatives."

416.    The Bondi Memo purports to define "[s]o-called 'sanctuary jurisdictions'" to "include state or local jurisdictions that refuse to comply with 8 U.S.C. § 1373, refuse to certify compliance with § 1373, or willfully fail to comply with other applicable federal immigration laws." But this definition is circular and fails to provide any more "fair notice of what is prohibited" than Executive Order 14,159 does. *Williams*, 553 U.S. at 304. Crucially, the Memo "does not make clear what conduct might subject a state or local jurisdiction to defunding or enforcement action, making it impossible for jurisdictions to determine how to modify their conduct, if at all, to avoid … penalties." *Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d at 535. Furthermore, use of the word "include" suggests that even a jurisdiction that does comply with Section 1373 could still be considered a "sanctuary jurisdiction" subject to defunding and prosecution under Executive Order 14,159 and the Bondi Memo.

417.    The lack of notice or procedure for how a local government is to be designated a "sanctuary jurisdiction" is particularly problematic when DOJ appears to have very recently taken on an expansive reinterpretation of 8 U.S.C. § 1373 that is likely contrary to how courts have interpreted the law. In other words, DOJ is now prosecuting jurisdictions for their ordinances and policies, when courts have previously held similar ordinances to be lawful and *not* in conflict with federal

immigration enforcement laws. *See United States v. State of Illinois*, No. 1:25-cv-1285 (N.D. Ill. filed Feb. 6, 2025); *United States v. New York*, No. 1:25-cv-00205 (N.D.N.Y. filed Feb. 12, 2025); *compare Barr*, 965 F.3d at 764 ("Plaintiffs' respective sanctuary laws comply with 8 U.S.C. § 1373."); *Steinle v. City & Cnty. of S.F.*, 919 F.3d 1154, 1164 (9th Cir. 2019) (local policy not to share release date information of an inmate who is also an alien not preempted under the plain language of 8 U.S.C. § 1373); *United States v. California*, 921 F.3d at 891 (state law restricting information sharing with federal immigration enforcement officials did not conflict with 8 U.S.C. § 1373); *see also Garland*, 42 F.4th at 1085–86 (Oregon's laws conserving use of state resources from being used to enforce federal immigration laws did not conflict with 8 U.S.C. § 1373).

418.    The reversal of policy effectuated by the Bondi Memo, without explanation, and without heed to the fact that it is *not* the province of the Executive Branch to say what the law is, *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 388–89 (2024), also violates fair notice requirements of the Fifth Amendment. *See FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 254 (2012).

### COUNT FIVE

### FIFTH AMENDMENT DUE PROCESS: PROCEDURAL DUE PROCESS

419.    Under the Fifth Amendment to the United States Constitution, the federal government may not deprive Plaintiffs of money or property without "due process of law."

420.    Plaintiffs each have a constitutionally protectable property interest in the federal funds they rely on to provide essential services to their residents. Plaintiffs' property interest in those federal funds is established and governed by rules and mutually explicit understandings with the federal government.

421.    Section 17 of Executive Order 14,159 and the Bondi Memo deprive the Plaintiffs of their procedural due process rights under the Fifth Amendment because they grant the Attorney General, DOJ, and the DHS Secretary unfettered discretion to "ensure that" so-called "'sanctuary jurisdictions'" "do not receive access to Federal funds from the Department."

422.    Section 2(a)(ii) of Executive Order 14,218 deprives the Plaintiffs of their procedural due process rights under the Fifth Amendment because it appears to grant Executive Branch agencies

1    unfettered discretion to condition or withhold "Federal payments" that they deem to "abet"

2    "sanctuary" policies.

3    423.    The Bondi Memo's thin reference that DOJ, when terminating or clawing back funds

4    from awardees it has deemed to be sanctuary jurisdictions, "shall comply with any notice and

5    procedural requirements in the award, agreement, or other instrument" does not insulate the Memo's

6    defunding threats from a Fifth Amendment challenge. Notwithstanding any notice or procedures

7    pursuant to terms of awarded funding that this sentence refers to, local jurisdictions have no way to

8    know if or when they have been designated by DOJ a "sanctuary jurisdiction" in the first place, or

9    have an opportunity to be heard to dispute that designation prior to initiation of proceedings against a

10   jurisdiction's funding or against the jurisdiction itself. *See Cnty. of Santa Clara v. Trump*, 250 F. Supp.

11   3d at 536.

12   424.    Moreover, the Bondi Memo's directive to "[a]ll litigating components of the

13   Department of Justice and each U.S. Attorneys' Office" to take action against local governments,

14   appears designed to chill lawful ordinances and policies that limit the use of local resources to assist

15   with federal immigration enforcement, and to coerce jurisdictions into abandoning those policies. The

16   Bondi Memo provides no mechanism by which a state or local government may review, challenge, or

17   even obtain notice that it has been designated a "sanctuary jurisdiction."

18   425.    The Bondi Memo's self-serving statements that the defunding and enforcement actions

19   contemplated will be "consistent with" the law do not shield the Administration from the Fifth

20   Amendment. *See Doe v. Harris*, 772 F.3d 563, 580–81 (9th Cir. 2014); *see also United States v.*

21   *Stevens*, 559 U.S. 460, 480 (2010) ("We would not uphold an unconstitutional statute merely because

22   the Government promised to use it responsibly."); *City & Cty. of S.F. v. Trump*, 897 F.3d at 1240 ("If

23   'consistent with law' precludes a court from examining whether the Executive Order is consistent with

24   law, judicial review is a meaningless exercise, precluding resolution of the critical legal issues.").

25   These statements are also likely illusory, given the several actions that the Administration has taken,

26   particularly with respect to federal funding, since January 20, 2025 that have already been held to be

27   unconstitutional by courts across the country. *See, e.g.*, Mem. Op. & Order, ECF No. 30, *Nat'l Council*

28   *of Nonprofits* (D.D.C. Feb. 3, 2025) (TRO against OMB directive); ECF No. 50, *New York* (D.R.I.

filed Jan. 28, 2025) (same); Preliminary Injunction, ECF No. 114, *State of Washington v. Trump*, No. 25-cv-00127 (W.D. Wash. Feb. 6, 2025) (granting preliminary injunction against Executive Order ending birthright citizenship for children born to certain noncitizen parents).

426.    Because the Executive Orders and the Bondi Memo deprive the Plaintiffs of a cognizable property interest while providing no notice, no pre-deprivation opportunity to be heard, and no post-deprivation opportunity to be heard, they violate the Fifth Amendment's due process clause.

**COUNT SIX**

**VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)**

(ARBITRARY AND CAPRICIOUS)

427.    Plaintiffs repeat and incorporate by reference each of the allegations of the prior paragraphs as if fully set forth herein.

428.    Defendant DOJ is an "agency" as defined in the APA, 5 U.S.C. § 551(1), and the Bondi Memo is an agency action subject to review under the APA.

429.    Final agency actions (1) "mark the 'consummation' of the agency's decision-making process" and (2) are ones "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 178 (1997).

430.    The Bondi Memo is a final agency action because it announces a final decision to pause funding on a blanket basis at a certain time and thus marks the consummation of DOJ's decision-making process.

431.    Further, the Bondi Memo is an action determining rights or obligations or from which legal consequences will flow because it exercises a purported authority held by DOJ to stop funding directed by Congress that would be provided but for the Bondi Memo.

432.    Under the APA, a "court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

433.    "An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'" *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). A court must therefore "ensure, among other things, that the

agency has offered 'a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made.'" *Id.* (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983)). "[A]n agency cannot simply ignore 'an important aspect of the problem'" addressed by its action. *Id.* at 293.

434.    As described above, the Bondi Memo provides no reasoned explanation for the extreme breadth of the withholding of funding to Plaintiffs or precipitous timing of that withholding.

435.    The Bondi Memo provides no reasoned basis for withholding funds Congress appropriated for disbursement, including via formula grants, except to the extent they make clear that the Executive Order enacts the President's policy desires in place of Congress's intent.

436.    The Bondi Memo also ignores essential aspects of the "problem" it purports to address, including the reasonable and inevitable reliance by Plaintiffs on now-suddenly frozen funding, the expectation of reimbursement from already appropriated funds, and the need for clarity by local governments about funding streams to provide day-to-day services relied on by their citizens.

437.    Plaintiffs therefore ask the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that the Bondi Memo violates the APA because it is arbitrary and capricious; vacate the Bondi Memo under 5 U.S.C. § 706; provide preliminary relief under 5 U.S.C. § 705; and preliminary and permanently enjoin Defendants from implementing or enforcing the Bondi Memo.

### COUNT SEVEN

### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)

(CONTRARY TO CONSTITUTION)

438.    Plaintiffs repeat and incorporate by reference each of the allegations of the prior paragraphs as if fully set forth herein.

439.    Under the APA, a "court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

440.    As described above, the Bondi Memo violates bedrock constitutional provisions and principles including the separation of powers between the president and Congress, the Spending

Clause, the Take Care Clause, the Presentment Clause, the Appropriations Clause, and the Tenth Amendment.

441.    Plaintiffs therefore ask the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that the Bondi Memo violates the APA because it is contrary to constitutional rights, powers, privileges, or immunities; vacate the Bondi Memo under 5 U.S.C. § 706; provide preliminary relief under 5 U.S.C. § 705; and preliminary and permanently enjoin Defendants from implementing or enforcing the Bondi Memo.

**COUNT EIGHT**

**VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2) (C)**

(IN EXCESS OF STATUTORY AUTHORITY)

442.    Plaintiffs repeat and incorporate by reference each of the allegations of the prior paragraphs as if fully set forth herein.

443.    Under the APA, a "court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

444.    Defendants may exercise only authority granted to them by statute.

445.    No law or provision of the Constitution authorizes DOJ to withdraw properly obligated federal funds or to impose extra-statutory conditions not authorized by Congress. Defendants exceed the statutory authority of several laws which do concern federal payments.

446.    First, "[a]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law," 31 U.S.C. § 1301(a). Federal agencies necessarily lack the authority to freeze funds immediately, categorically, and indefinitely, particularly where the stated purpose of that freeze is to pause, cancel, or reallocate funding to sources which do not align with the purpose for which those funds were appropriated by Congress.

447.    No appropriations act authorizes Defendants to unliterally pause, withhold, or conditions federal payments without congressional authorization. *See, e.g*., Inflation Reduction Act of 2022, Public Law 117-169; Infrastructure Investment and Jobs Act, Public Law 117-58; Consolidated

Appropriations and Extensions Act of 2024, Public Law 118-42; Consolidated Appropriations and Extensions Act of 2025, Public Law 118-83.

448.    Second, the Impoundment Control Act of 1974 requires the President to notify and request authority from Congress to rescind or defer funds *before* acting to withhold or pause federal payments. 2 U.S.C. §§ 681 *et seq*. The President has not done so.

449.    Defendants have no authority to withhold funding from Plaintiffs without considering the statutes, regulations, and terms governing each source of funding. The blanket freeze of DOJ funding is blatantly illegal.

450.    Plaintiffs therefore ask the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that the Bondi Memo violates the APA because it is in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; vacate the Bondi Memo under 5 U.S.C. § 706; provide preliminary relief under 5 U.S.C. § 705; and preliminary and permanently enjoin Defendants from implementing or enforcing the Bondi Memo.

### PRAYER FOR RELIEF

Wherefore, Plaintiffs pray that the Court grant the following relief:

1.    A declaration that Section 17 of Executive Order 14,159 is unconstitutional and invalid on its face;

2.    A declaration that Section 17 of Executive Order 14,159 is unconstitutional and invalid as applied to the local laws and policies identified in this complaint;

3.    A declaration that the portion of Section 2(a)(ii) of Executive Order 14,218 relating to "sanctuary" policies is unconstitutional and invalid on its face;

4.    A declaration that the portion of Section 2(a)(ii) of Executive Order 14,218 relating to "sanctuary" policies is unconstitutional and invalid as applied to the local laws and policies of identified in this complaint;

5.    A declaration that local laws and policies that limit (1) the honoring of civil immigration detainer requests; (2) cooperation with administrative warrants for purposes of immigration enforcement; (3) sharing of information with federal immigration authorities other than immigration or citizenship status; (4) the use of local law enforcement to arrest or detain individuals

solely for civil immigration violations; or (5) the use of local resources to assist with immigration

enforcement activities, do not violate federal law, including 8 U.S.C. § 1373 and 8 U.S.C. § 1324.

6.      A preliminary and permanent injunction enjoining Defendants from enforcing Section

17 of Executive Order 14,159, or taking any other action in furtherance of any withholding or

conditioning of federal funds based on Section 17 of Executive Order 14,159 or taking enforcement

actions against Plaintiffs based on the laws and policies identified in this complaint;

7.      A preliminary and permanent injunction enjoining Defendants from enforcing the

portion of Section 2(a)(ii) of Executive Order 14,218 relating to "sanctuary" policies, or taking any

other action in furtherance of any withholding or conditioning of federal payments based on that

portion of Section 2(a)(ii) of Executive Order 14,218;

8.      A preliminary and permanent injunction enjoining Defendants from implementing the

funding pause or the unlawful funding conditions directed by the Bondi Memo, or taking enforcement

action against Plaintiffs based on the laws and policies identified in this complaint;

9.      Award Plaintiffs reasonable costs and attorneys' fees; and

10.     Grant any other further relief that the Court deems fit and proper.

Dated:  February 27, 2025                    DAVID CHIU
                                             City Attorney
                                             YVONNE R. MERÉ
                                             Chief Deputy City Attorney
                                             MOLLIE M. LEE
                                             Chief of Strategic Advocacy
                                             SARA J. EISENBERG
                                             Chief of Complex and Affirmative Litigation
                                             NANCY E. HARRIS
                                             KARUN A. TILAK
                                             Deputy City Attorneys

                                       By:   /s/ David Chiu
                                             DAVID CHIU
                                             Deputy City Attorney

                                             Attorneys for Plaintiff
                                             CITY AND COUNTY OF SAN FRANCISCO

TONY LOPRESTI
County Counsel
KAVITA NARAYAN
Chief Assistant County Counsel
MEREDITH A. JOHNSON
Lead Deputy County Counsel
STEFANIE L. WILSON
RAJIV NARAYAN
Deputy County Counsels
BILL NGUYEN
Litigation Fellow

By: */s/Tony LoPresti*
TONY LOPRESTI
County Counsel

Attorneys for Plaintiff
COUNTY OF SANTA CLARA


ROBERT TAYLOR
Portland City Attorney

By: */s/ Naomi Sheffield*
NAOMI SHEFFIELD*
Chief Deputy City Attorney
1221 SW Fourth Avenue, Room 430
Portland, OR 97204
Tel: (503) 823-4047
Fax: (503) 823-3089
Naomi.Sheffield@portlandoregon.gov

*Application for admission pro hac vice forthcoming*

Attorneys for Plaintiff
CITY OF PORTLAND

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DOW CONSTANTINE
King County Executive

By: DAVID J. HACKETT*
General Counsel to King County
Executive
Chinook Building
401 5th Avenue, Suite 800
Seattle, Washington, 98104
(206) 477-9483
David.hackett@kingcounty.gov
PAUL J. LAWRENCE*
Pacifica Law Group
1191 2nd Avenue, Suite 2000
Seattle, WA 98101-3404
(206) 245-1708
Paul.Lawrence@pacificalawgroup.com

*Application for admission pro hac vice forthcoming*

Attorney for Plaintiff
MARTIN LUTHER KING, JR. COUNTY


PATRICIA KING
New Haven Corporation Counsel

By: /s/ Patricia King
PATRICIA KING*
Office of the Corporation Counsel
City of New Haven
165 Church Street-4th Floor
New Haven, CT 06510
Tel:   203-946-7951
Cell: 203-668-9282
Fax:  203-946-7942
pking@newhavenct.gov

*Application for admission pro hac vice forthcoming*

Attorney for Plaintiff
CITY OF NEW HAVEN

1  RYAN RICHARDSON
   Oakland City Attorney
2
   By:  */s/ Ryan Richardson*
3       RYAN RICHARDSON
        City Attorney
4       MARIA BEE
        Chief Assistant City Attorney
5       JAMIE HULING DELAYE
        Supervising City Attorney
6       H. LUKE EDWARDS
        Deputy City Attorney
7       One Frank H. Ogawa Plaza, 6th Floor
        Oakland, CA 94612
8       Tel: (510) 238-6629
        Fax: (510) 238-6500
9       Email: RRichardson@OaklandCityAttorney.org
10
        Attorneys for Plaintiff
11      CITY OF OAKLAND
12

13      JOHN I. KENNEDY
        City Attorney
14
   By:  */s/ John I. Kennedy*
15      JOHN I. KENNEDY, City Attorney
        1333 Park Ave, Emeryville, CA 94608-3517
16      Phone: 510-596-4381
        Fax: 510-596-3724
17      Email: John.Kennedy@emeryville.org
18
        Attorney for Plaintiff
19      CITY OF EMERYVILLE
20

21      NORA FRIMANN
        City Attorney
22
   By:  */s/ Nora Frimann*
23      NORA FRIMANN, City Attorney
        ELISA TOLENTINO, Chief Deputy City Attorney
24      200 E Santa Clara St
        San José, CA 95113-1905
25      Tel: 408-535-1900
        Fax: 408-998-3131
26      cao.main@sanjoseca.gov
27
        Attorneys for Plaintiff
28      CITY OF SAN JOSÉ

1

2

HEATHER FERBERT
City Attorney

3

By: */s/ Mark Ankcorn*
    MARK ANKCORN, Senior Chief Deputy City Attorney

4

    JULIE RAU, Deputy City Attorney
    1200 Third Avenue, Suite 1100

5

    San Diego, California 92101-4100
    Tel: (619) 533-5800

6

7

    Attorneys for Plaintiff
    CITY OF SAN DIEGO

8

9

SUSANA ALCALA WOOD
City Attorney

10

By: */s/ Andrea Velasquez*

11

    ANDREA VELASQUEZ, Supervising Deputy City
    Attorney

12

    915 I St Fl 4, Sacramento, CA 95814-2621
    Tel: 916-808-5346

13

    Fax: 916-808-7455
    Email: AVelasquez@cityofsacramento.org

14

15

    Attorneys for Plaintiff
    CITY OF SACRAMENTO

16

17

By: */s/ Anthony P. Condotti*

18

    Anthony P. Condotti, City Attorney
    Catherine M. Bronson, Assistant City Attorney

19

    Claire Hard, Deputy City Attorney
    PO Box 481

20

    Santa Cruz, CA 95061
    Tel: 831-423-8383

21

    Email: tcondotti@abc-law.com
    chard@abc-law.com

22

    cbronson@abc-law.com

23

    Attorneys for Plaintiff

24

    CITY OF SANTA CRUZ

25

26

27

28

1

2

SUSAN K. BLITCH
County Counsel

3    By: /s/ Susan K. Blitch
SUSAN K. BLITCH, County Counsel
4    HENRY BLUESTONE SMITH, Deputy County Counsel
168 W Alisal St Fl 3rd
5    Salinas, CA 93901-2439
Tel: 831-755-5045
6    Fax: 831-755-5283
Email: SmithHB@countyofmonterey.gov

7

8    Attorneys for Plaintiff
COUNTY OF MONTEREY

9

10    ANN DAVISON
Seattle City Attorney

11

By: /s/ Kerala Cowart
12    Kerala Cowart, Assistant City Attorney*
Ann Davison, Seattle City Attorney*
13    Dallas LePierre, Assistant City Attorney*
Rebecca Widen, Assistant City Attorney*
14    Seattle City Attorney's Office
701 Fifth Avenue, Suite 2050
15    Seattle, WA 98104
Tel: (206) 684-8200
16    E-mail: Kerala.Cowart@seattle.gov

17    *Application for admission pro hac vice forthcoming

18    Attorneys for Plaintiff
CITY OF SEATTLE

19

20

21

22

23

24

25

26

27

28

KRISTYN ANDERSON
City Attorney

By: */s/ Kristyn Anderson*
    KRISTYN ANDERSON (MN Lic. 0267752)*
    SARA J. LATHROP, Assistant City Attorney (MN Lic.
    0310232)*
    SHARDA ENSLIN, Assistant City Attorney (MN Lic.
    0389370)*
    350 South Fifth Street
    Minneapolis, MN 55415
    Tel: 612-673-3000
    Email: kristyn.anderson@minneapolismn.gov
    sara.lathrop@minneapolismn.gov
    sharda.enslin@minneapolismn.gov

    *Application for admission pro hac vice forthcoming*

    Attorneys for Plaintiff
    CITY OF MINNEAPOLIS


LYNDSEY OLSON
City Attorney

By: */s/ Lyndsey Olson*
    LYNDSEY OLSON, City Attorney (MN Lic. #
    0332288)*
    ANTHONY G. EDWARDS, Assistant City Attorney
    (MN Lic. # 0342555)*
    400 City Hall and Courthouse
    15 Kellogg Boulevard West
    Saint Paul, Minnesota 55102
    Tel: 651-266-8710
    Fax: 651-298-5619
    Email: Anthony.Edwards@ci.stpaul.mn.us

    *Application for admission pro hac vice forthcoming*

    Attorneys for Plaintiff
    CITY OF ST. PAUL

1

2

ERIN K. McSHERRY
City Attorney

3

By: /s/ Erin K. McSherry
ERIN K. McSHERRY, City Attorney*

4

200 Lincoln Avenue
Post Office Box 909

5

Santa Fe, NM 87504-0909
(505) 955-6967

6

Email: mdmartinez@santafenm.gov

7

*Application for admission pro hac vice forthcoming

8

Attorney for Plaintiff
CITY OF SANTA FE

9

10

By: /s/ Naomi Tsu
NAOMI TSU (admitted PHV)

11

JILL HABIG (CA Bar No. 268770)
Public Rights Project

12

490 43rd Street, Unit #115
Oakland, CA 94609

13

Tel: (510) 738-6788

14

jill@publicrightsproject.org
naomi@publicrightsproject.org

15

Attorneys for Plaintiffs

16

CITIES OF MINNEAPOLIS, NEW HAVEN,
PORTLAND, ST. PAUL, SANTA FE, and SEATTLE

17

18

19

20

21

22

23

24

25

26

27

28

1

**FILER'S ATTESTATION**

2

I, DAVID CHIU, am the ECF user whose identification and password are being used to file

3

this FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF.

4

Pursuant to Civil Local Rule 5-1(i)(3), I hereby attest that the other above-named signatories concur in

5

this filing.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

Federal Register / Vol. 90, No. 18 / Wednesday, January 29, 2025 / Presidential Documents    8443

# Presidential Documents

Executive Order 14159 of January 20, 2025

## Protecting the American People Against Invasion

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Immigration and Nationality Act (INA) (8 U.S.C. 1101 *et seq.*) and section 301 of title 3, United States Code, it is hereby ordered:

**Section 1**. *Purpose.* Over the last 4 years, the prior administration invited, administered, and oversaw an unprecedented flood of illegal immigration into the United States. Millions of illegal aliens crossed our borders or were permitted to fly directly into the United States on commercial flights and allowed to settle in American communities, in violation of longstanding Federal laws.

Many of these aliens unlawfully within the United States present significant threats to national security and public safety, committing vile and heinous acts against innocent Americans. Others are engaged in hostile activities, including espionage, economic espionage, and preparations for terror-related activities. Many have abused the generosity of the American people, and their presence in the United States has cost taxpayers billions of dollars at the Federal, State, and local levels.

Enforcing our Nation's immigration laws is critically important to the national security and public safety of the United States. The American people deserve a Federal Government that puts their interests first and a Government that understands its sacred obligation to prioritize the safety, security, and financial and economic well-being of Americans.

This order ensures that the Federal Government protects the American people by faithfully executing the immigration laws of the United States.

**Sec. 2**. *Policy.* It is the policy of the United States to faithfully execute the immigration laws against all inadmissible and removable aliens, particularly those aliens who threaten the safety or security of the American people. Further, it is the policy of the United States to achieve the total and efficient enforcement of those laws, including through lawful incentives and detention capabilities.

**Sec. 3**. *Faithful Execution of the Immigration Laws.* In furtherance of the policies described in section 2 of this order:

(a) Executive Order 13993 of January 20, 2021 (Revision of Civil Immigration Enforcement Policies and Priorities), Executive Order 14010 of February 2, 2021 (Creating a Comprehensive Regional Framework To Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border), Executive Order 14011 of February 2, 2021 (Establishment of Interagency Task Force on the Reunification of Families), and Executive Order 14012 of February 2, 2021 (Restoring Faith in Our Legal Immigration Systems and Strengthening Integration and Inclusion Efforts for New Americans) are hereby revoked; and

(b) Executive departments and agencies (agencies) shall take all appropriate action to promptly revoke all memoranda, guidance, or other policies based on the Executive Orders revoked in section 3(a) of this order and shall employ all lawful means to ensure the faithful execution of the immigration laws of the United States against all inadmissible and removable aliens.

**Sec. 4**. *Civil Enforcement Priorities.* The Secretary of Homeland Security shall take all appropriate action to enable the Director of U.S. Immigration and Customs Enforcement, the Commissioner of U.S. Customs and Border Protection, and the Director of U.S. Citizenship and Immigration Services to set priorities for their agencies that protect the public safety and national security interests of the American people, including by ensuring the successful enforcement of final orders of removal. Further, the Secretary of Homeland Security shall ensure that the primary mission of U.S. Immigration and Customs Enforcement's Homeland Security Investigations division is the enforcement of the provisions of the INA and other Federal laws related to the illegal entry and unlawful presence of aliens in the United States and the enforcement of the purposes of this order.

**Sec. 5**. *Criminal Enforcement Priorities.* The Attorney General, in coordination with the Secretary of State and the Secretary of Homeland Security, shall take all appropriate action to prioritize the prosecution of criminal offenses related to the unauthorized entry or continued unauthorized presence of aliens in the United States.

**Sec. 6**. *Federal Homeland Security Task Forces.* (a) The Attorney General and the Secretary of Homeland Security shall take all appropriate action to jointly establish Homeland Security Task Forces (HSTFs) in all States nationwide.

(b) The composition of each HSTF shall be subject to the direction of the Attorney General and the Secretary of Homeland Security, but shall include representation from any other Federal agencies with law enforcement officers, or agencies with the ability to provide logistics, intelligence, and operational support to the HSTFs, and shall also include representation from relevant State and local law enforcement agencies. The heads of all Federal agencies shall take all appropriate action to provide support to the Attorney General and the Secretary of Homeland Security to ensure that the HSTFs fulfill the objectives in subsection (c) of this section, and any other lawful purpose that fulfills the policy objectives of this order.

(c) The objective of each HSTF is to end the presence of criminal cartels, foreign gangs, and transnational criminal organizations throughout the United States, dismantle cross-border human smuggling and trafficking networks, end the scourge of human smuggling and trafficking, with a particular focus on such offenses involving children, and ensure the use of all available law enforcement tools to faithfully execute the immigration laws of the United States.

(d) The Attorney General and the Secretary of Homeland Security shall take all appropriate action to provide an operational command center to coordinate the activities of the HSTFs and provide such support as they may require, and shall also take all appropriate action to provide supervisory direction to their activities as may be required.

**Sec. 7**. *Identification of Unregistered Illegal Aliens.* The Secretary of Homeland Security, in coordination with the Secretary of State and the Attorney General, shall take all appropriate action to:

(a) Immediately announce and publicize information about the legal obligation of all previously unregistered aliens in the United States to comply with the requirements of part VII of subchapter II of chapter 12 of title 8, United States Code;

(b) Ensure that all previously unregistered aliens in the United States comply with the requirements of part VII of subchapter II of chapter 12 of title 8, United States Code; and

(c) Ensure that failure to comply with the legal obligations of part VII of subchapter II of chapter 12 of title 8, United States Code, is treated as a civil and criminal enforcement priority.

**Sec. 8**. *Civil Fines and Penalties.* (a) The Secretary of Homeland Security, in coordination with the Secretary of Treasury, shall take all appropriate action to ensure the assessment and collection of all fines and penalties

that the Secretary of Homeland Security is authorized by law to assess and collect from aliens unlawfully present in the United States, including aliens who unlawfully entered or unlawfully attempted to enter the United States, and from those who facilitate such aliens' presence in the United States.

(b) Within 90 days of the date of this order, the Secretary of the Treasury and the Secretary of Homeland Security shall submit a report to the President regarding their progress implementing the requirements of this section and recommending any additional actions that may need to be taken to achieve its objectives.

**Sec. 9.** *Efficient Removals of Recent Entrants and Other Aliens.* The Secretary of Homeland Security shall take all appropriate action, pursuant to section 235(b)(1)(A)(iii)(I) of the INA (8 U.S.C. 1225(b)(1)(A)(iii)(I)), to apply, in her sole and unreviewable discretion, the provisions of section 235(b)(1)(A)(i) and (ii) of the INA to the aliens designated under section 235(b)(1)(A)(iii)(II). Further, the Secretary of Homeland Security shall promptly take appropriate action to use all other provisions of the immigration laws or any other Federal law, including, but not limited to sections 238 and 240(d) of the INA (8 U.S.C. 1228 and 1229a(d)), to ensure the efficient and expedited removal of aliens from the United States.

**Sec. 10.** *Detention Facilities.* The Secretary of Homeland Security shall promptly take all appropriate action and allocate all legally available resources or establish contracts to construct, operate, control, or use facilities to detain removable aliens. The Secretary of Homeland Security, further, shall take all appropriate actions to ensure the detention of aliens apprehended for violations of immigration law pending the outcome of their removal proceedings or their removal from the country, to the extent permitted by law.

**Sec. 11.** *Federal-State Agreements.* To ensure State and local law enforcement agencies across the United States can assist with the protection of the American people, the Secretary of Homeland Security shall, to the maximum extent permitted by law, and with the consent of State or local officials as appropriate, take appropriate action, through agreements under section 287(g) of the INA (8 U.S.C. 1357(g)) or otherwise, to authorize State and local law enforcement officials, as the Secretary of Homeland Security determines are qualified and appropriate, to perform the functions of immigration officers in relation to the investigation, apprehension, or detention of aliens in the United States under the direction and the supervision of the Secretary of Homeland Security. Such authorization shall be in addition to, rather than in place of, Federal performance of these duties. To the extent permitted by law, the Secretary of Homeland Security may structure each agreement under section 287(g) of the INA (8 U.S.C. 1357(g)) in the manner that provides the most effective model for enforcing Federal immigration laws in that jurisdiction.

**Sec. 12.** *Encouraging Voluntary Compliance with the Law.* The Secretary of Homeland Security shall take all appropriate action, in coordination with the Secretary of State and the Attorney General, and subject to adequate safeguards, assurances, bonds, and any other lawful measure, to adopt policies and procedures to encourage aliens unlawfully in the United States to voluntarily depart as soon as possible, including through enhanced usage of the provisions of section 240B of the INA (8 U.S.C. 1229c), international agreements or assistance, or any other measures that encourage aliens unlawfully in the United States to depart as promptly as possible, including through removals of aliens as provided by section 250 of the INA (8 U.S.C. 1260).

**Sec. 13.** *Recalcitrant Countries.* The Secretary of State and the Secretary of Homeland Security shall take all appropriate action to:

(a) Cooperate and effectively implement, as appropriate, the sanctions provided by section 243(d) of the INA (8 U.S.C. 1253(d)), with the Secretary of State, to the maximum extent permitted by law, ensuring that diplomatic

efforts and negotiations with foreign states include the foreign states' acceptance of their nationals who are subject to removal from the United States; and

(b) Eliminate all documentary barriers, dilatory tactics, or other restrictions that prevent the prompt repatriation of aliens to any foreign state. Any failure or delay by a foreign state to verify the identity of a national of that state shall be considered in carrying out subsection (a) this section, and shall also be considered regarding the issuance of any other sanctions that may be available to the United States.

**Sec. 14.** *Visa Bonds.* The Secretary of Treasury shall take all appropriate action, in coordination with the Secretary of State and the Secretary of Homeland Security, to establish a system to facilitate the administration of all bonds that the Secretary of State or the Secretary of Homeland Security may lawfully require to administer the provisions of the INA.

**Sec. 15.** *Reestablishment of the VOICE Office and Addressing Victims of Crimes Committed by Removable Aliens.* The Secretary of Homeland Security shall direct the Director of U.S. Immigration and Customs Enforcement (ICE) to take all appropriate and lawful action to reestablish within ICE an office to provide proactive, timely, adequate, and professional services to victims of crimes committed by removable aliens, and those victims' family members. The Attorney General shall also ensure that the provisions of 18 U.S.C. 3771 are followed in all Federal prosecutions involving crimes committed by removable aliens.

**Sec. 16.** *Addressing Actions by the Previous Administration.* The Secretary of State, the Attorney General, and the Secretary of Homeland Security shall promptly take all appropriate action, consistent with law, to rescind the policy decisions of the previous administration that led to the increased or continued presence of illegal aliens in the United States, and align any and all departmental activities with the policies set out by this order and the immigration laws. Such action should include, but is not limited to:

(a) ensuring that the parole authority under section 212(d)(5) of the INA (8 U.S.C. 1182(d)(5)) is exercised on only a case-by-case basis in accordance with the plain language of the statute, and in all circumstances only when an individual alien demonstrates urgent humanitarian reasons or a significant public benefit derived from their particular continued presence in the United States arising from such parole;

(b) ensuring that designations of Temporary Protected Status are consistent with the provisions of section 244 of the INA (8 U.S.C. 1254a), and that such designations are appropriately limited in scope and made for only so long as may be necessary to fulfill the textual requirements of that statute; and

(c) ensuring that employment authorization is provided in a manner consistent with section 274A of the INA (8 U.S.C. 1324a), and that employment authorization is not provided to any unauthorized alien in the United States.

**Sec. 17.** *Sanctuary Jurisdictions.* The Attorney General and the Secretary of Homeland Security shall, to the maximum extent possible under law, evaluate and undertake any lawful actions to ensure that so-called ''sanctuary'' jurisdictions, which seek to interfere with the lawful exercise of Federal law enforcement operations, do not receive access to Federal funds. Further, the Attorney General and the Secretary of Homeland Security shall evaluate and undertake any other lawful actions, criminal or civil, that they deem warranted based on any such jurisdiction's practices that interfere with the enforcement of Federal law.

**Sec. 18.** *Information Sharing.* (a) The Secretary of Homeland Security shall promptly issue guidance to ensure maximum compliance by Department of Homeland Security personnel with the provisions of 8 U.S.C. 1373 and 8 U.S.C. 1644 and ensure that State and local governments are provided with the information necessary to fulfill law enforcement, citizenship, or immigration status verification requirements authorized by law; and

(b) The Attorney General, the Secretary of Health and Human Services, and the Secretary of Homeland Security shall take all appropriate action to stop the trafficking and smuggling of alien children into the United States, including through the sharing of any information necessary to assist in the achievement of that objective.

**Sec. 19**. *Funding Review.* The Attorney General and the Secretary of Homeland Security shall:

(a) Immediately review and, if appropriate, audit all contracts, grants, or other agreements providing Federal funding to non-governmental organizations supporting or providing services, either directly or indirectly, to removable or illegal aliens, to ensure that such agreements conform to applicable law and are free of waste, fraud, and abuse, and that they do not promote or facilitate violations of our immigration laws;

(b) Pause distribution of all further funds pursuant to such agreements pending the results of the review in subsection (a) of this section;

(c) Terminate all such agreements determined to be in violation of law or to be sources of waste, fraud, or abuse and prohibit any such future agreements;

(d) Coordinate with the Director of the Office of Management and Budget to ensure that no funding for agreements described in subsection (c) of this section is included in any appropriations request for the Department of Justice or the Department of Homeland Security; and

(e) Initiate clawback or recoupment procedures, if appropriate, for any agreements described in subsection (c) of this section.

**Sec. 20**. *Denial of Public Benefits to Illegal Aliens.* The Director of the Office of Management and Budget shall take all appropriate action to ensure that all agencies identify and stop the provision of any public benefits to any illegal alien not authorized to receive them under the provisions of the INA or other relevant statutory provisions.

**Sec. 21**. *Hiring More Agents and Officers.* Subject to available appropriations, the Secretary of Homeland Security, through the Commissioner of U.S. Customs and Border Protection and the Director of U.S. Immigration and Customs Enforcement, shall take all appropriate action to significantly increase the number of agents and officers available to perform the duties of immigration officers.

**Sec. 22**. *Severability.* It is the policy of the United States to enforce this order to the maximum extent possible to advance the interests of the United States. Accordingly:

(a) If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this order and the application of its other provisions to any other persons or circumstances shall not be affected thereby; and

(b) If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid because of the failure to follow certain procedures, the relevant executive branch officials shall implement those procedural requirements to conform with existing law and with any applicable court orders.

**Sec. 23**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party

against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*January 20, 2025.*

[FR Doc. 2025–02006
Filed 1–28–25; 11:15 am]
Billing code 3395–F4–P

# EXHIBIT B


Federal Register / Vol. 90, No. 36 / Tuesday, February 25, 2025 / Presidential Documents     10581

# Presidential Documents

Executive Order 14218 of February 19, 2025

## Ending Taxpayer Subsidization of Open Borders

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

**Section 1**. *Purpose*. The plain text of Federal law, including the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (Public Law 104–193) (PRWORA), generally prohibits illegal aliens from obtaining most taxpayer-funded benefits. Title IV of the PRWORA states that it is national policy that ''aliens within the Nation's borders not depend on public resources to meet their needs,'' and that ''[i]t is a compelling government interest to remove the incentive for illegal immigration provided by the availability of public benefits.'' But in the decades since the passage of the PRWORA, numerous administrations have acted to undermine the principles and limitations directed by the Congress through that law. Over the last 4 years, in particular, the prior administration repeatedly undercut the goals of that law, resulting in the improper expenditure of significant taxpayer resources. My Administration will uphold the rule of law, defend against the waste of hard-earned taxpayer resources, and protect benefits for American citizens in need, including individuals with disabilities and veterans.

**Sec. 2**. *Preserving Federal Public Benefits*. (a) To prevent taxpayer resources from acting as a magnet and fueling illegal immigration to the United States, and to ensure, to the maximum extent permitted by law, that no taxpayer-funded benefits go to unqualified aliens, the head of each executive department or agency (agency) shall:

(i) identify all federally funded programs administered by the agency that currently permit illegal aliens to obtain any cash or non-cash public benefit, and, consistent with applicable law, take all appropriate actions to align such programs with the purposes of this order and the requirements of applicable Federal law, including the PRWORA;

(ii) ensure, consistent with applicable law, that Federal payments to States and localities do not, by design or effect, facilitate the subsidization or promotion of illegal immigration, or abet so-called ''sanctuary'' policies that seek to shield illegal aliens from deportation; and

(iii) enhance eligibility verification systems, to the maximum extent possible, to ensure that taxpayer-funded benefits exclude any ineligible alien who entered the United States illegally or is otherwise unlawfully present in the United States.

(b) Within 30 days of the date of this order, the Director of the Office of Management and Budget and the Administrator of the United States DOGE Service, in coordination with the Assistant to the President for Domestic Policy, shall further:

(i) identify all other sources of Federal funding for illegal aliens; and

(ii) recommend additional agency actions to align Federal spending with the purposes of this order, and, where relevant, enhance eligibility verification systems.

(c) Agencies shall refer any improper receipt or use of Federal benefits to the Department of Justice and the Department of Homeland Security for appropriate action.

**Sec. 3**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*February 19, 2025.*

[FR Doc. 2025–03137
Filed 2–24–25; 8:45 am]
Billing code 3395–F4–P

# EXHIBIT C



**U.S. Department of Justice**

Office of the Deputy Attorney General

*Washington, DC 20530*

January 21, 2025

MEMORANDUM FOR ALL DEPARTMENT EMPLOYEES

FROM:                    THE ACTING DEPUTY ATTORNEY GENERAL

SUBJECT:             Interim Policy Changes Regarding Charging, Sentencing, And
                            Immigration Enforcement

Following President Trump's second inauguration yesterday, I write regarding interim
decisions and policy changes pending confirmation of the Attorney General.[1]  These interim
changes are necessary as an initial response to Executive Orders that President Trump issued
yesterday, critical to the Justice Department's mission, and part of the response to three of the
most serious threats facing the American people.  First, Cartels and other Transnational Criminal
Organizations, such as Tren de Aragua (TdA) and La Mara Salvatrucha (MS-13), are a scourge
on society resulting in an unstable and unsafe border and huge flows of illegal immigration in
violation of U.S. law.  Second, brutal and intolerable violent crime by members of these
organizations and illegal aliens is escalating rapidly across the country.  Third, the fentanyl crisis
and opioid epidemic are poisoning our communities and have inflicted an unprecedented toll of
addiction, suffering, and death.

The Justice Department must, and will, work to eradicate these threats.  Indeed, it is the
responsibility of the Justice Department to defend the Constitution and, accordingly, to lawfully
execute the policies that the American people elected President Trump to implement.  The
Justice Department's responsibility, proudly shouldered by each of its employees, includes
aggressive enforcement of laws enacted by Congress, as well as vigorous defense of the
President's actions on behalf of the United States against legal challenges.  The Department's
personnel must come together in the offices that taxpayers have funded to do this vitally
important work.

**I.    Core Principle: Pursuing The Most Serious, Readily Provable Offense**

Interim changes to the Justice Department's policy regarding charging and sentencing are
necessary in order to implement policies articulated in President Trump's January 20, 2025
Executive Orders relating to the elimination of Cartels and other Transnational Criminal
Organizations, and securing our borders against illegal immigration and drug trafficking.
Therefore, effective today, the Justice Department's interim policy regarding charging and

---

[1] This interim guidance is not intended to, does not, and may not be relied upon to create, any
right or benefit, substantive or procedural, enforceable at law or in equity by any party against
the United States, its departments, agencies, or entities, its officers, employees, or agents, or any
other person.

sentencing is set forth in the May 10, 2017 Memorandum entitled, "Department Charging and Sentencing Policy," which applies to all charging decisions at the Department of Justice and the U.S. Attorney's Offices. Any inconsistent previous policy of the Department of Justice relating to charging and sentencing policy is rescinded, effective today.[2]

Specifically, in the absence of unusual facts, prosecutorial discretion at the Department of Justice and the U.S. Attorney's Offices is bounded by the core principle that prosecutors should charge and pursue the most serious, readily provable offenses. The most serious offenses are those punishable by death where applicable, and offenses with the most significant mandatory minimum sentences (including under the Armed Career Criminal Act and 21 U.S.C. § 851) and the most substantial recommendation under the Sentencing Guidelines.

Each United States Attorney and Assistant Attorney General is responsible for ensuring that this interim policy is implemented and followed. Any deviations from the interim policy's core principle require significant extenuating circumstances, shall be carefully considered, and must be approved consistent with the process described in the May 10, 2017 Memorandum.

## II.    Faithful Execution of the Immigration Laws

Consistent with President Trump's January 20, 2025 Executive Order entitled, "Protecting The American People Against Invasion," the Department of Justice will take all steps necessary to protect the public and secure the American border by removing illegal aliens from the Country and prosecuting illegal aliens for crimes committed within U.S. jurisdiction. These steps shall include, but not be limited to, the following:

Consistent with the core principle of pursuing the most serious, readily provable offense, U.S. Attorney's Offices and the other components shall pursue charges relating to criminal immigration-related violations when such violations are presented by federal, state, or local law enforcement or the Intelligence Community. *See, e.g.*, 8 U.S.C. §§ 1324(c), 1252c (authorizing certain immigration-related arrests by State and local law enforcement officials). This includes, where supported by evidence, prosecutions for violations of 8 U.S.C. §§ 1304, 1306, 1324-1328, 1373 and 18 U.S.C. § 922(g)(5). Each U.S. Attorney's Office shall coordinate as appropriate with the federal courts to inform the courts of this interim policy and develop processes for handling the increased number of prosecutions that will result. Declination decisions relating to immigration-related conduct shall be disclosed as Urgent Reports pursuant to Justice Manual § 1-13.130. On a quarterly basis, the U.S. Attorney's Offices shall report statistics to EOUSA, broken down by law enforcement agency, regarding the number of immigration-related cases referred to the Office, the number of pending immigration-related investigations and prosecutions, the number of immigration-related convictions, and the resulting sentences and removals.

---

[2] The previous policies and guidance rescinded include: "General Department Policies Regarding Charging, Pleas, and Sentencing" (December 16, 2022); "Interim Guidance on Prosecutorial Discretion, Charging, and Sentencing" (January 29, 2021); "Department Policy on Charging Mandatory Minimum Sentences and Recidivist Enhancements in Certain Drug Cases" (August 12, 2013); and "Guidance Regarding § 851 Enhancements in Plea Negotiations" (September 24, 2014).

The Organized Crime Drug Enforcement Task Force (OCDETF) and the Project Safe Neighborhoods (PSN) program shall establish national initiatives to provide focused resources and attention to immigration-related prosecutions at the federal, state, and local levels. OCDETF and PSN will focus on facilitating access by U.S. Attorney's Offices to existing structures in which the Justice Department participates, such as Joint Task Force Vulcan, which targets MS-13 and will be expanded to target TdA, and Joint Task Force Alpha, which targets human trafficking. The regional OCDETF Strike Forces shall prioritize the investigation and prosecution of immigration offenses, including by requiring OCDETF-funded AUSAs to devote significant time and attention to the investigation and prosecution of these crimes. The new OCDETF and PSN national initiatives shall also prioritize enhanced statistical tracking of these efforts.

Pending implementation of the Homeland Security Task Forces announced by President Trump on January 20, 2025, the FBI's Joint Terrorism Task Forces are directed to coordinate with DHS, as well as state and local members, to assist in the execution of President Trump's immigration-related initiatives. The FBI, DEA, ATF, USMS, and BOP shall review their files for identifying information and/or biometric data relating to non-citizens located illegally in the United States. All such information and data shall be disclosed to DHS, for the sole purpose of facilitating appropriate removals, enforcement actions, and immigration-related investigations and prosecutions, unless the agency possessing the information and data determines that a particular disclosure would compromise a significant law enforcement investigation and the U.S. Attorney's Office participating in the investigation concurs in writing with the agency's non-disclosure determination. The agencies' reviews and disclosures shall be completed in 60 days. Concurrences by U.S. Attorney's Offices in non-disclosure determinations shall be disclosed as Urgent Reports pursuant to Justice Manual § 1-13.130.

The Supremacy Clause and other authorities require state and local actors to comply with the Executive Branch's immigration enforcement initiatives. Federal law prohibits state and local actors from resisting, obstructing, and otherwise failing to comply with lawful immigration-related commands and requests pursuant to, for example, the President's extensive Article II authority with respect to foreign affairs and national security, the Immigration and Nationality Act, and the Alien Enemies Act. The U.S. Attorney's Offices and litigating components of the Department of Justice shall investigate incidents involving any such misconduct for potential prosecution, including for obstructing federal functions in violation of 18 U.S.C. § 371, and violations of other statutes, such as 8 U.S.C. §§ 1324, 1373. Declination decisions with respect to resistance, obstruction, or other non-compliance with lawful immigration-related commands and requests from federal authorities shall be disclosed as Urgent Reports pursuant to Justice Manual § 1-13.130.

Finally, laws and actions that threaten to impede Executive Branch immigration initiatives, including by prohibiting disclosures of information to federal authorities engaged in immigration-enforcement activities, threaten public safety and national security. The Civil Division shall work with the newly established Sanctuary Cities Enforcement Working Group, within the Office of the Associate Attorney General, to identify state and local laws, policies, and activities that are inconsistent with Executive Branch immigration initiatives and, where appropriate, to take legal action to challenge such laws.

# EXHIBIT D



# Office of the Attorney General
## Washington, D. C. 20530

February 5, 2025

MEMORANDUM FOR ALL DEPARTMENT EMPLOYEES

FROM:          THE ATTORNEY GENERAL

SUBJECT:       SANCTUARY JURISDICTION DIRECTIVES[1]

Unlawful border crossings and illegal migration into the United States have reached record levels, resulting in a substantial and unacceptable threat to our national security and public safety. To protect the American people from the effects of unlawful mass migration, President Trump has prioritized securing our Nation's borders and enforcing federal immigration laws. In furtherance of that objective, the Department of Justice will ensure that, consistent with law, "sanctuary jurisdictions" do not receive access to Federal funds from the Department. Consistent with applicable statutes, regulations, court orders, and terms, the Department of Justice shall pause the distribution of all funds until a review has been completed, terminate any agreements that are in violation of law or are the source of waste, fraud, or abuse, and initiate clawback or recoupment procedures, where appropriate.[2] In carrying out this directive, each component shall comply with any notice and procedural requirements in the award, agreement, or other instrument.

## I.     End Funding to State and Local Jurisdictions That Unlawfully Interfere with Federal Law Enforcement Operations

Sanctuary jurisdictions should not receive access to federal grants administered by the Department of Justice. The Department will exercise its own authority to impose any conditions of funding that do not violate applicable constitutional or statutory limitations. *See New York v. Dep't of Justice*, 951 F.3d 84, 111 (2d Cir. 2020) ("Because 8 U.S.C. § 1373 is a law applicable to all plaintiffs in this action, the Attorney General was authorized to impose the challenged Certification Condition and did not violate either the APA or separation of powers by doing so.").

Federal law provides that state and local jurisdictions "may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [federal immigration officers] information regarding the citizenship or immigration status, lawful or unlawful, of any

---

[1] This guidance is not intended to, does not, and may not be relied upon to create, any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

[2] This memorandum rescinds, effective today, any inconsistent previous memoranda, policies, or guidance documents of the Department of Justice.

individual." 8 U.S.C. § 1373(a). So-called "sanctuary jurisdictions" include state or local jurisdictions that refuse to comply with 8 U.S.C. § 1373, refuse to certify compliance with § 1373, or willfully fail to comply with other applicable federal immigration laws. Consistent with statutory authority and past practice, the Department will require any jurisdiction that applies for certain Department grants to be compliant with 8 U.S.C. § 1373(a). Within 30 days, the Associate Attorney General, in coordination with components that provide Department grants, will report to the Attorney General the grants to which this requirement applies.

Additionally, to the extent consistent with applicable statutes, regulations, and terms, the Department may seek to tailor future grants to promote a lawful system of immigration, and to reduce efforts by state or local jurisdictions to undermine a lawful system of immigration. The Department will also seek to take any appropriate enforcement action where state or local practices violate federal laws, regulations, or grant conditions.

## II.    Identify and Evaluate All Funding Agreements with Non-Governmental Organizations That Provide Support to Illegal Aliens

All Department components that provide federal funding to non-governmental organizations shall immediately identify all contracts, grants, or other agreements with organizations that support or provide services to removable or illegal aliens. For any such agreement, each component shall, to the extent consistent with applicable statutes, regulations, court orders, and terms:

(1) Pause any further distribution of funds for 60 days after complying with any notice and procedural requirements.

(2) Identify non-governmental organization(s) receiving funding from the Department and describe the support or services provided. The component shall direct each organization to report whether the disbursed funds: (a) were provided in accordance with applicable laws; (b) resulted in the provision of any funds or services to removable or illegal aliens; (c) resulted in or were the subject of waste, fraud, or abuse; and (d) promoted or facilitated violations of our immigration laws. The component shall further direct each organization to certify that it will not use any remaining funds to promote or facilitate the violation of Federal immigration law.

(3) Compile information set forth at (2) above and submit it to the Associate Attorney General within 45 days of this memorandum.

Upon completion of this process, the Associate Attorney General, in consultation with the Deputy Attorney General, shall determine which (if any) agreements to terminate and whether to resume funding of any remaining agreements, consistent with applicable statutes, regulations, and terms.

Effective immediately, consistent with applicable law, the Department of Justice shall not enter into any new contract, grant, or other agreement to provide Federal funding to non-

governmental organizations that support or provide services, either directly or indirectly (*e.g.*, through sub-contracting or other arrangements), to removable or illegal aliens.

### III.    Pursue Enforcement Actions Against Jurisdictions That Facilitate Violations of Federal Immigration Laws or Impede Lawful Federal Immigration Operations

Actions that impede federal efforts to enforce immigration law threaten public safety and national security.  State and local jurisdictions must comply with applicable immigration-related federal laws.  State and local actors may not impede, obstruct, or otherwise fail to comply with lawful immigration-related directives pursuant to the President's Article II authority to ensure national security, the Immigration and Nationality Act, or other authorities.

All litigating components of the Department of Justice and each U.S. Attorney's Office shall investigate incidents involving any such misconduct and shall, where supported by the evidence, prosecute violations of federal laws such as 18 U.S.C. § 371 and 8 U.S.C. §§ 1324 and 1373.  All declination decisions with respect to any effort to obstruct or fail to comply with a lawful immigration-related directive from the Executive Branch shall be promptly reported pursuant to Justice Manual § 1-13.130.

The Civil Division shall, in coordination with the Sanctuary Cities Enforcement Working Group, identify state and local laws, policies, and practices that facilitate violations of federal immigration laws or impede lawful federal immigration operations.  Where appropriate, the Civil Division shall take legal action to challenge such laws, policies, or practices.  Attorneys tasked to the Sanctuary Cities Enforcement Working Group shall regularly report to the Associate Attorney General and the Deputy Attorney General their progress regarding the review of state and local laws, policies, and practices, and shall promptly report any decisions not to pursue enforcement actions against state and local jurisdictions found to be facilitating violations of federal immigration laws or impeding lawful federal immigration operations.