1
DAVID CHIU, SBN 189542
City Attorney
2
YVONNE R. MERÉ, SBN 175394
Chief Deputy City Attorney
3
MOLLIE M. LEE, SBN 251404
Chief of Strategic Advocacy
4
SARA J. EISENBERG, SBN 269303
Chief of Complex and Affirmative Litigation
5
NANCY E. HARRIS, SBN 197042
KARUN A. TILAK, SBN 323939
6
Deputy City Attorneys
Fox Plaza
7
1390 Market Street, 7th Floor
San Francisco, CA  94102-5402
8
Telephone:     (415) 355-3308
Facsimile:      (415) 437-4644
9
E-Mail:         karun.tilak@sfcityatty.org

10
Attorneys for Plaintiff
CITY AND COUNTY OF SAN FRANCISCO
11

TONY LOPRESTI, SBN 289269
County Counsel
KAVITA NARAYAN, SBN 264191
Chief Assistant County Counsel
MEREDITH A. JOHNSON, SBN 291018
Lead Deputy County Counsel
STEFANIE L. WILSON, SBN 314899
RAJIV NARAYAN, SBN 334511
Deputy County Counsels
BILL NGUYEN, SBN 333671
Litigation Fellow
70 W. Hedding Street, East Wing, 9th Floor
San José, CA 95110
Telephone:     (408) 299-5900
Facsimile:      (408) 292-7240
E-Mail:         tony.lopresti@cco.sccgov.org

Attorneys for Plaintiff
COUNTY OF SANTA CLARA

12
[additional counsel on signature page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| 15 CITY AND COUNTY OF SAN FRANCISCO, COUNTY OF SANTA CLARA, CITY OF PORTLAND, MARTIN LUTHER KING, JR. COUNTY, CITY OF NEW HAVEN, CITY OF OAKLAND, CITY OF EMERYVILLE, CITY OF SAN JOSÉ, CITY OF SAN DIEGO, CITY OF SACRAMENTO, CITY OF SANTA CRUZ, COUNTY OF MONTEREY, CITY OF SEATTLE, CITY OF MINNEAPOLIS, CITY OF ST. PAUL, CITY OF SANTA FE, | Case No. 3:25-cv-1350-WHO **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT** |
| 20    Plaintiffs, | |
| 21    vs. | Hearing Date:   April 23, 2025 Time:            2:00 p.m. Judge:           Hon. William H. Orrick III Place:           Courtroom 2 |
| 22 DONALD J. TRUMP, President of the United States, UNITED STATES OF AMERICA, PAMELA BONDI, Attorney General of the United States, EMIL BOVE, Acting Deputy Attorney General, UNITED STATES DEPARTMENT OF JUSTICE, KRISTI NOEM, Secretary of United States Department of Homeland Security, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, DOES 1-100, | Date Filed:      February 7, 2025 Trial Date:      None Set |
| 27    Defendants. | |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................................... ii

NOTICE OF MOTION AND MOTION ....................................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................ 2

INTRODUCTION ........................................................................................................................ 2

BACKGROUND .......................................................................................................................... 3

I.  Plaintiffs Limit the Use of Local Resources for Federal Civil Immigration Enforcement ........................................................................................................... 3

II.  The First Trump Administration Threatened and Unsuccessfully Attempted to Defund Jurisdictions That Limit Involvement in Federal Civil Immigration Enforcement ........................................................................................................... 5

III.  The Current Trump Administration Pursues the Same Threats to Coerce Localities Into Enforcing Federal Immigration Law ............................................. 6

A.  EO 14,159 and the Bove Memo ................................................................. 6

B.  The Bondi Directive .................................................................................... 7

C.  EO 14,218 ................................................................................................... 8

D.  DOJ Sues "Sanctuary" Jurisdictions That Do Not Assist ICE ................... 9

IV.  The Executive Orders and the Bondi Directive Imminently Harm Plaintiffs ....... 10

LEGAL STANDARD ................................................................................................................. 13

ARGUMENT ............................................................................................................................. 14

I.  Plaintiffs Are Likely to Succeed on the Merits of Their Claims ........................... 14

A.  The Executive Orders and the Bondi Directive Violate Separation of Powers Principles ..................................................................................... 14

B.  The Executive Orders and the Bondi Directive Violate the Spending Clause ......................................................................................................... 16

1.  Ambiguous, After-the-Fact Conditions ........................................... 16

2.  Conditions With No Nexus to Affected Funds ................................ 17

3.  Unduly Coercive Conditions ........................................................... 18

C.  The Executive Orders and Bondi Directive Violate Plaintiffs' Fifth Amendment Rights ..................................................................................... 19

D.  The Executive Order Violates Plaintiffs' Tenth Amendment Rights ........ 20

E.  The Bondi Directive Violates the Administrative Procedure Act ............. 21

II.  Plaintiffs Are Imminently and Irreparably Harmed by Defendants' Actions ........ 22

III.  The Balance of the Equities and the Public Interest Favor a Preliminary Injunction ............................................................................................................. 25

CONCLUSION .......................................................................................................................... 25

1

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*
   559 F.3d 1046 (9th Cir. 2009) ...................................................................................24

*Arc. of Cal. v. Douglas*
   757 F.3d 975 (9th Cir. 2014) .....................................................................................13

*Ariz. Dream Act Coal. v. Brewer*
   757 F.3d 1053 (9th Cir. 2014) ...................................................................................25

*Bennett v. Spear*
   520 U.S. 154 (1997)...................................................................................................21

*California v. Azar*
   911 F.3d 558 (9th Cir. 2018) .....................................................................................23

*City & Cnty. of S.F. v. Barr*
   965 F.3d 753 (9th Cir. 2020) .......................................................................................6

*City & Cnty. of S.F. v. Sessions*
   349 F. Supp. 3d 924 (N.D. Cal. 2018) ...................................................................6, 18

*City & Cnty. of S.F. v. Trump*
   897 F.3d 1225 (9th Cir. 2018) .......................................................................... passim

*City of Los Angeles v. Barr*
   941 F.3d 931 (9th Cir. 2019) .....................................................................................24

*City of Los Angeles v. Sessions*
   2018 WL 6071072 (C.D. Cal. Sept. 13, 2018) .........................................................24

*Clinton v. City of New York*
   524 U.S. 417 (1998)...................................................................................................15

*Cnty. of Santa Clara v. Trump*
   275 F. Supp. 3d 1196 (N.D. Cal. Nov. 20, 2017) .......................................................6

*Cnty. of Santa Clara v. Trump*
   267 F. Supp. 3d 1201 (N.D. Cal. 2017)....................................................................19

*Cnty. of Santa Clara v. Trump*
   250 F. Supp. 3d 497 (N.D. Cal. 2017) ............................................................. passim

*Drakes Bay Oyster Co. v. Jewell*
   747 F.3d 1073 (9th Cir. 2014) ...................................................................................25

*FCC v. Fox Television Stations, Inc.*
   567 U.S. 239 (2012)...................................................................................................20

*FCC v. Fox Television Stations, Inc.*
  556 U.S. 502 (2009)...........................................................................................22

*FCC v. Prometheus Radio Project*
  592 U.S. 414 (2021)...........................................................................................22

*Immigr. & Naturalization Serv. v. Chadha*
  462 U.S. 919 (1983)...........................................................................................16

*In re Aiken Cnty.*
  725 F.3d 255 (D.C. Cir. 2013)...........................................................................15

*Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*
  4 F.3d 819 (9th Cir. 1992)...............................................................................25

*Matthews v. Eldridge*
  424 U.S. 319 (1976)...........................................................................................20

*Melendres v. Arpaio*
  695 F.3d 990 (9th Cir. 2012)............................................................................24

*Michigan v. DeVos*
  481 F. Supp. 3d 984 (N.D. Cal. 2020)..............................................................23

*Nat'l Fed. of Indep. Bus. v. Sebelius ("NFIB")*
  567 U.S. 519 (2012).....................................................................................passim

*New York v. United States*
  505 U.S. 144 (1992)...................................................................................18, 20

*Ohio v. EPA*
  603 U.S. 279 (2024)...........................................................................................22

*Printz v. United States*
  521 U.S. 898 (1997)...........................................................................................20

*Sessions v. Dimaya*
  584 U.S. 148 (2018)...........................................................................................19

*Shell Offshore, Inc. v. Greenpeace, Inc.*
  709 F.3d 1281 (9th Cir. 2013)..........................................................................22

*South Dakota v. Dole*
  483 U.S. 203 (1987)..............................................................................16, 17, 18

*Trump v. United States*
  603 U.S. 593 (2024)...........................................................................................14

*Washington v. Trump*
  847 F.3d 1151 (9th Cir. 2017)..........................................................................24

*Winter v. Nat'l Res. Def. Council, Inc.*
   555 U.S. 7 (2008) .................................................................................................. 13

*Youngstown Sheet & Tube Co v. Sawyer*
   343 U.S. 579 (1952) ........................................................................................ 14, 15

**Constitutional Provisions**
U.S. Const. art. I, § 1 .......................................................................................... 15
U.S. Const. art. I, § 7 .......................................................................................... 15
U.S. Const. art. I, § 8 .......................................................................................... 15
U.S. Const. art. I, § 9 .......................................................................................... 15
U.S. Const. art. II, § 3 ......................................................................................... 15

**Statutes**
2 United States Code
   §§ 681–88 ..................................................................................................... 15, 22

5 United States Code
   § 551(1) ............................................................................................................. 21
   § 706(2)(A) ....................................................................................................... 22
   § 706(2)(B) ....................................................................................................... 21
   § 706(2)(C) ....................................................................................................... 22

8 United States Code
   § 1373 ......................................................................................................... passim

**Regulations**
8 Code of Federal Regulations
   § 287.7 ................................................................................................................. 4

**Other Authorities**
@SecretaryTurner X Account (Mar. 13, 2025), https://perma.cc/C2JV-9DL7 ............................. 9

"HUD Ensures Continuum of Care Program Is Used to Address Homelessness,"
@HUDgov X account, available at https://perma.cc/8Y5W-EGFL ................................... 9

Ending Sanctuary Cities Act of 2021, H.R. 3195, 117th Cong. (2021) ......................... 15

No Bailout for Sanctuary Cities Act, H.R. 5717, 118th Cong. (2024) ......................... 15

No Tax Breaks for Sanctuary Cities Act, H.R. 894, 117th Cong. (2021) .................... 15

Mobilizing Against Sanctuary Cities Act, H.R. 94, 117th Cong. (2021) .................... 15

Stop Dangerous Sanctuary Cities Act, S. 3452, 117th Cong. (2021) ......................... 15

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on April 23, 2025 at 2:00 p.m. or as soon thereafter as may be heard before the Honorable William H. Orrick III in Courtroom 2 of the United States District Court for the Northern District of California, 450 Golden Gate Avenue, San Francisco, CA 94102, Plaintiffs[1] will and hereby do move the Court pursuant to Federal Rule of Civil Procedure 65 for a preliminary injunction against Defendants: Donald J. Trump, President of the United States; the United States Department of Justice ("DOJ"); Pamela Bondi ("Bondi") in her official capacity as Attorney General of the United States; Emil Bove ("Bove") in his capacity as Acting Deputy Attorney General of the United States; the United States Department of Homeland Security ("DHS"); Kristi Noem ("Noem") in her official capacity as Secretary of the Department of Homeland Security; and the United States (collectively "Defendants"); and their officers, agents, servants, employees, and attorneys, and any other persons who are in active concert or participation with them.

Plaintiffs respectfully move the Court to enter a preliminary injunction prohibiting Defendants from taking any action to withhold, freeze, or condition federal funds based on (1) Section 17 of Executive Order 14,159; (2) Section 2(a)(ii) of Executive Order 14,218; or (3) the February 5, 2025 Memorandum from the Attorney General entitled "Sanctuary Jurisdictions Directives," to jurisdictions on the basis that they have policies that limit (i) the honoring of civil immigration detainer requests; (ii) cooperation with administrative warrants for purposes of immigration enforcement; (iii) the sharing of information with federal immigration authorities other than immigration or citizenship status; (iv) the use of local law enforcement to arrest or detain individuals solely for civil immigration violations; or (v) the use of local resources to assist with civil immigration enforcement activities.

This motion is based on this Notice of Motion and Motion, the accompanying supporting Memorandum of Points and Authorities, the accompanying supporting declarations and exhibits thereto, as well as the papers, evidence, and records on file in this action, and any other written or oral

---

[1] Plaintiffs are City and County of San Francisco ("San Francisco"), County of Santa Clara ("Santa Clara"), City of Portland ("Portland"), Martin Luther King, Jr. County ("King County"), City of New Haven ("New Haven"), City of Oakland ("Oakland"), City of Emeryville ("Emeryville"), City of San Jose ("San Jose"), City of San Diego ("San Diego"), City of Sacramento ("Sacramento"), City of Santa Cruz ("Santa Cruz"), County of Monterey ("Monterey"), City of Seattle ("Seattle"), City of Minneapolis ("Minneapolis"), City of St. Paul ("St. Paul"), and City of Santa Fe ("Santa Fe").

evidence or argument as may be presented at or before the time this motion is heard by the Court.

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

During his first term in office, President Trump and his Department of Justice ("DOJ") sought to force local authorities to carry out federal civil immigration enforcement by threatening to withhold funds from so-called "sanctuary" jurisdictions that limit the use of local resources to enforce federal civil immigration law. This Court and the Ninth Circuit struck down these unlawful actions, holding that the Executive Branch lacked the constitutional and statutory authority to withhold federal funds in order to compel localities to implement the Executive Branch's civil immigration agenda.

Undaunted, President Trump has begun his second term in office intent on ignoring the rule of law and binding court orders. He once again seeks to punish Plaintiffs and other jurisdictions that have exercised their constitutional rights to limit the use of their resources for federal civil immigration enforcement. Immediately upon assuming office, President Trump issued Executive Order 14,159 ("EO 14,159") directing Defendants Bondi and Noem to withhold federal funds from so-called "sanctuary" jurisdictions. He then doubled down, issuing Executive Order 14,218 ("EO 14,218"), which directs every federal agency to ensure that "federal payments" to localities do not "by design or effect" "abet so-called 'sanctuary' policies that seek to shield illegal aliens from deportation." Pursuant to this vague and undefined command, at least one federal department appears to have started implementing this unlawful funding restriction. As soon as she took office, Defendant Bondi, in turn, began implementing the President's illegal orders. On February 5, 2025, she issued a directive (the "Bondi Directive") announcing a freeze on *all* DOJ funds in order to effectuate DOJ's stated policy of depriving "sanctuary" jurisdictions of funding.

Just as in 2017, Defendants' actions violate fundamental constitutional rights and run roughshod over bedrock principles of our democracy. The Executive Orders and the Bondi Directive purport to exercise spending power that the Constitution entrusts exclusively to Congress and deploy that power in ways that exceed even the Legislative Branch's authority. The Executive Orders and Directive also violate Plaintiffs' rights under the Fifth Amendment's Due Process Clause by depriving Plaintiffs of funding without notice and opportunity to be heard, based on unconstitutionally vague

criteria. The Orders—by purporting to withhold *all* federal funds from so-called "sanctuary" jurisdictions and condition *all* payments to such jurisdictions—seek to commandeer Plaintiffs' resources to enforce federal immigration laws, in violation of the Tenth Amendment. Finally, the Bondi Directive, beyond being constitutionally infirm, is arbitrary and capricious and exceeds statutory authority under the Administrative Procedure Act ("APA").

Defendants' actions have thrown Plaintiffs' budgeting and planning processes into immediate and ongoing disarray. Plaintiffs each rely heavily on federal funding to provide essential public services to their communities. Absent an injunction, the administration's decision to withhold federal funds to so-called "sanctuary" jurisdictions forces Plaintiffs to make one of three untenable choices: (1) continue to spend money today on services for which they may be denied federal reimbursement tomorrow, thereby incurring significant deficits; (2) slash essential services and programs in anticipation of the withdrawal of federal funding, to the detriment of Plaintiffs' communities; or (3) buckle under Defendants' unlawful directives and use scarce local resources to enforce federal civil immigration law, undermining community trust and contravening their own considered local judgment. The imposition of amorphous immigration-related conditions on federal funds likewise forces Plaintiffs to choose between giving up funds for critical public services and abandoning their local policies. Plaintiffs face imminent budgetary deadlines and must make these decisions now, with the health, welfare, and safety of their millions of residents in the balance. Plaintiffs therefore seek an injunction to stop Defendants' blatantly illegal and gravely harmful actions.

## BACKGROUND

### I.    Plaintiffs Limit the Use of Local Resources for Federal Civil Immigration Enforcement

Plaintiffs are localities spread across the country, each of which limits the use of local resources to assist with federal civil immigration enforcement. Plaintiffs' policies all share two common goals: to improve trust between Plaintiffs and the communities they serve and to ensure that scarce local resources are used for the benefit of Plaintiffs' communities. For example, in enacting San Francisco's ordinance, the Board of Supervisors found that the law was necessary "to foster respect and trust between law enforcement and residents, to protect limited local resources, [and] to encourage cooperation between residents and City officials, including especially law enforcement and public

health officers and employees . . . ." Tilak Decl. Ex. 5 (S.F. Admin. Code) § 12I.1; *see also* Scott Decl. ¶ 4; Murillo Decl. ¶¶ 5–6. Likewise, Santa Clara's top law enforcement officials have reiterated that to encourage the reporting of crime and cooperation in criminal investigations, all community members, regardless of their immigration status, must feel safe and secure when contacting local public safety agencies, without fear that such contact will lead to adverse immigration consequences. Jonsen Decl. ¶ 9; Rosen Decl. ¶¶ 5–11. Limiting local entanglement with civil immigration enforcement also encourages the public to share sensitive information with Plaintiffs for purposes of reporting code enforcement violations and accessing public housing, schools, and hospitals. *See, e.g.*, Tilak Decl. Ex. 15 (Sacramento Res. No. 2017-0158) at pp.1–2; *id.* Ex. 22 (Monterey Res. No. 25-009) at p.1.

In furtherance of these goals, Plaintiffs' laws and policies each share certain features. First, Plaintiffs generally limit local officials from inquiring about immigration status, conditioning local services based on immigration status, arresting individuals solely for civil immigration violations, or participating in enforcement of federal civil immigration laws. *See, e.g.*, Tilak Decl. Ex. 4 (S.F. Admin. Code) § 12H.2; Ex. 6 (Portland Res. 37277) at p.3; Ex. 7 (King Cnty. Code) §§ 2.15.010, .020; Ex. 8 (New Haven Exec. Order) § III; Ex. 9 (Oakland Ord. 13515) § 2; Ex. 10 (Emeryville Res. 17-08) §§ 3, 5; Ex. 13 (San Jose Res. 2025-19) §§ 1–2; Ex. 15 § 2; Ex. 20 (Santa Cruz Ord. 2017-06) §§ 3, 5; Ex. 22 § 2; Ex. 23 (Seattle Mun. Code) § 4.18.015(A); Ex. 24 (Minneapolis Code of Ordinances) §§ 19.20, 19.30; Ex. 25 (St. Paul Code of Ordinances) §§ 44.02, 44.03; Ex. 27 (Santa Fe Res. 2017-19) §§ 1–2; Williams Decl. Ex. D (Santa Clara Board Policy Manual) § 3.54(C).

Several of Plaintiffs' policies also limit or prohibit local law enforcement from detaining an individual who is otherwise eligible for release from custody based solely on a civil immigration detainer request or administrative warrant issued by U.S. Customs and Immigration Enforcement ("ICE"). *See, e.g.*, Tilak Decl. Ex. 5 § 12I.3(b); Ex. 7 § 2.15.020(B)(2); Ex. 8 § III.8(c); Ex. 15 § 2(A)(3); Ex. 20 § 5(c); Williams Decl. Ex. D § 3.54(A)-(B); Bluestone Smith Decl. Ex. B (Monterey Cnty. Sheriff's Office Policy) § 502.3.1. ICE detainer requests do not require a judicial finding of probable cause; they are simply requests by ICE that a state or local law enforcement agency voluntarily hold individuals for up to 48 hours to provide ICE extra time to decide whether to take those individuals into federal custody for purposes of removal. *See* 8 C.F.R. § 287.7. ICE detainers

impose a significant burden on scarce local law enforcement personnel, as they require Plaintiffs to commit personnel and resources to detain, feed, house, and supervise these individuals, all without remuneration from the federal government. *See* 8 C.F.R. § 287.7(e); Miyamoto Decl. ¶ 8; Williams Decl. ¶ 52. ICE detainer requests also raise significant constitutional concerns and potentially expose Plaintiffs to civil liability. *See Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 510 (N.D. Cal. 2017) (reviewing caselaw and noting that several courts have found that local jurisdictions violate Fourth Amendment rights by holding individuals subject to civil detainers, which are "often not supported by an individualized determination of probable cause that a crime has been committed").

As social safety-net service providers, Plaintiffs also collect sensitive, personal information about community members who may interact with Plaintiffs' departments or access Plaintiffs' services. To ensure that all members of their communities feel safe accessing Plaintiffs' services, many of Plaintiffs' policies limit local officials from sharing certain personal information about community members—including home addresses and contact information, or the release dates of individuals held in custody—with federal immigration authorities. *See, e.g.*, Tilak Decl. Ex. 4 § 12H.2; Ex. 7 § 2.15.020(B)(4); Ex. 8 § III.7; Ex. 15 § 2(A)(5); Ex. 27 § 2; Williams Decl. Ex. D § 3.54(C).

## II.    The First Trump Administration Threatened and Unsuccessfully Attempted to Defund Jurisdictions That Limit Involvement in Federal Civil Immigration Enforcement

President Trump has long antagonized localities, including Plaintiffs, that choose to limit their involvement in federal civil immigration enforcement efforts. Immediately upon taking office in January 2017, the President issued Executive Order 13,768 ("EO 13,768"), which directed that any jurisdictions "that willfully refuse to comply with 8 U.S.C. § 1373 (sanctuary jurisdictions) are not eligible to receive Federal grants, except as deemed necessary for law enforcement purposes by the Attorney General or the Secretary [of Homeland Security]." *See Cnty. of Santa Clara*, 250 F. Supp. 3d at 509 (quoting EO 13,768). Plaintiffs San Francisco and Santa Clara immediately challenged EO 13,768 before this Court. This Court preliminarily and then permanently enjoined EO 13,768 on a nationwide basis, finding that it violated the Constitution's separation-of-powers principles, the Spending Clause, and the Tenth Amendment, and was unconstitutionally vague and denied procedural due process under the Fifth Amendment. *Cnty. of Santa Clara*, 250 F. Supp. 3d at 530–36; *Cnty. of*

*Santa Clara v. Trump*, 275 F. Supp. 3d 1196 (N.D. Cal. Nov. 20, 2017). The Ninth Circuit affirmed

the Court's finding that EO 13,768 violated the constitutional separation of powers. *See City & Cnty.*

*of S.F. v. Trump*, 897 F.3d 1225, 1234–35 (9th Cir. 2018).[2]

DOJ then tried a different tactic to press local jurisdictions into immigration enforcement by

imposing various immigration-related conditions on grants under the Edward Byrne Memorial Justice

Access Grant ("Byrne JAG") program. Plaintiff San Francisco challenged DOJ's attempt to condition

Byrne JAG funds on cooperation with immigration enforcement. This Court concluded that DOJ's

conditions violated the separation of powers and the Spending Clause, and were arbitrary and

capricious under the APA, and that San Francisco complied with relevant federal law. *City & Cnty. of*

*S.F. v. Sessions*, 349 F. Supp. 3d 924 (N.D. Cal. 2018), *aff'd in part and vacated in part*, *City & Cnty.*

*of S.F. v. Barr*, 965 F.3d 753 (9th Cir. 2020).

## III.    The Current Trump Administration Pursues the Same Threats to Coerce Localities Into Enforcing Federal Immigration Law

Undaunted by clear orders from this Court and the Ninth Circuit, President Trump has begun

his second term in office by once again threatening localities like Plaintiffs with crippling funding cuts

unless they utilize their resources to actively assist with enforcing federal civil immigration law.

### A.    EO 14,159 and the Bove Memo

Shortly after his inauguration on January 20, 2025, President Trump issued EO 14,159, entitled

"Protecting the American People Against Invasion." Tilak Decl. Ex. 1 (EO 14,159), 90 Fed. Reg.

8443. Section 17 of EO 14,159 directs the Attorney General and Secretary of Homeland Security to

take "any lawful actions to ensure that so-called 'sanctuary' jurisdictions, which seek to interfere with

the lawful exercise of Federal law enforcement operations, do not receive access to Federal funds." *Id.*,

90 Fed. Reg. at.[3] Much like EO 13,768, EO 14,159 on its face threatens all "Federal funds" received

---

[2] The Ninth Circuit reversed this Court's preliminary injunction decision with respect to the nationwide scope of this Court's injunction. 897 F.3d at 1244–45.

[3] Section 17 of the Order also directs the Attorney General and Secretary of Homeland Security to undertake "criminal or civil" legal action against "jurisdiction's practices that interfere with the enforcement of Federal law." Tilak Decl. Ex. 1, 90 Fed. Reg. at 8446. These threats of civil and criminal enforcement are repeated in the Bove Memo and Bondi Directive. Tilak Ex. 2 at p.3; Ex. 3 at p.2. While Plaintiffs challenge the lawfulness of these civil and criminal enforcement threats, they do not at this time seek a preliminary injunction with respect to these threats.

by so-called "sanctuary" jurisdictions, but the definition of a "sanctuary jurisdiction" is even more unclear. While EO 13,768 defined "sanctuary jurisdictions" by specific reference to compliance with 8 U.S.C. § 1373 and civil immigration detainer requests, EO 14,159 defines the term to include any jurisdiction that, in the administration's view, "seek[s] to interfere with the lawful exercise of Federal law enforcement operations," *id.*—an entirely amorphous and subjective standard.

The day after EO 14,159 was issued, Defendant Bove issued a memorandum to all DOJ employees entitled "Interim Policy Changes Regarding Charging, Sentencing, And Immigration Enforcement" ("Bove Memo"), which purports to implement the Executive Order. Tilak Decl. Ex. 2. The Bove Memo expresses DOJ's view that "[t]he Supremacy Clause and other authorities require state and local actors to comply with the Executive Branch's immigration enforcement initiatives" and that states and localities violate federal law by "failing to comply with lawful immigration-related commands and requests." *Id.* at p.3. The Memo does not define what constitutes immigration enforcement "initiatives," "commands," or "requests," but broadly asserts that the President has the unilateral authority to command compliance by states and localities. The Memo also states DOJ's view that laws and policies that "prohibit[] disclosures of information" "threaten to impede Executive Branch immigration initiatives," and that such policies will be subject to investigation by a dedicated DOJ working group focused on so-called "sanctuary" jurisdictions. *Id*. The Memo's assertion is not limited to prohibitions on the sharing of *immigration status* information, but appears to require localities to share *any* information that DOJ deems relevant to immigration enforcement.

## B.     The Bondi Directive

On February 5, 2025, Defendant Bondi issued the Bondi Directive to all DOJ employees. Tilak Decl. Ex. 3. In furtherance of the policy announced in EO 14,159, the Bondi Directive commits DOJ to "ensure that, consistent with law, 'sanctuary jurisdictions' do not receive access to Federal funds from the Department." *Id.* at p.1; see also *id.* ("Sanctuary jurisdictions should not receive access to federal grants administered by the Department of Justice."). To effectuate this goal, the Bondi Directive announces that DOJ will "pause the distribution of all funds" in order to perform a review and will "terminate any agreements that are in violation of law or are the source of waste, fraud, or abuse, and initiate clawback or recoupment procedures, where appropriate." *Id.* at p.1. While the

Bondi Directive states that this will be done "[c]onsistent with applicable statutes, regulations, court orders, and terms," it does not identify any authority to justify the freezing or termination of funds. *Id.* The Bondi Directive defines "sanctuary jurisdictions" to include states and localities that decline to comply or certify compliance with 8 U.S.C. § 1373 or "other applicable federal immigration laws." *Id.* at p.2. The Directive also states that, under "applicable immigration-related federal laws," state and local actors must "comply with lawful immigration-related directives," without specifying what those directives may be. *Id.* at p.3. Nor does the Directive specify which "applicable federal immigration laws" or "immigration-related federal laws" may trigger the department's termination or clawback and recoupment procedures for agreements that it deems "in violation of law." *Id.* at pp.1–3.[4]

### C.    EO 14,218

In a further effort to weaponize federal funding to coerce local jurisdictions, on February 19, 2025, President Trump issued EO 14,218. Tilak Decl. Ex. 33, 90 Fed. Reg. 10581. Section 2(a)(ii) of that Executive Order directs every federal agency to "ensure, consistent with applicable law, that Federal payments to States and localities do not, by design or effect, facilitate the subsidization or promotion of illegal immigration, or abet so-called 'sanctuary' policies that seek to shield illegal aliens from deportation." *Id.*, 90 Fed. Reg. at 10581. The asserted purpose of this directive is to "prevent taxpayer resources from acting as a magnet and fueling illegal immigration to the United States" and to ensure that "no taxpayer-funded benefits go to unqualified aliens." *Id*. EO 14,218 does not define "Federal payments" or "sanctuary" policies, clarify what it means for a payment to "abet" "sanctuary policies" by "design or effect," or explain why funding to localities with "sanctuary policies" "fuel[s] illegal immigration" or results in "taxpayer-funded benefits" to "unqualified aliens." *Id.*

The Executive Branch appears to interpret EO 14,218 broadly. On March 12, 2025, the

---

[4] The Directive also states that DOJ will invoke its "own authority" to impose immigration-related conditions on DOJ funding, including requiring "any jurisdiction that applies for certain Department grants to be compliant with 8 U.S.C. § 1373(a)" and "tailor[ing] future grants to promote a lawful system of immigration, and to reduce efforts by state or local jurisdictions to undermine a lawful system of immigration." Tilak Decl. Ex. 3 at pp. 1–2. If DOJ publishes a list of grants that will be conditioned on compliance with 8 U.S.C. § 1373 or other immigration-related conditions, or begins imposing such conditions on grants, Plaintiffs reserve the right to seek additional injunctive relief if appropriate.  However, given the imminent budgetary quandary that Plaintiffs already face, *see* Background, Part IV, *infra*, Plaintiffs can no longer wait to seek injunctive relief from the Court.

Department of Housing and Urban Development ("HUD") notified San Francisco that annual renewals of over thirty grants through the Continuum of Care program—which supports San Francisco's social safety network to house people facing chronic homelessness—would be subject to new grant conditions. McSpadden Decl. ¶¶ 9–12. These new conditions were announced months after San Francisco was notified that it had been awarded the grants, and after the City had expended its own resources to reimburse nonprofit service providers in the interim in anticipation of receiving HUD funding once the grant agreements were executed. *Id.* ¶ 8. These new conditions require compliance with "all applicable immigration restrictions and requirements," including under "Executive Order 14,218[] or other Executive Orders." McSpadden Decl. Ex. A, at p.3.[5] The grant agreement recites the language of Section 2(a)(ii) of EO 14,218, stating that funds may not be used "in a manner that by design or effect facilitates the subsidization or promotion of illegal immigration or abets so-called 'sanctuary' policies that seek to shield illegal aliens from deportation." *Id.*[6]

### D.    DOJ Sues "Sanctuary" Jurisdictions That Do Not Assist ICE

The administration has also sued states and localities it deems to be "sanctuary" jurisdictions. On February 6, 2025, the United States filed a lawsuit against the State of Illinois, Chicago, Cook County, and their officials. *See* Tilak Decl. Ex. 20 (*Illinois* Compl.). In its complaint, DOJ asserts that these jurisdictions' policies violate federal law because they prohibit state and local officials from (1) detaining an individual on the basis of a detainer or civil administrative warrant, *id.* ¶¶ 42, 48, 54; (2) assisting with federal civil immigration enforcement or detaining an individual for federal civil immigration violations, *id.* ¶ 43; (3) inquiring about the citizenship or immigration status of any individual, *id.* ¶ 44; (4) providing immigration authorities access to individuals in local custody for investigative interviews, *id.* ¶ 48; and (5) responding to immigration enforcement inquiries about

---

[5] On March 13, HUD posted these terms to its official X account. *See* "HUD Ensures Continuum of Care Program Is Used to Address Homelessness," @HUDgov X account, available at https://perma.cc/8Y5W-EGFL; *see also* @SecretaryTurner X Account (Mar. 13, 2025), https://perma.cc/C2JV-9DL7. The grant conditions also include various terms related to not promoting "gender ideology," "diversity, equity, and inclusion," or "elective abortions." McSpadden Decl. ¶ 11; *id.* Ex. A at p.3

[6] While the HUD notice appears to impose conditions on grant renewals and new grants, EO 14,218 on its face does not appear to be limited solely to forward-looking conditions. *See* Tilak Decl. Ex. 33, 90 Fed. Reg. at 10581.

"custody status, release date, or contact information," *id.* ¶ 66; *see generally id.* ¶¶ 8–10. The

following week, DOJ sued the State of New York and state officials claiming that the Supremacy

Clause and federal law requires New York to share records—including home and work addresses—

with immigration authorities as long as the federal government deems this information "relevant" to

immigration-related determinations. *See* Tilak Decl. Ex. 29 (*New York* Compl.) ¶¶ 37–38.

## IV.   The Executive Orders and the Bondi Directive Imminently Harm Plaintiffs

EO 14,159 asserts that "sanctuary" jurisdictions are those that "seek to interfere with the lawful

exercise of Federal law enforcement operations," Tilak Decl. Ex. 1, 90 Fed. Reg. at 8446, and EO

14,218 defines "sanctuary" policies as those that "seek to shield illegal aliens from deportation," *id.*

Ex. 33, 90 Fed. Reg. at 10581. Plaintiffs' policies neither interfere with lawful federal immigration

enforcement nor shield individuals subject to deportation. But the Bove Memo, Bondi Directive, and

the *Illinois* and *New York* lawsuits show that Defendants view jurisdictions as impeding immigration

enforcement (and presumably preventing deportations) merely because they limit the use of their local

resources for federal civil immigration enforcement in many of the same ways that Plaintiffs' policies

require. *See* Background, Parts I.A, III, *supra*. The administration has also publicly identified some

Plaintiffs to be "sanctuary" jurisdictions. For example, a White House press release recently labeled

St. Paul as a "'sanctuary' locale[]," Tilak Decl. Ex. 30; the acting director of ICE has referred to San

Francisco as a "sanctuary city," *id.* Ex. 31; and the Small Business Administration announced that it

would relocate its office out of Seattle because it identified Seattle as a "sanctuary" jurisdiction, *id.* Ex.

32. As such, Plaintiffs anticipate that they will be subject to the full panoply of punitive funding

freezes, withdrawals, and conditions in EO 14,159, EO 14,218, and the Bondi Directive.

This threatened loss of funding creates immediate harm to Plaintiffs. Federal funding accounts

for a significant portion of Plaintiffs' budgets. *See, e.g.*, Kittler Decl. ¶ 13 (federal funds make up $2.5

billion or 16% of San Francisco's FY 24–25 operating budget, plus an additional $1.2 billion in public

infrastructure grants); Williams Decl. ¶ 25 ($3.5 billion in federal funding, accounting for 31% of

Santa Clara's FY 23–24 budget); *see also, e.g.*, Eder Decl. ¶ 10 ($370 million in federal funds

expected for Seattle in 2025); McCarthy Decl. ¶¶ 5–6 ($259 million in federal funds for St. Paul);

Biery Decl. ¶ 6 ($344 million in active federal grants for Portland); Shannon Decl. ¶ 4 ($187 million in

federal funds for San José); De La Rosa Decl. ¶ 7 ($480 million in federal funds for Monterey County in FY 23–24 and FY 24–25); Charvel Decl. ¶ 14 ($530 million in federal funds for San Diego). These funds support essential safety-net and public safety services for Plaintiffs' communities. For example, federal funding supports a variety of disease prevention, mental health and substance abuse treatment, and other vital public health functions in Plaintiffs' jurisdictions—including accounting for over half of the budgets of San Francisco's and Santa Clara's safety-net health and hospital systems. *See, e.g.*, Kittler Decl. ¶ 19; Williams Decl. ¶¶ 38–41; Cody Decl. ¶¶ 10–12; *see also, e.g.*, Dively Decl. ¶ 12(b). Federal funding also supports Plaintiffs' efforts to provide needed nutrition assistance, income support, and services for their poorest residents; child welfare services; and support for seniors and people living with disabilities. *See, e.g.*, Kittler Decl. ¶¶ 24–29; Williams Decl. ¶¶ 24–25, 41; Little Decl. ¶¶ 6–17; Dively Decl. ¶ 12(c); McCarthy Decl. ¶ 10(b)-(d); J. Johnson Decl. ¶ 8; Oster Decl. ¶ 4; Soliván Decl. ¶¶ 5–8. Many Plaintiffs rely on HUD funding to support their efforts to provide housing to members of their communities facing homelessness and housing instability. *See, e.g.*, Soliván Decl. ¶¶ 2–3; Bower Decl. ¶ 7; McSpadden Decl. ¶ 4. Plaintiffs' ability to prepare for emergencies and maintain safe and effective public infrastructure similarly depends on federal funding. *See, e.g.*, Williams Decl. ¶¶ 42–48; Maxey Decl. ¶¶ 17–25; McCluskey Decl. ¶¶ 8–11, 14–21; Boyd Decl. ¶¶ 8–11; Eder Decl. ¶ 13.

DOJ funding plays a particularly important role in Plaintiffs' efforts to promote public safety in their communities. The critical public safety functions that DOJ grants fund are varied, and include supporting Plaintiffs' efforts to (1) ensure local law enforcement agencies are able to maintain adequate staffing; (2) address crimes against vulnerable populations, including domestic violence and sexual assault, crimes against children, and hate crimes; (3) tackle gun violence in their communities; (4) meet the needs of those with mental health crises; (5) prevent school violence and support justice-involved youth; (6) procure critical equipment to keep law enforcement officers and the public safe; and (7) invest in technology to help law enforcement solve crimes more efficiently. Scott Decl. ¶¶ 7–13; Murillo Decl. ¶¶ 7–8; Rosen Decl. ¶¶ 12–13; Öberg Decl. ¶ 4(a)–(j); Katz Decl. ¶ 6; Maxey Decl. ¶¶ 6–16; J. Johnson Decl. ¶ 4; Cole-Tindall Decl. ¶¶ 20–24; Dauer Decl. ¶¶ 4–10; Elicker Decl. ¶¶ 25–29; Bower Decl. ¶ 6; McCarthy Decl. ¶¶ 8–9; Lee Decl. ¶ 4; Boyd Decl. ¶¶ 4–6; Meaux Decl. ¶¶ 3–19;

S. Johnson Decl. ¶¶ 4–8; Lara Decl. ¶ 3. In a cruel twist, Defendants' "law and order" justification for freezing (and potentially terminating) distribution of DOJ funds would in fact directly and gravely undermine Plaintiffs' efforts to keep their communities safe. Scott Decl. ¶ 16; Rosen Decl. ¶ 14; Katz Decl. ¶ 7; Maxey Decl. ¶¶ 5, 26; J. Johnson Decl. ¶ 7; Cole-Tindall Decl. ¶¶ 25–26; Dauer Decl. ¶ 12; Elicker Decl. ¶¶ 27, 30; Meaux Decl. ¶ 20; Öberg Decl. ¶ 5; S. Johnson Decl. ¶ 10; Cabell Decl. ¶ 4.

The threats that funding will be frozen or withdrawn under EO 14,159, EO 14,218, or the Bondi Directive are causing present harm. Most of the federal funds that Plaintiffs receive are reimbursement-based, meaning that Plaintiffs are *currently spending millions of their own dollars* on services for which they are legally entitled to seek reimbursement from the federal government. *See, e.g.*, Kittler Decl. ¶ 16; Williams Decl. ¶¶ 26–28; Eder Decl. ¶¶ 8–9; Milstein Decl. ¶ 4; McCarthy Decl. ¶ 7; Charvel Decl. ¶ 16; Shannon Decl. ¶ 4; Oster Decl. ¶ 12; Cabell Decl. ¶ 5. But, because of the Executive Orders and the Bondi Directive, it is suddenly unclear whether or when those reimbursements will be available. The possible imposition of grant conditions requiring compliance with the Executive Orders' unintelligible anti-"sanctuary" policies further adds to the uncertainty—especially where Plaintiffs have expended their own resources in anticipation of receiving grant funds. McSpadden Decl. ¶ 8. Many Plaintiffs are in the middle of their annual budgetary processes and face imminent deadlines to make critical budgetary decisions. The present uncertainty of whether or when Plaintiffs will receive federal funds hinders the already complex task of developing a budget. *See, e.g.*, Williams Decl. ¶¶ 58–60; Kittler Decl. ¶¶ 30–39; Milstein Decl. ¶ 6; Elicker Decl. ¶¶ 11–13; Bower Decl. ¶¶ 11–13; Biery Decl. ¶¶ 4–5; Charvel Decl. ¶¶ 9–13; Shannon Decl. ¶¶ 7–9.

Faced with a threat that significant federal funding streams will be withdrawn, Plaintiffs must immediately decide between one of three choices, each of which harms Plaintiffs and their communities. First, Plaintiffs could budget under the assumption that federal funds will be unavailable. But, because Plaintiffs are unable to self-fund the various essential services supported by federal funding, budgeting based on a lack of federal funds would mean a drastic roll back of critical services supporting the health, safety, and welfare of millions of residents. Kittler Decl. ¶¶ 40–46; McSpadden Decl. ¶ 14; Williams Decl. ¶¶ 61–64; Eder Decl. ¶¶ 11–13; Milstein Decl. ¶ 5; J. Johnson Decl. ¶ 9; Dively Decl. ¶¶ 9, 11, 14; Cole-Tindall Decl. ¶¶ 17–18, 26; McCarthy Decl. ¶ 11; Cabell

Decl. ¶¶ 7–10; Charvel Decl. ¶¶ 7, 9, 17; Shannon Decl. ¶¶ 6, 9; Oster Decl. ¶ 15; Bower Decl. ¶ 14. Alternatively, Plaintiffs could budget based on the continued receipt of federal funds, knowing that potentially devastating cuts could come suddenly at any time. But, if unanticipated cuts come mid-fiscal year, the impact will be even more severe, as there will be less time to absorb the loss of funds. Kittler Decl. ¶ 33; Williams Decl. ¶¶ 58–60; Charvel Decl. ¶¶ 6–7; Elicker Decl. ¶¶ 18–21; Oster Decl. ¶ 8; Cabell Decl. ¶¶ 7–11. To the extent that Plaintiffs maintain contingency reserves, those would not cover the loss of a substantial amount of federal funds. Kittler Decl. ¶ 39; Williams Decl. ¶ 29; Milstein Decl. ¶ 7; Elicker Decl. ¶¶ 15–16. Local agencies that rely on DOJ funding face a similar choice between stopping expenditures on critical public safety services supported by DOJ funding, and continuing to expend resources and risk that their budgets will be thrown into disarray if they are suddenly unable to obtain reimbursement for these expenses. *See, e.g.*, Scott Decl. ¶ 14; Cole-Tindall Decl. ¶ 26; Boyd Decl. ¶ 7; Lara Decl. ¶¶ 4–5. The only other option available to Plaintiffs is to accede to Defendants' unlawful threats and redirect their local resources to implementing Defendants' immigration policy preferences. But requiring Plaintiffs to surrender the constitutional authority reserved to states and localities and bow to Defendants' disregard for core constitutional principles is a grave injury in its own right.

## LEGAL STANDARD

A plaintiff seeking a preliminary injunction "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Courts evaluate these factors on a "sliding scale" such that "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and the injunction is in the public interest." *Arc. of Cal. v. Douglas*, 757 F.3d 975, 983 (9th Cir. 2014) (cleaned up).

**ARGUMENT**

**I.    Plaintiffs Are Likely to Succeed on the Merits of Their Claims**

EO 14,159, EO 14,218, and the Bondi Directive suffer from the same constitutional and statutory deficiencies that this Court and the Ninth Circuit identified in entering and upholding injunctions against the first Trump administration's efforts to withhold funding from so-called "sanctuary" jurisdictions. Defendants cannot, under the guise of a new Presidential administration, evade binding precedent, and Plaintiffs are likely to succeed on the merits of their claims.

**A.    The Executive Orders and the Bondi Directive Violate Separation of Powers Principles**

In *City and County of San Francisco*, the Ninth Circuit faced the same question that the Executive Orders and the Bondi Directive now pose again: "whether, in the absence of congressional authorization, the Executive Branch may withhold all federal grants from so-called 'sanctuary' cities and counties." 897 F.3d at 1231. Then, as now, the answer is no: "under the principle of Separation of Powers and in consideration of the Spending Clause, which vests exclusive power to Congress to impose conditions on federal grants, the Executive Branch may not refuse to disperse the federal grants in question without congressional authorization." *Id.* Thus, the Executive Orders' and the Bondi Directive's attempts to prevent funds from going to so-called "sanctuary" jurisdictions, in the absence of Congressional authorization, violate the constitutional separation of powers.

As the Supreme Court has explained, "[n]o matter the context, the President's authority to act necessarily 'stem[s] either from an act of Congress or from the Constitution itself.'" *Trump v. United States*, 603 U.S. 593, 607 (2024) (quoting *Youngstown Sheet & Tube Co v. Sawyer*, 343 U.S. 579, 585 (1952)). Where the President acts in a manner "incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter." *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring). In the six years since the Ninth Circuit's decision in *City and County of San Francisco*, Congress has not exercised its legislative or appropriations authority to impose immigration enforcement conditions on federal funding or delegate authority to impose such conditions to the

Executive Branch.[7] Moreover, for over 50 years, Congress has established procedures through which the President can defer or rescind budgetary authority subject to Congressional oversight. *See* 2 U.S.C. §§ 681–88. By unilaterally imposing immigration enforcement conditions on federal funds—without Congressional authorization and in the face of Congressionally established procedures to defer or rescind budgetary authority—the President's authority is "at its lowest ebb," and can be sustained only if the authority is "within his domain and beyond control by Congress." *Youngstown*, 343 U.S. at 637, 640. But the opposite is true here: Congress has *exclusive* power over appropriations and spending, and the Executive Branch has *no* power to condition funds appropriated by Congress.

The Constitution grants Congress exclusive power to legislate, appropriate, and spend. U.S. Const. art. I, § 1; art. I, § 9, cl. 7; art. I, § 8, cl. 1; *see City & Cnty. of S.F.*, 897 F.3d at 1231 ("The United States Constitution exclusively grants the power of the purse to Congress, not the President."). The authority of the Executive Branch is circumscribed. When a bill passes both houses of Congress, it must be presented to the President for signature or veto. *See* U.S. Const. art. I, § 7, cl. 3 (Presentment Clause); *Clinton v. City of New York*, 524 U.S. 417, 439–40 (1998). Once a bill becomes law, the President must "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3—a duty that "necessarily extends to appropriations." *City & Cnty. of S.F.*, 897 F.3d at 1234. Thus, the Executive Branch has no power to "enact, to amend, or to repeal statutes," *Clinton*, 524 U.S. at 438; to "redistribute or withhold properly appropriated funds in order to effectuate its own policy goals," *City & Cnty. of S.F.*, 897 F.3d at 1235; or to unilaterally "refuse to spend the funds appropriated by Congress," *In re Aiken Cnty.*, 725 F.3d 255, 259, 261 n.1 (D.C. Cir. 2013) (Kavanaugh, J.).

By unilaterally directing Defendants Bondi and Noem to stop federal funding to "sanctuary" jurisdictions, Tilak Decl. Ex. 1, 90 Fed. Reg. at 8446, and by directing all federal agencies to condition funds on jurisdictions agreeing not to "abet so-called 'sanctuary' policies," *id.* Ex. 33, 90 Fed. Reg. at 10581, EO 14,159 and EO 14,218 violate the constitutional separation of powers because they exceed

---

[7] No Bailout for Sanctuary Cities Act, H.R. 5717, 118th Cong. (2024); Stop Dangerous Sanctuary Cities Act, S. 3452, 117th Cong. (2021); Mobilizing Against Sanctuary Cities Act, H.R. 94, 117th Cong. (2021); No Tax Breaks for Sanctuary Cities Act, H.R. 894, 117th Cong. (2021); Ending Sanctuary Cities Act of 2021, H.R. 3195, 117th Cong. (2021); *see also City & Cnty. of S.F.*, 897 F.3d at 1234 n.4.

Presidential power and trample on Congressional authority. Through these Executive Orders, the Trump administration "claim[s] for itself Congress's exclusive spending power, [and] attempt[s] to co-opt Congress's power to legislate." *City & Cnty. of S.F.*, 897 F.3d at 1234. The Executive Orders also violate the Presentment Clause by effectively amending or repealing duly enacted Congressional appropriations. *Immigr. & Naturalization Serv. v. Chadha*, 462 U.S. 919, 951, 954 (1983). And the Orders violate the President's obligation to take care that enacted laws—including appropriations—are faithfully executed. *See City & Cnty. of S.F.*, 897 F.3d at 1234.

The Bondi Directive likewise effects an unconstitutional usurpation of Congressional authority. The Directive threatens to indefinitely freeze the "distribution of all funds" until they can be reviewed as part of DOJ's efforts to ensure that "'sanctuary jurisdictions' do not receive access to Federal funds from the Department," but identifies no Congressional authorization for such a freeze. Tilak Decl. Ex. 3 at p.1. DOJ's across-the-board freeze on funds therefore unlawfully legislates new conditions on already-appropriated funding, exercises spending power not authorized by Congress, and repeals Congressionally authorized appropriations and allocation formulas in favor of Executive Branch policy preferences. These violations are further compounded by the Bondi Directive's threat that this freeze will be followed by actions to terminate funding agreements unilaterally deemed "in violation of law"—including potentially the undefined set of "applicable federal immigration laws" that the Directive asserts "sanctuary" jurisdictions violate—without regard to whether Congress authorized such funding to be contingent on compliance with these laws. *Id.* at pp.1–2.

### B.    The Executive Orders and the Bondi Directive Violate the Spending Clause

In addition to unlawfully arrogating spending power reserved to Congress, EO 14,159, EO 14,218, and the Bondi Directive exercise that spending power in ways that would be manifestly unconstitutional even if carried out by the appropriate branch of government.

### 1.    Ambiguous, After-the-Fact Conditions

When Congress imposes conditions on federal funds, it must do so unambiguously "so that states and local jurisdictions contemplating whether to accept such funds can 'exercise their choice knowingly, cognizant of the consequences of their participation.'" *Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d at 532 (quoting *South Dakota v. Dole*, 483 U.S. 203, 207 (1987)); *see also Nat'l Fed. of*

*Indep. Bus. v. Sebelius* ("*NFIB*"), 567 U.S. 519, 577 (2012) (cleaned up). These conditions must also be shared *in advance*. "Because states must opt-in to a federal program willingly, fully aware of the associated conditions, Congress cannot implement new conditions after-the-fact." *Cnty. of Santa Clara*, 250 F. Supp. 3d at 532. EO 14,159, EO 14,218, and the Bondi Directive violate these precepts.

EO 14,159 and EO 14,218 ostensibly apply to all "Federal funds" and "Federal payments"—including funds already appropriated by Congress or awarded to states and localities. As such, the Executive Orders purport to impose immigration-related conditions that local jurisdictions were unaware of—and thus could not have voluntarily accepted—at the time Congress appropriated the funds. *See, e.g.*, McSpadden Decl. ¶¶ 8–13 (describing potential imposition of new conditions after the department expended its own resources in reliance on grant award notice). The conditions in the Executive Orders are also entirely ambiguous. EO 14,159 does not specify which "Federal funds" are at issue or define when a jurisdiction "interfere[s]" with "Federal law enforcement operations" such that it is subject to defunding. Tilak Decl. Ex. 1, 90 Fed. Reg. at 8446. EO 14,218 similarly does not define what "federal payments" are at stake or explain what it means for a jurisdiction to use federal payments to "abet so-called 'sanctuary' policies." *Id.* Ex. 33, 90 Fed. Reg. at 10581. Localities cannot knowingly or voluntarily accept conditions based on such vacuous and subjective phrases. *See Cnty. of Santa Clara*, 250 F. Supp. 3d at 532.

By purporting to freeze *all* DOJ funds in order to determine alignment with the Department's immigration-related priorities—and threatening to unilaterally terminate agreements that DOJ deems to violate the law—the Bondi Directive likewise imposes retroactive conditions on already-awarded funds. The Directive is also ambiguous as to what constitutes a "sanctuary" jurisdiction, what "other applicable federal immigration laws" such jurisdictions violate, and what "directives" localities must comply with. Tilak Decl. Ex. 3 at p.2.

### 2.    Conditions With No Nexus to Affected Funds

As this Court has held, "conditions placed on congressional spending must have some nexus with the purpose of the implicated funds." *Cnty. of Santa Clara*, 250 F. Supp. 3d at 532; *see also id.* ("Congress may condition grants under the spending power only in ways reasonably related to the purpose of the federal program.") (quoting *Dole*, 483 U.S. at 213); *New York v. United States*, 505

U.S. 144, 172 (1992). Thus, as this Court previously concluded with respect to EO 13,768, funds conditioned on compliance with Executive Branch immigration policy "must have some nexus to immigration enforcement." *Id.* The Executive Orders at issue here fail this nexus requirement. EO 14,159 and EO 14,218 purport to condition *all* federal funding and federal payments on local assistance with federal civil immigration law—even though "most categories of federal funding, including without limitation funding related to Medicare, Medicaid, transportation, child welfare services, immunization and vaccination programs, and emergency preparedness," have nothing to do with immigration enforcement. *See* 250 F. Supp. 3d at 532–33; Background, Part IV, *supra*. The possible conditioning of HUD funds *used to house the chronically homeless* on jurisdictions agreeing not to "abet so-called 'sanctuary' policies," McSpadden Decl. ¶¶ 11, 13, illustrates the utter lack of connection between immigration enforcement and the funding streams Defendants seek to weaponize.

The Bondi Directive's threat to freeze *all* DOJ funds in an effort to effectuate its immigration policy preferences likewise fails this nexus requirement; indeed, none of the DOJ grants on which Plaintiffs rely have anything to do with immigration enforcement. *See* Background, Part IV, *supra*; *City & Cnty. of S.F. v. Sessions*, 349 F. Supp. 3d at 958 (requiring compliance with 8 U.S.C. § 1373 and other immigration-related conditions was unrelated to purpose of DOJ Byrne JAG grants).

### 3. Unduly Coercive Conditions

"Congress cannot use the spending power in a way that compels local jurisdictions to adopt certain policies," *Cnty. of Santa Clara*, 250 F. Supp. 3d at 533, such as by offering a "financial inducement . . . so coercive as to pass the point at which pressure turns to compulsion." *Dole*, 483 U.S. at 211. Legislation that "coerces a State to adopt a federal regulatory system as its own" "runs contrary to our system of federalism." *NFIB*, 567 U.S. at 577–78. Yet this is precisely what EO 14,159 (which applies to federal funds without limitation) and EO 14,218 (which applies to federal payments administered by every federal agency) seek to do. Just as with EO 13,768, these Executive Orders are unconstitutionally coercive because they "threaten[] to deny sanctuary jurisdictions all federal grants, hundreds of millions of dollars on which Plaintiffs rely." *Cnty. of Santa Clara*, 250 F. Supp. 3d at 533. For each Plaintiff, losing all—or even a substantial portion—of the federal funds on which they rely to provide essential services would have severe impacts. Indeed, for many Plaintiffs, the amount of

federal funding at stake constitutes a significant portion of their budgets. *See* Background, Part IV,

*supra*; *NFIB*, 567 U.S. at 582 (threat of denying Medicaid funding, which constituted over 10 percent

of a state's budget, constituted "economic dragooning that leaves the States with no real option").

### C.    The Executive Orders and Bondi Directive Violate Plaintiffs' Fifth Amendment Rights

The Fifth Amendment protects against federal laws that are so vague they fail to provide fair

notice of what is prohibited or so standardless that they permit discriminatory enforcement. *Sessions v.

Dimaya*, 584 U.S. 148, 155–56 (2018). In 2017, this Court found EO 13,768 unconstitutionally vague

and violative of procedural due process. *Cnty. of Santa Clara*, 250 F. Supp. 3d at 534–36; *Cnty. of

Santa Clara v. Trump*, 267 F. Supp. 3d 1201, 1215 (N.D. Cal. 2017). EO 14,159, EO 14,218, and the

Bondi Directive are no different. By directing the Attorney General and Secretary of Homeland

Security to withhold funding based on their subjective determination that a state or locality is a

"sanctuary" jurisdiction that "seek[s] to interfere" with "Federal law enforcement operations," Tilak

Decl. Ex. 1, 90 Fed. Reg. at 8446, EO 14,159 contains precisely the kind of "expansive, standardless

language" that "creates huge potential for arbitrary and discriminatory enforcement," *Cnty. of Santa

Clara*, 250 F. Supp. 3d at 535. Likewise, EO 14,218 fails to meaningfully define key terms, such as

"sanctuary policies" or "Federal payments," or what constitutes "seek[ing] to shield illegal aliens from

deportation" or "abet[ting] so-called 'sanctuary' policies," Tilak Decl. Ex. 33, 90 Fed. Reg. at

10581—instead leaving these terms subject to the Executive Branch's unbridled discretion. The Bondi

Directive, in turn, vaguely defines "[s]o-called 'sanctuary jurisdictions'" to "include state or local

jurisdictions that refuse to comply with 8 U.S.C. § 1373, refuse to certify compliance with § 1373, or

willfully fail to comply with other applicable federal immigration laws." *Id.* Ex. 3 at p.2. The

Directive's open-ended definition of "sanctuary jurisdictions" does not specify what other federal

immigration laws are "applicable," and the use of "include" leaves open the possibility that even

jurisdictions that comply with the undefined set of immigration laws may still be deemed "sanctuary

jurisdictions" subject to defunding (as well as enforcement actions). The language in the Executive

Orders and Bondi Directive does not explain "what conduct might subject a state or local jurisdiction

to defunding or enforcement action, making it impossible for jurisdictions to determine how to modify

their conduct, if at all, to avoid . . . penalties." *Cnty. of Santa Clara*, 250 F. Supp. 3d at 534–35. The lack of clarity and potential for abuse are exacerbated because these actions reflect an abrupt reversal of policy from the prior administration and impose a serious consequence (the freezing or withholding of funds) without fair notice. *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253–55 (2012) (change in agency policy without reasonable notice prior to enforcement was void for vagueness).

EO 14,159, EO 14,218, and the Bondi Directive also violate the Fifth Amendment's guarantee of procedural due process. Plaintiffs have a constitutionally protected property interest in the federal funds on which they rely to provide essential services within their respective jurisdictions. Plaintiffs' property interest in those federal funds is well established and is governed by rules and mutually explicit understandings with the federal government when those funds were Congressionally appropriated and subsequently awarded. *See Cnty. of Santa Clara*, 250 F. Supp. 3d at 536 (citing *NFIB*, 567 U.S. at 576–77). By making Plaintiffs ineligible for federal funds "through a discretionary and undefined process[,]" EO 14,159 and EO 14,218 violate Plaintiffs' procedural due process rights. *Cnty. of Santa Clara*, 250 F. Supp. 3d at 536; *see also Matthews v. Eldridge*, 424 U.S. 319, 348–49 (1976) (due process requires notice and opportunity to respond). Likewise, the Bondi Directive's threat of an immediate and indefinite funding freeze without providing "any administrative or judicial procedure for states and local jurisdictions to be heard, to challenge [the] action, or to appeal any action taken against them" violates due process. *Cnty. of Santa Clara*, 250 F. Supp. 3d at 536.[8]

### D.    The Executive Order Violates Plaintiffs' Tenth Amendment Rights

The Tenth Amendment prohibits the federal government from "commandeering" state and local officials to help enforce federal law. *See Printz v. United States*, 521 U.S. 898 (1997). The "Federal Government may not compel the States to enact or administer a federal regulatory program," *New York*, 505 U.S. at 188, regardless of whether it "directly commands a State to regulate or indirectly coerces a State to adopt a federal regulatory system as its own." *NFIB*, 567 U.S. at 578.

---

[8] The Bondi Directive's illusory statements that the contemplated defunding will be "consistent with" the law, Tilak Decl. Ex. 3 at p. 1, do not shield the administration from the Fifth Amendment. *See City & Cnty. of S.F.*, 897 F.3d at 1240 ("If 'consistent with law' precludes a court from examining whether the Executive Order is consistent with law, judicial review is a meaningless exercise, precluding resolution of the critical legal issues.").

Congress cannot "force the States to implement a federal program" through coercive use of its spending power. *Id*. The Executive Branch certainly cannot do the same via executive order.

This Court previously found that EO 13,768 violated the Tenth Amendment by purporting to withhold all grant funding from "sanctuary" jurisdictions because the loss of funding "would have significant effects on [localities'] ability to provide services to their residents and . . . they may have no legitimate choice regarding whether to accept the government's conditions in exchange for those funds." *Cnty. of Santa Clara*, 250 F. Supp. 3d at 533. EO 14,159 and EO 14,218 have precisely the same coercive effect. Neither Order limits the federal funding or federal payments that may be withheld on the basis of a jurisdiction's "sanctuary" policies. EO 14,218, for example, expressly applies to payments administered by every executive department and agency. As discussed above, the Bove Memo, the Bondi Directive, the *Illinois* and *New York* lawsuits, and the Trump administration's public statements suggest that Defendants likely view states and localities like Plaintiffs as "sanctuary" jurisdictions based on their policies limiting the use of local resources to assist with enforcing federal civil immigration laws. The Orders therefore put a "gun to the head" of Plaintiffs, *NFIB*, 567 U.S. at 581, forcing them to either forfeit federal funding that makes up a significant portion of their budgets or acquiesce to Defendants' unconstitutional assertion of power over local policymaking. *Cnty. of Santa Clara*, 250 F. Supp. 3d at 534.

### E.    The Bondi Directive Violates the Administrative Procedure Act

The APA governs the process of federal agency decision-making. Defendant DOJ is an "agency" as defined in the APA, 5 U.S.C. § 551(1), and the Bondi Directive is therefore an agency action subject to review under the APA.[9] The Bondi Directive violates the APA in numerous respects.

First, because the Bondi Directive is unconstitutional for the reasons explained above, it is "contrary to constitutional right [and] power," in violation of the APA. 5 U.S.C. § 706(2)(B). Second, the Bondi Directive's threatened across-the-board freeze on funds is in excess of statutory authority.

---

[9] The Bondi Directive is a final agency action because it announces a final decision to pause funding entirely at a certain time. It "mark[s] the consummation of" the DOJ's "decision-making process" that so-called "sanctuary" jurisdictions are ineligible for federal funding—a decision "by which rights or obligations have been determined" and "from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (internal quotation marks omitted).

*See* 5 U.S.C. § 706(2)(C). No law or provision of the Constitution authorizes DOJ to indefinitely withhold properly obligated federal funds or to impose extra-statutory conditions not authorized by Congress. Moreover, through the Impoundment Control Act, 2 U.S.C. §§ 681–88, Congress has strictly delineated the limited circumstances and procedures through which the administration may request deferral or rescission of appropriated funds from Congress. *See* 2 U.S.C. §§ 683–84; *City & Cnty. of S.F.*, 897 F.3d at 1234 & n.3. The Bondi Directive does not even attempt to satisfy these limitations. It is therefore *ultra vires* in violation of the APA.

Third, the Bondi Directive is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'" *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). Here, the Bondi Directive "simply ignore[s] an important aspect of the problem" addressed by its action, *id.* at 293 (citation and quotation marks omitted)—i.e., how the sudden loss of DOJ funding will harm the public safety and health of Plaintiffs' communities. *See* Background, Part IV, *supra.* The Bondi Directive also fails entirely to offer a reasonable explanation for the breadth of funding withheld and the basis for withholding funds already appropriated. Finally, because the Bondi Directive reflects a significant departure from prior policy that "engendered serious reliance interests," DOJ must "provide a more detailed justification than what would suffice for a new policy created on a blank slate." *FCC v. Fox Telev. Stations, Inc.*, 556 U.S. 502, 515–16 (2009). But the Bondi Directive fails entirely to consider Plaintiffs' reliance on the threatened federal funding, the expectation of reimbursement from already-appropriated funds, and local governments' need for clarity about funding streams used to provide services to their communities.

## II.    Plaintiffs Are Imminently and Irreparably Harmed by Defendants' Actions

EO 14,159, EO 14,218, and the Bondi Directive inflict on Plaintiffs at least three types of irreparable harm: to their budgets, to their constitutional rights, and to the goodwill and well-being of their communities.[10] Each type suffices to support a preliminary injunction. Indeed, this Court and the

---

[10] Plaintiffs' showing of irreparable harm also establishes their Article III standing *See, e.g.*, *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1286–87 (9th Cir. 2013). In any event, this Court and the Ninth Circuit have previously found that the very kinds of injuries caused by

Ninth Circuit already ruled that the very actions repackaged here by Defendants are likely to cause irreparable harm. *See City & Cnty. of S.F.*, 897 F.3d at 1243–44; *Cnty. of Santa Clara*, 250 F. Supp. 3d at 537–38. Here, on a virtually identical record, the Court should reach the same result.

**Budgetary Harm:** Defendants' actions mire Plaintiffs in financial uncertainty that irreparably harms their budgets and, by extension, their abilities to govern and provide services to the public. As discussed above, federal funding represents not just a significant portion of Plaintiffs' overall budgets but a lifeline for many of Plaintiffs' safety-net services, including healthcare, disease control, emergency management, public benefits, and—especially in the case of DOJ funding—law enforcement. *See* Background, Part IV, *supra.* The threat of losing all federal funding or federal payments under EO 14,159 or EO 14,218 is existential; it would shrink Plaintiffs' budgets and services to a level commensurate with only a fraction of the people whom Plaintiffs are required to serve. *See City & Cnty. of S.F.*, 897 F.3d at 1244 ("total loss of funding" threatened by EO 13,768 "would be catastrophic"). Indeed, the withholding of DOJ funding, which constitutes millions of dollars for many Plaintiffs, would alone disrupt Plaintiffs' budgets and require Plaintiffs to gut critical public safety services, creating an uncompensable harm to Plaintiffs and their communities. *See California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018) (analysis "focuses on irreparability, irrespective of the magnitude of the injury") (cleaned up); *Michigan v. DeVos*, 481 F. Supp. 3d 984, 995–96 (N.D. Cal. 2020) (budgetary disruptions requiring jurisdictions to abandon public health efforts were irreparable).

Even now, Defendants' actions leave Plaintiffs in limbo, irreparably harming their present abilities to budget and serve the public. Plaintiffs have already made massive expenditures to provide services on the expectation of being reimbursed by federal dollars. The Executive Orders and the Bondi Directive threaten to upend that expectation, and leave Plaintiffs with no good options to mitigate the risk of loss. Just as in 2017, the threats posed by the Executive Orders and the Bondi Directive require Plaintiffs "to take steps to mitigate the risk of losing millions of dollars in federal funding, which will include placing funds in reserve and making cuts to services. These mitigating steps will cause [Plaintiffs] irreparable harm." *Cnty. of Santa Clara*, 250 F. Supp. 3d at 537; *see also*

---

Defendants' actions are justiciable. *City & Cnty. of S.F.*, 897 F.3d at 1235–36; *Cnty. of Santa Clara*, 250 F. Supp. 3d at 514–30.

1   *City & Cnty. of S.F.*, 897 F.3d at 1244 (need for budgetary certainty "renders damages inadequate").

2       **Constitutional Harm:** Defendants' actions subject Plaintiffs to another irreparable harm: the

3   deprivation of their constitutional rights. As the Ninth Circuit has held, "the deprivation of

4   constitutional rights"—including by executive action—"'unquestionably constitutes irreparable

5   injury.'" *See Washington v. Trump*, 847 F.3d 1151, 1169 (9th Cir. 2017) (quoting *Melendres v.*

6   *Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)). A plaintiff may suffer constitutional injury from being

7   forced into the "Hobson's choice" between accepting unconstitutional conditions and incurring

8   financial penalties. *See Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1057–59 (9th

9   Cir. 2009) (finding that the plaintiffs were likely to suffer irreparable harm because they had to choose

10  between signing unconstitutional agreements and losing significant business). Defendants' actions

11  force Plaintiffs to make a textbook "Hobson's choice": accede to Defendants' unconstitutional

12  demands to require local participation in immigration enforcement, or risk fatal financial penalties. As

13  in 2017, "forcing [localities] to make this unreasonable choice . . . results in a constitutional injury

14  sufficient to establish standing *and* irreparable harm." *Cnty. of Santa Clara*, 250 F. Supp. 3d at 538.

15      **Operational and Community Harm**: Finally, Defendants' actions irreparably harm the trust

16  between Plaintiffs and their local communities on which Plaintiffs depend to fulfill their

17  responsibilities. This injury is not just symbolic but material. Plaintiffs have engaged in painstaking

18  efforts to build trust with immigrant communities, which is vital to ensuring that all community

19  members, regardless of immigration status, feel safe cooperating with local law enforcement and

20  interacting with government agencies to access public health and other critical services. Scott Decl. ¶

21  4; Miyamoto Decl. ¶ 4; Murillo Decl. ¶ 6; Rosen Decl. ¶¶ 5–11; Ritchie Decl. ¶¶ 4–6; Rivero Decl. ¶¶

22  6–9. Requiring Plaintiffs to adopt federal government conditions that would gravely undermine trust

23  between the public and local government constitutes irreparable harm. *See City of Los Angeles v.*

24  *Sessions*, 2018 WL 6071072, at *3 (C.D. Cal. Sept. 13, 2018) (irreparable harm where city had to

25  either "diminish[] community trust and undermine[] public safety" by implementing objectionable

26  policies or forgo DOJ funds), *aff'd sub nom. City of Los Angeles v. Barr*, 941 F.3d 931 (9th Cir. 2019);

27  *City of Chicago v. Sessions*, 264 F. Supp. 3d 933, 950 (N.D. Ill. 2017) ("The harm to the City's

28  relationship with the immigrant community if it should accede to the conditions is irreparable."),

*vacated in part on other grounds*, 2018 WL 4268817 (7th Cir. June 4, 2018).

## III.    The Balance of the Equities and the Public Interest Favor a Preliminary Injunction

It is neither equitable nor in the public's interest to allow Defendants to violate the U.S. Constitution. In a case against the government, the third and fourth preliminary injunction factors merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). "[B]y establishing a likelihood" of a constitutional violation, "Plaintiffs have also established that both the public interest and the balance of the equities favor a preliminary injunction." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014). While the inquiry should end there, weighing the impact that granting or denying a preliminary injunction would have on the parties also supports an injunction in this case. *See Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 827 (9th Cir. 1992). Plaintiffs' requested injunction is targeted to only those portions of EO 14,159, EO 14,218, and the Bondi Directive challenged in this motion, and would extend only to jurisdictions with the kinds of policies targeted by Defendants' actions. The requested injunction would not harm Defendants' ability to continue to enforce federal immigration law through federal agents. In contrast, Plaintiffs face immediate serious fiscal consequences, the resolution of which will impact the health, welfare, and safety of millions of people. *See City & Cnty. of S.F.*, 897 F.3d at 1244 ("[T]he public interest cannot be disserved by an injunction that brings clarity to all parties and to citizens dependent on public services.").

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully ask the Court to enter the injunction requested in Plaintiffs' motion.

///

///

///

///

///

///

///

///

1  Dated:  March 17, 2025

                                     DAVID CHIU
2                                    City Attorney
                                     YVONNE R. MERÉ
3                                    Chief Deputy City Attorney
                                     MOLLIE M. LEE
4                                    Chief of Strategic Advocacy
                                     SARA J. EISENBERG
5                                    Chief of Complex and Affirmative Litigation
                                     NANCY E. HARRIS
6                                    KARUN A. TILAK
                                     Deputy City Attorneys
7
                                 By: /s/ David Chiu
8                                    DAVID CHIU
                                     City Attorney
9
                                     Attorneys for Plaintiff
10                                   CITY AND COUNTY OF SAN FRANCISCO
11

12                                   TONY LOPRESTI
                                     County Counsel
13                                   KAVITA NARAYAN
                                     Chief Assistant County Counsel
14                                   MEREDITH A. JOHNSON
                                     Lead Deputy County Counsel
15                                   STEFANIE L. WILSON
                                     RAJIV NARAYAN
16                                   Deputy County Counsels
                                     BILL NGUYEN
17                                   Litigation Fellow

18                               By: /s/Tony LoPresti
19                                   TONY LOPRESTI
                                     County Counsel
20
                                     Attorneys for Plaintiff
21                                   COUNTY OF SANTA CLARA
22

23

24

25

26

27

28

ROBERT TAYLOR
Portland City Attorney

By:  */s/ Naomi Sheffield*
NAOMI SHEFFIELD*
Chief Deputy City Attorney
1221 SW Fourth Avenue, Room 430
Portland, OR 97204
Tel: (503) 823-4047
Fax: (503) 823-3089
Naomi.Sheffield@portlandoregon.gov

*Admitted *pro hac vice*

Attorneys for Plaintiff
CITY OF PORTLAND


DOW CONSTANTINE
King County Executive

By:  DAVID J. HACKETT*
General Counsel to King County
Executive
Chinook Building
401 5th Avenue, Suite 800
Seattle, Washington, 98104
(206) 477-9483
David.hackett@kingcounty.gov
PAUL J. LAWRENCE*
Pacifica Law Group
1191 2nd Avenue, Suite 2000
Seattle, WA 98101-3404
(206) 245-1708
Paul.Lawrence@pacificalawgroup.com

*Admitted *pro hac vice*

Attorney for Plaintiff
MARTIN LUTHER KING, JR. COUNTY

1

PATRICIA KING
New Haven Corporation Counsel

2

By: /s/ Patricia King

3

PATRICIA KING*
Office of the Corporation Counsel

4

City of New Haven
165 Church Street-4th Floor

5

New Haven, CT 06510
Tel:  203-946-7951

6

Cell: 203-668-9282
Fax:  203-946-7942

7

pking@newhavenct.gov

8

*Admitted pro hac vice

9

Attorney for Plaintiff

10

CITY OF NEW HAVEN

11

RYAN RICHARDSON

12

Oakland City Attorney

13

By: /s/ Ryan Richardson

14

RYAN RICHARDSON
City Attorney

15

MARIA BEE
Chief Assistant City Attorney

16

JAMIE HULING DELAYE
Supervising City Attorney

17

H. LUKE EDWARDS
Deputy City Attorney

18

One Frank H. Ogawa Plaza, 6th Floor
Oakland, CA 94612

19

Tel: (510) 238-6629
Fax: (510) 238-6500

20

Email: RRichardson@OaklandCityAttorney.org

21

Attorneys for Plaintiff

22

CITY OF OAKLAND

23

24

25

26

27

28

1

2

JOHN I. KENNEDY
City Attorney

By: */s/ John I. Kennedy*
JOHN I. KENNEDY, City Attorney
1333 Park Ave, Emeryville, CA 94608-3517
Phone: 510-596-4381
Fax: 510-596-3724
Email: John.Kennedy@emeryville.org

Attorney for Plaintiff
CITY OF EMERYVILLE

3

4

5

6

7

8

9

NORA FRIMANN
City Attorney

By: */s/ Nora Frimann*
NORA FRIMANN, City Attorney
ELISA TOLENTINO, Chief Deputy City Attorney
200 E Santa Clara St
San José, CA 95113-1905
Tel: 408-535-1900
Fax: 408-998-3131
cao.main@sanjoseca.gov

Attorneys for Plaintiff
CITY OF SAN JOSÉ

10

11

12

13

14

15

16

17

HEATHER FERBERT
City Attorney

By: */s/ Mark Ankcorn*
MARK ANKCORN, Senior Chief Deputy City Attorney
JULIE RAU, Deputy City Attorney
1200 Third Avenue, Suite 1100
San Diego, California 92101-4100
Tel: (619) 533-5800

Attorneys for Plaintiff
CITY OF SAN DIEGO

18

19

20

21

22

23

24

25

26

27

28

1

SUSANA ALCALA WOOD
City Attorney

2

By: */s/ Andrea Velasquez*

3

ANDREA VELASQUEZ, Supervising Deputy City
Attorney

4

915 I St Fl 4, Sacramento, CA 95814-2621
Tel: 916-808-5346

5

Fax: 916-808-7455
Email: AVelasquez@cityofsacramento.org

6

7

Attorneys for Plaintiff
CITY OF SACRAMENTO

8

9

By: */s/ Anthony P. Condotti*

10

Anthony P. Condotti, City Attorney
Catherine M. Bronson, Assistant City Attorney
Claire Hard, Deputy City Attorney

11

PO Box 481
Santa Cruz, CA 95061

12

Tel: 831-423-8383
Email: tcondotti@abc-law.com

13

chard@abc-law.com
cbronson@abc-law.com

14

15

Attorneys for Plaintiff
CITY OF SANTA CRUZ

16

17

SUSAN K. BLITCH
County Counsel

18

19

By: */s/ Susan K. Blitch*

20

SUSAN K. BLITCH, County Counsel
HENRY BLUESTONE SMITH, Deputy County Counsel

21

168 W Alisal St Fl 3rd
Salinas, CA 93901-2439

22

Tel: 831-755-5045
Fax: 831-755-5283

23

Email: SmithHB@countyofmonterey.gov

24

Attorneys for Plaintiff
COUNTY OF MONTEREY

25

26

27

28

ANN DAVISON
Seattle City Attorney

By: */s/ Ann Davison*
    Ann Davison, Seattle City Attorney*
    Kerala Cowart, Assistant City Attorney*
    Dallas LePierre, Assistant City Attorney*
    Rebecca Widen, Assistant City Attorney*
    Seattle City Attorney's Office
    701 Fifth Avenue, Suite 2050
    Seattle, WA 98104
    Tel: (206) 684-8200
    E-mail: ann.davison@seattle.gov

    *Admitted *pro hac vice*

    Attorneys for Plaintiff
    CITY OF SEATTLE


KRISTYN ANDERSON
City Attorney

By: */s/ Kristyn Anderson*
    KRISTYN ANDERSON (MN Lic. 0267752)*
    SARA J. LATHROP, Assistant City Attorney (MN Lic. 0310232)*
    SHARDA ENSLIN, Assistant City Attorney (MN Lic. 0389370)*
    350 South Fifth Street
    Minneapolis, MN 55415
    Tel: 612-673-3000
    Email: kristyn.anderson@minneapolismn.gov
    sara.lathrop@minneapolismn.gov
    sharda.enslin@minneapolismn.gov

    *Admitted *pro hac vice*

    Attorneys for Plaintiff
    CITY OF MINNEAPOLIS

LYNDSEY OLSON
City Attorney

By: */s/ Lyndsey Olson*
LYNDSEY OLSON, City Attorney*
ANTHONY G. EDWARDS, Assistant City Attorney*
400 City Hall and Courthouse
15 Kellogg Boulevard West
Saint Paul, Minnesota 55102
Tel: 651-266-8710
Fax: 651-298-5619
Email: Anthony.Edwards@ci.stpaul.mn.us

*Admitted *pro hac vice*

Attorneys for Plaintiff
CITY OF ST. PAUL


ERIN K. McSHERRY
City Attorney

By: */s/ Erin K. McSherry*
ERIN K. McSHERRY, City Attorney*
200 Lincoln Avenue
Post Office Box 909
Santa Fe, NM 87504-0909
(505) 955-6512
Email: ekmcsherry@santafenm.gov

**Application for admission pro hac vice forthcoming*

Attorney for Plaintiff
CITY OF SANTA FE


By: */s/ Naomi Tsu*
NAOMI TSU*
JILL HABIG (CA Bar No. 268770)
Public Rights Project
490 43rd Street, Unit #115
Oakland, CA 94609
Tel: (510) 738-6788
jill@publicrightsproject.org
naomi@publicrightsproject.org

*Admitted *pro hac vice*

Attorneys for Plaintiffs
CITIES OF MINNEAPOLIS, NEW HAVEN,
PORTLAND, ST. PAUL, SANTA FE, and SEATTLE

**FILER'S ATTESTATION**

I, DAVID CHIU, am the ECF user whose identification and password are being used to file this PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF. Pursuant to Civil Local Rule 5-1(i)(3), I hereby attest that the other above-named signatories concur in this filing.