DAVID CHIU, SBN 189542
City Attorney
YVONNE R. MERÉ, SBN 175394
Chief Deputy City Attorney
MOLLIE M. LEE, SBN 251404
Chief of Strategic Advocacy
SARA J. EISENBERG, SBN 269303
Chief of Complex and Affirmative Litigation
NANCY E. HARRIS, SBN 197042
KARUN A. TILAK, SBN 323939
Deputy City Attorneys
Fox Plaza
1390 Market Street, 7th Floor
San Francisco, CA  94102-5402
Telephone:      (415) 355-3308
Facsimile:      (415) 437-4644
E-Mail:        karun.tilak@sfcityatty.org

Attorneys for Plaintiff
CITY AND COUNTY OF SAN FRANCISCO

TONY LOPRESTI, SBN 289269
County Counsel
KAVITA NARAYAN, SBN 264191
Chief Assistant County Counsel
MEREDITH A. JOHNSON, SBN 291018
Lead Deputy County Counsel
STEFANIE L. WILSON, SBN 314899
RAJIV NARAYAN, SBN 334511
Deputy County Counsels
BILL NGUYEN, SBN 333671
Litigation Fellow
70 W. Hedding Street, East Wing, 9th Floor
San José, CA 95110
Telephone:      (408) 299-5900
Facsimile:      (408) 292-7240
E-Mail:        tony.lopresti@cco.sccgov.org

Attorneys for Plaintiff
COUNTY OF SANTA CLARA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO, COUNTY OF SANTA CLARA, CITY OF PORTLAND, MARTIN LUTHER KING, JR. COUNTY, CITY OF NEW HAVEN, CITY OF OAKLAND, CITY OF EMERYVILLE, CITY OF SAN JOSÉ, CITY OF SAN DIEGO, CITY OF SACRAMENTO, CITY OF SANTA CRUZ, COUNTY OF MONTEREY, CITY OF SEATTLE, CITY OF MINNEAPOLIS, CITY OF ST. PAUL, CITY OF SANTA FE,<br><br>     Plaintiffs,<br><br>     vs.<br><br>DONALD J. TRUMP, President of the United States, UNITED STATES OF AMERICA, PAMELA BONDI, Attorney General of the United States, EMIL BOVE, Acting Deputy Attorney General, UNITED STATES DEPARTMENT OF JUSTICE, KRISTI NOEM, Secretary of United States Department of Homeland Security, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, DOES 1-100,<br><br>     Defendants. | Case No. 3:25-cv-1350-WHO<br><br>**DECLARATION OF KARUN A. TILAK IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>Hearing Date:  April 23, 2025<br>Time:  2:00 p.m.<br>Judge:  Hon. William H. Orrick III<br>Place:  Courtroom 2<br><br>Date Filed:  February 7, 2025<br>Trial Date:  None Set |

I, Karun A. Tilak, declare and state the following:

1.      I am an attorney and a member of the Bar of this Court.  I am a Deputy City Attorney with the San Francisco City Attorney's Office, and an attorney of record for the Party City and County of San Francisco in the action *City and County of San Francisco v. Trump*, No. 25-cv-1350 (N.D. Cal.), filed in this District on February 7, 2025.  I make this declaration of my own personal knowledge.  If called on to do so, I could and would testify to the matters stated here.

2.      Attached hereto as **Exhibit 1** is a true and correct copy of Executive Order 14,159, entitled "Protecting the American People Against Invasion," issued on January 20, 2025 and published in the Federal Register at 90 Fed. Reg. 8443.

3.      Attached hereto as **Exhibit 2** is a true and correct copy of a January 21, 2025 Memorandum from Acting Deputy Attorney General Emil Bove to all Department of Justice Employees entitled "Interim Policy Changes Regarding Charging, Sentencing, and Immigration Enforcement."

4.      Attached hereto as **Exhibit 3** is a true and correct copy of a February 5, 2025 Memorandum from Attorney General Pamela Bondi to all Department of Justice Employees entitled "Sanctuary Jurisdiction Directives."

5.      Attached hereto as **Exhibit 4** is a true and correct copy of Chapter 12H of the San Francisco Administrative Code, available at https://codelibrary.amlegal.com/codes/san_francisco/latest/sf_admin/0-0-0-7738.

6.      Attached hereto as **Exhibit 5** is a true and correct copy of Chapter 12I of the San Francisco Administrative Code, available at https://codelibrary.amlegal.com/codes/san_francisco/latest/sf_admin/0-0-0-7769.

7.      Attached hereto as **Exhibit 6** is a true and correct copy of City of Portland Resolution No. 37277, entitled "Declare the City of Portland a Welcoming City, a Sanctuary City, and an Inclusive city for all," obtained from the City of Portland's website at https://efiles.portlandoregon.gov/record/10774926/.

8.      Attached hereto as **Exhibit 7** is a true and correct copy of King County Code Chapter 2.15, available from the King County website at https://aqua.kingcounty.gov/council/clerk/code/05_Title_2.htm#_Toc51932405.

9.      Attached hereto as **Exhibit 8** is a true and correct copy of a City of New Haven Executive Order, entitled "An Executive Order to Affirm New Haven a Welcoming City," obtained from the City of New Haven's website at https://www.newhavenct.gov/government/office-of-the-mayor/executive-orders.

10.     Attached hereto as **Exhibit 9** is a true and correct copy of City of Oakland Ordinance No. 13515, entitled "Ordinance Amending Resolution Numbers 63950, 80584 and 86498 in Order to Strengthen the Sanctuary City Policy of the City of Oakland Not to Cooperate With or Provide Support for Federal Immigration Agencies, Based Upon Resolution 87036," obtained from https://library.municode.com/CA/Oakland/ordinances/Code_of_Ordinances?nodeId=938054.

11.     Attached hereto as **Exhibit 10** is a true and correct copy of City of Emeryville Resolution No. 17-08, entitled "Resolution of the City Council of the City of Emeryville Declaring the City of Emeryville a Welcoming and Sanctuary City," obtained from https://emeryville.legistar.com/LegislationDetail.aspx?ID=2930031&GUID=5FFAC888-3EBA-4451-ABF7-E96267C54933.

12.     Attached hereto as **Exhibit 11** is a true and correct copy of City of San Jose Resolution No. 73677, entitled "A Resolution of the Council of the City of San Jose Supporting Public Safety and Immigrant Rights," obtained from the City of San Jose's website at https://records.sanjoseca.gov/Resolutions/RES73677.pdf.

13.     Attached hereto as **Exhibit 12** is a true and correct copy of City of San Jose Resolution No. 77517, entitled "A Resolution of the Council of the City of San Jose Affirming the City of San Jose as a Welcoming City," obtained from the City of San Jose's website at https://records.sanjoseca.gov/Resolutions/RES77517.pdf.

14.     Attached hereto as **Exhibit 13** is a true and correct copy of City of San Jose Resolution No. 2025-19, entitled "A Resolution of the Council of the City of San Jose Reaffirming the City's Commitment to Protecting the Rights and Safety of Immigrant Communities," obtained from the City of San Jose's website at https://records.sanjoseca.gov/Resolutions/RES2025-19.pdf.

15.     Attached hereto as **Exhibit 14** is a true and correct copy of City of San Diego Resolution No. 313834, entitled "A Resolution of the Council of the City of San Diego Declaring the City of San Diego as a Welcoming City That Respects the Dignity of All People and Promotes Programs and Policies to Foster Inclusion for All," obtained from the City of San Diego's website at https://docs.sandiego.gov/council_reso_ordinance/rao2021/R-313834.pdf.

16.     Attached hereto as **Exhibit 15** is a true and correct copy of City of Sacramento Resolution No. 2017-0158, entitled "Reaffirming the City of Sacramento's Status as a City of Sanctuary, Clarifying the City's Policies and Procedures on the Enforcement of Federal Civil Immigration Laws, and Repealing Resolution No. 85-973," obtained from the City of Sacramento's website at https://records.cityofsacramento.org/ViewDoc.aspx?ID=s6tFBnt4W+IL4r3nrtnUbwPZHnTT27r4.

17.     Attached hereto as **Exhibit 16** is a true and correct copy of City of Santa Cruz Resolution No. NS-16,876, entitled "Santa Cruz City Sanctuary Resolution."

18.     Attached hereto as **Exhibit 17** is a true and correct copy of City of Santa Cruz Resolution No. NS-27,504, entitled "Resolution of the City Council of the City of Santa Cruz Declaring Non-Cooperation With U.S. Immigration & Customs Enforcement."

19.     Attached hereto as **Exhibit 18** is a true and correct copy of City of Santa Cruz Resolution No. NS-29,187, entitled "Resolution of the City Council of the City of Santa Cruz to Maintain Trust and Safety for Local Immigrants."

20.     Attached hereto as **Exhibit 19** is a true and correct copy of City of Santa Cruz Resolution No. NS-30-438, entitled "Resolution of the City Council of the City of Santa Cruz Affirming Santa Cruz's Commitment to Abide by the California Values Act and Reaffirming Prior council Action Restricting the Use of City Resources for Immigration Enforcement."

21.     Attached hereto as **Exhibit 20** is a true and correct copy of City of Santa Cruz Ordinance No. 2017-06, entitled "An Uncodified Ordinance of the City Council of the City of Santa Cruz Relating to the City's Procedures Concerning Federal Immigration Law and Reaffirming Its Declaration of the City of Santa Cruz as a Sanctuary for All Its Residents."

22.     Attached hereto as **Exhibit 21** is a true and correct copy of County of Monterey

Resolution No. 17-042, entitled "Resolution of the Monterey County Board of Supervisors Designating Monterey County a Welcoming County for Immigrants and Refugees, and Declaring the County a Place of Trust and Safety for Local Immigrants," obtained from https://monterey.legistar.com/LegislationDetail.aspx?ID=7089432&GUID=22CF39C1-F6D6-4E43-9943-442018CD700D.

23.    Attached hereto as **Exhibit 22** is a true and correct copy of County of Monterey Resolution No. 25-009, entitled "Adopt Resolution Reestablishing the County of Monterey as a Welcoming County for Immigrants and Refugees, and Declaring the County a Place of Trust and Safety for Immigrants; and Authorizing an increase of appropriations ($25,000) to fund related public service announcements," obtained from https://monterey.legistar.com/LegislationDetail.aspx?ID=7089432&GUID=22CF39C1-F6D6-4E43-9943-442018CD700D.

24.    Attached hereto as **Exhibit 23** is a true and correct copy of Chapter 4.18 of the City of Seattle Municipal Code, available at https://library.municode.com/wa/seattle/codes/municipal_code?nodeId=TIT4PE_CH4.18ENFEIMLA.

25.    Attached hereto as **Exhibit 24** is a true and correct copy of Chapter 19 of the Minneapolis Code of Ordinances, available at https://library.municode.com/mn/minneapolis/codes/code_of_ordinances?nodeId=COOR_TIT2AD_CH19EMAUIMMA.

26.    Attached hereto as **Exhibit 25** is a true and correct copy of Chapter 44 of the Saint Paul Code of Ordinances, available at https://library.municode.com/mn/st._paul/codes/code_of_ordinances?nodeId=PTIIIADCO_TITIIIOFEM_CH44EMAUIMMA.

27.    Attached hereto as **Exhibit 26** is a true and correct copy of City of Santa Fe Resolution No. 1999-6, entitled "Declaring a Policy of Non-Discrimination on the Basis of a Person's National Origin and Appointing an Immigration Task Force."

28.    Attached hereto as **Exhibit 27** is a true and correct copy of City of Santa Fe Resolution No. 2017-19, entitled "A Resolution Making Policy Changes to Safeguard Residents' Sensitive Personal Information, Reaffirming the City of Santa Fe's Commitment to Human and Civil Rights, the Established Rule of Law, and its Status as a Welcoming Community for Immigrants and Refugees; and Directing the City Manager and City Attorney to Assess the City's Legal Rights and

Responsibilities Under Applicable Law," obtained from the City of Santa Fe's website at https://santafenm.gov/city-clerk-community-engagement/city-clerk-1/documents-1-1-1-1-1-1-1-1-1?type=resolution&year=2017.

29.    Attached hereto as **Exhibit 28** is a true and correct copy of the Complaint filed on February 6, 2025 in *United States v. Illinois et al.*, No. 25-cv-01285 (N.D. Ill.).

30.    Attached hereto as **Exhibit 29** is a true and correct copy of the Complaint filed on February 12, 2025 in *United States v. New York et al.*, No. 1:25-cv-00205 (N.D.N.Y.).

31.    Attached hereto as **Exhibit 30** is a true and correct copy of a February 25, 2025 article posted on the White House website, www.whitehouse.gov, entitled "Sick Politicians Want Killers, Rapists Roaming Our Streets."  The article is available at https://www.whitehouse.gov/articles/2025/02/sick-politicians-want-killers-rapists-roaming-our-streets/.

32.    Attached hereto as **Exhibit 31** is a true and correct copy of a January 18, 2025 article from the New York Times entitled "Trump's Deportation Plan Could Start Next Week in Chicago," available at https://www.nytimes.com/2025/01/17/us/politics/trump-immigration-raids-chicago.html.

33.    Attached hereto as **Exhibit 32** is a true and correct copy of a March 6, 2025 press release from the U.S. Small Business Administration's website, www.sba.gov, entitled "Administrator Loeffler Announces SBA Reforms to Put American Citizens First."  The press release is available at https://www.sba.gov/article/2025/03/06/administrator-loeffler-announces-sba-reforms-put-american-citizens-first.

34.    Attached hereto as **Exhibit 33** is a true and correct copy of Executive Order 14,218, entitled "Ending Taxpayer Subsidization of Open Borders," issued on February 19, 2025 and published in the Federal Register at 90 Fed. Reg. 10581.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, and that this declaration was executed in San Francisco, California, on March 17, 2025.

_____
KARUN A. TILAK

# EXHIBIT 1

# Presidential Documents

Executive Order 14159 of January 20, 2025

## Protecting the American People Against Invasion

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Immigration and Nationality Act (INA) (8 U.S.C. 1101 *et seq.*) and section 301 of title 3, United States Code, it is hereby ordered:

**Section 1**. *Purpose.* Over the last 4 years, the prior administration invited, administered, and oversaw an unprecedented flood of illegal immigration into the United States. Millions of illegal aliens crossed our borders or were permitted to fly directly into the United States on commercial flights and allowed to settle in American communities, in violation of longstanding Federal laws.

Many of these aliens unlawfully within the United States present significant threats to national security and public safety, committing vile and heinous acts against innocent Americans. Others are engaged in hostile activities, including espionage, economic espionage, and preparations for terror-related activities. Many have abused the generosity of the American people, and their presence in the United States has cost taxpayers billions of dollars at the Federal, State, and local levels.

Enforcing our Nation's immigration laws is critically important to the national security and public safety of the United States. The American people deserve a Federal Government that puts their interests first and a Government that understands its sacred obligation to prioritize the safety, security, and financial and economic well-being of Americans.

This order ensures that the Federal Government protects the American people by faithfully executing the immigration laws of the United States.

**Sec. 2**. *Policy.* It is the policy of the United States to faithfully execute the immigration laws against all inadmissible and removable aliens, particularly those aliens who threaten the safety or security of the American people. Further, it is the policy of the United States to achieve the total and efficient enforcement of those laws, including through lawful incentives and detention capabilities.

**Sec. 3**. *Faithful Execution of the Immigration Laws.* In furtherance of the policies described in section 2 of this order:

(a) Executive Order 13993 of January 20, 2021 (Revision of Civil Immigration Enforcement Policies and Priorities), Executive Order 14010 of February 2, 2021 (Creating a Comprehensive Regional Framework To Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border), Executive Order 14011 of February 2, 2021 (Establishment of Interagency Task Force on the Reunification of Families), and Executive Order 14012 of February 2, 2021 (Restoring Faith in Our Legal Immigration Systems and Strengthening Integration and Inclusion Efforts for New Americans) are hereby revoked; and

(b) Executive departments and agencies (agencies) shall take all appropriate action to promptly revoke all memoranda, guidance, or other policies based on the Executive Orders revoked in section 3(a) of this order and shall employ all lawful means to ensure the faithful execution of the immigration laws of the United States against all inadmissible and removable aliens.

**Sec. 4**. *Civil Enforcement Priorities.* The Secretary of Homeland Security shall take all appropriate action to enable the Director of U.S. Immigration and Customs Enforcement, the Commissioner of U.S. Customs and Border Protection, and the Director of U.S. Citizenship and Immigration Services to set priorities for their agencies that protect the public safety and national security interests of the American people, including by ensuring the successful enforcement of final orders of removal. Further, the Secretary of Homeland Security shall ensure that the primary mission of U.S. Immigration and Customs Enforcement's Homeland Security Investigations division is the enforcement of the provisions of the INA and other Federal laws related to the illegal entry and unlawful presence of aliens in the United States and the enforcement of the purposes of this order.

**Sec. 5**. *Criminal Enforcement Priorities.* The Attorney General, in coordination with the Secretary of State and the Secretary of Homeland Security, shall take all appropriate action to prioritize the prosecution of criminal offenses related to the unauthorized entry or continued unauthorized presence of aliens in the United States.

**Sec. 6**. *Federal Homeland Security Task Forces.* (a) The Attorney General and the Secretary of Homeland Security shall take all appropriate action to jointly establish Homeland Security Task Forces (HSTFs) in all States nationwide.

(b) The composition of each HSTF shall be subject to the direction of the Attorney General and the Secretary of Homeland Security, but shall include representation from any other Federal agencies with law enforcement officers, or agencies with the ability to provide logistics, intelligence, and operational support to the HSTFs, and shall also include representation from relevant State and local law enforcement agencies. The heads of all Federal agencies shall take all appropriate action to provide support to the Attorney General and the Secretary of Homeland Security to ensure that the HSTFs fulfill the objectives in subsection (c) of this section, and any other lawful purpose that fulfills the policy objectives of this order.

(c) The objective of each HSTF is to end the presence of criminal cartels, foreign gangs, and transnational criminal organizations throughout the United States, dismantle cross-border human smuggling and trafficking networks, end the scourge of human smuggling and trafficking, with a particular focus on such offenses involving children, and ensure the use of all available law enforcement tools to faithfully execute the immigration laws of the United States.

(d) The Attorney General and the Secretary of Homeland Security shall take all appropriate action to provide an operational command center to coordinate the activities of the HSTFs and provide such support as they may require, and shall also take all appropriate action to provide supervisory direction to their activities as may be required.

**Sec. 7**. *Identification of Unregistered Illegal Aliens.* The Secretary of Homeland Security, in coordination with the Secretary of State and the Attorney General, shall take all appropriate action to:

(a) Immediately announce and publicize information about the legal obligation of all previously unregistered aliens in the United States to comply with the requirements of part VII of subchapter II of chapter 12 of title 8, United States Code;

(b) Ensure that all previously unregistered aliens in the United States comply with the requirements of part VII of subchapter II of chapter 12 of title 8, United States Code; and

(c) Ensure that failure to comply with the legal obligations of part VII of subchapter II of chapter 12 of title 8, United States Code, is treated as a civil and criminal enforcement priority.

**Sec. 8**. *Civil Fines and Penalties.* (a) The Secretary of Homeland Security, in coordination with the Secretary of Treasury, shall take all appropriate action to ensure the assessment and collection of all fines and penalties

that the Secretary of Homeland Security is authorized by law to assess and collect from aliens unlawfully present in the United States, including aliens who unlawfully entered or unlawfully attempted to enter the United States, and from those who facilitate such aliens' presence in the United States.

(b) Within 90 days of the date of this order, the Secretary of the Treasury and the Secretary of Homeland Security shall submit a report to the President regarding their progress implementing the requirements of this section and recommending any additional actions that may need to be taken to achieve its objectives.

**Sec. 9.** *Efficient Removals of Recent Entrants and Other Aliens.* The Secretary of Homeland Security shall take all appropriate action, pursuant to section 235(b)(1)(A)(iii)(I) of the INA (8 U.S.C. 1225(b)(1)(A)(iii)(I)), to apply, in her sole and unreviewable discretion, the provisions of section 235(b)(1)(A)(i) and (ii) of the INA to the aliens designated under section 235(b)(1)(A)(iii)(II). Further, the Secretary of Homeland Security shall promptly take appropriate action to use all other provisions of the immigration laws or any other Federal law, including, but not limited to sections 238 and 240(d) of the INA (8 U.S.C. 1228 and 1229a(d)), to ensure the efficient and expedited removal of aliens from the United States.

**Sec. 10.** *Detention Facilities.* The Secretary of Homeland Security shall promptly take all appropriate action and allocate all legally available resources or establish contracts to construct, operate, control, or use facilities to detain removable aliens. The Secretary of Homeland Security, further, shall take all appropriate actions to ensure the detention of aliens apprehended for violations of immigration law pending the outcome of their removal proceedings or their removal from the country, to the extent permitted by law.

**Sec. 11.** *Federal-State Agreements.* To ensure State and local law enforcement agencies across the United States can assist with the protection of the American people, the Secretary of Homeland Security shall, to the maximum extent permitted by law, and with the consent of State or local officials as appropriate, take appropriate action, through agreements under section 287(g) of the INA (8 U.S.C. 1357(g)) or otherwise, to authorize State and local law enforcement officials, as the Secretary of Homeland Security determines are qualified and appropriate, to perform the functions of immigration officers in relation to the investigation, apprehension, or detention of aliens in the United States under the direction and the supervision of the Secretary of Homeland Security. Such authorization shall be in addition to, rather than in place of, Federal performance of these duties. To the extent permitted by law, the Secretary of Homeland Security may structure each agreement under section 287(g) of the INA (8 U.S.C. 1357(g)) in the manner that provides the most effective model for enforcing Federal immigration laws in that jurisdiction.

**Sec. 12.** *Encouraging Voluntary Compliance with the Law.* The Secretary of Homeland Security shall take all appropriate action, in coordination with the Secretary of State and the Attorney General, and subject to adequate safeguards, assurances, bonds, and any other lawful measure, to adopt policies and procedures to encourage aliens unlawfully in the United States to voluntarily depart as soon as possible, including through enhanced usage of the provisions of section 240B of the INA (8 U.S.C. 1229c), international agreements or assistance, or any other measures that encourage aliens unlawfully in the United States to depart as promptly as possible, including through removals of aliens as provided by section 250 of the INA (8 U.S.C. 1260).

**Sec. 13.** *Recalcitrant Countries.* The Secretary of State and the Secretary of Homeland Security shall take all appropriate action to:

(a) Cooperate and effectively implement, as appropriate, the sanctions provided by section 243(d) of the INA (8 U.S.C. 1253(d)), with the Secretary of State, to the maximum extent permitted by law, ensuring that diplomatic

efforts and negotiations with foreign states include the foreign states' acceptance of their nationals who are subject to removal from the United States; and

(b) Eliminate all documentary barriers, dilatory tactics, or other restrictions that prevent the prompt repatriation of aliens to any foreign state. Any failure or delay by a foreign state to verify the identity of a national of that state shall be considered in carrying out subsection (a) this section, and shall also be considered regarding the issuance of any other sanctions that may be available to the United States.

**Sec. 14.** *Visa Bonds.* The Secretary of Treasury shall take all appropriate action, in coordination with the Secretary of State and the Secretary of Homeland Security, to establish a system to facilitate the administration of all bonds that the Secretary of State or the Secretary of Homeland Security may lawfully require to administer the provisions of the INA.

**Sec. 15.** *Reestablishment of the VOICE Office and Addressing Victims of Crimes Committed by Removable Aliens.* The Secretary of Homeland Security shall direct the Director of U.S. Immigration and Customs Enforcement (ICE) to take all appropriate and lawful action to reestablish within ICE an office to provide proactive, timely, adequate, and professional services to victims of crimes committed by removable aliens, and those victims' family members. The Attorney General shall also ensure that the provisions of 18 U.S.C. 3771 are followed in all Federal prosecutions involving crimes committed by removable aliens.

**Sec. 16.** *Addressing Actions by the Previous Administration.* The Secretary of State, the Attorney General, and the Secretary of Homeland Security shall promptly take all appropriate action, consistent with law, to rescind the policy decisions of the previous administration that led to the increased or continued presence of illegal aliens in the United States, and align any and all departmental activities with the policies set out by this order and the immigration laws. Such action should include, but is not limited to:

(a) ensuring that the parole authority under section 212(d)(5) of the INA (8 U.S.C. 1182(d)(5)) is exercised on only a case-by-case basis in accordance with the plain language of the statute, and in all circumstances only when an individual alien demonstrates urgent humanitarian reasons or a significant public benefit derived from their particular continued presence in the United States arising from such parole;

(b) ensuring that designations of Temporary Protected Status are consistent with the provisions of section 244 of the INA (8 U.S.C. 1254a), and that such designations are appropriately limited in scope and made for only so long as may be necessary to fulfill the textual requirements of that statute; and

(c) ensuring that employment authorization is provided in a manner consistent with section 274A of the INA (8 U.S.C. 1324a), and that employment authorization is not provided to any unauthorized alien in the United States.

**Sec. 17.** *Sanctuary Jurisdictions.* The Attorney General and the Secretary of Homeland Security shall, to the maximum extent possible under law, evaluate and undertake any lawful actions to ensure that so-called ''sanctuary'' jurisdictions, which seek to interfere with the lawful exercise of Federal law enforcement operations, do not receive access to Federal funds. Further, the Attorney General and the Secretary of Homeland Security shall evaluate and undertake any other lawful actions, criminal or civil, that they deem warranted based on any such jurisdiction's practices that interfere with the enforcement of Federal law.

**Sec. 18.** *Information Sharing.* (a) The Secretary of Homeland Security shall promptly issue guidance to ensure maximum compliance by Department of Homeland Security personnel with the provisions of 8 U.S.C. 1373 and 8 U.S.C. 1644 and ensure that State and local governments are provided with the information necessary to fulfill law enforcement, citizenship, or immigration status verification requirements authorized by law; and

(b) The Attorney General, the Secretary of Health and Human Services, and the Secretary of Homeland Security shall take all appropriate action to stop the trafficking and smuggling of alien children into the United States, including through the sharing of any information necessary to assist in the achievement of that objective.

**Sec. 19**. *Funding Review.* The Attorney General and the Secretary of Homeland Security shall:

(a) Immediately review and, if appropriate, audit all contracts, grants, or other agreements providing Federal funding to non-governmental organizations supporting or providing services, either directly or indirectly, to removable or illegal aliens, to ensure that such agreements conform to applicable law and are free of waste, fraud, and abuse, and that they do not promote or facilitate violations of our immigration laws;

(b) Pause distribution of all further funds pursuant to such agreements pending the results of the review in subsection (a) of this section;

(c) Terminate all such agreements determined to be in violation of law or to be sources of waste, fraud, or abuse and prohibit any such future agreements;

(d) Coordinate with the Director of the Office of Management and Budget to ensure that no funding for agreements described in subsection (c) of this section is included in any appropriations request for the Department of Justice or the Department of Homeland Security; and

(e) Initiate clawback or recoupment procedures, if appropriate, for any agreements described in subsection (c) of this section.

**Sec. 20**. *Denial of Public Benefits to Illegal Aliens.* The Director of the Office of Management and Budget shall take all appropriate action to ensure that all agencies identify and stop the provision of any public benefits to any illegal alien not authorized to receive them under the provisions of the INA or other relevant statutory provisions.

**Sec. 21**. *Hiring More Agents and Officers.* Subject to available appropriations, the Secretary of Homeland Security, through the Commissioner of U.S. Customs and Border Protection and the Director of U.S. Immigration and Customs Enforcement, shall take all appropriate action to significantly increase the number of agents and officers available to perform the duties of immigration officers.

**Sec. 22**. *Severability.* It is the policy of the United States to enforce this order to the maximum extent possible to advance the interests of the United States. Accordingly:

(a) If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this order and the application of its other provisions to any other persons or circumstances shall not be affected thereby; and

(b) If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid because of the failure to follow certain procedures, the relevant executive branch officials shall implement those procedural requirements to conform with existing law and with any applicable court orders.

**Sec. 23**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party

against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*January 20, 2025.*

[FR Doc. 2025–02006
Filed 1–28–25; 11:15 am]
Billing code 3395–F4–P

# EXHIBIT 2



**U.S. Department of Justice**

Office of the Deputy Attorney General



*Washington, DC  20530*

January 21, 2025

MEMORANDUM FOR ALL DEPARTMENT EMPLOYEES

FROM:              THE ACTING DEPUTY ATTORNEY GENERAL

SUBJECT:           Interim Policy Changes Regarding Charging, Sentencing, And
                   Immigration Enforcement

Following President Trump's second inauguration yesterday, I write regarding interim decisions and policy changes pending confirmation of the Attorney General.[1]  These interim changes are necessary as an initial response to Executive Orders that President Trump issued yesterday, critical to the Justice Department's mission, and part of the response to three of the most serious threats facing the American people.  First, Cartels and other Transnational Criminal Organizations, such as Tren de Aragua (TdA) and La Mara Salvatrucha (MS-13), are a scourge on society resulting in an unstable and unsafe border and huge flows of illegal immigration in violation of U.S. law.  Second, brutal and intolerable violent crime by members of these organizations and illegal aliens is escalating rapidly across the country.  Third, the fentanyl crisis and opioid epidemic are poisoning our communities and have inflicted an unprecedented toll of addiction, suffering, and death.

The Justice Department must, and will, work to eradicate these threats.  Indeed, it is the responsibility of the Justice Department to defend the Constitution and, accordingly, to lawfully execute the policies that the American people elected President Trump to implement.  The Justice Department's responsibility, proudly shouldered by each of its employees, includes aggressive enforcement of laws enacted by Congress, as well as vigorous defense of the President's actions on behalf of the United States against legal challenges.  The Department's personnel must come together in the offices that taxpayers have funded to do this vitally important work.

**I.    Core Principle: Pursuing The Most Serious, Readily Provable Offense**

Interim changes to the Justice Department's policy regarding charging and sentencing are necessary in order to implement policies articulated in President Trump's January 20, 2025 Executive Orders relating to the elimination of Cartels and other Transnational Criminal Organizations, and securing our borders against illegal immigration and drug trafficking.  Therefore, effective today, the Justice Department's interim policy regarding charging and

---

[1] This interim guidance is not intended to, does not, and may not be relied upon to create, any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

Case 3:25-cv-01350-WHO    Document 61-2    Filed 03/17/25    Page 16 of 197

Memorandum from the Acting Deputy Attorney General                                          Page 2
Subject: Interim Policy Changes Regarding Charging, Sentencing, And Immigration Enforcement

sentencing is set forth in the May 10, 2017 Memorandum entitled, "Department Charging and Sentencing Policy," which applies to all charging decisions at the Department of Justice and the U.S. Attorney's Offices. Any inconsistent previous policy of the Department of Justice relating to charging and sentencing policy is rescinded, effective today.[2]

Specifically, in the absence of unusual facts, prosecutorial discretion at the Department of Justice and the U.S. Attorney's Offices is bounded by the core principle that prosecutors should charge and pursue the most serious, readily provable offenses. The most serious offenses are those punishable by death where applicable, and offenses with the most significant mandatory minimum sentences (including under the Armed Career Criminal Act and 21 U.S.C. § 851) and the most substantial recommendation under the Sentencing Guidelines.

Each United States Attorney and Assistant Attorney General is responsible for ensuring that this interim policy is implemented and followed. Any deviations from the interim policy's core principle require significant extenuating circumstances, shall be carefully considered, and must be approved consistent with the process described in the May 10, 2017 Memorandum.

## II.    Faithful Execution of the Immigration Laws

Consistent with President Trump's January 20, 2025 Executive Order entitled, "Protecting The American People Against Invasion," the Department of Justice will take all steps necessary to protect the public and secure the American border by removing illegal aliens from the Country and prosecuting illegal aliens for crimes committed within U.S. jurisdiction. These steps shall include, but not be limited to, the following:

Consistent with the core principle of pursuing the most serious, readily provable offense, U.S. Attorney's Offices and the other components shall pursue charges relating to criminal immigration-related violations when such violations are presented by federal, state, or local law enforcement or the Intelligence Community. *See, e.g.*, 8 U.S.C. §§ 1324(c), 1252c (authorizing certain immigration-related arrests by State and local law enforcement officials). This includes, where supported by evidence, prosecutions for violations of 8 U.S.C. §§ 1304, 1306, 1324-1328, 1373 and 18 U.S.C. § 922(g)(5). Each U.S. Attorney's Office shall coordinate as appropriate with the federal courts to inform the courts of this interim policy and develop processes for handling the increased number of prosecutions that will result. Declination decisions relating to immigration-related conduct shall be disclosed as Urgent Reports pursuant to Justice Manual § 1-13.130. On a quarterly basis, the U.S. Attorney's Offices shall report statistics to EOUSA, broken down by law enforcement agency, regarding the number of immigration-related cases referred to the Office, the number of pending immigration-related investigations and prosecutions, the number of immigration-related convictions, and the resulting sentences and removals.

---

[2] The previous policies and guidance rescinded include: "General Department Policies Regarding Charging, Pleas, and Sentencing" (December 16, 2022); "Interim Guidance on Prosecutorial Discretion, Charging, and Sentencing" (January 29, 2021); "Department Policy on Charging Mandatory Minimum Sentences and Recidivist Enhancements in Certain Drug Cases" (August 12, 2013); and "Guidance Regarding § 851 Enhancements in Plea Negotiations" (September 24, 2014).

Memorandum from the Acting Deputy Attorney General                                      Page 3
Subject: Interim Policy Changes Regarding Charging, Sentencing, And Immigration Enforcement

The Organized Crime Drug Enforcement Task Force (OCDETF) and the Project Safe Neighborhoods (PSN) program shall establish national initiatives to provide focused resources and attention to immigration-related prosecutions at the federal, state, and local levels. OCDETF and PSN will focus on facilitating access by U.S. Attorney's Offices to existing structures in which the Justice Department participates, such as Joint Task Force Vulcan, which targets MS-13 and will be expanded to target TdA, and Joint Task Force Alpha, which targets human trafficking. The regional OCDETF Strike Forces shall prioritize the investigation and prosecution of immigration offenses, including by requiring OCDETF-funded AUSAs to devote significant time and attention to the investigation and prosecution of these crimes. The new OCDETF and PSN national initiatives shall also prioritize enhanced statistical tracking of these efforts.

Pending implementation of the Homeland Security Task Forces announced by President Trump on January 20, 2025, the FBI's Joint Terrorism Task Forces are directed to coordinate with DHS, as well as state and local members, to assist in the execution of President Trump's immigration-related initiatives. The FBI, DEA, ATF, USMS, and BOP shall review their files for identifying information and/or biometric data relating to non-citizens located illegally in the United States. All such information and data shall be disclosed to DHS, for the sole purpose of facilitating appropriate removals, enforcement actions, and immigration-related investigations and prosecutions, unless the agency possessing the information and data determines that a particular disclosure would compromise a significant law enforcement investigation and the U.S. Attorney's Office participating in the investigation concurs in writing with the agency's non-disclosure determination. The agencies' reviews and disclosures shall be completed in 60 days. Concurrences by U.S. Attorney's Offices in non-disclosure determinations shall be disclosed as Urgent Reports pursuant to Justice Manual § 1-13.130.

The Supremacy Clause and other authorities require state and local actors to comply with the Executive Branch's immigration enforcement initiatives. Federal law prohibits state and local actors from resisting, obstructing, and otherwise failing to comply with lawful immigration-related commands and requests pursuant to, for example, the President's extensive Article II authority with respect to foreign affairs and national security, the Immigration and Nationality Act, and the Alien Enemies Act. The U.S. Attorney's Offices and litigating components of the Department of Justice shall investigate incidents involving any such misconduct for potential prosecution, including for obstructing federal functions in violation of 18 U.S.C. § 371, and violations of other statutes, such as 8 U.S.C. §§ 1324, 1373. Declination decisions with respect to resistance, obstruction, or other non-compliance with lawful immigration-related commands and requests from federal authorities shall be disclosed as Urgent Reports pursuant to Justice Manual § 1-13.130.

Finally, laws and actions that threaten to impede Executive Branch immigration initiatives, including by prohibiting disclosures of information to federal authorities engaged in immigration-enforcement activities, threaten public safety and national security. The Civil Division shall work with the newly established Sanctuary Cities Enforcement Working Group, within the Office of the Associate Attorney General, to identify state and local laws, policies, and activities that are inconsistent with Executive Branch immigration initiatives and, where appropriate, to take legal action to challenge such laws.

# EXHIBIT 3



**Office of the Attorney General**
**Washington, D. C. 20530**

February 5, 2025

MEMORANDUM FOR ALL DEPARTMENT EMPLOYEES

FROM:         THE ATTORNEY GENERAL

SUBJECT:      SANCTUARY JURISDICTION DIRECTIVES[1]

       Unlawful border crossings and illegal migration into the United States have reached record levels, resulting in a substantial and unacceptable threat to our national security and public safety. To protect the American people from the effects of unlawful mass migration, President Trump has prioritized securing our Nation's borders and enforcing federal immigration laws. In furtherance of that objective, the Department of Justice will ensure that, consistent with law, "sanctuary jurisdictions" do not receive access to Federal funds from the Department. Consistent with applicable statutes, regulations, court orders, and terms, the Department of Justice shall pause the distribution of all funds until a review has been completed, terminate any agreements that are in violation of law or are the source of waste, fraud, or abuse, and initiate clawback or recoupment procedures, where appropriate.[2] In carrying out this directive, each component shall comply with any notice and procedural requirements in the award, agreement, or other instrument.

**I.     End Funding to State and Local Jurisdictions That Unlawfully Interfere with Federal Law Enforcement Operations**

       Sanctuary jurisdictions should not receive access to federal grants administered by the Department of Justice. The Department will exercise its own authority to impose any conditions of funding that do not violate applicable constitutional or statutory limitations. *See New York v. Dep't of Justice*, 951 F.3d 84, 111 (2d Cir. 2020) ("Because 8 U.S.C. § 1373 is a law applicable to all plaintiffs in this action, the Attorney General was authorized to impose the challenged Certification Condition and did not violate either the APA or separation of powers by doing so.").

       Federal law provides that state and local jurisdictions "may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [federal immigration officers] information regarding the citizenship or immigration status, lawful or unlawful, of any

---

[1] This guidance is not intended to, does not, and may not be relied upon to create, any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

[2] This memorandum rescinds, effective today, any inconsistent previous memoranda, policies, or guidance documents of the Department of Justice.

individual." 8 U.S.C. § 1373(a). So-called "sanctuary jurisdictions" include state or local jurisdictions that refuse to comply with 8 U.S.C. § 1373, refuse to certify compliance with § 1373, or willfully fail to comply with other applicable federal immigration laws. Consistent with statutory authority and past practice, the Department will require any jurisdiction that applies for certain Department grants to be compliant with 8 U.S.C. § 1373(a). Within 30 days, the Associate Attorney General, in coordination with components that provide Department grants, will report to the Attorney General the grants to which this requirement applies.

Additionally, to the extent consistent with applicable statutes, regulations, and terms, the Department may seek to tailor future grants to promote a lawful system of immigration, and to reduce efforts by state or local jurisdictions to undermine a lawful system of immigration. The Department will also seek to take any appropriate enforcement action where state or local practices violate federal laws, regulations, or grant conditions.

## II.   Identify and Evaluate All Funding Agreements with Non-Governmental Organizations That Provide Support to Illegal Aliens

All Department components that provide federal funding to non-governmental organizations shall immediately identify all contracts, grants, or other agreements with organizations that support or provide services to removable or illegal aliens. For any such agreement, each component shall, to the extent consistent with applicable statutes, regulations, court orders, and terms:

(1) Pause any further distribution of funds for 60 days after complying with any notice and procedural requirements.

(2) Identify non-governmental organization(s) receiving funding from the Department and describe the support or services provided. The component shall direct each organization to report whether the disbursed funds: (a) were provided in accordance with applicable laws; (b) resulted in the provision of any funds or services to removable or illegal aliens; (c) resulted in or were the subject of waste, fraud, or abuse; and (d) promoted or facilitated violations of our immigration laws. The component shall further direct each organization to certify that it will not use any remaining funds to promote or facilitate the violation of Federal immigration law.

(3) Compile information set forth at (2) above and submit it to the Associate Attorney General within 45 days of this memorandum.

Upon completion of this process, the Associate Attorney General, in consultation with the Deputy Attorney General, shall determine which (if any) agreements to terminate and whether to resume funding of any remaining agreements, consistent with applicable statutes, regulations, and terms.

Effective immediately, consistent with applicable law, the Department of Justice shall not enter into any new contract, grant, or other agreement to provide Federal funding to non-

governmental organizations that support or provide services, either directly or indirectly (*e.g.*, through sub-contracting or other arrangements), to removable or illegal aliens.

### III. Pursue Enforcement Actions Against Jurisdictions That Facilitate Violations of Federal Immigration Laws or Impede Lawful Federal Immigration Operations

Actions that impede federal efforts to enforce immigration law threaten public safety and national security. State and local jurisdictions must comply with applicable immigration-related federal laws. State and local actors may not impede, obstruct, or otherwise fail to comply with lawful immigration-related directives pursuant to the President's Article II authority to ensure national security, the Immigration and Nationality Act, or other authorities.

All litigating components of the Department of Justice and each U.S. Attorney's Office shall investigate incidents involving any such misconduct and shall, where supported by the evidence, prosecute violations of federal laws such as 18 U.S.C. § 371 and 8 U.S.C. §§ 1324 and 1373. All declination decisions with respect to any effort to obstruct or fail to comply with a lawful immigration-related directive from the Executive Branch shall be promptly reported pursuant to Justice Manual § 1-13.130.

The Civil Division shall, in coordination with the Sanctuary Cities Enforcement Working Group, identify state and local laws, policies, and practices that facilitate violations of federal immigration laws or impede lawful federal immigration operations. Where appropriate, the Civil Division shall take legal action to challenge such laws, policies, or practices. Attorneys tasked to the Sanctuary Cities Enforcement Working Group shall regularly report to the Associate Attorney General and the Deputy Attorney General their progress regarding the review of state and local laws, policies, and practices, and shall promptly report any decisions not to pursue enforcement actions against state and local jurisdictions found to be facilitating violations of federal immigration laws or impeding lawful federal immigration operations.

# EXHIBIT 4

# CHAPTER 12H:

# IMMIGRATION STATUS

Sec. 12H.1.        City and County of Refuge.
Sec. 12H.2.        Use of City Funds Prohibited.
Sec. 12H.3.        Clerk of Board to Transmit Copies of this Chapter; Informing City Employees.
Sec. 12H.4.        Enforcement.
Sec. 12H.5.        City Undertaking Limited to Promotion of General Welfare.
Sec. 12H.6.        Severability.

## SEC. 12H.1. CITY AND COUNTY OF REFUGE.

It is hereby affirmed that the City and County of San Francisco is a City and County of Refuge.

(Added by Ord. 375-89, App. 10/24/89)

## SEC. 12H.2. USE OF CITY FUNDS PROHIBITED.

No department, agency, commission, officer, or employee of the City and County of San Francisco shall use any City funds or resources to assist in the enforcement of Federal immigration law or to gather or disseminate information regarding release status of individuals or any other such personal information as defined in Chapter 12I in the City and County of San Francisco unless such assistance is required by Federal or State statute, regulation, or court decision. The prohibition set forth in this Chapter 12H shall include, but shall not be limited to:

   (a)   Assisting or cooperating, in one's official capacity, with any investigation, detention, or arrest procedures, public or clandestine, conducted by the Federal agency charged with enforcement of the Federal immigration law and relating to alleged violations of the civil provisions of the Federal immigration law, except as permitted under Administrative Code Section 12I.3.

   (b)   Assisting or cooperating, in one's official capacity, with any investigation, surveillance, or gathering of information conducted by foreign governments, except for cooperation related to an alleged violation of City and County, State, or Federal criminal laws.

   (c)   Requesting information about, or disseminating information, in one's official capacity, regarding the release status of any individual or any other such personal information as defined in Chapter 12I, except as permitted under Administrative Code Section 12I.3, or conditioning the provision of services or benefits by the City and County of San Francisco upon immigration status, except as required by Federal or State statute or regulation, City and County public assistance criteria, or court decision.

   (d)   Including on any application, questionnaire, or interview form used in relation to benefits, services, or opportunities provided by the City and County of San Francisco any question regarding immigration status other than required by Federal or State statute, regulation, or court decision. Any such questions existing or being used by the City and County at the time this Chapter is adopted shall be deleted within sixty days of the adoption of this Chapter.

(Added by Ord. 375-89, App. 10/24/89; amended by Ord. 228-09, File No. 091032, App. 10-28-2009; Ord. 96-16 , File No. 160022, App. 6/17/2016, Eff. 7/17/2016)

## SEC. 12H.2-1. [REPEALED.]

(Added by Ord. 282-92, App. 9/4/92; amended by Ord. 238-93, App. 8/4/93; Ord. 228-09, File No. 091032, App. 10-28-2009; repealed by Ord. 96-16 , File No. 160022, App. 6/17/2016, Eff. 7/17/2016)

## SEC. 12H.3. CLERK OF BOARD TO TRANSMIT COPIES OF THIS CHAPTER; INFORMING CITY EMPLOYEES.

The Clerk of the Board of Supervisors shall send copies of this Chapter, including any future amendments thereto that may be made, to every department, agency and commission of the City and County of San Francisco, to California's United States Senators, and to the California Congressional delegation, the Commissioner of the Federal agency charged with enforcement of the Federal immigration law, the United States Attorney General, and the Secretary of State and the President of the United States. Each appointing officer of the City and County of San Francisco shall inform all employees under her or his jurisdiction of the prohibitions in this ordinance, the duty of all of her or his employees to comply with the prohibitions in this ordinance, and that employees who fail to comply with the prohibitions of the ordinance shall be subject to appropriate disciplinary action. Each City and County employee shall be given a written directive with instructions for implementing the provisions of this Chapter.

(Added by Ord. 375-89, App. 10/24/89; Ord. 228-09, File No. 091032, App. 10-28-2009)

## SEC. 12H.4. ENFORCEMENT.

The Human Rights Commission shall review the compliance of the City and County departments, agencies, commissions and employees with the mandates of this ordinance in particular instances in which there is question of noncompliance or when a complaint alleging noncompliance has been lodged.

(Added by Ord. 375-89, App. 10/24/89)

## SEC. 12H.5. CITY UNDERTAKING LIMITED TO PROMOTION OF GENERAL WELFARE.

In undertaking the adoption and enforcement of this Chapter, the City is assuming an undertaking only to promote the general welfare. This Chapter is not intended to create any new rights for breach of which the City is liable in money damages to any person who claims that such breach proximately caused injury. This section shall not be construed to limit or proscribe any other existing rights or remedies possessed by such person.

(Added by Ord. 375-89, App. 10/24/89)

## SEC. 12H.6. SEVERABILITY.

If any part of this ordinance, or the application thereof, is held to be invalid, the remainder of this ordinance shall not be affected thereby, and this ordinance shall otherwise continue in full force and effect. To this end, the provisions of this ordinance, and each of them, are severable.

(Added by Ord. 375-89, App. 10/24/89)

# EXHIBIT 7

# CHAPTER 12I:

# CIVIL IMMIGRATION DETAINERS

Sec. 12I.1.    Findings.
Sec. 12I.2.    Definitions.
Sec. 12I.3.    Restrictions on Law Enforcement Officials.
Sec. 12I.4.    Purpose of this Chapter.
Sec. 12I.5.    Semiannual Report.
Sec. 12I.6.    Severability.
Sec. 12I.7.    Undertaking for the General Welfare.

## SEC. 12I.1. FINDINGS.

The City and County of San Francisco (the "City") is home to persons of diverse racial, ethnic, and national backgrounds, including a large immigrant population. The City respects, upholds, and values equal protection and equal treatment for all of our residents, regardless of immigration status. Fostering a relationship of trust, respect, and open communication between City employees and City residents is essential to the City's core mission of ensuring public health, safety, and welfare, and serving the needs of everyone in the community, including immigrants. The purpose of this Chapter 12I, as well as of Administrative Code Chapter 12H, is to foster respect and trust between law enforcement and residents, to protect limited local resources, to encourage cooperation between residents and City officials, including especially law enforcement and public health officers and employees, and to ensure community security, and due process for all.

The United States Immigration and Customs Enforcement ("ICE") is responsible for enforcing the civil immigration laws. ICE's programs, including Secure Communities and its replacement, the Priority Enforcement Program ("PEP"), seek to enlist local law enforcement's voluntary cooperation and assistance in its enforcement efforts. In its description of PEP, ICE explains that all requests under PEP are for voluntary action and that any request is not an authorization to detain persons at the expense of the federal government. The federal government should not shift the financial burden of federal civil immigration enforcement, including personnel time and costs relating to notification and detention, onto local law enforcement by requesting that local law enforcement agencies continue detaining persons based on non-mandatory civil immigration detainers or cooperating and assisting with requests to notify ICE that a person will be released from local custody. It is not a wise and effective use of valuable City resources at a time when vital services are being cut.

ICE's Secure Communities program (also known as "S-Comm") shifted the burden of federal civil immigration enforcement onto local law enforcement. S-Comm came into operation after the state sent fingerprints that state and local law enforcement agencies had transmitted to the California Department of Justice ("Cal DOJ") to positively identify the arrestees and to check their criminal history. The FBI would forward the fingerprints to the Department of Homeland Security ("DHS") to be checked against immigration and other databases. To give itself time to take a detainee into immigration custody, ICE would send an Immigration Detainer – Notice of Action (DHS Form I-247) to the local law enforcement official requesting that the local law enforcement official hold the individual for up to 48 hours after that individual would otherwise be released ("civil immigration detainers"). Civil Immigration detainers may be issued without evidentiary support or probable cause by border patrol agents, aircraft pilots, special agents, deportation officers, immigration inspectors, and immigration adjudication officers.

Given that civil immigration detainers are issued by immigration officers without judicial oversight, and the regulation authorizing civil immigration detainers provides no minimum standard of proof for their issuance, there are serious questions as to their constitutionality. Unlike criminal warrants, which must be supported by probable cause and issued by a neutral magistrate, there are no such requirements for the issuance of a civil immigration detainer. Several federal courts have ruled that because civil immigration detainers and other ICE "Notice of Action" documents are issued without probable cause of criminal conduct, they do not meet the Fourth Amendment requirements for state or local law enforcement officials to arrest and hold an individual in custody. (*Miranda-Olivares v. Clackamas Co.*, No. 3:12-cv-02317-ST *17 (D.Or. April 11, 2014) (finding that detention pursuant to an immigration detainer is a seizure that must comport with the Fourth Amendment). *See also Morales v. Chadbourne*, 996 F. Supp. 2d 19, 29 (D.R.I 2014); *Villars v. Kubiatowski*, No. 12-cv-4586 *10-12 (N.D. Ill. filed May 5, 2014).)

On December 4, 2012, the Attorney General of California, Kamala Harris, clarified the responsibilities of local law enforcement agencies under S-Comm. The Attorney General clarified that S-Comm did not require state or local law enforcement officials to determine an individual's immigration status or to enforce federal immigration laws. The Attorney General also clarified that civil immigration detainers are voluntary requests to local law enforcement agencies that do not mandate compliance. California local law enforcement agencies may determine on their own whether to comply with non-mandatory civil immigration detainers. In a June 25, 2014, bulletin, the Attorney General warned that a federal court outside of California had held a county liable for damages where it voluntarily complied with an ICE request to detain an individual, and the individual was otherwise eligible for release and that local law enforcement agencies may also be held liable for such conduct. Over 350 jurisdictions, including Washington, D.C., Cook County, Illinois, and many of California's 58 counties, have already acknowledged the discretionary nature of civil immigration detainers and are declining to hold people in their jails for the additional 48 hours as requested by ICE. Local law enforcement agencies' responsibilities, duties, and powers are regulated by state law. However, complying with non-mandatory civil immigration detainers frequently raises due

process concerns.

According to Section 287.7 of Title 8 of the Code of Federal Regulations, the City is not reimbursed by the federal government for the costs associated with civil immigration detainers alone. The full cost of responding to a civil immigration detainer can include, but is not limited to, extended detention time, the administrative costs of tracking and responding to detainers, and the legal liability for erroneously holding an individual who is not subject to a civil immigration detainer. Compliance with civil immigration detainers and involvement in civil immigration enforcement diverts limited local resources from programs that are beneficial to the City.

The City seeks to protect public safety, which is founded on trust and cooperation of community residents and local law enforcement. However, civil immigration detainers and notifications regarding release undermine community trust of law enforcement by instilling fear in immigrant communities of coming forward to report crimes and cooperate with local law enforcement agencies. A 2013 study by the University of Illinois, entitled "Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement," found that at least 40% of Latinos surveyed are less likely to provide information to police because they fear exposing themselves, family, or friends to a risk of deportation. Indeed, civil immigration detainers have resulted in the transfer of victims of crime, including domestic violence victims, to ICE.

The City has enacted numerous laws and policies to strengthen communities and to build trust between communities and local law enforcement. Local cooperation and assistance with civil immigration enforcement undermines community policing strategies.

In 2014, DHS ended the Secure Communities program and replaced it with PEP. PEP and S-Comm share many similarities. Just as with S-Comm, PEP uses state and federal databases to check an individual's fingerprints against immigration and other databases. PEP employs a number of tactics to facilitate transfers of individuals from local jails to immigration custody.

First, PEP uses a new form (known as DHS Form I-247N), which requests notification from local jails about an individual's release date prior to his or her release from local custody. As with civil immigration detainers, these notification requests are issued by immigration officers without judicial oversight, thus raising questions about local law enforcement's liability for constitutional violations if any person is overdetained when immigration agents are unable to be present at the time of the person's release from local custody.

Second, under PEP, ICE will continue to issue civil immigration detainer requests where local law enforcement officials are willing to respond to the requests, and in instances of "special circumstances," a term that has yet to be defined by DHS. Despite federal courts finding civil immigration detainers do not meet Fourth Amendment requirements, local jurisdictions are often unable to confirm whether or not a detention request is supported by probable cause or has been reviewed by a neutral magistrate.

The increase in information-sharing between local law enforcement and immigration officials raises serious concerns about privacy rights. Across the country, including in the California Central Valley, there has been an increase of ICE agents stationed in jails, who often have unrestricted access to jail databases, booking logs, and other documents that contain personal information of all jail inmates.

The City has an interest in ensuring that confidential information collected in the course of carrying out its municipal functions, including but not limited to public health programs and criminal investigations, is not used for unintended purposes that could hamper collection of information vital to those functions. To carry out public health programs, the City must be able to reliably collect confidential information from all residents. To solve crimes and protect the public, local law enforcement depends on the cooperation of all City residents. Information gathering and cooperation may be jeopardized if release of personal information results in a person being taken into immigration custody.

In late 2015, Pedro Figueroa, an immigrant father of an 8-year-old U.S. citizen, sought the San Francisco Police Department's help in locating his stolen vehicle. When Mr. Figueroa went to the police station to retrieve his car, which police had located, he was detained for some time by police officers before being released, and an ICE agent was waiting to take him into immigration custody immediately as he left the police station. It was later reported that both the Police Department and the San Francisco Sheriff's Department had contact with ICE officials while Mr. Figueroa was at the police station. He spent over two months in an immigration detention facility and remains in deportation proceedings. Mr. Figueroa's case has raised major concerns about local law enforcement's relationship with immigration authorities, and has weakened the immigrant community's confidence in policing practices. Community cooperation with local law enforcement is critical to investigating and prosecuting crimes. Without the cooperation of crime victims – like Mr. Figueroa – and witnesses, local law enforcement's ability to investigate and prosecute crime, particularly in communities with large immigrant populations, will be seriously compromised.

(Added by Ord. 204-13, File No. 130764, App. 10/8/2013, Eff. 11/7/2013; amended by Ord. 96-16 , File No. 160022, App. 6/17/2016, Eff. 7/17/2016)

(Former Sec. 12I.1 added by Ord. 391-90, App. 12/6/90; amended by Ord. 409-97, App. 10/31/97; Ord. 38-01, File No. 010010, App. 3/16/2001; repealed by Ord. 171-03, File No. 030422, App. 7/3/2003)

## SEC. 12I.2. DEFINITIONS.

"Administrative warrant" means a document issued by the federal agency charged with the enforcement of the Federal immigration law that is used as a non-criminal, civil warrant for immigration purposes.

"Eligible for release from custody" means that the individual may be released from custody because one of the following conditions has occurred:

(a)   All criminal charges against the individual have been dropped or dismissed.

(b)   The individual has been acquitted of all criminal charges filed against him or her.

(c)   The individual has served all the time required for his or her sentence.

(d)  The individual has posted a bond, or has been released on his or her own recognizance.

(e)  The individual has been referred to pre-trial diversion services.

(f)  The individual is otherwise eligible for release under state or local law.

"Civil immigration detainer" means a non-mandatory request issued by an authorized federal immigration officer under Section 287.7 of Title 8 of the Code of Federal Regulations, to a local law enforcement official to maintain custody of an individual for a period not to exceed 48 hours and advise the authorized federal immigration officer prior to the release of that individual.

"Convicted" means the state of having been proved guilty in a judicial proceeding, unless the convictions have been expunged or vacated pursuant to applicable law. The date that an individual is Convicted starts from the date of release.

"Firearm" means a device, designed to be used as a weapon, from which is expelled through a barrel, a projectile by the force of an explosion or other form of combustion as defined in Penal Code Section 16520.

"Law enforcement official" means any City Department or officer or employee of a City Department, authorized to enforce criminal statutes, regulations, or local ordinances; operate jails or maintain custody of individuals in jails; and operate juvenile detention facilities or maintain custody of individuals in juvenile detention facilities.

"Notification request" means a non-mandatory request issued by an authorized federal immigration officer to a local law enforcement official asking for notification to the authorized immigration officer of an individual's release from local custody prior to the release of an individual from local custody. Notification requests may also include informal requests for release information by the Federal agency charged with enforcement of the Federal immigration law.

"Personal information" means any confidential, identifying information about an individual, including, but not limited to, home or work contact information, and family or emergency contact information.

"Serious Felony" means all serious felonies listed under Penal Code Section 1192.7(c) that also are defined as violent felonies under Penal Code Section 667.5(c); rape as defined in Penal Code Sections 261, and 262; exploding a destructive device with intent to injure as defined in Penal Code Section 18740; assault on a person with caustic chemicals or flammable substances as defined in Penal Code Section 244; shooting from a vehicle at a person outside the vehicle or with great bodily injury as defined in Penal Code Sections 26100(c) and (d).

"Violent Felony" means any crime listed in Penal Code Section 667.5(c); human trafficking as defined in Penal Code Section 236.1; felony assault with a deadly weapon as defined in Penal Code Section 245; any crime involving use of a firearm, assault weapon, machine gun, or .50 BMG rifle, while committing or attempting to commit a felony that is charged as a sentencing enhancement as listed in Penal Code Sections 12022.4 and 12022.5.

(Added by Ord. 204-13, File No. 130764, App. 10/8/2013, Eff. 11/7/2013; amended by Ord. 96-16 , File No. 160022, App. 6/17/2016, Eff. 7/17/2016)

(Former Sec. 12I.2 added by Ord. 391-90, App. 12/6/90; amended by Ord. 278-96, App. 7/3/96; Ord. 409-97, App. 10/31/97; Ord. 38-01, File No. 010010, App. 3/16/2001; repealed by Ord. 171-03, File No. 030422, App. 7/3/2003)

## SEC. 12I.3. RESTRICTIONS ON LAW ENFORCEMENT OFFICIALS.

(a)  Except as provided in subsection (b), a law enforcement official shall not detain an individual on the basis of a civil immigration detainer after that individual becomes eligible for release from custody.

(b)  Law enforcement officials may continue to detain an individual in response to a civil immigration detainer for up to 48 hours after that individual becomes eligible for release if the continued detention is consistent with state and federal law, and the individual meets both of the following criteria:

(1)  The individual has been Convicted of a Violent Felony in the seven years immediately prior to the date of the civil immigration detainer; and

(2)  A magistrate has determined that there is probable cause to believe the individual is guilty of a Violent Felony and has ordered the individual to answer to the same pursuant to Penal Code Section 872.

In determining whether to continue to detain an individual based solely on a civil immigration detainer as permitted in this subsection (b), law enforcement officials shall consider evidence of the individual's rehabilitation and evaluate whether the individual poses a public safety risk. Evidence of rehabilitation or other mitigating factors to consider includes, but is not limited to: the individual's ties to the community, whether the individual has been a victim of any crime, the individual's contribution to the community, and the individual's participation in social service or rehabilitation programs.

This subsection (b) shall expire by operation of law on October 1, 2016, or upon a resolution passed by the Board of Supervisors that finds for purposes of this Chapter, the federal government has enacted comprehensive immigration reform that diminishes the need for this subsection (b), whichever comes first.

(c)  Except as provided in subsection (d), a law enforcement official shall not respond to a federal immigration officer's notification request.

(d)  Law Enforcement officials may respond to a federal immigration officer's notification request if the individual meets both of the following criteria:

(1)  The individual either:

(A)  has been Convicted of a Violent Felony in the seven years immediately prior to the date of the notification request; or

(B)  has been Convicted of a Serious Felony in the five years immediately prior to the date of the notification request; or

(C)  has been Convicted of three felonies identified in Penal Code sections 1192.7(c) or 667.5(c), or Government Code sections 7282.5(a)(2) or 7282.5(a)(3), other than domestic violence, arising out of three separate incidents in the five years immediately prior to the date of the notification request; and

(2)  A magistrate has determined that there is probable cause to believe the individual is guilty of a felony identified in Penal Code sections 1192.7(c) or 667.5(c), or Government Code sections 7282.5(a)(2) or 7282.5(a)(3), other than domestic violence, and has ordered the individual to answer to the same pursuant to Penal Code Section 872.

In determining whether to respond to a notification request as permitted by this subsection (d), law enforcement officials shall consider evidence of the individual's rehabilitation and evaluate whether the individual poses a public safety risk. Evidence of rehabilitation or other mitigating factors to consider includes, but is not limited to, the individual's ties to the community, whether the individual has been a victim of any crime, the individual's contribution to the community, and the individual's participation in social service or rehabilitation programs.

(e)  Law enforcement officials shall not arrest or detain an individual, or provide any individual's personal information to a federal immigration officer, on the basis of an administrative warrant, prior deportation order, or other civil immigration document based solely on alleged violations of the civil provisions of immigration laws.

(f)  Law enforcement officials shall make good faith efforts to seek federal reimbursement for all costs incurred in continuing to detain an individual, after that individual becomes eligible for release, in response each civil immigration detainer.

(Added by Ord. 204-13, File No. 130764, App. 10/8/2013, Eff. 11/7/2013; amended by Ord. 96-16 , File No. 160022, App. 6/17/2016, Eff. 7/17/2016)

(Former Sec. 12I.3 added by Ord. 391-90, App. 12/6/90; amended by Ord. 409-97, App. 10/31/97; Ord. 38-01, File No. 010010, App. 3/16/2001; repealed by Ord. 171-03, File No. 030422, App. 7/3/2003)

## SEC. 12I.4. PURPOSE OF THIS CHAPTER.

The intent of this Chapter 12I is to address requests for non-mandatory civil immigration detainers, voluntary notification of release of individuals, transmission of personal information, and civil immigration documents based solely on alleged violations of the civil provisions of immigration laws. Nothing in this Chapter shall be construed to apply to matters other than those relating to federal civil immigration detainers, notification of release of individuals, transmission of personal information, or civil immigration documents, based solely on alleged violations of the civil provisions of immigration laws. In all other respects, local law enforcement agencies may continue to collaborate with federal authorities to protect public safety. This collaboration includes, but is not limited to, participation in joint criminal investigations that are permitted under local policy or applicable city or state law.

(Added by Ord. 204-13, File No. 130764, App. 10/8/2013, Eff. 11/7/2013; amended by Ord. 96-16 , File No. 160022, App. 6/17/2016, Eff. 7/17/2016)

(Former Sec. 12I.4 added by Ord. 391-90, App. 12/6/90; amended by Ord. 409-97, App. 10/31/97; Ord. 38-01, File No. 010010, App. 3/16/2001; repealed by Ord. 171-03, File No. 030422, App. 7/3/2003)

## SEC. 12I.5. SEMIANNUAL REPORT.

By no later than July 1, 2014, the Sheriff and Juvenile Probation Officer shall each provide to the Board of Supervisors and the Mayor a written report stating the number of detentions that were solely based on civil immigration detainers during the first six months following the effective date of this Chapter, and detailing the rationale behind each of those civil immigration detainers. Thereafter, the Sheriff and Juvenile Probation Officer shall each submit a written report to the Board of Supervisors and the Mayor, by January 1st and July 1st of each year, addressing the following issues for the time period covered by the report:

(a)  a description of all communications received from the Federal agency charged with enforcement of the Federal immigration law, including but not limited to the number of civil immigration detainers, notification requests, or other types of communications.

(b)  a description of any communications the Department made to the Federal agency charged with enforcement of the Federal immigration law, including but not limited to any Department's responses to inquires as described in subsection 12I.5 and the Department's determination of the applicability of subsections 12I.3(b), 12I.3(d) and 12I.3(e).

(Added by Ord. 204-13, File No. 130764, App. 10/8/2013, Eff. 11/7/2013; amended by Ord. 96-16 , File No. 160022, App. 6/17/2016, Eff. 7/17/2016)

(Former Sec. 12I.5 added by Ord. 391-90, App. 12/6/90; amended by Ord. 304-92, App. 9/29/92; Ord. 409-97, App. 10/31/97; Ord. 38-01, File No. 010010, App. 3/16/2001; repealed by Ord. 171-03, File No. 030422, App. 7/3/2003)

## SEC. 12I.6. SEVERABILITY.

If any section, subsection, sentence, clause, phrase, or word of this Chapter 12I or it[1] application, is for any reason held to be invalid or unconstitutional by a decision of any court of competent jurisdiction, such decision shall not affect the validity of the remaining portions of this Chapter 12I. The Board of Supervisors hereby declares that it would have passed this Chapter 12I and each and every section, subsection, sentence, clause, phrase, and word not declared invalid or unconstitutional without regard to whether any other portion of this

Chapter 12I would be subsequently declared invalid or unconstitutional.

(Added by Ord. 204-13, File No. 130764, App. 10/8/2013, Eff. 11/7/2013)

(Former Sec. 12I.6 added by Ord. 391-90, App. 12/6/90; amended by Ord. 409-97, App. 10/31/97; Ord. 38-01, File No. 010010, App. 3/16/2001; repealed by Ord. 171-03, File No. 030422, App. 7/3/2003)

CODIFICATION NOTE

1. So in Ord. 204-13.

## SEC. 12I.7. UNDERTAKING FOR THE GENERAL WELFARE.

In enacting and implementing this Chapter 12I the City is assuming an undertaking only to promote the general welfare. It is not assuming, nor is it imposing on its officers and employees, an obligation for breach of which it is liable in money damages to any person who claims that such breach proximately caused injury.

(Added by Ord. 204-13, File No. 130764, App. 10/8/2013, Eff. 11/7/2013)

(Former Sec. 12I.7 added by Ord. 391-90, App. 12/6/90; amended by Ord. 38-01, File No. 010010, App. 3/16/2001; repealed by Ord. 171-03, File No. 030422, App. 7/3/2003)

## SEC. 12I.8.

(Added by Ord. 391-90, App. 12/6/90; amended by Ord. 409-97, App. 10/31/97; Ord. 38-01, File No. 010010, App. 3/16/2001; repealed by Ord. 171-03, File No. 030422, App. 7/3/2003)

## SEC. 12I.10.

(Added by Ord. 391-90, App. 12/6/90; amended by Ord. 38-01, File No. 010010, App. 3/16/2001; repealed by Ord. 171-03, File No. 030422, App. 7/3/2003)

## SEC. 12I.11.

(Added by Ord. 391-90, App. 12/6/90; amended by Ord. 38-01, File No. 010010, App. 3/16/2001; repealed by Ord. 171-03, File No. 030422, App. 7/3/2003)

# EXHIBIT 8

RESOLUTION NO.  **37277**  As Amended

Declare the City of Portland a Welcoming City, a Sanctuary City, and an Inclusive City for all (Resolution)

WHEREAS, President Barack Obama established the White House Task Force on New Americans in 2014 which spearheaded the Building Welcoming Communities Campaign to build inclusive, welcoming communities that allow all residents to thrive and advance integration efforts in three core areas: civic, economic, and linguistic integration; and

WHEREAS, City Council recognizes that recent changes to federal immigration policies have generated fear and anxiety among members of the City's many communities; and

WHEREAS, people of all races, colors, national origins, immigration or refugee statuses, heritages, cultures, religions, sexes, gender identities and gender expressions, sexual orientations, abilities, ages, and economic statuses contribute to the health, well-being, prosperity, and general welfare of the City as families, neighbors, workers, and taxpayers; and

WHEREAS, the City seeks to affirm Portland's commitment to protect and support immigrant and refugee communities; and

WHEREAS, immigrant and refugee communities contribute significantly to our workforce and economy. The Oregon Community Foundation's 2015 report *Latinos in Oregon: Trends and Opportunities in a Changing State* shows that a higher proportion of Latinos participate in the labor force than the percentage participating from White Oregonians and foreign-born workers make up 13 percent of the state's civilian employed population; and

WHEREAS, Portland ranks 11th among US cities for resettling international refugees. Since 1975, 65,832 refugees have resettled in Oregon, including 15,545 since 2002, most initially settling in the greater Portland metro area. The most common refugee groups arriving in Oregon are from Cuba, Burma, Bhutan, Iran, Iraq, Somalia; and

WHEREAS, the City of Portland employs (as of February 2017) a fulltime workforce that is 25.41% people of color, and a non-fulltime workforce that is 34% people of color; and

WHEREAS, the City's core principles include inclusivity, diversity, and equity, which are embodied in City code, rules, and policy; and

WHEREAS, Portland City Code Section 23.01.010 states that "[i]t is the policy of the City of Portland to eliminate discrimination based on race, religion, color, sex, marital status, familial status, national origin, age, mental or physical disability, sexual orientation, gender identity or source of income.  Such discrimination poses a threat to the health, safety and general welfare of the citizens of Portland and menaces the institutions and foundation of our community"; and

WHEREAS, in accordance with the 2013 City of Portland Civil Rights Title VI Plan adopted by Council, "[i]t is the policy of the City of Portland that no person shall be denied the benefits of or be subjected to discrimination in any City program, service, or activity on the grounds of race, religion, color, national origin, English proficiency, sex, age, disability, religion, sexual orientation, gender identity, or source of income"; and

WHEREAS, according to TRAC Immigration's 2013 report, *ICE Detainers Placed on U.S. Citizens and Legal Permanent Residents*, detainers have been placed erroneously on U.S. Citizens and legal permanent residents, or, "green card holders"; and

WHEREAS, the City of Portland engages and advocates for immigrants and refugees in the New Portlanders program and Parks for New Portlanders; supports the Diversity and Civic Leadership Program for broad and diverse participation in the civic governance of the City; and improves Portland's livability and sense of community with a focus on communities of color, immigrant and refugee communities; and

WHEREAS, in January of 2017, the Chief of Police announced to Portland Police Bureau employees and members of the community that, in accordance with Oregon Revised Statute (ORS) 181A.820, the Portland Police Bureau does not enforce federal immigration laws and that positive engagement with refugees and immigrants in our community will improve public safety; and

WHEREAS, Ordinance No. 187805 declares that the Portland City Council is committed to the development of policy and best practices to more fully integrate immigrant and refugee community members into civic life in Portland; and

WHEREAS, Portland City Council in 2016 adopted Code Section 3.131.010, which established the New Portlander Policy Commission to "advise the City on policies and practices to integrate immigrant and refugee communities' voices and needs into the provision of City services, City decision-making and civic engagement in Portland"; and

WHEREAS, Portland United Against Hate and other community groups collaborating on Portland's response to federal actions is working towards developing a rapid-response program related to hate crimes and graffiti; and

WHEREAS, the Center for American Progress's 2017 study *The Effects of Sanctuary Policies on Crime and the Economy* shows that crime is lower and economies are stronger in sanctuary counties compared to nonsanctuary counties; and

WHEREAS, Multnomah County was declared a Sanctuary County by unanimous action of the Board of Commissioners on December 19th, 2016 and resolved to support and endorse the Multnomah County Sheriff's Office's continued compliance with ORS 181A.820 and applicable federal law in regards to federal immigration detainers. Multnomah County also resolved to seek reaffirm, and declare its commitment to equity and respect for all community members by ensuring and affirming they are able to continue accessing County resources and services regardless of their immigration status; and

37277

WHEREAS, Oregon Governor Kate Brown's Executive Order 17-04 renews Oregon's commitment to protecting its immigrant, refugee, and religious-minority residents; and

NOW THEREFORE, BE IT RESOLVED that the City of Portland embraces, celebrates, and welcomes the collective contributions of all persons cherishing and respecting people every of race, color, national origin, immigration or refugee status, heritage, culture, religion, sex, gender identity and gender expression, sexual orientation, ability, age, and economic status.

BE IT FURTHER RESOLVED that the City will continue to, in a manner consistent with state and federal law, prohibit the use of City funds, personnel or equipment to enforce federal immigration law. The Resolution shall be interpreted and executed in a manner consistent with ORS 181A.820 and with 8 U.S.C. §§ 1373 and 1644. In the event that this Resolution conflicts with either state or federal law, state and federal law shall control.

BE IT FURTHER RESOLVED that in the current universal review process the Council directs the Portland Police Bureau to ensure that directive 810.10 provides that the PPB personnel shall not cooperate with ICE except as expressly required by Federal Law.

BE IT FURTHER RESOLVED that the City of Portland will support the Multnomah County Public Defenders in its work to help immigrants fight deportation, including through the February 2017 allocation of $50,000.

BE IT FURTHER RESOLVED that the City of Portland shall coordinate with school district, regional, statewide and federal leaders and convene a workgroup to coordinate efforts to support and protect the City's immigrant and refugee communities.

BE IT FURTHER RESOLVED that within the next 90 days the Bureau of Human Resources, the Office of Equity and Human Rights, and the City Attorney's Office in collaboration with other City bureaus shall develop a plan for training staff on how to respond to and if appropriate, notify individuals about ICE personnel requesting information about City of Portland employees or residents or attempting to enter City property or a City meeting, and how to support employees whose family members have been displaced because of ICE.

BE IT FURTHER RESOLVED that the City Council encourages all Portlanders to unite and work together to promote kindness and understanding in our shared community, rejecting hatred and divisiveness, as we strive to protect the freedoms we all hold dear.

Adopted by the Council:    MAR 2 2 2017

Mayor Ted Wheeler
Commissioner Eudaly
Commissioner Fish
Commissioner Fritz
Commissioner Saltzman
Prepared by: Andrea Valderrama
Date Prepared: March 14th, 2017

**Mary Hull Caballero**
Auditor of the City of Portland
By

_Susan Parsons_
Deputy

Agenda No.

**RESOLUTION NO.   37277   As Amended**

Title

Declare the City of Portland a Welcoming City, a Sanctuary City, and an Inclusive City for all
(Resolution)

| INTRODUCED BY<br>Commissioner/Auditor:<br>**Mayor Wheeler** | CLERK USE: DATE FILED ___ MAR 1 4 2017 |
|---|---|
| **COMMISSIONER APPROVAL** | Mary Hull Caballero<br>Auditor of the City of Portland |
| Mayor—Finance & Administration – Wheeler | |
| Position 1/Utilities - Fritz | By: _Susan Parsons_ |
| Position 2/Works - Fish | Deputy |
| Position 3/Affairs - Saltzman | |
| Position 4/Safety - Eudaly | **ACTION TAKEN:** |
| **BUREAU APPROVAL** | |
| Bureau: Office of the Mayor<br>Bureau Head: Kristin Dennis | |
| Prepared by: Andrea Valderrama<br>Date Prepared: March 14, 2017 | |
| Impact Statement<br>Completed ☒   Amends Budget ☐ | |
| Portland Policy Document<br>If "Yes" requires City Policy paragraph stated<br>in document.<br>Yes ☐   No ☒ | |
| **City Auditor Office Approval:**<br>required for Code Ordinances | |
| **City Attorney Approval:**<br>required for contract, code. easement,<br>franchise, charter, Comp Plan | |
| Council Meeting Date   **March 22,<br>2017** | |

| AGENDA | FOUR-FIFTHS AGENDA | COMMISSIONERS VOTED<br>AS FOLLOWS: | | |
|---|---|---|---|---|
| | | | YEAS | NAYS |
| **TIME CERTAIN** ☒<br>Start time: **2 p.m.** | | | | |
| | 1. Fritz | 1. Fritz | ✓ | |
| **Total amount of time needed: 2 hours**<br>(for presentation, testimony and discussion) | 2. Fish | 2. Fish | ✓ | |
| **CONSENT** ☐ | 3. Saltzman | 3. Saltzman | ✓ | |
| **REGULAR** ☐ | 4. Eudaly | 4. Eudaly | ✓ | |
| **Total amount of time needed:** _____<br>(for presentation, testimony and discussion) | Wheeler | Wheeler | ✓ | |

# EXHIBIT 9

# KING COUNTY CODE ("KCC") CH. 2.15: CITIZEN AND IMMIGRATION STATUS

(Available at: aqua.kingcounty.gov/council/clerk/code/05_Title_2.htm#_Toc51932405)

**Sections:**
2.15.005    Definitions.
2.15.010    County and county agents limitations and responsibilities - exceptions.
2.15.015    Sheriff's office limitations and responsibilities.
2.15.020    Civil immigration enforcement – county and county agents limitations and duties - exceptions.
2.15.030    County and county contractors – interpretation and translation services – language assistance plans.
2.15.100    Complaints for damages for violation of chapter.
2.15.110    Citizenship or immigration status – limitations of chapter on uses.

**2.15.005  Definitions.**  The definitions in this section apply throughout this chapter unless the context clearly requires otherwise.

A.  "Administrative warrant" means a noncriminal immigration warrant of arrest, order to detain or release aliens, notice of custody determination, notice to appear, removal order, warrant of removal or any other document, issued by ICE, CBP or USCIS that can form the basis for a person's arrest or detention for a civil immigration enforcement purpose.  ICE administrative warrant forms include the U.S. DHS form I-200 (Rev. 09/16) "Warrant for Arrest of Alien" and Form I-205 "Warrant Of Removal/Deportation," as well as predecessor and successor versions.  "Administrative warrant" does not include any criminal warrants issued upon a judicial determination of probable cause and in compliance with the Fourth Amendment to the United States Constitution.

B.  "Agency" means a King County department, agency, division, commission, council, committee, board, other body or person, established by authority of an ordinance, executive order, or charter.

C.  "Agent" means a person acting within the scope of employment by or acting on behalf of an agency.

D.  "CBP" means the United States Customs and Border Protection agency of the United States Department of Homeland Security and shall include any successor federal agency charged with border enforcement.

E.  "Citizenship or immigration status" means a person's recorded citizenship or immigration status, as such status is defined in the Immigration and Nationality Act, at the time an agent or agency receives the information.

F.  "Civil immigration enforcement operation" means an operation that has as one of its objectives the identification or apprehension of a person or persons in order to investigate them for a violation of the immigration laws and subject them to one or more of the following:

1.  Civil immigration detention;

2.  Removal proceedings; and

3.  Removal from the United States.

G.  "Coerce" means to use express or implied threats towards a person or any family member of a person that attempts to put the person in immediate fear of the consequences in order to compel that person to act against the person's will.

H.  "Commitment" means confinement in secure detention for a specified amount of time following a determination of guilt.  "Commitment" does not include pretrial detention of any persons such as those who [are] unable to post bail.

I.  "Employee" means a person who is appointed as an employee by the appointing authority of a county agency, office, department, council, board, commission or other separate unit or division of county government, however designated, acting within the scope of employment by or acting on behalf of the county.  "County employee" also includes a county elected official and a member of a county board, commission, committee or other multimember body, but does not include an official or employee of the county's judicial branch, though it does include an employee of the department of judicial administration.

J.  "ICE" means the United States Immigration and Customs Enforcement agency including Enforcement and Removal Operations and Homeland Security Investigations and shall include any successor federal agency charged with the enforcement of immigration laws.

K.  "Immigration detainer" means a request by ICE to a federal, state or local law enforcement agency, such as the King County department of adult and juvenile detention, to provide notice of release or maintain custody of a person based on an alleged violation of a civil immigration law.  "Immigration detainer" includes a detainer issued under Sections 236 or 287 of the Immigration and Nationality Act or 287.7 or 236.1 of Title 8 of the Code of Federal Regulations.  "Immigration detainer" includes a detainer issued under DHS form I-274A entitled Immigration Detainer- Notice of Action, as well as predecessor and successor versions.

L.  "Interpretation" means the transfer of an oral communication from one language to another.

2

M.  "Limited-English-proficient" means a person who does not speak English as the person's primary language, who has a limited ability to read, speak, write, or understand English.

N.  "Nonpublic" means any area of a county facility, including the secure detention facilities of the department of adult and juvenile detention that is not generally open and accessible to the general public, but instead requires special permission for admittance by a county employee on an individual basis.

O.  "Personal information" means one or more of the following, when the information is linked with or is reasonably linkable, including via analytic technology, to the person's first name or first initial and last name:

1.  Home address;

2.  Work address;

3.  Telephone number;

4.  Electronic mail address;

5.  Social media handle or other identifying social media information;

6.  Any other means of contacting a person;

7.  Social security number;

8.  Driver's license number or Washington identification card number;

9.  Bank account number or credit or debit card number;

10.  Information or data collected through the use or operation of an automated license plate recognition system; and

11.  User name that, in combination with a password or security question and answer, would permit access to an online account.

P.  "Public communication materials" means materials that are intended for broad distribution to inform or educate people served by King County.  For the purpose of translation, "public communication materials" refers only to printed media such as brochures, posters, booklets, pamphlets, billboards and advertisements in printed publications.

Q.  "Translation" means the transfer of a written communication from one language to another while preserving the intent and essential meaning of the original text.

R.  "USCIS" shall mean the United States Citizenship and Immigration Services and any successor agency charged with overseeing United States immigration laws.

S.  "Verbal abuse" means the use of a remark which is overtly insulting, mocking or belittling directed at a person based upon the actual or perceived:

1.  Race, color, sex, religion, national origin, English proficiency, sexual orientation or gender identity or expression of the person; or

2.  Citizenship or immigration status of the person or the person's family member.

3

T.  "Vital documents" are materials that provide essential information for accessing basic county services and benefits and for which serious consequences would result if the information were not provided.  (Ord. 19026 § 1, 2019:  Ord. 18665 § 1, 2018).

## 2.15.010 County and county agents limitations and responsibilities - exceptions.

A.  Except as otherwise provided in this section or when otherwise required by law, a Reverend Doctor Martin Luther King, Jr., County office, department, employee, agency or agent shall not condition the provision of county services on the citizenship or immigration status of any person.

B.  All applications, questionnaires, and interview forms used in relation to the provision of county benefits, opportunities, or services shall be reviewed by each agency, and any question requiring disclosure of information related to citizenship, immigration status, or national origin unless required by state or federal law, or international treaty, shall be deleted.  Agencies that are required by state or federal law, or international treaty, to collect immigration status or national origin information must separate that information from personal information in the agencies' records as soon as is practicable.

C.  The department of public health shall not condition the provision of health benefits, opportunities, or services on matters related to citizenship, national origin, or immigration status.  The department of public health may inquire about or disclose information relating to a person's citizenship, national origin, or immigration status for the purpose of determining eligibility for benefits or seeking reimbursement from federal, state, or other third-party payers.

D.  Except when otherwise required by law, where the county accepts presentation of a state-issued driver's license or identification card as adequate evidence of identity, presentation of a state-issued document marked as not valid for federal purposes or presentation of a photo identity document issued by the person's nation of origin, such as a driver's license, passport, or other consul-issued document, such as a Matricula Consular de Alta Seguridad, shall also be accepted and shall not subject the person to a higher level of scrutiny or different treatment than if the person had provided a Washington state driver's license or identification card.  A request for translation of such a document to English shall not be deemed a violation of any provision of this chapter; however, translation services may not be provided by any federal immigration authority.  This subsection does not apply to documentation required to complete a federal I-9 employment eligibility verification form.  Once the county agency's legitimate purpose in viewing the required documentation is completed, the documentation shall be promptly returned to its

owner.  Copies of the required documentation shall not be made or maintained by a county agency unless otherwise required by law.

E.  A county employee or an agent or agency of King County shall not inquire about or request, from a member of the public information about the citizenship, national origin, or immigration status or place of birth of any person unless the inquiry, request, or investigation is required by state or federal law, regulation, or directive or court order or rule, or to ensure compliance with any state or federal law, regulation, or directive or court order.  When an inquiry, request, or investigation into nationality, immigration status or citizenship, including place of birth, is required to be or for any reason is made, the King County agent or county employee shall not attempt to coerce a response.  All persons to whom the inquiries are made shall be explicitly informed of their right to decline to respond, free from fear or threat of retaliation.

F.  Agents of King County and county employees are hereby prohibited from conditioning King County services on immigration status, except where required under applicable federal or state law or regulation or directive or court order or rule.  Agents of King County and county employees are prohibited from verbally abusing or coercing persons or threatening to report them or their family members to ICE or threatening to take other immigration-related action against them or their family members.

G.  Except where necessary to provide King County services, for performance measurement purposes including data analysis conducted to ensure services are being provided in an equitable and nondiscriminatory manner, or where otherwise required by state or federal law or regulation or directive or court order, King County agents and employees are not permitted to obtain, maintain, or shareinformation about a person's race, ethnicity, language proficiency, religion, sexual orientation, gender identity or expression, disability, housing status, financial status, marital status, status as a victim of domestic violence, criminal history, release date from incarceration or confinement in a secure detention or other custody, or status as a veteran.

H.  Nothing in this chapter shall be construed as to prohibit any county employee, upon request of the noncitizen, from aiding a noncitizen to obtain immigration benefits pursuant federal immigration law.

I. An agent of King County or a county employee shall not expend any time, moneys or other resources on facilitating the civil enforcement of federal immigration law or participating in civil immigration enforcement operations, except where state or federal law, regulation, or court order shall so require.  However, a county agency, employee or agent is not prohibited from sending to, or receiving from, federal immigration authorities, information regarding the citizenship or immigration status of a person.  Also, nothing in this section prohibits any county agency from sending to, receiving from, requesting

from, or exchanging with any federal, state, or local government agency information regarding the immigration status of a person or from maintaining such information.

J.  Nothing in this section shall be construed to prohibit any county employee from participating in cross-designation or task force activities with federal law enforcement authorities for criminal law enforcement.

K.  The executive shall ensure that all King County employees and agents receive appropriate training on the implementation of the provisions of this section.  (Ord. 19772 § 1, 2024:  Ord. 19026 § 2, 2019:  Ord. 18665 § 2, 2018:  Ord. 16692 § 2, 2009).

### 2.15.015  Sheriff's office limitations and responsibilities.

A.  The King County sheriff's office shall not request specific documents relating to a person's civil immigration status from a member of the public, for the sole purpose of determining whether the person has violated federal civil immigration laws.  The documents include but are not limited to:

1.  Passports;

2.  Alien registration cards; or

3.  Work permits.

B.  The sheriff's office may use documents relating to a person's civil immigration status if the documents are offered by the person upon a general, nonspecific request.

C.  The sheriff's office shall not use stops for minor offenses or requests for voluntary information as a pretext for discovering a person's immigration status.

D.  The sheriff's office shall not initiate any inquiry of, or enforcement action against, a member of the public, based solely on a person's:

1.  Civil immigration status;

2.  Race;

3.  Inability to speak English;

4.  Inability to understand the sheriff's office personnel; or

5.  Hit on the National Crime Information Center database.  (Ord. 18665 § 3, 2018).

### 2.15.020  Civil immigration enforcement – county and county agents limitations and duties - exceptions.

A.  An agent of King County or county employee shall not expend any time, moneys or other resources on facilitating the civil enforcement of federal immigration law or participating in civil immigration enforcement operations, except where state or federal law, regulation or court order or rule shall so require.  However, a county agency, employee or agent not is prohibited from

sending to, or receiving from, federal immigration authorities, the citizenship or immigration status of a person. Also, nothing in this section prohibits any county agency from sending to, receiving from, requesting from or exchanging with any federal, state or local government agency information regarding the immigration status of a person or from maintaining such information.

B. King County and its agents and departments and county employees shall not:

1. Enter into any contract, agreement or arrangement, whether written or oral, that would grant federal civil immigration enforcement authority or powers to King County or its agents or law enforcement officers, including but not limited to agreements created under 8 U.S.C. Sec. 1357(g) or Intergovernmental Service Agreements;

2. Honor immigration detainer requests or administrative warrants issued by ICE, CBP or USCIS, or hold any person upon the basis of an ICE, CBP or USCIS detainer request or administrative warrant unless such request or warrant is accompanied by a criminal warrant issued by a United States District Court judge or magistrate. The sheriff's office or the department of adult and juvenile detention personnel shall not carry out a civil arrest, detain a person after the release date set by a court or refuse to accept a bond based on an administrative warrant separately or in combination with an ICE detainer request;

3. For purposes of execution of federal civil immigration enforcement, permit ICE, CBP or USCIS officers, agents or representatives access to nonpublic areas of King County's facilities, property, equipment or nonpublic databases, or nonpublic portions of otherwise public databases, or people in King County's custody, absent a judicial criminal warrant specifying the information or persons sought unless otherwise required by state or federal law. Any warrantless attempts or requests for access to those facilities, property, equipment or nonpublic databases shall be immediately sent to the department or agency director or their designee responsible for the operation of the facility, property, database or equipment. Permission to access any such a facility, property, equipment or nonpublic database without a judicial criminal warrant may only be provided with the express, written approval of the appropriate person. Any detention facilities, including secure detention facilities, prisons and halfway houses, that King County contracts with or leases land to for the purposes of criminal or civil detention must include the requirement in this subsection B.3. in any contract with King County; and

4. Provide personal information to federal immigration authorities for purpose of civil immigration enforcement, except as required by state or federal law, about any person, including place of birth or household members, the

services received by the person or the person's next court date or release date, absent a warrant signed by a judge or a law requiring disclosure.

C.  It is the policy of King County to obtain the minimum information required under RCW 10.70.140 and to provide it to immigration officials after the person has been convicted and sentenced.  In complying with RCW 10.70.140, the department of adult and juvenile detention personnel shall only inquire as to the nationality of persons who have been committed to secure detention after an adjudication of guilt and imposition of sentence.  The preceding sentence only applies to the department of adult and juvenile detention's direct inquiries of persons committed to secure detention, and not to interactions with other governmental entities.  Only persons who self-identify as being nationals of a country other than the United States shall be subject to the notification requirements of RCW 10.70.140.

D.1.  If permission to access a King County detention facility without a judicial criminal warrant is granted to ICE, CBP or USCIS in accordance with subsection B.3. of this section for the purpose of conducting an interview which does not relate to civil immigration enforcement between either ICE or CBP, or both, and a person who is in the custody of the department of adult and juvenile detention, the department of adult and juvenile detention shall provide the person with an oral explanation and a written consent form that explains the purpose of the interview, that the interview is voluntary and that the person may decline to be interviewed or may choose to be interviewed only with the person's attorney present.  The form shall state explicitly that the person will not be punished or suffer retaliation for declining to be interviewed.  The form shall be available in English, Spanish and any other language identified by the county's language assistance plan as established in K.C.C. 2.15.030.B. and explained orally to a person who is unable to read the form.  Either ICE or CBP officials, or both, shall only be permitted to interview persons who have consented in writing to be interviewed, absent a judicial criminal warrant.

2.  Upon receiving any ICE hold, notification or transfer request, department of adult and juvenile detention personnel shall provide a copy of the request to the person and inform the person whether the department intends to comply with the request.

3.  Consistent with Article 36 of the Vienna Convention on Consular Relations, any person in custody or detention shall be informed through the person's attorney of the right to communicate with the consular post of a country of which the person is a national, if other than the United States, and informed that the person's consular officers have the right to visit, converse or correspond with the person, if the person wishes the communication.  If a person chooses to disclose that the person is a foreign national and requests consular notification, the custodian shall contact the appropriate consulate.  The

informed consent requirements of the Vienna Convention on Consular Relations shall apply to all such inquiries.  The same requirements shall apply to inquiries into nationality status for the purpose of complying with mandatory consular notification under any bilateral consular convention. In all cases, identification as a foreign national shall be voluntary and based on informed consent by the person.

4.  King County shall consider all records relating to ICE, CBP or USCIS access to facilities and information, including all communications with ICE, CBP or USCIS to be public records for purposes of chapter 42.56, the state Public Records Act, and King County shall handle all such requests in accordance with the usual procedures for receipt of public records requests.  (Ord. 18665 § 4, 2018: Ord. 18635 § 5, 2017: Ord. 17886 § 2, 2014:  Ord. 17706 § 2, 2013).

**2.15.030  County and county contractors – interpretation and translation services – language assistance plans.**

A.1.  King County and all its contractors shall provide free interpretation and translation services as required by this chapter to limited-English-proficient persons.  When a limited-English-proficient person seeks or receives benefits or services from a local agency, office or contractor, the agency, office or contractor shall make reasonable efforts provide prompt interpretation services in all interactions with the person, whether the interaction is done remotely or in person.  King County agencies and offices shall either employ sufficient qualified bilingual employees or contract with remote language services to provide interpretation services in languages spoken by limited-English-proficient county residents.

2.  The agency, office or contractor shall meet its obligation to provide prompt interpretation services for purposes of this subdivision by ensuring that limited-English-proficient persons do not have to wait unreasonably longer to receive assistance than persons who do not require interpretation services.  King County agencies shall provide support to contractors to meet the requirements of this section.

3.  Where an application or form administered by King County requires completion in English by a limited-English-proficient person for submission to a local, state or federal authority, King County or its contractor shall make reasonable efforts to provide oral interpretation of the application or form as well as acknowledgement by the limited-English-proficient person that the form was translated and completed by an interpreter.  King County agencies shall provide support to contractors to meet the requirements of this section.

B.  King County agencies and offices shall develop language assistance plans that identify which of its vital documents and public communication

materials need to be translated into languages for use by limited-English-proficient persons. The plans should also include identification of agency or office plans for providing translation of webpages, automated telephonic greetings, automated telephonic voice messages and informational signage. The threshold for the translation of vital documents and public communication materials shall be based on the top six languages identified by the tier map of limited-English-proficient persons maintained by the office of equity and social justice and the county demographer. (Ord. 18665 § 6, 2018).

**2.15.100  Complaints for damages for violation of chapter.**  A person who has been injured or otherwise sustained damages as a result of a violation of this chapter may file a complaint with the King County office of equity and racial and social justice in accordance with K.C.C. 12.22.040. (Ord. 19541 § 1, 2022:  Ord. 19047 § 10, 2019 [did not take effect]:  Ord. 18665 § 8, 2018).

**2.15.110  Citizenship or immigration status – limitations of chapter on uses.**  In accordance with 8 U.S.C. Sec. 1373, nothing in this chapter prohibits any county agency, agent or employee from sending to, or receiving from, federal immigration authorities, the citizenship or immigration status of a person.  Also, nothing in this chapter prohibits any county agency from sending to, receiving from, requesting from or exchanging with any federal, state or local government agency information regarding the immigration status of a person or from maintaining such information.  (Ord. 18665 § 9,

# EXHIBIT :

**<u>An Executive Order to Affirm New Haven a Welcoming City</u>**

**WHEREAS,** the City of New Haven is home to a diverse population which contributes to the City's economy and cultural richness; and

**WHEREAS,** the City's Administration is committed to promoting the health and safety of all its residents, without regard to their immigration status, in order to achieve the City's goals of protecting life, liberty, and property:

**NOW, THEREFORE:** I, Justin Elicker, by virtue of the power vested in me, as Mayor of the City of New Haven, by the Charter and the laws of the State of Connecticut, hereby proclaim as follows:

I.   The American promise to welcome immigrants of the world, from wherever they come, has long-defined the true spirit of our nation;

II.  This American promise of welcome drives the Constitution State and the goals of our City.

III. In support of that commitment to promoting the safety of all who live here and in recognition of the fact that all persons need to feel comfortable in their interactions with City officials for the safety and security of the entire community, I declare:

   1. New Haven introduced the Elm City Resident Card in 2007, which allows all city residents to obtain a government-issued ID, regardless of immigration status;

   2. The New Haven Police Department issued General Order 06-2 in 2006, providing, inter alia, that City police officers may not inquire about immigration status;

   3. It shall be the policy of the City that no New Haven officer or City employee shall inquire about a person's immigration status unless required by state or federal law; and

   4. No New Haven officer or City employee shall engage in activities designed to ascertain a person's immigration status unless required by state or federal law; and

   5. No New Haven officer or City employee shall use agency or department resources, including but not limited to monies, facilities, property, equipment or personnel to investigate, enforce or assist in the investigation or enforcement of any federal program

requiring registration of individuals on the basis of race, gender, sexual orientation, religion or national or ethnic origin.

6. "Confidential information" shall mean an individual's social security number, and any information obtained and maintained by a New Haven officer or City employee, relating to an individual's sexual orientation, status as a victim of domestic violence, status as a victim of sexual assault, status as a crime witness, recipient of public assistance, or immigration status.

7. No New Haven officer or City employee shall disclose confidential information unless such disclosure:

    a.    has been authorized in writing by the individual to whom the information pertains, or by the parent or guardian of same if the individual is a minor or not legally competent; or

    b.    is required by law; or

    c.    is necessary to apprehend an individual suspected of engaging in criminal activity other than mere status as an undocumented immigrant, or

    d.    is necessary in furtherance of a criminal investigation of potential terrorism.

8. Local law enforcement agencies, school police, and security departments shall not use agency or department resources, including but not limited to monies, facilities, property, equipment, or personnel to:

    a.    Inquire about the immigration status of crime victims, witnesses or others who call or approach local law enforcement personnel, school police or security personnel seeking assistance;

    b.    Detain or arrest a person solely on the belief that she or he is not present legally in the United States, or that she/he has committed a civil immigration violation. There is no general obligation for a police officer to initiate contact with U.S. Immigration and Customs Enforcement (ICE) regarding any person;

    c.    Detain or arrest a person, based on ICE detainer requests or administrative warrants entered by ICE into the FBI's National Crime Information Center (NCIC) database, unless required by law.

9. The New Haven Police Department and the New Haven Office of Human Resources shall conduct all necessary training and education to ensure that its officers and the City's

employees are knowledgeable about all the provisions of this Executive Order, and knowledge of such provision may be tested on department promotional examinations.

10. Any employee of the City who is found to have violated this Executive Order may be subject to discipline in accordance with applicable union contract, civil service rules, or department work rules.

11. The Mayor will provide details regarding the implementation of this Executive Order upon request.

Respectfully Submitted

Justin Elicker,
Mayor

7/23/2020

Dated

# EXHIBIT ;

FILED
OFFICE OF THE CITY CLERK
OAKLAND

2018 OCT 11 PM 4: 03

Approved as to Form and Legality

*[signature]*

City Attorney's Office

# OAKLAND CITY COUNCIL

ORDINANCE ____ 1 3 5 1 5 ____ C.M.S.

## INTRODUCED BY
## City Councilmembers Kaplan, Brooks and Gallo

**ORDINANCE AMENDING RESOLUTION NUMBERS 63950, 80584 AND 86498 IN ORDER TO STRENGTHEN THE SANCTUARY CITY POLICY OF THE CITY OF OAKLAND NOT TO COOPERATE WITH OR PROVIDE SUPPORT FOR FEDERAL IMMIGRATION AGENCIES, BASED UPON RESOLUTION 87036**

**WHEREAS**, the City of Oakland has a strong tradition of embracing and valuing diversity and respecting the civil and human rights of all residents regardless of their immigration status; and

**WHEREAS**, Oakland has been on record as a City of Refuge since July 8, 1986, when it adopted Resolution No. 63950; and

**WHEREAS**, Oakland reaffirmed its status as a Sanctuary City on November 29, 2016 when it adopted in Resolution No. 86498, which stated "the City Council's desire to ensure that its immigrant residents participate in civic life and daily activities without fear of being arrested or reported to the United States Immigration and Customs Enforcement (ICE) agency;" and

**WHEREAS**, the Trump Administration is working to vilify municipalities who choose to protect aspiring citizens in an effort to browbeat them into enforcing federal immigration law; and

**WHEREAS**, under Acting ICE Director Thomas Homan, ICE agents have been targeting immigrants with no criminal record at all and flouting longstanding ICE policy against conducting arrests in sensitive locations like schools and churches; and

**WHEREAS**, ICE Director Homan has stated that "[s]anctuary jurisdictions …creat[e] a magnet for illegal immigration. As a result, ICE is forced to dedicate more resources to conduct at-large arrests in these communities;" and

**WHERAS**, Oakland is proud to be one of a growing number of municipalities around the country standing up to threats against privacy and liberties by taking

1

meaningful steps to ensure that communities are safe, and that the rights of all residents are respected, so that our City may continue to thrive; and

**WHEREAS**, on June 1, 2017, the Privacy Advisory Commission voted unanimously to recommend to the City Council that the cooperation agreement between the Oakland Police Department ("OPD") and ICE, be rescinded; and

**WHEREAS,** on July 18, 2017, Oakland City Council unanimously passed Resolution No. 86860 by Councilmember Kaplan, which "direct[ed] the City Administrator to immediately terminate the agreement with 'ICE'"; and

**WHEREAS,** in Resolution No. 86860, Oakland City Council declared that "the presence of ICE in Oakland is causing trauma in the community, and causing a chilling effect that weakens cooperation with local law enforcement;" and

**WHEREAS,** the Oakland Police Department provided traffic control for an ICE operation in West Oakland on August 16, 2017; and

**WHEREAS,** Councilmembers Brooks and Kaplan requested that the Oakland Police Department provide an Informational Report regarding its role in the ICE operation that occurred in West Oakland on August 16, 2017. OPD's responsive report took the position that "OPD has fully complied with all City of Oakland resolutions concerning the status of Oakland as a sanctuary city in immigration actions;" and

**WHEREAS,** Resolutions No. 80584 and 86498 both provided, in part, "[t]hat in accordance with state and federal laws the Oakland Police Department will continue to cooperate with federal immigration agencies in matters involving criminal activity and the protection of public safety;" and

**WHEREAS,** on November 8, 2017, the Privacy Advisory Commission approved a motion recommending that Oakland City Council adopt the following policy: "OPD shall not provide law enforcement assistance to ICE in any capacity. This shall not prevent OPD from responding to a public safety emergency related to an ICE action; in such event OPD shall explain the facts giving rise to its action in a written report to the Public Safety Committee at the earliest opportunity;" and

**WHEREAS**, the City Council adopted Resolution 87036 which supplements and amends Resolutions 63950, 80587, and 86498 in order to strengthen the policy of the City of Oakland not to cooperate with or provide support for immigrations and customs enforcement actions on January 16, 2018; and

**WHEREAS,** Oakland City Council wishes to make clear that no City of Oakland resources shall go towards assisting or cooperating with any investigation, detention, or arrest procedure or operation, public or clandestine ICE, including any subdivision of ICE, regardless of ICE's stated purpose for the procedure or operation;

2

**NOW, THEREFORE, <u>THE COUNCIL OF THE CITY OF OAKLAND DOES</u> ORDAIN <u>AS FOLLOWS:</u>**

### Section 1.  Definitions.

A. This Ordinance shall be known as the Oakland Sanctuary City Ordinance.

B. OPD means City of Oakland Police Department.

C. ICE means any employee, member, agent, or representative of the federal Department of Immigration and Customs Enforcement.

### Section 2. Prohibitions.

A. OPD employees shall not provide law enforcement assistance, including traffic support, to ICE, including any subdivision of ICE, in any capacity except to respond to a public safety emergency related to an ICE action or where assistance is required by Federal or State statute, regulation or court decision.

B. In the event OPD assists in an ICE investigation, detention, arrest or any other operation, OPD shall explain the facts giving rise to its action in a written report to the Public Safety Committee at the earliest opportunity.

C. This Ordinance codifies Resolution 87036 and supplements Resolutions 63950, 80584 and 86498.

**Section 3. Severability.**  If any section, subsection, sentence, clause or phrase of this Ordinance is for any reason held to be invalid or unconstitutional by decision of any court of competent jurisdiction, such decision shall not affect the validity of the remaining portions of the Ordinance.  The City Council hereby declares that it would have passed this Ordinance and each section, subsection, clause or phrase thereof irrespective of the fact that one or more other sections, subsections, clauses or phrases may be declared invalid or unconstitutional.

**Section 4. Effective Date.** This Ordinance shall become effective immediately on final adoption if it receives six or more affirmative votes; otherwise, it shall become effective in accordance with the law.

Introduction Date  DEC 1 1 2018

IN COUNCIL, OAKLAND, CALIFORNIA

PASSED BY THE FOLLOWING VOTE: JAN 2 2 2019

AYES:  BROOKS, CAMPBELL WASHINGTON, GALLO, GIBSON McELHANEY, GUILLEN, KALB, KAPLAN and PRESIDENT REID —8

NOES: 0

ABSENT: 0

ABSTENTIONS: 0

ATTEST: _____

LATONDA SIMMONS
City Clerk and Clerk of the Council
of the City of Oakland, California

Date of Attestation: __1/25/2019__

2367990v1

4

# EXHIBIT 32

## RESOLUTION NO. 17-08

## RESOLUTION OF THE CITY COUNCIL OF THE CITY OF EMERYVILLE DECLARING THE CITY OF EMERYVILLE A WELCOMING AND SANCTUARY CITY

**WHEREAS**, the City of Emeryville is a welcoming and sanctuary city that is committed to serving and protecting all of its residents, regardless of their immigration status; and

**WHEREAS**, the City of Emeryville is a city of peace where all people, regardless of immigration status, are respected, valued and can live in safety and security; and

**WHEREAS**, immigrants are at the foundation of our nation's success throughout all of its history; and

**WHEREAS**, the Public Policy Institute of California estimates that as of 2013, more than 2.67 million people of undocumented immigration status called California home – the most of any state in the nation, with an estimated 129,500 of those people living here in Alameda County; and

**WHEREAS**, one in ten California workers are of undocumented immigration status and are invaluable contributors to the fifth largest economy in the world; and

**WHEREAS**, the City Council recognizes and reaffirms that the City of Emeryville is a community that is committed to equality, celebrates diversity, and values the contributions and traditions of all cultures and heritages; and

**WHEREAS**, the Emeryville Police Department is committed to protecting and maintaining a safe and secure environment that enhances the quality of life for everyone in our community, regardless of immigration status; and

**WHEREAS**, subsequent to the 2016 General Election, members and friends of immigrant communities across the country, including members of the Emeryville community may be experiencing fear or anxiety resulting from potential changes to federal immigration laws and enforcement policies proposed by other elected officials; and

**WHEREAS**, the City Council of the City of Emeryville desires to publicly declare and reinforce the City's positions relating to immigration status and the protection of the rights of all persons in our community, to help address and alleviate the anxiety and fear produced by the uncertainties associated with the future of federal immigration policies; now, therefore, be it

**RESOLVED**, the City Council of the City of Emeryville hereby declares the following:

1. The City of Emeryville declares itself to be a Welcoming and Sanctuary City; and

2. As a Welcoming and Sanctuary City, City employees will serve all residents, and city services will be accessible to all residents regardless of immigration status; and

3. The City of Emeryville will not inquire upon a person's immigration status in either the provision of municipal services or in the course of law enforcement; and

Resolution No. 17-08
Declaring the City of Emeryville a Welcoming and Sanctuary City
City Council Meeting | January 17, 2017
Page 2 of 2

4. As a Welcoming and Sanctuary City, the City of Emeryville will have policies that instruct employees to refuse the application of any request from a state or federal agency that requires the identification of a resident's immigration status, leaving that determination to federal authorities; and

5. The City of Emeryville shall refuse any requests that are an extension of any federal immigration policy enforcement actions to federal authorities and shall not enter into any agreements to carry out such federal enforcement actions or dedicate any City time or resources to such enforcement, but leave such actions to federal authorities; and

6. The City of Emeryville strongly condemns any and all statements by other elected officials or members of the public that promote or provoke hate, xenophobia, intolerance or racism against any person or persons on account of their immigration status, ethnicity, nationality or place or origin.

7. The City of Emeryville shall further review its policies to ensure that they reflect Emeryville's status as a Welcoming and Sanctuary City, including the possibility of revision to other City policies such that they comply with the spirit and intent of this Resolution.

**ADOPTED**, by the City Council of the City of Emeryville at a special meeting held Tuesday, January 17, 2017, by the following vote:

| | | |
|---|---|---|
| AYES: | 5 | Mayor Donahue, Vice Mayor Bauters and Council Members Martinez, Medina and Patz |
| NOES: | 0 | |
| ABSTAIN: | 0 | |
| ABSENT: | 0 | |

MAYOR

ATTEST:

APPROVED AS TO FORM:

Michael Guina

CITY CLERK

CITY ATTORNEY

CITY OF EMERYVILLE

# EXHIBIT 33

Res. No. 73677

RESOLUTION NO. 73677

**A RESOLUTION OF THE COUNCIL OF THE CITY OF SAN JOSE SUPPORTING PUBLIC SAFETY AND IMMIGRANT RIGHTS**

**WHEREAS**, since June of 2006, the U.S. Immigration and Customs Enforcement agency (ICE) has conducted repeated immigration sweeps under "Operation Return to Sender," which has targeted criminal aliens for deportation; and

**WHEREAS**, raids in recent months in Watsonville, Santa Cruz, Redwood City, Contra Costa County, and other locations--conducted for the purpose of arresting undocumented immigrants with serious criminal records--have also netted scores of immigrants with no criminal ties; and

**WHEREAS**, the *San Francisco Chronicle*, ICE reported that of the 119 arrested in a set of January sweeps in Contra Costa County, 18 were criminals, while 94 never appeared on ICE's original "wanted" list; and

**WHEREAS**, as a result of those raids, waves of fear have swept through immigrant communities in California, and within the City of San José; and

**WHEREAS**, the City of San José has a strong interest in assuring that legal and undocumented immigrants do not fear interacting with their local governmental authorities.  In past years, the City has seen how the reluctance of immigrants to interact with local authorities can critically undermine the health and safety of our community.  For example, the failure of victims to report crimes, the reluctance of witnesses to cooperate with the police, or the unwillingness of parents to take children to school or to a health clinic, can have grave impacts on the well-being of all of San José's residents, including U.S. citizens;

**NOW, THEREFORE,** BE IT RESOLVED BY THE COUNCIL OF THE CITY OF SAN JOSE THAT:

T-342.062\ 402158 (2)                                            1

Res. No. 73677

The City of San José reaffirms the San José Police Department's longstanding policy that its officers will not arrest persons merely for their unlawful presence in the United States; that no otherwise law-abiding undocumented immigrants should fear arrest or deportation for coming forward to report a crime as a victim or a witness; and that no otherwise law-abiding undocumented immigrants should fear arrest or deportation by contacting any employee of the City of San José to express concerns or to ask questions. Moreover, the City of San José, maintains that ICE raids—while laudable where they target violent or predatory criminals for deportation—can have harsh unintended consequences. Those sweeps that have cast the net widely to arrest otherwise law-abiding undocumented immigrants have raised the Council's concern, insofar as they undermine the ability of our police, fire department, and other city agencies to interact with fearful immigrants, leaving all of San José's residents less safe.

ADOPTED this 6th day of March, 2007, by the following vote:

| | |
|---|---|
| AYES: | CAMPOS, CHIRCO, CONSTANT, CORTESE, LICCARDO, NGUYEN, PYLE, WILLIAMS; REED |
| NOES: | NONE |
| ABSENT: | NONE |
| DISQUALIFIED: | NONE |
| VACANT: | DISTRICT 4, DISTRICT 6 |

CHUCK REED
Mayor

ATTEST:

LEE PRICE, MMC
City Clerk

T-342.062\402158 (3)                                    2

# EXHIBIT 34

RD:AFS:CER                                                          RES NO 77517
8/4/2015

## RESOLUTION NO. <u>77517</u>

### A RESOLUTION OF THE COUNCIL OF THE CITY OF SAN JOSE AFFIRMING THE CITY OF SAN JOSE AS A WELCOMING CITY

**WHEREAS,** fostering a welcoming environment for all individuals, regardless of race, ethnicity or place of origin, enhances the City of San José's ("City") cultural fabric, economic growth, global competitiveness and overall prosperity for current and future generations; and

**WHEREAS,** the City has long been recognized as a hospitable and welcoming place where people, families and institutions thrive and the contributions of all are celebrated and valued; and

**WHEREAS,** the City is committed to continue building a welcoming and neighborly atmosphere in our community, where all people, including immigrants, are welcome, accepted and integrated; and

**WHEREAS,** community efforts that promote understanding and collaboration between long-time residents and foreign-born community members are crucial to ensuring a welcoming environment; and

**WHEREAS,** the City encourages the business leadership, civic groups, other government agencies and community institutions and residents to join in a community-wide effort to expand prosperity and inclusion for all residents; and

**WHEREAS,** the City supports the national Cities for Citizenship initiative by encouraging legal permanent residents to pursue the naturalization process;

1

T-29982 /1230423
Council Agenda: 9/15/2015
Item No.: 3.5

RD:AFS:CER
8/4/2015

RES NO 77517

**NOW, THEREFORE,** BE IT RESOLVED BY THE COUNCIL OF THE CITY OF SAN
JOSE THAT:

The City is hereby affirmed as a Welcoming City, helping to unite our community and
ensure that all are welcome here.

ADOPTED this 15th day of September, 2015, by the following vote:

AYES:           CARRASCO, HERRERA, JONES, KALRA, KHAMIS,
                M. NGUYEN, T. NGUYEN, PERALEZ, ROCHA;
                LICCARDO.

NOES:           OLIVERIO.

ABSENT:         NONE.

DISQUALIFIED:   NONE.

SAM LICCARDO
Mayor

ATTEST:

TONI J. TABER, CMC
City Clerk

2

T-29982 /1230423
Council Agenda: 9/15/2015
Item No.: 3.5

# EXHIBIT 35

NVF:RLT:JMD
1/21/2025

## RESOLUTION NO. RES2025-19

## A RESOLUTION OF THE COUNCIL OF THE CITY OF SAN JOSE REAFFIRMING THE CITY'S COMMITMENT TO PROTECTING THE RIGHTS AND SAFETY OF IMMIGRANT COMMUNITIES

**WHEREAS**, the City of San José's many immigrant communities play a central role in the cultural, social, and economic fabric of the City; and

**WHEREAS,** the City of San José has a history of supporting our diverse population including adoption of Resolution No. 71759 on September 23, 2003 in response to the provisions of the USA Patriot Act to affirm our support for the constitutional rights of immigrant communities in San Jose; and

**WHEREAS**, on June 8, 2010, in response to the Arizona Immigrant Enforcement Law, the City Council adopted Resolution No. 75401 to, in part, announce to the public that the City will not detain persons solely for suspicion of having unlawful resident status in the United States, and the City will serve all residents without reporting any otherwise law-abiding persons to federal immigration officials unless otherwise required by federal law, court decision or other legal requirement; and

**WHEREAS**, on September 18, 2018, the City Council adopted Resolution No. 78788 to denounce the U.S. Department of Justice's Zero Tolerance Policy that resulted in the inhumane separation of families, and called for the immediate reunification of existing separated families; and

**WHEREAS**, on March 19, 2019, the City Council adopted Resolution No. 79013 denouncing the attempted deportation of Vietnamese refugees and immigrants who arrived in the United States prior to 1995, and acknowledging the rights of refugees and asylum seekers to pursue sanctuary and avoid the endangerment that may accompany a forced return to their country of origin; and

T-25798.002 / 2176723_5                                    1
Council Agenda:  02-04-2025
Item No.:        2.9

NVF:RLT:JMD
1/21/2025

RES. NO. RES2025-19

**WHEREAS**, on April 14, 2020, the City Council adopted Resolution No. 79473 to monitor, protect, and defend the confidentiality of resident information provided to the Federal Government through the 2020 Census from breach and misuse, and to support outreach activities to ensure a complete count and broad participation in the Census as a way to guarantee that marginalized and hard-to-count communities participate in the Census without fear; and

**WHEREAS**, proposals from the incoming presidential administration, including a promised mass deportation program, pose an existential threat to many residents of the City; and

**WHEREAS**, waves of fear have already swept through immigrant communities across the country, and within the City of San José; and

**WHEREAS,** widespread fear of indiscriminate deportation decreases cooperation with law enforcement, withdrawal from public spaces such as schools, and worsening public health outcomes; and

**WHEREAS,** the City of San José has played a central role in community initiatives such as the Rapid Response Network to keep immigrant communities secure;

**NOW, THEREFORE,** BE IT RESOLVED BY THE COUNCIL OF THE CITY OF SAN JOSE THAT:

The City of San José:

1.    Reaffirms the longstanding San José Police Department's policy that its officers will not arrest persons merely for their unlawful presence in the United States; that no undocumented immigrants should fear arrest or deportation for coming

NVF:RLT:JMD
1/21/2025

RES. NO. RES2025-19

forward to report a crime as a victim or a witness; and that no undocumented immigrants should fear arrest or deportation by contacting any employee of the City of San José to express concerns or to ask questions.

2.  Affirms that no City employee will voluntarily support immigration enforcement actions that target San José residents solely based on their immigration status.

3.  Affirms its commitment to preserving the safety and integrity of all its residents, regardless of national origin or legal status.

ADOPTED this 4th day of February, 2025, by the following vote:

| | |
|---|---|
| AYES: | CAMPOS, CANDELAS, CASEY, COHEN, DOAN, KAMEI, MULCAHY, ORTIZ, SALAS, FOLEY, MAHAN. |
| NOES: | NONE. |
| ABSENT: | NONE. |
| DISQUALIFIED: | NONE. |

MATT MAHAN
Mayor

ATTEST:

TONI J. TABER, MMC
City Clerk

T-25798.002 / 2176723_5
Council Agenda: 02-04-2025
Item No.:          2.9

3

# EXHIBIT 36

#610

12/14/2021

(R-2022-188)

RESOLUTION NUMBER R-___313834___

DATE OF FINAL PASSAGE ___DEC 17 2021___

A RESOLUTION OF THE COUNCIL OF THE CITY OF
SAN DIEGO DECLARING THE CITY OF SAN DIEGO AS A
WELCOMING CITY THAT RESPECTS THE DIGNITY OF
ALL PEOPLE AND PROMOTES PROGRAMS AND POLICIES
TO FOSTER INCLUSION FOR ALL.

WHEREAS, San Diego is a global city in a binational region that has long been a

destination for migrants in search of opportunity and an established hub for refugees rebuilding

their lives; and

WHEREAS, one in four San Diego residents is foreign-born, and San Diegans represent

at least 115 countries and territories and speak 70 languages and dialects; and

WHEREAS, immigrants, refugees, and asylees add to the economic strength, social and

political fabric, and cultural richness of our community; and

WHEREAS, the City adopted the Welcoming San Diego Strategic Plan on Immigrant

and Refugee Integration to advance the civic, social, and economic integration of immigrants and

refugees, and to implement policies and programs that build a welcoming and neighborly

atmosphere in our community and beyond, where all people are welcome and accepted; and

WHEREAS, the Welcoming San Diego Strategic Plan on Immigrant and Refugee

Integration envisions a region that attracts families and businesses from around the world to

build an inclusive regional culture bridging newcomer and native-born communities toward

shared prosperity and a common future where all San Diegans can flourish; and

WHEREAS, the tradition of welcoming is in keeping with our national values and respect

for human rights, and community efforts that promote understanding and collaboration between

native-born and foreign-born community members are crucial to ensuring a welcoming

environment; and

-PAGE 1 OF 3-

(R-2022-188)

WHEREAS, the City's heritage, strength, and future are tied to its ability to ensure aspiring New Americans can fully participate in civic life, access public resources, and enrich the region with their talents and cultures; and

WHEREAS, the City is committed to recognizing the dignity of all residents, including the right of all San Diegans to live in a city that does not subject them to prejudicial treatment or discrimination; and

WHEREAS, the City seeks to implement programs and policies that build a welcoming and neighborly atmosphere in our community and beyond, where all people are welcome and accepted; and

WHEREAS, fostering a welcoming environment for all – regardless of immigration status, race, ethnicity, place of origin, English language proficiency, religion, income, gender, sexual orientation, differing abilities, age, and other factors – enhances San Diego's health, economic prosperity, and well-being for current and future generations; NOW, THEREFORE,

BE IT RESOLVED, by the City Council of the City of San Diego, that the City of San Diego is hereby declared a Welcoming City, and one that affirms the beauty and richness of our diversity, and one in which all are welcome, accepted, and valued.

APPROVED: MARA W. ELLIOTT, City Attorney


By      */s/ David J. Karlin*  
        David J. Karlin  
        Senior Deputy City Attorney

DJK:cm  
October 19, 2021  
Or.Dept.: Mayor  
Doc. No.: 2789934

(R-2022-188)

I certify that the foregoing Resolution was passed by the Council of the City of San Diego, at this meeting of _____ DEC 1 4 2021 _____.

ELIZABETH S. MALAND
City Clerk

By _Connie Patterson_
Deputy City Clerk

Approved: _12/17/21_
              (date)

_____ TODD GLORIA, Mayor

Vetoed: _____
              (date)

_____
TODD GLORIA, Mayor

-PAGE 3 OF 3-

Passed by the Council of The City of San Diego on _____ **DEC 1 4 2021** _____, by the following vote:

| Councilmembers | Yeas | Nays | Not Present | Recused |
|---|---|---|---|---|
| Joe LaCava | ☑ | ☐ | ☐ | ☐ |
| Jennifer Campbell | ☐ | ☐ | ☑ | ☐ |
| Stephen Whitburn | ☑ | ☐ | ☐ | ☐ |
| Monica Montgomery Steppe | ☑ | ☐ | ☐ | ☐ |
| Marni von Wilpert | ☑ | ☐ | ☐ | ☐ |
| Chris Cate | ☑ | ☐ | ☐ | ☐ |
| Raul A. Campillo | ☑ | ☐ | ☐ | ☐ |
| Vivian Moreno | ☑ | ☐ | ☐ | ☐ |
| Sean Elo-Rivera | ☑ | ☐ | ☐ | ☐ |

Date of final passage _____ **DEC 1 7 2021** _____.

**(Please note:  When a resolution is approved by the Mayor, the date of final passage is the date the approved resolution was returned to the Office of the City Clerk.)**

AUTHENTICATED BY:

_____
TODD GLORIA
Mayor of The City of San Diego, California.

_____
ELIZABETH S. MALAND
City Clerk of The City of San Diego, California.

(Seal)

By _Connie Patterson_ , Deputy

| Office of the City Clerk, San Diego, California |
|---|
| Resolution Number R- **313834** |

# EXHIBIT 15

RESOLUTION NO. 2017-0158

Adopted by the Sacramento City Council

May 4, 2017

**Reaffirming the City of Sacramento's Status as a City of Sanctuary, Clarifying the City's Policies and Procedures on the Enforcement of Federal Civil Immigration Laws, and Repealing Resolution No. 85-973**

**BACKGROUND:**

The City Council finds and declares the following:

A.  The City of Sacramento ("City") has a long history of welcoming and embracing individuals of diverse racial, ethnic, religious, and national backgrounds. Immigrants have a strong history of loyalty and positive contributions to the City and the United States of America. Since the local Gold Rush beginnings in the mid-1800s, immigrants have long been part of the fabric of the region. Today, Sacramento's diverse immigrant population has been instrumental in the local economy as they form 22% of the work force in the region. Most of their contributions are reflected in the agricultural, manufacturing, and construction industries where they contribute 20% of the region's Gross Domestic Product or 9.3 billion dollars. The City has greatly benefited from being one of the most integrated and diverse cities in the United States of America.

B.  The City respects, upholds, and values equal protection and equal treatment for all of its residents, regardless of immigration status. Fostering a relationship of trust, respect, and open communication between City employees and all residents is essential to the City's core mission of ensuring public health, safety, and welfare, and serving the needs of everyone in the community, including undocumented immigrants.

C.  The City seeks to protect public safety, which is founded on, and dependent on, trust and cooperation between community residents and local law enforcement. The City has enacted numerous non-discrimination policies and modern police practices to strengthen communities and to build trust between communities and local law enforcement. However, this trust is threatened when the City's employees, including police officers, are entangled with federal immigration enforcement, instilling fear in immigrant communities of coming forward to report crimes and cooperate with local law enforcement agencies.

D.  It is the public policy of this City to protect the public from crime and violence by encouraging all persons who are victims of or witnesses to crimes, or who otherwise can give evidence in a criminal investigation, to cooperate with the criminal justice

system and not to penalize these persons for being victims, undocumented immigrants, or for cooperating with the criminal justice system.

E.    The City has an interest in ensuring that confidential information collected in the course of carrying out its municipal functions, including but not limited to, public housing programs and code enforcement, is not used for unintended purposes that could hinder collection of information vital to those functions.  To carry out public housing programs, the City must be able to reliably collect confidential information from applicants.  To solve code enforcement violations and respond to criminal activity, the City's Code Enforcement and Police Departments depend on the cooperation of all City residents. Information gathering, cooperation, and enforcement will be compromised if release of necessary confidential information results in a person being taken into immigration custody.

F.    The City's potential participation in federal immigration enforcement also raises constitutional concerns, including the prospect that City residents could be detained in violation of the Fourth Amendment to the United States Constitution, targeted on the basis of race or ethnicity in violation of the Equal Protection Clause, or denied access to education based on perceived immigration status.  The participation could also require the City to violate a person's right to privacy guaranteed under the California Constitution by forcing the City to disseminate a person's private and confidential information to the federal government.

G.    This Resolution is to reaffirm that the City has been, and continues to be, a city of sanctuary which means it is a place where all persons are treated equally, with respect and dignity, regardless of immigration status.  This status is also intended to promote respect and trust between City employees, including police officers, and City residents; to protect and conserve limited local resources; and to ensure community safety and security for all.

## BASED ON THE FACTS SET FORTH IN THE BACKGROUND, THE CITY COUNCIL RESOLVES AS FOLLOWS:

Section 1.    Purpose and Intent.  The City has long derived its strength and prosperity from its diverse community, including those who identify as immigrants, and prides itself on their achievements.  The cooperation of the City's immigrants is essential to advancing the City's mission, vision, and guiding principles, including community safety and security, support for youth and education, economic development, and financial stability.  In light of the City's limited resources, the complexity of federal immigration laws, the separate jurisdictions of the City and the federal government, the need to promote trust and cooperation between City employees and City residents, including undocumented immigrants, the City Council finds it necessary to clarify the communication and cooperation between the City and

the federal government to prevent the federal government's commandeering of local resources and City personnel in violation of the Tenth Amendment to the Constitution of the United States of America. Accordingly, the purpose of this Resolution is to establish the City's policies and procedures on the enforcement of federal civil immigration laws.

Section 2.    Cooperation with Federal Immigration Authorities.

      A.    No City official, employee or agent of the City, while in the course and scope of employment, shall use any City funds or resources to enforce federal civil immigration law. The prohibitions set forth in this Resolution shall include, but shall not be limited to:

          1.    Investigating, interrogating, or collecting or maintaining information about an individual solely to determine his or her immigration status, except as required to comply with Section 922(d)(5) of Title 18 of the United States Code or to certify an individual who has been identified as a potential crime or trafficking victim for a T or U Visa pursuant to Section 1101 (a)(15)(T) or 1101 (a)(15)(U) of Title 8 of the United States Code;

          2.    Arresting, detaining, or continuing to detain a person solely on the belief that the person is not present lawfully in the United States or on the basis of alleged violation(s) of the civil provisions of federal immigration laws;

          3.    Arresting, detaining, or continuing to detain a person solely on the basis of an immigration detainer or federal administrative warrant, when such detainer or warrant is based solely on alleged violation(s) of the civil provisions of federal immigration laws;

          4.    Notifying the federal government about the release or pending release of any person detained, arrested or imprisoned, solely on the basis of alleged violation(s) of the civil provisions of federal immigration laws;

          5.    Providing or responding to requests for confidential information about an individual, including, but not limited to, information about the individual's home address; work address; person's status as a victim of domestic abuse or sexual assault; sexual orientation; or disability solely on the basis of alleged violation(s) of the civil provisions of federal immigration laws;

6.     Absent a judicial warrant, detaining or arresting an individual solely on the basis of alleged violation(s) of the civil provisions of federal immigration laws; and

7.     Including on any application, questionnaire, or interview form used in relation to benefits or services, provided by the City, any question regarding immigration status other than those required by federal or state laws.

B.     The prohibitions in subdivisions one and five, above, shall not apply where the person to whom such information pertains provides his or her consent (or if such individual is a minor, the consent of that person's parent or guardian), where the information is necessary to provide a City service.

C.     Nothing in this Resolution prohibits or restricts any City official, employee or agent of the City from sending to, or receiving from, federal immigration authorities, information regarding the citizenship or immigration status, lawful or unlawful, of a person pursuant to Sections 1373 and 1644 of Title 8 of the United States Code.

D.     Nothing in this Resolution shall be construed to apply to matters other than those relating to federal civil immigration and none of its terms shall be interpreted to prevent or prohibit City officials, employees or agents from enforcing criminal laws, including but not limited to, investigating criminal suspects that are participating or engaging in, human trafficking, sexual assault, domestic violence, and the sale, distribution, and manufacturing of illegal narcotics, and violent crimes.  In all other respects, City officials, employees and agents may continue to comply with lawfully issued judicial warrants or subpoenas and cooperate with federal authorities to protect public safety. This collaboration includes, but is not limited to, participation in joint criminal investigations that are permitted under City policy and applicable federal or state law.

Section 3.    Resolution No. 85-973 is repealed.

Adopted by the City of Sacramento City Council on May 4, 2017, by the following vote:

Ayes:       Members Ashby, Carr, Guerra, Hansen, Harris, Jennings, Schenirer, and
            Mayor Steinberg

Noes:       None

Abstain:    None

Absent:     Member Warren

Attest:     e-Signed by Shirley Concolino    City Clerk, MMC    August 02, 2017
            on 2017-08-02 17:26:48 GMT

*The presence of an electronic signature certifies that the foregoing is a true and correct copy as approved by the Sacramento City Council.*

# EXHIBIT 38

RESOLUTION NO. NS -16,876

SANTA CRUZ CITY SANCTUARY RESOLUTION

WHEREAS, the United States of America has provided an enduring symbol of freedom for generations of people from other countries who fear persecution in their native lands on the basis of their political beliefs; and

WHEREAS, the United States Convention Relating to the Status of Refugees has defined the political refugee as "any person who, owing to a well-founded fear of being persecuted for reasons of race, religion, nationality, membership in a particular social group or of a political opinion, is outside the country of his/her nationality and is unable, or, owing to such fear, is unwilling to avail himself/herself of the protection of that country"; and

WHEREAS, the United States Congress, recognizing this country's historic and moral tradition of providing safe haven for those fleeing *political and religious persecution*, has adopted the language of the United Nations Convention and made it the law of the land in its Refugee Act of 1980 (8 USC 1101 (a) (42) ); and

WHEREAS, the United Nations High Commission on Refugees has recognized the fact that persons fleeing El Salvador and Guatemala are bona fide political refugees, yet fewer than two percent of those applicants whose cases have been considered have been granted political asylum by the United States Immigration and Naturalization Service over the past three years; and

WHEREAS, over one hundred thousand civilians, including the Archbishop, priests, nuns, women and children have been murdered by the armies and death squads of El Salvador and Guatemala without anyone ever being brought to justice for these heinous crimes; and

WHEREAS, the climate of fear prevalent among the approximately 250 Salvadoran and Guatemalan refugees presently living in and contributing to the economy of Santa Cruz may impair the efficiency of city government and social service agencies, and hinder the efforts of law enforcement agencies to resolve pending cases; and

WHEREAS, those religious communities and concerned citizens of the city of Santa Cruz who have undertaken the work of providing sanctuary to

RESOLUTION ᴉ . . NS-16,876

refugees from El Salvador and Guatemala have done so in an open and public
fashion, believing this humanitarian and religious work to be in accord
with the spirit and letter of international and United States law:

THEREFORE BE IT RESOLVED:

That the city of Santa Cruz declare itself a CITY OF SANCTUARY AND
REFUGE for Salvadoran and Guatemalan refugees until these refugees can
safely return to their homelands or until they are granted federally
recognized residency status, temporary or permanent; and

BE IT FURTHER RESOLVED:

That the city of Santa Cruz requests that Congress ratify H.R. 822
(Moakley) and S. 377 (DeConcini) which would establish as official policy
the granting of "extended voluntary departure" status to refugees who have
escaped persecution in their native countries; and

BE IT FURTHER RESOLVED:

That the citizens of Santa Cruz be encouraged to support the efforts
of the existing sanctuary and refugee programs in the city of Santa Cruz;
and

BE IT FURTHER RESOLVED:

That the people of Santa Cruz will not condone for its own citizens
providing sanctuary, the harassment, indictments or arrests which have been
experienced by sanctuary workers in other cities at the instigation of the
U.S. Immigration Service; and

BE IT FURTHER RESOLVED:

That to the extent legally possible, no agency or employee of the city
of Santa Cruz shall officially assist or voluntarily cooperate with
investigations or arrest procedures, public or clandestine, relating to
alleged violations of immigrations laws by refugees from El Salvador and
Guatemala; and

BE IT FURTHER RESOLVED:

That the city of Santa Cruz urge the Mayor to request the police of
Santa Cruz to take no action such as relaying information regarding
identity and residency status which would facilitate the arrest and
detention by the Immigration and Naturalization Service of Salvadoran and
Guatemalan refugees; and

2

RESOLUTION NO. NS-16,876

BE IT FURTHER RESOLVED:

That copies of this resolution be sent to Senators Cranston and Wilson, the California Congressional Delegation, the Director of the Immigration and Naturalization Service, the State Department, the President of the United States, and local and selected national media.

PASSED AND ADOPTED this ___25th___ day of ___March_____, 1986, by the following vote:

AYES:    Councilmember - Levine, Wormhoudt, Laird, Weed; Mayor Rotkin.

NOES:    Councilmember - Sears-Williams, Ghio.

ABSENT:  Councilmember - None.

APPROVED _____
                    MAYOR

Attest _____
         City Clerk

This is to certify that the above and foregoing is the original document: Resolution No. NS-16,876.

_____
City Clerk

3

# EXHIBIT 39

RESOLUTION NO. NS-27,504

RESOLUTION OF THE CITY COUNCIL OF THE CITY OF SANTA CRUZ DECLARING
NON-COOPERATION WITH U.S.IMMIGRATION & CUSTOMS ENFORCEMENT

WHEREAS, the recent immigration raids, described by Immigration and Customs
Enforcement (ICE) as part of their "Operation: Return to Sender" in the City of Santa Cruz have
disrupted the lives of many City residents and brought unnecessary fear and consternation into
the lives of our local immigrant community; and

WHEREAS, it is not reasonable or constitutional and it is in fact deplorable to demand
identification papers of people simply because they appear to be undocumented or because they
live with a person who may be undocumented; and

WHEREAS, it traumatizes families and neighbors to be accosted in the day and
especially to be awakened in the middle of the night by ICE agents who show up to serve a
deportation order; and

WHEREAS, it is unacceptable to rip families apart especially since many of our Santa
Cruz families are of mixed immigration status including, but not limited to, citizens, permanent
legal residents, and temporary residents; and

WHEREAS, the ICE agency under the Bush Administration denied that deportation
orders had been served in the middle of the night when in fact various local residents reported
being awakened on the night of Thursday, September 7, 2006 by ICE agents who claimed to be
serving deportation orders on specific individuals; and

WHEREAS, ICE agents also took into custody other individuals living in the home for
whom they did not have deportation orders; and

WHEREAS, immigrants throughout the history of Santa Cruz have made enormous
social, economic, and cultural contributions to our community; and

WHEREAS, we believe that the contributions of many of these individuals who were
taken into custody far outweigh any federal immigration policies that ICE agents are trying to
enforce in Santa Cruz; and

WHEREAS, we hereby declare that our communitywide effort to highlight and
appreciate the contributions of our immigrant community to be part of our own "Operation:
Postage Paid"; and

WHEREAS, on behalf of our immigrant community, the City of Santa Cruz rejects ICE's
recent and future deportation operations in our community, and invite other local jurisdictions to
adopt similar resolutions to protect immigrants who live and work in their respective
communities.

RESOLUTION NO. NS-27,504

NOW, THEREFORE, BE IT RESOLVED by the City Council of the City of Santa Cruz that it declares itself a sanctuary for immigrants who live and work in our community.

BE IT FURTHER RESOLVED that it shall be the policy of the City Council that, to the fullest extent possible by law, the City of Santa Cruz shall not cooperate with ICE and shall prohibit the use of City funds or resources for any Federal immigration enforcement including, but not limited to, gathering or disseminating information regarding immigration status or country of birth of individuals in the City.

BE IT FURTHER RESOLVED the City Council hereby declares that it shall be the intent of the City Council to work with the City's Federal legislators to have ICE conduct community education forums in 2007 regarding ICE activities, protocols, programs, and procedures.

PASSED AND ADOPTED this 10th day of April, 2007, by the following vote:

AYES:            Councilmembers Robinson, Mathews, Madrigal, Rotkin, Vice Mayor
                 Coonerty; Mayor Reilly.

NOES:            None.

ABSENT:          Councilmember Porter.

DISQUALIFIED:    None.

APPROVED: _____
                    Mayor

ATTEST: _____
              City Clerk

2

# EXHIBIT 3:

RESOLUTION NO. NS-29,187

## RESOLUTION OF THE CITY COUNCIL OF THE CITY OF SANTA CRUZ TO MAINTAIN TRUST AND SAFETY FOR LOCAL IMMIGRANTS

WHEREAS, many City of Santa Cruz residents have deep concerns about the potential policies and actions of the President-Elect, and many immigrants are particularly fearful in the wake of the election; and

WHEREAS, it is important to make it clear that we are one community in the City of Santa Cruz and all of our children, mothers, fathers, sisters and brothers, regardless of immigration status, contribute to the social and economic fabric of this community; and

WHEREAS, it is important for our City Council to make a statement of support to the immigrant community and for the City to be a place of sanctuary for immigrants who live and work in our community; and

WHEREAS, a relationship of trust between California's immigrant residents and our local agencies, including law enforcement, schools, and healthcare providers is essential to carrying out basic local functions; and

WHEREAS, that trust is threatened when local agencies are involved in immigration enforcement; and

WHEREAS, a strong community is one that includes people of all backgrounds and invests in all of its people; and

WHEREAS, the City of Santa Cruz will be a model for a more just and equitable society for everyone.

NOW, THEREFORE, BE IT RESOLVED BY THE CITY COUNCIL OF THE CITY OF SANTA CRUZ:

1.      City of Santa Cruz hereby declares itself a place of sanctuary in that no City resources may be used to assist in the enforcement of Federal immigration law or to gather or disseminate information regarding the immigration status of individuals or any other such personal information unless such assistance is required by Federal or State statue, regulation, or court decision.

2.      The City Council commends the Santa Cruz Police Chief for not involving his department with federal immigration policies and for building trust with all the communities his department serves.

3.      The City Council directs City departments to review their policies in order to ensure that eligible individuals are not deterred from seeking services or engaging with City services based on immigration status.

RESOLUTION NO. NS-29,187

4.     The City Council commends the work of other local institutions and individuals who join in building a climate of trust and support for our immigrant community.

PASSED AND ADOPTED this 10th day of January, 2017 by the following vote:

AYES:                    Councilmembers Krohn, Mathews, Watkins, Brown, Noroyan; Vice Mayor Terrazas; Mayor Chase.

NOES:                   None.

ABSENT:               None.

DISQUALIFIED:     None.

APPROVED: _____
                                                    Mayor

ATTEST: _____
                        City Clerk Administrator

# EXHIBIT 3;

RESOLUTION NO. NS-30,438

RESOLUTION OF THE CITY COUNCIL OF THE CITY OF SANTA CRUZ AFFIRMING
SANTA CRUZ'S COMMITMENT TO ABIDE BY THE CALIFORNIA VALUES ACT AND
REAFFIRMING PRIOR COUNCIL ACTION RESTRICTING THE USE OF CITY
RESOURCES FOR IMMIGRATION ENFORCEMENT

WHEREAS, the residents of the City of Santa Cruz have a long history of and deep commitment to welcoming immigrants, refugees, and those in exile; and

WHEREAS, in 1986 via City Council Resolution No. NS-16,876, in response to the federal government failing to grant asylum to persons fleeing armies and death squads in El Salvador and Guatemala, City Council declared the City of Santa Cruz a "refuge for Salvadoran and Guatemalan refugees until these refugees can safely return to their homelands or until they are granted federally recognized residency status, temporary or permanent"; and

WHEREAS, in 2007 via City Council Resolution No. NS-27,504, in response to the Bush Administration's Immigration & Customs Enforcement (ICE) initiating large sweeps of undocumented immigrants, the City Council declared its intent that the City be a safe haven for all immigrants who live and work in the Santa Cruz community; and

WHEREAS, in January 2017 via City Council Resolution No. NS-29,187, in anticipation of the first Trump Administration's anti-immigrant policies, the City Council again re-stated the City's intention to be a safe haven for immigrants and declared that "no City resources may be used to assist in the enforcement of Federal immigration law or to gather or disseminate information regarding the immigration status of individuals or any other such personal information unless such assistance is required by Federal or State statute, regulation, or court decision"; and

WHEREAS, on March 14, 2017, via Ordinance No. 2017-06, the City Council passed an uncodified ordinance addressing the City's procedures concerning federal immigration law and reaffirming itself as inclusive and welcoming for all residents; and

WHEREAS, in October 2017, the State of California passed "The California Values Act" (SB 54) which prohibits state and local law enforcement agencies from using money or personnel to investigate, interrogate, detain, detect, or arrest persons for immigration enforcement purposes and proscribes other activities or conduct in connection with immigration enforcement by law enforcement agencies; and

WHEREAS, in the interest of promoting public safety, it is important to create an environment in which people feel comfortable interacting with local law enforcement, and not erode that trust by permitting local police officers to assist federal immigration enforcement; and

WHEREAS, studies have proven that jurisdictions that provide protections for immigrants are safer and economically more prosperous compared to other jurisdictions – including a 2017 report by the Center for American Progress that shows on average there are 35.5 fewer crimes

RESOLUTION NO. NS-30,438

committed per 10,000 people in these jurisdictions, the average annual income is $4,353 higher, the poverty rate is 2.3% lower, and unemployment is 1.1% lower; and

WHEREAS, the new Trump administration has declared its intention to implement mass deportations, and has issued executive orders purporting to rescind longstanding federal policy restricting immigration enforcement activity at schools, after-school programs, hospitals, community health centers, and places of worship; and

WHEREAS, as of this date of this Resolution, multiple California cities, counties, and other governmental entities have enacted policies intended to protect immigrants and/or declared their intent to abide by the California Values Act and related policies of the State of California. This includes, but is not limited to: the County of Santa Cruz, City of Watsonville, the City and County of San Francisco, the City of Berkeley, and the City of Los Angeles.

NOW, THEREFORE, BE IT RESOLVED, by the City Council of the City of Santa Cruz as follows:

1. The foregoing recitals are true and correct.

2. The City Council reaffirms the City's prior Council action restricting the use of City resources for federal immigration enforcement, specifically the Council's 2017 Resolution No. NS-29,187 and the Council's 2017 Uncodified Ordinance No. 2017-06.

3. The City Council affirms the City of Santa Cruz's intention to abide by the California Values Act.

4. The City Manager's Office and the City Attorney's Office are directed to review the Council's 2017 Resolution No. NS-29,187, the Council's 2017 Uncodified Ordinance No. 2017-06, and the California Values Act and take all necessary actions to assure that all: (a) City policies are consistent with the foregoing, and (b) City departments, commissions, officers, and employees act in accordance with these requirements.

5. The City Manager's Office is directed to collaborate and communicate with other local government and non-profit partners who are committed to the State's California Values Act and related laws and policies.

6. This resolution shall take effect immediately upon its adoption.

RESOLUTION NO. NS-30,438

PASSED AND ADOPTED this 11th day of February, 2025 by the following vote:

AYES:                  Councilmembers Trigueiro, Brunner, Newsome, Golder, O'Hara; Vice
                       Mayor Kalantari-Johnson; Mayor Keeley.

NOES:                  None.

ABSENT:                None.

DISQUALIFIED:          None.

APPROVED: _____
                                    Fred Keeley, Mayor

ATTEST: _____
        Bonnie Bush, City Clerk Administrator

3

RESOLUCIÓN N.º NS-30,438

RESOLUCIÓN DEL CONCEJO DE LA CIUDAD DE SANTA CRUZ AFIRMAR EL COMPROMISO
DE SANTA CRUZ DE CUMPLIR CON EL ACTO DE VALORES DE CALIFORNIA Y REAFIRMAR
LA ACCIÓN PREVIA DEL CONCEJO QUE RESTRINGE EL USO DE RECURSOS DE LA CIUDAD
PARA LA APLICACIÓN DE LA LEY DE INMIGRACIÓN

POR CUANTO, los residentes de la Ciudad de Santa Cruz tienen una larga historia y un compromiso profundo con la recepción de inmigrantes, refugiados y personas exiliadas.

POR CUANTO, en 1986, a través de la Resolución N.º NS-16,876 del Concejo de la Ciudad, en respuesta a la falla del gobierno federal en otorgar asilo a las personas que huían de los ejércitos y escuadrones de la muerte en El Salvador y Guatemala, el Concejo de la Ciudad declaró a la Ciudad de Santa Cruz como un "refugio para los refugiados salvadoreños y guatemaltecos hasta que estos pudieran regresar de forma segura a sus países de origen o hasta que se les otorgase el estado de residencia con reconocimiento federal, ya sea temporal o permanente".

POR CUANTO, en 2007, a través de la Resolución N.º NS-27,504 del Concejo de la Ciudad, en respuesta al inicio por parte del Servicio de Inmigración y Control de Aduanas (ICE) del Gobierno de Bush de grandes redadas de inmigrantes indocumentados, el Concejo de la Ciudad declaró su intención de que la Ciudad fuera un refugio seguro para todos los inmigrantes que viven y trabajan en la comunidad de Santa Cruz.

POR CUANTO, en enero de 2017, a través de la Resolución N.º NS-29,187 del Concejo de la Ciudad, en anticipación a las políticas contra la inmigración del primer Gobierno de Trump, el Concejo de la Ciudad nuevamente restableció la intención de la Ciudad de ser un refugio seguro para los inmigrantes y declaró que "no se puede utilizar ningún recurso de la Ciudad para ayudar en la aplicación de la ley federal de inmigración ni para recopilar o distribuir información sobre el estado migratorio de las personas ni su información personal, a menos que tal ayuda sea requerida conforme a un estatuto o reglamentación federal o estatal o la decisión de un tribunal."

POR CUANTO, el 14 de marzo de 2017, a través de la Ordenanza N.º 2017-06, el Concejo de la Ciudad promulgó una ordenanza no codificada para abordar los procedimientos de la Ciudad referidos a la ley federal de inmigración y reafirmándose como inclusiva y acogedora para todos los residentes.

POR CUANTO, en octubre de 2017, el Estado de California promulgó el "Acto de Valores de California" (SB 54) que prohíbe que los organismos de seguridad estatales y locales utilicen recursos financieros o personal para investigar, interrogar, detener, detectar o arrestar a personas para fines de cumplimiento de la ley de inmigración y prohíbe otras actividades o conductas relacionadas con la aplicación de la ley de inmigración por parte de las fuerzas de orden público.

POR CUANTO, en interés de la promoción de la seguridad pública, es importante crear un ambiente donde las personas se sientan cómodas al interactuar con miembros de los organismos de seguridad locales y no se socave la confianza al permitir que los oficiales de la policía local asistan a las agencias federales de inmigración.

POR CUANTO, los estudios han comprobado que las jurisdicciones que proporcionan protecciones a los inmigrantes son más seguras y económicamente más prósperas en comparación con otras jurisdicciones, incluido un informe de 2017 del Centro de Progreso Estadounidense en el que se muestra

RESOLUCIÓN N.° NS-30,438

que, en promedio, hubo 35.5 menos delitos cometidos por cada 10,000 personas en estas jurisdicciones, el ingreso promedio anual es $4,353 mayor, la tasa de pobreza es 2.3 % menor y el desempleo es 1.1 % menor.

POR CUANTO, el nuevo Gobierno de Trump ha declarado su intención de implementar deportaciones masivas y ha emitido órdenes ejecutivas destinadas a rescindir la política federal de larga data que restringe la actividad de las agencias de inmigración en escuelas, programas extraescolares, hospitales, centros de salud comunitarios y lugares de adoración.

POR CUANTO, a la fecha de esta Resolución, múltiples ciudades, condados y otras entidades de California han promulgado políticas destinadas a proteger a los inmigrantes o han declarado su intención de cumplir con el Acta de Valores de California y las políticas relacionadas del Estado de California. Esto incluye, entre otros, el Condado de Santa Cruz, la Ciudad de Watsonville, la Ciudad y el Condado de San Francisco, la Ciudad de Berkeley, y la Ciudad de Los Ángeles.

AHORA, POR LO TANTO, el Concejo Municipal de la Ciudad de Santa Cruz RESUELVE lo siguiente:

1. Las cláusulas anteriores son verdaderas y correctas.

2. El Concejo de la Ciudad reafirma la acción previa del Concejo de la Ciudad que restringe el uso de los recursos de la Ciudad para la aplicación de la ley federal de inmigración, específicamente la Resolución N.° NS-29,187 de 2017 del Concejo y la Ordenanza no codificada N.° 2017-06 de 2017 del Concejo.

3. El Concejo de la Ciudad afirma la intención de la Ciudad de Santa Cruz de cumplir con el Acto de Valores de California.

4. La Oficina del Administrador de la Ciudad y la Oficina del Fiscal de la Ciudad tienen la instrucción de revisar la Resolución N.° NS-29,187 de 2017 del Concejo, la Ordenanza no codificada N.° 2017-06 de 2017 del Concejo y el Acto de Valores de California y tomar todas las medidas necesarias para asegurar que: (a) todas las políticas de la Ciudad estén en concordancia con lo anterior, y (b) todos los departamentos, las comisiones, los funcionarios y los empleados de la Ciudad actúen de acuerdo con estos requisitos.

5. La Oficina del Administrador de la Ciudad tiene la instrucción de colaborar y comunicarse con otros gobiernos locales y socios sin fines de lucro que estén comprometidos con el Acto Estatal de Valores de California y las leyes y políticas relacionadas.

6. Esta resolución tendrá vigencia inmediata a partir de su adopción.

RESOLUCIÓN N.º NS-30,438

PROMULGADA Y ADOPTADA a los 11 días del mes de Febrero de 2025 por la siguiente intención de voto:

VOTOS AFIRMATIVOS:   Concejales Trigueiro, Brunner, Newsome, Golder, O'Hara; Vicealcalde Kalantari-Johnson; Alcalde Keeley.

VOTOS NEGATIVOS:     Ninguno.

AUSENTES:            Ninguno.

DESCALIFICADOS:      Ninguno.

APROBADOS: _____

Fred Keeley, Alcalde

CERTIFICACIÓN: _____

Bonnie Bush, Secretaria de la Ciudad

3

# EXHIBIT 42

ORDINANCE NO. 2017-06

AN UNCODIFIED ORDINANCE OF THE CITY COUNCIL OF THE CITY OF SANTA
CRUZ RELATING TO THE CITY'S PROCEDURES CONCERNING FEDERAL
IMMIGRATION LAW AND REAFFIRMING ITS DECLARATION OF THE CITY OF
SANTA CRUZ AS A SANCTUARY FOR ALL ITS RESIDENTS

THE CITY COUNCIL OF THE CITY OF SANTA CRUZ DOES ORDAIN AS
FOLLOWS:

Section 1.       The City Council of the City of Santa Cruz hereby finds, determines, and declares
as follows:

A.       The City of Santa Cruz has long embraced and welcomed individuals of diverse racial,
ethnic, religious, and national backgrounds, including a large immigrant population.

B.       The City of Santa Cruz welcomes, honors, and respects the contributions of all of its
residents, regardless of their immigration status.

C.       Immigrants and their families in Santa Cruz contribute to the economic and social fabric
of the City by establishing and patronizing businesses, participating in the arts and culture, and
achieving significant educational accomplishments.

D.       Fostering a relationship of trust, respect, and open communication between City officials
and residents is essential to the City's mission of delivering efficient public services in
partnership with our community, which ensures public safety, a prosperous economic
environment, opportunities for our youth, and a high quality of life for residents.

E.       The City of Santa Cruz seeks to continue to foster trust between City officials and
residents to protect limited local resources, to encourage cooperation between residents and City
officials, including law enforcement officers and employees, and to ensure public safety and due
process for all.

F.       In recognition of the City's continued commitment to the equal, respectful, and dignified
treatment of all people, the City Council, on January 10, 2017, adopted Resolution No. NS-
29,187 - a Resolution of the City Council of the City of Santa Cruz to Maintain Trust and Safety
for Local Immigrants.  This resolution called for certain actions by the City relative to the
administration and enforcement of federal immigration law, which is the exclusive authority of
the federal government.

G. The City now wishes to enact specific procedures consistent with Resolution No. NS-29,187
and the City's commitment to social justice and inclusion.

Section 2.       Purpose and Intent.  The purpose of this ordinance is to reaffirm the City of Santa
Cruz's status as a sanctuary City and to establish the City's procedures concerning immigration
status and enforcement of federal civil immigration laws.

Section 3.       Requesting or Maintaining Information Prohibited. No City agency, department,
officer, employee or agent shall enforce Federal civil immigration laws, request or maintain
information concerning a person's immigration status, or use City monies, resources, or
personnel to investigate, question, detect, apprehend, or question a person on the basis of his or
her immigration status except as provided in this ordinance.

ORDINANCE NO. 2017-06

Section 4.    Disclosing Information Prohibited.  No  City  agency,  department,  officer, employee, or agent shall disclose information about a person's immigration status except as authorized by this ordinance.

Section 5.    Use of City Resources Prohibited. No City agency, department, officer, employee, or agent shall use City funds, resources, facilities, property, equipment, or personnel (collectively "City resources") to assist in the enforcement of federal immigration law, unless such assistance is required by any valid and enforceable federal or state law, including, but not be limited to, using City resources for the purpose of:

(a)    identifying, investigating, arresting, detaining, or continuing to detain a person solely on the belief that the person is not present legally in the United States or that the person has committed a violation of immigration law;

(b)    assisting with or participating in any immigration enforcement operation or joint operation;

(c)    arresting, detaining, or continuing to detain a person based on any immigration detainer or federal administrative warrant, when such immigration detainer or administrative warrant is based solely on a violation of federal immigration law, or otherwise honoring any such detainer, warrant, or request to detain, interview, or transfer;

(d)    notifying federal authorities about the release or pending release of any person detained for immigration purposes;

(e)    providing federal authorities with non-public information about any person's immigration status for immigration enforcement purposes; and

(f)    enforcing any federal program requiring the registration of individuals on the basis of religious affiliation or ethnic or national origin.

Nothing in this Section shall prevent the City, including any agency, department, officer, employee, or agent of the City, from lawfully discharging his or her duties in compliance with and in response to a lawfully issued judicial warrant or subpoena.

Section 6.    Exceptions. Nothing in herein shall prevent the City, including any agency, department, officer, employee, or agent of the City, from lawfully discharging his or her duties in compliance with and in response to a lawfully issued judicial warrant or subpoena. In addition, the restrictions of this ordinance shall not apply: (i) where the individual to whom such information pertains provides his or her consent to disclosure of such information (or if such individual is a minor, the consent of that person's parent or guardian); (ii) where disclosure of such information is necessary to provide a City service; (iii) to actions taken or disclosures made as necessary to prevent an imminent threat to public health or safety; or (iv) as otherwise required by state or federal law or judicial decision.

Section 7.    Ordinance Not to Conflict with Federal Law. Nothing in this ordinance shall be construed or implemented to conflict with any valid and enforceable duty and obligation imposed by a court order or any federal, state or otherwise applicable law.

Section 8.    No Private Right of Action. This ordinance does not create or form the basis of liability on the part of the City, its agencies, departments, officers, employees, or agents. It is not

2

intended to create any new rights for breach of which the City is liable for money or any other damages to any person who claims that such breach proximately caused injury. The exclusive remedy for violation of this ordinance shall be through the City's personnel policies and procedures for employees under applicable City regulations.

Section 9.    Notification. Except as described below, the Chief of Police, or designee, shall notify City Councilmembers, via electronic mail, of immigration enforcement activities that occur within the City of Santa Cruz as soon as practical following the immigration enforcement. The timeliness of the notification shall not jeopardize the integrity of the federal investigation or the safety of the federal law enforcement personnel. The notification specified in this section shall not apply when:

(a)    the person is arrested for any crime unrelated to immigration status; or

(b)    the Chief of Police, or designee, has no knowledge of ICE enforcement activities.

Section 10.    Dissemination. This ordinance shall be disseminated to all departments of the City, whose respective administrative policies shall be modified as necessary to ensure consistency herewith.

Section 11.    Severability. If any section, subsection, sentence, clause, phrase or portion of this ordinance is for any reason held to be invalid or unconstitutional by the decision of any court of competent jurisdiction, such decision shall not affect the validity of the remaining portions of this ordinance. The City Council of the City of Santa Cruz hereby declares that it would have adopted this ordinance and each section, subsection, sentence, clause, phrase or portion thereof irrespective of the fact that any one or more sections, subsections, sentences, clauses, phrases, or portions were to be declared invalid or unconstitutional.

Section 12.    Effective Date. This ordinance shall take effect and be in full force thirty (30) days after its final adoption.

PASSED FOR PUBLICATION this 28th day of February, 2017, by the following vote:

AYES:                Councilmembers Krohn, Mathews, Watkins, Brown, Noroyan; Vice Mayor Terrazas; Mayor Chase.

NOES:            None.

ABSENT:          None.

DISQUALIFIED:    None.

APPROVED: _____
                    Cynthia Chase, Mayor

ATTEST: _____
                City Clerk Administrator

3

ORDINANCE NO. 2017-06

PASSED FOR FINAL ADOPTION this 14th day of March, 2017 by the following vote:

AYES:            Councilmembers Krohn, Mathews, Watkins, Brown, Noroyan; Vice Mayor Terrazas; Mayor Chase.

NOES:            None.

ABSENT:          None.

DISQUALIFIED:    None.

APPROVED: _____
                Cynthia Chase, Mayor

ATTEST: _____
                City Clerk Administrator

This is to certify that the above
and foregoing document is the
original of Ordinance No. 2017-06
and that it has been published or
posted in accordance with the
Charter of the City of Santa Cruz.

_____
City Clerk Administrator

4

ORDENANZA NO. 2017-06

UNA ORDENACIÓN NO CÓDIGO DEL CONCEJO MUNICIPAL DE LA CIUDAD DE
SANTA CRUZ RELATIVO A LOS PROCEDIMIENTOS DE LA CIUDAD RELATIVOS A
LA LEY FEDERAL DE INMIGRACIÓN Y REAFIRMANDO SU DECLARACIÓN DE LA
CIUDAD DE SANTA CRUZ COMO SANTUARIO PARA TODOS SUS RESIDENTES

THE CITY COUNCIL OF THE CITY OF SANTA CRUZ DOES ORDAIN AS FOLLOWS:

EL CONCEJO MUNICIPAL DE LA CIUDAD DE SANTA CRUZ ORDENA LO SIGUIENTE:

Sección 1.    El Ayuntamiento de la Ciudad de Santa Cruz por la presente constata, determina y
declara lo siguiente:

A.    La Ciudad de Santa Cruz ha abrazado desde hace mucho tiempo a personas de diversos
orígenes raciales, étnicos, religiosos y nacionales, incluyendo una gran población de inmigrantes.

B.    La Ciudad de Santa Cruz da la bienvenida, honra y respeta las contribuciones de todos
sus residentes, independientemente de su estatus migratorio.

C.    Los inmigrantes y sus familias en Santa Cruz contribuyen al tejido económico y social de
la ciudad estableciendo y patrocinando negocios, participando en las artes y la cultura y logrando
logros educativos significativos.

D.    Promover una relación de confianza, respeto y comunicación abierta entre los
funcionarios de la Ciudad y los residentes es esencial para la misión de la Ciudad de brindar
servicios públicos eficientes en asociación con nuestra comunidad, lo que garantiza la seguridad
pública, un ambiente económico próspero, Y una alta calidad de vida para los residentes.

E.    La Ciudad de Santa Cruz busca continuar fomentando la confianza entre los funcionarios
de la Ciudad y los residentes para proteger recursos locales limitados, para fomentar la
cooperación entre los residentes y los funcionarios de la Ciudad, incluyendo oficiales de la ley y
empleados y para garantizar la seguridad pública y el debido proceso para todos .

F.    En reconocimiento al continuo compromiso de la ciudad con el trato igualitario,
respetuoso y digno de todas las personas, el 10 de enero de 2017, el Concejo Municipal aprobó la
Resolución NS-29.187-Resolución del Ayuntamiento de la Ciudad de Santa Cruz para Mantener
la Confianza y Seguridad para los Inmigrantes Locales. Esta Resolución exigía ciertas acciones
por parte de la Ciudad en relación con la administración y aplicación de la ley federal de
inmigración, que es la autoridad exclusiva del gobierno federal.

G.    La Ciudad ahora desea promulgar procedimientos específicos consistentes con la
Resolución NS-29187 y el compromiso de la Ciudad con la justicia social y la inclusión.

Sección 2. ·    Propósito e Intención. El propósito de esta ordenanza es reafirmar la ciudad de
Santa Cruz como una ciudad santuario y establecer los procedimientos de la Ciudad con respecto
al estatus migratorio y el cumplimiento de las leyes federales de inmigración civil.

Sección 3. Solicitud o Mantenimiento de Información Prohibida. Ninguna agencia, departamento, oficial, empleado o agente de la Ciudad hará cumplir las leyes federales de inmigración civil, solicitará o mantendrá información sobre el estatus migratorio de una persona o utilizará dinero, recursos, o personal de la ciudad para investigar, interrogar, detectar, Con base en su estado migratorio, salvo lo dispuesto en esta ordenanza.

Sección 4.    Divulgación de Información Prohibida. Ninguna agencia, departamento, oficial, empleado o agente de la Ciudad deberá revelar información sobre el estatus migratorio de una persona, excepto como lo autorice esta ordenanza.

Sección 5.    Uso de los Recursos de la Ciudad Prohibidos. Ninguna agencia, departamento, oficial, empleado o agente de la Ciudad utilizará los fondos, recursos, instalaciones, propiedad, equipo o personal de la Ciudad (colectivamente "Recursos de la Ciudad") para ayudar en la aplicación de la ley federal de inmigración, a menos que dicha asistencia sea requerida por Cualquier ley federal o estatal válida y aplicable, incluyendo, pero no limitado a, el uso de recursos de la Ciudad con el propósito de:

(a)    identifying, investigating, arresting, detaining, or continuing to detain a person solely on the belief that the person is not present legally in the United States or that the person has committed a violation of immigration law;

(b)    asistir o participar en cualquier operación de aplicación de la inmigración o operación conjunta;

(c)    detener, detener o continuar deteniendo a una persona en base a cualquier detención de inmigrantes o órdenes administrativas federales, cuando tal detención de inmigrantes o una orden administrativa se base únicamente en una violación de la ley federal de inmigración o, de otra manera, O solicitud para detener, entrevistar o transferir;

(d)    notificar a las autoridades federales acerca de la liberación o liberación pendiente de cualquier persona detenida para fines de inmigración;

(e)    proporcionar a las autoridades federales información no pública sobre el estatus migratorio de cualquier persona con fines de inmigración; y

(f)    hacer cumplir cualquier programa federal que requiera el registro de individuos en base a su afiliación religiosa o origen étnico o nacional.

Nada de lo dispuesto en esta Sección impedirá que la Ciudad, incluyendo cualquier agencia, departamento, oficial, empleado o agente de la Ciudad, desempeñe legalmente sus deberes en cumplimiento y en respuesta a una orden judicial o citación legalmente emitida.

Sección 6.    Excepciones. Ninguna de las presentes Cláusulas impedirá que la Ciudad, incluyendo cualquier agencia, departamento, oficial, empleado o agente de la Ciudad, desempeñe legalmente sus deberes en cumplimiento y en respuesta a una orden judicial o citación legalmente emitida. Además, las restricciones de esta ordenanza no se aplicarán: (i) cuando el individuo a quien pertenezca dicha información proporcione su consentimiento a la divulgación de dicha información (o si esa persona es menor, el consentimiento de los padres o tutores de esa

2

persona ); (Ii) cuando la revelación de dicha información sea necesaria para proporcionar un servicio de la Ciudad; Iii) a las medidas adoptadas o divulgadas cuando sea necesario para evitar una amenaza inminente para la salud o la seguridad públicas; O (iv) según se requiera por ley estatal o federal o decisión judicial.

Sección 7.     Ordenanza para No Conflicto con la Ley Federal. Nada en esta ordenanza será interpretado o implementado para entrar en conflicto con cualquier deber y obligación válida y obligatoria impuesta por una orden judicial o cualquier ley federal, estatal o de otra manera aplicable.

Sección 8.     No hay derecho privado de acción. Esta ordenanza no crea ni forma la base de responsabilidad por parte de la Ciudad, sus agencias, departamentos, oficiales, empleados o agentes. No se pretende crear nuevos derechos por incumplimiento de los cuales la Ciudad sea responsable por dinero o cualquier otro daño a cualquier persona que afirme que dicha violación causó aproximadamente daño. El recurso exclusivo para la violación de esta ordenanza será a través de las políticas y procedimientos de personal de la Ciudad para empleados bajo las regulaciones de la Ciudad aplicables.

Sección 9. Notificación. Excepto como se describe a continuación, el Jefe de Policía, o persona designada, deberá notificar a los miembros del Consejo Municipal, por correo electrónico, las actividades de cumplimiento de la ley de inmigración que ocurren dentro de la Ciudad de Santa Cruz tan pronto como sea posible después de la aplicación de inmigración. La puntualidad de la notificación no pondrá en peligro la integridad de la investigación federal ni la seguridad del personal federal encargado de hacer cumplir la ley. La notificación especificada en esta sección no se aplicará cuando:

(a) la persona es arrestada por cualquier crimen no relacionado con el estatus migratorio; o

(b) el Jefe de Policía, o su designado, no tiene conocimiento de las actividades de cumplimiento de ICE.

Section 10.     Difusión. Esta ordenanza será difundida a todos los departamentos de la Ciudad, cuyas respectivas políticas administrativas se modificarán según sea necesario para asegurar la coherencia con la presente.

Section 11.     Divisibilidad. Si alguna sección, subsección, oración, cláusula, frase o parte de esta ordenanza es por cualquier razón considerada inválida o inconstitucional por la decisión de cualquier tribunal de jurisdicción competente, dicha decisión no afectará la validez de las partes restantes de esta ordenanza . El Ayuntamiento de la Ciudad de Santa Cruz declara que habría adoptado esta ordenanza y cada sección, subsección, oración, cláusula, frase o parte de la misma independientemente de que una o más secciones, subsecciones, oraciones, cláusulas, frases , O las porciones debían ser declaradas inválidas o inconstitucionales.

Section 12.     Fecha de vigencia. Esta ordenanza entrará en vigor y estará en pleno vigor treinta (30) días después de su adopción final.

3

ORDINANCE NO. 2017-06

PASADO Y ADOPTADO ESTE 28 día de febrero de 2017, por la siguiente votación:

AYES:                   Miembros del Consejo Krohn, Mathews, Watkins, Brown, Noroyan; Teniente de alcalde Terrazas; Alcaldesa Chase.

NOES:                   Ninguna.

AUSENTE:                Ninguna.

DESCALIFICADO:   Ninguna.

APROBADO: _____
                                Cynthia Chase, Alcaldesa

DAR FE: _____
              Bren Lehr, Administrador de la ciudad

PASADO POR APROBACION FINAL este dia 14 de marzo de 2017 por la siguiente votacion:

AYES:                   Miembros del Consejo Krohn, Mathews, Watkins, Brown, Noroyan; Teniente de alcalde Terrazas; Alcaldesa Chase.

NOES:                   Ninguna.

AUSENTE:                Ninguna.

DESCALIFICADO:   Ninguna.

APROBADO: _____
                                Cynthia Chase, Alcaldesa

DAR FE: _____
              Bren Lehr, Administrador de la ciudad

Esto es para certificar que lo anterior
Y el documento anterior es el
Original de la Ordenanza No. 2017-06
Y que ha sido publicado o
Publicadas de conformidad con el
Carta de la Ciudad de Santa Cruz.

_____
Administrador de la ciudad

4

# EXHIBIT 43

File ID 17-0156 No. 11.2

**Before the Board of Supervisors in and for the**
**County of Monterey, State of California**

**Resolution No. 17-042**

| | |
|---|---|
| Resolution of the Monterey County Board of | ) |
| Supervisors Designating Monterey County a | ) |
| Welcoming County for Immigrants and | ) |
| Refugees, and Declaring the County a Place of | ) |
| Trust and Safety for Local Immigrants........... | ) |

WHEREAS, Monterey County recognizes its long and rich history of immigrants who have contributed to our local economy and have become leaders in agriculture, tourism, the military, education, business, healthcare and other professions; and

WHEREAS, Monterey County is a diverse county with foreign-born residents comprising over 30% of the County's total population and large numbers of undocumented immigrants who face challenges with access and safety due to their status; and

WHEREAS, immigrants, refugees, and other newcomers add significantly to the vitality of the state and national economies, with foreign-born workers representing close to 17% of the current U.S. labor force, and over 33.4 percent of business owners in California; and will account for over 85 percent of the net growth in the U.S. labor force over the next 20 years; and

WHEREAS, the building of a welcoming community is fundamental to a vibrant and inclusive Monterey County, assuring immigrants, refugees, and other newcomers opportunities for economic security, empowerment, civic engagement, safety and freedom from discrimination, oppression and violence; and

WHEREAS, many Monterey County residents have deep concerns about the potential policies and actions by the new federal administration; and

WHEREAS, it is important to make clear that we are one community in Monterey County and all of our children, mothers, fathers, sisters and brothers, regardless of immigration status, contribute to the social and economic fabric of this county; and

WHEREAS, it is important for our Board to make a statement of support to the immigrant community and for the County to be a place of trust and safety for immigrants who live and work in our community; and

WHEREAS, a relationship of trust between California's immigrant residents and our local agencies, including law enforcement, schools and hospitals, is essential to carrying out basic local functions; and that trust is threatened when local agencies are involved in immigration enforcement; and

WHEREAS, ensuring the health, well-being and civil rights of all people regardless of their immigration status, through a dynamic and responsive process that respects the

community's diversity, is a shared responsibility between the Board and all County agencies; and

WHEREAS, a welcoming community addresses language and cultural access barriers to services and participation in civic life, promotes coordination of services and resources for immigrants and refugees across all systems, champions cultural competence and understanding, and strengthens accountability to maintain the highest quality of services for immigrant and refugee communities; and

WHEREAS, Monterey County communities are the most equitable when all residents are fully able to participate in the region's economic vitality, contribute to the region's readiness for the future, and connect to the region's assets and resources; and

WHEREAS, a strong community is one that includes people of all backgrounds and invests in all of its people; and

WHEREAS, Monterey County aspires to be a model for inclusion and equity for all populations, including immigrants, refugees, and other newcomers, through its commitments to support the ongoing inclusion and long-term economic and social integration of newcomers, demonstrates values of unity and understanding, by implementing policies and practices ensuring that interactions between new and longer-term Americans remain positive ones;

NOW, THEREFORE, BE IT RESOLVED by the Board of Supervisors of the County of Monterey that the Board:

1.     Declares and affirms that Monterey County is a Welcoming County; and declares itself a place of trust and safety and urges that no County resources be used to assist in the enforcement of federal immigration law or to gather or disseminate information regarding the immigration status of individuals or any other such personal information unless such assistance is required by Federal or State statute, regulation or court decision; and

2.     Urges that no department or employee initiate inquiry or enforcement action based solely on a person's actual or suspected immigration status, national origin, race, ethnicity and/or English proficiency; and

3.     Commends the Sheriff's Department for its commitment to not inquire about immigration status when carrying out its duties, to generally not participate in any immigration enforcement raids and to building trust with all communities the department serves; and

4.     Directs County departments to review their confidentiality policies to ensure that eligible individuals are not deterred from seeking services or engaging with county services based on immigration status; and

5.     Urges, that with regards to juveniles, that all departments respect juvenile confidentiality for all minors regardless of immigration status, pursuant to the recently enacted California Welfare & Institutions Code, Section 831.

6.     Commends the District Attorney's Office, which has since 2012 instructed and trained prosecutors pursuant to the Supreme Court case of *Padilla v Kentucky* to consider the

avoidance of adverse immigration consequences in the plea negotiations process as one factor in an effort to reach a just resolution in the case of non-citizen defendants, which has now been codified in California Penal Code, Section 1016.3; and

7.    Encourages the Public Defender's Office to continue to provide effective assistance to immigrants facing criminal charges as required by California Penal Code, Section 1016.2; and

8.    Supports that all departments continue to support immigrant crime victims and witnesses, and encourages them to come forward to report crime by providing certification of their cooperation (which is needed to obtain humanitarian visas known as the "U Visa") in a fair and timely manner; and

9.    Promotes the value among all residents of advancing efforts for integrating immigrant and refugee communities, recognizing that a community is strongest when everyone feels welcomed; and

10.    Supports efforts to bring immigrants, refugees, newcomers and the broader community together to develop policies, programs, and initiatives that build welcoming communities and provide all residents with the knowledge and tools to thrive and fully participate in their communities; and

11.    Commits to continuing dialogue with all stakeholder in Monterey County concerning any potential inequities in the justice system and commends the work of our local institutions, organizations and individuals who join in building a climate of trust and support for our immigrant community.

**PASSED AND ADOPTED** upon motion of Supervisor Alejo, seconded by Supervisor Salinas carried this 14th day of February 2017, by the following vote, to wit:

AYES:    Supervisors Alejo, Salinas, Parker and Adams
NOES:    Supervisor Phillips
ABSENT: None

I, Gail T. Borkowski, Clerk of the Board of Supervisors of the County of Monterey, State of California, hereby certify that the foregoing is a true copy of an original order of said Board of Supervisors duly made and entered in the minutes thereof of Minute Book 80 for the meeting on February 14, 2017.

Dated: February 14, 2017                          Gail T. Borkowski, Clerk of the Board of Supervisors
File Number: 17-0156                              County of Monterey, State of California

By ___Denise Hancock___
                Deputy

# EXHIBIT 44

Legistar File ID No. RES 25-004 Agenda Item No. 9

***Before the Board of Supervisors
County of Monterey, State of California***

**Resolution No.: 25-009**
Adopt Resolution Reestablishing the County of Monterey as a **Welcoming County for Immigrants and Refugees**, and Declaring the County a Place of Trust and Safety for Immigrants; and Authorizing an increase of appropriations ($25,000) to fund related public service announcements

**WHEREAS,** Monterey County recognizes its long and rich history of immigrants who have contributed to our local economy and become leaders in agriculture, tourism, military, education, business, healthcare and other professions; and

**WHEREAS,** Monterey County is diverse with foreign-born residents comprising over 28.9% of the County's total population and significant numbers of foreign-born immigrants comprise our county's workforce in the agriculture, hospitality and construction industries; and

**WHEREAS,** Immigrants, refugees, and other newcomers add significantly to the vitality of the state and national economies, with foreign-born workers representing close to 19.1% of the 2024 U.S. labor force, and over 38.6% of business owners in California in 2019; and

**WHEREAS,** The building of a Welcoming County is fundamental to a vibrant and inclusive Monterey County, assuring immigrants, refugees, and other newcomers opportunities for economic security, empowerment, civic engagement, safety and freedom from discrimination, oppression and violence; and

**WHEREAS,** Many Monterey County residents have deep concerns about the massive detention and deportation plans by the incoming presidential administration starting in January 2025; and

**WHEREAS,** It is important to make clear that we are One Community in Monterey County and that all of our residents, regardless of immigration status, contribute to the social and economic fabric of this county; and

**WHEREAS,** It is important for the County of Monterey Board of Supervisors to make a statement of support and to advocate for our immigrant community and for the County to be a place of trust and safety for immigrants who live and work in our community; and

**WHEREAS,** A relationship of trust between California's immigrant residents and our local agencies, including law enforcement, schools and hospitals, is essential to carrying out basic local functions, including improving public safety; and that trust is threatened when local agencies are involved in immigration enforcement; and

**WHEREAS,** A Welcoming County addresses language and cultural access barriers to services and participation in civic life, promotes coordination of services and resources for immigrants

and refugees across all systems, champions cultural competence and understanding, and strengthens accountability to maintain the highest quality of services for immigrant and refugee communities; and

**WHEREAS,** the County of Monterey aspires to be a model for inclusion and equity for all populations, including immigrants, refugees, and other newcomers, through its commitments to support the ongoing inclusion and long-term economic and social integration of newcomers, demonstrates values of unity and understanding, by implementing policies and practices ensuring that interactions between new and longer-term Americans remain positive.

**NOW, THEREFORE, BE IT RESOLVED THAT THE BOARD OF SUPERVISORS OF THE COUNTY OF MONTEREY,**

1. Declares and affirms that the County of Monterey remains a Welcoming County; and declares itself a place of trust and safety for ALL immigrants; and

2. Declares that no County resources shall be used to assist in the enforcement of federal immigration law, participate in any immigration enforcement operation or joint operation involving any federal immigration agent for the purpose of enforcing federal immigration law, unless such assistance is required by federal or state statute, regulation or court decision; and

3. Urges that no department or employee initiate inquiry or enforcement action based solely on a person's actual or suspected immigration status, national origin, race, ethnicity and/or English proficiency; and

4. Commends the Monterey County Sheriff's Office for its commitment to not inquire about immigration status when carrying out its duties, to not participate in any immigration enforcement unless required under state law per the California Values Act (Senate Bill 54, Chapter 495, Statues of 2017), and to building trust with all communities the office serves; and

5. Directs departments to review their confidentiality policies to ensure that eligible individuals are not deterred from seeking services or engaging with services based on immigration status; and

6. Urges, that with regards to juveniles, that departments respect juvenile confidentiality for all minors regardless of immigration status, pursuant to the recently enacted California Welfare & Institutions Code, Section 831; and

7. Commends the District Attorney's Office, which has since 2012 instructed and trained prosecutors pursuant to the Supreme Court case of *Padilla v. Kentucky* to consider the avoidance of adverse immigration consequences in the plea negotiations process as one factor in an effort to reach a just resolution in the case of non-citizen defendants, which has now been codified in California Penal Code, Section 1016.3; and

Legistar File ID No. RES 25-004 Agenda Item No. 9

8. Commends the Public Defender's Office for its ongoing commitment to training its attorneys since 2012 on their obligations to inform clients about immigration issues, in accordance with the Supreme Court ruling in *Padilla v. Kentucky*; and encourages the Office to continue providing effective legal assistance to immigrants facing criminal charges as mandated by California Penal Code, Section 1016.2; and

Furthermore, commends the Office for the work it's doing with the immigrant communities in Monterey County to assess the potential and actual adverse immigration consequences resulting from prior criminal convictions, and to evaluate the availability of post-conviction relief that may assist individuals in qualifying for immigration benefits or relief; and

9. Supports that departments continue to support immigrant crime victims and witnesses, and encourages them to come forward to report crime by providing certification of their cooperation, which is needed to obtain humanitarian visas known as the "U Visa," in a fair and timely manner; and

10. Promotes the value among residents of advancing efforts for integrating immigrant and refugee communities, recognizing that a community is strongest when everyone feels welcomed; and

11. Supports efforts to bring immigrants, refugees, newcomers and the broader community together to develop policies, programs, and initiatives that build welcoming communities and provide all residents with the knowledge and tools to thrive and fully participate in their communities; and

12. Commits to dialogue and collaborate with stakeholders in the County of Monterey in light of the proposed massive federal immigration enforcement, and commends the work of our local institutions, organizations and individuals who join in building a climate of trust and support for our immigrant community; and

13. Directs staff to continue activities in support of a comprehensive public education campaign entitled "Know Your Rights," to inform about immigration rights; and

14. Authorizes and directs the Auditor-Controller to amend the Fiscal Year 2024-25 Adopted Budget by increasing appropriations by $25,000 to fund the placement of public service announcements in County Administrative Office– Communications (001-1050-CAO004-8597) financed by a decrease in appropriations in Contingencies, General Fund 001, Appropriation Unit CAO020; and

15. Directs the Clerk of the Board of Supervisors to transmit a copy of this resolution to all twelve Monterey County cities, our local state and federal legislators, and the Governor of California.

Legistar File ID No. RES 25-004 Agenda Item No. 9

PASSED AND ADOPTED on this 14th day of January 2025, by roll call vote:

AYES:    Supervisors Alejo, Church, Lopez, Askew, and Daniels
NOES:    None
ABSENT: None

I, Valerie Ralph, Clerk of the Board of Supervisors of the County of Monterey, State of California, hereby certify that the foregoing is a true copy of an original order of said Board of Supervisors duly made and entered in the minutes thereof of Minute Book 82 for the meeting January 14, 2025.

Dated: January 21, 2025                    Valerie Ralph, Clerk of the Board of Supervisors
File ID: RES 25-004                            County of Monterey, State of California
Agenda Item No.: 9

                                                          Vicente Ramirez, Deputy

# EXHIBIT 45

Chapter 4.18 - ENFORCEMENT OF FEDERAL IMMIGRATION LAWS

4.18.010 - Cooperation with enforcement of federal immigration laws.

City officers and employees are directed to cooperate with, and not hinder, enforcement of federal immigration laws.

(Ord. 113192 § 4, 1986.)

4.18.015 - Inquiries into immigration status.

A. Notwithstanding Seattle Municipal Code Section 4.18.010, unless otherwise required by law or by court order, no Seattle City officer or employee shall inquire into the immigration status of any person, or engage in activities designed to ascertain the immigration status of any person.

B. Seattle Police officers are exempt from the limitations imposed by subsection A, above, with respect to a person whom the officer has reasonable suspicion to believe: (1) has previously been deported from the United States; (2) is again present in the United States; and (3) is committing or has committed a felony criminal-law violation.

(Ord. 121063 § 1, 2003.)

4.18.020 - Mayor reports to Council.

The Mayor shall report to the City Council and the people on a yearly basis as to the actions taken and being taken in support of this chapter.

(Ord. 121159 § 1, 2003: Ord. 121063 § 2, 2003: Ord. 113192 § 5, 1986.)

4.18.030 - City Attorney enforcement duties.

Consistent with and subject to Article XIII of the City Charter and the Code of Professional Responsibility, the City Attorney is requested to defend every action brought to declare invalid any section of this chapter, and maintain actions enforcing provisions of this chapter.

(Ord. 121159 § 2, 2003: Ord. 121063 § 3, 2003: Ord. 113192 § 6, 1986.)

4.18.035 - Required cooperation not prohibited.

Nothing in this chapter shall be construed to prohibit any Seattle City officer or employee from cooperating with federal immigration authorities as required by law.

(Ord. 121063 § 4, 2003.)

4.18.040 - Liability.

Nothing in this chapter is intended to create or form the basis for liability, on the part of the City, or its officers, employees, or agents.

(Ord. 121159 § 3, 2003.)

# EXHIBIT 46

19.10. - Purpose and policy statement.

This chapter clarifies the communication and enforcement relationship between the city and the United States Department of Homeland Security and other federal agencies with respect to the enforcement of civil immigration laws. The city works cooperatively with the Homeland Security, as it does with all state and federal agencies, but the city does not operate its programs for the purpose of enforcing federal immigration laws. The Homeland Security has the legal authority to enforce immigration laws in the United States, in Minnesota and in the city. This chapter ordinance shall be the only regulation within the city on this subject matter, and it shall supersede all conflicting policies, ordinances, rules, procedures and practices.

(2003-Or-092, § 1, 7-11-03)

19.20. - General city services.

(a) To the extent permitted by law, in determining eligibility for, and providing general city services, city employees shall be governed by the following requirements:

   (1) City employees are to carry out their regular duties for the purpose of administering general city services and programs. Employees may complete I-9 forms, may question a person regarding the I-9 form and documents supporting the I-9 form, and may allow Homeland Security to audit the I-9 forms as allowed by law. Employees shall comply with any properly issued subpoena for the production of documents or witnesses, even if related to immigration issues or issues of the Homeland Security.

   (2) City employees shall follow general city, state and federal guidelines to assess eligibility for services. City employees shall only solicit immigration information or inquire about immigration status when specifically required to do so by law or program guidelines as a condition of eligibility for the service sought. City employees may require evidence of a person's identity and may ask to see a person's personal identifying documents only when specifically authorized and required to do so by the employee's work duties. City employees shall not discriminate against any current or potential service users on the basis of any of the protected categories listed in the city's civil rights ordinance (139.40), or on the basis of immigration status.

   (3) Other than complying with lawful subpoenas, city employees and representatives shall not use city resources or personnel solely for the purpose of detecting or apprehending persons whose only violation of law is or may be being undocumented, being out of status, or illegally

residing in the United States (collectively "undocumented").

    (4) Where presentation of a Minnesota driver's license is customarily accepted as adequate evidence of identity, presentation of a photo identity document issued by the person's nation of origin, such as a driver's license, passport, or matricula consular (consulate-issued document) shall be accepted and shall not subject the person to a higher level of scrutiny or different treatment than if the person had provided a Minnesota driver's license. This paragraph does not apply to I-9 forms.

  (b) General city services defined. General city services shall mean all city services excepting those services specifically listed as public safety services in section 19.30.

  (c) City attorney's office - civil division employees may investigate and inquire about immigration status when relevant to potential or actual litigation or an administrative proceeding.

(2003-Or-092, § 1, 7-11-03)

19.30. - Public safety services.

(a) To the extent permitted by law, in providing public safety services, employees of the police and fire departments, and the city attorney's office - criminal division, (collectively, public safety officials), shall be governed by the following requirements:

    (1) Public safety officials shall not undertake any law enforcement action for the purpose of detecting the presence of undocumented persons, or to verify immigration status, including but not limited to questioning any person or persons about their immigration status.

    (2) City attorney's office - criminal division employees shall be permitted to:

      a. Inform persons of the possible immigration consequences of a guilty plea.

      b. Question and conduct cross-examination of a witness or defendant regarding immigration status.

      c. Inquire about immigration status for purposes of bail or conditional release.

      d. Investigate and inquire about immigration status when relevant to the potential or actual prosecution of the case or when immigration status is an element of the crime.

      e. Take immigration status and collateral effects of possible deportation into consideration during discussions held for the purpose of case resolution.

    (3) Public safety officials shall not question, arrest or detain any person for violations of federal civil immigration laws except when immigration status is an element of the crime or when enforcing 8 U.S.C. 1324(c).

    (4) Nothing in this chapter shall prohibit public safety personnel from assisting federal law enforcement officers in the investigation of criminal activity involving individuals present in the United States who may also be in violation of federal civil immigration laws.

(b) All such use of city public safety personnel under 19.30(a)(3) and (a)(4) shall be documented, including any applicable Department of Homeland Security mission statement and operational guidelines, the reason for the dispatch of personnel, the name of the homeland security agent in charge, and the name of the officer authorizing the use of city personnel. (2003-Or-092, § 1, 7-11-03)

## 19.40 - Complaints and discipline.

Complaints of a violation of this chapter shall be shall be subject to disciplinary action under the appropriate union contract, civil service commission rules, or department work rules. It shall not be a violation of this chapter to require the completion of I-9 forms or to inquire into or disclose the immigration status of the complainant or witnesses if necessary as part of the investigation of a complaint of a violation of this chapter, or if deemed necessary by the appointing authority in order to administer discipline for such violations.

(2003-Or-092, § 1, 7-11-03)

## 19.50. - Subpoena.

Nothing in this chapter prohibits city employees from responding to a properly issued subpoena.

(2003-Or-092, § 1, 7-11-03)

## 19.60. - Certifications for victims of crimes.

(a) *Definitions.* For the purposes of this section, the following definitions shall apply:

(1) *Certification request.* A request made by a victim of crime, or the victim's attorney or other appropriate representative, to a city certifying agency for a U Nonimmigrant Status certification or a T Visa Declaration of Law Enforcement Officer for Victim of Trafficking in Persons for persons eligible under 8 U.S.C. §1101(a)(15)(T) and (U) as provided in the Victims of Trafficking and Violence Prevention Act of 2000.

(2) *City certifying agency.* Any city department having legal authority to sign a U Visa Nonimmigrant Status Certification or a T Visa Declaration of Law Enforcement Officer for Victim of Trafficking in Persons, including the Minneapolis Police Department, the city attorney's office and the Civil Rights Department in their respective areas of responsibility for detection, investigation and/or prosecution.

(3) *Investigation or prosecution.* The phrase "investigation and/or prosecution" has the meaning set out in 8 CFR §214.14(a)(5) that includes the detection or investigation of a qualifying crime or criminal activity, as well as the prosecution, conviction, or sentencing of the perpetrator of the qualifying crime or criminal activity.

(b)  *Certification process.*

    (1)  *Standard review.* City certifying agencies shall process certification requests as quickly as reasonably possible. All certification requests shall be processed within thirty (30) days of receipt by the applicable city certifying agency of the request or as soon as reasonably possible thereafter if the processing is delayed by the need to seek off-site records or other good cause.

    (2)  *Expedited review.* City certifying agencies shall provide for an expedited review process for victims or for qualifying family members of victims who are in removal proceedings, with requests processed within seven (7) days request or as soon as reasonably possible thereafter if the processing is delayed by the need to seek off-site records or other good cause.

    (3)  City certifying agencies shall make information about the standard and expedited review process readily available to the public in multiple languages and include a link to this information on the city's website.

    (4)  The head of each city certifying agency shall designate a certifying official who shall be authorized to review, process, and sign certification requests as legally appropriate. The designated certifying official shall exercise sound discretion and judgment and shall review each certification request on a case-by-case basis taking into consideration all relevant facts.

(c)  *Certification of helpfulness.* A city certifying agency shall certify the helpfulness of a U-Visa applicant if the applicant possesses information concerning a qualifying criminal activity, and has been helpful, is being helpful, or is likely to be helpful in the investigation and/or prosecution of the criminal activity as provided in 8 U.S.C. §1101(a)(15)(U). This includes being helpful and providing assistance when reasonably requested. This also includes an ongoing responsibility on the part of the victim to be helpful as noted in 8 C.F.R. §214.14(b)(3). Subject to section 19.60(b)(4) above, it shall be a rebuttable presumption that the victim is likely to be helpful if a victim has not unreasonably refused to cooperate or unreasonably failed to provide information and assistance reasonably requested by law enforcement or prosecution.

(d)  *Data privacy.* City certifying agencies shall not disclose personal information of victims obtained through the certification request process except as provided in the Minnesota Government Data Practices Act or as otherwise required by law or court order.

(Ord. No. 2017-083, § 1, 12-15-17)

# EXHIBIT 47

# Chapter 44. Employee Authority in Immigration Matters

## Sec. 44.01. Purpose and policy statement.

This chapter clarifies the communication and enforcement relationship between the city and the United States Department of Homeland Security ("homeland security") and other federal agencies with respect to the enforcement of civil immigration laws. The city works cooperatively with homeland security, as it does with all state and federal agencies, but the city does not operate its programs for the purpose of enforcing federal immigration laws. Homeland security has the legal authority to enforce immigration laws in the United States, in Minnesota and in the city. It is the policy of the city to respect the role of homeland security by avoiding pro-active enforcement of civil immigration laws. This chapter is not intended to limit the proper enforcement of generally applicable laws. It is the policy of the city that all residents are equally entitled to protection and that all residents should be able to access city services to which they are entitled, without regard to their immigration status under federal law.

(C.F. No. 04-316, § 1, 5-5-04)

## Sec. 44.02. General city services.

(a) To the extent permitted by law, in determining eligibility for, and providing general city services, city employees shall be governed by the following requirements:

(1) City employees are to carry out their regular duties for the purpose of administering general city services and program. Employees may complete I-9 forms, may question a person regarding the I-9 form and documents supporting the I-9 form, and may allow homeland security to audit the I-9 forms as allowed by law. With the exception of inquiries allowed by law or as necessary for law enforcement purposes, no St. Paul city officer or employee should inquire into the immigration status of any person or request any documents or information verifying the immigration status of any individual. Employees shall comply with any properly issued subpoena for the production of documents or witnesses, even if related to immigration issues or issues of homeland security.

(2) City employees shall follow general city, state and federal guidelines to assess eligibility for services. City employees shall only solicit immigration information or inquire about immigration status when specifically required to do so by law or program guidelines as a condition of eligibility for the service sought. City employees may require evidence of a person's identity and may ask to see a person's personal identifying documents only when specifically authorized and required to do so by the employee's work duties. Information about immigration status in the possession of or known to city employees and representatives, however received, shall not be maintained or recorded except as otherwise specifically required by law. The confidentiality of such information shall be maintained to the fullest extent permitted by the laws of the United States and the state, including the obligation to maintain the confidentiality of personal information under the Minnesota Government Data Practices Act. City employees shall not discriminate against any current or potential service users on the basis of any of the protected categories listed in the city's human rights ordinance, Legislative Code Chapter 183.02(5), or on the basis of immigration status.

(3) Other than complying with lawful subpoenas, city employees and representatives shall not use city resources or personnel solely for the purpose of detecting or apprehending persons whose only

St. Paul, Minnesota, Code of Ordinances
(Supp. No. 127)

Created: 2024-12-20 13:41:22 [EST]

Page 1 of 5

violation of law is or may be being undocumented, being out of status, or illegally residing in the United States (collectively "undocumented").

(4)  Where presentation of a state driver's license is customarily accepted as adequate evidence of identity, presentation of a photo identity document issued by the person's nation of origin, such as a driver's license, passport, or matricula consular (consulate-issued document), or of a photo identity document issued by any Minnesota county, shall not subject the person to an inquiry into the person's immigration status. This paragraph does not apply to I-9 forms.

(b)  General city services defined. General city services shall mean all city services excepting those services specifically listed as public safety services in section 44.03

(c)  Supervisors of general city services employees shall include information regarding the city's policy and expectations as set forth in this chapter in the orientation of new employees and as part of their employees' on-going in-service training.

(d)  City attorney's office. Civil division employees may investigate and inquire about immigration status when relevant to potential or actual litigation or an administrative proceeding.

(C.F. No. 04-316, § 1, 5-5-04)

## Sec. 44.03. Public safety services.

(a)  To the extent permitted by law, in providing public safety services, employees of the police and fire departments, and the city attorney's office - criminal division, (collectively, public safety officials), shall be governed by the following requirements:

(1)  Public safety officials may not undertake any law enforcement action for the sole purpose of detecting the presence of undocumented persons, or to verify immigration status, including but not limited to questioning any person or persons about their immigration status.

(2)  City attorney's office - criminal division employees shall be permitted to:

   a.  Inform persons of the possible immigration consequences of a guilty plea.

   b.  Question and conduct cross-examination of a witness or defendant regarding immigration status.

   c.  Inquire about immigration status for purposes of bail or conditional release.

   d.  Investigate and inquire about immigration status when relevant to the potential or actual prosecution of the case or when immigration status is an element of the crime.

   e.  Take immigration status and collateral effects of possible deportation into consideration during discussions held for the purpose of case resolution.

(3)  Public safety officials may not question, arrest or detain any person for violations of federal civil immigration laws except when immigration status is an element of the crime or when enforcing 8 U.S.C. 1324(c).

(4)  Nothing in this chapter shall prohibit public safety personnel from assisting federal law enforcement officers in the investigation of criminal activity involving individuals present in the United States who may also be in violation of federal civil immigration laws.

(5)  Nothing in this chapter prohibits public safety personnel from adequately identifying criminal suspects or assessing the risk of flight of criminal suspects.

(6)  Where presentation of a state driver's license is customarily accepted as adequate evidence of identity, presentation of a photo identity document issued by the person's nation of origin, such as a driver's

license, passport, or matricula consular (consulate-issued document), or of a photo identity document issued by any Minnesota county, shall not subject the person to an inquiry into the person's immigration status.

(b)    All such use of city public safety personnel under 44.03(a)(3) and (a)(4) shall be documented, including any applicable homeland security mission statement and operational guidelines, the reason for the dispatch of personnel, the name of the homeland security agent in charge, and the name of the officer authorizing the use of city personnel.

(c)    Supervisors of public safety officials shall include information regarding the city's policy and expectations as set forth in this chapter, in the orientation of new employees and as part of their employees' on-going in-service training.

(C.F. No. 04-316, § 1, 5-5-04)

## Sec. 44.04. Complaints and discipline.

(a)    An employee of the city who violates this chapter may be subject to disciplinary action, such as oral reprimands, written reprimands, suspension without pay, and discharge, under the appropriate union contract, civil service commission rules, or department work rules.

(b)    Complaints of a violation by an employee of the city police department shall be received and investigated by the police internal integrity assurance unit and forwarded to the police civilian review commission. Complaints of a violation of this chapter by an employee of any other city department shall be received and investigated by the director of the office of human resources. The results of any such investigation shall be provided to the complainant in writing within ninety (90) days of receipt of the complaint. Complainants and witnesses shall not be asked to provide their immigration status at any point during the complaint process, and no investigation of the immigration status of the complainant and witnesses shall be made by any city personnel in the investigation of such a complaint or thereafter.

(c)    It shall not be a violation of this chapter to require the completion of I-9 forms .

(d)    The city office of human resources, in consultation with the police civilian internal affairs review commission and affected communities, shall prepare and file in April of each year with the city council and the mayor an annual report and recommendations regarding the implementation of this chapter.

(C.F. No. 04-316, § 1, 5-5-04)

## Sec. 44.05. Subpoena.

Nothing in this chapter prohibits city employees from responding to a properly issued subpoena.

(C.F. No. 04-316, § 1, 5-5-04)

## Sec. 44.06. Certifications for victims of crimes.

(a)    *Definitions.* For the purposes of this section, the following definitions shall apply:

(1)    *Certification request.* A request made by a victim of crime, or the victim's attorney or other appropriate representative, to a city certifying agency for a U Nonimmigrant Status Certification or a T Visa Declaration of Law Enforcement Officer for Victim of Trafficking in Persons for persons eligible under 8 U.S.C. §1101(a)(15)(T) or (U) as provided in the Victims of Trafficking and Violence Prevention Act of 2000.

(2) *City certifying agency.* Any city department having legal authority to sign a U Visa Nonimmigrant Status Certification or a T Visa Declaration of Law Enforcement Officer for Victim of Trafficking in Persons, including the Saint Paul police department and the city attorney's office.

(3) *Investigation or prosecution.* The phrase "investigation or prosecution" has the meaning set out in 8 CFR §214.14(a)(5) that includes the detection or investigation of a qualifying crime or criminal activity, as well as the prosecution, conviction, or sentencing of the perpetrator of the qualifying crime or criminal activity.

(b) *Certification process.*

(1) Standard review. City certifying agencies must process certification requests as quickly as reasonably possible. All certification requests must be processed within thirty (30) days of receipt by the applicable city certifying agency of the request or as soon as reasonably possible thereafter if the processing is delayed by the need to seek off-site records or other good cause.

(2) Expedited review. City certifying agencies must provide for an expedited review process for victims or qualifying family members of victims who are in removal proceedings, with requests processed within seven (7) days request or as soon as reasonably possible thereafter if the processing is delayed by the need to seek off-site records or other good cause.

(3) City certifying agencies shall make information about the certification process, including standard and expedited review, readily available to the public in multiple languages and include this information on the city's website.

(4) The head of each city certifying agency must designate a certifying official authorized to review, process, and certify requests as legally appropriate on a case-by-case basis taking into consideration all relevant facts.

(c) *Certification of helpfulness.* A city certifying agency must evaluate whether a victim requesting U Nonimmigrant Status Certification possesses information concerning a qualifying criminal activity, and has been helpful, is being helpful, or is likely to be helpful in the investigation or prosecution of the criminal activity as provided in 8 U.S.C. §1101(a)(15)(U). Victim helpfulness is minimally established by making a criminal complaint or filing a full and accurate police report.

(d) *Data privacy.* City certifying agencies must not disclose private or confidential information about victims obtained through the certification request process except as provided in the Minnesota Government Data Practices Act or as otherwise required by law or court order.

(Ord. No. 18-21, § 1, 6-13-18)

Editor's note(s)—Ord. No. 18-21, § l, adopted June 13, 2018, in effect, repealed § 44.06 and enacted a new § 44.06 as set out herein. Former § 44.06 pertained to no intent to create private cause of action and derived from C.F. No. 04-316, adopted May 5, 2004.

## Sec. 44.07. No intent to create private cause of action.

Nothing in this chapter is intended to create a private cause of action for violations of this chapter.

(Ord. No. 18-21, § 2, 6-13-18)

Editor's note(s)—Ord. No. 18-21, § 3, adopted June 13, 2018, renumbered § 44.07 as § 44.08.

**Sec. 44.08. Severability.**

If a section of this chapter is found to be invalid for any reason, the remaining sections of the chapter shall continue in full force and effect.

(C.F. No. 04-316, § 1, 5-5-04; Ord. No. 18-21, § 3, 6-13-18)

Editor's note(s)—See editor's note, § 44.07.

# EXHIBIT 48

# CITY OF SANTA FE, NEW MEXICO

## RESOLUTION NO. 1999-_6_

### INTRODUCED BY:



## A RESOLUTION

DECLARING A POLICY OF NON-DISCRIMINATION ON THE BASIS OF A PERSON'S NATIONAL ORIGIN AND APPOINTING AN IMMIGRATION TASK FORCE.

**WHEREAS,** the City of Santa Fe, New Mexico, is a historic community of Native American origins subsequently settled by the Spanish and numerous other immigrants; and

**WHEREAS,** during the past almost 390 years, Santa Fe has been a home for many immigrants who came to this continent seeking a better way of life; and

**WHEREAS,** immigrants from throughout the world contribute to Santa Fe's cultural richness and the support of the economy, through their labor and initiative, the purchase of goods and the payment of taxes, thereby contradicting the argument that immigrants drain government resources; and

**WHEREAS,** the Treaty of Guadalupe Hidalgo, the United Nations Declaration of Human Rights, the Constitution of the United States and the Constitution of New Mexico guarantee the right to equal treatment of all peoples who remained in the new territory after 1848

1

1    and immigrants who have arrived at a later date; and

2        **WHEREAS,** immigrants do not generally rely on public services and many immigrants

3    are long time tax-paying residents of the United States; and

4        **WHEREAS,** the City of Santa Fe is a multi-cultural community which celebrates the

5    diversity of its citizens and abhors discrimination.

6        **NOW, THEREFORE, BE IT RESOLVED BY THE GOVERNING BODY OF THE**

7    **CITY OF SANTA FE** declares a policy of non-discrimination on the basis of a person's national

8    origin and that the City of Santa Fe will be a community where all persons will be treated

9    equally, with respect and dignity, regardless of immigration status.  The Governing Body hereby

10    declares that no municipal resources will be used to identify or apprehend any non-citizen

11    resident on the sole basis of immigration status, unless otherwise lawfully required to do so.

12        **BE IT FURTHER RESOLVED** that the Mayor will appoint an Immigration Task Force

13    within 60 days, members to be selected from the following areas:  human rights, social services,

14    business community, health care, labor organizations, religious community, youth services

15    providers, women's advocacy groups, educators and legal services.  The task force will monitor

16    the human rights status of non-citizens residing in the City of Santa Fe and report its findings and

17    recommendations after one year to the Governing Body.

18        **PASSED, APPROVED and ADOPTED** this 13th day of January, 1999.

19

20

21                                LARRY A. DELGADO, MAYOR

22    ATTEST:

23

24

25    YOLANDA Y. VIGIL, CITY CLERK

APPROVED AS TO FORM:

MARK A. BASHAM, CITY ATTORNEY

*Melissa/Resolution-Immigration Task Force*

3

# EXHIBIT 49

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**CITY OF SANTA FE, NEW MEXICO**

**RESOLUTION NO. 2017-19**

**INTRODUCED BY:**


Councilor Joseph M. Maestas

Councilor Renee D. Villarreal

Councilor Peter Ives




**A RESOLUTION**

**MAKING POLICY CHANGES TO SAFEGUARD RESIDENTS' SENSITIVE PERSONAL INFORMATION, REAFFIRMING THE CITY OF SANTA FE'S COMMITMENT TO HUMAN AND CIVIL RIGHTS, THE ESTABLISHED RULE OF LAW, AND ITS STATUS AS A WELCOMING COMMUNITY FOR IMMIGRANTS AND REFUGEES; AND DIRECTING THE CITY MANAGER AND CITY ATTORNEY TO ASSESS THE CITY'S LEGAL RIGHTS AND RESPONSIBILITIES UNDER APPLICABLE LAW.**


      **WHEREAS**, through many centuries Santa Fe has been a home to many migrants and immigrants who came to Santa Fe seeking a better life for themselves and their families; and

      **WHEREAS**, the voters of the City of Santa Fe, as a means to maximize their self-determination and self-governance, adopted a home rule charter on December 9, 1997 and subsequent charter amendments in 2008 and 2014; and

      **WHEREAS**, the Preamble of the City Charter declares: "We, the people of Santa Fe, a capital city for four centuries, a community with rich and lasting multi-cultural traditions and a history of tolerance towards all peoples, cultures, traditions, and lifestyles, recognize our right to define our

1

1    way of life and our form of government;" and

2         **WHEREAS**, the City Charter also declares: "The human and civil rights of the residents

3    of Santa Fe are inviolate and shall not be diminished or otherwise infringed. To that end, no city

4    ordinance, resolution or policy shall be enacted or adopted nor shall any action be condoned which

5    discriminates on the basis of ethnicity, race, age, religion, creed, color, national origin, ancestry,

6    sex, gender, sexual orientation, physical or mental disability, medical condition or citizenship

7    status;" and

8         **WHEREAS**, the City of Santa Fe has a long record of adopting policies that welcome,

9    integrate, and embrace migrants, immigrants, refugees and their families into the local community

10    irrespective of citizenship status; and

11         **WHEREAS**, City Resolution No. 1985-129 declared Santa Fe a city of refuge for refugees

12    from El Salvador and Guatemala and resolved that the City, its agents, agencies, officers, and

13    employees in performance of official duties, shall not, to the extent legally possible, assist or

14    voluntarily cooperate with Immigration and Naturalization Service Investigations or arrest

15    procedures relating to alleged violations of immigration law by Salvadorans and Guatemalan

16    nationals; and

17         **WHEREAS**, City of Santa Fe Resolution No.1999-6 declares a policy of non-

18    discrimination on the basis of a person's national origin and that the City of Santa Fe will be a

19    community where all persons will be treated equally with respect and dignity regardless of their

20    immigration status; and

21         **WHEREAS**, Resolution No. 1999-6 also declares that no municipal resources will be used

22    to identify or apprehend any non-citizen on the sole basis of immigration status, unless otherwise

23    lawfully required to do so; and

24         **WHEREAS**, the City has long recognized the contributions made to the City's economy

25    and its culture by the community of immigrants, who make up approximately 15% of the city's

1    population, often live in mixed-status families with U.S. citizen children, and are long-time

2    residents of the City; and

3        **WHEREAS**, the use of resources by the City to enforce federal civil immigration laws

4    both diverts resources from other productive services for the people of Santa Fe and undermines a

5    productive and trusting relationship between the immigrant community and the City of Santa Fe ;

6    and

7        **WHEREAS** the City of Santa Fe has the authority to preserve the confidentiality of

8    certain private and sensitive information of its residents obtained for the purposes of carrying out

9    essential city functions, and the residents of Santa Fe have a basic expectation that certain

10   sensitive and private information will be not be disclosed; and

11       **WHEREAS**, the Tenth Amendment to the Constitution of the United States provides that

12   the powers that are not delegated expressly or by implication to the United States, or prohibited to

13   the States, are reserved to the States, respectively, or to the people, and has been interpreted by the

14   U.S. Supreme Court to preclude the Federal government from compelling or commandeering any

15   State or local government, either directly or by the use of coercive threats to withhold federal

16   funding, to adopt federal programs or enforce federal laws, including immigration laws; and

17       **WHEREAS**, City of Santa Fe Resolution No. 1999-6 has resulted in the following actions

18   by the City in furtherance of its purposes:

19       1. Establishing an Immigration Committee to monitor the human rights status of non-

20   citizens residing in the City of Santa Fe and report its findings and recommendations to the

21   Governing Body; and

22       2. Adopting procedures regulating communications between the police department and

23   federal immigration enforcement agencies; and

24       **WHEREAS**, these measures have contributed to a trusting and productive relationship

25   with the City's immigrant community and continue to contribute to the safety and well-being of all

1  the City's residents; and

2      **WHEREAS**, Santa Fe is regarded as a safe city with a low crime rate, seen in many ways

3  as related to the non-discrimination policies adopted through Resolution 1999-6; and

4      **WHEREAS**, between 1990 and 2013 the number of unauthorized immigrants in the United

5  States more than tripled from 3.5 million to 11.2 million, while FBI date from the same period

6  indicates that violent crime declined 48 percent and property crime declined 41 percent[1]; and

7      **WHEREAS**, the productive relationship between the City and immigrants living in Santa

8  Fe would be undermined if the City were to retreat from its longstanding support of immigrant-

9  friendly policies.

10      **NOW THEREFORE BE IT RESOLVED** that the City of Santa Fe reaffirms and

11  continues to abide by its non-discrimination and integration policies toward residents irrespective

12  of immigration and citizenship status as set forth in Resolutions 1985-129 and 1999-6.

13      **BE IT FURTHER RESOLVED** that the city of Santa Fe reaffirms its immigrant-friendly

14  status and commitment to the established rule of law.

15      **BE IT FURTHER RESOLVED** that the City shall strengthen its status as a welcoming

16  community by adopting and implementing the following policies:

17      1. No employee of the City of Santa Fe shall make or initiate any inquiry regarding the

18  immigration status of any person, except as required by law, including, without limitation, to

19  determine eligibility for City employment or for a federal benefit or program administered by the

20  City.

21      2. No employee of the City of Santa Fe shall disclose to any person or agency outside city

22  government any sensitive information about any person that comes into the employee's possession

23  during the course and scope of that employee's work for the City of Santa Fe, except as required

---

[1]https://www.americanimmigrationcouncil.org/sites/default/files/research/the_criminalization_of_immigration_in_the_united_states.pdf

4

1    by law in order to provide a City service or carry out a function of City government or upon receipt
2    of a valid court order or a request pursuant to the New Mexico Inspection of Public Records Act,
3    NMSA 1978, Chapter 14, Article 2. Sensitive information includes confidential identifying
4    information such as social security numbers or individual tax identification numbers, a person's
5    place and date of birth, a person's status as a recipient of public assistance or as a crime victim, and
6    a person's sexual orientation, physical or mental disability, immigration status or national origin.

7       3. The City Manager shall, within 60 to 90 days of passage of this resolution, provide to
8    the Governing Body a copy of updated policies and procedures relating to applications for U Visa
9    certification as approved and reviewed by the appropriate parties.

10      4. The City Manager shall provide to the City's Public Safety Committee, Immigration
11   Committee and the Governing Body, quarterly and upon request, a report of the number of
12   applications for U-Visa certifications received and the number of certifications issued.

13      5. City elected and appointed officials and employees shall refuse access to all non-public
14   areas of City property by federal immigration agents for the purposes of enforcing federal
15   immigration laws who do not present a warrant issued by a federal court specifically requiring such
16   access.

17      6. All City departments and employees shall accept driving authorization cards and non-
18   Real-ID compliant identification cards issued by the New Mexico Motor Vehicle Division (MVD)
19   for all of the purposes for which they would accept Real-ID-compliant drivers' licenses and
20   identification cards issued by the MVD.

21      7. City departments shall not use the voluntary federal e-verify system to investigate or
22   determine the work eligibility of applicants for city employment unless required by law for the
23   purposes of administering a federal benefit or program.

24      8. The City commits to improve language access to City services and programs for its
25   diverse multilingual residents, and to that end the City Managershall undertake a review of potential

5

1    language barriers throughout City government that may limit such access and recommend to the

2    Governing Body a means to address any identified barriers including the need for professional

3    translation and interpretation services with the goal of improving access to City services and

4    programs by non-English speakers, and to consider these as part of the FY 2018 and future budget

5    proposals.

6         9. The City Manager within 60 to 90 days of the passage of this resolution, shall develop

7    and present to the Governing Body a plan to work through legal advocacy groups and community

8    partners to provide community outreach and education regarding the City's non-discrimination

9    and confidentiality policies and the civil rights of immigrant and non-immigrant residents and

10   employers and business owners.

11        10. The Governing Body of the City of Santa Fe commits to supporting the formation of

12   a working group with the Board of Commissioners of Santa Fe County and the governing boards

13   of Santa Fe Public Schools and the Santa Fe Community College District, and other community

14   partners to consider methods, in accordance with the law, of providing protection and support to

15   immigrant workers, families, and youth in our community.

16        11. The City of Santa Fe shall continue to promote, enforce, and defend City policies and

17   procedures that protect the human and civil rights of all residents and that ensure adherence to the

18   non-discrimination principles enacted by the people of Santa Fe in the City's Charter.

19        12.    The City Manager shall communicate these policies to all City employees in

20   accordance with Human Resources Department policies.

21        **BE IT FURTHER RESOLVED** that the city manager and the city attorney are directed

22   to assess and report to the Governing Body the city's rights and responsibilities under applicable

23   law, and identify all reasonable legal means to defend the city's policies and procedures.

24        PASSED, APPROVED AND ADOPTED this 22nd day of February, 2017.

25

6

JAVIER M. GONZALES, MAYOR

ATTEST:

YOLANDA Y. VIGIL, CITY CLERK

APPROVED AS TO FORM:

KELLEY A. BRENNAN, CITY ATTORNEY

*M/Legislation/Resolutions 2017/2017-19 Reaffirming Non-Discrimination Status (Revised Substitute)*

7

# EXHIBIT 4:

BRETT A. SHUMATE
Acting Assistant Attorney General
Civil Division
DREW C. ENSIGN
Deputy Assistant Attorney General
AUGUST FLENTJE
Deputy Director
EREZ REUVENI
Assistant Director
Office of Immigration Litigation
ERIC HAMILTON
Deputy Assistant Attorney General
ALEXANDER K. HAAS
Director
JACQUELINE COLEMAN SNEAD
Assistant Director
ELISABETH J. NEYLAN
Trial Attorney
Federal Programs Branch
*Attorneys for the United States*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
|---|---|
| THE UNITED STATES OF AMERICA, | No. 1:25-cv-1285 |
| Plaintiff, |  |
| v. | **COMPLAINT** |
| STATE OF ILLINOIS; JB PRITZKER, Governor of Illinois, in his Official Capacity; THE CITY OF CHICAGO; BRANDON JOHNSON, Mayor of Chicago, in his Official Capacity; LARRY SNELLING, Chicago Police Superintendent, in his Official Capacity; COOK COUNTY, ILLINOIS; COOK COUNTY BOARD OF COMMISSIONERS; TONI PRECKWINKLE, President of the Cook County Board of Commissioners, in her Official Capacity; THOMAS J. DART, Cook County Sheriff, in his Official Capacity, |  |
| Defendants. |  |

Complaint of the United States

Plaintiff, the United States of America, by and through its undersigned counsel, brings this civil action for declaratory and injunctive relief, and alleges as follows:

## PRELIMINARY STATEMENT

1.  Within hours of assuming the Presidency, President Trump declared a "national emergency exists at the southern border of the United States" from the unprecedented "illegal entry of aliens" into the country.  Proclamation 10,886, *Declaring a National Emergency at the Southern Border of the United States*, 90 Fed. Reg. 8327, 8327 (Jan. 20, 2025).  "Many of these aliens unlawfully within the United States present significant threats to national security and public safety, committing vile and heinous acts against innocent Americans." Executive Order 14,159, *Protecting the American People Against Invasion*, 90 Fed. Reg. 8443, 8443 (Jan. 20, 2025).  Further exacerbating this national crisis, some of these aliens find safe havens from federal law enforcement detection in so-called Sanctuary Cities where they live and work among innocent Americans, who may later become their crime victims.

2.  This national crisis underscores the vital importance of "[e]nforcing our Nation's immigration laws."  *Id.*  This action seeks to put an end to one State's efforts to impede the Federal Government from doing that.

3.  The United States brings this declaratory and injunctive action to prohibit the State of Illinois and its subdivisions from enforcing several state and local laws—namely, the Way Forward Act, TRUST Act, Welcoming City Act, and Cook County, Ill. Ordinance 11-O-73—that are designed to and in fact interfere with and discriminate against the Federal Government's enforcement of federal immigration law in violation of the Supremacy Clause of the United States Constitution. *See* The TRUST Act, 5 Ill. Comp. Stat. 805/1 *et*

*seq.* (2017), *amended*, Illinois Way Forward Act, 2021 Ill. Legis. Serv. 102-234; Cook County, Illinois Ordinance 11-O-73 (2011); and Welcoming City Ordinance, Chicago Mun. Code ch. 2-173 (2012).

4.   The United States has well-established, preeminent, and preemptive authority to regulate immigration matters. This authority derives from the United States Constitution, numerous acts of Congress, and binding U.S. Supreme Court precedent. Indeed, Congress last week strengthened that authority with the enactment of the Laken Riley Act, S. 5, 119th Cong. (2025), which "mandates the federal detention of illegal immigrants who are accused of theft, burglary, assaulting a law enforcement officer, and any crime that causes death or serious bodily injury." DHS, Press Release, President Trump Signs the Laken Riley Act in Law, https://www.dhs.gov/news/2025/01/29/president-trump-signs-laken-riley-act-law.

5.   Both the Governor of Illinois JB Pritzker and Mayor of Chicago Brandon Johnson, sued here in their official capacities, profess a shared interest with the Federal Government in enforcing immigration laws to effectuate the removal of such offenders from the United States. Last week on CNN, Governor Pritzker proclaimed: "Well let me start by being clear that when we're talking about violent criminals who've been convicted and who are undocumented, we don't want them in our state. We want them out of the country. We hope they do get deported. And if that's who they're picking up, we're all for it." https://www.cnn.com/2025/01/26/politics/video/sotu-pritzker-on-planned-chicago-immigration-raids. Illinois laws, however, provide otherwise.

6.   The challenged provisions of Illinois, Chicago, and Cook County law reflect their intentional effort to obstruct the Federal Government's enforcement of federal

immigration law and to impede consultation and communication between federal, state, and local law enforcement officials that is necessary for federal officials to carry out federal immigration law and keep Americans safe.

7. Upon information and belief, the conduct of officials in Chicago and Illinois minimally enforcing—and oftentimes affirmatively thwarting—federal immigration laws over a period of years has resulted in countless criminals being released into Chicago who should have been held for immigration removal from the United States. According to the U.S. Immigration and Customs Enforcement's (ICE) Law Enforcement Statistical Tracking Unit, from Fiscal Year 2016 until 2025, Enforcement and Removal Operations (ERO) arrested 13,564 aliens in Illinois, lodging 11,036 detainers. For those arrested, many were charged with serious crimes including assault, larceny, and sexual and drug-related offenses.

8. The Illinois Way Forward Act and TRUST Act both impede the Federal Government's ability to regulate immigration and take enforcement actions against illegal aliens by preventing state law enforcement officials from assisting with federal civil immigration enforcement. Under these laws, state officers are explicitly prohibited from complying with immigration detainers or civil immigration warrants; they are also prevented from entering into agreements to detain noncitizens for federal civil immigration violations. *See* 5 Ill. Comp. Stat. 805/15.

9. The Chicago law, the Welcoming City Ordinance, Chicago Municipal Code ch. 2-173, limits the ability of Chicago law enforcement officers (1) to provide the Federal Government with basic information about noncitizens who are in their custody and are subject to federal immigration custody, including custody status or release date, and (2)

to provide federal officers access to such individuals to effect their safe transfer to federal immigration custody when presented with a federal administrative warrant.

10. The Cook County law, Ordinance 11-O-73, "Policy for Responding to ICE Detainers," similarly limits the ability of Cook County law enforcement officers to provide the Federal Government with basic information about noncitizens who are in their custody and are subject to federal immigration custody, or to provide federal officers access to such noncitizens to effect their safe transfer to federal immigration custody when presented with a federal administrative warrant.

11. The challenged provisions of Illinois, Chicago, and Cook County law have the purpose and effect of making it more difficult for, and deliberately impeding, federal immigration officers' ability to carry out their responsibilities in those jurisdictions. These provisions intentionally obstruct the sharing of information envisioned by Congress, including basic information such as release dates and custodial status, thereby impairing federal detention of removable aliens, including dangerous criminals, as required by federal law; they further purport to direct federal officials to procure criminal arrest warrants in order to take custody of removable aliens, even though Congress has made an explicit policy choice that such removals can be effectuated by *civil* arrest warrants for immigration enforcement; and they facilitate the release of dangerous criminals into the community by directing local employees to refuse to transfer such aliens to federal officials in a secure environment—thereby resulting in their release onto the streets, where they all too often reoffend and commit serious crimes.

12. Upon information and belief, the provisions of Chicago and Cook County law that restrict information sharing jeopardize the safety of residents. For example, last August, federal officials issued a detainer request for an alien being held in Cook County jail on domestic violence charges. The detainer was not honored, and the alien was subsequently arrested on October 10, 2024 for aggravated criminal sexual assault and abuse of a minor.

13. The Supremacy Clause prohibits Illinois, Chicago, Cook County, and their officials from obstructing the Federal Government's ability to enforce laws that Congress has enacted or to take actions entrusted to it by the Constitution.

14. The Supremacy Clause also prohibits Illinois, Chicago, and Cook County from singling out the Federal Government for adverse treatment—as the challenged laws do—thereby discriminating against the Federal Government. Accordingly, the provisions challenged here are invalid and should be enjoined.

## JURISDICTION AND VENUE

15. The Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345.

16. Venue is proper in this jurisdiction under 28 U.S.C. § 1391(b) because Defendants City of Chicago, Cook County, and their officials reside within the Northern District of Illinois and because all Defendants' acts or omissions giving rise to this Complaint arose from events occurring within this judicial district.

17. The Court has the authority to provide the relief requested under 28 U.S.C. §§ 1651, 2201, and 2202, and its inherent equitable powers.

## PARTIES

18. Plaintiff, the United States of America, regulates immigration under its constitutional and statutory authorities, and it enforces federal immigration laws through its Executive

agencies, including the Departments of Justice, State, Labor, and Homeland Security (DHS) as well as DHS's component agencies U.S. Immigration and Customs Enforcement (ICE), and U.S. Customs and Border Protection (CBP).

19.    Defendant State of Illinois is a state of the Union.

20.    Defendant JB Pritzker is the Governor of Illinois, and is being sued in his official capacity.

21.    Defendant City of Chicago is a city in the State of Illinois and a Sanctuary City.

22.    Defendant Brandon Johnson is the Mayor of Chicago, and is being sued in his official capacity.

23.    Defendant Larry Snelling is the Superintendent of the Chicago Police Department, and is being sued in his official capacity.

24.    Defendant Cook County is a county in the State of Illinois.

25.    Defendant Cook County Board of Commissioners is the governing board and legislative body of Cook County, and is responsible for the management of the affairs of Cook County.

26.    Defendant Toni Preckwinkle is President of the Cook County Board of Commissioners, and is being sued in her official capacity.

27.    Defendant Thomas J. Dart is the Sheriff of Cook County, and is being sued in his official capacity.

## FEDERAL IMMIGRATION LAW

28.    The Constitution affords Congress the power to "establish a uniform Rule of Naturalization," U.S. Const. art. I, § 8, cl. 4, and to "regulate Commerce with foreign Nations," U.S. Const. art. I, § 8, cl. 3, and affords the President of the United States the

authority to "take Care that the Laws be faithfully executed[.]" U.S. Const. art. II, § 3.

29. The Supremacy Clause of the Constitution mandates that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Thus, a state enactment is invalid if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941), or if it "discriminate[s] against the United States or those with whom it deals," *South Carolina v. Baker*, 485 U.S. 505, 523 (1988).

30. Based on its enumerated constitutional and sovereign powers to control and conduct relations with foreign nations, the Federal Government has broad authority to establish immigration laws, the execution of which States cannot obstruct or take discriminatory actions against. *See Arizona v. United States*, 567 U.S. 387, 394–95 (2012); *accord North Dakota v. United States*, 495 U.S. 423, 435 (1990) (plurality); *id.* at 444–47 (Scalia, J., concurring).

31. Congress has exercised its authority to make laws governing the entry, presence, status, and removal of aliens within the United States by enacting various provisions of the Immigration and Nationality Act (INA), 8 U.S.C. § 1101 *et seq*.

32. These laws confer upon the Executive Branch extensive authority to inspect, investigate, arrest, detain, and remove aliens who are suspected of being, or found to be, unlawfully in the United States. *See* 8 U.S.C. §§ 1182, 1225, 1226, 1227, 1228, 1231.

33. In effectuating these provisions, DHS may issue an "immigration detainer" that "serves to advise another law enforcement agency that [DHS] seeks custody of an alien presently

in the custody of that agency, for the purpose of arresting and removing the alien." 8 C.F.R. § 287.7(a); *see* 8 U.S.C. §§ 1103(a)(3), 1226(a), (c), 1231(a), 1357(d). An immigration "detainer is a request that such agency advise the Department, prior to release of the alien, in order for the Department to arrange to assume custody[.]" 8 C.F.R. § 287.7(a).

34. DHS also may request, but not require, that custody be extended by a period not to exceed 48 hours, "in order to permit assumption of custody by the Department." *Id.* § 287.7(d). And in some instances, DHS is statutorily required – upon request from local authorities – to consider whether to issue a detainer for an alien in local custody. *See* 8 U.S.C. § 1357(d) (addressing violations of laws regulating controlled substances). In other cases, DHS is required to issue a detainer for certain aliens, including any alien who is "charged with, is arrested for, is convicted of, admits having committed, or admits committing acts which constitute the essential elements of any burglary, theft, larceny, shoplifting, or assault of a law enforcement officer offense, or any crime that results in death or serious bodily injury to another person[.]" 8 U.S.C. § 1226(c).

35. On January 29, 2025, President Trump signed into law the Laken Riley Act, named for the nursing student killed by an alien who, after entering the United States illegally, committed additional crimes but was released before immigration authorities could intervene. *See* Laken Riley Act, S. 5, 119th Cong. (2025). The Laken Riley Act requires DHS to detain aliens who are unlawfully present in the United States and have been arrested for theft and other crimes. *Id.*

36. Congress has also codified basic principles of cooperation and comity between state and local authorities and the Federal Government. For example, federal law contemplates that

removable aliens in state custody who have been convicted of state or local offenses will generally serve their state or local criminal sentences before being subject to removal but will be taken into federal custody upon the expiration of their state prison terms. *See* 8 U.S.C. §§ 1226(c), 1231(a)(1)(B)(iii), (a)(4).

37. "Consultation between federal and state officials is an important feature of the immigration system." *Arizona*, 567 U.S. at 411. Congress has therefore directed that a federal, state, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, DHS "information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a); *see id.* § 1644 (same); *see also id.* § 1357(g)(10)(A) (providing for state and local "communicat[ion] with [DHS] regarding the immigration status of any individual, including reporting knowledge that a particular alien is not lawfully present in the United States"). Likewise, "no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from," among other things, "[m]aintaining" "information regarding the immigration status, lawful or unlawful, of any individual," or "[e]xchanging such information with any other Federal, State, or local government entity." *Id.* § 1373(b).

38. Congress also authorized states and localities "to cooperate with the [Secretary of DHS] in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States." *Id.* § 1357(g)(10)(B).

39. Congress further sought to affirmatively penalize efforts to obstruct immigration enforcement by, among other things, prohibiting the "conceal[ing], harbor[ing], or shield[ing] from detection, or attempts to" accomplish the same, of any "alien in any place,

1    including any building or any means of transportation." *Id.* § 1324(a)(1)(A)(iii).

2  40.    DHS, through ICE and CBP, performs a significant portion of its law enforcement

3         activities in Chicago and Cook County.  For example, since Fiscal Year 2024, ERO has

4         issued 1,470 detainers in Illinois, and made 400 at-large arrests in Illinois, with 329, or

5         roughly 82%, occurring in the Chicago area.  And CBP is responsible for enforcing the

6         immigration laws at international ports of entry, including apprehending attempted

7         entrants with criminal convictions or who are national security concerns.

### FACTUAL BACKGROUND

### Illinois's TRUST Act and Way Forward Act

41.    The Illinois TRUST Act was enacted in 2017 to prohibit state law enforcement officials

       from participating in federal civil immigration enforcement.  *See* TRUST Act, 5 Ill. Comp.

       Stat. 805/1 *et seq*. (2017). The TRUST Act was amended in 2021 by the Way Forward

       Act, to, among other things, prevent state and local law enforcement officials from

       entering into agreements to detain individuals for federal civil immigration violations.  *See*

       *id.* at 805/15(g).

42.    The Way Forward Act along with the TRUST Act limit cooperation with federal

       enforcement in numerous ways. For example, Section 15 of the TRUST Act prohibits "[a]

       law enforcement agency or law enforcement official" from "detain[ing] or continu[ing] to

       detain any individual solely on the basis of any immigration detainer or civil immigration

       warrant or otherwise comply with an immigration detainer or civil immigration warrant."

       *Id.* at 805/15(a).

43.    Under that section, unless presented with a federal criminal warrant, or otherwise required

       by federal law, state law enforcement officials may not "assist in any capacity with an

immigration agent's enforcement operations," *id.* at 805/15(h).  The prohibition extends to offering collateral assistance, including coordinating an arrest in a public facility; giving an immigration agent access, even by telephone, to an alien in state custody; transferring an alien to an immigration agent's custody; providing information in response to an immigration agent's inquiry or request; and providing information to an immigration agent regarding an alien's release date or contact information that is not otherwise publicly available. *See id.* at 805/15(h).

44.    In addition, "[a state] law enforcement agency or law enforcement official may not inquire about or investigate the citizenship or immigration status or place of birth of any individual in the agency or official's custody or who has otherwise been stopped or detained by the agency or official." *Id.* at 805/15(e).

45.    The TRUST Act purportedly does not prohibit "sending to, or receiving from, the United States Department of Homeland Security or other federal, State, or local government entity information regarding the citizenship or immigration status of any individual under Sections 1373 and 1644 of Title 8 of the United States Code," or "contacting another law enforcement agency for the purposes of clarifying or confirming the civil or criminal nature of notifications or other records" in certain databases. *Id.* at 805/5. And the Act permits "a [state] law enforcement agency or law enforcement official to request evidence of citizenship or immigration status pursuant to the Firearm Owners Identification Card Act, the Firearm Concealed Carry Act, Article 24 of the Criminal Code of 2012, or 18 United States Code Sections 921 through 931." *Id.* at 805/15(e).

46.    Finally, the TRUST Act does not preclude a state law enforcement official from cooperating with other federal agencies, including Homeland Security Investigations

(HSI), in investigating criminal violations "in order to ensure public safety." *See id.* at 805/15(i).

### Chicago's Restrictions on State and Local Cooperation with Federal Officials (Chicago Municipal Code ch. 2-173)

47.    In 2012, the Chicago City Council passed the "Welcoming City Ordinance," Chicago Code ch. 2-173, which sought to "clarify the communications and enforcement relationship between the City and the federal government," in addition to "establish[ing] the City's procedures concerning immigration status and enforcement of federal civil immigration laws." Chicago Mun. Code § 2-173-005.

48.    The Ordinance explicitly and intentionally limits local cooperation with federal immigration enforcement in various ways.   It provides that no city agent or agency shall "detain, or continue to detain a person based upon an immigration detainer" or "an administrative warrant, including, but not limited to, those entered into the Federal Bureau of Investigation's National Crime Information Center database, or successor or similar database maintained by the United States." *Id.* § 2-173-020(a)(1).  Moreover, no city agent shall permit ICE agents "access, including by telephone, to a person being detained by, or in the custody of, the [city] agency or agent," or "use of [city] agency facilities for investigative interviews or other investigative purpose." *Id.* § 2-173-020(a)(2).  Nor shall city agents "expend their time responding to ICE inquiries or communicating with ICE regarding a person's custody status, release date, or contact information." *Id.* § 2-173-020(a)(3).

49.    Section 2-173-030 provides that: "Unless required to do so by statute, federal regulation, court order, or a lawfully issued judicial warrant, no [city] agent or agency shall request, maintain, or share the citizenship or immigration status of any person unless such

disclosure has been authorized in writing by the individual to whom such information pertains, or if such individual is a minor or is otherwise not legally competent, by such individual's parent or guardian." *Id.* § 2-17-030(a)(1).

50. These provisions used to contain a limited exception when the subject of the investigation: (1) had an outstanding criminal warrant, (2) had been convicted of a felony, (3) was a defendant in a criminal case with a pending felony charge, or (4) was a known gang member, but those exceptions were repealed in 2021. *See id.* 2-173-042(c) (repealed).

51. Upon information and belief, Chicago law enforcement officials have been chilled by these prohibitions.

52. Upon information and belief, Chicago law enforcement officials are also confused by the restrictions on them and thus do not provide even the permissible cooperation out of fear of punishment.

**Cook County's Restrictions on State and Local Cooperation with Federal Officials
(Cook County Code § 46-37)**

53. In 2011, the Cook County Board of Commissioners approved and adopted Ordinance 11-O-73, "Policy for Responding to ICE Detainers," which added Section 46-37 to the Cook County Code. The policy purports to establish the "proper boundaries of the relationship between local law enforcement and" ICE. Ordinance 11-O-73, pmbl.

54. The Cook County Ordinance limits local cooperation with federal immigration enforcement in numerous ways. It mandates that the county Sheriff "shall decline all ICE detainer requests unless there is a written agreement with the federal government by which all costs incurred by Cook County in responding to the detainer shall be reimbursed" and that "there shall be no expenditure of any County resources or effort by on-duty County personnel for [the] purpose" of cooperating with ICE detainers. Cook County Code, § 46-

37(a), (c). Section 46-37(b) of the County Code provides that "ICE agents shall not be given access to individuals . . . , and County personnel shall not expend their time responding to ICE inquiries or communicating with ICE regarding individuals' incarceration status or release dates while on duty."

55. These provisions contain limited exceptions. County personnel may only provide ICE access to individuals in County custody or share information concerning an individual's incarceration status or release date if "ICE agents have a criminal warrant, or County officials have a legitimate law enforcement purpose that is not related to the enforcement of immigration laws." *Id.* § 46-37(b).

56. The Federal Government, through ICE, has offered to reimburse certain costs incurred by Cook County as a result of honoring ICE detainers. Cook County rejected that offer.

57. Upon information and belief, since April 1, 2024, there have been numerous instances where Cook County law enforcement officers failed to honor a federal immigration detainer request concerning an alien who was subsequently criminally charged following the alien's release from jail. Had the requested information sharing occurred in these instances, the commission of numerous crimes likely would have been averted.

58. Consequently, not only are Cook County employees effectively barred from requesting and sharing information regarding immigration status with ICE or other law enforcement agencies, but where ICE has issued an immigration detainer for an alien in local custody, the detainer is removed from the alien's permanent criminal file, and therefore does not follow the alien if he/she is transferred to long-term state incarceration.

59. Upon information and belief, Cook County does not impose these restrictions on other forms of information sharing or other law enforcement agencies. *See* Cook County

Ordinance 11-O-73.

60.     Upon information and belief, Cook County law enforcement officials have been chilled by these prohibitions.

61.     Upon information and belief, Cook County law enforcement officials are also confused by the county restrictions on them and thus do not provide even the permissible cooperation out of fear of punishment.

## THE CHALLENGED PROVISIONS' IMPACT ON FEDERAL IMMIGRATION ENFORCEMENT

62.     The combined effect of the challenged provisions of Illinois, Chicago, and Cook County laws, Ill. SB0667, 5 Ill. Comp. Stat. 805, Chicago Mun. Code §§ 2-173-020, 2-173-030 and Cook County Code § 46-37, facially and as applied, prohibits even the most basic cooperation with federal officials. Congress, in comity to States, permitted state and local jurisdictions to fully punish aliens for state criminal violations prior to removal.  *See* 8 U.S.C. § 1231(a)(4)(A) (providing that, subject to limited exceptions, federal agents "may not remove an alien who is sentenced to imprisonment until the alien is released from imprisonment").  But Congress crafted a statutory scheme that clearly envisioned the Federal Government being able to detain and remove those aliens, once their state proceedings and sentences concluded.

63.     Specifically, Congress specified that the removal period begins immediately upon release from state criminal custody, *id.* § 1231(a)(1)(B)(iii), and detention during that period is mandatory, *id.* § 1231(a)(2); *see also* 8 U.S.C. § 1226(c)(3), *id.* § 1357(d) (directing immigration officers to obtain a detainer to facilitate the transfer of criminal aliens from state to federal custody).  Congress granted this permission expecting that States would

then facilitate, or at the very least not obstruct, detention of criminal aliens by federal immigration authorities. If ICE lacks knowledge of criminal aliens' release dates from state custody, ICE cannot exercise its statutory responsibility of effecting an arrest upon the alien's release.

64. Furthermore, federal law contemplates that DHS will be able to inspect all applicants for admission, and take all appropriate action against those found to be inadmissible to the United States, even those transferred to state or local custody pending prosecution. *See id.* §§ 1182, 1225(b)(2); 8 C.F.R. § 235.2. And, to facilitate coordination between state and local officials and the Federal Government, Congress expressly prohibited any federal, state, or local government entity or official from prohibiting, or in any way restricting, any government entity or official from sending to, or receiving from, DHS "information regarding the citizenship or immigration status, lawful or unlawful, of any individual," 8 U.S.C. § 1373(a), or from maintaining and exchanging such information with other law enforcement entities. *Id.* § 1373(b); *see also id.* § 1644.

65. The challenged Illinois, Chicago, and Cook County laws directly conflict with this scheme.

66. The Welcoming City Ordinance runs directly afoul of 8 U.S.C. § 1373 by forbidding city officers from "expend[ing] their time responding to ICE inquiries . . . regarding a person's custody status, release date, or contact information," Chicago Mun. Code § 2-173-020(a)(3), and further providing that such officers may not "request, maintain, or share the citizenship or immigration status of any person," *id.* § 2-173-030(a)(1). Nor can Chicago point to its purported savings clause to avoid that reality. The savings clause allows agents to undertake those activities "if required to do so by statute, federal

regulation, court order, or a lawfully issued judicial warrant," *id.* § 2-173-030(a), but rather than require States and local governments to share and maintain that information, federal law only prohibits restrictions on those activities. Chicago has therefore prohibited the activities that federal law expressly contemplates States will do.

67. Moreover, Chicago's failure to provide exceptions to its prohibition on cooperation with federal immigration agents conflicts with federal law governing what constitutes a predicate for inadmissibility or removability. *See id.* §§ 1182(a)(2), 1227(a)(2). Federal agents are required to detain illegal aliens who have committed certain offenses upon their release from state custody. Congress not only recently reaffirmed its commitment to this mandate, but augmented the authority of federal agents in this space by adding predicate offenses that trigger this detention requirement, *id.* §§ 1226(c), (c)(3), 1357(d); *see also* Laken Riley Act, S. 5, 119th Cong. (2025).

68. The restrictions on providing ICE access to removable aliens in their custody, *see* 5 Ill. Comp. Stat. 805/15(a), (h); Cook County Code § 46-37(b); Chicago Mun. Code § 2-173-020, also conflict with federal law, which establishes a system of civil administrative warrants as the basis for immigration arrest and removal, and does not require or contemplate use of a judicial warrant for civil immigration enforcement. *See* 8 U.S.C. §§ 1226(a), 1231(a).

69. Further, upon information and belief, because of the challenged laws, DHS lacks the ability to readily obtain from local law enforcement the release date of aliens whom DHS has reason to believe are removable from the United States, and DHS lacks access to such aliens to facilitate the transfer of custody, even where DHS presents a Congressionally authorized civil administrative warrant of arrest or removal, *see id.* §§ 1226(a), 1231(a),

or has transferred those aliens to local law enforcement in the first instance to permit their prosecution for a state crime.

70. By restricting basic information sharing and barring DHS access to aliens in state or local custody upon their release as provided by federal law (e.g., an administrative warrant), the challenged Illinois, Chicago, and Cook County laws require federal immigration officers either (1) to engage in difficult and dangerous efforts to re-arrest aliens who were previously in local custody, endangering immigration officers, the particular alien, and others who may be nearby, or (2) to determine that it is not appropriate to transfer an alien to local custody in the first place, in order to comply with their mission to enforce the immigration laws.

71. Illinois, Chicago, and Cook County have no lawful interest in assisting removable aliens' evasion of federal law enforcement.

72. Upon information and belief, neither Illinois, nor Chicago, nor Cook County permits its employees to place a detainer or administrative warrant in the alien's file or to enter its existence in government databases, such that if an alien is transferred to another law enforcement agency, that agency cannot act on the undisclosed detainer or administrative warrant or learn about and share that alien's immigration status with other law enforcement, including the Federal Government.

73. Illinois, Chicago, and Cook County single out the Federal Government for their disfavored treatment. *See* 5 Ill. Comp. Stat 805/15; Chicago Mun. Code § 2-173-020; Cook County Ordinance 11-O-73.

74. These provisions are an obstacle to the Federal Government's enforcement of the immigration laws and discriminate against federal immigration enforcement, as well as

(with respect to the information-sharing and maintenance restrictions) expressly violate 8 U.S.C. § 1373.

75.    In rejecting congressionally authorized means of enforcing federal immigration law, including detainers and administrative warrants, these provisions constitute unlawful direct regulation of the Federal Government.

## CLAIMS FOR RELIEF

## COUNT ONE – VIOLATION OF THE SUPREMACY CLAUSE (PREEMPTION)

76.    Plaintiff hereby incorporates paragraphs 1 through 75 of the Complaint as if fully stated herein.

77.    The challenged provisions of the TRUST Act, 5 Ill. Comp. Stat. 805/1 *et seq.* (2017), as amended by the Way Forward Act, SB0667 (2021); Cook County Ordinance 11-O-73, § 46-37 (2011); and Chicago Welcoming City Ordinance ch. 2-173 constitute and create obstacles to the enforcement of federal immigration law.

78.    The challenged provisions of those acts also undermine federal immigration law's protections for information sharing and are thus preempted under both express and conflict preemption principles. *E.g.*, 8 U.S.C. §§ 1373(a), 1644.

79.    Federal immigration law therefore preempts the challenged provisions of the TRUST Act, 5 Ill. Comp. Stat. 805/1 *et seq.* (2017), as amended by the Way Forward Act, SB0667 (2021); Cook County Ordinance 11-O-73, § 46-37 (2011); and Chicago Welcoming City Ordinance ch. 2-173.

80.    Accordingly, those provisions violate the Supremacy Clause, interfere with federal law, and create obstacles to the enforcement of federal immigration law both on their face and as applied to the Federal Government.

## COUNT TWO – VIOLATION OF THE SUPREMACY CLAUSE
### (UNLAWFUL DISCRIMINATION AGAINST THE FEDERAL GOVERNMENT)

81. Plaintiff hereby incorporates paragraphs 1 through 80 of the Complaint as if fully stated herein.

82. Defendants' enforcement of the challenged provisions of the TRUST Act, 5 Ill. Comp. Stat. 805/1 *et seq.* (2017), as amended by the Way Forward Act, SB0667 (2021); Cook County Ordinance 11-O-73, § 46-37 (2011); and Chicago Welcoming City Ordinance ch. 2-173 discriminates against the Federal Government.

83. The challenged provisions single out federal immigration officials, expressly and implicitly, for unfavorable and uncooperative treatment when other law enforcement officials are not so treated.

84. Accordingly, the challenged provisions of the TRUST Act, 5 Ill. Comp. Stat. 805/1 *et seq.* (2017), as amended by the Way Forward Act, SB0667 (2021); Cook County Ordinance 11-O-73, § 46-37 (2011); and Chicago Welcoming City Ordinance ch. 2-173 violate the Doctrine of Intergovernmental Immunity and therefore alternatively are invalid on that basis.

## COUNT THREE – VIOLATION OF THE SUPREMACY CLAUSE
### (UNLAWFUL REGULATION OF THE FEDERAL GOVERNMENT)

85. Plaintiff hereby incorporates paragraphs 1 through 84 of the Complaint as if fully stated herein.

86. Defendants' enforcement of the challenged provisions of the TRUST Act, 5 Ill. Comp. Stat. 805/1 *et seq.* (2017), as amended by the Way Forward Act, SB0667 (2021); Cook County Ordinance 11-O-73, § 46-37 (2011); and Chicago Welcoming City Ordinance ch. 2-173 effects direct regulation of the Federal Government.

87. By refusing to honor civil detainers and warrants expressly authorized by Congress, Defendants have unlawfully eliminated these means for federal immigrations officials to carry out their statutory functions.

88. Accordingly, the challenged provisions of the TRUST Act, 5 Ill. Comp. Stat. 805/1 *et seq.* (2017), as amended by the Way Forward Act, SB0667 (2021); Cook County Ordinance 11-O-73, § 46-37 (2011); and Chicago Welcoming City Ordinance ch. 2-173 effect regulation of the Federal Government and alternatively are invalid on that basis.

## PRAYER FOR RELIEF

WHEREFORE, the United States respectfully requests the following relief:

1. That this Court enter a judgment declaring that the challenged provisions of the TRUST Act, 5 Ill. Comp. Stat. 805/1 *et seq.* (2017), as amended by the Way Forward Act, SB0667 (2021); Cook County Ordinance 11-O-73, § 46-37 (2011); and Chicago Welcoming City Ordinance ch. 2-173 violate the Supremacy Clause and are therefore invalid;

2. That this Court enter a judgment declaring that the challenged provisions of the TRUST Act, 5 Ill. Comp. Stat. 805/1 *et seq.* (2017), as amended by the Way Forward Act, SB0667 (2021); Cook County Ordinance 11-O-73, § 46-37 (2011); and Chicago Welcoming City Ordinance ch. 2-173 violate 8 U.S.C. § 1373 and are therefore invalid;

3. That this Court issue preliminary and permanent injunctions that prohibit Defendants as well as their successors, agents, and employees, from enforcing the challenged provisions of the TRUST Act, 5 Ill. Comp. Stat. 805/1 *et seq.* (2017), as amended by the Way Forward Act, SB0667 (2021); Cook County Ordinance 11-O-73, § 46-37 (2011); and Chicago Welcoming City Ordinance ch. 2-173;

4. That this Court award the United States its costs and fees in this action; and

5. That this Court award any other relief it deems just and proper.

DATED: February 6, 2025

                                    BRETT A. SHUMATE
                                    Acting Assistant Attorney General
                                    Civil Division

                                    DREW C. ENSIGN
                                    Deputy Assistant Attorney General
                                    AUGUST FLENTJE
                                    Deputy Director
                                    EREZ REUVENI
                                    Assistant Director
                                    Office of Immigration Litigation

                                    ERIC HAMILTON
                                    Deputy Assistant Attorney General
                                    ALEXANDER K. HAAS
                                    Director
                                    JACQUELINE COLEMAN SNEAD
                                    Assistant Director
                                    ELISABETH J. NEYLAN
                                    Trial Attorney
                                    Federal Programs Branch

                                    *Attorneys for the United States*

# EXHIBIT 4;

BRETT A. SHUMATE
Acting Assistant Attorney General
Civil Division

DREW C. ENSIGN
Deputy Assistant Attorney General
AUGUST FLENTJE
Deputy Director
EREZ REUVENI
Assistant Director
Office of Immigration Litigation

ERIC HAMILTON
Deputy Assistant Attorney General
ALEXANDER K. HAAS
Director
JACQUELINE COLEMAN SNEAD
Assistant Director
CRISTEN C. HANDLEY
ELISABETH J. NEYLAN
Trial Attorneys
Federal Programs Branch

*Attorneys for the United States*

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF NEW YORK
**(Albany Division)**

| | |
|---|---|
| THE UNITED STATES OF AMERICA, | No. ___1:25-CV-0205 (AMN/MJK)___ |
| Plaintiff, | |
| v. | |
| STATE OF NEW YORK; KATHLEEN HOCHUL, Governor of New York, in her Official Capacity; LETITIA A. JAMES, Attorney General of New York, in her Official Capacity; MARK J.F. SCHROEDER, Commissioner of the New York State Department of Motor Vehicles, in his Official Capacity. | **COMPLAINT** |
| Defendants. | |

1

## INTRODUCTION

1.     The United States is currently facing a crisis of illegal immigration.  *See, e.g.*, Proclamation 10,866, *Declaring a National Emergency at the Southern Border of the United States*, 90 Fed. Reg. 8327 (Jan. 20, 2025).  And the Federal Government is set to put a stop to it. While States are welcome partners in that effort, it is their prerogative as separate sovereigns to refrain.  But a State's freedom to stand aside is not a freedom to stand in the way.  And where inaction crosses into obstruction, a State breaks the law.  The State of New York is doing just that. It must be stopped.

2.     In 2019, New York amended its Vehicle and Traffic Law to include a provision known as the "Green Light Law."  *See* N.Y. Veh. & Traf. § 201.12.  The Green Light Law generally bars the sharing of New York State Department of Motor Vehicles ("DMV") records or information (*e.g.*, addresses, vehicle registrations, identification photos) with federal immigration agencies. *See id.* § 201.12(a).  And it requires New York's DMV Commissioner to promptly tip off any illegal alien when a federal immigration agency has requested his or her information.  *See* § 201.12(b). As its supporters and sponsors made clear, the Green Light Law was passed to directly impair the enforcement of the federal immigration laws in New York.  And those lawmakers have achieved their objective.

3.     DMV information is critical to federal immigration agencies—in particular their ability to identify and remove those who are here illegally.  As important, DMV information is critical to keeping federal immigration officers safe.  From vehicle stops to border crossings to executing arrests and searches, immigration authorities depend on these records to assess real-time the situations they face and the people they encounter.  But New York's Green Light Law deprives

them of this insight; and in turn, unnecessarily forces brave law enforcement officers into dangerous and uncertain circumstances.

4.       For some, like Attorney General Letitia James, these are all the markings of a "well crafted"[1] law designed to ensure that "information of undocumented immigrants . . . will be protected" from federal immigration authorities.[2]  But the Constitution sees things differently. New York's Green Light Law violates the Supremacy Clause at every turn.

5.       Foremost, federal immigration law expressly preempts state and local laws that restrict sharing information with the Federal Government "regarding the immigration status . . . of any individual."  *See* 8 U.S.C. § 1373(a).  But that is *exactly* what the Green Light Law does.

6.       Moreover, under conflict preemption principles, a State cannot fashion "an obstacle to the accomplishment and execution of the full purposes and objectives" of the federal immigration laws.  *Arizona v. United States*, 567 U.S. 387, 399 (2012) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).  But again, that is the *entire point* behind the Green Light Law—impeding the Federal Government's ability to learn and share valuable information to remove illegal aliens.

7.       Further, well-established principles of intergovernmental immunity prohibit a State from directly regulating or discriminating against the Federal Government.  Yet here too, the Green Light Law does so *on its face*.  The Law directly regulates the Federal Government's own operations: Even in the narrow circumstances where one part of the Government is given access

---

[1] *See* Office of the New York State Attorney General, *Attorney General James' Statement on Green Light Bill* (June 17, 2019), https://ag.ny.gov/press-release/2019/attorney-general-james-statement-green-light-bill.
[2] *See* Spectrum News, *New York AG James Committed to Defending Green Light Bill* (Aug. 5, 2019), https://spectrumlocalnews.com/nys/central-ny/politics/2019/08/05/letitia-james-interview-green-light-bill.

to New York DMV material, it is still criminally barred from sharing it with federal immigration components. Relatedly, the Law singles out federal immigration agencies for adverse treatment— the exact discrimination the Constitution forbids.

8. By intent and design, the Green Light Law is a frontal assault on the federal immigration laws, and the federal authorities that administer them. More than that, the Law has had dangerous consequences—precisely because it has worked as intended. But federal law does not tolerate this sort of obstruction. Nor does the Constitution. New York's Green Light Law cannot stand.

## JURISDICTION AND VENUE

9. This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345.

10. Venue is proper in this jurisdiction under 28 U.S.C. § 1391(b), because at least one Defendant resides in this District and a substantial part of the acts or omissions giving rise to this action arose from events in this District.

11. This Court has authority to provide the relief requested under its inherent equitable powers, as well as the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202.

## PARTIES

12. Plaintiff is the United States of America. It regulates immigration under its statutory and constitutional authorities. It is responsible for enforcing the federal immigration laws through its agencies—including the Departments of Justice, State, Labor, and Homeland Security ("DHS"), along with DHS's component agencies, including U.S. Immigration and Customs Enforcement ("ICE") and U.S. Customs and Border Protection ("CBP").

13. Defendant New York is a State of the United States.

14. Defendant Kathleen Hochul is the Governor of New York.

4

15.     Defendant Letitia A. James is the Attorney General of New York.

16.     Defendant Mark J.F. Schroeder is the Commissioner of the New York State Department of Motor Vehicles.

17.     All individual Defendants are being sued only in their official capacities.

**CONSTITUTIONAL AND STATUTORY BACKGROUND**

18.     The Supremacy Clause of the United States Constitution provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. art. VI, cl. 2.

19.     "The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona*, 567 U.S. at 394.  This authority stems from "the National Government's constitutional power to 'establish an uniform Rule of Naturalization,' and its inherent power as sovereign to control and conduct relations with foreign nations." *Id.* (citations omitted).

20.     Accordingly, "Congress [has] the right, as it may see fit, to expel aliens of a particular class, or to permit them to remain," and "has undoubtedly the right . . . to take all proper means to carry out the system which it provides."  *Fong Yue Ting v. United States*, 149 U.S. 698, 714 (1893); *see, e.g.*, *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952) (the United States has the "exclusive[]" control over "any policy toward aliens").

21.     Exercising this function, the Federal Government has devised an "extensive and complex" statutory scheme for the "governance of immigration and alien status." *Arizona*, 567 U.S. at 395.  This scheme codifies the Executive's authority to inspect, investigate, arrest, detain, and remove aliens who are suspected of being, or are found to be, unlawfully in the United States. *E.g.*, 8 U.S.C. §§ 1182, 1225, 1226, 1227, 1228, 1231.

5

22.     Taken together, "Congress has specified which aliens may be removed from the United States and the procedures for doing so." *Arizona*, 567 U.S. at 396. Indeed, New York itself put it well: "The removal of undocumented immigrants is [an] exclusively federal function," and the Federal Government alone decides "not only *who* may be removed from the United States, but *how* such individuals should be identified, apprehended, and detained." *Amici Br. of New York et al.* at 3, *Arizona v. United States*, No. 11-182, 2012 WL 1054493 (U.S. Mar. 26, 2012).

23.     Nonetheless, "[c]onsultation between federal and state officials is an important feature of the immigration system." *Arizona*, 567 U.S. at 411. "Absent any cooperation at all from local officials," the immigration system—like other federal programs—"may fail or fall short of [its] goals[.]" *New York v. United States*, 179 F.3d 29, 35 (2d Cir. 1999).

24.     The immigration laws thus provide for basic principles of cooperation between state and local governments and the Federal Government. For instance, federal authorities must "make available" to state and local authorities "investigative resources . . . to determine whether individuals arrested by such authorities for aggravated felonies are aliens[.]" 8 U.S.C. § 1226(d)(1)(A). Likewise, federal officials must also "designate and train officers and employees . . . to serve as a liaison to" state and local officials "with respect to the arrest, conviction, and release of any alien charged with an aggravated felony[.]" *Id.* § 1226(d)(1)(B); *see id.* §§ 1226(c), 1231(a). And state and local officials may "cooperate with the [Federal Government] in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States." *Id.* § 1357(g)(10)(B).

25.     Naturally, information-sharing across (and within) governments is integral to this system functioning. Section 1373 thus requires federal officials to "respond to an inquiry" by state or local officials "seeking to verify or ascertain the citizenship or immigration status of any

individual within the[ir] jurisdiction." *Id.* § 1373(c); *see* 6 U.S.C. § 482(b) (requiring information-sharing among federal agencies). By the same token, state and local government officials "may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [federal immigration authorities] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a); *see id.* §§ 1373(b), 1644 (similar).

26. Critically, Congress passed the latter provision to fix a specific problem, after it observed "certain states and localities were restricting their officials' cooperation with federal immigration authorities." *New York v. U.S. Dep't of Justice*, 951 F.3d 84, 96 (2d Cir. 2020); *see New York*, 179 F.3d at 35. Thus, in enacting Section 1373, "Congress sought to give state and local officials the authority to communicate with [federal immigration authorities] regarding the presence, whereabouts, or activities of illegal aliens, notwithstanding any local laws to the contrary." *New York*, 951 F.3d at 97 (citations omitted).

27. In short, under federal immigration laws—and our system of government—state and local governments *do not have* "an untrammeled right to forbid all voluntary cooperation by [their] officials" with federal immigration authorities. *New York*, 179 F.3d at 35. Indeed, Congress has affirmatively outlawed any effort to "conceal, harbor, or shield from detection" any "alien in any place[.]" 8 U.S.C. § 1324(a)(1)(A)(iii).

## FACTUAL BACKGROUND

28. In 2019, New York added Section 201.12 to its Vehicle and Traffic Law (herein, its "Green Light Law"). It also created a system by which illegal aliens could obtain standard, not-for-federal purposes, non-commercial driver's licenses or permits.

29. As amended in 2020, the Green Light Law has three main provisions.

30.    *First*, the Green Light Law prohibits the Commissioner of the New York DMV—as well as his agents or employees—from sharing any DMV "records or information" with "any agency that primarily enforces immigration law or to any employee or agent of such agency," absent a federal court order or judicial warrant.  N.Y. Veh. & Traf. § 201.12(a).  The Law states that such agencies "shall include, but not be limited to" ICE and CBP, thereby leaving the determination of which other agencies "primarily enforce[] immigration law" wholly to the discretion of the DMV Commissioner.  *Id.* § 201.12(c).

31.    The DMV "records or information" covered by this provision include a person's "photo image, . . . social security number, telephone number, place of birth, country of origin, place of employment, school or educational institution attended, source of income, status as a recipient of public benefits, the customer identification number associated with a public utilities account, [and] medical information or disability information[.]"  *Id.* § 201.8.

32.    *Second*, the Green Light Law includes a tip-off provision, wherein the DMV Commissioner "shall"—within three days of receiving a request for "records or information from an agency that primarily enforces immigration law"—"notify the individual about whom such information was requested, informing such individual of the request and the identity of the agency that made such request."  *Id.* § 201.12(a).

33.    *Third*, the Green Light Law imposes strict limitations on those who have access to or receive "records or information" from the New York DMV.  *Id.* § 201.12(b).  One must "certify" to the Commissioner that he or she will not "use such records or information for civil immigration purposes" or "disclose such records or information to any agency that primarily enforces immigration law or to any employee or agent of any such agency" (unless there is a cooperative agreement that does not involve enforcement of immigration law).  *Id.*  The Law also requires that

"any person or entity certifying pursuant to this paragraph shall keep for a period of five years records of all uses and identifying each person or entity that primarily enforces immigration law that received department records or information from such certifying person or entity"—plus make those records available for inspection by the DMV Commissioner upon request.  *Id.*  Violations of these certification and record-keeping requirements are subject to a Class E felony penalty, with punishments of up to four years in prison and $5,000 in fines.  *Id.*; N.Y. Penal Code §§ 70.00(2)(e), 80.00(1)(a).

34.     The Green Light law contains narrow exceptions, allowing DMV records or information to be given to federal immigration agencies "as required for the commissioner to issue or renew a driver's license or learner's permit that meets federal standards for identification, as necessary for an individual seeking acceptance into a trusted traveler program, or to facilitate vehicle imports and/or exports[.]"  N.Y. Veh. & Traf. § 201.12(a).  But even where one of these exceptions applies, the Law's tip-off provision, and the provision prohibiting the use of such information for civil immigration purposes and the sharing of such information to another agency that primarily enforces immigration law, still apply.  For instance, if CBP were to receive New York DMV material in order to process an application under the trusted traveler program, CBP would nonetheless be restricted—again, on penalty of felony—from sharing that material with ICE because ICE works to primarily enforce immigration law.  *See id.* § 201.12(b).

35.     The sponsors and supporters of the Green Light Law were candid about its objective.  The Law was designed to "secure driving privileges" for "undocumented immigrants," while "protect[ing]" them from federal law enforcement.[3]  As Assembly Member Catalina Cruz

---

[3]  *See* New York State Senate, S1747B, 2019–2020 Regular Sess. (N.Y. 2019), https://www.nysenate.gov/legislation/bills/2019/S1747?intent=support.

9

put it: "We passed a strong, comprehensive bill that not only permits undocumented individuals in the state to obtain driver's licenses, but also protects their personal data from the federal government."[4]  Or in the words of its sponsor, Senator Luis Sepúlveda: The Law allows illegal aliens to "move freely" throughout New York "without fear" that federal law will be enforced against them.[5]

New York's Green Light to Illegal Immigration

36.    New York's Green Light Law has worked exactly as designed—it has materially impeded the Federal Government's ability to enforce the federal immigration laws.

37.    The Green Light Law keeps critical information from the Federal Government—like driver's license information, vehicle registration information, and photographs—which federal officers need to effectively perform mission-critical law enforcement operations.

38.    DMV information (e.g., one's home and work address) is relevant to the following sorts of immigration-status determinations: (1) whether an alien admitted in a particular nonimmigrant status (e.g., B-1 business visitor) has stayed in the United States beyond his or her authorized period of admission, evidenced an intent not to abandon his or her foreign residence, or otherwise violated the conditions of such admission (e.g., engaged in unauthorized employment), 8 U.S.C. § 1227(a)(1)(C); (2) whether the alien has been granted work authorization as a benefit attached to a particular status or form of relief, 8 C.F.R. 274a.12; (3) whether the alien has kept DHS informed of any change of address as required by 8 U.S.C. § 1305; and (4) whether an alien has accrued the necessary continuous presence to be eligible for removal relief, id. §§

---

[4] *See* New York Immigration Coalition, *All New Yorkers Will Have a Green Light to Drive Beginning December 16* (Dec. 9, 2019), https://www.nyic.org/2019/12/all-new-yorkers-will-have-a-green-light-to-drive-beginning-december-16/.
[5] *See* CNN, *New York Passes Bill to Allow Driver's Licenses for Undocumented Immigrants* (June 17, 2019), https://www.cnn.com/2019/06/17/us/new-york-green-light-bill/index.html.

1229b(a)(1), (a)(2), (b)(1)(A).  The Green Light Law works to impair federal immigration officials'

access to this information.

39.     The Green Light Law also impedes the Federal Government's ability to arrest and

remove illegal aliens, thereby threatening the safety of Americans, including those in New York.

For example, ICE's Enforcement and Removal Operations ("ERO") component is responsible for

arresting and removing certain illegal aliens.  In discharging these duties, ERO officers arrest tens

of thousands of illegal aliens who have been accused of, charged with, or convicted of committing

serious criminal offenses—such as homicide, sexual assault, kidnapping, robberies, and other

crimes.  And as with other law enforcement operations, being able to access DMV records—

whether as part of a traffic stop, surveillance operation, or in executing a warrant—is indispensable

for this work, because it is often one of the best sources of real-time information about a target or

his associates.  DMV data also are used to determine the whereabouts and presence of an

enforcement target in a particular state.  The Law shuts out, however, federal immigration

authorities from this oft-needed information, thereby compromising their ability to do their jobs

and to keep Americans safe.

40.     Moreover, the Green Light Law directly threatens the safety of federal immigration

officials themselves.  Namely, the Law prevents CBP and ICE officers (along with officers of any

other federal agency that the DMV Commissioner decides "primarily enforces immigration law")

from getting essential information real-time on individuals they are about to encounter.  For

instance, when CBP officers at land ports of entry in New York encounter an individual, the Law

restricts their visibility into that person's background, to determine whether safety concerns merit

further inspection or precautions.  Or when U.S. Border Patrol agents stop a New York-licensed

vehicle near the border, they lack access to information that could provide valuable insight into

11

whom they are stopping, and whether the car has been involved in illicit or suspicious activity. Or when an ICE ERO officer does the same—or runs a check on New York-licensed vehicles outside a residence or place of business, before executing a warrant—he or she too is no longer able to check the license plate to determine the vehicle's owner, which could reveal the owner has a criminal record or has been flagged as dangerous. In each scenario, the fundamental problem remains the same—New York's Green Light Law is putting at risk the lives of those on the front lines of federal immigration enforcement.

41.     Finally, the Green Light Law also impairs the Federal Government's broader law enforcement capacity. Because of the Law's certification requirement, the Federal Government is unable to share information across all its law enforcement agencies unimpeded. This poses a serious problem for deconfliction efforts among law enforcement agencies, who need to be able to freely communicate to ensure that one operation does not undercut another. The Government uses state DMV information daily to identify, locate, and arrest individuals as part of ongoing investigations into narcotics smuggling, child exploitation, human trafficking, trans-national gangs, national security, identity and benefit fraud, and much more. The difference between catching these criminals or letting them escape is often a matter of minutes—and depends on getting the right information into the right hands timely. Because of the Green Light Law, that crucial material may be shielded from the appropriate federal officers, putting their lives and safety and the public in harm's way. The Green Light Law must be enjoined to put an end to these senseless, unlawful risks.

12

## CLAIMS FOR RELIEF

## COUNT ONE – VIOLATION OF THE SUPREMACY CLAUSE
(PREEMPTION)

42.     Plaintiff hereby incorporates paragraph 1 through 41 of the Complaint as if fully stated herein.

43.     The Supremacy Clause of the United States Constitution provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. art. VI, cl. 2.

44.     New York's Green Light Law violates the Supremacy Clause because it is expressly preempted by Section 1373's requirement that States "not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [federal immigration officials] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373.

45.     New York DMV records show "information regarding" an alien's "citizenship or immigration status," because they bear on whether an alien is removable or has been ordered removed.  New York's Green Light Law illustrates *precisely* why Congress enacted Section 1373 in the first place—and thus falls within the heartland of what that provision preempts.  *See New York*, 951 F.3d at 96; *New York*, 179 F.3d at 35; *see also, e.g.*, H.R. Rep. No. 104-725, at 383 (1996) (Section 1373 ensures that state and local officials will be free to voluntarily "communicate with [federal authorities] regarding the presence, whereabouts, or activities of illegal aliens").

46.     New York's Green Light Law is also conflict preempted because it "stands as an obstacle to the accomplishment and execution" of the federal immigration laws.  *Arizona*, 567 U.S. at 406 (citation omitted).

13

47.     Establishing an "obstacle" to the enforcement of federal immigration law was the *entire point* of the Green Light Law.  And it accomplishes that end at every turn.  The Green Light Law frustrates the principles of cooperation underlying the immigration laws, barring state and local officials from sharing material with federal immigration officials—even when they wish to do so.  It further limits how the Federal Government can share material across (or even within) its own components, interfering with the information-sharing system in place among agencies for "homeland security information[.]"  *E.g.*, 6 U.S.C. § 482.

48.     The Green Light Law also creates an obstacle undermining general federal immigration enforcement efforts.  Its tip-off provision requires the New York DMV Commissioner to tell illegal aliens that their information has been requested by a federal immigration agency.  *Contra* 8 U.S.C. § 1324(a)(1)(A)(iii) (making it a crime to "attempt[]" to "shield from detection" any illegal alien).

49.     Accordingly, New York's Green Light Law violates the Supremacy Clause.

## COUNT TWO – VIOLATION OF THE SUPREMACY CLAUSE
## (UNLAWFUL REGULATION OF THE FEDERAL GOVERNMENT)

50.     Plaintiff hereby incorporates paragraphs 1 through 49 of the Complaint as if fully stated herein.

51.     New York's Green Light Law violates basic principles of intergovernmental immunity by unlawfully regulating the Federal Government.  Under the Supremacy Clause, "the activities of the Federal Government are free from regulation by any state."  *Mayo v. United States*, 319 U.S. 441, 445 (1943).

52.     The Green Light Law does just that.  The Law's restrictions on information sharing between and among Federal Government agencies, and its certification requirement, constitute unlawful direct regulation of the Federal Government.

14

53.     Accordingly, New York's Green Light Law violates the Intergovernmental Immunity Doctrine in violation of the Supremacy Clause.

## COUNT THREE – VIOLATION OF THE SUPREMACY CLAUSE
### (UNLAWFUL DISCRIMINATION AGAINST THE FEDERAL GOVERNMENT)

54.     Plaintiff hereby incorporates paragraphs 1 through 53 of the Complaint as if fully stated herein.

55.     New York's Green Light Law "singles out" federal immigration authorities, specifically ICE and CBP, for disfavored treatment—exactly what intergovernmental-immunity principles bar.  *See Dawson v. Steager*, 586 U.S. 171, 178 (2019).  The Law limits information-sharing *only* with "any agency that primarily enforces immigration law"—which definitionally is federal, given the United States' exclusive authority over immigration.  *See* N.Y. Veh. & Traf. § 201.12(a).

56.     Such discriminatory targeting of the Federal Government is unlawful.  *See, e.g.*, *United States v. Washington*, 596 U.S. 832, 839 (2022) (A "state law discriminates against the Federal Government . . . if it singles them out for less favorable treatment or if it regulates them unfavorably on some basis related to their governmental status.") (citations and alterations omitted).

57.     For this additional, separate reason, New York's Green Light Law violates the Intergovernmental Immunity Doctrine in violation of the Supremacy Clause.

## PRAYER FOR RELIEF

The United States respectfully requests the following relief:

A.      That this Court enter a judgment declaring that New York's Green Light Law violates the Supremacy Clause, and is therefore both unlawful and unenforceable;

15

B.      That this Court enter a permanent injunction barring Defendants—as well as any of

their successors, agents, or employees—from enforcing New York's Green Light Law;

C.      That this Court award the United States its fees and costs in this action; and

D.      That this Court award any other relief it deems just and proper.


DATED: February 12, 2025

                                    BRETT A. SHUMATE
                                    Acting Assistant Attorney General
                                    Civil Division

                                    DREW C. ENSIGN
                                    Deputy Assistant Attorney General
                                    AUGUST FLENTJE
                                    Deputy Director
                                    EREZ REUVENI
                                    Assistant Director
                                    Office of Immigration Litigation

                                    ERIC HAMILTON
                                    Deputy Assistant Attorney General
                                    ALEXANDER K. HAAS
                                    Director
                                    JACQUELINE COLEMAN SNEAD
                                    Assistant Director
                                    CRISTEN C. HANDLEY
                                    ELISABETH J. NEYLAN
                                    Trial Attorneys
                                    Federal Programs Branch

                                    *Attorneys for the United States*

# EXHIBIT 52

*The* WHITE HOUSE

**ARTICLES**

Sick Politicians Want Killers, Rapists Roaming Our Streets

The White House

February 25, 2025

President Donald J. Trump is removing illegal immigrant killers, rapists, and drug dealers from our streets and sending them back where they belong — but if politicians in so-called "sanctuary" locales had it their way, these vicious criminals would still be free to roam our streets.

**Here is a tiny sample of the illegal immigrant criminals arrested in "sanctuary" destinations under President Trump:**

- **In Saint Paul, Minnesota,** ICE has arrested a Sudanese national convicted of rape of a victim under 13, a Mexican national convicted of criminal sexual conduct against a victim under 14, and a Laotian national convicted of child endangerment and criminal sexual conduct against a victim under 13.
    - Minnesota Attorney General Keith Ellison underline warns law enforcement of "liability if they enforce immigration detainers" and underline says protecting communities from violent illegal immigrant criminals is "not our job."
    - Mayor Melvin Carter underline says targeting violent illegal immigrant criminals is "threaten[ing] our safe spaces" and underline calls it a "rapidly alarming situation."
    - Saint Paul City Council Vice President Hwa Jeong Kim underline reminds constituents that the police department "cannot and does not cooperate with ICE."

- **In Chicago, Illinois,** ICE has arrested a Mexican national convicted of drunk driving resulting in a death (who had an order of removal from 2006), a Mexican national convicted of possession of methamphetamine with intent to distribute (who had an order of removal from 2022), and a Mexican national convicted of negligent manslaughter.

- Rep. Delia Ramirez <u>decries</u> how "welcoming states and sanctuary cities that defend our neighbors" are a "target."
- Rep. Chuy García <u>says</u> "no one should live in fear" of an "immigration raid."
- Rep. Mike Quigley <u>advises</u> illegal immigrants "to become familiar with their rights."

- **In Washington State,** ICE has arrested a Salvadoran national convicted of sodomy/anal intercourse with a victim under 13.
  - Washington Attorney General Nick Brown <u>boasts</u> that "state or local law enforcement" will not be utilized "for immigration enforcement actions."

- **In Los Angeles, California,** immigration authorities arrested a Mexican national convicted of rape (who had an order of removal from 1996).
  - Mayor Karen Bass <u>says</u> "no one should live in fear due to their immigration status."

- **In New York City, New York,** immigration authorities arrested a Chinese national convicted of murder.
  - Rep. Alexandria Ocasio-Cortez <u>reminds</u> illegal immigrants to "protect" themselves: "<u>Do not open your door</u>."

NEWS

ADMINISTRATION

ISSUES

CONTACT

VISIT



THE WHITE HOUSE

1600 Pennsylvania Ave NW
Washington, DC 20500

WH.GOV

Copyright

Privacy

Style Guide

# EXHIBIT 53

# Trump's Deportation Plan Could Start Next Week in Chicago

Details of planned immigration raids are unclear, but they would be the opening step in the president-elect's goal of overseeing the largest deportation program in history.

 ▶ Listen to this article · 4:31 min  Learn more

 

**By Zolan Kanno-Youngs and Hamed Aleaziz**

Zolan Kanno-Youngs and Hamed Aleaziz have covered immigration politics and enforcement during both the Biden and Trump administrations. They reported from Washington.

Published Jan. 17, 2025   Updated Jan. 18, 2025

The incoming Trump administration has planned for "post-inauguration" immigration raids in Chicago next week, according to two people familiar with the planning and correspondence reviewed by The New York Times, an opening step in President-elect Donald J. Trump's goal to oversee the largest deportation operation in American history.

The plan, called "Operation Safeguard" by Immigration and Customs Enforcement, would start on Tuesday, the day after Mr. Trump is inaugurated, and last until the following Monday, according to the people familiar with it and the correspondence. The dates were still being finalized, however, and could change.

On Saturday, after the plan were reported by news media outlets including The New York Times, Tom Homan, Mr. Trump's border czar, said that the reports had increased "officer safety risks."

"Chicago's not off the table" after the reports, he said, but "no decision has been made yet."

The size of the planned operation was unclear. ICE routinely conducts deportations in cities throughout the United States. But the agency was taking additional steps to ramp up enforcement for the operation and tied it to Mr. Trump's inauguration in a message sent to personnel throughout the agency.

Hundreds of agents were asked to volunteer and participate in the "post-inauguration" operation targeting immigrants in the United States illegally. ICE is planning on sending

roughly 150 agents to Chicago for the raids.

For Mr. Trump, the optics of immigration agents sporting ballistic gear and arresting immigrants with uncertain or contested status in a Democratic-led city could be enough. The incoming administration is eager to find ways to send a message that it is cracking down on undocumented immigrants and punishing so-called sanctuary cities — communities like Chicago that refuse to hand over immigrants detained by the police to federal immigration authorities.

Don Terry, a spokesman for the Chicago police, said the department would not "intervene or interfere with any other government agencies performing their duties," but said that it "does not document immigration status" and, following municipal code, "will not share information with federal immigration authorities."

The planned raids were first reported by The Wall Street Journal.

Mr. Homan has said the public should expect immigration action in the early days of the Trump presidency that creates "shock and awe."

Mr. Trump has promised to carry out mass deportations that would target millions of unauthorized immigrants in the United States. Mr. Homan has said the administration will not hesitate to deport parents who are in the country illegally but have U.S.-born children.

Mr. Trump's team also plans to reassign other federal agents and deputize local police officers and members of the National Guard voluntarily contributed by Republican-run states to help with the deportation efforts.

Mr. Homan has tried to draw attention to the so-called sanctuary cities. In November, he suggested that he would ramp up the number of federal immigration officers in those areas.

"New York City, Chicago, San Francisco, Los Angeles, the major cities in this country are still sanctuary cities," Mr. Homan said then, adding, "If they're not going to help us, then we'll just double the manpower in those cities."

But plans to deport millions of undocumented immigrants are still likely to face enormous financial and logistical hurdles. In recent weeks, Mr. Trump and his immigration officials have said their immigration operation would first target those with a criminal record.

Mr. Trump often threatened nationwide deportation raids when he was last in the White House, shocking many of his ICE officials. He achieved mixed results.

In 2019, Mr. Trump promoted a blitz-like effort to target roughly 2,000 migrants who were in the United States illegally as a show of force against migration. Just 35 people were detained in the operation.

In 2019, ICE removed more than 267,000 people — the highest annual total during the Trump administration. That pales in comparison to the high mark that occurred under President Barack Obama, who deported more than 400,000 people in one year.

Julie Bosman contributed reporting.

**Zolan Kanno-Youngs** is a White House correspondent, covering President Biden and his administration. More about Zolan Kanno-Youngs

**Hamed Aleaziz** covers the Department of Homeland Security and immigration policy. More about Hamed Aleaziz

# EXHIBIT 54

An official website of the United States government  Here's how you know

 U.S. Small Business Administration



Home    Article search    Administrator Loeffler Announces SBA Reforms to Put America…

**NEWS RELEASE 25-33**

# Administrator Loeffler Announces SBA Reforms to Put American Citizens First

SBA will require citizenship verification for loan applications, relocate regional offices out of sanctuary cities

Published on March 6, 2025

—

**WASHINGTON** — Today, U.S. Small Business Administration Administrator Kelly Loeffler

announced a series of reforms to put American citizens first by ending taxpayer benefits for illegal aliens and moving SBA offices out of sanctuary cities. These actions support President Trump's agenda to secure our borders – which has already resulted in the lowest rates 🗗 of illegal border crossings in history.

In the coming days, the SBA will promulgate a new policy requiring SBA loan applications to include a citizenship verification provision to ensure only legal, eligible applicants can access SBA programs. Lenders will be required to confirm that applicant businesses are not owned in whole or in part by an illegal alien, consistent with President Trump's executive order 🗗 ending the taxpayer subsidization of open borders.

Additionally, the SBA will relocate six of its regional offices currently in municipalities that do not comply with U.S. Immigration and Customs Enforcement. Over the coming months, the Atlanta, Boston, Chicago, Denver, New York City, and Seattle regional offices will be moved to less costly, more accessible locations that better serve the small business community and comply with federal immigration law.

"Over the last four years, the record invasion of illegal aliens has jeopardized both the lives of American citizens and the livelihoods of American small business owners, who have each become victims of Joe Biden's migrant crime spree. Under President Trump, the SBA is committed to putting American citizens first again – starting by ensuring that zero taxpayer dollars go to fund illegal aliens," **Administrator Loeffler said.**

"Today, I am pleased to announce that this agency will cut off access to loans for illegal aliens and relocate our regional offices out of sanctuary cities that reward criminal behavior. We will return our focus to empowering legal, eligible business owners across the United States – in partnership with the municipalities who share this Administration's commitment to secure borders and safe communities."

Under the last Administration, lax guardrails allowed illegal aliens to both apply for and get approved for SBA assistance. In June 2024, the agency approved a $783,000 loan application for a small business that was 49% owned by an illegal alien. Last month, under the leadership of this Administration, an internal SBA audit identified the illegal status of the individual and halted the loan from being disbursed – ensuring that $0 was distributed to the business.

# # #

**About the U.S. Small Business Administration**

The U.S. Small Business Administration helps power the American dream of entrepreneurship. As the leading voice for small businesses within the federal government, the SBA empowers job creators with the resources and support they need to start, grow, and expand their businesses or recover from a declared disaster. It delivers services through an extensive network of SBA field offices and partnerships with public and private organizations. To learn more, visit www.sba.gov.

# Media contacts

**U.S. Small Business Administration**
✉ Press_Office@sba.gov ✉

Return to top

**About SBA**

Contact SBA

Locations

Upcoming events

Newsroom

SBA blog

Leadership team

**Open government**

Freedom of Information Act

**About the site**

Site map

Privacy policy

Linking policy

Plain language

Accessibility

Disclaimers

**Oversight**

Inspector General

## Sign up

Receive information about upcoming SBA events, news alerts, and program updates.

**\*** *indicates a required field*

Email **\***

ZIP Code **\***

[No Fear Act](#)

[Open data sources](#)

[Policies and guidance](#)

[Budget and performance](#)

[Regulations.gov](#) ⮺

[Advocacy](#)

[Hearings and appeals](#)

[Ombudsman](#)

[Fraud and identity theft](#)

[WhiteHouse.gov](#) ⮺

[USA.gov](#) ⮺

**Subscribe to
SBA emails**

Your information will only be used in accordance with our [website privacy policy](#).



**U.S. Small Business Administration**
409 3rd St., SW
Washington, DC 20416
[800-827-5722](#) ☏

    

# EXHIBIT 33

## Presidential Documents

Executive Order 14218 of February 19, 2025

### Ending Taxpayer Subsidization of Open Borders

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

Section 1. *Purpose*. The plain text of Federal law, including the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (Public Law 104–193) (PRWORA), generally prohibits illegal aliens from obtaining most taxpayer-funded benefits. Title IV of the PRWORA states that it is national policy that ''aliens within the Nation's borders not depend on public resources to meet their needs,'' and that ''[i]t is a compelling government interest to remove the incentive for illegal immigration provided by the availability of public benefits.'' But in the decades since the passage of the PRWORA, numerous administrations have acted to undermine the principles and limitations directed by the Congress through that law. Over the last 4 years, in particular, the prior administration repeatedly undercut the goals of that law, resulting in the improper expenditure of significant taxpayer resources. My Administration will uphold the rule of law, defend against the waste of hard-earned taxpayer resources, and protect benefits for American citizens in need, including individuals with disabilities and veterans.

Sec. 2. *Preserving Federal Public Benefits*. (a) To prevent taxpayer resources from acting as a magnet and fueling illegal immigration to the United States, and to ensure, to the maximum extent permitted by law, that no taxpayer-funded benefits go to unqualified aliens, the head of each executive department or agency (agency) shall:

(i) identify all federally funded programs administered by the agency that currently permit illegal aliens to obtain any cash or non-cash public benefit, and, consistent with applicable law, take all appropriate actions to align such programs with the purposes of this order and the requirements of applicable Federal law, including the PRWORA;

(ii) ensure, consistent with applicable law, that Federal payments to States and localities do not, by design or effect, facilitate the subsidization or promotion of illegal immigration, or abet so-called ''sanctuary'' policies that seek to shield illegal aliens from deportation; and

(iii) enhance eligibility verification systems, to the maximum extent possible, to ensure that taxpayer-funded benefits exclude any ineligible alien who entered the United States illegally or is otherwise unlawfully present in the United States.

(b) Within 30 days of the date of this order, the Director of the Office of Management and Budget and the Administrator of the United States DOGE Service, in coordination with the Assistant to the President for Domestic Policy, shall further:

(i) identify all other sources of Federal funding for illegal aliens; and

(ii) recommend additional agency actions to align Federal spending with the purposes of this order, and, where relevant, enhance eligibility verification systems.

(c) Agencies shall refer any improper receipt or use of Federal benefits to the Department of Justice and the Department of Homeland Security for appropriate action.

**Sec. 3**. *General Provisions*. (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*February 19, 2025.*

[FR Doc. 2025–03137
Filed 2–24–25; 8:45 am]
Billing code 3395–F4–P