DAVID CHIU, SBN 189542
City Attorney
YVONNE R. MERÉ, SBN 175394
Chief Deputy City Attorney
MOLLIE M. LEE, SBN 251404
Chief of Strategic Advocacy
SARA J. EISENBERG, SBN 269303
Chief of Complex and Affirmative Litigation
NANCY E. HARRIS, SBN 197042
KARUN A. TILAK, SBN 323939
Deputy City Attorneys
Fox Plaza
1390 Market Street, 7th Floor
San Francisco, CA 94102-5402
Telephone: (415) 355-3308
Facsimile: (415) 437-4644
E-Mail: karun.tilak@sfcityatty.org

Attorneys for Plaintiff
CITY AND COUNTY OF SAN FRANCISCO

TONY LOPRESTI, SBN 289269
County Counsel
KAVITA NARAYAN, SBN 264191
Chief Assistant County Counsel
MEREDITH A. JOHNSON, SBN 291018
Lead Deputy County Counsel
STEFANIE L. WILSON, SBN 314899
RAJIV NARAYAN, SBN 334511
Deputy County Counsels
BILL NGUYEN, SBN 333671
Litigation Fellow
70 W. Hedding Street, East Wing, 9th Floor
San José, CA 95110
Telephone: (408) 299-5900
Facsimile: (408) 292-7240
E-Mail: tony.lopresti@cco.sccgov.org

Attorneys for Plaintiff
COUNTY OF SANTA CLARA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO, COUNTY OF SANTA CLARA, CITY OF PORTLAND, MARTIN LUTHER KING, JR. COUNTY, CITY OF NEW HAVEN, CITY OF OAKLAND, CITY OF EMERYVILLE, CITY OF SAN JOSÉ, CITY OF SAN DIEGO, CITY OF SACRAMENTO, CITY OF SANTA CRUZ, COUNTY OF MONTEREY, CITY OF SEATTLE, CITY OF MINNEAPOLIS, CITY OF ST. PAUL, CITY OF SANTA FE,<br><br>Plaintiffs,<br><br>vs.<br><br>DONALD J. TRUMP, President of the United States, UNITED STATES OF AMERICA, PAMELA BONDI, Attorney General of the United States, EMIL BOVE, Acting Deputy Attorney General, UNITED STATES DEPARTMENT OF JUSTICE, KRISTI NOEM, Secretary of United States Department of Homeland Security, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, DOES 1-100,<br><br>Defendants. | Case No. 3:25-cv-1350-WHO<br><br>**DECLARATION OF JUSTIN ELICKER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

# DECLARATION OF JUSTIN ELICKER

I, Justin Elicker, declare as follows:

1. I have personal knowledge of the facts set out in this affirmation and, if called as a witness, could testify competently to the matters set out below.

2. I am the Mayor of the City of New Haven, Connecticut. I have served in this position since January 1, 2020, and I supervise the City's Budget Director in developing the City's annual budget. In my tenure as Mayor, I have worked on the financial planning process for five budget cycles.

3. I signed New Haven's Welcoming City Executive Order, which generally limits the City's entanglement with federal civil immigration enforcement unless the City's assistance is required by law. The Executive Order is not only a statement of values shared by our residents but also a policy to foster better community relations and enhance public safety by facilitating trust between local law enforcement and the immigrant community.

4. I am familiar with Executive Order 14,159, dated January 20, 2025, and titled "Protecting the American People Against Invasion." I am also familiar with a United States Department of Justice memo issued by Attorney General Pamela Bondi, dated February 5, 2025, and titled "Sanctuary Jurisdiction Directives" ("Bondi Memo").

5. New Haven relies heavily on federal funding to deliver important public services to our residents.

6. If New Haven were to lose federal funding, I would need to recommend a financial mitigation plan to the City's legislative body.

7. New Haven has taken several steps in the annual budget planning process for fiscal year 2025–2026 ("FY25–FY26"). The annual budget expenditures are broken down into two categories: (i) the General Fund expenditures that largely are paid by locally collected taxes and state aid for municipalities, and (ii) the Special Fund expenditures that are paid by public or philanthropic grants.

8. As part of the usual planning process, the Budget Director instructed City departments to submit General and Special Fund expenditure and revenue estimates, which include, but are not limited to, personnel requests, program costs, and capital needs during October and November 2024.

9. On January 31, 2025, the City Assessor certified the Grand List for the municipality.

10. The Grand List establishes the value of personal and real property within the City. This then becomes the basis of New Haven's local revenue source from taxable property and a major source of General Fund expenditures.

11. As required by law, on March 1, 2025, I submitted a recommended budget and tax rate to the Board of Alders, New Haven's legislative body. My recommended budget and tax rate were based on the City's expenses for the next fiscal year and the rate of taxation needed to meet those expenses. My recommended budget and tax rate were based in part on the expectation of receiving previously awarded federal monies.

12. Between March and June, the Board of Alders holds several public hearings and department workshops on the proposed budget. The Board must approve a balanced budget by June 30, 2025.

13. New Haven's operating budget for the fiscal year beginning July 1, 2025, in the drafting process now, will be approximately $700 million. Approximately $496 million of the budget is legally obligated to specific purposes, leaving approximately $204 million to cover the essential operational needs of New Haven departments, including economic development, parks and recreation, youth programming, and cultural programs, among others.

14. New Haven is scheduled to receive approximately $30 million in federal funds in the fiscal year starting July 1, 2025.

15. New Haven currently has a rainy-day fund of $53,361,287, which remains below what the Government Finance Officers Association recommends for a municipal rainy-day fund approximating 16.7% of annual municipal revenue. The City's current cash flow is approximately $50 million per month.

16. If all federal funds were to be indefinitely frozen or eliminated, or if the City became ineligible for federal grants, and the City then had to cover the affected personnel and programs using

resources from the General Fund, New Haven would be left with less than two to three months of reserves. However, sustaining operations into a third month would be extremely difficult, placing the City in a challenging financial position and forcing significant and difficult choices of reallocating resources or significantly increasing taxes on homeowners. New Haven's property taxes are already well over state and national averages.

17. The uncertainty around continued federal grant funding is already complicating the budget-making process and creating substantial confusion for City departments and vendors.

18. The loss of all federal funding mid-year, after the budget is created, would be devastating to New Haven, likely requiring mid-year cuts to police, fire, education, and medical responses that would decrease or eliminate City services, with a detrimental effect on public health and safety.

19. The City would likely need to conduct a workforce reduction through the elimination of employees and cancelation of contracts with vendors that deliver vital services.

20. The City currently has 85 positions doing critical work funded by $6.5 million in federal grants for their salaries. To compensate for the loss of federal funds, the City would need to reallocate resources from other areas of the budget, increase local taxes, or seek alternative philanthropic funding sources—something very difficult to accomplish.

21. This reallocation of resources would strain the municipal budget and adversely affect other public services. For example, the City has been awarded a geothermal project at Union Station, a $9.5 million project aimed at sustainable energy solutions. These funds have been frozen and unfrozen twice since January 20, 2025. This disruption has caused staff to spend time trying to secure funding that could have been better spent advancing the progress of this project, which is subject to a strict timeline to take advantage of related tax credits. This issue highlights just one example of the City's dependence on federal funds for infrastructure improvements.

22. Other examples include a $2.1 million grant used to provide services for overdose prevention and harm reduction and $20 million in federal funding for New Haven and 20 partner organizations to advance a series of environmental initiatives designed to mitigate climate change, build resiliency, and reduce pollution in New Haven.

23. If all federal monies are frozen, denied, or eliminated, the City would likely need to consider cutting back services, or increasing the taxation rate, which would stress our residents who are already financially strapped by inflation and rising prices. Given that 56.8% of property within New Haven is tax exempt, homeowners would bear a significant burden in making up for lost grants. Further, increased taxes would adversely impact the rental housing market if landlords are forced to raise rents to meet the increased tax burden, making housing less affordable for City residents.

24. The loss of even *some* grants after submission of the budget or after adoption of the budget would force the City to choose between ending important public safety programs and paying for their continuation in the General Fund through a mix of increasing local taxes and position and program eliminations.

25. For example, New Haven's Office of Violence Prevention, with a mission to decrease firearm-related injuries and deaths, is funded with a $2 million DOJ grant.

26. Another $2 million in DOJ grant funds support the Elm City C.O.M.P.A.S.S. program, which funds crisis intervention services for individuals with mental illness or substance addiction problems. The mental health providers funded by this grant enhance the City's police officers' ability to respond effectively to calls for service where an individual may benefit from mental health care.

27. Given the current tax burden, should New Haven lose those funds, the City would undoubtedly need to cut some of these programs, making the New Haven community less safe.

28. In addition to significantly impacting existing grants, the loss of federal funds would have a grave impact on future public safety efforts. New Haven has relied heavily on federal funding over many years to implement important programs that keep our community safe. DOJ funds alone have been vital to our ability to provide critical support to a police department that already faces significant challenges.

29. Over the last few years, New Haven has been awarded more than $6 million in DOJ grants. These funds support critical public safety needs, including various violence prevention programs, improved training and equipment for police officers, mental health professionals to work with police officers in crisis response, purchase and installation of public safety technology and safety gear for police protection, and other public safety–related initiatives.

30. Should New Haven not have the ability to apply for and receive federal grants such as these in the future, the City would be severely limited in its ability to support our police department with our many technological, staffing, and other related public safety needs. This loss of support would make our law enforcement responses less effective and our community less safe.

31. In conclusion, these federal grant funds are necessary for New Haven to continue vital services to all our residents.

I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed on March 12, 2025, in New Haven, CT.

_____
Justin Elicker