DAVID CHIU, SBN 189542
City Attorney
YVONNE R. MERÉ, SBN 175394
Chief Deputy City Attorney
MOLLIE M. LEE, SBN 251404
Chief of Strategic Advocacy
SARA J. EISENBERG, SBN 269303
Chief of Complex and Affirmative Litigation
NANCY E. HARRIS, SBN 197042
KARUN A. TILAK, SBN 323939
Deputy City Attorneys
Fox Plaza
1390 Market Street, 7th Floor
San Francisco, CA  94102-5402
Telephone:    (415) 355-3308
Facsimile:    (415) 437-4644
E-Mail:       karun.tilak@sfcityatty.org

Attorneys for Plaintiff
CITY AND COUNTY OF SAN FRANCISCO

TONY LOPRESTI, SBN 289269
County Counsel
KAVITA NARAYAN, SBN 264191
Chief Assistant County Counsel
MEREDITH A. JOHNSON, SBN 291018
Lead Deputy County Counsel
STEFANIE L. WILSON, SBN 314899
RAJIV NARAYAN, SBN 334511
Deputy County Counsels
BILL NGUYEN, SBN 333671
Litigation Fellow
70 W. Hedding Street, East Wing, 9th Floor
San José, CA 95110
Telephone:    (408) 299-5900
Facsimile:    (408) 292-7240
E-Mail:       tony.lopresti@cco.sccgov.org

Attorneys for Plaintiff
COUNTY OF SANTA CLARA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO, COUNTY OF SANTA CLARA, CITY OF PORTLAND, MARTIN LUTHER KING, JR. COUNTY, CITY OF NEW HAVEN, CITY OF OAKLAND, CITY OF EMERYVILLE, CITY OF SAN JOSÉ, CITY OF SAN DIEGO, CITY OF SACRAMENTO, CITY OF SANTA CRUZ, COUNTY OF MONTEREY, CITY OF SEATTLE, CITY OF MINNEAPOLIS, CITY OF ST. PAUL, CITY OF SANTA FE, <br><br> Plaintiffs, <br><br> vs. <br><br> DONALD J. TRUMP, President of the United States, UNITED STATES OF AMERICA, PAMELA BONDI, Attorney General of the United States, EMIL BOVE, Acting Deputy Attorney General, UNITED STATES DEPARTMENT OF JUSTICE, KRISTI NOEM, Secretary of United States Department of Homeland Security, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, DOES 1-100, <br><br> Defendants. | Case No. 3:25-cv-1350-WHO <br><br> **DECLARATION OF SOPHIA KITTLER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

I, Sophia Kittler, declare as follows:

1.  I am a resident of the State of California. I have personal knowledge of the facts set forth in this declaration and, if called as a witness, could and would testify competently to the matters set forth below.

2.  I am the Mayor's Budget Director for the City and County of San Francisco. Among many policy and budgetary responsibilities, my main charge is developing and submitting the City's balanced budget each June.

3.  I have worked in the San Francisco Mayor's Office for the last six years as a Policy Advisor, Liaison to the Board of Supervisors, Director of the Mayor's Office of Innovation and, most recently, the Budget Director. Prior to that, I worked two years for the San Francisco Board of Supervisors, including staffing the Chair of the Board's Budget & Appropriations Committee.

4.  I am familiar with Executive Order 14,159, dated January 20, 2025, and titled "Protecting the American People Against Invasion" ("EO 14,159""). The Executive Order requires the Attorney General and DHS Secretary to withhold all "Federal funds" from sanctuary jurisdictions "to the maximum extent permissible by law." The EO 14,159 defines sanctuary jurisdictions as those "seek[ing] to interfere with the lawful exercise of Federal law enforcement operations" in the Administration's view. It is my understanding that the new federal administration considers San Francisco to be a "sanctuary jurisdiction."

5.  I have also reviewed and am familiar with a memorandum issued by U.S. Attorney General Pamela J. Bondi on February 5, 2025 entitled "Sanctuary Jurisdiction Directives" (the "Bondi Memo"). Via the Bondi Memo the DOJ announced its own funding restriction to "ensure that, consistent with law, 'sanctuary jurisdictions' do not receive access to Federal funds from the Department." The Attorney General also proscribes that "[s]anctuary jurisdictions should not receive access to federal grants administered by the Department of Justice."

6.  I am also familiar with Executive Order 14,218, dated February 19, 2025, and titled "Ending Taxpayer Subsidization of Open Borders" ("EO 14,218" and together with EO 14,159, the Executive Orders), which directs every federal agency to "ensure, consistent with applicable law, that

Federal payments to States and localities do not, by design or effect, . . . abet so-called 'sanctuary' policies that seek to shield illegal aliens from deportation."

7. The Executive Orders and the Bondi Memo threaten San Francisco with the loss of federal funds. The threatened cuts are unrelated to immigration enforcement and counter to the goals of public safety stated in the Executive Orders, and they would have far reaching consequences in San Francisco. As the Mayor's Budget Director, I must decide how to handle this possible loss of funds in the budget for the fiscal year beginning on July 1, 2025.

### A.  San Francisco Relies on Federal Funding for Essential Public Services

8. San Francisco is home to about 865,000 residents and has a total daytime population of about 1,050,000. People who live in, work in or visit San Francisco rely on—in addition to other public services—law enforcement provided by the San Francisco Police Department and the San Francisco Sheriff; public infrastructure projects such as roads, bridges and public transit; and the availability of high-quality emergency care from San Francisco General Hospital. Residents also rely on public health programs such as Medi-Cal and public assistance programs like CalWORKS.

9. The State of California, including San Francisco, pays more to the Federal government in taxes than it receives in federal spending. In 2022, California residents and businesses paid a total of $692.2 billion in federal business and personal income, estate, gift, and excise taxes to the Internal Revenue Services and were the beneficiaries of $609.1 billion in federal expenditures (including COVID relief expenditures). California ranked 50th among states in the ratio of federal spending to collections.

10. As both a City and a County, San Francisco's budget and operational responsibilities are unique. The City's budget includes the costs of running a public health system, jail, public utility, international airport, port, and municipal transit system. It also includes the costs of serving as the state-mandated county public social services agency providing public benefits to low-income children, parents, single adults, seniors, and disabled adults.

11. San Francisco relies on federal funding to provide these essential services and build and maintain public infrastructure projects.

12. San Francisco budgets for a fiscal year that runs from July 1 to June 30. The current fiscal year began July 1, 2024, and will end June 30, 2025 ("Fiscal Year 2024-25"). The next fiscal year will run from July 1, 2025 to June 30, 2026 ("Fiscal Year 2025-26").

13. San Francisco's annual operating budget for Fiscal Year 2024-25 includes just under $2.5 billion in federal funds. This is approximately 16% of the total annual operating budget of $15.9 billion.

14. In addition to the federal funds allocated in the annual operating budget, San Francisco expects to receive an additional $1.2 billion in federal multi-year grants budgeted in prior years, largely for public infrastructure projects such as ground and air transportation investments, but also investments in programs to address homelessness and affordable housing.

15. San Francisco receives federal funds directly from the Federal government, as well as indirectly through the State of California and other pass-through entities. For Fiscal Year 2024-25, in addition the amounts above, San Francisco's budget includes approximately $175 million in safety net program funds passed through the State of California. If Defendants cut off federal funds to California, this could result in the loss of pass-through funds to San Francisco.

16. San Francisco receives most federal funds—for both grants and entitlement programs—as reimbursements. San Francisco is currently providing services and benefits that the Federal government has agreed to reimburse. San Francisco is also building major transit expansions and other public infrastructure projects, as well as running programs across a variety of San Francisco agencies, based on the Federal governments' commitment to pay for these projects and programs. The Executive Orders call into question whether the Federal government will in fact reimburse San Francisco for these funds.

17. The vast majority of federal funds in the annual operating budget support programs in San Francisco's Human Services Agency and Department of Public Health. These amounts fund entitlement and safety net programs such as Medicaid and Medicare, Temporary Assistance for Needy Families, Supplemental Nutrition Assistance Program, Foster Care, and various child welfare

programs. There is no connection between the purpose of the funds and federal immigration enforcement for all or almost all federal funds received by the City.

18. The programs, projects, and services described below are just a few examples of how San Francisco uses federal funds.

19. Rescissions of Federal funds could seriously impact the City's ability to deliver critical health services. For example, Zuckerberg San Francisco General Hospital ("ZSFGH") is a licensed general acute care hospital owned and operated by San Francisco's Department of Public Health ("DPH"). ZSFGH has 284 beds and provides a full complement of inpatient, outpatient, emergency, skilled nursing, diagnostic, mental health, and rehabilitation services for adults and children. ZSFGH is the largest safety net provider in San Francisco and is the designated trauma center for the 1.5 million residents of San Francisco and northern San Mateo County. In Fiscal Year 2024-25, ZSFGH expects to receive approximately $866 million in federal funding for Medi-Cal and Medicare patient services. This accounts for over half of the ZSFGH Fiscal Year 2024-25 budget of $1.2 billion. Virtually all of these funds are provided as reimbursements.

20. Laguna Honda Hospital provides a full range of skilled nursing services to adult residents of San Francisco who are disabled or chronically ill, including specialized care for those with wounds, head trauma, stroke, spinal cord and orthopedic injuries, HIV/AIDS, and dementia. In Fiscal Year 2024-25, Laguna Honda Hospital expects to receive approximately $288 million in federal funding for Medi-Cal and Medicare patient services, accounting for nearly 90% of its budget. Virtually all of these funds are provided as reimbursements.

21. DPH also provides direct services through its primary care clinics, HIV/AIDS health services, mental health and substance abuse treatment, housing and homelessness assistance, maternal and child healthcare, and jail health services. Additionally, the DPH Population Health Division addresses public health concerns, including consumer safety, health promotion, and disease prevention. DPH also monitors threats to public health.

22. Overall, in Fiscal Year 2024-25, DPH expects to receive approximately $1.5 billion in federal funding. This represents almost 47% of the Department's Fiscal Year 2024-25 budget.

23. DPH has approximately 7,200 full-time equivalent employees, and it funds hundreds of additional jobs through contracts to service providers. Loss of federal funds would threaten many of the thousands of jobs that depend on DPH funds, as well as the services that DPH provides.

24. The City's Human Services Agency ("HSA") provides critical services to San Francisco's most vulnerable residents. It works with over 250,000 residents each year to provide needed nutrition assistance, income support, and child welfare services, among other support services. Approximately one in four San Franciscans is a client of HSA. HSA also manages numerous programs that serve young children and their families, older adults, and individuals with disabilities. HSA relies on federal funding to provide these services.

25. For example, the In-Home Supportive Services ("IHSS") program enables about 30,000 low-income elderly, disabled, or blind San Franciscans to live safely in their own homes and communities. For some recipients, the IHSS program reduces acute health care and institutional long-term care costs that would otherwise be incurred by the state and federal governments through Medi-Cal. About 28,000 individuals work as independent providers for IHSS recipients. For Fiscal Year 2024-25, the County's IHSS program is budgeted to receive approximately $108 million in federal funds, accounting for nearly 30% of the program's budget. Virtually all of these funds are provided as reimbursements. This amount does not include the approximately $390 million of federal funds that the State of California pays directly to independent IHSS providers.

26. HSA also provides financial assistance and services to San Francisco's neediest residents, including children and families living in poverty. For example, through California Work Opportunity and Responsibility to Kids (CalWORKS), HSA provides financial assistance, family stabilization, case management, vocational counseling, job readiness assistance, behavioral health treatment, transportation, and other services designed to help parents of low-income families meet welfare-to-work requirements, secure and retain employment, and become self-sufficient. San Francisco's CalWORKS program is budgeted to receive approximately $94 million in federal funding in Fiscal Year 2024-25, accounting for over 60% of the County's CalWORKS and Welfare-to-Work Fiscal Year 2024-25 budget. Virtually all of these funds are provided as reimbursements.

27. HSA offers numerous other social services, including child welfare programs and services, early childhood care and education services, adult protective services and a County Veteran's Service Office that helps veterans and their families receive benefits to which they are entitled.

28. In Fiscal Year 2024-25, HSA expects to receive a total of approximately $429 million in federal funding. This represents approximately 35% of its Fiscal Year 2024-25 budget.

29. HSA directly employs nearly 2,400 employees. It also funds hundreds of additional jobs through contracts to service providers. Loss of federal funds would threaten many of these jobs, as well as the underlying services, that depend on HSA funds.

### B. The Impact of the Executive Orders and the Threat of Federal Funding Rescissions on San Francisco's Budget Process

#### 1. Budget Preparation Process and Timing

30. San Francisco began the seven-month process of adopting the annual budget for the fiscal year beginning on July 1, 2025, in December 2024. On December 3, 2024, the Mayor issued budget instructions to all San Francisco departments with detailed guidance on the preparation of departments' budget requests. These budget instructions were informed by the Proposed Five-Year Financial Plan, the final version of which was issued jointly by the Mayor's Budget Office, the Controller (San Francisco's chief financial officer), and the Budget & Legislative Analyst on December 18, 2024. Most San Francisco departments held public hearings on their budget proposals in January and February and submitted their budget requests for the coming fiscal year to the Controller by February 21. San Francisco law requires the Controller to submit a consolidated budget proposal to the Mayor by March 1, the Mayor to submit a balanced budget to the Board of Supervisors by June 1, and the Board of Supervisors to approve a balanced budget by August 1.

31. To meet the June 1 deadline, the Mayor must make fundamental budget decisions by mid-May, and input these decisions into San Francisco's budget software by late May. During the last week of May, the Controller's Office reconciles and confirms all financial calculations in the Mayor's proposed budget, while the Mayor's Budget Office finalizes the narrative publication that accompanies the proposed budget.

### 2. Impact on Budget Reserve Decisions

32. One of the fundamental budget decisions the Mayor must make by mid-May is whether to increase its budget reserve to account for the possible loss of federal and state funds in the coming fiscal year. Placing additional funds into reserve at the beginning of the fiscal year would harm the public by reducing the amount of money available in San Francisco's General Fund for core services like public safety or social safety net programs. Alternatively, San Francisco could budget based assuming the continued receipt of federal and state funds, knowing that cuts could come suddenly, outside of the budget process.

33. If unanticipated cuts come mid-year, the General Fund will take an even bigger hit at that time, as there will be less time to absorb the loss of funds. For example, a $1 billion cut that must be absorbed over six months would feel like a $2 billion cut spread out over 12 months. Additionally, sudden and unanticipated cuts create additional harm because there is no time to plan how to manage the loss of funds. Depending on the nature of the cuts, they would lead to immediate service cuts, layoffs, and/or cancellation of City contracts and associated penalties.

34. The final amount of the reserve set-aside will depend on the Mayor's assessment of the amount of funding at risk and the likelihood that federal or state funds will be cut. Money used to fund the reserve is money that will not be available for General Fund programs and services.

35. San Francisco's existing reserves are insufficient to cover the loss of all federal funds. San Francisco currently has contingency reserves of approximately $390 million, in a Rainy Day Fund and a Budget Stabilization Fund, which were created and funded in the economic expansion preceding the pandemic purpose of managing local tax revenue volatility created by economic conditions. These reserve levels, totaling just above 6% of general fund revenues, remain below levels recommended by the Government Finance Officers Association for local governments and the 10% target established by San Francisco law. There are restrictions on the use of these reserves, and even if entirely depleted, their levels would be inadequate to cover a shortfall in federal funds for even a single year. To fully absorb the loss of all federal funds for even a single year, San Francisco would also have to deplete these reserves, suspend capital projects needed to maintain the City's aging infrastructure, and make

drastic service cuts in order to maintain a balanced budget, as it is legally required to do. All of these actions would result in significant job losses and the abandonment of key safety net services.

36. A portion of the federal and state budget reserve will reflect the possible loss of federal funds that could result from the Executive Orders. Assuming the Executive Orders are still in place in mid-May, and there is no further clarity about the funds at risk, the Mayor must account for the possibility that some or all applications of the Executive Orders might be upheld, and set the reserve accordingly.

37. The reserve amount will be affected by direction from Defendants or the Court about the intended or permissible scope of the Executive Orders. A preliminary injunction enjoining Defendants from enforcing Section 17 of EO 14,159, the sanctuary provisions of EO 14,218 or the Bondi Memo would lead to a lower reserve and allow the City to have more money in its General Fund to fund critical programs and services.

38. A decision to set the reserve at a specified amount will have a real-world impact when the new fiscal year begins on July 1, 2025. Beginning on this date, funds allocated for the reserve will sit in the reserve instead of being available for General Fund services and programs. Once funds are placed in a federal and state budget reserve, they will remain there for the entire fiscal year unless they are needed to backfill federal or state funding cuts.

39. The Mayor must make a trade-off between putting money into a reserve and using it for other San Francisco priorities, some of which are currently unfunded. The strategy of putting funds into reserve will help San Francisco maintain budgeted operations if it loses a relatively small amount of federal funding. It will not, however, be adequate to compensate for the loss of significant federal funds.

**3. Fiscal Impact of Federal Funding Rescissions on San Francisco's Budget**

40. Like many local jurisdictions, San Francisco is confronting a serious fiscal crisis. San Francisco is currently facing an $840 million two-year deficit covering Fiscal Years 2025-26 and 2026-27.

41. The budget for the fiscal year beginning July 1, 2025, is anticipated to be approximately $16 billion, about $6.5 billion of which is in San Francisco's General Fund. Money in San Francisco's General Fund is used to support public services such as public health, human services, police and fire services, and public works. Approximately $2 billion of General Fund money is legally dedicated for specific purposes, leaving approximately $4.5 billion in discretionary funds. The remainder of the budget is comprised of self-supporting activities at San Francisco's enterprise departments, which focus on city-related business operations and include the Port, the Municipal Transportation Agency, the Airport, the Public Utilities Commission, and others. The use of funds in these operations is legally restricted and cannot be redirected to backfill a shortfall in the General Fund.

42. Not only will the Mayor be making numerous fundamental budget decisions to balance the projected deficit by June 1, 2025, he must also contend with how to address the possible loss of federal funds that could result from the Executive Orders. The Mayor must make trade-offs between using discretionary General Fund resources to backfill the loss of federal funding or using it for other San Francisco priorities.

43. Every dollar of federal funding lost or at risk puts more pressure on limited General Fund resources which are needed to support core functions of the City and balance the deficit. For example, San Francisco is currently 300 police officers short of its recommended staffing levels and additional funding is needed to hire new officers. The Department of Public Works needs $16.7 million to continue enhanced street cleaning efforts. The Department of Homelessness and Supportive Housing is contending with the sunsetting of $154 million of one-time funds for critical shelter and housing programs. Additionally, $20 million is needed to fund the replacement of an existing 74 bed adult homeless shelter.

44. While the City could delay or pause capital projects currently underway or scheduled to begin which rely on federal funding, the scale of the impacts to health and human services is staggering. If patients are not covered through Medi-Cal, the City's General Fund must pay for the cost of care. 3,700 low-income families currently receiving welfare-to work services including cash,

housing assistance, and childcare as part of the CalWORKS program would need alternative support. The more than 22,000 in home support service workers who care for seniors and adults with disabilities would need their wages paid from another source. The City would need to find alternative funding to support food for the more than 100,000 CalFresh recipients. It would cost an estimated $1.2 billion or 26% of the City's entire discretionary General Fund resources just to backfill the loss of federal funding associated with health and human services programs.

45. It would decimate San Francisco to lose all federal funds. Thousands of San Francisco's most vulnerable residents would lose access to meals, medical care and other lifesaving social safety net services. Required reductions in police, fire, and emergency medical response functions would impair core public safety services for those that work, visit, or live in the City. The City would have to lay off thousands of employees and cancel contracts that create thousands of additional jobs. Roads, public transportation, and other infrastructure necessary to support the City and region's economy would fall into disrepair, causing longer-term damage beyond San Francisco's borders. Seismic upgrades would be postponed, rendering San Francisco vulnerable during the next earthquake.

46. Even a mid-year loss of, for illustrative purposes, 10% of annual federal funds would have a significant negative impact on the safety of our City and residents. A cut of that magnitude would require the Mayor to make significant reductions to critical government services and spending. For example, mid-year cuts of this magnitude would likely require reductions in the number of first responders, including police officers, firefighters, paramedics, and 911 operators. Our Muni bus and train system would experience significant crowding and delays due to reductions in service and deferral of vehicle maintenance. The Bay Area's regional economy depends on a functioning Muni system, and service cuts would significantly hamper our economic growth. Furthermore, infrastructure safety would be compromised, as the City would be forced to consider cuts to road repaving, building inspection services, and fire safety programs. Furthermore, San Francisco would likely be forced to cut social service safety net programs such as senior meal programs, services for low-income children, violence prevention services and programs for domestic violence survivors.

1  I declare under penalty of perjury that the foregoing is true and correct and that this declaration
2  was executed on March 14, 2025 at San Francisco, California.

_____
SOPHIA KITTLER