DAVID CHIU, SBN 189542
City Attorney
YVONNE R. MERÉ, SBN 175394
Chief Deputy City Attorney
MOLLIE M. LEE, SBN 251404
Chief of Strategic Advocacy
SARA J. EISENBERG, SBN 269303
Chief of Complex and Affirmative Litigation
NANCY E. HARRIS, SBN 197042
KARUN A. TILAK, SBN 323939
Deputy City Attorneys
Fox Plaza
1390 Market Street, 7th Floor
San Francisco, CA  94102-5408
Telephone:     (415) 355-3308
Facsimile:      (415) 437-4644
E-Mail:         karun.tilak@sfcityatty.org

Attorneys for Plaintiff
CITY AND COUNTY OF SAN FRANCISCO

TONY LOPRESTI, SBN 289269
County Counsel
KAVITA NARAYAN, SBN 264191
Chief Assistant County Counsel
MEREDITH A. JOHNSON, SBN 291018
Lead Deputy County Counsel
STEFANIE L. WILSON, SBN 314899
RAJIV NARAYAN, SBN 334511
Deputy County Counsels
BILL NGUYEN, SBN 333671
Litigation Fellow
70 W. Hedding Street, East Wing, 9th Floor
San José, CA 95110
Telephone:     (408) 299-5900
Facsimile:      (408) 292-7240
E-Mail:         tony.lopresti@cco.sccgov.org

Attorneys for Plaintiff
COUNTY OF SANTA CLARA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO, COUNTY OF SANTA CLARA, CITY OF PORTLAND, MARTIN LUTHER KING, JR. COUNTY, CITY OF NEW HAVEN, CITY OF OAKLAND, CITY OF EMERYVILLE, CITY OF SAN JOSÉ, CITY OF SAN DIEGO, CITY OF SACRAMENTO, CITY OF SANTA CRUZ, COUNTY OF MONTEREY, CITY OF SEATTLE, CITY OF MINNEAPOLIS, CITY OF ST. PAUL, CITY OF SANTA FE, <br><br> Plaintiffs, <br><br> vs. <br><br> DONALD J. TRUMP, President of the United States, UNITED STATES OF AMERICA, PAMELA BONDI, Attorney General of the United States, EMIL BOVE, Acting Deputy Attorney General, UNITED STATES DEPARTMENT OF JUSTICE, KRISTI NOEM, Secretary of United States Department of Homeland Security, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, DOES 1-100, <br><br> Defendants. | Case No. 25-CV-01350-WHO <br><br> **DECLARATION OF SANTA CLARA COUNTY EXECUTIVE JAMES R. WILLIAMS IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |

Declaration of County Executive James R. Williams in
Support of Plaintiffs' Mot. for Prelim. Inj.
   1   
Case No. 25-CV-01350-WHO

I, JAMES R. WILLIAMS, declare and state the following:

1.      I make this declaration in support of Plaintiffs' motion for a preliminary injunction.  I have personal knowledge of all facts stated in this declaration, and if called to testify, I could and would testify to them competently under oath.

2.      I am the County Executive of the County of Santa Clara (the "County"), which is a political subdivision of the State of California and a governmental entity that serves the Santa Clara County geographic region.

3.      I have held the position of County Executive since July 2023.  I began my career with the County in 2010 as a Social Justice and Impact Litigation Fellow in the Office of the County Counsel, and subsequently served as a Deputy County Counsel.  In June 2012, I moved to the Office of the County Executive.  From 2013 to 2016, I served as a Deputy County Executive and oversaw several County departments and programs, including several components of the emergency response system (the Office of Emergency Management (then called the Office of Emergency Services), County 9-1-1 Communications, and the County's relationships with several fire districts); departments and offices responsible for County contracting (the Procurement Department and Office of Countywide Contracting Management); Redevelopment Dissolution; and the Bail and Release Work Group.  In 2016, the Board of Supervisors appointed me as the County Counsel, a position I held from August 2016 to July 2023.  As the County Counsel, I managed more than 200 staff and was the chief legal advisor to the Board of Supervisors and all County officials, agencies, and departments.  My position as the County Executive is also an appointment by the Board of Supervisors.

4.      As the County Executive, I am the chief administrative officer of the County and I am responsible for oversight of almost all County employees and the proper administration of the County's operations.  Under the County Charter, the County Executive is responsible for supervising and directing the preparation of the annual budget, which is submitted to the Board of Supervisors for final approval.  In addition to its fiscal importance, the annual budget is also the major annual policy document for the County.  The budget identifies priorities for the County and allocates projected resources and funding in order to implement those priorities.  Once the budget is approved by the

Board of Supervisors, it is the responsibility of the County Executive to ensure that those policies are implemented with the allocated resources.

5.      I am familiar with Executive Order 14159 ("EO 14159") of January 20, 2025, titled "Protecting the American People Against Invasion."  Section 17 of EO 14159 ("Sanctuary Jurisdictions") requires the Attorney General and Department of Homeland Security (DHS) Secretary to withhold all "Federal funds" from so-called sanctuary jurisdictions "to the maximum extent permissible by law."  90 Fed. Reg. at 8446.  EO 14159 further directs the Attorney General and DHS Secretary to evaluate and pursue "criminal or civil" legal action against any so-called sanctuary jurisdiction based on any practices deemed to "interfere with the enforcement of Federal law." *Id.*

6.      I am familiar with the memo that Defendant Attorney General Pamela Bondi issued on February 5, 2025, to all Department of Justice (DOJ) employees titled "Sanctuary Jurisdiction Directives" ("Bondi Memo").  The Bondi Memo pauses and threatens to terminate the disbursement of federal grants administered by the DOJ to so-called sanctuary jurisdictions.  The Bondi Memo also instructs DOJ staff to investigate and prosecute local jurisdictions that "impede lawful federal immigration operations" under 18 U.S.C. § 371 and 8 U.S.C. §§ 1324 and 1373, and directs the Sanctuary Cities Enforcement Working Group to bring legal actions challenging so-called sanctuary policies.

7.      I am also familiar with Executive Order 14218 ("EO 14218") of February 19, 2025, titled "Ending Taxpayer Subsidization of Open Borders."  90 Fed. Reg. 10581.  Section 2(a)(ii) of EO 14218 directs every federal agency to "ensure, consistent with applicable law, that Federal payments to States and localities do not, by design or effect, facilitate the subsidization or promotion of illegal immigration, or abet so-called 'sanctuary' policies that seek to shield illegal aliens from deportation." 90 Fed. Reg. at 10581.  The asserted purpose of this directive is to "prevent taxpayer resources from acting as a magnet and fueling illegal immigration to the United States" and to ensure that "no taxpayer-funded benefits go to unqualified aliens." *Id.*

### The County of Santa Clara

8.      The County is a charter county and a political subdivision of the State of California.  It is home to 1.9 million residents, making it the most populous county in Northern California and more

1  populous than 12 U.S. states.

2      9.    Santa Clara County is also one of the most diverse counties in the nation.  More than

3  40% of Santa Clara County residents are foreign-born, and more than 60% of children in Santa Clara

4  County have at least one foreign-born parent.  These percentages are the highest of any county in

5  California and among the highest of any county in the United States.

6      10.    Santa Clara County's foreign-born population exceeds 750,000 and includes people

7  holding a wide range of immigration statuses: naturalized citizens; lawful permanent residents;

8  refugees and asylees; people with a wide variety of lawful but temporary statuses, including students,

9  employees, and victims of human trafficking or other crimes who have assisted law enforcement and

10  hold T or U visas; and people without lawful immigration status.

11      11.    The County's mission is to plan for the needs of its dynamic community, provide

12  quality services, and promote a healthy, safe, and prosperous community for all.  Under law, the

13  County is responsible for administering the social safety net and providing services to meet the basic

14  needs of vulnerable residents.  The County is also responsible for public services that promote the

15  safety and welfare of the community overall, including public health, disaster response, and public

16  safety functions.

17      12.    The County employs approximately 25,970 people to carry out its essential safety net

18  and public service functions.  These employees include doctors, nurses, epidemiologists, and other

19  staff providing health services within the County's comprehensive public safety net health system;

20  social workers and eligibility workers who provide protective services and administer benefits within

21  the County's Social Services Agency; election workers; community outreach specialists; park rangers;

22  law enforcement officers; accountants; housing and community development specialists; and

23  numerous other workers who provide and support necessary public services for the Santa Clara

24  County community.

25  **The County's Policies Relating to Immigration Enforcement**

26      13.    I have deep experience with the County's policies concerning non-cooperation with

27  federal civil immigration enforcement (which are sometimes referred to as "sanctuary" policies,

28  although that is not a term used by the County).  I also oversaw the Office of the County Counsel's

prior successful litigation before this Court in 2017 challenging President Trump's previous attempt to withhold funding from so-called sanctuary jurisdictions under Executive Order 13768.

14.     For almost 15 years, the County has had policies in place that limit the use of County resources to assist with federal civil immigration enforcement.  The County's Board of Supervisors first adopted these policies after one of my predecessors as County Counsel, Miguel Márquez, exchanged significant correspondence with U.S. Immigration and Customs Enforcement (ICE) regarding ICE's requests at that time that localities like the County honor "civil detainer requests." Civil detainer requests asked localities to agree to hold incarcerated individuals in jail, beyond the time they would otherwise be released, to facilitate ICE's potential arrest and initiation of removal proceedings against those individuals.

15.     The County had concerns that honoring civil detainer requests would both violate the constitutional rights of incarcerated persons, creating major liability for the County, and impose significant monetary costs on the County's jail operations.  Mr. Márquez raised these concerns in correspondence to ICE in late 2010.  In response, ICE stated in a letter that it would not reimburse incarceration costs incurred by localities that held individuals on ICE civil detainer requests, except if it chose to enter into a written agreement with the locality, and that ICE would "not indemnify localities for any liability incurred" as a result of honoring civil detainer requests.  A true and correct copy of ICE's correspondence is attached hereto as Exhibit A.

16.     Mr. Márquez informed ICE that the County would not be honoring civil detainer requests.  A true and correct copy of Mr. Márquez's October 13, 2010 letter to ICE is attached hereto as Exhibit B.

17.     Thereafter, on October 18, 2011, the County's Board of Supervisors adopted Board Policy 3.54 on Civil Detainer Requests with the express legislative purpose of "limit[ing] County resources spent on the enforcement of civil immigration law."  A true and correct copy of the 2011 version of Board Policy 3.54 is attached hereto as Exhibit C.  As adopted in 2011, Board Policy 3.54 permitted County staff to honor ICE civil detainer requests under certain limited circumstances, and only if ICE agreed to reimburse the County for the full costs associated with doing so.  In practice,

1    because ICE never agreed to reimburse the County, to my knowledge the County has not honored a

2    civil detainer request since Board Policy 3.54 was adopted in 2011.

3        18.    The Board of Supervisors amended Board Policy 3.54 eight years later, on June 4,

4    2019.  By this point, the State of California had adopted statewide legislation prohibiting any state or

5    local agency in California from honoring an ICE civil detainer request.  Although California law

6    allowed localities to engage in certain other forms of cooperation with federal civil immigration

7    enforcement, the law recognized that localities could opt to impose greater limitations in their own

8    local laws and policies.

9        19.    As amended in 2019, Board Policy 3.54 now flatly prohibits honoring civil detainer

10   requests, stating, "Consistent with longstanding County policy, the California Values Act (Gov. Code,

11   §§ 7284-7284.12), and the Fourth Amendment to the United States Constitution, the County does not,

12   under any circumstances, honor civil detainer requests from ICE by holding inmates on ICE's behalf

13   for additional time after they would otherwise be released from County custody."  The policy also

14   provides that the County Sheriff may opt to facilitate transfers of incarcerated individuals to ICE

15   custody *only* if ICE presents a signed judicial warrant or court order; and it prohibits County staff from

16   using local resources or local facilities to support civil immigration enforcement activities, including

17   by "communicating with ICE regarding individuals' incarceration status or release dates."  Board

18   Policy 3.54, by its express terms, does not in any way hamper the County's cooperation with other law

19   enforcement agencies (including federal DHS law enforcement agencies) in any *criminal* law

20   enforcement activities.  A true and correct copy of the current (2019) version of Board Policy 3.54 is

21   attached hereto as Exhibit D.

22       20.    I strongly support the County's non-cooperation policies.  Based on more than a decade

23   of experience in high-level legal and administrative leadership roles in the County, including many

24   discussions with County staff, community members, County and community-based service providers,

25   and fellow County leaders, I believe that policies limiting the County's assistance with the

26   enforcement of federal civil immigration law promote community members' trust in government

27   services.  With that trust comes increased engagement with County systems across the board, from

28   maternal and pediatric healthcare to services for vulnerable seniors, increasing the wellbeing of the

entire community.  Based on my own experience and my conversations over the years with our County's law enforcement leadership, I also know that non-cooperation policies promote public safety by ensuring that everyone in the community feels safe and secure contacting local law enforcement to report crime and cooperate with criminal investigations, including providing critical testimony necessary to obtain criminal convictions, without worrying that making contact will lead to a civil immigration inquiry or enforcement proceeding against them or a loved one.  In my view, our federalist system of government works best when the federal government carries out its duties (in this case, civil immigration enforcement) without interfering with the limited resources of local government to carry out its duties (in this case, general public safety and welfare).

21.    Moreover, compliance with the full scope of the federal government's immigration-related laws, requests, and priorities could result in significant liability and cost exposure to the County.  This could include exposure to liability for Fourth Amendment and other constitutional violations (as I am aware that several federal courts have held), as well as significant fiscal and administrative costs.  The federal government has made clear to the County that it does not provide indemnity for such liability or costs.  And, of course, the County has an independent duty not to violate the constitutional rights of its residents, whether or not at the behest of another governmental entity.

22.    These concerns are particularly heightened because I am aware that when the County previously honored civil detainers, ICE on many occasions did not pick up from the County's custody the individuals it was seeking, resulting in significant costs to the County, and in other cases has picked up individuals who were erroneously identified by ICE as not having lawful immigration status.

## Overview of Harms Resulting from the Loss of Federal Funding

23.    The potential loss of federal funding if the County is deemed to be a "sanctuary jurisdiction" has placed the County's budget process and its plans for providing services in an untenable position.  This is due to the tremendous uncertainty relating to the amount of resources that may or may not be available to provide critical services—now and in the future—to county residents.

24.    The County provides many community services that hold together the fabric of society in the region.  For example, the County provides:

- Hospital and outpatient medical and psychiatric services for both the vulnerable members of our community and all those in need (including a Level 1 trauma center, the only inpatient rehabilitation unit in the region, a unique burn unit for the region, and a critical neonatal intensive care unit);
- Child protective services, foster care services, food for the elderly, and adult protective services;
- In-home supportive services that allow individuals with disabilities to stay home;
- Ongoing mental health services and substance use services;
- Social assistance for individuals in poverty, including food assistance through CalFresh, which is California's implementation of the federal Supplemental Nutrition Assistance Program (SNAP);
- Criminal justice services, including custody, patrol, probation, public defense, prosecution, and community services;
- Regional emergency response services and communication;
- Public health services, including disease control and pandemic response; and
- General government services such as property assessment, tax collection, official recording, and finance and investment support for regional governmental agencies.

25.     To provide these services, the County receives resources from local taxes, the State of California, and the federal government. As a public entity, the County is not a profit-making enterprise, and the costs of providing public services exceed our non-tax-related revenues by billions of dollars each year. Total federal funds, including federal funds passed through the State of California, accounted for approximately $3.5 billion (31%) of the County's $11.3 billion in revenue in the 2023-2024 fiscal year. Due to the complex nature of federal financial participation for various programs, the stated figure is an estimate. What is certain is that losing federal funds would eviscerate the County budget and cause immediate and devastating injury to the 1.9 million residents who rely on the essential services that the County provides.

26.     The County receives federal funding through several types of arrangements. The most common arrangements are fee-for-service and reimbursement-based. In these arrangements, the

County first spends funds or provides a service using County resources then is reimbursed fully or partially with federal funds. Many of these arrangements are pass-through arrangements, in which the payment is made by another governmental agency (in many cases, the State of California) from federal funds that are earned by the County.

27. In addition, most of the services that are provided by the County with federal funding are "entitlement" programs that are mandated by either the federal or state government, and many of the services are interrelated with other state and federal programs either because beneficiaries receive services from multiple programs, or because one service facilitates or enables the County to provide another service. Thus, the loss of so much revenue would have a severe cascading effect upon services; the County would be unable to provide both "entitlement" services and other critical community services. Both federal programs and other programs would be lost or paralyzed.

28. Accordingly, the County is currently spending hundreds of millions of dollars on services for which it is otherwise entitled to receive federal reimbursement. EO 14159, EO 14218, and the Bondi Memo threaten those funds. The County is actively considering how to manage this risk. For example, I recently discussed with the Board of Supervisors in a public meeting the enormous financial risks the County faces as a result of the federal administration's funding threats.

29. While the County has some contingency reserves, they are not remotely adequate to cover the loss of all federal funds. As a result, and because the County is continuing to operate federally funded programs on a daily basis, the County needs to know whether to (1) continue incurring hundreds of millions of dollars in costs that may never be reimbursed by the federal government, (2) discontinue basic safety-net services delivered to its most vulnerable residents, or (3) in an attempt to avoid either of these outcomes, be effectively conscripted into using local law enforcement and other resources to assist the federal government in its immigration enforcement efforts (and incur both the costs and local harms that would therefore occur).

**Harms to the County Health System and Social Services Agency**

30. Santa Clara Valley Healthcare (SCVH) is the only public safety-net healthcare provider in Santa Clara County and the second largest public healthcare system in California. SCVH is comprised of the hospitals and clinics within the County of Santa Clara Health System, which also

includes the Behavioral Health Services Department, Public Health Department, Emergency Medical Services Agency, and Valley Health Plan. The County is in the process of purchasing another hospital, Regional Medical Center, which provides emergency care and other hospital services in an otherwise underserved area of Santa Clara County. The County is purchasing Regional Medical Center to ensure continued provision of a full range of hospital services to communities in this area and will integrate this fourth hospital into SCVH.

31.    In 2024, SCVH delivered approximately 4,500 babies, handled 189,000 Emergency Department and urgent care visits, provided 234,000 days of acute inpatient hospital care, and received 785,000 visits to its outpatient clinics.

32.    SCVH's three hospitals provide critical emergency and acute care services to Santa Clara County residents. Valley Medical Center provides the highest level of adult and pediatric emergency medical and trauma services and offers a wide range of specialty acute care services, including pediatric trauma, burn, and rehabilitation care; a regional high-risk neonatal intensive care unit; and a high-risk pregnancy program for women who have conditions that may affect their health or their baby's health. O'Connor and St. Louise Hospitals both offer birth centers, among many other services, and O'Connor Hospital offers a pediatric urgent care clinic and a neonatal intensive care unit.

33.    SCVH also operates a network of clinics, including 15 ambulatory care clinics located throughout Santa Clara County. These clinics provide a full complement of primary care services, including internal medicine, family medicine, pediatrics, women's health, primary care behavioral health, and dental services.

34.    As a safety net provider, SCVH provides health services regardless of income or ability to pay. Like the rest of the County organization, SCVH is not a profit-making enterprise, and the costs of caring for our patients exceed our revenues by hundreds of millions of dollars each year. Our patients are disproportionately indigent, uninsured, or reliant on government-sponsored health coverage, such as Medi-Cal (California's implementation of Medicaid) and Medicare (federally funded health coverage for disabled individuals and people age 65 or older). In Fiscal Year 2024 (July 1, 2023 to June 30, 2024), approximately 64% of SCVH's patient services revenues derived from Medi-Cal and another 19% derived from Medicare.

35.     Medicaid is a joint federal and state program that provides healthcare coverage for low-income people.  When a person is covered by Medicaid, the federal government and the state each pay for a portion of that person's healthcare costs.

36.     Medi-Cal is California's Medicaid program.  SCVH receives several types of Medi-Cal revenues, including: (1) capitation revenue paid on a Per Member Per Month Basis for each Medi-Cal member assigned to SCVH by a Medi-Cal managed care plan on a capitated basis; (2) fee-for-service revenue paid on a per-service basis for services provided to other Medi-Cal enrollees who either are assigned to SCVH by a Medi-Cal managed care plan on a fee-for-service basis or otherwise seek services from SCVH; and (3) supplemental revenues from programs designed to help public hospitals reduce the gap between the costs of providing care and the typically low reimbursement received for services provided.

37.     Currently and historically, the revenues SCVH receives from state and federal programs, private insurers, and self-pay patients are not sufficient to fully cover the costs of the care SCVH provides.  Accordingly, each year the County makes a significant investment from its General Fund to support SCVH's operations.  In Fiscal Year 2023 (July 1, 2022 to June 30, 2023), the County invested $442 million from its General Fund to cover unreimbursed costs of SCVH services, and in Fiscal Year 2024, the County increased that investment to $483 million.  The County's adopted budget for Fiscal Year 2025 provides for a General Fund contribution of $581.3 million to cover unreimbursed SCVH costs.  The County also contributes funds from other revenue streams, such as Tobacco Settlement Revenues, to support the delivery of healthcare services by SCVH.  These amounts reflect the County's investments in SCVH hospitals and community clinics; they do not include separate General Fund expenditures for the provision of Custody Health services in County correctional facilities.

38.     A majority of budget cuts threatened by EO 14159 would impact the County's health system.  SCVH relies heavily on federally dependent funds.  In the 2023-2024 fiscal year, SCVH received federally dependent revenues of approximately $1.9 billion.  For the same fiscal year, SCVH's total gross expenditures were approximately $3.6 billion.  The County simply cannot absorb a $1.9 billion annual funding gap.  Thus, if federal funds were withheld, the County would be unable to

provide thousands of the county's indigent residents with the healthcare services they are entitled to receive absent extremely deep cuts in other areas.

39.     If SCVH were to lose its federal funding, it would create a massive and untenable public health crisis in the county.  SCVH would not be able to continue providing the broad range of services it currently provides to the thousands of poor, elderly, and vulnerable populations that rely on SCVH as the safety net provider for their health care.  It would be impossible for SCVH to continue providing the same range, amount, or quality of services.

40.     If SCVH were stripped of federal funding, it would no longer be able to serve as a Medicaid or Medicare provider, a result that would have catastrophic consequences for county residents.  Given the dearth of Medicaid providers in the county, the hundreds of thousands of patients receiving support from these programs—including infants and children, the elderly, and those with chronic disease—would be left without viable healthcare options, leaving them with little choice but to flood overcrowded emergency rooms of other nearby hospitals whenever they needed care.  Moreover, the loss of federal funding for SCVH would not only mean fewer and worse healthcare services for the County, but it would also result in a substantially less healthy community, force layoffs of potentially thousands of SCVH employees, and impose greater health care costs on all county residents and anyone else using SCVH facilities.  At worst, the unforeseeable consequences of the removal of all federal funding could potentially force the closure of the only public safety net hospital system in the county.

41.     Similarly, the County's Public Health Department, which provides disease control and pandemic response services throughout the County—and functions as the public health agency for each of the cities within Santa Clara County—had, in fiscal year 2023-2024, federal revenues of approximately $68 million.  Its expenditures for the same fiscal year were approximately $209.2 million, meaning nearly one-third of its funding was federally derived.  The County would have to significantly reduce or cut these critical services in the absence of federal funding.  As another example, the County's Social Services Agency (SSA), which provides safety net and protective services to children, families, and adults in need of assistance, received more than $417 million in federal revenues during the 2023-2024 fiscal year.  For comparison, SSA's expenditures for the same

fiscal year were approximately $1.16 billion.  Thus, if federal funding were withheld, the County would need to decide which of SSA's critical functions it could continue to fund and at what level, and which functions could no longer be funded.

**Public Safety in Santa Clara County**

42.    Outside of the health and social services systems, critically important services relating to protecting community safety would also be jeopardized by a loss of federal funding.  Among the services heavily supported by federal funding streams are the operations coordinated by the County's Office of Emergency Management (OEM), which is part of the Office of the County Executive.  I am intimately familiar with OEM's operations, having directly supervised that office both when I served as a Deputy County Executive and in my current role as the County Executive; and having also worked closely to provide legal support to OEM during my years serving as the County Counsel.

43.    OEM's core function is to support regional efforts to prepare for, respond to, and recover from emergencies and complex incidents of all types, including natural disasters and human-caused incidents and events, such as terrorist attacks.  OEM is the lead emergency management agency for the entire Santa Clara County region, including the cities, towns, and special districts located within the county.  During emergency situations, OEM serves in a critical coordination role among local jurisdictions, and between local jurisdictions and the State of California.  Without this coordination, which is prescribed by California's Emergency Services Act, local jurisdictions would lack a formal and centralized means of sharing intelligence and other information that is critical to community safety.

44.    Among its many responsibilities, OEM coordinates emergency management trainings; engages in region-wide hazard planning; activates, staffs, and operates the County's Emergency Operations Center, which serves the entire region during emergency incidents; and coordinates public and private post-disaster recovery efforts.  These efforts all benefit and safeguard the entire community.  Immigration status plays no part in determining who receives preparedness support, assistance during and after proclaimed emergencies, or any other services from OEM.

45.    OEM receives a significant amount of federal grant funding from the Federal Emergency Management Agency (FEMA), which is part of DHS.  This funding is critical to OEM's

continued operation.  Federal grant funding represents nearly 60% of OEM's total budget for fiscal year 2025, and OEM could not perform its current functions without it.

46.    FEMA funds are granted on a reimbursement basis after qualifying projects are completed.  In the meantime, the projects are funded by the County and by the cities, towns, and special districts that are carrying them out.  The County currently has more than $1 million in outstanding FEMA grant funding that has been expended, but not yet reimbursed, for fiscal year 2025.

47.    The FEMA funding that the County receives from DHS supports programs like the following:

- First, under the State Homeland Security Grant Program (SHSGP), the County receives funds to build the capability to prevent, protect against, mitigate, respond to, and recover from acts of terrorism.  Without SHSGP funds, the County could not fund community-wide exercises to test responses to catastrophic events, train first responders on terrorism response, create plans to ensure it can meet the needs of residents with disabilities during disasters, or purchase critical equipment for hazard response.  Losing SHSGP funding would also mean the County would not be reimbursed for the salary and benefit costs of three existing positions at OEM and two other positions that serve the region, or for prior purchases of critical equipment for hazard response and secure communications.

- The County has already applied and been approved for an upcoming SHSGP award to fund five positions and the purchase of cybersecurity technology, election security equipment, regional warehouse software, rapid DNA technology to expedite criminal investigations, mobile storage trailers for decontamination equipment, and portable ventilators for mass casualty events.  If SHSGP funds were withheld, these critical projects that contribute to the safety of the entire community would have to be abandoned.

- Second, the Emergency Management Grant Program (EMPG) supports state and local government activities to prevent, prepare for, mitigate against, respond to, and recover from emergencies and disasters of all types.  EMPG funding currently supports the County's distribution of emergency planning materials to schools, community groups, and faith-based organizations; stocking of emergency supply points; provision of specialized

earthquake response training; and support of volunteer Community Emergency Response Teams, who are often the first line in disaster response before professional first responders arrive. A loss of EMPG funding would significantly jeopardize community preparedness and resiliency throughout the region. Without EMPG funding, the County could not engage in these coordinated community-wide response efforts; and in addition, it would not be reimbursed for the salary and benefits of one existing OEM staff position.

- The County anticipates applying for EMPG funding for the upcoming year, which requires engaging in significant advance planning in order to satisfy FEMA requirements to detail qualifying projects in its grant application. Future EMPG funds, if not withheld, would continue to support the existing OEM staff position, allow the County to continue providing region-wide disaster response training, and support the purchase of a shelter trailer for use during emergency incidents.

- Third, funding through the Urban Areas Security Initiative (UASI) supports local agencies in urban areas in building capacity to prevent, protect against, mitigate, respond to, and recover from terrorist attacks and other catastrophes. UASI funding addresses homeland security needs including cybersecurity, communications interoperability, infrastructure protection, emergency medical needs, and public health preparedness. Without UASI funding, the County would lose funds needed to cover expenditures it has already made to enhance law enforcement agencies' public safety capabilities by purchasing software that allows police agencies to combine and analyze data from multiple sources, generate leads, and share investigatory data securely. The County would also have to abandon plans to purchase a Bomb Squad incident response vehicle for the Sheriff's Office.

- The County has already been approved for an upcoming UASI award, with which it plans to purchase an armored vehicle for response to hostage or barricade incidents, as well as tactical command accessories to enhance the Sheriff's Office's mobile command vehicle for use during critical incidents. These plans would need to be abandoned if the federal government withheld UASI funds, undermining community preparedness and safety.

48.     Based on my oversight of OEM's operations, I am aware that the emergency

1   management community is particularly concerned with sustaining its preparedness for terrorist and

2   domestic violent extremist attacks given the attack that occurred on New Year's Day 2025 in New

3   Orleans.  Santa Clara County will be hosting Super Bowl LX and the FIFA World Cup in 2026, for

4   which multi-agency planning is already underway.  Resources and equipment will be needed to

5   support public and community resiliency during these two significant special events, which are

6   expected to draw thousands of spectators and visitors.  Federal funds are critical to help ensure

7   enhanced capability beyond what local government can provide on its own.

8       49.    Another significant area of both cost and legal liability to the County is the jail system.

9   Based on my experience with several significant criminal justice projects while I was serving as the

10  County Counsel—including my oversight of cases in which two federal consent decrees were entered

11  governing the County jails—as well as my current experience as the County Executive, I am very

12  familiar with the budgetary, legal, and structural issues facing the jails.  The County also publishes a

13  significant amount of information about its jail population online (at

14  https://sheriff.santaclaracounty.gov/transparency-portal/reports/jail-population), and I have reviewed

15  this information recently.

16      50.    The County's jail system is the fifth largest in California and among the 20 largest

17  nationally, with a maximum housing capacity of approximately 4,200.  Annually, the jail system

18  receives and books 32,000 people.  Many are booked and then cited and released shortly thereafter, or

19  post bail on their charges to obtain release.  Others are housed in the jail after booking.  For the past

20  two years, the County's average daily jail population has hovered around 3,000, with a current

21  population count of 2,708 as of late February 2025.  The vast majority of those housed in the jail

22  (currently around 90%) are in pretrial custody, while others are serving sentences in local custody after

23  conviction.  An incarcerated person's length of stay in the County jails currently averages 298 days.

24      51.    Prior to October 2011, when the Board of Supervisors adopted Board Policy 3.54, the

25  County responded to ICE civil detainer requests and other inquiries from federal immigration officials.

26  I previously learned from jail leadership that during that time period, solely because of ICE civil

27  detainers, the County housed an average of 135 additional incarcerated people each day, at a cost of

28  approximately $159 per incarcerated person per jail day.  More recently, based on a 2021 study, the

daily cost of housing an incarcerated person in the County jails has risen to approximately $291 per day (and undoubtedly costs even more today).

52.    Currently, California law and County policy both prohibit honoring ICE civil detainer immigration detainer requests.  If the County were compelled to comply with ICE detainer requests, the change would strain the County's resources.  An ICE detainer request asks a local jail to maintain custody of an individual for an additional 48 hours beyond their local release date, which could be a pretrial release date or a scheduled date for release after serving a sentence.  An additional 48-hour hold would appreciably increase the burden on the County's staffing resources and jail facilities.  And based on our prior experience with ICE civil detainers, ICE often did not pick up individuals on hold, so the holds resulted in pretrial individuals who would otherwise be released remaining in custody for an indefinite period of time—often many months.  The County is already struggling with both low jail staffing levels and very poor facility conditions in two aging jails, so much so that both have been the subject of dedicated "jail study sessions" at multiple Board of Supervisors meetings and significant attention from the County's consent decree monitors.   Like all other incarcerated individuals, ICE detainees would need housing, food, supervision, healthcare, programs, transportation, and security.  They might need to undergo a re-classification and be re-housed in a new unit based on their changed status.  These are all costs that ICE has previously made clear it will not reimburse to localities.

53.    The daily cost of incarceration does not even account for the potentially massive costs associated with legal liability for honoring ICE detainers, which courts have held violate the Fourth Amendment.  I am aware from when I oversaw the County's 2017 litigation before this Court regarding the first Trump Administration's attempt to defund so-called "sanctuary jurisdictions" that localities that honored ICE detainers faced very costly judgments and settlements.  If the County were forced to honor ICE detainers, the costs associated with liability could be crushing.

54.     In the adopted budget for the current fiscal year, the County's authorized expenditures for custody operations total more than $319 million.  These expenditures are offset by only $21.5 million in revenue.  As these figures reflect, spending on the jail overwhelmingly draws from the County's General Fund.  Every General Fund dollar spent on the jail is a dollar that cannot be used to support other County-funded programs and services—including health care, social safety net services, law enforcement and prosecution, and programs that specifically reduce the incarcerated population and better promote community safety, including diversion and reentry programming.

55.     I have reviewed the declaration of District Attorney Jeffrey Rosen and I agree with his assessments regarding the impact a loss of DOJ funding would have on his office's operations.  With respect to the Sheriff's Office, federal DOJ grants support Sheriff's Office participation in task forces that combat internet crimes against children, drug trafficking, organized crime, and terrorism.  Without these funds, which support officer salaries, technology, equipment, and training, the Sheriff's Office would be forced to reduce or eliminate related operations and its participation in these specialized task forces.  The absence of these resources would not only affect the Sheriff's Office but also hinder multi-jurisdictional efforts that rely on local, state, and federal collaboration.

**The County's Budgeting Process**

56.     EO 14159, EO 14218, and the Bondi Memo force a current, daily choice about ongoing County operations.  But they also fundamentally disrupt the County's budgeting process for the upcoming fiscal year.

57.     In developing the County's annual budget, the County Executive is required to present a balanced recommended budget for approval by the County's Board of Supervisors.  Development of the recommended budget involves careful analysis and weighing of a multitude of factors, including anticipated revenues, specific service needs for diverse subsets of County residents, salary and benefit costs for the County's approximately 25,970 employees, and an array of local priorities.  The County's adopted budget represents the outcome of this weighing of resources and priorities and represents the County's determination of what services can and should be provided, given the limited resources at the County's disposal.  The services the County provides and the resources it has available are inextricably linked.

58.     In October of each year, the County Executive's Office of Budget and Analysis (OBA) begins to forecast its estimate of the subsequent fiscal year's anticipated revenues.  Then, around February 1 of the ensuing year, each County department must provide a budget submittal to OBA in which the department requests a level of funding necessary to provide services during the upcoming fiscal year.  During March and April, OBA balances anticipated revenues with proposed departmental budgets to prepare the County Executive's recommended balanced budget for consideration by the Board of Supervisors during May and June.  By June 30, the Board of Supervisors approves a balanced budget for the next fiscal year, as set forth in the County Budget Act, Cal. Govt. Code § 29064(a).

59.     This process has already been completed for the current fiscal year.  The County's current operations and services are being provided pursuant to the balanced budget that was adopted last year using this process.  As with any other budget, that budget reflects the County's judgment of how best to fulfill its obligations and priorities with limited resources.  Central to this judgment was the expectation that the County would receive the federal funds to which it is entitled under its agreements with a number of federal and state agencies.  Disrupting this expectation would throw the County's budget—and therefore its operations—into complete disarray.

60.     My staff and I are in the process of developing a proposed budget for fiscal year 2025-2026 for submission to the Board of Supervisors.  Without certainty in the near term, the County will be forced to make an untenable choice to either continue incurring hundreds of millions in expenses with no expectation of federal reimbursement, or to reduce its expenditures by discontinuing critical safety-net services to the community.

**The Urgency of Preliminary Relief**

61.     Without preliminary relief and clarification regarding the legality and effect of EO 14159, EO 14218, and the Bondi Memo, the County could have to wait months or years before final resolution of this case.  In the interim, the County will be in an untenable financial situation, and decisions that must be made while awaiting a final decision could cause the County to go into a financial crisis.

62.    Without preliminary relief, I believe the County will be forced to take one of two very risky courses: the County could continue to provide services to its residents without any assurance that it will be reimbursed by the federal government for those services, or it can discontinue essential and mandatory services to its residents.  Either course would result in devastating consequences for the County and substantial, irreparable harm to its residents.

63.    Indeed, any action by the County to reduce programs supported by federal funds to a level sustainable in the absence of federal funding would be so dramatic that it would quickly put the community in a crisis.  Such a dramatic reduction of services provided by the County would also require a significant reduction of County staff and contracted community-based organizations currently providing those services, and thousands of individuals could lose their jobs.

64.    The potential impact of the cumulative loss of federal revenue is of such magnitude that the County would not be able to absorb it even if the County took drastic actions such as closing its health and hospital system, eliminating mandated social service programs, closing the County jails, curtailing Sheriff's Office patrol services to dangerous levels, eliminating emergency response services, decimating public health, mental health, and substance abuse services, and reducing all general government services to below minimums.  The ongoing loss of all federal revenue could send the County into dire financial straits.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, and that this declaration was executed in San José, California, on March 11, 2025.

JAMES R. WILLIAMS

# EXHIBIT A

*Secure Communities*



**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, D.C. 20536

**U.S. Immigration
and Customs
Enforcement**

Mr. Miguel Márquez
County Counsel
County of Santa Clara
70 West Hedding Street, Ninth Floor
San Jose, CA 95110-1770

Dear Mr. Márquez:

Thank you for your August 16, 2010, letter regarding U.S. Immigration and Customs Enforcement's (ICE) Secure Communities initiative. I appreciate the opportunity to discuss ICE's immigration enforcement policies with you and to respond to your questions.

As an overview, Secure Communities is ICE's comprehensive strategy to improve and modernize the identification and removal of criminal aliens from the United States. As part of the strategy, ICE uses a federal biometric information sharing capability to more quickly and accurately identify aliens when they are booked into local law enforcement custody. ICE uses a risk-based approach that prioritizes immigration enforcement actions against criminal aliens based on the severity of their crimes, focusing first on criminal aliens convicted of serious crimes like murder, rape, drug trafficking, national security crimes, and other "aggravated felonies," as defined in § 101(a)(43) of the Immigration and Nationality Act (INA). Under this strategy, ICE maintains the authority to enforce immigration law. The activation of biometric information-sharing capability in new jurisdictions enables ICE to identify criminal aliens before they are released from law enforcement custody into our communities, which strengthens public safety. ICE works with state identification bureaus to develop deployment plans for activating the biometric information sharing capability in their jurisdictions. Your specific questions about Secure Communities are answered below.

**1. Is there a mechanism by which localities can opt out?**

As part of the Secure Communities activation process, ICE conducts outreach to local jurisdictions, which includes providing information about the biometric information sharing capability, explaining the benefits of this capability, explaining when the jurisdiction is scheduled for activation, and addressing any concerns the jurisdiction may have. If a jurisdiction does not wish to activate on the scheduled date in the Secure Communities deployment plan, it must formally notify its state identification bureau and ICE in writing by email, letter, or facsimile. Upon receipt of that information, ICE will request a meeting with federal partners, the jurisdiction, and the state to discuss any issues and come to a resolution, which may include adjusting the jurisdiction's activation date or removing the jurisdiction from the deployment plan.

Mr. Miguel Márquez
Page 2

    a) **Can you provide information on the Statement of Intent referenced in the cover letter accompanying the 2009 MOA?**

ICE does not require local jurisdictions to sign Statements of Intent or any other document to participate in Secure Communities. The reference to the Statement of Intent in the cover letter to the MOA was an oversight. The MOA signed by the state of California makes no mention of a Statement of Intent, and ICE has advised the California Department of Justice that it will not be utilizing Statements of Intent.

    b) **Do you view the State of California as having the ability to exempt certain counties from the program under the 2009 MOA signed by ICE and the California Department of Justice?**

ICE recognizes the California Department of Justice as the agency having the responsibility for the management and administration of the state's criminal data repositories, which includes development of and adherence to policies and procedures that govern their use and how information is shared with other state and federal agencies. Therefore, ICE defers to the California State Attorney General on how state, county, and local law enforcement agencies within the state of California will share biometric data under the MOA.

    c) **Have you allowed other localities of law enforcement agencies, either inside or outside California, to opt out or modify their participation in the program?**

The Washington, D.C. Metropolitan Police Department is the only jurisdiction to date that has terminated its signed Memorandum of Agreement. As referenced by your letter, activated jurisdictions do not have to receive the "match responses" and Secure Communities, in coordination with the state identification bureaus and the FBI's Criminal Justice Information Services (CJIS) Division, has accommodated jurisdictions that requested not to receive that information.

    d) **What is the purpose of receiving the "match messages"? Do they require or authorize counties to take action with respect to arrested individuals?**

The purpose of local law enforcement receiving a 'match message' is to provide any additional identity information about the subject, including aliases, from the DHS biometric database storing over 100 million records that may not have been available based only on a criminal history check. Additional identity information may further a law enforcement officer's open investigations and lead to improved officer safety. Receiving a 'match message' does **not** authorize or require any action by local law enforcement.

Mr. Miguel Márquez
Page 3

    **2. Once Secure Communities is deployed in a locality, is the locality required to comply with detainers, and will you provide reimbursement and identification?**

        **a) Is it ICE's position that localities are required to hold individuals pursuant to Form I-247 or are detainers merely requests with which a county could legally decline to comply?**

ICE views an immigration detainer as a request that a law enforcement agency maintain custody of an alien who may otherwise be released for up to 48 hours (excluding Saturdays, Sundays, and holidays). This provides ICE time to assume custody of the alien.

        **b) Who bears the costs related to detaining individuals at ICE's request?**

Pursuant to 8 C.F.R. § 287.7(e), ICE is not responsible for incarceration costs of any individual against whom a detainer is lodged until "actual assumption of custody." The exception provided in section 287.7(e) stating that ICE shall not incur "fiscal obligation…except as provided in paragraph (d) of this section" only serves to authorize payment but does not require it. To the extent a payment is considered, it should only be made pursuant to a written agreement because, under INA § 103(a)(11), ICE pays detention costs when aliens are in its custody pursuant to "an agreement with a State or political subdivision of a State."

        **c) Will ICE reimburse localities for the cost of detaining individuals pursuant to Form I-247 beyond their scheduled release times? Will ICE indemnify localities for any liability incurred because of that detention?**

ICE does not reimburse localities for detaining any individual until ICE has assumed actual custody of the individual. Further, ICE will not indemnify localities for any liability incurred because the Anti-Deficiency Act prohibits such indemnity agreements by federal agencies.

    **3. Is it ICE's position that localities where Secure Communities is deployed are legally required to:**

            **i. Inform ICE if a subject is to be transferred or released thirty days in advance of any release or transfer? If so, what is the legal basis for such a requirement?**

The notification to ICE of inmate transfer or release within thirty days is pursuant to ICE's request for that information. It is not a statutory requirement.

Mr. Miguel Márquez
Page 4

      **ii.  Allow ICE agents and officers access to detainees to conduct interviews and serve documents? If so, what is the legal basis for such a requirement?**

INA § 238, 8 U.S.C. 1228, provides for the availability of special removal proceedings at federal, state, and local correctional facilities for aliens convicted of certain criminal offenses. Such programs require ICE officers to conduct inmate interviews to determine alienage and any possibilities for relief or protection from removal. The statute does not require state or local jurisdictions to participate in such programs.

      **iii.  Assist ICE in acquiring information about detainees? If so, what is the legal basis for such a requirement?**

Assisting ICE in acquiring detainee information is not a legal requirement.

      Thank you again for your letter. If you have any additional questions, please feel free to contact me at (202) 732-3900.

                Sincerely yours,

                David Venturella
                Assistant Director

# EXHIBIT B

**OFFICE OF THE COUNTY EXECUTIVE**
**COUNTY OF SANTA CLARA**

70 West Hedding Street, 11th Floor
San Jose, California  95110-1770
(408) 299-5105
(408) 293-5649 (FAX)

Jeffrey V. Smith
**COUNTY EXECUTIVE**



**OFFICE OF THE COUNTY COUNSEL**
**COUNTY OF SANTA CLARA**

70 West Hedding Street, 9th Floor
San Jose, California  95110-1770
(408) 299-5900
(408) 292-7240 (FAX)

Miguel Márquez
**COUNTY COUNSEL**

October 13, 2010

<u>VIA U.S. MAIL</u>

David Venturella, Executive Director
Office of Secure Communities
U.S. Department of Homeland Security
500 12th Street SW
Washington, DC 20024

Dear Mr. Venturella:

Thank you for responding to our inquiry on behalf of the County of Santa Clara ("the County") regarding the Secure Communities program.  On September 28, 2010, by a unanimous vote, the County's Board of Supervisors directed us to take all necessary actions to allow the County to opt out of participation in the Secure Communities program.

Pursuant to the instructions in your letter, we are sending this letter to your office and to the California Department of Justice to provide you with formal notice that the County does not wish to participate in the Secure Communities program.  The County respectfully requests that Immigration and Customs Enforcement, along with the California Department of Justice, de-activate the sharing of biometric information called for under the Secure Communities program ("IDENT/IAFIS Interoperability") with respect to Santa Clara County.

Because the County was activated as a Secure Communities jurisdiction on May 4, 2010, without being provided an opportunity to discuss our concerns about the program or to have them addressed, we ask that such de-activation take place immediately.

Letter to David Venturella, Executive Director, Office of Secure Communities
Re: Secure Communities
October 13, 2010
Page 2 of 2

     If, as set forth in your letter, you would like to set up a meeting between federal partners, the State, and the County to discuss deployment of Secure Communities in the County, please contact the Office of the County Counsel at 408-299-5902 to schedule such a meeting. We look forward to hearing from you.

Very truly yours,                Very truly yours,

JEFFREY V. SMITH        MIGUEL MÁRQUEZ
County Executive          County Counsel

c:     Edmund G. Brown, Jr.
Attorney General, State of California
Department of Justice
1300 I Street
Sacramento, CA 95814

Linda Denly
Bureau of Criminal Identification and Information
Division of California Justice Information Services
Department of Justice
4949 Broadway, Room G-116
Sacramento, CA 95820

Honorable Zoe Lofgren, Chair, U.S. House of Representatives Subcommittee on Immigration, Citizenship, Refugees, Border Security, and International Law *(via email)*

Honorable Board of Supervisors, County of Santa Clara

325631

# EXHIBIT C

a Certified Residential Specialist (CRS) designation from the Council of Residential Specialists, a Graduate Realtor Institute (GRI) designation from the National Association of Realtors, or a similar designation;

(C)   Real property appraisers with the designation of Member Appraisal Institute (MAI) or a similar designation evidencing experience with complex income property valuation;

(D)   Personal property appraisers with an Accredited Senior Appraiser (ASA) designation from the American Society of Appraisers or a similar designation;

(E)   Attorneys with experience with complex income and business property valuation; or

(F)   Individuals having experience which is comparable to that set forth in subsections (A) through (E) above.

In addition, Board members may, but shall not be obligated to, ensure that each separate AAB panel has at least one real property appraiser with the designation of MAI from the Appraisal Institute, or similar designation evidencing experience with complex income property valuation, as well as one experienced Assessment Appeals Board member.

### 3.53.2 Appointment of Value Hearing Officers

It is the policy of the Board of Supervisors that when considering prospective value hearing officers, Board members may, but shall not be obligated to, give preference to candidates possessing the following background:

(A)   Residential real property appraisers with an SRA designation from the Appraisal Institute;

(B)   Residential real property appraisers licensed at the Certified Residential or Certified General level by the State of California Office of Real Estate Appraisers; or

(C)   Individuals having experience which is comparable to that set forth in subsections (A) and (B) above.

In addition, Board members may, but shall not be obligated to, give preference to candidates with prior experience as either a hearing officer or arbitrator.

## 3.54   CIVIL IMMIGRATION DETAINER REQUESTS (Adopted 10-18-11)

It is the policy of Santa Clara County (County) to honor civil detainer requests from the United States Immigration and Customs Enforcement (ICE) by holding adult inmates for an additional 24-hour period after they would otherwise be released in accordance with the following policy, so long as there is a prior written agreement with the federal govern-

ment by which all costs incurred by the County in complying with the ICE detainer shall be reimbursed:

(A)    Upon written request by an Immigration Customs and Enforcement (ICE) agent to detain a County inmate for suspected violations of federal civil immigration law, the County will exercise its discretion to honor the request if one or more of the following apply:

   (1)    The individual is convicted of a serious or violent felony offense for which he or she is currently in custody.

      (a)    For purposes of the policy, a serious felony is any felony listed in subdivision (c) of Section 1192.7 of the Penal Code and a violent felony is any felony listed in subdivision (c) of Section 667.5 of the Penal Code.

   (2)    The individual has been convicted of a serious or violent felony within 10 years of the request, or was released after having served a sentence for a serious or violent felony within 5 years of the request, whichever is later.

      (a)    If the individual has been convicted of a homicide crime, an immigration detainer request will be honored regardless of when the conviction occurred.

      (b)    This subsection also applies if the Santa Clara County Department of Corrections has been informed by a law enforcement agency, either directly or through a criminal justice database, that the individual has been convicted of a serious or violent offense which, if committed in this state, would have been punishable as a serious or violent felony.

(B)    In the case of individuals younger than 18 years of age, the County shall not apply a detainer hold.

(C)    Except as otherwise required by this policy or unless ICE agents have a criminal warrant, or County officials have a legitimate law enforcement purpose that is not related to the enforcement of immigration laws, ICE agents shall not be given access to individuals or be allowed to use County facilities for investigative interviews or other purposes, and County personnel shall not expend County time or resources responding to ICE inquiries or communicating with ICE regarding individuals' incarceration status or release dates.

## 3.55  DEFENDING PROFESSIONALLY LICENSED EMPLOYEES IN ADMINISTRATIVE PROCEEDINGS (Adopted 10-25-11)

The County values its employees and desires to support them when they perform their duties within the scope of their employment in a good-faith manner and to the best of their

# EXHIBIT D

In addition, Board members may, but shall not be obligated to, ensure that each separate AAB panel has at least one real property appraiser with the designation of MAI from the Appraisal Institute, or similar designation evidencing experience with complex income property valuation, as well as one experienced Assessment Appeals Board member.

### 3.53.2 Assessment Appeals Board IV

Assessment Appeals Board IV may be dedicated to the resolution of appeals contesting a "change in ownership" or new construction determination by the Assessor, as well as appeals regarding the Assessor's valuation of real property. If so, then notwithstanding the guidelines above, Seat 1 of Assessment Appeals Board IV shall be filled by one member with experience as a real property appraiser with the designation of MAI from the Appraisal Institute or a similar designation evidencing experience with complex income property valuation. Seats 2 and 3 shall each be filled by a member who has a minimum of five years' professional experience in this State as an attorney, preferably related to real estate and property transfers, and who the nominating member of the Board of Supervisors has reason to believe is possessed of competent knowledge of property taxation. However, a panel that does not meet these requirements is not precluded from hearing any type of appeal.

### 3.53.3 Appointment of Value Hearing Officers

It is the policy of the Board of Supervisors that when considering prospective value hearing officers, Board members may, but shall not be obligated to, give preference to candidates possessing the following background:

(A)    Residential real property appraisers with an SRA designation from the Appraisal Institute;

(B)    Residential real property appraisers licensed at the Certified Residential or Certified General level by the State of California Office of Real Estate Appraisers; or

(C)    Individuals having experience which is comparable to that set forth in subsections (A) and (B) above.

In addition, Board members may, but shall not be obligated to, give preference to candidates with prior experience as either a hearing officer or arbitrator.

## 3.54   COOPERATION WITH U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT (Adopted 10-18-11; Amended 6-4-19)

It is the policy of the County of Santa Clara that County officials and employees may cooperate with United States Immigration and Customs Enforcement (ICE) only as follows:

(A)     Consistent with longstanding County policy, the California Values Act (Gov. Code, §§ 7284-7284.12), and the Fourth Amendment to the United States Constitution, the County does not, under any circumstances, honor civil detainer requests from ICE by holding inmates on ICE's behalf for additional time after they would otherwise be released from County custody.

(B)     It is the policy of the County that the Sheriff may exercise discretion to facilitate the transfer of an adult inmate to ICE custody if an ICE agent presents a valid arrest warrant signed by a federal or state judicial officer, or other signed writ or order from a federal or state judicial officer authorizing ICE's arrest of the inmate. An administrative warrant signed by an agent or official of ICE or of the Department of Homeland Security (such as a Form I-200) is not a judicial warrant and will not be honored. The Sheriff and Chief of Correction shall jointly develop transfer procedures to implement this paragraph.

(C)     Except as permitted by this Policy, the County shall not provide assistance or cooperation to ICE in its civil immigration enforcement efforts, including by giving ICE agents access to individuals or allowing them to use County facilities for investigative interviews or other purposes, expending County time or resources responding to ICE inquiries or communicating with ICE regarding individuals' incarceration status or release dates, or otherwise participating in any civil immigration enforcement activities. This Policy does not limit or prohibit giving assistance with the investigative activities of any local, state, or federal law enforcement agency relating to suspected violations of criminal laws.

## 3.55  DEFENDING PROFESSIONALLY LICENSED EMPLOYEES IN ADMINISTRATIVE PROCEEDINGS (Adopted 10-25-11)

The County values its employees and desires to support them when they perform their duties within the scope of their employment in a good-faith manner and to the best of their abilities. The County acknowledges that its professionally-licensed employees often face difficult judgment calls that need to be made promptly and sometimes result in good-faith mistakes. The County considered these factors in adopting this policy.

Further, this policy may be applied retroactively to underlying actions or failures to act that form the subject matter of a professional-licensing entity proceeding, but is prospective in nature in that it applies only to matters that were initiated by a professional-licensing entity after the enactment of this policy.

### 3.55.1 Policy

Pursuant to Government Code section 995.6, the County does not have a legal duty to defend employees licensed pursuant to the provisions of the California Business and Professions Code ("professionally-licensed employees") in administrative proceedings initi-