DAVID CHIU, SBN 189542
City Attorney
YVONNE R. MERÉ, SBN 175394
Chief Deputy City Attorney
MOLLIE M. LEE, SBN 251404
Chief of Strategic Advocacy
SARA J. EISENBERG, SBN 269303
Chief of Complex and Affirmative Litigation
NANCY E. HARRIS, SBN 197042
KARUN A. TILAK, SBN 323939
Deputy City Attorneys
Fox Plaza
1390 Market Street, 7th Floor
San Francisco, CA  94102-5402
Telephone:     (415) 355-3308
Facsimile:     (415) 437-4644
E-Mail:        karun.tilak@sfcityatty.org

Attorneys for Plaintiff
CITY AND COUNTY OF SAN FRANCISCO

TONY LOPRESTI, SBN 289269
County Counsel
KAVITA NARAYAN, SBN 264191
Chief Assistant County Counsel
MEREDITH A. JOHNSON, SBN 291018
Lead Deputy County Counsel
STEFANIE L. WILSON, SBN 314899
RAJIV NARAYAN, SBN 334511
Deputy County Counsels
BILL NGUYEN, SBN 333671
Litigation Fellow
70 W. Hedding Street, East Wing, 9th Floor
San José, CA 95110
Telephone:     (408) 299-5900
Facsimile:     (408) 292-7240
E-Mail:        tony.lopresti@cco.sccgov.org

Attorneys for Plaintiff
COUNTY OF SANTA CLARA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO, COUNTY OF SANTA CLARA, CITY OF PORTLAND, MARTIN LUTHER KING, JR. COUNTY, CITY OF NEW HAVEN, CITY OF OAKLAND, CITY OF EMERYVILLE, CITY OF SAN JOSÉ, CITY OF SAN DIEGO, CITY OF SACRAMENTO, CITY OF SANTA CRUZ, COUNTY OF MONTEREY, CITY OF SEATTLE, CITY OF MINNEAPOLIS, CITY OF ST. PAUL, CITY OF SANTA FE,<br><br>        Plaintiffs,<br><br>    vs.<br><br>DONALD J. TRUMP, President of the United States, UNITED STATES OF AMERICA, PAMELA BONDI, Attorney General of the United States, EMIL BOVE, Acting Deputy Attorney General, UNITED STATES DEPARTMENT OF JUSTICE, KRISTI NOEM, Secretary of United States Department of Homeland Security, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, DOES 1-100,<br><br>        Defendants. | Case No. 3:25-cv-1350-WHO<br><br>**SUPPLEMENTAL DECLARATION OF BILL NGUYEN IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>Hearing Date:   April 23, 2025<br>Time:           2:00 p.m.<br>Judge:          Hon. William H. Orrick III<br>Place:          Courtroom 2<br><br>Date Filed:     February 7, 2025<br>Trial Date:     None Set |

I, Bill Nguyen, declare and state the following:

1.      I am an attorney and a member of the Bar of this Court.  I am a Litigation Fellow with the Office of the County Counsel, County of Santa Clara, and an attorney of record for the Party County of Santa Clara in the action *City and County of San Francisco v. Trump*, No. 25-cv-1350 (N.D. Cal.), filed in this District on February 7, 2025.  In support of Plaintiffs' motion for preliminary injunction, I made a declaration filed on March 27, 2025, at ECF No. 89.  I make this supplemental declaration of my own personal knowledge.  If called on to do so, I could and would testify to the matters stated here.

2.      Attached hereto as **Exhibit 1** is a true and correct copy of a March 20, 2025 Memorandum from Senior Official Performing the Duties of the Administrator of the Federal Emergency Management Agency Cameron Hamilton to Defendant Secretary of the Department of Homeland Security Kristi Noem, entitled "Approval of FEMA-Administered Grant Disbursements" and signed by Defendant Noem on March 25, 2025.

3.      Attached hereto as **Exhibit 2** is a true and correct copy of a March 27, 2025 document on Defendant Department of Homeland Security's website, entitled "FY 2025 DHS STANDARD TERMS AND CONDITIONS" and available at https://www.dhs.gov/sites/default/files/2025-03/2025_0327_fy2025_dhs_terms_and_conditions_version_2_0.pdf.

4.      Attached hereto as **Exhibit 3** is a true and correct copy of a March 19, 2025 article from the *Daily Journal*, entitled "'Sanctuary' jurisdictions seek injunction against Trump administration's funding freeze" and available at https://perma.cc/44YQ-FD8P.

5.      Attached hereto as **Exhibit 4** is a true and correct copy of a March 27, 2025 article from *Fox News*, entitled "Trump anti-sanctuary city executive order could target federal funding, says expert," and available at https://perma.cc/3UXA-VV72.

6.      Attached hereto as **Exhibit 5** is a true and correct copy of the February 25, 2025 Order granting plaintiffs' motion for preliminary injunction filed in *Nat'l Council of Nonprofits v. Office of Management and Budget*, No. 1:25-cv-00239-LLA (D.D.C.).

7. Attached hereto as **Exhibit 6** is a true and correct copy of the March 31, 2025 Order Granting Plaintiffs' Motion for a Temporary Restraining Order and Order to Show Cause filed in *San Francisco Unified School District v. AmeriCorps*, No. 3:25-cv-02425-EMC (N.D. Cal.).

8. Attached hereto as **Exhibit 7** is a true and correct copy of a March 11, 2025 Memorandum for the Heads of Executive Departments and Agencies posted on the White House website, entitled "Ensuring the Enforcement of Federal Rule of Civil Procedure 65(c)" and available at https://www.whitehouse.gov/presidential-actions/2025/03/ensuring-the-enforcement-of-federal-rule-of-civil-procedure-65c/.

9. Attached hereto as **Exhibit 8** is a true and correct copy of the April 4, 2025 Memorandum and Order granting plaintiffs' motion for enforcement of preliminary injunction filed in *New York v. Trump*, No. 1:25-cv-00039-JJM-PAS (D.R.I.).

10. Attached hereto as **Exhibit 9** is a true and correct copy of an April 4, 2025 letter from Secretary of the U.S. Department of Housing and Urban Development Scott Turner to "HUD Grantees and Stakeholders."


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, and that this declaration was executed in San José, California, on April 7, 2025.


*Bill Nguyen*

BILL NGUYEN

# Exhibit 1

U.S. Department of Homeland Security
Washington, DC 20472



March 20, 2025

**DECISION**

MEMORANDUM FOR:    Kristi Noem
Secretary of the Department of Homeland Security

FROM:    Cameron Hamilton
Senior Official Performing the Duties of the Administrator
Federal Emergency Management Agency

SUBJECT:    **Approval of FEMA-Administered Grant Disbursements**

---

**Purpose:** To seek approval on the review process and parameters of grant programs administered by the Federal Emergency Management Agency (FEMA) to align with Administration and Secretary priorities on non-governmental organizations, immigration, and sanctuary jurisdictions.

**Background:** On Jan. 28, 2025, the Secretary of the Department of Homeland Security (DHS) issued a memo to components and agency heads entitled *"Direction on Grants to Non-governmental Organizations,"* which required the development and implementation of a process to review payments and obligations for grants that *"(1) go to non-profit organizations or for which non-profit organizations are eligible and (2) touch in any way on immigration."* In accordance with this instruction, FEMA is recommending the implementation of additional processes to review certain grants prior to releasing funds, as outlined in this memo.

The Secretary also issued a memo on Feb. 19, 2025, *"Restricting Grant Funding for Sanctuary Jurisdictions,"* instructing all components to "review all federal financial assistance awards to determine if Department funds, directly or indirectly, are going to sanctuary jurisdictions." In compliance with this memo, FEMA is providing recommendations for which grant programs sanctuary jurisdiction conditions should apply.

**Appendix A** provides a programmatic overview of all FEMA programs.

**<u>Action: FEMA Recommendations for Approval</u>**

1. The grant programs for which sanctuary jurisdiction conditions or restrictions should be applied;
2. The methodology FEMA will use to assess disaster and non-disaster grant programs in accordance with the Secretary's direction on non-governmental organizations (NGOs) and immigration; and
3. FEMA's recommended determinations for each grant program.

1

**Action Item 1: FEMA Proposed Sanctuary Jurisdiction Programs and Applicability**

FEMA recommends applying conditions or restrictions on FEMA administered non-disaster preparedness grant programs that go to a sanctuary jurisdiction as designated by U.S. Immigration and Customs Enforcement (ICE) and:

    a. where the purpose of the grant has a nexus to immigration activities, law enforcement, or national security; or,

    b. where statute does not limit how FEMA implements the program.

Based on the criteria above, FEMA recommends the conditions or restrictions be placed on all open and future awards for the following 12 programs[1]:

1. Case Management Pilot Program (CMPP);
2. Emergency Management Performance Grant (EMPG);
3. Homeland Security Grant Program – Operation Stonegarden (OPSG);
4. Homeland Security Grant Program – State Homeland Security Program (SHSP);
5. Homeland Security Grant Program – Urban Area Security Initiative;
6. Homeland Security National Training Program - Continuing Training Grants - Competitive (HSNTP-CTG);
7. Port Security Grant Program (PSGP);
8. Presidential Residence Protection Assistance Grant Program (PRPA);
9. Regional Catastrophic Preparedness Grant Program (RCPGP);
10. Shelter and Services Program (SSP);
11. Targeted Violence and Terrorism Prevention Grant Program (TVTP); and
12. Transit Security Grant Program (TSGP); and

As noted above, application of conditions or restrictions will vary based on the structure or authority of each respective program.[2] FEMA will assess each grant and submit proposed program implementation recommendations to the General Counsel for a legal determination as appropriate. These program implementation recommendations will include how the conditions or restrictions apply to prime awards, sub-awards, and existing awards and payments.

FEMA recommends conditions or restrictions on sanctuary jurisdictions not apply to disaster grants, non-disaster mitigation grants, and grants to fire departments and organizations that comprise the National Urban Search and Rescue Response System.

To implement guidance from the Secretary's memo, *"Restricting Grant Funding for Sanctuary Jurisdictions,"* FEMA has categorized disaster and non-disaster programs into two risk profiles using the above criteria. FEMA recommends approval of the proposed methodology:

---

1 While the Tribal Homeland Security Grant Program meets the criteria outlined above, FEMA did not include it for sanctuary jurisdiction conditions or restrictions due to Tribal sovereignty.
2 See Appendix A for additional information on program eligibility.

**Image A: Proposed Sanctuary Jurisdictions Risk Methodology**

| Sanctuary Jurisdiction Does Not Apply | Sanctuary Jurisdiction Applies |
|---|---|
| • Grant programs that:<br>  • Do not go to sanctuary jurisdiction; or<br>  • Are disaster or non-disaster mitigation grants; or<br>  • Are non-disaster grants with no nexus to immigration activities, law enforcement, or national security; or<br>  • Are limited by statute.<br>• These programs/projects <u>should move forward without additional review.</u> | • Grant programs that:<br>  • Go to a designated sanctuary jurisdiction; or<br>  • Are non-disaster grants; <u>and</u><br>  • Have a nexus to immigration activities, law enforcement, or national security; or<br>  • Are not limited by statute.<br>• These programs/projects <u>require additional review by DHS review.</u> |
| Clears through existing program controls and review processes | Project identified as meeting S1 criteria, requires DHS review |

Approve/date _____  Disapprove/date _____

3-25-25

Modify/date _____  Needs discussion/date _____

**Action Item 2: FEMA Proposed NGO/Immigration Grant Risk Assessment Methodology**

To implement guidance from the Secretary's memo, *"Direction on Grants to Non-governmental Organizations,"* FEMA has categorized all disaster and non-disaster grant programs into three risk profiles. In considering the risk level, FEMA will evaluate whether the intent and primary purpose of the grant relates to the nexus of immigration. The intent is to ensure that FEMA's grant programs do not encourage or induce illegal immigration or illegal harboring of illegal aliens or any other unlawful activity. This information will lead to the determination of their risk profile as outlined in Image B. FEMA recommends approval of the proposed methodology:

**Image B: Proposed NGO/Immigration Risk Assessment Methodology**

| Low Risk | Medium Risk | High Risk |
|---|---|---|
| • Low likelihood that grant disbursements (1) go to NGOs, <u>and</u> (2) touch in any way on immigration.<br>• These programs/projects <u>should move forward without additional review.</u> | • Further analysis required to determine likelihood. Indeterminate risk that grant disbursements (1) go to NGOs, <u>and</u> (2) touch in any way on immigration.<br>• These programs/projects are <u>pending review by FEMA to assess low or high risk, with concurrence from DHS.</u> | • High likelihood that grant disbursements (1) go to NGOs, <u>and</u> (2) touch in any way on immigration.<br>• These programs/projects <u>require additional review by DHS.</u> |
| Clears through existing program controls and review processes | Requires FEMA review to assess high or low risk, with concurrence from DHS | Project identified as meeting S1 criteria, requires DHS review |

Approve/date _____    Disapprove/date_____

3-25-25

Modify/date _____    Needs discussion/date_____

### Action Item 3: Approval of FEMA's Recommended Determinations

In accordance with the above methodologies for non-disaster and disaster grants, FEMA recommends approval of the determinations by grant program as outlined in the table below. The recommended determinations are:

- **Green:** Cleared by FEMA to undergo the existing program controls and review processes. Programs have been identified to have a low likelihood of grant disbursements to NGOs **and** low likelihood of a nexus to immigration, and the sanctuary jurisdiction restriction do not apply. Grants with a "green" assessment are approved to move forward with payment consistent with FEMA's existing processes without additional review by DHS.
- **Yellow:** Pending review by FEMA to conduct additional analysis on the projects and awards to determine likelihood of grant disbursements to NGOs with an immigration nexus. Sanctuary jurisdiction restrictions do not apply. As FEMA completes the analysis, FEMA will submit decision memos to DHS to recommend a grant program be moved to green or red status. FEMA will also submit yellow payments weekly for DHS consideration and approval if payment can move forward.
- **Red:** For DHS review and approval of payment requests or evaluation for termination of grant program. Programs have been identified to have a high likelihood of grant disbursements to NGOs and immigration nexus, and/or meets the sanctuary jurisdiction restrictions. FEMA will conduct an assessment and provide recommendations to DHS on whether payments should be denied or approved. In the recommendation, FEMA will review the sanctuary jurisdictions identified by U.S. Immigration and Customs Enforcement (ICE) and specifically notate the jurisdictional restrictions. The recommendation will consider, among other things, the purpose and intent of the grant, the benefits to the DHS mission and risks, and the context of which organization is receiving the award. For example, is the individual grant award going to a county government who is not on the ICE sanctuary jurisdiction list, but the state is on the list. FEMA will also provide recommendations on if programs and/or individual grant awards should be terminated based on the Secretary's guidance.

Approve/date _____    Disapprove/date_____

3-25-25

Modify/date _____    Needs discussion/date_____

**TABLE A: All FEMA Grant Programs and Recommended Review**

| AFT | Program | # of Open Awards | ULO Balance* | Risk of NGO / Immigration | Apply Sanctuary Jurisdiction | Recommended Determination |
|-----|---------|------------------|--------------|---------------------------|------------------------------|---------------------------|
| DRF | Community Disaster Loans (CDL) | 44 | $93,791,763 | Low | No | Cleared by FEMA |
| DRF | Disaster Unemployment Assistance (DUA) | 18 | $49,847,337 | Low | No | Cleared by FEMA |
| DRF | Fire Management Assistance Grants (FMAG) – previously included as part of Public Assistance – Grants to State & Local | 124 | $52,479,916 | Low | No | Cleared by FEMA |
| DRF | Hazard Mitigation Grant Program (HMGP) | 386 | $4,414,617,261 | Low | No | Cleared by FEMA |
| DRF | Hazard Mitigation Grant Program Post Fire (HMGP Post Fire) | 269 | $58,007,937 | Low | No | Cleared by FEMA |
| DRF | Individual and Households Program (IHP) | N/A | $380,898,640 | Low | No | Cleared by FEMA |
| DRF | Public Assistance – Grants to State & Local | 44,266 | $73,241,454,318 | Low | No | Cleared by FEMA |
| DRF | Urban Search and Rescue (US&R) | NA | $141,254,817 | Low | No | Cleared by FEMA |
| FA | Alliance for System Safety of Unmanned Aircraft Systems through Research Excellence (ASSURE) | 4 | $4,669,770 | Low | No | Cleared by FEMA |
| FA | Assistance to Firefighter Grants (AFG) | 3801 | $464,132,184 | Low | No | Cleared by FEMA |
| FA | Building Resilient Infrastructure and Communities (BRIC) | 1365 | $1,154,059,629** | Low | No | Cleared by FEMA |
| FA | Chemical Stockpile Emergency Preparedness Program (CSEPP) | 9 | $26,180,310 | Low | No | Cleared by FEMA |
| FA | Community Assistance Program State Support Services Element (CAP-SSSE) | 76 | $11,587,984 | Low | No | Cleared by FEMA |

| AFT | Program | # of Open Awards | ULO Balance* | Risk of NGO / Immigration | Apply Sanctuary Jurisdiction | Recommended Determination |
|-----|---------|------------------|--------------|---------------------------|------------------------------|---------------------------|
| FA | Cooperating Technical Partners (CTP) | 480** | $239,537,976** | Low | No | Cleared by FEMA |
| FA | Emergency Management Baseline Assessments Grant (EMBAG) | 3** | $127,416** | Low | No | Cleared by FEMA |
| FA | Emergency Operations Center (EOC) | 95 | $228,725,861 | Low | No | Cleared by FEMA |
| FA | Fire Prevention and Safety (FP&S) | 373 | $80,643,658 | Low | No | Cleared by FEMA |
| FA | Flood Mitigation Assistance (FMA) | 473 | $909,252,393 | Low | No | Cleared by FEMA |
| FA | Flood Mitigation Assistance Swift Current (FMA Swift) | 14 | $0** | Low | No | Cleared by FEMA |
| FA | Homeland Security Preparedness Technical Assistance Program (HSPTAP) | 4 | $406,557 | Low | No | Cleared by FEMA |
| FA | Homeland Security National Training Program (HSNTP) - National Domestic Preparedness Consortium (NDPC) | 17 | $134,067,348 | Low | No | Cleared by FEMA |
| FA | HSNTP– National Cybersecurity Preparedness Consortium | 5 | $16,906,852 | Low | No | Cleared by FEMA |
| FA | Intercity Bus Security Grant Program (IBSGP) | 59 | $2,905,029 | Low | No | Cleared by FEMA |
| FA | National Dam Safety Program and Rehabilitation of High Hazard Potential Dams Grant Program (HHPD) | 207 | $244,022,266 | Low | No | Cleared by FEMA |
| FA | National Earthquake Hazards Reduction Program (NEHRP) and Multi-State and National Earthquake Assistance (MSNEA) Grant Program | 62 | $4,876,775 | Low | No | Cleared by FEMA |
| FA | National Fire Academy Training Assistance (NFATA) | 10 | $1,446,388 | Low | No | Cleared by FEMA |

| AFT | Program | # of Open Awards | ULO Balance* | Risk of NGO / Immigration | Apply Sanctuary Jurisdiction | Recommended Determination |
|---|---|---|---|---|---|---|
| FA | National Incident Management System (NIMS) | 3 | $2,208,411** | Low | No | Cleared by FEMA |
| FA | National Urban Search and Rescue (US&R) | 153 | $66,105,406 | Low | No | Cleared by FEMA |
| FA | Next Generation Warning System Grant Program (NGWSGP)[1] | 3 | $134,196,015 | Low | No | Cleared by FEMA |
| FA | Pre-Disaster Mitigation (PDM) | 99 | $504,369,174 | Low | No | Cleared by FEMA |
| FA | Safeguarding Tomorrow Revolving Loan Fund/Safeguarding Tomorrow through Ongoing Risk Mitigation Act (STORM) | 9 | $51,397,697 | Low | No | Cleared by FEMA |
| FA | Staffing For Adequate Fire and Emergency Response (SAFER) | 1125 | $1,148,541,961** | Low | No | Cleared by FEMA |
| FA | State and Local Cybersecurity Grant Program (SLCGP) | 161 | $760,367,208 | Low | No | Cleared by FEMA |
| FA | State Fire Training Systems Grants (SFT) | 59 | $876,377 | Low | No | Cleared by FEMA |
| FA | Tribal Cybersecurity Grant Program (TCGP) | 31 | $17,620,204 | Low | No | Cleared by FEMA |
| FA | Tribal Homeland Security Grant Program (THSGP) | 77 | $42,539,321 | Low | No | Cleared by FEMA |
| DRF | Crisis Counseling Program (CCP) | 63 | $53,020,947 | Medium | No | Pending Review |

[1] The Corporation for Public Broadcasting has filed a lawsuit in the District of Columbia District Court on March 13, 2025, contending that FEMA's manual payment review process for NGWSGP awards was arbitrary and capricious in violation of the Administrative Procedures Act. If FEMA's recommended approach to categorizing the NGWSGP as "Cleared by FEMA" is approved, FEMA will make appropriate payments to the CPB using the manual payment review process.

| AFT | Program | # of Open Awards | ULO Balance* | Risk of NGO / Immigration | Apply Sanctuary Jurisdiction | Recommended Determination |
|---|---|---|---|---|---|---|
| DRF | Disaster Case Management (DCM) | 44 | $182,577,136 | Medium | No | Pending Review |
| DRF | Disaster Legal Services (DLS) | 11 | $95,000 | Medium | No | Pending Review |
| DRF | Public Assistance – NGOs | 7,234 | $8,498,374,550 | Medium | No | Pending Review |
| DRF | Public Assistance – Non-Congregate Sheltering | 284 | $1,297,129,208 | Medium | No | Pending Review |
| FA | Emergency Food and Shelter Program (EFSP) | 12 | $251,590,333 | Medium | No | Pending Review |
| FA | Nonprofit Security Grant Program (NSGP)[2] | 400 | $943,940,157 | Medium | No | Pending Review |
| FA | Emergency Management Performance Grant (EMPG) | 206 | $476,990,846 | Low | Yes | DHS Review |
| FA | Homeland Security Grant Program – Operation Stonegarden (OPSG) | 87 | $170,946,880 | Low | Yes | DHS Review |
| FA | Homeland Security Grant Program – State Homeland Security Program (SHSP) | 203 | $761,745,900 | Low | Yes | DHS Review |
| FA | Homeland Security Grant Program – Urban Area Security Initiative (UASI) | 104 | $1,919,725,009 | Low | Yes | DHS Review |
| FA | Homeland Security National Training Program (HSNTP) - Continuing Training Grants Program - Competitive (CTG) | 15 | $15,525,591 | Low | Yes | DHS Review |
| FA | Port Security Grant Program (PSGP) | 787 | $266,441,010 | Low | Yes | DHS Review |
| FA | Presidential Residence Protection Assistance (PRPA) | 2 | $2,241,788** | Low | Yes | DHS Review |
| FA | Regional Catastrophic Preparedness Grant Program (RCPGP) | 41 | $36,087,421 | Low | Yes | DHS Review |

[2] While State Administrative Agencies (SAA) are the direct recipients of NSGP funding, awards are passed through to nonprofit organizations that are not subject to the sanctuary jurisdiction conditions or restrictions as described in the criteria above. Management and Administration costs are allowable under this grant program and may be retained by SAAs.

| AFT | Program | # of Open Awards | ULO Balance* | Risk of NGO / Immigration | Apply Sanctuary Jurisdiction | Recommended Determination |
|---|---|---|---|---|---|---|
| FA | Targeted Violence and Terrorism Prevention Grant Program (TVTP) | 122 | $34,939,702 | Medium | Yes | DHS Review |
| FA | Transit Security Grant Program (TSGP) / Intercity Passenger Rail (IPR)*** | 84 | $283,147,532 | Low | Yes | DHS Review |
| FA | Case Management Pilot Program (CMPP) | 4 | $47,201,306 | High | Yes | DHS Review for Termination |
| FA | Emergency Food and Shelter Program – Humanitarian (EFSP-H)[3] | 3** | $46,050,064** | High | No | DHS Review for Termination |
| FA | Shelter and Services Program (SSP) | 156** | $887,107,461 | High | Yes | DHS Review for Termination |
| **TOTAL** | | | **$100.859B** | | | |

\* ULOs are as of Jan. 28, 2025.

** Chart updated with revised figures. After further review, inaccuracies were identified in previous data that have now been corrected.[4] Previous FMA Swift Current number reflected unobligated amount rather than unliquidated.

*** Sanctuary jurisdiction conditions would apply to Transit Security Grant Program (TSGP) and not Intercity Passenger Rail (IPR).

---

[3] For EFSP-H, all spending periods for subawards have expired and the provision of services under the sunset program has ended. The remaining amount is funding reserved for management and administration (approximately $4 million) for the grantee and funds returned by the board.

**TABLE B: Summary of Unliquidated Obligation (ULO) by Recommended Risk Determination**

FEMA is  reviewing all grants at a programmatic level, and also at the individual grant award level to understand the existing information available, and where additional research within the system can be conducted or where information from recipients will need to be collected. As the policy decisions and process are under development, FEMA has begun and will continue the individual grant award manual payment review process in preparation for the approach and methodology being approved. This manual review process requires significant staff time, but once the backlog is cleared, the process will operate on a much shorter processing time.

| Risk Determination | Disaster Grants ULO | Non-Disaster Grant ULO | Total | Backlog Processing Time* |
|---|---|---|---|---|
| Cleared by FEMA | $78,432,351,989 | $6,251,770,170 | $84,684,122,159 | 45 days |
| Pending FEMA Review | $10,031,196,841 | $1,195,530,490 | $11,226,727,331 | 90 days |
| Recommend DHS Review | N/A | $3,967,791,679 | $3,967,791,679 | 60 days |
| Recommended Terminated Programs | N/A | $980,358,831 | $980,358,831 | 60 days |
| **Total** | **$88,463,548,830** | **$12,395,451,170** | **$100.859B** | |

*This estimate includes the approximately 1,450 payment requests already submitted in FEMA grants systems only. It is not inclusive of the total ULO because payment requests will continue to be submitted for these programs as the work is completed throughout the period of performance, which for some programs may be up to three years.

**Appendix A**
**Federal Emergency Management Agency Grant Programs Overview**
**Background/Purpose**

On Feb. 19, 2025, Secretary Noem issued a memorandum *Restricting Grant Funding for Sanctuary Jurisdictions* and directed all components to review all federal financial assistance awards to determine if Department funds, directly or indirectly, are going to sanctuary jurisdictions (hereinafter "S1 Memo"). Appendix A below provides an overview of each FEMA administered grant program, to include the purpose of each grant program and the award criteria (i.e. whether the award criteria are discretionary or governed by statutory or regulatory competition, allocation, or eligibility criteria).

<div style="background-color:green">

**Recommended Determination: Cleared by FEMA**

</div>

1. **Community Disaster Loans (42 U.S.C. §§ 5121, et seq.)**

   <u>Purpose</u>: Provides funding for local governments to operate their essential community services after substantial revenue loss caused by a disaster.

   <u>Award Criteria</u>: Statutory and regulatory eligibility criteria.

2. **Disaster Unemployment Assistance (42 U.S.C. §§ 5121, et seq.)**

   <u>Purpose</u>: Assistance to individuals unemployed as a result of a major disaster administered through a grant to the declared state or tribe.

   <u>Award Criteria</u>: Statutory and regulatory eligibility criteria.

3. **Fire Management Assistance Grants (42 U.S.C. §§ 5121, et seq.)**

   <u>Purpose</u>: The mitigation, management, and control of any fire on public or private forest land or grassland that threatens such destruction as would constitute a major disaster.

   <u>Award Criteria</u>: Statutory and regulatory eligibility criteria.

4. **Hazard Mitigation Grant Program (42 U.S.C. § 5170c)**

   <u>Purpose</u>: To help communities implement hazard mitigation measures, such as elevation, acquisition, and flood control projects, to reduce or eliminate long-term risk to people and property from natural hazards following a presidential major disaster declaration under the Stafford Act.

   <u>Award Criteria</u>: Statutory and regulatory eligibility criteria.

5. **Hazard Mitigation Grant Program – Post Fire (42 U.S.C. § 5170c(a); 42 U.S.C. § 5187(d))**

<u>Purpose</u>: Makes assistance available to help communities implement hazard mitigation measures after wildfire disasters.

<u>Award Criteria</u>: Statutory and regulatory eligibility criteria. States, federally recognized tribes and territories affected by fires resulting in a Fire Management Assistance Grant (FMAG) declaration on or after Oct. 5, 2018, are eligible to apply.

6. **Individual and Households Programs (IHP) (42 U.S.C. §§ 5121, et seq.)**

<u>Purpose</u>: Provides financial and direct services to eligible individuals and households affected by a disaster, who have uninsured or under-insured necessary expenses and serious needs. IHP assistance is not a substitute for insurance and cannot compensate for all losses caused by a disaster. The assistance is intended to meet your basic needs and supplement disaster recovery efforts.

<u>Award Criteria</u>: Statutory and regulatory eligibility criteria.

7. **Urban Search & Rescue (US&R) (42 U.S.C. §§ 5121, et seq)**

<u>Purpose:</u> Provides reimbursement for lifesaving rescue operations that were performed by Federal Urban Search and Rescue teams during declared disaster.

<u>Award Criteria</u>**:** Statutory and regulatory eligibility criteria.

8. **Public Assistance – State and Local (42 U.S.C. §§ 5121, et seq.)**

<u>Purpose</u>: Financial assistance to states, tribal, territorial, and local governments for debris removal, for emergency work to support public safety, and for the repair, restoration, reconstruction, or replacement of a public facility damaged or destroyed by a major disaster.

<u>Award Criteria</u>: Noncompetitive, but with statutory and regulatory eligibility criteria.

9. **Homeland Security National Training Program (HSNTP) – Alliance for System Safety of Unmanned Aircraft Systems through Research Alliance (Title III of the Department of Homeland Security Appropriations Act, 2024, (Pub. L. No. 118-47); Joint Explanatory Statement accompanying the Department of Homeland Security Appropriations Act, 2024)**

<u>Purpose</u>: Provides funding for Mississippi State University's Federal Aviation Administration Center of Excellence for Unmanned Aircraft Systems (ASSURE) to support and target training solutions for state, local, tribal and territorial partners, which supports the objective of the National Preparedness System to facilitate an integrated, whole community, risk-informed, capabilities-based approach to preparedness.

<u>Award Criteria</u>: Discretionary, limited statutory award criteria. Award goes to Mississippi State University's Federal Aviation Administration Center of Excellence for Unmanned Aircraft Systems.

## 10. Assistance to Firefighters (15 U.S.C. § 2229)

<u>Purpose</u>: Financial assistance to fire departments, EMS organizations, and state fire training academies to enhance their ability to protect the health and safety of the public, as well as that of firefighting and EMS personnel against fire, fire-related, and other hazards.

<u>Award Criteria</u>: Competitive award with statutorily mandated criteria and peer review and statutory allocation requirements.

## 11. Building Resilient Infrastructure and Communities (42 U.S.C. §§ 5133, 5136)

<u>Purpose</u>: Makes federal funds available to states, the District of Columbia, U.S. territories, federally recognized Tribal governments, and local governments for hazard mitigation activities. BRIC aims to shift the focus of federal investments away from reactive, post-disaster spending and toward research-supported, proactive investments in community resilience. These investments aim to reduce future disaster losses, including loss of life and property as well as future spending from the Disaster Relief Fund (DRF). BRIC focuses on cost-effective mitigation measures including protecting public infrastructure so that critical services can withstand or more rapidly recover from future disasters, as well as other projects and activities to increase resilience throughout the nation.

<u>Award Criteria</u>: For the FY23 NOFO, there was a State/Territory allocation, a Tribal Set-Aside, and a National Competition with the remaining funds that are not awarded from the State/Territory Allocation and Tribal Set-Aside.

## 12. Chemical Stockpile Emergency Preparedness Program (50 U.S.C. § 1521)

<u>Purpose</u>: To assist state, local, and tribal governments in carrying out functions related to emergency preparedness and response in connection with the disposal of the lethal chemical agents and munitions in the United States' lethal chemical agents and munitions that existed on Nov. 8, 1985.

<u>Award Criteria</u>: Eligibility limited to communities in close proximity to military installations storing chemical weapons. FEMA currently awards a cooperative agreement to Kentucky who in turn pass-through subawards to local governments.

## 13. Community Assistance Program – State Support Services Element (CAP-SSSE) (42 U.S.C. §§ 4101, 4102)

Purpose: CAP-SSSE is a cooperative agreement which provides funding to state National Flood Insurance Program (NFIP) Coordinators to monitor community adoption and enforcement of the minimum floodplain management standards required for participation in the NFIP. CAP-SSSE funding is used to provide technical assistance to NFIP communities, evaluate community performance in implementing floodplain management activities, and conduct community assistance contacts and visits to ensure communities are compliant with NFIP minimum requirements and flood insurance remains available for sale within the communities.

Award Criteria: Discretionary, non-competitive award to State NFIP Coordinators, which may subaward funding to local or municipal floodplain management authorities.

### 14. Cooperating Technical Partners (CTP) Program (42 U.S.C. § 4101)

Purpose: To provide assistance to state, local, tribal, university, and nonprofit organizations to increase local involvement in and ownership of flood hazard identification and assessment programs. Recipients assist in the development and maintenance of flood risk data, which is used to develop or amend Flood Insurance Rate Maps and provide the baseline for communities to prepare for and mitigate against flood risks.

Award Criteria: Discretionary. No statutory criteria.

### 15. Emergency Management Baseline Assessment Grant (6 U.S.C. § 112 (b)(2))

Purpose: To assist the updating and enhancement of a set of standards for emergency preparedness and response and a related assessment methodology for the evaluation of state, local, and territorial emergency management operations.

Award Criteria: Discretionary, no statutory award criteria.

### 16. Emergency Operations Center Grant Program (42 U.S.C. § 5196c)

Purpose: Grants made available to State Administrative Agencies (SAAs) for equipping, upgrading, and constructing state, local, and tribal emergency operations centers.

Award Criteria: Eligible Emergency Operations Center projects identified in the Joint Explanatory Statement.

### 17. Fire Prevention and Safety (15 U.S.C. § 2229)

Purpose: Financial assistance to fire prevention programs and support for firefighter health and safety research and development.

Award Criteria: Competitive award with statutorily mandated criteria and peer review and statutory allocation requirements.

### 18. Flood Mitigation Assistance (42 U.S.C. § 4104c)

<u>Purpose</u>: To fund mitigation projects such as elevation, acquisition, floodproofing, and planning that reduces or eliminates long-term risk of flood damage to structures insured under the NFIP.

<u>Award Criteria</u>: Statutory eligibility criteria. Award determinations and funding allocations among eligible jurisdictions are made on a competitive basis with discretion to add criteria.

### 19. Flood Mitigation Assistance – Swift Current (42 U.S.C. § 4104c)

<u>Purpose:</u> Provides funding to mitigate buildings insured through the National Flood Insurance Program (NFIP) after a major disaster declaration following a flood-related disaster event to reduce risk against future flood damage. Funds are made available to states, territories, and federally recognized tribal governments that receive a major disaster declaration following a flood-related disaster event and meet all other eligibility criteria.

<u>Award Criteria</u>: Funding is only available to property owners that have a current flood insurance policy under the National Flood Insurance Program (NFIP) and a history of repetitive or substantial damage from flooding.

### 20. Homeland Security Preparedness Technical Assistance Program (6 U.S.C. § 112 (b)(2))

<u>Purpose</u>: To help private organization recipients to conduct planning, coordination, and training activities related to emergency management and preparedness.

<u>Award Criteria</u>: Discretionary, no statutory award criteria.

### 21. Homeland Security National Training Program (HSNTP) - National Domestic Preparedness Consortium (NDPC) (6 U.S.C. §§ 1102 and 112 (b)(2))

<u>Purpose</u>: To assist statutorily designated National Domestic Preparedness Consortium members to identify, develop, test, and deliver training to state, local, and tribal emergency response providers; provide on-site and mobile training; and facilitate delivery of training.

<u>Award Criteria</u>: Discretionary, limited statutory award criteria. Awards may only go to one of the six non-Federal members of the National Domestic Preparedness Consortium named in statute, which consist of five state universities and one private entity.

### 22. National Cyber Security Preparedness Consortium (National Cybersecurity Preparedness Consortium Act, 2021 (Pub. L. No. 117-122))

<u>Purpose</u>: Delivers over 40 training courses for more than 1,000 SLTT emergency managers, cyber network managers, and critical infrastructure professionals, annually to strengthen local, state, and national cyber and information systems and defend against and recover from cyber-attacks including attacks with cascading physical consequences.

<u>Award Criteria</u>: Awards may only go to one of the six non-federal members of the National Domestic Preparedness Consortium named in statute, which consist of five state universities and one private entity.

### 23. Intercity Bus Security Grant Program (6 U.S.C. § 1182)

<u>Purpose</u>: To make awards to eligible private operators providing transportation by an over-the-road bus for security improvements.

<u>Award Criteria</u>: Discretionary, competitive award based on statutory criteria that require funding decisions to prioritize security risks. The eligible applicants are private bus operators and not states or local governments.

### 24. National Dam Safety Program (33 U.S.C. § 467f)

<u>Purpose</u>: To enable states to increase dam safety through increased inspections, emergency action planning, improved state and federal coordination, training and workshops, and purchasing of equipment.

<u>Award Criteria</u>: Awards are based on eligibility criteria that are set by statute with funding allocations based on a statutory formula.

### 25. Rehabilitation of High Hazard Potential Dam Program (33 U.S.C. § 467f-2)

<u>Purpose</u>: Provide technical, planning, design, and construction assistance in the form of grants for rehabilitation, repair, and removal of eligible high hazard potential dams.

<u>Award Criteria</u>: For FY 2024, FEMA made funding available in allocations for 32 states and one territory.

### 26. National Earthquake Hazards Reduction Program – Multi-State and National Earthquake Assistance (MSNEA) (42 U.S.C. § 7704(a)(2)(B), (b)(2)(A)(i))

<u>Purpose</u>: The National Earthquake Hazards Reduction Program (NEHRP) Multi-State and National Earthquake Assistance (MSNEA) grant program makes funds available to nonprofit organizations and institutions of higher education that possess the critical skills necessary to develop and implement regional (multi-state) and/or national earthquake risk mitigation activities.

<u>Award Criteria</u>: Discretionary. The program's authorizing statutes do not prescribe specific criteria for recipients. FEMA awards competitive grants to nonprofit organizations and institutions of higher education that possess the critical skills necessary to develop and implement regional (multi-state) and/or national earthquake risk mitigation activities, on behalf of states and territories participating in the FEMA NEHRP State Assistance program.

### 27. National Earthquake Hazards Reduction Program – Individual State Earthquake Assistance (ISEA) (42 U.S.C. § 7704(b)(2)(A)(ix) and 42 U.S.C. § 7704(b) (2)(B))

<u>Purpose:</u> FEMA awards non-competitive grants to eligible states and territories with high to very high seismic risks to fund one or more of the following allowable activities. The purpose is to support the establishment of earthquake hazards reduction programming and the implementation of earthquake safety, mitigation, and resilience activities at the state and local level.

<u>Award Criteria</u>: Statutory and regulatory eligibility criteria. Eligibility is limited to states and territories that have been determined to have a high or very high risk of earthquakes. Eligibility is further limited to those states and territories who can provide the statutory 25% non-federal cost share.

**28. National Fire Academy Training Assistance (Section 7 of the Federal Fire prevention and Control Act 15 U.S.C. 2206 (i)(1))**

<u>Purpose:</u> Provides travel stipends (air or mileage) to SLTT fire and EMS personnel who attend resident classes at the National Fire Academy.

<u>Award Criteria</u>: Assistance to individuals reimbursing for part of cost to attend trainings in Emmitsburg, MD

**29. National Incident Management System (NIMS) / Emergency Management Assistance Compact Program (EMAC) Program (6 U.S.C. § 761)**

<u>Purpose:</u> To assist the administrator of the Emergency Management Assistance Compact (EMAC) to administer EMAC operations, to implement NIMS, and to continue coordination with FEMA and state, local, and tribal governments.

<u>Award Criteria</u>: Eligibility limited to administration of the Emergency Management Assistance Compact (EMAC).

**30. National Urban Search and Rescue (US&R) Response System (42 U.S.C. § 5165f, 6 U.S.C. § 722)**

<u>Purpose:</u> The purpose of these Readiness Cooperative Agreements is to support the continued development and maintenance of a national urban search and rescue capability among the 28 task forces within the National Urban Search and Rescue Response System.

<u>Award Criteria</u>: Statutory and regulatory eligibility criteria. Only the 28 sponsoring agencies currently designated by FEMA as members of the National Urban Search and Rescue Response System are eligible for readiness and response cooperative agreements.

**31. Next Generation Warning System (Annual DHS Appropriations Acts)**

Purpose: Enables public television broadcasters to upgrade to the Advanced Television Systems Committee broadcast standard (ATSC 3.0) that enables public projects that improve the ability of remote rural areas to receive alerts and warnings.

Award Criteria: The Corporation for Public Broadcasting is the only awardee of the grant. Per the FY24 NOFO, the awardee will then manage a competitive process to solicit sub-grant applications from eligible subrecipients to use these funds in accordance with the requirements and priorities set forth in the NOFO.

### 32. Pre-Disaster Mitigation (42 U.S.C. § 5133)

Purpose: Makes federal funds available to state, local, tribal, and territorial governments to plan for and implement sustainable cost-effective measures designed to reduce the risk to individuals and property from future natural hazards, while also reducing reliance on federal funding from future disasters.

Award Criteria: The FY 2024 PDM Grant Program provided funding to projects identified in the 2024 DHS Appropriations Act's Joint Explanatory Statement (JES) in the table starting on page 59 entitled "Homeland Security Community Project Funding/Congressionally Directed Spending."

### 33. Safeguarding Tomorrow Through Ongoing Risk Mitigation Loan Fund Program (42 U.S.C. § 5135)

Purpose: Provides capitalization grants to states, eligible federally recognized tribal governments, territories and the District of Columbia to establish revolving loan funds that provide hazard mitigation assistance for local governments to reduce risks from natural hazards and disasters.

Award Criteria: Awards are based on eligibility criteria that are set by statute with funding allocations based on a statutory formula.

### 34. Staffing for Adequate Fire and Emergency Response (15 U.S.C. § 2229a)

Purpose: Financial assistance for increasing the number of firefighters to help communities meet industry standards and attain 24-hour staffing to provide adequate protection from fire and fire-related hazards.

Award Criteria: Competitive award program with statutorily mandated minimum application criteria and peer review.

### 35. State and Local Cybersecurity Grant Program (6 U.S.C. § 665g)

Purpose: To assist state, local, and territorial governments with managing and reducing systemic cyber risk.

Award Criteria: Mandatory, allocations to each state and territory based on statutory formula with the remainder to the states based on population.

**36. State Fire Training Systems Grants (15 U.S.C. § 2206(f))**

<u>Purpose</u>: To assist state fire service systems in providing training programs.

<u>Award Criteria</u>: Discretionary, no statutory award criteria.

**37. Tribal Cybersecurity Grant Program (6 U.S.C. § 665g)**

<u>Purpose:</u> To assist tribal governments with managing and reducing systemic cyber risk.

<u>Award Criteria:</u> Statutory requirement that the Secretary of DHS shall consult with the Secretary of the Interior and tribal governments in determining whether the grant would be competitive or allocated equally among the tribal governments of the federally recognized tribal nations.

**38. Tribal Homeland Security Grant Program (6 U.S.C. § 606)**

<u>Purpose</u>: Financial assistance to tribal governments to build and sustain capabilities related to preventing, preparing for, protecting against, and responding to acts of terrorism.

<u>Award Criteria</u>: Competitive award based on statutory criteria.

**39. Intercity Passenger Rail (6 U.S.C. § 1163)**

<u>Purpose</u>: To assist Amtrak in protecting critical surface transportation infrastructure and the traveling public from acts of terrorism and to increase the resilience of the Amtrak rail system.

<u>Award Criteria</u>: Sole source award to Amtrak. No funding is granted to states or local governments.

<div style="background-color:orange; border:1px solid black; padding:4px;">

**Recommended Determination: Pending Review**

</div>

**1. Crisis Counseling Program (42 U.S.C. §§ 5121, et seq.)**

<u>Purpose</u>: Assistance to provide professional counseling services or training of disaster workers to survivors of major disasters to relieve mental health problems caused or aggravated by major disasters or their aftermath.

<u>Award Criteria</u>: Statutory and regulatory eligibility criteria.

**2. Disaster Case Management (42 U.S.C. §§ 5121, et seq.)**

<u>Purpose</u>: Case management services to survivors of major disasters to identify and address unmet needs.

<u>Award Criteria</u>: Statutory and regulatory eligibility criteria.

3. **Disaster Legal Services (DLS) (42 U.S.C. §§ 5121, et seq.)**

<u>Purpose</u>: Provides confidential, free legal assistance to survivors who need legal help due to a major disaster, but who do not have the means to secure adequate legal services. For individuals seeking DLS, there is no formal application process. Individuals can access these services by contacting the phone number designated for the specific major disaster, which is established once the program has been authorized. In addition to this phone number, individuals can visit FEMA Disaster Recovery Centers where DLS attorneys may be physically located.

<u>Award Criteria</u>: Statutory and regulatory eligibility criteria.

4. **Public Assistance – Non-Governmental Organizations (42 U.S.C. §§ 5121, et seq.)**

<u>Purpose</u>: Financial Assistance to NGOs that perform essential community services for emergency work to ensure public safety, and for the repair, restoration, reconstruction, or replacement of an eligible facility damaged or destroyed by a major disaster.

<u>Award Criteria</u>: Statutory and regulatory eligibility criteria.

5. **Public Assistance – Non-Congregate Sheltering (42 U.S.C. §§ 5121, et seq.)**

<u>Purpose</u>: Financial Assistance to state, local, tribal and territorial governments for eligible sheltering expenses caused by a disaster.

<u>Award Criteria</u>: Statutory and regulatory eligibility criteria.

6. **Emergency Food and Shelter Program (42 U.S.C. §§ 11331-11346)**

<u>Purpose</u>: To supplement and expand ongoing efforts to provide shelter, food and supportive services for hungry and homeless people across the nation.

<u>Award Criteria</u>: Mandatory, subaward determinations made by external board based on statutory criteria.

7. **Nonprofit Security Grant Program (6 U.S.C. § 609a)**

<u>Purpose</u>: To assist non-profit organizations in target hardening and other physical security enhancements and activities.

<u>Award Criteria</u>: By statute, only nonprofits that are located within a FEMA designated Urban Area for purposes of the Urban Area Security Initiative (UASI) program are eligible to apply for funding. The criteria for competitive award include a risk prioritization that is statutorily required, providing limited discretion to add grant conditions. There is no discernible connection between an award for a nonprofit organization and 8 U.S.C. §§ 1324(a)(1)(A)(ii)-(iv), 1373, and 1644 and the other criteria established in the S1 Memo.

<span style="background-color:#8B0000;color:white">**Recommended Determination: DHS Review**</span>

1. **Emergency Management Performance Grant (6 U.S.C. § 762)**

   <u>Purpose</u>: To assist state, local, tribal, and territorial governments "in preparing for all hazards" and all phases of emergency management.

   <u>Award Criteria</u>: Mandatory, allocations to each state based on a statutory formula.

2. **State Homeland Security Grant Program (6 U.S.C. §§ 601 – 613)**

   <u>Purpose</u>: Assists states and local and tribal governments in building and sustaining capabilities related to preventing, preparing for, protecting against, and responding to acts of terrorism.

   <u>Award Criteria</u>: Statutory minimum allocation for each state with remaining awarded based on risk calculated using statutory criteria.

3. **Urban Area Security Initiative (6 U.S.C. §§ 601 – 613, DHS Appropriations Acts)**

   <u>Purpose</u>: Financial assistance to high-risk urban areas in building and sustaining capabilities related to preventing, preparing for, protecting against, and responding to acts of terrorism.

   <u>Award Criteria</u>: Awards based on risk calculated using statutorily required criteria. Discretion in determining how many high-risk urban areas shall receive funding through a State, but that discretion is often limited or guided by Congress through the annual appropriations process.

4. **Operation Stonegarden (6 U.S.C. §§ 601 – 613, DHS Appropriations Acts)**

   <u>Purpose</u>: Operation Stonegarden funds target expenditure by local governments for the purpose of border protection and border security.

   <u>Award Criteria</u>: Discretionary, competitive awards to states with 100% of funds sub-awarded to local law enforcement. The Department adopts the requirement for competition and criteria for award that is provided for in the legislative history of the appropriations act funding the program.

5. **Homeland Security National Training Program - Continuing Training Grants – Competitive (Annual DHS Appropriations Acts)**

   <u>Purpose</u>: To help training partners develop and deliver training to prepare whole communities to prevent, protect against, mitigate, respond to, and recover from acts of terrorism and natural, man-made, and technological hazards.

   <u>Award Criteria</u>: Discretionary, no statutory award criteria. Per the FY24 NOFO, the Joint Explanatory Statement accompanying the FY 2024 DHS Appropriations Act (Pub. L. No.

118-47) directs Continuing Training Grants to be competitively awarded for FEMA-certified rural and tribal training.

**6. Port Security Grant Program (46 U.S.C. § 70107)**

<u>Purpose</u>: Assistance to port authorities, facility operators, and state and local governments for maritime transportation infrastructure security.

<u>Award Criteria</u>: Statute requires that funds be allocated based on risk, but otherwise discretionary.

**7. Presidential Residence Protection Assistance Program (Annual DHS Appropriations Acts)**

<u>Purpose:</u> Provides funds to reimburse state and local enforcement agencies (LEAs) and emergency management agencies (EMAs) for extraordinary law enforcement or other emergency personnel costs incurred while protecting any non-governmental residence of the President that is designated or identified to be secured by the U.S. Secret Service.

**8. Regional Catastrophic Preparedness Grant Program. (Annual DHS Appropriations Acts)**

<u>Purpose:</u> Supports the building of core capabilities essential to achieving the National Preparedness Goal of a secure and resilient nation by providing resources to close known capability gaps in Housing and Logistics and Supply Chain Management, encouraging innovative regional solutions to issues related to catastrophic incidents, and building on existing regional efforts.

<u>Award Criteria</u>: Discretionary program with no statutory award criteria. This program is administered through a competitive selection process.

**9. Targeted Violence and Terrorism Prevention (6 U.S.C. § 112 (b)(2); Annual DHS Appropriations Acts)**

<u>Purpose</u>: To help prepare for, prevent and respond to emergent threats from violent extremism through planning, developing, implementing, or expanding educational outreach, community engagement, social service programs, training and exercises.

<u>Award Criteria</u>: Discretionary program with no statutory award criteria.  This program is administered through a competitive selection process.

**10. Transit Security Grant Program (6 U.S.C. § 1135)**

<u>Purpose</u>: The purpose of the grant is to build and sustain transit agency security capabilities that protect national security.

<u>Award Criteria</u>: Discretionary, competitive awards based on statutory criteria that require prioritization of funding based on risk.

**Recommended Determination: DHS Review for Termination**

1. **Case Management Pilot Program (Annual DHS Appropriation Acts)**

   <u>Purpose:</u> Makes funds available to local governments and/or nonprofits to provide voluntary case management and other services to aliens in immigration removal proceedings.

   <u>Award Criteria:</u> Discretionary; the CMPP National Board makes funds available to local governments and/or nonprofits (subrecipients) to provide case management and culturally, trauma-informed, and linguistically responsive services to eligible noncitizens who affirmatively volunteer to participate in the program.

2. **Emergency Food and Shelter Program – Humanitarian (42 U.S.C. §§ 11331-11346)**

   <u>Purpose:</u> To provide shelter and other services to families and individuals encountered by the Department of Homeland Security.

   <u>Award Criteria</u>: Mandatory, subaward determinations made by external board based on statutory criteria.

3. **Shelter and Services Program. (Annual DHS Appropriations Acts)**

   <u>Purpose:</u> To provide funds to non-federal entities for sheltering and related activities to aliens following their release from DHS. The intent is to support Customs and Border Protection in the safe, orderly, and humane release of aliens from short-term holding facilities.

   <u>Award Criteria:</u> SSP-Competitive: Competitive grants made available to local governments, federally recognized tribal governments, nonprofit organizations, and states that serve aliens recently released from DHS custody to provide shelter, food, transportation, acute medical care, personal hygiene supplies, and case management services and to increase the non-federal entities capacity to shelter aliens recently released from DHS custody, including renovations and modifications to existing facilities.

   SSP-Allocated: Funding in the FY24 NOFO is allocated to eligible applicants listed in a table in the NOFO. The allocations were based on release and destination data received from CBP over the time period of July 1, 2023, to Dec. 31, 2023, along with operational information available to CBP.

# Exhibit 2

# FY 2025 DHS STANDARD TERMS AND CONDITIONS

The Fiscal Year (FY) 2025 Department of Homeland Security (DHS) Standard Terms and Conditions apply to all new federal awards of federal financial assistance (federal awards) for which the federal award date occurs in FY 2025 and flow down to subrecipients unless a term or condition specifically indicates otherwise. For federal continuation awards made in subsequent FYs, the FY 2025 DHS Standard Terms and Conditions apply unless otherwise specified in the terms and conditions of the continuation awards. The United States has the right to seek judicial enforcement of these terms and conditions.

All legislation and digital resources are referenced with no digital links. These FY 2025 DHS Standard Terms and Conditions are maintained on the DHS website at https://www.dhs.gov/publication/dhs-standard-terms-and-conditions.

## A. Assurance, Administrative Requirements, Cost Principles, Representations, and Certifications

    I. Recipients must complete either the Office of Management and Budget (OMB) Standard Form 424B Assurances – Non- Construction Programs, or OMB Standard Form 424D Assurances – Construction Programs, as applicable. Certain assurances in these documents may not be applicable to your program and the DHS financial assistance office (DHS FAO) may require applicants to certify additional assurances. Applicants are required to fill out the assurances, as instructed.

## B. General Acknowledgements and Assurances Recipients are required to follow the applicable provisions of the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards in effect as of the federal award date and located in Title 2, Code of Federal Regulations, Part 200 and adopted by DHS at 2 C.F.R. § 3002.10.

All recipients and subrecipients must acknowledge and agree to provide DHS access to records, accounts, documents, information, facilities, and staff pursuant to 2 C.F.R. § 200.337.

    I. Recipients must cooperate with any DHS compliance reviews or compliance investigations.

    II. Recipients must give DHS access to examine and copy records, accounts, and other documents and sources of information related to the federal award and permit access to facilities and personnel.

    III. Recipients must submit timely, complete, and accurate reports to the appropriate DHS officials and maintain appropriate backup documentation to support the reports.

    IV. Recipients must comply with all other special reporting, data collection, and evaluation requirements required by law, federal regulation, Notice of Funding Opportunity, federal award specific terms and conditions, and/or DHS Component program guidance. Organization costs related to data and evaluation are allowable. The definition of data and evaluation costs is in 2 C.F.R. § 200.455(c), the full text of which is incorporated by reference.

    V. Recipients must complete DHS Form 3095 within 60 days of receipt of the Notice of Award for the first award under which this term applies. For further instructions and to access the form, please visit: https://www.dhs.gov/civil-rights-resources-recipients-dhs-financial-assistance.

## C. Standard Terms & Conditions

    I. Acknowledgement of Federal Funding from DHS

        Recipients must acknowledge their use of federal award funding when issuing statements, press releases, requests for proposal, bid invitations, and other documents describing projects or programs funded in whole or in part with federal

# FY 2025 DHS STANDARD TERMS AND CONDITIONS

award funds.

II.   Activities Conducted Abroad

Recipients must coordinate with appropriate government authorities when performing project activities outside the United States obtain all appropriate licenses, permits, or approvals.

III.   *Age Discrimination Act of 1975*

Recipients must comply with the requirements of the *Age Discrimination Act of 1975*, Pub. L. No. 94-135 (codified as amended at Title 42, U.S. Code § 6101 *et seq.*), which prohibits discrimination on the basis of age in any program or activity receiving federal financial assistance.

IV.   *Americans with Disabilities Act of 1990*

Recipients must comply with the requirements of Titles I, II, and III of the *Americans with Disabilities Act*, Pub. L. No. 101-336 (1990) (codified as amended at 42 U.S.C. §§ 12101– 12213), which prohibits recipients from discriminating on the basis of disability in the operation of public entities, public and private transportation systems, places of public accommodation, and certain testing entities.

V.   Best Practices for Collection and Use of Personally Identifiable Information

(1)   Recipients who collect personally identifiable information (PII) as part of carrying out the scope of work under a federal award are required to have a publicly available privacy policy that describes standards on the usage and maintenance of the PII they collect.

(2)   Definition. DHS defines "PII" as any information that permits the identity of an individual to be directly or indirectly inferred, including any information that is linked or linkable to that individual. Recipients may also find the DHS Privacy Impact Assessments: Privacy Guidance and Privacy Template as useful resources respectively.

VI.   *CHIPS and Science Act of 2022*, Public Law 117-167 CHIPS

(1)   Recipients of DHS research and development (R&D) awards must report to the DHS Component research program office any finding or determination of sex-based and sexual harassment and/or an administrative or disciplinary action taken against principal investigators or co-investigators to be completed by an authorized organizational representative (AOR) at the recipient institution.

(2)   Notification. An AOR must disclose the following information to agencies within 10 days of the date/the finding is made, or 10 days from when a recipient imposes an administrative action on the reported individual, whichever is sooner. Reports should include:

(a)   Award number,

(b)   Name of PI or Co-PI being reported,

(c)   Awardee name,

(d)   Awardee address,

(e)   AOR name, title, phone, and email address,

(f)   Indication of the report type:

# FY 2025 DHS STANDARD TERMS AND CONDITIONS

(i)    Finding or determination has been made that the reported individual violated awardee policies or codes of conduct, statutes, or regulations related to sexual harassment, sexual assault, or other forms of harassment, including the date that the finding was made.

(ii)    Imposition of an administrative or disciplinary action by the recipient on the reporting individual related to a finding/determination or an investigation of an alleged violation of recipient policy or codes of conduct, statutes, or regulations, or other forms of harassment.

(iii)    The date and nature of the administrative/disciplinary action, including a basic explanation or description of the event, which should not disclose personally identifiable information regarding any complaints or individuals involved. Any description provided must be consistent with the *Family Educational Rights in Privacy Act*.

(3)  Definitions.

(a)  An "authorized organizational representative (AOR)" is an administrative official who, on behalf of the proposing institution, is empowered to make certifications and representations and can commit the institution to the conduct of a project that an agency is being asked to support as well as adhere to various agency policies and award requirements.

(b)  "Principal investigators and co-principal investigators" are award personnel supported by a grant, cooperative agreement, or contract under Federal law.

(c)  A "reported individual" refers to recipient personnel who have been reported to a federal agency for potential sexual harassment violations.

(d)  "Sex based harassment" means a form of sex discrimination and includes harassment based on sex, sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity.

(e)  "Sexual harassment" means unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when this conduct explicitly or implicitly affects an individual's employment, unreasonably interferes with an individual's work performance, or creates an intimidating, hostile, or offensive work environment, whether such activity is carried out by a supervisor or by a co-worker, volunteer, or contractor.

VII.    *Civil Rights Act of 1964 – Title VI*

Recipients must comply with the requirements of Title VI of the *Civil Rights Act of 1964*, Pub. L. No. 88-352 (codified as amended at 42 U.S.C. § 2000d *et seq.*), which provides that no person in the United States will, on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance. DHS implementing regulations for the Act are found at 6 C.F.R. Part 21. Recipients of a federal award from the Federal Emergency Management Agency (FEMA) must also comply with FEMA's implementing regulations at 44 C.F.R. Part 7.

VIII.    *Civil Rights Act of 1968*

Recipients must comply with Title VIII of the *Civil Rights Act of 1968*, Pub. L. No. 90-284 (codified as amended at 42 U.S.C. § 3601 *et seq.*)  which prohibits recipients from discriminating in the sale, rental, financing, and advertising of dwellings, or in the provision of services in connection. therewith, on the basis of race, color, national

# FY 2025 DHS STANDARD TERMS AND CONDITIONS

origin, religion, disability, familial status, and sex, as implemented by the U.S. Department of Housing and Urban Development at 24 C.F.R. Part 100. The prohibition on disability discrimination includes the requirement that new multifamily housing with four or more dwelling units— i.e., the public and common use areas and individual apartment units (all units in buildings with elevators and ground-floor units in buildings without elevators)—be designed and constructed with certain accessible features. (See 24 C.F.R. Part 100, Subpart D.)

IX.   <u>Communication and Cooperation with the Department of Homeland Security and Immigration Officials</u>

(1) All recipients and other recipients of funds under this award must agree that they will comply with the following requirements related to coordination and cooperation with the Department of Homeland Security and immigration officials:

(a) They must comply with the requirements of 8 U.S.C. §§ 1373 and 1644. These statutes prohibit restrictions on information sharing by state and local government entities with DHS regarding the citizenship or immigration status, lawful or unlawful, of any individual. Additionally, 8 U.S.C. § 1373 prohibits any person or agency from prohibiting, or in any way restricting, a Federal, State, or local government entity from doing any of the following with respect to information regarding the immigration status of any individual: 1) sending such information to, or requesting or receiving such information from, Federal immigration officials; 2) maintaining such information; or 3) exchanging such information with any other Federal, State, or local government entity;

(b) They must comply with other relevant laws related to immigration, including prohibitions on encouraging or inducing an alien to come to, enter, or reside in the United States in violation of law, 8 U.S.C. § 1324(a)(1)(A)(iv), prohibitions on transporting or moving illegal aliens, 8 U.S.C. § 1324(a)(1)(A)(ii), prohibitions on harboring, concealing, or shielding from detection illegal aliens, 8 U.S.C. § 1324(a)(1)(A)(iii), and any applicable conspiracy, aiding or abetting, or attempt liability regarding these statutes;

(c) That they will honor requests for cooperation, such as participation in joint operations, sharing of information, or requests for short term detention of an alien pursuant to a valid detainer. A jurisdiction does not fail to comply with this requirement merely because it lacks the necessary resources to assist in a particular instance;

(d) That they will provide access to detainees, such as when an immigration officer seeks to interview a person who might be a removable alien; and

(e) That they will not leak or otherwise publicize the existence of an immigration enforcement operation.

(2) The recipient must certify under penalty of perjury pursuant to 28 U.S.C. § 1746 and using a form that is acceptable to DHS, that it will comply with the requirements of this term. Additionally, the recipient agrees that it will require any subrecipients or contractors to certify in the same manner that they will comply with this term prior to providing them with any funding under this award.

(3) The recipient agrees that compliance with this term is material to the Government's decision to make or continue with this award and that the Department of homeland Security may terminate this grant, or take any other allowable enforcement action, if the recipient fails to comply with this term.

# FY 2025 DHS STANDARD TERMS AND CONDITIONS

X.  Copyright

Recipients must affix the applicable copyright notices of 17 U.S.C. §§ 401 or 402 to any work first produced under federal awards and also include an acknowledgement that the work was produced under a federal award (including the federal award number and federal awarding agency). As detailed in 2 C.F.R. § 200.315, a federal awarding agency reserves a royalty-free, nonexclusive, and irrevocable right to reproduce, publish, or otherwise use the work for federal purposes and to authorize others to do so.

XI.  Debarment and Suspension

Recipients must comply with the non-procurement debarment and suspension regulations implementing Executive Orders 12549 and 12689 set forth at 2 C.F.R. Part 180 as implemented by DHS at 2 C.F.R. Part 3000.  These regulations prohibit recipients from entering into covered transactions (such as subawards and contracts) with certain parties that are debarred, suspended, or otherwise excluded from or ineligible for participation in federal assistance programs or activities.

XII.  Drug-Free Workplace Regulations

Recipients must comply with drug-free workplace requirements in Subpart B (or Subpart C, if the recipient is an individual) of 2 C.F.R. Part 3001, which adopts the Government- wide implementation (2 C.F.R. Part 182) of the *Drug-Free Workplace Act of 1988* (41 U.S.C. §§ 8101-8106).

XIII.  Duplicative Costs

Recipients are prohibited from charging any cost to this federal award that will be included as a cost or used to meet cost sharing requirements of any other federal award in either the current or a prior budget period. See 2 C.F.R. § 200.403(f). However, recipients may shift costs that are allowable under two or more federal awards where otherwise permitted by federal statutes, regulations, or the federal award terms and conditions.

XIV.  Education Amendments of 1972 (*Equal Opportunity in Education Act*) – Title IX

Recipients must comply with the requirements of Title IX of the Education Amendments of 1972, Pub. L. No. 92-318 (codified as amended at 20 U.S.C. § 1681 *et seq.*), which provide that no person in the United States will, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving federal financial assistance.  DHS implementing regulations are codified at 6 C.F.R. Part 17. Recipients of a federal award from the Federal Emergency Management Agency (FEMA) must also comply with FEMA's implementing regulations at 44 C.F.R. Part 19.

XV.  *Energy Policy and Conservation Act*

Recipients must comply with the requirements of the *Energy Policy and Conservation Act*, Pub. L. No. 94-163 (1975) (codified as amended at 42 U.S.C. § 6201 *et seq.*), which contain policies relating to energy efficiency that are defined in the state energy conservation plan issued in compliance with this Act.

XVI.  Equal Treatment of Faith-Based Organizations

It is DHS policy to ensure the equal treatment of faith-based organizations in social service programs administered or supported by DHS or its component agencies, enabling those organizations to participate in providing important social services to beneficiaries.

Recipients must comply with the equal treatment policies and requirements contained in 6 C.F.R. Part 19 and other applicable statutes, regulations, and guidance governing the participations of faith-based organizations in individual DHS programs.

# FY 2025 DHS STANDARD TERMS AND CONDITIONS

XVII.    Anti-Discrimination

Recipients must comply with all applicable Federal anti-discrimination laws material to the government's payment decisions for purposes of 31 U.S.C. § 372(b)(4).

(1) Definitions. As used in this clause –

(a) DEI means "diversity, equity, and inclusion."

(b) DEIA means "diversity, equity, inclusion, and accessibility."

(c) Discriminatory equity ideology has the meaning set forth in Section 2(b) of Executive Order 14190 of January 29, 2025.

(d) Discriminatory prohibited boycott means refusing to deal, cutting commercial relations, or otherwise limiting commercial relations specifically with Israeli companies or with companies doing business in or with Israel or authorized by, licensed by, or organized under the laws of Israel to do business.

(e) Federal anti-discrimination laws means Federal civil rights law that protect individual Americans from discrimination on the basis of race, color, sex, religion, and national origin.

(2) Grant award certification.

(a) By accepting the grant award, recipients are certifying that:

(i) They do not, and will not during the term of this financial assistance award, operate any programs that advance or promote DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws; and

(ii) They do not engage in, and will not during the term of this award engage in, a discriminatory prohibited boycott.

(3) DHS reserves the right to terminate financial assistance awards and claw back all funds if the recipients, during the term of this award, operate any program in violation of Federal anti-discriminatory laws or engages in a discriminatory prohibited boycott.

XVIII.    *False Claims Act* and Program Fraud Civil Remedies

Recipients must comply with the requirements of the *False Claims Act*, 31 U.S.C. §§ 3729- 3733, which prohibit the submission of false or fraudulent claims for payment to the Federal Government.  (See 31 U.S.C. §§ 3801-3812, which details the administrative remedies for false claims and statements made.)

XIX.    Federal Debt Status

All recipients are required to be non-delinquent in their repayment of any federal debt. Examples of relevant debt include delinquent payroll and other taxes, audit disallowances, and benefit overpayments. See OMB Circular A-129.

XX.    Federal Leadership on Reducing Text Messaging While Driving

Recipients are encouraged to adopt and enforce policies that ban text messaging while driving recipient-owned, recipient-rented, or privately owned vehicles when on official government business or when performing any work for or on behalf of the Federal Government. Recipients are also encouraged to conduct the initiatives of the type described in Section 3(a) of Executive Order 13513.

XXI.    *Fly America Act of 1974*

Recipients must comply with Preference for U.S. Flag Air Carriers (a list of certified air carriers can be found at: Certificated Air Carriers List | US Department of Transportation, https://www.transportation.gov/policy/aviation-policy/certificated-air-carriers-list)for international air transportation of people and property to the extent that such service is available, in accordance with the *International Air Transportation*

# FY 2025 DHS STANDARD TERMS AND CONDITIONS

*Fair Competitive Practices Act of 1974*, 49 U.S.C. § 40118, and the interpretative guidelines issued by the Comptroller General of the United States in the March 31, 1981, amendment to Comptroller General Decision B-138942.

XXII.   *Hotel and Motel Fire Safety Act of 1990*

Recipients must ensure that all conference, meeting, convention, or training space funded entirely or in part by federal award funds complies with the fire prevention and control guidelines of Section 6 of the *Hotel and Motel Fire Safety Act of 1990*, 15 U.S.C. § 2225a.

XXIII.   *John S. McCain National Defense Authorization Act of Fiscal Year 2019*

Recipients, subrecipients, and their contractors and subcontractors are subject to the prohibitions described in section 889 of the *John S. McCain National Defense Authorization Act for Fiscal Year 2019*, Pub. L. No. 115-232 (2018) and 2 C.F.R. §§ 200.216, 200.327, 200.471, and Appendix II to 2 C.F.R. Part 200. The statute – as it applies to DHS recipients, subrecipients, and their contractors and subcontractors – prohibits obligating or expending federal award funds on certain telecommunications and video surveillance products and contracting with certain entities for national security reasons.

XXIV.   Limited English Proficiency (*Civil Rights Act of 1964, Title VI*)

Recipients must comply with Title VI of the *Civil Rights Act of 1964* (42 U.S.C. § 2000d *et seq.*) prohibition against discrimination on the basis of national origin, which requires that recipients of federal financial assistance take reasonable steps to provide meaningful access to persons with limited English proficiency (LEP) to their programs and services. For additional assistance and information regarding language access obligations, please refer to the DHS Recipient Guidance: https://www.dhs.gov/guidance-published-help- department-supported-organizations-provide-meaningful-access-people-limited and additional resources on http://www.lep.gov.

XXV.   Lobbying Prohibitions

Recipients must comply with 31 U.S.C. § 1352 and 6 C.F.R. Part 9, which provide that none of the funds provided under a federal award may be expended by the recipient to pay any person to influence, or attempt to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with any federal action related to a federal award or contract, including any extension, continuation, renewal, amendment, or modification. Per 6 C.F.R. Part 9, recipients must file a lobbying certification form as described in Appendix A to 6 C.F.R. Part 9 or available on Grants.gov as the Grants.gov Lobbying Form and file a lobbying disclosure form as described in Appendix B to 6 C.F.R. Part 9 or available on Grants.gov as the Disclosure of Lobbying Activities (SF-LLL).

XXVI.   *National Environmental Policy Act*

Recipients must comply with the requirements of the *National Environmental Policy Act of 1969*, Pub. L. No. 91-190 (1970) (codified as amended at 42 U.S.C. § 4321 *et seq.*) (NEPA) and the Council on Environmental Quality (CEQ) Regulations for Implementing the Procedural Provisions of NEPA, which require recipients to use all practicable means within their authority, and consistent with other essential considerations of national policy, to create and maintain conditions under which people and nature can exist in productive harmony and fulfill the social, economic, and other needs of present and future generations of Americans.

XXVII.   National Security Presidential Memorandum-33 (NSPM-33) and provisions of the CHIPS and

# FY 2025 DHS STANDARD TERMS AND CONDITIONS

Science Act of 2022, Pub. L. 117-167, Section 10254

(1) Recipient research institutions ("covered institutions") must comply with the requirements in NSPM-33 and provisions of Pub. L.117-167, Section 10254 (codified at 42 U.S.C. § 18951) certifying that the institution has established and operates a research security program that includes elements relating to:

    (a) cybersecurity;

    (b) foreign travel security;

    (c) research security training; and

    (d) export control training, as appropriate.

(2) Definition. "Covered institutions" means recipient research institutions receiving federal Research and Development (R&D) science and engineering support "in excess of $50 million per year."

XXVIII. Non-Supplanting Requirement

Recipients of federal awards under programs that prohibit supplanting by law must ensure that federal funds supplement but do not supplant non-federal funds that, in the absence of such federal funds, would otherwise have been made available for the same purpose.

XXIX. Notice of Funding Opportunity Requirements

All the instructions, guidance, limitations, scope of work, and other conditions set forth in the Notice of Funding Opportunity (NOFO) for this federal award are incorporated by reference. All recipients must comply with any such requirements set forth in the NOFO. If a condition of the NOFO is inconsistent with these terms and conditions and any such terms of the federal award, the condition in the NOFO shall be invalid to the extent of the inconsistency. The remainder of that condition and all other conditions set forth in the NOFO shall remain in effect.

XXX. Patents and Intellectual Property Rights

Recipients are subject to the *Bayh-Dole Act*, 35 U.S.C. § 200 *et seq*. and applicable regulations governing inventions and patents, including the regulations issued by the Department of Commerce at 37 C.F.R. Part 401 (Rights to Inventions Made by Nonprofit Organizations and Small Business Firms under Government Awards, Contracts, and Cooperative Agreements) and the standard patent rights clause set forth at 37 C.F.R. § 401.14.

XXXI. Presidential Executive Orders

Recipients must comply with the requirements of Presidential Executive Orders related to grants (also known as federal assistance and financial assistance), the full text of which are incorporated by reference.

XXXII. Procurement of Recovered Materials

States, political subdivisions of states, and their contractors must comply with Section 6002 of the *Solid Waste Disposal Act*, Pub. L. No. 89-272 (1965) (codified as amended by the *Resource Conservation and Recovery Act* at 42 U.S.C. § 6962) and 2 C.F.R. § 200.323. The requirements of Section 6002 include procuring only items designated in guidelines of the Environmental Protection Agency (EPA) at 40 C.F.R. Part 247 that contain the highest percentage of recovered materials practicable, consistent with maintaining a satisfactory level of competition.

XXXIII. *Rehabilitation Act of 1973*

Recipients must comply with the requirements of Section 504 of the *Rehabilitation Act of 1973*, Pub. L. No. 93-112 (codified as amended at 29 U.S.C. § 794), which provides that no otherwise qualified handicapped individuals in the United States

# FY 2025 DHS STANDARD TERMS AND CONDITIONS

will, solely by reason of the handicap, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance.

XXXIV. <u>Reporting Recipient Integrity and Performance Matters</u>

If the total value of any currently active grants, cooperative agreements, and procurement contracts from all federal awarding agencies exceeds $10,000,000 for any period of time during the period of performance of the federal award, then the recipient must comply with the requirements set forth in the government-wide federal award term and condition for Recipient Integrity and Performance Matters is in 2 C.F.R. Part 200, Appendix XII, the full text of which is incorporated by reference.

XXXV. <u>Reporting Subawards and Executive Compensation</u>

For federal awards that total or exceed $30,000, recipients are required to comply with the requirements set forth in the government-wide federal award term and condition on Reporting Subawards and Executive Compensation set forth at 2 C.F.R. Part 170, Appendix A, the full text of which is incorporated by reference.

XXXVI. <u>Required Use of American Iron, Steel, Manufactured Products, and Construction Materials</u>

(1) Recipients of a federal award from a financial assistance program that provides funding for infrastructure are hereby notified that none of the funds provided under this federal award may be used for a project for infrastructure unless:

  (a) all iron and steel used in the project are produced in the United States—this means all manufacturing processes, from the initial melting stage through the application of coatings, occurred in the United States;

  (b) all manufactured products used in the project are produced in the United States—this means the manufactured product was manufactured in the United States; and the cost of the components of the manufactured product that are mined, produced, or manufactured in the United States is greater than 55 percent of the total cost of all components of the manufactured product, unless another standard for determining the minimum amount of domestic content of the manufactured product has been established under applicable law or regulation; and

  (c) all construction materials are manufactured in the United States—this means that all manufacturing processes for the construction material occurred in the United States.

(2) The Buy America preference only applies to articles, materials, and supplies that are consumed in, incorporated into, or affixed to an infrastructure project. As such, it does not apply to tools, equipment, and supplies, such as temporary scaffolding, brought to the construction site and removed at or before the completion of the infrastructure project. Nor does a Buy America preference apply to equipment and furnishings, such as movable chairs, desks, and portable computer equipment, that are used at or within the finished infrastructure project but are not an integral part of the structure or permanently affixed to the infrastructure project.

(3) *Waivers*

When necessary, recipients may apply for, and the agency may grant, a waiver from these requirements. The agency should notify the recipient for information on the process for requesting a waiver from these requirements.

# FY 2025 DHS STANDARD TERMS AND CONDITIONS

(a) When the Federal agency has determined that one of the following exceptions applies, the federal awarding official may waive the application of the domestic content procurement preference in any case in which the agency determines that:

(i) applying the domestic content procurement preference would be inconsistent with the public interest;

(ii) the types of iron, steel, manufactured products, or construction materials are not produced in the United States in sufficient and reasonably available quantities or of a satisfactory quality; or

(iii) the inclusion of iron, steel, manufactured products, or construction materials produced in the United States will increase the cost of the overall project by more than 25 percent.

(b) A request to waive the application of the domestic content procurement preference must be in writing. The agency will provide instructions on the format, contents, and supporting materials required for any waiver request. Waiver requests are subject to public comment periods of no less than 15 days and must be reviewed by the Made in America Office.

(c) There may be instances where a federal award qualifies, in whole or in part, for an existing waiver described at "Buy America" Preference in FEMA Financial Assistance Programs for Infrastructure | FEMA.gov.

(4) *Definitions*. The definitions applicable to this term are set forth at 2 C.F.R. § 184.3, the full text of which is incorporated by reference.

XXXVII. <u>SAFECOM</u>

Recipients receiving federal awards made under programs that provide emergency communication equipment and its related activities must comply with the SAFECOM Guidance for Emergency Communication Grants, including provisions on technical standards that ensure and enhance interoperable communications. The SAFECOM Guidance is updated annually and can be found at Funding and Sustainment | CISA.

XXXVIII. <u>Subrecipient Monitoring and Management</u>

Pass-through entities must comply with the requirements for subrecipient monitoring and management as set forth in 2 C.F.R. §§ 200.331-333.

XXXIX. <u>System for Award Management and Unique Entity Identifier Requirements</u>

Recipients are required to comply with the requirements set forth in the government-wide federal award term and condition regarding the System for Award Management and Unique Entity Identifier Requirements in 2 C.F.R. Part 25, Appendix A, the full text of which is incorporated reference.

XL. <u>Termination of a Federal Award</u>

(1) By DHS. DHS may terminate a federal award, in whole or in part, for the following reasons:

(a) If the recipient fails to comply with the terms and conditions of the federal award;

(b) With the consent of the recipient, in which case the parties must agree

# FY 2025 DHS STANDARD TERMS AND CONDITIONS

upon the termination conditions, including the effective date, and in the case of partial termination, the portion to be terminated; or

(c) Pursuant to the terms and conditions of the federal award, including, to the extent authorized by law, if the federal award no longer effectuates the program goals or agency priorities.

(3) By the Recipient. The recipient may terminate the federal award, in whole or in part, by sending written notification to DHS stating the reasons for such termination, the effective date, and in the case of partial termination, the portion to be terminated. However, if DHS determines that the remaining portion of the federal award will not accomplish the purposes for which the federal award was made, DHS may terminate the federal award in its entirety.

(4) Notice. Either party will provide written notice of intent to terminate for any reason to the other party no less than 30 calendar days prior to the effective date of the termination.

(5) Compliance with Closeout Requirements for Terminated Awards. The recipient must continue to comply with closeout requirements in 2 C.F.R. §§ 200.344-200.345 after an award is terminated.

XLI.    Terrorist Financing

Recipients must comply with Executive Order 13224 and applicable statutory prohibitions on transactions with, and the provisions of resources and support to, individuals and organizations associated with terrorism. Recipients are legally responsible for ensuring compliance with the Executive Order and laws.

XLII.    Trafficking Victims Protection Act of 2000(TVPA)

Recipients must comply with the requirements of the government-wide federal award term and condition which implements Trafficking Victims Protection Act of 2000, Pub. L. No. 106-386, § 106 (codified as amended at 22 U.S.C. § 7104). The federal award term and condition is in 2 C.F.R. § 175.105, the full text of which is incorporated by reference.

XLIII.    *Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT) Act of 2001*, Pub. L. 107-56

Recipients must comply with the requirements of Pub. L. 107-56, Section 817 of the USA PATRIOT Act, which amends 18 U.S.C. §§ 175–175c.

XLIV.    Use of DHS Seal, Logo and Flags

Recipients must obtain written permission from DHS prior to using the DHS seals, logos, crests, or reproductions of flags, or likenesses of DHS agency officials. This includes use of DHS component (e.g., FEMA, CISA, etc.) seals, logos, crests, or reproductions of flags, or likenesses of component officials.

XLV.    *Whistleblower Protection Act*

Recipients must comply with the statutory requirements for whistleblower protections in 10 U.S.C § 470141 U.S.C. § 4712.

# Exhibit 3



Sign In

 


HIGH-SPEED PRINTING FOR LESS    click here for 25% off your first order

# NEWS

Immigration
Mar. 19, 2025

# 'Sanctuary' jurisdictions seek injunction against Trump administration's funding freeze

A coalition of 16 sanctuary jurisdictions, led by Santa Clara County and San Francisco, has asked a federal judge to halt the Trump administration's attempt to cut off federal funds over immigration enforcement policies. The

**legal battle revisits a fight from Trump's first term, where similar efforts were struck down.**

   



*San Francisco. Photo: Shutterstock*

A group of 16 "sanctuary" jurisdictions, led by Santa Clara County and the City and County of San Francisco, asked a San Francisco federal judge to grant a preliminary injunction blocking the federal government from cutting off access to federal funds.

The Department of Justice responded in an email Wednesday, "The Department of Justice has made it crystal clear that sanctuary cities that continue to harbor dangerous illegal aliens will be sued and stripped of federal funding. In an effort to make America safe again, the Department will continue to vigorously enforce federal immigration law and cities and states that do not comply should expect aggressive legal action in return.

The motion, filed Monday, asks U.S. District Judge William Orrick to restrain the U.S. government from continuing to enforce President Donald Trump's executive orders from Jan. 20 that instructed two federal departments to freeze the delivery of funds to "sanctuary" cities and counties that refrain from aiding the federal government in enforcing immigration laws.

The Trump administration says the municipalities are interfering with enforcement and that supporting and helping people remain in the country illegally - as sanctuary cities do - is a violation of federal law.

David Chiu, San Francisco city attorney, and Tony LoPresti, Santa Clara county counsel, accused the Trump administration of trying to "bully counties and cities" into allowing the U.S. Department of Justice and the U.S. Department of Homeland Security to "commandeer local police officers as federal ICE agents," in a joint news release Tuesday on the filing of the motion.

"The federal government is illegally asserting rights it does not have, as courts already determined during the first Trump Administration. ... Eroding trust between our

communities and law enforcement will make us all less safe. The Administration's actions are illegal and authoritarian, and we seek to put a stop to it," Chiu said.

LoPresti echoed Chiu's sentiments, saying local governments have a right to continue getting taxpayer funds and a right to avoid helping the federal government enforce immigration laws.

"The Trump Administration is putting the safety of millions of Americans at risk by threatening to withhold critical funding from local governments," LoPresti said.

Orrick will hear arguments on the preliminary injunction request on April 23. The media relations offices for the DOJ, Homeland Security, and the White House could not immediately be reached for comment Tuesday. The DOJ attorneys from Washington D.C. representing the government, Caroline McGuire and Christopher Ian Pryby, also did not respond to requests for comment

The other local government plaintiffs include: Oakland, Sacramento, San Diego, Seattle, Portland, Minneapolis and St. Paul. *City and County of San Francisco et al. v. Trump et al.*, 3:25-cv-01350 (N.D. Cal. filed Feb. 7, 2025).

In the complaint, the plaintiffs claimed that Executive Orders 14218, 14159 and a list of "Sanctuary Jurisdictions Directives" U.S. Attorney General Pam Bondi circulated to DOJ employees on Feb. 5 serve as a continuance of the

Trump administration's attack on sanctuary cities from his first term as president.

Soon after taking office in January 2017, Trump issued Executive Order 13768 that instructed government agencies to withhold federal funds from sanctuary jurisdictions. A 9th U.S. Circuit Court of Appeals panel unanimously ruled that executive order unconstitutional. *City and County of San Francisco v. Trump et al.*, 17-17478 (9th Cir. Aug. 1, 2018).

#384409

---

### Wisdom Howell

Daily Journal Staff Writer
wisdom_howell@dailyjournal.com

### For reprint rights or to order a copy of your photo:

Email jeremy@reprintpros.com for prices.
Direct dial: 949-702-5390

### Send a letter to the editor:

Email: letters@dailyjournal.com

## Enewsletter Sign-up











Increase the strength of your practice with Lawyers' Mutual exclusive member benefits.



© 2025 Daily Journal Corporation. All Rights Reserved.

Feedback

Advertise With Us

Printing Services

Privacy

User Agreement

SEC

About ▲

Submit ▲

# Exhibit 4



Print    Close

# Trump anti-sanctuary city executive order could target federal funding, says expert

By Michael Lee

Published March 27, 2025

Fox News

President Donald Trump is expected to take aim at so-called "sanctuary" jurisdictions with an executive order on Thursday in what is likely to become another legal battle for the administration.

Trump hinted earlier this week that an executive order on sanctuary cities may be in the works, telling reporters that he planned to "end sanctuary cities for some of these jurisdictions that aren't cooperating with law enforcement."

"They're guarding criminals… we may just end the entire thing all together," Trump said.

**YOUNGKIN TO DRAFT SANCTUARY CITY BAN, MAKING STATE FUNDING CONTINGENT ON ICE COOPERATION**



President Donald Trump has battled with sanctuary cities since taking office in January. (Getty Images)

Sanctuary jurisdictions, or those that limit or completely ban local agencies from cooperating with federal immigration authorities, have come under fire since Trump took office in January, hindering the president's campaign promise to swiftly deport illegal immigrants from the country.

However, what Trump could do with executive action to force more compliance from the jurisdictions remains a question, opening up the possibility of even more legal action against the administration.

"While [Trump] works tirelessly to safeguard our communities and strengthen our national security, the radical left continues to weaponize the legal system to oppose common-sense policies," former Kentucky Attorney General Daniel J. Cameron, who currently serves as the CEO of the 1792 Exchange, told Fox News Digital. "It will surprise no one that the radical left will double and triple down on this strategy."

Trump has faced an unprecedented number of court obstacles during the first few months of his administration, with legal challenges resulting in 15 injunctions at least temporarily blocking his executive actions as of February, according to data compiled by Harvard Law Review. That number already outpaces the total injunctions faced by former Presidents Barack Obama and Joe Biden, who saw 12 and 14 during their entire terms in office, respectively.



President Donald Trump is expected to sign multiple executive orders on Thursday. (REUTERS/Evelyn Hockstein)

**COLUMBIA UNIVERSITY STUDENT PROTESTER SUES TRUMP ADMIN TO PREVENT DEPORTATION**

Cameron expects more of the same when it comes to Trump's looming order on sanctuary cities. "It will surprise no one that the radical left will double and triple down on this strategy," he said.

Given the limitations, Cameron expects Trump's order to target federal funding for jurisdictions who fail to comply.

"Inside of the United States, your zip code should be irrelevant when it comes to enforceable federal law.," he said. "Cities and states that harbor illegal aliens from federal authorities or otherwise actively interfere with the enforcement of federal law do not deserve taxpayer money or support. Plain and simple. I suspect the executive order will stop taxpayers from being on the hook for the unsafe immigration decisions of local authorities."



ICE agents get very little, if any, help from the local law enforcement agencies of sanctuary cities. (ICE Seattle)

**CLICK HERE TO GET THE FOX NEWS APP**

Overall, Cameron believes that Trump's plan to sign an executive order would be a good start, noting the success the president has had with executive actions to close down the southern border.

"Executive orders are a good first step," Camerson said. "Look at the southern border. We didn't need new laws for border crossings to plummet from the Biden-era highs. All we needed was a new president with the courage to do something."

Michael Lee is a writer for Fox News. Prior to joining *Fox News*, Michael worked for the *Washington Examiner*, *Bongino.com*, and *Unbiased America*. He has covered politics for more than eight years.

🖨 Print     ⊗ Close

**URL**

https://www.foxnews.com/politics/trump-anti-sanctuary-city-executive-order-could-target-federal-funding-says-expert

Home | Video | Politics | U.S. | Opinion | Entertainment | Tech | Science | Health | Travel | Lifestyle | World | Sports | Weather

Privacy | Terms

This material may not be published, broadcast, rewritten, or redistributed. © FOX News Network, LLC. All rights reserved. Quotes displayed in real-time or delayed by at least 15 minutes. Market data provided by Factset. Powered and implemented by FactSet Digital Solutions. Legal Statement. Mutual Fund and ETF data provided by Refinitiv Lipper.Do Not Sell my Personal Information - New Terms of Use - FAQ

# Exhibit 5

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

NATIONAL COUNCIL OF
NONPROFITS, *et al.*,

        *Plaintiffs*,

   v.

OFFICE OF MANAGEMENT AND
BUDGET, *et al.*,

        *Defendants*.

Civil Action No. 25 - 239 (LLA)

## <u>ORDER</u>

For the reasons stated in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that Plaintiffs' Motion for a Preliminary Injunction, ECF No. 40, is **GRANTED** to the extent that it is

**ORDERED** that Defendants are enjoined from implementing, giving effect to, or reinstating under a different name the unilateral, non-individualized directives in OMB Memorandum M-25-13 with respect to the disbursement of Federal funds under all open awards; it is further

**ORDERED** that Defendants must provide written notice of the court's preliminary injunction to all agencies to which OMB Memorandum M-25-13 was addressed.  The written notice shall instruct those agencies that they may not take any steps to implement, give effect to, or reinstate under a different name the unilateral, non-individualized directives in OMB Memorandum M-25-13 with respect to the disbursement of Federal Funds under all open awards.  It shall also instruct those agencies to continue releasing any disbursements on open awards that were paused due to OMB Memorandum M-25-13; it is further

**ORDERED** that this Order shall apply to the maximum extent provided for by Federal Rule of Civil Procedure 65(d)(2) and 5 U.S.C. §§ 705 and 706; it is further

**ORDERED** that Defendants shall file a status report on or before February 28, 2025, apprising the court of the status of their compliance with this Order, including by providing a copy of the written notice described above; it is further

**ORDERED** that the parties shall meet and confer and file a joint status report proposing next steps in this proceeding on or before February 28, 2025; and it is further

**ORDERED** that Beatrice Adams's Motion to Intervene, ECF No. 19, is **DENIED**.

**SO ORDERED.**

_____
LOREN L. ALIKHAN
United States District Judge

Date:   February 25, 2025

2

# Exhibit 6

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO UNIFIED SCHOOL
DISTRICT, et al.,

        Plaintiffs,

    v.

AMERICORPS, A.K.A. THE
CORPORATION FOR NATIONAL AND
COMMUNITY SERVICE, et al.,

        Defendants.

Case No.  25-cv-02425-EMC

**ORDER GRANTING PLAINTIFFS'
MOTION FOR A TEMPORARY
RESTRAINING ORDER AND ORDER
TO SHOW CAUSE**

Docket No. 18

## I.    <u>INTRODUCTION</u>

Plaintiffs, the San Francisco Unified School District ("SFUSD") and the City of Santa Fe ("Santa Fe"), filed a lawsuit against Defendants Corporation for National and Community Service ("AmeriCorps") and its Interim Agency Head Jennifer Bastress Tahmasebi in her official capacity, seeking declaratory and injunctive relief.  The complaint alleges, in part, violations of the United States Constitution and the Administrative Procedure Act ("APA").  Currently pending before the Court is Plaintiffs' motion for a temporary restraining order ("TRO") in which they seek to enjoin Defendants from imposing and enforcing new conditions on Plaintiffs' AmeriCorps grants.

## II.    <u>BACKGROUND</u>

### A.    <u>Factual Background</u>

AmeriCorps is an agency of the federal government.  42 U.S.C. § 12651.  The purpose of AmeriCorps includes "meet[ing] unmet human…needs" and supporting "diverse communities." 42 U.S.C. § 12501(b).  To achieve its purpose, AmeriCorps "may make grants…"  42 U.S.C. § 12571(a).  AmeriCorps grants are designed, in part, to support programs that "meet[] unmet health, veteran, and other human, educational, environmental, or public safety needs and

Case 3:25-cv-01034-MMC   Document 93   Filed 03/17/25   Page 2 of 29

United States District Court
Northern District of California

1 promote[] greater community unity through the use of organized teams of participants of varied

2 social and economic backgrounds, skill levels, physical and developmental capabilities, ages,

3 ethnic backgrounds, or genders."  42 U.S.C. § 12572(c)(1)(A).

4     SFUSD has received AmeriCorps grant funding for ten years to operate its Healthy

5 Choices AmeriCorps program.  Dkt. 1 at 7 (Compl. ¶ 24).  SFUSD's Healthy Choices AmeriCorps

6 Program ("Healthy Choices") "provides mentoring services to vulnerable students across dozens

7 of SFUSD schools…to increase these students' school attendance and wellbeing."  *Id.*  On August

8 23, 2024, SFUSD received a $667,194 AmeriCorps grant to run Healthy Choices for the 2024-25

9 academic year, representing half of the entire program's budget.  *Id.*; Dkt. 18-3 at 5 (Vargas-

10 Zeuschner Decl. ¶ 17 (SFUSD Wellness Counselor & District Coordinator for Healthy Choices)).

11 The grant provides funding for 44 AmeriCorps members ("Members") to mentor, counsel, and

12 manage cases for at-risk students.  Dkt. 1-1 at 6 (Ex. 1, SFUSD Healthy Choices Grant

13 Agreement).  These Members serve 38 schools in San Francisco, specifically targeting youth with

14 high rates of truancy and low rates of academic engagement.  *Id.* at 5.

15     Santa Fe has been an AmeriCorps grant recipient for 25 years.  *Id.* at 9 (¶ 37).  In

16 particular, AmeriCorps funding has allowed Santa Fe to operate the Foster Grandparent Program,

17 the Senior Companion Program, and the Retired & Senior Volunteer Program ("RSVP") for 25

18 years each.  *Id.* at 10-11 (¶¶ 41, 45, 49).  These grants support programming "related to elder care,

19 child mentoring and development, retiree community-building, and overall community

20 wellbeing."  *Id.* at 9 (¶ 37).  Santa Fe received its AmeriCorps grants for these programs in 2024.

21 Dkts. 1-2, 1-3, 1-4 (Santa Fe's AmeriCorps Grant Agreements).

22     The new grant conditions at issue here come from AmeriCorps' February 13, 2025

23 "Executive Order Compliance Instructions" ("AmeriCorps Directive").  The AmeriCorps

24 Directive states: "All aspects of AmeriCorps grants/awards must comply with President Trump's

25 executive orders…"  Dkt. 18-2 at 8 (AmeriCorps Directive, Overview).  In particular, the

26 AmeriCorps Directive requires compliance with the following executive orders:

27     • "Defending Women From Gender Ideology Extremism And Restoring Biological Truth To

28       The Federal Government," which requires that "[f]ederal funds…not be used to promote

United States District Court
Northern District of California

1   gender ideology." *Id.* at 15.

2   • "Ending Radical And Wasteful Government DEI Programs And Preferencing" ("Anti-DEI

3      EO 1"), which requires in part the "terminat[ion of]…all 'equity-related' grants or

4      contracts." *Id.*

5   • "Ending Illegal Discrimination And Restoring Merit-Based Opportunity" ("Anti-DEI EO

6      2"), which requires that agencies include a term in grant awards requiring recipients "to

7      certify that…[they] do not operate any programs promoting DEI that violate any applicable

8      Federal anti-discrimination laws." *Id.* at 16.

9   • "Unleashing American Energy," which requires the immediate termination of "[a]ll

10     activities, programs, and operations associated with the American Climate Corps." *Id.*

11     The AmeriCorps Directive goes beyond the executive orders in that it requires cessation of

12  DEI activities *without* reference to the requirement that the activity violate any applicable Federal

13  anti-discrimination laws.  Specifically, Anti-DEI EO 2 requires that agencies include "in every

14  contract or grant award":

15          A term requiring the contractual counterparty or grant recipient to
            agree that its compliance in all respects with all applicable Federal
16          anti-discrimination laws is material to the government's payment
            decisions for purposes of section 3729(b)(4) of title 31, United
17          States Code

18  Exec. Order No. 14173 (2025).  As the Directive's self-certification statement below illustrates,

19  the Directive requires that grant recipients seeking to maintain their funding certify that their

20  program "does not include any activities that promote DEI activities."  Dkt. 18-2 at 10.

21     The Directive requires that grantees respond in one of three ways:

22  1) Self-certify compliance by submitting a completed statement: "I certify that [Program

23     Name], [application ID] complies with all administration Executive Orders and does not

24     include any activities that promote DEI activities."  *Id.* at 10.

25  2) Amend awards to "move into full compliance."  *Id.* at 11.  Those amending "must cease"

26     all "noncompliant activities…immediately, initiate an amendment," and "remove or update

27     any language related to out of compliance activities."  *Id.* at 9.

28  3) Relinquish awards, should grantees' projects conduct "noncompliant activities."  *Id.*

3

United States District Court
Northern District of California

## B.    <u>Procedural Background</u>

On March 10, 2025, Plaintiffs filed their complaint against Defendants.  Dkt. 1.  On March 11, 2025, Plaintiffs filed the instant motion for a temporary restraining order and order to show cause.  Dkt. 18.

On March 28, 2025, the Court heard Plaintiffs' motion for a temporary restraining order and order to show cause.  Upon review of the parties' briefs and their oral arguments, the Court ruled from the bench that 1) it had subject matter jurisdiction over the Plaintiffs' claims, and that 2) Plaintiffs had demonstrated a likelihood of success on the merits.  Regarding subject matter jurisdiction, the Court so held because Plaintiffs' claims fell under federal question jurisdiction under 28 U.S.C. § 1331, the waiver of sovereign immunity under 5 U.S.C. § 702 applied, and the exception to the waiver in 5 U.S.C. § 701(a)(2) did not apply because the agency action at issue was not "committed to agency discretion by law."  5 U.S.C. § 701(a)(2).  Moreover, the Court found that the Tucker Act did not bar its jurisdiction.  A more complete written order articulating the Court's jurisdictional analysis will follow.  Regarding Plaintiffs' demonstration of a likelihood of success on the merits of their claims, Defendants challenged Plaintiffs' likelihood of success on the merits at this TRO stage solely on a lack of subject matter jurisdiction.  Dkt. 30 (Opposition).  Defendants did not brief the substantive merits of Plaintiff's APA and constitutional claims.  Because the Court found that it had subject matter jurisdiction over Plaintiffs' claims and Defendants did not oppose Plaintiffs' substantive arguments, the Court held that Plaintiffs demonstrated a likelihood of success on the merits for the purposes of a TRO.

## III.    <u>LEGAL STANDARD</u>

For temporary injunctive relief, a plaintiff must show that:

> (1) they are likely to succeed on the merits,
> (2) they are likely to suffer irreparable harm absent preliminary relief,
> (3) the balance of equities tips in their favor, and
> (4) an injunction is in the public interest.
>
> [A court] employ[s] a "sliding scale test," which allows a strong showing on the balance of hardships to compensate for a lesser showing of likelihood of success. Thus, when plaintiffs establish that the balance of hardships tips sharply in their favor, there is a likelihood of irreparable injury, and the injunction is in the public

4

United States District Court
Northern District of California

interest, they need only show "serious questions" on the merits.

*Where Do We Go Berkeley v. Cal. DOT*, 32 F.4th 852, 859 (9th Cir. 2022) (spacing added); *see*

*Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008).

## IV.    DISCUSSION

### A.    Likelihood of Success on the Merits

As noted above, Plaintiffs have demonstrated a likelihood of success on the merits at this

juncture, the merits thus far having been focused solely on jurisdiction.

### B.    Irreparable Harm

Irreparable harm is "harm for which there is no adequate legal remedy, such as an award of

damages." *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). "Because

intangible injuries generally lack an adequate legal remedy, 'intangible injuries [may] qualify as

irreparable harm.'" *Id.* (quoting *Rent–A–Ctr., Inc. v. Canyon Television & Appliance Rental, Inc*.,

944 F.2d 597, 603 (9th Cir. 1991)).

Plaintiffs have made an adequate showing that they would likely suffer irreparable harm

absent preliminary relief on three bases. These include: 1) current and ongoing harm, 2) harm

from loss of funding for non-compliance, and 3) a constitutional violation.

#### 1.    Current and Ongoing Harm

First, to maintain their AmeriCorps funding, Plaintiffs have had to make "actual,

substantive programmatic changes" with consequences that money cannot remedy. Dkt. 31 at 18.[1]

For example, SFUSD hosts weekly trainings for AmeriCorps Members that "usually involve

principles of diversity, equity, and inclusion." Dkt. 18-3 at 8 (Vargas Decl. ¶ 26). In these weekly

sessions, SFUSD trains Members in "evidence-based practices related to diversity, equity, and

inclusion," including "trauma-informed care, Youth Mental Health First-Aid," and "social-

emotional learning." Dkt. 31 at 14-15; *see* Dkt. 18-3 at 8-9 (Vargas-Zeuschner Decl. ¶¶ 26-28).

The ultimate purpose of these trainings is to support and improve "student learning and

---

[1] The AmeriCorps Directive instructed that those seeking "to remain an AmeriCorps grantee…must cease ['non-compliant activities'] immediately, initiate an amendment," and "remove or update any language related to out of compliance activities." Dkt. 18-2 at 9 (quoting *Id.*).

5

United States District Court
Northern District of California

wellbeing." *Id.* at 8 (¶ 24). To attempt to comply with the AmeriCorps Directive, SFUSD has begun "to remove diversity, equity, and inclusion-related materials from [their] trainings." Dkt. 18-3 at 8 (¶ 26). SFUSD hosted one such training, stripped of potentially 'non-compliant activities,' on "Monday, March 10, 2025." *Id.* ("We have already been forced to spend time and resources to remove diversity, equity, and inclusion-related materials from our trainings, including one that occurred on Monday, March 10, 2025").[2]

Further, SFUSD is modifying its mentorship program, which exists to "support [students'] learning, literacy, and attendance." *Id.* at 9 (¶ 27). Specifically, if forced to comply, SFUSD would stop matching students with mentors "that look like and reflect the values of the student" because this may entail "matching students and mentors of the same racial or ethnic background, gender identity, or sexual orientation." *Id.*

Plaintiffs allege that "[r]emoving these aspects…harms both students' wellbeing and [AmeriCorps] Members' ability to effectively perform their jobs." *Id.* More specifically, "program reductions" may cause a "decrease" in "students' social-emotional functioning and pro-social behaviors" and an "increase" in "suspensions and bullying." *Id.* at 11 (¶ 33). Retracting support for students' development causes irreparable harm. *See N. D. v. Reykdal*, 102 F.4th 982, 995 (9th Cir. 2024) (quoting *Cosgrove v. Board of Educ. of Niskayuna Cent. Sch. Dist.*, 175 F. Supp. 2d 375, 392 (N.D.N.Y. 2001) ("It is almost beyond dispute that wrongful discontinuation of a special education program to which a student is entitled subjects that student to actual irreparable harm"); *see N.D. ex rel. parents acting as guardians ad litem v. Hawaii Dep't of Educ.*, 600 F.3d 1104, 1112 (9th Cir. 2010) (affirming finding that teacher furloughs caused irreparable harm related to the "regression in" student's "behavior, increased difficulty with activities," "outbursts of frustration and violence," and "regression in behavior leading to increased aggression"); *see also John T. v. Delaware County Intermediate Unit,* 2000 WL 558582 at *8 (E.D. Pa. May 8, 2000) ("Compensation in money can never atone for deprivation of a meaningful education in an appropriate manner at the appropriate time").

---

[2] SFUSD is also reviewing the permissibility of student gender and sexuality alliance clubs in light of the Directive.

## 2. **Harm from Threat of Loss of Funding for Non-Compliance**

Second, Plaintiffs are likely to suffer irreparable harm from ongoing threat of a loss of funding for non-compliance, particularly where the mandated conditions for compliance appear at this juncture to be unclear.  In its Directive, AmeriCorps gave recipients three clear options: certify compliance, amend awards to be able to certify compliance, or relinquish awards.  Dkt. 18-2 at 8.  Plaintiffs argue that losing funding is not a viable option and Defendants have failed to unconditionally guarantee that they will not pull Plaintiffs' funding for non-compliance during the period of the requested TRO.[3]  For SFUSD's Healthy Choices Program, its AmeriCorps grant represents "half of the program's budget."  Dkt. 1 at 7 (Compl. ¶ 25).  Consequently, losing access to the "$667,194 obligated to the District" means "drastically cut[ting] the number of mentors in…schools and significantly reduc[ing] the programs provided, including impacting Mentoring for Success."  Dkt. 18-3 (¶ 33).  SFUSD's AmeriCorps funding is critical in light of SFUSD's "$113 million deficit for the 2025-26 school year."  Dkt. 18-4 at 2 (Su Decl. ¶¶ 5-6) (Superintendent of SFUSD states: "In this budget climate, losing around $667,000—which is being used…to provide services…to vulnerable students—would be a significant hardship").  Similarly, Santa Fe faced the impossible choice of amending its awards or losing "at least $93,013 in federal funding…[for] vital services."  Dkt. 18-6 at 5 (Hammond-Paul Decl. ¶ 23).[4]  Such loss of funding is a "predictable result from a broad policy" and "is sufficiently-specific to allege

---

[3] Plaintiffs note that AmeriCorps communicated that it would take "no further action" to enforce the new conditions "until lawsuits challenging the legality of the applicable executive orders have been resolved."  Dkt. 31 at 17 (quoting Opposition at 5).  However, several lawsuits are pending, and Plaintiffs cannot ascertain when they will be finally resolved.  *See Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump,* No. 1:25-CV-00333-ABA, 2025 WL 573764 (D. Md. Feb. 21, 2025), *opinion clarified,* 2025 WL 750690 (D. Md. Mar. 10, 2025), *appeal filed,* No. 25-1189 (4th Cir.) (preliminary injunction stayed pending appeal); *R.I. Latino Arts v. Nat'l Endowment for the Arts,* No. 1:25-cv-00079 (D.R.I. filed Mar. 6, 2025).  More to the point, the fact that AmeriCorps will not take immediate action, does not mean it will not cut funding retroactively based on the current failure of the Plaintiffs to comply with its Directive.  When invited by the Court at the hearing to make a commitment not to penalize conduct during the pendency of the TRO, Defendants refused.

[4] Losing their funding means that children will lose access to "one-on-one mentorship provided by Foster Grandparents…to close opportunity gaps in education," underrepresented groups will have reduced access to "food security programs" and "literacy projects" managed by the Retired & Senior Volunteer Program, and homebound individuals will lose care from Senior Companions.  *See* Dkt. 18-6 at 5-6 (Hammond Decl. ¶¶ 26-29).

United States District Court
Northern District of California

irreparable harm." *City & Cnty. of San Francisco v. U.S. Citizenship & Immigr. Servs*., 408 F. Supp. 3d 1057, 1122 (N.D. Cal. 2019), *aff'd sub nom. City & Cnty. of San Francisco v. United States Citizenship & Immigr. Servs*., 981 F.3d 742 (9th Cir. 2020) (finding that a "likely loss of $7.5 million in Medicaid reimbursements (based on a 2.5% disenrollment rate)" constituted irreparable harm). Plaintiffs point out that they are faced with a Hobson's choice of cutting certain services to minimize the risk of being found in non-compliance or continuing to provide current services and programs and run the substantial risk of losing all funding. Or putting it differently, the choice is between refusing to sign a constitutionally objectionable grant agreement or signing an amended grant agreement that contains unconstitutional conditions. However framed, the fact remains that having to decide between two losing options constitutes irreparable injury because "very real penalty attaches to [Plaintiffs] regardless of how they proceed." *Am. Trucking Associations, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1058 (9th Cir. 2009) (finding irreparable harm where plaintiffs faced a "Hobson's choice" between 1) "refus[ing] to sign [a] likely unconstitutional…agreement[]" and losing "customer goodwill" or their business, or 2) "sign[ing] an agreement to conditions which are likely unconstitutional," which would "disrupt and change the whole nature of its business in ways that most likely cannot be compensated with damages alone"). Plaintiffs contend with good reason that this choice is made even more problematic because the conditions for compliance are unclear.

### a. Confusion Regarding How to Comply

Moreover, confusion about the new conditions, particularly regarding which activities are 'non-compliant' because they 'promote DEI', harms Plaintiffs because they do not know how to come into compliance with the AmeriCorps Directive. Plaintiffs' amendments to their awards illustrate the total confusion. Upon receiving a "spreadsheet showing terms AmeriCorps found to be problematic in [SFUSD's] original grant applications," such as "equity" and "gender identity," SFUSD employees "delete[d] any practices that might 'promote DEI activities,' even though [they] did not really understand what that means and still don't." *Id.* at 7 (¶ 23). This is one of many examples of how the ambiguity of the conditions leaves Plaintiffs operating in the dark.

For example, Santa Fe does not know whether compliance with AmeriCorps' new

8

conditions means significant modifications to or wholesale termination of its AmeriCorps programs. Specifically, Santa Fe is "unsure whether its entire Foster Grandparent program…can exist at all" because the program "serves children from racially diverse and economically disadvantaged communities" and, therefore, may be viewed as 'promoting DEI.' Dkt. 31 at 15. Thus, Santa Fe fears that the program may be considered 'non-compliant' in its entirety.

For SFUSD, Members do not know whether compliance with the new conditions includes, for example, forbidding mentees from seeking counsel from AmeriCorps mentors on "community violence, racism, poverty, and drug use," which would undermine "student success and safety." Dkt. 18-3 at 9 (¶ 30). Thus, because Plaintiffs do not know which activities are 'non-compliant,' Plaintiffs do not know how to protect their funding.

### b.    Consequent Chilling Effect

The specter of an abrupt loss of funding and the muddied language of the new conditions have spurred a chilling effect. The consequent chilling effect includes self-censorship, mired recruiting, and inability to build or maintain essential partnerships. At SFUSD:

> Members and SFUSD employees worry that their conversations, questions, good intentions, and attempts to help students may jeopardize the entire Healthy Choices program. As Members start to censor themselves or end conversations with students about these important topics, our students are left underserved.

*Id.* at 10 (¶ 32). In Santa Fe, "[t]he new restrictions have created a chilling effect on the programs by threatening their long-term stability, which has impacted the City's ability to recruit potential volunteers and build or maintain partnerships that are crucial to the success of the programs." Dkt. 18-6 at 5 (Hammond-Paul Decl. ¶ 24).

### 3.    Harm from a Constitutional Violation

"[T]he deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Here, Plaintiffs allege that AmeriCorps' new conditions on the receipt of federal funds violates the Spending Clause of the Constitution because they are ambiguous. Specifically, Plaintiffs maintain that the new conditions are unconstitutional because they fail to "put [grant] recipients on notice of what is required of them." Dkt. 18-1 at 13. A condition on the grant of

9

United States District Court
Northern District of California

federal funds violates the Spending Clause when the condition fails to enable the prospective recipient to "clearly understand…the obligations of the [conditions]." *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). That is what Plaintiffs have alleged here, and although this Court is not reviewing the merits of the Spending Clause claim, from the briefing received thus far, it appears at least to be plausible. *See Arizona v. Yellen*, 34 F.4th 841, 853 (9th Cir. 2022) (finding cognizable injury related to potential violation of Spending Clause because plaintiff would face "serious consequences" from being held to federal funding offer with "ambiguous and coercive" terms that it allegedly did not understand)*; see also W. Virginia by & through Morrisey v. U.S. Dep't of the Treasury*, 59 F.4th 1124, 1149 (11th Cir. 2023) (affirming district court's decision that the same "ambiguous terms" of federal funding in *Arizona v. Yellen* constituted a facial violation of the Spending Clause and irreparable injury warranting a grant of preliminary injunction).

Thus, because Plaintiffs have demonstrated current and future "harm for which there is no adequate legal remedy," Plaintiffs have shown a likelihood of irreparable injury. *Brewer*, 757 F.3d at 1068.

## C.    Balance of Hardships and Public Interest

Finally, the balance of hardships and public interest tip sharply in Plaintiffs' favor. *See Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) ("When the government is a party, these last two factors merge"). Defendants offer no argument regarding any hardship they will face if the Court grants the requested TRO. Much of the Defendants' concern about unlawful preferences already falls within the ambit of anti-discrimination laws such as Title VI of the Civil Rights Act of 1964 which prohibits recipients of federal grants from engaging in unlawful discrimination. *See* 42 U.S.C. § 2000d *et seq*. And while the federal government has an interest in being able to enforce a chosen policy, that interest is eviscerated if the policy is not lawful, the very issue before this Court. At bottom, Defendants have pointed to no current concrete harm if the TRO were granted. Thus, Plaintiffs' likely irreparable injury outweighs any hardship to Defendants.

Similarly, public interest favors the Plaintiffs. Plaintiffs were approved for grants and

were authorized to use AmeriCorps funding to fulfill the purpose of AmeriCorps to "meet unmet human…needs" and supporting "diverse communities."  42 U.S.C. § 12501(b).  For example, SFUSD's Healthy Choices program supports youth with high rates of truancy and low rates of academic engagement across 38 schools in San Francisco.  Dkt. 1-1 at 5 (SFUSD Healthy Choices Grant Agreement).  Santa Fe's Senior Companion program supports homebound elderly who often have physical and/or mental health limitations with everyday tasks such as grocery shopping and healthcare planning.  Dkt. 1 at 11 (¶ 44); Dkt. 1-3 at 2 (Santa Fe Senior Companion Grant Agreement). The public interest embodied in the AmeriCorps statute favors permitting the previously approved grants — and programs of the Plaintiffs thereunder — to continue pending a hearing on the preliminary injunction.

Consequently, all factors favor a grant of the requested TRO.

## V.   **CONCLUSION**

For the foregoing reasons, Plaintiffs have made a sufficient showing in support of their motion for a TRO.  Accordingly, until this Court rules on the motion for preliminary injunction (to be heard on April 15, 2025 unless the parties stipulate to an extension of time), it is ordered that:

- Defendants shall not, at any time now or in the future, pause, freeze, impede, block, cancel, or terminate AmeriCorps funding awards on the basis of recipients' continued operation, during the pendency of this TRO, of their AmeriCorps-funded programs as originally approved;

- Defendants shall not, at any time now or in the future, pause, freeze, impede, block, cancel, or terminate AmeriCorps funding awards on the basis of recipients' failure to certify or execute new grants, during the pendency of this TRO, certifying compliance with executive orders issued by President Trump on or after January 20, 2025;

- Defendants shall not, at any time now or in the future, pause, freeze, impede, block, cancel, or terminate existing AmeriCorps funding awards on the basis of recipients' failure, during the pendency of this TRO, to certify, or execute new grants certifying, that the funded programs do not include any "activities that promote DEI activities" or similar language (together with the executive order compliance condition, the "Enjoined Conditions");

11

- Defendants are **ENJOINED** during the pendency of this TRO from modifying, or requiring Plaintiffs to modify, the terms of any of Plaintiffs' extant federal grants and contracts to comply with the Enjoined Conditions, or adding, or requiring Plaintiffs to add, any terms to forthcoming grants and contracts predicated on the Enjoined Conditions or similar language;

- Defendants are **ENJOINED** during the pendency of this TRO from requiring Plaintiffs to make any "certification" or other representation related to compliance with the Enjoined Conditions;

- Defendants, and other persons who are in active concert or participation with Defendant, are **ENJOINED**, during the pendency of this TRO, from initiating any investigations of Plaintiffs under the authority of the Enjoined Conditions, and specifically from publishing or making any list of Plaintiffs as targets of investigation as mandated by Executive Order 14173;

It is furthered ordered that Defendants are ordered to show cause why a preliminary injunction should not be issued. Defendants shall have until April 3, 2025 to file a brief in response to the OSC and in opposition to a preliminary injunction. Plaintiffs shall have until April 8, 2025 to file a reply. Absent stipulation, the preliminary injunction shall be heard on April 15, 2025 at 9:30 a.m. This TRO shall remain in place until such time as the Court rules on the preliminary injunction.

**IT IS SO ORDERED**.

Dated: March 31, 2025

_____

EDWARD M. CHEN
United States District Judge

# Exhibit 7

*The* WHITE HOUSE

Ensuring the Enforcement of Federal Rule of Civil Procedure 65(c)

The White House

March 11, 2025

MEMORANDUM FOR THE HEADS OF EXECUTIVE DEPARTMENTS AND AGENCIES

Subject:     Ensuring the Enforcement of Federal Rule of Civil Procedure 65(c)

In recent weeks, activist organizations fueled by hundreds of millions of dollars in donations and sometimes even Government grants have obtained sweeping injunctions far beyond the scope of relief contemplated by the Federal Rules of Civil Procedure, functionally inserting themselves into the executive policy making process and therefore undermining the democratic process.

This anti-democratic takeover is orchestrated by forum-shopping organizations that repeatedly bring meritless suits, used for fundraising and political grandstanding, without any repercussions when they fail.  Taxpayers are forced not only to cover the costs of their antics when funding and hiring decisions are enjoined, but must needlessly wait for Government policies they voted for.  Moreover, this situation results in the Department of Justice, the Nation's chief law enforcement agency, dedicating substantial resources to fighting frivolous suits instead of defending public safety.

The effective administration of justice in the Federal courts depends on mechanisms that deter frivolous litigation, protect parties from unwarranted costs, and streamline judicial processes.  One key mechanism is Federal Rule of Civil Procedure 65(c) (Rule 65(c)), which mandates that a party seeking a <u>preliminary injunction or temporary restraining order (injunction)</u> provide security in an amount that the court considers proper to cover potential costs and damages to the enjoined or restrained party if the

injunction is wrongly issued. Consistent enforcement of this rule is critical to ensuring that taxpayers do not foot the bill for costs or damages caused by wrongly issued preliminary relief by activist judges and to achieving the effective administration of justice.

Therefore, it is the policy of the United States to demand that parties seeking injunctions against the Federal Government must cover the costs and damages incurred if the Government is ultimately found to have been wrongfully enjoined or restrained. Federal courts should hold litigants accountable for their misrepresentations and ill-granted injunctions.

Consistent with applicable law, the heads of executive departments and agencies (agencies), in consultation with the Attorney General, are directed to ensure that their respective agencies properly request under Rule 65(c) that Federal district courts require plaintiffs to post security equal to the Federal Government's potential costs and damages from a wrongly issued injunction. The scope of this directive covers all lawsuits filed against the Federal Government seeking an injunction where agencies can show expected monetary damages or costs from the requested preliminary relief, unless extraordinary circumstances justify an exception.

In requests for security under Rule 65(c), agencies shall include, among other things, that:

(a) Rule 65(c) mandates the court to require, in all applicable cases, that a movant for an injunction post security in an amount that the court considers proper to cover potential costs and damages to the enjoined or restrained party;

(b) the security amount the agency is requesting is based on a reasoned assessment of the potential harm to the enjoined or restrained party; and

(c) failure of the party that moved for preliminary relief to comply with Rule 65(c) results in denial or dissolution of the requested injunctive relief.

This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

    DONALD J. TRUMP

NEWS

ADMINISTRATION

ISSUES

CONTACT

VISIT

GALLERY

EOP



THE WHITE HOUSE

1600 Pennsylvania Ave NW
Washington, DC 20500

WH.GOV

Copyright

Privacy

Style Guide

# Exhibit 8

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

STATE OF NEW YORK; STATE OF
CALIFORNIA; STATE OF
ILLINOIS; STATE OF RHODE
ISLAND; STATE OF NEW JERSEY;
COMMONWEALTH OF
MASSACHUSETTS; STATE OF
ARIZONA; STATE OF COLORADO;
STATE OF CONNECTICUT; STATE
OF DELAWARE; THE DISTRICT
OF COLUMBIA; STATE OF
HAWAII; OFFICE OF THE
GOVERNOR *ex rel.* Andy Beshear, in
his official capacity as Governor of
the COMMONWEALTH OF
KENTUCKY; STATE OF MAINE;
STATE OF MARYLAND; STATE OF
MICHIGAN; STATE OF
MINNESOTA; STATE OF NEVADA;
STATE OF NEW MEXICO; STATE
OF NORTH CAROLINA; STATE OF
OREGON; STATE OF VERMONT;
STATE OF WASHINGTON; and
STATE OF WISCONSIN,

     Plaintiffs,

v.

DONALD TRUMP, in his official
capacity as President of the United
States; U.S. OFFICE OF
MANAGEMENT AND BUDGET;
RUSSELL VOUGHT, in his official
capacity as Director of the U.S. Office
of Management and Budget; U.S.
DEPARTMENT OF THE
TREASURY; SCOTT BESSENT, in
his official capacity as Secretary of
the Treasury; PATRICIA COLLINS,
in her official capacity as Treasurer
of the United States; U.S.

C.A. No. 25-cv-39-JJM-PAS

DEPARTMENT OF HEALTH AND
HUMAN SERVICES; ROBERT F.
KENNEDY, JR., in his official
capacity as Secretary of Health and
Human Services; U.S.
DEPARTMENT OF EDUCATION;
LINDA MCMAHON, in her official
capacity as Secretary of Education;
U.S. DEPARTMENT OF
TRANSPORTATION; SEAN DUFFY,
in his official capacity as Secretary of
Transportation; U.S. DEPARTMENT
OF LABOR; LORI CHAVEZ-
DEREMER, in her official capacity as
Secretary of Labor; U.S.
DEPARTMENT OF ENERGY;
CHRIS WRIGHT, in his official
capacity as Secretary of Energy; U.S.
ENVIRONMENTAL PROTECTION
AGENCY; LEE ZELDIN, in his
official capacity as Administrator of
the U.S. Environmental Protection
Agency; U.S. DEPARTMENT OF
THE INTERIOR; DOUG BURGUM,
in his official capacity as Secretary of
the Interior; U.S. DEPARTMENT OF
HOMELAND SECURITY; KRISTI
NOEM, in her capacity as Secretary
of Homeland Security; U.S.
DEPARTMENT OF JUSTICE;
PAMELA BONDI, in her official
capacity as Attorney General of the
U.S. Department of Justice; THE
NATIONAL SCIENCE
FOUNDATION; DR. SETHURAMAN
PANCHANATHAN, in his capacity
as Director of the National Science
Foundation; U.S. DEPARTMENT OF
AGRICULTURE; BROOKE
ROLLINS, in her official capacity as
Secretary of Agriculture; U.S.
DEPARTMENT OF HOUSING AND
URBAN DEVELOPMENT; SCOTT
TURNER, in his official capacity as

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Secretary of Housing and Urban
Development; U.S. DEPARTMENT
OF STATE; MARCO RUBIO, in his
official capacity as Secretary of State;
U.S. AGENCY FOR
INTERNATIONAL
DEVELOPMENT; MARCO RUBIO,
in his official capacity as Acting
Administrator of the United States
Agency for International
Development; U.S. DEPARTMENT
OF DEFENSE; PETER HEGSETH,
in his official capacity as Secretary of
Defense; U.S. DEPARTMENT OF
VETERANS AFFAIRS; DOUG
COLLINS, in his official capacity as
Secretary of Veterans Affairs; U.S.
DEPARTMENT OF COMMERCE;
HOWARD LUTNICK, in his official
capacity as Secretary of Commerce;
NATIONAL AERONAUTICS AND
SPACE ADMINISTRATION; JANET
PETRO in her official capacity as
Acting Administrator of National
Aeronautics and Space
Administration; CORPORATION
FOR NATIONAL AND
COMMUNITY SERVICE;
JENNIFER BASTRESS
TAHMASEBI, in her official capacity
as Interim Head of the Corporation
for National and Community Service;
U.S. SOCIAL SECURITY
ADMINISTRATION; LELAND
DUDEK, in his official capacity as
Acting Commissioner of United
States Social Security
Administration; U.S. SMALL
BUSINESS ADMINISTRATION; and
KELLY LOEFFLER, in her official
capacity as Administrator of U.S.
Small Business Administration,

     Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

## MEMORANDUM AND ORDER

JOHN J. MCCONNELL, JR., United States District Court Chief Judge.

Before the Court is the Plaintiff States' Motion for Enforcement of Preliminary Injunction. ECF No. 168. The States allege that Defendant Federal Emergency Management Agency ("FEMA") is implementing a categorical freeze on obligated funds that violates the Court's preliminary injunction order. The Defendants oppose the motion, contending that FEMA is merely implementing a manual review process of which the Court's preliminary injunction does not restrain. ECF No. 172. For the reasons stated below, the Court GRANTS the States' Motion for Enforcement.

## I. BACKGROUND

On January 31, 2025, the Court entered a temporary restraining order ("TRO") that enjoined the Defendants from "paus[ing], freez[ing], imped[ing], block[ing], cancel[ling], or terminat[ing] Defendants' compliance with awards and obligations to provide federal financial assistance to the States," and instructed that the Defendants "shall not impede the States' access to such awards and obligations, except on the basis of the applicable authorizing statutes, regulations, and terms." ECF No. 50, at 11. The TRO also stated that if the Defendants "engage in the 'indentif[ication] and review' of federal financial assistance programs" such an exercise "shall not affect a pause, freeze, impediment, block, cancellation, or termination of Defendants' compliance with such awards and obligations, except on the basis of the applicable authorizing statutes, regulations, and terms." *Id.* at 12.

4

Within the weeks after the Court issued the TRO, the States continued to experience freezes of numerous grants and awards that went unresolved even after conferring with the Defendants' counsel. Thus, the States moved to enforce the TRO, ECF No. 66, which the Court granted—ordering the Defendants to: (1) "immediately restore frozen funding" and "immediately end any funding pause" during the pendency of the TRO, and (2) "immediately take every step necessary to effectuate the TRO."[1] ECF No. 96 at 4. Eventually, the States filed a Second Motion to Enforce, alleging that the States were facing obstacles to accessing millions of dollars of awarded and obligated FEMA funds and requesting the Court to order FEMA to show compliance with the Court's previous orders. ECF No. 160.

On March 6, the Court issued a preliminary injunction order that enjoined the Defendants—including FEMA—from "pausing, freezing, blocking, canceling, suspending, terminating, or otherwise impeding the disbursement of appropriated federal funds to the States under awarded grants, executed contracts, or other executed financial obligations based on the OMB Directive, . . . or any other materially similar order, memorandum, directive, policy, or practice under which the federal government imposes or applies a categorical pause or freeze of funding appropriated by Congress." ECF No. 161 at 44.[2] Because the Court's issuance of the

---

[1] The Court later issued an order reaffirming that the TRO does not restrain the Defendants from limiting access to federal funds "on the basis of the applicable authorizing statutes, regulations, and term." ECF No. 107 at 3.

[2] The Defendants have since appealed the Court's preliminary injunction order. ECF No. 162. Though, the 1st Circuit denied the Defendants' motion for stay pending appeal of the Court's preliminary injunction. ECF No. 171.

preliminary injunction order rendered the TRO expired, the Court denied the States'

Second Motion to Enforce the TRO as moot. *Id.* at 45. Still, the Court ordered FEMA

to file a status report telling the Court of the status of their compliance with the

preliminary injunction order by March 14, 2025. *Id.* FEMA timely filed the ordered

status report, ECF No. 166, and the States swiftly responded, ECF No. 167—alleging

that FEMA was not in compliance with the Court's preliminary injunction order.

Now, the States move to enforce the Court's preliminary injunction order based on

these allegations of FEMA's noncompliance.

## II.    STANDARD OF REVIEW

"To prove civil contempt,[3] a movant must show with clear and convincing

evidence that (1) the alleged contemnor had notice of a court order, (2) the order was

clear and unambiguous, (3) the alleged contemnor had the ability to comply with the

order, and (4) the alleged contemnor violated the order." *Letourneau v. Aul*, No. CV

14-421JJM, 2024 WL 1364340, at *2 (D.R.I. Apr. 1, 2024) (citing *Hawkins v. Dep't of*

*Health & Hum. Servs.*, 665 F.3d 25, 31 (1st Cir. 2012)).

## III.    DISCUSSION

The States assert that they have not received "substantial disbursement of

funds on important grants since early February." ECF No. 174 at 5. They highlight

that these funding disruptions coincide with an email that Stacey Street, Director of

the Office of Grants Administration at FEMA, sent to all staff on February 10, 2025,

---

[3] While the States do no seek contempt at this time, the Court uses the same factors to determine whether it should order enforcement of its preliminary injunction.

which instructed the placement of "hold toggles" and "financial holds" on "all [FEMA] awards." ECF No. 166-4. Director Street clarified in a follow up email that these holds were not the holds directed in the OMB M-25-13 ("OMB Directive") that the Court enjoined in the TRO. ECF No. 166-5 at 2. Rather, Director Street indicated that "we are still processing out awards but will be adding a level of internal controls." *Id.*

But the States have presented undisputed evidence that this "processing" of awards has yet to come. *See e.g.*, ECF No. 168-1 at ¶¶ 11-12 (Hawaii's February 21 second obligation request for almost $6 million and February 25 drawdown reimbursement request for almost $500,000 still pending with FEMA); ECF No. 168-2 ¶ 20 (Oregon's Department of Emergency Management has not received federal FEMA funds since February 20, thus waiting on approximately $129.4 million in federal funds); ECF No. 168-3 ¶ 6 (None of the Colorado Department of Public Safety's Division of Homeland Security and Emergency Management's requests—between February 18 to March 25—for over $33 million in reimbursement costs from FEMA under fourteen grant program have been approved); ECF No. 168-4 ¶ 7 (Rhode Island's FEMA grants, which support nearly a dozen grant programs, have been unavailable for more thirty days); ECF No. 160-1 ¶¶ 4-20 (listing several FEMA grants to state agencies in Arizona, California, Colorado, Hawaii, Illinois, Maine, Maryland, Michigan, New Jersey, New York, Vermont, Washington, and Wisconsin that are frozen and unavailable for drawdown). Overall, the States contend that "as of March 12, 2025, at least 215 FEMA grants to at least nineteen

plaintiff states remain frozen or otherwise inaccessible." ECF No. 168 at 4. Thus, the States allege that FEMA's implementation of a manual review process for payment requests violates the Court's preliminary injunction order because it constitutes "a categorical pause or freeze of funding appropriate by Congress." ECF No. 174 at 1.

But the Defendants counter that FEMA's manual review process is not a "pause or withholding of grant funds" but "simply an internal control where FEMA staff manually review all grant payment requests before disbursing payments to recipients." ECF No. 172 at 7. Cameron Hamilton, Acting FEMA Administrator, attests that he started this manual review process in response to the Department of Homeland Security ("DHS") Secretary Kristi Noem's January 28, 2025 memorandum titled "Direction on Grants to Non-governmental Organizations" ("NGO Grants Directive") ECF No. 172-1 ¶ 6; *see also* ECF No. 166-2. In the memorandum, Secretary Noem ordered a "hold pending review" on "all Department grant disbursements . . . that (a) go to non-profit organizations or for which non-profit organizations are eligible and (b) touch in any way on immigration." ECF No. 166-2. Thus, on February 14, Mr. Hamilton formalized the ordered review process, issuing the Grant Processing Guidance that ordered FEMA to review certain "obligations, disbursements, and payments" to ensure compliance with Secretary Noem's directive. *See* ECF No. 166-7 at 1.

The Defendants assert that this "review" of grant payments is not the type contemplated by the OMB Directive that instructed agencies to "review agency

programs and determine the best uses of the funding for those programs consistent with the law and the President's priorities." ECF No. 172 at 8. Instead, the Defendants assert that the purpose of this review is to "ensure reimbursement payment requests are allowable, allocable, and reasonable per each award's terms and conditions . . . and are free from fraud, waste, or abuse." *Id.*

Further, the Defendants assert that this manual review process is not violative of the Court's injunction because FEMA is relying on its own independent authorities to implement the process rather than the OMB Directive. ECF No. 172 at 10. They contend that under 2 C.F.R. § 200.300(a), FEMA has an obligation to "manage and administer [each] Federal award in a manner so as to ensure that Federal funding is expended and associated programs are implemented in full accordance with the U.S. Constitution, applicable Federal statutes and regulations . . . and the requirements of this part." *Id.* at 11. The Defendants also highlight that relevant grant regulations dictate that for costs to be allowable under an award, such costs must be "necessary and reasonable for the performance of the Federal award and be allocable thereto" and be "adequately documented." *Id.* at 10-11 (citing 2 C.F.R. § 200.403(a), (g); 2 C.F.R. §§ 200.404-405). Thus, the Defendants contend that these regulations illustrate that "FEMA has independent regulatory authority to review payment requests to ensure they are appropriate and lawful before approving funds for disbursement." *Id* at 11.

But 2 C.F.R. § 200.300(a)'s text is general and nothing within the regulation authorizes FEMA's imposition of the challenged manual review process—which

essentially imposes an indefinite categorical pause on payments. Nor does 2 C.F.R. § 200.403 provide FEMA with independent regulatory authority to conduct such a review as that regulation merely sets forth the criteria that costs must meet to be allowable under Federal awards. As the States point out, 2 C.F.R Part 200 already prescribes the means that federal agencies may use to manage recipients' performance and ensure appropriate controls over federal awards—such as Subpart D[4] (Post Federal Award Requirements) and Subpart F (Audit Requirements). But neither § 200.300(a) nor § 200.403: (1) add to these existing regulatory mechanisms for managing recipients' compliance the Constitution, federal statutes, and applicable grant terms, or (2) imbue FEMA with the authority to implement an indefinite categorical manual review process with no clear end.[5]

In any event, the States have presented evidence that strongly suggests that FEMA is implementing this manual review process based, covertly, on the President's January 20, 2025 executive order—"Protecting the American People Against Invasions" ("*Invasion* EO"). Section 17 of the *Invasion* EO provides that the DHS

---

[4] Notably, 2 C.F.R. § 200.339, which falls under Subpart D, provides federal agencies like FEMA with remedies for recipients' noncompliance "with the U.S. Constitution, Federal statutes, regulations, or terms and conditions of the Federal award."

[5] To be clear, the preliminary injunction order does not enjoin the Defendants from making funding decisions based on their actual authority under the applicable statutory, regulatory or grant terms. That said, the regulations the Defendants cite to support FEMA's implementation of this manual review process does not provide FEMA with the "independent regulatory authority" to implement such a "review process" that amounts to an indefinite pause on payments—especially considering the explicit regulatory mechanisms that provides the means for federal agencies to manage federal award recipients' compliance with the Constitution, federal statutes, and grant terms and conditions. *See e.g.,* 2 C.F.R. § 200.339.

Secretary "shall . . . evaluate and undertake any lawful actions to ensure that so-called 'sanctuary' jurisdictions . . . do not receive access to Federal funds." Exec. Order 14159, 90 Fed. Reg. 8443, 8446 (Jan. 29, 2025). Then, section 19 directs that the DHS Secretary shall "(a) Immediately review and, if appropriate, audit all contracts, grants, or other agreements providing Federal funding to non-governmental organizations supporting or providing services, either directly or indirectly, to removable or illegal aliens . . . [and] (b) Pause distribution of all further funds pursuant to such agreements pending the results of the review in subsection (a)." *Id.* at 8447.

Secretary Noem's NGO Grants Directive take steps to effectuate section 19 of the *Invasion* EO, as she directs a "hold" on "all Department grant disbursements . . . that (a) go to non-profit organizations or for which non-profit organizations are eligible and (b) touch in any way on immigration." ECF No. 166-2. Further, the NGO Grants Directive was issued barely a week after the *Invasion* EO and a day after the OMB Directive, which called for a pause on disbursements of all federal financial assistance that may be implicated by the Executive Orders—including the *Invasion* EO. *See* OMB M-25-13 at 1-2. The temporal proximity between the issuance of the *Invasion* EO, the OMB Directive, and the NGO Grants Directive further illustrates that Secretary Noem's mandate to pause DHS funding related to immigration was an effort to carry out the funding pause directed in the *Invasion* EO. Thus, Mr. Hamilton's assertion that the manual review process was implemented in response

11

to Secretary Noem's January 28 memorandum truly means that the manual review

process was implemented to comply with the funding directives in the *Invasion* EO.

But the connection between FEMA's manual review process and the *Invasion*

EO does not end with the NGO Grants Directive. On February 19, Secretary Noem

issued a memorandum titled "Restricting Grant Funding for Sanctuary

Jurisdictions." ECF No. 174 at 42-43. This memorandum ordered that:

> All components are to review all federal financial assistance awards to
> determine if Department funds, directly or indirectly, are going to
> sanctuary jurisdictions. To the extent consistent with relevant legal
> authorities and the applicable terms and conditions of each award, each
> component must cease providing federal funding to sanctuary
> jurisdictions."[6]

---

[6] The memorandum defines sanctuary jurisdictions as:

- Jurisdictions that fail to comply with the information sharing
  requirements of 8 U.S.C. §§ 1373 and 1644.
- Jurisdictions that violate other relevant laws, including prohibitions
  on encouraging or inducing an alien to come to, enter, or reside in the
  United States in violation of law, 8 U.S.C. § 1324(a)(l)(A)(iv),
  prohibitions on transporting or moving illegal aliens, *id.* § 1324(a)(l
  )(A)(ii), prohibitions on harboring, concealing, or shielding from
  detection illegal aliens, *id.* § 1324(a)(l)(A)(iii), and any applicable
  conspiracy, aiding or abetting, or attempt liability respecting these
  statutes.
- Jurisdictions that fail to honor requests for cooperation, such as
  participation in joint operations, sharing of information, or requests
  for short term detention of alien pursuant to a valid detainer. A
  jurisdiction, however, is not a sanctuary jurisdiction merely because
  it lacks the necessary resources to assist in a particular instance.
- Any jurisdiction that fails to provide access to detainees, such as
  when an immigration officer seeks to interview a person who might
  be a removable alien.
- Any jurisdiction that leaks the existence of an enforcement
  operation.

ECF No. 174 at 42-43.

*Id.* at 43. On March 20, Mr. Hamilton sent a memorandum to Secretary Noem that outlined FEMA's proposed plans to ensure compliance with the NGO Grants Directive and the Secretary's February 19 memorandum. *See id.* at 18-41. Specifically, Mr. Hamilton proposed a "review process" for grant programs that FEMA administers to ensure alignment "with Administration and Secretary priorities on non-governmental organizations, immigration, and sanctuary jurisdictions." *Id.* at 18. Secretary Noem approved the proposals on March 25. *See id.* at 20-21.

Secretary Noem's directive that "each component must cease providing federal funding to sanctuary jurisdictions" effectuates the *Invasion* EO mandate that the DHS Secretary ""shall . . . evaluate and undertake any lawful actions to ensure that so-called 'sanctuary' jurisdictions . . . do not receive access to Federal funds." *Compare* ECF No. 174 at 43 *with* 90 Fed. Reg. at 8447. Thus, Mr. Hamilton's March 20 memorandum reveals that FEMA's adoption of a manual review process—which purports to ensure compliance with Secretary Noem's February 19 memorandum—is essentially an adoption of a funding review scheme that strives to effectuate the funding mandates in section 17 of the *Invasion* EO, which the Court enjoined in its preliminary injunction.

The Court reaffirms its preliminary injunction order that the Defendants are enjoined from "pausing, freezing, blocking, canceling, suspending, terminating, or otherwise impeding the disbursement of appropriated federal funds to the States . . . based on the OMB Directive, **including funding freezes dictated, described, or implied**

by Executive Orders issued by the President before rescission of the OMB Directive
or any other materially similar order, memorandum, directive, policy, or practice
under which the federal government imposes or applies a categorical pause or freeze
of funding appropriated by Congress." ECF No. 161 at 44 (emphasis added).  FEMA
received notice of the preliminary injunction order, the order is clear and ambiguous,
and there are no impediments to FEMA's compliance with the order.  The record
makes clear that FEMA's manual review process imposes an indefinite pause on the
disbursement of federal funds to the States, based on funding freezes dictated by: (1)
the *Invasion* EO—an "Executive Order issued by the President before rescission of
the OMB Directive"—and (2) Secretary Noem's NGO Grant Directive and
February 19 memorandum—i.e., memoranda that are "materially similar" to the
*Invasion* EO "under which the federal government imposes . . . a categorical pause or
freeze of funding appropriated by Congress."  Thus, FEMA's manual review process
violates the Court's preliminary injunction order.  So in accordance with the
preliminary injunction order, FEMA is hereby ORDERED as follows:

1. Throughout the duration of the preliminary injunction order, FEMA must
   immediately cease the challenged manual review process implemented
   pursuant to Secretary Noem's "Direction on Grants to Non-governmental
   Organizations" and "Restricting Grant Funding for Sanctuary
   Jurisdictions" memoranda—including the manual review process as
   described in Cameron Hamilton's March 20, 2025 Memorandum to DHS
   Secretary Noem.
2. FEMA must immediately comply with the plain text of the preliminary
   injunction order not to pause or otherwise impede the disbursement of
   appropriated federal funds to the States based on funding freezes dictated,
   described, or implied by Executive Orders issued by the President before
   the rescission of the OMB Directive, which includes sections 17 and 19 of
   the *Invasion* Executive Order.

3. FEMA must direct notice of this Order and notice of the Court's preliminary injunction order to FEMA's leadership and all FEMA staff who administer these FEMA grants and other federal financial assistance. FEMA shall provide confirmation of these notices, including the names of recipients of the notice, no later than 48 hours after this Order.

IT IS SO ORDERED.

_____
John J. McConnell, Jr.
Chief Judge
United States District Court
    for the District of Rhode Island

April 4, 2025

# Exhibit 9



**U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**
THE SECRETARY
WASHINGTON, DC 20410-0001

April 4, 2025

Dear HUD Grantees and Stakeholders,

President Trump issued Executive Order 14218, "Ending Taxpayer Subsidization of Open Borders," on February 19, 2025, to promote the rule of law and prevent American taxpayer dollars from being spent on federal assistance for illegal aliens. As Secretary of the Department of Housing and Urban Development (HUD), it is my responsibility to effectively implement the President's executive order at the agency.

HUD's contributions to housing and community development across the country serve some of America's most vulnerable citizens on a path towards self-sufficiency. To that end, the President's Executive Order emphasizes that the federal resources distributed by HUD shall be primarily focused on benefiting American citizens and other qualified recipients, not illegal aliens.

President Trump's Executive Order reinforces the 1996 Personal Responsibility and Work Opportunity Reconciliation Act (PRWORA, P.L. 104-193), which unequivocally prohibits illegal aliens from receiving certain federal public benefits, including many forms of assistance provided under HUD programs. Further, Section 214 of the Housing and Community Development Act of 1980 (P.L. 96-399) prohibits HUD from making financial assistance available to persons other than United States citizens or certain categories of eligible noncitizens in the Section 8 Housing Assistance programs, Public Housing programs, Housing Development Grant programs, Section 202 direct loan program, Section 235 program, Section 236 Program, and Rent Supplement Program. This letter serves as a reminder to all HUD grantees of their legal obligations to comply with these laws and the President's Executive Order.

Recently, I directed HUD senior leadership to review our programs and institute mechanisms that can ensure that HUD programs are compliant with President Trump's Executive Order. For example, going forward, grant agreements will include language that will require compliance with Executive Order 14218, and the Department will take steps to ensure that Federal resources are not used to support "sanctuary" policies of State and local jurisdictions that actively prevent federal authorities from deporting illegal aliens.

I am excited to work with our grantees and other stakeholders to implement this Executive Order and enforce the law so that HUD programs are used for the benefit of the American people. Thank you for your cooperation, and I encourage you to contact our team at HUD with any ideas that may be able to help improve our implementation of President Trump's Executive Order.

Sincerely,

Scott Turner
Secretary