1  Mark Rosenbaum (SBN 59940)
2  Gina Amato (SBN 215519)
   Rebecca Brown (SBN 345805)
3  Jacob Maddox (SBN 354368)
   Sophia Wrench (SBN 354416)
4  PUBLIC COUNSEL
   610 South Ardmore Avenue
5  Los Angeles, CA 90005
   (213) 385-2977
6  mrosenbaum@publiccounsel.org
7  gamato@publiccounsel.org
   rbrown@publiccounsel.org
8  jmaddox@publiccounsel.org
   swrench@publiccounsel.org
9
   Matthew J. Craig (SBN 350030)
10 Mack E. Jenkins (SBN 242101)
   Susan Har (SBN 301924)
11 HECKER FINK LLP
   1150 South Olive Street, Suite 10-140
12 Los Angeles, CA 90015
   (212) 763-0883
13 mcraig@heckerfink.com
   mjenkins@heckerfink.com
14 shar@heckerfink.com
15 *Attorneys for Plaintiffs-Intervenors*
   *Central American Resource Center –*
16 *CARECEN – of California, Coalition for*
   *Humane Immigrant Rights, and Immigrant*
17 *Defenders Law Center*
18
19            UNITED STATES DISTRICT COURT
20    NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION
21
22 CITY AND COUNTY OF SAN              Case No. 25-CV-01350-WHO
   FRANCISCO, COUNTY OF SANTA
23 CLARA, CITY OF PORTLAND, MARTIN     **NOTICE OF MOTION AND MOTION**
   LUTHER KING, JR. COUNTY, CITY OF    **FOR PERMISSIVE INTERVENTION OF**
24 NEW HAVEN, CITY OF OAKLAND,         **CENTRAL AMERICAN RESOURCE**
   CITY OF EMERYVILLE, CITY OF SAN     **CENTER – CARECEN – OF**
25 JOSE, CITY OF SAN DIEGO, CITY OF    **CALIFORNIA, COALITION FOR**
   SACRAMENTO, CITY OF SANTA           **HUMANE IMMIGRANT RIGHTS, AND**
26 CRUZ, COUNTY OF MONTEREY, CITY      **IMMIGRANT DEFENDERS LAW**
   OF SEATTLE, CITY OF MINNEAPOLIS,    **CENTER; MEMORANDUM OF POINTS**
27 CITY OF ST. PAUL, CITY OF SANTA     **AND AUTHORITIES**
   FE,
28                                     Hearing Date: May 21, 2025
          Plaintiffs,                  Time: 2:00 p.m.
                                       Courtroom: Courtroom 2
          v.                           Before: Hon. William H. Orrick

1

2

3

4

5

6

7

8

DONALD J. TRUMP, President of the
United States, UNITED STATES OF
AMERICA, PAMELA BONDI, Attorney
General of the United States, EMIL BOVE,
Acting Deputy Attorney General, UNITED
STATES DEPARTMENT OF JUSTICE,
KRISTI NOEM, Secretary of United States
Department of Homeland Security,
UNITED STATES DEPARTMENT OF
HOMELAND SECURITY, DOES 1-100,

    Defendants.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION ..................................................................................2

MEMORANDUM OF POINTS AND AUTHORITIES ....................................................3

    I.     INTRODUCTION ....................................................................................................3

    II.    STATEMENT OF FACTS ......................................................................................4

        A.   Los Angeles Has Long Maintained Sanctuary Practices and Policies to Enhance Local Governance, Public Safety, and Community Trust..............................................................4

        B.   Plaintiffs-Intervenors Are Non-Profit Organizations That Serve Immigrant Communities and Helped Establish the City as a Sanctuary City ......................................6

        C.   Defendants Seek to Commandeer Jurisdictions Like the City to Abandon Their Sanctuary Policies and Enforce Federal Immigration Law.................................................8

        D.   Defendants' Executive Actions Directly Harm Plaintiffs-Intervenors, Their Clients, and Their Members ..................................................................................10

    III.   ARGUMENT ..........................................................................................................12

        A.   Plaintiffs-Intervenors Meet the Three Threshold Requirements for Permissive Intervention ....................................................................................................13

        B.   The Discretionary Factors Weigh in Favor of Intervention ..............................15

    IV.   CONCLUSION ......................................................................................................20

1

# TABLE OF AUTHORITIES

2

Page(s)

**CASES**

3

4

*ACLU of N. Cal. v. Burwell*,
 No. 16 Civ. 03539, 2017 WL 492833 (N.D. Cal. Feb. 7, 2017)....................................13, 18

5

6

*Arakaki v. Cayetano*,
 324 F.3d 1078 (9th Cir. 2003)...........................................................................................11

7

*Bacoka v. Best Buy Co.*,
 No. 18 Civ. 866, 2018 WL 6430533 (C.D. Cal. Nov. 7, 2018) ..........................................17

8

9

*Bennett v. Spear*,
 520 U.S. 154 (1997)..........................................................................................................16

10

11

*BlueTriton Brands v. U.S. Forest Serv.*,
 No. 24 Civ. 9720, 2025 WL 746247 (C.D. Cal. Jan. 14, 2025).........................................17

12

13

*California v. EPA*,
 No. 18 Civ. 03237, 2018 WL 6069943 (N.D. Cal. Nov. 20, 2018) ..............................14, 18

14

*Citizens for Balanced Use v. Mont. Wilderness Ass'n*,
 647 F.3d 893 (9th Cir. 2011)...............................................................................12, 13, 15

15

16

*City & Cnty. of S.F. v. Trump*,
 897 F.3d 1225 (9th Cir. 2018)......................................................................3, 10, 16, 17, 18

17

18

*COR Clearing, LLC v. Khan*,
 No. 15 Civ. 668, 2016 WL 11668990 (C.D. Cal. May 12, 2016).......................................15

19

20

*County of Santa Clara v. Trump*,
 250 F. Supp. 3d 497 (N.D. Cal. 2017) ................................................................................3

21

22

*County of Santa Clara v. Trump*,
 No. 17 Civ. 574 (N.D. Cal. Aug. 23, 2019) ..................................................................3, 10

23

24

*Dave Drilling Env't Eng'g, Inc. v. Gamblin*,
 No. 14 Civ. 02851, 2015 WL 4051968 (N.D. Cal. July 2, 2015) .......................................13

25

*Defs. of Wildlife v. Johanns*,
 No. 4 Civ. 4512, 2005 WL 3260986 (N.D. Cal. Dec. 1, 2005) .........................................18

26

27

*Dep't of Comm. v. New York*,
 588 U.S. 752 (2019)..........................................................................................................17

28

*Doe v. Harris*,
 No. 12 Civ. 5713, 2013 WL 140053 (N.D. Cal. Jan. 10, 2013) .......................14, 15, 16, 17

*E. Bay Sanctuary Covenant v. Biden,*
    993 F.3d 640 (9th Cir. 2021).........................................................................................17

*Freedom from Religion Found., Inc. v. Geithner,*
    644 F.3d 836 (9th Cir. 2011)........................................................................... 12, 13, 16

*Kamakahi v. Am. Soc'y for Reprod. Med.,*
    No. 11 Civ. 01781, 2015 WL 1926312 (N.D. Cal. Apr. 27, 2015)...................................19

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania,*
    591 U.S. 657 (2020).....................................................................................................16

*Officers for Just. v. Civ. Serv. Comm'n of S.F.,*
    934 F.2d 1092 (9th Cir. 1991)......................................................................................14

*Orange County v. Air Cal.,*
    799 F.2d 535 (9th Cir. 1986)........................................................................................12

*Organized Vill. of Kake v. U.S. Dep't of Agric.,*
    795 F.3d 956 (9th Cir. 2015)........................................................................................17

*Perry v. Schwarzenegger,*
    630 F.3d 898 (9th Cir. 2011)........................................................................................15

*Prete v. Bradbury,*
    438 F.3d 949 (9th Cir. 2006)........................................................................................15

*Religion Found., Inc. v. Geithner,*
    644 F.3d 836 (9th Cir. 2011)........................................................................... 12, 13, 16

*Rollins v. Dignity Health,*
    No. 13 Civ. 01450, 2020 WL 13220648 (N.D. Cal. Nov. 2, 2020)...................................14

*Scholl v. Mnuchin,*
    No. 20 Civ. 05309, 2021 WL 84487 (N.D. Cal. Jan. 11, 2021).......................................16

*Sec. & Exch. Comm'n v. U.S. Realty & Imp. Co.,*
    310 U.S. 434 (1940).....................................................................................................16

*Spangler v. Pasadena City Bd. of Educ.,*
    552 F.2d 1326 (9th Cir. 1977)........................................................................... 12, 15, 19

*Sturgeon v. Bratton,*
    174 Cal. App. 4th 1407 (2009).......................................................................................5

*Sw. Ctr. for Biological Diversity v. Berg,*
    268 F.3d 810 (9th Cir. 2001)........................................................................................13

*Thompson v. Wolverine Servs., LLC*,
    No. 20 Civ. 08865, 2021 WL 827605 (N.D. Cal. Mar. 4, 2021) ......................................... 13

*Valle Del Sol Inc. v. Whiting*,
    732 F.3d 1006 (9th Cir. 2013).......................................................................................... 17

*W. States Trucking Ass'n v. Becerra*,
    No. 19 Civ. 2447, 2020 WL 1032348 (C.D. Cal. Mar. 2, 2020) ........................................ 13

*In re Wells Fargo & Co. Hiring Pracs. Derivative Litig.*,
    No. 22 Civ. 5173, 2023 WL 4536883 (N.D. Cal. July 13, 2023) ....................................... 18

**STATUTES**

8 U.S.C. § 1373 ............................................................................................................................... 3

Cal. Gov't Code § 7282 .................................................................................................................. 7

Cal. Gov't Code § 7283 .................................................................................................................. 7

Cal. Gov't Code. § 7284 ................................................................................................................. 7

L.A. Admin Code § 19.191 ........................................................................................................ 5, 6

**RULES**

Fed. R. Civ. P. 12 .......................................................................................................................... 13

Fed. R. Civ. P. 24 ...................................................................................................................... 2, 21

Fed. R. Civ. P. 82 .......................................................................................................................... 13

1

### NOTICE OF MOTION AND MOTION

2
    **PLEASE TAKE NOTICE that on May 21, 2025 at 2:00 p.m., or as soon thereafter as**

3
**the matter may be heard, in the Courtroom of the Honorable William H. Orrick, located at**

4
**455 Golden Gate Avenue, San Francisco, California 94102, Central American Resource**

5
**Center – CARECEN – of California ("CARECEN"), Coalition for Humane Immigrant**

6
**Rights ("CHIRLA"), and Immigrant Defenders Law Center ("ImmDef") will, and hereby do,**

7
**move pursuant to Federal Rule of Civil Procedure 24(b) for an order granting leave to**

8
**intervene as Plaintiffs-Intervenors in this action. This motion is supported by the**

9
**accompanying Memorandum of Points and Authorities, the concurrently filed Complaint-in-**

10
**Intervention, any oral argument this Court may allow, and any other matter of which this**

11
**Court takes notice.**

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.      INTRODUCTION

The sovereign authority of states and cities that have enacted policies to limit local entanglement with federal civil immigration authorities, and the security of immigrant residents who rely on those policies, are under attack. President Donald J. Trump and the other Defendants unlawfully seek to coerce "sanctuary jurisdictions" into enforcing federal immigration law by withholding federal funds and threatening enforcement action—all in brazen disregard for prior court rulings enjoining him from doing exactly that. *See County of Santa Clara v. Trump*, 250 F. Supp. 3d 497 (N.D. Cal. 2017); *County of Santa Clara v. Trump*, 275 F. Supp. 3d 1196 (N.D. Cal. 2017); *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225 (9th Cir. 2018); *see also* Stipulation and Final Judgment and Order, *County of Santa Clara v. Trump*, No. 17 Civ. 574, ECF 206 (N.D. Cal. Aug. 23, 2019) (permanently enjoining Section 9 of Executive Order 13,768 in California).

The existing Plaintiffs are sixteen different cities and municipalities across the country who have filed suit to defend against Defendants' unconstitutional actions. *See* ECF 22. Although nine of the Plaintiffs are in California—where the prior permanent injunction remains intact—the City of Los Angeles (the "City" or "Los Angeles") is conspicuously absent. Yet the stakes for the 1.35 million immigrant residents who call the City home could not be higher. The City's longstanding practices and policies limiting the use of local law enforcement and resources to aid federal immigration enforcement, and the hundreds of millions of federal dollars on which the City relies, hang in the balance—and yet no other party to this action is here specifically to protect those interests.

That is why Plaintiffs-Intervenors CARECEN, CHIRLA, and ImmDef should be permitted to intervene. Plaintiffs-Intervenors—three of the largest non-profits in Los Angeles that provide advocacy, legal services, and support to immigrant communities—are long-time champions of the City's sanctuary policies. Plaintiffs-Intervenors are well-positioned to join this action: they have experienced firsthand the ways in which the City's sanctuary protections afford countless immigrant Angelenos safety and access to critical local services and benefits without fear of federal immigration authorities lurking; they strongly advocated for (and have a vested interest in) the legislative passage of the City's latest Sanctuary Ordinance that is now under attack; they have witnessed the damage

that the challenged executive actions have already inflicted on their members and clients in the face of Defendants' coercion campaign against the City's sanctuary policies; and they can speak to the injuries their own organizations have sustained, including the diversion of resources required to respond to needs of their members and clients as a result of the federal threats to the City's sanctuary policies as well as the loss of pass-through federal funds.

While adding important and unique perspectives to the case, Plaintiffs-Intervenors seek to join in claims present in the main action, thereby minimizing any concern of undue complication or delay. Intervention would advance judicial economy and ensure a just and equitable adjudication, particularly in view of Defendants' recent argument that any injunction should not extend nationwide (or even statewide in California), but should be limited to "only those Plaintiffs who reside in this judicial district and federal circuit." ECF 93 at 24. Absent intervention, Defendants will continue to insist that the City should be carved out of relief to which it is entitled, even though it was this Court that afforded the entire State of California necessary relief during the first Trump administration.

Accordingly, the Court should exercise its broad discretion and permit Plaintiffs-Intervenors to intervene in this action.[1]

## II.    STATEMENT OF FACTS

### A.    Los Angeles Has Long Maintained Sanctuary Practices and Policies to Enhance Local Governance, Public Safety, and Community Trust

Los Angeles is, and has always been, a city of immigrants. One in three Angelenos are foreign-born, and 1.35 million immigrants reside in the City. ¶ 25.[2] The City receives hundreds of millions of dollars in federal funds to support a wide variety of City projects providing disaster relief and housing assistance, investing in the City's infrastructure, improving economic and workforce development, supporting cultural affairs and the arts, cultivating the City's recreation areas and parks, and investing in local law enforcement.[3] As part of those federal funds, the City, especially the Los Angeles Police Department ("LAPD"), receives millions in grants from Defendant Department of Justice ("DOJ") to combat crime and support critical law enforcement prerogatives.[4]

---

[1] Defendants object to this motion. Plaintiff Emeryville has not yet expressed a position on the motion. The remaining Plaintiffs take no position with respect to this motion.
[2] All citations to "¶" refer to Plaintiffs-Intervenors' Complaint-in-Intervention filed herewith.
[3] *See* FY 2024-2025 Proposed Budget, City of Los Angeles 457-62, https://cao.lacity.gov/budget24-25/2024-25Proposed_Budget.pdf.
[4] Los Angeles Grant Funding, Nat'l Police Funding Database (last updated July 1, 2024),

1    In view of its diverse population, the City has long stated its commitment to welcoming

2   immigrants. As a matter of self-governance and public policy, the City has implemented a series of

3   sanctuary policies and practices limiting the use of local law enforcement and resources to aid federal

4   civil immigration enforcement.[5] Those policies go back at least as far as 1979, when the Los Angeles

5   Board of Police Commissioners instituted Special Order 40, prohibiting LAPD officers from

6   initiating contact with the sole objective of discovering the immigration status of an individual. ¶ 27;

7   *see Sturgeon v. Bratton*, 174 Cal. App. 4th 1407 (2009) (affirming that Special Order 40 is not

8   preempted by federal immigration law, 8 U.S.C. § 1373). Over decades, the City has passed other

9   resolutions and directives that reinforce its commitment to limiting local entanglement with federal

10  immigration authorities, including by prohibiting city employees from using public facilities or

11  resources to assist or cooperate with federal civil immigration enforcement. ¶ 27.[6]

12   Most recently, on December 9, 2024, Mayor Karen Bass signed into law Ordinance No.

13  188441 (the "Ordinance"), which had been unanimously passed by the City Council. ¶ 28.[7] The

14  Ordinance "prohibit[s] City resources, including property and personnel, from being utilized for

15  immigration enforcement or for cooperation with federal immigration agents." *Id.* Except as required

16  by federal or state law, the prohibition extends to (among other things) investigating, citing, arresting,

17  holding, transferring, or detaining any person for the purpose of immigration enforcement and

18  responding to any administrative warrant or other request by immigration agents for the purpose of

19  immigration enforcement. L.A. Admin. Code § 19.191. The Ordinance further prohibits providing

20  access to any City data or information "that can be used to determine or trace a person's Citizenship

21  or Immigration Status to any Immigration Agent." *Id.* § 19.192. Exempted from the Ordinance's

22

23  https://policefundingdatabase.org/explore-the-database/locations/california/los-angeles/grant-funding?page=1&all=true.

[5] Plaintiffs-Intervenors, as longtime supporters of the sanctuary movement, use the term "sanctuary"
24  to refer to commonsense policies enacted by local governments to protect scarce resources, ensure
the efficiency of local law enforcement, and allow immigrant communities to live their lives out in
25  the open. But as Plaintiffs detail in their First Amended Complaint, ECF 22 ¶ 43, and Plaintiffs-
Intervenors in the attached Complaint-in-Intervention, ¶ 1 n.1, "sanctuary" is not a legally defined
26  term and many local governments (including some Plaintiffs) do not use the term to refer to their
own policies. Plaintiffs-Intervenors' use of the term "sanctuary" herein should not be taken to suggest
27  that Defendants have meaningfully defined that term as required by law in the challenged executive
actions.
28  [6] *See, e.g.*, Mayor Eric Garcetti, Executive Directive No. 20, *Standing with Immigrants: A City of
Safety, Refuge, and Opportunity for All* (Mar. 21, 2017), https://gsg.usc.edu/wp-
content/uploads/2021/04/Exec.-Dir.-No.-20-Standing-with-Immigrants.pdf.
[7] L.A., Cal., Ordinance 188441 (Dec. 4, 2024), https://clkrep.lacity.org/onlinedocs/2023/23-
0243_ord_%20188441_12-19-24.pdf.

prohibitions is compliance "with a valid warrant for a criminal offense issued by a federal or state judge, or other order evidencing a judicial determination of probable cause." *Id.* § 19.193.

The City's long-standing policy priorities and intent behind the Ordinance is clear. Like Plaintiffs, the City has determined that "Los Angeles is safer when our City personnel maintain a relationship of trust, respect, and cooperation with City residents." L.A., Cal. Ordinance No. 188441 § 2. The City has further determined that "[t]he cooperation of immigrant communities to report crimes and assist in the investigation and prosecution of criminals is critical to the fair and effective enforcement of the law and the safety of all members of the community." *Id.* Thus, in order to effectuate "the immediate protection of the public peace, health, and safety of all residents across the City," the City enacted the Ordinance "to protect[] all residents from City resources being utilized for immigration enforcement" and to reduce the fear in immigrant communities that ultimately "erodes the relationship between the City and its communities." *Id.*

**B.    Plaintiffs-Intervenors Are Non-Profit Organizations That Serve Immigrant Communities and Helped Establish the City as a Sanctuary City**

Plaintiffs-Intervenors CARECEN, CHIRLA, and ImmDef are three of the largest nonprofit organizations supporting immigrant communities in Los Angeles. ¶ 3. They provide a variety of legal, social, and immigration services and advocate for immigrant rights by organizing, educating, and defending their clients and members. ¶ 13–16. Collectively, Plaintiffs-Intervenors serve approximately 300,000 immigrant residents in Southern California annually, and CHIRLA is a membership organization with approximately 50,000 active members across California. *Id.* To fund part of their work, CHIRLA and CARECEN rely on millions of dollars in federal funds that pass through the City, including, for instance, funds from the Federal Emergency Management Agency ("FEMA"). ¶ 62.

For years, Plaintiffs-Intervenors have experienced firsthand the ways in which the City's sanctuary protections allowed their clients and members to access critical local services and benefits, free of fear that engaging with state and local government would trigger federal immigration enforcement action. ¶ 32. Under the City's sanctuary protections, Plaintiffs-Intervenors have aided immigrant Angelenos with accessing necessary local public services, like obtaining identification for

themselves and for their children from the DMV; registering their children at local schools; applying for state and local housing, employment, and food benefit programs; accompanying them to report crimes to local law enforcement; navigating them through various state court proceedings, including helping children apply for Special Immigrant Juvenile Status (SIJS) in family or probate court; and providing consultation on local-government-facing interactions and other forms of civic engagement. ¶ 33. Plaintiffs-Intervenors have also relied heavily on the City's sanctuary policies and practices to develop their holistic representation model, which allows them to support their clients in accessing both legal and social services without fear that access to one will imperil the other. ¶ 34. As a result, in the course of their work, Plaintiffs-Intervenors have also become intimately familiar with the important assurances that the City's sanctuary policies give to immigrant Angelenos—enabling them to live openly and to access common locations like public transportation, local schools, hospitals, and administrative buildings. ¶ 60.

Plaintiffs-Intervenors have also participated in numerous rallies, protests, marches, legislative meetings, and coalition calls to garner broad, bipartisan support for sanctuary practices in the City and state of California. ¶ 35. For example, CHIRLA (which itself began when its first director declared his parish a sanctuary in 1986), has advocated for sanctuary policies across California, including the TRUST Act, Cal. Gov't Code. §§ 7282-7282.5,, which prevents local law enforcement from detaining noncitizens pursuant to an immigration hold or detainer; the TRUTH Act, Cal. Gov't Code §§ 7283-7283.2, which requires local law enforcement to inform noncitizens of their rights prior to an interview between federal immigration enforcement and the noncitizen in custody; and the California Values Act, Cal. Gov't Code §§ 7284-7284.10, which limits cooperation between local law enforcement and federal immigration enforcement, and forbids local law enforcement from asking about a noncitizen's immigration status or providing information regarding a person's release date to federal immigration enforcement. ¶ 35. Likewise, CARECEN was founded on the principles of sanctuary and has advocated for sanctuary policies across the state. CARECEN submitted support letters to back the passage of the California Values Act in the California Assembly and Senate; ImmDef advocated in support of the same. CARECEN also advocated for the TRUST and TRUTH Acts, supporting their passage through the California Senate. *Id.*

Thus, it is no surprise that Plaintiffs-Intervenors were key advocates of the City's 2024 Ordinance. ¶ 36. The first City Council motion to initiate a sanctuary ordinance was passed on March 7, 2023. *Id.*[8] During the nearly two years it took for the Ordinance to be enacted into law, Plaintiffs-Intervenors worked tirelessly for its passage. *Id.* CARECEN held various events to rally support for the Ordinance, including a town hall. *Id.* CARECEN and CHIRLA engaged media sources and participated in press conferences to further advocate for the Ordinance. *Id.* Numerous ImmDef staffers and members of CHIRLA gave public comment before the City Council, oftentimes relaying their personal experiences and urging the Council to pass the Ordinance. *Id.* CHIRLA members testified to the difficulties inherent in building trust between local law enforcement and immigrant communities and how this barrier to trust becomes almost insurmountable when sanctuary protections are not provided. *Id.*

Following a unanimous vote by City Council, Mayor Karen Bass signed into law the Ordinance. ¶ 28.

### C. Defendants Seek to Commandeer Jurisdictions Like the City to Abandon Their Sanctuary Policies and Enforce Federal Immigration Law

Plaintiffs-Intervenors' hard-won Ordinance, and the City's other long-standing sanctuary policies and practices, are now under direct threat. Immediately following the start of Defendant Trump's second presidential term, Defendants deployed a coercion campaign against jurisdictions like the City, taking direct aim at their sanctuary policies and practices with two executive actions: Executive Order 14,159[9] and Executive Order 14,218.[10] ¶¶ 42–44.

Section 17 of Executive Order 14,159 directs the Attorney General and the Secretary of the Department of Homeland Security ("DHS") to both (i) ensure that so-called "sanctuary jurisdictions" do not receive access to federal funds "to the maximum extent possible under law," and (ii) "evaluate and undertake any other lawful actions, criminal or civil, that they deem warranted based on any such [sanctuary] jurisdiction's practices that interfere with the enforcement of federal law." Section 8 of Executive Order 14,159 additionally directs the DHS Secretary, in coordination with the

---

[8] Motion No. 23-243 (Mar. 7, 2023), https://clkrep.lacity.org/onlinedocs/2023/23-0243_misc_03-07-23.pdf.
[9] Executive Order 14,159, *Protecting the American People Against Invasion*, 90 Fed. Reg. 8443, 8446 (Jan. 20, 2025)
[10] Executive Order 14,218, *Ending Taxpayer Subsidization of Open Borders*, 90 Fed. Reg. 10581, 10581 (Feb. 19, 2025).

1    Secretary of Treasury, to "ensure the assessment and collection of all fines and penalties ... from

2    those who facilitate [unlawful] aliens' presence in the United States."

3        Section 2(ii) of Executive Order 14,218 similarly directs every federal agency to "ensure,

4    consistent with applicable law, that Federal payments to States and localities do not, by design or

5    effect, facilitate the subsidization or promotion of illegal immigration, or abet so-called 'sanctuary'

6    policies that seek to shield illegal aliens from deportation."

7        The individual agency Defendants, in their official capacities, acted quickly to implement the

8    executive orders through memoranda to restrict federal funding and to direct enforcement actions.

9    Defendant Bondi issued a memorandum (the "Bondi Memo") to implement the funding restriction

10   and enforcement directive of the Executive Orders, including by mandating that Defendant DOJ

11   "will ensure that, consistent with law, 'sanctuary jurisdictions' do not receive access to Federal funds

12   from the department" and instructing Defendant DOJ to "seek to take any appropriate enforcement

13   action where state or local practices violate federal laws, regulations, or grant conditions."[11] The

14   Bondi Memo also reiterated a directive from a memorandum issued by Acting Deputy Attorney

15   General Bove (the "Bove Memo") instructing "the newly established Sanctuary Cities Enforcement

16   Working Group … to identify state and local laws, policies, and activities that are inconsistent with

17   Executive Branch immigration initiatives," and for the Civil Division, "where appropriate, to take

18   legal action to challenge such laws."[12] Finally, Defendant Noem issued a similar memorandum to

19   DHS, ordering "all components are to review all federal financial assistance awards to determine if

20   [DHS] funds, directly or indirectly, are going to sanctuary jurisdictions" and that, "consistent with

21   relevant legal authorities and the applicable terms and conditions of each award, each component

22   must cease providing federal funding to sanctuary jurisdictions." ECF 89, Ex. 1 at 2.

23       Executive Order 14,159 and Executive Order 14,218, along with the implementing

24   memoranda, leverage spending powers that belong to the legislative branch (while imposing

25   conditions in violation of the Spending Clause), rely on unconstitutionally vague terms, and

26   unlawfully seek to coerce local governments like the City into abandoning their sanctuary practices

27   and policies and using their local resources to carry out federal immigration enforcement.

28

[11]  Memorandum from Att'y Gen. Pamela Bondi to All Dep't Emps. (Feb. 5, 2025), https://www.justice.gov/ag/media/1388531/dl?inline.

[12] Memorandum from Acting Deputy Att'y Gen. Emil Bove to All Dep't Emps. (Jan. 21, 2025), https://assets.aila.org/files/7ee3a6c0-8ca6-4806-9ffb-96c53b01a954/25012912.pdf?1738188120.

Adding to the brazen illegality of Defendants' executive actions is the fact that they circumvent the existing permanent injunction in California. During his first presidential term, Defendant Trump issued Executive Order 13,768, Section 9 of which sought to withhold federal grants from "sanctuary jurisdictions" and directed the Attorney General to take enforcement action against any entity that prevented or hindered the enforcement of federal immigration law—just like Section 17 of Executive Order 14,159.[13] That executive order was swiftly challenged, and this Court held, as did the Ninth Circuit on appeal, that Section 9 of Executive Order 13,768 was unconstitutional. *County of Santa Clara*, 275 F.Supp.3d 1196; *City & Cnty. of S.F.*, 897 F.3d 1225. This Court permanently enjoined Section 9's funding restriction and enforcement directive for the entire State of California. Stipulation and Final Judgment and Order, *Cnty. of Santa Clara v. Trump*, No. 17 Civ. 574 (N.D. Cal. Aug. 23, 2019), ECF 206. Although President Biden revoked Executive Order 13,768,[14] Defendant Trump signed Executive Order 14,148, purporting to revoke President Biden's Executive Order and thereby reinstating Executive Order 13,768 and its permanently enjoined Section 9.[15]

### D. Defendants' Executive Actions Directly Harm Plaintiffs-Intervenors, Their Clients, and Their Members

Defendants' actions directly harm Plaintiffs-Intervenors and their clients and members, who rely heavily on the City's longstanding sanctuary practices.

*First*, Plaintiff-Intervenors are seeing the effects of the federal government's coercive tactics on the City's enforcement of its sanctuary ordinance. Already, community members and the media reported on the presence of LAPD during multiple federal enforcement operations throughout Los Angeles in late February 2025.[16] Expressing concern at the prospect of local law enforcement aiding immigration enforcement efforts by Homeland Security Investigations, Immigration and Customs Enforcement, and U.S. Customs and Border Patrol, the councilmember for District 1 made a motion

---

[13] Executive Order 13,768, *Enhancing Public Safety in the Interior of the United States*, 82 Fed. Reg. 8799, 8801 (Jan. 25, 2017).

[14] Executive Order 13,993, *Revision of Civil Immigration Enforcement Policies and Priorities*, 86 Fed. Reg. 7051, 7051 (Jan. 20, 2021).

[15] Executive Order 14,148, *Initial Recissions of Harmful Executive Orders and Actions*, 90 Fed. Reg. 8237, 8237 (Jan. 20, 2025)

[16] Rachel Uranga, Libor Jany & Ruben Vives, *LAPD Presence at South L.A. Immigration Raid Sparks Questions*, L.A. Times (Feb. 28, 2025), https://www.latimes.com/california/story/2025-02-28/lapd-presence-at-south-l-a-immigration-raid-sparks-questions; *see also* Motion 23-243-S1, L.A. City Council (Feb. 28, 2025), https://clkrep.lacity.org/onlinedocs/2023/23-0243-S1_misc_2-28-25.pdf.

seeking a report from LAPD on all incidents occurring the day of the federal enforcement actions. The motion also sought direction from the City Attorney "with detailed protocol under the Sanctuary City Ordinance outlining allowed and disallowed interactions with the different federal agencies that participate in any immigration enforcement activities."[17] Because the City has not joined Plaintiffs in this action, only Plaintiffs-Intervenors are left to advocate on behalf of the City's sanctuary practices and policies and to ensure that any judicial relief issued in this action properly extends to the City.

*Second,* Defendants' coercion campaign against the City, coupled with the early signs of the City's potential submission, have bred a well-founded fear in the City's immigrant communities and, specifically, in the members and clients of Plaintiffs-Intervenors. Just this week, there have been reports of federal enforcement authorities attempting to engage City employees at local public schools to allow them to investigate civil immigration enforcement on City property.[18] As a result, where immigrant Angelenos were once free(r) to frequent local government offices, buildings, schools, and hospitals; access local services and benefits, including by providing personal information to obtain necessary public assistance; and report crimes or participate as witnesses in criminal prosecutions, they are now chilled in their ability to engage in local community. ¶¶ 33, 59–60. Plaintiffs-Intervenors have already gathered countless reports by their members and clients expressing a deep fear of local government and skepticism that the City will abide by its prior sanctuary policies and practices. ¶¶ 59–61.

*Third*, the challenged executive actions have also directly harmed Plaintiffs-Intervenors as non-profit organizations that provide immigration services. Plaintiffs-Intervenors receive significant amounts of pass-through federal funding from the City. CHIRLA and CARECEN were expected to receive millions of dollars in funding from the FEMA Shelter and Service Program grant over three years to help defray the cost of providing services to new migrants that had landed in Los Angeles. ¶ 62. That federal grant was expected to be paid by the City, but that payment to Los Angeles has

---

[17] Subsequently, the City Council passed a package of motions aimed at informing immigrant workers of their rights ahead of potential ICE raids, and to increase funding for immigration legal services to certain organizations. *LA Council Votes to Approve Motions Aimed at Protecting Immigrants Amid Federal Crackdown*, ABC7 (Mar. 27, 2025), https://abc7.com/post/la-council-vote-motions-aimed-protecting-immigrants-amid-federal-ice-crackdown/16085313/.

[18] Howard Blume & Melissa Gomez, *Federal Officials Arrived, Denied Entry at L.A. Schools Amid Immigration Enforcement Fears*, L.A. Times (Apr. 9, 2025), https://www.latimes.com/california/story/2025-04-09/federal-agents-arrived-denied-entry-at-los-angeles-schools-officials-say.

1   been frozen as of March 11.[19] As a result, CARECEN, for example, has had to scrap plans for a

2   migrant welcome center, which would provide hot food, showers, and a community closet for

3   migrants to get a fresh start. *Id*. More generally, in the face of these funding losses, CHIRLA and

4   CARECEN have been hamstrung in their ability to plan their budgets, their services, and even their

5   continued staffing. *Id*.

6       Even as Plaintiffs-Intervenors face the loss of pass-through federal funds, Plaintiffs-

7   Intervenors have had to surge resources to respond to a growing influx of new responsibilities

8   flowing from the executive actions. They receive daily calls from terrified community members;

9   must deploy additional Know Your Rights and Raid Response presentations and supports; provide

10  triage materials, tailored to each specific client, regarding their immigration status in case of local

11  and/or federal immigration enforcement; and attempt to assuage clients' fears of entering City and

12  state buildings, including state court, where, for example, ImmDef's juvenile clients apply for SIJS.

13  ¶ 61. These diversions of resources—coming at a time when Plaintiffs-Intervenors are already

14  stretched thin due to lost federal funding sources—have caused hours of extra work on a per-client

15  basis. *Id*. That, in turn, has hampered Plaintiffs-Intervenors' ability to take on new individual

16  representations, which is the heart of the work they do in the community. *Id*.

17  **III.  ARGUMENT**

18      A party seeking permissive intervention under Rule 24(b)(1)(B) must meet three threshold

19  requirements: "(1) an independent ground for jurisdiction; (2) a timely motion; and (3) a common

20  question of law and fact between the movant's claim or defense and the main action." *Freedom from*

21  *Religion Found., Inc. v. Geithner*, 644 F.3d 836, 843 (9th Cir. 2011) (internal quotation marks

22  omitted). If a court determines that these requirements are met, it may then consider other factors in

23  deciding whether to exercise its "broad discretion" to permit intervention. *Orange County v. Air Cal.*,

24  799 F.2d 535, 539 (9th Cir. 1986); *see Spangler v. Pasadena City Bd. of Educ.*, 552 F.2d 1326, 1329

25  (9th Cir. 1977). "Rule 24 traditionally receives liberal construction in favor of applicants for

26  intervention." *Arakaki v. Cayetano*, 324 F.3d 1078, 1083 (9th Cir. 2003). In deciding a motion to

27  intervene, a court must "take all well-pleaded, nonconclusory allegations in the motion … , the

28  proposed complaint or answer in intervention, and declarations supporting the motion as true absent

---

[19] Letter from Cameron Hamilton, Senior Official, FEMA, *Remedy for Noncompliance Letter: Shelter and Services Program (SSP)*, (Mar. 11, 2025), https://immpolicytracking.org/policies/fema-announces-review-of-migrant-shelter-aid/#/tab-policy-documents.

1    sham, frivolity or other objections." *Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 820 (9th

2    Cir. 2001).

3        Plaintiffs-Intervenors here easily satisfy the threshold requirements for permissive

4    intervention, and the discretionary factors all weigh in their favor.

5    **A.    Plaintiffs-Intervenors Meet the Three Threshold Requirements for Permissive**

6    **Intervention**

7        The first requirement asks whether there is an "independent ground for jurisdiction."

8    *Freedom from Religion Found.*, 644 F.3d at 843. That requirement serves to ensure that intervention

9    does not "enlarge inappropriately the jurisdiction of the district courts." *Id.* (citing Fed. R. Civ. P.

10   82). Where, as here, the case is a federal-question case and jurisdiction is "grounded in the federal

11   question(s) raised by the plaintiff," the jurisdictional requirement for intervention only precludes a

12   proposed intervenor from "seek[ing] to bring new state-law claims." *Id.* at 844 (citations omitted).

13   Where the intervenor "brings no new claims, the jurisdictional concern drops away." *Id.*; *accord*

14   *Dave Drilling Env't Eng'g, Inc. v. Gamblin*, No. 14 Civ. 02851, 2015 WL 4051968, at *5 (N.D. Cal.

15   July 2, 2015). Because Plaintiffs-Intervenors bring no state-law claims and challenge Defendants'

16   executive actions on the same grounds as Plaintiffs, the jurisdictional element is satisfied.

17       Plaintiffs-Intervenors also satisfy the second requirement—timeliness of motion—because

18   they "seek[] to intervene at the very outset of litigation." *W. States Trucking Ass'n v. Becerra*, No.

19   19 Civ. 2447, 2020 WL 1032348, at *2 (C.D. Cal. Mar. 2, 2020). Plaintiffs filed their amended

20   complaint in this action on February 27, 2025, ECF 22; Defendants' deadline to respond to the

21   amended complaint is not until April 28, 2025, *see* Fed. R. Civ. P. 12(a)(2); and a hearing on

22   Plaintiffs' motion for preliminary injunction is nearly two weeks away, *see* ECF 61. *See Citizens for*

23   *Balanced Use v. Mont. Wilderness Ass'n*, 647 F.3d 893, 897 (9th Cir. 2011) (finding all "traditional

24   features of a timely motion" satisfied where intervenors filed their motion "less than three months

25   after the complaint was filed"); *Thompson v. Wolverine Servs., LLC*, No. 20 Civ. 08865, 2021 WL

26   827605, at *2 (N.D. Cal. Mar. 4, 2021) (intervention motion was timely because "case is in its

27   preliminary stages, with [the defendant] having just filed its answer and the initial case management

28   conference two months away").

1        Moreover, Plaintiffs-Intervenors are filing their motion to intervene the week after

2  Defendants filed their opposition to Plaintiffs' motion for a preliminary injunction, ECF 93, and just

3  days after Plaintiffs filed their reply, ECF 94. It was only after Defendants filed their opposition that

4  it became clear how critical Plaintiffs-Intervenors' intervention was: first, because Defendants'

5  ripeness and standing arguments focused on the precise status of Plaintiffs' federal funding, ECF 93

6  at 8–12, whereas Plaintiffs-Intervenors can speak to the effect the challenged executive actions are

7  already having on immigrant communities, *see* ¶¶ 59–60; and second, because Defendants' argument

8  that any injunction should be limited to the named Plaintiffs, ECF 93 at 23-24, leaves Plaintiffs-

9  Intervenors and the City of Los Angeles without any protection from Defendants' unconstitutional

10  actions. Because Defendants themselves supplied reasons for intervention for the first time in their

11  opposition, it cannot be that Plaintiffs-Intervenors' motion, coming on the heels of Defendants'

12  filing, is untimely. *See, e.g.*, *Officers for Just. v. Civ. Serv. Comm'n of S.F.,* 934 F.2d 1092, 1095–96

13  (9th Cir. 1991) (motion to intervene was timely when filed one month from "date the proposed

14  intervenor should have been aware that its interests would no longer be protected adequately by the

15  parties"); *Rollins v. Dignity Health*, No. 13 Civ. 01450, 2020 WL 13220648, at *2 (N.D. Cal. Nov.

16  2, 2020) (motion to intervene was timely, even though action had been "pending for several years,"

17  because it was filed "only a few weeks" after court issued order that made need for intervention

18  clear).[20]

19        Finally, Plaintiffs-Intervenors satisfy the third threshold requirement for intervention.

20  Plaintiffs-Intervenors challenge the same executive actions that Plaintiffs challenge, raising the same

21  constitutional claims. *Compare* ¶¶ 63–102, *with* ECF 22 ¶¶ 386–426. Where an intervenor shares

22  "common questions" regarding the constitutionality of the challenged government action, the third

23  requirement is met. *ACLU of N. Cal. v. Burwell*, No. 16 Civ. 03539, 2017 WL 492833, at *3 (N.D.

24  Cal. Feb. 7, 2017); *see also Doe v. Harris*, No. 12 Civ. 5713, 2013 WL 140053 (N.D. Cal. Jan. 10,

25  2013) (third requirement is satisfied where intervenor's constitutional challenge "address[ed] the

26

27  ―――――――――――――

[20] Consistent with Civil Local Rule 7-2, Plaintiffs-Intervenors have set this motion for a hearing on

28  May 21. Should the Court prefer to hear the motion earlier, Plaintiffs-Intervenors would have no objection to an abbreviated briefing schedule. Plaintiffs-Intervenors do not seek any adjournment of the preliminary injunction hearing currently set for April 23, and their counsel will attend that hearing to address any questions that the Court may have regarding Plaintiffs-Intervenors' interests in the pending request for preliminary injunctive relief. Plaintiffs-Intervenors will provide any additional briefing requested with respect to those interests, either in anticipation of that hearing or following a decision on this motion to intervene, on whatever schedule the Court may set.

1    questions of law and fact at the heart of [the main] action"); *COR Clearing, LLC v. Khan*, No. 15

2    Civ. 668, 2016 WL 11668990, at *2 (C.D. Cal. May 12, 2016) (same conclusion where claims "are

3    identical" and are "predicated on the same factual allegations against the same defendants").

4          **B.     The Discretionary Factors Weigh in Favor of Intervention**

5          Because Plaintiffs-Intervenors satisfy the three threshold requirements, the Court may

6    consider discretionary factors in deciding whether to permit intervention. These include: (1) the

7    nature and extent of the intervenors' interest; (2) their standing to raise relevant legal issues; (3) the

8    legal position they seek to advance and its probable relation to the merits of the case; (4) whether the

9    intervenors' interests are adequately represented by other parties; (5) whether intervention will

10   prolong or unduly delay the litigation; and (6) whether the intervenors will significantly contribute

11   to full development of the underlying factual issues and to the just and equitable adjudication of the

12   legal questions presented. *Spangler*, 552 F.2d at 1329; *accord Perry v. Schwarzenegger*, 630 F.3d

13   898, 905 (9th Cir. 2011).[21]

14         Here, all the discretionary factors firmly weigh in favor of permitting intervention.

15         ***The nature and extent of interest.*** The first factor considers the nature and extent of

16   Plaintiffs-Intervenors' interest. Whether an applicant for intervention demonstrates a sufficient

17   interest is a "practical, threshold inquiry," and "no specific legal or equitable interest need be

18   established." *Citizens for Balanced Use*, 647 F.3d at 897 (cleaned up). Indeed, interest in preserving

19   a status quo that Plaintiffs-Intervenors and their members enjoy—like the City's sanctuary status—

20   is sufficient. *See id.* (explaining that applicants have a significant protectible interest "in preserving

21   wilderness character within the Study Area"). Further, when considering cases that center on

22   "defending the initiative [Plaintiffs-Intervenors] helped pass," courts have held that proponents of

23   that initiative "have a significant, protectible interest" in that litigation sufficient to allow

24   intervention. *Harris*, 2013 WL 140053, at *1; *see also Prete v. Bradbury*, 438 F.3d 949, 954 (9th

25   Cir. 2006) ("[A] public interest group that has supported a measure (such as an initiative or

26   ordinance) has a 'significant protectable interest' in defending the legality of the measure"

27   warranting intervention); *California v. EPA*, No. 18 Civ. 03237, 2018 WL 6069943, at *4 (N.D. Cal.

28   Nov. 20, 2018) (holding that the extent of a plaintiff-intervenor's interest was substantial, "given its

---

[21] An additional factor is not relevant here: "whether changes have occurred in the litigation so that intervention that was once denied should be reexamined." *Spangler*, 552 F.2d at 1329. No party (including any of the Plaintiffs-Intervenors) has previously sought to intervene in this action.

1    past and continued participation in landfill emission legislation").

2         As discussed above, Plaintiffs-Intervenors advocated for sanctuary practices and policies in

3    Los Angeles for decades and strongly advocated for the passage of the City's Ordinance. ¶¶ 35–36.

4    Furthermore, Plaintiffs-Intervenors and their members and clients rely heavily upon, and enjoy the

5    benefit of, the City's continued enforcement of its sanctuary policies and practices. ¶¶ 32–33;

6    *Citizens for Balanced Use*, 647 F.3d at 897-98 (recognizing significant interest in "conserving and

7    enjoying" the wilderness character of the area at issue). The City's sanctuary protections permit

8    immigrant Angelenos and their families to live out their daily lives, engaging with the local

9    community, accessing necessary public services, and contributing to a productive and safe society.

10   Plaintiffs-Intervenors' interest in defending those protections is undeniably significant.

11        ***Standing.*** The Supreme Court has recognized that Rule 24 "plainly dispenses with any

12   requirement that the intervenor shall have a direct personal or pecuniary interest in the subject of the

13   litigation." *Scholl v. Mnuchin*, No. 20 Civ. 05309, 2021 WL 84487, at *4 (N.D. Cal. Jan. 11, 2021)

14   (quoting *Sec. & Exch. Comm'n v. U.S. Realty & Imp. Co.*, 310 U.S. 434, 459 (1940)). And in "a

15   federal question case in which the party on whose side intervention is sought … remains in the suit,"

16   "the requirement of independent Article III standing does not apply to proposed intervenors who …

17   do not seek to raise additional claims." *Harris*, 2013 WL 140053, at *2 (citing *Freedom from*

18   *Religion Found.*, 644 F.3d at 843); *see also Little Sisters of the Poor Saints Peter & Paul Home v.*

19   *Pennsylvania*, 591 U.S. 657, 674 n.6 (2020) (court erred in inquiring into an intervenor's standing

20   where existing party "clearly had standing"). Because Plaintiffs have standing to challenge the same

21   executive actions that Plaintiffs-Intervenors challenge, *see* ECF 61 at 22-25, ECF 94 at 1-7; *City &*

22   *Cnty. of S.F.*, 897 F.3d at 1236, the Court need not undertake a separate standing analysis.

23        Even if the Court were to consider Plaintiffs-Intervenors' standing, there is no doubt that they

24   establish it in multiple ways. Defendants' unconstitutional actions have caused direct harm to

25   Plaintiffs-Intervenors as organizations. In the face of exceptional need from their communities,

26   Plaintiffs-Intervenors have been forced to divert resources to respond to a growing influx of calls

27   from fearful immigrant clients and members; to provide additional educational programming and

28   Know Your Rights trainings to community members to prepare them for possible immigration

enforcement aided by local law enforcement; and to provide triage materials tailored to clients regarding their immigration status in case of local and/or federal immigration enforcement. ¶ 61. "[A]n organization has direct standing to sue where it establishes that the defendant's behavior has frustrated its mission and caused it to divert resources in response to that frustration of purpose." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 663 (9th Cir. 2021); *see also Valle Del Sol Inc. v. Whiting*, 732 F.3d 1006, 1018 (9th Cir. 2013) (finding standing where the plaintiffs "had to divert resources to educational programs to address its members' and volunteers' concerns about the [challenged] law's effect"). In addition, Plaintiffs-Intervenors CARECEN and CHIRLA were expecting to receive a cumulative $8.5 million in FEMA funds passed through the City over three years, with no certainty of when or even if any those funds will ever be released. ¶ 62. *See City & Cnty. of S.F.*, 897 F.3d at 1236 (holding that "a likely 'loss of funds promised under federal law'" confers standing (quoting *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 965 (9th Cir. 2015)). Finally, Defendants' threats to the City's sanctuary policies have blunted the ability of CHIRLA's members to engage with local government and law enforcement, frequent public places, and access local services and benefits. ¶ 60. Just as the federal government's addition of the citizenship question on the census predictably caused the immigrant community to shy away from participation, *see Dep't of Comm. v. New York*, 588 U.S. 752, 768 (2019), so too here: the federal government's coercion of Los Angeles to abandon its sanctuary ordinance has caused the immigrant community in Los Angeles to retreat into the shadows. CHIRLA's standing, like that of states and organizations in the census case, thus rests "on the predictable effect of Government action on the decisions of third parties." *Id.*; *see also Bennett v. Spear*, 520 U.S. 154, 169 (1997).

**Relevance of legal position to merits of case.** Plaintiffs-Intervenors' legal position is clearly in concert with Plaintiffs' position and the overall merits of the main action. Plaintiffs-Intervenors bring only claims that Plaintiffs bring, and they are here simply to ensure that the immediate harms of Defendants' actions are fully represented and that injunctive relief extents to Los Angeles, home to one of the largest immigrant populations in the country. *See Harris*, 2013 WL 140053, at *2.

**Adequacy of representation by other parties.** Although Plaintiffs-Intervenors bring the same constitutional challenges as Plaintiffs, that does not mean that Plaintiffs adequately represent their

interests. None of the current Plaintiffs represent the City of Los Angeles or its sanctuary policies and practices. None of the current Plaintiffs are non-governmental organizations that work directly with immigrants, count thousands of immigrants as members, and serve as trusted direct services providers that can speak to the experiences and fears of individuals as their local jurisdiction's sanctuary protections hang in the balance.

By contrast, Plaintiffs-Intervenors are longtime advocates of the sanctuary movement and have worked with the Los Angeles immigrant community for decades. Plaintiffs-Intervenors can speak concretely about what is truly at stake in this action: the tangible and positive effects of sanctuary policies on more than a million immigrants in Los Angeles and millions more beyond. Plaintiffs-Intervenors can also provide important information to this Court about the current harms of Defendants' actions that extend beyond loss of federal funding to sanctuary jurisdictions (as is Plaintiffs' primary focus). Accordingly, Plaintiffs-Intervenors "would bring a perspective none of the other parties to the litigation have." *Defs. of Wildlife v. Johanns*, No. 4 Civ. 4512, 2005 WL 3260986, at *8 (N.D. Cal. Dec. 1, 2005); *BlueTriton Brands v. U.S. Forest Serv.,* No. 24 Civ. 9720, 2025 WL 746247, at *3 (C.D. Cal. Jan. 14, 2025) (holding that intervention is proper where parties may "advance different theories and arguments for narrower relief," even if the parties share the same "ultimate objective"). As the earlier litigation before this Court regarding Executive Order 13,768 made clear, it is important to sufficiently develop the record "as to the question of the national scope of" any injunction imposed by this Court. *City & Cnty. of S.F.*, 897 F.3d at 1244–45. Plaintiffs-Intervenors seek to provide evidence of the harm ensuing from the challenged executive actions to Los Angeles and its immigrant community, both to develop the record for a nationwide injunction, and, if necessary, to ensure that any narrower injunctive relief extends to the City.

**Prejudice.** As discussed above, Plaintiffs-Intervenors seek to join this case at an early stage, before the government has responded to the Plaintiffs' amended complaint and before any discovery has started. When an action "is at the pleading stage," far from causing prejudice, "intervention provides judicial efficiency from having [Plaintiffs-Intervenors] as a part of this action, rather than a separate action that [they] may bring." *In re Wells Fargo & Co. Hiring Pracs. Derivative Litig.*, No. 22 Civ. 5173, 2023 WL 4536883, at *4 (N.D. Cal. July 13, 2023); *see also Bacoka v. Best Buy Co.,*

No. 18 Civ. 866, 2018 WL 6430533, at *1 (C.D. Cal. Nov. 7, 2018) ("[I]ntervention would not prolong or unduly delay the litigation but would instead likely have the practical benefit of consolidating discovery, motions and trial on the same legal claims and factual questions into a single action."). To the extent Defendants protest they are prejudiced by having to respond to Plaintiffs-Intervenors' intervention motion and arguments, "prejudice is evaluated based on the difference between timely and untimely intervention—not based on the work Defendants would need to do regardless of when [Plaintiffs-Intervenors] sought to intervene." *Kamakahi v. Am. Soc'y for Reprod. Med.,* No. 11 Civ. 01781, 2015 WL 1926312, at *4 (N.D. Cal. Apr. 27, 2015). Because Plaintiffs-Intervenors timely seek to intervene at this early stage to bring only claims brought by the existing Plaintiffs, they cause no cognizable prejudice to the parties.

*Contributions to full development of underlying factual issues.* The final factor considers whether "the parties seeking intervention will significantly contribute to full development of the underlying factual issues in the suit and to the just and equitable adjudication of the legal questions presented." *Spangler*, 552 F.2d at 1329. As discussed above, Plaintiffs-Intervenors have particularly significant contributions to make to this litigation. They represent tens of thousands of vulnerable community members in Los Angeles who have been deterred from accessing essential services because of the Executive Orders and the threat they pose to the City's sanctuary policies. ¶¶ 59–60. Plaintiffs-Intervenors can also speak to how the fear rippling through the community has altered their work, causing them to devote significant resources to address the credible concerns of the immigrant community. ¶¶ 61. This window into the effect of the executive actions on the ground will directly "contribute to the development of the factual and legal landscape" in this action. *ACLU of N. Cal.*, 2017 WL 492833, at *3. Plaintiffs-Intervenors, as three of the largest immigrants' rights organizations in California, bring to this action decades of experience and knowledge regarding the effect of sanctuary policies on the immigrant community in Los Angeles and elsewhere. This significant "technical expertise," coupled with the fact "that the outcome [of this case] could have significant consequences for [their] members" and clients, militates in favor of intervention. *California*, 2018 WL 6069943, at *4.

1  **IV.    CONCLUSION**

2         Plaintiffs-Intervenors can bring into the Court the voices of those who have the most at stake

3  in this action. For all the foregoing reasons, the Court should grant their motion to intervene.

4

5  Dated: Los Angeles, California

                                      *Mark Rosenbaum*

6         April 11, 2025

                                       Mark Rosenbaum (SBN 59940)

7                                         Gina Amato (SBN 215519)

Rebecca Brown (SBN 345805)

8  Jacob Maddox (SBN 354368)

Sophia Wrench (SBN 354416)*

9  PUBLIC COUNSEL

610 South Ardmore Avenue

10  Los Angeles, CA 90005

(213) 385-2977

11  mrosenbaum@publiccounsel.org

gamato@publiccounsel.org

12  rbrown@publiccounsel.org

jmaddox@publiccounsel.org

13  swrench@publiccounsel.org

14  Matthew J. Craig (SBN 350030)

Mack E. Jenkins (SBN 242101)

15  Susan Har (SBN 301924)

HECKER FINK LLP

16  1150 South Olive Street, Suite 10-140

Los Angeles, CA 90015

17  (212) 763-0883

mcraig@heckerfink.com

18  mjenkins@heckerfink.com

shar@heckerfink.com

19

20  *Attorneys for Plaintiffs-Intervenors*

*Central American Resource Center –*

21  *CARECEN – of California, Coalition for*

*Humane Immigrant Rights, and Immigrant*

22  *Defenders Law Center*

23  * N.D. Cal. admission pending

24

25

26

27

28

1

UNITED STATES DISTRICT COURT

2

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

3

4

CITY AND COUNTY OF SAN
FRANCISCO, COUNTY OF SANTA
CLARA, CITY OF PORTLAND, MARTIN
LUTHER KING, JR. COUNTY, CITY OF
NEW HAVEN, CITY OF OAKLAND,
CITY OF EMERYVILLE, CITY OF SAN
JOSE, CITY OF SAN DIEGO, CITY OF
SACRAMENTO, CITY OF SANTA
CRUZ, COUNTY OF MONTEREY, CITY
OF SEATTLE, CITY OF MINNEAPOLIS,
CITY OF ST. PAUL, CITY OF SANTA
FE,

Plaintiffs,

vs.

DONALD J. TRUMP, President of the
United States, UNITED STATES OF
AMERICA, PAMELA BONDI, Attorney
General of the United States, TODD
BLANCHE, Deputy Attorney General,
UNITED STATES DEPARTMENT OF
JUSTICE, KRISTI NOEM, Secretary of
United States Department of Homeland
Security, UNITED STATES
DEPARTMENT OF HOMELAND
SECURITY, DOES 1-100,

Defendants.

Case No. 25-CV-01350-WHO

**[PROPOSED] ORDER GRANTING
MOTION FOR PERMISSIVE
INTERVENTION OF CENTRAL
AMERICAN RESOURCE CENTER –
CARECEN – OF CALIFORNIA,
COALITION FOR HUMANE
IMMIGRANT RIGHTS, AND
IMMIGRANT DEFENDERS LAW
CENTER**

Hearing Date: May 21, 2025
Time: 2:00 p.m.
Courtroom: Courtroom 2
Before: Hon. William H. Orrick

Having considered the briefs and arguments of counsel and all other matters presented, the Court concludes that Central American Resource Center – CARECEN – of California, Coalition for Humane Immigrant Rights, and Immigration Defenders Law Center meet the standards for permissive intervention under Federal Rule of Civil Procedure Rule 24(b)(1)(B), and their motion to intervene is GRANTED.

IT IS SO ORDERED.

Dated: _____, 2025

_____
Hon. William H. Orrick
United States District Judge