Mark Rosenbaum (SBN 59940)
Gina Amato (SBN 215519)
Rebecca Brown (SBN 345805)
Jacob Maddox (SBN 354368)
Sophia Wrench (SBN 354416)
PUBLIC COUNSEL
610 South Ardmore Avenue
Los Angeles, CA 90005
 (213) 385-2977
mrosenbaum@publiccounsel.org
gamato@publiccounsel.org
rbrown@publiccounsel.org
jmaddox@publiccounsel.org
swrench@publiccounsel.org

Matthew J. Craig (SBN 350030)
Mack E. Jenkins (SBN 242101)
Susan Har (SBN 301924)
Hecker Fink LLP
1150 South Olive Street, Suite 10-140
Los Angeles, CA 90015
(212) 763-0883
mcraig@heckerfink.com
mjenkins@heckerfink.com
shar@heckerfink.com

*Attorneys for Plaintiffs-Intervenors
Central American Resource
Center – CARECEN – of California,
Coalition for Humane Immigrant
Rights, and Immigrant Defenders
Law Center*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO, COUNTY OF SANTA CLARA, CITY OF PORTLAND, MARTIN LUTHER KING, JR. COUNTY, CITY OF NEW HAVEN, CITY OF OAKLAND, CITY OF EMERYVILLE, CITY OF SAN JOSE, CITY OF SAN DIEGO, CITY OF SACRAMENTO, CITY OF SANTA CRUZ, COUNTY OF MONTEREY, CITY OF SEATTLE, CITY OF MINNEAPOLIS, CITY OF ST. PAUL, CITY OF SANTA FE,<br><br>Plaintiffs, | Case No. 25-CV-01350-WHO<br><br>**PLAINTIFFS-INTERVENORS CENTRAL AMERICAN RESOURCE CENTER – CARECEN – OF CALIFORNIA, COALITION FOR HUMANE IMMIGRANT RIGHTS, AND IMMIGRANT DEFENDERS LAW CENTER'S COMPLAINT-IN-INTERVENTION** |

1   CENTRAL AMERICAN RESOURCE
    CENTER – CARECEN – OF
2   CALIFORNIA, COALITION FOR
    HUMANE IMMIGRANT RIGHTS,
3   IMMIGRANT DEFENDERS LAW
    CENTER,
4
5            Plaintiffs-Intervenors,

6            v.

7   DONALD J. TRUMP, President of the
    United States, UNITED STATES OF
8   AMERICA, PAMELA BONDI, Attorney
    General of the United States, TODD
9   BLANCHE, Deputy Attorney General,
    UNITED STATES DEPARTMENT OF
10  JUSTICE, KRISTI NOEM, Secretary of
    United States Department of Homeland
11  Security, UNITED STATES
    DEPARTMENT OF HOMELAND
12  SECURITY, DOES 1-100,

13           Defendants.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiffs-Intervenors Central American Resource Center – CARECEN – of California ("CARECEN"), Coalition for Humane Immigrant Rights ("CHIRLA"), and Immigrant Defenders Law Center ("ImmDef"), for its Complaint-in-Intervention, allege as follows:

## INTRODUCTION

1.      Sanctuary practices and policies are the bedrocks of trust between immigrant families and local communities.[1] By lawfully limiting local law enforcement's entanglement with federal immigration enforcement, sanctuary policies allow immigrants—regardless of their citizenship or immigration status—to interact with the world around them, free of fear. Sanctuary policies grant immigrants the sense of safety necessary to engage in activities that are productive to their community as a whole, including reporting crime, obtaining necessary medical care, and accessing other critical public services. They also allow local governments to direct scarce resources towards their own law enforcement priorities. As a result, sanctuary policies are associated with lower crime rates, increased median household income, decreased poverty, decreased unemployment, and decreased reliance on public assistance. They are solidly constitutional.

2.      To actualize these many social benefits, a number of state and local governments across the country, including Plaintiffs in this action and the City of Los Angeles (the "City" or "Los Angeles"), have each exercised their sovereign authority protected by the Tenth Amendment to limit the use of local resources to enforce or administer federal civil immigration law.

3.      For years, Plaintiffs-Intervenors CARECEN, CHIRLA, and ImmDef—three of the largest non-profit organizations operating in the City that support immigrant communities—have been at the forefront of advocating for the City's sanctuary practices and policies. Most recently, on December 9, 2024, the City passed Ordinance No. 188441, which formalized longstanding policies and practices limiting the use of City resources to assist in the enforcement of federal immigration law or to gather and disseminate information relating to citizenship or immigration status, unless required by federal or state law. As direct legal service providers and organizer-advocates, Plaintiffs-

---

[1] Plaintiffs-Intervenors, as longtime supporters of the sanctuary movement, use the term "sanctuary" to refer to commonsense policies enacted by local governments to protect scarce resources, ensure the efficiency of local law enforcement, and allow immigrant communities to live without fear. As Plaintiffs' First Amended Complaint details, however, "sanctuary" is not a legally defined term, and many local governments (including some Plaintiffs) do not use the term to refer to their own policies. ECF 22 ¶ 43. Plaintiffs-Intervenors' use of the term "sanctuary" herein should not be taken to suggest that *Defendants* have meaningfully defined that term as required by law in the challenged executive actions. *See infra* ¶¶ 87–102. Far from it.

Intervenors—and the immigrant communities they serve—are longtime beneficiaries of the City's sanctuary policies and practices, and they rely heavily on their continued enforcement.

4.     But those crucial protections to the immigrant community in Los Angeles—and the sovereign authority of the City itself—are now under attack. Defendant President Donald J. Trump, a well-known adversary of the sanctuary movement, is once again intent on coercing local jurisdictions like the City into abandoning sanctuary policies and practices through the unlawful freeze of federal funds and threats of enforcement actions.

5.     On his first day in office of his second term, Defendant Trump issued multiple executive orders purporting to withhold all federal funds to "sanctuary jurisdictions" and further directing Defendant Attorney General Pamela Bondi and Defendant Secretary of Homeland Security Kristi Noem to undertake enforcement actions "that they deem warranted based on any such jurisdiction's practices that interfere with the enforcement of Federal law." The individual Defendants, in their official capacities, acted quickly to implement the executive orders through memoranda to restrict federal funding and to direct enforcement actions.

6.     Defendants' actions purport to wield legislative powers that they do not possess and amount to a flagrantly unconstitutional attempt to coerce local governments like the City into abandoning their lawfully enacted sanctuary policies and carrying out the Trump Administration's immigration agenda on the locality's own dime. Defendants' trampling of states' sovereignty to determine their own policies and direct their own local funds is all the more egregious in view of the numerous federal courts that roundly rejected similar efforts during Defendant Trump's first presidential term. *See, e.g.*, *County of Santa Clara v. Trump*, 250 F. Supp. 3d 497 (N.D. Cal. 2017); *County of Santa Clara v. Trump*, 275 F. Supp. 3d 1196 (N.D. Cal. 2017); *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225 (9th Cir. 2018); *City & Cnty. of S.F. v. Sessions*, 349 F. Supp. 3d 924 (N.D. Cal. 2018); *City & Cnty. of S.F. v. Barr*, 965 F.3d 753 (9th Cir. 2020).

7.     Those affected by Defendants' actions must now turn to the federal courts once again. Defendants' coercive tactics targeted at the City, which receives hundreds of millions of dollars from the federal government, are working. Already, there have been recent reports of LAPD coordination during federal enforcement operations, as well as federal law enforcement trying to gain entry to Los Angeles elementary schools just this week, putting the immigrant community in significant danger.

8.     In the face of the pressure that Defendants have placed on the City, Plaintiffs-

1   Intervenors as well as their members and clients confront an impossible choice: withdraw from the
2   local community or face the prospect of local enforcement of federal immigration law. As a result,
3   Plaintiffs-Intervenors' immigrant members and clients are unable and unwilling to access necessary
4   City services that they otherwise could obtain if protection under the City's Ordinance and sanctuary
5   practices was assured. Plaintiffs-Intervenors have been impaired in their ability to engage in some of
6   their core services—individual legal services and representation—as their limited resources are
7   diverted to community education, Know-Your-Rights trainings, and simply trying to assuage the
8   fears of their existing members and clients.

9       9.      Plaintiffs-Intervenors bring this action to stop Defendants' unlawful executive actions
10  and to provide Plaintiffs-Intervenors, their members, and their clients the necessary security and
11  protections of their City's Ordinance and sanctuary practices.

12                              **JURISDICTION AND VENUE**

13      10.     This Court has jurisdiction to hear this action under 28 U.S.C. §§ 1331 and 1346. This
14  Court has additional authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202
15  *et seq.*

16      11.     Venue properly lies within the Northern District of California under 28 U.S.C.
17  § 1391(e) because Plaintiffs City & County of San Francisco and County of Santa Clara reside in
18  this judicial district, because Defendants are officers and employees of the United States or any
19  agency thereof acting in their official capacities, and a substantial part of the events or omissions
20  giving rise to this action are occurring in this District.

21      12.     Plaintiffs-Intervenors satisfy the requirements for permissive intervention set forth in
22  Federal Rule of Civil Procedure 24(b)(1)(B) because they have claims that share common questions
23  of law or fact with that of Plaintiffs in this action, and intervention will not unduly delay or prejudice
24  the adjudication of the original parties' rights.

25
26
27
28

**PARTIES**

13.    Plaintiff-Intervenor CARECEN is a nonprofit organization with its headquarters in Los Angeles, California. Founded in 1983, CARECEN is the largest Central American immigrant rights organization in the country and serves all immigrants in Southern California by providing comprehensive immigration legal services and promoting community engagement on immigration policy, education reform, and workers' rights. Each year, CARECEN serves approximately 25,000 members of the immigrant community in and around Southern California.

14.    Plaintiff-Intervenor CHIRLA is a nonprofit organization with its headquarters in Los Angeles, California. Founded in 1986 to advance the human and civil rights of immigrants and refugees, CHIRLA is now the largest statewide immigrant rights organization in California and advocates for immigrant rights, including by organizing, educating, and defending immigrants and refugees.

15.    CHIRLA is a membership organization, with approximately 50,000 active members across California. CHIRLA's membership includes U.S. citizens, non-U.S. citizens with lawful status, and non-U.S. citizens without lawful status. CHIRLA educates its membership as well as the broader community through Know-Your-Rights trainings, workshops, social media, and educational literature about a variety of social services and benefits, including immigration law, financial literacy, workers' rights, and civic engagement. Each year, CHIRLA engages approximately 250,000 individuals.

16.    Plaintiff-Intervenor ImmDef is a nonprofit organization with its headquarters in Los Angeles, California. ImmDef was founded in 2015 to protect the due process rights of immigrants facing deportation. ImmDef's mission includes ensuring that all immigrants before the immigration court have a lawyer by their side and working towards systemic change to create a more just immigration system. ImmDef provides full-scale deportation defense, legal representation, legal education, and social services to over 30,000 detained and non-detained children and adults annually, making ImmDef one of the largest immigration legal providers in California.

17.    Defendant Donald J. Trump is the President of the United States and is sued in his official capacity.

18.    Defendant United States of America is sued under 28 U.S.C. § 1346.

19.    Defendant United States Department of Justice ("DOJ") is an executive department of the United States federal government. 28 U.S.C § 501.

20.    Defendant Pamela Bondi is the Attorney General of the United States, the highest ranking official in DOJ, and is responsible for the decisions of DOJ. She is sued in her official capacity.

21.    Defendant Todd Blanche is the Deputy Attorney General, the second-ranking official within DOJ, and is responsible for the decisions of DOJ. He is sued in his official capacity.[2]

22.    Defendant United States Department of Homeland Security ("DHS") is an executive department of the United States federal government. 6 U.S.C. § 111.

23.    Defendant Kristi Noem is the Secretary of Homeland Security, the highest ranking official in DHS, and is responsible for the decisions of DHS. She is sued in her official capacity.

24.    Doe 1 through Doe 100 are sued under fictitious names. Plaintiffs-Intervenors do not now know the true names or capacities of said Defendants, who were responsible for the alleged violations, but will allege them in an amended complaint when ascertained.

## FACTUAL ALLEGATIONS

**A.    Los Angeles Has Long Maintained Its Sanctuary Practices and Policies to Build Trust Between Local Government and Immigrant Communities**

25.    Los Angeles—the most populous city in California—is a city of immigrants. One in three Angelenos are foreign-born, with 1.35 million immigrants calling the City home. Los Angeles receives hundreds of millions of dollars in federal funding to support a wide variety of City projects, providing disaster relief, supporting cultural affairs and the arts, providing housing and homeless assistance, improving economic and workforce development, investing in the City's infrastructure, cultivating the City's recreation areas and parks, and, especially, investing in local law enforcement.[3]

26.    The City, including the Los Angeles Police Department ("LAPD"), receives millions in DOJ grants, including the Edward Byrne Memorial Justice Assistance Grant Program, Public Safety Partnership and Community Policing grants, and Body Worn Camera Policy and

---

[2] Defendant Blanche should be substituted in this case for Emil Bove, who served as Acting Deputy Attorney General prior to Defendant Blanche's confirmation. *See* Fed. R. Civ. P. 25(d).
[3] *See* City of L.A., FY 2024-2025 Proposed Budget, https://cao.lacity.gov/budget24-25/2024-25Proposed_Budget.pdf [last visited Apr. 10, 2025]; "City of Los Angeles," USA Spending, https://www.usaspending.gov/recipient [last visited Apr. 10, 2025].

1  Implementation grants.[4] These grants support critical law enforcement prerogatives like upgrading

2  the LAPD's de-escalation courses for its officers; developing new approaches to combat human

3  trafficking; preventing and addressing anti-Asian hate crime; purchasing and deploying body-worn

4  cameras and digital in-car video systems and associated data storage and management systems;

5  reducing the forensic DNA testing backlog; and supporting a broad array of community-policing and

6  public safety initiatives.

7       27.    The City has long stated its commitment to welcoming immigrants and limiting the

8  use of local law enforcement and resources to aid in federal civil immigration enforcement. The

9  City's sanctuary policies go back at least as far as 1979, when the Los Angeles Board of Police

10  Commissioners instituted Special Order 40, prohibiting LAPD officers from initiating contact with

11  the sole objective of discovering the immigration status of an individual. *See Sturgeon v. Bratton*,

12  174 Cal. App. 4th 1407 (2009) (affirming validity of Special Order 40 as not preempted by federal

13  immigration law, 8 U.S.C. § 1373). Over the decades, the City has passed other resolutions and

14  directives that reinforce its commitment to limiting local entanglement with federal immigration

15  authorities.[5]

16       28.    Most recently, on December 9, 2024, Los Angeles Mayor Karen Bass signed into law

17  Ordinance No. 188441 (the "Ordinance"), which had been unanimously passed by the City Council.[6]

18  The Ordinance "prohibit[s] City resources, including property and personnel, from being utilized for

19  immigration enforcement or for cooperation with federal immigration agents." *Id.* Except as required

20  by federal or state law, the prohibition extends to (among other things) investigating, citing, arresting,

21  holding, transferring, or detaining any person for the purpose of immigration enforcement and

22  responding to any administrative warrant or other request by immigration agents for the purpose of

23  immigration enforcement. L.A. Admin. Code § 19.191. The Ordinance further prohibits City

24  personnel from providing access to any City data or information "that can be used to determine or

25  trace a person's Citizenship or Immigration Status to any Immigration Agent." *Id.* § 19.192.

26  

27  [4] *See* Thurgood Marshall Inst., Nat'l Police Funding Database, Los Angeles Grant Funding, https://policefundingdatabase.org/explore-the-database/locations/california/los-angeles/grant-funding?page=1&all=true#grants-for-location [last updated July 1, 2024].

28  [5] Dakota Smith, *Is L.A.'s Planned 'Sanctuary City' Law Languishing?*, L.A. Times (Sept. 28, 2024), https://www.latimes.com/california/newsletter/2024-09-28/la-on-the-record-newsletter-sanctuary-city-l-a-on-the-record.
[6] L.A., Cal., Ordinance No. 188441 (Dec. 9, 2024), https://clkrep.lacity.org/onlinedocs/2023/23-0243_ord_%20188441_12-19-24.pdf.

29. Exempted from the Ordinance's prohibitions is compliance "with a valid warrant for a criminal offense issued by a federal or state judge, or other order evidencing a judicial determination of probable cause." *Id.* § 19.193.

30. The City's long-standing policy priorities and intent behind the Ordinance is clear. Like Plaintiffs, the City has determined as a matter of self-governance and public policy that "Los Angeles is safer when our City personnel maintain a relationship of trust, respect, and cooperation with City residents." L.A., Cal., Ordinance No. 188441 § 2. The City further determined that "[t]he cooperation of immigrant communities to report crimes and assist in the investigation and prosecution of criminals is critical to the fair and effective enforcement of the law and the safety of all members of the community." *Id.* Thus, in order to effectuate "the immediate protection of the public peace, health, and safety of all residents across the City," the City enacted the Ordinance "to protect[] all residents from City resources being utilized for immigration enforcement" and to reduce the fear in immigrant communities that ultimately "erodes the relationship between the City and its communities." *Id.*

**B.    Plaintiffs-Intervenors Helped Establish Los Angeles as a Sanctuary City**

31. Through years of engagement, advocacy, and client representation, Plaintiffs-Intervenors have been some of the strongest supporters of the Ordinance.

32. Even before the passage of the Ordinance, Plaintiffs-Intervenors and their clients and members benefitted from long-standing sanctuary practices and policies of the City, which allowed immigrants to access critical local services and benefits, free of fear that engaging with state and local government would trigger federal enforcement action.

33. Under the City's protections, Plaintiffs-Intervenors have aided immigrant Angelenos over the years in accessing necessary local public services, like obtaining identification for themselves and their children from the DMV; registering their children at local schools; applying for state and local housing, employment, and food benefit programs; accompanying them to report crimes to local law enforcement; navigating them through various state-court proceedings, including helping children apply for Special Immigrant Juvenile Status (SIJS) in family or probate court; and providing consultation on local-government-facing interactions and other forms of civic engagement,

even before the formal ordinance.

34.    Plaintiffs-Intervenors have also relied heavily on the City's sanctuary policies and practices in devising and implementing their work. For example, Plaintiffs-Intervenors have formulated and provide broad-based social services for their clients (beyond just legal services) under the assurances of the City's sanctuary practices, which mitigate certain risks to both immigrant members and staffers. In furtherance of their missions, Plaintiffs-Intervenors have cultivated years-long productive relationships with local officials and advocate on behalf of their clients and members to those officials—again, under the common understanding of the City's sanctuary protections. Plaintiffs-Intervenors also rely on the City's sanctuary policies and protections when advising clients and in developing Know-Your-Rights and Raid Response trainings and support.

35.    Given their support for and reliance on the City's sanctuary policies, for years, Plaintiffs-Intervenors had exercised their constitutional right to participate in rallies, protests, marches, legislative meetings, and coalition calls, often in leadership positions, to garner broad, bipartisan support for the Ordinance. For example, CHIRLA (which itself began when its first Director declared his parish a sanctuary in 1986), has advocated for sanctuary policies across California, including the TRUST Act, (Cal. Gov't Code §§ 7282-7282.5), which prevents local law enforcement from detaining noncitizens pursuant to an immigration hold or detainer; the TRUTH Act, (Cal Gov't Code §§ 7283-7283.2), which requires local law enforcement to inform noncitizens of their rights prior to an interview between federal immigration enforcement and the noncitizen in custody; and the California Values Act, Cal. Gov't Code §§ 7284-7284.10, which limits cooperation between local law enforcement and federal immigration enforcement, and forbids local law enforcement from asking about a noncitizen's immigration status. Likewise, CARECEN was founded on the principles of sanctuary and has advocated for sanctuary policies across the state. CARECEN submitted support letters to back the passage of the California Values Act in the California Assembly and Senate; ImmDef advocated in support of the same. CARECEN also advocated for the TRUST and TRUTH Acts, supporting their passage through the California Senate.

36.    The first City Council motion to request that the City Attorney prepare a draft of a sanctuary ordinance was passed on March 7, 2023.[7] During the nearly two years it took for the

---

[7] Motion No. 23-243 (Mar. 7, 2023), https://clkrep.lacity.org/onlinedocs/2023/23-0243_misc_03-07-23.pdf.

Ordinance to be enacted into law, Plaintiffs-Intervenors actively advocated and lobbied for its passage. CARECEN hosted various events to rally support for the Ordinance, including a town hall. CARECEN and CHIRLA engaged media sources and participated in press conferences to further advocate for the Ordinance. As part of the legislative process, Plaintiffs-Intervenors submitted a formal letter of support for the Ordinance, and numerous staffers and members of CHIRLA and ImmDef gave public comment to City Council, oftentimes relaying their personal experiences and urging City Council to pass the Ordinance. CHIRLA members, in particular, testified to the difficulties inherent in building trust between local law enforcement and immigrant communities, and how this barrier to trust becomes almost insurmountable when sanctuary protections are not provided.

### C.    Federal Courts Previously Blocked Defendant Trump from Commandeering Sanctuary Jurisdictions Like Los Angeles to Enforce Federal Immigration Laws

37.    During Defendant Trump's first presidential term, he took a series of executive actions that unconstitutionally usurped Congress's spending power to coerce states and local jurisdictions to enforce federal immigration laws. Among other things, Defendant Trump issued Executive Order 13,768, titled "Enhancing Public Safety in the Interior of the United States," Section 9 of which directed the Attorney General and the DHS Secretary to "ensure that jurisdictions that willfully refuse to comply with 8 U.S.C. § 1373 (sanctuary jurisdictions) are not eligible to receive Federal grants," and granted the Secretary the discretionary authority to designate "a jurisdiction as a sanctuary jurisdiction." 82 Fed. Reg. 8799, 8801 (Jan. 25, 2017). Section 9 additionally directed the Attorney General to "take appropriate enforcement action against any entity that violates 8 U.S.C. § 1373, or which has in effect a statute, policy, or practice that prevents or hinders the enforcement of Federal law." *Id.*

38.    The County of Santa Clara and the City and County of San Francisco promptly challenged Executive Order 13,768 as unconstitutional. This Court held, as did the Ninth Circuit on appeal, that Section 9 of Executive Order 13,678 violated the Separation of Powers, the Spending Clause, the Tenth Amendment, and the Fifth Amendment under void-for-vagueness and procedural due process theories. *County of Santa Clara*, 275 F. Supp. 3d at 1212–18; *City & Cnty. of S.F.*, 897

1   F.3d at 1245.

2       39.     According to "pretty basic" "constitutional principle[s]," this Court concluded that

3   the president lacked the power, belonging only to Congress, to condition federal funds on compliance

4   with 8 U.S.C. § 1373, 275 F. Supp. 3d at 1212–13; that such a condition, even if imposed, would be

5   "unconstitutionally coercive," under the Spending Clause, *id.* at 1215; that such a condition would

6   also "compel the states and local jurisdictions to enforce a federal regulatory program through

7   coercion," in violation of the Tenth Amendment, *id.* at 1216; that Executive Order 13,768 "does not

8   make clear what conduct might subject a state or local jurisdiction to defunding … making it

9   impossible for jurisdictions to determine how to modify their conduct," *id.* at 1217; and that Santa

10  Clara and San Francisco were afforded "a complete lack of process" in violation of the Fifth

11  Amendment, *id.* at 2018. The Court also reasoned that Section 9's threat of "appropriate enforcement

12  action" by the Attorney General was vague and operated to compel compliance (by way of honoring

13  civil detainer requests) in violation of the Tenth Amendment. *Id.* at 1216.

14      40.     The Ninth Circuit affirmed on the merits but remanded for reconsideration as to the

15  scope of the injunction. 897 F.3d at 1244–45. Following remand, this Court entered a final judgment

16  permanently enjoining the enforcement of Section 9 of Executive Order 13,678 within the state of

17  California. Stipulation and Final Judgment and Order, *County of Santa Clara v. Trump*, No. 17 Civ.

18  574 (N.D. Cal. Aug. 23, 2019), ECF 206.

19      41.     On the first day of his presidency, President Biden revoked Executive Order 13,768.

20  Executive Order 13,993, *Revision of Civil Immigration Enforcement Policies and Priorities*, 86 Fed.

21  Reg. 7051, 7051–52 (Jan. 20, 2021).

22      **D.    Notwithstanding Court Orders, Defendant Trump Again Uses Coercive and
23          Unconstitutional Tactics to Compel Cities to Eliminate Sanctuary Practices**

24      42.     Notwithstanding the above-described court orders—indeed, in deliberate disregard of

25  them—Defendant Trump seeks to circumvent this Court's 2019 injunction against Section 9 of

26  Executive Order 13,768 and commandeer sanctuary jurisdictions once again into enforcing federal

27  immigration law by usurping legislative authority. Immediately following Defendant Trump's

28  second inauguration on January 20, 2025, the Trump Administration took a series of actions targeted

1    at sanctuary jurisdictions like Los Angeles.

2        43.    **Executive Order 14,148.** On January 20, 2025, Defendant Trump signed Executive

3    Order 14,148, titled "Initial Recessions of Harmful Executive Orders and Actions," which purports

4    to revoke President Biden's Executive Order 13,993 and thereby reinstate Executive Order 13,768,

5    Section 9 of which remains permanently enjoined in California by this Court. 90 Fed. Reg. 8237,

6    8237 (Jan. 20, 2025).

7        44.    **Executive Order 14,159.** On January 20, 2025, Defendant Trump issued Executive

8    Order 14,159, titled "Protecting the American People Against Invasion." 90 Fed. Reg. 8443, 8443

9    (Jan. 20, 2025). Section 17 of Executive Order 14,159 contains both a funding restriction and an

10   enforcement directive. The funding restriction requires the Attorney General and the DHS Secretary

11   "to the maximum extent possible under law, evaluate and undertake any lawful actions to ensure that

12   so-called 'sanctuary' jurisdictions … do not receive access to Federal funds." *Id.* at 8446. The

13   enforcement directive instructs the Attorney General and the DHS Secretary to further "evaluate and

14   undertake any other lawful actions, criminal or civil, that they deem warranted based on any such

15   [sanctuary] jurisdiction's practices that interfere with the enforcement of federal law."[8] *Id.* at 8446.

16   Section 8 of Executive Order 14,159 additionally directs the DHS Secretary, in coordination with

17   the Secretary of Treasury, to "ensure the assessment and collection of all fines and penalties … from

18   those who facilitate [unlawful] aliens' presence in the United States." *Id.* at 8444–45.

19       45.    **Bove Memo.** On January 21, 2025, the Acting Deputy Attorney General Emil Bove—

20   the predecessor of Defendant Todd Blanche—issued a memorandum to all DOJ employees, titled

21   "Interim Policy Changes Regarding Charging, Sentencing, and Immigration Enforcement" ("Bove

22   Memo").[9] The Bove Memo asserts that "[t]he Supremacy Clause and other authorities require state

23   and local actors to comply with the Executive Branch's immigration enforcement initiatives" and

24   that state and local actors are prohibited from "failing to comply with lawful immigration-related

25   commands and requests." The scope of "immigration-related commands and requests" is not defined.

26       46.    The Bove Memo directs U.S. Attorney's Offices and litigating components of DOJ

---

[8] Through its funding restriction and enforcement directive targeting sanctuary jurisdictions, Section 17 of current Executive Order 14,159 closely mirrors Section 9 of Executive Order 13,768, which remains permanently enjoined in California. Executive Order 14,159 fails to cabin its reach to any subset of federal funds and is therefore, on its face, as expansive as Executive Order 13,768.
[9] Memorandum from Acting Deputy Att'y Gen. Emil Bove to All Dep't Emps. (Jan. 21, 2025), https://assets.aila.org/files/7ee3a6c0-8ca6-4806-9ffb-96c53b01a954/25012912.pdf?1738188120.

to "investigate incidents involving any such misconduct for potential prosecution, including for obstructing federal functions in violation of 18 U.S.C. § 371, and … 8 U.S.C. §§ 1324, 1373." The Bove Memo further directs "the newly established Sanctuary Cities Enforcement Working Group … to identify state and local laws, policies, and activities that are inconsistent with Executive Branch immigration initiatives," and directs the Civil Division, "where appropriate, to take legal action to challenge such laws."

47.    **Bondi Memo.** On February 5, 2025, Defendant Bondi issued a memorandum to all DOJ employees, titled "Sanctuary Jurisdiction Directives" ("Bondi Memo"), to implement the funding restriction and enforcement directive of Executive Order 14,159 against sanctuary jurisdictions.[10] As to funding, the Bondi Memo provides that DOJ "will ensure that, consistent with law, 'sanctuary jurisdictions' do not receive access to Federal funds from the Department" and that, accordingly, DOJ "shall pause the distribution of all funds until a review has been completed." Section I of the Bondi Memo reiterates that "[s]anctuary jurisdictions should not receive access to federal grants administered by the Department of Justice" and asserts that sanctuary jurisdictions "include state or local jurisdictions that refuse to comply with 8 U.S.C. § 1373, refuse to certify compliance with § 1373, or willfully fail to comply with other applicable federal immigration laws."

48.    As to enforcement, Section I of the Bondi Memo states that DOJ will "seek to take any appropriate enforcement action where state and local practices violate federal laws, regulations, or grant conditions." Section III orders "[a]ll litigating components of the Department of Justice and each U.S. Attorney's Office" to investigate incidents involving purported violations of immigration-related federal laws by state and local jurisdictions.

49.    Finally, like the Bove Memo, the Bondi Memo instructs the Civil Division and the Sanctuary Cities Enforcement Working Group to "identify state and local laws, policies, and practices that," in its view, "facilitate violations of federal immigration laws or impede lawful federal immigration operations" and "take legal action to challenge such laws, policies, or practices."

50.    Since the issuance of Executive Order 14,159, the Bove Memo, and the Bondi Memo, the federal government has already filed two lawsuits challenging the sanctuary policies of jurisdictions in Illinois and New York. *See United States v. Illinois*, No. 25 Civ. 1285 (N.D. Ill.);

---

[10]  Memorandum from Att'y Gen. Pamela Bondi to All Dep't Emps. (Feb. 5, 2025), https://www.justice.gov/ag/media/1388531/dl?inline.

*United States v. New York*, No. 25 Civ. 205 (N.D.N.Y.).

51.     **Executive Order 14,218.** On February 19, 2025, Defendant Trump issued Executive Order 14,218, titled "Ending Taxpayer Subsidization of Open Borders." 90 Fed. Reg. 10,581, 10,581 (Feb. 19, 2025). Expanding on Executive Order 14,159, Section 2(ii) of Executive Order 14,218 directs every federal agency to "ensure, consistent with applicable law, that Federal payments to States and localities do not, by design or effect, facilitate the subsidization or promotion of illegal immigration, or abet so-called 'sanctuary' policies that seek to shield illegal aliens from deportation." *Id.*

52.     **Noem Memo.** On January 31, 2025, Defendant Noem appeared for an interview on Fox News during which she was asked whether the Administration would take action against sanctuary city officials. She confirmed that "of course we will," and stated that she would follow Defendant Trump's direction on "how we are going to go after these individuals."[11]

53.     On February 19, 2025, Defendant Noem issued a memorandum to all DHS agencies and offices titled "Restricting Grant Funding for Sanctuary Jurisdictions" ("Noem Memo"). The Noem Memo claims that "[s]tate and local governments that refuse to cooperate with [or] refuse to share information with … federal immigration enforcement" reject national ideals relating to national security and public safety. ECF 89, Ex. 1 at 1. The Noem Memo defines sanctuary jurisdictions to include jurisdictions that, among other things "fail to honor requests for cooperation, such as participation in joint operations, sharing of information, or requests for short term detention of alien pursuant to a valid detainer." *Id.* at 2. The Memo directs all components "to review all federal financial assistance awards to determine if Department funds, directly or indirectly, are going to sanctuary jurisdictions" and that, "consistent with relevant legal authorities and the applicable terms and conditions of each award, each component must cease providing federal funding to sanctuary jurisdictions." *Id.*

54.     Through the foregoing executive actions, Defendants seek to unconstitutionally leverage spending powers that belong to the legislative branch and coerce local jurisdictions like Plaintiffs and the City into abandoning sanctuary policies and participating in the enforcement of federal immigration law. Defendants' vague and unlawful threats of enforcement action against local

---

[11] *DHS Secretary Kristi Noem Says it 'Won't Take Very Long at All' to Prepare Gitmo for Criminal Migrants*, Fox News (Jan. 30, 2025), https://www.foxnews.com/video/6368025256112.

jurisdictions like the City that may be deemed as "interfer[ing] with the lawful exercise of Federal law enforcement operations," 90 Fed. Reg. at 8446, add to the coercion campaign against the City and directly harm Plaintiffs-Intervenors and their clients and members, who heavily rely on the City's longstanding sanctuary practices.

55. It is essential that the interests of Plaintiffs-Intervenors, and thus the City of Los Angeles, be represented in this action. No party to this action is here to defend the Ordinance from unconstitutional attack or to stand up specifically for the interests of Los Angeles, its residents, and its immigrant community.

**E.    Plaintiffs-Intervenors, Their Members, and Their Clients Have Been Harmed by the Trump Administration's Unlawful Executive Actions**

56. Plaintiffs-Intervenors, their members, and their clients are already seeing the effects of the federal government's coercive tactics on the City's enforcement of its sanctuary practices and Ordinance.

57. Community members and the media reported on the presence of LAPD during multiple federal enforcement operations throughout Los Angeles in late February 2025.[12] Expressing concern at the prospect of local law enforcement aiding immigration enforcement efforts by Homeland Security Investigations, Immigration and Customs Enforcement, and U.S. Customs and Border Patrol, the City Councilmember for District 1 made a motion seeking a report from LAPD on all incidents occurring the day of the federal enforcement actions. The motion also sought direction from the City Attorney "with detailed protocol under the Sanctuary City Ordinance outlining allowed and disallowed interactions with the different federal agencies that participate in any immigration enforcement activities."

58. And just this week, there have been reports of federal enforcement authorities attempting to engage City employees at local public schools to allow them to investigate civil immigration enforcement on City property.[13]

---

[12] Rachel Uranga, Libor Jany & Ruben Vives, *LAPD Presence at South L.A. Immigration Raid Sparks Questions*, L.A. Times (Feb. 28, 2025), https://www.latimes.com/california/story/2025-02-28/lapd-presence-at-south-l-a-immigration-raid-sparks-questions; *see also* Motion 23-243-S1, L.A. City Council (Feb. 28, 2025), https://clkrep.lacity.org/onlinedocs/2023/23-0243-S1_misc_2-28-25.pdf.

[13] Howard Blume & Melissa Gomez, *Federal Officials Arrived, Denied Entry at L.A. Schools Amid Immigration Enforcement Fears*, L.A. Times (Apr. 9, 2025), https://www.latimes.com/california/story/2025-04-09/federal-agents-arrived-denied-entry-at-los-angeles-schools-officials-say.

59.     Plaintiffs-Intervenors are rightfully concerned that federal immigration enforcement—even while knowing that Los Angeles has a sanctuary ordinance—continue to pressure, coerce, and commandeer ordinary City employees to allow them to engage in federal civil immigration enforcement on City property in violation of the ordinance. Such occurrences fuel fears among Plaintiffs-Intervenors, their members, and their clients about things as basic as sending their children to school.

60.     Signs that the City might succumb to Defendants' coercion campaign have bred a well-founded fear in Plaintiffs-Intervenors and their members and clients. Where immigrant Angelenos were once able to frequent local government offices, buildings, schools, and hospitals; access local services and benefits, including by providing information to obtain necessary public assistance; and report crimes or participate as witnesses in criminal prosecutions, they are now chilled in their ability to engage in their local community. CHIRLA members have expressed a fear of going to work and even of using public transportation, in light of the pressure that Defendants have put on local law enforcement and other officials to abandon the City's sanctuary commitments.

61.     Defendants' actions have also directly harmed Plaintiffs-Intervenors as organizations that provide immigration services. Plaintiffs-Intervenors have had to expend resources to respond to a growing influx of calls from terrified community members; to deploy additional Know-Your-Rights and Raid Response presentations and supports; to provide triage materials regarding clients' immigration status in case of local and/or federal immigration enforcement; and to attempt to assuage clients' fears of entering City and state buildings, including state court, where, for example, ImmDef's juvenile clients apply for SIJS. These diversions of resources—coming at a time when Plaintiffs-Intervenors are already stretched thin due to lost federal funding sources—have caused hours of extra work on a per-client basis. That, in turn, has hampered Plaintiffs-Intervenors' ability to take on new individual representations, which is the heart of the work they do in the community.

62.     All this has occurred while Plaintiffs-Intervenors face the threatened loss of millions in federal funds passed through the City. For example, CHIRLA and CARECEN were expected to receive $5.5 million and $3 million, respectively, in funding over three years from the Federal Emergency Management Agency (FEMA) Shelter and Service Program grant to help defray the cost

of providing services to new migrants that had landed in Los Angeles. That federal grant was expected to be paid by the City, but that payment to Los Angeles has been frozen as of March 11.[14] As a result, CARECEN, for example, has had to scrap plans for a migrant welcome center, which would have provided hot food, showers, and a community closet for migrants to get a fresh start. More generally, in the face of these funding losses, CHIRLA and CARECEN have been hamstrung in their ability to plan their budgets, their services, and even their continued staffing.

## CAUSES OF ACTION

### COUNT ONE: TENTH AMENDMENT

63.    Plaintiffs-Intervenors repeat and incorporate by reference each allegation of the prior paragraphs as if fully set forth herein.

64.    The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const., amend X. This provision prohibits the federal government from "commandeering" state and local officials to help enforce federal law. *See Printz v. United States*, 521 U.S. 898, 925 (1997) ("[T]he Federal Government may not compel the States to implement, by legislation or executive action, federal regulatory programs."). Otherwise, the federal government could invade the sovereign power reserved to the states and simply "shift[] the costs of regulation to the States." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 474 (2018).

65.    In limiting its use of local resources in aiding the execution of federal civil immigration, the City of Los Angeles has exercised lawful authority reserved to it under the Tenth Amendment.

66.    Defendants violate the Tenth Amendment and the principle of state sovereignty and seek to commandeer localities like Plaintiffs and the City through the federal funding restrictions and threats of civil and criminal enforcement set forth in Executive Orders 14,159 and 14,218 and implementing agency memoranda.

67.    The federal funding restrictions in Executive Orders 14,159 and 14,218, and the implementing agency memoranda, violate the anti-commandeering principle inherent in the Tenth Amendment and seek to use the spending power to coerce Plaintiffs and the City into acting as arms

---

[14] Letter from Cameron Hamilton, Senior Official, FEMA, *Remedy for Noncompliance Letter: Shelter and Services Program (SSP)*, (Mar. 11, 2025), https://immpolicytracking.org/policies/fema-announces-review-of-migrant-shelter-aid/#/tab-policy-documents.

of the federal government.

68.    Under the threat of criminal prosecution and the assessment of civil fines and penalties, Executive Order 14,159 requires Plaintiffs and the City to enforce federal immigration law—including by using local resources to hold individuals pursuant to civil immigration detainers and administrative warrants and share confidential personal information, including release dates for individuals in custody, with immigration authorities. For example, Executive Order 14,159 directs the Attorney General and DHS Secretary to undertake civil and criminal enforcement actions against any jurisdiction for practices that they deem, in their discretion, to "interfere with the enforcement of Federal law."

69.    The implementing memoranda faithfully apply the Executive Order's directive. For example, the Bove Memo calls out local laws and actions that "prohibit[] disclosures of information to federal authorities engaged in immigration-enforcement activities" as "threaten[ing] to impede Executive Branch immigration initiatives" and directs the Sanctuary Cities Enforcement Working Group to take legal action to challenge "state and local laws, policies, and activities that are inconsistent with Executive Branch immigration initiatives." It also states that local officials who fail to comply with "lawful immigration-related commands and requests" violate federal law. The memo directs that DOJ employees investigate "incidents involving any such misconduct" for criminal prosecution under 18 U.S.C. § 371 and 8 U.S.C. §§ 1324 and 1373. The Bondi Memo similarly orders the DOJ to take "appropriate enforcement action" against sanctuary jurisdictions and directs the Civil Division (working with the Sanctuary Cities Enforcement Work Group) to "take legal action to challenge such laws, policies, or practices."

70.    By restricting funding and directing enforcement against Plaintiffs and the City for employing policies that limit cooperation with federal immigration authorities, Defendants seek to commandeer Plaintiffs and the City in furtherance of a federal regulatory program in violation of the Tenth Amendment to the United States Constitution.

71.    Defendants' unconstitutional interference with, and coercion of, the City directly harms Plaintiffs-Intervenors, their members, and their clients by causing the City to back away from its sanctuary practices and Ordinance, the passage of which Plaintiffs-Intervenors facilitated. *See*

*Bond v. United States*, 564 U.S. 211, 225 (2011) ("Impermissible interference with state sovereignty is not within the enumerated powers of the National Government … [and] can cause concomitant injury to persons in individual cases."). Plaintiffs-Intervenors are additionally harmed because, as a result of the City's weakened sanctuary practices, they have been forced to divert resources from individual representations to community education, Know-Your-Rights trainings, and Raid Response, all while losing pass-through federal funds issued through the City.

## COUNT TWO: SEPARATION OF POWERS

72.    Plaintiffs-Intervenors repeat and incorporate by reference each allegation of the prior paragraphs as if fully set forth herein.

73.    The Constitution vests Congress with legislative powers, *see* U.S. Const. art. 1, § 1, the spending power, *see* U.S. Const. art. 1, § 8, cl. 1, and the appropriation power, *see* U.S. Const. art. 1, § 9, cl. 7. Absent a statutory provision or an express delegation, only Congress is entitled to attach conditions to federal funds.

74.    Pursuant to the separation of powers doctrine, the Executive Branch may not "claim[] for itself Congress's exclusive spending power, … [or] coopt Congress's power to legislate." *City & Cnty. of S.F.*, 897 F.3d at 1234. "The structural principles secured by the separation of powers protect the individual," and as a result, it is "the claims of individuals—not of Government departments—[that] have been the principal source of judicial decisions concerning separation of powers and checks and balances." *Bond*, 564 U.S. at 222.

75.    Moreover, any restriction on eligibility for federal funds must be imposed—clearly, unambiguously, and in advance—by Congress. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). When Congress has not imposed such a restriction by statute, the President may not do so by fiat. The President does not have "unilateral power to change the text of duly enacted statutes." *Clinton v. City of New York*, 524 U.S. 417, 447 (1998). Defendants may not unilaterally impose new restrictions on jurisdictions' eligibility for federal funding.

76.    Other provisions of the Constitution establish the separation of powers among the branches of our government, including: (i) the President's obligation to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, cl. 5 (Take Care Clause), (ii) the limitation that

congressional enactments must "be presented to the President of the United States," who then may sign that enactment or veto it, but has no power to merely revise it, either upon presentment or after enactment, U.S. Const. art. I, § 7, cls. 2-3 (Presentment Clause); and (iii) Congress's authority to levy taxes, to finance government operations through appropriations, and to set the terms and conditions on the use of those appropriations, U.S. Const. art. I, § 9, cl. 7 (Appropriations Clause).

77.    Congress has not conditioned the provision of federal funding on compliance with Defendants' immigration enforcement policies and requests.

78.    Congress has not delegated to Defendants the authority to impose immigration enforcement conditions on federal funds.

79.    Yet, through Executive Orders 14,159 and 14,218 and implementing memoranda, Defendants (all part of the Executive Branch) violate the separation of powers by unilaterally imposing new conditions on federal funding without authorization from Congress.

80.    In addition, through these actions, Defendants are legislating new sanctions for failure to comply with immigration enforcement authorities that are unsupported by any act of Congress, including under the Immigration and Nationality Act, or by the Constitution.

81.    These actions target the City's sanctuary practices and Ordinance, thereby directly harming Plaintiffs-Intervenors' members and clients, who rely heavily on the City continuing to enforce its sanctuary policies and practices to access basic local services. These actions also harm Plaintiffs-Intervenors (and by extension their members and clients), which rely on federal funds administered by the City to conduct their work serving immigrant communities, and must divert funds from other priorities to address the crisis these Executive Actions have caused.

**COUNT THREE: SPENDING CLAUSE**

82.    Plaintiffs-Intervenors repeat and incorporate by reference each allegation of the prior paragraphs as if fully set forth herein.

83.    The Spending Clause of the U.S. Constitution provides that "Congress"—not the

84.    Executive—"shall have Power to lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1.

85.    As described above, Defendants violate separation-of-powers principles because the funding restrictions in Executive Orders 14,159 and 14,218 and the implementing memoranda are not authorized by Congress, expressly or impliedly, and therefore violate the Spending Clause.

86.    Even if Congress had delegated its authority to impose conditions on federal funds, the funding restrictions in Executive Orders 14,159 and 14,218 and the Bondi Memo would violate the Spending Clause by:

a.    imposing conditions that are ambiguous, *see Pennhurst State Sch. & Hosp.*, 451 U.S. at 17 ("The legitimacy of Congress' power to legislate under the spending power … rests on whether the State voluntarily and knowingly accepts [Congress' conditions] …. There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it …. [I]f Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously.");

b.    imposing conditions that are not germane to the stated purpose of the federal funds provided to Plaintiffs and the City, since the conditions are imposed irrespective of any purpose of the funds, *see South Dakota v. Dole*, 483 U.S. 203, 207 (1987) ("[C]onditions on federal grants might be illegitimate if they are unrelated to the federal interest in particular national projects or programs." (internal quotation marks omitted));

c.    imposing conditions that are so severe as to coerce Plaintiffs and the City into abandoning their sanctuary policies, *see New York v. United States*, 505 U.S. 144, 175 (1992) (Congress may not impose conditions so severe that they "cross[] the line distinguishing encouragement from coercion."); and

d.    imposing conditions that would require Plaintiffs and the City to act unconstitutionally by detaining individuals based on civil detainers without a finding of probable cause, *see Dole*, 483 U.S. at 210 (Congress's spending power "may not be used to induce the States to engage in activities that would themselves be unconstitutional.").

87.    Defendants' violations of the Spending Clause, which target the City's sanctuary practices and Ordinance, directly harm Plaintiffs-Intervenors' members and clients, who rely heavily on maintaining the City as a sanctuary jurisdiction to access local services. These actions also harm

1  Plaintiffs-Intervenors (and by extension their members and clients), which rely on federal funds

2  administered by the City to conduct their work serving immigrant communities, and must divert

3  funds from other priorities to address the crisis the Executive Actions have caused.

4  **COUNT FOUR: FIFTH AMENDMENT—VOID FOR VAGUENESS**

5  88.    Plaintiffs-Intervenors repeat and incorporate by reference each allegation of the prior

6  paragraphs as if fully set forth herein.

7  89.    Under the Fifth Amendment to the United States Constitution, a federal law is

8  unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is

9  prohibited, or is so standardless that it authorizes or encourages seriously discriminatory

10  enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008).

11  90.    The constitutional vagueness standard applies with full force to executive orders. *See*

12  *United States v. Soussi*, 316 F.3d 1095, 1101 (10th Cir. 2002). When an executive order contains

13  terms that are not "susceptible of a clear meaning," nor "mitigate the vagueness of the term by

14  supplying any definition," then the provision "lends itself to subjective interpretation" and is

15  unconstitutionally vague. *Humanitarian L. Project v. U.S. Dep't of Treasury*, 463 F. Supp. 2d 1049,

16  1070 (C.D. Cal. 2006).

17  91.    Section 17 of Executive Order 14,159 fails to meaningfully define key terms, such as

18  "sanctuary jurisdictions," "Federal funds," or "practices that interfere with the enforcement of

19  Federal law." Nonetheless, having such a "practice" subjects a jurisdiction to criminal or civil

20  actions, which could be draconian in nature. What such a "practice" might be is left undefined, and

21  subject to the Executive Branch's unbridled discretion and subjective interpretation.

22  92.    Section 2(a)(ii) of Executive Order 14,218 fails to meaningfully define key terms,

23  such as "sanctuary policies" or "Federal payments," or what constitutes "seek[ing] to shield illegal

24  aliens from deportation" or "abet[ting] so-called 'sanctuary' policies," instead leaving these terms

25  subject to the Executive Branch's unbridled discretion and subjective interpretation.

26  93.    The enforcement provisions of the Executive Order 14,159 are equally and

27  unconstitutionally vague. Section 8, for example, requires assessment of "fines and penalties" against

28  anyone who "facilitate[s] … aliens' [unlawful] presence in the United States." The term "facilitate"

is left completely undefined and could be read to apply to jurisdictions with sanctuary policies like Plaintiffs and the City. Not only does this standardless provision exceed the President's authority by legislating through executive order, but it also encourages and sanctions arbitrary, subjective, and discriminatory enforcement.

94.    The implementing memoranda are equally vague and lean into the unfettered discretion purportedly granted to them by the Executive Orders. For example, the Bove Memo directs "the newly established Sanctuary Cities Enforcement Working Group … to identify state and local laws, policies, and activities that are inconsistent with Executive Branch immigration initiatives," but does not define what would be encompassed within the expansive phrase "inconsistent with Executive Branch immigration initiatives." The Bove Memo further directs the Civil Division "where appropriate, to take legal action to challenge such laws," but does not explain what laws will merit legal action.

95.    The Bondi Memo purports to define "[s]o-called 'sanctuary jurisdictions'" to "include state or local jurisdictions that refuse to comply with 8 U.S.C. § 1373, refuse to certify compliance with § 1373, or willfully fail to comply with other applicable federal immigration laws." But this definition is circular and fails to provide any more "fair notice of what is prohibited" than Executive Order 14,159 does. *Williams*, 553 U.S. at 304. Crucially, the Bondi Memo "does not make clear what conduct might subject a state or local jurisdiction to defunding or enforcement action, making it impossible for jurisdictions to determine how to modify their conduct, if at all, to avoid … penalties." *Cnty. of Santa Clara*, 250 F. Supp. 3d at 534–35. Furthermore, use of the word "include" suggests that even a jurisdiction that does comply with Section 1373 could still be considered a "sanctuary jurisdiction" subject to defunding and prosecution under Executive Order 14,159 and the Bondi Memo.

96.    The unconstitutionally vague terms of the Executive Orders and the implementing memoranda violate the Fifth Amendment's due process clause and fair notice requirements.

97.    Defendants' unconstitutionally vague threats against "sanctuary jurisdictions," which appear to target the City's sanctuary practices and Ordinance, directly harm Plaintiffs-Intervenors' members and clients, who rely heavily on maintaining the City as a sanctuary jurisdiction to access

local services. These actions also harm Plaintiffs-Intervenors (and by extension their members and clients), which rely on federal funds administered by the City to conduct their work serving immigrant communities, and must divert funds from other priorities to address the crisis the Executive Actions have caused.

### COUNT FIVE: FIFTH AMENDMENT—PROCEDURAL DUE PROCESS

98.    Plaintiffs-Intervenors repeat and incorporate by reference each allegation of the prior paragraphs as if fully set forth herein.

99.    Under the Fifth Amendment to the United States Constitution, the federal government may not deprive anyone of money or property without "due process of law."

100.    Plaintiffs and the City of Los Angeles have a constitutionally protectable property interest in the federal funds they receive.

101.    Section 17 of Executive Order 14,159 deprives Plaintiffs and the City of their procedural due process rights under the Fifth Amendment because they grant the agency Defendants unfettered discretion to "ensure that" so-called "'sanctuary jurisdictions'" "do not receive access to Federal funds." Similarly, Section 2(a)(ii) of Executive Order 14,218 deprives Plaintiffs and the City of their procedural due process rights because it appears to grant Executive Branch agencies unfettered discretion to condition or withhold "Federal payments" that they deem to "abet" "sanctuary" policies.

102.    Moreover, the Bondi Memo's directive to "[a]ll litigating components of the Department of Justice and each U.S. Attorney's Office" to take action against local governments, appears designed to chill lawful ordinances and policies that limit the use of local resources to assist with federal immigration enforcement, and to coerce jurisdictions into abandoning those policies. The Bondi Memo provides no mechanism by which a state or local government may review, challenge, or even obtain notice that it has been designated a "sanctuary jurisdiction."

103.    Defendants' violations of the Due Process Clause, which target the City's sanctuary practices and Ordinance without constitutionally required process, directly harm Plaintiffs-Intervenors' members and clients, who rely heavily on maintaining the City as a sanctuary jurisdiction to access local services. These actions also harm Plaintiffs-Intervenors (and by extension

their members and clients), which rely on federal funds administered by the City to conduct their work serving immigrant communities, and must divert funds from other priorities to address the crisis the Executive Actions have caused.

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs-Intervenors pray that the Court grant the following relief:

1.    A declaration that Section 17 of Executive Order 14,159 is unconstitutional and invalid on its face;

2.    A declaration that Section 17 of Executive Order 14,159 is unconstitutional and invalid as applied to the Ordinance and the City's related policies and practices;

3.    A declaration that the portion of Section 2(a)(ii) of Executive Order 14,218 relating to "sanctuary" policies is unconstitutional and invalid on its face;

4.    A declaration that the portion of Section 2(a)(ii) of Executive Order 14,218 relating to "sanctuary" policies is unconstitutional and invalid as applied to the Ordinance and the City's related policies and practices;

5.    A declaration that local laws and policies that limit (1) the honoring of civil immigration detainer requests; (2) cooperation with administrative warrants for purposes of immigration enforcement; (3) sharing of information with federal immigration authorities other than immigration or citizenship status; (4) the use of local law enforcement to arrest or detain individuals solely for civil immigration violations; or (5) the use of local resources to assist with immigration enforcement activities, do not violate federal law, including 8 U.S.C. § 1373 and 8 U.S.C. § 1324.

6.    A preliminary and permanent injunction enjoining Defendants from enforcing Section 17 of Executive Order 14,159, or taking any other action in furtherance of any withholding or conditioning of federal funds based on Section 17 of Executive Order 14,159 or taking enforcement actions against the City based on the Ordinance and related policies and practices;

7.    A preliminary and permanent injunction enjoining Defendants from enforcing the portion of Section 2(a)(ii) of Executive Order 14,218 relating to "sanctuary" policies, or taking any other action in furtherance of any withholding or conditioning of federal payments based on that portion of Section 2(a)(ii) of Executive Order 14,218;

8.    A preliminary and permanent injunction enjoining Defendants from implementing the funding pause or the unlawful funding conditions directed by the Bondi Memo, or taking enforcement action against the City based on the Ordinance and related policies and practices;

9.    Award Plaintiffs-Intervenors' reasonable costs and attorneys' fees; and

10.    Grant any other further relief that the Court deems fit and proper.

Dated: Los Angeles, California

April 11, 2025

*Mark Rosenbaum*

_____
Mark Rosenbaum (SBN 59940)
Gina Amato (SBN 215519)
Rebecca Brown (SBN 345805)
Jacob Maddox (SBN 354368)
Sophia Wrench (SBN 354416)*
PUBLIC COUNSEL
610 South Ardmore Avenue
Los Angeles, CA 90005
(213) 385-2977
mrosenbaum@publiccounsel.org
gamato@publiccounsel.org
rbrown@publiccounsel.org
jmaddox@publiccounsel.org
swrench@publiccounsel.org

Matthew J. Craig (SBN 350030)
Mack E. Jenkins (SBN 242101)
Susan Har (SBN 301924)
HECKER FINK LLP
1150 South Olive Street, Suite 10-140
Los Angeles, CA 90015
(212) 763-0883
mcraig@heckerfink.com
mjenkins@heckerfink.com
shar@heckerfink.com

*Attorneys for Plaintiffs-Intervenors Central American Resource Center – CARECEN – of California, Coalition for Humane Immigrant Rights, and Immigrant Defenders Law Center*

* N.D. Cal. admission pending