UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO, et al., | Case No.  25-cv-01350-WHO |
| Plaintiffs, | **FURTHER ORDER REGARDING PRELIMINARY INJUNCTION** |
| v. | Re: Dkt. Nos. 61, 108 |
| DONALD J. TRUMP, et al., | |
| Defendants. | |

On April 24, 2025, I issued an Order Granting Preliminary Injunction to plaintiffs San Francisco, Santa Clara, and fourteen other cities and counties that maintain policies placing them within the definition of "sanctuary jurisdictions" (hereafter, the "Cities and Counties").[1]  Dkt. No. 111.  The Preliminary Injunction blocks the first sentence of Section 17 of Executive Order 14,159 ("Protecting the American People Against Invasion") (hereafter, "EO 14,159"), Section 2(a)(ii) of Executive Order 14,218 ("Ending Taxpayer Subsidization of Open Borders") (hereafter, "EO 14,218") (together the "2025 Executive Orders") and the Preamble and Section 1 of the February 5, 2025, Memorandum from the Attorney General entitled "Sanctuary Jurisdictions Directives," (the "Bondi Directive").  Dkt. No. 111.  I enjoined the defendants the day after the hearing because of the Cities and Counties' well-founded fear of enforcement, the merits of their claims, and the irreparable injury they faced.  This Order explains my reasoning in greater detail.

---

[1] Plaintiffs are City and County of San Francisco ("San Francisco"), County of Santa Clara ("Santa Clara"), City of Portland ("Portland"), Martin Luther King, Jr. County ("King County"), City of New Haven ("New Haven"), City of Oakland ("Oakland"), City of Emeryville ("Emeryville"), City of San Jose ("San Jose"), City of San Diego ("San Diego"), City of Sacramento ("Sacramento"), City of Santa Cruz ("Santa Cruz"), County of Monterey ("Monterey"), City of Seattle ("Seattle"), City of Minneapolis ("Minneapolis"), City of St. Paul ("St. Paul"), and City of Santa Fe ("Santa Fe").

**BACKGROUND**

**I. THE 2017 EXECUTIVE ORDER AND RELATED LITIGATION**

Days after being sworn into office for the first time in January 2017, President Trump issued Executive Order 13,768, 82 Fed. Reg. 8799 (Jan. 25, 2017), which directed the Attorney General and Secretary of the Department of Homeland Security ("DHS") to, "in their discretion and to the extent consistent with the law," "ensure that jurisdictions that willfully refuse to comply with 8 U.S.C. § 1373 (sanctuary jurisdictions) are not eligible to receive Federal grants, except as deemed necessary for law enforcement purposes by the Attorney General or the Secretary [of Homeland Security]." Executive Order 13,768, Section 9, 82 Fed. Reg. 8799 (Jan. 25, 2017).

San Francisco and Santa Clara challenged Section 9 of EO 13,768 in this court. I preliminarily and then permanently enjoined Section 9(a) of EO 13,768, finding that it violated the Constitution's separation of powers doctrine, the Spending Clause and the Tenth Amendment. I also held that it was unconstitutionally vague and denied sanctuary jurisdictions the procedural due process they were owed under the Fifth Amendment. *See Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 509 (N.D. Cal. Apr. 25, 2017) (granting preliminary injunction motion brought by San Francisco and Santa Clara, seeking to enjoin Section 9 of EO 13,768); *Cnty. of Santa Clara v. Trump*, 275 F. Supp. 3d 1196 (N.D. Cal. Nov. 20, 2017) (granting plaintiffs' motion for summary judgment and motion for a permanent injunction). The Ninth Circuit affirmed. *See City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1234–35 (9th Cir. 2018).

After I enjoined Section 9(a) of EO 13,768, the government inserted various immigration-related conditions on grants under the Edward Byrne Memorial Justice Access Grant ("Byrne JAG") program in several jurisdictions. In a second lawsuit filed by San Francisco (along with the State of California) over DOJ's efforts to condition Byrne JAG funding on cooperation with federal immigration enforcement, I concluded that DOJ's conditions violated the Constitution's separation of powers doctrine and the Spending Clause, and were arbitrary and capricious under the Administrative Procedure Act, 5 U.S.C. § 706. I also found that San Francisco complied with relevant federal law. I entered summary judgment in the plaintiffs' favor and issued a permanent injunction. *City & Cnty. of S.F. v. Sessions*, 349 F. Supp. 3d 924 (N.D. Cal. 2018), *aff'd in part*

United States District Court
Northern District of California

*and vacated in part, City & Cnty. of S.F. v. Barr*, 965 F.3d 753 (9th Cir. 2020). The Ninth Circuit agreed, and the Third and Seventh Circuits reached similar conclusions. *See City of Philadelphia v. Attorney General of United States*, 916 F.3d 276 (3d Cir. 2019); *City of Chicago v. Sessions*, 888 F.3d 272 (7th Cir. 2018) ("*Chicago I*"); *City of Chicago v. Barr*, 961 F.3d 882 (7th Cir. 2020) ("*Chicago II*"). The Second Circuit disagreed. *State v. Dep't of Just.*, 951 F.3d 84 (2d Cir. 2020).

## II. THE 2025 EXECUTIVE ORDERS AND GOVERNMENT CONDUCT

### A. Executive Order 14,159

On the day of his second inauguration, President Trump issued EO 14,159, 90 Fed. Reg. 8443 (Jan. 20, 2025). Section 17 of EO 14,159 directs the United States Attorney General and DHS Secretary to take "any lawful actions to ensure that so-called 'sanctuary' jurisdictions, which seek to interfere with the lawful exercise of Federal law enforcement operations, do not receive access to Federal funds." *Id.*

EO 14,159, like its 2017 predecessor, threatens all "Federal funds" destined for so-called "sanctuary" jurisdictions. What qualifies as a "sanctuary" jurisdiction is less clear in EO 14,159 than it was in EO 13,768. While EO 13,768 defined "sanctuary jurisdictions" within the text of the Executive Order by specific reference to compliance with 8 U.S.C. § 1373 and civil immigration detainer requests, EO 14,159 defines the term to include any jurisdiction that, according to the President, "seek[s] to interfere with the lawful exercise of Federal law enforcement operations." 90 Fed. Reg. 8443. Additional agency directives, and communications from the Executive Branch, make it clear that the term is meant to encompass jurisdictions, like the Cities and Counties, that limit the use of local resources to assist in federal immigration enforcement. This is consistent with how the term was understood in 2017.

### 1. The Bove Memo

On January 21, 2025, the day after EO 14,159 was issued, defendant Emil Bove, as Acting Deputy U.S. Attorney General, issued a memorandum to all DOJ employees entitled "Interim Policy Changes Regarding Charging, Sentencing, And Immigration Enforcement" (the "Bove Memo"), which purports to implement EO 14,159. Tilak Decl., Ex. 2. Through the Bove Memo, the DOJ expressed its view that "[t]he Supremacy Clause and other authorities require state and

local actors to comply with the Executive Branch's immigration enforcement initiatives" and that states and localities violate federal law by "failing to comply with lawful immigration-related commands and requests." *Id.* at p. 3. The Bove Memo states that the President has the unilateral authority to require states and localities to comply with EO 14,159. It also declares that laws and policies that "prohibit[] disclosures of information" "threaten to impede Executive Branch immigration initiatives" and that those policies that pose such a "threat[]" will be subject to investigation by a DOJ task force focused upon so-called "sanctuary" jurisdictions. *Id.*

### 2. The Bondi Directive

On February 5, 2025, defendant Pamela Bondi, in her capacity as United States Attorney General, issued the Bondi Directive to all DOJ employees. Tilak Decl. Ex. 3. It commits DOJ to "ensure that, consistent with the law, 'sanctuary jurisdictions' do not receive access to Federal funds from the Department." *Id.* at p. 1. It orders DOJ to "pause distribution of all funds" so that it could review agreements with states and municipalities and announces that DOJ would "terminate any agreements that are in violation of law or are the source of waste, fraud, or abuse, and initiate clawback or recoupment procedures, where appropriate." *Id.* at p. 1.

The Bondi Directive provides a definition for "sanctuary jurisdictions" that had been missing from EO 14,159. It defines them as "includ[ing]" states and localities that choose not to comply or certify compliance with 8 U.S.C. § 1373, which is consistent with how EO 13,768 defined the term. Tilak Decl. Ex. 3 at p. 2. It states that, in accordance with "applicable immigration-related federal laws," state and local actors must "comply with lawful immigration-related directives," but does not specify what those directives are, or which "applicable federal immigration laws" or "immigration-related federal laws" might trigger "clawback" or "recoupment" procedures if agreements contain provisions that violate those laws.[2] *See id.*

---

[2] The Bondi Directive also states that DOJ will invoke its "own authority" to impose immigration-related conditions upon DOJ funding. That authority apparently includes requiring "any jurisdiction that applies for certain [DOJ] grants to be compliant with 8 U.S.C. § 1373(a)." Tilak Decl., Ex. 3 at pp. 1-2. The Cities and Counties state in a footnote to their Motion that if DOJ publishes a list of grants the receipt of which will be conditioned upon compliance with 8 U.S.C. § 1373 or other immigration-related conditions, or starts imposing such conditions upon grants, then the Cities and Counties will likely seek additional injunctive relief if necessary. But they state that "given the imminent budgetary quandary that [they] already face," they are forced to seek

United States District Court
Northern District of California

United States District Court
Northern District of California

**B.  Executive Order 14,218**

On February 19, 2025, President Trump issued EO 14,218, 90 Fed. Reg. 10581.  Tilak Decl. Ex. 33.  Section 2(a)(ii) of EO 14,218 directs every federal agency to "ensure, consistent with applicable law, that Federal payments to States and localities do not, by design or effect, facilitate the subsidization or promotion of illegal immigration, or abet so-called 'sanctuary' policies that seek to shield illegal aliens from deportation." *Id.*, 90 Fed. Reg. at 10581.  EO 14,218 is intended to "prevent taxpayer resources from acting as a magnet and fueling illegal immigration into the United States," and to ensure that "no taxpayer-funded benefits go to unqualified aliens." *Id.*  Like EO 14,159, EO 14,218 does not define many of its key terms.  It does not define "Federal payments" or "sanctuary" policies.  It does not clarify what it means for a payment to "abet" "sanctuary policies" by "design or effect," nor does it explain why providing federal funding to jurisdictions with "sanctuary" policies "fuel[s] illegal immigration," or leads to "taxpayer-funded benefits" afforded to "unqualified aliens." *Id.*

**C.  Actions Taken in the Wake of the 2025 Executive Orders**

Since the issuance of the 2025 Executive Orders, the Government has taken numerous steps to try to implement them.  On the litigation front, it has initiated lawsuits against New York and Illinois, in which it asserts that the defendants' respective sanctuary policies violate the Supremacy Clause.  *See United States of America v. State of New York, et al.*, No. 1:25-cv-00205 (N.D.N.Y., filed Feb. 12, 2025) (Dkt. No. 1) (Complaint); *United States of America v. State of Illinois, et al.*, No. 1:25-cv-1285 (N.D. Ill., filed Feb. 6, 2025) (Dkt. No. 1) (Complaint).

Executive departments have followed suit.  On the same day that EO 14,218 issued, DHS Secretary defendant Kristi Noem issued a memorandum to all executive agencies and offices, entitled "Restricting Grant Funding for Sanctuary Jurisdictions." Supp. Nguyen Decl. Ex. 1 (Noem Directive). [3]  In it, Secretary Noem directs the DHS to review federal financial assistance

---

immediate injunctive relief without waiting to see what grants may appear on a DOJ list.

[3] The Cities and Counties filed a Request for Judicial Notice of a February 19, 2025, Memorandum from the Secretary of the Department of Homeland Security, Kristi Noem, to "ALL AGENCIES AND OFFICES" that is entitled "Restricting Grant Funding for Sanctuary Jurisdictions." Dkt. Nos. 88 (the Noem Memo), 89.  The Government protests that because the Cities and Counties did not "challenge this memo in their Amended Complaint or Motion for

1  awards to "determine if [DHS] funds, directly or indirectly, are going to sanctuary jurisdictions,"

2  and then, "to the extent consistent with relevant legal authorities," "cease providing federal

3  funding to sanctuary jurisdictions." *Id.* at p. 2.

4      On March 25, 2025, Secretary Noem approved the Federal Emergency Management

5  Agency's ("FEMA") recommendation that "conditions or restrictions" related to "sanctuary"

6  jurisdictions should be placed on "all open and future awards" for twelve grant programs that fund

7  essential emergency preparedness activities, each of which, according to FEMA, has "a nexus to

8  immigration activities, law enforcement, *or* national security," and where a "statute does not limit

9  how FEMA implements the program."  Supp. Nguyen Decl. Ex. 1 at pp. 2-3 (emphasis added).

10     DHS's actions led the California Governor's Office of Emergency Services ("Cal OES") to

11  issue a "Grant Management Memorandum," informing all Cal OES, Homeland Security Grant

12  Program ("HSGP"), Nonprofit Security Grant Program ("NSGP"), Emergency Operations Center

13  Grant Program ("EOCGP"), Emergency Management Performance Grant Program ("EMPG") and

14  State and Local Cybersecurity Grant Program ("SLCGP") subrecipients that DHS and the Federal

15  Emergency Management Agency ("FEMA") had paused federal grant funding while they conduct

16  a "manual review" of grant programs, including pending disbursement requests for obligated grant

17  funds.  Dkt. No. 108-2, Ex. 1.  The Cal OES memo instructed the grant programs to be prepared to

18  comply with the federal government's requests by compiling various documentation and

19  information about the programs.  *Id.*

20     And on April 18, 2025, DHS released a document entitled "FY 2025 DHS STANDARD

21  TERMS AND CONDITIONS," available at https://www.dhs.gov/sites/default/files/2025-

22  04/2025_0418_fy2025_dhs_terms_and_conditions_version_3.pdf.[4]  The DHS Terms and

23  ────────────────────

24  Preliminary Injunction" it is improper for consideration here.  Oppo. 4, n.3.  The Cities and
    Counties are not asking that I enjoin any part of the Noem Memo.  They offer it as further

25  evidence of the Government's intent to enforce the 2025 Executive Orders through agency action.
    It is a public document issued by an executive agency in an official capacity; its authenticity is

26  uncontested.  I will take judicial notice of it.

27  [4] On April 22, 2025, the Cities and Counties filed a Third Supplemental Request for Judicial
    Notice (Dkt. No. 108), asking that this court take judicial notice of the DHS Terms and Conditions

28  (Dkt. No. 108-2, Ex. 2), along with the April 11, 2025, Memorandum from the California
    Governor's Office of Emergency Services ("Cal OES") Grants Management, which was issued to

United States District Court
Northern District of California

Conditions for Fiscal Year 2025 apply to "all new federal awards of federal financial assistance … for which the federal award date occurs in FY 2025 and flow down to subrecipients unless a term or condition specifically indicates otherwise." Dkt. No. 108-2, Ex. 2.  In it, the executive agency states, in relevant part:

> (1) All recipients . . . must agree that they will comply with the following requirements related to coordination and cooperation with [DHS] and immigration officials:
> (a) They must comply with the requirements of 8 U.S.C. §§ 1373 and 1644. . . . ; (b) they must comply with other relevant laws related to immigration . . .(2) the recipient must certify under penalty of perjury . . . that it will comply with the requirements of this term. . . . (3) The recipient agrees that compliance with this term is material to the Government's decision to make or continue with this award and that the Department of Homeland Security may terminate this grant, or take any other allowable enforcement action, if the recipient fails to comply with this term.

Dkt. No. 108-2 (Ex. 2) (DHS Terms and Conditions).

The Department of Housing and Urban Development ("HUD") is doing the same thing. On March 12, 2025, it notified San Francisco that annual renewals of more than thirty grants through the Continuum of Care program (a program that supports San Francisco's safety network to house people experiencing chronic homelessness) would be subject to new grant conditions. McSpadden Decl. ¶¶ 9-12.  The new HUD conditions require compliance with "all applicable immigration restrictions and requirements," including under "Executive Order 14,218[] or other Executive Orders," seemingly incorporating those restrictions and requirements iterated in EO 14,159.  The HUD grant agreement also contains language pulled directly from Section 2(a)(ii) of EO 14,218, stating that funds may not be used "in a manner that by design or effect facilitates the subsidization or promotion of illegal immigration or abets so-called 'sanctuary' policies that seek to shield illegal aliens from deportation." Tilak Decl., Ex. 33.  The new conditions came months after HUD told San Francisco that it had been awarded the grants; San Francisco had already expended its own resources to reimburse nonprofit service providers, expecting that it would receive HUD funding once the grant agreements were executed.  McSpadden Decl. ¶ 8.  And on

United States District Court
Northern District of California

all subrecipients of the Cal OES Homeland Security Grant Program, among other grant programs. *See* Dkt. No. 108.  These are public documents issued by state and executive agencies.  Their authenticity is uncontested.  I will take judicial notice of both the DHS Terms and Conditions and Cal OES memorandum.

7

April 4, 2025, HUD Secretary Scott Turner issued a memo to "all HUD Grantees and Stakeholders," stating that he had recently directed HUD senior leadership to "institute mechanisms that can ensure HUD programs are compliant with President Trump's Executive Order," and explaining that "going forward, grant agreements will include language that will require compliance with Executive Order 14218, and the Department will take steps to ensure that Federal resources are not used to support 'sanctuary' policies of State and local jurisdictions[.]" Supp. Nguyen Decl. Ex. 9.

Communications shedding light on the intended purpose of the 2025 Executive Orders have not been limited to official executive agency directives or publications. President Trump's intent to withhold all federal funds from sanctuary jurisdictions is crystal clear through his own commentary. For example, on March 27, 2025, President Trump told reporters that he planned to "end sanctuary cities for some of these jurisdictions that aren't cooperating with law enforcement," and that he might "just end the thing altogether." Supp. Nguyen Decl. Ex. 4. On April 10, 2025, he posted on the social media platform Truth Social, "No more Sanctuary Cities! They protect the Criminals, not the Victims. They are disgracing our Country, and are being mocked all over the World. Working on papers to withhold all Federal Funding for any City or State that allows these Death Traps to exist!!!" Donald Trump (@realDonaldTrump), Truth Social, https://truthsocial.com/@realDonaldTrump/posts/114313927527638500 (last visited April 28, 2025).[5]

### III.  THE CITIES AND COUNTIES' POLICIES AND FUNDING

The history, Executive Orders and conduct described in the previous two sections form the basis of the Cities and Counties' well-founded fear of enforcement. Each plaintiff has submitted declarations describing how their policies and practices regarding federal immigration enforcement are at odds with the 2025 Executive Orders and the Bondi Directive. I summarize

---

[5] On April 28, 2025, four days after I issued the Preliminary Injunction Order in this case, President Trump issued another Executive Order concerning sanctuary cities. *See* Executive Order issued April 28, 2025 ("Protecting American Communities from Criminal Aliens"), -- Fed. Reg. – (April 28 EO). Given its timing, I do not consider the April 28 EO in any way in this Order, except to note that it is consistent with the Government's other Executive Orders and conduct since January 20, 2025.

them below.

### A. San Francisco

#### 1. Policies

The City and County of San Francisco asserts that its local policies and practices with regard to federal immigration enforcement are at odds with the 2025 Executive Orders and the Bondi Directive concerning Section 1373. PI Mot. 3-5. San Francisco's sanctuary jurisdiction policies are contained in Chapters 12H and 12I of its Administrative Code, first passed in 1989, and amended in 2016. Declaration of Karun Tilak ("Tilak Decl.") [Dkt. No. 61] Exs. 4-5. The stated purpose of these laws is "to foster respect and trust between law enforcement and residents, to protect limited local resources, to encourage cooperation between residents and City officials, including especially law enforcement and public health officers and employees, and to ensure community security, and due process for all." S.F. Admin Code § 12I.1.

As relevant to Section 1373, Chapter 12H prohibits San Francisco departments, agencies, commissions, officers, and employees from using San Francisco funds or resources to assist in enforcing federal immigration law or gathering or disseminating information regarding an individual's release status, or other confidential identifying information (which as defined does not include immigration status), unless such assistance is required by federal or state law. S.F. Admin Code § 12H.2; Declaration of William Scott ("Scott Decl.") [Dkt. No. 65] ¶ 5. While Chapter 12H at one time prohibited San Francisco city employees from sharing information about individuals' immigration status, the San Francisco Board of Supervisors removed that restriction in July 2016, out of concerns that the provision violated Section 1373.

San Francisco also has a policy that prohibits San Francisco law enforcement from detaining an individual who is otherwise eligible for release from custody solely on the basis of a civil immigration detainer request. S.F. Admin Code § 12I.3; Scott Decl. ¶ 5; Declaration of Paul Miyamoto [Dkt. No. 67] ¶¶ 4-7.

San Francisco explains that it adopted these policies in part to build trust with immigrant communities and to ensure that all individuals, regardless of their immigration status, feel safe approaching San Francisco police officers. Scott Decl. ¶ 4. This allows for greater cooperation

United States District Court
Northern District of California

1    with law enforcement, which the San Francisco Police Department says is "essential to SFPD's

2    ability to apprehend criminals[.]" *Id.*

3    ### 2.    Funding

4    San Francisco's yearly budget, as both a city and a county, is approximately $15.9 billion.

5    Declaration of Sophia Kittler ("Kittler Decl.") [Dkt. No. 66] ¶ 13.  Its annual operating budget for

6    the Fiscal Year 2024-25 includes just under $2.5 billion in federal funds, accounting for

7    approximately 16% of the total annual operating budget.  In addition to the federal funds allocated

8    in the annual operating budget, San Francisco expects to receive an additional $1.2 billion in

9    federal multi-year grants budgeted in prior years.  *Id.* ¶ 14.  San Francisco receives most of these

10   funds as reimbursements.  *Id.* ¶ 16.

11   San Francisco uses most of the federal funds in its annual operating budget to support

12   programs in its Human Services Agency and Department of Public Health.  *Id.* ¶ 17.  These

13   amounts fund critical services like Medicaid and Medicare, Temporary Assistance for Needy

14   Families, Supplemental Nutrition Assistance Program, Foster Care, and other child welfare

15   programs.  San Francisco states that there is no connection between the purpose of the funds and

16   federal immigration enforcement for "all or almost all federal funds received by the City." *Id.* ¶

17   17; *see also id.* ¶ 19 (describing how federal funds enable San Francisco to deliver critical health

18   services through institutions like Zuckerberg San Francisco General Hospital ("ZSFGH"), which

19   is owned and operated by the City's Department of Public Health, is the largest safety net provider

20   in San Francisco, and is the designated trauma center for the 1.5 million residents of San Francisco

21   and northern San Mateo County, but the Executive Orders and Bondi Directive call into question

22   whether ZSFGH will receive the approximately $866 million in federal funding it has budgeted

23   for in 2024-25); ¶ 20 (describing how Laguna Honda Hospital, which provides a full range of

24   skilled nursing services to disabled or chronically ill adult San Francisco residents, relies on

25   federal funding for approximately 90% of its annual budget, virtually all of which is provided as

26   reimbursements); ¶¶ 23-20 (explaining that San Francisco's Department of Public Health, Human

27   Services Agency, and In-Home Support Services programs rely heavily on federal funds to run

28   their critical services, and that loss of federal funds would mean that these programs would likely

United States District Court
Northern District of California

1   have to cut significant portions of their workforces and reduce their capacity to provide care).

2         San Francisco must adopt a balanced budget for the fiscal year beginning on July 1, 2025.

3   Kittler Decl. ¶ 30.  It began the process of adopting the annual budget in December 2024.  San

4   Francisco law requires the City Controller to submit a consolidated budget proposal to the City

5   Mayor by March 1, the Mayor to submit a balanced budget to the Board of Supervisors by June 1,

6   and the Board of Supervisors to approve a balanced budget by August 1.  Kittler Decl. ¶ 30.  To

7   meet the June 1 deadline, the Mayor must make fundamental budget decisions by mid-May and

8   input these decisions into the City's budget software by late May.  One of the fundamental

9   decisions the Mayor's office must make by mid-May is whether to increase its budget reserve to

10  account for the possible loss of federal and state funds in the coming fiscal year.  Any money used

11  to fund the reserve is money that will not be available for General Fund programs and services; the

12  General Fund is what funds core services like public safety and social safety net programs.  *Id.* ¶

13  32.

14        **B.    Santa Clara**

15              **1.  Policies**

16        The County of Santa Clara asserts that its local policies and practices with regard to federal

17  immigration enforcement are at odds with the 2025 Executive Orders and the Bondi Directive with

18  respect to Section 1373.  PI Mot. 4-5.  In 2010, the Santa Clara County Board of Supervisors

19  adopted a Resolution that limits the use of County resources to assist with federal civil

20  immigration enforcement.  Declaration of James Williams ("Williams Decl.") [Dkt. No. 76] ¶ 14.

21  A Board Policy adopted by the County in 2011 limits County resources spent on the enforcement

22  of civil immigration law.  Williams Decl. ¶ 17; Santa Clara County Board Policy 3.54.  As

23  adopted in 2011, Board Policy 3.54 allowed County staff to honor ICE civil detainer requests

24  under certain limited circumstances, and only if ICE agreed to reimburse the County for the full

25  costs associated with doing so.  In practice, according to the County, ICE never agreed to

26  reimburse the County and so the County has not honored a civil detainer request since Board

27  Policy 3.54 was adopted in 2011.  Williams Decl. ¶ 17.

28        The Board of Supervisors amended Board Policy 3.54 in 2019.  By that point, the State of

California had adopted statewide legislation prohibiting any state or local agency in California from honoring ICE civil detainer requests; the law allowed localities to engage in certain other forms of cooperation with federal civil immigration enforcement, and also recognized that localities could opt to impose greater limitations on their own policies and laws.  As amended in 2019, Board Policy 3.54 prohibits honoring civil detainer requests.  Williams Decl. ¶ 19; *id.* Ex. D.

### 2. Funding

In the 2023-24 fiscal year, Santa Clara received approximately $3.5 billion in federal and federally dependent funds, which constitutes approximately 31% of the County's total revenues. Williams Decl. ¶¶ 25-26.   The County receives federal funding primarily through fee-for-service and reimbursement-based models.  *Id.*  In these arrangements, the County first spends the money or provides a service using County resources and then is reimbursed fully or partially with federal funds. *Id.* ¶ 26.  Most of the services that the County provides with federal funding are what are known as "entitlement" programs that are mandated by either the federal or state governments; the County says it is spending "hundreds of millions of dollars on services for which it is otherwise entitled to receive federal reimbursement." *Id.* ¶ 27.

Most of the County's federal funds are used to provide essential services to its residents. In support of its motion, the County includes several declarations outlining how a loss of any significant amount of federal funding would force it to make substantial cutbacks to safety-net programs providing essential services to struggling Santa Clara residents, and would require it to lay off thousands of employees.  For example: Santa Clara Valley Healthcare ("SCVH") is the only public safety-net healthcare provider in Santa Clara County, and is the second largest public healthcare system in California.  *Id.* ¶ 30.  SCVH's three hospitals provide critical emergency and acute care services to Santa Clara County residents; it offers specialty acute care services, including pediatric trauma, burn, and rehabilitation care, a high-risk neonatal intensive care unit, and a high-risk pregnancy program for women who have conditions that may affect their health or the health of their baby.  *Id.* ¶ 32.  In the 2023-24 year, SCVH received federally dependent revenues of approximately $1.9 billion, and its gross expenditures were $3.6 billion.  Each year, anticipating this funding gap, the County makes a significant investment from its General Fund to

United States District Court
Northern District of California

1    support SCVH's operations.  *Id.* ¶ 36.  If federal funds were withheld, the County would be unable

2    to absorb the larger difference that would arise.

3         The County's Public Health Department, which provides disease control and pandemic

4    response services and functions as the public health agency for each of the cities within Santa

5    Clara County had, in fiscal year 2023-24, federal revenues of approximately $68 million,

6    accounting for approximately one-third of its funding.  The County would have to significantly

7    reduce or cut these critical services without federal funding.  Similarly, it would have to

8    significantly cut funding for its Social Services Agency ("SSA"), which provides safety net and

9    protective services to children, families, and adults in need of assistance—SSA received more than

10   $417 million in federal revenues during the 2023-24 fiscal year, while its expenditures were

11   approximately $1.16 billion.  If federal funding were withheld from SSA, the County would be

12   forced to cut some of SSA's services.  *Id.* ¶ 41.  The County also explains that some of its

13   community safety programs, including the County's Office of Emergency Management ("OEM")

14   would be jeopardized if the County were to lose federal funding.  *See id.* ¶¶ 42-47.

15        **C.    Emeryville**

16             **1.    Policies**

17        The City of Emeryville asserts that its local policies and practices with regard to federal

18   immigration enforcement are at odds with the 2025 Executive Orders and the Bondi Directive with

19   respect to Section 1373.  In 2017, the Emeryville City Council adopted Resolution No. 17-08,

20   known as the "Welcoming and Sanctuary Resolution." Declaration of Frederick Daur ("Daur

21   Decl.") [Dkt. No. 61-3] ¶ 3; Tilak Decl., Ex. 10.  The Welcoming and Sanctuary Resolution

22   provides: "(a) Emeryville is a Welcoming and Sanctuary City; (b) Emeryville employees serve all

23   residents, and city services are accessible to all residents regardless of immigration status; (c)

24   Emeryville employees do not inquire about a person's immigration status in either the provision of

25   municipal services or in the course of law enforcement; (d) Emeryville refuses any requests that

26   are an extension of any federal immigration policy enforcement actions; (e) Emeryville does not

27   enter into any agreements to carry out such federal enforcement actions; and (f) Emeryville does

28   not dedicate any City time or resources to such enforcement but leaves such actions to federal

authorities." *Id.*

### 2. Funding

The Emeryville Police Department ("EPD") utilizes federal funds, including DOJ funding, for various officer safety and community safety programs. EPD receives approximately $10,000 to $12,000 annually in DOJ funding, passed through Alameda County, as part of the Edward Byrne Memorial Justice Assistance Grant Program ("Byrne JAG"). Daur Decl. ¶ 5. EPD uses Byrne funding to purchase updated equipment for officers, among other things. It also receives approximately $10,000 annually in DOJ funding through the Patrick Leahy Bulletproof Vest Partnership Program ("BVP Program"), which allows EPD to keep its officers' body armor up to date. *Id.* ¶¶ 8-9. The BVP Program operates on a reimbursement basis. *Id.* ¶ 10.

EPD also receives "non-DOJ" federal funds. Its 9-1-1 system, run by the California government, is partially funded with federal grants, and it receives approximately $50,000 to $100,000 annually through the Highway Safety Grants Program from the National Highway Traffic Safety Administration ("NHTSA"), passed through the California Office of Traffic Safety. The California Office of Traffic Safety applies for grants from NHTSA, which EPD then uses to enhance traffic safety by increasing enforcement of moving violations and impaired driving. *Id.* ¶ 11.

Without federal funding, according to the Acting Captain of the EPD, Captain Dauer, Emeryville would have to backfill these costs from its General Fund. *Id.* ¶ 12. Emeryville has an $11 million budget deficit. The EPD believes that in light of this deficit, if federal funding were to be cut due to Emeryville's lack of compliance with federal civil immigration enforcement policies, EPD would have to cut spending, reducing public safety.

### D.    Martin Luther King, Jr. County (King County)

#### 1. Policies

Martin Luther King, Jr. County ("King County") asserts that its local policies and practices with regard to federal immigration enforcement are at odds with the 2025 Executive Orders and the Bondi Directive with respect to Section 1373. Consistent with Washington state law forbidding discrimination, King County does not use its resources toward enforcement of federal

14

1    immigration laws.  Declaration of Dwight Dively ("Dively Decl.") [Dkt. No. 61-4] ¶ 4; Tilak

2    Decl., Ex. 7.

3                              **2.  Funding**

4         The King County government manages a budget of approximately $10.2 billion.  It

5    provides local and regional, urban and rural services across King County, which encompasses

6    2,307 square miles, making it the largest county in Washington State.  Dively Decl. ¶¶ 3-4.  The

7    King County sheriff provides direct law enforcement services for unincorporated King County,

8    and twelve contract cities, as well as county-wide services that are mandated by state law.  *Id.*  The

9    County runs public health, safety, social health, and mental health services, and supports other

10   social service infrastructure.  The County is also responsible for overseeing voting in local, state,

11   and federal elections and funding emergency management services.  *Id.*

12        King County's 2025 general fund and enterprise operating budgets include more than $200

13   million in federal revenue (approximately 2.7% of the County's overall budget).  Some federal

14   funding is received through the state; other times County departments receive federal funding

15   through specific grants funded by Congress and competitively awarded by a federal agency for a

16   specific purpose.  *Id.* ¶ 6.  King County also receives federal funding by formula; formula funds

17   are automatically calculated and awarded by congressional appropriation based on specific facts.

18   Examples include airport funding based on the annual number of passengers and amount of cargo

19   moving through the King County airport and Emergency Management Performance Grant

20   Program and Homeland Security Grant Program funds based on the threat level assigned to the

21   County on the risk of terrorist attack.  *See* Declaration of Brendan McClusky ("McClusky Decl.")

22   [Dkt. No. 61-5] ¶ 4; *see also* Declaration of Patricia Cole-Tindall [Dkt. No. 61-6] ¶¶ 7-14.  King

23   County relies heavily on federal funding to prepare for potential terrorist attacks (for which the

24   threat is high in the County due to its high and dense population) and for natural disasters (to

25   which the County is predisposed given its location on the "Pacific Ring of Fire," which contains

26   five major, active, high threat volcanoes and numerous fault lines).

27        King County's capital budget is supported by federal revenue forecasted years into the

28   future.  The amount of federal capital funds either awarded to King County for 2025 or included in

United States District Court
Northern District of California

1   the budget for 2025 based on congressionally required funding formula funding is approximately

2   $500 million.

3        King County has already been affected by the 2025 Executive Orders and the Bondi

4   Directive because it must "devote significant resources to evaluating risk to already awarded

5   federal funding, continuously monitor developments, create new federal funding tracking systems,

6   and coordinate internal and external communications and responses." *Id.* ¶ 10. According to the

7   Chief Operating Officer and Director of Performance, Strategy and Budget for King County,

8   failure to receive awarded federal funding may have "material adverse impact" on King County

9   funding streams because if enough federal funding were to be withheld, the County would be

10   forced to take on unplanned debt at potentially higher rates to support its contract, program, and

11   project commitments. *Id.* The County identifies its Metro Transit program as an example. The

12   Metro Transit program is supposed to receive $203 million in grant applications from the Federal

13   Transit Administration ("FTA") from 2021 through fiscal year 2024, but the FTA has informed

14   the County it placed a nationwide hold on obligation of all discretionary funding. Dively Decl. ¶

15   12(a). Other offices, including King County's office of public health, Department of Community

16   Services, Climate Office, Department of Natural Resources and Parks, Department of Local

17   Services, along with local infrastructure projects, all face funding shortages if federal funding goes

18   away. *Id.* ¶ 12.

19        King County points out that the federal funding discussion provided by its Chief Operating

20   Officer for the purpose of his declaration is "conservative," considering that the County's

21   projections reflect that general fund programs at 2025 levels will cost approximately $150 million

22   more than available revenues in 2026-27, making federal funding "especially critical now and into

23   the upcoming budget cycle." *Id.* ¶ 13.

24       **E.**     **Minneapolis**

25            **1.**   **Policies**

26        The City of Minneapolis asserts that its local policies and practices with regard to federal

27   immigration enforcement are at odds with the 2025 Executive Orders and the Bondi Directive with

28   respect to Section 1373. Minneapolis's Separation Ordinance, M.C.O. Chapter 19 was enacted to

ensure that all residents can feel comfortable accessing public health services without fear of immigration consequences.  Declaration of Heidi Ritchie ("Ritchie Decl.") [Dkt. No. 61-8] ¶ 4; Tilak Decl., Ex. 24.  Chapter 19 of the Minneapolis Code of Ordinances clarifies the communication and enforcement relationship between the city and the United States Department of Homeland Security and other federal agencies with respect to the enforcement of civil immigration laws.  Chapter 19 provides that "[t]he City works cooperatively with the Homeland Security . . . but the city does not operate its programs for the purpose of enforcing federal immigration laws." M.C.O. Ch. 19.10.

Declarations provided by Minneapolis set forth that the city relies on M.C.O. Ch. 19 to ensure that residents feel comfortable accessing public health services and receiving training and education on public health practices, such that the city can successfully implement its public health programs and policies.  Ritchie Decl. ¶¶ 4-6; *see also* Declaration of Michelle Rivero [Dkt. No. 61-9] (stating that concerns about federal enforcement of federal immigration policy within Minneapolis, in contravention of the City's policies, "hamper City efforts to offer services and support in person and prevent residents from accessing municipal services").

### 2. Funding

According to declarations filed by the city of Minneapolis, federal funding in 2024 from federal agencies including the Departments of Housing and Urban Development ("HUD"), Health and Human Services ("HHS"), Labor, and Transportation, financed approximately $54,360,000 of Minneapolis's programs and services.  In some cases, Minneapolis receives federal funding through formula grants (grants that are noncompetitive and allocated to grantees based on distribution formulas) and has built programs around the continuing nature of these funds.  *Id.* ¶ 8.

In 2024, direct and pass-through funds from the United States Department of Justice ("DOJ") financed almost $1.8 million of Minneapolis's expenditures.  Declaration of Matthew Bower ("Bower Decl.") [Dkt. No. 61-7] ¶ 6.  The City used DOJ funding to: (a) fund recruitment for its police department; (b) fund the inventorying, testing, tracking, and reporting of sexual assault kits; (c) pay the salary and fringe benefits of an attorney who serves as the direct legal adviser to the Minneapolis Police Department; and (d) fund an opioid addiction treatment

1    program.  Bower Decl. ¶ 6.

2        Minneapolis is currently planning its budget for 2026.  Departments are now determining

3    whether grant supported positions will be supported by grants in 2026.  The Mayor must deliver a

4    proposed budget to the City Council by August 2025.  *Id.* ¶ 12.  The loss of Minneapolis's

5    anticipated federal funding would force the City to choose between cuts to municipal services or

6    "imposition of a historically large tax levy on its residents." *Id.* ¶ 14.

7        **F.        Monterey**

8            **1.   Policies**

9        The County of Monterey asserts that its local policies and practices with regard to federal

10   immigration enforcement are at odds with the 2025 Executive Orders and the Bondi Directive with

11   respect to Section 1373.  Monterey has a guidance document entitled "U.S. Immigration and

12   Customs Enforcement Activity in Monterey County," which is current as of February 10, 2025.

13   Declaration of Henry Bluestone Smith ("Bluestone Smith Decl.") [Dkt. No. 61-12] Ex. A; Tilak

14   Decl. Ex. 22.  In it, the County Board of Supervisors recently "reiterated its commitment to

15   maintaining the County as a 'Welcome County for Immigrants and Refugees' and declared the

16   County to be a 'Place of Trust and Safety for Immigrants."  *Id.*

17       The document states that "[w]hile federal law prevents public employees from being

18   legally prohibited from sharing information about an individual's immigration status with federal

19   immigration officials, employees are also under no legal obligation to share such information, and

20   consistent with state law may not take it upon themselves to use public resources to assist with any

21   federal immigration enforcement." *Id.*  The purpose of these policies, the County has explained, is

22   "to ensure that all residents trust county government, cooperate with the County's institutions, and

23   participate in the County's programs that promise the public health, safety, and welfare." *Id.*

24           **2.   Funding**

25       Federal funding, coming either directly from the federal government or passed through at

26   the state level, makes up a significant portion of Monterey's annual budget.  In fiscal year 2024-

27   25, Monterey had an approved budget of approximately $2 billion.  Declaration of Sonia De La

28   Rosa ("De La Rosa Decl.") [Dkt. No. 61-11] ¶ 6.  For the last two years of which finalized budget

United States District Court
Northern District of California

data is currently available (fiscal years 2023-24 and 2024-25), a total of roughly $480 million in federal funding was budgeted for use in the County during that two-year period. *Id.* ¶ 7. That funding is used for public assistance programs, capital projects, and health administration.

In December 2024, the County began its annual budgeting process. The budget for this fiscal year must be finalized by July 1, 2025. Current projections suggest that the County will be budgeting for expenditures in excess of revenues. In order to finalize the budget for the upcoming fiscal year, "fundamental budget decisions are being made that presume the County's ongoing ability to receive federal funds." *Id.* ¶¶ 10-11.

The loss of an estimated 13% of Monterey's budgeted revenue if the County's direct federal funding were cut off "would significantly undermine [the County's] ability to provide services to County residents," and this loss would particularly impact County health and safety programs. *Id.* ¶ 12. The County would also have to "hurriedly develop" new budgetary proposals, while drastically reducing services or rushing to backfill funding. The loss of federal funding would leave the County's ability to finalize a budget in advance of the upcoming fiscal year "in significant doubt." *Id.* ¶ 13.

### G.    New Haven

#### 1.    Policies

The City of New Haven asserts that its local policies and practices with regard to federal immigration enforcement are at odds with the 2024 Executive Orders and the Bondi Directive with respect to Section 1373. Mot. 3-5. In 2020, the mayor signed an "Executive Order to Affirm New Haven as a Welcoming City." Tilak Decl. Ex. 8. The Order limits New Haven police officers and city employees from inquiring about immigration status, and using agency or department resources to assist in the investigation or enforcement of any federal program requiring registration of individuals on the basis of, among other things, national or ethnic origin. *Id.* at p. 1. It also limits city employees from using local resources generally to assist federal civil immigration enforcement proceedings. *Id.* at p. 2.

#### 2.    Funding

New Haven's operating budget for FY 2025-26 is in the drafting process now. It is

estimated to be around $700 million. Approximately $30 million of that is scheduled to come in the form of federal funds. Declaration of Justin Elicker ("Elicker Decl.") [Dkt. No. 61-13] ¶¶ 13-14. New Haven relies on federal funding to provide important public services to its residents. If New Haven were to lose federal funding, the Mayor would need to recommend a financial mitigation plan to the City's legislative body. *Id.* ¶¶ 6-7. New Haven has already begun to make its FY 2025-26 budget. On March 1, 2025, as he was required to do by law, Mayor Elicker submitted a recommended budget and tax rate to the Board of Alders, which is New Haven's legislative body. *Id.* ¶ 11. The Mayor's recommended budget and tax rate were based in part on the expectation of receiving federal funds. *Id.* The Board must approve a balanced budget by June 30, 2025. *Id.* ¶ 12. The uncertainty around the continued grant funding is already complicating the budget-making process. *Id.* ¶ 17. Loss of all federal funding mid-year, after the budget is created, would be devastating to New Haven, likely requiring mid-year cuts to police, fire, education, and medical responses, and a workforce reduction. *Id.* ¶¶ 18-19.

### H.    Oakland

#### 1.    Policies

The City of Oakland has been on record as a City of Refuge since July 8, 1986. In 2019, the City adopted City of Oakland Ordinance No. 13515, entitled "Ordinance Amending Resolution Numbers 63950, 80584 and 86498 in Order to Strengthen the Sanctuary City Policy of the City of Oakland Not to Cooperate With or Provide Support for Federal Immigration Agencies, Based Upon Resolution 87036." Tilak Decl., Ex. 9. In that Ordinance, the City "ma[de] clear that no City of Oakland resources shall go towards assisting or cooperating with any investigation, detention, or arrest procedure or operation, public or clandestine ICE, including any subdivision of ICE, regardless of ICE's stated purpose for the procedure or operation[.]" *Id.*

#### 2.    Funding

The City of Oakland received approximately $170 million in federal funds and awards for 2024. Declaration of Jestin Johnson ("Johnson Decl.") [Dkt. No. 61-14] ¶ 8. As part of funding cycles included in the 2025 calendar year, Oakland was awarded approximately $8 million in grants from the United States Department of Justice ("DOJ"). This funding came from Justice

United States District Court
Northern District of California

Access grants, DNA Capacity Enhancement for Backlog Reduction grants, Byrne Access to Justice grants, and Office of Juvenile Justice and Delinquency Prevention Enhancing School Capacity to Address Youth Violence grants, among others. The funding allowed Oakland to provide or expand critical public safety services. *See* Johnson Decl. ¶ 4. Oakland also has more than $5 million in outstanding DOJ awards that the City has yet to receive. *Id.* ¶ 5.

All City departments must submit their budget proposals to the Mayor by March 21, 2025. The Mayor then finalizes their budget in the second week of April, and publishes that budget at the beginning of May. The Oakland City Council must then provide any amendments and adopt a final budget by June 30, 2025.

Declarations submitted by the City state that the "threatened withdrawal of federal funding makes the budgeting process for Oakland more daunting and puts Oakland at risk of having to guess whether it can afford to count on those funds or if it needs to cut programs, spending, and potentially staff to be able to withstand that loss of funding." Johnson Decl. ¶ 9.

## I.    Portland

### 1.    Policies

In 2017, the City of Portland adopted Resolution No. 37277, entitled "Declare the City of Portland a Welcoming City, a Sanctuary City, and an Inclusive city for all," where the City "[sought] to affirm Portland's commitment to protect and support immigrant and refugee communities," and resolved that "the City will continue to, in a manner consistent with state and federal law, prohibit the use of City funds, personnel or equipment to enforce federal immigration law." Tilak Decl., Ex. 6.

### 2.    Funding

The City of Portland operates with an annual budget of approximately $8 billion. It currently possesses approximately $344 million in "active federal grants." Declaration of Jonas Biery ("Biery Decl.") [Dkt. No. 61-16] ¶ 6. Approximately $135 million of that has already been reimbursed to the City, leaving approximately $193 million outstanding on existing grants. According to declarations submitted by the City in support of its motion, the City depends on this federal grant funding in "nearly all service areas," including significant funding for the Portland

United States District Court
Northern District of California

Housing Bureau, the Portland Bureau of Transportation, and public safety bureaus, including its police and fire departments.  *Id.*

The City operates on a July 1-June 30 budget year.  For the 2025-26 budget year, the City currently estimates at least a $100 million budget shortfall.  The budget cycle includes many phases.  First, the Mayor releases budget guidance and each of the City's service areas begin budget preparations, including preparing proposed budgets.  *Id.* ¶ 4.  (This year, the budget guidance from the Mayor requested that all service areas offer budgets with proposed 5% and 8% reductions to account for the anticipated budget shortfall.  *Id.*)  The City Administrator then drafts budget recommendations, which the City releases publicly at the end of February.  After working sessions through March and April, the Mayor releases a proposed budget by May 5.  After receiving proposed budgets from each of the City's service areas, the Mayor and the City Administrator create a unified proposed budget, which is submitted to the City Council.  *Id.*  The City Council convenes under state law as the Budget Committee to approve the City's budget in late May, and the City Council adopts the proposed budget in June.  *Id.*  In light of this schedule, late winter and spring are essential times for making determinations related to the City's budgeting.  *Id.* ¶ 5.

Declarations from Portland city officials state that it is "challenging to engage in a complete and thorough budget process with uncertainty over millions of dollars of already-awarded federal grant money." *Id.* ¶ 8.

### J.    Sacramento

#### 1.    Policies

The City of Sacramento asserts that its local policies and practices with regard to federal immigration enforcement are at odds with the 2024 Executive Orders and the Bondi Directive with respect to Section 1373.  Mot. 3-5.  In 2017, the Sacramento City Council adopted Resolution No. 2017-0158, "Reaffirming the City of Sacramento's Status as a City of Sanctuary, Clarifying the City's Policies and Procedures on the Enforcement of Federal Civil Immigration Laws, and Repealing Resolution No. 85-973."  It provides that, in an effort to promote public health, safety, and welfare, and to serve the needs of everyone in the community, Sacramento has enacted

United States District Court
Northern District of California

numerous non-discrimination policies and modern police practices aimed at strengthening communities and build trust between communities and local law enforcement. *Id.* at p. 1. Resolution No. 2017-0158 states that "this trust is threatened when the City's employees, including police officers, are entangled with federal immigration enforcement, instilling fear in immigrant communities of coming forward to report crimes and cooperate with local law enforcement agencies." *Id.* Accordingly, to promote trust and cooperation between City residents and employees, and to "prevent the federal government's commandeering of local resources and City personnel in violation of the Tenth Amendment," Resolution No. 2017-0158 resolves that "[n]o City official, employee or agent of the City, while in the course and scope of employment, shall use any City funds or resources to enforce federal civil immigration law," and lists prohibited practices that constitute such prohibited enforcement activities. *See id.* at p. 2. The Resolution also clarifies that "[n]othing in this Resolution prohibits or restricts any City official, employee or agent of the City from sending to, or receiving from, federal immigration authorities, information regarding the citizenship or immigration status, lawful or unlawful, of a person pursuant to Sections 1373 and 1644 of Title 8 of the United States Code." *Id.*

### 2. Funding

Sacramento's annual budget is approximately $1.6 billion. Declaration of Leyne Milstein ("Milstein Decl.") [Dkt. No. 61-8] ¶ 7. Across all City operations, Sacramento is expecting approximately $175 million in outstanding federal reimbursements. *Id.* ¶ 4. It maintains an Economic Uncertainty Reserve ("EUR"), which it says is not sufficient to cover the loss of all or a substantial amount of federal funding. *Id.* If all federal funding were removed, Sacramento would face a large budget deficit, and would likely be forced to cut services, including public safety services. *Id.* ¶ 4.

Sacramento has begun the budgeting process for fiscal year 2025-26, which begins on July 1, 2025. The City Manager must submit a proposed balanced budget to the City Council for FY 2025-26 by April 30, 2025. *Id.* ¶ 6. The City Council must pass a balanced FY 2025-26 budget by June 30, 2025. *Id.* According to the City Manager, "[n]ot knowing whether federal reimbursements will arrive as expected creates uncertainty about how to achieve a balanced

budget." *Id.*

## K.    Santa Cruz

### 1.    Policies

The City of Santa Cruz asserts that its local policies and practices with regard to federal immigration enforcement are at odds with the 2024 Executive Orders and the Bondi Directive with respect to Section 1373.  Mot. 3-5.   In 1986, in the context of crises in El Salvador and Guatamala, the Santa Cruz City Council adopted Resolution No. NS-16,876, making Santa Cruz a "City of Sanctuary and Refuge" for Salvadorean and Guatamalan refugees, until they could safely return to their home countries.  Tilak Decl. Ex. 16.  In 2007, in the context of "recent immigration raids" by ICE, the City Council adopted Resolution No. NS-27,504, which declared that Santa Cruz was a "sanctuary for immigrants who live and work in our community," and made it the policy of the City Council that the City of Santa Cruz "shall not cooperate with ICE and shall prohibit the use of City funds or resources for any Federal immigration enforcement proceeding." *Id.* Ex. 17.  This was reaffirmed in 2017 by Resolution No. NS-29,187, *id.* Ex. 18, and most recently in February 2025, when the City Council reaffirmed its prior actions restricting the use of local resources for federal immigration proceedings, and affirmed the City's intention to abide by the California Values Act (SB 54), which prohibits state and local law enforcement agencies from using money or personnel to investigate, interrogate, detain, detect, or arrest persons for immigration enforcement purposes, Tilak Decl. Ex. 19.

### 2.    Funding

Santa Cruz's budget for the current fiscal year is already in place.  Declaration of Elizabeth Cabell ("Cabell Decl.") [Dkt. No. 77] ¶ 3.  Santa Cruz built this budget around its anticipation of receiving approximately $90.9 million in federal grants.  *Id.* ¶ 4.  The City has only received approximately $23.7 million of that $90.9 million, to date, because it operates on a reimbursement plan with the federal government.  *Id.* ¶ 5.  The City anticipated receiving an additional $67.2 million for this fiscal year.  Those funds are intended to support Santa Cruz's Department of Economic Development and Housing, the City Manager's Office, the Police Department, the Fire Department, the Parks and Recreation Department, the Public Works Department, and the Water

United States District Court
Northern District of California

1    Department.  *Id.* ¶ 6.

2         According to the City's finance director, if the federal government withholds the remaining

3    federal awards, the City faces a "dire financial situation," where it will "struggle to provide

4    essential public services, including emergency assistance, food, and shelter." *Id.* ¶ 7.  Additionally,

5    its ongoing projects, including water infrastructure, affordable housing development, and hazard

6    mitigation construction "risk significant delays or outright incompletion."  *Id.*  The uncertainty

7    may also require Santa Cruz to "reconsider its staffing," including by "layoffs of employees across

8    all departments." *Id.* ¶ 8.  Moreover, Santa Cruz states that if it were to lose federal funding and

9    later regain it, it would "struggle to rebuild [its] faithful, dedicated workforce." *Id.* ¶ 9.

10        **L.    San Diego**

11             **1.  Policies**

12        The City of San Diego asserts that its local policies and practices with regard to federal

13   immigration enforcement are at odds with the 2024 Executive Orders and the Bondi Directive with

14   respect to Section 1373.  Mot. 3-5.   In 2021, the San Diego City Council adopted Resolution No.

15   R-313834, declaring San Diego a "Welcoming City" that "respects the dignity of all people and

16   promotes programs and policies to foster inclusion for all." Tilak Decl. Ex. 14.  The Resolution

17   recognized that San Diego's "heritage, strength, and future are tied to its ability to ensure aspiring

18   New Americans can fully participate in civic life, access public resources, and enrich the region

19   with their talents and cultures" and adopted the "welcoming city" status to "foster[ ] a welcoming

20   environment for all – regardless of immigration status," which the City believed "enhances [its]

21   health, economic prosperity, and well-being for current and future generations." *Id.*

22             **2.  Funding**

23        The San Diego Police Department ("SDPD") relies on approximately $8 million in federal

24   grants from at least four different DOJ programs: 1) Internet Crimes Against Children (total

25   awarded since 2018 is approximately $3.5 million); 2) Edward Byrne Justice Assistance Grant

26   (total awarded since 2019 is approximately $3 million); 3) DNA Capacity Enhancement for

27   Backlog Reduction Grant (total awarded since 2021 is approximately $1 million); and 4) Paul

28   Coverdell Forensic Science Improvement Grant (total awarded since 2022 is approximately

                                                        25

$167,000). These programs all support public safety in San Diego. Declaration of Kyle Meaux ("Meaux Decl.") [Dkt. No. 63] ¶ 3.

The Internet Crimes Against Children ("ICAC") Grant Program funds local law enforcement efforts to investigate computer crimes that target youth, provide educational training to teachers, parents, and children, and serve as a forensic resource to other local law enforcement agencies. *Id.* ¶ 4. Loss of federal funds would directly impact its ability to protect San Diego's youth during a time when internet crimes are on the rise. *Id.* ¶ 5. The Edward Byrne Memorial Justice Assistance Grant ("Byrne JAG") Program enables SDPD to support crime control and criminal justice system strengthening programs, to address the City's unique challenges as a port city. *Id.* ¶¶ 7-8. The lack of federal funds would significantly reduce SDPD's ability to respond to emergencies, and without Byrne JAG funds, SDPD would likely be forced to shift funds from other public safety initiatives, which would undermine long-term crime prevention efforts. *Id.* ¶¶ 9-10.

### M.    Santa Fe

#### 1.    Policies

The City of Santa Fe asserts that its local policies and practices with regard to federal immigration enforcement are at odds with the 2024 Executive Orders and the Bondi Directive with respect to Section 1373. Mot. 3-5. In 1999, the City of Santa Fe adopted a Resolution "Declaring a policy of non-discrimination on the basis of a person's national origin and appointing an immigration task force." Tilak Decl. Ex. 26. In 2017, it adopted Resolution No. 2017-19, which reaffirmed Santa Fe's status as a "welcoming community for immigrants and refugees," and declared that "the use of resources by the City to enforce federal civil immigration laws . . . diverts resources from other productive services for the people of Santa Fe and undermines a productive and trusting relationship between the immigrant communities and the City of Santa Fe." Tilak Decl. Ex. 27. Resolution No. 2017-19 adopted policies preventing City employees from using local resources to aid in federal civil immigration enforcement.

#### 2.    Funding

Santa Fe approved a budget for FY 2025 of approximately $440 million. Declaration of

United States District Court
Northern District of California

1   Emily Oster ("Oster Decl." [Dkt. No. 78] ¶ 5.  The budget maintains essential city services like

2   police, fire, lifeguards, water, sewer, and libraries, addresses homelessness and housing shortages,

3   and fixes critical infrastructure.  *Id.*  In total, the City has over $20 million in awarded but not yet

4   expended federal grants from the DOJ and other executive agencies.  *Id.* ¶ 12.

5   According to the City's Finance Director, if unanticipated federal funding cuts occur

6   before the end of FY 2025, the City's budget could be "seriously impacted" because there is not

7   much time to "absorb the loss of funds."  *Id.* ¶ 6.  And depending on the nature and extent of the

8   federal funding cuts, they could "lead to service reductions, hiring freezes for vacant positions,

9   and cancellation of contracts and associated penalties."  *Id.* ¶ 7.  The City is also in the process of

10  developing an FY 2026 budget that considers the possible loss of federal funds; the budget must

11  be approved by June 1, 2025.  *Id.* ¶ 11.  If it creates a budget anticipating this loss, the City may

12  have to reduce services; if it budgets assuming the continued receipt of millions of dollars in

13  grants, it risks later having to use its own General Fund revenues to replace budgeted grant

14  funding, which will also divert resources from essential services.  *Id.* ¶ 8.  Either way, the

15  residents of Santa Fe face reductions in transit services, housing, and senior services.  Road, public

16  transportation, and key infrastructure risk falling into disrepair.  *Id.* ¶ 15.

17  **N.      San Jose**

18  **1.      Policies**

19  The City of San Jose asserts that its local policies and practices with regard to federal

20  immigration enforcement are at odds with the 2024 Executive Orders and the Bondi Directive with

21  respect to Section 1373.  Mot. 3-5.  San Jose has adopted three different resolutions affirming its

22  status as a sanctuary jurisdiction.  *See* Tilak Decl. Exs. 11-13.  Resolution No. 73677, entitled "A

23  Resolution of the Council of the City of San Jose Supporting Public Safety and Immigrant

24  Rights," was adopted in 2007, and it affirms that no otherwise law-abiding undocumented

25  immigrants in San Jose should fear arrest or deportation for coming forward to report a crime or a

26  witness, or for contacting a City employee.  Tilak Decl. Ex. 11.  Resolution No. 77517, which

27  affirmed San Jose as a welcoming city, was adopted in 2015.  *Id.* Ex. 12.  Resolution No.

28  RES2025-19 was adopted on January 21, 2025. *Id.* Ex. 13.  It reaffirmed the San Jose Police

Department's policy "that its officers will not arrest persons merely for their unlawful presence in the United States; that no undocumented immigrants should fear arrest or deportation for coming forward to report a crime as a victim or a witness; and that no undocumented immigrants should fear arrest or deportation by contacting any employee of the City of San José to express concerns or to ask questions." *Id.* It further affirmed that "no City employee will voluntarily support immigration enforcement actions that target San José residents solely based on their immigration status." *Id.*

### 2. Funding

San Jose's budget for FY 2024-25 included nearly $187 million in federal funding ($98.1 million for operations, and $88.6 million for capital projects). Declaration of Jim Shannon ("Shannon Decl.") [Dkt. No. 70] ¶ 4. San Jose has budgeted, and has expended or will expend on reliance on the funding awarded. Most funds are disbursed on a reimbursement basis. The federal funding supports critical programs including workforce development, low-income and interim housing, law enforcement, the airport, and public safety services. *Id.* ¶ 6.

San Jose has begun budgeting for FY 2025-26, and uncertainty about the loss of federal funds, including from DOJ and HUD, impacts its ability to plan and determine what services can be reliably funded. *Id.* ¶ 7. The loss of funds, even on a temporary basis, could lead to the elimination of programs serving San Jose's most vulnerable residents. *Id.* ¶ 9. For instance, HUD has awarded approximately $52 million in grants to San Jose's Housing Department, which is used for a wide range of activities from building housing, preventing slums and blight, housing rehabilitation, capital improvement projects, and code enforcement. *Id.* The Housing Department, consistent with state and local law, does not engage in any immigration enforcement activities. *Id.* ¶ 10. There are no alternative sources of funding in the Housing Department for the programs it funds with federal grant money. *Id.* ¶ 9.

### O. Saint Paul

#### 1. Policies

The City of Saint Paul asserts that its local policies and practices with regard to federal immigration enforcement are at odds with the 2024 Executive Orders and the Bondi Directive with

United States District Court
Northern District of California

respect to Section 1373.  Mot. 3-5.  Saint Paul's Code of Ordinances contains a section addressing "Employe Authority in Immigration Matters."  *See* Tilak Decl. Ex. 25.  It provides that while the city works cooperatively with homeland security, it "does not operate its programs for the purpose of enforcing federal immigration laws." *Id.*  While the ordinance is clear that homeland security has the legal authority to enforce immigration laws in the United States, in Minnesota, and in Saint Paul, it is the policy of the city to "respect the role of homeland security by avoiding pro-active enforcement of civil immigration laws." *Id.*; *see also* Declaration of John McCarthy ("McCarthy Decl.") [Dkt. No. 61-19] ¶ 3.

### 2.  Funding

Saint Paul has $192.2 million in federal funds that are currently under contract.  McCarthy Decl. ¶ 5.  The majority of these funds, roughly $139.4 million, is tied to one-time projects, largely capital investments, and the remainder consist of operational funding supporting outgoing programs and departments.  *Id.*  In addition to this, Saint Paul has been awarded $66.8 million in federal funds for which it is in the post-award phase of establishing work plans and executing contracts.  It has applied for an additional amount of federal grants totaling $66.1 million, which was pending as of March 12, 2025.  *Id.* ¶ 6.  Saint Paul currently has $7,108,957 in grant funds under contract from the DOJ.  Of this amount, $2,971,692 has already been spent, $2,255,151 has been reimbursed, and $716, 541 has not yet been reimbursed.  *Id.* ¶ 7.  Saint Paul uses DOJ funds for a host of public safety initiatives, including its COPS Hiring Program (which helped Saint Paul hire 15 full-time police officers), the Law Enforcement Career Path Academy and the Familiar Faces program (which assists frequent users of emergency and shelter services within the City.  DOJ funds also generally support DWI enforcement, drug trafficking unit, traffic enforcement, and equipment for gathering evidence at crime scenes, as well as paramedic and firefighter training and equipment for firefighters).  *Id.*  If DOJ funds for these programs were withdrawn, the City likely could not fund these activities fully, and to the extent it chose to, that would mandate commensurate reductions in funding for other City programs.  *Id.*

**P.      Seattle**

**1.   Policies**

The City of Seattle asserts that its local policies and practices with regard to federal immigration enforcement are at odds with the 2024 Executive Orders and the Bondi Directive with respect to Section 1373.  Mot. 3-5.  Seattle's Municipal Code provides that unless required by law or a court order, "no Seattle City officer or employee shall inquire into the immigration status of any person, or engage in activities designed to ascertain the immigration status of any person." Seattle Mun. Code § 4.18.015; *see also* Declaration of Daniel Eder ("Eder Decl.") [Dkt. No. 81] ¶ 4.

**2.   Funding**

Seattle's budget for the fiscal year beginning January 1, 2025, totals approximately $8.5 billion, including approximately $1.9 billion in Seattle's General Fund, which is used to support public services like police and fire services, human services, parks and recreation, and transportation.  Eder Decl. ¶ 7.  Much of Seattle's federal funding is provided on a reimbursement basis. *Id.* ¶ 8.  Uncertainty regarding the ongoing availability of federal funds "presents a monumental fiscal challenge." *Id.* ¶ 9.

Seattle adopted the 2025 budget on November 21, 2024.  As of the 2025 Adopted Budget, Seattle has legal authority and appropriations authority to spend about $370 million in federal funds during the year beginning on January 1, 2025.  *Id.* ¶ 10.  If Seattle were to lose all federal funds, the impacts would be felt "immediately." *Id.* ¶ 11.  Federal funding supports programming that provides vulnerable Seattle residents access to food, medical care, shelter, and other housing assistance, as well as supporting survivors of domestic violence and sexual assault.  These services would be lost along with federal funding.  Federal dollars also support critical seismic upgrades in a high-risk earthquake-impact area, transportation, and weatherization of low-income households. *Id.* ¶ 13.  The loss of funds would "exacerbate an already acute housing shortage in Seattle." *Id.*

**LEGAL STANDARD**

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on

the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). This has been interpreted as a four-part conjunctive test, not a four-factor balancing test. However, the Ninth Circuit has held that a plaintiff may also obtain an injunction if he has demonstrated "serious questions going to the merits" that the balance of hardships "tips sharply" in his favor, that he is likely to suffer irreparable harm, and that an injunction is in the public interest. *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-35 (9th Cir. 2011).

## DISCUSSION

### I. JUSTICIABILITY

The Government opposes the Cities and Counties' motion on justiciability grounds. It argues now, as it did in 2017, that the plaintiffs cannot establish injury-in-fact, a prerequisite for standing, and that their claims are not ripe because the 2025 Executive Orders and Bondi Directive have not been yet, and may never be, implemented.

The Government's justiciability arguments are no more persuasive now than they were in 2017, when I rejected them. The Ninth Circuit affirmed my decision, holding that where plaintiffs "have policies in place that arguably would qualify for grant withdrawal under the [Executive Orders], with potentially devastating fiscal consequences," they had satisfied Article III's standing requirement. *City & Cnty. of S.F.*, 897 F.3d at 1236. The Cities and Counties have made an even stronger showing of Article III standing today than they did in 2017. The 2025 Executive Orders are accompanied by the Bondi Directive, other directives by executive agencies instructing compliance with the President's orders, the President's own statements threatening to "end" sanctuary jurisdictions altogether, and two lawsuits against sanctuary jurisdictions. *See* discussion *supra* "Background," Section II. And this list does not include the history of sanctuary jurisdiction litigation during the first Trump term. *See id.*, Section I.

The Cities and Counties have policies in place that would arguably trigger loss of federal funding under the 2025 Executive Orders. They each rely on federal funds for a substantial percentage of their annual budgets. The 2025 Executive Orders have jeopardized their

31

sovereignty.  The Cities and Counties face a choice that is no choice at all: Modify their policies to match those of the federal government or face devastating fiscal consequences, the impact of which will have far-reaching effects across various public services and the very fabric of their communities.  In light of binding precedent and the record before me, I conclude that the plaintiffs have Article III standing to bring their claims, and that those claims are ripe.

### A. Pre-Enforcement Standing

This court's jurisdiction is limited to "Cases" and "Controversies." U.S. Const. art. III, § 2. "Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy … [that] limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 136 S.Ct. 1540, 1547, 194 L.Ed.2d 635 (2016).  Standing exists only where the plaintiff demonstrates "that it has suffered a concrete and particularized injury that is either actual or imminent, that the injury is fairly traceable to the defendant, and that it is likely that a favorable decision will redress that injury." *Massachusetts v. EPA*, 549 U.S. 497, 517, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007).

Because the Cities and Counties have not yet suffered a loss of funds or other enforcement action under the 2025 Executive Orders, they must establish pre-enforcement standing, as they did in 2017.  A plaintiff may demonstrate pre-enforcement standing by showing "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and [that] there exists a credible threat of prosecution thereunder." *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979).  The Cities and Counties can establish standing by demonstrating a "well-founded fear that the law will be enforced against them." *City & Cnty. of S.F.*, 897 F.3d at 1236 (quoting *American Booksellers*, 484 U.S. at 392).

### 1. The Cities and Counties' policies are proscribed by the 2025 Executive Orders and the Bondi Directive

Where, as here, it is not fully clear what conduct is proscribed by a statute, a well-founded fear of enforcement may be based in part on a plaintiff's reasonable interpretation of what conduct is proscribed.  *American Booksellers*, 484 U.S. 392.  This is true even if a narrower reading of the statute is available.  *Id.* at 397.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    The Cities and Counties' interpretation of the 2025 Executive Orders as proscribing their

2    policies is reasonable.  First, and most critically, the Government does not contest that the Cities

3    and Counties are "sanctuary" jurisdictions, and "sanctuary" jurisdictions are targeted by the 2025

4    Executive Orders and the Bondi Directive for funding freezes or elimination.  EO 14,159 asserts

5    that "sanctuary" jurisdictions are those that "seek to interfere with the lawful exercise of Federal

6    law enforcement operations" and directs the Attorney General and DHS Secretary to "evaluate and

7    undertake any lawful actions to ensure that so-called 'sanctuary' jurisdictions" "do not receive

8    access to Federal funds." Tilak Decl. Ex. 1 (EO 14,159, 90 Fed. Reg. at 8446).  EO 14,218 defines

9    "sanctuary" *policies* as those that "seek to shield illegal aliens from deportation," *id.* Ex. 33 (EO

10   14,218, 90 Fed. Reg. at 10581).  These definitions are ambiguous, but when taken alongside

11   communications from executive agencies, and past litigation of these same issues, *see* discussion

12   *supra* "Background," Sections I, II, they suggest that the Cities and Counties, all of which have in

13   place policies that limit the use of local resources to assist in federal immigration enforcement, *see*

14   discussion *supra* "Background," Section III, fit squarely within the scope of the 2025 Executive

15   Orders.

16   The Bondi Directive, while still ambiguous in many ways, states that "sanctuary"

17   jurisdictions "include" localities that "refuse to comply with 8 U.S.C. § 1373, refuse to certify

18   compliance with § 1373, or willfully fail to comply with other applicable federal immigration

19   laws." Tilak Decl. Ex. 3 (Bondi Directive).  This definition is consistent with how the first Trump

20   Administration defined "sanctuary jurisdictions," when it sought to withhold funding from

21   localities like the plaintiffs that choose to limit their involvement in federal civil immigration

22   enforcement.  *See Cnty. of Santa Clara*, 250 F. Supp. 3d at 509.  Communications from the Trump

23   administration, and lawsuits already filed by the federal government against "sanctuary" localities

24   in New York and Illinois (which maintain sanctuary policies akin to the plaintiffs', *see infra* "Pre-

25   Enforcement Standing," Section 2(b)), further solidify the Cities and Counties' reasonable fear

26   that they are targets of the 2025 Executive Orders.  *See* discussion *supra*, "Background" Section

27   II(C).

28   The Cities and Counties' interpretation of the 2025 Executive Orders and Bondi Directive

as targeting them for enforcement is reasonable.

### 2. The Government has repeatedly indicated an intent to enforce the 2025 Executive Orders against jurisdictions like the Cities and Counties

The Government argues now, as it did in 2017, that the Cities and Counties lack standing because the Government has not officially designated them as "sanctuary jurisdictions" or withheld funds and may never do so, so the plaintiffs cannot show that they have a well-founded fear of enforcement. It insists that the challenged orders are merely guidance for executive agencies to use in evaluating federal funding to localities, not directives to freeze that funding. Its argument is inconsistent with the clear and specific language of the 2025 Executive Orders and belied by the Government's actions.

#### a. Possibility of non-enforcement does not defeat standing

The Ninth Circuit held that "the possibility of non-enforcement does not mean that the [Cities and Counties] lack standing." *City & Cnty. of S.F.*, 897 F.3d at 1236. It is enough that, if the Cities and Counties' "interpretation of the Executive Order is correct," they will be "forced to either change their policies or face serious consequences." *Id.* (quoting *Virginia v. American Booksellers Assoc.*, 484 U.S. 383, 393, 103 S.Ct. 636 (1988)).

The Cities and Counties have demonstrated the devastating repercussions to their budgets and to their ability to provide public services if their federal funding is eliminated, and to intra-community trust if they are forced to change their policies. *See* discussion *supra*, "Background" Section III (discussing both fiscal consequences the plaintiffs face if they do not change their policies to comply with federal immigration policies and explaining that those policies were adopted to foster trust and cooperation within their communities, in an effort to improve public health and safety). I reject the Government's assertion that the 2025 Executive Orders merely "provide guidance," but that is immaterial for considerations of standing. The Cities and Counties have shown that if their interpretation of the orders is correct, they will suffer serious injury unless they adapt their policies. The mere possibility that their reasonable fears are not realized does not defeat standing.

**b.  The 2025 Executive Orders and the Bondi Directive Command Executive Agencies to Freeze Funds**

The Cities and Counties seek to enjoin the first sentence of Section 17 of EO 14,159 and Section 2(a)(ii) of EO 14,218.  The interpretation of an Executive Order "begins with its text," which must be "construed consistently with the Order's 'object and policy.'" *City & Cnty. of S.F.*, 897 F.3d at 1238-39 (quoting *Bassidiji v. Goe*, 413 F.3d 928, 934 (9th Cir. 2005)).  The clear and specific language of the 2025 Executive Orders themselves, and the Government's communications and actions since their implementation, give rise to the Cities and Counties' reasonable fear that these sections will be enforced.

Section 17 of EO 14,159 does not merely request an "evaluation" of federal funding, as the Government insists that it does.  It includes a mandatory directive that the United States Attorney General and Secretary of Homeland Security "shall . . . *undertake* any lawful *actions*" to "*ensure* that so-called 'sanctuary' jurisdictions . . . do not receive access to Federal Funds." Tilak Decl. Ex. 1 (emphasis added).  Section 2(a)(ii) of EO 14,218 provides that every Executive department "shall" ensure that federal payments to states and localities "do not, by design or effect . . . abet so-called 'sanctuary' policies." *Id.* Ex. 33.  Those Orders target federal funds and payments at large.  And the Bondi Directive freezes *all* DOJ funds to sanctuary jurisdictions.  *See* Tilak Decl. Ex. 3 (Bondi Directive) (directing that DOJ "shall" freeze "the distribution of *all* funds.") (emphasis added).  The text of the challenged provisions does not merely provide guidance to executive agencies on how to evaluate funds; it requires compliance.

In assessing whether enforcement action is likely for the purposes of evaluating pre-enforcement standing, courts look to the past conduct of the government as well as its statements and representations.  *See Steffel*, 415 U.S. at 459; *American Booksellers*, 484 U.S. at 393.  The threat of enforcement must be "at least 'credible,' not simply 'imaginary or speculative.'" *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1140 (9th Cir. 2000).  The Government's actions and communications regarding the 2025 Executive Orders further belie its argument that they are intended merely to guide, just as the first Trump Administration's actions and communications in 2017 regarding EO 13,768 demonstrated its intended purpose.

This record contains even more credible threats of enforcement than did the 2017 record,

United States District Court
Northern District of California

1   which the Ninth Circuit confirmed showed more than an "imaginary or speculative" threat.  *City &*

2   *Cnty. of S.F.*, 897 F.3d at 1237-38 (outlining the various ways in which the first Trump

3   Administration "communicated specific warning[s and] threat[s] to initiate proceedings,"

4   including comments from then-Press Secretary Sean Spicer, comments from President Trump at

5   the Congressional Republicans Retreat, White House Press Releases, and comments from

6   President Trump in Fox News interviews).  This time, as described earlier, the communications

7   have included memoranda issued by executive agencies as well as press releases and presidential

8   commentary (President Trump has issued threats to "end" sanctuary jurisdictions, as he did in

9   2017).  *See supra* "Background" Section II(C); *see Cnty. of Santa Clara*, 275 F. Supp. 3d at 1209

10   (discussing the first Trump Administration's threats to defund sanctuary jurisdictions generally,

11   and San Francisco specifically).

12        In addition, the Government has already filed lawsuits against sanctuary jurisdictions.  It

13   sued the city of Chicago and the state of Illinois, alleging that state and local laws limiting law

14   enforcement from cooperating with immigration authorities are unconstitutional because they

15   interfere with powers allocated to the federal government.  *See United States of America v. State of*

16   *Illinois, et al.*, No. 1:25-cv-1285 (N.D. Ill., filed Feb. 6, 2025) ("*Illinois*") (Dkt. No. 1)

17   (Complaint).  The Government claims that "[t]he challenged provisions of Illinois, Chicago, and

18   Cook County law have the purpose and effect of making it more difficult for, and deliberately

19   impeding, federal immigration officers' ability to carry out their responsibilities in those

20   jurisdictions," and "[t]hese provisions intentionally obstruct the sharing of information envisioned

21   by Congress, including basic information such as release dates and custodial status, thereby

22   impairing federal detention of removable aliens, including dangerous criminals, as required by

23   federal law." *Id.*  And the week after it filed the Illinois lawsuit, the Government filed a similar

24   lawsuit against the state of New York, alleging that the state violates federal law by impeding

25   communication between local law enforcement and federal law enforcement.  *See United States of*

26   *America v. State of New York, et al.*, No: 1:25-cv-00205 (N.D.N.Y., filed Feb. 12, 2025) ("*New*

27   *York*").

28        The plaintiffs in this case have sanctuary policies that mirror those challenged by the

Government in *New York* and *Illinois*. *Compare e.g.*, S.F. Admin Code §§ 12H.2 and 12I.3 (San Francisco's "City and County of Refuge" and "Due Process for All" Ordinances, which, respectively, prohibit City employees from using City funds or resources to assist ICE with enforcement of federal civil immigration law unless required by federal or state law, and limit when City law enforcement officers may give ICE advance notice of a person's release from a local jail) *with Illinois*, No. 1:25-cv-1285, Dkt. No. 1 (Complaint) ¶¶ 8-10 (identifying and challenging Chicago's "Welcoming City Ordinance" and various Cook County Ordinances limiting the use of local resources to aid federal civil immigration enforcement as violating the Supremacy Clause) *and New York*, No: 1:25-cv-00205, Dkt. No. 1 (Complaint) ¶¶ 2-5 (identifying and challenging New York's "Green Light Law," which limits the New York State Department of Motor Vehicles' ability to share its records with federal immigration agencies, as violating the Supremacy Clause).

The clear and specific language of the 2025 Executive Orders, communications from executive agencies and from the President, and actions already taken by the Government against localities with policies like the plaintiffs', illustrate just how credible the threat of enforcement the Cities and Counties now face is.

### 3. The Cities and Counties' claims implicate a constitutional interest

To demonstrate pre-enforcement standing, plaintiffs must also show that the conduct in which they intend to engage, which the Government claims is proscribed by law, is affected with a "constitutional interest." *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979). Here, one of the Cities and Counties' constitutional interests is the rights of states and local governments to determine their own local policies and law enforcement priorities pursuant to the Tenth Amendment. The Ninth Circuit affirmed that cities and states hold this constitutional interest when the first Trump administration attempted to violate it. *See City & Cnty. of S.F.*, 897 F.3d at 1236. This is not a new principle: localities' right to sovereignty and self-determination forms the bedrock of our republic. It is essential to federalism. *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601 (1982) (noting that states have a sovereign interest in "the exercise of sovereign power over individuals and entities within the relevant jurisdiction—this

1    involves the power to create and enforce a legal code, both civil and criminal.").

2        The Tenth Amendment prohibits the federal government from "commandeering" state and

3    local officials to help enforce federal law. *Printz v. United States*, 521 U.S. 898 (1997). The

4    "Federal Government may not compel the States to act or administer a federal regulatory

5    program," *New York*, 505 U.S. at 188, regardless of whether that compulsion is direct (through

6    command) or indirect (through coercion), *see NFIB*, 567 U.S. at 578. The Cities and Counties

7    limit the use of local resources for federal civil immigration enforcement because they believe that

8    policies to this end serve the interests of their communities. *See* discussion *supra* "Background"

9    Section III. Their policies share a common goal: "to improve trust between Plaintiffs and the

10    communities they serve and to ensure that scarce local resources are used for the benefit of

11    Plaintiffs' communities." Mot. 3.

12        For example, in San Francisco, the Board of Supervisors enacted its sanctuary ordinance in

13    1989 "to foster respect and trust between law enforcement and residents, to protect limited local

14    resources, [and] to encourage cooperation between residents and City officials, including

15    especially law enforcement and public health officers and employees[.]" Tilak Decl. Ex. 5 (S.F.

16    Admin Code) § 12I.1; *see also* Scott Decl. ¶ 4; Murillo Decl. ¶¶ 5-6. Santa Clara's top law

17    enforcement officials stated in declarations that to encourage Santa Clara residents to report crime

18    and cooperate in criminal investigations, all community members, regardless of immigration or

19    documentation status, must feel comfortable contacting local public safety agencies; this is

20    hampered by any fear that such contact will lead to a city official contacting federal immigration

21    officials, so Santa Clara adopted its policy to ameliorate that fear. *See* Jonsen Decl. ¶ 9; Rosen

22    Decl. ¶¶ 5-11.

23        Some cities implement their sanctuary codes to encourage the public to share sensitive

24    information with the city for the purpose of reporting code enforcement violations, and accessing

25    public programs like housing, schooling, and healthcare. *See* Tilak Decl. Ex. 15 (Sacramento Res.

26    No. 2017-0158) at 1-2; *id.* Ex. 22 (Monterey Res. No. 25-009) at 1. Some, following the results of

27    studies, enact these resolutions to ensure that immigrants are "more fully integrate[ed]" into their

28    communities, and to promote "positive engagement" by its police bureaus "with refugees and

United States District Court
Northern District of California

immigrants" in an effort to "improve public safety." *Id.* Ex. 6 (Portland Res. No. 37277) (adopting a policy limiting the use of local resources to aid federal immigration enforcement, citing a Center for American Progress 2017 study, *The Effects of Sanctuary Policies on Crime and the Economy*, which showed that "crime is lower and economies are stronger in sanctuary counties compared to nonsanctuary counties."). Some cite the "American promise of welcome" as the driving force behind adopting such policies, *see id.* Ex. 8 (New Haven Executive Order), and still others adopted sanctuary policies to "attract families and businesses from around the world to build an inclusive regional culture bridging newcomer and native-born communities toward . . . a common future," *id.* Ex. 14 (San Deigo Res. No. 313834).

While their motivations for adopting these so-called "sanctuary" laws and policies may vary, the laws and policies themselves share certain common features. The Cities and Counties generally limit local officials from inquiring about immigration status, conditioning local services based upon immigration status, arresting individuals solely for civil immigration violations, or participating in enforcement of federal immigration laws. *See, e.g.*, Tilak Decl. Ex. 4 (S.F. Admin. Code) § 12H.2; Ex. 6 (Portland Res. 37277) at p.3; Ex. 7 (King Cnty. Code) §§ 2.15.010, .020; Ex. 8 (New Haven Exec. Order) § III; Ex. 9 (Oakland Ord. 13515) § 2; Ex. 10 (Emeryville Res. 17-08) §§ 3, 5; Ex. 13 (San Jose Res. 2025-19) §§ 1–2; Ex. 15 § 2; Ex. 20 (Santa Cruz Ord. 2017-06) §§ 3, 5; Ex. 22 § 2; Ex. 23 (Seattle Mun. Code) § 4.18.015(A); Ex. 24 (Minneapolis Code of Ordinances) §§ 19.20, 19.30; Ex. 25 (St. Paul Code of Ordinances) §§ 44.02, 44.03; Ex. 27 (Santa Fe Res. 2017-19) §§ 1–2; Williams Decl. Ex. D (Santa Clara Board Policy Manual) § 3.54(C).

Many, but not all, of the Cities and Counties' policies also limit or prohibit local law enforcement from detaining an individual who could otherwise be released from custody based solely on a civil immigration detainer request or an administrative warrant issued by U.S. Customs and Immigration Enforcement ("ICE"). *See, e.g.*, Tilak Decl. Ex. 5 § 12I.3(b); Ex. 7 § 2.15.020(B)(2); Ex. 8 § III.8(c); Ex. 15 § 2(A)(3); Ex. 20 § 5(c); Williams Decl. Ex. D § 3.54(A)-(B); Bluestone Smith Decl. Ex. B (Monterey Cnty. Sheriff's Office Policy) § 502.3.1. Those plaintiffs who limit compliance with civil immigration detainer requests do so because the

1   requests impose a "significant burden" on law enforcement personnel and because they require the

2   city or county to detain, feed, house, and supervise these individuals identified via request or

3   warrant, without remuneration from the federal government. *See* 8 C.F.R. § 287.7(e); Miyamoto

4   Decl. ¶ 8; Williams Decl. ¶ 52.

5       As San Francisco and Santa Clara did in 2017, the Cities and Counties have shown again

6   in 2025 that their sanctuary policies reflect their local judgment about the policies and practices

7   that are best suited to maintaining public safety and community health and cohesion. As EO

8   13,768 did in 2017, here the 2025 Executive Orders and the Bondi Directive seek to undermine

9   the Cities and Counties' judgment by coercing them to change their policies and to enforce the

10  Federal government's immigration laws, in violation of the Tenth Amendment. Now, as in 2017,

11  the Cities' and Counties' claims implicate a constitutional interest upon which the Government's

12  conduct is already infringing.

### 4. The Cities and Counties have shown that they face concrete and imminent injury

13
14
15  To meet the final element of standing, the plaintiffs must show that the harm they face is

16  concrete and imminent. The Ninth Circuit held that analogous actions taken by the first Trump

17  administration in 2017 threatened imminent, irreparable harm. *See City & Cnty. of S.F.*, 897 F.3d

18  at 1243–44. Today, the Cities and Counties argue that the 2025 Executive Orders and the Bondi

19  Directive inflict "at least three types of irreparable harm": (1) to their budgets, (2) to their

20  constitutional rights, and (3) to the goodwill and well-being of their communities.

21      The Cities and Counties assert that enforcement under the 2025 Executive Orders and

22  Bondi Directive would result in their injury-in-fact in the form of cuts to federal funds. The

23  directive to halt federal funds to sanctuary jurisdictions plunges the plaintiffs' budgetary planning

24  into a state of uncertainty, "irreparably harm[ing] their budgets and, by extension, their abilities to

25  govern and provide services to the public." Mot. 23. As was the case in 2017, the loss the Cities

26  and Counties face if the challenged sections of EO 14,159 and EO 14,218 are enforced is

27  "catastrophic." *See City & Cnty. of S.F.*, 897 F.3d at 1244 ("total loss of [federal] funding"

28  threatened by EO 13,768 "would be catastrophic"). The federal funding that the Cities and

Counties receive is not merely supplementary: it keeps many of their safety-net services afloat. Without it, the Cities and Counties' healthcare, disease control, emergency management, public benefits, and law enforcement programs will be forced to make significant cuts to spending and/or personnel, causing the plaintiffs' irreparable harm that they can avoid only by ending their sanctuary policies and practices. *See Michigan v. DeVos*, 481 F. Supp. 3d 984, 995–96 (N.D. Cal. 2020) (budgetary disruptions requiring jurisdictions to abandon public health efforts were irreparable).

The 2025 Executive Orders need not even be actively enforced to cause the Cities and Counties irreparable harm. Uncertainty about whether they *will* be enforced is already harming them. As in 2017, the threats posed by the 2025 Executive Orders and the Bondi Directive require the Cities and Counties to "take steps to mitigate the risk of losing millions of dollars in federal funding, which will include placing funds in reserve and making cuts to services." *Cnty. of Santa Clara*, 250 F. Supp. 3d at 537 (need for certainty during the budget-making process "renders damages inadequate"), *aff'd City & Cnty of S.F.*, 897 F.3d at 1245. Right now, the Cities and Counties' governing bodies face looming budget deadlines without knowing whether they will receive reimbursements for funds already expended in the last fiscal year, much less whether they will be able to rely on federal funds in the next. They have "already made massive expenditures to provide services on the expectation of being reimbursed by federal dollars." Mot. 23; *see also* Kittler Decl. ¶ 16; Williams Decl. ¶¶ 26–28; Eder Decl. ¶¶ 8–9; Milstein Decl. ¶ 4; McCarthy Decl. ¶ 7; Charvel Decl. ¶ 16; Shannon Decl. ¶ 4; Oster Decl. ¶ 12; Cabell Decl. ¶ 5. This uncertainty is hindering budget-making procedures, which, as the Ninth Circuit held, constitutes irreparable harm. *See, e.g.*, Williams Decl. ¶¶ 58–60; Kittler Decl. ¶¶ 30–39; Milstein Decl. ¶ 6; Elicker Decl. ¶¶ 11–13; Bower Decl. ¶¶ 11–13; Biery Decl. ¶¶ 4–5; Charvel Decl. ¶¶ 9–13; Shannon Decl. ¶¶ 7–9; *City & Cnty. of S.F.*, at 1245.

The Government rehashes an argument that failed in 2017: It insists that the plaintiffs' declarations, to the extent that they request immediate relief because of "alleged financial uncertainty in budget planning," "are insufficient to establish a present, concrete injury." Government's Opposition to PI Motion ("Oppo.") [Dkt. No. 93] 11. The Ninth Circuit (and I)

United States District Court
Northern District of California

have already ruled that an Executive Order that is nearly identical to those challenged today, accompanied by *fewer* credible threats of enforcement, created a sufficient threat of irreparable harm to satisfy pre-enforcement standing requirements. *Cnty. of Santa Clara*, 897 F.3d 1225.

"[T]he deprivation of constitutional rights unquestionably constitutes irreparable injury." *Washington v. Trump*, 847 F.3d 1151, 1169 (9th Cir. 2017). Compliance with the 2025 Executive Orders would also cause irreparable injury to the Cities and Counties because they would be forced to change their local policies in ways that conflict with their local judgment and cause tangible harm to their communities, both directly (through the expenditure of resources to enforce federal immigration laws) and indirectly (through potential loss of trust and community participation in public health and safety programs by those who fear contact with ICE). The Ninth Circuit (and I) have already held that this constitutes a violation of the Tenth Amendment. *See* discussion *supra* "Justiciability," Section (A)(3). As in 2017, "forcing [the Cities and Counties] to make this unreasonable choice … results in a constitutional injury sufficient to establish standing *and* irreparable harm." *Cnty. of Santa Clara*, 250 F. Supp. 3d at 538.

Finally, requiring localities to adopt federal government conditions that threaten to undermine trust between the public and local government constitutes irreparable harm. *See City of Los Angeles v. Sessions*, No. Cv-17-7215-R, 2018 WL 6071072, at *3 (C.D. Cal. Sept. 13, 2018) (irreparable harm where city had to either "diminish[] community trust and undermine[] public safety" by implementing objectionable policies or forgo DOJ funds), *aff'd sub nom. City of Los Angeles v. Barr*, 941 F.3d 931 (9th Cir. 2019). The Cities and Counties argue that the Government's actions irreparably damage the trust between them and the local communities upon which they depend to fulfill their public health, safety, and law enforcement responsibilities. Mot. 24-25. According to their declarations, the Cities and Counties have each deliberately endeavored to build trust with immigrant communities, which they consider to be essential to ensuring that all community members, regardless of immigration status, feel comfortable speaking with law enforcement and interacting with government agencies that provide public health and public safety services. *See* Scott Decl. ¶ 4; Miyamoto Decl. ¶ 4; Murillo Decl. ¶ 6; Rosen Decl. ¶¶ 5–11; Ritchie Decl. ¶¶ 4–6; Rivero Decl. ¶¶ 6–9. If they are coerced into changing their policies, this

United States District Court
Northern District of California

1    work will be undone.

2          The Government's response to this threat of irreparable harm is to point to various savings

3    clauses included in the 2025 Executive Orders and the Bondi Directive.  It insists that these orders

4    are different than the Executive Order in 2017.  It argues that the use in Section 17 of EO 14,159

5    of the phrase "evaluate and undertake any lawful actions" in directing the Attorney General and

6    DHS Secretary to "ensure that so-called 'sanctuary' jurisdictions . . . do not receive access to

7    Federal funds"  distinguishes that Order from EO 13,768, which directed the same executive

8    agencies to, "to the extent consistent with law . . . ensure that [sanctuary jurisdictions] … are not

9    eligible for Federal grants."  I discuss this issue in more depth later, *see infra* Section II(A), but

10   suffice it to say that Section 17 of EO 14,159 and Section 2(a)(ii) of EO 14,218, like Section 9(a)

11   of EO 13,768, "unambiguously command action," *see City & Cnty. of S.F.*, 897 F.3d at 1239, and

12   neither Executive Order's savings clause insulates it from judicial review.  EO 14,159, like EO

13   13,768, orders executive agencies to take action to ensure that sanctuary jurisdictions are cut off

14   from federal funding.  The standardless use of the word "evaluate" hardly matters given the clarity

15   of the 2025 Executive Orders and the President and Attorney General's own statements

16   throughout the last four months.

17              **5.    The Cities and Counties have shown that they have pre-
                 enforcement standing to bring their claims**
18

19          The Cities and Counties need not wait for the Government to make good on its threat to

20   withhold all federal funds unless they change their policies.  The federal funding freeze is already

21   wreaking havoc on the plaintiffs' budgets, it threatens their sovereignty, and compliance with the

22   Government's directives threatens the trust relationship between the plaintiffs and their

23   communities.  The Cities and Counties have established that they have pre-enforcement standing

24   to bring their claims.

25          **B.  Ripeness**

26          The Government also argues that the Cities and Counties' claims are not justiciable

27   because they are "palpably premature." Oppo. 8.  Where, as here, the Government disputes the

28   "real" and "concrete" nature of the plaintiffs' injury, questions of standing and ripeness overlap

43

1    significantly.  *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1149 (9th Cir. 2000).

2    What is palpable, here, is the Cities and Counties' well-founded fear of enforcement.  The

3    Government's argument is meritless.

4         I am bound by the Ninth Circuit's decision in 2018.  As the court explained, there are three

5    factors that inform whether a claimed threat of prosecution is "genuine," such that a plaintiff's

6    claim against what it says will be wrongful prosecution is ripe for review.  *City & Cnty. of S.F.*,

7    897 F.3d at 1236-37.  First, the court determines "whether the plaintiffs have articulated a

8    'concrete plan' to violate the law in question"; second, it evaluates "whether the prosecuting

9    authorities have communicated a specific warning or threat to initiate proceedings"; and third, it

10   considers "the history of past prosecution or enforcement under the challenged statute."  *Id.*

11   (quoting *Anchorage Equal Rights Commission*, 220 F.3d at 1138).

12        With respect to the first factor, as discussed *supra*, Section I(A), the Cities and Counties

13   have demonstrated that they each maintain policies that conflict with the Government's federal

14   immigration policy, and the Government does not dispute that they are "sanctuary" jurisdictions,

15   the likes of which are identified for funding freezes in the 2025 Executive Orders and the Bondi

16   Directive.  *See generally* Oppo.; *see* Reply 5.  Therefore, the Cities and Counties have "articulated

17   . . . concrete plan[s]" to violate the law in question as asserted in the 2025 Executive Orders.  *City*

18   *& Cnty. of S.F.*, 897 F.3d at 1237.

19        With respect to the second factor, the Bondi Directive, the other executive agencies'

20   memoranda, and communications from other actors within the Government (including, but not

21   limited to, the President himself), "have communicated specific warning[s and] threat[s] to initiate

22   proceedings."  *Id.*; *see* discussion *supra* "Justiciability," Section (A)(2).  And with respect to the

23   third factor, which considers any history of past enforcement, past actions by the first and the

24   second Trump administrations suggest that future enforcement is likely.  *See id.*

25        The Government's main argument against ripeness is familiar: It insists that the Cities and

26   Counties are challenging guidance, rather than any "specific action" that has been taken against

27   them.  Oppo. 8-9.  It argues that the Cities and Counties' allegations "reduce to the theory that the

28   mere existence of Executive Orders and memoranda, providing guidance to executive agencies,

United States District Court
Northern District of California

United States District Court
Northern District of California

1    somehow already interferes with their state and local sovereignty." *Id.* 9.  It compares the

2    plaintiffs' claims to those of the plaintiffs in *City & Cnty. of S.F. v. Garland*, 42 F.4th 1078 (9th

3    Cir. 2022), where the Ninth Circuit held that the plaintiffs' facial constitutional challenge to 8

4    U.S.C. § 1373 was unripe because any future injury was purely conjectural.

5            *Garland* was in a very different posture.  The plaintiffs there had made *facial* constitutional

6    challenges to immigration enforcement-related conditions imposed on a specific grant (Byrne JAG

7    grants) and the court held that the challenges were not ripe because the plaintiffs had not alleged

8    facts identifying actual or concrete sovereign injuries, only a potential conflict with Section 1373.[6]

9    After the Ninth Circuit's decision in *United States v. California*, 921 F.3d 865 (9th Cir. 2019), it

10   was clear when *Garland* was decided that the plaintiffs' laws at issue in the consolidated appeals

11   *did* comply with federal provisions.  *Garland*, 42 F.4th at 1086-87.  As a result, the court

12   explained, "post-*California*, [the plaintiffs'] remaining allegations reduce to the theory that

13   Section 1373's existence interferes with their sovereignty." *Id.*  The mere "possibility of some

14   future unconstitutional application of Section 1373" did not "entitle Plaintiffs to dispositive

15   judgments on the provision's constitutionality." *Id.*, at 1087.  The plaintiffs' claims were "no

16   longer ripe" because "any future injury [wa]s purely conjectural" by the time the case reached the

17   Ninth Circuit.  *Id.* (internal quotations omitted).

18           Unlike the situation in *Garland*, the Cities and Counties have alleged facts identifying

19   actual and concrete sovereign injuries arising from the 2025 Executive Orders and Bondi Directive

20   because their implementation is causing present budgetary uncertainty.  *See* discussion *supra*,

21   "Justiciability," Section (A)(4) (discussing the real and imminent harm that the plaintiffs have

22   identified).  They are not seeking a ruling on a resolved constitutional issue.  The dispute before

23   me today is very much alive.

24           Given the severe potential for harm and the high likelihood of enforcement, the

25   controversy before me today is ripe for adjudication.

26

27   ───────────────────────

28   [6] The court affirmed this court's decision and the Oregon district court's decision to enjoin DOJ
     from withholding Byrne JAG program grant funds based on immigration enforcement-related
     conditions imposed by the DOJ on that specific grant program.  *Garland*, 42 F.4th at 1082.

## II.  LIKELIHOOD OF SUCCESS ON THE MERITS

The Cities and Counties challenge the 2025 Executive Orders and the Bondi Directive because: they violate the Separation of Powers doctrine enshrined in the United States Constitution in purporting to exercise spending power that the Constitution entrusts solely to Congress; they violate the Fifth Amendment's Due Process Clause by depriving the plaintiffs of funding without notice or an opportunity to be heard, based on unconstitutionally vague criteria; the 2025 Executive Orders violate the Tenth Amendment by purporting to withhold all federal funds from the sanctuary jurisdictions and condition all payments to such jurisdictions, seeking to commandeer plaintiffs' resources to enforce federal immigration laws; and the Bondi Directive is arbitrary and capricious and exceeds statutory authority under the Administrative Procedure Act ("APA").

In light of binding Ninth Circuit precedent, the Cities and Counties have shown they are likely to prevail on the merits of their Separation of Powers and Spending Clause arguments.  On similar facts, I have previously decided similar Tenth and Fifth Amendment claims in their favor.  And they have also shown that they are likely to succeed on their APA claim.

### A.  Separation of Powers

The Cities and Counties are likely to prevail on the merits of their claim alleging that the 2025 Executive Orders and Bondi Directive violate the Separation of Powers doctrine.  Two crucial points guide my analysis of this issue, neither of which is disputed: the Constitution places limits on the Executive Branch's power to appropriate funds, and I am bound by Ninth Circuit precedent.

Under the principle of the Separation of Powers and considering the Spending Clause, which vests the exclusive power to Congress to impose conditions on federal grants, the Executive Branch may not refuse to disperse federal grants already allocated by Congress to sanctuary jurisdictions without authorization by Congress.  *Cnty of Santa Clara*, 250 F. Supp. 3d at 530-31 (citing *South Dakota v. Dole*, 483 U.S. 203, 206, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987) (where the Supreme Court held that "*Congress* may attach conditions on the receipt of federal funds, and has repeatedly employed the power 'to further broad policy objectives by conditioning receipt of

United States District Court
Northern District of California

1  federal moneys upon compliance by the recipient with federal statutory and administrative

2  directives.'").  The Ninth Circuit (and I) found that this applied to the 2017 Executive Order, and it

3  applies as well to the 2025 Executive Orders.

4      The President cannot "repeal[] or amend[] parts of duly enacted statutes" after they

5  become law.  *City of New York*, 524 U.S. at 438, 118 S.Ct. 2091.  After a bill becomes law, the

6  President is required to "take Care that the Law be faithfully executed." *See* U.S. Const. art. II, §

7  3, cl. 5.  Where Congress has failed to give the President discretion in allocating funds, the

8  President has no constitutional authority to withhold such funds and violates his obligation to

9  faithfully execute the laws duly enacted by Congress if he does so.  *See City of New York*, 524

10  U.S. at 439, 118 S.Ct. 2091; U.S. Const. art. I, § 8, cl. 1.  Further, "[w]hen the President takes

11  measures incompatible with the expressed or implied will of Congress, his power is at its lowest

12  ebb . . ." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637, 72 S.Ct. 863, 96 L.Ed. 1153

13  (1952) (Jackson, J., concurring).  Congress has intentionally limited the ability of the President to

14  withhold or "impound" appropriated funds and has provided that the President may only do so

15  after following specific procedures and receiving express permission from Congress.  *Cnty. of*

16  *Santa Clara*, at 531 (citing Impoundment Control Act of 1974, 2 U.S.C. §§ 683 *et seq.*).

17      As was the case in 2017, the President has followed no such procedures here and has

18  received no such permission.  He has acted unilaterally to attempt to withhold from every

19  sanctuary city in the country millions of dollars already appropriated by Congress, in direct

20  contravention of our nation's laws.  By directing defendants Attorney General Bondi and

21  Secretary Noem to freeze all DOJ funds from sanctuary cities, *see* Tilak Decl. Ex. 1 (EO 14,159),

22  and by directing all federal agencies to condition federal funds on jurisdictions agreeing not to

23  "abet so-called 'sanctuary' policies," *id.* Ex. 3 (EO 14,218), the 2025 Executive Orders violate the

24  constitutional Separation of Powers.

25      That the 2025 Executive Orders contain savings clauses, stating that the executive

26  agencies' withholding of federal funds and evaluation of federal funding programs should be done

27  in a way that is "lawful," does not insulate them from judicial review any more than the inclusion

28  of the phrase "consistent with law" in EO 13,768 insulated *it* from judicial review.  *See City &*

United States District Court
Northern District of California

1    *Cnty. of S.F.*, 897 F.3d at 1239-40.  The "clear and specific" language of the 2025 Executive

2    Orders communicates that their intent is to direct executive agencies to withhold *all* federal funds

3    from sanctuary jurisdictions.  *See City & Cnty. of S.F.*, 897 F.3d at 1239-40 ("[s]avings clauses are

4    read in their context, and they cannot be given effect when the Court, by rescuing the

5    constitutionality of a measure, would override clear and specific language."); *see also, e.g.*,

6    *Shomberg v. United States*, 348 U.S. 540, 547–48, 75 S.Ct. 509, 99 L.Ed. 624 (1955) (refusing to

7    "nullify" "clear legislative purpose" to give effect to a savings clause).  As the Ninth Circuit held

8    last time, "[b]ecause the Executive Order unambiguously commands action, here there is more

9    than a 'mere possibility that some agency might make a legally suspect decision.'" *Id.* at 1240.

10        This situation is different from those where courts have accepted savings clauses, like

11    *Building & Construction Trades Dep't v. Allbaugh*, 295 F.3d 28 (D.C. Cir. 2002).  There, the D.C.

12    Circuit considered an executive order with a savings clause and rejected the plaintiffs' argument

13    that "notwithstanding the President's instruction that the Executive Order be applied only '[t]o the

14    extent permitted by law,' a particular agency may try to give effect to the Executive Order when to

15    do so is inconsistent with the relevant funding statute." *Allbaugh*, 295 F.3d at 33.  As the Ninth

16    Circuit explained in 2018, *Allbaugh* is distinguishable because the executive order there did not

17    "command action"—the plaintiffs in *Allbaugh* merely speculated that an agency "may" try to give

18    it effect, when to do so would be unlawful.  *See City & Cnty. of S.F.*, at 1239-40 (discussing

19    *Allbaugh*).  Here, as I have explained in detail, the plaintiffs' fear that executive agencies will give

20    effect to the 2025 Executive Orders, and that the effect will be unlawful, is not speculative: it

21    arises from the clear and specific language of the orders themselves, and is reinforced by the

22    Government's actions and statements since their issuance.  *See* discussion *supra*, Section I(A)(4).

23        As for the Bondi Directive, it too oversteps DOJ authority in violation of the Separation of

24    Powers doctrine.  The Government has identified no statutory basis or Congressional authorization

25    for the Attorney General to indefinitely freeze the distribution of already-appropriated DOJ funds.

26    The Bondi Directive imposes new conditions on funds that were already promised to the Cities

27    and Counties.  *See* Tilak Decl. Ex. 1.  This action, like President Trump's, is an exercise of

28    spending power not authorized by Congress, violating the Separation of Powers doctrine.

United States District Court
Northern District of California

1       The Government's arguments in defense of the Separation of Powers claim are weak,

2   inapplicable, or nonexistent.  It defends Section 2(b) of EO 14,218, *see* Oppo. 13, which is not in

3   issue in the Cities and Counties' motion.  It offers no defense of Section 2(a)(ii), the challenged

4   provision that directs all executive departments to ensure that federal payments do not "abet so-

5   called 'sanctuary' policies" regardless of whether Congress has appropriated money for those

6   payments.  It offers no defense of the Bondi Directive's indefinite freeze on the distribution of

7   Congressionally appropriated funds.

8       The Government does argue that "Congress has frequently authorized agencies

9   administering certain grant programs to impose discretionary conditions on their receipt." Oppo.

10  14.  The examples it provides involve, ironically, DOJ's decision in 2017 to condition eligibility

11  for participation in three DOJ-administered grant programs on the applicant's certification of

12  compliance with Section 1373.  Oppo. 14.  What the Government neglects to mention is that the

13  Ninth Circuit held that those conditions were unconstitutional.  *See City of Los Angeles v. Barr*

14  *("Barr I")*, 941 F.3d 931, 938–44 (9th Cir. 2019) (determining that DOJ has only limited statutory

15  authority to impose special conditions necessary for carrying out the Byrne JAG program); *see*

16  *also Trump*, 897 F.3d at 1233–35 (holding that the Executive Branch may not withhold properly

17  appropriated funds without congressional authorization to do so).

18      The 2025 Executive Orders and Bondi Directive do not purport to authorize "agencies

19  administering certain grant programs to impose discretionary conditions on their receipt"—they

20  direct, respectively, a freeze on *all federal funding* to sanctuary jurisdictions and a freeze on *all*

21  *DOJ* funding to the same.  These are not targeted certification conditions imposed on the receipt of

22  Byrne JAG funding, as was the case in *Barr I* and *Trump*.  These are universal funding freezes,

23  intended to coerce localities into following Executive Branch commands instead of their

24  constitutionally protected local decisions about how to govern.

25      **B.  Spending Clause**

26      The Cities and Counties assert that even if the President and Attorney General Bondi had

27  acted within the authority delegated to them by Congress, the 2025 Executive Orders and the

28  Bondi Directive violate the Spending Clause in three distinct ways.  The Government does not

United States District Court
Northern District of California

1    have a persuasive response to any of them.

2         First, when Congress imposes conditions on federal funds, it must do so unambiguously so

3    that jurisdictions can plan accordingly. *Cnty. of Santa Clara*, 250 F. Supp. 3d at 532; *Dole*, 483

4    U.S. at 203, 107 S.Ct. 2793. Moreover, "[b]ecause states must opt-in to a federal program

5    willingly, fully aware of the associated conditions, Congress cannot implement new conditions

6    after-the-fact." *Cnty. of Santa Clara*, at 532; *Nat'l Fed. of Indep. Bus. v. Sebelius ("NFIB")*, 567

7    U.S. 519, 132 S.Ct. 2566, 2602-04 (2012). The Cities and Counties argue that because the 2025

8    Executive Orders ostensibly apply to all "federal funds" and "federal payments," including funds

9    already appropriated by Congress or already awarded to states and localities, they impose

10   immigration-related conditions that localities were unaware of and therefore could not have

11   assented to when choosing to receive federal funding. Mot. 17; McSpadden Decl. ¶¶ 8-1; *see*

12   Kittler Decl. ¶¶ 16, 30-39; Williams Decl. ¶¶ 26–28, 58-60; Eder Decl. ¶¶ 8–9; Milstein Decl. ¶¶

13   4, 6; McCarthy Decl. ¶ 7; Charvel Decl. ¶ 16; Shannon Decl. ¶¶ 4, 7-9; Oster Decl. ¶ 12; Cabell

14   Decl. ¶ 5.

15        The Government repeats that it is merely providing guidance for executive agencies about

16   how to evaluate the way federal funding is allocated. It argues that the Cities and Counties are

17   still afforded the opportunity to opt-in to federal programs willingly because they can consider the

18   immigration-related conditions before choosing to accept or reject federal funds. Oppo. 14-15.[7]

19   This misrepresents the purpose and plain language of the 2025 Executive Orders and Bondi

20   Directive. *See* discussion *supra* "Background" Section II; "Discussion" Section I(A)(2). The

21   challenged orders and DOJ directive purport to apply to all federal funds, both apportioned and

22   future.

23        Second, the 2025 Executive Orders and Bondi Directive violate the Spending Clause

24   because they are conditions without a nexus to the affected funds. As the Ninth Circuit (and I)

25

26   _____

27   [7] The Cities and Counties also argue that the 2025 Executive Orders and the Bondi Directive
     violate the rule iterated by the Ninth Circuit because they are ambiguous with respect to critical
     terms, like what constitutes a "sanctuary" policy or a "sanctuary" jurisdiction, and what amounts
28   to "abet[ting]" such a policy. Mot. 17. The Government has no response to this.

United States District Court
Northern District of California

1    held before, conditions placed on congressional spending must have some nexus with the purpose

2    of the implicated funds.  *Cnty. of Santa Clara*, 250 F. Supp. 3d at 532 (citing *New York v. United*

3    *States*, 505 U.S. 144, 172 (1992)).  The Cities and Counties rely on the threatened federal funding

4    for critical social and public health services, law enforcement, child welfare services,

5    transportation, programs that shelter the homeless, anti-terrorism programs, and natural disaster

6    preparedness programs, to name just a few.  *See, e.g.*, Kittler Decl. ¶¶ 17-20 (explaining how San

7    Francisco uses federal funding to run its Medicaid and Medicare programs, its Temporary

8    Assistance for Needy Families program, its Supplemental Nutrition Assistance Program, foster

9    care system, and other child welfare programs, and stating that there is no connection between the

10   purpose of the federal funds and federal immigration enforcement); Williams Decl. ¶¶ 25-41

11   (explaining that Santa Clara uses federal funding for "entitlement" programs, and mostly uses the

12   funds to provide essential services to its residents like funding its three biggest hospitals, which

13   offer neonatal intensive care, a pediatric trauma center, and burn rehabilitation services, and

14   funding its public health department, which provides disease control and pandemic response

15   services); Dauer Decl. ¶¶ 5-12 (explaining that Emeryville uses federal funds, including DOJ

16   funding, for officer safety and community safety programs, including purchasing bulletproof vests

17   for its officers, and enhancing traffic safety by increasing enforcement of moving violations and

18   DUI arrests); Dively Decl. ¶¶ 3-6 (explaining how King County relies on federal funding to run its

19   emergency management and antiterrorism programs and its Metro Transit line).  Because both the

20   executive orders and the Bondi Directive, respectively, purport to condition *all* federal funding

21   and federal payments and *all* DOJ funding on local assistance with federal immigration

22   enforcement, even though most of the categories of federal funding have *nothing to do* with

23   immigration enforcement, nexus is lacking and the Cities and Counties are likely to prevail on

24   their claim for a violation of the Spending Clause, as they did in 2017.  The Government has no

25   meaningful response to this argument.

26       Finally, I held last time, "Congress cannot use the spending power in a way that compels

27   local jurisdictions to adopt certain policies." *Cnty. of Santa Clara*, 250 F. Supp. 3d at 533.

28   Offering a financial inducement that is "so coercive as to pass the point at which pressure turns

into compulsion" is unacceptable. *See Dole*, 483 U.S. at 211, 107 S.Ct. 2793. The 2025 Executive Orders and the Bondi Directive are just that kind of coercive inducement. Conditioning *all* federal funding, which can account for as much as 31% of a locality's annual budget (as is the case for Santa Clara, *see e.g.* Williams Decl. ¶¶ 25-26), on compliance with federal immigration enforcement policies crosses the line from pressure to compulsion. EO 14,218 applies to federal payments administered by every federal agency, and EO 14,159 applies to federal funds without limitation. The Bondi Directive does not place certification conditions on particular sources of DOJ funding—it directs DOJ to freeze *all department funds* to sanctuary jurisdictions.

Consideration of the 2025 Executive Orders and Bondi Directive requires a different analysis than the challenged Byrne JAG grants that the Second Circuit considered in *State v. Dep't of Just.*, 951 F.3d 84 (2d Cir. 2020), authority that the Government repeatedly cites in its defense (and upon which the Bondi Directive relies). There, the Second Circuit considered whether placing certification conditions on a *particular* source of DOJ funding (Byrne JAG funds) was constitutional or an overstep of executive and agency authority. It reached a different conclusion than the Ninth, Seventh and Third Circuits. *Compare State v. Dep't of Just.*, 951 F.3d 84 (2d Cir. 2020) *with City & Cnty. of S.F. v. Barr*, 965 F.3d 753 (9th Cir. 2020) *and City of Philadelphia v. Att'y Gen. of United States*, 916 F.3d 276 (3d Cir. 2019) *and City of Chicago v. Barr*, 961 F.3d 882 (7th Cir. 2020) ("*Chicago II*"). But here, the 2025 Executive Orders and the Bondi Directive target all applicable funds, not one grant program. The Second Circuit's reasoning is contradicted by Ninth Circuit precedent, which is binding on me, but the Circuits' disagreement is not material in deciding this motion in any event.

## C. Tenth Amendment

The Cities and Counties argue that the 2025 Executive Orders violate the Tenth Amendment because they attempt to conscript states and local jurisdictions into carrying out federal immigration law. This argument is the same as the one I addressed in 2017.[8]

---

[8] In granting summary judgment for Santa Clara and San Francisco in 2017, I concluded that: (1) the Executive Order violated the Separation of Powers; (2) even if the President had acted within authority delegated to him by Congress, the congressional action would violate the Spending Clause; (3) the Executive Order violated the Tenth Amendment's anti-commandeering principle;

United States District Court
Northern District of California

1    The Tenth Amendment prohibits the federal government from commandeering state and

2    local officials to help enforce federal law. *Printz v. U.S.*, 521 U.S. 898 (1997). The federal

3    government may not compel states to enact or administer a federal regulatory program. *New York*,

4    505 U.S. at 188. This is true regardless of whether it "directly commands" a state to regulate or

5    "indirectly coerces" a state to adopt a federal regulatory system as its own. *NFIB*, 567 U.S. at 578.

6    The 2025 Executive Orders coerce the Cities and Counties to adopt federal immigration

7    enforcement laws by ordering that all federal funding (which accounts for huge percentages of

8    their total annual budgets) be withheld unless these "sanctuary" jurisdictions change their policies

9    to comport with § 1373. They, like EO 13,768, wield critical federal funding as a cudgel with

10   which to coerce localities that do not wish to cut essential programs into accepting the federal

11   government's conditions in exchange for the funds they were promised.

12   The Government says that plaintiffs may "decline to apply for the specific DOJ or DHS

13   grants to which any offensive conditions are attached," so there is "no commandeering of their

14   sovereignty." Oppo. 16. It offers *Envtl. Def. Ctr., Inc. v. EPA*, for the rule that "as long as the

15   alternative to implementing a federal regulatory program does not offend the Constitution's

16   guarantees of federalism, the fact that the alternative is difficult, expensive, or . . . unappealing

17   does not establish a Tenth Amendment violation." 344 F.3d 832 (9th Cir. 2003).

18   *EPA* is a different case. For one thing, it did not involve threats to *all* federal funding.

19   And the thrust of the holding is different. There, environmental groups and cities brought

20   petitions for review of an EPA rule mandating that discharges from small city storm sewers be

21   subject to federal pollutant elimination permitting requirements. The court held, in relevant part,

22   that the rule did not violate the Tenth Amendment because the EPA gave the operators of small

23   "Municipal Separate Storm Sewer Systems" ("MS4s") (which are regulated by the EPA) a choice:

24   either implement the regulatory program spelled out by the EPA rule or pursue an Alternative

25   _____

26   (4) the Executive Order is void for vagueness under the Fifth Amendment; and (5) the Executive
     Order infringed upon the Counties' procedural due process rights. Given the Ninth Circuit's

27   resolution of the merits on the basis of the Separation of Powers in consideration of the Spending
     Clause, it did not reach the merits of the other bases of my decision. *See City & Cnty. of S.F.*, 897

28   F.3d at 1235, n.5.

United States District Court
Northern District of California

1    Permit option and seek a permit under a different provision of the Rule. This meant that unless the

2    alternative option "offend[ed] the Constitution's guarantees of federalism," the challenged rule did

3    not violate the Tenth Amendment. Nothing in the alternative permit option required the operator

4    of an MS4 to implement a federal regulatory program to receive a permit to discharge because the

5    rule specified application requirements, not permit requirements. But here, there is no alternative

6    funding option: the Cities and Counties have no choice to pursue their chosen sanctuary policies if

7    they are to receive federal funding.

8          At oral argument, counsel for the Government contended that this case is like *Printz v.*

9    *U.S.*, 521 U.S. 898, 117 S.Ct. 2365 (1997), where the Supreme Court, the Government says,

10   "implied" that each ministerial reporting may not violate the Tenth Amendment. *See* Transcript

11   [Dkt. No. 117] 26:3-8. In *Printz*, the Court considered if the federal government was unlawfully

12   commandeering state governments when it required county sheriffs to implement background

13   checks on prospective handgun purchasers under the Brady Handgun Violence Prevention Act (the

14   "Brady Act"). In a concurring opinion, which the Government now references, Justice O'Connor

15   observed that the Court "appropriately refrain[ed] from deciding whether other purely ministerial

16   reporting requirements imposed by Congress on state and local authorities pursuant to its

17   Commerce Clause powers are similarly invalid," and cited 42 U.S.C. § 5779(a) as an example of

18   such a reporting requirement.[9]

19         The Government's invocation of *Printz* is odd. Justice O'Connor's concurrence was with

20   a majority opinion holding that the federal government was imposing unconstitutional obligations

21   upon state officers to execute federal laws. The decision supports the Cities and Counties, not the

22   Government. And the Court was evaluating "ministerial reporting requirements" as opposed to

23   Executive Orders that coerce state and local governments to change substantive policies that affect

24   a wide array of social services, law enforcement programs, and public health infrastructure.

25         Accordingly, the Cities and Counties have shown that they are likely to prevail on their

26   claim that the 2025 Executive Orders violate the Tenth Amendment.

27   _____

28   [9] 4 U.S.C. § 5779(a) requires state and local law enforcement agencies to report cases of missing children to the DOJ.

54

### D. Fifth Amendment

The Fifth Amendment protects against federal laws that are so vague that they fail to provide fair notice of what is prohibited or are so standardless that they permit discriminatory enforcement. *Sessions v. Dimaya*, 584 U.S. 148 (2018). In 2017, I found that Section 9(a) of EO 13,768 was unconstitutionally vague and violated procedural due process. *Cnty. of Santa Clara*, 250 F. Supp. 3d at 534-36.

The 2025 Executive Orders and the Bondi Directive are arguably more vague than the Executive Order I considered in 2017. EO 14,159 directs the Attorney General and DHS Secretary to withhold funding based on their determination that a state or locality is a "sanctuary" jurisdiction that "seeks to interfere" with "Federal Law Enforcement operations." Tilak Decl. Ex. 1 (EO 14,159, 90 Fed. Reg. at 8446). This is the kind of "expansive, standardless language" that "creates huge potential for arbitrary and discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304, 128 S.Ct. 1830, 170 L.Ed.2d 650 (2008). EO 14,218 does not define key terms either, like what constitute "sanctuary policies," or "Federal payments," and does not specify what counts as "seek[ing] to shield illegal aliens from deportation," even though failure to comply with these terms will apparently lead to total loss of DOJ funding. Tilak Decl. Ex. 33 (EO 14,218, 90 Fed. Reg. 10581).

The Bondi Directive provides a vague definition for so-called "sanctuary" jurisdictions, identifying them as "includ[ing]" "state or local jurisdictions that refuse to comply with 8 U.S.C. § 1373, refuse to certify compliance with § 1373, or willfully fail to comply with other applicable federal immigration laws." Tilak Decl. Ex. 3 (Bondi Directive) at p. 1. It does not explain what other federal immigration laws are "applicable," and the use of the term "include" leaves open the possibility that jurisdictions that *do* comply with Section 1373 and/or whatever federal immigration laws are deemed "applicable" may *also* be subject to loss of federal funds. As in 2017, the 2025 Executive Orders and Bondi Directive "do[ ] not make clear what conduct might subject a state or local jurisdiction to defunding or enforcement action, making it impossible for jurisdictions to determine how to modify their conduct, if at all, to avoid [the Executive Orders'] penalties." *Cnty. of Santa Clara*, at 535.

United States District Court
Northern District of California

1        The Cities and Counties also assert that the 2025 Executive Orders fail to provide them

2    with procedural due process in violation of the Fifth Amendment.  To sustain a valid procedural

3    due process claim, a person must demonstrate that he has a legally protectable property interest

4    and that he has suffered or will suffer a deprivation of that property without adequate process.  *See*

5    *Thornton v. City of St. Helens*, 425 F.3d 1158, 1164 (9th Cir. 2005).  To have a legitimate property

6    interest, a person "must have more than a unilateral expectation of it.  He must, instead, have a

7    legitimate claim of entitlement to it." *Bd. of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33

8    L.Ed.2d 548 (1972).  A state or local government has a legitimate claim of entitlement to

9    congressionally appropriated funds, which are akin to funds owed on a contract.  *See NFIB*, 132

10   S.Ct. at 2602 ("The legitimacy of Congress' power to legislate under the spending power [ ] rests

11   on whether the State voluntarily and knowingly accepts the terms of the 'contract.'").

12   Accordingly, the Cities and Counties have a legitimate property interest in federal funds that

13   Congress has already appropriated and that they have accepted.

14        The 2025 Executive Orders purport to make sanctuary jurisdictions like the Cities and

15   Counties ineligible to receive federal funds through a discretionary and largely undefined process.

16   Section 17 of EO 14,159 directs the Attorney General and DHS Secretary to identify "so-called

17   'sanctuary' jurisdictions," and "undertake any lawful actions" to "ensure that" they "do not receive

18   access to Federal funds." Tilak Decl. Ex. 1 (EO 14,159, 90 Fed. Reg. 8443).  It does not direct the

19   Attorney General or the DHS Secretary to provide notice to these jurisdictions of these impending

20   funding cuts.  And, like Section 9(a) in EO 13,768, it does not set up any administrative or judicial

21   procedures for states and local jurisdictions to be heard, to challenge enforcement, or to appeal any

22   action taken against them.  *See id.*  This complete lack of process violates the Fifth Amendment's

23   due process requirements.  *See Mathews v. Eldridge*, 424 U.S. 319, 349, 96 S.Ct. 893, 47 L.Ed.2d

24   18 (1976) ("The essence of due process is the requirement that a person in jeopardy of serious loss

25   be given notice of the case against him and opportunity to meet it.") (internal alterations and

26   quotations omitted).

27        Section 2(a)(ii) of EO 14,218 fares no better under scrutiny.  It directs executive agency

28   heads to "ensure, consistent with applicable law, that Federal payments to States and localities do

not, by design or effect, facilitate the subsidization or promotion of illegal immigration, or abet so-called 'sanctuary' policies that seek to shield illegal aliens from deportation." Tilak Decl. Ex. 33 (EO 14,218, 90 Fed. Reg. 10581).  It is even more vague than EO 14,159 with respect to what constitutes "facilitat[ing]" the "subsidization or promotion of illegal immigration," or how the identified Federal payments will be halted.  *Id.*  It provides no instructions to agencies to warn sanctuary jurisdictions of impending funding cuts, or to provide procedures for challenging those cuts.  The Bondi Directive suffers from the same problems.

The Government once again cites the savings clauses in both Executive Orders and the Bondi Directive, asking this court—and sanctuary jurisdictions—to essentially trust that the Government will abide by the law while it implements the President's directives.  But, as discussed, these savings clauses, taken in the context of the clear and specific language of the orders and directives in which they appear, cannot insulate their hosts from judicial review.  *See* discussion *supra* Section II(A).)  There is no dispute that while the 2025 Executive Orders command executive agencies to identify sanctuary jurisdictions and ensure that they receive no federal funding, they provide no process for notifying jurisdictions about such a determination and no opportunity to be heard.  The same is true for the Bondi Directive.  The Cities and Counties are likely to succeed on their claim that the 2025 Executive Orders and Bondi Directive fail to provide adequate due process in violation of the Fifth Amendment.

### E.  Administrative Procedure Act

The APA governs the process and procedures of federal agency decision-making. Defendant DOJ is an "agency" as defined in the APA, 5 U.S.C. § 551(1).  Plaintiffs argue that the Bondi Directive violates the APA because it is (1) unconstitutional, so it is "contrary to constitutional right [and] power, violating 5 U.S.C. § 706(2)(B), (2) in excess of statutory authority, violating 5 U.S.C. § 706(2)(C), and (3) "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," violating 5 U.S.C. § 706(2)(A).

#### 1.  The Bondi Directive is a Final Agency Action

The APA allows judicial review of "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704.  An agency action is final if: (1) the agency action

marks "the consummation of the agency's decision-making process" and (2) the "action . . . [is] one by which rights or obligations have been determined or from which legal consequences flow." *Bennett v. Spear*, 520 U.S. 154 (1997).  To determine whether an action is "final," courts "look to whether the action 'amounts to a definitive statement of the agency's position' or 'has a direct and immediate effect on the day-to-day operations of the subject party, or if 'immediate compliance [with the terms of the agency action] is expected.'" *Oregon Natural Desert Ass'n v. U.S. Forest Service*, 465 F.3d 977, 982-83 (9th Cir. 2006).

The Government's main argument against the APA claim is that the Bondi Directive is not a "final" agency action subject to APA review.  It contends that the Bondi Directive merely instructs executive agencies to *evaluate* federal funding decisions, which is not a final action because it does not have a "direct" or "immediate" effect on "the day-to-day operations" of the localities.  Oppo. 17-18.

As I have discussed, what the Government proposes is a disingenuous interpretation of the Bondi Directive, and of the plaintiffs' quest for relief.  While the Cities and Counties reserve the right to seek future relief if DOJ publishes a list of grants that are conditioned on localities' compliance with 8 U.S.C. § 1373, their arguments today focus upon the Bondi Directive's instruction to freeze the distribution of all DOJ funds to implement President Trump's directive to defund "sanctuary" jurisdictions.  The Bondi Directive commands action in that it provides *"the Department of Justice will ensure, consistent with law, 'sanctuary jurisdictions' do not receive access to Federal funds from the Department"* and that DOJ "shall pause the distribution of all funds."[10] Tilak Decl. Ex. 3 (Bondi Directive).

---

[10] The Bondi Directive's savings clause does not insulate it from judicial review any more than do the savings clauses in the 2025 Executive Orders.  True, the Bondi Directive instructs DOJ to pause all federal funds to sanctuary jurisdictions in a way that is "consistent with law," and "[c]onsistent with applicable statutes, regulations, court orders, and terms," but it also states, unequivocally, that "[s]anctuary jurisdictions should not receive access to federal grants administered by the Department of Justice."  Tilak Decl. Ex. 3 at p. 1.  To allow its savings clauses to insulate the Bondi Directive from judicial review would require looking past the clear and specific language within the directive that communicates DOJ's intent to withhold all federal funds from sanctuary jurisdictions, regardless of—or at least before determining—the legality of that freeze.  I cannot do that.  *See City & Cnty. of S.F.*, at 1239.

That statement clearly "mark[s] the consummation of" the DOJ's "decision-making process" that so-called "sanctuary" jurisdictions are ineligible for federal funding.  And it is a statement from which legal consequences will flow.  *U.S. Forest Service*, 465 F.3d at 982-83.  The Directive is unclear as to some of its key terms, which raises other problems, but its finality is not reasonably questioned.

The Government offers several cases to support its contention that the Bondi Directive is not a final agency action.  None is on point.  For example, in *F.T.C. v. Standard Oil*, an oil company sued the Federal Trade Commission ("FTC") after the FTC issued a complaint "averring reason to believe" that the company was violating the Federal Trade Commission Act ("FTCA").  449 U.S. 232 (1980).  The Supreme Court explained that the FTC's issuance of its complaint was not a "final agency action" under the APA (nor was it a "collateral order"), and was thus not judicially reviewable before the conclusion of the administrative action; it was definitive only on the question of whether the FTC "avers reason to believe that the respondent . . . is violating [the FTCA]," but "the extent to which the respondent may challenge the complaint and its charges proves that the averment of reason to believe [was] not 'definitive' in a comparable manner to the regulations in *Abbot Laboratories*." *Standard Oil*, 449 U.S. at 242.  The complaint, by itself, had "no legal force comparable to that of the regulation at issue in *Abbot Laboratories*," and had no "comparable effect upon [Standard Oil's] daily business." *Id.*  Here, as I have explained at length, the Cities and Counties are experiencing very real effects on their equivalent of "daily business" as a result of the Bondi Directive, and the Bondi Directive purports to have legal force.

This case is also different than *Fairbanks North Star Borough v. U.S. Army Corps of Engineers*, where the Ninth Circuit affirmed dismissal for lack of jurisdiction over a "jurisdictional determination" of the Army Corps of Engineers that property proposed to be developed by a municipality contained waters of the United States subject to regulation under the Clean Water Act ("CWA").  543 F.3d 586 (9th Cir. 2008).  The determination was not a final agency action because the municipality's "rights and obligations remain unchanged" by the approved jurisdictional determination.  The determination did not, by itself, command the municipality to do or forbear from anything; through it, the Corps had simply "expresse[d] its

view of what the law requires" of the municipality. *Fairbanks*, 543 F.3d at 593-94. The same cannot be said here, where the Bondi Directive commands the DOJ to pause funding to sanctuary jurisdictions.[11]

### 2. Arbitrary and Capricious

The Cities and Counties contend that the Bondi Directive is "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law" in violation of 5 U.S.C. § 706(2)(A). I tend to agree. "An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'" *Ohio v. EPA*, 603 U.S. 279, 292 (2024). As is discussed above, the Bondi Directive fails to offer a reasonable explanation of the breadth of funding withheld or the basis for withholding funds that Congress has already appropriated.

The Government has not offered a plausible reason for why a total freeze on all DOJ funding is necessary to advance the 2025 Executive Orders. Nothing in the record before me suggests that the Attorney General considered the Cities and Counties' reliance on the threatened federal funding before issuing the freeze, their expectation of reimbursement for funds already appropriated, or their need for clarity about what funding will be available in the future to support critical services and infrastructure; all this is required given the Bondi Directive's reversal of prior DOJ policy that "engendered serious reliance interests." *See FCC v. Fox Telev. Stations, Inc.*, 556 U.S. 502, 515–16 (2009) (holding that where a policy decision "engender[s] serious reliance

---

[11] The situation here is more akin to the situation that a district court in Rhode Island recently considered, where several states sought judicial review under the APA of actions taken by President Trump, the Office of Management and Budget ("OMB"), and other executive branch agencies and departments, alleging, in relevant part, that an OMB directive was arbitrary and capricious, and therefore violated the APA. *See New York v. Trump*, No. 25-CV-39-JJM-PAS, 2025 WL 715621 (D.R.I. Mar. 6, 2025), enforced, No. 25-CV-39-JJM-PAS, 2025 WL 1009025 (D.R.I. Apr. 4, 2025), reconsideration denied, No. 1:25-CV-39-JJM-PAS, 2025 WL 1098966 (D.R.I. Apr. 14, 2025). The OMB Directive instructed federal agencies to 'complete a comprehensive analysis of all their Federal financial assistance programs to identify programs, projects, and activities that may be implicated by any of the President's executive orders,'" and then mandated that, "in the interim of comprehensive analysis, 'Federal agencies must temporarily pause all activities related to obligation or disbursement of all Federal financial assistance . . . for foreign aid, nongovernmental organizations, DEI . . . woke gender ideology, and the green new deal." *Trump*, 2025 WL 715621, at *3. The court determined that the OMB Directive was a "final agency action" subject to judicial review under the APA because it amounted to "a command, not a suggestion, that Agency Defendants shall execute a categorical, indefinite funding freeze to align funding with the President's priorities." *Id.* at *8-9.

United States District Court
Northern District of California

1   interests," the agency making that decision must "provide a more detailed justification than what

2   would suffice for a new policy created on a blank slate.")  This is enough for the plaintiffs to

3   show they are likely to prevail on the merits of their APA claim, at least to the extent that they

4   allege defendant Attorney General Bondi violated 5 U.S.C. § 706(2)(A).

5                   **3.       Contrary to Law/Excess of Statutory Authority**

6           The Cities and Counties also argue that the Bondi Directive is unconstitutional, and

7   therefore "contrary to constitutional right [and] power" in violation of the APA, 5 U.S.C. §

8   706(2)(B).  They also argue that it is in excess of statutory authority to the extent that it threatens

9   all DOJ funds, in violation of 5 U.S.C. § 706(2)(C).  Once more the Government responds with an

10  unavailing analogy to *State v. Dep't of Just.*, where the Second Circuit held that "because 8 U.S.C.

11  § 1373 is a law applicable to all plaintiffs in this action, the Attorney General was authorized to

12  impose the challenged Certification Condition and did not violate either the APA or the Separation

13  of Powers by doing so." 951 F.3d 84 (2d Cir. 2020); Oppo. 20-21.

14          As a preliminary matter, the Second Circuit in *State* considered whether DOJ violated 5

15  U.S.C. § 706(2)(C), not (B), when the Attorney General imposed certain certification conditions

16  on the receipt of Byrne JAG funds.  More importantly, as discussed before, several appellate

17  courts, not only the Second Circuit, have considered the scope of the DOJ's statutory authority to

18  impose conditions on a *particular* DOJ grant: the Byrne JAG grant.  *See e.g. Chicago I*, 888 F.3d

19  at 285; *Barr*, 941 F.3d at 939; *City & Cnty. of S.F.*, 965 F.3d 753.  Each of these courts has

20  considered how far the Attorney General's authority stretches such that she can impose "special

21  conditions" on *Byrne grants* specifically.

22          In *State*, the Second Circuit determined that the challenged certification condition was

23  statutorily authorized by 34 U.S.C. § 10153(a)(5)(D), which requires a Byrne grant applicant to

24  include in its application "'[a] certification, made in a form acceptable to the Attorney General'

25  stating that 'the applicant will comply with all provisions of this part and all other applicable

26  Federal laws.'" *Id.* at 103 (citing 34 U.S.C. § 10153(a)(5)(D)).  The court held that since the

27  plaintiffs only relied on Byrne JAG funds for less than .1% of annual funds, the certification

28  condition was not coercive.  Other appellate courts considered the same statutory constraint and

1  reached different conclusions, including the Ninth Circuit.  And because neither the 2025

2  Executive Orders nor the Bondi Directive identify *which* federal funds arising from *what* grants

3  will be frozen absent certified compliance with Section 1373, the analysis in *State* is not germane.

4        This case is also distinct from *State* with respect to coercion.  The Cities and Counties are

5  challenging the impending loss of *all* their DOJ-allocated funding, not just Byrne JAG funding.

6  Some plaintiffs declare that they receive dozens of DOJ grants annually that serve to fund their

7  public safety services.  *See e.g.* Cole-Tindall Decl. (describing King County's reliance on several

8  different outstanding DOJ grants, totaling $3.1 million); Bower Decl. (describing Minneapolis's

9  reliance on $1.8 million in DOJ grants for public safety expenditures).  The loss of *all* DOJ grants

10  requires different analysis than loss of only Byrne JAG grants in the event of non-compliance, and

11  not just from a purely quantitative perspective.  It is coercive to be prohibited from receiving any

12  funding from DOJ, regardless of the percentage of the plaintiffs' budget that DOJ funding

13  currently constitutes.

14        Ultimately, unlike the DOJ in *State*, the Government has offered no statutory or caselaw

15  authority supporting its right to impose a total funding freeze to all localities that choose not to use

16  local resources to enforce federal immigration law, so the Bondi Directive likely violates 5 U.S.C.

17  § 706(2)(C).  No law authorizes the DOJ to impose conditions not authorized by Congress and, as

18  mentioned briefly before, the Impoundment Control Act ("ICA") sets out the circumstances and

19  procedures for the Executive Branch to request deferral or recission of appropriated funds from

20  Congress.  *See* discussion *supra* Section II(A); Impoundment Control Act of 1974, 2 U.S.C. §§ 683

21  *et seq*.  Those conditions prescribed by the ICA have not been shown to be satisfied here.[12]

22  _____

23  [12] My decision is not inconsistent with the Supreme Court's recent per curiam decision in *U.S. Dep't of Ed v. California*, 604 U.S. – (2025).  There, the Court considered the Government's

24  appeal from a TRO issued by a district court in Massachusetts, enjoining the Government from terminating various education-related grants.  The district court's TRO also required the

25  Government to pay out past-due grant obligations and to continue paying obligations as they accrue.  Its decision rested upon the finding that the respondents were likely to prevail on the

26  merits of their APA claim.  The Supreme Court construed the district court's order as a preliminary injunction, not a TRO, and granted certiorari.  In staying the effect of the district

27  court's Order pending the disposition of the Government's First Circuit appeal, the Court held that the Government was "likely to succeed in showing the District Court lacked jurisdiction to order

28  the payment of money under the APA." *Id.* at p. 2 (citing *Sampson v. Murray*, 415 U.S. 61, 87 (1964)).  The Court explained that the APA's waiver of sovereign immunity does not apply "if any

62

United States District Court
Northern District of California

## IV.    IRREPARABLE HARM

The Cities and Counties face irreparable harm without an injunction enjoining the first sentence of Section 17 of EO 14,159 and Section 2(a)(ii) of EO 14,218, along with the Preamble and Section I of the Bondi Directive.  They face present and future budgetary uncertainty, which is wreaking havoc on their budgetary planning process.  They are suffering constitutional injury because the Executive Orders and Bondi Directive infringe on their sovereignty in violation of the Tenth Amendment.  The Government's actions threaten to irreparably damage the relationship the Cities and Counties have built with their immigrant communities in reliance on their sanctuary policies.

The Government's defense is that the Cities and Counties have just identified speculative harm because no funds have been impacted yet.  *See* discussion *supra* "Justiciability" Sections A(2), A(4); Oppo. 21-22.  But, as the Cities and Counties have demonstrated through numerous declarations from public health officials, law enforcement officials, treasurers, and city and county managers, the harm that they face is real and imminent.  They are unable to plan their budgets for the upcoming fiscal year in the shadow of the 2025 Executive Orders and Bondi Directive, which threaten all federal funding, they are being forced to subordinate their local policies and practices to the preferences of the Federal Government, and their relationships with their communities suffer for it.  The Cities and Counties have shown that they face irreparable harm absent the injunction that I issued on April 24, 2025.

---

other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U. S. C. §702.  Nor does the waiver apply to claims seeking "money damages."  *Id.*  The Court conceded that a district court's jurisdiction "is not barred by the possibility" that an order setting aside an agency's action may result in the disbursement of funds, *see Bowen v. Massachusetts*, 487 U.S. 879, 910 (1988), but the APA's limited waiver of immunity does not extend to orders "to enforce a contractual obligation to pay money" along the lines of what the District Court ordered in *U.S. Dep't of Ed.*  The Court stayed the effect of the Order because the respondents had represented facts showing that a stay would not irreparably harm them; they "ha[d] the financial wherewithal to keep their programs running." *U.S. Dep't of Ed.*, at p. 2.

This Order, on the other hand, does not require the Government to pay out past-due obligations to the Cities and Counties now; it enjoins the Bondi Directive to the extent that the directive commands DOJ to freeze all funds to the Cities and Counties.  This Order may very well result in the disbursement of funds to the Cities and Counties; but if it does, as discussed, that is a scenario expressly considered and accepted by the Supreme Court in *U.S. Dep't of Ed.*, and in *Bowen*.

### V.    PUBLIC INTEREST AND BALANCE OF EQUITIES

A party seeking a preliminary injunction must "establish . . . that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20, 129 S.Ct. 365.  When the federal government is a party, these factors merge.  *Nken v. Holder*, 556 U.S. 418, 435, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009).

The Cities and Counties have established a likelihood of constitutional violations arising from the 2025 Executive Orders and Bondi Directive.  The public interest is served by allowing them clarity about their budgets and programmatic capacities in line with the Constitution.  The Cities and Counties have a strong interest in avoiding unconstitutional federal enforcement and the significant budget uncertainty that has resulted from the 2025 Executive Orders and Bondi Directive's broad and threatening language.

The Government's arguments about the public interest being served by enforcing federal immigration law fell short in 2017 and they fall short now.  As was the case in 2017, *see City & Cnty. of S.F.*, 897 F.3d at 539, to the extent that the Government wishes to use all lawful means to enforce federal immigration laws such as 8 U.S.C. § 1373, it does not need Section 17 of EO 14,159 or Section 2(a)(ii) of EO 14,218 or the Bondi Directive to do so.  The confusion caused by these documents and their coercive effects on the plaintiffs weigh heavily against the Government. The balance of harms weighs in favor of an injunction.

### VI. SECURITY

The Government requests a security bond under Fed. R. Civ. P. Rule 65(c), requiring plaintiffs to "post security for any taxpayer funds expended during the pendency of the Court's order." Oppo. 24-25.  That request is DENIED.

Whether to require security and if so, for what amount, is within the court's discretion. *Barahona–Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999).  It is within district court's discretion to waive bond requirement entirely if "no evidence the party will suffer damages from the injunction," or if there is a "high probability of success that equity compels waiving the bond, the balance of equities overwhelmingly favors the movant . . . or the requirement of a bond would negatively impact the movant's constitutional rights." *Conn. Gen. Life Ins. Co. v. New Images of*

United States District Court
Northern District of California

1    *Beverly Hills*, 321 F.3d 878 (9th Cir. 2003); *Gilmore v. Wells Fargo Bank, N.A.*, No. C 14-2389-

2    CW, 2014 WL 3749984, at *6 (N.D. Cal. July 29, 2014); *East Bay Sanctuary Covenant v. Trump*,

3    349 F. Supp. 3d 838. 868 (N.D. Cal. 2018).

4         It is highly unusual for the Government to request a bond under the circumstances of this

5    case.  Its request is unsupported.  It offers no explanation for how taxpayer funds expended during

6    the pendency of the order could qualify as damages for Government later.  And the balance of

7    equities tips strongly in Cities and Counties' favor; imposing a bond would negatively impact their

8    access to the courts and their ability to assert their constitutional rights.[13] The Government has not

9    shown why a bond is necessary here, and no bond will issue.

10   **VII.    PRELIMINARY INJUNCTION**

11        This Order is meant to be read together with the Order Granting Preliminary Injunction.

12   Dkt. 111.  For the avoidance of doubt, as reflected in the April 24, 2025, Preliminary Injunction

13   Order, it is ORDERED that:

14   1.    Defendants[14] and their officers, agents, servants, employees, and attorneys, and any other

15   persons who are in active concert or participation with them ARE RESTRAINED AND

16   ENJOINED from directly or indirectly taking any action to withhold, freeze, or condition federal

17   funds from the Cities and Counties based on (1) the first sentence of Section 17 of Executive

18   Order 14,159, (2) Section 2(a)(ii) of Executive Order 14,218, or (3) the Preamble and Section I of

19

20   [13] The Government has failed to secure the kind of bond they request here in other, similar
21   litigation over the course of the last few months.  *See, e.g., Nat'l Ass'n of Diversity Officers in
     Higher Educ. v. Trump*, No. 1:25-CV-00333-ABA, 2025 WL 573764, at *30 (D. Md. Feb. 21,
22   2025), opinion clarified, No. 25-CV-0333-ABA, 2025 WL 750690 (D. Md. Mar. 10, 2025),
     injunction stayed on appeal, Order, Dkt. No. 29, No. 25-1189 (4th Cir. Mar. 14, 2025).

23   [14] Defendant President Donald J. Trump is not enjoined by this Order with respect to the
24   "performance of his official duties." *See Franklin v. Massachusetts*, 505 U.S. 788, 802–03 (1992)
     (citation and quotation marks omitted).  The injunction does run against any federal agency or
25   official, including the other named defendants and any other agency or individual acting in concert
     with or as an agent of the President or other defendants to implement the enjoined provisions of
26   Executive Orders 14,159 and 14,128 and the Bondi Directive. *See Hawaii v. Trump*, 859 F.3d 741,
     788 (9th Cir. 2017) ("Injunctive relief, however, may run against executive officials"), *rev'd on
27   other grounds, Trump v. Hawaii*, 583 U.S. 941 (2017); *see also* Fed. R. Civ. Proc. 65(d)(2)
     (preliminary injunction may reach "other persons who are in active concert or participation with"
28   the enjoined parties).

United States District Court
Northern District of California

1   the February 5, 2025 Memorandum from the Attorney General entitled "Sanctuary Jurisdictions

2   Directives" on the basis that the Cities and Counties have policies that limit (i) the honoring of

3   civil immigration detainer requests; (ii) cooperation with administrative warrants for purposes of

4   immigration enforcement; (iii) sharing of information with federal immigration authorities other

5   than immigration or citizenship status; (iv) the use of local law enforcement to arrest or detain

6   individuals solely for civil immigration violations; or (v) the use of local resources to assist with

7   civil immigration enforcement activities.

8   2.      This Order shall apply to the maximum extent provided for by Federal Rule of Civil

9   Procedure 65(d)(2) and 5 U.S.C. §§ 705 and 706. [15]

10          **IT IS SO ORDERED.**

11  Dated: May 3, 2025

William H. Orrick
United States District Judge

United States District Court
Northern District of California

---

[15] The Order Granting Preliminary Injunction required that the Government provide notice of the injunction to all federal departments and agencies.  Dkt. No. 111.  The Government has done so. Dkt. Nos. 119, and 123.