UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, et al.,<br><br>Defendants. | Case No. 25-cv-01350-WHO<br><br>**ORDER CLARIFYING PRELIMINARY INJUNCTION**<br><br>Re: Dkt. No. 128 |

How will the litigation over sanctuary cities and federal funding unfold during the next four years? That is the unasked question that President Trump's Executive Order 14,287, 90 Fed. Reg. 18765 ("Protecting American Communities from Criminal Aliens") (hereafter, "EO 14,287"), which is aimed at so-called "sanctuary" jurisdictions, and the Cities and Counties[1] Motion to Enforce, or in the Alternative, to Modify Preliminary Injunction (hereafter, the "Motion to Enforce"), bring to mind. To answer it, and rule on the Motion to Enforce, I return to first principles.

First, the litigation may not proceed with the coercive threat to end all federal funding hanging over the Cities and Counties' heads like the sword of Damocles. That threat was explicit in the first sentence of Section 17 of Executive Order 14,159, in Section 2(a)(ii) of Executive Order 14,218, and in the Preamble and Section I of the February 5, 2025, memo from the Attorney General defendant Pamela Bondi (the "Bondi Directive"), and that is why they are enjoined. *See*

---

[1] Plaintiffs are City and County of San Francisco ("San Francisco"), County of Santa Clara ("Santa Clara"), City of Portland ("Portland"), Martin Luther King, Jr. County ("King County"), City of New Haven ("New Haven"), City of Oakland ("Oakland"), City of Emeryville ("Emeryville"), City of San Jose ("San Jose"), City of San Diego ("San Diego"), City of Sacramento ("Sacramento"), City of Santa Cruz ("Santa Cruz"), County of Monterey ("Monterey"), City of Seattle ("Seattle"), City of Minneapolis ("Minneapolis"), City of St. Paul ("St. Paul"), and City of Santa Fe ("Santa Fe").

Dkt. No. 111 (Preliminary Injunction).

Second, the Government must proceed within the bounds of the Constitution. That is the reason that I asked Government counsel at the hearing on April 23, 2025, to confirm: (1) that Congress has the spending power and the Executive Branch and its agencies cannot place new conditions on already appropriated funds; (2) that the President does not have unilateral authority to refuse to spend funds appropriated by Congress; (3) that conditions on federal funds must be unambiguous and timely; (4) that conditions on federal funds must bear relation to the funds at issue; and (5) that the total financial incentive for compliance with federal immigration law cannot be coercive. The Government agreed that those principles apply. *See* April 23, 2025, Preliminary Injunction Hearing Tr. [Dkt. No. 117] at 3:14-5:20.

Third, while complying with the first two principles, the Government is entitled to identify particular grants and funding programs that it believes should be conditioned upon compliance with immigration-related objectives, and to litigate its position. The Preliminary Injunction does not reach the litigation filed by the Government against Illinois, New York or Colorado, for example, nor does it prohibit efforts to enforce a condition regarding the Byrne JAG Act or other specific programs with a plausible nexus to "sanctuary" policies.

With that, I turn to the Motion to Enforce.

## BACKGROUND

On April 24, 2025, I issued the Preliminary Injunction in this case, enjoining the defendants[2] and their officers, agents, servants, employees, and attorneys, and any other persons in active concert or participation with them, from taking any action to withhold, freeze, or condition federal funds from the Cities and Counties based on the first sentence of Section 17 of Executive Order 14,159, Section 2(a)(ii) of Executive Order 14,218, or the Preamble and Section I of the February 5, 2025, memo from the Attorney General defendant Pamela Bondi (the "Bondi

---

[2] Defendants are Donald J. Trump, President of the United States; the United States; the United States Department of Justice; Pamela Bondi in her official capacity as Attorney General of the United States; Emil Bove in his capacity as Acting Deputy Attorney General of the United States; the United States Department of Homeland Security; and Kristi Noem in her official capacity as Secretary of the Department of Homeland Security.

1  Directive"). Dkt. No. 111 (Preliminary Injunction). On May 3, 2025, I issued a longer order
2  expanding upon my reasoning for issuing the Preliminary Injunction. Dkt. No. 126 (Further
3  Order).
4        On April 28, 2025, four days after I issued the Preliminary Injunction, President Trump
5  issued a *new* Executive Order, EO 14,287, which also concerns sanctuary jurisdictions and their
6  receipt of federal funds. Because EO 14,287 issued after the Preliminary Injunction, I did not
7  consider it in my decision making or in the more detailed analysis provided in the Further Order.
8  A week after President Trump issued EO 14,287, the Cities and Counties filed the Motion to
9  Enforce, arguing that EO 14,287 repackages its predecessors' unconstitutional funding threats.[3]
10       It is well-settled that district courts have the power to supervise compliance with an
11 injunction and to "modify a preliminary injunction in consideration of new facts." *A&M Records,*
12 *Inc. v. Napster, Inc.*, 284 F.3d 1091, 1098 (9th Cir. 2002); *State v. Trump*, 871 F.3d 646, 654 (9th
13 Cir. 2017); *accord* Fed. R. Civ. P. 62(c)-(d). "A party seeking modification . . . of an injunction
14 bears the burden of establishing that a significant change in facts or laws warrants revision . . . of
15 the injunction." *Sharp v. Weston*, 233 F.3d 1166. 1170 (9th Cir. 2000); *Trump*, 871 F.3d at 654.

## DISCUSSION

17       At this early moment in the case, it is incumbent upon me to clarify the core purpose of the
18 Preliminary Injunction: to ensure that litigation over how federal funding is allocated to the Cities
19 and Counties is not driven by coercion and remains within the parameters of the United States
20 Constitution. Executive Orders 14,159 and 14,218, which were the subject of the Preliminary
21 Injunction, threatened to withhold *all* federal funding from sanctuary jurisdictions if they did not
22 adapt their policies and practices to conform with the federal government's preferences. That

---

[3] After the Cities and Counties filed the Motion to Enforce (and accompanying Motion to Shorten Time for Expedited Briefing and Hearing on the Motion to Enforce), I told the parties that if they could stipulate to the plaintiffs' requested relief at least until the matter could be fully briefed on a normal briefing schedule, I would hold a hearing on June 11, 2025. Otherwise, I set an expedited briefing schedule and a hearing for May 8, 2025, at 3 p.m. Pacific time. At a Case Management Conference on May 6, 2025, the parties informed me that no such stipulation would be entered. The Government timely submitted its expedited response to the Cities and Counties' Motion to Enforce. *See* Dkt. No. 132 (Response). I held a hearing on May 8, 2025, at 3 p.m. Pacific time, at which counsel for both the Cities and Counties' and the Government was heard.

United States District Court
Northern District of California

coercive threat (and any actions agencies take to realize that threat) is unconstitutional, so I enjoined its effect. To be clear: While the *letter* of the Preliminary Injunction refers to specific sections of EO 14,159, EO 14,218, and the Bondi Directive, its *spirit* enjoins the kind of coercion that was evident, at the time of the Preliminary Injunction's issuance, in the language of those sections. The Government cannot avoid liability down the line by "hewing to the narrow letter of the injunction" while "simultaneously ignoring its spirit[.]" *Inst. Of Cetacean Research v. Sea Shepard Conserv. Soc'y*, 774 F.3d 935, 954 (9th Cir. 2014). The Preliminary Injunction in this case reaches any subsequent Executive Order or Government action that poses the same coercive threat to eliminate or suspend federal funding based on the Government's assertion that a jurisdiction is a "sanctuary" jurisdiction.

At the same time, the Preliminary Injunction was not designed to freeze litigation over the propriety of "sanctuary" policies or immigration-related conditions on particular government grants and contracts. The Ninth Circuit, for example, has held that the Department of Justice may include immigration-related factors when considering certain grants. Response [Dkt. No. 132] at 9; *City of Los Angeles. v. Barr*, 929 F.3d 1163, 1178 (9th Cir. 2019) (discussing conditions on DOJ grants issued through DOJ's competitive federal grant program under the Public Safety Partnership and Community Policing Act).

With this in mind, I turn to the differences between EO 14,287 and the Orders already specifically enjoined. While addressing the same topic and seemingly targeting the same ultimate goal (ending or severely curtailing the issuance of federal funds to States and localities that limit the use of local resources for aiding in federal civil immigration enforcement), there are material differences between the challenged sections of EO 14,287 and the sections of EO 14,159 and EO 14,218 that I enjoined.

Section 17 of EO 14,159 and Section 2(a)(ii) of EO 14,218 both direct the Attorney General and DHS Secretary to withhold *all* federal funds from localities deemed to be "sanctuary" jurisdictions. Section 17 of EO 14,159 directs the Attorney General and DHS Secretary to "evaluate and undertake any lawful actions to ensure that so-called 'sanctuary' jurisdictions . . . *do not receive access to Federal funds*." EO 14,159, Section 17 (emphasis added). And Section

4

2(a)(ii) of EO 14,218 similarly directs the head of "each executive department or agency" to "ensure . . . that Federal payments to States and localities do not . . . facilitate the subsidization or promotion of illegal immigration, or abet so-called 'sanctuary' policies[.]" EO 14,218, Section 2(a)(ii). These provisions' respective broad scopes drove my conclusion under binding Ninth Circuit authority to issue the Preliminary Injunction. *See* Further Order at pp. 35-36 (Section I(A)(2)(b)). In so finding, I rejected the Government's arguments that those orders merely provided guidance for executive agencies conducting evaluations of localities' federal funding as a disingenuous read of their plain language, and I rejected its arguments that the Orders' savings clauses insulated them from judicial review; to give such weight to those clauses would require looking past the Orders' clear and specific language directing unlawful action, which I cannot do. *See* Further Order at pp. 47-49 (Section II(A)).

Executive Order 14,287 is different from EO 14,159 and EO 14,218 in some ways. Section 2 of EO 14,287 calls for the Attorney General, in coordination with the DHS Secretary, to publish a list of States and local jurisdictions they have identified as "sanctuary" jurisdictions[4], and to notify[5] those jurisdictions of their status on the list. In contrast with Section 17 of EO 14,159 and Section 2(a)(ii) of EO 14,218, nothing in Section 2 of EO 14,287 directs executive agency heads to withhold from, freeze, or condition all federal funding to sanctuary jurisdictions on their compliance with federal immigration law; it directs them to *identify* those jurisdictions that qualify as sanctuary jurisdictions and *notify* them of their inclusion on that list. This will at least resolve the ambiguity of what jurisdictions the Government considers to be "sanctuary" jurisdictions and put those States and localities that qualify on notice. *See* Further Order at p. 50, n.7.[6] There is nothing improper about Section 2.

---

[4] Section 2(a) directs the Attorney General, in coordination with the DHS Secretary, to "publish a list of States and local jurisdictions that obstruct the enforcement of Federal immigration laws (sanctuary jurisdictions)." EO 14,287, Section 2(a).

[5] Section 2(b) directs the same agency heads to "notify each sanctuary jurisdiction regarding its defiance of Federal immigration law enforcement and any potential violations of Federal criminal law." *Id.*, Section 2(b).

[6] At the hearing on May 8, 2025, counsel for the Cities and Counties clarified that the plaintiffs' Motion to Enforce only seeks to enjoin Section 2 of EO 14,287 to the extent that it informs the

5

Section 3 of EO 14,287 is closer to the enjoined sections of EO 14,159 and EO 14,218. It lays out "Consequences for Sanctuary Jurisdiction Status." Section 3(a) provides that "with respect to sanctuary jurisdictions that are designated under section 2(a)" of EO 14,287, "the head of each executive department or agency . . . in coordination with the Director of the Office of Management and Budget and as permitted by law, shall identify appropriate Federal funds to sanctuary jurisdictions, including grants and contracts, for suspension or termination as appropriate." *Id.*, Section 3(a). And Section 3(b) says that, after notice under Section 2(b), the Attorney General and DHS Secretary "shall pursue all necessary legal remedies and enforcement measures to end these violations and bring such jurisdictions into compliance with the laws of the United States." *Id.*, Section 3(b). While the Government asserts that Section 3 does not direct actual termination or suspension of funds, a "Fact Sheet" published by the White House alongside EO 14,287 explains that President Trump signed EO 14,287 "to enforce federal law with respect to sanctuary jurisdictions," states that sanctuary jurisdictions that do not comply with federal law "may lose federal funding," and quotes President Trump's Truth Social post declaring his intent to "end" sanctuary jurisdictions. *See* Tilak Decl. Ex. 2 (White House Fact Sheet entitled "Cracking Down on Sanctuary Jurisdictions," published April 28, 2025).

That said, some aspects of Section 3 may resolve some of the problems I described pertaining to the overbreadth of EO 14,159 and EO 14,218. Identification of the funds the Government believes are at issue would, if done in a constitutionally targeted way, provide clarity. The requirement to identify funds for potential rescission, by itself, is not inappropriate, following an evaluation of the type of funding involved to determine if there is a nexus between the funding stream, the jurisdiction's policies, and the desired immigration-related conditions, as the Government is constitutionally obligated to do before it acts. *See* Further Order at pp. 50-51 (Section II(B)).

What *would* be inappropriate is if the criterion for identification of funds for "suspension or termination" was *the fact that* the so-called "sanctuary" jurisdictions received them. If the

---

action called for in Section 3(a) of the same Order.

6

Government were to take the unconstitutional approach of flagging *all* federal funds (or funds unrelated to sanctuary policies) to those States and localities the Attorney General and DHS Secretary determined to be "sanctuary" jurisdictions as being "appropriate" for suspension or termination, it would violate Constitution in the same way that the enjoined sections of EO 14,159 and EO 14,218 do. *That* approach would violate the Preliminary Injunction.

The Government argues that EO 14,287 only calls for the publication of a list, the notification of jurisdictions on that list of their presence on it, and identification of funds for possible suspension or termination, but that it "does not direct for actual termination or suspension." Response at 7. Executive Order 14,287 does not direct executive agencies to freeze *all* federal funds to jurisdictions like the Cities and Counties. But the context surrounding this Executive Order and its predecessors raises the threat that the Government will employ these executive actions to unconstitutionally coerce the Cities and Counties (and other jurisdictions like them) into changing their policies and practices to conform with the second Trump Administration's preferences.

President Trump's actions, communications, and representations about sanctuary jurisdictions have made it perfectly clear that his ultimate goal is their elimination; directives from executive agencies in his administration have put finer points on his (often informal) expressions. *See* Further Order at pp. 5-7 (discussing actions and communications surrounding EO 14,159 and EO 14,218 that gave rise to the Cities and Counties' reasonable fear of enforcement). Since I issued the Preliminary Injunction, the Executive Branch has compounded the concern that it will wield the latest Executive Order to cut off (or coercively *threaten* to cut off) *all* federal funds from so-called "sanctuary" jurisdictions; the White House "Fact Sheet" published alongside EO 14,287, proclaiming that through EO 14,287, President Trump is "following through on his promise to rid the United States of sanctuary cities," and quoting a Truth Social post from the President wherein he stated that he was "[w]orking on papers to withhold all Federal Funding for any City or State that allows these Death Traps [referring to sanctuary cities] to exist!!!" does not inspire confidence in the Government's representation that it will limit its implementation of EO 14,287 to "identification" of funds for "suspension or termination."

The Preliminary Injunction is not intended to hamstring the Government's lawful evaluation of federal funds to States and localities that have sanctuary policies. It seems relatively easy to identify categories of funds that have little or nothing to do with sanctuary policies (such as healthcare, transportation, emergency relief and so forth), that would have an unlawfully coercive effect on the Cities and Counties if those categories of funds were identified for suspension or termination; to do so would violate the Preliminary Injunction. As the Government's counsel acknowledged, the Preliminary Injunction reaches the Government's proscribed conduct whether it is based on EO 14,287 or on some as yet unpublished Executive Order.

In light of all these considerations, I clarify that neither Executive Order 14,287 nor any other Government action that postdates the Preliminary Injunction can be used as an end run around the Preliminary Injunction Order. *See Inst. Of Cetacean Research*, supra. The language "based on the first sentence of Section 17 of Executive Order 14,159, Section 2(a)(ii) of Executive Order 14,218, or the Preamble and Section I of the February 5, 2025, memo from the Attorney General defendant Pamela Bondi (the "Bondi Directive")" shall be read to apply to *any* Executive Order or agency directive that purports to attempt to cut off federal funding from States or localities that meet the Government's definition of "sanctuary" jurisdiction in the wholesale, overly broad and unconstitutional manner threatened by Section 17 of EO 14,159 and Section 2(a)(ii) of EO 14,218.

So that there is no failure of communication, the defendants are instructed to provide written notice of this Order Clarifying Preliminary Injunction to all federal departments and agencies by May 16, 2025.

**IT IS SO ORDERED.**

Dated: May 9, 2025



William H. Orrick
United States District Judge