UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, et al.,<br><br>Defendants. | Case No. 25-cv-01350-WHO<br><br>**ORDER REGARDING DISPUTES OVER PROPRIETY OF STANDARD CONDITIONS ON FEDERAL GRANTS**<br><br>Re: Dkt. No. 143 |

On April 24, 2025, I issued an Order Granting Preliminary Injunction to enjoin the defendants[1] from taking any action to withhold from, freeze, or condition federal funds to the Cities and Counties[2] (the plaintiffs in this case) based on (1) the first sentence of Section 17 of Executive Order 14,159, (2) Section 2(a)(ii) of Executive Order 14,218, or (3) the Preamble and Section I of the February 5, 2025, Memorandum from the Attorney General entitled "Sanctuary Jurisdictions Directives." Dkt. No. 111 (Order Granting Preliminary Injunction). I described in detail in my Further Order Regarding Preliminary Injunction on May 3, 2025, the many ways in

---

[1] Defendants are Donald J. Trump, President of the United States; the United States; the United States Department of Justice; Pamela Bondi in her official capacity as Attorney General of the United States; Emil Bove in his capacity as Acting Deputy Attorney General of the United States; the United States Department of Homeland Security; and Kristi Noem in her official capacity as Secretary of the Department of Homeland Security. The Preliminary Injunction enjoins the defendants and their officers, agents, servants, employees, and attorneys, as well as any other persons in active concert or participation with them.

[2] Plaintiffs are City and County of San Francisco ("San Francisco"), County of Santa Clara ("Santa Clara"), City of Portland ("Portland"), Martin Luther King, Jr. County ("King County"), City of New Haven ("New Haven"), City of Oakland ("Oakland"), City of Emeryville ("Emeryville"), City of San Jose ("San Jose"), City of San Diego ("San Diego"), City of Sacramento ("Sacramento"), City of Santa Cruz ("Santa Cruz"), County of Monterey ("Monterey"), City of Seattle ("Seattle"), City of Minneapolis ("Minneapolis"), City of St. Paul ("St. Paul"), and City of Santa Fe ("Santa Fe").

1  which those Executive Orders and threatened actions were likely unconstitutional and illegal under

2  the Separation of Powers doctrine, the Fifth Amendment's Due Process Clause, the Tenth

3  Amendment, and the Administrative Procedure Act ("APA"). Dkt. No. 126 (Further Order). In

4  the Order Clarifying Preliminary Injunction on May 9, 2025, I emphasized that other Executive

5  Orders and actions by government agencies could not evade the strictures of the Preliminary

6  Injunction simply because they used different language or occurred after the Preliminary

7  Injunction went into effect. Dkt. No. 136 (Order Clarifying Preliminary Injunction). It "reaches

8  any subsequent Executive Order or Government action that poses the same coercive threat." *Id.*

9  4.[3]

10  In their joint letter brief dated June 13, 2025, the parties clashed over whether grant

11  conditions imposed by the Department of Homeland Security ("DHS"), the Department of

12  Transportation ("DOT"), and the Department of Housing and Urban Development ("HUD") fall

13  within the scope of the Preliminary Injunction insofar as they implement the enjoined sections of

14  Executive Order 14,159 ("EO 14,159") and Executive Order 14,218 ("EO 14,218") to impose

15  immigration-related conditions upon grants to sanctuary jurisdictions. Dkt. No. 143 (Joint Letter

16  Brief). I would have thought the answer was obvious. The identified provisions in the DHS and

17  DOT Standard Terms may not be applied in the blunderbuss way that Secretaries Noem and Duffy

18  have directed.[4] Conditions placed on congressional spending must have some nexus with the

19  purpose of the implicated funds. *See* Further Order at 50-51; *see also Cnty. of Santa Clara v.*

20  *Trump*, 250 F. Supp. 3d 497, 532 (N.D. Cal. Apr. 25, 2017), *aff'd*, *City & Cnty. of S.F. v. Trump*,

21  897 F.3d 1225, 1234–35 (9th Cir. 2018). They impose ill-defined immigration conditions upon

---

[3] Defendants filed a Notice of Appeal of the Preliminary Injunction, the Further Order, and the Order Clarifying Preliminary Injunction on June 19, 2025. Dkt. No. 146 (Notice of Appeal).

[4] I previously explained that the Preliminary Injunction was "not designed to freeze litigation over the propriety of 'sanctuary' policies or immigration-related conditions on particular government grants and contracts." Dkt. No. 136 (Order Clarifying Preliminary Injunction) 4. There may be individual law enforcement grant programs, for example, that have a sufficient relationship to the sanctuary jurisdiction policies that immigration-related conditions may be legal. That is a different matter altogether than efforts like the Executive Orders and challenged standard terms and conditions to coerce the Cities and Counties to change their so-called sanctuary policies.

1  grants that have no evident nexus with the plaintiffs' so-called "sanctuary" policies.

2      The Preliminary Injunction enjoins the DHS and DOT standard terms and conditions from applying to grants issued to the plaintiff Cities and Counties that are implemented by DHS and DOT. The HUD Continuum of Care grant terms and conditions appear to be inconsistent with the Preliminary Injunction as well.

    The plaintiffs also ask that I order the defendants to produce copies of the court-ordered notice that they have provided to federal agencies. Given the defendants' apparent unwillingness to comply or confusion about their obligations under the Preliminary Injunction, the defendants shall provide the Cities and Counties copies of the notices as requested no later than July 2, 2025.

## I.  DHS STANDARD TERMS

    On April 18, 2025, DHS issued standard terms and conditions (the "DHS Standard Terms") that apply to "all new federal awards" in Fiscal Year 2025 and include numerous immigration conditions that reflect the enjoined language of EO 14,218. *See* Dkt. No. 143, Attachment B. Section IX of the DHS Standard Terms (entitled "Communication and Cooperation with [DHS] and Immigration Officials") requires grant recipients to certify five different immigration conditions, the language of each of which evidences their connection to the enjoined Orders. *Compare* Dkt. No. 143, Attachment B (DHS Standard Terms, Section IX), *with* EO 14,159, Section 17 (directing the Attorney General and DHS Secretary to condition Federal funds to so-called "sanctuary" jurisdictions on compliance with federal immigration law), *and* EO 14,218 Section 2 (directing agency and executive department heads to "ensure . . . that Federal payments to States and localities do not . . . abet so-called 'sanctuary' policies that seek to shield illegal aliens from deportation.").[5]

    Although the DHS Standard Terms apply to "all new federal awards," the defendants contend that the conditions will only apply based on individualized assessments of different federal grants. I do not credit that representation for at least two reasons.

---

[5] In the Further Order, I referenced the DHS Standard Terms and HUD Continuum of Care grants, among other things, as evidence that the federal government had already taken steps to try to implement EO 14,159 and EO 14,218. *See* Further Order 5-7.

First, the promise—articulated in both the defendants' letter brief and in a June 11, 2025, DHS website update[6]—echoes the savings clauses I already rejected as insufficient to insulate the 2025 Executive Orders from judicial scrutiny. *See* Further Order 41, 47-48. Here, as there, the "clear and specific language" of the DHS Standard Terms communicates DHS's intent to apply those terms to "all new federal awards." Even if I were to interpret the June 11, 2025, DHS website update as a formal savings clause (which I am not inclined to do, given the relative informality of a sentence on a website compared to adopted agency terms and conditions), when read in context, the clause cannot be given effect because to do so would "override clear and specific language" found in the DHS Standard Terms. *See* Further Order 48 (quoting *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1239-40 (9th Cir. 2018)).

Second, DHS's conduct belies its representation. DHS has already acted as though the immigration conditions in its Standard Terms may be applied to grants with no nexus to immigration or so-called "sanctuary" policies. A March 20, 2025, memo from a senior FEMA administrator to DHS Secretary Noem is a good example. In the memo, FEMA sought approval of its review process and parameters of its grant programs "to align with Administration and Secretary priorities on non-governmental organizations, immigration, and sanctuary jurisdictions." Dkt. No. 143, Attachment D (March 20, 2025, FEMA memo). The memo, which DHS Secretary Noem approved, acknowledges that immigration conditions may be applied to the Emergency Management Performance Grant ("EMPG"), State Homeland Security Grant Program ("HSGP"), and Urban Area Security Initiative ("UASI") grants. *Id.*

Declarations from various city officials submitted alongside the Cities and Counties' Preliminary Injunction Motion indicate that these grants are used for emergency preparedness, which has no nexus to immigration enforcement. *See* Declaration of Brendan McClusky [Dkt. No. 61-5] ¶¶ 8-11 (describing how King County relies on EMPG, HSGP, and UASI grants to prepare the region against terrorist attacks); Declaration of Patricia Cole-Tindall [Dkt. No. 61-6] ¶¶ 14-19

---

[6] The DHS website states that "[n]ot all of DHS's Standard Terms and Conditions apply to every DHS grant program[]." DHS Website, https://www.dhs.gov/publication/dhs-standard-terms-and-conditions, last updated June 11, 2025, last accessed June 18, 2025.

(describing how the King County Sheriff's Office employs UASI Grants, which are awarded to "assist high-threat, high-density Urban Areas efforts to build, sustain, and deliver the capabilities necessary to prevent, prepare for, protect against, and respond to acts of terrorism," to train aviation aircrews, conduct joint agency drills and use small unmanned aerial systems (SUAS) which are important anti-terrorism tools); Declaration of Maria Oberg [Dkt. No. 71] ¶ 4(k) (describing how the City of San Jose uses the UASI grant to help local agencies "prepare for and respond to terrorism").

The DHS Standard Terms are exactly what the Preliminary Injunction is designed to prohibit. This is not to say that the terms cannot be imposed on individual grants with a meaningful nexus to sanctuary jurisdiction policies. The defendants point to the Targeted Violence and Terrorism Prevention Grant Program ("TVTP") as an example of the type of grant the Preliminary Injunction should not reach. Dkt. No. 143 at 6. DHS authorizes and appropriates funds for TVTP annually; TVTP grant awards are discretionary and competitive, and they lack statutory award criteria. Litigation may be necessary to determine whether the challenged immigration conditions are appropriate to that grant program, and nothing in the Preliminary Injunction Order precludes defendants from trying to impose them on an individual basis. And that is precisely the point: on a case-by-case basis, the Trump administration may attempt to apply immigration conditions as long as there exists a substantive relationship between the conditions and the grant upon which they are to be imposed. But defendants cannot pretend, as they do now, that they are assessing the relationship between immigration conditions on federal funding and the programs those funds enable in a manner that is consistent with the Constitution and the APA, when the defendants apply those conditions to FEMA or, as will be seen below, the DOT infrastructure projects. Applying immigration conditions to all new federal awards without regard to whether those awards enjoy a real nexus to so-called "sanctuary" policies violates the Preliminary Injunction.

## II. DOT STANDARD TERMS

On April 24, 2025, Secretary of Transportation Secretary Sean Duffy issued a letter (the "Duffy Letter") that announced DOT's policy of providing federal funding only to recipients that

5

"cooperate with Federal authorities in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." Dkt. No. 143, Attachment E.  The Duffy Letter utilizes language found in EO 14,159.  *Compare id.*, *with* EO 14,159, Section 17 (directing the Attorney General and DHS Secretary to ensure that so-called "sanctuary" jurisdictions, which "seek to interfere with the lawful exercise of Federal law enforcement operations," "do not receive access to Federal funds.").  The DOT has since included that language in standard terms and template grant agreements employed across various operating administrations, including the Federal Transit Administration ("FTA"), Federal Highway Administration ("FHWA"), Federal Aviation Administration ("FAA"), and Federal Railroad Administration ("FRA").  *See* Dkt. No. 143, Attachments F-I (collectively, the "DOT Standard Terms.").

The DOT Standard Terms have made their way into specific grant programs and agreements that the Cities and Counties have received, including grants with no conceivable nexus to sanctuary policies.  *See id.*, Attachments J-L.  The conditions apply to transportation infrastructure grants; they apply to grants related to railroad crossing studies, bridge improvements, and airport repairs.  *See e.g.*, Dkt. No. 143, Attachment K ("Better Utilizing Infrastructure to Leverage Development Grant Agreement," which has a stated purpose to "fund an eligible project that will have a significant local or regional impact and improve transportation infrastructure[]"), *id.*, Attachment L ("Strengthening Mobility and Revolutionizing Transportation," or "SMART" grant, which has a stated purpose of providing grants to improve transportation efficiency and safety); *see also e.g., id.*, Attachments F-I.

The defendants raise the same argument in defense of the DOT Standard Terms as they do with respect to the DHS Standard Terms: They insist that the immigration conditions will only apply where there is statutory authority.  But that is obviously untrue.  DOT has included these conditions across a vast array of programs and grants, *see e.g.* Dkt. No. 143, Attachments F-L:  it

6

is apparent that they are being applied without meaningful regard to statutory authority.[7] These conditions exist to strongarm the Cities and Counties to abandon their policies or face critical infrastructure degradation.

I am not the only judge to think so. In the United States District Court for the Western District of Washington, the Hon. Barbara Rothstein recently held that the immigration conditions in the DOT Standard Terms are likely unconstitutional and arbitrary and capricious under the APA. *See Martin Luther King, Jr. Cnty. v. Turner*, No. 2:25-CV-814, 2025 WL 1582368, at *17 (W.D. Wash. June 3, 2025) ("*King County*"). That injunction applies to six plaintiffs in this action who are also parties to that action: Martin Luther King Jr. County, City and County of San Francisco, County of Santa Clara, City of Minneapolis, City of Portland, and the City of San Jose. Ten other plaintiffs here are not protected by the *King County* injunction. They are by this one.

The defendants speculate that there may be programs for which immigration conditions like those found in the DOT Standard Terms are appropriate. They did not provide an example. If there is one, the challenged immigration conditions may be applied. But just because the conditions may apply on a case-by-case basis to *some* grants does not justify their present overbroad application to seemingly *any* grant.

### III.  HUD CONTINUUM OF CARE GRANTS

The HUD grant agreements that the plaintiffs highlight also use language from the enjoined executive orders; the HUD Continuum of Care ("CoC") grant agreements include language like EO 14,218, stating that "[n]o state or unit of general local government that receives funding under this grant may use that funding in a manner that by design or effect facilitates the subsidization or promotion of illegal immigration or abets policies that seek to shield illegal aliens from deportation." Dkt. No. 143, Attachment M, p. 2. The immigration conditions found in the HUD CoC grant agreements differ from their DOT and DHS counterparts in that they apply to the use of already awarded funds, they do not condition the receipt of funds.

---

[7] As for the defendants' argument that those terms are now beyond the scope of the Preliminary Injunction because they have been incorporated into particular grant programs, *see* Dkt. No. 143 at 7, to accept that argument would be to hamstring the Preliminary Injunction.

1    Congress enacted the McKinney-Vento Homeless Assistance Act to "meet the critically
2 urgent needs of the homeless of the Nation" by providing "funds for programs to assist the
3 homeless, with special emphasis on elderly persons, handicapped persons, families with children,
4 Native Americans, and veterans." 42 U.S.C. §11301(b)(2)-(3). Congress, through the Act,
5 provides federal funding to several programs, including the Continuum of Care program, which is
6 designed to "assist individuals (including unaccompanied youth) and families experiencing
7 homelessness" by providing services "to help such individuals move into transitional and
8 permanent housing, with the goal of long-term stability."[8] HUD is responsible for administering
9 the CoC program.

10    The 2024 HUD CoC grant agreements at issue state that "[n]o state or unit of general local
11 government that receives funding under this grant may use that funding in a manner that by design
12 or effect facilitates the subsidization or promotion of illegal immigration or abets policies that seek
13 to shield illegal aliens from deportation." Dkt. No. 143, Attachment M. As the thoughtful opinion
14 of Judge Rothstein in *King County* illustrates, the defendants have no more shown a nexus
15 between immigration enforcement and the kind of services that the HUD CoC grants provide—
16 safety-net services for cities' most vulnerable populations, including the homeless, veterans, and
17 unaccompanied youth—than they have shown a nexus here between immigration enforcement and
18 the DHS and DOT programs. *See King County*, 2025 WL 1582368, at *17.

19    The programs that HUD CoC grants fund do not promote illegal immigration or attempt to
20 shield individuals in the country illegally from deportation. Judge Rothstein's opinion is
21 persuasive and likely on all fours with the situation here. Unlike the DHS and DOT conditions,
22 the HUD CoC grants are for an individual program where the funding has already been received
23 by the Cities and Counties. The defendants have not yet attempted to show the required nexus.
24 They may file a brief and supporting declarations on the merits of their assertion that the
25 conditions are substantively related to the HUD CoC grants and should not be enjoined by July 11,

---

[8] *Continuum of Care (CoC) Program Eligibility Requirements*, HUD Exchange, https://www.hudexchange.info/programs/coc/coc-program-eligibility-requirements/, last accessed June 19, 2025.

8

2025. The Cities and Counties may reply by July 25, 2025, and I will rule thereafter.

## IV.     NOTICE DISCLOSURE

The Cities and Counties also ask that I order the defendants to disclose a copy of the court-ordered notice they issued to all federal departments and agencies regarding the April 24, 2025, Preliminary Injunction Order and the May 9, 2025, Further Order. Dkt. No. 143 at 1-3. Defendants have thus far rejected the plaintiffs' request, stating that since I did not order them to provide copies of the notice to the plaintiffs, their confirmation that the notices did go out is sufficient.

Because the federal government continues to act inconsistently with my prior orders, the Cities and Counties' request to know what notice was sent to agencies of the federal government is reasonable. The defendants are now ORDERED to provide the plaintiffs with copies of the notices disseminated to all federal departments and agencies by July 2, 2025.

## CONCLUSION

The Preliminary Injunction protects the Cities and Counties from the coercive impact of the DHS and DOT Standard Terms. The DHS Standard Terms are applied to "all new federal awards," and the DOT Standard Terms have already been applied to a vast array of agency operations, most of which appear to have no relation to immigration enforcement or sanctuary policies. The defendants' promise to apply the terms only after individualized, grant-by-grant assessment is empty rhetoric belied by the words of the Standard Terms and the defendants' own conduct. I will allow further briefing to understand if there is a substantive relationship between the HUD CoC grant agreements and the Cities and Counties' so-called sanctuary policies.

It appears that the defendants continue to seek an end run around the Preliminary Injunction. There is a way, which I have suggested, for defendants to lawfully seek to achieve their policy objectives without attempting to coerce the Cities and Counties. I suggest that they use it.

**IT IS SO ORDERED.**

Dated: June 23, 2025



William H. Orrick
United States District Judge

9