DAVID CHIU, SBN 189542
City Attorney
YVONNE R. MERÉ, SBN 175394
Chief Deputy City Attorney
MOLLIE M. LEE, SBN 251404
Chief of Strategic Advocacy
SARA J. EISENBERG, SBN 269303
Chief of Complex and Affirmative Litigation
NANCY E. HARRIS, SBN 197042
KARUN A. TILAK, SBN 323939
Deputy City Attorneys
Fox Plaza
1390 Market Street, 7th Floor
San Francisco, CA  94102-5402
Telephone:       (415) 355-3308
Facsimile:       (415) 437-4644
E-Mail:          karun.tilak@sfcityatty.org

Attorneys for Plaintiff
CITY AND COUNTY OF SAN FRANCISCO

TONY LOPRESTI, SBN 289269
County Counsel
KAVITA NARAYAN, SBN 264191
Chief Assistant County Counsel
MEREDITH A. JOHNSON, SBN 291018
Lead Deputy County Counsel
STEFANIE L. WILSON, SBN 314899
RAJIV NARAYAN, SBN 334511
Deputy County Counsels
BILL NGUYEN, SBN 333671
Litigation Fellow
70 W. Hedding Street, East Wing, 9th Floor
San José, CA 95110
Telephone:       (408) 299-5900
Facsimile:       (408) 292-7240
E-Mail:          tony.lopresti@cco.sccgov.org

Attorneys for Plaintiff
COUNTY OF SANTA CLARA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO, COUNTY OF SANTA CLARA, et al., <br><br> Plaintiffs, <br><br> vs. <br><br> DONALD J. TRUMP, President of the United States, et al., <br><br> Defendants. | Case No. 3:25-cv-1350-WHO <br><br> **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SECOND PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT** <br><br> Hearing Date:    August 15, 2025 <br> Time:            2:00 p.m. <br> Judge:           Hon. William H. Orrick III <br> Place:           Courtroom 2 <br><br> Date Filed:      July 29, 2025 <br> Trial Date:      None Set <br><br> **NO ORAL ARGUMENT UNLESS REQUESTED BY THE COURT** |

## TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION ......................................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES .........................................................2

INTRODUCTION ...................................................................................................................2

FACTUAL BACKGROUND ..................................................................................................4

I.    Like the Original Plaintiffs, Additional Plaintiffs Limit the Use of Local
      Resources for Federal Civil Immigration Enforcement....................................................4

II.   The Trump Administration Doubles Down on Its Efforts to Threaten and
      Coerce Localities Into Enforcing Federal Immigration Law ............................................5

III.  Defendants' Actions Imminently Harm Additional Plaintiffs .......................................10

LEGAL STANDARD ..........................................................................................................16

ARGUMENT .......................................................................................................................16

I.    Plaintiffs Are Likely to Succeed on the Merits of their Claims.....................................16

      A.    EO 14,159, EO 14,218, and the Bondi Directive Are
            Unconstitutional and Illegal Under the APA .......................................................16

      B.    Defendants' More Recent Conduct Confirms the Court's Earlier
            Findings ...............................................................................................................18

II.   Plaintiffs Are Imminently and Irreparably Harmed by Defendants' Actions................20

III.  The Balance of the Equities and the Public Interest Favor a Preliminary
      Injunction .............................................................................................................22

CONCLUSION....................................................................................................................22

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*,
  559 F.3d 1046 (9th Cir. 2009) .................................................................21

*Bennett v. Spear*,
  520 U.S. 154 (1997)...............................................................................18

*City & Cnty. of San Francisco v. Trump.*,
  897 F.3d 1225 (9th Cir. 2018) ....................................................16, 20, 21

*City of Chicago v. Sessions*,
  264 F. Supp. 3d 933 (N.D. Ill. 2017) .......................................................22

*City of Los Angeles v. Sessions*,
  2018 WL 6071072 (C.D. Cal. Sept. 13, 2018) .........................................22

*Cnty. of Santa Clara v. Trump*,
  250 F. Supp. 3d 497 (N.D. Cal. 2017) ..........................................16, 20, 21

*FCC v. Fox Telev. Stations, Inc.*,
  556 U.S. 502 (2009)...............................................................................18

*New York v. United States*,
  505 U.S. 144 (1992)...............................................................................17

*NFIB v. Sebelius*,
  567 U.S. 519 (2012)...............................................................................17

*Ohio v. EPA*,
  603 U.S. 279 (2024)...............................................................................18

*Shell Offshore, Inc. v. Greenpeace, Inc.*,
  709 F.3d 1281 (9th Cir. 2013) .................................................................20

*South Dakota v. Dole*,
  483 U.S. 203 (1987)...............................................................................17

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008)...................................................................................16

**OTHER AUTHORITIES**

Chris Johnson, *Homeland Security posts, then deletes, sanctuary jurisdictions list*,
  Roll Call (June 2, 2025)............................................................................7

*DHS Exposes Sanctuary Jurisdictions Defying Federal Immigration Law*, Dep't
  of Homeland Sec. (May 29, 2025)..............................................................7

Letter from Dep't of Justice to Mayor Craig Greenberg (June 25, 2025) .................10

Letter from Mayor Craig Greenberg to Assistant Attorney Brett A. General
    Shumate (July 21, 2025) .................................................................................................10

Post by @AGPamBondi, X.com (July 22, 2025) .......................................................................10

*Sanctuary Jurisdictions Defying Federal Immigration Law,* Dep't of Homeland
    Sec...................................................................................................................................3

*Trump's Transportation Secretary Sean P. Duffy: Follow the Law*, Dep't. of
    Transp. (Apr. 24, 2025) ...................................................................................................8

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on August 15, 2025, at 2 P.M., or as soon thereafter as may be heard before the Honorable William H. Orrick III in Courtroom 2 of the United States District Court for the Northern District of California, 450 Golden Gate Avenue, San Francisco, CA 94102, Plaintiffs will and hereby do move the Court, pursuant to Federal Rule of Civil Procedure 65, to enter a second preliminary injunction prohibiting Defendants and their officers, agents, servants, employees, and attorneys, and any other persons who are in active concert or participation with them, from directly or indirectly taking any action to withhold, freeze, or condition federal funds from the Additional Plaintiffs[1] in this case based on (1) the first sentence of Section 17 of Executive Order 14,159; (2) Section 2(a)(ii) of Executive Order 14,218; (3) the February 5, 2025 memorandum from the Attorney General entitled "Sanctuary Jurisdictions Directives" (the "Bondi Directive"); or (4) any other Executive Order or Government action that poses the same coercive threat to eliminate or suspend federal funding based on the Government's assertion that a jurisdiction is a "sanctuary jurisdiction," on the basis that the jurisdiction has policies that limit

---

[1] "Additional Plaintiffs," newly included in the pending Second Amended Complaint, *see* ECF No. 151-3, are County of Alameda ("Alameda County"), City of Albany ("Albany"), City of Albuquerque ("Albuquerque"), County of Allegheny ("Allegheny County"), City of Baltimore ("Baltimore"), City of Bend ("Bend"), City of Benicia ("Benicia"), City of Berkeley ("Berkeley"), City of Boston ("Boston"), City of Cambridge ("Cambridge"), City of Cathedral City ("Cathedral City"), City of Chicago ("Chicago"), City of Columbus ("Columbus"), City of Culver City ("Culver City"), County of Dane ("Dane County"), City and County of Denver ("Denver"), City of Healdsburg ("Healdsburg"), County of Hennepin ("Hennepin County"), City of Los Angeles ("Los Angeles"), County of Marin ("Marin County"), City of Menlo Park ("Menlo Park"), Multnomah County, City of Pacifica ("Pacifica"), City of Palo Alto ("Palo Alto"), City of Petaluma ("Petaluma"), Pierce County, City of Richmond ("Richmond"), City of Rochester ("Rochester"), City of Rohnert Park ("Rohnert Park"), County of San Mateo ("San Mateo County"), City of Santa Rosa ("Santa Rosa"), County of Sonoma ("Sonoma County"), City of Watsonville ("Watsonville"), and City of Wilsonville ("Wilsonville"). Several Additional Plaintiffs are also plaintiffs in *King County v. Turner*, No. 2:25-cv-00814 (W.D. Wash.), a case challenging the legality of certain grant conditions imposed by the U.S. Departments of Transportation ("DOT"), Housing and Urban Development ("HUD"), and Health and Human Services.

(i) the honoring of civil immigration detainer requests; (ii) cooperation with administrative warrants for purposes of immigration enforcement; (iii) the sharing of information with federal immigration authorities other than immigration or citizenship status; (iv) the use of local law enforcement to arrest or detain individuals solely for civil immigration violations; or (v) the use of local resources to assist with civil immigration enforcement activities.[2]

This motion is based on this Notice of Motion and Motion, the accompanying supporting Memorandum of Points and Authorities, the accompanying supporting declarations and exhibits thereto, as well as the papers, evidence, and records on file in this action, and any other written or oral evidence or argument as may be presented at or before the time this motion is heard by the Court.[3]

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

Despite a raft of court orders underscoring the illegality of their conduct, Defendants remain undaunted in their efforts either to strip federal funding from jurisdictions who limit use of their local resources for federal civil immigration enforcement or to shatter these jurisdictions' autonomy by forcing federal immigration prerogatives upon them. Since the Court's grant of the initial Preliminary Injunction in this case, President Donald Trump has issued yet another

---

[2] *See* ECF Nos. 111 at 5–6; 126 at 65–66; 136 at 4, 8; 143 at 1–3, 9 (issuing this relief to Plaintiffs in the First Amended Complaint and holding that the relief enjoins "any Executive Order or agency directive that purports to attempt to cut off federal funding from States or localities that meet the Government's definition of 'sanctuary' jurisdiction in the wholesale, overly broad and unconstitutional manner threatened by Section 17 of EO 14,159 and Section 2(a)(ii) of EO 14,218," including "coercive" grant terms imposed by DOT and the U.S. Department of Homeland Security ("DHS")).

[3] Plaintiffs' motion for leave to file their Second Amended Complaint is pending. *See* ECF No. 151. Plaintiffs do not seek a ruling on this motion unless and until the Second Amended Complaint is accepted; however, they have proceeded with this motion now given the ongoing and imminent harms Additional Plaintiffs are suffering.

executive order—EO 14,287—threatening federal funding for "sanctuary jurisdictions," which he directed to be identified in a "list." *See* ECF 128-1 at 4–5. Shortly after, DHS published that list—identifying more than 500 states, cities, and counties as "sanctuary jurisdictions" that it claimed "are deliberately obstructing the enforcement of federal immigration laws and endangering American citizens."[4] The list was removed without explanation days later, but the enforcement threat it revealed remains: Although any jurisdiction that limits use of its local resources for federal civil immigration enforcement was at immediate risk of having federal funds withheld prior to the release of the list—and remains so today—the list made clear the vast scale at which Defendants intend to punish such jurisdictions, by putting at risk *all* of their federal funding, from *every* executive department and agency, for jurisdictions in *every* corner of the country. In addition, the U.S. Department of Justice ("DOJ") has expressly invoked EO 14,287 to threaten discontinuation of a locality's federal funding if it did not abandon its "sanctuary" policies, *see infra* pp. 9–10, and several federal agencies have acted to implement the other Executive Orders challenged in this action, EO 14,159 and EO 14,218, by issuing agency-wide grant terms and conditions that in effect punish "sanctuary jurisdictions" for their policies, *see* ECF No. 147.

In light of these escalating actions—and the enforcement threat already posed by EO 14,159, EO 14,218, and the Bondi Directive that supported entry of the initial Preliminary Injunction—the Additional Plaintiffs seek entry of a second preliminary injunction to halt enforcement of Defendants' illegal threats against them. Entry of a second preliminary injunction is warranted here for the same reasons the Court entered the initial Preliminary Injunction. Defendants' continued pressure campaign against Additional Plaintiffs only further underscores

---

[4] An archived version of the list is available at https://perma.cc/RTB9-MNWZ.

the need for immediate injunctive relief.  For these reasons and those below, Plaintiffs respectfully

submit that Defendants' illegal conduct should again be enjoined.

## FACTUAL BACKGROUND

### I.    Like the Original Plaintiffs, Additional Plaintiffs Limit the Use of Local Resources for Federal Civil Immigration Enforcement

As with the original Plaintiffs, the Additional Plaintiffs have adopted or enforced policies

that limit use of their local resources to assist with federal civil immigration enforcement.  These

policies generally work to improve trust between the jurisdictions and the communities they serve

and to ensure that scarce local resources are used for the benefit of local communities.  That is,

through these policies, Additional Plaintiffs aim to facilitate their communities' access to law

enforcement, health services, educational programming, and other local goods, while preserving

the trust and resources necessary to providing these essential programs and services.  *See, e.g.*,

Sanchez Decl. ¶¶ 8, 10; Grande Decl. ¶¶ 6–7; Fournier Decl. ¶¶ 8–9; Smullian Decl. ¶ 5; Nutt

Decl. ¶ 6.

Like the policies of the original Plaintiffs, Additional Plaintiffs' policies have common

features.  They generally limit or prohibit local law enforcement from detaining an individual

who is otherwise eligible for release based solely on (1) a civil immigration detainer request or

(2) an administrative warrant issued by U.S. Customs and Immigration Enforcement ("ICE").[5]

---

[5] *See, e.g.*, Courtney Decl. Ex. 1 at A (Alameda Cnty. Res. 2013-142); Ex. 2 at A (Alameda Cnty. Res. 2016-274), Ex. 7 at Sec. 3(3)(b) (Albuquerque Res. 18-7), Ex. 8 at p. 1–2 (Allegheny Cnty. Bureau of Corrs. Policy No. 220), Ex. 11 at 413.7.1 (Bend Police Dept. Policy 413), Ex. 13 at 5 (Berkeley Res. No. 71,658-N.S.), Ex. 14 at 11-1.9(B) (Boston Trust Act), Ex. 15 at Sec. 2.129.040(D) (Cambridge Muni. Code), Ex. 16 at Sec. 4(1) (Cathedral City Res. No. 2017-19), Ex. 17 at 2-173-042(a)(3) (Chicago Muni. Code), Ex. 19 at Sec. 2(1-2) (Culver City Res. No. 2017-R025), Ex. 20 (Dane Cnty. Sheriff's Off. Booking Manual), Ex. 21 at Sec. 28-253(c) (Denver Rev'd Muni. Code, Art. VIII), Ex. 23 (Hennepin Cnty. Sheriff's Off. Admin. Directive 21-02), Ex. 24 at 19.191(c) (Los Angeles Muni. Code), Ex. 26 at 414.7.1 (Marin Cnty. Sheriff's Off. Policy 414), Ex. 29 at Sec. 4-17.03(a)(1)(ii) (Pacifica Muni. Code), Ex. 32 at Sec. 2.30.040(a)(1)(B) (Richmond Muni. Code 2.30.030-.060), Ex. 34 at Sec. 2.48.010(a)(1) (San

They also generally limit local officials and employees from (3) sharing sensitive, personal information—such as release dates—with outside parties, including federal immigration authorities[6], (4) arresting individuals solely for civil immigration violations[7], or (5) otherwise participating in enforcement of federal civil immigration laws[8].

## II. The Trump Administration Doubles Down on Its Efforts to Threaten and Coerce Localities Into Enforcing Federal Immigration Law

As detailed in the original Plaintiffs' preliminary injunction briefing, and as applies equally to Additional Plaintiffs, promptly upon being sworn in, President Trump and his administration began taking steps to strip so-called "sanctuary jurisdictions" of their federal funding—without regard to constitutional or statutory guardrails, or the havoc such action would wreak on the threatened jurisdictions. *See* ECF No. 61 at 11–15 (summarizing EO 14,159, EO 14,218, the Bove Directive, and the Bondi Directive). Since that briefing—and the Court's initial order finding that this conduct was likely illegal—the administration has redoubled its efforts to

---

Mateo Cnty. Ord. Code), Ex. 35 at 420.2 (Santa Rosa Police Dept. Policy), Ex. 38 at Sec. 5(c) (Watsonville Ord. No. 1353-17, § 5); *see also* ECF No. 61 at 9−10 (describing resource and legal burdens imposed on localities by ICE detainers).

[6] *See, e.g.*, Courtney Decl. Ex. 5 at Sec. 1(b) (Albany Exec. Order 1-17), Ex. 7 at Sec. 3(2), Ex. 8 at p. 2, Ex. 9 at 11 (Baltimore Police Dept. Policy 1021), Ex. 13 at 3(b), Ex. 14 at D(1)(a)(3)–(4), Ex. 15 at 2.129.040(E), Ex. 17 at 2-173-030, Ex. 19 at Sec. 2(6); Ex. 21 at Sec. 28-250(a)(4), Ex. 24 at 19.191(c), Ex. 25 at 4 (Marin Cnty. Res. 2020-97), Ex. 27 at 2.60.020 (Menlo Park Muni. Code), Ex. 29 at Sec. 4-17.03(a)(3), Ex. 32 at Sec. 2.30.030(d), Ex. 35 at 420.4.1, Ex. 38 at Sec. 5(d)–(e); *see also* ECF No. 61 at 10 (discussing safety and security motivation for limiting information sharing).

[7] *See, e.g.*, Courtney Decl. Ex. 2, Ex. 5, Ex. 6 (Albuquerque Code of Res., Sec. 3-1-11), Ex. 9, Ex. 12 at 2(a) (Benicia Res. 17-13), Ex. 15 at 2.129.040(C), Ex. 16 at Secs. 3–4, Ex. 17 at 2-173-042(a)(1), Ex. 18 at 2 (Columbus Exec. Order 2017-01), Ex. 21 Sec. 28-250(a)(1), Ex. 24 at 19.191(b), Ex. 26 at 414.5, Ex. 29 at Sec. 4-17.03(a)(1)(iii), Ex. 32 at Sec. 2.30.040(a)(1), Ex. 35 at 420.2, Ex. 37 at (A) (Sonoma Cnty. Res. No. 25-0015), Ex. 38 at Sec. 5(a).

[8] *See, e.g.*, Courtney Decl. Exs. 1–7, Ex. 9, Ex. 10 (Bend Res. 3068), Ex. 11, Ex. 16 at Sec. 4, Ex. 19 at Sec. 3(1), Ex. 21 at Sec. 28-250(a), Ex. 24 at 19.191(d-f), Ex. 31 at Sec. 4 (Pierce Cnty. Res. No. R20255-139s), Ex. 32 at Sec. 2.30.030(b), Ex. 33 at 5 (Rochester City Council Res. 2017-5), Ex. 34 at Sec. 2.48.010(a), Ex. 36 at Sec. 3 (Santa Rosa Res. RES-2017-017), Ex. 38 at Sec. 5, Ex. 39 at 2 (Wilsonville Res. No. 2626).

punish such jurisdictions. On April 28, 2025, President Donald Trump issued EO 14,287, which threatens federal funding for all "sanctuary jurisdictions." The Executive Order—entitled "Protecting American Communities from Criminal Aliens"—directs the Attorney General and Secretary of Homeland Security to identify a "list" of "sanctuary jurisdictions" "that obstruct the enforcement of Federal immigration laws" and further directs *all* executive departments and agencies to coordinate with the Office of Management and Budget to "identify appropriate Federal funds" to sanctuary jurisdictions" on the list "for suspension or termination, as appropriate." *See* ECF No. 151-8 at §§ 2–3. A "Fact Sheet" simultaneously released by the White House made the intent of the Executive Order clear—per the White House, EO 14,287 "follow[s] through on [President Trump's] promise to rid the United States of sanctuary cities." *See* ECF No. 128-1 at 9.

Weeks later, Defendants tipped their hand as to the breadth of the threat EO 14,287 poses to "sanctuary jurisdictions." On May 29, 2025, as directed by EO 14,287, DHS published a "list" of more than 500 states, cities, and counties that it claimed are "sanctuary jurisdictions" that "are deliberately and shamefully obstructing the enforcement of federal immigration laws and endangering American communities." *See supra* note 4. The list is stunning in its breadth, including *every* Plaintiff, as a stand-alone jurisdiction or a jurisdiction in a "sanctuary" state[9]. *See id.* Remarkably, while inclusion on the list put each jurisdiction at risk of having its federal funding revoked, the list did not include any criteria for inclusion or method to challenge inclusion. Although the list was taken down days later, the abrupt, unexplained removal provided no comfort to the included jurisdictions that they would not be targeted as a result of their

---

[9] Four such jurisdictions are noted in the Second Amended Complaint. ECF No. 151-3 at 92 n. 15. Additional Plaintiff Rohnert Park is also not included in the list; however, the city is located in the State of California, which is included in the list and limits its localities' use of their resources to assist in federal immigration enforcement. Rohnert Park complies with that law.

inclusion. To that end, during a June 1, 2025 Fox News interview, Defendant Noem stated that the "list is absolutely continuing to be used and it is going to be identifying those cities and those jurisdictions that aren't honoring law and justice."[10] Further, DHS still has not taken down the press release that accompanied the list, which baselessly referred to the included jurisdictions as "lawless" and threatened that they could be found to be violating criminal law—a threat that hangs over the jurisdictions now.[11]

As the Court is aware, federal agencies have also followed the directives in the challenged Executive Orders to include immigration-related terms and conditions in their grant programs. For example, Defendant DHS Secretary Kristi Noem has issued a memorandum, entitled "Restricting Grant Funding for Sanctuary Jurisdictions," that directed "all" DHS components to "cease providing federal funding to sanctuary jurisdictions" ("Noem Directive"). *See* ECF Nos. 126 at 5–6; 151-9 at 1–2. DHS has since acted to implement this guidance, issuing grant terms and conditions applicable to "*all* new federal awards" for FY 2025, including almost a full page of immigration-related conditions ("DHS Standard Terms"). *See* ECF Nos. 126 at 6–7; 151-12 at 1, IX, XVII(2)(a)(iii), XXXI; 147 at 1–5, 9. The Federal Emergency Management Agency ("FEMA"), a component of DHS, has, in turn, indicated it may "compl[y]" with the Noem Directive by applying the immigration conditions in the DHS Standard Terms to its grant programs ("FEMA Memo").[12] But FEMA's own descriptions of the targeted grant programs

---

[10] *See, e.g.*, Chris Johnson, *Homeland Security posts, then deletes, sanctuary jurisdictions list,* Roll Call (June 2, 2025), https://perma.cc/HW82-9TMV.

[11] The press release is available at https://perma.cc/2LJA-ZDJC.

[12] The FEMA Memo identified 12 grant programs for potential enforcement of the DHS Standard Terms' immigration conditions. *See* ECF No. 151-10 at 1–3. A FEMA official has since represented that it may enforce the immigration conditions in five grant programs: the Emergency Management Performance Grant, the State Homeland Security Program, the Urban Area Security Initiative, the Port Security Grant Program, and the Presidential Residence Protection Assistance Program. *See* Decl. of David Richardson, *Illinois v. FEMA*, No. 1:25-cv-00206-WES-PAS (D.R.I. June 9, 2025), ECF No. 52-1 at ¶¶ 9, 12.

make clear that they are unrelated to civil immigration enforcement. *See id.* ECF No. 151-10 at 21–23 (describing the purpose of each grant, including "emergency management," "responding to acts of terrorism," and "maritime transportation infrastructure security"); 147 at 4–5 (noting no nexus between FEMA grants and immigration). Indeed, many Additional Plaintiffs rely on these grants to prepare for and respond to terrorist attacks and similar threats. *See, e.g.*, Sanchez Decl. ¶ 14; Grande Decl. ¶ 16; Medina Decl. ¶ 10; Leach Decl. ¶¶ 24–26; King Decl. ¶ 15; Groffenberger Decl. ¶ 12; Maulawin Decl. ¶¶ 13–31; Myers Decl. ¶ 16; Demuth Decl. ¶ 7(d).

Similarly, DOT Secretary Sean Duffy has announced that agency's policy to fund only recipients that cooperate "in the enforcement of Federal immigration law" ("Duffy Letter"). *See* ECF No. 143 at 43–46; 147 at 1–3, 5–7, 9[13]. DOT, in turn, has included immigration-related language from the Duffy Letter in standard grant terms and agreements from agencies such as the Federal Transit Administration ("FTA"), Federal Railroad Administration ("FRA"), Federal Aviation Administration ("FAA"), and Federal Highway Administration ("FHWA") ("DOT Standard Terms"), *see* ECF No. 151-15 at § 12(m), 151-16 at § 20.2, 151-17 at § 32, and 151-18 at § 18.2—all agencies whose grants support services provided by many Additional Plaintiffs, *see, e.g.*, Sandoval Decl. ¶ 12; King Decl. ¶¶ 18, 20–22; Tschudi Decl. ¶ 8; Nachbar Decl. ¶ 18; Cochran Decl. ¶¶ 6, 8; Piedra Decl. ¶ 6; Nutt Decl. ¶ 13; Katko Decl. ¶¶ 6–9.

HUD has also added immigration-related conditions to its grant programs, including the Continuum of Care ("CoC") and Community Development Block Grant ("CDBG") programs— non-competitive grants that support services to address homelessness and boost economic development, that are relied on by many Additional Plaintiffs. *See, e.g.*, ECF Nos. 126 at 7–8, 147 at 7–9, 151-13; King Decl. ¶ 24; Spinner Decl. ¶¶ 14–15, 20–21; Chavez Decl. ¶ 10; Cochran

---

[13] A press release linking the Duffy Letter to EO 14,159 is available at https://perma.cc/N5HL-ZNYW.

Decl. ¶¶ 9, 10; Demuth Decl. ¶ 7(b).  These conditions compel grantees to agree to "administer [the] grant in accordance with all applicable immigration restrictions and requirements, including" those that "may [be] establish[ed]" to "comply with" EO 14,218, and direct that grantees may not use funding "in a manner that by design or effect facilitates the subsidization or promotion of illegal immigration or abets policies that seek to shield illegal aliens from deportation"—without defining those terms.  *See* ECF No. 151-13 at 1, 5.

If that were not enough, DOJ has now filed at least *eight* enforcement actions against state and local governments alleging violations of federal law for, effectively, refusing to abandon the very types of laws and policies adopted or enforced by Additional Plaintiffs, including an action against New York City filed just last week.[14]  Through these actions, DOJ has sued four Additional Plaintiffs—Chicago, Denver, Los Angeles, and Rochester—over their duly enacted policies, confirming that the government's targeting of these jurisdictions is no passing whim. Instead, Defendants' actions demonstrate a systematic, studied effort to extinguish localities' duly enacted policies governing the use of their own scarce resources—a goal that has been openly and repeatedly embraced by Defendants and other administration officials.  *See, e.g.*, ECF No. 151-3 at 68–70.

Without preliminary relief, the likely outcome of this pressure campaign is clear—as played out recently in Kentucky.  In May, DHS included Louisville on its "list" of "sanctuary jurisdictions."  *See supra* note 4.  In June, DOJ sent a letter to the Mayor of Louisville, calling the

---

[14] *See United States v. City of New York, et al.*, No. 25-cv-04084 (E.D.N.Y.); *United States v. Colorado, et al.*, No. 25-cv-01391 (D. Colo.); *United States v. Illinois, et al.*, No. 25-cv-01285 (N.D. Ill.); *United States v. Los Angeles, et al.*, 25-cv-05917 (C.D. Cal.); *United States v. Newark, et al.*, No. 25-cv-05081 (D.N.J.); *United States v. New York, et al. I*, No. 25-cv-0205 (N.D.N.Y.); *United States v. New York, et al. II*, No. 25-cv-0744 (N.D.N.Y.); *United States v. Rochester, et al.*, No. 25-cv-06226 (W.D.N.Y.).  The complaint against Chicago has since been dismissed for failure to state a claim, underscoring the impropriety of Defendants' campaign.  *See Illinois, et al.*, No. 25-cv-01285 (N.D. Ill.), ECF No. 86 (July 25, 2025).

city's policy of declining to honor ICE detainers requests "unlawful" and citing the Bondi Directive to threaten suit against the city.[15]  But DOJ did not limit itself to litigation threats. Remarkably, in the *first paragraph of its letter*, DOJ effectively held Louisville's federal funding hostage, by citing EO 14,287 to state that, to "ensure" "cooperation" with the Trump Administration's immigration priorities, the President had directed the Attorney General to refer "Sanctuary" jurisdictions (like Louisville) to the Office of Management and Budget "for termination of grants, contracts, and federal funds as appropriate."  *Id.*  The magnitude of the threat was not lost on Louisville.  Weeks later, the city abandoned its detainer policy, noting that DOJ's letter had made clear the "negative consequences" of being deemed a "sanctuary jurisdiction" and emphasizing that "the potential loss of millions of dollars of federal funding for critical city services" had been of "great concern" to the city.[16]  In short, these threats work—and will continue without intervention by the Court.[17]

### III.    Defendants' Actions Imminently Harm Additional Plaintiffs

Defendants have labeled Additional Plaintiffs "lawless" jurisdictions that "obstruct" federal immigration enforcement—to the point they may violate criminal law—and threatened to strip Additional Plaintiffs of federal funding.  *See supra* p. 6–7.  Additional Plaintiffs have engaged in no such conduct; they merely limit use of their local resources for federal civil immigration enforcement.  Nonetheless, Defendants' continued campaign against "sanctuary jurisdictions"—via EO 14,287, DHS's broad-reaching list of target jurisdictions, and agencies' blanket grant terms and conditions—has only crystalized Additional Plaintiffs' fear that they will

---

[15] A copy of DOJ's letter is available at https://perma.cc/786Y-36UY.

[16] A copy of Louisville's response is available at https://perma.cc/SUZ4-EKEJ.

[17] As an example, Defendant Attorney General Pamela Bondi posted on X that Louisville's policy change was a "major victory" spurred by "a strong written warning" from "[her] office," and that the episode should "set an example to other cities."  *See* Post by @AGPamBondi, X.com (July 22, 2025), *available at* https://perma.cc/BH43-TWBV.

be subject to the same funding freezes, withdrawals, and conditions in EO 14,159, EO 14,218, the Bondi Directive, and the "numerous directives from executive agencies ordering the withholding of funds" that threatened the original Plaintiffs. *See* ECF No. 111 at 4–5.

As with the original Plaintiffs, this threatened loss of funding has created immediate harm to Additional Plaintiffs:  Federal funding accounts for a significant portion of Additional Plaintiffs' budgets.[18]  Additional Plaintiffs use these funds to provide essential programs and

---

[18] *See, e.g.*, Atendido Decl. ¶ 5 (federal funds projected to account for over $1 billion, more than 20%, of Alameda County's FY 2025–26 budget); Grande Decl. ¶ 13 (Albany received about $12.5 million in federal funding in FY 2023); Sandoval Decl. ¶ 11 (federal funding amounts to 7% of Albuquerque's $1.5 billion budget for FY 2026); Fournier Decl. ¶ 3 (Allegheny County plans to receive over $617 million in federal funding, or 20% of its budget, this year); Leach Decl. ¶ 5 (Baltimore anticipates receiving $216 million in federal funding for FY 2026 and has open federal grants of over $1.8 billion); King Decl. ¶ 8 (Bend anticipates receiving $90 million in federal funding over next five years); Tschudi Decl. ¶ 6 (Benicia has $5.7 million in open federal funding); Buddenhagen Decl. ¶ 12 (Berkeley has open federal contracts of over $60 million); Groffenberger Decl. ¶ 9 (Boston received about $240 million in federal funds in FY 2024); Spinner Decl. ¶ 12 (Cambridge used over $23 million in federal grants in FY 2024); Biersack Decl. ¶ 8 (Cathedral City has $14 million in open federal funding); Guzman Decl. ¶ 4 (Chicago estimates about $3.5 billion in federal grant revenues for FY 2025, 20% of the City's budget); Long Decl. ¶ 7 (Columbus received over $163 million in federal funding in FY 2025); Nachbar Decl. ¶ 17 (Culver City has about $47.5 million in current federal grant funding); Hicklin Decl. ¶ 6 (Dane County's 2024 budget included over $60 million in federal funding); Doheny Decl. ¶ 4 (Denver expects to expend about $250 million in federal grant funding this year); Kay Decl. ¶¶ 7, 8, 10 (noting Healdsburg's use of over $3 million in federal funding); Mathews Decl. ¶ 3 (Hennepin County's FY 2025 budget anticipates over $271 million in federal funding); Chavez Decl. ¶ 4 (Los Angeles expects to receive over $700 million in federal funding this FY); Eilerman Decl. ¶ 8 (Marin County received over $103 million in federal funding for FY 2023–24); Stolte Decl. ¶ 5 (federal funding accounts for over $21 million of Menlo Park's budget this FY); Arellano Decl. ¶ 6 ($126 million in federal funding for Multnomah County in FY 2025); Woodhouse Decl. ¶ 6 (Pacifica plans to expend over $12.5 million in federal funds this FY); Shikada Decl. ¶ 6 (Palo Alto plans to receive $87 million in federal grant funding over the next three years); Cochran Decl. ¶ 6 ($29 million in federal grant funds currently allocated to Petaluma); Demuth Decl. ¶ 6 (Pierce County's biennial budget includes about $187 million in federal funding); Mastay Decl. ¶ 11 (Richmond received nearly $38 million in federal funding in FY 2024–25); Warren Decl. ¶ 8 (Rochester's total federal expenditures in FY 2023–24 exceeded $81 million); Piedra Decl. ¶ 5 (federal funding makes up over $4.3 million of Rohnert Park's budget this FY); Manchia Decl. ¶ 8 (federal funds to account for $1 billion or 20% of San Mateo County's FY 2025–26 budget); Nutt Decl. ¶ 12 (Santa Rosa's FY 2025–26 budget anticipates receipt of $218 million in federal funding); Rivera Decl. ¶ 7 (Sonoma County has budgeted for about $566 million in federal funding across FY 2023–24 and 2024–25); Duran Decl. ¶ 6

services to their communities: Many Additional Plaintiffs use these funds to provide critical safety-net services to their most vulnerable populations, such as educational programming, nutrition assistance and school meals, child welfare services, childcare support, youth employment and enrichment services, literacy programs, support for seniors such as meal delivery and transportation services, and support for individuals with disabilities. *See, e.g.*, Atendido Decl. ¶ 6; Grande Decl. ¶ 14; Fournier Decl. ¶ 16; Leach Decl. ¶¶ 10–11, 32–33; Tschudi Decl. ¶ 11; Buddenhagen Decl. ¶¶ 12–13; Groffenberger Decl. ¶ 10; Spinner Decl. ¶¶ 18–19, 27–30; Guzman Decl. ¶ 8; Woodhouse Decl. ¶ 7; Cochran Decl. ¶ 10; Demuth Decl. ¶¶ 7(a), 8; Mastay Decl. ¶ 11; Manchia Decl. ¶ 12; Katko Decl. ¶ 10. Additional Plaintiffs also use these funds to provide core public health services, such as mental health and substance abuse treatment, health care services for indigent individuals, in-home health services, maternal and infant health care, and other vital public health initiatives. *See, e.g.*, Atendido Decl. ¶ 6; Baker Decl. ¶¶ 4–8; Fournier Decl. ¶ 15; Leach Decl. ¶¶ 7–9; Buddenhagen Decl. ¶ 13; Spinner Decl. ¶ 24; E. Johnson Decl. ¶ 8; Eilerman Decl. ¶ 9; Manchia Decl. ¶ 11; Katko Decl. ¶ 10.

Many Additional Plaintiffs rely on DHS and FEMA funding to support critical public safety programs, such as preventing and responding to acts of terror, and other emergency preparedness issues. *See, e.g.*, *supra* p. 8. Additional Plaintiffs also use DOT dollars to fund public infrastructure and safety initiatives, such as capital improvements to roads and bridges, construction and improvement of transit hubs and arteries, mass-transit vehicle maintenance, pedestrian- and cyclist-safety improvements, and road-safety services and programming. *See, e.g.*, Leach Decl. ¶¶ 21–23; King Decl. ¶¶ 8, 18, 20–23; Spinner Decl. ¶¶ 25, 31; Nachbar Decl. ¶¶ 18–19; Hicklin Decl. ¶ 6; Kay Decl. ¶¶ 7–8, 10; Chavez Decl. ¶ 13; Eilerman Decl. ¶ 9; Stolte

---

(Watsonville plans to receive over $19 million in federal funding this FY); and Katko Decl. ¶ 5 (Wilsonville typically receives over $1 million annually in federal grant funds).

Decl. ¶ 6; Arellano Decl. ¶¶ 9–11; Woodhouse Decl. ¶¶ 8, 10; Cochran Decl. ¶¶ 7; Demuth Decl. ¶ 7(c); Nutt Decl. ¶ 13;  Katko Decl. ¶¶ 6–9.  DOJ funding also plays a crucial role in Additional Plaintiffs' budgets, supporting public safety services such as crime victim assistance; domestic violence prevention; sexual assault kit and evidence processing; crime reduction initiatives; and funding for police salaries, trainings, and equipment.  *See, e.g.*, Sanchez Decl. ¶¶ 11–13; Medina Decl. ¶¶ 3–9, 11; Fournier Decl. ¶ 10; Smullian Decl. ¶¶ 10–19; Groffenberger Decl. ¶¶ 14–15; Biersack Decl. ¶ 9; Maulawin Decl. ¶¶ 6–12; Myers Decl. ¶¶ 10–16; Tucker Decl. ¶¶ 7–10; Arellano Decl. ¶¶ 12–13; Cochran Decl. ¶ 7–8; Demuth Decl. ¶ 7(f); Warren Decl. ¶ 6; Piedra Decl. ¶ 7; Manchia Decl. ¶ 13; Cregan Decl. ¶¶ 12–20;  Duran Decl. ¶ 7.  Additional Plaintiffs also use HUD funding to ensure that their most vulnerable populations are safely housed in thriving communities.  *See, e.g., supra* p. 12; Grande Decl. ¶¶ 13, 15; Leach Decl. ¶¶ 12–19; Buddenhagen Decl. ¶ 14; Spinner Decl. ¶¶ 16, 22, 26; Eilerman Decl. ¶ 9; Arellano Decl. ¶¶ 7–8; Mastay Decl. ¶ 11; Warren Decl. ¶ 5.

The threats to this funding have harmed Additional Plaintiffs in much the same manner they harmed the original Plaintiffs—presently and imminently.  Without federal funding, Additional Plaintiffs would be forced to eliminate or sharply curtail these essential programs and services, and terminate contracts and employees who support them, causing immense harm to Additional Plaintiffs and their communities.  *See, e.g.* Atendido Decl. ¶ 8; Baker Decl. ¶ 9; Sandoval Decl. ¶ 16; King Decl. ¶ 12; Buddenhagen Decl. ¶ 15; Guzman Decl. ¶ 7; Hicklin Decl. ¶ 12; Chavez Decl. ¶¶ 8–9; Cochran Decl. ¶¶ 16–17; Demuth Decl. ¶ 9; Mastay Decl. ¶ 12; Warren Decl. ¶ 13; Manchia Decl. ¶ 8.  Because of the gravity of that threat, Additional Plaintiffs are now grappling with how to prepare for potential budgetary devastation—and dealing with the fallout of Defendants' conduct, in the form of revised grant conditions and agreements—without

desperately needed clarity as to whether Defendants will be permitted to carry out their illegal threats.

For example, as with the original Plaintiffs, most of Additional Plaintiffs' federal funding is reimbursement-based, meaning Additional Plaintiffs are currently weighing whether to expend millions of their own dollars for which they are legally entitled to seek reimbursement from the federal government—without knowing whether they will receive reimbursement at all. *See, e.g.*, Atendido Decl. ¶ 9; Grande Decl. ¶ 19; Sandoval Decl. ¶ 13; King Decl. ¶ 28; Groffenberger Decl. ¶ 11; Spinner Decl. ¶ 33; Guzman Decl. ¶ 7; Nachbar Decl. ¶ 18; Hicklin Decl. ¶ 7; Kay Decl. ¶ 14; Mathews Decl. ¶ 12; Chavez Decl. ¶ 10; Demuth Decl. ¶ 11; Manchia Decl. ¶ 9; Nutt Decl. ¶ 16. Additional Plaintiffs also receive non-competitive formula grants that support ongoing local services. *See, e.g.*, Fournier Decl. ¶ 14; Buddenhagen Decl. ¶ 12; Manchia Decl. ¶ 16. Because of the non-competitive nature of these grants, Additional Plaintiffs have constructed budgets around their receipt—but the dependability of those funds is now in doubt. *See, e.g.*, *id.* Similarly, many Additional Plaintiffs face intense uncertainty as they attempt to plan their budgets. *See, e.g.*, Grande Decl. ¶¶ 12, 20; Fournier Decl. ¶¶ 21–23; Guzman Decl. ¶ 10; Mathews Decl. ¶ 9; Woodhouse Decl. ¶¶ 11–12; Mastay Decl. ¶¶ 7, 9; Manchia Decl. ¶ 17. Meanwhile, Additional Plaintiffs must also struggle to track, respond to, and mitigate the constant threat of budgetary instability caused by Defendants' conduct. *See, e.g.*, Fournier Decl. ¶ 19; Groffenberger Decl. ¶ 17; Nachbar Decl. ¶ 24; Mathews Decl. ¶ 13; Chavez Decl. ¶ 14; Cochran Decl. ¶ 19; Mastay Decl. ¶ 10. Facing this uncertainty, several Additional Plaintiffs have engaged in anticipatory savings measures—including hiring freezes and budget cuts—depriving their communities of benefits and services they would have received but for Defendants' conduct. *See, e.g.*, Grande Decl. ¶ 21; King Decl. ¶ 13; Buddenhagen Decl. ¶ 20; Hicklin Decl. ¶ 10; Doheny Decl. ¶ 14; Demuth Decl. ¶ 11; Warren Decl. ¶ 12. Even these preparatory measures cannot

defuse Defendants' threats, given that Additional Plaintiffs cannot cover the substantial budgetary holes that would be created by the loss of federal funds—particularly mid-budget cycle when losses are even more difficult.  *See, e.g.*, Atendido Decl. ¶ 9; Sandoval Decl. ¶ 17; Spinner Decl. ¶ 23; Hicklin Decl. ¶ 11; Doheny Decl. ¶ 12; Shikada Decl. ¶ 11; Warren Decl. ¶ 13; Manchia Decl. ¶ 18; Nutt Decl. ¶¶ 16–17; Rivera Decl. ¶ 14.

In addition, Additional Plaintiffs must now confront whether and how to submit grant applications and agreements—a once-routine task that has been complicated by Defendants' conduct.  *See, e.g.*, Nutt Decl. ¶¶ 8–9.  For example, several Additional Plaintiffs are in the process of submitting consolidated action plans that are a prerequisite to receiving several HUD grants, including CDBG.  *See, e.g.*, Grande Decl. ¶ 15; Fournier Decl. ¶ 24; Buddenhagen Decl. ¶ 14; Shikada Decl. ¶ 7; Cochran Decl. ¶¶ 11–14.  At least one Additional Plaintiff has had its plan challenged, in part because it failed to state expressly that it would comply with HUD's immigration-related conditions.  *See* Cochran Decl. ¶ 13.  Even if a jurisdiction's plan is approved, it will then have to decide whether to execute an agreement with immigration-related conditions—an issue many Additional Plaintiffs are confronting.  *See, e.g.*, Buddenhagen Decl. ¶ 14; Spinner Decl. ¶ 23; Nachbar Decl. ¶¶ 12–15, 18; Eilerman Decl. ¶ 10; Woodhouse Decl. ¶ 10; Cochran Decl. ¶¶ 13–15, 19.

Like the original Plaintiffs, Additional Plaintiffs are thus faced with an immediate choice "that is no choice at all:  Modify their policies to match those of the federal government or face devastating fiscal consequences, the impact of which will have far-reaching effects across various public services and the very fabric of their communities."  *See* ECF No. 126 at 32.  Because of these ongoing harms, Additional Plaintiffs seek immediate, preliminary relief.

**LEGAL STANDARD**

A preliminary injunction is warranted when the movant establishes (1) a likelihood of success on the merits, (2) likely irreparable harm absent preliminary relief, (3) that the balance of equities tips in the movant's favor, and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Plaintiffs satisfy all four prerequisites.

**ARGUMENT**

**I.    Plaintiffs Are Likely to Succeed on the Merits of their Claims**

Plaintiffs seek a second preliminary injunction to protect Additional Plaintiffs that is identical to the preliminary relief already granted in this case. For the reasons the Court found that original Plaintiffs are likely to succeed on their Separation of Powers, Spending Clause, Fifth and Tenth Amendment, and Administrative Procedure Act ("APA") claims, Additional Plaintiffs are at least as likely to succeed. *See* ECF No. 126 at 46–62; ECF No. 61 at 14–22. Indeed, the likelihood of success has only increased given Defendants' escalating actions.

**A.    EO 14,159, EO 14,218, and the Bondi Directive Are Unconstitutional and Illegal Under the APA**

The Court's finding that the sweeping dictates in EO 14,159, EO 14,218, and the Bondi Directive unconstitutionally infringe on Congress's exclusive power to condition funding—in violation of Separation of Powers principles and the Spending Clause—applies with equal force here. *See* ECF No. 126 at 46–52 (citing, *inter alia*, *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018); *Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497 (N.D. Cal. 2017)). Just as President Trump acted "unilaterally to attempt to withhold" "millions of dollars already appropriated by Congress" from the original Plaintiffs, so too did he act toward Additional Plaintiffs—"in direct contravention of our nation's laws." *See id.* at 47. Just as Defendants "identified no statutory basis or Congressional authorization for the Attorney General to indefinitely freeze" DOJ funds for the original Plaintiffs, so too here. *See id.* at 48. And, as with

the original Plaintiffs, EO 14,159, EO 14,218, and the Bondi Directive (1) impose ambiguous conditions on Additional Plaintiffs' receipt and use of federal funds, (2) those conditions lack any nexus to the affected funds[19], and (3) the conditions are "'so coercive'" on Additional Plaintiffs "'as to pass the point at which pressure turns into compulsion.'" *See id.* at 50–52 (quoting *South Dakota v. Dole*, 483 U.S. 203, 211 (1987)); *supra* note 18 (identifying billions of dollars under threat); *supra* p. 13 (noting devastating impacts of threatened cuts).

The Court's findings that EO 14,159 and EO 14,218 violate the Tenth Amendment, and that those Executive Orders and the Bondi Directive violate the Fifth Amendment, apply here as well. *See* ECF No. 126 at 52–57. Under the Tenth Amendment, the federal government "may not compel [a state] to enact or administer a federal regulatory program," *New York v. United States*, 505 U.S. 144, 188 (1992), regardless of whether the government "directly commands" or "indirectly coerces" the state "to adopt a federal regulatory system as its own," *NFIB v. Sebelius*, 567 U.S. 519, 578 (2012). As the Court held, EO 14,159 and EO 14,218 violate that precept, by "wield[ing] critical federal funding as a cudgel with which to coerce localities that do not wish to cut essential programs into accepting the federal government's conditions in exchange for the funds they were promised." *See* ECF No. 126 at 53. That cudgel strikes as hard a blow against Additional Plaintiffs as it does the original Plaintiffs.

As to the Fifth Amendment, that amendment "protects against federal laws that are so vague that they fail to provide fair notice of what is prohibited or are so standardless that they permit discriminatory enforcement." *See id.* at 55. The language of EO 14,159, EO 14,218, and the Bondi Directive have not changed since entry of the Preliminary Injunction—and their language remains as "'expansive [and] standardless'" now as it did when the Court granted that

---

[19] *Compare supra* pp. 11–12 (noting threats to federal funding used to support, *inter alia*, child welfare services, support for the homeless, public health services, and transportation); *with* ECF Nos. 126 at 51, 136 at 8 (noting lack of nexus between such services and immigration).

relief.  *Id.*  Likewise, as the Court held, the "complete lack of process" offered by EO 14,159, EO 14,218, and the Bondi Directive "violates the Fifth Amendment's due process requirements."  *Id.* at 56 (addressing EO 14,159); *see also id.* at 56–57 (finding EO 14,218 to be "even more vague" and stating that the Bondi Directive "suffers from the same problems").  Those findings, too, remain as true today as when the Preliminary Injunction was issued.

Finally, the Bondi Directive violates the APA.  *See* ECF No. 126 at 57–62.  As the Court previously held, the Bondi Directive "'mark[ed] the consummation of' the DOJ's 'decision-making process' that so-called 'sanctuary' jurisdictions are ineligible for federal funding" and is "a statement from which legal consequences will flow"—rendering it a "final" agency action subject to review.  *Id.* at 58–59 (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)).  Further, the Bondi Directive is arbitrary and capricious because, as the Court found, it "fails to offer a reasonable explanation of the breadth of funding withheld or the basis for withholding funds that Congress has already appropriated," and because, in promulgating the Directive, DOJ failed to consider the considerable reliance interests localities—such as Additional Plaintiffs—have in DOJ funding.  *Id.* at 60–61 (citing *Ohio v. EPA*, 603 U.S. 279, 292 (2024); *FCC v. Fox Telev. Stations, Inc.*, 556 U.S. 502, 515–16 (2009)).  Because "[n]o law authorizes the DOJ to impose conditions not authorized by Congress," much less to freeze the availability of all DOJ funds to supposed "sanctuary jurisdictions," the Bondi Directive is also "'contrary to constitutional right [and] power'" and in excess of statutory authority, in violation of the APA, 5 U.S.C. § 706(2)(B), (C).  *Id.* at 61–62.

### B.    Defendants' More Recent Conduct Confirms the Court's Earlier Findings

In defense of their unconstitutional and illegal acts, Defendants previously argued that their challenged conduct was "merely guidance for executive agencies to use in evaluating federal funding to localities, not directives to freeze that funding," *see id.* at 34, and that the Court and

"sanctuary jurisdictions" should "essentially trust that the Government will abide by the law while it implements the President's directives," *see id.* at 126. Defendants' conduct since the issuance of the initial Preliminary Injunction underscores the hollowness of those arguments and further supports entry of preliminary relief to protect Additional Plaintiffs, should Defendants raise these arguments again.

EO 14,287—issued just days after entry of the initial Preliminary Injunction—threatens the same sort of broad-ranging termination of Additional Plaintiffs' federal funding that was threatened by EO 14,159 and EO 14,218. *See* ECF No. 151-8 at § 3. Further, the White House was not coy about that fact: EO 14,287 is—in the White House's own words—an effort to "rid the United States of sanctuary cities." *See* ECF No. 128-1 at 9. Yet, as with EO 14,159 and EO 14,218, Congress has not granted any authority to the President to sow budgetary chaos on "sanctuary jurisdictions" because of their laws and policies. *See, e.g.*, ECF No. 61 at 14–15 & n.7. Thus, as the Court found, if the government were to rely on EO 14,287 to suspend or terminate "all federal funds (or funds unrelated to sanctuary policies)" for jurisdictions deemed to be "sanctuary jurisdictions," that "would violate Constitution in the same way that the enjoined sections of EO 14,159 and EO 14,218 do." *See* ECF No. 136 at 7. But that is precisely how Defendants have continued to proceed.

Following the Court's ruling on EO 14,287, Plaintiffs were compelled to approach the Court again for relief, given DHS's, DOT's, and HUD's continued efforts to effectuate EO 14,159 and EO 14,218 via the Noem Directive, DHS Standard Terms, Duffy Letter, DOT Standard Terms, and immigration-related conditions in HUD CoC grants. *See* ECF No. 143 at 1–4. Despite the Court's order that "any" "agency directive that purports to attempt to cut off federal funding from [Defendant-identified] 'sanctuary' jurisdiction[s] in the wholesale, overly broad and unconstitutional manner threatened by [EO 14,159] and [EO 14,218]" would violate the

Preliminary Injunction, *see* ECF No. 136 at 8, Defendants have continued to impose immigration-related conditions across a swath of grant programs that were unrelated to immigration enforcement, without Congressional authorization to do so, *see* ECF No. 143 at 1–4.  That this "blunderbuss" approach violated the Preliminary Injunction was "obvious."  *See* ECF No. 147 at 2.  Yet Defendants have continued to require assent to these conditions to receive funds, *see supra* p. 15—putting the lie to Defendants' claims that EO 14,159, EO 14,218, the Bondi Directive, and Defendants' related conduct are mere directives and not concerted efforts to coerce jurisdictions into adopting Defendants' immigration enforcement priorities.

## II.    Plaintiffs Are Imminently and Irreparably Harmed by Defendants' Actions

The same conduct that caused the original Plaintiffs irreparable harm, *see* ECF No. 126 at 63, is now inflicting irreparable harm on Additional Plaintiffs—by upending their budgetary planning and spending decisions, suppressing their constitutional rights, and interfering with the trust they have built with their communities.  Each of these harms supports entry of preliminary relief.[20]  *See, e.g.*, ECF No. 126 at 63; *City & Cnty. of S.F.*, 897 F.3d at 1243–44; *Cnty. of Santa Clara*, 250 F. Supp. 3d at 537–38; *see also* ECF No. 61 at 22–25 (citing additional support).

To begin, any significant loss of federal funding would be devastating to Additional Plaintiffs' ability to serve their communities, and the threat of that loss has mired Additional Plaintiffs' budget and spending decisions in uncertainty.  As noted above, Additional Plaintiffs rely on federal dollars to fund a substantial portion of their budgets.  *See supra* note 18.  Those dollars, in turn, are used to provide essential safety-net, public health, education, housing, public safety, transportation, and economic development services, often to Additional Plaintiffs' most

---

[20] As noted in the original Plaintiffs' briefing and as found by the Court when it issued the initial Preliminary Injunction, these harms also establish Article III standing and justiciability.  See ECF No. 61 at 22–23 n.10 (citing *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1286–87 (9th Cir. 2013); *City & Cnty. of S.F.*, 897 F.3d at 1235–36; *Cnty. of Santa Clara*, 250 F. Supp. 3d at 514–30)); ECF No. 126 at 31–45.

vulnerable residents. *See supra* Background, Part III, pp. 10–15. Without federal funding, or even a material portion of it, Additional Plaintiffs' current and future budgets will be critically destabilized, forcing these jurisdictions to sharply curtail or end these essential services, terminate contracts and employees, and divert funding from other public goods. *See id.* at pp. 13–14. That looming threat is also causing harm now, given Additional Plaintiffs' inability to compensate for these threatened losses with local resources. *See id.* at pp. 14–15. As a result, Additional Plaintiffs' current budget and spending decisions are racked with uncertainty: Additional Plaintiffs must decide whether to terminate programs now or to pay for them with local funds, not knowing if they will receive reimbursement. *See id.* at p. 14. They must weigh whether preemptive cuts are warranted, given the increased difficulty of metabolizing losses later in the budget cycle. *See id.* at pp. 14–15. They are allocating limited staff resources to track the federal government's constantly shifting funding tactics. *See id.* at p. 14. And, in many cases, they are preemptively reducing spending to do what little they can to limit the threatened budgetary blow. *See id.* at p. 14. Ultimately, this uncertainty harms Additional Plaintiffs' ability to engage in long-term planning, to hire and retain qualified staff, and to adequately serve their communities. *See, e.g.*, *City & Cnty. of S.F.*, 897 F.3d at 1244; *Cnty. of Santa Clara*, 250 F. Supp. 3d at 526.

In addition, Defendants' conduct irreparably harms Additional Plaintiffs by depriving them of their constitutional rights. For the same reasons stated in the original Plaintiffs' preliminary injunction briefing, *see* ECF No. 61 at 24, Defendants are forcing Additional Plaintiffs to make a "Hobson's choice" between acceding to Defendants' unconstitutional demands and risking existential financial penalties., *id.* (citing *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1057–59 (9th Cir. 2009); *Cnty. of Santa Clara*, 250 F. Supp. 3d at 537–38). That choice has come into sharp relief since entry of the initial Preliminary Injunction, as Additional Plaintiffs have begun to receive grant agreements with illegal

immigration-related terms.  Each time Additional Plaintiffs weigh whether to put pen to paper to accept these agreements, or to deprive their communities of much-needed funding, Additional Plaintiffs' constitutional protections are chipped away.

Finally, for the reasons stated in the original Plaintiffs' preliminary injunction briefing, *see* ECF No. 61 at 24, Defendants' conduct irreparably harms Additional Plaintiffs by disrupting the trust they have built with their local communities.  Like the original Plaintiffs, Additional Plaintiffs have taken pains to ensure that members of their communities feel safe cooperating with local law enforcement and accessing local services.  *See, e.g.*, *supra* p. 4–5.  Having to violate that hard-earned trust by acceding to Defendants' immigration-enforcement commands constitutes irreparable harm.  *See* ECF No. 61 at 24 (citing *City of Los Angeles v. Sessions*, 2018 WL 6071072, at *3 (C.D. Cal. Sept. 13, 2018); *City of Chicago v. Sessions*, 264 F. Supp. 3d 933, 950 (N.D. Ill. 2017)).

**III.    The Balance of the Equities and the Public Interest Favor a Preliminary Injunction**

For the same reasons stated in the original Plaintiffs' initial preliminary injunction briefing, *see* ECF No. 61 at 25, and as found by the Court in its decision granting that injunction, *see* ECF No. 126 at 64, the equities and public interest tip decisively in Additional Plaintiffs' favor.  *See id.* (finding that the "public interest is served" by "clarity about . . . budgets and programmatic capacities" and noting a "strong interest in avoiding unconstitutional federal enforcement and the significant budget uncertainty" caused by Defendants' conduct).

**CONCLUSION**

Because this litigation should not proceed "with the coercive threat to end all federal funding hanging over" Additional Plaintiffs' "heads like the sword of Damocles," *see* ECF No. 136 at 1, Plaintiffs respectfully ask the Court to grant their motion for a second injunction.

Dated: July 29, 2025

DAVID CHIU
City Attorney
YVONNE R. MERÉ
Chief Deputy City Attorney
MOLLIE M. LEE
Chief of Strategic Advocacy
SARA J. EISENBERG
Chief of Complex and Affirmative Litigation
NANCY E. HARRIS
KARUN A. TILAK
Deputy City Attorneys

By: /s/ Karun A. Tilak
KARUN A. TILAK
Deputy City Attorney

Attorneys for Plaintiff
CITY AND COUNTY OF SAN FRANCISCO


TONY LOPRESTI
County Counsel
KAVITA NARAYAN
Chief Assistant County Counsel
MEREDITH A. JOHNSON
Lead Deputy County Counsel
STEFANIE L. WILSON
RAJIV NARAYAN
Deputy County Counsels
BILL NGUYEN
Litigation Fellow

By: /s/ Bill Nguyen
BILL NGUYEN
Litigation Fellow

Attorneys for Plaintiff
COUNTY OF SANTA CLARA

ROBERT TAYLOR
Portland City Attorney

By: /s/ Naomi Sheffield
NAOMI SHEFFIELD*
Chief Deputy City Attorney
1221 SW Fourth Avenue, Room 430
Portland, OR 97204
Tel: (503) 823-4047
Fax: (503) 823-3089
Naomi.Sheffield@portlandoregon.gov

*Admitted *pro hac vice*

Attorneys for Plaintiff
CITY OF PORTLAND


SHANNON BRADDOCK
King County Executive

By: /s/ David J. Hackett
DAVID J. HACKETT*
General Counsel to King County Executive
Chinook Building
401 5th Avenue, Suite 800
Seattle, Washington, 98104
(206) 477-9483
David.hackett@kingcounty.gov
PAUL J. LAWRENCE*
Pacifica Law Group
1191 2nd Avenue, Suite 2000
Seattle, WA 98101-3404
(206) 245-1708
Paul.Lawrence@pacificalawgroup.com

*Admitted *pro hac vice*

Attorney for Plaintiff
MARTIN LUTHER KING, JR. COUNTY

PATRICIA KING
New Haven Corporation Counsel

By: /s/ *Patricia King*
PATRICIA KING*
Office of the Corporation Counsel
City of New Haven
165 Church Street-4th Floor
New Haven, CT 06510
Tel:  203-946-7951
Cell: 203-668-9282
Fax:  203-946-7942
pking@newhavenct.gov

*Admitted *pro hac vice*

Attorney for Plaintiff
CITY OF NEW HAVEN


RYAN RICHARDSON
Oakland City Attorney

By: /s/ *Ryan Richardson*
RYAN RICHARDSON
City Attorney
MARIA BEE
Chief Assistant City Attorney
JAMIE HULING DELAYE
Supervising City Attorney
H. LUKE EDWARDS
Deputy City Attorney
One Frank H. Ogawa Plaza, 6th Floor
Oakland, CA 94612
Tel: (510) 238-6629
Fax: (510) 238-6500
Email: RRichardson@OaklandCityAttorney.org

Attorneys for Plaintiff
CITY OF OAKLAND

JOHN I. KENNEDY
City Attorney

By: /s/ *John I. Kennedy*
JOHN I. KENNEDY, City Attorney
1333 Park Ave, Emeryville, CA 94608-3517
Phone: 510-596-4381
Fax: 510-596-3724
Email: John.Kennedy@emeryville.org

Attorney for Plaintiff
CITY OF EMERYVILLE


NORA FRIMANN
City Attorney

By: /s/ *Nora Frimann*
NORA FRIMANN, City Attorney
ELISA TOLENTINO, Chief Deputy City Attorney
200 E Santa Clara St
San José, CA 95113-1905
Tel: 408-535-1900
Fax: 408-998-3131
cao.main@sanjoseca.gov

Attorneys for Plaintiff
CITY OF SAN JOSÉ


HEATHER FERBERT
City Attorney

By: /s/ *Mark Ankcorn*
MARK ANKCORN, Senior Chief Deputy City
Attorney
JULIE RAU, Deputy City Attorney
1200 Third Avenue, Suite 1100
San Diego, California 92101-4100
Tel: (619) 533-5800

Attorneys for Plaintiff
CITY OF SAN DIEGO

1

SUSANA ALCALA WOOD
City Attorney

2

By: /s/ *Andrea Velasquez*

3

ANDREA VELASQUEZ, Supervising Deputy
City Attorney

4

915 I St Fl 4, Sacramento, CA 95814-2621
Tel: 916-808-5346

5

Fax: 916-808-7455
Email: AVelasquez@cityofsacramento.org

6

7

Attorneys for Plaintiff
CITY OF SACRAMENTO

8

9

By: /s/ *Anthony P. Condotti*

Anthony P. Condotti, City Attorney

10

Catherine M. Bronson, Assistant City Attorney
Claire Hard, Deputy City Attorney

11

PO Box 481
Santa Cruz, CA 95061

12

Tel: 831-423-8383
Email: tcondotti@abc-law.com

13

chard@abc-law.com
cbronson@abc-law.com

14

15

Attorneys for Plaintiff
CITY OF SANTA CRUZ

16

17

SUSAN K. BLITCH
County Counsel

18

By: /s/ *Susan K. Blitch*

19

SUSAN K. BLITCH, County Counsel
HENRY BLUESTONE SMITH, Deputy County

20

Counsel
168 W Alisal St Fl 3rd

21

Salinas, CA 93901-2439
Tel: 831-755-5045

22

Fax: 831-755-5283
Email: SmithHB@countyofmonterey.gov

23

24

Attorneys for Plaintiff
COUNTY OF MONTEREY

25

26

27

28

ANN DAVISON
Seattle City Attorney

By: /s/ *Ann Davison*
Ann Davison, Seattle City Attorney*
Kerala Cowart, Assistant City Attorney*
Dallas LePierre, Assistant City Attorney*
Rebecca Widen, Assistant City Attorney*
Seattle City Attorney's Office
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
Tel: (206) 684-8200
E-mail: ann.davison@seattle.gov

*Admitted *pro hac vice*

Attorneys for Plaintiff
CITY OF SEATTLE


KRISTYN ANDERSON
City Attorney

By: /s/ *Kristyn Anderson*
KRISTYN ANDERSON (MN Lic. 0267752)*
SARA J. LATHROP, Assistant City Attorney (MN Lic. 0310232)*
SHARDA ENSLIN, Assistant City Attorney (MN Lic. 0389370)*
350 South Fifth Street
Minneapolis, MN 55415
Tel: 612-673-3000
Email: kristyn.anderson@minneapolismn.gov
sara.lathrop@minneapolismn.gov
sharda.enslin@minneapolismn.gov

*Admitted *pro hac vice*

Attorneys for Plaintiff
CITY OF MINNEAPOLIS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

LYNDSEY OLSON
City Attorney

By: /s/ *Lyndsey Olson*
LYNDSEY OLSON, City Attorney*
ANTHONY G. EDWARDS, Assistant City
Attorney*
400 City Hall and Courthouse
15 Kellogg Boulevard West
Saint Paul, Minnesota 55102
Tel: 651-266-8710
Fax: 651-298-5619
Email: Anthony.Edwards@ci.stpaul.mn.us

*Admitted *pro hac vice*

Attorneys for Plaintiff
CITY OF ST. PAUL

ERIN K. McSHERRY
City Attorney

By: /s/ *Erin K. McSherry*
ERIN K. McSHERRY, City Attorney*
200 Lincoln Avenue
Post Office Box 909
Santa Fe, NM 87504-0909
(505) 955-6512
Email: ekmcsherry@santafenm.gov

*Admitted *pro hac vice*

Attorney for Plaintiff
CITY OF SANTA FE

By: /s/ *Erin Monju*
ERIN MONJU*
KATHERINE COURTNEY (CA Bar No. 341165)
NAOMI TSU**
JILL HABIG (CA Bar No. 268770)
Public Rights Project
490 43rd Street, Unit #115
Oakland, CA 94609
Tel: (510) 738-6788
jill@publicrightsproject.org
naomi@publicrightsproject.org

*  *Pro hac vice* forthcoming; practicing under
supervision of D.C. Bar member pursuant to Local
Rule 49(c)(8) while application to the D.C. Bar is
pending
**Admitted *pro hac vice*

Attorneys for Plaintiffs
CITIES OF MINNEAPOLIS, NEW HAVEN,
PORTLAND, ST. PAUL, SANTA FE, and
SEATTLE

**FILER'S ATTESTATION**

I, KATHERINE COURTNEY, am the ECF user whose identification and password are being used to file this PLAINTIFFS' MOTION FOR SECOND PRELIMINARY INJUNCTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF. Pursuant to Civil Local Rule 5-1(i)(3), I hereby attest that the other above-named signatories concur in this filing.