DAVID CHIU, SBN 189542
City Attorney
YVONNE R. MERÉ, SBN 175394
Chief Deputy City Attorney
MOLLIE M. LEE, SBN 251404
Chief of Strategic Advocacy
SARA J. EISENBERG, SBN 269303
Chief of Complex and Affirmative Litigation
NANCY E. HARRIS, SBN 197042
KARUN A. TILAK, SBN 323939
Deputy City Attorneys
Fox Plaza
1390 Market Street, 7th Floor
San Francisco, CA  94102-5408
Telephone:     (415) 355-33308
Facsimile:     (415) 437-4644
E-Mail:        karun.tilak@sfcityatty.org

Attorneys for Plaintiff
CITY AND COUNTY OF SAN FRANCISCO

TONY LOPRESTI, SBN 289269
County Counsel
KAVITA NARAYAN, SBN 264191
Chief Assistant County Counsel
MEREDITH A. JOHNSON, SBN 291018
Lead Deputy County Counsel
STEFANIE L. WILSON, SBN 314899
RAJIV NARAYAN, SBN 334511
Deputy County Counsels
BILL NGUYEN, SBN 333671
Litigation Fellow
70 W. Hedding Street, East Wing, 9th Floor
San José, CA 95110
Telephone:     (408) 299-5900
Facsimile:     (408) 292-7240
E-Mail:        bill.nguyen@cco.sccgov.org

Attorneys for Plaintiff
COUNTY OF SANTA CLARA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CITY AND COUNTY OF SAN FRANCISCO,
COUNTY OF SANTA CLARA, et al.,

      Plaintiffs,

      vs.

DONALD J. TRUMP, President of the United
States, et al.,

      Defendants.

Case No. 25-CV-01350

**DECLARATION OF KATHERINE
COURTNEY IN SUPPORT OF PLAINTIFFS'
MOTION FOR SECOND PRELIMINARY
INJUNCTION**

Decl. of Katherine Courtney ISO
Plts.' Mot. for Second Prelim. Injunction

Case No. 25-CV-01350-WHO

I, Katherine Courtney, declare and state the following:

1.     I am an attorney and a member of the Bar of this Court.  I am a Staff Attorney with Public Rights Project, which is counsel of record for Plaintiffs Minneapolis, New Haven, Portland, St. Paul, Santa Fe, and Seattle in this action.  I state the matters herein of my personal knowledge.  If called on to do so, I could and would testify to them.

2.     Attached hereto as **Exhibit 1** is a true and correct copy of Alameda County Resolution 2013-142, titled "Resolution Regarding Civil Immigration Detainer Requests."

3.     Attached hereto as **Exhibit 2** is a true and correct copy of Alameda County Resolution 2016-274, titled "Resolution Regarding Upholding Due Process and Protecting Civil Rights of Immigrant Residents."

4.     Attached hereto as **Exhibit 3** is a true and correct copy of Resolution 2016-303, titled "A Resolution Designating Alameda County a Welcoming County for Immigrants and Refugees."

5.     Attached hereto as **Exhibit 4** is a true and correct copy of Alameda County Sheriff's Office General Order 1.24.

6.     Attached hereto as **Exhibit 5** is a true and correct copy of Albany Executive Order 1-17, "City of Albany Policy Regarding Community Policing and Protecting Immigrants."

7.     Attached hereto as **Exhibit 6** is a true and correct copy of Section 3-1-11 of the Albuquerque Code of Resolutions, titled "Immigrants and their Families."

8.     Attached hereto as **Exhibit 7** is a true and correct copy of Albuquerque Resolution 18-7, titled "Resolution Strengthening Albuquerque's Status as an Immigrant Friendly City, Promoting Public Safety, Safeguarding the Civil Rights, Safety, and Dignity of all our Residents and Creating an Environment Conducive to all Victims of Violent Crime Seeking Assistance."

9.     Attached hereto as **Exhibit 8** is a true and correct copy of Allegheny County Bureau of Corrections Policy No. 220.

10.     Attached hereto as **Exhibit 9** is a true and correct copy of Baltimore Police Department Policy 1021.

11.     Attached hereto as **Exhibit 10** is a true and correct copy of Bend City Council Resolution No. 3068, titled "A Resolution to Declare Bend a Welcoming City and Affirm Membership in the National Welcoming America Initiative."

12.     Attached hereto as **Exhibit 11** is a true and correct copy of Bend Police Department Policy 413.

13.     Attached hereto as **Exhibit 12** is a true and correct copy of Benicia City Council Resolution 17-13, titled ""Resolution Declaring the City of Benicia's Commitment of Being a Welcoming, Inclusive, Tolerant and Safe Community for Everyone."

14.     Attached hereto as **Exhibit 13** is a true and correct copy of Berkeley City Council Resolution No. 71,658-N.S., entitled "Reaffirming Berkeley as a Sanctuary City."

15.     Attached hereto as **Exhibit 14** is a true and correct copy of the Boston Trust Act, codified at Boston City Code Section 11-1.9.

16.     Attached hereto as **Exhibit 15** is a true and correct copy of Cambridge's Welcoming Community Ordinance, codified at Cambridge Municipal Code, Sec. 2.129.010.

17.     Attached hereto as **Exhibit 16** is a true and correct copy of Cathedral City Resolution No. 2017-19, titled "A Resolution of the City Council of the City of Cathedral City Proclaiming Sanctuary City Status."

18.     Attached hereto as **Exhibit 17** is a true and correct copy of Chicago's Welcoming City Ordinance, codified at Chapter 2-173 of the Chicago Municipal Code.

19.     Attached hereto as **Exhibit 18** is a true and correct copy of Columbus Executive Order 2017-01, titled "Reinforcing and Expanding City Immigration Policy for All Columbus Residents," codified at Section 161.10 of the Columbus Municipal Code.

20.    Attached hereto as **Exhibit 19** is a true and correct copy of Culver City Resolution No. 2017-R025, titled "A Resolution of the City Council of the City of Culver City, California, Declaring Culver City to be a Sanctuary City for all its Residents Regardless of Immigration Status."

21.    Attached hereto as **Exhibit 20** is a true and correct copy of a portion of the Dane County Sheriff's Office Booking Manual.

22.    Attached hereto as **Exhibit 21** is a true and correct copy of Denver Revised Municipal Code, Art. VIII, Sec. 28-250, *et. seq*.

23.    Attached hereto as **Exhibit 22** is a true and correct copy of Healdsburg Resolution No. 15-2017, titled "A Resolution of the City Council of the City of Healdsburg Acknowledging and Embracing the Community's Diversity; and Expressing the City's Commitment to Non-Discrimination and Inclusivity and to Enhancing and Protecting the Quality of Life of our Residents."

24.    Attached hereto as **Exhibit 23** is a true and correct copy of Hennepin County's Sheriff's Office Administrative Directive 21-02.

25.    Attached hereto as **Exhibit 24** is a true and correct copy of Los Angeles Municipal Code Sec. 19.190 *et seq*.

26.    Attached hereto as **Exhibit 25** is a true and correct copy of Marin County Board of Supervisors Resolution 2020-97, titled "Resolution of the Marin County Board of Supervisors Reaffirming Support for SB54, the California Values Act, Supporting Changes that Further Reduce Cooperation with Federal Immigration Enforcement, and Reaffirming Direction to all County Departments/Staff to Provide Services to all Marin Residents Regardless of Immigration Status."

27.    Attached hereto as **Exhibit 26** is a true and correct copy of Marin County Sheriff's Office's Policy 414, titled "Immigration Violations," which appears in the Marin County Sheriff's Office Policy Manual at pages 387-392.

28.    Attached hereto as **Exhibit 27** is a true and correct copy of Menlo Park Municipal Code Chapter 2.60, titled "Noncooperation with Sensitive Information Registry."

29.    Attached hereto as **Exhibit 28** is a true and correct copy of Multnomah County Board of County Commissioners Resolution 2016-132, titled "Resolution Declaring Multnomah County a Sanctuary County."

30.    Attached hereto as **Exhibit 29** is a true and correct copy of Pacifica Municipal Code Title 4, Chapter 17.

31.    Attached hereto as **Exhibit 30** is a true and correct copy of Petaluma City Council Resolution no. 2025-019 N.C.S., titled "A Resolution of the City Council of the City of Petaluma Reaffirming the City's Commitment to Immigrants, Inclusivity, and Compliance with California Law, Including Senate Bill 54."

32.    Attached hereto as **Exhibit 31** is a true and correct copy of Pierce County's Resolution R2025-139s, titled "A Resolution of the Pierce County Council Affirming Pierce County's Commitment to Public Safety, Equity, and Inclusive Access to County Services for Immigrants, Refugees and All Residents."

33.    Attached hereto as **Exhibit 32** is a true and correct copy of Richmond Ordinance No. 08-25 N.S.

34.    Attached hereto as **Exhibit 33** is a true and correct copy of Rochester City Council Resolution 2017-5, at pages 69-70, titled "Resolution affirming that Rochester is a Sanctuary City committed to equal rights for all."

35.    Attached hereto as **Exhibit 34** is a true and correct copy of San Mateo County Ordinance Code Section 2.48.010(a), titled "Non-Cooperation with Immigration Authorities."

36.    Attached hereto as **Exhibit 35** is a true and correct copy of Santa Rosa Police Department Policy 420.4.

37.     Attached hereto as **Exhibit 36** is a true and correct copy of Santa Rosa Resolution RES-2017-017, titled "Resolution of the Council of the City of Santa Rosa to Declare Itself an Indivisible City and Safeguard the Civil Rights, Safety and Dignity of All Santa Rosa Residents."

38.     Attached hereto as **Exhibit 37** is a true and correct copy of Sonoma County Board of Supervisors Resolution No. 25-0015, titled "Resolution of the Board of Supervisors to Uphold the Civil Rights, Dignity Health and Safety of Our Immigration Population and All Sonoma County Residents."

39.     Attached hereto as **Exhibit 38** is a true and correct copy of Watsonville Ordinance No. 1353-17, titled "An Uncodified Ordinance of the City Council of the City of Watsonville Relating to the City's Procedures Concerning Federal Immigration Law and Reaffirming its Declaration as a Sanctuary for All its Residents."

40.     Attached hereto as **Exhibit 39** is a true and correct copy of Wilsonville City Council Resolution No. 2626, titled "A Resolution Declaring the City of Wilsonville a Welcoming and Inclusive City."

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, and that this declaration was executed in Washington, D.C., on July 29, 2025.

KATHERINE COURTNEY

# EXHIBIT 1



# BOARD OF SUPERVISORS

### RICHARD VALLE
Supervisor, District 2

Agenda ____ **April 23, 2013**

Revised

April 17, 2013

The Honorable Board of Supervisors
County Administration Building
1221 Oak Street
Oakland, CA 94612

Dear Board Members:

**Subject:** **Approve the Resolution Regarding Civil Immigration Detainer Requests**

## RECOMMENDATION:

It is recommended that your Board approve the Resolution Regarding Civil Immigration Detainer Requests to recognize that ICE Detainer requests are not mandatory but discretionary as stated by ICE and California Attorney General Kamala Harris. Detainer requests are issued by U.S. Immigration and Customs Enforcement (ICE) to detain individuals at local jails to allow ICE to determine if immigration enforcement is needed. The detainers often extend the individual's sentence and results in additional County costs, family separations and distrust among immigrant communities toward the County and Sheriff's Office.

## DISCUSSION/SUMMARY:

We are a country of immigrants. Many immigrants do the work and have jobs that are low paying service industry jobs and they work hard for themselves and their families. Working hard to support our family is the cornerstone of our country. I believe hard work should be rewarded with great benefits regardless of immigration status. California is very quickly becoming a majority-minority state and Alameda County is home to persons of diverse racial, ethnic, and national backgrounds, including many immigrants. Approximately 31% of all County residents are foreign born, and approximately 43% speak a language other than English at home, and approximately 55% of children in the County live in families with at least one foreign-born parent.

The federal immigration enforcement program which has been labeled "Secure Communities" enlists our local law enforcement to engage in federal civil immigration enforcement and this has shown to be problematic. For example, people in immigration proceedings don't have a right to legal counsel. Too many people are deported unjustly because of this flawed program "Secure Communities." It becomes easy then to deport people causing the families to be separated. Everyone deserves a fair trial and a fair hearing. The immigration policy of the country is in need of repair. Supporting this resolution is one way that Alameda County can have a voice.

Alameda County effectuates deportation of community members by treating "ICE holds" as mandatory, when the California Attorney General and Immigration and Custom Enforcement (ICE) have gone on record stating they are merely *requests*.

Individuals with an "ICE hold" or "detainer" spend, on average, 7 days longer in Alameda County than similarly situated individuals without an "ICE hold". This is a financial burden on our County and brings hardship to families who are separated from their loved ones.

Public safety is a shared responsibility between the Sheriff and the Board of Supervisors and both the Sheriff and Board of Supervisors must cooperate to maintain public safety.

I ask the Board to support the resolution stating the Alameda County Board of Supervisors does not support any law enforcement policy that denies due process or equal protection based on an individual's civil immigration status and that the Board does not support the use of the Sheriff's Office personnel and County resources responding to ICE unless ICE agents have a criminal warrant. The resolution also states that the Board does not support ICE agents being given access to inmates held in criminal custody or using County facilities for investigative interviews with such inmates.

## SELECTION CRITERIA
*N/A*

## FINANCING:
Approval of the attached resolution will have no impact on the County General Fund.

Sincerely,

Richard Valle
Supervisor, District 2

cc:  Auditor-Controller
     County Administrator
     County Counsel

RESOLUTION NUMBER:  R-2013-
**Resolution Regarding Civil Immigration Detainer Requests**

*WHEREAS*, the County of Alameda is home to persons of diverse racial, ethnic, and national backgrounds, including many immigrants; and

*WHEREAS*, approximately 31% of all County residents are foreign born, and approximately 43% speak a language other than English at home, and approximately, 55% of children in the County live in families with at least one foreign-born parent; and

*WHEREAS*, the Board of Supervisors recognizes that fostering a relationship of trust, respect, and open communication between County employees and County residents is essential to the County's core mission of ensuring public safety and serving the needs of the entire community; and

*WHEREAS*, the federal immigration enforcement program which has been labeled "Secure Communities" enlists local law enforcement to engage in federal civil immigration enforcement through the sharing of biometric data at the point of arrest and/or booking at county jails undermines this trust and harms public safety by increasing fear in immigrant communities of coming forward to report crimes and cooperate with local law enforcement; and

*WHEREAS*, public safety is a shared responsibility between the Sheriff and the Board of Supervisors and both the Sheriff and Board of Supervisors must cooperate to maintain public safety; and

*WHEREAS*, "Secure Communities" results in the deportation of many individuals who have no criminal conviction on their record, and in Alameda County as of January 2013, 76% percent of the 1,947 Alameda County residents deported through "Secure Communities" had no criminal convictions or had convictions involving only minor offenses[i]; and

*WHEREAS*, "Secure Communities" has resulted in the separation of families, more than one-third of those targeted by "Secure Communities" have a U.S. citizen spouse or child, meaning that approximately 88,000 families with U.S. citizen members have been negatively impacted by "Secure Communities" nationwide; and

*WHEREAS*, Immigration and Customs Enforcement (ICE) has falsely detained approximately 3,600 U.S. citizens as a result of "Secure Communities"[viii]; and

*WHEREAS*, impacted communities are concerned that "Secure Communities" incentivizes racial profiling, including the disproportionate targeting of Latino men, and that Latinos make up 93% of those detained through "Secure Communities" although they account for only 75% of the undocumented population in the U.S.[iii]; and

*WHEREAS*, involvement in civil immigration enforcement diverts limited local resources away from other county priorities because ICE requests result in additional incarceration costs resulting from additional incarceration time[iv] in comparison to those without ICE requests, which is not reimbursed by the Federal Government, aside from partial reimbursement from State Criminal Alien Assistance Program (SCAAP) funding, the requirements for which do not cover all ICE requests[v], and the average reimbursement amount which covers only a fraction of incarceration costs[vi]; and

*WHEREAS*, the enforcement of immigration laws is a responsibility of the federal government; and

*WHEREAS*, Alameda County effectuates deportation of community members by treating "ICE holds" as mandatory, when the California Attorney General and ICE have gone on record stating they are merely *requests* for local law enforcement to advise immigration authorities when an individual is due to be released from custody and to hold the individual beyond the scheduled time of release in order for ICE to arrange to assume custody to initiate deportation proceedings[vii]; and

*WHEREAS*, individuals with an "ICE hold" or "detainer" spend, on average, 7 days longer in Alameda County than similarly situated individuals without an "ICE hold"[viii]; and

*WHEREAS*, "ICE holds" have been improperly issued by ICE and have even been imposed on U.S. citizens by mistake, as well as on immigrants who are not deportable; and

*WHEREAS*, ICE will not indemnify local agencies for costs or liability incurred as a result of wrongfully placed "ICE holds"; and

*WHEREAS*, "ICE holds" requests result in the use of local resources including jail space and jail staff, but the federal government does not fully reimburse for those costs[ix]; and

*WHEREAS*, the federal government spends more on civil immigration enforcement than all federal criminal law enforcement combined[x] and therefore, limited local funds should not be expended to further federal civil immigration enforcement efforts, but rather on essential local County programs; and

*WHEREAS*, the Board of Supervisors acknowledges that California law authorizes the Sheriff to exercise independent, constitutionally and statutorily designated functions that this Board may not obstruct, and recognizes that the decision to comply with ICE detainer requests is discretionary and is within the Sheriff's sole and exclusive authority to keep the jail and the prisoners in it,

**NOW, THEREFORE BE IT RESOLVED, THAT:**
   A.  By means of this resolution, Alameda County stands in support of states, counties, and cities across the nation including Berkeley, California, Cook County, Illinois and Santa Clara County, California, that are informed about the discretionary nature of "ICE holds" and therefore decline to enforce them.
   B.  The Alameda County's Sheriff's role is to reduce crime and protect public safety while respecting the constitutional principles of equal protection and due process of law for all individuals.
   C.  The Board of Supervisors does not support any law enforcement policy that would deny or limit due process of law or equal protection of the laws to any individual because of the individual's civil immigration status or the presence of any Immigration Customs and Enforcement (ICE) hold "request," also known as a federal immigration detainer.
   D.  The Board of Supervisors encourages the Sheriff not to honor requests by the United States Immigration and Customs Enforcement (ICE) to detain an inmate for suspected violations of civil federal immigration law.
   E.  The Board of Supervisors does not support the use of Sheriff's Office personnel and County time or resources responding to ICE inquiries or communicating with ICE regarding individuals' incarceration status or release dates, unless ICE agents have a criminal warrant, or the Sheriff's Office has a legitimate law enforcement purpose that is not related to the enforcement of immigration laws, nor does this Board support ICE agents being given access to inmates held in criminal custody or using County facilities for investigative interviews with such inmates.

**PASSED AND ADOPTED** by the Board of Supervisors of the County of Alameda, State of California, on _____, 2013 by the following vote:

AYES:
NOES:
EXCUSED:

KEITH CARSON, President
Board of Supervisors

ATTESTED TO:

_____
Clerk of the Board of Supervisors

APPROVED AS TO FORM
Donna R. Ziegler, County Counsel
By: _____  County Counsel

[i] Immigration and Customs Enforcement, *Secure Communities Monthly Statistics through January 31, 2013 IDENT/IAFIS Interoperability* (January 2013), http://www.ice.gov/doclib/foia/sc-stats/nationwide_interop_stats-fy2013-to-date.pdf.

[ii] Chief Justice Earl Warren Institute on Law and Social Policy, University of California, Berkeley Law School, "Secure Communities by the Numbers: An Analysis of Demographics and Due Process," October 2011 (finding based upon federal data that approximately 3,600 United States citizens have been arrested by ICE through the Secure communities program).

[iii] *Id.*

[iv] Judith A. Greene, *The Cost of Responding to Immigration Detainers in California, Preliminary Findings,* Justice Strategies, August 22, 2012; Kathy A. White & Lucy Dwight, *Misplaced Priorities: SB90 & The Costs to Local Communities,* The Colorado Fiscal Institute (December 1, 2012).

[v] SCAAP funding is limited to covering incarceration costs incurred for *undocumented* people who have received at least one felony or two misdemeanor *convictions* and have been incarcerated for at least four consecutive days. Bureau of Justice Assistance, State Criminal Alien Assistance Program (SCAAP), Updated Requirement's for Fiscal year 2012, available at: https://www.bja.gov/Funding/12SCAAP_Guidelines.pdf.

[vi] According to the Department of Justice, the average 2012 per diem cost reimbursed by SCAAP was $28.16. Bureau of Justice Assistance, State Criminal Alien Assistance Program (SCAAP), Updated Requirement's for Fiscal year 2012, available at: https://www.bja.gov/Funding/12SCAAP_Guidelines.pdf.

[vii] Attorney General Kamala Harris, Attorney General, *Responsibilities of Local Law Enforcement Agencies under Secure Communities,* Information Bulletin, December 4, 2012.

[viii] Letter from Sheriff Ahern to ACLU April 11, 2012 response to Information Request Item 3: D: Average total length of incarceration of an inmate subject to ICE detainer: **27days** vs. **22 days** for an inmate not subject to ICE detainer:

[ix] Letter to Miguel Marquez, County Counsel, County of Santa Clara, from David Venturella, Immigration and Customs Enforcement Assistant Director, dated 2010 (stating that "[p]ursuant to 8 C.F.R. section 287.7(e), ICE is not responsible for incarceration costs of any individual against whom a detainer is lodge until 'actual assumption of custody'").

[x] Doris Meissner et al., *Immigration Enforcement in the United States: The Rise of a Formidable Machinery,* Migration Policy Institute (January 2013), http://www.migrationpolicy.org/pubs/pillars-reportinbrief.pdf

# EXHIBIT 2

## COUNTY OF ALAMEDA BOARD OF SUPERVISORS

### RESOLUTION NUMBER: 2016-274

**Resolution Regarding Upholding Due Process and Protecting Civil Rights of Immigrant Residents**

***WHEREAS,*** there has been a vicious flare of anti-immigrant sentiment in the United States, with political figures demonizing Latino immigrants by using racist and xenophobic rhetoric, inspiring hate crimes based on perceived immigration status[1]; and

***WHEREAS***, federal immigration raids across the country, a practice which the current Presidential Administration has said that it will continue, have spurred an additional wave of fear and panic among immigrant communities; and

***WHEREAS,*** the County of Alameda is home to persons of diverse racial, ethnic, and national backgrounds, including many immigrants, which is a great cause for celebration and creates diversity and strengthens our democracy; and

***WHEREAS***, approximately 31% of all County residents are foreign born[2], hailing from Latin America, Asia, Africa, and beyond, and approximately 43% speak a language other than English at home[3], and approximately 53% of children in the County live in families with at least one parent born outside the U.S[4].; and

***WHEREAS***, the County aspires to be a model for inclusion and equity for all populations, including immigrants, refugees, and other newcomers, through its commitments to support the ongoing inclusion and long-term economic and social integration of newcomers; and

***WHEREAS***, the Board of Supervisors recognizes that fostering a relationship of trust, respect, and open communication between County employees and County residents is essential to the County's core mission of ensuring public safety and serving the needs of the entire community; and

***WHEREAS***, racial disparities in the nation's criminal justice system and a system increasingly referred to as "mass incarceration" have received unprecedented national attention; and

***WHEREAS***, the Alameda County Sheriff's Office and Alameda County Probation Department both report significant reductions in incarceration and detention rates; and

---

[1] Telesur, "4 Examples of Trump-Inspired Hate Crimes", (March 1, 2016) *available at* http://www.telesurtv.net/english/news/4-Examples-of-Trump-Inspired-Hate-Crimes-20160301-0030.html

[2] U.S. Census *available at* https://www.census.gov/quickfacts/table/VET605214/06001

[3] U.S. Census *available at* https://www.census.gov/quickfacts/table/HSD410214/06001

[4] Kids Data *available at* http://www.kidsdata.org/topic/573/foreign-parents250/table#fmt=786&loc=127&tf=79&sortColumnId=0&sortType=asc

***WHEREAS***, The County, including the District Attorney's Office, the Public Defender's Office, the Alameda County Sheriff's Office and the Probation Department, has a long-standing commitment to the rehabilitation of residents who have had criminal offenses, including through the support of State advances such as Prop 47 and AB-109 which stand for second chances, and recognize the full humanity and potential of such individuals; and,

***WHEREAS***, the State of California has enacted legislation ensuring that immigrant victims and witnesses to violent crime have equal access to justice,[5] prosecutors consider the immigration consequences of a noncitizen defendant's criminal charges in furtherance of justice,[6] and the confidentiality of all juvenile information and records is protected from federal officials regardless of immigration status[7]; and,

***WHEREAS***, the District Attorney's Office created the First Victim-Witness Assistance Program in the nation that provides services and support to all victims of crime and the Alameda County Justice Center that provides services to victims of domestic violence and their children and victims of sexual assault and child sexual abuse, to victims of human trafficking of all forms, to elders who have suffered abuse at the hands of another; and,

***WHEREAS***, the District Attorney's Office assists victims, irrespective of their legal status in the U.S., in obtaining U-Visas and T-Visas so victims of domestic violence and human trafficking can stay in the country and receive public benefits; and,

***WHEREAS***, the Board has previously resolved that federal deportation programs that enlist local law enforcement to enforce federal civil immigration law undermine community trust, have resulted in the separation of families, and have raised serious civil liberties, racial profiling, local resource, and liability concerns[8]; and,

***WHEREAS***, after years of advocacy, the Department of Homeland Security acknowledged significant opposition to and fundamental flaws with the "Secure Communities" program, but rather than discontinuing the program, it recreated S-Comm's flaws in the Priority Enforcement Program (PEP) which continues to facilitate the transfer of individuals to ICE in a flawed fashion, and with the voluntary cooperation of local law enforcement; and

***WHEREAS,*** current Alameda County Sheriff's Office (ACSO) policy allows deputies to respond to ICE Requests for Notification, which are voluntary in nature, and also permits deputies in Alameda County jails to affirmatively inform ICE about the immigration status of particular individuals and the scheduled release time of those individuals so that ICE can detain them upon their release from ACSO custody;[9] and

---

[5] Cal. Penal Code §679.10

[6] Cal. Penal Code §§ 1016.2 and 1016.3

[7] Cal. Welfare & Institutions Code § 831

[8] Resolution Regarding Civil Immigration Detainer Requests, April 23, 2013

[9] General Order 1.24, revised July 6, 2015 Sec. IV(E)(2) and (3).

*WHEREAS,* The Board of Supervisors has previously resolved that it "does not support the use of Sheriff's Office personnel and County time or resources responding to ICE inquiries or communicating with ICE regarding individuals' incarceration status or release dates," absent a criminal warrant or a legitimate law enforcement purpose unrelated to immigration laws, and does not "support ICE agents being given access to inmates held in criminal custody or using County facilities for investigative interviews with such inmates;"[10] and,

*WHEREAS,* any cost associated with involvement with ICE is generally passed on to the county, including costs brought on by exposure to legal liability, despite the fact that federal immigration enforcement is extremely well funded, with the U.S. spending 18 billion on immigration enforcement in 2012 alone;[11] and,

*WHEREAS,* ensuring the health, well-being, and civil rights of all people regardless of their immigration status, through a dynamic and responsive process that respects the community's diversity, is a shared responsibility between the Board, the Sheriff, and County agencies;

**NOW, THEREFORE BE IT RESOLVED, THAT:**

A.    The Board acknowledges the discretionary nature of any entanglement with federal immigration authorities including but not limited to, responding to "ICE Requests for Notification", to ICE hold or detainer requests, "ICE warrants," as well as providing ICE access to interview inmates and access to local databases, and expresses its opposition to the entanglement of County law enforcement departments, agencies, offices, officers, and employees with the enforcement of civil federal immigration laws.

B.    The Board expresses its opposition to any County law enforcement department, agency, office, officer, or employee initiating any inquiry or enforcement action based solely on a person's actual or suspected immigration status, national origin, race, ethnicity, and/or English proficiency.

C.    The Board of Supervisors does not support any law enforcement policy that would deny or limit due process of law or equal protection of the laws to any individual because of the individual's civil immigration status or the presence of any Immigration Customs and Enforcement (ICE) "notification request."

D.    The Board expresses its opposition to the use of County funds, resources or personnel by any County law enforcement department, agency, or office to investigate, question,

---

[10] Resolution Regarding Civil Immigration Detainer Requests, April 23, 2013

[11] In 2012, the U.S. spent 18 billion on immigration enforcement. This is more than was spent on the FBI, DEA, Secret Service, and all other federal criminal law enforcement agencies combined. Doris Meissner et al., Immigration Enforcement in the United States: The Rise of a Formidable Machinery, Migration Policy Institute (January 2013), http://www.migrationpolicy.org/pubs/pillars-reportinbrief.pdf

apprehend, or arrest an individual for an actual or suspected civil violation of federal immigration law.

E.    The Board of Supervisors reaffirms that it does not support the use of any county agencies' personnel, time or resources in initiating contact with ICE. The Board further states that unless ICE agents have a valid judicial warrant, or County officials have a legitimate law enforcement purpose that is not related to the enforcement of civil immigration laws, ICE agents should not be given access to individuals or be allowed to use County facilities for investigative interviews or other purposes, and the Board does not support County agencies' personnel expending County time or resources responding to ICE inquiries or communicating with ICE regarding individuals' current criminal case status including pending criminal charges, probation status, incarceration status, or release dates.

F.    The Board reaffirms that, with regard to juveniles, the Probation Office and all other county offices should continue to respect juvenile confidentiality for all minors regardless of immigration status pursuant to the recently enacted California Welfare & Institutions Code § 831, which prohibits agencies from sharing any juvenile information or records with federal officials including Department of Homeland Security and ICE except where there is a court order signed by the juvenile court allowing for the sharing of designated information and files.

G.    The Board supports the District Attorney's Office's commitment to continue to consider the avoidance of adverse immigration consequences in the plea negotiation process as one factor in an effort to reach a just resolution in the case of a noncitizen defendant pursuant to the recently enacted California Penal Code § 1016.3.

H.    The Board supports that all County law enforcement agencies will continue to support immigrant crime victims and witnesses and encourage them to come forward to report crime by providing certification of their cooperation (which is needed to obtain humanitarian visas known as the "U Visa") in a fair and timely manner, pursuant to the newly enacted Cal. Penal Code § 679.10.

I.    The Board supports the Public Defender's efforts to provide representation to immigrants facing deportation through their Immigration Representation Project.

J.    The Board supports efforts to bring immigrants, refugees and other newcomers together with the broader community to develop policies, programs, and initiatives that build welcoming communities.

K.    The Board urges the Obama administration to suspend "PEP" and similar initiatives.

L.    The Board commits to continuing a dialogue with all stakeholders in Alameda County concerning inequities in the nation's criminal justice and incarceration systems.

**THE FOREGOING was PASSED and ADOPTED by a majority vote of the Alameda County Board of Supervisors this** _13th_ **day of September 2016, by the following vote:**

**AYES:** Supervisors Carson, Chan, Miley, Valle & President Haggerty

**NOES:**    None

**EXCUSED:**    None

**Scott Haggerty**
**PRESIDENT, BOARD OF SUPERVISORS**

**Attest:**
Clerk, Board of Supervisors

By _____

**Approved as to Form:**
Donna R. Ziegler
County Counsel

_____
Donna R. Ziegler

EXHIBIT 3

# Wilma Chan, SUPERVISOR, THIRD DISTRICT

ALAMEDA COUNTY BOARD OF SUPERVISORS

COMMITTEES:
Health, Chair
Personnel & Legislative
Unincorporated Services

September 20, 2016

Honorable Board of Supervisors
Alameda County Administration Building
1221 Oak Street
Oakland, CA 94612

Dear Board Members:

**SUBJECT:  Adopt a Resolution Designating Alameda County a Welcoming County for Immigrants and Refugees**

RECOMMENDATION:
It is recommended that the Board of Supervisors adopt a resolution declaring Alameda County a Welcoming County for immigrants and refugees; promoting the value of immigrant integration efforts; and supporting a comprehensive planning process that engages immigrants, refugees, and the broader community in the development of policies, programs, and initiatives that build welcoming communities.

DISCUSSION/SUMMARY:
Alameda County is now the fourth most diverse county in the United States, and is trending towards even greater diversity. In 2014, approximately 31 percent of Alameda County's 1.6 million residents were foreign born. The percentage of foreign-born was even higher in cities like Union City (46 percent), Fremont (44 percent), Hayward (38.1 percent), San Leandro (35.4 percent), and Montclair (34.5 percent).[1]

In Alameda County, many of the growing number of foreign-born residents, especially those who are Limited English Proficient (LEP), live at or below 200 percent of the Federal Poverty Threshold. They also face significant barriers to employment, education, language access, health care access, affordable housing, and cultural integration. Unfortunately, the current system of services and providers who work with immigrant and refugee communities is fragmented and lacks a proactive, coordinated strategy that can effectively address these barriers and meet the needs of the immigrant and refugee population.[2]

In 2016, *Building Home Together*—a network of community-based organizations, community leaders, advocates, and systems serving the immigrant and refugee community—came together to organize a campaign for Alameda County and area cities to formally adopt a resolution that prioritizes being welcoming communities for immigrants and refugees and supports their efforts to create a comprehensive plan that will address the needs of immigrant and refugee communities.

---

[1] United States Census Bureau, 2010-2014 Population Estimates.
[2] Position Paper: A Newcomer Immigrant and Refugee Welcome Center in Alameda County, Prepared by Community Health for Asian Americans (CHAA), April 22, 2015.



# Wilma Chan, SUPERVISOR, THIRD DISTRICT

ALAMEDA COUNTY BOARD OF SUPERVISORS

COMMITTEES:
Health, Chair
Personnel & Legislative
Unincorporated Services

On July 25, 2016, the Joint Health and Social Services Committee heard a presentation by *Building Home Together* on why Alameda County should become a "Welcoming County," and advanced the resolution before you to the full Board of Supervisors for consideration. The Power Point presentation, supporting materials, and resolution are attached to this board letter.

Recognizing that Alameda County seeks to promote inclusivity, diversity, and equity and that immigrants and refugees contribute significantly to the social, civic, and economic fabric of our County, I respectfully request the Board support the resolution declaring Alameda County a Welcoming County for immigrants and refugees.

<u>FINANCING:</u>
There is no fiscal impact to this resolution at this time.

Respectfully,

Wilma Chan



# A Welcoming County Resolution for Alameda County

Presentation to Alameda County Board of Supervisors' Joint Health and Social Services Committee

July 25, 2016

Presenters: Amanda Irwin (Community Mobilization Manager, Centro Legal de la Raza), Beatrice Lee (Executive Director, Diversity in Health Training Institute), Sean Kirkpatrick (Co-Founder and Member, Building Home Together) on behalf of the Building Home Together Collaborative



# Building Home Together

- A collaborative of immigrant and refugee-serving organizations, community leaders, advocates and systems with shared concerns about the state of immigrant and refugee community wellbeing in Alameda County established in May 2015
- **Goal:** to lift up and support the leadership, visibility and voices of diverse immigrant and refugee communities in Alameda County towards systems change
- We seek changes in policy and praxis including:
    - addressing **language access** barriers to services and **participation in civic life;**
    - improving **coordination of services and resources** for immigrants and refugees across all systems;
    - improving **cultural competency and understanding of immigrant and refugee communities** for organizations and systems that support their wellbeing; and
    - strengthening **accountability through policies and infrastructure** built to maintain the highest overall quality of attention to immigrant and refugee community needs and aspirations

## Context



- As of 2014, the **foreign-born population in Alameda County** represents **34% or around 500,000 residents**, and that number is growing (up from 27% in 2008)
- Alameda County is the **4th most diverse County in the United States**
- **Broader efforts to create welcoming communities nationally: Building Welcoming Communities** Initiative (Federal, out of the White House Task Force on New Americans) and **Welcoming America** (non-profit, supporting welcoming initiatives throughout the US and in Europe)
- **Current environment** of anti-immigrant, anti-refugee, anti-Muslim, and anti-undocumented rhetoric
- **Opportunity for Alameda County** to become a model for the region and nation in how to embody what a welcoming community can look like in practice

## Foreign-Born by District and City (population estimates July 1, 2014)



| **District** | **% Foreign Born by City** |
|---|---|
| District 1 (Sup. Haggerty) | Fremont (44%), Dublin (28.7%) |
| District 2 (Sup. Valle) | Hayward (38.1%), Union City (46%), Fremont (44%), Newark (34.6%) |
| District 3 (Sup. Chan) | Alameda (26.7%), San Leandro (35.4%), Oakland (27.1%), San Lorenzo (32.6%) |
| District 4 (Sup. Miley) | Oakland (27.1%), Montclair (34.5%), Ashland (32.5%), Pleasanton (25.1%) |
| District 5 (Sup. Carson) | Oakland (27.1%), Albany (32.2%), Emeryville (26.6%) |

## Initiatives in the Bay Area



**Building Home Together**

- San Francisco City and County
  - Immigrant Affairs Office since late 1980s housed in GSA-City Administrator's office
  - Welcoming America municipality
- Santa Clara County
  - Strong pro-immigrant policies since 1996 with Office of Immigrant Affairs established in 2015 within County's Executive Office in response to Obama's executive order for DACA
- San Jose, CA
  - Office of Immigrant Affairs recently established in response to Obama's executive order for DACA
  - Welcoming America municipality
- Oakley, CA
  - Building Welcoming Communities municipality

## Purpose of a Welcoming County Resolution

**Building Home Together**

- **Affirm that Alameda County is a Welcoming County;**
- **Define and promote the value** among all residents **of advancing efforts for integrating immigrant and refugee communities,** recognizing that a community is strongest when everyone feels welcomed;
- **Provide a foundation for bringing immigrants and refugees and the broader community together** to develop policies, programs, and initiatives that build welcoming communities, and provide all residents with the knowledge and tools to thrive and fully participate in their communities;
- Support the Building Home Together collaborative in its efforts to **engage the entire community in a comprehensive planning process that will examine the issues, challenges and aspirations of Alameda County's foreign born immigrant and refugee communities,** examine the systems, structures, resources and programs that support them, and explore new models for effectively serving immigrant, refugee, and newcomers needs.

## Asks



Building
Home
Together

- That the Joint Health and Social Services Committee **support the adoption of the Welcoming County Resolution**;

- That the full Board of Supervisors **adopt the Welcoming County Resolution at the first available public BOS meeting in September 2016**, preferably during or near National Welcoming Week (Sept. 16-25, 2016).



Building
Home
Together

# Questions and Answers



**Building Home Together**

# B H T

## Thank you for your leadership and support!

Contact: buildinghometogether@gmail.com or (510) 282-7550

**Our Vision for Change**

Building Home Together sees this work as healing. Our shared vision for change includes the intersection of work, health, legal rights and protections, visibility and community empowerment as they impact all immigrants and refugees. Our efforts seek changes in policy and praxis including addressing language access barriers to services and participation in civic life, improving coordination of services and resources for immigrants and refugees across all systems, improving cultural competency and understanding of immigrant and refugee communities for organizations and systems that support their wellbeing, and strengthening accountability through policies and infrastructure built to maintain the highest overall quality of attention to immigrant and refugee community needs and aspirations.

**Change Involves Us All**

Building Home Together recognizes that the way our most vulnerable individuals and communities fair impacts and implicates everyone. Working on the quality of life for immigrants and refugees requires building relationships across communities, building allies and being allies for social justice and health equity. It requires creating spaces for curiosity, dialogue and deep sharing, building trust, deepening mutual understandings, cultivating durable relationships, and shifting from a culture that promotes divisiveness and competitiveness between communities to a culture of building, together, a community that is home for everyone.

**First Steps**

In 2016, Building Home Together is organizing a campaign for the County and area cities to formally adopt a resolution that prioritizes being welcoming communities for immigrants and refugees. As part of this request, we are asking for investment in a process that will engage the diverse stakeholders necessary to create a comprehensive plan to address the needs of immigrant and refugee communities, **including pushing for the establishment of a Newcomer Immigrant and Refugee Welcome Center** that will serve as a hub for communities and the network of organizations and systems that advocate for and serve them and an **Office of Immigrant and Refugee Affairs** in Alameda County to hold their needs as a priority.

Immigrant Services Comparison

| Topic Area | San Francisco | Santa Clara | San Jose |
|---|---|---|---|
| Total population | 852K | 1.9M | 1M |
| Foreign-born residents make up 1/3 or more of the population | 37% | 36% | 38.7% |
| Immigrant affairs office | Housed in GSA-City Administrator's office since late 1980's | Strong pro-immigrant policies since 1996 with Office of Immigrant Affairs established in 2015 within County's Executive Office in response to Obama's executive order for DACA | Office of Immigrant Affairs recently established in response to Obama's executive order for DACA |
| Immigrants Affairs Office comprise approximately $1.8-$2.2 M of the county's budgets | 1.8M | 2.2M | 250K + 500K from Santa Clara County! |
| Services of the office | Civic engagement, community safety, grantmaking, integrated immigrant services, language access | Immigration reform, coordination of services, immigrant integration, research on community needs, community awareness of immigrant contributions | Welcoming Immigration Plan to address: Equitable access and civic engagement, economic opportunity, education and safe, healthy & connected communities. |
| Needs assessments | Contributes 50% of total funding for a 3-year public-private partnership between the city and 6 philanthropic organizations, the SF Pathways to Citizenship Initiative. The first year is a pilot needs assessment phase | Committed $500k to conduct a two-year assessment of human needs of immigrants | Working on a three-year immigrant integration plan beginning August 2015 |

THE BOARD OF SUPERVISORS OF THE COUNTY OF ALAMEDA, STATE OF CALIFORNIA

RESOLUTION NUMBER 2016- 303

A RESOLUTION DESIGNATING ALAMEDA COUNTY A WELCOMING COUNTY FOR IMMIGRANTS AND REFUGEES

**WHEREAS**, a collaborative of community, non-profit, agency, and other stakeholders have established Building Home Together, a multi-sector initiative to create a vision and strategy for expanding opportunities for New Americans and all other residents in Alameda County, and supporting the leadership, visibility, and voices of the County's diverse immigrant and refugee communities; and

**WHEREAS**, the building of a welcoming community is fundamental to a vibrant and inclusive Alameda County, assuring immigrants, refugees, and other newcomers opportunities for economic security, empowerment, civic engagement, safety and freedom from discrimination, oppression and violence; and

**WHEREAS**, a welcoming community addresses language and cultural access barriers to services and participation in civic life, promotes coordination of services and resources for immigrants and refugees across all systems, champions cultural competency and understanding, and strengthens accountability to maintain the highest quality of services for immigrant and refugee communities; and

**WHEREAS**, Bay Area communities are the most equitable when all residents are fully able to participate in the region's economic vitality, contribute to the region's readiness for the future, and connect to the region's assets and resources[1];and

**WHEREAS**, addressing quality of life issues, including access to housing, quality health and legal resources, gentrification, healthy and safe communities, living wages, economic stability, and safety from discrimination and exploitation, requires immigrant and refugee communities to building partnerships across all communities, thereby improving quality of life for all county residents; and

**WHEREAS**, Alameda County is the fourth most diverse county in the United States, with foreign-born residents comprising over 34% of the County's total population, and cities in each supervisorial district having foreign-born resident populations over 30%; and large numbers of undocumented immigrants who face challenges with access and safety due to their status; and

**WHEREAS**, immigrants, refugees, and other newcomers add significantly to the vitality of the state and national economies, with foreign-born workers representing close to 17 percent

---

[1] PolicyLink and the University of Southern California's Program for Environmental and Regional Equity (PERE), *An Equity Profile of the San Francisco Bay Area Region*, 2015.

of the current U.S. labor force, and over 33.4 percent of business owners in California[2]; and will account for over 85 percent of the net growth in the U.S. labor force over the next 20 years; and

**WHEREAS**, the current political environment is marked by anti-immigrant, anti-refugee, and Islamophobic rhetoric, requiring of all residents greater awareness, understanding, and dialogue; and

**WHEREAS**, The President, through the Building Welcoming Communities Campaign of the White House Task Force on New Americans, has called upon local communities to endorse a set of principles to build inclusive, welcoming communities that allow all residents to thrive and advance civic, economic, and social integration; and

**WHEREAS**, Alameda County aspires to be a model for inclusion and equity for all populations, including immigrants, refugees, and other newcomers, through its commitments to support the ongoing inclusion and long-term economic and social integration of newcomers, demonstrate values of unity and understanding, by implementing policies and practices ensuring that interactions between new and longer-term Americans remain positive ones; and

**WHEREAS**, Building Home Together is organizing a campaign for Alameda County and Bay Area cities and counties to become welcoming communities for immigrants and refugees, and develop policies, programs, and systems to fully address the issues and needs of foreign born residents;

**NOW, THEREFORE, BE IT RESOLVED THAT THE BOARD OF SUPERVISORS OF ALAMEDA COUNTY,**

1) Declares and affirms that Alameda County is a Welcoming County;

2) Promotes the value among all residents of advancing efforts for integrating immigrant and refugee communities, recognizing that a community is strongest when everyone feels welcomed;

3) Brings immigrants, refugees, and the broader community together to develop policies, programs, and initiatives that build welcoming communities and provide all residents with the knowledge and tools to thrive and fully participate in their communities;

4) Supports the Building Home Together collaborative in its efforts to engage the entire community in a comprehensive planning process that will examine the issues, challenges, and aspirations of Alameda County's foreign born immigrant and refugee communities, examine the systems, structures, resources, and programs that support them, and explore new models for effectively serving immigrant, refugee, and newcomers needs.

---

[2] Institute for Local Government, 2010.

**THE FOREGOING was PASSED and ADOPTED by a majority vote of the Alameda County Board of Supervisors this 27th day of September 2016, by the following vote:**

AYES: Supervisors Carson, Chan, Miley, Valle & President Haggerty

**NOES:**     None

**EXCUSED:**     None

**Scott Haggerty**
**PRESIDENT, BOARD OF SUPERVISORS**

**Attest:**
Clerk, Board of Supervisors

**Approved as to Form:**
Donna R. Ziegler
County Counsel

By _____

Brian E. Washington
Chief Assistant County Counsel

# EXHIBIT 4



| GENERAL ORDER: | **1.24** |
|---|---|
| **CHAPTER:** | **Law Enforcement Role, Responsibilities, and Relationships** |
| **SUBJECT:** | **Communication with Immigration Authorities** |
| **ISSUED DATE:** | January 1, 2014 |
| **REVISION DATE:** | April 12, 2023 |
| **NOTES:** | Creating a Zero-Contact Policy |
| **RELATED ORDERS:** | General Order 1.22, 9.14<br>D&C 11.02, 11.09, 11.40 |
| **ATTACHMENTS:** | 1. I-247 Detainer Notice of Action<br>2. I-247A Notification/Interview Request<br>3. SRJ ICE Log<br>4. I-200 Arrest Warrant<br>5. I-205 Removal Order |

**PURPOSE:** The purpose of this policy is to ensure the Agency's resources are used to promote public safety and maintain trust and cooperation within our communities. We recognize that our communities are diverse and consist of individuals from different backgrounds, cultures, and immigration statuses. Therefore, our policy is designed to prioritize the safety and well-being of everyone in our communities, regardless of their immigration status.

**POLICY:** The Alameda County Sheriff's Office (ACSO) shall have a Zero-Contact Policy with immigration officials, except when a criminal warrant has been signed by a judge. The immigration status of a person, and the lack of immigration documentation, alone, shall have no bearing on the manner in which Agency members execute their duties. This policy shall ensure the ACSO is consistent with the County of Alameda's Welcoming County Resolution (2016).

**DEFINITIONS:**

IMMIGRATION ENFORCEMENT JURISDICTION: The U.S. Department of Homeland Security (DHS) Immigration and Customs Enforcement (ICE) has primary responsibility to investigate and enforce federal immigration laws.

ICE DETAINER: Includes DHS form I-247A, I-247G, and similar forms or communications from federal immigration agents that request the receiving law enforcement agency to notify ICE of a person's release date and time, transfer the person to ICE, hold the person in custody in order to facilitate transfer to ICE, or otherwise request the Agency provide information or assistance to ICE in apprehending someone in the Agency's custody.

ADMINISTRATIVE WARRANT: An order signed by an ICE agent, which directs federal immigration agents to arrest or remove an individual pursuant to federal immigration law, typically indicated on DHS form I-200 or I-205.

JUDICIAL WARRANT: An order for arrest signed by a federal or state judge or magistrate (as defined in Gov Code 7284.4(i)).

ICE Access:  The TRUTH ACT, defines "ICE Access" for the purposes of civil immigration enforcement, to include when an individual is stopped with or without their consent, arrested, detained, or otherwise under the control of the local law enforcement agency, all the following:

1.  Responding to an ICE hold, notification, or transfer request.

2.  Providing notification to ICE in advance of the public that an individual is being or will be released at a certain date and time through data sharing or otherwise.

3.  Providing ICE non-publicly available information regarding release dates, home addresses, or work addresses, whether through computer databases, jail logs or otherwise.

4.  Allowing ICE to interview an individual.

5.  Providing ICE information regarding dates and times of probation or parole check-ins.

TRUST ACT: Provides that a person **may not** be held in custody solely on the basis of a request for notification and/or detainer if he or she is otherwise eligible to be released from custody. "Eligible for release from custody" means that the individual may be released from custody because one of the following conditions has occurred:

1.  All criminal charges against the individual have been dropped or dismissed

2.  The individual has been acquitted of all criminal charges

3.  The individual has served all the time required for their sentence

4.  The individual has posted a bond

5.  The individual is otherwise eligible for release under state or local law

TRANSFER OF CUSTODY: The custody exchange of an inmate within the secure area of the facility not accessible to the public, from ACSO's custody to the custody of another law enforcement agency.

JOINT LAW ENFORCEMENT TASK FORCE: At least one California law enforcement agency collaborating, engaging, or partnering with at least one federal law enforcement agency in investigating federal or state crimes.

**ORDER:**

A.  ZERO CONTACT POLICY

1.  Agency members will not detain, arrest, or contact individuals based solely on their immigration status or suspected immigration violations.

2.  Agency members will not enter into agreements with federal immigration authorities, including but not limited to, Immigration and Customs Enforcement (ICE), to enforce federal immigration laws.

3. Agency members will not use resources, including but not limited to, personnel, facilities, or equipment, to assist or facilitate federal immigration enforcement operations.

This does not preclude Agency members from responding to critical incidents or emergency requests for assistance from any other law enforcement entity. Each level of assistance will be evaluated by the on-scene supervisor to ensure the ACSO's level of participation remains consistent with this order and California law while protecting human life and property.

4. Agency members will not honor civil immigration detainers, except when accompanied by a criminal warrant signed by a judge.

   a. The on-duty SRJ Intake, Transfer, and Release (ITR) Sergeant, or their designee, will ensure that the warrant is valid, enforceable, and specific to the individual in question before taking any action.

   b. Agency members shall not detain individuals based solely on an immigration warrant or hold.

5. Agency members will not inquire about an individual's immigration status unless the information is necessary to obtain in order to conduct a criminal investigation into a violation of California law, such as, but not limited to, trafficking, smuggling, or harboring of humans, and terrorism.

   a. This does not preclude Agency members from making all attempts to identify any person they detain, arrest, or who comes into the custody of the ACSO, when lawful to do so.

   b. Any person who would be cited and released, but who is unable to present satisfactory evidence of his or her identity, will be detained for the purpose of establishing his or her identity, consistent with the treatment of all individuals.

6. Agency members are prohibited from using immigration authorities as interpreters for law enforcement matters relating to individuals in Agency or department custody.

7. Agency members are prohibited from initiating contact with ICE for the purposes of providing information regarding an individual in ACSO's custody who is suspected of violating federal immigration laws.

8. Agency members will not participate in organized sweeps to locate and detain undocumented residents.

B. ADMINISTRATIVE WARRANTS AND INFORMATION REQUESTS FROM ICE

1. Agency members will no longer respond to I-247A requests or requests to interview inmates in ACSO's custody from ICE for immigration purposes (See attachment 1). Upon receiving such a request, Agency members shall do the following:

    a. Forward the request to SRJ ITR Records, who will complete the Santa Rita Jail ICE Log         (See attachment3).

2. Upon receiving a request, SRJ ITR Records will do the following:

    a. Make a copy of the request, place the original in the inmate's jacket, and scan a copy into the Jail Management System (JMS) to maintain a permanent electronic record of proof of service

    b. Provide a copy to the inmate in question

    c. Provide the inmate with a "Notification of I-247A/Request to Interview" form (See attachment 2)

    The "Notification of I-247A/Request to Interview" form is available in multiple languages. The forms are available in English, Spanish, Cantonese, Mandarin, Tagalog, Vietnamese and Korean.

    d. Provide a copy to the public defender's office or the inmate's attorney of record

3. ACSO will not honor DHS Form I-200 - Warrant for arrest of Alien (attachment 4), or DHS Form I-205 - Warrant of Removal/Deportation (attachment 5).

## C. ADDITIONAL GUIDELINES

1. ACSO Agency members may make inquiries into information necessary to certify an individual who has been identified as a potential crime or trafficking victim for a T or U Visa pursuant to Section 1101(a)(15)(T) or 1101(a)(15)(U) of Title 8 of the United States Code or to comply with Section 922(d)(5) of Title 18 of the United States Code.

2. All records relating to ICE access provided by and to ACSO, including all non-exempt and non-privileged communication involving ICE, shall be public records for purposes of the California Public Records Act (CPRA).  As permitted under the CPRA, Personal Identifying Information (PII) and other exempt information may be redacted prior to public disclosure.  Senate Bill 54 does not otherwise preempt or overrule ACSO's obligations under the CPRA, including the information required to be released under Government Code 6254(f)(1).  Records relating to ICE access may include, but are not limited to:

    a. Data maintained by ACSO regarding the number and demographic characteristics of individuals to whom ACSO has provided ICE access;

    b. The date ICE access was provided;

    c. Whether the ICE access was provided through a notification request, transfer, or through other means, to the extent the ACSO maintains such records; and

    d. Non-exempt records to and/or from ICE and ACSO, including, but not limited to ICE notification or transfer requests.

    e.  These records shall be maintained in the current Jail Management Service.

3.  Beginning January 1, 2018, if ACSO has provided ICE access to an individual during the last year, the County Board of Supervisors (BOS) shall hold at least one community forum during the following year that is open to the public, in an accessible location, and with at least 30 days' notice to provide information to the public about ICE's access to individuals to receive and consider public comment.

As part of this forum, ACSO may provide the California Department of Justice with data it maintains regarding the number and demographic characteristics of individuals to whom the Agency has provided ICE access, the date ICE access was provided and whether the ICE access was provided through a notification request or through other means.  Data may be provided in the form of statistics or, if statistics are not maintained, individual records, provided that Personal Identifying Information shall be redacted

4.  Beginning January 1, 2018, ACSO is also required to report statistics to the BOS on all individuals transferred to immigration authorities under the Values Act, GC 7284.6(a)(4). The report must include the following information:

    a.  The date the reporting form was submitted.

    b.  Submitting agency ORI and name.

    d.  Number of transfers to ICE by offense code.

    e.  Contact information for the individual completing this form.

# EXHIBIT 5



**CITY OF ALBANY**
**OFFICE OF THE MAYOR**
24 EAGLE STREET
ALBANY, NEW YORK 12207
TELEPHONE (518) 434-5100
WWW.ALBANYNY.ORG
MAYOR@ALBANYNY.GOV

**KATHY SHEEHAN**
MAYOR

# EXECUTIVE ORDER No. 1-17

## April 24, 2017

## City of Albany Policy Regarding
## Community Policing and Protection of Immigrants

WHEREAS, the City of Albany is a diverse City where more than one in ten of our residents were born in a country other than the United States; and

WHEREAS, access to city services is essential to all residents and visitors regardless of their immigration status; and

WHEREAS, the City of Albany ensures equity and social justice guide all decisions; and

WHEREAS, the City of Albany is committed to community policing and 21st century policing strategies, and law enforcement is more effective as a result of the partnerships cultivated from continued interaction and trust between all residents, visitors, and the Albany Police Department; and

WHEREAS, the Albany Police Department's role is to protect all individuals, and individuals should not be afraid to contact the police if they are the victim or witness of a crime because they are concerned the police will inquire as to their immigration status; and

WHEREAS, the Federal Government is best suited, and required by law, to enforce federal immigration laws; and

WHEREAS, in furtherance of these policies, the City of Albany will not inquire as to the immigration status of any individual as provided herein;

NOW, THEREFORE, I, Kathy M. Sheehan, Mayor of the City of Albany, by the authority vested in me by the charter and laws of the City of Albany do hereby order:

Section 1. Definitions. As used herein,

a. "Alien" means any person who is not a citizen or national of the United States.

b. "Employee" means any officer, official, board or committee member, agent, or person employed by or acting on behalf of the City of Albany.

c. "Law enforcement officer" means any person employed by or acting on behalf of the Albany Police Department.

Section 2. Law Enforcement Officers

a. The Albany Police Department and its law enforcement officers shall not inquire as to an individual's immigrations status, including a crime victim, a witness, or a person who contacts or approaches a law enforcement officer seeking assistance, unless necessary to investigate criminal activity by that individual.

b. The Albany Police Department and its law enforcement officers shall not stop, question, interrogate, investigate, or arrest an individual based solely on the following:

   (1) Actual or suspected immigration or citizenship status; or

   (2) A "civil immigration warrant," administrative warrant, or a civil immigration detainer in the individual's name, including those identified in the National Crime Information Center (NCIC) database.

c. As per the Tenth Amendment to the United States Constitution, the Albany Police Department and its law enforcement officers shall not perform the functions of a federal immigration officer or otherwise engage in the enforcement of federal immigration law  pursuant to 8 U.S.C. § 1357(g).

Section 3. Information Regarding Aliens

a. Employees of the City of Albany shall not inquire about or request proof of immigration status or citizenship when providing services or benefits, except where the receipt of such services or benefits are contingent upon one's immigration or citizenship status or where inquiries are otherwise lawfully required by federal, state, or local laws.

b. Any service provided by the City of Albany shall be made available to all individuals who are otherwise eligible for such service.  The City of Albany shall encourage all aliens to make use of those services provided for which aliens are not denied eligibility by law.

Section 4. Communication with Federal Officials

a. The Albany Police Department shall not collect information regarding immigration or citizenship status except as required by law, and shall prohibit the use or disclosure of such information except as required by law.  Nothing in this Executive Order shall be construed to direct the Albany Police Department to violate 8 U.S.C. § 1373.

b. The Albany Police Department shall not respond to a U.S. Immigration and Customs Enforcement (ICE) or U.S. Customs and Border Protection (CBP) request for non-public information about an individual, including but not limited to non-public information about an individual's release, home address, or work address, unless the request is otherwise permitted by law.

Section 5. Effective Date

a. This order shall take effect immediately.

IN WITNESS WHEREOF, I have hereunto set my hand and caused the Seal of the City of Albany to be affixed this 24th day of April, 2017.



Kathy M. Sheehan
Mayor, City of Albany

EXHIBIT 6

6/18/25, 2:02 PM
Case 3:25-cv-01350-WHO   Document 173-2   Filed 07/29/25   Page 41 of 211
American Legal Code Export requests 5f8eab4e-2923-424f-a7ee-50b08ae8d6a1 download

## § 3-1-11 IMMIGRANTS AND THEIR FAMILIES.

(A)   The Council declares Albuquerque to be an immigrant-friendly City. The Council welcomes and encourages immigrants to live, work, and study in Albuquerque and to participate in community affairs, and recognizes immigrants for their important contributions to our culture and economy.

(B)   The Council establishes the following policies for the City of Albuquerque:

(1)   To the fullest extent allowed by federal and state law, immigrants who live within the City limits of Albuquerque and their families shall have access to all City services and programs.

(2)   The City encourages all public agencies to facilitate the access of immigrants and their families to basic services, including but not limited to legal driver's licenses, health care, and education, including Albuquerque Technical Vocational Institute and the University of New Mexico, to the fullest extent allowable by law.

(3)   The City will include in its legislative agenda requests that Congress enact just and humane immigration reforms that provide immigrants and their families with rights in this country that are commensurate with human dignity and their status as taxpayers and contributing members of our community, and that the State of New Mexico Legislature revise its laws and policies for health care, education, and drivers' licenses to such that immigrants and their families will have fair access to those services and privileges.

(4)   The City shall not discriminate on the basis of a person's national origin and will treat all persons with respect and dignity, regardless of immigration status. The Human Rights Commission shall oversee the implementation of this policy.

(5)   No municipal resources shall be used to identify individuals' immigration status or apprehend persons on the sole basis of immigration status, unless otherwise required by law to do so.

(C)   Each City department shall develop operational procedures consistent with the policies set out in this section.

(D)   An Immigrant Resource Program is established, to provide information and referral in the areas of English as a Second Language education, citizenship classes, housing, health care, secondary vocational and higher education and other areas. The Administration will recommend to the Council whether this program should be administered by a City department or by contract.

(Res. 9-2001, approved 1-11-01)

EXHIBIT 7

# CITY of ALBUQUERQUE
## TWENTY-THIRD COUNCIL

COUNCIL BILL NO. ____C/S R-18-7_____   ENACTMENT NO. **R-2018-018**

**SPONSORED BY:** Klarissa Peña, Patrick Davis

1        **RESOLUTION**

2        STRENGTHENING ALBUQUERQUE'S STATUS AS AN IMMIGRANT

3    FRIENDLY CITY, PROMOTING PUBLIC SAFETY, SAFEGUARDING THE CIVIL

4    RIGHTS, SAFETY AND DIGNITY OF ALL OUR RESIDENTS AND CREATING AN

5    ENVIRONMENT CONDUCIVE TO ALL VICTIMS OF VIOLENT CRIME SEEKING

6    ASSISTANCE.

7        WHEREAS, Article VIII of the City Charter states that, "The Council shall

8    preserve, protect and promote human rights and human dignity…. and shall

9    prohibit discrimination on the basis of race, color, religion, sex, national origin

10   or ancestry, age or physical handicap"; and

11       WHEREAS, the Albuquerque City Council re-affirmed its commitment to

12   immigrant integration and inclusion exemplified in R-00-151 by passing M-17-4

13   which states "the Council welcomes and encourages immigrants to live, work,

14   and study in Albuquerque and to participate in community affairs, and

15   recognizes immigrants for their important contributions to our culture and

16   economy"; and

17       WHEREAS, R-00-151 states, and M-17-4 reaffirms, that the "City shall not

18   discriminate on the basis of a person's national origin and will treat all

19   persons with respect and dignity, regardless of immigration status"; and

20       WHEREAS, R-00-151 states and M-17-4 reaffirms that "no municipal

21   resources shall be used to identify individuals' immigration status or

22   apprehend persons on the sole basis of immigration status, unless otherwise

23   required by law to do so"; and

24       WHEREAS, the Tenth Amendment of the Constitution of the United States

25   recognizes the sovereign status of the states and their political subdivisions

26   and precludes the federal government from attempting to compel state and

27   local governments, either directly or by their use of threats to withhold federal

1

1    funding, to assist the federal government in enforcing federal laws, including

2    immigration laws; and

3        WHEREAS, immigrants are twice as likely to start a business as U.S. born

4    citizens and immigrant-owned businesses generated approximately $389

5    million dollars in economic activity in New Mexico between 2006 and 2010,

6    according to the Partnership for the New American Economy; and

7        WHEREAS, immigrants play a vital role in New Mexico's workforce, and

8    comprised 12.34 percent of the state's workforce in 2016 (117,534 workers),

9    according to the Migration Policy Institute; and

10       WHEREAS, unauthorized immigrants in New Mexico paid $101.5 million in

11   state and local taxes in 2010, according to data from the Institute for Taxation

12   and Economic Policy; and

13       WHEREAS, the foreign-born share of the US population has grown from 7.9

14   percent in 1990 to 13.1 percent in 2013. During the same period, FBI data

15   shows that the violent crime rate has dropped 48 percent; and

16       WHEREAS, according to the Pew Research Center, decades-worth of data

17   indicate that immigrants commit far fewer crimes than native born Americans

18   with a study in 2013 finding first generation adolescent immigrants are almost

19   ten percent less likely to commit crimes than adolescents who were born in

20   the country; and

21       WHEREAS, at least 89.12 percent of children with one or more immigrant

22   parents in New Mexico were U.S. citizens in 2016, according to data from the

23   Migration Policy Institute; and

24       WHEREAS, M-17-4 acknowledges that recent Presidential Executive Orders

25   relating to immigration "contain directives that threaten to lead to family

26   separation, endanger refugees fleeing violence and persecution, strip

27   immigrants of their due process and discriminate against the Muslim

28   community"; and

29       WHEREAS, the Trump administration has rescinded the Deferred Action for

30   Childhood Arrivals (DACA) program putting more than 800,000 young people

31   at risk of deportation and undermining the economic, moral, social, cultural,

32   and intellectual fiber of this nation; and

2

1    WHEREAS, according to estimates by the Immigrant Legal Resource

2    Center, ending DACA will cause far-reaching unemployment, lead to the

3    immediate job loss of 645,145 DACA recipients currently employed by

4    businesses in the United States; reduce Social Security and Medicare tax

5    contributions by DACA employees and employers by $24.6 billion over a

6    decade, and weaken the Social Security and Medicare trust funds; and

7    WHEREAS, the Trump administration has rescinded Temporary Protected

8    Status (TPS) for immigrants from certain countries, with the promise of

9    deporting hundreds of thousands of immigrants from countries devastated by

10   war and natural disaster; and

11   WHEREAS, the Trump administration has issued executive orders that

12   amongst other provisions, criminalize immigrants, further militarize the

13   border, expand the number of Immigration Customs and Enforcement and

14   Customs and Border Patrol agents, expand the use of private prisons for

15   immigrants, target "sanctuary cities", strip hundreds of thousands of

16   immigrants of protections such as DACA and TPS, institute a travel ban that

17   targets Muslim immigrants, dramatically reduce the number of refugees

18   allowed to resettle in the United States, and violate constitutional rights; and

19   WHEREAS, the current immigration system is outdated and has had a

20   devastating impact on New Mexico's families resulting in family separation,

21   labor abuses and exploitation of workers, and has prevented immigrants from

22   fully integrating into the broader community; and

23   WHEREAS, the City understands that the enforcement of federal civil

24   immigration laws is under the sole purview of the federal government and

25   firmly believes that the involvement of local government in enforcement of

26   federal civil immigration laws would undermine community policing, hinder a

27   productive and trusting relationship with the immigrant community, and divert

28   important public safety resources; and

29   WHEREAS, the City should not adopt policies that may violate its residents

30   constitutional rights under the Fourth Amendment such as "immigration

31   detainers," and that exceed the government's limited warrantless arrest

32   authority under federal law, exposing the City to civil rights violations; and

3

1     WHEREAS, the City wishes to assure its vulnerable communities that the

2    City supports them, will do all it can to maintain and improve their quality of

3    life, and does not tolerate acts of hate, discrimination, bullying, or

4    harassment; and

5     WHEREAS, the City wishes to reaffirm and declare that Albuquerque is a

6    safe place for immigrants from all countries, as well as for war refugees,

7    people of color, Muslims, Jews, LGBTQ people and people with disabilities;

8    and

9     WHEREAS, through the adoption of R-00-151, enacted in 2000 and still the

10    official policy of the City, the City declared Albuquerque to be immigrant

11    friendly; and

12     WHEREAS, R-00-151 committed that "the City will include in its legislative

13    agenda requests that Congress enact just and humane immigration reforms

14    that provide immigrants and their families with rights in this country that are

15    commensurate with human dignity and their status as taxpayers and

16    contributing members of our community."; and

17     WHEREAS, the City believes in the human dignity of all Albuquerque

18    residents, regardless of immigration status, and recognizes the importance of

19    immigrants' many contributions to the social, cultural, intellectual and

20    economic fabric of the City; and

21     WHEREAS, the City of Albuquerque is made up of diverse individuals, both

22    native born and immigrants, whose collective cultures, religions,

23    backgrounds, orientations, abilities and viewpoints join to form a highly

24    pluralistic community which prides itself on being a place which welcomes

25    persons and families of all walks of life; and

26     WHEREAS, the City of Albuquerque has a strong tradition and mission of

27    embracing and valuing diversity and the City Council believes that it is

28    similarly important to support diversity and to provide services to all persons

29    in the City regardless of their race, disability, national origin, gender identity,

30    religion, sex, sexual orientation, ethnicity, economic or immigration status (in

31    addition to any other protected classes under local, state, or federal law); and

1      WHEREAS, the City of Albuquerque and Mexico have a shared economy

2    and shared culture going back over 300 years, and we are proud of our Sister-

3    City relationships with the Mexican cities of Chihuahua and Guadalajara; and

4      WHEREAS, the relationship between the City of Albuquerque and Mexico is

5    one that has coexisted for a long time and the current anti-Mexican rhetoric is

6    not a reflection of how we feel about Mexico and immigrants; and

7      WHEREAS, the City is greatly concerned about public safety in

8    Albuquerque and the mission of the Albuquerque Police Department is to

9    protect the safety of the public against crimes committed by persons whoever

10   they may be; and

11     WHEREAS, most residents in the City, including the vast majority of

12   immigrants, are law-abiding citizens and are, when crimes occur, themselves

13   the victims of crime, and because of this the City wishes to foster trust and

14   cooperation between the City, its police department, and its immigrant

15   communities, and wishes to encourage immigrants to report crime and speak

16   to the police without fear of being arrested or reported to the United States

17   Immigration and Customs Enforcement agency; and

18     WHEREAS, current policies regarding immigration enforcement efforts

19   have had a chilling impact on immigrant survivors of domestic violence and

20   sexual assault; and a national study released by the National Alliance to End

21   Sexual Violence (NAESV) and the National Network to End Domestic Violence

22   (NNEDV) in May of 2017 indicates that 78 percent of advocates reported that

23   immigrant survivors expressed concerns about contacting police, three in four

24   service providers reported that immigrant survivors have concerns about

25   going to court for a matter related to the abuser or offender and 43 percent of

26   advocates worked with immigrant survivors who dropped civil or criminal

27   cases because they were fearful to continue with their cases; and

28     WHEREAS, APD'S standard operating procedures are consistent with the

29   policy established under R-00-151 and recognizes that "enforcement of

30   immigration laws and arrest of undocumented foreign nationals resides

31   exclusively with the federal government," and that "officers shall not stop,

32   question, detain, or arrest any person solely on the ground that they may be

33   undocumented," and "shall not inquire about or seek proof of a person's

1    immigration status" unless it is pertinent to the investigation of an underlying

2    non-immigration criminal violation; and

3         WHEREAS, the City does not operate any criminal detention facilities and

4    does not otherwise have information regarding any release date or pending

5    release date of any person in custody, and thus cannot and does not notify

6    any federal agency about any such release dates for immigration purposes.

7    BE IT RESOLVED BY THE COUNCIL, THE GOVERNING BODY OF THE CITY OF

8    ALBUQUERQUE:

9         SECTION 1.  That the City Council reaffirms the City of Albuquerque's

10   status as an "Immigrant Friendly City" and welcomes and encourages

11   immigrants to live, work and study in Albuquerque and to participate in

12   community affairs, and recognizes immigrants for their important

13   contributions to our culture and economy.

14        SECTION 2.  That the City Council reaffirms its commitment to policies

15   established under R-00-151 including but not limited to its commitment to

16   "treat all persons with respect and dignity, regardless of their immigration

17   status" and that "to the fullest extent allowed by federal and state law,

18   immigrants who live within the city limits of Albuquerque and their families

19   shall have access to all City services and programs."

20        SECTION 3. Immigrant Friendly Policy.

21   1.        The City, or any third party on its behalf, shall not:

22             a.        Make or initiate any inquiry regarding, or collect in any way

23   information regarding, the citizenship, immigration status, place of birth,

24   religion, or national origin, of any person;

25             b.        Collect, or make or initiate any inquiry regarding an

26   individual's social security number except as required to: (1) determine

27   eligibility for a federal or state benefit or program administered by the City

28   conditioned on verification of such status; (2) in order to determine eligibility

29   for City employment; (3) in order to carry out a necessary function of City

30   Government; or (4) as otherwise required by law; or

31             c.        Collect, or make or initiate any inquiry regarding an

32   individual's Individual Tax Identification Number (ITIN) except where

1    necessary for purposes of executing a city contract with the person or

2    person's company or employer.

3        2.    Paragraph 1 above limits the information that the City will collect and

4    store; where the City is required by law or policy to provide information to any

5    person or agency, it can only provide that information which it has collected

6    and stored. The City shall not disclose information that the City currently

7    possesses regarding place of birth, religion, or national origin, nor information

8    collected under the exceptions stated above in Paragraph 1 absent a valid

9    judicial warrant for such information or as otherwise required by law.

10        3.    The City shall not use any City resources, including but not limited to

11    moneys, equipment, personnel, or City facilities, nor permit any City facility to

12    be used for the enforcement or to assist in the enforcement of federal

13    immigration law by any of the following:

14            a.    Detecting, apprehending, identifying, investigating, arresting,

15    detaining, or continuing to detain a person based on the individual's

16    immigration status or the belief that the person has committed a violation of

17    immigration law;

18            b.    Arresting, detaining or continuing to detain a person in

19    response to, or honoring in any other way, any immigration detainer, or

20    federal administrative warrant that is based solely on a violation of federal

21    immigration law; or

22            c.    Enforcing any federal program requiring the registration of

23    individuals on the basis of religious affiliation or ethnic or national origin.

24        4.    The City shall refuse access to all city-operated, non-public areas of

25    City property (including but not limited to the Prisoner Transport Center) by

26    federal immigration agents who are requesting access for the purpose of

27    enforcing federal immigration law unless presented with a judicial warrant

28    issued specifically requiring such access.

29        5.    That the City Council supports the equal treatment of all persons and

30    states that all persons who live within the City should have full access to all

31    city services with respect and dignity, including public safety services and

32    programs, regardless of their race, disability, national origin, gender identity,

1  religion, sex, sexual orientation, ethnicity, economic or immigration status (in

2  addition to any other protected classes under local, state, or federal law).

3      6.      All City departments are directed to review current City policies,

4  procedures, and practices to ensure they are in accordance with this

5  Resolution and report back to the Council within six months of the passage of

6  this resolution. The City's Office of Equity and Inclusion is responsible for

7  monitoring compliance with this Resolution. City staff may identify and

8  recommend policies and proposals that would serve to implement and

9  enhance the City's immigrant friendly status.

10     7.      The CAO shall communicate these policies to all City employees

11  within 30 days of the passage of this resolution.  The CAO shall develop and

12  publicly post a notice of all known instances where information is required to

13  be collected by the City pursuant to any of the exceptions in paragraph 1 of

14  this Section, and that advises of other instances where the provisions of this

15  resolution may not fully apply in dealings with the City or when using a City

16  facility, if any.

17     8.      Nothing in this resolution shall be construed or implemented to

18  conflict with any valid and enforceable duty or obligation imposed by a

19  warrant, court order or any federal or other applicable law.

20     SECTION 4.  SEVERABILITY.    If any section, subsection, sentence,

21  clause, phrase, or portion of this resolution is held to be invalid or

22  unconstitutional by the decision of any court of competent jurisdiction, such

23  decision shall not affect the validity of the remaining portions of this

24  resolution.

25     SECTION 5.  COMPILATION.    Section 3 of this Resolution shall be

26  incorporated in and made part of the Code of Resolutions of Albuquerque,

27  New Mexico, 1994, as Chapter 3 Article 12, titled "Immigrant Friendly Policy."

28

29

30

31

32  X:\CITY COUNCIL\SHARE\CL-Staff\_Legislative Staff\Legislation\23 Council\R-7CSfinal.docx

8

PASSED AND ADOPTED THIS _____16th_____ DAY OF ___April___, 2018

BY A VOTE OF:_____6_____ FOR_____3_____ AGAINST.

For: Benton, Borrego, Davis, Gibson, Peña, Sanchez
Against: Harris, Jones, Winter

Ken Sanchez, President

City Council

APPROVED THIS _24_ DAY OF _____, 2018

Bill No. C/S R-18-7

Timothy M. Keller, Mayor

City of Albuquerque

ATTEST:

Trina Gurule, Acting City Clerk

[+ Bracketed/Underscored Material +] - New
[- Bracketed/Strikethrough Material -] - Deletion

9

EXHIBIT 8



| | APPLICABILITY: All Authorized Personnel |
|---|---|
| **ALLEGHENY COUNTY BUREAU OF CORRECTIONS** | **POLICY NUMBER: #220**    **EFFECTIVE: 6/19/15** / **REVISED: 3/12/25** |
| | **TITLE: Immigration Detainers and Warrants** |
| | **AUTHORIZED BY: Trevor A. Wingard** <br><br>SIGNATURE: |

**POLICY:** It is the policy of the Allegheny County Jail (ACJ) that the facility will not detain any inmate and will not delay the otherwise authorized release of any inmate, because of detainer requests or administrative warrants received by Department of Homeland Security, Immigration and Customs Enforcement ("ICE")

**PURPOSE:** ACJ receives requests from the Department of Homeland Security, Immigration and Customs Enforcement ("ICE") to hold aliens not otherwise detained by criminal justice agencies for periods not to exceed 48 hours, excluding Saturdays, Sundays, and holidays, to permit assumption of custody by the U.S. Government, pursuant to 8 CFR§ 287.7.(DHS Form I-247). In addition, ACJ also receives administrative warrants ("Warrant for Arrest of Alien" Form I·200) purporting to require ACJ to detain the inmate for a violation of immigration law or regulation. The purpose of this policy is to establish guidelines and procedures pertaining to ACJ's receipt of immigration detainer requests and administrative warrants. Hereinafter, the term "detainer" means DHS Form I- 247 and the term "administrative warrant" means Warrant for Arrest of Alien, Form I-200.

**PROCEDURAL GUIDELINES:**

1. Any inmate who has bondable charges upon admission shall be allowed to post     bond to secure his or her release. An immigration detainer request or an administrative warrant shall not inhibit an inmate's ability to post bond.
2. No inmate release shall be delayed in any way, because of an immigration detainer.

3. All immigration warrants must be signed by a judge or magistrate. No inmate Shall be booked on an administrative warrant signed by persons other than a Member of the judiciary.

4. The immigration detainer request and the administrative warrant form are public records. Copies of the forms shall be provided to persons not employed By Allegheny County only pursuant to inspection of Pennsylvania Right to Know Act  or other legal process.  ACJ staff may confirm by telephone, upon request from any party, whether a detainer request or administrative warrant has been received for an inmate. No other details from    the detainer request may be given by telephone.

## PROCEDURES UPON RECIEPT OF A DETAINER REQUEST OR ADMINISTRATIVE WARRANT:

1. Records staff will receive immigration detainer requests and administrative warrants from ICE and place a copy of the form(s) in the subject inmate's file. Immigration detainer requests and administrative warrants from ICE shall not be placed in OMS.

2. Releases shall not be delayed, in any way, because of immigration detainer requests or administrative warrants.

3. Staff shall not provide notice of an individual's incarceration status or release date from custody or further communicate with ICE regarding non-publicly available information, such as, but not limited to, a person's custody status, home address, work address, or other information absent a judicial warrant.

4. This policy shall not be construed to prohibit or restrict administrative staff from receiving information from federal immigration authorities regarding the citizenship or immigration status of specific individuals, lawful or unlawful. Additionally. This policy shall not be construed to restrict the Warden, or those staff whom he expressly authorizes to act on his behalf in regard to this policy, to respond to official requests from federal immigration authorities for information contained in ACJ records pertaining to the citizenship or immigration status of individual inmates, lawful or unlawful.

# EXHIBIT 9

## Policy 1021



| Subject | |
|---|---|
| **IMMIGRATION STATUS** | |
| Date Published | Page |
| **23 March 2024** | **1 of 19** |

*By Order of the Police Commissioner*

<div style="background:yellow">

**SPANISH VERSION OF POLICY CAN BE FOUND ON PAGE 7**

**LA VERSIÓN EN ESPAÑOL DE LA POLÍTICA ESTÁ EN LA PÁGINA 7**

</div>

## PURPOSE

The purpose of this policy is to set forth the rules of the Baltimore Police Department (BPD) to provide police services to all persons within the City of Baltimore regardless of their Immigration Status.

## DEFINITIONS

**Administrative Warrant** — For purposes of this policy, this term refers to administrative removal warrants used by U.S. Immigration and Customs Enforcement officers to arrest noncitizens who have committed immigration violations. An Administrative Warrant is not a criminal warrant signed by a judge, nor is it a court order, and it shall not be used by BPD as the basis to detain or arrest a person or persons.

**Immigration Status** — Refers to an individual's status with respect to federal immigration law and/or citizenship. For example, a person who enters the United States without legal permission may be considered an "undocumented person." Another person who is legally granted permission to reside in the United States permanently may be considered a "lawful permanent resident."

**United States Immigration and Customs Enforcement (ICE)** — The United States Immigration and Customs Enforcement (ICE) is the federal law enforcement agency under the Department of Homeland Security (DHS) responsible for enforcement of federal laws related to border control, customs, trade and immigration.

## GENERAL

1.    The enforcement of civil federal immigration laws falls exclusively within the authority of ICE.

2.    This policy is to be construed in accordance with federal and state law.

3.    Nothing in this policy shall prohibit BPD from approving certification requests for crime victims or witnesses applying for U Visa/T Visas, where appropriate.

## DIRECTIVES

### Member

**Required Actions**

4.    Members shall treat all persons equally and without regard to race, color, ethnicity, religion, national origin, or ability to speak English in any way that would violate the United States or Maryland State Constitutions. To encourage crime reporting and cooperation in the investigation of criminal activity, all persons, regardless of their Immigration Status, must feel secure that contacting or being addressed by members of the BPD will not lead to an immigration inquiry.

5.    This policy is to be construed in accordance with 8 U.S.C. §1373(a) which provides "Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [ICE] information regarding the citizenship or immigration status, lawful or unlawful, of any individual."

**Prohibited Actions**

6.    Members shall not initiate an investigation or take law enforcement action on the basis of actual or perceived Immigration Status, including the initiation of a stop, apprehension, arrest, or any other field contact. See Policy 317, *Fair and Impartial Policing* and Policy 1112, *Field Interviews, Investigative Stops, Weapons Pat-Downs, and Searches.*

7.    Members shall not make inquiries into the Immigration Status of any individual, including those who are not the subject of the law enforcement encounter (e.g., friends or family of the person being questioned), except as authorized by this policy.

8.    Members shall not make any threats of immigration actions or consequences as a result of any interaction with law enforcement, including in the context of criminal investigations.

9.    The BPD shall not engage in, assist, or support immigration enforcement except as follows:

  9.1.    In response to an articulated, direct threat to life or public safety.

  9.2.    When such services are required to safely execute a criminal warrant or court order issued by a federal or state judge.

  9.3.    When BPD members are assigned as task force officers to Homeland Security Investigations, they may work with immigration officers while conducting other law enforcement activities. However, under no circumstances does a BPD member, whether assigned to a task force or not, have the authority to enforce administrative violations of immigration law.

  9.4.    Sending to ICE, or receiving from ICE, information regarding the citizenship or immigration status of an individual as provided in Paragraph 5 under "Required Actions" above.

10.    Except as provided in Paragraph 9 and its subparagraphs, members are not permitted to accept requests by ICE or other agencies to support or assist in civil immigration enforcement operations, including but not limited to requests to establish traffic perimeters related to immigration enforcement. In the event a member receives a request to support or assist in a civil immigration enforcement action, they shall report the request to their supervisor, who shall decline the request and document the declination in an Administrative Report, Form 95, to the Police Commissioner through the chain of command.

11.    Except as provided in Paragraph 9 and its subparagraphs, members shall not notify ICE of the location of an individual for the purposes of civil immigration enforcement.

NOTE:   In Santos v. Frederick Cty. Bd. of Comm'rs, 725 F.3d 451, 468 (4th Cir. 2013), the Fourth Circuit held that "absent express direction or authorization by federal statute or federal officials, state and local law enforcement officers may not detain or arrest an individual solely based on known or suspected civil violations of federal immigration law."

**Requesting Identifying Information**

12.    While it may often be necessary to determine the identity of a victim or witness, consistent with applicable law, members shall not question, investigate, or inquire about the Immigration Status of any person, including a victim or witness. Accordingly, members are permitted to request identification from an individual only as authorized by BPD policy.

13.    Persons are not required to prove their citizenship status, country of origin, or information related to their Immigration Status in the United States. Members shall not request identification for the purpose of determining any of this information.

14.    When identification is requested, members shall accept presentation of a photo identity document issued by a government entity, non-government organization (see examples in Appendix B) or a verbal statement of the person's full name and date of birth. Members shall not require that a person produce a foreign passport or non-U.S. driver's license as evidence of identity.

15.    Although not required as evidence of identity or citizenship, a driver's license is required for operation of a motor vehicle, regardless of a person's Immigration Status. Members may request the driver of a motor vehicle to produce a driver's license. The failure of a motor vehicle operator to produce a driver's license upon request after a moving violation or traffic stop may subject the operator to the appropriate charge (i.e., driving without a license).

**Use of NCIC Database Information**

16.    When the member receives a "hit" in the NCIC database on a person, the member shall contact the BPD Hot Desk in accordance with Policy 1301, *National Crime Information Center (NCIC).*

17.    If the Hot Desk personnel advises the member that the person is subject to an Administrative Warrant, the member shall take no action on the Administrative Warrant.

18.    If the BPD Hot Desk confirms that there is no outstanding federal, state or local criminal warrant, the member shall immediately release the person.

19. If BPD Hot Desk is unable to promptly determine the nature of the warrant, the person shall be released.

20. If the member receives verification of an outstanding criminal warrant, normal arrest procedures shall be followed.

## Supervisor

**Required Actions**

21. Supervisors shall ensure compliance with this policy when reviewing and signing a member's enforcement reporting.

## Hot Desk

**Required Actions**

22. Upon receiving a call from a member to verify a warrant, Hot Desk personnel must attempt to determine whether the warrant is an immigration Administrative Warrant. To make this determination, Hot Desk personnel shall review the introductory message at the beginning of the "hit" from NCIC. If it is administrative in nature, it will contain the language:

    22.1. SUBJECT HAS AN OUTSTANDING **ADMINISTRATIVE** WARRANT OF REMOVAL, or

    22.2. SUBJECT HAS AN OUTSTANDING **ADMINISTRATIVE** WARRANT OF ARREST FOR IMMIGRATION VIOLATIONS

23. If the above language appears, Hot Desk personnel must advise the member that the warrant is administrative, which is a non-arrestable warrant.

24. If the BPD Hot Desk is unable to determine whether the warrant is administrative or criminal, the BPD Hot Desk shall contact ICE at the number provided in the NCIC database to verify whether the person has an outstanding criminal warrant.

25. Hot Desk personnel must inform the member of the outcome of the contact - whether the person has an outstanding criminal warrant, and/or an outstanding administrative warrant, or that the Hot Desk is unable to promptly determine the nature of the warrant.

NOTE:  See Appendix A for sample NCIC "hit" results for administrative and criminal ICE warrants.

## U VISA / T VISA NONIMMIGRANT STATUS

## Member

**Required Actions**

26. Under certain circumstances, federal law allows victims and witnesses of certain qualifying crimes to obtain temporary Immigration Status from the U.S. Citizenship and Immigration Services (USCIS) (See 8 U.S.C. § 1101(a) (15) (U), 8 U.S.C. § 1101(a) (15) (T)). Upon the request of a victim or witness for the completion of a certification for a U Visa or T Visa, the certification may be completed on the appropriate DHS Form supplements (Supplements B for I-918 or I-914) by

the designated BPD member when appropriate. The certification must include information detailing how the person has been, is being, or is likely to be helpful in a criminal investigation or prosecution.

27. Any request for assistance in completing a certification for a U Visa or T Visa application shall be directed to the BPD's Criminal Investigations Division (CID).

28. All requests for U Visa certifications will be considered on a case-by-case basis. The more time that has passed between the crime and the certification request, the more requestors are encouraged to provide as much information, evidence, and explanation as possible regarding the requestor's participation in the case and/or any reason for delaying the certification request.

## Criminal Investigations Division

**Required Actions**

29. All requests for certifications of Supplement B for Forms I-918 and I-914, shall be forwarded to the designated certifying officials. The person responsible for certifying such certification is the Commander of CID.

<u>NOTE</u>:   The certifier must sign all approved Supplement B forms in blue ink.

30. Before completing a Form I-918, Supplement B (a request for a U-visa certification), the certifying official is required to verify the following:

    30.1. The noncitizen was or is:

        30.1.1. A victim of a qualifying criminal activity (See Appendix C) that took place in the U.S. or its territories or occurred outside the U.S. but violates U.S. extraterritorial law; or

        30.1.2. The spouse or under-21-year-old child of a victim who is deceased because of murder or manslaughter, or who is incompetent or incapacitated; or

        30.1.3. The parent or unmarried under-18-year-old sibling of an under-21-year-old victim who is deceased because of murder or manslaughter, or who is incompetent or incapacitated.

    30.2. The noncitizen has been, is being, or is likely to be helpful to the investigation (this applies to U visa applicants and T visa applicants). BPD determines the victim to have been helpful when they:

        30.2.1. Possess information about a qualifying crime; or

        30.2.2. Demonstrate cooperation during the detection or investigation of that crime, even if the investigation is not completed.

<u>NOTE</u>:  When a certification is based on a prior investigation or a criminal case that has been closed or suspended, or when a statute of limitations has passed, the certification shall be completed after the above verification has been conducted.

31. Before completing a Form I-914, Supplement B (law enforcement declaration for a T-visa application) the certifying official is required to verify the following:

| Policy 1021 | IMMIGRATION STATUS | Page 6 of 19 |
|---|---|---|

31.1. The noncitizen applicant is or was a victim of a severe form of trafficking in persons (which may include sex or labor trafficking), as defined by federal law (See Appendix D for federal definitions), or

31.2. In the case of a noncitizen victim who is 21-years-old or older, the applicant may be the spouse or child of that victim, or

31.3. In the case of a noncitizen victim under 21 years-old, the applicant may be the spouse, child, parent, or unmarried sibling under 18-years-old of the victim.

32. No request for certification will be accepted unless it is made on the proper USCIS form (Supplement B for Form I-918 or I-914). All appropriate fields must have been completed by the referrer, such as a private attorney, non-profit organization, or victim. See Appendix E for guidelines for attorneys on certification request requirements.

33. The certifier shall complete the appropriate fields on Supplement B for Form I-918 or I-914, as instructed by the prompts on the USCIS form.

34. The request for certification shall be completed within 30 business days from the time it was received by CID.

EXCEPTION: For cases where the applicant or their representative has informed BPD that the applicant is in imminent and immediate immigration removal proceedings, the certification must be completed in 5 business days from the time it was received by CID.

EXCEPTION: The time requirement will be suspended in the event of a state of emergency or emergency event that requires deployment of CID units beyond their normal duties.

35. Upon completing a certification, the certifying officer will include a copy of the certification in the case file and will return the original certification to the victim or their representative.

NOTE: BPD cannot send the signed certification directly to DHS; this is the victim's or their representative's responsibility.

36. In cases where BPD determines that the certification will not be signed because the victim does not qualify, document this in the case file, and inform the victim or their representative.

37. Ensure all approvals and denials are tracked in an internal log located at CID.


**TRAINING**

38. The Education and Training Division shall ensure that all members in the Recruit Basic Training Program receive training on this policy and that all members receive appropriate training on this policy as part of their annual In-Service training.

**Versión en español de la política**

## <u>PROPÓSITO</u>

El propósito de esta política es establecer las normas del Departamento de Policía de Baltimore (BPD, en inglés) para proporcionar servicios de policía a todas las personas de la ciudad de Baltimore independientemente de su condición migratoria.

## <u>DEFINITIONS</u>

**Orden Administrativa** — A los fines de esta política, este término se refiere a las órdenes administrativas de expulsión que aplican los funcionarios del Servicio de Control de Inmigración y Aduanas de EE. UU. (ICE, en inglés) para detener a las personas que no son ciudadanas y que han incumplido normas de inmigración. Las órdenes administrativas no son órdenes penales firmadas por un juez ni tampoco son órdenes judiciales, y el BPD no las puede usar como herramienta para detener o arrestar a una o más personas.

**Condición Migratoria** — Se refiere a la condición de una persona con respecto a las leyes federales de inmigración o a la ciudadanía. Por ejemplo, una persona que ingresa a Estados Unidos sin un permiso legal puede considerarse una "persona indocumentada". Otra persona que cuenta con un permiso legal para vivir en Estados Unidos de forma permanente puede considerarse un "residente permanente legal".

**Servicio de Control de Inmigración y Aduanas de EE.UU. (ICE)** — El Servicio de Control de Inmigración y Aduanas de EE. UU. (ICE) es el organismo federal de cumplimiento de la ley que depende del Departamento de Seguridad Nacional (DHS, en inglés) y que es responsable de la aplicación de las leyes federales relacionadas con el control de fronteras, aduanas, comercio e inmigración.

## <u>INFORMACIÓN GENERAL</u>

1.    La aplicación de las leyes federales civiles de inmigración es competencia exclusiva del ICE.

2.    Esta política se debe interpretar de acuerdo con las leyes federales y estatales.

3.    Ninguna disposición de esta política puede impedir que el BPD apruebe solicitudes de certificación para víctimas o testigos de delitos que deseen obtener Visas U o Visas T, cuando corresponda. <u>IRECTIVAS</u>

### <u>Miembro</u>

### **Obligaciones**

4.    Los miembros deben tratar a todas las personas por igual y sin distinción por motivos de raza, color, origen étnico, religión, origen nacional o dominio del inglés de cualquier manera que vaya en contra de las constituciones de Estados Unidos o del estado de Maryland. Con el fin de fomentar la denuncia de delitos y la cooperación en la investigación de actividades delictivas, todas las personas, independientemente de su condición migratoria, deben tener la seguridad de que contactarse o ser contactadas por miembros del BPD no implicará una investigación relacionada con la inmigración.

5.    Esta política se debe interpretar de acuerdo con la sección 1373(a) del título 8 del Código de EE. UU. (U.S.C., en inglés), la cual establece lo siguiente: "Sin perjuicio de cualquier otra

disposición de las leyes federales, estatales o locales, ninguna entidad del gobierno federal, estatal o local, ni ningún funcionario puede prohibir o impedir de ninguna manera a cualquier entidad o funcionario del gobierno que envíe o reciba información relativa a la ciudadanía o a la condición migratoria de cualquier persona, ya sea información legal o ilegal, de parte del ICE".

**Prohibiciones**

6.   Los miembros no pueden iniciar una investigación ni tomar medidas para hacer cumplir la ley en función de la condición migratoria real o percibida de una persona. Esto incluye el inicio de una detención, una interrogación, un arresto, o cualquier otro contacto en el campo. Ver la política 317: *Vigilancia justa e imparcial* y la política 1112: *Entrevistas en el campo, detenciones de investigación, cacheos de armas y registros.*

7.   Los miembros no pueden indagar sobre la condición migratoria de ninguna persona, lo que incluye a aquellos que no son objeto de la interacción con la policía (p.ej., amigos o familiares de la persona a la que se interroga), excepto en los casos que se autorizan en esta política.

8.   Los miembros no pueden amenazar con acciones o consecuencias migratorias como resultado de ninguna interacción con cuerpos policiales, incluso en el contexto de las investigaciones penales.

9.   El BPD no se puede involucrar, colaborar ni ayudar con la aplicación de las leyes de inmigración, excepto en los siguientes casos:

   9.1.   En respuesta a una amenaza explícita y directa a la vida o a la seguridad pública.

   9.2.   Cuando se necesitan esos servicios para ejecutar de manera segura una orden penal o una orden judicial emitida por un juez federal o estatal.

   9.3.   Cuando se designa a los miembros del BPD como funcionarios de un grupo operativo de Investigaciones de Seguridad Nacional, pueden trabajar con los funcionarios de inmigración a la vez que realizan otras actividades para hacer cumplir la ley. Sin embargo, los miembros del BPD no tienen en ninguna circunstancia, independientemente de haber sido designados a un grupo operativo o no, la autoridad para ejecutar los incumplimientos administrativos de las leyes de inmigración.

   9.4.   Si envían o reciben información del ICE sobre la condición migratoria o de ciudadanía de una persona, tal como se establece en el párrafo 5 de la sección "Obligaciones".

10.   A excepción de lo dispuesto en el párrafo 9 y en sus subpárrafos, los miembros no tienen autorización para aceptar solicitudes del ICE o de otros organismos para asistir o colaborar en operaciones de aplicación de las leyes migratorias, lo que incluye las solicitudes para establecer perímetros de circulación en relación con la aplicación de las leyes migratorias. En caso de que algún miembro reciba una solicitud para colaborar o asistir en las medidas civiles de aplicación de las leyes migratorias, debe informar sobre la solicitud a su supervisor, quien debe rechazar la solicitud y registrar la denegación en un informe administrativo por medio del formulario 95, dirigido al comisionado de policía a través de la cadena de mando.

11.   A excepción de lo dispuesto en el párrafo 9 y sus subpárrafos, los miembros no pueden informar al ICE la ubicación de ninguna persona con fines relacionados con las medidas civiles de aplicación de las leyes migratorias.

<u>NOTA</u>:   En el caso de <u>Santos v. Frederick Cty. Bd. of Comm'rs</u>, 725 F.3d 451, 468 (Tribunal de Circuito

4, 2013), el Tribunal de Circuito 4 determinó que "ante la falta de una orden o autorización expresa por parte de la ley federal o de los funcionarios federales, los funcionarios estatales y locales a cargo del cumplimiento de la ley no pueden detener ni arrestar a una persona únicamente por incumplimientos civiles conocidos o presuntos de las leyes federales de inmigración".

**Solicitar Información de Identificación**

12.  Aunque a menudo puede ser necesario determinar la identidad de una víctima o testigo, de acuerdo a la ley aplicable, los miembros no pueden cuestionar, investigar ni indagar sobre la condición migratoria de ninguna persona, lo que incluye víctimas o testigos. Así, los miembros pueden solicitar la identificación de una persona según autoriza la política del BPD.

13.  Las personas no tienen la obligación de demostrar su condición migratoria, país de origen ni información relacionada con su condición migratoria dentro de Estados Unidos. Los miembros no pueden solicitar una identificación con el fin de conocer alguno de estos datos.

14.  Cuando se solicite la identificación, los miembros deben aceptar la presentación de un documento de identidad con foto emitido por una entidad gubernamental, una organización no gubernamental (ver ejemplos en el anexo B) o una declaración verbal del nombre completo y la fecha de nacimiento de la persona. Los miembros no pueden solicitar que una persona presente un pasaporte extranjero o una licencia de conducir de un país distinto a EE. UU. a modo de prueba de identidad.

15.  Si bien no se la requiere como prueba de identidad o de ciudadanía, se requiere una licencia de conducir para manejar un vehículo con motor, independientemente de la condición migratoria de una persona. Los miembros pueden solicitarle al conductor de un vehículo con motor que les muestre la licencia de conducir. Si el conductor de un vehículo con motor no muestra la licencia de conducir cuando se lo solicitan tras haber cometido una infracción o al indicarle que se detenga, dicho conductor puede tener que pagar la infracción correspondiente (p. ej., manejar sin licencia).

**Uso de la información de la base de datos del Centro Nacional de Información sobre Delitos (NCIC, en inglés)**

16.  Cuando el miembro obtenga una "coincidencia" en la base de datos del NCIC sobre una persona, el miembro se debe comunicar con la Unidad de Información del BPD de acuerdo con la política 1301, *Centro Nacional de Información sobre Delitos (NCIC).*

17.  Si el personal de la Unidad de Información le informa al miembro que la persona es objeto de una orden administrativa, el miembro no puede tomar ninguna medida en relación con la orden administrativa.

18.  Si la Unidad de Información del BPD confirma que no hay ninguna orden de detención penal federal, estatal o local pendiente, el miembro debe liberar a la persona de inmediato.

19.  Si la Unidad de Información del BPD no puede determinar rápidamente de qué tipo de orden se trata, se debe liberar a la persona.

20.  Si el miembro recibe la verificación de una orden penal pendiente, se deben seguir los procedimientos de detención habituales.

**<u>Supervisor</u>**

**Obligaciones**

21. Los supervisores deben garantizar el cumplimiento de esta política al revisar y firmar el informe de cumplimiento de un miembro.

**Unidad de Información**

**Obligaciones**

22. Al recibir una llamada de un miembro para verificar una orden judicial, el personal de la Unidad de Información debe intentar determinar si la orden judicial es una orden administrativa de inmigración. Para determinarlo, el personal de la Unidad de Información debe revisar el mensaje introductorio que figura al comienzo de la "coincidencia" del NCIC. Si es de tipo administrativo, dirá lo siguiente:

22.1. LA PERSONA TIENE UNA **ORDEN ADMINISTRATIVA** DE EXPULSIÓN PENDIENTE O

22.2. LA PERSONA TIENE UNA ORDEN DE DETENCIÓN **ADMINISTRATIVA** PENDIENTE POR INCUMPLIMIENTOS DE INMIGRACIÓN

23. Si figuran estas frases, el personal de la Unidad de Información debe informarle al miembro que la orden es administrativa, es decir, que no es una orden de detención.

24. Si el personal de la Unidad de Información del BPD no puede determinar si la orden es administrativa o penal, la Unidad de Información del BPD debe comunicarse con el ICE al número proporcionado en la base de datos del NCIC para verificar si la persona tiene una orden penal pendiente.

25. El personal de la Unidad de Información debe informarle al miembro el resultado de la comunicación, es decir, si la persona tiene una orden penal o administrativa pendiente, o que la Unidad de Información no puede determinar rápidamente el tipo de orden.

NOTA:  Consulte el anexo A para ver ejemplos de resultados de "coincidencias" del NCIC para órdenes administrativas y penales del ICE.

**CONDICIÓN DE NO INMIGRANTE CON VISA U / VISA T**

**Miembro**

**Obligaciones**

26. En ciertas circunstancias, las leyes federales permiten que las víctimas y testigos de determinados delitos obtengan la condición migratoria temporal de parte de los Servicios de Ciudadanía e Inmigración de EE. UU. (USCIS, en inglés) (Ver las secciones 1101(a) (15) (U) y 1101(a) (15) (T) del título 8 del U.S.C.). A pedido de una víctima o testigo y a fines de completar una certificación para una Visa U o T, el miembro designado del BPD puede completar la certificación en los suplementos del formulario correspondiente del DHS (suplementos B para I-918 o I-914), cuando sea necesario. La certificación debe incluir información detallada sobre cómo la persona ha sido, es o puede ser de ayuda en una investigación o proceso penal.

27. Cualquier solicitud de asistencia para completar una certificación para una solicitud de visa U o visa T debe dirigirse a la División de Investigaciones Criminales (CID, en inglés) del BPD.

28. Todas las solicitudes de certificaciones para Visas U se considerarán de manera individual. Cuanto

más tiempo haya pasado entre el delito y la solicitud de certificación, más se alienta a los solicitantes a proporcionar tanta información, pruebas y explicaciones como sea posible en relación con la participación del solicitante en el caso o cualquier motivo de retraso en la solicitud de certificación.

## División de Investigaciones Criminales

### Obligaciones

29. Todas las solicitudes de certificaciones del suplemento B para los formularios I-918 e I-914 se derivarán a los funcionarios a cargo de la certificación. La persona responsable de realizar la certificación es el jefe de la CID.

NOTA:   El certificador debe firmar todos los formularios del suplemento B aprobados con tinta azul.

30. Antes de completar el suplemento B de un formulario I-918 (una solicitud de certificación de una Visa U), el funcionario a cargo de la certificación debe verificar lo siguiente:

   30.1.   La persona no ciudadana fue o es alguna de las siguientes:

      30.1.1. Víctima de alguna actividad elegible (ver el anexo C) que tuvo lugar en EE. UU. o en sus territorios, o que ocurrió fuera de EE. UU. pero que viola la ley extraterritorial de EE. UU; o

      30.1.2. El cónyuge o hijo menor de 21 años de una víctima que ha fallecido por asesinato u homicidio, o que es incompetente o está incapacitada; o

      30.1.3. El padre o hermano soltero menor de 18 años de una víctima menor de 21 años que ha fallecido por asesinato u homicidio involuntario, o que es incompetente o está incapacitada.

   30.2.   La persona no ciudadana ha sido, es o puede ser de ayuda para la investigación (esto aplica a los solicitantes de Visas U y a los solicitantes de Visas T). El BPD determina que la víctima es de ayuda en los siguientes casos:

      30.2.1. Cuando tiene información sobre un delito elegible; o

      30.2.2. Cuando demuestra cooperación durante la detección o la investigación de ese delito, incluso si la investigación no ha finalizado.

NOTA:   Cuando una certificación se base en una investigación previa o en un caso penal que se haya cerrado o suspendido, o cuando haya pasado el período de prescripción, la certificación se debe realizar después de que se haya llevado a cabo la verificación.

31. Antes de completar el suplemento B de un formulario I-914 (declaración de la policía para una solicitud de Visa T), el funcionario a cargo de la certificación debe verificar lo siguiente:

   31.1.   La persona solicitante no ciudadana es o fue víctima de una forma grave de trata de personas (que puede incluir la trata con fines de explotación sexual o laboral), según la definición de las leyes federales (consultar el anexo D para ver las definiciones federales); o

   31.2.   En el caso de una víctima no ciudadana que tenga 21 años o más, el solicitante puede ser el/la cónyuge o el/la hijo/a de esa víctima; o

31.3.  En el caso de una víctima no ciudadana menor de 21 años, el solicitante puede ser el/la cónyuge, hijo/a, padre/madre o hermano/a soltero/a menor de 18 años de la víctima.

32.  No se aceptará ninguna solicitud de certificación a menos que se realice en el formulario de los USCIS correspondiente (suplemento B para el formulario I-918 o I-914). La persona que remite la solicitud, que puede ser un abogado privado, una organización sin fines de lucro o una víctima, debe haber completado todos los campos correspondientes. Consulte el anexo E para ver las pautas para abogados sobre los requisitos de la solicitud de certificación.

33.  El certificador debe completar los campos correspondientes en el suplemento B del formulario I-918 o I-914, según las instrucciones del formulario de los USCIS.

34.  La solicitud de certificación se debe realizar en un plazo de 30 días hábiles a partir de la fecha en que la CID la haya recibido.

EXCEPCIÓN: En los casos en que el solicitante o su representante haya informado al BPD que el solicitante se encuentra en un proceso de expulsión inminente e inmediato relacionado con la inmigración, la certificación se debe realizar en un plazo de 5 días hábiles a partir de la fecha en que la CID la haya recibido.

EXCEPCIÓN: El requisito de tiempo se suspenderá en caso de que se declare un estado de emergencia o se produzca una situación de emergencia que requiera el despliegue de unidades de la CID en funciones distintas de las habituales.

35.  Al realizar una certificación, el funcionario a cargo de esta incluirá una copia de la certificación en el expediente del caso y devolverá la certificación original a la víctima o a su representante.

NOTA:  El BPD no puede enviar la certificación firmada directamente al DHS; esto es responsabilidad de la víctima o de su representante.

36.  En los casos en que el BPD determine que la certificación no se firmará porque la víctima no califica, se debe documentar esto en el expediente del caso e informarle a la víctima o a su representante.

37.  Todas las aprobaciones y denegaciones se deben documentar en un registro interno ubicado en el CID.


**CAPACITACIÓN**

38.  La División de Educación y Capacitación debe garantizar que todos los miembros del Programa de Formación Básica de Reclutamiento reciban capacitaciones sobre esta política y que todos los miembros reciban las capacitaciones adecuadas sobre esta política como parte de su capacitación anual durante el trabajo.


**APPENDICES**

A.  Sample Response from NCIC Inquiry
B.  Sample Identification from Government and Non-Government Entities
C.  Qualifying Crimes for U Visa Eligibility
D.  Qualifying Crimes for T Visa Eligibility
E.  Guidelines for Attorneys – U and T Visa Certification Request

| **Policy 1021** | **IMMIGRATION STATUS** | **Page 13 of 19** |

**REFERENCED POLICIES**

Policy 317,       *Fair and Impartial Policing*
Policy 1112,     *Field Interviews, Investigative Stops, Weapons Pat-Downs, and Searches*
Policy 1301,     *National Crime Information Center (NCIC)*

**RESCISSION**

Remove and destroy/recycle Policy 1021, *Immigration Status* dated 13 November 2022.

**COMMUNICATION OF POLICY**

This policy is effective on the date listed herein.   Each employee is responsible for complying with the contents of this policy.

## APPENDIX A

## Sample Response from NCIC Inquiry

**SAMPLE RESPONSE FROM NCIC INQUIRY: ADMINISTRATIVE (CIVIL) WARRANTS**

**Administrative Warrant of Removal:**

WARNING REGARDING FOLLOWING RECORD - SUBJECT OF NIC/N307770847 HAS AN
OUTSTANDING ADMINISTRATIVE WARRANT OF REMOVAL FROM THE UNITED STATES. CONTACT
LESC
AT (877) 999-5372 FOR IMMEDIATE HIT CONFIRMATION AND AVAILABILITY OF
BUREAU OF IMMIGRATION AND CUSTOMS ENFORCEMENT DETAINER.

MKE/IMMIGRATION VIOLATION - FAILURE TO APPEAR FOR REMOVAL
ORI/VTINS1000 NAM/SMITH, JOHN SEX/M RAC/W POB/FN DOB/19510101
HGT/510 WGT/180 EYE/BRO HAI/BRO CTZ/FN SKN/DRK
SMT/SC LF ARM
SOC/777010000
OFF/ALIEN UNLAWFULLY PRESENT DUE TO ORDER OF REMOVAL OR EXCLUSION FROM THE USA
OCA/ASD1234-T MIS/KNOWN AS JOHNNY BOY
ORI IS BUREAU OF IMMIGRATION AND CUSTOMS ENFORCEMENT, LAW ENFORCEMENT SUPPORT
CENTER
(877) 999-5372
NIC/N307770847 DTE/19980605 0000 EDT DLU/20090101 0600 EST
*****THIS RECORD MAY BE USED ONLY BY CRIMINAL JUSTICE AGENCIES FOR
CRIMINAL JUSTICE PURPOSES.
*****END OF IMMIGRATION VIOLATOR FILE RESPONSE*****

**Administrative Warrant of Arrest:**

WARNING REGARDING FOLLOWING RECORD - SUBJECT OF NIC/N307770847 HAS AN OUTSTANDING
ADMINISTRATIVE WARRANT OF ARREST FOR IMMIGRATION VIOLATIONS FOR FAILURE TO COMPLY
WITH NS REGISTRATION. CONTACT LESC AT (877) 999-5372 FOR IMMEDIATE HIT
CONFIRMATION AND AVAILABILITY OF BUREAU OF IMMIGRATION AND CUSTOMS ENFORCEMENT
DETAINER.

MKE/IMMIGRATION VIOLATION - NS REGISTRATION
ORI/VTINS1000 NAM/SMITH, JOHN SEX/M RAC/W POB/FN DOB/19510101
HGT/510 WGT/180 EYE/BRO HAI/BRO CTZ/FN SKN/DRK
SMT/SC LF ARM
SOC/777010000
OFF/SOUGHT FOR VIOLATION OF NS REGISTRATION
OCA/ASD1234-T MIS/KNOWN AS JOHNNY BOY
ORI IS BUREAU OF IMMIGRATION AND CUSTOMS ENFORCEMENT, LAW ENFORCEMENT SUPPORT
CENTER (877) 999-5372
NIC/N307770847 DTE/19980605 0000 0830 EDT DLU/20090101 0600 EST
*****THIS RECORD MAY BE USED ONLY BY CRIMINAL JUSTICE AGENCIES FOR
CRIMINAL JUSTICE PURPOSES.
*****END OF IMMIGRATION VIOLATOR FILE RESPONSE*****

| Policy 1021 | IMMIGRATION STATUS | Page 15 of 19 |

## APPENDIX A

**Sample Response from NCIC Inquiry (con.)**

**SAMPLE RESPONSE FROM NCIC INQUIRY:  CRIMINAL ICE WARRANT**

**One Example of a <u>Criminal</u> ICE Warrant:**

```
***MESSAGE KEY ZW SEARCHES WANTED PERSON FILE FELONY RECORDS REGARDLESS OF
EXTRADITION AND MISDEMEANOR RECORDS INDICATING POSSIBLE INTERSTATE
EXTRADITION FROM THE INQUIRING AGENCY'S LOCATION.  ALL OTHER NCIC PERSONS
FILES ARE SEARCHED WITHOUT LIMITATIONS.
MKE/WANTED PERSON
EXL/1 - FULL EXTRADITION UNLESS OTHERWISE NOTED IN THE MIS FIELD
ORI/VTICE0900 NAM/TEST, TEST SEX/M RAC/W POB/EY
DOB/19000101 HGT/509 WGT/175 EYE/BR0 HAI/BLK
SKN/LGT
MNU/PP-1234567 SOC/123456789
OFF/FRAUD - FALSE STATEMENT
DOW/20090114 OCA/2-M-TEST
VLD/20120411
MIS/CRIMINAL WARRANT ON VIOLATION OF TITLE 18 USC, SECTION 1542, FALSE STATEMENT
MIS/ON A PASSPORT APPLICATION; ISSUED BY THE U S DISTRICT COURT, EASTERN
MIS/DISTRICT OF VIRGINIA
DNA/N
ORI IS ICE LESC 802 872-6020
DOB/19730515
AKA/TESTER, TEST
AKA/ALPHA, BET
MNU/PP-5678943
SOC/9854321
NIC/W123456789 DTE/20090115 1510 EST DLU/20120411 1301 EST
IMMED CONFIRM WARRANT AND EXTRADITION WITH ORI
```

## APPENDIX B

**Sample Identification from Government and Non-Government Entities**



### APPENDIX C

**Qualifying Crimes for U Visa Eligibility**

Defined by statute to be "activity involving one or more of the following or any similar activity** in violation of federal, state, or local criminal law." The statute also includes the attempt, conspiracy, or solicitation to commit any of the crimes listed below:

| | | |
|---|---|---|
| Abduction | Hostage | Stalking |
| Incest | Rape | Fraud in Foreign Labor Contracting |
| Abusive sexual contact | Involuntary servitude | Sexual assault |
| Blackmail | Kidnapping | Sexual exploitation |
| Domestic violence | Manslaughter | Slave trade |
| Extortion | Murder | Torture |
| False imprisonment | Obstruction of justice | Trafficking |
| Felonious assault | Peonage | Perjury |
| Unlawful criminal restraint | Female genital mutilation | Witness tampering |
| Being held hostage | Prostitution | Other related crimes |

**"Any Similar Activity" refers to other criminal activity when the similarities are substantial and the nature and elements of the criminal activity are comparable.

## APPENDIX D

**Qualifying Crimes for T Visa Eligibility**

Are or were a victim of a severe form of human trafficking as defined as:

- **Sex trafficking**: When someone recruits, harbors, transports, provides, solicits, patronizes, or obtains a person for the purpose of a commercial sex act, where the commercial sex act is induced by force, fraud, or coercion, or the person being induced to perform such act is under 18 years of age; or

- **Labor trafficking**: When someone recruits, harbors, transports, provides, or obtains a person for labor or services through the use of force, fraud, or coercion for the purpose of involuntary servitude, peonage, debt bondage, or slavery.

https://www.uscis.gov/humanitarian/victims-human-trafficking-other-crimes/victims-human-trafficking-t-nonimmigrant-status

## APPENDIX E

## Guidelines for Attorneys – U and T Visa Certification Request



<u>I-918b (U Visa Supplement) & I-914b (T Visa Supplement) Process for Law Enforcement Certification:</u>

The Baltimore Police Department (BPD) supports the cooperation of immigrant crime victims with our investigations.  To that end, we will review requests for I-918b and I-914b certifications and provide an original signature, where appropriate.  The Deputy Commissioner of the Patrol & Community Policing Bureau and their designee(s) are designated  as BPD's certifiers.

To facilitate our review, please follow these required guidelines.  If a submitted certification request has any of  the below information missing, we will not be able to make a decision.  If complete, we will review the file to make a  determination and may edit the narrative.

1. Cover letter including (Please include a letter in mailed and emailed submissions):
   a. The full name of your client
   b. The full name of the defendant/suspect, if available
   c. Incident Report #
   d. Date and short description of incident(s)
2. I-918b or I-914b Form – <u>TWO</u> Versions:
   a. <u>Version 1</u>: I-918b Form with pre-drafted Parts 1, 2 only (for I-914b, pre-drafted with Parts A, B only)
   b. <u>Version 2</u>: I-918b Form with all sections pre-drafted (for I-914b, with all sections pre-drafted)
3. Related hospital or medical reports
4. Contact information to send the signed I-918b or I-914b

Requests can be submitted either by U.S. mail or by electronic mail.

| By U.S. Mail:* | By Electronic Mail: |
|---|---|
| Deputy Commissioner, Patrol & Community Policing Bureau ATTN: U-Visa & T-Visa Application Processing 242 W. 29th St. Baltimore, MD 21211 | visacertifications@baltimorepolice.org |

*In order to expedite the processing of requests made by U.S. mail, attorneys are encouraged to include a self-addressed stamped envelope with the request packet.*

Please share this information with other service providers, immigrant crime victims, private attorneys, and any  relevant list-serves.  If you have any questions, please contact visacertifications@baltimorepolice.org (preferred) or call 410-396-2626.

Updated
Mar. 2024

EXHIBIT 10

## RESOLUTION NO. 3068

## A RESOLUTION TO DECLARE BEND A *WELCOMING CITY* AND AFFIRM MEMBERSHIP IN THE NATIONAL WELCOMING AMERICA INITIATIVE

### RECITALS

A.    Discrimination is understood to negatively impact local economic activity and the health and well-being of all our residents; and

B.    Fostering a welcoming environment and treating all individuals with compassion and respect, regardless of race, ethnicity, place of origin, or citizenship status enhances Bend's cultural fabric, economic growth, global competitiveness and overall prosperity for current and future generations; and

C.    Bend aspires to be a welcoming place where people, families and institutions thrive and the contributions of all are celebrated and valued; and

D.    Bend is committed to ensuring a welcoming and neighborly atmosphere in our community, where all people, including immigrants and refugees, are welcomed, accepted and encouraged to participate fully in civic life; and

E.    Community efforts that promote inclusivity, understanding and collaboration across cultures to learn about and appreciate everyone's unique perspectives and experience are crucial to ensuring a welcoming and thriving city; and

F.    Bend encourages business leaders, civic groups, other government agencies and community institutions, and residents to join in a community-wide effort to expand prosperity, integration and inclusion for all residents.

Based on these Findings,

### THE CITY COUNCIL OF THE CITY OF BEND RESOLVES AS FOLLOWS:

Section 1.    The City Council declares Bend an Inclusive and Welcoming[1] City that embraces and celebrates its immigrant and refugee residents, and welcomes and encourages their contributions to the collective prosperity and security of all current and future residents.

Section 2.  To achieve this vision, and in alignment with Oregon State laws[2], the City will continue to refrain from the use of City funds, personnel and equipment from enforcing federal immigration laws and detaining people solely on their immigration status.

Section 3. As an initial action toward honoring the spirit and intent of this resolution, Bend is declared a Welcoming City and a member of the National Welcoming Cities and Counties Initiative the City Council directs City staff to join as a proud member of the National *Welcoming America* Initiative.

Section 4.    This resolution is effective on passage.


Adopted by a roll call vote of the Bend City Council on June 21, 2017.

      YES:   Casey Roats, Mayor      NO:  NONE
             Sally Russell
             Bill Moseley
             Bruce Abernethy
             Nathan Boddie
             Justin Livingston
             Barb Campbell


Casey Roats, Mayor

ATTEST:

Robyn Christie, City Recorder

APPROVED AS TO FORM:

Mary A. Winters, City Attorney


[1] The Membership Commitment, along with the Membership Principles and Values, for the national network of Welcoming America [www.welcomingamerica.org] affiliates are attached.

[2] Oregon law, adopted nearly 30 years ago, states in part: "No law enforcement in the State of Oregon or any political subdivision of the state shall use agency moneys, equipment or personnel for the purpose of detecting or apprehending persons whose only violation of law is that they are persons of foreign citizenship present in the United States in violation of federal immigration laws."  *See* ORS 181A.820(1).

*The Latino Community Association and Bend 2030 have joined as Welcoming Nonprofits and pledge to support and be a partner to the City of Bend's efforts to fulfill its membership commitment.*

EXHIBIT 11

# Contact with members of immigrant communities and enforcement prohibitions of federal immigration laws

## 413.1  PURPOSE AND SCOPE

The purpose of this policy is to provide guidelines to members of the Bend Police Department in their interactions with immigrants, immigrant communities and foreign national community members as well as with persons who voluntarily disclose their immigration status. This policy also provides limitations to inquires of immigration status and when uses of immigration status are acceptable. This policy is also intended to offer reassurance to members of our community that we are committed to the standard of equal protection, safety, and enforcement regardless of immigration status.

Bend Police Officers are not trained nor instructed to ask for a person's legal residency status or immigration status and instead are trained and instructed to treat all individuals with respect, fairness, and dignity.

This policy is also intended to reassure immigrant communities that there is no need to fear contact with the Bend Police Department as to a person's immigration or legal residency status does not impact our service to a community member.

For Consular Notifications see Foreign Diplomatic and Consular Representatives Policy.

### 413.1.1  DEFINITIONS

**Administrative Removal Warrant** – An order signed by a supervisory level administrator of the United States Immigration and Customs Enforcement (ICE) agency and not a judge. The document authorized ICE officers or officers with the United States Enforcement and Removal Operations (ERO) to arrest non-citizens who are alleged or suspected of having committed immigration violations and/or who are alleged to be deportable. Administrative Removal Warrants are not required to be supported by probable cause and only allow ICE and ERO members to detain the named person and do not allow for premise searches.

**Detainer Request**– A detainer request is typically completed by any federal immigration law enforcement branch of ICE submitting a Federal Form I-247A upon a law enforcement agency that has custody of an individual suspected of violating federal immigration law.  The form asks the law enforcement agency for which it is served to contact ICE and agree to secure the transfer of a person into the custody of ICE before their release from custody on state or local criminal charges.  This form is only submitted where the law enforcement agency is holding a person on other criminal charges.

**Judicial Order** – A judicial order or judicial warrant is signed by a federal district court magistrate or judge, or an Oregon state or county judge, that must be executed by law enforcement as a

Copyright Lexipol, LLC 2025/06/16, All Rights Reserved.
Published with permission by Bend Police Department

Contact with members of immigrant
communities and enforcement prohibitions of
federal immigration laws - 1

Bend Police Department
Bend PD Policy Manual

## Contact with members of immigrant communities and enforcement prohibitions of federal immigration laws

judicial order based on probable cause. Specific to persons, these orders or warrants generally allow for a complete search and seizure of persons, as described in the warrant.

**United States Department of Homeland Security (DHS)** – The federal government agency, comprised of various departments and sub-agencies, responsible for enforcing and administering customs and immigration laws, managing natural and man-made disasters, combatting terrorism and other threats to national security, and regulating trade and travel.

- **Enforcement and Removal Operations (ERO)** – The immigration law enforcement branch of ICE, under the United States Department of Homeland Security (DHS) responsible for identifying, detaining, and removing individuals who are alleged to be unlawfully present in the United States.

- **Immigration and Customs Enforcement (ICE)** – The federal law enforcement agency under the United States Department of Homeland Security (DHS) responsible for the enforcement of federal laws governing border control, customs, trade, and immigration.

- **Customs and Border Protection (CBP)** – The federal law enforcement agency under the United States Department of Homeland Security (DHS) responsible for the management of border security, regulation and facilitation of trade and travel, and the enforcement of federal laws governing trade, customs, and immigration.

- **Homeland Security Investigations (HSI)** – The investigative branch of the United States Department of Homeland Security (DHS) responsible for combating criminal organizations illegally exploiting America's travel, trade, financial, and immigration systems.  HSI is authorized to investigate criminal activities related to human, drug, and weapons trafficking, cybercrime, transnational gang activity, human rights violations, and other cross-border criminal activity.

## 413.2  POLICY

It is the policy of the Bend Police Department that all members make personal and professional commitments to equal enforcement of the law and equal service to the public. Confidence in this commitment will increase the effectiveness of this department in protecting and serving the entire community and recognizing the dignity of all persons, regardless of their national origin or immigration status.

The immigration status of individuals alone is generally not a matter for police action.  It is incumbent that all members of the Bend Police Department make personal and professional commitments to equal enforcement of the law and equal service and protection to all members of the community regardless of their actual or perceived immigration status or national origin. The Bend Police Department does not participate in immigration investigation and enforcement activities.

No member shall interview, detain, arrest, initiate an investigation, or take other official police action against an individual solely based on their actual or perceived immigration status or national origin.

Copyright Lexipol, LLC 2025/06/16, All Rights Reserved.
Published with permission by Bend Police Department

Bend Police Department
Bend PD Policy Manual

*Contact with members of immigrant communities and enforcement prohibitions of federal immigration laws*

### 413.3   VICTIMS AND WITNESSES

To encourage crime reporting and cooperation in the investigation of criminal activity, all individuals, regardless of their immigration status, must feel secure that contacting or being addressed by members of law enforcement will not automatically lead to immigration inquiry and/or deportation. While it may be necessary to determine the identity of a victim or witness, members shall treat all individuals equally and not in any way that would violate the United States or Oregon constitutions.

### 413.4   DETENTIONS

This department does not participate in routine immigration investigation and enforcement activities (ORS 181A.820).

An officer should not detain any individual, for any length of time, for a civil violation of federal immigration laws or a related civil warrant.

An officer who has a reasonable suspicion that an individual already lawfully contacted or detained has committed a criminal violation of federal immigration law may detain the person for a reasonable period of time in order to contact federal immigration officials to verify whether an immigration violation is a federal civil violation or a criminal violation. If the violation is a criminal violation, the officer may continue to detain the person for a reasonable period of time if requested by federal immigration officials (8 USC § 1357(g)(10)). No individual who is otherwise ready to be released should continue to be detained only because questions about the individual's status are unresolved.

If the officer has facts that establish probable cause to believe that a person already lawfully detained has committed a criminal immigration offense, they may continue the detention and may request a federal immigration official to respond to the location to take custody of the detained person (8 USC § 1357(g)(10)).

An officer is encouraged to forgo detentions made solely on the basis of a misdemeanor offense when time limitations, availability of personnel, issues of officer safety, communication capabilities, or the potential to obstruct a separate investigation outweigh the need for the detention.

An officer may arrest any person who is the subject of an arrest warrant issued by a federal magistrate for a criminal violation of federal immigration laws (ORS 181A.820).

An officer should notify a supervisor as soon as practicable whenever an individual is being detained or arrested for a criminal immigration violation.

### 413.4.1   IMMIGRATION INQUIRIES PROHIBITED

An officer shall not inquire into an individual's immigration status, citizenship status, or country of birth except where allowed by law (ORS 181A.823).

Copyright Lexipol, LLC 2025/06/16, All Rights Reserved.
Published with permission by Bend Police Department

# Bend Police Department
## Bend PD Policy Manual

*Contact with members of immigrant communities and enforcement prohibitions of federal immigration laws*

### 413.4.2 INDIVIDUAL RIGHT NOTIFICATION

To ensure compliance with all treaty obligations, including consular notification and state and federal laws, an officer should ensure individuals who are detained receive an explanation in writing, with interpretation into another language if requested, of the following (ORS 181A.823):

(a) The individual's right to refuse to disclose the individual's nationality, citizenship, or immigration status.

(b) That the disclosure of the individual's nationality, citizenship, or immigration status may result in a civil or criminal immigration enforcement, including removal from the United States.

### 413.4.3 SUPERVISOR RESPONSIBILITIES

When notified that an officer has detained an individual and established reasonable suspicion or probable cause to believe the person has violated a criminal immigration offense, the supervisor should determine whether it is appropriate to:

(a) Transfer the person to federal authorities.

(b) Lawfully arrest the person for a criminal offense or pursuant to a judicial warrant (see the Law Enforcement Authority Policy).

If a supervisor is made aware of a request from any federal immigration officials for assistance, the supervisor shall ensure that information is reported through their chain of command for the Chief of Police, or their designee,  to determine the course of action.

### 413.5 ARREST NOTIFICATION TO IMMIGRATION AND CUSTOMS ENFORCEMENT

Except as required or as allowed by state or federal law, members shall not notify federal immigration officials when booking arrestees at a jail facility or custodial facility. Any required notifications will be handled according to the receiving agency's procedures. An individual who is otherwise ready to be released from custody shall not continue to be detained solely for violation of federal immigration law unless a judicial order or warrant exists ordering that person to be taken into custody. A judicial order or warrant does not include an administrative removal warrant.

### 413.6 FEDERAL REQUESTS FOR ASSISTANCE

Requests by federal immigration officials for assistance from this department should be directed to a supervisor. The Department may provide available support services (unrelated to immigration enforcement), such as peacekeeping efforts (ORS 181A.826). Any requests from federal immigration officials for assistance relating to immigration enforcement (other than a judicial subpoena or a request related to the international extradition of a person to Oregon) shall be declined and the communication or request shall be documented. The documentation shall be forwarded to the Chief of Police or the authorized designee. The Chief of Police or the authorized designee should ensure the documentation is forwarded to the Oregon Criminal Justice Commission (OCJC) as prescribed by the OCJC (ORS 181A.826).

# Bend Police Department
Bend PD Policy Manual

*Contact with members of immigrant communities and enforcement prohibitions of federal immigration laws*

## 413.7 INFORMATION SHARING

No member of this department will prohibit, or in any way restrict, any other member from doing any of the following regarding the citizenship or immigration status, lawful or unlawful, of any individual (8 USC § 1373; 8 USC § 1644):

(a) Sending information to, or requesting or receiving such information from federal immigration officials

(b) Maintaining such information in department records

(c) Exchanging such information with any other federal, state, or local government entity

Any request for immigration status information shall be referred up the chain of command for an individualized determination about sharing the requested immigration status information, including whether such disclosure is required by federal or other law. All requests for immigration status information from any federal immigration authority shall be documented and reported as provided in Section 413.12 (Assistance to the Department of Homeland Security (DHS)) of this Policy.

Nothing in this policy restricts sharing information that is permissible under Oregon State Law.

### 413.7.1 IMMIGRATION DETAINERS

No individual should be held based solely on a federal immigration detainer under 8 CFR 287.7 unless the person has been charged with a federal crime or the detainer is accompanied by a warrant, affidavit of probable cause, or removal order. Notification to the federal authority issuing the detainer should be made prior to the release.

### 413.7.2 NON-DISCLOSURE OF CERTAIN INFORMATION

Except as required by state or federal law, members should not disclose for the purpose of enforcement of federal immigration laws the following information about a person or their known relatives or associates, whether current or otherwise (ORS 180.805):

(a) The person's address

(b) The person's workplace or hours of work

(c) The person's school or school hours

(d) The person's contact information, including telephone number, email address, or social media account information

(e) The identity of known associates or relatives of the person

(f) The date, time, or location of a person's hearings, proceedings, or appointments with the Department that are not matters of public record

### 413.7.3 SHARING OF INFORMATION OF IN- CUSTODY INDIVIDUALS

Except as provided in Section 413.7 of this Policy regarding immigration status information, no member shall provide information about an individual in the custody of the Department to a federal immigration authority for the purpose of civil immigration enforcement, except (ORS 181A.823(1) (c)):

Copyright Lexipol, LLC 2025/06/16, All Rights Reserved.
Published with permission by Bend Police Department

Bend Police Department

Bend PD Policy Manual

*Contact with members of immigrant communities and enforcement prohibitions of federal immigration laws*

(a) As may be required by a judicial subpoena issued as part of a court proceeding or by another compulsory court-issued legal process, or

(b) To the extent that the information is available to the general public and under the same terms and conditions as the information is available to the general public.

A judicial subpoena does not include an administrative subpoena created and signed by a federal immigration authority.

### 413.8  U VISA AND T VISA NON-IMMIGRANT STATUS

Under certain circumstances, federal law allows temporary immigration benefits, known as a U visa, to victims and witnesses of certain qualifying crimes (8 USC § 1101(a)(15)(U)).

Similar immigration protection, known as a T visa, is available for certain qualifying victims of human trafficking (8 USC § 1101(a)(15)(T)).

Any request for assistance in applying for U-visa or T-visa status should be forwarded promptly to the Detectives supervisor assigned to oversee the handling of the underlying criminal case or related criminal cases. The Detective Division supervisor should confirm that all requests for certifications are assigned to be reviewed and are consistent with the requirements in Oregon Revised Statues 147.620 by taking the following actions;

(a) Consult with the assigned investigator to determine the current status of any related case and whether further documentation is warranted,

(b) Contact the appropriate prosecutor assigned to the case, if applicable, to ensure the certification or declaration has not already been completed and whether a certification or declaration is warranted,

(c) Address the request and complete the certification or declaration, if appropriate, in a timely manner (ORS 147.620).

   (a) The instructions for completing certification and declaration forms can be found on the U.S. Department of Homeland Security (DHS) website.

(d) Ensure that any decision to complete, or not complete, a certification or declaration form is documented in the case file and forwarded to the appropriate prosecutor. Include a copy of any completed form in the case file (e.g., electronic records system for all case reports).

(e) The Detective supervisor shall ensure the packet is complete and once prepared, present it to the Chief of Police for signature.

### 413.8.1  DENIAL OF CERTIFICATION

If certification is denied, the Detectives supervisor shall inform the petitioner in writing regarding the reason for the denial as provided in ORS 147.620. A copy of the notice shall be kept for a minimum of three years and in accordance with the established records retention schedule (ORS 147.620).

Copyright Lexipol, LLC 2025/06/16, All Rights Reserved.
Published with permission by Bend Police Department

# Bend Police Department
Bend PD Policy Manual

*Contact with members of immigrant communities and enforcement prohibitions of federal immigration laws*

### 413.8.2  TIME FRAME FOR COMPLETION
Except under circumstances where there is good cause for delay, the Detectives supervisor shall process the certification for the U visa or T visa within 90 days of the request, unless the victim is in federal immigration removal proceedings, in which case the certification shall be executed within 14 days after the request is received (ORS 147.620).

### 413.8.3  RECORD KEEPING AND REPORTING
The Detective supervisor shall collect written documentation regarding the number of certification forms that are;

(a)    Requested by a victim,

(b)    Granted,

(c)    Denied, with the reason for denial.

The Detective supervisor or the authorized designee should ensure that the information collected regarding certification forms is transmitted, promptly upon completion, to the Records Division for annual reporting to the Oregon Criminal Justice Commission.

## 413.9  RESOURCE RESTRICTIONS
No member of the Bend Police Department shall use any public facilities, property, money, equipment, technology, or personnel to enforce federal civil immigration laws. This includes the investigation, detection apprehension, arresting, detaining or holding individuals whose only violation of law is that they are persons of foreign citizenship present in the United States in violation of federal civil immigration laws.

## 413.10  IMMIGRATION INFORMATION
Bend Police Department members shall not make inquiries regarding the immigration or citizenship status of individuals, including when investigating a crime. An exception does exist if the individual's immigration status is relevant to the investigation, such as in cases of human trafficking, hate crimes, etc.  If this is the case, the member should communicate to the individual the reason they are being asked the information and the relevance it has to the investigation.

If a member does receive immigration status information of an individual that was either volunteered or inadvertently obtained by other means, members shall not include immigration status information in written police reports, unless the information itself is essential to the investigation being conducted or relates to a legitimate law enforcement purpose, unrelated to the enforcement of federal immigration laws. Immigration status information, if obtained, shall be maintained in the form in which it was obtained or inadvertently received or noted.

A member may exchange information with agencies of DHS to verify the immigration status of a person if the person is arrested for any criminal offense or to request criminal investigation information regarding persons named in records of the DHS.

If an individual appears that they may qualify and meet the need as a victim or witness for a visa or other immigration protections based on cooperation with law enforcement in an investigation

Copyright Lexipol, LLC 2025/06/16, All Rights Reserved.
Published with permission by Bend Police Department

Contact with members of immigrant
communities and enforcement prohibitions of
federal immigration laws - 7

# Bend Police Department
Bend PD Policy Manual

*Contact with members of immigrant communities and enforcement prohibitions of federal immigration laws*

of a crime, according to federal temporary immigration benefits and protections rules, then the information may be requested from an individual regarding their immigration status.

Requests for immigration status information by any federal immigration agency shall be handled as described in section 413.7 (Information Sharing) of this Policy.

## 413.11   ARREST AND DETENTIONS
An officer shall not arrest, detain, transport, or investigate, any individual solely for a civil violation of federal immigration laws, Administrative Removal Warrants, or any other administrative document issued by ICE.

An officer or member of the Bend Police Department shall not honor or comply with federal agency immigration detainer requests.

An officer shall have the responsibility and requirement to detain and arrest an individual if they discover that an individual they are already lawfully in contact with is the subject of a valid judicial order or judicial warrant, including if the order or warrant is for immigration-related crimes.  If the officer's only authority to take a person into custody and hold them is the existence of a federal judicial order for immigration-related crimes, then the officer may request a federal immigration official to respond to the location to take custody of the detained person.

An officer may arrest any person who is charged by the United States with a criminal violation of federal immigration laws under Title II of the Immigration and Nationality Act or 18 U.S.C. 1015, 1422 to 1429.

An officer shall notify a supervisor as soon as practicable whenever an individual is being detained or arrested for a criminal immigration violation or as ordered by a judicial order or warrant for a criminal immigration violation.

## 413.12   ASSISTANCE TO DEPARTMENT OF HOMELAND SECURITY (DHS)
Bend Police Department members shall not assist any Federal Agencies (e.g., DHS, ICE, CBP, HSI or ERO) with any enforcement or investigative efforts for federal civil immigration law violations or immigration enforcement. Any request by federal immigration officials or agency representatives for assistance from the Bend Police Department for assistance for enforcement of federal immigration law violations or immigration enforcement shall be referred to a supervisor.

The supervisor shall decline the request, other than a request for emergency assistance or immigration status information, and document the request, and the details of the request, in a memorandum forwarded to the Chief of Police, through their chain of command. This shall be completed within 48 hours of the request.

Requests for immigration status information by any federal immigration agency shall be handled as described in section 413.7 (Information Sharing) of this Policy.

The Chief of Police shall review this documentation and ensure that these are archived for monthly reporting to the Oregon Criminal Justice Commission (CJC). If the Bend Police Department does

Copyright Lexipol, LLC 2025/06/16, All Rights Reserved.
Published with permission by Bend Police Department

# Bend Police Department

Bend PD Policy Manual

---

*Contact with members of immigrant communities and enforcement prohibitions of federal immigration laws*

---

not receive requests that are required to be denied during any calendar month, then there is no requirement to report to the CJC. Monthly reporting shall be in accordance with the requirements for the reporting as identified by the CJC.

Any non-immigration enforcement requests by federal immigration officials or agency representatives for assistance from the Bend Police Department shall be referred to a supervisor. This request shall be communicated to the Chain of Command, and the decision to assist will be made by the Chief of Police or their designee. The Chief of Police or their designee will evaluate the assistance request and limitations depending on the circumstances.

The United States Department of Homeland Security consists of many departments and sub-agencies whose responsibility is to investigate and enforce federal laws other than immigration law. The Bend Police Department will continue to assist and collaborate with federal law enforcement agencies, outside of federal immigration law, in the interest of overall community safety and enforcement of criminal matters.

Members of the Bend Police Department will respond to emergency calls for assistance, such as emergency cover or assistance, injured officers, shots fired calls, and other matters relating to life safety concerns when requested by any federal agency, regardless of their department or sub-agency affiliation.

## 413.13  TRAINING

The Training Sergeant should ensure officers receive training on this policy. Training should include:

(a)    Identifying civil versus criminal immigration violations.

(b)    Factors that may be considered in determining whether a criminal immigration offense has been committed.

---

Copyright Lexipol, LLC 2025/06/16, All Rights Reserved.
Published with permission by Bend Police Department

EXHIBIT 12

RESOLUTION NO. 17- 13

**A RESOLUTION OF THE CITY COUNCIL OF THE CITY OF BENICIA DECLARING THE CITY OF BENICIA'S COMMITMENT TO BEING A WELCOMING, INCLUSIVE, AND SAFE COMMUNITY FOR EVERYONE**

**WHEREAS,** the Mayor and City Council of the City of Benicia are united in our commitment to serve the people that we represent; and

**WHEREAS,** we feel strongly that all persons should support due process and adhere to the rule of law; and

**WHEREAS,** in alignment with the City Council's goal of creating a safe and welcoming community that supports the protection of human rights, social justice, equality, public safety, and social well-being; and

**WHEREAS,** the City has a long standing history and commitment of celebrating diversity; and

**WHEREAS,** fostering a relationship of trust, respect, and open communication between City officials and residents as codified in our Open Government Ordinance, is essential to the City's mission of delivering efficient public services in partnership with our community, which ensures public safety, a prosperous economic environment, opportunities for our youth, and a high quality of life for resident; and

**WHEREAS,** the City of Benicia seeks to continue to foster trust between City officials and residents to protect limited local resources, to encourage cooperation between residents and City officials, including law enforcement officers and employees, and to ensure public safety and due process for all; and

**WHEREAS,** through the City's commitment to social justice and inclusion one of the City's most important objectives is to enhance its relationship with all its residents, including immigrants.

**NOW, THEREFORE, BE IT RESOLVED THAT** the City Council of the City of Benicia does hereby resolve that we are firm in our commitment to ensure that all people residing in, working, visiting and passing through the City of Benicia be safe.

**BE IT FURTHER RESOLVED THAT** due to the City's limited resources, the complexity of federal civil immigration laws, the laws of the State of California, the need to promote trust and cooperation from the public, including

immigrants, and to attain the City's objectives, the City Council seeks to clarify through this resolution the alignment with State Law including, but not limited to, the TRUST Act, and the communication and enforcement relationship between the City and the federal government with the following:

It is the City's policy that:

1.  No person shall be contacted, detained, or arrested solely on the basis of his or her immigration status.

2.  The Benicia Police Department will equally enforce the laws and serve the public without regard to immigration status.  Except as specifically set forth in below, the immigration status of a person, and the lack of immigration documentation, should have no bearing on the manner in which Officers execute their duties.

a.  Police Officer's suspicion about any person's immigration status shall not be used as a sole basis to initiate contact, detain, or arrest that person unless such status is reasonably relevant to the investigation of a crime, such as trafficking, smuggling, harboring, and terrorism.
b.  Sweeps intended solely to locate and detain undocumented immigrants are not permitted. Police Officers will not participate in Immigration and Customs Enforcement organized sweeps to locate and detain undocumented aliens. Police personnel may, however, provide support services, including traffic control, during an Immigration and Customs Enforcement operation, upon the specific request of Immigration and Customs Enforcement for assistance.

**BE IT FURTHER RESOLVED THAT** nothing in this resolution shall be construed or implemented to conflict with any valid and enforceable duty and obligation imposed by a court order or any federal or applicable law.

**BE IT FURTHER RESOLVED THAT** we choose to be a leader in promoting human rights, social justice, equality, public safety, and social well-being.

**BE IT FURTHER RESOLVED THAT** we believe in and are committed to continue our work to build a community that is welcoming, inclusive, just, law-abiding, and safe for all individuals, regardless of their race, religion, class, identification, ethnicity, sexual orientation, disability status, gender, or country of origin.

*****

On motion of Council Member **Young**, seconded by Council Member **Campbell**, the above Resolution is introduced and passed by the City Council of the City of Benicia at a regular meeting of the Council held on the 7th day of February, 2017 and adopted by the following vote:

Ayes:     **Council Members Campbell, Young, and Mayor Patterson**

Noes:     **Council Members Hughes and Schwartzman**

Absent: **None**

_____
Elizabeth Patterson, Mayor

Attest:

_____
Lisa Wolfe, City Clerk

_____
Date

# EXHIBIT 13

RESOLUTION NO. 71,658-N.S.

REAFFIRMING BERKELEY AS A SANCTUARY CITY

WHEREAS, the residents of Berkeley have a long history and deep commitment to welcoming immigrants, refugees, and those in exile; and

WHEREAS, the Berkeley community believes in protecting all of our residents and letting them know they are safe, regardless of their immigration status; and

WHEREAS, the City of Berkeley was the first City in the Nation to declare itself a City of Refuge in 1971 (Resolution 44,784-N.S.) and the first City to support the "New Border Vision", in 2020, to encourage Congress to expand public safety, protect human rights, and welcome people to our communities; and

WHEREAS, Berkeley reaffirmed its City of Refuge status in 1986 (Resolution No. 52,596-N.S.), 2007 (Resolution No. 63,711-N.S.), 2015 (Resolution No. 67,325-N.S.), 2016 (Resolution No. 67,598-N.S. & No. 67,763-N.S.) and 2017 (Resolution No. 68,131-N.S.); and

WHEREAS, as of 2023, 21.3% of Berkeley's population are immigrants of varying statuses, with undocumented, DACA, and TPS holders most vulnerable to the incoming administration's threats of discrimination and deportation; and

WHEREAS, multiple studies have proven that jurisdictions that provide sanctuaries are safer and economically more prosperous compared to other jurisdictions – including a 2017 report by the Center for American Progress that shows on average there are 35.5 fewer crimes committed per 10,000 people in sanctuary jurisdictions, the average annual income is $4,353 higher, the poverty rate is 2.3% lower, and unemployment is 1.1% lower; and

WHEREAS, in the interest of promoting public safety, it is important to create an environment in which people feel comfortable interacting with local law enforcement, not eroding that trust by permitting local police officers to assist federal immigration enforcement; and

WHEREAS, in early 2017, a Sanctuary City Task Force was convened, which brought immigration and civil rights groups, faith leaders, legal experts, school and university officials, and community activists together to discuss ways to strengthen our City of Refuge policy, as well as support our undocumented community members; and

WHEREAS, the Task Force and working groups developed resources and protocols to clarify the rights of undocumented individuals and city/community partners in the case of U.S. Immigration & Customs Enforcement (ICE) enforcement activity; and

WHEREAS, the Task Force created procedures to help City Staff act in accordance with Berkeley's Sanctuary City status, should ICE agents contact city officials or visit city

facilities or engage with city staff to collect information, or request assistance with arresting any undocumented or naturalized resident or visitor beyond what is required by federal law; and

WHEREAS, all City of Berkeley Departments and employees of the City of Berkeley, including the Berkeley Police Department, have committed to not comply with ICE officers lacking a valid judicial warrant; and

WHEREAS, the Berkeley School Board passed a similar sanctuary campus policy in December 2017 which articulated restrictions on information sharing, providing access to school facilities, and collaboration with Immigration officials; and

WHEREAS, the Berkeley School Board will soon consider at an upcoming meeting to reaffirm the 2017 Berkeley Unified School District Sanctuary Campus Policy (Resolution 17-050), which articulated restrictions on information sharing, providing access to school facilities, and collaborating with immigration officials; and

WHEREAS, Berkeley City College, UC Berkeley, and University Lutheran Chapel have adopted similar policies; and

WHEREAS, California State Superintendent of Instruction Tony Thurmond champions the bill introduced by Senate Majority Leader Lena Gonzalez SB 48 to Keep Immigration and Customs Enforcement Off of School Campuses, Protecting School Attendance and Funding Amid Deportation Threats; and

WHEREAS, hospitals, clinics, schools, and public transportation are key locations of direct services that immigrants rely on for basic needs and are vulnerable to deportation raids from federal immigration enforcement officers; and

WHEREAS, faith communities and other Community Based Organizations (CBOs) play a vital role by protecting essential human rights and offering support to refugees and undocumented immigrants, requiring commitments from local governments to stand with these institutions and protect them from federal deportation raids or other attacks; and

WHEREAS, the incoming Trump administration has campaigned on threats of mass deportation and has indicated its intent to rescind the longstanding federal policy restricting immigration enforcement activity at schools, after-school programs, hospitals, community health centers, and places of worship; and

WHEREAS, in light of the beginning of the Trump administration's term, the City of Berkeley must remind the community and City Staff of Berkeley's status as a Sanctuary City and a City of Refuge.

NOW THEREFORE, BE IT RESOLVED by the Council of the City of Berkeley that it reaffirms that the City of Berkeley is a City of Refuge and a Sanctuary City, and that the

Page 5 of 8

following restrictions on the use of City funds and resources shall be applied relating to enforcement of federal immigration law:

1.    No department, agency, commission, officer or employee of the City of Berkeley shall use any City funds or resources to assist in the enforcement of Federal immigration law or to gather or disseminate information on the status of individuals in the City of Berkeley unless required by federal law.

2.    No department, agency, commission, officer or employee shall deny access to any city services or benefits to residents on the basis of their immigration status.

3.    The prohibition set forth shall include but not be limited to:

    a. Assisting or cooperating, in one's official capacity, with any Department of Homeland Security (DHS) investigation, detention, or arrest procedures, including but not limited to any such procedures in schools, after-school programs, hospitals, health centers or places of worship, whether public or clandestine, relating to alleged violations of the civil provision of federal immigration law, except as required by federal law.

    b. Requesting information about, or disseminating information regarding, the citizenship, immigration status, or birth country of any individual, except as required by federal law.

    c. Including on any application, questionnaire or interview form used in relation to benefits, services or opportunities provided by the City of Berkeley, any question regarding immigration status, except as required by federal law.

4.    It is the policy of the City of Berkeley to not allow any individual or organization to enter city facilities if their presence would disrupt city operations. Because the City Council believes that ICE activities in city facilities would constitute a severe disruption to the provision of city services, any request by ICE to any City officer or employee shall be immediately assessed for legality through the City Attorney to ensure the safety of city employees and residents accessing city services and compliance with applicable state and federal laws.

5.    Except in limited circumstances where ICE agents have a valid judicial warrant, after review and consultation with the City Manager and City Attorney, city departments, agencies, commissions, officers or employees are **not required to**:

    - Cooperate with ICE agents
    - Answer ICE agents' questions or provide any protected data
    - Comply with an ICE Administrative Warrant
    - Immediately comply with a subpoena served by ICE agents
    - Speak with ICE agents at all

6.    City officers or employees shall not consent to a search by ICE agents of a non-public area or non-public city records, without a valid judicial warrant.

7.    If any person asks questions regarding their immigration status to City staff (while working in their official capacity), City staff shall not refer them to ICE or any other government agency. Instead, City staff shall refer such individuals to local non-profit immigration law organizations. A list of such organizations shall be compiled and disseminated at City buildings and on the City's website. The City Manager is also encouraged to increase and enhance partnerships with community-based organizations, legal service providers, and educational institutions to provide resources for families and City residents facing deportation or other adverse immigration actions.

8.    All requests for documents or protected data by ICE to City personnel shall be immediately forwarded to the City Manager for review and consultation with the City Attorney to ensure the safety of city employees and residents, and compliance with applicable state and federal laws.

BE IT FURTHER RESOLVED that the City of Berkeley stands in solidarity with the Berkeley School Board, Berkeley City College, UC Berkeley, University Lutheran Chapel, and other schools, medical institutions, or places of worship that have committed to similar sanctuary policies to protect the residents of Berkeley, regardless of their immigration status.

BE IT FURTHER RESOLVED that the City of Berkeley offers its support and protection to local CBOs and faith communities offering safety and protection to immigrants in the face of direct threats from federal agencies.

BE IT FURTHER RESOLVED that the Council shall refer to the City Attorney to explore the possibility of pledging the City's legal support to help local CBOs and other "sensitive sites", such as schools, after-school programs, hospitals, community health centers, and places of worship, defend themselves against civil litigation.

BE IT FURTHER RESOLVED that the City Council will collaborate with the boards of BART, AC Transit, East Bay Regional Parks District, UC and CSU systems, Peralta Community College District, and county hospital systems to ensure that the Right to Sanctuary is protected on a regional level.

BE IT FURTHER RESOLVED that the City of Berkeley calls on other Bay Area and California cities to reaffirm their commitments to sanctuary and pass legislation that protects all California residents.

BE IT FURTHER RESOLVED that the City of Berkeley calls on the California legislature to pass SB 48 to Keep Immigration and Customs Enforcement Off of School Campuses, Protecting School Attendance and Funding Amid Deportation Threats.

BE IT FURTHER RESOLVED that copies of this resolution, including any future amendments thereto, shall be transmitted to every department, agency and commission, and employee of the City of Berkeley; to our Alameda County, California, and Congressional representatives; and to the mayors of the rest of the Bay Area cities.

BE IT FURTHER RESOLVED that the City of Berkeley will continue to seek additional ways to enact protections for undocumented immigrants in our community.


The foregoing Resolution was adopted by the Berkeley City Council on January 21, 2025 by the following vote:

Ayes:       Blackaby, Humbert, Kesarwani, Lunaparra, O'Keefe, Taplin, Tregub, and Ishii.

Noes:       None.

Absent:     Bartlett.

_Adena Ishii_

Adena Ishii, Mayor

Attest:  _Mark Numainville_

Mark Numainville, City Clerk

# EXHIBIT 14

### 11-1.9   Boston Trust Act.

(A)   *Definitions.* For the purpose of this Section, the following definitions shall apply unless the context clearly indicates or requires a different meaning.

**CIVIL IMMIGRATION DETAINER REQUEST.** A non-mandatory request issued by an authorized federal Immigration Officer under 8 U.S.C. § 287.7 to a local law enforcement official to maintain custody of an individual for a period not to exceed 48 hours, excluding Saturdays, Sundays and holidays, and advise the authorized federal Immigration Officer prior to the release of that individual.

**CONVICTED.** A state of having been proved guilty in a judicial proceeding, unless the conviction has been expunged or vacated pursuant to applicable law.

**ELIGIBLE FOR RELEASE FROM CUSTODY.** The individual may be released from custody because any of the following conditions has occurred:

(a)   All criminal charges against the individual have been dropped or dismissed;

(b)   The individual has been acquitted of all criminal charges filed against him or her;

(c)   The individual has served all the time required for his or her sentence;

(d)   The individual has posted a bond, or has been released on his or her own recognizance;

(e)   The individual has been referred to pre-trial diversion services; and

(f)   The individual is otherwise eligible for release under commonwealth or local law.

**ICE ADMINISTRATIVE WARRANT.** A warrant issued by a federal Immigration Officer, not a Judicial Officer, that does not confer detention authority on a local jurisdiction.

**ICE-HSI.** The Department of Homeland Security Investigations division of ICE whose purpose is to work alone or in concert with other federal, commonwealth and local law enforcement to investigate and enforce laws prohibiting human smuggling and trafficking; narcotics and weapons smuggling and trafficking; transnational gang activity; cybercrimes; money laundering, financial crimes, bulk cash smuggling; document and benefit fraud; human rights violations; commercial fraud and intellectual property theft; export enforcement; and international art and antiquities theft.

**IMMIGRATION AND CUSTOMS ENFORCEMENT** or **ICE.** The federal Agency whose enforcement and removal division enforces federal immigration laws, including issuance and action on civil detainers and detainer requests.

**IMMIGRATION ENFORCEMENT.** Identifying, arresting, detaining or assisting in the arrest or detention of any person solely on the basis of their immigration status or a suspected violation of federal civil immigration law.

**LAW ENFORCEMENT OFFICIAL.** Any City Department, or Officer or employee of a City Department, authorized to enforce criminal statutes, regulations or local ordinances; operate jails or maintain custody of individuals in jails; and operate juvenile detention facilities or maintain custody of individuals in juvenile detention facilities.

**PERSONAL INFORMATION.** Any information that is maintained by an Agency that identifies or describes an individual, that can be used, either alone or in combination with other information, to identify individual subjects, such as his or her name, Social Security number, physical description, home address and/or work address.

(B)   *Detainer requests.* A law enforcement official shall not detain an individual solely on the basis of a civil immigration detainer request or an ICE administrative warrant after the individual is eligible for release from custody, unless ICE has a criminal warrant, issued by a Judicial Officer, for the individual.

(C)   *Reporting.* No later than December 31 of each year, the Boston Police Commissioner shall submit a report to the City Clerk, and the Clerk shall forward the report to the Mayor of the city and shall docket the report and include the docket on the agenda of the next-occurring meeting of the Boston City Council. The report shall include the following information for the preceding 12-month period:

(1)   A statistical breakdown of the total number of civil immigration detainer requests lodged with the city's law enforcement officials, organized by the reason(s) given for the request;

(2)   A statistical breakdown of the total number of individuals that city law enforcement officials detained pursuant to division (C)(2) above, organized by the reason(s) supporting the detention;

(3)   The total number of individuals transferred to ICE custody; and

(4)   A statistical breakdown of the total cost reimbursements received from the federal government pursuant to division (B) above, organized by individual case.

(D)   *Law enforcement.*

(1)   A law enforcement official or an employee of a City Department, Agency or Commission, shall not:

(a)   Use Agency or Department monies or personnel to interrogate, detain or arrest persons for immigration enforcement purposes, that are otherwise the responsibility of the federal Immigration and Customs Enforcement Agency, including any of the following:

1.   Inquiring of an individual his or her immigration status;

2.   Detaining an individual solely on the basis of a civil immigration detainer request;

3.   Providing personal information, as defined in division (A) above, or regarding a person's release date or time to the federal Immigration and Customs Enforcement Agency;

4.   Providing personal information, as defined in division (A) above, or regarding a person's release date or time to ICE-HSI solely for the purpose of enforcing civil violations of United States immigration laws;

5.   Making arrests based solely on ICE administrative warrants including administrative warrants after the individual is eligible for release from custody; and

6.   Performing the functions of an Immigration Officer.

(b)   Transfer an individual to immigration authorities unless authorized by a judicial warrant or other judicial order.

(2)   Notwithstanding the limitations in division (A) above, this Section does not prevent any Boston law enforcement official or an employee of a City Department, Agency or Commission from doing any of the following:

(a)   Investigating, enforcing or detaining upon reasonable suspicion of, or arresting for a criminal violation of, 8 U.S.C. § 1326(a) that may be subject to the enhancement specified in 8 U.S.C. § 1326(b)(2) and that is detected during an unrelated Boston Police activity. Any arrests executed under this provision by any Boston law enforcement official shall be included in the annual report of the Boston Police Commissioner to the City Clerk, in accordance with division (C) above;

(b)   Responding to a request from ICE-HSI for information about a specific person's criminal history, including, but not limited to, previous criminal arrests, convictions or CORI, where otherwise permitted by commonwealth law;

(c)   Conducting enforcement or investigative duties associated with partnerships with federal authorities or task forces, including the sharing of confidential information with the Boston Police or other Agencies for purposes of joint investigations, so long as the primary purpose of the partnership or task force is not to enforce civil violations of United States immigration laws;

(d)   Certifying an individual who has been identified as a potential crime or trafficking victim for a T or U Visa pursuant to 8 U.S.C. §§ 1101(a)(15)(T) or 1101(a)(15)(U);

(e)   Enforcing 18 U.S.C. § 922(d)(5); and

(f)   An inquiry into an individual's citizenship status by the Boston Elections Commission to determine their eligibility to vote in local, commonwealth and federal elections.

(3)   This Section does not prohibit or restrict any government Agency from complying with 8 U.S.C. §§ 1373 and 1644.

(4)   Nothing in this Section shall prohibit the Boston Police from asserting its own jurisdiction over criminal law enforcement matters.

(5)   Within six months of the passage of this Section, the Boston Police Department shall incorporate the requirements of this Section into its regular training for all Officers.

(CBC 1985 11-1.9; Ord. 2019 c. 9)

# EXHIBIT 15

# Chapter 2.129 WELCOMING COMMUNITY ORDINANCE

**Sections:**

## 2.129.010 Purpose.

The purpose of this Chapter is to establish the City of Cambridge as a Welcoming City, to declare that all are welcome here, and to increase public confidence in the City of Cambridge's government by establishing standards associated with the City's voluntary involvement in federal immigration enforcement.

(Ord. No. 2020-3, 2-10-2020)

## 2.129.020 Preamble.

It is not within the purview nor mandate of the City of Cambridge to enforce federal immigration law or seek the detention, transfer or deportation of Cambridge residents for civil immigration purposes, nor should the City's resources be expended toward that end.

The City of Cambridge will equally enforce the law and serve the public without consideration of immigration status, citizenship, national origin, race, or ethnicity.

(Ord. No. 2020-3, 2-10-2020)

## 2.129.030 Definitions.

"ICE." The federal agency known as the U.S. Immigration and Customs Enforcement, and any other federal agency charged with the enforcement of immigration laws, including but not limited to the Department of Homeland Security.

"Immigration detainers and ICE detainers." Requests made by federal immigration officials, including but not limited to those authorized under Section 287.7 of Title 8 of the Code of Federal Regulations to local Law Enforcement or Courts to voluntarily maintain custody of an individual once that individual is released from local custody, and/or to notify a federal agency before the pending release of an individual.

"ICE administrative warrant." A warrant, notice to appear, removal order, warrant of deportation, or other ICE custody document (I-200, I-203, I-205 or another listed in the National Crime Information Database (NCIC)) issued by a federal immigration official, not a judicial officer, and not based on a finding of probable cause for an alleged criminal law violation.

(Ord. No. 2020-3, 2-10-2020)

## 2.129.040 Requirements.

(A)   Equal treatment. The City will treat all persons equally, enforce laws, and serve the public without consideration of immigration status. Citizenship, immigration status, national origin, race, and ethnicity shall have no bearing on an individual's treatment by City employees or officials.

Cambridge, Massachusetts, Code of Ordinances
(Supp. No. 14)

Created: 2025-04-22 12:17:04 [EST]

Page 1 of 4

(B)  Inquiries about immigration status. City employees and officials may not inquire about the immigration status of any victim, suspect, arrestee, 911 caller, or other member of the public with whom they have contact, except as required by 8 U.S.C. § 1373.

(C)  Role of Police Department in immigration enforcement. The Cambridge Police Department will not initiate investigations or take law enforcement action on the sole basis of actual or perceived immigration status, including the initiation of a stop, an apprehension or arrest. The Cambridge Police Department shall not take part in or assist with federal immigration enforcement operations, except as permitted with Subjection (j) below. This section shall not limit the Cambridge Police Department's ability to actively assist in Federal human trafficking operations.

(D)  ICE detainers and administrative warrants. Consistent with state law, no officer or employee of the Cambridge Police Department may arrest or detain an individual solely on the basis of an ICE detainer or ICE administrative warrant. This includes extending the length of detention by any amount of time once an individual is or would otherwise be released from local custody, or before being transferred to court or admitted to bail.

(E)  Federal requests for information. No officer or employee of the Cambridge Police Department shall provide an officer or employee of ICE with the following information relating to a person in the custody of the Police Department: information about an individual's incarceration status, length of detention, home address, work address, personal information other than citizenship or immigration status, hearing information, or pending release, except information that is available through the Massachusetts Public Records Laws, G.L, c. 66, section 10 and G.L. c. 4, section 7 (twenty-sixth). Nothing in this section shall prohibit or restrain an officer or employee of the Cambridge Police Department from sending to, or receiving from, any local, state, or federal agency, information regarding citizenship or immigration status, consistent with 8 U.S.C. § 1373.

(F)  Encountering persons driving without a license. When taking action against a person who is found to be driving without a valid driver's license, officers of the Cambridge Police Department shall, whenever possible in the officer's discretion and if there are no other violations causing the person to be arrested, issue a summons to court instead of taking the person into custody. In such circumstances, the law enforcement officer taking action shall endeavor to provide the driver a reasonable opportunity to arrange for a properly licensed operator to drive the vehicle before seeking to impound the vehicle, unless the violation is one subject to a statutory or regulatory requirement of vehicle impoundment.

(G)  Notice to individuals subject to ICE interventions. If the Cambridge Police Department receives an immigration detainer or ICE administrative warrant for a person in its custody, the Police Department shall provide the person with a copy of such detainer request or administrative warrant, and any other documentation it possesses pertaining to the person's immigration case.

(H)  ICE access to facilities. Except in response to a judicial warrant or other court order, ICE agents shall not be allowed access to individuals in Cambridge Police Department custody either in person or via telephone or videoconference.

(I)  Programs that protect removal. In furtherance of the US Victims of Trafficking and Violence Prevention Act, as well as the Violence Against Women Act ("VAWA"), the Cambridge Police Department shall consider a U or T Visa request, or other protections conferred by VAWA if an individual (i) is the victim of a qualifying crime, and (ii) has been, is being, or will likely be helpful in the investigation/prosecution of that crime, or is the victim of domestic violence and removal will place them in immediate danger.

(J)  Raids and other immigration enforcement actions. No officer or employee of the Cambridge Police Department may participate in an operation led by a federal agency to detain persons for deportation purposes, except in response to a request to assist with support services deemed necessary to ensure officer safety or to prevent a breach of the peace during a federal operation, such as requests to establish traffic perimeters, control traffic or provide police escort.

(K)    Deputizing of local officials. No officer or employee of the Cambridge Police Department shall perform the functions of an immigration officer, whether pursuant to 8 U.S.C. § 1357(g) or any other law, regulation, or policy, whether formal or informal, except as required by federal or state law or regulations.

(L)    School records and enrollment. No employee of the Cambridge School Department shall require a student or parent to provide information regarding their immigration or citizenship status to establish the student's residency in the district for enrollment purposes. If such information becomes known to an employee of the Cambridge School Department, such information shall not be kept or distributed, except as required by federal or state law or regulations, and shall have no bearing of the student's ability to register for school or the school's treatment of that student. Information collected regarding place of birth for the purpose of providing appropriate services to any student shall be used only for that purpose and not distributed further, except as required by federal or state law or regulation.

(Ord. No. 2020-3, 2-10-2020)

## 2.129.050 Complaints.

Allegations of violations of this Chapter may be filed with the City Manager's Office, who shall investigate the complaint and take appropriate disciplinary action. In the case of a complaint against an officer or employee of the Cambridge Police Department, allegations of violations of this Chapter shall also be filed with the Department's Professional Standards Unit. In the case of a complaint against an employee of the Cambridge School Department, allegations of violations of this Chapter shall also be filed with the Superintendent of Schools.

(Ord. No. 2020-3, 2-10-2020)

## 2.129.060 Reporting.

Beginning on the date of passage of this Chapter and every six months thereafter, the Cambridge Police Commissioner shall submit a report, with the information detailed below, to the City Clerk, with a copy to the City Manager, and the City Clerk shall include the report on the agenda of the next-occurring meeting of the Public Safety Committee of the City.

The report shall contain:

(A)    A statistical breakdown of the total number of ICE detainers requests and, administrative warrants lodged with Cambridge Police Department;

(B)    The total number of individuals detained as a result of an ICE detainer or administrative warrants, if any;

(C)    The total number of individuals transferred to ICE custody, if any;

(D)    The total reimbursements received from the federal government pursuant to any granted ICE detainer or administrative warrant, organized by case; and

(E)    The total number of investigations where the Cambridge Police Department cooperated with or provided information to ICE unless any part of such information cannot be publicly disclosed.

(Ord. No. 2020-3, 2-10-2020)

## 2.129.070 Compliance with federal law.

Nothing in this Chapter shall be construed to violate any valid federal law, or to prohibit any Cambridge agency or department from providing another law enforcement agency citizenship or information status, consistent with 8 U.S.C. § 1373.

(Ord. No. 2020-3, 2-10-2020)

# EXHIBIT 16

**RESOLUTION NO. 2017-19**

### A RESOLUTION OF THE CITY COUNCIL OF THE CITY OF CATHEDRAL CITY PROCLAIMING SANCTUARY CITY STATUS

**WHEREAS**, the City of Cathedral City has long embraced and welcomed individuals of diverse racial, ethnic, religious, and national backgrounds, including a large immigrant population; and

**WHEREAS**, the City of Cathedral City respects, upholds, and values equal treatment for all of its residents, regardless of immigration status; and

**WHEREAS**, fostering a relationship of trust, respect, and open communication between City officials and residents is essential to the City's mission of delivering efficient public services in partnership with our community, which ensures public safety, a prosperous economic environment, opportunities for our youth, and a high quality of life for residents; and

**WHEREAS**, the City of Cathedral City seeks to continue to foster trust between City officials and residents to protect limited local resources, to encourage cooperation between residents and City officials, including law enforcement officers and employees, to ensure public safety and due process for all; and

**WHEREAS**, the City of Cathedral City will not utilize local funds and resources to enforce federal immigration laws, and has reaffirmed the Cathedral City Police Department policy on immigration violations; and

**WHEREAS**, the Cathedral City Police Department is committed to protect individuals from persecution within the city limits based solely on immigration status; and

**WHEREAS**, in recognition of the City's continued commitment to the equal, respectful, and dignified treatment of all people regardless of sex, gender, gender identity, gender expression, marital status, domestic partnership status, sexual orientation, race, color, religion, ancestry, national origin, or disability, the City Council, desires to adopt this Resolution declaring the City of Cathedral City a sanctuary city for all its residents, regardless of their immigration status; and

**WHEREAS**, the City of Cathedral City objects to the enforcement of Executive Order Number 13768 on the basis of ensuring the public health, safety, and welfare of all Cathedral City residents, including undocumented immigrants; and

**WHEREAS**, on April 25, 2017, the United States District Court for the Northern District of California granted the County of Santa Clara and City and County of San Francisco's motions to prevent the enforcement of Section 9(a) of Executive Order Number 13768, finding that the section is unconstitutional and cities would suffer irreparable harm from the discontinuation of federal funds based on their sanctuary jurisdiction status; and

**WHEREAS**, the City Council of the City of Cathedral City believes that the above Executive Order strongly betrays the longstanding principles, values, and traditions of not only the City of Cathedral City but also those of the United States of America.

**NOW, THEREFORE, THE CITY COUNCIL OF THE CITY OF CATHEDRAL CITY, DOES HEREBY RESOLVE, DETERMINE AND ORDER AS FOLLOWS:**

**SECTION 1.** As federal immigration laws become more complex, the City Council finds it necessary to clarify the communication between the City and the federal government to prevent the use of local resources for federal immigration enforcement. Accordingly, the purpose of this Resolution is to reaffirm the City's policies and procedures in the enforcement of federal immigration laws.

**SECTION 2.** A sanctuary city means it is a place where all persons are treated equally, with respect and dignity, regardless of immigration status. This sanctuary city status is designed to promote trust between City employees and City residents ensuring community safety and security.

**SECTION 3.** Except as otherwise provided or required in this resolution, no City official, employee or agent of the City, while in the course and scope of employment shall use any City funds or resources to enforce federal civil immigration law. City officials, employees and agents may continue to comply with lawfully issued judicial warrants or other subpoenas and cooperate with federal authorities to protect public safety. This collaboration includes, but is not limited to, participation in joint criminal investigations that are permitted under City policy and applicable under federal or state law.

**SECTION 4.** The regulations set forth in the Cathedral City Police Department Policy Manual, Policy 428 entitled, "Immigration Violations", provide guidelines to members of the Cathedral City Police Department for investigating and enforcing immigration laws. The regulations include, but are not limited to, the following:

1. An officer will require a judicial warrant prior to detaining an individual solely on the basis of alleged violations of the civil provisions of federal immigration law.

2. Arresting, detaining, or continuing to detain a person solely on the belief that a person is not lawfully present in the United States is prohibited.

**SECTION 5.** Nothing in this Resolution restricts any City official, employee or agent of the City from sending to and/or receiving information from federal immigration authorities regarding a person's citizenship or immigration status pursuant to Sections 1373 and 1644 of Title 8 of the United States Code. Nothing in this Resolution shall be construed to apply to matters other than those relating to federal civil immigration and none of its terms shall be interpreted to prevent or prohibit City officials, employees or agents from enforcing criminal laws.

**SECTION 6.** The regulations set forth in Policy 428 will not apply where confidential information is required to provide a resident with City services and the necessary consent is given by the resident.

**SECTION 7.** It is the public policy of this City to encourage cooperation with the criminal justice system and not to penalize persons for being victims, undocumented immigrants, or witnesses who can give evidence in a criminal investigation.

**SECTION 8.** The City of Cathedral City hereby objects to Executive Order Number 13768 on the basis that it is contrary to the values of openness and inclusion of the City of Cathedral City and to the ideals upon which the United States of America was founded as a population of persons that at one time were all immigrants or refugees from some other country.

**SECTION 9.** The City of Cathedral City implores the repeal of Executive Order Number 13768 on the basis that it is contrary to traditional American values of acceptance, inclusion, and the idea of the American Dream.

**SECTION 10.** This Resolution shall take effect immediately upon its adoption by the City Council, and the Clerk of the Council shall attest to and certify the vote adopting this Resolution. This Resolution will also be made available in Spanish to ensure trust and respect between all Cathedral City residents and City personnel.

**PASSED, APPROVED AND ADOPTED** at a regular meeting of the City Council of the City of Cathedral City held on this 24th day of May, 2017, by the following vote:

Ayes:     Councilmembers Aguilar and Kaplan; Mayor PRo Tem Pettis

Noes:     Councilmember Carnevale and Mayor Henry

Absent:   None

Abstain:  None

Stanley E. Henry, Mayor

ATTEST:

Gary F. Howell, City Clerk

APPROVED AS TO FORM:

Eric S. Vail, City Attorney

EXHIBIT 17

Municipal Code of Chicago

CHAPTER 2-173

WELCOMING CITY ORDINANCE

2-173-005 Purpose and intent.

2-173-010 Definitions.

2-173-020 Requesting information prohibited.

2-173-030 Disclosing information prohibited.

2-173-040 Conditioning benefits, services, or opportunities on immigrant status prohibited.

2-173-042 Civil immigration enforcement actions - Federal responsibility.

2-173-050 No private cause of action.

2-173-060 Exchanging file information.

2-173-070 Severability.

2-173-005 Purpose and intent.

The vitality of the City of Chicago (the "City"), one of the most ethnically, racially and religiously diverse cities in the world, where one-out-of-five of the City's residents is an immigrant, has been built on the strength of its immigrant communities. The City Council finds that the cooperation of all persons, both documented citizens and those without documentation status, is essential to achieve the City's goals of protecting life and property, preventing crime and resolving problems. The City Council further finds that assistance from a person, whether documented or not, who is a victim of, or a witness to, a crime is important to promoting the safety of all its residents. The cooperation of the City's immigrant communities is essential to prevent and solve crimes and maintain public order, safety and security in the entire City. One of the City's most important goals is to enhance the City's relationship with the immigrant Communities.

Due to the City's limited resources; the complexity of immigration laws; the clear need to foster the trust of and cooperation from the public, including members of the immigrant communities; and to effectuate the City's goals, the City Council finds that there is a need to clarify the communications and enforcement relationship between the City and the federal government. The purpose of this chapter is to establish the City's procedures concerning immigration status and enforcement of federal civil immigration laws.

(Added Coun. J. 9-12-12, p. 33041, § 1)

2-173-010 Definitions.

As used in this ordinance, the following words and phrases shall mean and include:"Administrative warrant" means an immigration warrant issued by ICE, or a successor or similar federal agency charged with enforcement of civil immigration laws, used as a non-criminal, civil warrant for immigration purposes.Agency. "Agency" means every City department, agency, division, commission, council, committee, board, other body, or person established by authority of an ordinance, executive order, or City Council order.Agent. "Agent" means any person employed by or acting on behalf of an agency.Citizenship or immigration status. "Citizenship or immigration status" means all matters regarding questions of citizenship of the United States or any other country, the authority to reside in or otherwise be present in the United States,"ICE" means the United States Immigration and Customs Enforcement Agency and shall include any successor agency charged with the enforcement of civil immigration laws."Immigration detainer" means an official request issued by ICE, or other federal agency

charged with the enforcement of civil immigration laws, to another federal, state or local law enforcement agency to detain an individual based on a violation of a civil immigration law.
(Added Coun. J. 3-29-06, p. 74325, § 1; Amend Coun. J. 9-12-12, p. 33041, § 1)
2-173-020 Requesting information prohibited.
No agent or agency shall request information about or otherwise investigate or assist in the investigation of the citizenship or immigration status of any person unless such inquiry or investigation is required by Illinois State Statute, federal regulation, or court decision. Notwithstanding this provision, the Corporation Counsel may investigate and inquire about immigration status when relevant to potential or actual litigation or an administrative proceeding in which the City is or may be a party.
(Added Coun. J. 3-29-06, p. 74325, § 1; Amend Coun. J. 11-8-12, p. 38872, § 24)
2-173-030 Disclosing information prohibited.
Except as otherwise provided under applicable federal law, no agent or agency shall disclose information regarding the citizenship or immigration status of any person unless required to do so by legal process or such disclosure has been authorized in writing by the individual to whom such information pertains, or if such individual is a minor or is otherwise not legally competent, by such individual's parent or guardian.
(Added Coun. J. 3-29-06, p. 74325, § 1; Amend Coun. J. 11-8-12, p. 38872, § 25)
2-173-040 Conditioning benefits, services, or opportunities on immigrant status prohibited.
(a) No agent or agency shall condition the provision of City of Chicago benefits, opportunities, or services on matters related to citizenship or immigration status unless required to do so by statute, federal regulation, or court decision.
(b) Where presentation of an Illinois driver's license or identification card is accepted as adequate evidence of identity, presentation of a photo identity document issued by the person's nation of origin, such as a driver's license, passport, or matricula consular (consulate-issued document), shall be accepted and shall not subject the person to a higher level of scrutiny or different treatment than if the person had provided an Illinois driver's license or identification card except that this subsection (b) shall not apply to the completion of the federally mandated I-9 forms.
(Added Coun. J. 3-29-06, p. 74325, § 1; Amend Coun. J. 11-8-12, p. 38872, § 26)
2-173-042 Civil immigration enforcement actions - Federal responsibility.
(a) Except for such reasonable time as is necessary to conduct the investigation specified in subsection (c) of this section, no agency or agent shall:(1) arrest, detain or continue to detain a person solely on the belief that the person is not present legally in the United States, or that the person has committed a civil immigration violation;(2) arrest, detain, or continue to detain a person based on an administrative warrant entered into the Federal Bureau of Investigation's National Crime Information Center database, or successor or similar database maintained by the United States, when the administrative warrant is based solely on a violation of a civil immigration law; or(3) detain, or continue to detain, a person based upon an immigration detainer, when such immigration detainer is based solely on a violation of a civil immigration law.
(b) (1) Unless an agency or agent is acting pursuant to a legitimate law enforcement purpose that is unrelated to the enforcement of a civil immigration law, no agency or agent shall:(A) permit ICE agents access to a person being detained by, or in the custody of, the agency or

agent;(B) permit ICE agents use of agency facilities for investigative interviews or other investigative purpose; or(C) while on duty, expend their time responding to ICE inquiries or communicating with ICE regarding a person's custody status or release date.

(2) An agency or agent is authorized to communicate with ICE in order to determine whether any matter involves enforcement based solely on a violation of a civil immigration law.

(c) This section shall not apply when an investigation conducted by the agency or agent indicates that the subject of the investigation:

(1) has an outstanding criminal warrant;

(2) has been convicted of a felony in any court of competent jurisdiction;

(3) is a defendant in a criminal case in any court of competent jurisdiction where a judgment has not been entered and a felony

charge is pending; or

(4) has been identified as a known gang member either in a law enforcement agency's database or by his own admission.

(Added Coun. J. 9-12-12, p. 33041, § 1)

2-173-050 No private cause of action.

This chapter does not create or form the basis for liability on the part of the City, its agents, or agencies. The exclusive remedy for violation of this chapter shall be through the City's disciplinary procedures for officers and employees under regulations including but not limited to this City personnel rules, union contracts, civil service commission rules, or any other agency rules and/or regulations. A person alleging a violation of this chapter shall forward a complaint to the Office of the Inspector General ("Inspector General") who shall process it in accordance with the complaint-processing procedures established in Chapter 2-56 of this Code except that if the complaint is against any member of the City Council or any employee or staff person of any City Council committee, the Inspector General shall promptly transmit said complaint to the chairman of the City Council Committee on Committees, Rules and Ethics for processing or such successor committee having jurisdiction over said matters and if the complaint is against any member of the Chicago Police Department, the Inspector General shall transmit it to the Chicago Police Department for processing.

(Added Coun. J. 3-29-06, p. 74325, § 1)

2-173-060 Exchanging file information.

All applications, questionnaires, and interview forms used in relation to City of Chicago benefits, opportunities, or services shall be promptly reviewed by the pertinent agencies and any questions regarding citizenship or immigration status, other than those required by statute, ordinance, federal regulation or court decision, shall be deleted within 60 days of the passage of this ordinance.

(Added Coun. J. 3-29-06, p. 74325, § 1; Amend Coun. J. 11-8-12, p. 38872, § 27)

2-173-070 Severability.

If any provision, clause, section, part, or application of this chapter to any person or circumstance is declared invalid by any court of competent jurisdiction, such invalidity shall not affect, impair, or invalidate the remainder hereof or its application to any other person or circumstance. It is hereby declared that the legislative intent of the City Council that this chapter would have been adopted had such invalid provision, clause, section, part or application not been included herein.

(Added Coun. J. 3-29-06, p. 74325, § 1)

EXHIBIT 18

# EXECUTIVE ORDER

**2017-01**

## By: ANDREW J. GINTHER, MAYOR

### Reinforcing and Expanding City Immigration Policy for All Columbus Residents

**WHEREAS,** Columbus is America's Opportunity City and that means opportunity for all who reside here; and

**WHEREAS,** for over 200 years, the fabric of our city has been woven by immigrants and refugees from around the world; and

**WHEREAS,** Columbus neighborhoods – from German Village to American Addition and Highland West to Northland – reflect the waves of migration and immigration throughout our history, and those neighborhoods make us stronger as a city; and

**WHEREAS,** it is the responsibility of municipal leaders to protect the well-being and safety of all people residing in their cities; and

**WHEREAS,** our city will be best served by reinforcing and instituting strong public policies that respect the rights of all individuals, regardless of national origin or immigration status, and promote strong police-community relations; and

**WHEREAS,** whether we are native born or New American, we all have a responsibility to actively engage in the success of our city; and

**WHEREAS,** Columbus' future is big enough, bright enough, and safe enough for everyone; and

**NOW, THEREFORE,** I, Andrew J. Ginther, Mayor of the City of Columbus, declare and institute this Executive Order in furtherance of the foregoing:

1. It shall be policy of the City of Columbus to actively support, to the greatest extent practicable, the placement or settlement in this jurisdiction of aliens eligible to be admitted to the United States as refugees. City staff are hereby authorized and directed to cooperate to the greatest extent practicable with federal and state officials in such placement or settlement.

2. No city department or employee may use city moneys, equipment, or personnel for the sole purpose of detecting or apprehending persons based on suspected immigration status, unless in response to a court order. In furtherance of this policy, no city office or employee shall request information about or otherwise investigate or assist in the investigation of a person's immigration status unless a warrant exists, a criminal violation was reported, or an arrest was made.

3.  No city department or employee shall deny equal access to city services based on immigration status unless required by law or court order. Such denial of access shall include, but shall not be limited to, soliciting immigration status in any application for city services; predicating the provision of services on the immigration status of any person; or delaying the provision of services based solely on immigration status.

4.  It shall be the policy of the City of Columbus to vigorously oppose any effort to require the use of local taxpayer resources for the enforcement of federal immigration policy.

This order shall be in full force and effect after my signature is affixed to this document.

**IN WITNESS WHEREOF**, I have hereunto set My hand and caused the Great Seal of the Mayor of the City of Columbus, Ohio, to be hereto affixed this 3rd day of February, 2017.

_____

Andrew J. Ginther
Mayor

# EXHIBIT 19

1

**RESOLUTION NO. 2017-R 025**

2

3

4

**A RESOLUTION OF THE CITY COUNCIL OF THE CITY OF CULVER CITY, CALIFORNIA, DECLARING CULVER CITY TO BE A SANCTUARY CITY FOR ALL ITS RESIDENTS REGARDLESS OF IMMIGRATION STATUS.**

5

6

7

8

9

**WHEREAS**, the City Council's 2016 Legislative and Policy Platform states that the City of Culver City "commits to pursuing a policy agenda that affirms civil and human rights, and ensures that those targeted on the basis of race, religion, sexual orientation, or immigration status can turn to government without fear of recrimination;" and

10

11

12

13

**WHEREAS**, on October 12, 2016, the City Council reaffirmed its policy goals, and adopted Resolution No. 2016-R099, condemning violence and hate speech, and expressing solidarity with those targeted for their ethnicity, race, religion or sexual orientation; and

14

15

16

17

18

19

**WHEREAS**, on November 22, 2016, the Culver City Unified School District (CCUSD) declared that every CCUSD campus is a safe zone where students and their families may seek assistance, information and sanctuary if faced with fear and anxiety about immigration enforcement efforts or any efforts to curtail or deny civil or human rights; and

20

21

22

**WHEREAS**, on November 22, 2016, Culver City Chief of Police Bixby issued a letter to the community, expressing the Police Department's commitment to protecting everyone's rights, regardless of immigration status; and

23

24

25

26

27

**WHEREAS**, in further affirmation of its policy goals, on February 27, 2017, the City Council adopted Resolution 2017-R014, supporting state Senate Bill 54, the California Values Act, which among other things, if passed, would prohibit state and local law enforcement agencies and school police from using resources to investigate,

-1-

28

interrogate, detain, detect or arrest persons for immigration enforcement purposes, including but not limited to inquiring into or collecting information about an individual's immigration status, detaining an individual on the basis of a hold request, and responding to requests for notification or transfer requests; and

**WHEREAS**, many cities and towns throughout the United States have adopted resolutions, ordinances, policies and practices to demonstrate their commitment to equal, respectful, dignified treatment of all people regardless of their immigration status, and as a result may be referred to as "sanctuary cities;" and

**WHEREAS**, the City of Culver City desires to demonstrate its commitment to fostering trust between City officials and the public, to protecting the safety, well-being and constitutional rights of its residents and the people of the State of California, and to directing the City's resources to matters of greatest concern to local government.

**NOW, THEREFORE,** the City Council of the City of Culver City, California, **DOES HEREBY RESOLVE** as follows:

**SECTION 1.** The City of Culver City is a sanctuary city for all of its residents, and the City stands in solidarity with other sanctuary jurisdictions. The City reaffirms its commitment to welcome individuals with diverse backgrounds, and will uphold and protect the human and civil rights of all individuals under the State and Federal Constitutions, including the First Amendment rights of free speech and assembly, regardless of immigration status.

**SECTION 2.** In furtherance of its policy agenda, the City of Culver City will act in a manner consistent with the American Civil Liberties Union 9 Model State and Local Law Enforcement Policies and Rules, as follows:

2017-R025

1.    Judicial Warrant. City officials will require a judicial warrant before detaining an individual or prolonging a detention in any manner at the request of federal immigration authorities;

2.    No Facilitation. City officials will require a judicial warrant before arresting, detaining or transporting an individual solely on the basis of an immigration detainer or other administrative document;

3.    Defined Access. Unless pursuant to a court order or a legitimate law enforcement purpose unrelated to civil immigration law, City officials will not permit federal immigration authorities access to City facilities or to any person in City custody, subject to the California Truth Act;

4.    Clear Identification. Requiring federal immigration authorities to wear jackets and badges when given access to City facilities, so that they are clearly identified as federal agents;

5.    Don't Ask. City officials will not inquire into the immigration status of any individual, unless there is a legitimate law enforcement purpose unrelated to civil immigration law, or where required by law to verify eligibility for a benefit or service;

6.    Privacy Protection. City officials will not voluntarily release personally identifiable information to federal immigration authorities, or information that may be used to ascertain an individual's race, religion or ethnicity, unless for a law enforcement purpose unrelated to the enforcement of civil immigration law;

7.    Discriminatory Surveillance Prohibition. City officials will not engage in surveillance of any person or group based solely on their actual or perceived religion, ethnicity, race or immigration status;

-3-

2017-R025

8.    Redress.  Any person who alleges a violation of the above policies may file a written complaint with the City.

9.    Fair and Impartial Policing. City officials will not detain, interrogate, or arrest an individual based on their perceived race, national origin, religion, language or immigration status.

**SECTION 3:** The City also adopts the following in furtherance of its policy goals:

1.    No City agency, department, officer, employee, or agent shall use City funds, resources, facilities, property, equipment, or personnel to assist in the enforcement of federal immigration law, unless such assistance is required by any valid and enforceable federal or state law or is contractually obligated. This prohibition shall include, but not be limited to, assisting with or participating in any immigration enforcement operation or joint operation or patrol that involves, in whole or in part, the enforcement of federal immigration law, except for purposes of protecting the public safety.

2.    No City agency, department, officer, employee, or agent shall use City funds, resources, facilities, property, equipment, or personnel to assist any federal program requiring the registration of individuals on the basis of race, religion, or ethnicity, including those persons of the Muslim faith or those perceived to be of the Muslim faith, and/or of Middle Eastern descent.

///

///

///

-4-

2017-R025

3.    The City shall continue to follow its policies to prevent bias-based policing and law enforcement personnel will continue to exercise discretion to favor citing and releasing individuals in lieu of arrest or continued detention, where consistent with protecting public safety.

APPROVED AND ADOPTED on the ___27___ day of March, 2017.

JIM B. CLARKE, Mayor
City of Culver City, California

ATTEST:                                              APPROVED AS TO FORM:

JEREMY GREEN, City Clerk                   CAROL A. SCHWAB, City Attorney

A17-00169

-5-

2017−R025

EXHIBIT 20

I

## Search Area: Incarceration Authorization of Adult Offenders

The Jail requires proper documentation authorizing incarceration when admitting an adult person into the Jail. If at any time there are concerns with the documentation or authority to incarcerate, a supervisor should be notified immediately. The law enforcement or transporting official presenting the person for incarceration shall provide a completed Dane County Jail Booking Form and one or more of the following documents to the Booking Deputy for review:

- ### U.S. Immigration and Customs Enforcement

    The Jail will only honor a hold from the U.S. Immigration and Customs Enforcement (ICE) Office if they provide the Jail with a warrant approved by a judicial officer authorizing arrest or detention of the individual.  ICE detainers and administrative warrants do not satisfy this requirement as they are not issued or approved by a judge.

    If ICE submits a Request for Advanced Notification of Release, the Jail will notify ICE of a known release date, if applicable.   The Jail shall not hold the individual beyond the time they would normally be released without Judicial Authority.[1]

 Dane County Corporation Counsel Memo. Subject: Detention Past Scheduled Release Date at the Request of Federal Immigration Officials (February 2025) United States v.Valdez-Hurtado, 638F. Supp 3d 879, 8885(N.S.III. 2022)

---

[1] Dane County Corporation Counsel Memo. Subject: Detention Past Scheduled Release Date at the Request of Federal Immigration Officials (February 2025) United States v.Valdez-Hurtado, 638F. Supp 3d 879, 8885(N.S.III. 2022)

EXHIBIT 21

Denver Public Safety Enforcement Priorities Act prohibits city funds or resources from being used to assist in enforcement of federal immigration laws, with certain exceptions:

ARTICLE VIII. - PUBLIC SAFETY ENFORCEMENT PRIORITIES ACT[8]

Footnotes:
--- (8) ---
Editor's note— Ord. No. 940-17, § 1, adopted August 28, 2017, shall be effective as of October 13, 2017, except for the requirements related to reporting of notification requests set forth in subsection 28-253(f) which shall be effective October 1, 2017.


Sec. 28-250. - Use of city funds and resources limited; exceptions.
(a)Except as specifically authorized in this article VIII, no department, agency, board, commission, officer or employee of the city, including without limitation, county court administrative and clerical employees, probation, pre-trial services and community corrections, shall use any city funds or resources to assist in the enforcement of federal immigration laws. The prohibition set forth in this section shall include but not be limited to:(1)Assisting or cooperating in one's official capacity with any investigation, detention, or arrest procedures relating to alleged violations of the civil provisions of federal immigration laws.(2)Requesting information about the national origin, immigration or citizenship status of any individual or engaging in activities designed to ascertain such information, except to the extent required by any federal, state or city law or regulation, or any international treaty to which the United States is a party.

(3)Including on the application for any city services or benefits any question regarding national origin, immigration or citizenship status of the applicant, or conditioning the provision of city services or benefits upon the national origin, immigration or citizenship status of any individual, except to the extent required by any federal, state or city law or regulation.(4)Disseminating information about the national origin, immigration or citizenship status of any individual except to the extent required by any federal, state or city law or regulation, including by way of example 8 U.S.C. §1373 and 8 U.S.C. §1644, or any international treaty to which the United States is a party.(5)Initiating any law enforcement contact solely for purposes of determining the person's national origin, immigration or citizenship status, or arresting or detaining any individual solely on the basis of the individual's immigration or citizenship status.(b)Nothing in subsection (a) of this section shall preclude any city officer or employee from cooperating or assisting federal immigration enforcement authorities in the execution of a warrant issued by a federal judge or magistrate or honoring any writ issued by any state or federal judge concerning the transfer of a prisoner to or from federal custody. The time and resources expended by any city law enforcement officer investigating and determining whether an immigration-related warrant listed in any crime information database is judicial or administrative in nature shall not be considered a violation of subsection (a) of this section.

(c) City law enforcement officers may respond to calls for assistance from federal immigration enforcement authorities to the extent necessary to keep the peace, protect public safety, or enforce any applicable state and city criminal laws beyond the scope of effectuating an immigration arrest. Nothing in subsection (a) of this section shall preclude city law enforcement officers from participating in coordinated law enforcement actions with federal law enforcement agencies, as long as the primary purpose of the coordinated action is the enforcement of city, state or federal criminal laws.

(d)Nothing in subsection (a) of this section or in section 28-251 shall restrict the authority of the city to enter into agreements concerning the transport of persons who are already in federal custody through Denver International Airport, to the extent such agreements are deemed necessary to ensure that city officials are made aware whenever federal prisoners are being transported through the airport by federal immigration authorities, and to make space available to federal immigration officials for the safe and secure transport of such prisoners within the airport.
(Ord. No. 940-17, § 1, 8-28-17)

Sec. 28-251. - City contracts related to enforcement of federal immigration laws prohibited.
The city shall not enter into any contractual agreement that would commit or require any city officer or employee to directly or indirectly assist in the enforcement of federal immigration laws, including by example any agreement authorized by 8 U.S.C. §1357(g) (commonly known as "287(g) Agreements") or any intergovernmental services agreement entered into with the U.S. Department of Homeland Security under the authority of 8 U.S.C. § 1103(a)(11)(B). The city shall not enter into any contractual agreement requiring the collection or dissemination of individually identifiable information about the national origin, immigration or citizenship status of any person, over and above the extent to which the city is required to collect or disseminate such information in accordance with any federal, state or city law or regulation.

(Ord. No. 940-17, § 1, 8-28-17)

Sec. 28-252. - Limitations on access to secure areas of city and county jails and related facilities.
(a) Unless federal immigration authorities present a warrant issued by a federal judge or magistrate, federal immigration authorities shall not be granted access or allowed to use the secure areas of any city or county jail or other city-owned law enforcement facility for the purpose of conducting investigative interviews or any other purpose related to the enforcement of federal immigration laws. For purposes of this section the term "secure area" means any area of the facility that is not generally open and accessible to the general public, but instead requires special permission for admittance by a city officer or employee on an individual basis.
(b) Nothing in subsection (a) of this section or in section 28-250 shall prevent city law enforcement officials from coordinating telephone or video interviews between federal immigration authorities and individuals incarcerated in any city or county jail to the same extent as telephone or video contact with such individuals is allowed by the general public; provided,

however, that no such interview shall be allowed until the individual has been advised of certain legal rights in writing in the individual's language of choice, including but not limited to:

(1) The interview is being sought by federal immigration authorities;

(2) The individual has the right to decline the interview and remain silent;

(3) The individual has the right to speak to an attorney before submitting to the interview; and

(4) Anything the individual says may be used against him or her in subsequent proceedings, including in a federal immigration court.

(Ord. No. 940-17, § 1, 8-28-17)

Sec. 28-253. - Civil immigration detainers and requests for voluntary notification.

(a) Purpose. The purpose of this section is to address requests for non-mandatory civil immigration detainers, voluntary notification for release of individuals from custody, transmission of personal information, and other civil immigration documents based solely on alleged violations of the civil provisions of federal immigration laws. Nothing in this section shall be construed to apply to the authority of city law enforcement officers to investigate or enforce any criminal law.

(b) Definitions.(1) "Eligible for release from custody" means that the individual may be released from custody because one (1) of the following conditions has occurred: a.All criminal charges against the individual have been dropped or dismissed. b.The individual has been acquitted of all criminal charges filed against him or her. c.The individual has served all the time required for his or her sentence. d.The individual has posted a bond or has been released on his or her own recognizance. e.The individual has been referred to pre-trial division services. f.The individual is otherwise eligible for release under state or city law. (2) "Civil immigration detainer" means a non-mandatory request issued by federal immigration enforcement authorities under Section 287.7 of Title 8 of the Code of Federal Regulations, to city law enforcement officers to maintain custody of an individual for a period not to exceed forty-eight (48) hours, including by way of example any such request appearing on an I-247A form or any similar form promulgated by federal immigration enforcement authorities.(3)"Notification request" means a non-mandatory written request issued by federal immigration enforcement authorities to a city law enforcement officer asking for notification to the federal immigration enforcement authorities of an individual's release from city custody prior to such release, including by way of example any such request appearing on an I-247A form or any similar form promulgated by federal immigration enforcement authorities.(4) "Personal information" means any confidential, identifying information about an individual, including but not limited to home or work contact information, and family or emergency contact information; but not including any information about the national origin, immigration or citizenship status of the individual if known to a city law enforcement officer.

(c) Detainers and other civil enforcement actions. A city law enforcement officer shall not detain an individual solely on the basis of a civil immigration detainer. City law enforcement officers shall not arrest or detain an individual, or provide any individual's personal information to federal immigration enforcement authorities on the basis of an administrative warrant regardless of whether or not the administrative warrant is accompanied by a final order of removal or deportation, any prior deportation order, or any other civil immigration document based solely on

alleged violations of the civil provisions of federal immigration laws. Nothing in subsection (c) of this section shall preclude any city officer or employee from cooperating or assisting federal immigration enforcement authorities in the execution of a warrant issued by a federal judge or magistrate.

(d) Notification requests. Notwithstanding the restrictions set forth in section 28-250, the sheriff department may respond to a notification request and provide such notifications to the extent the department is reasonably capable of doing so. In no event shall a notification request be deemed to create any obligation on the part of the department to detain the inmate who is the subject of the notification request beyond the date and time the inmate is eligible for release from custody, unless the request is accompanied by a warrant issued by a federal judge or magistrate. Upon receipt of any notification request, the sheriff department shall as promptly as practicable advise the inmate who is the subject of the notification request that federal immigration enforcement authorities have requested information concerning the date and time when the inmate will be released. The advisement to the inmate shall be given in writing in the inmate's language of choice, shall be accompanied by a copy of the notification request, and shall also advise the inmate that he or she enjoys certain legal rights if contacted by federal immigration enforcement authorities while in custody or after having been released from custody, including but not limited to: (1)The individual has the right to refuse to speak to federal immigration enforcement authorities and remain silent; (2)The individual has the right to speak to an attorney before speaking to federal immigration enforcement authorities; and (3)Anything the individual says may be used against him or her in subsequent proceedings, including in a federal immigration court.
If the sheriff department does give notice of an inmate's release to federal immigration authorities pursuant to a notification request, the written advisement of rights to the inmate shall be provided to the inmate again when the inmate is released.

(e) Records related to notification requests. In accordance with the city's record retention policy, the sheriff department shall maintain a record of all notification requests received by the department, which shall include the following information for each individual notification request:(1)Date and time the notification request was received.(2)Whether the department responded to the notification request, and if so, the date and time upon which the response was given.(3)The charges for which the inmate who was the subject of the notification request was being held by the city prior to being released from custody.(4)Whether the inmate who was the subject of the notification request was detained or arrested by federal immigration authorities after being released from city custody, if such information is made known to the department.

(f) Reporting of notification request records. The sheriff department shall prepare a report concerning notification requests and distribute the report quarterly to both the city council and the mayor beginning on October 1, 2017. The report shall contain a year-to-date summary of the total number of notifications received by the department, along with the information for each notification request set forth in subsection (e) of this section.
(Ord. No. 940-17, § 1, 8-28-17)

# EXHIBIT 22

CITY OF HEALDSBURG

RESOLUTION NO. 15-2017

A RESOLUTION OF THE CITY COUNCIL OF THE CITY OF
HEALDSBURG ACKNOWLEDGING AND EMBRACING THE
COMMUNITY'S DIVERSITY; AND EXPRESSING THE CITY'S
COMMITMENT       TO      NON-DISCRIMINATION        AND
INCLUSIVITY AND TO ENHANCING AND PROTECTING
THE QUALITY OF LIFE OF OUR RESIDENTS

WHEREAS, the City of Healdsburg owes its strength and resilience to its diversity going back multiple generations; and

WHEREAS, the City of Healdsburg has established a long tradition of embracing its diversity, both culturally and economically; and

WHEREAS, nurturing a relationship of trust, openness, and respect while embracing an open dialogue with all members of our community is essential to delivering effective services to and ensuring the safety of all members of our community; and

WHEREAS, celebrating community diversity is re-affirmed as City Council Goal 1.8 in the City's adopted Strategic Plan; and

WHEREAS, it is the City Council's desire to ensure that its immigrant residents participate in civic life and daily activities with the same freedoms, respect, and access to resources as everyone else in our community.

NOW, THEREFORE, BE IT RESOLVED that the City Council of the City of Healdsburg hereby declares that:

1.  The City of Healdsburg strives to welcome and provide services to all members of our community, regardless of immigration status; and

2.  The City of Healdsburg has strong safeguards for non-discrimination in its interactions with all community members and these securities are included in all City practices, policies, ordinances, and resolutions, as well as in State and federal law; and

3.  The Healdsburg Police Department's mission is to protect the safety of all members of our community regardless of immigration status; and

4.  The Healdsburg Police Department, along with almost all California police departments, does not ask for one's immigration status when working with community members in order to ensure the Department works cooperatively with everyone in our community; and

5.  The City of Healdsburg is committed to allocating resources necessary to support diversity, inclusion, and the values of a multicultural society; and

Resolution No. 15-2017
Page 2

6.     The City is committed to helping impacted residents by working with area non-profits and connecting those in need with available resources.  To that end, Healdsburg City Staff is currently working on ways to partner with local groups to provide needed services for those impacted by increased federal immigration efforts; and

7.     The City Council of the City of Healdsburg reaffirms its commitment to continue to work with all of our community members to ensure Healdsburg continues to thrive as a culturally diverse community where all are welcome regardless of immigration status; and

8.     The City Council of the City of Healdsburg is committed to respecting the life and dignity of every human being without discrimination or prejudice to ensure this diverse community continues to prosper into the future.

PASSED, APPROVED AND ADOPTED this 21st day of February, 2017 by the following vote:

          AYES:  Councilmembers:  (5)  Hagele, Mansell, Naujokas, Plass and Mayor McCaffery

          NOES:  Councilmembers:  (0)  None

      ABSENT:  Councilmembers:  (0)  None

   ABSTAINING:  Councilmembers:  (0)  None

SO ORDERED:                                   ATTEST:


_____              _____
Shaun F. McCaffery, Mayor                     Maria Curiel, City Clerk


I, MARIA CURIEL, City Clerk of the City of Healdsburg, do hereby certify that the foregoing is a full, true, and correct copy of Resolution No. 15-2017 adopted by the City Council of the City of Healdsburg on the 21st  day of February, 2017.


_____
Maria Curiel, City Clerk

# EXHIBIT 23



# HENNEPIN COUNTY SHERIFF'S OFFICE
# ADULT DETENTION DIVISION
# ADMINISTRATIVE DIRECTIVE # 21-02

**Date:** 06/09/2021

**Subject:** **ICE Procedure Change** (This directive supersedes Administrative Directives #14-018, #14-019, #14-020, #17-004, #17-005)

**Directive:**

The Hennepin County Sheriff's Office will not hold individuals in custody at the Adult Detention Center when the only documentation for that individual to be held in custody is a Department of Homeland Security / Immigration and Customs Enforcement (DHS/ICE) Immigration Detainer. These detainers (I247G, I247A, I200, and I205) are administrative warrants which are not signed by a judge and do not constitute judicial authority to hold an individual. ICE <u>will not</u> be notified of the admittance or release of any individual based on any of these detainers.

If continued detention of an individual for ICE is authorized based on a judicially signed immigration warrant, ICE will be notified when they become the holding agency. Absent a judicially signed immigration warrant authorizing the continued detention of an individual for ICE, that individual will be released from custody when all local charges or other holds have been disposed of.

**Captain(s) Issuing the Directive:** 

# EXHIBIT 24

7/28/25, 5:18 PM
Case 3:25-cv-01350-WHO   Document 177-2   Filed 07/29/25   Page 137 of 211
export.amlegal.com/api/export-requests/df4e429e-ec3b-4be5-80e5-c4a369a5db2b/download/

# CHAPTER 19

# PROHIBITION OF THE USE OF CITY RESOURCES FOR FEDERAL IMMIGRATION ENFORCEMENT

Section
19.190   Definitions.
19.191   Prohibition on the Use of City Resources.
19.192   Confidentiality and Protection of City Data.
19.193   Judicial Warrants.
19.194   Adoption of Policy.
19.195   Severability.

## Sec. 19.190. Definitions.

For purposes of this chapter, the following words and phrases are defined as follows:

"**Citizenship or Immigration Status**" shall mean all information or classification regarding citizenship of the United States or any other country, place of birth, the authority to reside in or otherwise be present in the United States, including visa status, and the time or manner of a person's entry into the United States.

"**Immigration Agent**" means an individual engaged in Immigration Enforcement against natural persons, including agents employed by U.S. Immigration and Customs Enforcement or U.S. Customs and Border Protection, and all other individuals authorized to conduct Immigration Enforcement against natural persons under 8 U.S.C. § 1357(g) or any other federal law.

"**Immigration Enforcement**" means any and all efforts to investigate, enforce, or assist in the investigation or enforcement of any federal civil immigration law against natural persons, and also includes any and all efforts to investigate, enforce, or assist in the investigation or enforcement of any federal criminal immigration law that penalizes a natural person's presence in, entry, or reentry to, or employment in, the United States.

SECTION HISTORY

Chapter and Section Added by Ord. No. 188,441, Eff. 12-19-24.

## Sec. 19.191. Prohibition on the Use of City Resources.

Unless required by federal or state law, no City resources, including, but not limited to, City personnel and City property, shall be utilized to:

(a)   Inquire into or collect information about an individual's Citizenship or Immigration Status, unless such information is necessary to provide a City service, including the provision of immigration and naturalization assistance, for election-related purposes or appointment to a City office or commission, or as required for purposes of City employment or the disbursement of City funds.

(b)     Investigate, cite, arrest, hold, transfer, or detain any person for the purpose of Immigration Enforcement, except as authorized under California Government Code Section 7284.6(b)(1). Prior to conducting any probable cause arrest for a violation of 8 U.S.C. § 1326(a) that may be subject to the enhancement specified in 8 U.S.C. § 1326(b)(2), or prior to transferring a suspect to an Immigration Agent based on a probable cause arrest for a violation of 8 U.S.C. § 1326(a) that may be subject to the enhancement specified in 8 U.S.C. § 1326(b)(2), City personnel shall obtain approval from their respective department's designated immigrant affairs liaison.

(c)     Respond to any administrative warrant or other request to detain, transfer, or notify any Immigration Agent about the status or release of any individual for the purpose of Immigration Enforcement.

(d)   Provide any Immigration Agent access to any non-public areas of property owned or controlled by the City, including City jails, for the purpose of Immigration Enforcement.

(e)   Make any person in City custody available to any Immigration Agent for an interview for the purpose of Immigration Enforcement.

(f)     Participate in Immigration Enforcement in any operation, joint operation, or joint task force involving any Immigration Agent.

SECTION HISTORY

Chapter and Section Added by Ord. No. 188,441, Eff. 12-19-24.

## Sec. 19.192. Confidentiality and Protection of City Data.

Except as required by 8 U.S.C. § 1373 or other applicable federal or state law, no City personnel shall provide access to any City data or information that can be used to determine or trace a person's Citizenship or Immigration Status to any Immigration Agent. In furtherance of this restriction, as of the effective date of this ordinance, City personnel shall not provide City data or information that can be used to determine or trace a person's Citizenship or Immigration Status to any City contractor unless the contractor first agrees in writing to prohibit the contractor's employees and subcontractors from providing that data or information to any Immigration Agent, to the extent permitted by law. All City employees shall treat information that can be used to distinguish or trace a person's Citizenship or Immigration Status, either on its own or when combined with other information, as confidential information, to the extent permitted by law, and shall handle, maintain, and secure such information according to the standards for confidential information set forth in City policy.

SECTION HISTORY

Chapter and Section Added by Ord. No. 188,441, Eff. 12-19-24.

## Sec. 19.193. Judicial Warrants.

Nothing in this chapter shall prohibit or otherwise restrict the City from complying with a valid warrant for a criminal offense issued by a federal or state judge, or other order evidencing a judicial determination of probable cause.

SECTION HISTORY

Chapter and Section Added by Ord. No. 188,441, Eff. 12-19-24.

### Sec. 19.194. Adoption of Policy.

To the extent that some City departments are, by terms of the charter, exempt from the prohibitions in this chapter, they are strongly encouraged to adopt policies consonant with the provisions contained herein.

SECTION HISTORY

Chapter and Section Added by Ord. No. 188,441, Eff. 12-19-24.


### Sec. 19.195. Severability.

If any subsection, sentence, clause, or phrase of this chapter is for any reason held to be invalid or unconstitutional by a court of competent jurisdiction, such decision shall not affect the validity of the remaining portions of this chapter. The City Council hereby declares that it would have adopted this chapter, and each and every subsection, sentence, clause, and phrase thereof not declared invalid or unconstitutional, without regard to whether any portion of the chapter would be subsequently declared invalid or unconstitutional.

SECTION HISTORY

Chapter and Section Added by Ord. No. 188,441, Eff. 12-19-24.

EXHIBIT 25

# RESOLUTION NO. 2020-97
## RESOLUTION OF THE MARIN COUNTY BOARD OF SUPERVISORS REAFFIRMING SUPPORT FOR SB54, THE CALIFORNIA VALUES ACT, SUPPORTING CHANGES THAT FURTHER REDUCE COOPERATION WITH FEDERAL IMMIGRATION ENFORCEMENT, AND REAFFIRMING DIRECTION TO ALL COUNTY DEPARTMENTS/STAFF TO PROVIDE SERVICES TO ALL MARIN RESIDENTS REGARDLESS OF IMMIGRATION STATUS

**WHEREAS**, Marin County is home to approximately 260,000 people of diverse racial, ethnic and national backgrounds, including a large immigrant population from countries around the world, among them the Latinx community which accounts for 16 percent of the County's total population; and

**WHEREAS**, the County of Marin continues to believe that diversity of backgrounds, perspectives and experiences of all people is a great cause for celebration and strengthens our community and nation, and the County aspires to be a model for inclusion and equity for all populations, including immigrants, refugees, and other newcomers; and

**WHEREAS**, the County of Marin celebrates and recognizes immigrants as valuable and essential members of our community; and

**WHEREAS**, public safety in every community requires a relationship of trust between residents and local law enforcement; and

**WHEREAS**, this trust is threatened when local law enforcement agencies work with federal immigration enforcement programs, resulting in fear on the part of the immigrant community in approaching police when they are victims of, or witnesses to, crimes; in seeking basic health services; attending school, or accessing critical support services to the detriment of the public safety and the well-being of all residents in Marin County; and

**WHEREAS**, local law enforcement working with federal immigration enforcement programs diverts already limited local resources and blurs lines of accountability between local and federal government; and

**WHEREAS**, local participation in federal immigration enforcement programs also raises constitutional concerns, including the issue of being targeted on the basis of race or ethnicity in violation of the Equal Protection Clause; and

**WHEREAS**, the Board of Supervisors has taken the following actions to publicly express its strong support for all members of the community:

1) On December 13, 2016, adopting Resolution 2016-142 affirming equity and inclusion as priorities for the County of Marin, and taking a stand against all forms of discrimination and intolerance; and

2) On March 21, 2017, adopting Resolution No. 2017-25, "A Resolution of the Marin County Board of Supervisors to Ensure Family Unity, Community Security, Dignity and Due Process for All Residents of Marin County," committing to provide essential services to all Marin County residents regardless of immigration status, directing County staff to review policies and procedures to ensure eligible individuals are not deterred from seeking services based on immigration status, and supporting efforts to include immigrant

communities in ensuring dignity, security and due process for all Marin County residents; and

3) In 2017, offering a letter of support for the passage of SB 54, the California Values Act, which was subsequently passed by the California legislature, signed by Governor Brown, and took effect on January 1, 2018, providing a California-wide, general prohibition against law enforcement agencies enforcing federal immigration law, prohibiting law enforcement from responding to federal Immigration and Customs Enforcement ("ICE") detainer requests, and limiting when law enforcement can respond to ICE notification requests, among other things; and

4) On May 8, 2018, the Board of Supervisors joined other California local governments in joining an amicus brief supporting the State's defense of SB 54 against a federal court challenge by the Federal Government seeking to have the law declared unconstitutional; and

**WHEREAS**, in 2018, the Sheriff announced that his Department would no longer respond to ICE notification requests except when the notification request concerns detainees convicted or charged with crimes that SB 54 permits responding to the notification request; and

**WHEREAS**, the County held two Truth Act Forums, on December 6, 2018, and July 9, 2019, pursuant to AB 2792, to provide information on access that Marin law enforcement has provided for ICE and to provide an opportunity for public comment; and

**WHEREAS**, the Sheriff has reported that the Sheriff's Office responded to 75 ICE notification requests during 2018, 27 during 2019, but reduced to 6 so far in 2020; and

**WHEREAS**, the COVID-19 pandemic and shelter-in-place order has increased unemployment, poverty and homelessness nationwide, disproportionately affecting communities of color in particular the Latinx community in Marin which accounts for 75% of the county's confirmed COVID 19 cases, while only representing 16% of the total population; and

**WHEREAS**, it is well established that the persistent disparities in employment, income, health status, and access to health care experienced by communities of color also correlate with susceptibility to the Corona Virus; and

**WHEREAS**, the County of Marin has partnered in a variety of ways to provide support to communities disproportionately impacted by the COVID-19 virus, most notably in the Canal area of San Rafael, to reduce spread of the virus and support individuals and families financially impacted by the shelter in place; and

**WHEREAS**, towards supporting the immigrant community and addressing legitimate fears associated with potential ICE presence and activities in Marin, the Board of Supervisors has sought to ensure that the County comply with SB 54 and all applicable California law over law enforcement procedures and jail facilities; and

**WHEREAS**, the Board of Supervisors had previously urged the Sheriff to limit the sharing of inmate data which the Sheriff subsequently agreed to implement; and

**WHEREAS**, the Board recently urged the Sheriff to no longer allow ICE agents to enter the secured booking area to detain inmates being released, and the Sheriff has changed this practice effective August 15th, 2020; and

**WHEREAS**, actions by the federal government, particularly during the last three and one-half years, continue to create a climate of fear and uncertainty among immigrant communities nationwide, including in Marin County; and

**WHEREAS**, court rulings, including the Ninth Circuit Court of Appeals decisions in *United States v. California*, 921 F.3d 865 (2019) and *City and County of San Francisco v. Barr et al.*, 965 F.3d 753 (2020), have mostly stymied federal efforts to have SB 54 declared unconstitutional and to punish local entities for supporting policies that protect immigrant communities; and

**WHEREAS**, during this time of global health pandemic, a pandemic that is impacting many immigrant communities in Marin County and across the nation, it is imperative that the County do everything in its power to support immigrant communities and ensure that its policies promote all immigrants living in a safe and healthy environment; and

**WHEREAS**, the County looks forward to growing our community partnerships and implementing strengths-based and community-driven solutions and initiatives to address the COVID-19 pandemic and inequity and disparity in our community; and

**NOW, THEREFORE, BE IT RESOLVED** that:

1. Marin County will not waver in its commitment to remain a safe and inclusive community for its diverse population, including all immigrant families; and

2. The Board of Supervisors directs all County agencies and departments to review their policies and procedures to ensure that, to the extent allowed by law, Marin County policies and procedures do not deter anyone from seeking County services based on immigration status; and

3. The Board of Supervisors directs that no agency shall condition the provision of County benefits, opportunities, or services on matters related to citizenship or immigration status unless required to do so by statute, federal regulation, or court decision, and that all local agencies shall display prominently information on the rights of immigrants to access their services; and

4. The Board of Supervisors directs that, in order to ensure that eligible individuals are not deterred from seeking services or engaging with County offices, all local departments shall review their confidentiality policies and identify any changes necessary to ensure that information collected from individuals is limited to that necessary to perform agency duties and is not used or disclosed for any other purpose, and that any necessary changes to those policies shall be made within 60 days of the adoption of this resolution consistent with agency or department procedures; and

5. The Board of Supervisors commends Sheriff Robert Doyle for his department's commitment to not inquire about immigration status when carrying out its duties, to not

participate in federal immigration enforcement raids, and to build trust with all communities that the department serves; and

6. The Board of Supervisors commends Sheriff Robert Doyle for his decision to limit the sharing of data to requisite SB54 crimes and to end releases whereby the Sheriff's Office allowed ICE agents in the Marin County Jail's non-public booking area to detain inmates upon release; and

7. The Board of Supervisors urges Sheriff Robert Doyle and all Marin County law enforcement partners to continue their efforts to ensure that law enforcement in Marin County operates in a just, unbiased, and transparent manner to protect our community; and

8. The Board of Supervisors urges the Sheriff's Office to adhere to all California legal requirements while minimizing the extent to which posting of information facilitates federal immigration enforcement; and

9. When considering ICE notification requests for a detainee with a prior conviction, the Board of Supervisors urges the Sheriff's Office to only respond to the notification request if the detainee in question has a conviction for a "serious or violent felony" as described in Government Code Section 7282.5(a)(1); and

10. When considering ICE notification requests for a detainee who has no prior convictions but does have pending charges described in Government Code Section 7282.5(b), the Board of Supervisors urges the Sheriff's Office to only respond to the notification request if a judge has found at a preliminary hearing that there is probable cause on the pending charges.

**PASSED AND ADOPTED** at a regular meeting of the Board of Supervisors of the County of Marin held on this 15th day of September 2020, by the following vote:

AYES:      SUPERVISORS  Dennis Rodoni, Judy Arnold, Damon Connolly, Kathrin Sears
                                            Katie Rice

NOES:      NONE
ABSENT:   NONE

_____
PRESIDENT, BOARD OF SUPERVISORS

ATTEST:

_____
CLERK

Resolution No. 2020-97
Page 4 of 4

# EXHIBIT 26

Marin County Sheriff's Office

Policy Manual

# Immigration Violations

## 414.1   PURPOSE AND SCOPE

The purpose of this policy is to provide guidelines to members of the Marin County Sheriff's Office relating to immigration and interacting with federal immigration officials (e.g., U.S. Immigration and Customs Enforcement ("ICE")) whose role is to enforce immigration laws, in conformity with state and federal laws.

### 414.1.1   DEFINITIONS

The following definitions apply to this policy (Government Code § 7284.4):

**Criminal immigration violation** - Any federal criminal immigration violation that penalizes a person's presence in, entry, or reentry to, or employment in, the United States. This does not include any offense where a judicial warrant already has been issued.

**Immigration enforcement** - Any and all efforts to investigate, enforce, or assist in the investigation or enforcement of any federal civil immigration law, including any and all efforts to investigate, enforce, or assist in the investigation or enforcement of any federal criminal immigration law that penalizes a person's presence in, entry or reentry to, or employment in the United States.

**Judicial warrant** - A warrant based on probable cause for a violation of federal criminal immigration law and issued by a federal judge or a federal magistrate judge that authorizes a law enforcement officer to arrest and take into custody the person who is the subject of the warrant.

### 414.1.2   PROCEDURES

Procedures Manual: 414.1 IMMIGRATION VIOLATIONS - PROCEDURES

## 414.2   POLICY

It is the policy of the Marin County Sheriff's Office that all members make personal and professional commitments to equal enforcement of the law and equal service to the public. Confidence in this commitment will increase the effectiveness of this department in protecting and serving the entire community and recognizing the dignity of all persons, regardless of their national origin or immigration status.

## 414.3   VICTIMS AND WITNESSES

To encourage crime reporting and cooperation in the investigation of criminal activity, all individuals, regardless of their immigration status, must feel secure that contacting or being addressed by members of law enforcement will not automatically lead to immigration inquiry and/or deportation. While it may be necessary to determine the identity of a victim or witness, members shall treat all individuals equally and not in any way that would violate the United States or California constitutions.

Copyright Lexipol, LLC 2025/04/12, All Rights Reserved.
Published with permission by Marin County Sheriff's Office

Marin County Sheriff's Office
Policy Manual

*Immigration Violations*

## 414.4   IMMIGRATION INQUIRIES PROHIBITED
Deputies shall not inquire into an individual's immigration status for immigration enforcement purposes (Government Code § 7284.6). No person shall be contacted, detained, or arrested solely on the basis of his or her immigration status.

### 414.4.1   CALIFORNIA DEPARTMENT OF MOTOR VEHICLES
Members shall not obtain, access, use, or otherwise disclose noncriminal history information maintained by the DMV for immigration enforcement (Vehicle Code § 1808.48).

## 414.5   DETENTIONS AND ARRESTS
A deputy shall not detain any individual, for any length of time, for a civil violation of federal immigration laws or a related civil warrant (Government Code § 7284.6).

A deputy who has a reasonable suspicion that an individual already lawfully contacted or detained has committed a criminal violation of 8 USC § 1326(a) (unlawful reentry) that may be subject to an enhancement due to a previous conviction of an aggravated felony under 8 USC § 1326(b)(2), may detain the person for a reasonable period of time to contact federal immigration officials to verify whether the United States Attorney General has granted the individual permission for reentry and whether the violation is subject to enhancement (Government Code § 7284.6). No individual who is otherwise ready to be released should continue to be detained only because questions about the individual's status are unresolved.

If the deputy has facts that establish probable cause to believe that a person already lawfully detained has violated 8 USC § 1326(a) and the penalty may be subject to enhancement due to prior conviction for specified aggravated felonies, he/she may arrest the individual for that offense (Government Code § 7284.6).

A deputy should notify a supervisor as soon as practicable whenever an individual is arrested for violation of 8 USC § 1326(a).

### 414.5.1   SUPERVISOR RESPONSIBILITIES
When notified that a deputy has arrested an individual for violation of 8 USC § 1326(a) or under the authority of a judicial warrant, the supervisor should determine whether it is appropriate to:

(a)   Transfer the person to federal authorities.

(b)   Transfer the person to jail.

## 414.6   FEDERAL REQUESTS FOR ASSISTANCE
Absent an urgent issue of officer safety or other emergency circumstances, requests by federal immigration officials for assistance from this department should be directed to a supervisor. The supervisor is responsible for determining whether the requested assistance would be permitted under the California Values Act (Government Code § 7284.2 et seq.).

Marin County Sheriff's Office
Policy Manual

*Immigration Violations*

## 414.7  INFORMATION SHARING

No member of this department will prohibit, or in any way restrict, any other member from doing any of the following regarding the citizenship or immigration status, lawful or unlawful, of any individual (8 USC § 1373; Government Code § 7284.6):

(a)  Sending information to, or requesting or receiving such information from federal immigration officials

(b)  Maintaining such information in department records

(c)  Exchanging such information with any other federal, state, or local government entity

Nothing in this policy restricts sharing information that is permissible under the California Values Act (Government Code § 7284.2 et seq.).

### 414.7.1  IMMIGRATION DETAINERS

No individual should be held based solely on a federal immigration detainer under 8 CFR 287.7 (Government Code § 7284.6).

Notification to a federal authority may also be made prior to release of an individual who is the subject of a notification request only if the individual meets one of the following conditions (Government Code § 7282.5; Government Code § 7284.6):

(a)  The individual has been arrested and had a judicial probable cause determination for a serious or violent felony identified in Penal Code § 667.5(c) or Penal Code § 1192.7(c).

(b)  The individual has been arrested and had a judicial probable cause determination for a felony punishable by time in a state prison.

(c)  The individual has been convicted of an offense as identified in Government Code § 7282.5(a).

(d)  The individual is a current registrant on the California Sex and Arson Registry.

(e)  The individual is identified by the U.S. Department of Homeland Security's Immigration and Customs Enforcement as the subject of an outstanding federal felony arrest warrant.

### 414.7.2  NOTICE TO INDIVIDUALS

Individuals in custody shall be given a copy of documentation received from ICE regarding a hold, notification, or transfer request along with information as to whether the Marin County Sheriff's Office intends to comply with the request (Government Code § 7283.1).

If the Marin County Sheriff's Office provides ICE with notification that an individual is being, or will be, released on a certain date, the same notification shall be provided in writing to the individual and to his/her attorney or to one additional person who the individual may designate (Government Code § 7283.1).

### 414.7.3  ICE INTERVIEWS

Before any interview regarding civil immigration violations takes place between ICE and an individual in custody, the Marin County Sheriff's Office shall provide the individual with a written

Copyright Lexipol, LLC 2025/04/12, All Rights Reserved.
Published with permission by Marin County Sheriff's Office

Marin County Sheriff's Office
Policy Manual

*Immigration Violations*

consent form that explains the purpose of the interview, that the interview is voluntary, and that he/she may decline to be interviewed or may choose to be interviewed only with his/her attorney present. The consent form must be available in the languages specified in Government Code § 7283.1.

### 414.7.4  TRANSFERS TO IMMIGRATION AUTHORITIES

Members shall not transfer an individual to immigration authorities unless one of the following circumstances exist (Government Code § 7282.5; Government Code § 7284.6):

    (a)    Transfer is authorized by a judicial warrant or judicial probable cause determination.

    (b)    The individual has been convicted of an offense as identified in Government Code § 7282.5(a).

    (c)    The individual is a current registrant on the California Sex and Arson Registry.

    (d)    The individual is identified by the U.S. Department of Homeland Security's Immigration and Customs Enforcement as the subject of an outstanding federal felony arrest warrant.

### 414.7.5  REPORTING TO CALIFORNIA DEPARTMENT OF JUSTICE

An Investigations Division Supervisor shall ensure that data regarding the number of transfers of an individuals by the Patrol Division to immigration authorities, as permitted by Government Code § 7284.6(a)(4), and the offense that allowed for the transfer is collected and provided to the Records Manager for required reporting to the DOJ (Government Code § 7284.6(c)(2)(see the Documentary Services Division Policy).

The SB54 Coordinator shall ensure that data regarding the number of transfers of individuals by the Jail Division to immigration authorities, as permitted by Government Code § 7284.6(a)(4), and the offense that allowed for the transfer is collected and provided to the Records Manager for required reporting to the DOJ (Government Code § 7284.6(c)(2). See the Documentary Services Division Policy.

### 414.7.6  REPORTING TO THE BOARD OF SUPERVISORS

Consistent with the requirements of California Government Code § 7283.1(d), by January 31st of each year, the Sheriff's Office will report to the Marin County Board of Supervisors the number of inmates who ICE has requested access to in the prior year and the demographic characteristics of each.

### 414.8  U VISA AND T VISA NONIMMIGRANT STATUS

Under certain circumstances, federal law allows temporary immigration benefits, known as a U visa, to victims and witnesses of certain qualifying crimes (8 USC § 1101(a)(15)(U)).

Similar immigration protection, known as a T visa, is available for certain qualifying victims of human trafficking (8 USC § 1101(a)(15)(T)).

Copyright Lexipol, LLC 2025/04/12, All Rights Reserved.
Published with permission by Marin County Sheriff's Office

Marin County Sheriff's Office
Policy Manual

*Immigration Violations*

Any request for assistance in applying for U visa or T visa status should be forwarded in a timely manner to the Investigations Division supervisor assigned to oversee the handling of any related case. The Investigations Division supervisor should:

(a) Consult with the assigned investigator to determine the current status of any related case and whether further documentation is warranted.

(b) Contact the appropriate prosecutor assigned to the case, if applicable, to ensure the certification or declaration has not already been completed and whether a certification or declaration is warranted.

(c) Address the request and complete the certification or declaration, if appropriate, in a timely manner.

   1. The instructions for completing certification and declaration forms can be found on the U.S. Department of Homeland Security (DHS) website.

   2. Form I-918 Supplement B certification shall be completed if the victim qualifies under Penal Code § 679.10 (multiple serious offenses). The certification shall be completed and not refused for the specified reasons in Penal Code § 679.10(k) (3).

   3. Form I-914 Supplement B declaration shall be completed if the victim qualifies under Penal Code § 236.5 or Penal Code § 679.11 (human trafficking). The declaration shall be completed and not refused for completion for the specified reasons in Penal Code § 679.11(j)(3).

   4. Forward the completed Form I-918 Supplement B certification or completed Form I-914 declaration B to the victim, family member, or authorized representative (as defined in Penal Code § 679.10 and Penal Code § 679.11) without requiring the victim to provide government-issued identification (Penal Code § 679.10; Penal Code § 679.11)

(d) Ensure that any decision to complete, or not complete, a certification or declaration form is documented in the case file and forwarded to the appropriate prosecutor. Include a copy of any completed form in the case file.

   1. If Form I-918 Supplement B is not certified, a written explanation of denial shall be provided to the victim or authorized representative. The written denial shall include specific details of any reasonable requests for cooperation and a detailed description of how the victim refused to cooperate (Penal Code § 679.10).

(e) Inform the victim liaison of any requests and their status.

### 414.8.1   TIME FRAMES FOR COMPLETION

Deputies and their supervisors who are assigned to investigate a case of human trafficking as defined by Penal Code § 236.1 shall complete the above process and the documents needed for indicating the individual is a victim for the T visa application within 15 business days of the first encounter with the victim, regardless of whether it is requested by the victim (Penal Code § 236.5).

Deputies and their supervisors shall complete the above process and the documents needed certifying victim cooperation for a U visa or T visa application pursuant to Penal Code § 679.10

*Immigration Violations*

and Penal Code § 679.11 within 30 days of a request from the victim, victim's family, or authorized representative related to one of their assigned cases. If the victim is in removal proceedings, the certification shall be processed within seven days of the first business day following the day the request was received.

### 414.8.2   REPORTING TO LEGISLATURE
The Investigations Division supervisor or the authorized designee should ensure that certification requests are reported to the Legislature in January of each year and include the number of certifications signed and the number denied. The report shall comply with Government Code § 9795 (Penal Code § 679.10; Penal Code § 679.11).

### 414.8.3   POLICE REPORTS
Upon request, the Documentary Services Division shall provide a victim or authorized representative with a copy of the report filed by the victim within seven days of the request (Penal Code § 679.10).

## 414.9   TRAINING
The Training Manager should ensure that all appropriate members receive training on immigration issues.

Training should include:

(a) Identifying civil versus criminal immigration violations.

(b) Factors that may be considered in determining whether a criminal immigration violation has been committed.

(c) Prohibitions contained in the California Values Act (Government Code § 7284 et seq.).

Copyright Lexipol, LLC 2025/04/12, All Rights Reserved.
Published with permission by Marin County Sheriff's Office

EXHIBIT 27

# Chapter 2.60
# NONCOOPERATION WITH SENSITIVE INFORMATION REGISTRY

Sections:

**2.60.010    Purpose.**

**2.60.020    Prohibitions regarding sensitive information for registry.**

**2.60.030    Use of city funds prohibited.**

**2.60.040    Compliance—No private right of action.**

## 2.60.010 Purpose.

The city of Menlo Park is an ethnically, racially and religiously diverse city. The city has long derived its strength and prosperity from its diverse community. Cooperation with all members of the city's diverse community is essential to advancing the city's mission, vision and guiding principles, including community safety, support for youth and education, economic development and financial stability. The purpose of this chapter is to create a community free from fear in which individuals are assured that they can access the full range of city services, including law enforcement services, without the fear that information gained by city officials will be used to create or participate in creating a national registry based on sensitive information, including but not limited to racial, ethnic, religious or national background. (Ord. 1035 § 2 (part), 2017).

## 2.60.020 Prohibitions regarding sensitive information for registry.

No city agency, department, officer or employee shall request, maintain or disclose sensitive information about any person for the purposes of providing information to a national registry or national database specifically used to identify individuals on the basis of sensitive information. For purposes of this chapter, "sensitive information" includes any information that may be considered sensitive or personal in nature, including but not limited to a person's citizenship or immigration status, religion or religious beliefs, race, nationality, ethnicity, sexual orientation, gender or gender identity. (Ord. 1035 § 2 (part), 2017).

## 2.60.030 Use of city funds prohibited.

(a)    No city agency, department, officer or employee shall use city funds, resources, facilities, property, equipment or personnel to:

(1)    Compel an individual to identify, investigate, disseminate or otherwise gather sensitive information, including information regarding an individual's religious belief, race, or nation of

6/13/25, 12:50 PM    Chapter 2.60 NONCOOPERATION WITH DISCLOSURE OF INFORMATION GATHERED FOR...

Case 3:25-cv-01350-WHO    Document 37-8    Filed 07/29/25    Page 154 of 211

descent, for the purpose of providing information to a national registry or national database specifically used to identify individuals on the basis of sensitive information.

(2)    Detain, relocate or intern any individual based upon their religious beliefs, race, nation of descent or other sensitive information.

(b)    No city agency, department, officer or employee shall use city funds, resources, facilities, property, equipment or personnel unless such assistance is required by a valid and enforceable federal or state law or is contractually obligated. Nothing shall prevent the city, including any agency, department, officer or employee, from lawfully discharging his/her duties in compliance with a lawfully issued judicial warrant, subpoena or court decision. (Ord. 1035 § 2 (part), 2017).

**2.60.040 Compliance—No private right of action.**

(a)    The clerk of the city of Menlo Park shall send copies of this chapter, including any future amendments, to every department of the city of Menlo Park. Any employee who willfully and intentionally violates the prohibitions in this chapter may face department discipline up to and including termination.

(b)    In undertaking the adoption and enforcement of this chapter, the city is assuming an undertaking only to promote the general welfare. This chapter does not create or form the basis of liability on the part of the city, its agents, departments, officers or employees. It is not intended to create any new rights for breach of which the city or any of its employees are liable for money or any other damages to any person who claims that such breach proximately caused injury. (Ord. 1035 § 2 (part), 2017).

---

The Menlo Park Municipal Code is current through Ordinance 1123, passed March 11, 2025.

Disclaimer: The city clerk's office has the official version of the Menlo Park Municipal Code. Users should contact the city clerk's office for ordinances passed subsequent to the ordinance cited above.

City Website: https://www.menlopark.gov/
City Telephone: (650) 330-6620

Codification services provided by General Code

EXHIBIT 28

## BEFORE THE BOARD OF COUNTY COMMISSIONERS
## FOR MULTNOMAH COUNTY, OREGON

### RESOLUTION NO. 2016-132

Resolution Declaring Multnomah County a Sanctuary County.

**The Multnomah County Board of Commissioners Finds:**

a. Across the nation, recent political events have continued to spur and build a climate of hatred, bigotry, and discrimination toward many in our communities.

b. Multnomah County is home to individuals who represent a myriad of races, ethnicities, and nationalities, including immigrants and refugees from all over the world.

c. Many community members and groups have expressed fears regarding their ability to access Multnomah County government services such as health clinics, libraries, homeless shelters, domestic violence services, SUN programming, etc.

d. The deterioration of trust in one aspect of government jeopardizes trust in other aspects of government, including the provision of other County services.

**The Multnomah County Board of Commissioners Resolves:**

1. The Multnomah Board of County Commissioners recognizes the public's deep concern regarding whether community members will be able to continue accessing government resources and services.

2. The Board of County Commissioners supports and endorses the Multnomah County Sheriff's Office's continued compliance with ORS 181A.820 and applicable federal law in regards to federal immigration detainers.

3. The Board of County Commissioners seeks to reaffirm and declare its commitment to equity and respect for all community members by ensuring and affirming they are able to continue accessing County resources and services regardless of their immigration status.

**ADOPTED this 22nd day of December, 2016.**

BOARD OF COUNTY COMMISSIONERS
FOR MULTNOMAH COUNTY, OREGON

Deborah Kafoury

_____
Deborah Kafoury, Chair

REVIEWED:
JENNY M. MADKOUR, COUNTY ATTORNEY
FOR MULTNOMAH COUNTY, OREGON

By_____
Carlos J Calandriello, Senior Asst. County Attorney

**SUBMITTED BY:** Commissioner Loretta Smith, District 2 & Chair Deborah Kafoury.

# EXHIBIT 29

CHAPTER 17. - [SANCTUARY CITY]

*Footnotes:*

*--- (6) ---*

*Editor's note— Ord. 826-C.S., effective November 8, 2017, amended the Code by adding provisions designated as Title 4, Chapter 16. Inasmuch as there were already provisions so designated, the provisions have been redesignated as Title 4, Chapter 17 at the discretion of the editor.*

Sec. 4-17.01. - Findings and determinations.

(a)  The Pacifica City Council finds and declares the following:

(1)  WHEREAS, Immigrants are valuable and essential members of our community who contribute to our vibrant culture and power our economic engine; and

(2)  WHEREAS, A relationship of trust, respect, and open communication between the City of Pacifica's immigrant community and local law enforcement is central to the public safety of Pacifica; and

(3)  WHEREAS, Fostering a relationship of trust, respect, and open communication between City officials and the community is essential to the City's mission of delivering public services; and

(4)  WHEREAS, Trust between City officials and the community will diminish if City officials, including local law enforcement agencies, do not take steps to ensure that residents' sensitive or private data is protected; and

(5)  WHEREAS, Due to current events, immigrant community members fear approaching police when they are victims of, and witnesses to, crimes, and avoid seeking basic health services or attending school, to the detriment of the public safety and well-being of all Pacifica residents; and

(6)  WHEREAS, Immigration law enforcement is a responsibility of the federal government; and

(7)  WHEREAS, The City has limited resources, and those resources should be expended to provide local public services; and

(8)  WHEREAS, Entangling local law enforcement with federal immigration enforcement programs diverts already limited resources and blurs lines of accountability between local and federal government; and

(9)  WHEREAS, Local participation in federal immigration enforcement programs also raises constitutional concerns, including the prospect that Pacifica residents could be detained in violation of the Fourth Amendment, targeted on the basis of race or ethnicity in violation of the Equal Protection Clause, or denied access to education based on immigration status; and

(10)

WHEREAS, This chapter seeks to ensure effective policing, protect the safety, well-being, and constitutional rights of the residents of Pacifica and to direct the Pacifica's limited resources to matters of greatest concern to Pacifica.

(Ord. 826-C.S., eff. November 8, 2017)

Sec. 4-17.02. - Definitions.

For purposes of this chapter, these terms are defined as follows:

"Civil immigration warrant" means any warrant for a violation of federal civil immigration law, and includes civil immigration warrants entered in the National Crime Information Center database.

"Federal immigration authority" means any officer, employee, or person otherwise paid by or acting as an agent of United States Immigration and Customs Enforcement or United States Customs and Border Protection, or any division thereof, or any other officer, employee, or person otherwise paid by or acting as an agent of the United States Department of Homeland Security who is charged with immigration enforcement.

"Health facility" includes hospitals, medical offices, clinics, and substance abuse treatment facilities.

"Hold request" means a request from a federal immigration authority asking a local law enforcement agency to maintain custody of an individual currently in its custody beyond the time he or she would otherwise be eligible for release in order to facilitate transfer to federal immigration authorities and includes, but is not limited to, Department of Homeland Security (DHS) Form I-247.

"Immigration enforcement" includes any and all efforts to investigate, enforce, or assist in the investigation or enforcement of any federal civil immigration law, and also includes any and all efforts to investigate, enforce, or assist in the investigation or enforcement of any federal criminal immigration law that penalizes a person's presence in, entry, or reentry to, or employment in, the United States, including, but not limited to, violations of Section 1253, 1324c, 1325, or 1326 of Title 8 of the United States Code.

"Judicial warrant" means a warrant based on probable cause and issued by a federal judge or a federal magistrate judge that authorizes federal immigration authorities to take into custody the person who is the subject of the warrant.

"Local agency" means any county or city department, agency, division, commission, council, board or other body in Pacifica that is authorized to provide services to the residents of Pacifica, including but not limited to, health facilities, courthouses, and public schools.

"Local law enforcement agency" means any agency of a city, county, city and county, special district, or other political subdivision of the state that is authorized to enforce criminal statutes, regulations, or local ordinances; or to operate jails or to maintain custody of individuals in jails; or to operate juvenile detention

facilities or to maintain custody of individuals in juvenile detention facilities; or to monitor compliance with probation or parole conditions.

"Serious or violent felony" is any felony listed in subdivision (c) of Section 1192.7 and subdivision (c) of Section 667.5 of the Penal Code.

(Ord. 826-C.S., eff. November 8, 2017)

Sec. 4-17.03. - Restrictions on use of local resources and personnel from engaging in immigration enforcement.

(a)   Local law enforcement agencies shall not do any of the following:

(1)   Use agency or department moneys, facilities, property, equipment, or personnel to investigate, interrogate, detain, detect, or arrest persons for immigration enforcement purposes, including, but not limited to, any of the following:

(i)   Inquiring into or collecting information about an individual's immigration status.

(ii)   Detaining an individual on the basis of a hold request.

(iii)   Making arrests based on civil immigration warrants, unless any of the conditions listed in Section 4-17.03(c) herein apply.

(iv)   Giving federal immigration authorities access to interview individuals in agency or department custody for immigration enforcement purposes.

(v)   Assisting federal immigration authorities in the activities described in Section 1357(a)(3) of Title 8 of the United States Code.

(vi)   Performing the functions of an immigration officer, whether pursuant to Section 1357(g) of Title 8 of the United States Code or any other law, regulation, or policy, whether formal or informal.

(2)   Use agency or department moneys, facilities, property, equipment, or personnel to investigate, enforce, or assist in the investigation or enforcement of any federal program requiring registration of individuals on the basis of race, gender, sexual orientation, religion, or national or ethnic origin.

(3)   Make agency or department databases or the information contained therein available to anyone or any entity for the purpose of immigration enforcement or investigation or enforcement of any federal program requiring registration of individuals on the basis of race, gender, sexual orientation, religion, immigration status, or national or ethnic origin. Any agreements in existence on the date that this chapter becomes operative that make any agency or department database available for purposes prohibited by this paragraph are terminated on that date.

(4)

Place law enforcement officers under supervision of federal immigration enforcement agencies or employ local law enforcement officers deputized as special federal officers or special federal deputies for the purpose of enforcing federal immigration law.

(b) Notwithstanding any other law, in no event shall local law enforcement agencies transfer an individual to federal immigration authorities for purposes of immigration enforcement or detain an individual at the request of federal immigration authorities for purposes of immigration enforcement absent a judicial warrant.

(c) Notwithstanding the limitations in Section 4-17.03(a), this chapter does not prevent local law enforcement agencies from doing any of the following:

   (1) Participating in a joint law enforcement task force, so long as the primary purpose of the joint law enforcement task force is not immigration enforcement, and the enforcement or investigative duties of the task force is related to a violation of state or federal law unrelated to immigration enforcement.

   (2) Making inquiries into information necessary to certify an individual who has been identified as a potential crime or trafficking victim for a T or U Visa pursuant to Section 1101(a)(15)(T) or 1101(a)(15)(U) of Title 8 of the United States Code.

   (3) Responding to a request for information regarding a person who is serving a term pursuant to a conviction for a serious or violent felony.

(d) Nothing in this chapter shall be construed to prevent local law enforcement from providing assistance to secure a scene or act in cases of emergency when federal immigration officials are present, for the purpose of ensuring community safety.

(e) This chapter does not prohibit or restrict any government entity or official from voluntarily sending to, or receiving from, federal immigration authorities, information regarding the citizenship status, lawful or unlawful, of an individual, or from voluntarily requesting from federal immigration authorities immigration status information, lawful or unlawful, of any individual, or maintaining or exchanging that information with any other federal, state, or local government entity, pursuant to Sections 1373 and 1644 of Title 8 of the United States Code.

(Ord. 826-C.S., eff. November 8, 2017)

Sec. 4-17.04. - Equal access to services.

(a) The City shall not condition the provision of City benefits, opportunities, or services on matters related to citizenship or immigration status unless required to do so by statute, federal regulation, or court decision.

(b) City officials shall prohibit federal immigration authorities from operating on or gaining physical access to any lands or buildings owned, leased, or controlled by the City of Pacifica, if the sole purpose for gaining access to such facilities is for the enforcement of federal immigration law, by

using the following procedure:

    (1)  Local agencies shall deny any request or attempt by any federal immigration authorities to access local agency lands or buildings, or obtain information about individuals employed or served by the local agency.

    (2)  Local agencies shall refer federal immigration authorities to the City Attorney's Office. The City Attorney's Office shall only advise local agencies to provide access if federal immigration authorities present a warrant signed by a federal or state judge, not including administrative law judges, specifying the persons to be arrested and/or places to be searched. Access shall be strictly limited to the terms of the warrant signed by a federal or state judge.

(c)  City officials shall display prominently information on the rights of immigrants to access their services, and shall implement a policy that limits assistance with ICE to the fullest extent possible under state and federal law.

(d)  Where presentation of a state driver's license or identification card is accepted as adequate evidence of identity, presentation of a photo identity document issued by the person's nation of origin, such as a driver's license, passport, or matricula consular (consulate-issued document), shall be accepted and shall not subject the person to a higher level of scrutiny or different treatment than if the person had provided a state driver's license or identification card except that this subsection shall not apply to the completion of the federally mandated I-9 forms.

(Ord. 826-C.S., eff. November 8, 2017)

Sec. 4-17.05. **-** Data privacy.

(a)  City officials and law enforcement agencies shall protect an individual's privacy and handle sensitive and confidential information with care.

    (1)  City officials and law enforcement agencies shall not release sensitive details outside the agency regarding an individual in law enforcement custody, including a person's release date, unless the agency is compelled to do so through a judicial warrant, or court decision issued by an Article III Court.

    (2)  City officials and law enforcement agencies shall not provide sensitive personal information about an individual, including, but not limited to, information regarding an individual's home address or work address, unless the agency is compelled to do so through a judicial warrant, or court decision issued by an Article III Court.

(b)  In order to ensure that eligible individuals are not deterred from seeking services or engaging with state agencies, the City shall review its confidentiality policies and identify any changes necessary to ensure that information collected from individuals is limited to that necessary to perform agency duties and is not used or disclosed for any other purpose. Any necessary changes to those policies shall be made consistent with agency or department procedures.

(c)  All applications, questionnaires, and interview forms used in relation to City benefits, opportunities, or services shall be promptly reviewed by the local agencies and any questions regarding citizenship or immigration status, other than those required by statute, ordinance, federal regulation or court decision, shall not be asked. Existing forms that unnecessarily ask for citizenship or immigration status shall cease being used within sixty (60) days of the passage of the ordinance from which this chapter derived, and shall be destroyed in accordance with the City's records retention schedule.

(Ord. 826-C.S., eff. November 8, 2017)

Sec. 4-17.06. **-** No private right of action.

In undertaking the adoption and enforcement of this chapter, the City is assuming an undertaking only to promote the general welfare. This chapter does not create or form the basis of liability on the part of the City, its agents, departments, officers or employees. It is not intended to create any new rights for breach of which the City or any of its employees are liable for money or any other damages to any person who claims that such breach proximately caused injury.

(Ord. 826-C.S., eff. November 8, 2017)

Sec. 4-17.07. - Severability.

The provisions of this Act are severable. If any provision of this Act or its application is held invalid, that invalidity shall not affect other provisions or applications that can be given effect without the invalid.

(Ord. 826-C.S., eff. November 8, 2017)

# EXHIBIT 30

# Resolution No. 2025-XXX N.C.S.
## of the City of Petaluma, California

**RESOLUTION OF THE CITY COUNCIL OF THE CITY OF PETALUMA REAFFIRMING THE CITY'S COMMITMENT TO IMMIGRANTS, INCLUSIVITY, AND COMPLIANCE WITH CALIFORNIA LAW, INCLUDING SENATE BILL 54**

**WHEREAS**, all City of Petaluma immigrant residents, whether they are U.S. citizens, permanent residents, undocumented residents, refugees, or residents with any other immigration status, are valued and integral members of our social, cultural, and economic fabric; and

**WHEREAS**, immigrants, documented and undocumented, contribute to the prosperity, vitality, and diversity of Petaluma through their work, volunteerism, and cultural contributions; and

**WHEREAS**, the City of Petaluma values the safety and well-being of all its community members and is committed to fostering an inclusive and welcoming environment where every person is treated with dignity and respect; and

**WHEREAS**, many immigrants in the City of Petaluma have worked the front lines during the global pandemic and wildfires of recent years and are considered essential workers; and deserve to work with dignity and free from exploitation; and

**WHEREAS**, many immigrants have created deep ties in the City of Petaluma, which they have cultivated for themselves, their families, and their communities; and

**WHEREAS,** on February 27, 2017, the City Council adopted Resolution No. 2017-032 N.C.S., titled "Resolution in Support of the Protection of the Human, Constitutional, and Other Rights of Community Members of the City of Petaluma"; and

**WHEREAS,** on April 5, 2021, the City Council adopted Resolution No. 2021-040 N.C.S., titled "Resolution in Support of Solidarity with the Asian American Pacific Islander Communities and Denouncing Anti-Asian Racism, Discrimination, Intimidation, Threats and Violence"; and

**WHEREAS,** on October 16, 2023, the City Council adopted Resolution No. 2023-163 N.C.S., titled "Resolution Supporting Human Rights of All Petalumans and Condemning Hate Speech, Racism, and Acts of Extremism";

**WHEREAS**, on January 21, 2025, the U.S. Department of Justice issued a memorandum threatening legal action against jurisdictions like Petaluma for allegedly not cooperating with federal immigration enforcement; and

**WHEREAS**, the 10th Amendment to the U.S. Constitution, as upheld by the U.S. Supreme Court in *Printz v. United States* (1997), protects local jurisdictions, such as the City of Petaluma, from being compelled to enforce federal regulatory programs, including federal immigration laws, under the "anti-commandeering" doctrine.

**WHEREAS**, California Senate Bill 54 (SB 54), enacted in 2017 also known as the California Values Act, prohibits state and local law enforcement agencies from using their resources to assist federal immigration enforcement efforts, except as specifically authorized under federal or state law, to promote trust between immigrant communities and local government; and

**WHEREAS,** the 10th Amendment to the U.S. Constitution, as upheld by the Ninth Circuit in *United States v. California*, 921 F.3d 865 (9th Cir. 2019), affirms that states, such as California, have the sovereign right to decide whether to participate in federal enforcement efforts, rejecting the Trump administration's 2018 challenge to SB 54 and reinforcing the constitutional principle of the anti-commandeering doctrine; and

**WHEREAS**, the City of Petaluma recognizes the importance of aligning its policies with the law while upholding its values of inclusivity, respect, and support for immigrant communities; and

**WHEREAS**, the Petaluma Council wishes to declare that the City of Petaluma is a safe place for everyone, including, but not limited to, immigrants from all countries, people of color, people of all religions, gender identity, sexual orientation, people with disabilities and all vulnerable communities; and

**WHEREAS**, the City of Petaluma seeks to reaffirm its commitment to being a community that values all community members, regardless of immigration status, and acknowledges that this inclusivity strengthens Petaluma as a whole.

**NOW, THEREFORE, BE IT RESOLVED,** by the City Council of the City of Petaluma as follows:

1. **Reaffirms Resolution No. 2017-032 N.C.S.**: The provisions of Resolution No. 2017-032 N.C.S., titled "Resolution in Support of the Protection of the Human, Constitutional, and Other Rights of Community Members of the City of Petaluma," are hereby reaffirmed and fully incorporated into this Resolution.

2. **Reaffirms Resolution No. 2021-040 N.C.S.**: The provisions of Resolution No. 2021-040 N.C.S., titled "Resolution in Support of Solidarity with the Asian American Pacific Islander Communities and Denouncing Anti-Asian Racism, Discrimination, Intimidation, Threats, and Violence," are hereby reaffirmed and fully incorporated into this Resolution.

3. **Reaffirms Resolution No. 2023-163 N.C.S.**: The provisions of Resolution No. 2023-163 N.C.S., titled "Resolution Supporting Human Rights of all Petalumans and Condemning Hate Speech, Racism, and Acts of Extremism," are hereby reaffirmed and fully incorporated into this Resolution.

4. **Inclusivity Commitment**: The City of Petaluma reaffirms its commitment to ensuring all community members feel safe, included, and respected, regardless of immigration status, and recognizes that immigrants play a vital role in the City's success and character.

5. **Support for SB 54 Compliance**: The City affirms its commitment to complying with California Senate Bill 54 and other applicable state laws that ensure local resources are used to promote community trust and safety while protecting immigrant communities.

6. **Opposition to Threats Against Local Autonomy**: The City condemns any baseless threats or attempts by federal agencies to coerce or intimidate local jurisdictions into acting against their legal obligations and values, including those enshrined in SB 54.

7. **Promotion of Community Trust**: The City will continue to support policies and practices that strengthen trust and cooperation between local government, law enforcement, and immigrant communities to promote public safety and well-being.

8. **Recognition of Immigrant Contributions**: The City recognizes and celebrates the many contributions of immigrants to Petaluma, including their work in vital industries, their cultural and civic contributions, and their role in building a stronger and more vibrant community.

9. **Commitment to Compliance with Law**: The City reaffirms its dedication to upholding both state and federal laws while protecting the rights and dignity of all its community members. The City's policies will reflect a balanced approach that promotes inclusion and community trust in accordance with legal requirements.

<div style="text-align:center">Under the power and authority conferred upon this Council by the Charter of said City.</div>

| REFERENCE: | I hereby certify the foregoing Resolution was introduced and adopted by the Council of the City of Petaluma at a Regular meeting on the 3rd day of February 2025, by the following vote: | Approved as to form: |
|---|---|---|

City Attorney

**AYES: NOES:**
**ABSENT:**

**ABSTAIN:**

**ATTEST:**

              City Clerk                                 Mayor

EXHIBIT 31

1  Sponsored by:  Councilmembers Jani Hitchen, Rosie Ayala, Robyn Denson, and Bryan Yambe
2  Requested by:  County Executive
3
4
5
6  ## RESOLUTION NO. R2025-139s
7
8
9  **A Resolution of the Pierce County Council Affirming Pierce County's Commitment to Public Safety, Equity, and Inclusive Access to County Services for Immigrants, Refugees and All Residents.**
10
11
12
13
14  **Whereas,** the federal Immigration and Nationality Act of 1952, the Homeland
15  Security Act of 2002, and other federal laws establish that federal immigration
16  enforcement is the sole responsibility of the federal government; and
17
18  **Whereas,** federal agencies are enacting numerous policy changes and actions
19  regarding immigration enforcement, raising questions about the roles and
20  responsibilities of state and local governments in federal immigration enforcement; and
21
22  **Whereas,** Pierce County is committed to ensuring that all residents feel safe,
23  welcome, and connected, and that residents must have confidence in their ability to
24  seek county services and assistance without fear; and
25
26  **Whereas,** Pierce County is made up of individuals, both native born and
27  immigrants, whose collective cultures, religions, backgrounds, orientations, abilities, and
28  viewpoints join to form a healthy community that prides itself on being a place that
29  everyone feels safe, valued, and free to be their authentic selves regardless of how long
30  they have lived here or where they came from; and
31
32  **Whereas,** as of 2022, Pierce County, Washington, had a population of
33  approximately 919,000 residents, of whom 4.34% were non-citizens, including legal
34  permanent residents, international students, temporary workers, humanitarian migrants,
35  and undocumented immigrants; and
36
37  **Whereas,** to fully capitalize on our diversity as an asset, the Pierce County
38  Council strives to create a culture and policies that ensure everyone belongs and
39  thrives; and
40
41  **Whereas,** the Pierce County Council has demonstrated this commitment to
42  welcoming refugees and immigrants, including the passage of Ordinance No. 2021-86
43  to create a Commission on Refugee and Immigrant Affairs to provide insights and
44  recommendations to the County, enhancing the relationship between County
45  government and refugee and immigrant communities; and
46

**Whereas,** Washington State adopted the Keep Washington Working Act (KWW) in 2019 (E2SB 5497) to limit local law enforcement agencies' participation in federal immigration enforcement; require all Washington public schools, courthouses, publicly operated health facilities, and law enforcement agencies to adopt policies consistent with those published by the Attorney General's Office to limit immigration enforcement to the fullest extent possible under federal and state law; and prohibits local governments and law enforcement agencies from entering into immigration detention agreements; and

**Whereas,** the Pierce County Council strives for transparent county-wide government practices and respectfully reminds Separately Elected Officials of their duty to communicate with the public we serve regarding standards and expectations for interactions with public servants within County-operated spaces; and

**Whereas,** the Pierce County Council recognizes that there are significant non-civil public safety concerns, infrastructure needs, and community needs that are more deserving of focused attention and limited financial resources, and that there is no fiscal note attached to this Proposal as it poses no fiscal impact; and

**Whereas,** in accordance with state and federal law, this resolution does not interfere with or impede upon on Immigration Customs Enforcement's ability to carry out agency assignments within Pierce County when in possession of a judicially authorized warrant based on probable cause; and

**Whereas,** pursuant to the Keep Washington Working Act, this resolution relates to local law enforcement interaction for federal immigration enforcement only (RCW 10.93.160(2)), and does not impact local law enforcement's ability to collaborate with both state and federal agency regional task forces as they relate to organized crime that creates unsafe environments for members of our community; and

**Whereas,** the County Executive has issued a directive to County Departments to guide supervisors and employees on how to interact with federal officials with an immigration inquiry and to designate their private and non-public spaces within their workplace, **Now Therefore,**

**BE IT RESOLVED by the Council of Pierce County:**

Section 1.  The Pierce County Council expresses its full support for the County Executive's directive on federal immigration enforcement and affirms the County's commitment to policies that protect the rights and dignity of all residents.

Section 2.  The Pierce County Council encourages Separately Elected Officials to adopt and publicly share similar policies and/or office guidelines for responding to interactions with federal agencies and instruct their employees accordingly.

Section 3.  Pierce County shall take all necessary actions to comply with the Keep Washington Working Act and uphold its purpose of maintaining a just and inclusive community, ensuring that all residents can fully participate in economic and civic life without undue fear or discrimination.

Section 4.  Consistent with the Keep Washington Working Act, it is the policy of Pierce County that no County funds, facilities, property, equipment, or personnel shall be used to investigate, enforce, cooperate with, or assist in the enforcement of federal registration or surveillance programs, or any other policies that target Washington residents based solely on race, religion, immigration or citizenship status, or national or ethnic origin. Exceptions shall only be made in cases where state or federal law explicitly requires the collection, use, or disclosure of such information, or in response to a lawfully issued court order. Pierce County Council requests to be notified by County offices and departments if actions are taken pursuant to exceptions.

Section 5. The Pierce County Council requests that the policies and/or office guidelines referenced in Section 2 be publicly available and presented to the Pierce County Council's Health and Human Services Committee on or before August 31, 2025.

Section 6.  Pierce County Council affirms the County's commitment to fostering a community where all individuals feel secure in accessing public services, engaging in civic life, and contributing to the economic and social vitality of Pierce County.

ADOPTED this _29th_ day of _April_____, 2025.

ATTEST:

_____ for
**Stephanie Call**
Clerk to the Council

**PIERCE COUNTY COUNCIL**
Pierce County, Washington

_____
**Jani Hitchen**
Council Chair

# EXHIBIT 32

<u>ORDINANCE NO.  08-25 N.S.</u>

**AN ORDINANCE OF THE CITY COUNCIL OF THE CITY OF RICHMOND LIMITING THE USE OF CITY RESOURCES FOR FEDERAL IMMIGRATION ENFORCEMENT**

The City Council of the City of Richmond do ordain as follows:

**SECTION 1.  AUTHORITY.** This Ordinance is authorized by the City's authority under California Constitution, article XI, sections 5 (charter cities) and 7 (police power), and in conformity with California Senate Bill No. 54, codified in California Government Code Sections 7282 – 7284.10.

**SECTION 2.  MUNICIPAL CODE AMENDMENT.** Chapter 2.30 of Article II of the Richmond Municipal Code, Administration and City Government, is hereby added to read as follows:

Section 2.30.010 — **City Council Findings and Declarations**

   (a) The City of Richmond is home to people of diverse racial, ethnic, and national backgrounds, including a large immigrant population.

   (b) Immigrants are valuable and essential members of the City of Richmond community.

   (c) A relationship of trust between the City of Richmond's immigrant community and the City of Richmond, its departments, programs, and personnel is central to the public safety of Richmond residents.

   (d) This trust is threatened when state and local agencies are entangled with federal Immigration enforcement, with the result that immigrant community members fear approaching police when they are victims of, and witnesses to, crimes, seeking basic health services, or attending school, to the detriment of public safety and the well-being of all Californians, including Richmond residents.

   (e) Entangling state and local agencies with federal immigration enforcement programs diverts already limited resources and blurs the lines of accountability between local, state, and federal governments.

   (f) There are legal concerns with leveraging the City of Richmond's resources for federal immigration endeavors, including but not limited to the prospect of Richmond residents being detained in violation of the Fourth Amendment of the United States Constitution or targeted on the basis or race or ethnicity in violation of the Equal Protection Clause.

   (g) This chapter seeks to ensure effective policing, to protect the safety, well-being,   and constitutional rights of Richmond residents, and to direct the City's limited resources to matters of greatest concern.

Section 2.30.020 – **Definitions**

For purposes of this chapter, the following words and phrases are defined as follows:

   (a) **"Administrative warrant"** means a document issued by the federal agency charged with the enforcement of the Federal immigration law that is used as a non-criminal, civil warrant for immigration purposes.

(b) **"Eligible for release from custody"** means that the individual may be released from custody because one of the following conditions has occurred:

    (1) All criminal charges against the individual have been dropped or dismissed.

    (2) The individual has been acquitted of all criminal charges filed against him or her.

    (3) The individual has served all the time required for his or her sentence.

    (4) The individual has posted a bond or has been released on his or her own recognizance.

    (5) The individual has been referred to pre-trial diversion services.

    (6) The individual is otherwise eligible for release under state or local law.

(c) **"Citizenship or Immigration Status"** shall mean all information or classification regarding citizenship of the United States or any other country, place of birth, the authority to reside in or otherwise be present in the United States, including visa status, and the time or manner of a person's entry into the United States.

(d) **"Civil immigration detainer"** means a non-mandatory request issued by an authorized federal immigration officer under Section 287.7 of Title 8 of the Code of Federal Regulations, to a local law enforcement official to maintain custody of an individual for a period not to exceed 48 hours and advise the authorized federal immigration officer prior to the release of that individual.

(e) **"Convicted"** means the state of having been proved guilty in a judicial proceeding, unless the convictions have been expunged or vacated pursuant to applicable law. The date that an individual is Convicted starts from the date of release.

(f) **"Firearm"** means a device, designed to be used as a weapon, from which is expelled through a barrel, a projectile by the force of an explosion or other form of combustion as defined in Penal Code Section 16520.

(g) **"Immigration Agent"** means any federal, state, or local officer, employee, or person performing immigration enforcement functions including, but not limited to, agents employed by U.S. Immigration and Customs Enforcement or U.S. Customs and Border Protection.

(h) **"Immigration Enforcement"** means any and all efforts to investigate, enforce, or assist in the investigation or enforcement of any federal civil immigration law against natural persons, and also includes any and all efforts to investigate, enforce, or assist in the investigation or enforcement of any federal criminal immigration law that penalizes a natural person's presence in, entry, or reentry to, or employment in, the United States.

(i) **"Law enforcement official"** means any City Department or officer or employee of a City Department, authorized to enforce criminal statutes, regulations, or local ordinances; operate jails or maintain custody of individuals in jails; and operate juvenile detention facilities or maintain custody of individuals in juvenile detention facilities.

(j) **"Notification request"** means a non-mandatory request issued by an authorized federal immigration officer to a local law enforcement official asking for notification to the authorized immigration officer of an individual's release from local custody prior to the release of an individual from local custody. Notification requests may also include informal requests for release information by the Federal agency charged with enforcement of the Federal immigration law.

(k) **"Personal information"** means any confidential, identifying information about an individual, including, but not limited to, home or work contact information, and family or emergency contact information.

Section 2.30.030 – **Limitations on the Use of City Resources.**

Unless required by federal or state law, no City resources, including, but not limited to, City personnel and City property, shall be utilized to assist in the enforcement of federal immigration law or to gather or disseminate information regarding release status of individuals or any other such personal information as defined in Section 2.030.20, unless such assistance is required by federal or state statute, regulation, or court decision. The limitations set forth in this Section shall include, but shall not be limited to:

(a) Inquiring into or collecting information about an individual's Citizenship or Immigration
Status, unless such information is necessary to provide a City service, including the provision of immigration and naturalization assistance, for election-related purposes or appointment to a City office or commission, or as required for purposes of City employment or the disbursement of City funds.

(b) Assisting or cooperating, in one's official capacity, with any investigation, detention or arrest procedures, public or clandestine, conducted by the federal agency charged with enforcement of federal immigration law and relating to alleged violations of the civil provisions of the federal immigration law, except as permitted under this Chapter 2.30 and applicable state or federal law.

(c) Assisting or cooperating, in one's official capacity, with any investigation, surveillance, or
gathering of information conducted by foreign governments, except for cooperation related to an alleged violation of City, state, or federal criminal laws.

(d) Requesting information about, or disseminating information, in one's official capacity, regarding the release status of any individual, except as permitted under this Chapter 2.30, or conditioning the provision of services or benefits by the City upon immigration status, except as required by federal or state statute or regulation, City public assistance criteria, or applicable court decision.

(e) Providing any Immigration Agent access to any non-public areas of property owned or controlled by the City for the purpose of Immigration Enforcement.

Section 2.30.040 – **Limitations on Law Enforcement Officials**

(a) The City of Richmond's Police Department, consistent with California Government Code section 7284.6(a), shall not:

(1) Use agency or department moneys or personnel to investigate, interrogate, detain, detect, or arrest persons for immigration enforcement purposes, including any of the following:

(A) Inquiring into an individual's immigration status.

(B) Detaining an individual on the basis of a hold request.

(C) Providing information regarding a person's release date or responding to requests for notification by providing release dates or other information unless that information is available to the public or is in response to a notification request from immigration agents in accordance with California Government Code Section 7282.5.

Responses are never required, but are permitted under this subdivision, provided that they do not violate any local law or policy.

    (D) Making or intentionally participating in arrests based on civil immigration warrants.

    (E) Assisting immigration agents in the activities described in Section 1357(a)(3) of Title 8 of the United States Code.

    (F) Performing the functions of an immigration officer, whether pursuant to Section 1357(g) of Title 8 of the United States Code or any other law, regulation, or policy, whether formal or informal.

(2) Place Richmond police officers under the supervision of federal agencies or employ peace officers deputized as special federal officers or special federal deputies for purposes of immigration enforcement. All Richmond police officers remain subject to California law governing conduct of peace officers and the policies adopted by the City of Richmond.

(3) Use immigration agents as interpreters for law enforcement matters relating to individuals in agency or department custody.

(4) Transfer an individual to immigration agents unless authorized by a judicial warrant or judicial probable cause determination, or in accordance with California Government Code Section 7282.5.

(5) Provide office space exclusively dedicated for immigration agents for use within a Police Department facility.

(6) Contract with the federal government for use of Police Department facilities to house individuals as federal detainees, except pursuant to Chapter 17.8 of the California Government Code (commencing with Section 7310).

(b) Notwithstanding the limitations in subsection (a), this section is not intended to prevent personnel or officers of the City of Richmond's Police Department from taking actions consistent with or permitted by federal and state law, including, but not limited to, those actions enumerated within California Government Code Sections 7282.5 and 7284.6(b)(e), as amended.

## Section 2.30.050 – **Confidentiality and Protection of City Data.**

Except as required by 8 U.S.C. § 1373 or other applicable federal or state law, no City personnel or law enforcement official shall provide access to any City data or information that can be used to determine or trace a person's Citizenship or Immigration Status to any Immigration Agent. In furtherance of this restriction, as of the effective date of this ordinance, City personnel shall not provide City data or information that can be used to determine or trace a person's Citizenship or Immigration Status to any City contractor unless the contractor first agrees in writing to prohibit the contractor's employees and subcontractors from providing that data or information to any Immigration Agent, to the extent permitted by law. All City employees shall treat information that can be used to distinguish or trace a person's Citizenship or Immigration Status, either on its own or when combined with other information, as confidential information, to the extent permitted by law.

## Section 2.30.060 – **Judicial Warrants and Presiding Law.**

Nothing in this chapter shall prohibit or otherwise restrict the City or City personnel

from complying with a valid warrant issued by a federal or state judge, or other order evidencing a judicial determination of probable cause, nor shall this chapter prohibit the City or its personnel from complying with state or federal law.

**SECTION 3. CEQA FINDINGS.** The City Council finds that adoption of this Ordinance is exempt from CEQA because: (i) it is not a project within the meaning of Public Resources Code, section 21065 because it has no potential to alter the physical environment; (ii) and pursuant to CEQA Guidelines section 15061(b)(3), the so-called "common sense" exemption, for this same reason.

**SECTION 4. SEVERABILITY.** If any section, subsection, sentence, clause, phrase or portion of this Ordinance or its application to any person or circumstance is held to be invalid or unconstitutional by the decision of any court of competent jurisdiction, such decision shall not affect the validity of the remaining portions of this Ordinance or its application to other persons and circumstances. The City Council declares that it would have adopted this Ordinance and each section, subsection, sentence, clause, phrase or portion thereof despite the fact that any one or more sections, subsections, sentences, clauses, phrases, or portions be declared invalid or unconstitutional and, to that end, the provisions hereof are hereby declared to be severable.

**SECTION 5. EFFECTIVE DATE.** This Ordinance shall be in full force and effect 30 days after its adoption under Chapter 2.30, Administration and City Government, Article II of the City of Richmond's Municipal Code.

**SECTION 6. PUBLICATION.** The City Clerk shall certify to the passage and adoption of this Ordinance and shall cause the same to be published once in the East Bay Times, a newspaper of general circulation printed, published, and circulated within the City.

**SECTION 7. EFFECTIVE DATE.** This ordinance shall be effective thirty days after passage and adoption.

****************************

First introduced at a regular meeting of the City Council of the City of Richmond held on March 11, 2025, and finally passed and adopted at a regular meeting held on March 25, 2025, by the following vote:

| | |
|---|---|
| AYES: | Councilmembers Bana, Brown, Jimenez, Robinson, Wilson, Vice Mayor Zepeda, and Mayor Martinez. |
| NOES: | None. |
| ABSTENTIONS: | None. |
| ABSENT: | None. |

PAMELA CHRISTIAN
CLERK OF THE CITY OF RICHMOND
(SEAL)

Approved:

EDUARDO MARTINEZ
Mayor

Approved as to form:

DAVE ALESHIRE
City Attorney

State of California           }
County of Contra Costa             : ss.
City of Richmond           }

I certify that the foregoing is a true copy of **Ordinance No. 08-25 N.S.**, passed and adopted by the City Council of the City of Richmond at a regular meeting held on March 25, 2025.                    .

Pamela Christian, Clerk of the City of Richmond

# EXHIBIT 33

ebrating the centennial anniversary of women's suf-frage in New York State. Up All Night will provide artists for all opening and headlining acts. They will also be responsible for providing the stage, lights, and sound; a production manager and hospitality for the artists; internal event security; and vendors. The agreement will contain a revenue sharing compo-nent, providing Up All Night with exclusive rights to food and beverage vending in exchange for set rates of food and beverage by the volume sold. The City will retain all ticket revenue.

A request for proposals process was not completed due to the limited amount of time before the event. The City needs a producer to search for and book a national recording artist as soon as possible, and Up All Night was selected because of the time con-straint and the existing relationship with the pro-moter for Party in the Park and Bands on the Bricks. If a woman-centered music festival becomes an on-going event, a request for proposals will be issued for the selection of a promoter.

Respectfully submitted,
Lovely A. Warren
Mayor

Attachment No. AQ-28

Ordinance No. 2017-55
(Int. No. 54)

**Authorizing an agreement with Eskay Concerts, Inc. for event production**

BE IT ORDAINED, by the Council of the City of Rochester as follows:

Section 1. The Mayor is hereby authorized to en-ter into a professional services agreement in the maximum amount of $150,000 with Eskay Con-certs, Inc. (d/b/a Up All Night) to book artists and produce a July 2017 concert. The agreement shall have a term of one year.

Section 2. The cost of the agreement shall be funded by appropriating $150,000 from the Roch-ester Events Network Trust Fund. Ordinance No. 2016-180, the 2016-17 Budget of the City of Roch-ester, as amended, is hereby further amended by in-creasing the revenue estimates and appropriations to the 2016-17 Budget of the Bureau of Communi-cations by said amount.

Section 3. The agreement shall contain such ad-ditional terms and conditions as the Mayor deems to be appropriate.

Section 4. This ordinance shall take effect im-mediately.

Passed unanimously.

By President Scott
February 21, 2017

To the Council:

The Committee Of The Whole recommends for adoption the following entitled legislation:

Int. No. 59 - Resolution affirming that Rochester is a Sanctuary City committed to equal rights for all

Respectfully submitted,
Molly Clifford
Carolee A. Conklin
Matt Haag
Jacklyn Ortiz
Michael A. Patterson
Elaine M. Spaull
Dana K. Miller
Loretta C. Scott
COMMITTEE OF THE WHOLE

Received, filed and published.

TO THE COUNCIL
Ladies and Gentlemen:

Resolution No. 2017-5
Re: Resolution Affirming that Rochester
is a Sanctuary City

Council Priorities: Creating and Sustaining a Cul-ture of Vibrancy; Public Safety

Transmitted herewith for your approval is a resolu-tion reaffirming that Rochester is one community that is united and strengthened by our diversity and committed to upholding and protecting the civil and human rights of all individuals that come within its borders, including immigrants and refugees and, therefore, is a Sanctuary City.

On January 19, 2017, the New York State Attorney General, in anticipation of potential changes in fed-eral immigration enforcement practices and priori-ties, provided local governments and law enforce-ment agencies with guidance for improving public safety by protecting vulnerable immigrant commu-nities. A policy that assures immigrants and refu-gees that they can contact the police and other City agencies without fear of adverse immigration con-sequences will enhance public safety and neighbor-hood conditions for all citizens.

Officials across the state, including the Mayors of Albany, Kingston, White Plains, and Syracuse, have declared their appreciation for the Attorney General's guidance and support and affirmed their continued commitment to welcoming and protect-ing the rights of immigrant communities in their cit-ies.

As the Council is aware, Rochester, the home of Frederick Douglass and Susan B. Anthony, has a long tradition of support for equal rights for all, in-cluding immigrants and refugees. In 1986, this Council passed a resolution declaring Rochester as a "City of Sanctuaries" (Resolution No. 86-29)

which stated in part that "[t]he City of Rochester wishes to continue supporting its citizens in their efforts to maintain and further human rights for its citizens and for all who come within its borders." As this Council in the 1986 resolution resolved, and the United States Supreme Court has since confirmed, immigration and refugee policy is a matter of federal jurisdiction. Thus, federal agencies, not local governments, are responsible for implementation and enforcement of such policies.

Furthermore, Chapter 63 of the Rochester City Code requires the City to provide equal access to public services and prohibits discrimination in City services on the basis of age, race, creed, color, national origin, gender identity or expression, sexual orientation, disability or marital status, and existing Rochester Police Department General Orders prohibit bias-based profiling in traffic contacts, field contacts, investigations, or asset seizure and forfeiture efforts. Bias-based profiling is defined to be "[t]he targeting or stopping of an individual based solely on a common trait of the individual, including but not limited to: age, race, creed, color, religion, national origin, gender, sexual orientation, disability, marital status, limited English proficiency, or economic status."

The 1986 resolution recognized that the Rochester Sanctuary Committee had developed a local effort to involve local religious communities in considering offering sanctuary to refugees and that those local communities within Rochester providing shelter to those who were fleeing general conditions of persecution in their homelands had led Rochester to become a "City of Sanctuaries."
Thus, the City's long-standing history, policies and the practices of its local religious communities are consistent with sanctuary policies and the 1986 resolution should be updated to reflect current language usage by officially declaring that Rochester is a Sanctuary City.

This proposed resolution also states that City resources will not be used to create a registry based on a person's national origin, race, religion, or otherwise, and consistent with the 1986 resolution, that City personnel shall not inquire or request proof of immigration status or citizenship when providing services or benefits, unless specifically required to do so by law.

On January 25, 2017, President Trump issued an Executive Order that directs the Attorney General to review the actions of cities that adopt sanctuary policies to determine whether those policies violate federal law and whether federal funds should therefore be withheld. The federal law most relevant is 8 USC § 1373 (a) which says that a local government: *"...may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual."* The law also prohibits local policies that restrict the exchange of information regarding immigration status or maintaining such information.

This resolution does not conflict with that federal

law. It does not prohibit City employees from communications with federal immigration agencies regarding citizenship or immigration status. However, the law does not require local governments to collect such information or to engage in immigration enforcement. Therefore, this resolution contains language that states that the proposed policies to be adopted by the City are subject to federal, state and local laws and the Constitutions of the United States and the State of New York. This language avoids any conflict between the City's policies and applicable law, while preserving the City's right to control the use of its funds and personnel, and to protect our residents' constitutional rights of equal protection and due process.

Respectfully submitted,
Lovely A. Warren
Mayor

Loretta C. Scott
Council President

Dana K. Miller
Council Vice President

Adam C. McFadden
Councilmember

Carolee A Conklin
Councilmember

Elaine M. Spaull
Councilmember

Matt Haag
Councilmember

Jacklyn Ortiz
Councilmember

Michael A. Patterson
Councilmember

Molly Clifford
Councilmember

Attachment No. AQ-29

Resolution No. 2017-5
(Int. No. 59, as amended)

**Resolution affirming that Rochester is a Sanctuary City committed to equal rights for all**

WHEREAS, The City of Rochester, the home of Frederick Douglass and Susan B. Anthony, has a long tradition of support for equal rights for all people, including immigrants and refugees, as exemplified by City Council Resolution No. 86-29 recognizing Rochester as a City of Sanctuaries;

WHEREAS, Chapter 63 of the City Code requires that the City provide equal access to public services and prohibits discrimination in City services on the basis of age, race, creed, color, national origin, gender identity or expression, sexual orientation, disability or marital status;

**TUESDAY, FEBRUARY 21, 2017**

WHEREAS, federal immigration enforcement is the responsibility of federal enforcement agencies, not local government agencies;

WHEREAS, federal law does not require local law enforcement or other local service providers to inquire into an individual's immigration status;

WHEREAS, in response to changes in federal immigration enforcement practices and priorities, Cities across the United States have reaffirmed their support for the principle of sanctuary for persons fleeing persecution and on January 19, 2017, the New York State Attorney General provided local governments and law enforcement agencies with guidance for improving public safety by protecting vulnerable immigrant communities; and

WHEREAS, the City of Rochester wishes to join these cities and to reaffirm its continued support to its residents in their efforts to maintain and further human rights for all who come within its borders, including immigrants and refugees; and
WHEREAS, a policy that assures immigrants and refugees that they can contact the police and other City agencies without fear of adverse immigration consequences will enhance public safety for all citizens; and

WHEREAS, the Council finds that it is in the public interest for Rochester to adopt "Sanctuary City" policies.

NOW, THEREFORE, BE IT RESOLVED, by the Council of the City of Rochester as follows:

1. That the Mayor and City Council reaffirm the City of Rochester's commit ment that it is one community; that is welcoming and inclusive of all, is united and strengthened by our diversity and committed to upholding and protecting the civil and human rights of all individuals that come within its borders, including immigrants and refugees;

2. The City Council hereby requests that the Mayor and the City administration implement policies that further the City's role as a Sanctuary City to ensure compliance with the objectives herein, subject to Federal, state and local laws and the Constitutions of the United States of America and the State of New York;

3. The Police Department shall not engage in certain activities solely for the purpose of enforcing federal immigration laws, including not inquiring about the immigration status of an individual, including a crime victim, a witness, or a person who calls or approaches the police seeking assistance, unless necessary to investigate criminal activity ~~by that individual~~, and shall not stop, question, interrogate, investigate, or arrest an individual based solely on actual or suspected immigration or citizenship status;

4. That City personnel shall not inquire about or

request proof of immigration status or citizenship when providing services or benefits, except where the receipt of such services or benefits are contingent upon one's immigration or citizenship status or where inquiries are otherwise lawfully required by federal, state, or local laws, or where such information is needed for a criminal investigation;

5. That the City shall not use its funds or personnel to enforce or to assist in the enforcement of Federal immigration policies or participate in any program requiring registration of individuals on the basis of religion, race, gender, gender identity or expression, sexual orientation, ethnicity, or national origin, except to the extent specifically required by law and subject to the principles embodied in the Constitutions of the United States and the State of New York.

6. This resolution shall take effect thirty days after the date it is adopted.

Strikeout indicates deleted text, new text is underlined

Adopted unanimously.

The meeting was adjourned at 8:00 p.m.

HAZEL L. WASHINGTON
City Clerk

EXHIBIT 34

Title 2 - ADMINISTRATION
Article 2.4 - PUBLIC SAFETY AND THE ADMINISTRATION OF JUSTICE
Chapter 2.48 NON-COOPERATION WITH IMMIGRATION AUTHORITIES

# *Chapter 2.48 NON-COOPERATION WITH IMMIGRATION AUTHORITIES*

## 2.48.010 Restrictions.

(a)    All County of San Mateo ("County") departments, agencies, commissions, officers, agents, representatives, and employees are prohibited from using County resources, property, personnel, time, labor, or funds to:

1.    Assist or cooperate with requests by the United States Immigration and Customs Enforcement or other immigration authorities or persons, or entities contracted for immigration enforcement purposes ("Immigration Authorities"), to hold, detain, house, transfer, or otherwise facilitate the arrest of any person in the custody of the San Mateo County Sheriff's Office, Probation Department, or any other County Department, unless pursuant to a judicial warrant (as defined in California Government Code § 7284.4(i)) or otherwise required by federal or state statute, regulation, or court decision; or

2.    Communicate with Immigration Authorities regarding an individual's release time, date, or place, home or work address, or contact information, or to otherwise assist or cooperate in any immigration enforcement activities, including information gathering, unless pursuant to a judicial warrant (as defined in California Government Code § 7284.4(i)) or otherwise required by federal or state statute, regulation, or court decision; or

3.    Provide access to or use of non-public County property, including but not limited to, County jails, stations, courthouse holding cells, conference rooms, and databases to Immigration Authorities, unless pursuant to a judicial warrant (as defined in California Government Code § 7284.4(i)) or otherwise required by federal or state statute, regulation, or court decision.

(b)    Notwithstanding the foregoing provisions of Section 2.48.010(a), County departments, agencies, commissions, officers, agents, representatives, and employees may use County resources, property, personnel, time, labor, or funds to assist or cooperate with Immigration Authorities solely for the purpose of providing assistance with the investigation or enforcement activities of any local, state, or federal law enforcement agency relating to suspected violations of any federal or state criminal statute, regulation, or court decision, provided, however, that such activities do not involve immigration enforcement as defined in California Government Code § 7284.4(f).

(Ord. No. 04875, § 2, 4-25-2023)

San Mateo County, California, Code of Ordinances
(Supp. No. 46, Update 1)

Created: 2025-06-13 14:10:07 [EST]

Page 1 of 1

# EXHIBIT 35

## Santa Rosa Police Department
Santa Rosa PD Policy Manual

# Immigration Violations

### 420.1  PURPOSE AND SCOPE
The purpose of this policy is to provide guidelines to members of the Santa Rosa Police Department for investigating and enforcing immigration laws.

*Adopted 5-22-13 by Chief Thomas E. Schwedhelm.*

*Revised 6-30-17 by Chief Robert L. Schreeder.*

### 420.2  POLICY
It is the policy of the Santa Rosa Police Department that all members make professional commitments to equal enforcement of the law and equal service to the public. Confidence in this commitment will increase the effectiveness of this department in protecting and serving the entire community and recognizing the dignity of all persons, regardless of their immigration status.

Officers will not contact, detain, question or arrest an individual solely based on a suspected undocumented immigration status or seek to discover the immigration status of an individual. Pursuant to Government Code §§ 7282 and 7282.5, no individual who is otherwise ready to be released from custody by this department should continue to be detained for the sole purpose of notifying immigration authorities.

In some circumstances, to preserve public safety it may be necessary for this department to coordinate with, share, or gather intelligence from federal agencies in order to apprehend a violent offender. This coordination will occur only for the purpose of furthering the underlying criminal investigation.

### 420.3  DETERMINATION OF IMMIGRANT STATUS
Determination of immigration status is primarily the jurisdiction of the U.S. Immigration and Customs Enforcement (I.C.E.); United States Code Title 8 § 1304(e).

### 420.4  REQUESTS FOR ASSISTANCE BY FEDERAL AGENCIES
The Santa Rosa Police Department shall not undertake joint efforts with federal, state or local law enforcement agencies to investigate, detain or arrest individuals solely for violation of federal immigration law.

Nothing in this policy is intended to prevent police officers from responding to requests for assistance in connection with officer safety, traffic control, or peacekeeping efforts to maintain the overall health and safety of the public.

Requests by I.C.E. for assistance from this department shall be directed to a Watch Commander for approval. The department may provide available services where necessary to maintain the overall health and safety of the public.

Copyright Lexipol, LLC 2024/07/15, All Rights Reserved.
Published with permission by Santa Rosa Police Department

# Santa Rosa Police Department
Santa Rosa PD Policy Manual

*Immigration Violations*

---

### 420.4.1   CALIFORNIA DEPARTMENT OF MOTOR VEHICLES
Members shall not obtain, access, use, or otherwise disclose noncriminal history information maintained by the DMV for immigration enforcement (Vehicle Code § 1808.48).

### 420.5   VICTIMS AND WITNESSES
To encourage crime reporting and cooperation in the investigation of criminal activity, all individuals, regardless of their immigration status, must feel secure that contacting or being addressed by members of law enforcement will not automatically lead to immigration inquiry and/ or deportation. While it may be necessary for this department to determine the identity of a victim or witness, members shall treat all individuals equally and without regard to race, color, ethnicity or national origin in any way that would violate the United States or California Constitutions.

### 420.6   U VISA AND T VISA LAW ENFORCEMENT CERTIFICATION PROCESS
The Victims of Trafficking and Violence Prevention Act (VTVPA) of 2000 is a federal law that allows for temporary immigration benefits to individuals without immigration status who are victims of specified crimes (8 USC § 1101(a)(15)(U)).  Under the VTVPA, an immigrant victim of certain crimes may file a petition for U Nonimmigrant Status (Form I-918 Supplement B), known as a U Visa, with the United States Citizenship Immigration Services (USCIS).  Prior to sending the petition to the USCIS, the victim or that person's attorney must submit the completed form to a certifying agency for a law enforcement certification.  The form is reviewed by the agency's certifying official to determine if it meets the criteria for an approved certification.

Under Penal Code § 679.10(1), this department is a certifying agency for U Visa petitions.  The requirements set forth in this policy in the sections below shall govern this department's certification of the U Visa certification process.

Similar immigration protection, known as a T Visa, is available for certain victims of human trafficking (8 USC § 1101(a)(15)(TU).  T Visa petitions shall be subject to the same certification requirements that govern this department's certification of U Visas.

### 420.6.1   REVIEW BY CERTIFYING OFFICIAL
Any certification requests this department receives for certification of a U or T Visa petition shall be forwarded in a timely manner to the Domestic Violence Sexual Assault Investigations Team supervisor, whom the Chief of Police has designated as the sole U and T Visa petition certifying official for the department pursuant to Penal Code § 679.10(b)(2).  The supervisor shall:

    (a)    Be familiar with and understand the instructions for completing certifications, which can be found on the U.S. Department of Homeland Security (DHS) website.

    (b)    Review the report of the alleged crime that forms the basis for U or T Visa.  If the alleged crime is still being investigated, consult with the assigned investigator to determine the current status of the case and whether further documentation is warranted.  While reviewing the incident, the supervisor will determine if the following criteria is met:

        1.    A qualifying criminal activity has occurred;

        2.    The victim has/had information about the criminal activity;

---

Copyright Lexipol, LLC 2024/07/15, All Rights Reserved.
Published with permission by Santa Rosa Police Department

# Santa Rosa Police Department
Santa Rosa PD Policy Manual

*Immigration Violations*

3. The victim was/is helpful in the detection, investigation, prosecution, conviction, or sentencing of criminal activity, and responded to reasonable requests for assistance by law enforcement.

(c) Contact the appropriate prosecutor assigned to the case, if applicable, to ensure the victim is/was helpful with the prosecutor's office.

(d) Prepare an attachment to the I-918 Supplement B (for a U Visa) and Form I-914 Supplement B (for a T Visa) that summarizes the incident and any findings related to whether the qualifying criteria has been met. Reasons for refusal to certify must be listed explicitly in the attachment.

(e) If applicable, approve the certification by signing where indicated and return the form(s) to the victim or that person's attorney.

A current investigation, the filing of charges, a prosecution or conviction is not required for the certifying official to approve the law enforcement certification.

## 420.6.2 REVIEW AND REPORTING REQUIREMENTS
The certifying official shall review the submitted documents required for U Visa or T Visa applications pursuant to Penal Code §§ 679.10 and 679.11 within ninety (90) days of a request from the victim, or that person's family or attorney. If the victim is in removal proceedings, the certification shall be processed within fourteen (14) days of the request.

Pursuant to Penal Code § 236.5, when this department encounters a victim of human trafficking, the certifying official shall be notified and complete the above process and the documents needed for a T Visa application within fifteen (15) business days of the department's first encounter with the victim, regardless of whether the victim has requested certification of a T Visa application.

## 420.6.3 ANNUAL REPORTING TO LEGISLATURE
The department's certifying official shall report to the Legislature the number of victims that requested U or T Visa certifications, the number of those certification applications that were approved, and the number that were denied. Pursuant to Penal Code § 679.10(l), this report shall be completed annually, on or before January 1st, and shall comply with Government Code § 9795.

Copyright Lexipol, LLC 2024/07/15, All Rights Reserved.
Published with permission by Santa Rosa Police Department

EXHIBIT 36

RESOLUTION NO. RES-2017-017

RESOLUTION OF THE COUNCIL OF THE CITY OF SANTA ROSA TO DECLARE
ITSELF AN INDIVISIBLE CITY AND SAFEGUARD THE CIVIL RIGHTS, SAFETY AND
DIGNITY OF ALL SANTA ROSA RESIDENTS

WHEREAS, the City of Santa Rosa is made up of diverse individuals, both native born and immigrants, whose collective cultures, religions, backgrounds, orientations, abilities and viewpoints join to form a highly pluralistic community that prides itself on being a place that welcomes persons and families of all walks of life; and

WHEREAS, since the presidential election, there has been a sense of uncertainty and fear among many communities in Santa Rosa, across our State and across the Nation; and

WHEREAS, the City of Santa Rosa assures its vulnerable communities that the City supports them, will do all it can to maintain and improve their quality of life, and will not tolerate acts of hate, discrimination, bullying, or harassment; and

WHEREAS, the Santa Rosa City Council wishes to declare that Santa Rosa is a safe place for everyone, including, but not limited to, immigrants from all countries, people of color, people of all religions, gender identity, sexual orientation, people with disabilities and all vulnerable communities; and

WHEREAS, it is the City Council's desire to ensure that its immigrant residents participate in civic life and daily activities without fear of being arrested or detained by, or reported to the United States Immigration and Customs Enforcement agency based solely on immigration status; and

WHEREAS, many children who are native to the United States or are undocumented immigrants have been separated from their families by the United States Immigration and Customs Enforcement agency solely due to their parents' or their personal immigration status; and

WHEREAS, the enforcement of civil immigration laws by local police agencies raises many complex legal, logistical and resource issues for the City, including undermining the trust and cooperation with immigrant communities, increasing the risk of civil liability due to the complexity of civil immigration laws and the lack of training and expertise of local police on civil immigration enforcement and detracting from the core mission of the Santa Rosa Police Department to create safe communities; and

WHEREAS, the City Council is greatly concerned about public safety in Santa Rosa and the mission of the Santa Rosa Police Department is to protect the safety of the public against crimes committed by persons whoever they may be; and

WHEREAS, most residents in the City, including the vast majority of immigrants, are law-abiding citizens and are, when crimes occur, themselves the victims of crime, and because the City wishes to foster trust and cooperation as between the City, its police department, and its immigrant communities, and wishes to encourage immigrants to report crime and speak to the police without fear of being arrested or detained by, or reported to the United States Immigration and Customs Enforcement agency; and

Reso. No. RES-2017-017
Page 1 of 2

WHEREAS, consistent with the law and with Council policy, the Santa Rosa Police Department already declines to enforce federal civil immigration laws, does not conduct immigration raids, and does not question, detain or arrest individuals on the basis that they might be in this country illegally in violation of Federal civil immigration laws.

NOW, THEREFORE, BE IT RESOLVED by the Council of the City of Santa Rosa as follows:

SECTION 1. That the Santa Rosa City Council calls upon all City residents and all City Departments and employees to speak out against acts of bullying, discrimination and hate violence and to stand up for those who are targeted for such acts.

SECTION 2. That the Santa Rosa City Council opposes deportations based solely on immigration status which split up families, and calls upon the federal government to promptly legislate a pathway to citizenship for undocumented immigrants, and to refrain from deportations of immigrants who have not been convicted of felonies endangering the community, until such time as the U.S. Congress does legislate such a pathway.

SECTION 3. That City employees, including members of the Santa Rosa Police Department, shall not enforce Federal civil immigration laws and shall not use city monies, resources or personnel to investigate, question, detect, detain or apprehend persons solely on the basis of a possible violation of immigration law.

SECTION 4. That the Santa Rosa City Council calls upon the County of Sonoma and all incorporated cities within the County of Sonoma to adopt the foregoing policies, and we welcome opportunities to partner with the Legislature, other jurisdictions, local organizations, and businesses that support and defend these populations.

SECTION 5. The City Clerk shall attest and certify to the passage and adoption of this resolution and it shall become effective immediately upon its approval.

IN COUNCIL DULY PASSED this 7th day of February, 2017.

AYES:      (7) Mayor Coursey, Vice Mayor Tibbetts, Council Members Combs, Olivares
           Rogers, Sawyer, Schwedhelm

NOES:      (0)

ABSTAIN:   (0)

ABSENT:    (0)

ATTEST: _____    APPROVED: _____
            City Clerk                      Mayor

APPROVED AS TO FORM:

_____
   Interim City Attorney

Reso. No. RES-2017-017
Page 2 of 2

EXHIBIT 37



# County of Sonoma
## State of California

THE WITHIN INSTRUMENT IS A CORRECT COPY OF THE ORIGINAL ON FILE IN THIS OFFICE

ATTEST:        January 10, 2025
M. CHRISTINA RIVERA, Clerk/Secretary
BY  *Noelle Francis*

Date: January 10, 2025

Item Number: 2

Resolution Number:25-0015

☐ 4/5 Vote Required

**Resolution Of The Board Of Supervisors Of The County Of Sonoma, State Of California,**

**RESOLUTION OF THE BOARD OF SUPERVISORS TO UPHOLD THE CIVIL RIGHTS**

**, DIGNITY, HEALTH AND SAFETY OF OUR IMMIGRANT POPULATION**

**AND ALL SONOMA COUNTY RESIDENTS**

**WHEREAS,** Sonoma County is home to persons of diverse racial, ethnic, and national backgrounds, including a large immigrant population as noted in the Portrait of Sonoma County; and

**WHEREAS,** all County immigrant residents, whether they are U.S. citizens, permanent residents, undocumented residents, refugees, or residents with any other immigration status, are valued and integral members of our social, cultural, and economic fabric; and

**WHEREAS,** the national rhetoric regarding immigration during and since the 2024 National Presidential Election has resulted in concerns and uncertainty among many, including but not limited to immigrants, vulnerable residents, and families in our community, across our State, and across our nation; and

**WHEREAS,** the County endeavors to safeguard public health and safety, which relies on trust and cooperation between all residents and local law enforcement; and to strengthen communities and foster trust between immigrant communities and local law enforcement, the County has enacted various laws and policies; and

**WHEREAS,** in 2017 the Board of Supervisors adopted the Resolution Affirming the County's Commitment To Diversity And To Safeguarding The Civil Rights, Safety And Dignity Of All Our Residents; and

Resolution #25-0015
Date: January 10, 2025
Page 2

**WHEREAS**, in 2017, The Board authorized the extension of the Unaccompanied Child Deportation Defense Program (commenced September 23, 2014); approved the Sonoma County Immigration Initiative proposal; adopted the Resolution to Protect and Support Deferred Action for Childhood Arrivals Program (DACA); and authorized the County Counsel to execute a Funding Agreement and serve on an Advisory Committee with the Community Foundation Sonoma County to create the Sonoma County Secure Families Fund; and

**WHEREAS**, the Board has approved funding to support a rapid response network, approved funding for removal defense services through the Public Defender's Office and funded local non-profit legal service organizations to assist in representing Sonoma County residents in removal defense since 2018; and

**WHEREAS**, the statewide TRUST Act (AB 4) California Trust Act limits the circumstances under which local law enforcement can detain individuals on behalf of federal immigration authorities; and

**WHEREAS**, the statewide TRUTH Act (AB 2792) California Truth Act ensures transparency and oversight regarding local law enforcement's communication with federal immigration authorities; and

**WHEREAS,** the statewide VALUES Act (SB 54) California Values Act limits the circumstances under which local law enforcement may use funds or personnel to support immigration enforcement. It also prevents police and sheriff's deputies from asking about an individual's immigration status, from sharing a person's personal information with immigration authorities, unless otherwise required or permitted by law, or from arresting anyone only for having a deportation removal order or for most other immigration violations; and

**WHEREAS**, the California Education Code (link) prohibits schools from adopting policies or practices and discriminate against or hinder access to school services based on immigration status, and restricts schools from collecting or sharing information about immigration status; and

**WHEREAS**, these laws have been enacted statewide as a deliberate declaration that California recognizes and values the contributions of immigrants in our communities. And while we acknowledge the federal government's extensive legislation related to immigration regulation and enforcement, through these Acts we decline to participate in federal efforts to enforce such federal laws in our communities; and

Resolution #25-0015
Date: January 10, 2025
Page 3

**WHEREAS,** in a letter to the community in November 2024, the Sonoma County Law Enforcement Chiefs Association reaffirmed local police and sheriff's commitment to the above-mentioned state laws, and acknowledged that "participating in federal immigration enforcement undermines the trust and cooperation necessary for effecting policing" in our community; and

**WHEREAS,** the Board of Supervisors wants all residents of Sonoma County to know that interacting with local government, whether to access benefits, report a crime, file a legal document or any of the countless other ways a resident and government come together, should not put any resident at risk, regardless of immigration status. To that end, the Board directs all department staff, to the extent possible under law, to closely protect the personal information of clients, whether that information is collected at birth, marriage, or death, through the application of benefits for health, housing, or human services, through the county's Ag Pass program, or other situations in which sensitive information is stored; and

**WHEREAS,** in the interest of fostering inclusion for all residents of Sonoma County and our entire nation, the Board urges Congress to promptly legislate a pathway to Citizenship for undocumented immigrants, and to refrain from talk or action leading to mass or indiscriminate removals.

**NOW, THEREFORE, BE IT RESOLVED**, that the Board of Supervisors of the County of Sonoma does determine and declare as follows:

Unless required by state or federal law all County of Sonoma ("**County**") departments, agencies, commissions, officers, agents, representatives, and employees are prohibited from using County resources, property, personnel, time, labor, or funds to:

    (A) Investigate, interrogate, detain, detect, or arrest persons **only** for immigration enforcement purposes, (as defined in California Government Code § 7284.4(i)); or

    (B) Communicate with ICE regarding an individual's immigration status (as defined in California Government Code § 7284.4(i)), except as required by 8 U.S.C. § 1373 or other federal law.

**Be it further resolved**, that the County has created a centralized webpage of information, including but not limited to the existing legislative measures in place applicable in Sonoma County protecting individuals against the cooperation between state and local government officials and ICE, resources for immigrant communities including legal resources, the Secure Families Collaborative, and the Public Defender's office.

Resolution #25-0015
Date: January 10, 2025
Page 4

**Be it further resolved**, that County staff shall develop protocols and procedures to make training for staff on how to address ICE agents regarding the sharing of information and the prohibitions of it.

**Be it further resolved**, that the Board directs county staff to place disclosures regarding the use of program participants' personal information in office lobbies and County-sponsored community facing webpages.

**Be it further resolved,** that the County department leadership will provide for trainings as relevant and necessary to county staff regarding existing legislative measures, Trauma-Informed Care, Adverse Childhood Experiences, Cultural Proficiency, Unconscious Bias, Diversity, Equity, Inclusion and Belonging, and the values of a multicultural society.

**Be it further resolved**, that the Board of Supervisors reaffirms its commitment to safeguarding the civil rights of all our residents to the fullest extent provided by the law.

**Supervisors:**

Hermosillo: Aye   Rabbitt: Absent  Coursey: Aye     Gore:  Aye          Hopkins: Aye

Ayes: 4          Noes: 0            Absent: 1           Abstain: 0

**So Ordered.**

EXHIBIT 38

ORDINANCE NO.___1353-17___(CM)

**AN UNCODIFIED ORDINANCE OF THE CITY COUNCIL OF THE CITY OF WATSONVILLE RELATING TO THE CITY'S PROCEDURES CONCERNING FEDERAL IMMIGRATION LAW AND REAFFIRMING ITS DECLARATION AS A SANCTUARY FOR ALL ITS RESIDENTS**

**THE CITY COUNCIL OF THE CITY OF WATSONVILLE, CALIFORNIA, DOES HEREBY ORDAIN AS FOLLOWS:**

**SECTION 1. ENACTMENT.**

(a)     One of the most important civil rights issues in the country is immigrant rights. Some Watsonville residents have no documentation to prove that they are either citizens of the United States or non-citizens residing in the United States with the permission of the United States Government.

(b)     The City of Watsonville has for 150 years embraced and welcomed individuals of diverse racial, ethnic, religious, and national backgrounds, including a large immigrant population.

(c)     The City of Watsonville welcomes, honors, and respects the contributions of all of its residents, regardless of their immigration status.

(d)     Immigrants and their families in Watsonville contribute to the economic and social fabric of the City by establishing and patronizing businesses, working for both growers and food processors in the Pájaro Valley, participating in the arts and culture, and achieving significant educational accomplishments.

(e)     Fostering a relationship of trust, respect, and open communication between City officials and residents is essential to the City's mission of delivering efficient public services in partnership with our community, which ensures public safety, a prosperous economic environment, opportunities for our youth, and a high quality of life for residents.

(f)     Immigration and Customs Enforcement raids in private homes, churches, schools and service agencies are inhumane, discriminatory and may violate constitutional protections.

(g)     The City now wishes to enact specific procedures consistent with Resolution No. 98-07 (CM) from 2007, and reaffirm the City's commitment to social justice and inclusion, as follows:

**SECTION 2. PURPOSE AND INTENT.**

The purpose of this ordinance is to reaffirm the City of Watsonville's status as a Sanctuary City and to establish the City's procedures concerning immigration status and enforcement of federal civil immigration laws.

**SECTION 3. REQUESTING OR MAINTAINING INFORMATION PROHIBITED.**

No City department, officer, employee or agent shall enforce Federal civil immigration laws or use city monies, resources or personnel to investigate, question, detect, apprehend or question a person on the basis of his or her immigration status except as allowed by this ordinance.

**SECTION 4. DISCLOSING INFORMATION PROHIBITED.**

No City agency, department, officer, employee, or agent shall disclose information about a person's immigration status except as authorized by this ordinance.

**SECTION 5. USE OF CITY RESOURCES PROHIBITED.**

Unless such assistance is required by any valid and enforceable federal or state law, no City department, officer, employee, or agent shall use City funds, resources, facilities, property, equipment, or personnel (collectively "City resources") to assist in the enforcement of federal immigration law, including, but not be limited to, using City resources for the purpose of:

(a)     identifying, investigating, arresting, detaining, or continuing to detain a person solely on the belief that the person is not present legally in the United States or that the person has committed a violation of immigration law;

(b)     assisting with or participating in any immigration enforcement operation or joint operation;

(c)     arresting, detaining, or continuing to detain a person based on any immigration detainer or federal administrative warrant, when such immigration detainer or administrative warrant is based solely on a violation of federal immigration law, or otherwise honoring any such detainer, warrant, or request to detain, interview, or transfer;

(d)     notifying federal authorities about the release or pending release of any person detained for immigration purposes;

(e)     providing federal authorities with non-public information about any person's immigration status for immigration enforcement purposes; or

(f)     enforcing any federal program requiring the registration of individuals on the basis of religious affiliation or ethnic or national origin. Nothing in this Section shall prevent the City, including any agency, department, officer, employee, or agent of the City, from lawfully discharging his or her duties in compliance with and in response to a lawfully issued judicial warrant or subpoena.

**SECTION 6. EXCEPTIONS.**

Nothing in herein shall prevent the City, including any agency, department, officer, employee, or agent of the City, from lawfully discharging his or her duties in compliance with and in response to a lawfully issued judicial warrant or subpoena. In addition, the restrictions of this ordinance shall not apply: (i) where the individual to

whom such information pertains provides his or her consent to disclosure of such

information (or if such individual is a minor, the consent of that person's parent or

guardian); (ii) where disclosure of such information is necessary to provide a City

service; (iii) to actions taken or disclosures made as necessary to prevent an imminent

threat to public health or safety; or (iv) as otherwise required by state or federal law or

judicial decision.

## SECTION 7. ORDINANCE NOT TO CONFLICT WITH FEDERAL LAW.

Nothing in this ordinance shall be construed or implemented to conflict with any

valid and enforceable duty and obligation imposed by a court order or any federal, state

or otherwise applicable law.

## SECTION 8. NO PRIVATE RIGHT OF ACTION.

This ordinance does not create or form the basis of liability on the part of the City,

its agencies, departments, officers, employees, or agents. It is not intended to create

any new rights for breach of which the City is liable for money or any other damages to

any person who claims that such breach proximately caused injury. The exclusive

remedy for violation of this ordinance shall be through the City's personnel policies and

procedures for employees under applicable City regulations.

## SECTION 9. DISSEMINATION.

This ordinance shall be disseminated to all departments of the City, whose

respective administrative policies shall be modified as necessary to ensure consistency

herewith.

## SECTION 10. SEVERABILITY.

If any section, subsection, sentence, clause, phrase or portion of this ordinance

is for any reason held to be invalid or unconstitutional by the decision of any court of

competent jurisdiction, such decision shall not affect the validity of the remaining portions of this ordinance. The City Council of the City of Watsonville hereby declares that it would have adopted this ordinance and each section, subsection, sentence, clause, phrase or portion thereof irrespective of the fact that any one or more sections, subsections, sentences, clauses, phrases, or portions were to be declared invalid or unconstitutional.

## SECTION 11. PUBLICATION.

This ordinance shall be published in the Watsonville Register-Pajaronian and/or Santa Cruz Sentinel in compliance with the provisions of the Charter of the City of Watsonville.

## SECTION 12. EFFECTIVE DATE.

This ordinance shall be in force and take effect thirty (30) days after its final adoption.

<center>*******************************</center>

The foregoing ordinance was introduced at regular City Council meeting of the City of Watsonville, held on the __11th__ day of __April__, **2017**, by Member __Garcia__, who moved its adoption, which motion being duly seconded by Member __Hernandez__, was upon roll call carried and ordered printed and published by the following vote:

AYES:         COUNCIL MEMBERS:    **Bilicich, Coffman-Gomez, Dutra, Garcia, Hernandez, Hurst, Rios**

NOES:         COUNCIL MEMBERS:    **None**

ABSENT:     COUNCIL MEMBERS:    **None**

 

                                     Oscar Rios, Mayor

ATTEST:

_____
City Clerk

APPROVED AS TO FORM:

_____
City Attorney

ORDINANCE NO. ___**1353-17**___ (CM)

The foregoing ordinance, having been printed and published as required by the Charter of the City of Watsonville, and coming on for final consideration at the regular meeting of the Council of the City of Watsonville, held on the __9th__ day of ___**May**___, **2017**, by Mayor Pro Tempore ___**Hurst**___, who moved its adoption, which motion being duly seconded by Member ___**Coffman-Gomez**___, was upon roll call carried and the ordinance finally adopted by the following vote:

AYES:        COUNCIL MEMBERS:    **Bilicich, Coffman-Gomez, Dutra, Garcia Hernandez, Hurst, Rios**

NOES:        COUNCIL MEMBERS:    **None**

ABSENT:     COUNCIL MEMBERS:    **None**

_____
Oscar Rios, Mayor

ATTEST:

_____
City Clerk

EFFECTIVE DATE:

**June 8, 2017**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### CERTIFICATION

STATE OF CALIFORNIA
COUNTY OF SANTA CRUZ

I, Beatriz Vázquez Flores, City Clerk of the City of Watsonville, in the County of Santa Cruz, State of California, hereby certify that the attached Ordinance No. __1353-17__ (CM) is a true and correct copy of the original of said ordinance as it appears upon the official records of said City of Watsonville.

_____
Beatriz Vázquez Flores, City Clerk

Date _May 15, 2017_

I, Beatriz Vázquez Flores, City Clerk of the City of Watsonville, do hereby certify that the foregoing Ordinance No. 1353-17 (CM) of the Council of the City of Watsonville was passed and adopted by the Council thereof on the 9th day of May, 2017, and a summary was published according to law to-wit: by publication for one day in the Register Pájaronian issue May 6th, 2017.

City Clerk, City of Watsonville

Dated: _May 23, 2017_

# EXHIBIT 39

RESOLUTION NO. 2626

**A RESOLUTION DECLARING THE CITY OF WILSONVILLE A WELCOMING AND INCLUSIVE CITY**

WHEREAS, the City of Wilsonville has and will continue to encourage all Wilsonville residents to thrive and advance in all aspects of community life, including education, employment, recreation, City services, and community involvement; and

WHEREAS, persons of all races, color, national origin, immigration or refugee status, religion, sex, gender identity, sexual orientation, marital status, mental, emotional, and/or physical ability, age, or economic status all collectively contribute to the health, well-being, economy, and general welfare of the Wilsonville community as families, neighbors, workers, and taxpayers; and

WHEREAS, discrimination against any group of persons can negatively impact the health, well-being, and general welfare of the City by leading to community disengagement, diminished economic and educational opportunities, increased stigmatization, and diminished physical, mental, and emotional health; and

WHEREAS, the City recognizes the inherent worth and dignity of all persons and believes all should be treated with compassion and respect regardless of race, color, national origin, immigration or refugee status, religion, sex, gender identity, sexual orientation, marital status, mental, emotional, and/or physical ability, age, or economic status; and

WHEREAS, the City Council has received a significant amount of public testimony expressing concern that recent changes to federal immigration policies are generating fear and anxiety among members of the City's diverse communities; and

WHEREAS, in keeping with the City's commitment to fairness and equity, as recently expressed in the January 5, 2017 Martin Luther King Jr. Day Proclamation, Wilsonville hereby reaffirms a strong commitment to social equality and justice;

NOW, THEREFORE, THE CITY OF WILSONVILLE RESOLVES AS FOLLOWS:

1.     The City of Wilsonville is an inclusive City that has and will continue to welcome the collective contributions of all persons, honoring and respecting people of every race, color, national origin, immigration or refugee status, heritage, culture,

religion, sex, gender, gender identity, sexual orientation, marital status, mental and/or physical ability, age, or economic status.

2.    The City will continue, in a manner consistent with the laws of the United States of America, the State of Oregon, and the City of Wilsonville, to prohibit the use of City funds, personnel, and/or equipment for the enforcement of federal immigration laws.  This Resolution shall be interpreted and executed in a manner consistent with ORS 181A.820 and with 8 U.S.C. §§ 1373 and 1644.  In the event this Resolution directly conflicts with either state or federal law, such directly conflicting state or federal law must control.

3.    The City of Wilsonville will ensure all City services are provided regardless of immigration status.  Further, City staff will not ask for or otherwise seek out an individual's immigration status as a condition of providing City services, unless the provision of such services has a legal requirement to obtain such information.

4.    The City desires that all of its residents feel safe to utilize all City-owned or sponsored facilities, including the parks, Community Center, library, and SMART transit, without fear of discrimination or federal immigration enforcement or detention.

5.    The Wilsonville City Council encourages all Wilsonville residents to unite and work together to promote kindness and understanding in our shared community, rejecting hatred, bigotry, and divisiveness, as this community strives to protect the freedoms held dear and granted to all by the United States Constitution.  While this City Council may pass this inclusivity resolution in the hope that it is inspirational, the only true measure of its success will be in how all members of the community elect to treat each other day in and day out.

6.    This Resolution becomes effective upon the date of adoption.

ADOPTED by the Wilsonville City Council at a regular meeting thereof this 1st day of May, 2017, and filed with the Wilsonville City Recorder this date.

Tim Knapp, Mayor

**RESOLUTION NO.2626**
C:\Users\king\Desktop\5.1.17 Council Packet Materials\Res2626 Inclusive City (bj^) 3.1 CLN.docx

**Page 2 of 3**

ATTEST:

Sandra C. King, MMC, City Recorder

SUMMARY OF VOTES:

| | |
|---|---|
| Mayor Knapp | Yes |
| Council President Starr | Yes |
| Councilor Stevens | Yes |
| Councilor Lehan | Yes |
| Councilor Akervall | Yes |