DAVID CHIU, SBN 189542
City Attorney
YVONNE R. MERÉ, SBN 175394
Chief Deputy City Attorney
MOLLIE M. LEE, SBN 251404
Chief of Strategic Advocacy
SARA J. EISENBERG, SBN 269303
Chief of Complex and Affirmative Litigation
NANCY E. HARRIS, SBN 197042
KARUN A. TILAK, SBN 323939
Deputy City Attorneys
Fox Plaza
1390 Market Street, 7th Floor
San Francisco, CA 94102-5408
Telephone:    (415) 355-33308
Facsimile:    (415) 437-4644
E-Mail:       karun.tilak@sfcityatty.org

Attorneys for Plaintiff
CITY AND COUNTY OF SAN FRANCISCO

TONY LOPRESTI, SBN 289269
County Counsel
KAVITA NARAYAN, SBN 264191
Chief Assistant County Counsel
MEREDITH A. JOHNSON, SBN 291018
Lead Deputy County Counsel
STEFANIE L. WILSON, SBN 314899
RAJIV NARAYAN, SBN 334511
Deputy County Counsels
BILL NGUYEN, SBN 333671
Litigation Fellow
70 W. Hedding Street, East Wing, 9th Floor
San José, CA 95110
Telephone:    (408) 299-5900
Facsimile:    (408) 292-7240
E-Mail:       bill.nguyen@cco.sccgov.org

Attorneys for Plaintiff
COUNTY OF SANTA CLARA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO, COUNTY OF SANTA CLARA, et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>DONALD J. TRUMP, President of the United States, et al.,<br><br>Defendants. | Case No. 25-CV-01350<br><br>**DECLARATION OF ANDREW SMULLIAN IN SUPPORT OF PLAINTIFFS' MOTION FOR SECOND PRELIMINARY INJUNCTION** |

# DECLARATION OF ANDREW SMULLIAN

I, Andrew Smullian, declare as follows:

1. I have personal knowledge of the facts set forth in this declaration, based on information provided to me in the performance of my job duties and my review of business records, and, if called as a witness, could and would testify competently to the matters set forth below.

2. I am the Deputy Chief of Staff of the Baltimore Police Department ("BPD"). I have served in this role since 2019.

3. In my role, I have a wide-ranging portfolio touching many administrative issues, including working very closely with the Department's grants manager and the City's legal counsel.

4. BPD is one of the nation's larger municipal police agencies, with more than 2,000 sworn members.

5. To encourage crime reporting and cooperation with law enforcement by individuals who might otherwise fear an immigration inquiry, BPD policy generally prohibits officers from inquiring into the immigration status of an individual and limits BPD support to federal immigration enforcement efforts except as legally required. Under BPD Policy 1021, members of the department shall not (1) take law enforcement action, including initiating an investigation or conducting an arrest, based on actual or perceived immigration status; (2) make inquiries into immigration status except as otherwise authorized by BPD policy; or (3) engage in, assist, or support immigration enforcement, with limited exceptions such as those required by 8 U.S.C. § 1373, among other restrictions.

6. BPD is currently experiencing an officer shortage, with nearly 500 budgeted positions unfilled. This shortage has necessitated the spending of overtime to compensate for the lack of staff in order to provide the necessary coverage in patrol and investigations.

7. Due to the officer shortages, BPD has also had to create new civilian investigator positions to help with the caseloads of detectives and divert lower priority calls for service to the

Decl. of Andrew Smullian ISO
Plts.' Mot. for Second Prelim. Injunction.

1

Case No. 25-CV-01350-WHO

Telephone Reporting Unit as opposed to dispatching officers to the scene. The Telephone Reporting Unit takes written reports over the phone for lower-priority calls, which may include, for example, larceny from autos, stolen autos, and minor auto accidents.

8. BPD is currently projected to be $40 million overbudget this year. This problem is caused in significant part by officer shortages, because BPD pays more for officer overtime and civilian investigators.

9. Over the past three years, BPD has received approximately $10 million in federal grant funding.

10. A number of positions in BPD are funded by federal grants, including six forensic scientists, 13 victim coordinators (who assist with victims of domestic violence and sexual assault as well as the families of homicide victims; there is also a bilingual coordinator to assist non-English speaking victims), one fiscal technician, two crime analysts, court staff, housing code enforcement officers, and one violence prevention program educator. There is no alternative funding source for these positions. If we lose these federal grants, these positions will have to be eliminated.

11. The 13 victim coordinator positions are funded by the U.S. Department of Justice's ("DOJ") Victims of Crime Act ("VOCA") funds, which are administered by the State. These positions are critical to the victim service infrastructure that the City has built. Termination of VOCA monies would decimate BPD's ability to quickly and compassionately connect victims to the most appropriate services, which in turn can also reduce the victim's willingness to participate in the investigation and prosecution phases.

12. VOCA funds are also used to provide grants to partner agencies like the Mayor's Office of Neighborhood Safety and Engagement and other non-profit partners to engage in initiatives to combat neighborhood violence. Cutting VOCA funds would terminate those programs.

13. VOCA funds have also historically been used to fund the City's sexual assault response team and the human trafficking initiative.

14. BPD also receives funding from DOJ's Edward Byrne Memorial Justice Assistant Grant ("JAG") program. The JAG program provides the City with flexible funds to address citywide crime prevention initiatives.

15. Loss of JAG funds would reduce BPD's crime analysis capacity. JAG funds support two crime analysts and one fiscal technician. Without JAG funds, BPD would have to immediately lay off these employees.

16. Without JAG funds, BPD would also need to terminate sub-awards that fund 16 positions in the Circuit Court, the City's Department of Housing and Community Development, the State's Attorney's Office, and the University of Maryland's Shock Trauma. These positions support community engagement work, code enforcement, and violence prevention.

17. BPD also receives a Center for Biologics Evaluation and Research ("CBER") grant from DOJ. This funding supports BPD's work to address the backlog of DNA analysis recovered from crime scenes. Elimination of this funding would hinder the crime lab's efforts to improve BPD's efficiency in DNA analysis, hindering future prosecutions. BPD would need to lay off six forensic scientists and would not be able to hire for vacant positions covered in a recent award, if the funding is terminated.

18. BPD also receives funding from DOJ to support its International Association of Directors of Law Enforcement Standards and Training ("IADLEST") Training Initiative at BPD's Academy. The IADLEST Training Initiative supports BPD's efforts to reinforce critical topics, such as de-escalation, through its Academy Curriculum. Terminating this funding would eliminate support from the national experts at IADLEST to modernize BPD's curriculum and make policing more effective.

19. BPD also relies on federally funded training and technical assistance. For example, BPD currently receives no-cost training from DOJ's Office of Justice Programs' National Training and Technical Assistance Center to enhance its place-based policing analytical capability. Through this training, BPD receives tailored support to build better tools for district commanders to manage crime. Federal training and technical assistance programs have also supported full scholarships for BPD employees to attend trainings and conferences and on-site peer exchanges to learn best practices in other cities. A loss of this access would harm BPD's abilities to receive important training and support needed to fulfill its public safety mission.

20. In recent years, Baltimore has made incredible and historic strides in reducing homicide and violent crime rates in the City, despite having both an officer and a funding shortage. A sudden loss of federal funds would be devastating to those efforts.

21. Further, being underfunded and understaffed, BPD is not in a position to be able to participate in federal immigration enforcement.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on July 25, 2025 at BALTIMORE CITY, MARYLAND.

Andrew R. Smullian, Esq.