UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>DONALD J. TRUMP, et al.,<br><br>    Defendants. | Case No. 25-cv-01350-WHO<br><br>**ORDER ON MOTION TO AMEND AND MOTION TO EXPEDITE**<br><br>Re: Dkt. No. 151, 178 |

The plaintiffs ("the Cities and Counties") move to amend their pleadings to add thirty-four (34) new plaintiffs, all of which are so-called "sanctuary" jurisdictions[1], and two new defendants, the United States Office of Management and Budget ("OMB") and its director, Russell Vought.[2]

---

[1] The Cities and Counties are City and County of San Francisco ("San Francisco"), County of Santa Clara ("Santa Clara"), City of Portland ("Portland"), Martin Luther King, Jr. County ("King County"), City of New Haven ("New Haven"), City of Oakland ("Oakland"), City of Emeryville ("Emeryville"), City of San Jose ("San Jose"), City of San Diego ("San Diego"), City of Sacramento ("Sacramento"), City of Santa Cruz ("Santa Cruz"), County of Monterey ("Monterey"), City of Seattle ("Seattle"), City of Minneapolis ("Minneapolis"), City of Saint Paul ("Saint Paul"), and City of Santa Fe ("Santa Fe"). Prospective plaintiffs are County of Alameda ("Alameda County"), City of Albany ("Albany"), City of Albuquerque ("Albuquerque"), County of Allegheny ("Allegheny County"), City of Baltimore ("Baltimore"), City of Bend ("Bend"), City of Benicia ("Benicia"), City of Berkeley ("Berkeley"), City of Boston ("Boston"), City of Cambridge ("Cambridge"), City of Cathedral City ("Cathedral City"), City of Chicago ("Chicago"), City of Columbus ("Columbus"), City of Culver City ("Culver City"), County of Dane ("Dane County"), City and County of Denver ("Denver"), City of Healdsburg ("Healdsburg"), County of Hennepin ("Hennepin County"), City of Los Angeles ("Los Angeles"), County of Marin ("Marin County"), City of Menlo Park ("Menlo Park"), Multnomah County, City of Pacifica ("Pacifica"), City of Palo Alto ("Palo Alto"), City of Petaluma ("Petaluma"), Pierce County, City of Richmond ("Richmond"), City of Rochester ("Rochester"), City of Rohnert Park ("Rohnert Park"), County of San Mateo ("San Mateo County"), City of Santa Rosa ("Santa Rosa"), County of Sonoma ("Sonoma County"), City of Watsonville ("Watsonville"), and City of Wilsonville ("Wilsonville").

[2] Existing defendants are Donald J. Trump, President of the United States; the United States Department of Justice; Pamela Bondi in her official capacity as Attorney General of the United States; Emil Bove in his capacity as Acting Deputy Attorney General of the United States; the

They also wish to add allegations pertaining to executive actions taken by the second Trump Administration since I entered the Preliminary Injunction. Defendants oppose amendment, arguing that it is futile and prejudicial. Defendants' arguments are unpersuasive. Leave to amend should be granted liberally. While motion practice and discovery may well change the shape of this litigation, that is no reason to deny amendment. The addition of new plaintiffs, who bring the same claims and allege that they have suffered similar injury, does not unduly prejudice the defendants, new or old. Oral argument on this motion is unnecessary and the hearing is VACATED. The motion for leave to file the Second Amended Complaint ("SAC") is GRANTED.

Granting the Cities and Counties leave to file a SAC ripens the pending Motion to Expedite briefing on the plaintiffs' Second Motion for Preliminary Injunction. Given the exigencies identified by plaintiffs in that motion, I will treat the Second Motion for Preliminary Injunction as one that includes a request for a Temporary Restraining Order. As discussed at the end of this Order, defendants shall file a response to the Second Motion for Preliminary Injunction/request for a Temporary Restraining Order by **August 11, 2025**, and I will hold a hearing on **August 13, 2025**, at 2:00 p.m. Pacific Standard Time via Zoom videoconference.

## BACKGROUND

Five plaintiffs filed this action on February 7, 2025, Dkt. No. 1 (Complaint), challenging section 17 of Executive Order 14,159 (EO 14,159, issued January 20, 2025 and entitled "Protecting the American People Against Invasion"), which provides that "to the maximum extent possible under law," agencies should "evaluate and undertake any lawful actions" to limit sanctuary jurisdictions' access to federal funds. The Complaint also challenged a February 5, 2025, memo by Attorney General Pamela Bondi, which purported to enact EO 14,159. The plaintiffs alleged that the Executive Order and the resulting agency directive violated the Separation of Powers, the Spending Clause, Due Process, the Tenth Amendment, and the

---

United States Department of Homeland Security ("DHS"); Kristi Noem in her official capacity as Secretary of the Department of Homeland Security; and the United States. Proposed defendants are the United States Office of Management and Budget and Russell Vought in his capacity as Director of the Office of Management and Budget.

Administrative Procedure Act ("APA").

On February 27, 2025, the plaintiffs filed a First Amended Complaint ("FAC") as a matter of right, asserting the same eight counts as the original complaint and adding a challenge to the legality of Executive Order 14,218 (EO 14,218, issued February 19, 2025 and entitled "Ending Taypayer Subsidization of Open Borders"), which limited federal funds to illegal aliens. The FAC also added eleven (11) cities and counties as plaintiffs to the action, bringing the total number of plaintiffs to sixteen. *See* Dkt. No. 22 (FAC).

On March 17, 2025, the Cities and Counties filed a motion for a preliminary injunction ("First PI Motion"), seeking an order that "prohibit[ed] Defendants from taking any action to withhold, freeze, or condition federal funds based on" the challenged sections of EO 14,159 and EO 14,218. Shortly after filing the First PI Motion, they filed a Supplemental Request for Judicial Notice, asking that I take notice of a February 19, 2025, memo by Secretary of Homeland Security Kristi Noem entitled "Restricting Grant Funding for Sanctuary Jurisdictions." Dkt. Nos. 88, 89. That request was followed by a second supplemental request, asking the court to take judicial notice of a March 20, 2025, memo by Secretary Noem regarding how immigration conditions should be assessed with respect to application to FEMA funds, along with the DHS Standard Terms and Conditions, media articles, and other courts injunctions. Dkt. No. 95-1. I granted both requests for judicial notice.

After considering the parties' briefs and holding a hearing, I granted the preliminary injunction on April 24, 2025. Dkt. No. 111 (Preliminary Injunction). I explained my reasoning in greater detail on May 3, 2025. Dkt. No. 126 (Further Order).

Two days after I issued the Further Order, the Cities and Counties filed a motion to enforce, or in the alternative, to modify the Preliminary Injunction. Dkt. No. 128 (Motion to Enforce). The President had issued a new Executive Order, EO 14,287 entitled "Protecting American Communities from Criminal Aliens" on April 28, 2025. It directed that after sanctuary jurisdictions have been identified and notified of their status as such, "each executive department or agency (agency), in coordination with the Director of the Office of Management and Budget and as permitted by law, identify appropriate Federal funds to sanctuary jurisdictions, including

3

1  grants and contracts, for suspension or termination, as appropriate." Motion to Enforce 5-6; EO

2  14,287 §§ 2-3(a). I then issued an order explaining that the defendants could not use new

3  executive orders as an end run around the Preliminary Injunction and distinguishing between the

4  section of EO 14,287 that permissibly called for the identification of sanctuary jurisdictions and

5  the notification of their status as such that was not enjoined (Section 2), and the impermissible

6  conditioning of federal funds on compliance with federal immigration enforcement policy that was

7  enjoined (Section 3(a)). Dkt. No. 136 (Clarifying Order).[3]

8  The defendants appealed the Preliminary Injunction on June 20, 2025. Dkt. No. 146

9  (Notice of Appeal). The appeal remains pending before the Ninth Circuit.

10  On July 8, 2025, the Cities and Counties filed a Motion for Leave to File SAC, seeking to

11  add 34 new plaintiffs, new allegations pertaining to EO 14,287, and two new defendants. Motion

12  for Leave to File SAC ("Motion") [Dkt. No. 151]; Proposed SAC [Dkt. No. 151-3]. Defendants

13  oppose. Opposition to Motion ("Oppo.") [Dkt. No. 173]. On July 29, 2025, the Cities and

14  Counties filed a Second Motion for Preliminary Injunction, seeking to expand the protections

15  afforded to the Cities and Counties by the Preliminary Injunction to the 34 new plaintiffs

16  identified in the proposed SAC. Second Motion for Preliminary Injunction ("Second PI Motion")

17  [Dkt. No. 177]. That same day, the plaintiffs filed a Motion to Expedite (Dkt. No. 178) pursuant

18  to Civil Local Rule 6-3(a), asking that I expedite the hearing and briefing schedule on the Second

19  PI Motion "due to the imminent harms the prospective plaintiffs face as a result of Defendants'

20  continued threats to withhold federal funding as a result of jurisdictions' policies limiting use of

21  their local resources for federal civil immigration enforcement," which defendants also oppose.

22  *See* Dkt. No. 179 (Opposition/Response to Motion to Expedite).

---

[3] On June 13, 2025, the parties filed a joint dispute letter addressing the plaintiffs' concern that the defendants were not complying with the Preliminary Injunction. Dkt. No. 143 (Dispute Letter). I issued an order resolving that dispute, finding that the Preliminary Injunction enjoined DHS and DOT standard terms and conditions that mandated compliance with federal immigration enforcement policy from applying to DHS/DOT grants issued to plaintiffs. I ordered the defendants to provide further briefing on the nexus between the HUD Continuum of Care grant conditions and the grant programs to which they applied. *Id.* They have provided that briefing. I will hear argument on that issue in conjunction with the issues presented on August 13, 2025.

4

## MOTION FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT

### I. LEGAL STANDARD

A court should "freely give leave [to amend a complaint] when justice so requires." Fed. R. Civ. P. 15(a)(2). This policy is "to be applied with extreme liberality." *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 712 (9th Cir. 2001) (quoting *Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990)). In *Foman v. Davis*, the United States Supreme Court offered several factors that a district court should consider when deciding whether to grant leave to amend, which are sometimes referred to as the "*Foman* factors." 371 U.S. 178, 83 S.Ct. 227 (1962). The *Foman* factors are as follows: "In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be 'freely given.'" *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (citing *Foman*, at 182, 83 S.Ct. 227); *see also Allen v. City of Beverly Hills*, 911 F.2d 367, 373 (9th Cir. 1990) (citing *Foman* factors, as well as "previous amendment"); *Hurn v. Ret. Fund Trust of the Plumbing, Heating & Piping Indus. of S. Cal.*, 648 F.2d 1252, 1254 (9th Cir. 1981).

Not all of the *Foman* factors merit equal weight. *Eminence Capital, LLC*, 316 F.3d at 1052. "As this circuit and others have held, it is the consideration of prejudice to the opposing party that carries the greatest weight." *Id.* (citing cases). "Absent prejudice, or a strong showing of any of the remaining *Foman* factors, there exists a *presumption* under Rule 15(a) in favor of granting leave to amend." *Id.* "Amendments seeking to add claims are to be granted more freely than amendments adding parties." *Union Pac. R.R. Co. v. Nev. Power Co.*, 950 F.2d 1429, 1432 (9th Cir. 1991); *but see DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186 (9th Cir. 1987) ("liberality in granting leave to amend is not dependent on whether the amendment will add causes of action or parties").

### II. FUTILITY

In the SAC, plaintiffs challenge three Executive Orders, two that I have considered and

5

1  enjoined (Section 17 of EO 14,159, and Section 2(a)(ii) of EO 14,218), and one that I considered
2  in the context of the Clarifying Order (Section 3(a) of EO 14,287) and determined fell within the
3  ambit of the Preliminary Injunction.[4]  They also challenge the February 5, 2025, Bondi Memo,
4  and the February 19, 2025, Noem Memo.

### A.  Plausibility

Defendants first argue that the proposed SAC is futile because it would be "subject to dismissal" under Rule 12(b)(6).  Opposition to SAC Motion ("Oppo.") [Dkt. No. 173] 4; *Platt Elec. Supply, Inc. v. EOFF Elec., Inc.*, 522 F.3d 1049, 1060 (9th Cir. 2008) (holding that amendment is futile when the amended complaint would be subject to dismissal).  "An amendment is futile when 'no set of facts can be proved under the amendment to the pleadings that would constitute a valid and sufficient claim or defense.'" *Missouri ex rel. Koster v. Harris*, 847 F.3d 646, 656 (9th Cir. 2017) (quoting *Miller v. Rykoff–Sexton, Inc.*, 845 F.2d 209, 214 (9th Cir. 1988)).

Defendants' arguments regarding the plausibility of the plaintiffs' claims are no more convincing now than they were at the preliminary injunction stage.  As the plaintiffs point out in Reply, the defendants assert the same positions that they took with respect to the FAC, insisting that the challenged Executive Orders are not unconstitutional.  They contend that since the Executive Orders "call for only 'lawful actions'" and contain other similar savings clauses, there is no Separation of Powers concern and no APA concerns for any of the challenged executive actions.  *See* Oppo. 4-5.  Defendants promise to elaborate on this argument in their forthcoming motion to dismiss.

For now, as discussed at length in the Further Order, I think that the savings clauses in EO

---

[4] I again need to distinguish between Section 2 of EO 14,287, which the plaintiffs challenge but that I have not enjoined, and Section 3(a) of the same, which I have enjoined.  As I observed in the Clarifying Order, Section 2 of EO 14,287 calls for the Attorney General, in coordination with the DHS Secretary, to publish a list of States and local jurisdictions they have identified as "sanctuary" jurisdictions, and to notify those jurisdictions of their status on the list.  Nothing in Section 2 of EO 14,287 directs executive agency heads to withhold from, freeze, or condition all federal funding to sanctuary jurisdictions on their compliance with federal immigration law.  The same cannot be said for Section 3(a).  Going forward, when I reference the "challenged Executive Orders," I omit Section 2 of EO 14,287 from that group.

6

14,159 and EO 14,218 cannot be credited without ignoring the language of the challenged sections of those orders. The clear and specific language in the challenged sections of those Executive Orders call for freezing or pausing all federal funds to sanctuary jurisdictions. The inclusion of a savings clause alongside language like this does not insulate the challenged executive action from review or make the plaintiffs' claims futile.

The defendants cite Justice Sotomayor's concurrence in *Trump v. Am. Fed'n of Gov't Emps.*, arguing that it requires deference to the savings clauses at this juncture. *See* No. 24A1174, 606 U.S. --, -- S. Ct. --, 2025 WL 1873449, at *1 (U.S. July 8, 2025). In *Gov't Emps.*, the Court granted a stay of a preliminary injunction that stalled an Executive Order directing agencies to plan reorganizations and reductions in force "consistent with applicable law," and a resulting memorandum from the Office of Management and Budget and Office of Personnel Management that reiterated the Executive Order's directive. Justice Sotomayor, concurring, wrote:

> I agree with Justice JACKSON that the President cannot restructure federal agencies in a manner inconsistent with congressional mandates. See *post,* at ——. Here, however, the relevant Executive Order directs agencies to plan reorganizations and reductions in force "consistent with applicable law," App. to Application for Stay 2a, and the resulting joint memorandum from the Office of Management and Budget and Office of Personnel Management reiterates as much. The plans themselves are not before this Court, at this stage, and we thus have no occasion to consider whether they can and will be carried out consistent with the constraints of law.

*Id.*

Justice Sotomayor's concurrence applies to the Executive Order at issue in that case, which involves a different context, different directives and different language than the Executive Orders at issue here. As the Ninth Circuit explained in *San Francisco*, 897 F.3d at 1231, an Executive Order's savings clause "does not and cannot override its meaning," not where the Executive Order unambiguously commands action and that action is *not* "consistent with applicable law." *Id.* Here, the challenged Executive Orders command federal agencies to pause or freeze all funding to sanctuary jurisdictions pending their compliance with federal immigration law. I am bound by the *San Francisco* precedent. The mere inclusion of a boilerplate savings clause does not insulate the challenged Executive Orders from review at this time.

The defendants' other arguments against the plausibility of the plaintiffs' claims fare no

7

better. They once again insist that the plaintiffs have suffered no harm and that their claims are unripe because the challenged Executive Orders and agency guidance "does not, and has not, independently caused any actual harm to Plaintiffs." Oppo. 6. As I explained at length in the Further Order, *see* Further Order 31-37, the plaintiffs have pleaded sufficient facts to support pre-enforcement standing; they have shown "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and [that] there exists a credible threat of prosecution thereunder." *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979). This is true for the existing plaintiffs, and as is evident from the declarations accompanying the plaintiffs' proposed SAC, it appears to be true for the prospective plaintiffs. All of the plaintiffs maintain policies that are proscribed by the challenged Executive Orders. Some have appeared on the (ephemeral) list that was posted for a time on the DHS website.[5] The plaintiffs need not wait to suffer total loss of federal funds to challenge the constitutionality of the executive actions that threaten them. Where, as here, plaintiffs have demonstrated a credible threat of enforcement, pre-enforcement standing allows them to protect themselves via lawsuit.[6]

**B.    Venue**

Venue is proper in a suit against the federal government in any district in which "the

---

[5] DHS posted and then took down a list identifying sanctuary cities. After DHS took the list down, Secretary Noem has stated that the "list is absolutely continuing to be used and it is going to be identifying those cities and those jurisdictions that aren't honoring law and justice." *See* Dkt. 151-3, at ¶ 394; *see also* Roll Call, Homeland Security posts, then deletes, sanctuary jurisdictions list (June 2, 2025), available at https://rollcall.com/2025/06/02/homeland-security-posts-then-deletes-sanctuary-jurisdictions-list/

[6] The defendants' analogy to *City & Cnty. of San Francisco v. Garland*, 42 F.4th 1087 (9th Cir. 2022) is inapt. There, the Ninth Circuit affirmed in part, vacated in part, and remanded two summary judgment orders; one issued by this court, 372 F. Supp. 3d 928, and another by the United States District Court for the District of Oregon, 406 F. Supp. 3d 940. The Ninth Circuit held that the plaintiffs' claims, which challenged conditions on Byrne JAG grants, were not justiciable "in their present posture" in light of intervening law that had "resolved the controversy that once animated Plaintiffs' facial challenges to Section 1373." *Garland*, 42 F.4th at 1085. There, unlike here, plaintiffs had not alleged any facts identifying actual or concrete sovereign injuries outside of the conflict between their jurisdictional laws and Section 1373. Given an intervening decision that resolved that conflict, the claims were no longer constitutionally ripe. Here, of course, the plaintiffs do not raise only a facial constitutional challenge; they assert that the challenged Executive Orders are causing them present harm in the form of budgetary uncertainty, and they have shown a credible fear of enforcement of the kind that supports pre-enforcement standing.

plaintiff resides if no real property is involved." 28 U.S.C. § 1391(e)(1). The defendants contend that amending the complaint to add the 34 new plaintiffs would be futile because venue in the Northern District of California would be improper under Rule 12(b)(3) as to those new plaintiffs, the majority of which do not reside within this venue. Oppo. 8-9.

As the plaintiffs point out, defendants offer no authority for their position that when "the majority" of plaintiffs reside outside of the District in which the case is being litigated, venue is improper. In fact, the caselaw disfavors that position. "[T]he clear weight of federal authority holds that venue is proper in a multi-plaintiff case if any plaintiff resides in the District." *Californians for Renewable Energy v. EPA*, 2018 WL 1586211, at *5 (N.D. Cal. Mar. 20, 2018) (citing *Exxon Corp. v. Fed. Trade Commission*, 588 F.2d 895, 898-99 (3rd Cir. 1978) ("[R]equiring every plaintiff in an action against the federal government or an agent thereof to independently meet section 1391(e)'s standards would result in an unnecessary multiplicity of litigation. The language of the statute itself mandates no such narrow construction. There is no requirement that all plaintiffs reside in the forum district.") (overruled on other grounds)); *Sidney Coal Co., Inc. v. Soc. Sec. Admin.*, 427 F.3d 336, 343-46 (6th Cir. 2005) (citing *Exxon*, noting that every court to consider the issue since 1971 has interpreted § 1391(e) to require only that "any plaintiff" reside in the judicial district where suit is brought, and adding that requiring each plaintiff to reside in the district for the purposes of venue would undermine the intent driving § 1391(e), which is to ease the burden upon plaintiffs attempting to sue the federal government). The Ninth Circuit has cited *Exxon* approvingly on this point and assumed without deciding that the venue may be properly established based solely on the residence of any plaintiff. *See Railway Labor Executives' Ass'n v. I.C.C.*, 958 F.2d 252, 256 (9th Cir. 1991) (referencing a previous codification of 28 U.S.C. § 1391(e)(3)). And district courts around this Circuit have expressly followed *Exxon* on multiple occasions. *See e.g.*, *F.L.B. v. Lynch*, 180 F. Supp. 3d 811, 815 (W.D. Wash. 2016); *Matsuo v. United States*, 416 F. Supp. 2d 982, 997 (D. Haw. 2006). I join them in finding that venue is proper here.

### C. Joinder of additional plaintiffs

Next, defendants contend that the 34 prospective plaintiffs would be misjoined and subject

1  to severance under Rule 21, meaning their addition now is futile.[7] To this end, defendants argue
2  that the new plaintiffs' claims do not arise out of the same "transaction and occurrence," that they
3  do not share common facts with the other plaintiffs, and that their addition will render this
4  litigation "unwieldy" in contravention of judicial economy.

5  Under Rule 20(a), joinder is appropriate where "(1) the plaintiffs asserted a right to relief
6  arising out of the same transaction and occurrence and (2) some question of law or fact common to
7  all the plaintiffs will arise in the action." *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1296 (9th
8  Cir. 2000) (emphasis added); Fed. R. Civ. P. 20(a). "If the test for permissive joinder is not
9  satisfied, a court, in its discretion, may sever the misjoined parties, so long as no substantial right
10 will be prejudiced by the severance." *Coughlin v. Rogers*, 130 F.3d 1348, 1350 (9th Cir. 1997).
11 The rules of permissive joinder are to be "construed liberally in order to promote trial convenience
12 and to expedite the final determination of disputes, thereby preventing multiple lawsuits." *League
13 to Save Lake Tahoe v. Tahoe Reg'l Planning Agency*, 558 F.2d 914, 917 (9th Cir. 1977).

14 Under Rule 21, the court has broad discretion to sever a party or any claim against a party.
15 Fed. R. Civ. P. 21. While "[t]here is no established test in the Ninth Circuit for when a district
16 court should exercise its broad discretion [to sever a claim or a party]," *Arcure v. Cal. Dep't. of
17 Developmental Servs.*, No. 1:13-cv-00541-LJO-BAM, 2014 WL 346612, at *6 (E.D. Cal. Jan. 30,
18 2014), courts repeatedly consider the same five factors: "(1) whether the claims arise out of the
19 same transaction or occurrence; (2) whether the claims present some common questions of law or
20 fact; (3) whether settlement of the claims or judicial economy would be facilitated; (4) whether
21 prejudice would be avoided if severance were granted; and (5) whether different witnesses and
22 documentary proof are required for the separate claims." *SEC v. Leslie*, 2010 WL 2991038, at *4
23 (N.D. Cal. July 29, 2010); *see Hernandez v. City of San Jose*, No. 16-CV-03957-LHK, 2017 WL
24 2081236, at *4 (N.D. Cal. May 15, 2017). These factors support joinder in this case.

25  **i.   "Transaction and occurrence" and "common questions"**
26 Defendants argue that the plaintiffs "seek to curb all individual agency action that purports

---

[7] Defendants say that they were preparing to file a motion for severance of certain plaintiffs from the case when the plaintiffs indicated they would amend the Complaint again.

10

to impose conditions on funding on specific jurisdictions under specific grants" and that claims of this nature, which challenge a federal agency's statutory authority to add conditions to funding, "inevitably arise out of separate transactions or occurrences and are thus improperly joined." Oppo. 10.  They also assert that to assess the "coercive" nature of a particular funding condition, the court will have to assess the locality's "sanctuary" policies to determine if they conflict with that condition and may need to review the particularities of the jurisdiction's budget to determine what portion of that budget the conditioned funding effects.  *Id*.  That, the defendants argue, requires particularized analysis that makes joinder impracticable.

Plaintiffs respond that all of their claims arise out of the same transaction or occurrence—defendants' "issuance and implementation of the challenged Executive Orders to coerce Plaintiffs into changing their policies." Reply 4.  They invoke a recent decision where the Hon. William H. Alsup held that plaintiffs' claims related to the same transaction where they arose from "OPM's purported directive to other federal agencies to terminate probationary employees," despite that OPM disputed that agencies were in fact terminating employees per that directive.  *Am. Fed'n of Gov't Emps., AFL-CIO v. U.S. Off. of Pers. Mgmt*., No. C 25-01780-WHA, 2025 WL 770360, at *4 (N.D. Cal. Mar. 10, 2025) (emergency stay denied, No. 25-1677, 2025 WL 835337 (9th Cir. Mar. 17, 2025)).

As the plaintiffs point out in their Reply, the proposed SAC seeks relief from Executive Orders and resulting agency directives that impose immigration conditions upon *all* federal grants, regardless of those grants' nexus with immigration (or lack thereof).  The SAC does not challenge individualized determinations by agencies about particular grants, although the parties have already brought disagreements to this court about whether conditions on certain grants violate the Preliminary Injunction.  *See* SAC ¶¶ 1-13.  The SAC addresses what the plaintiffs say is the overbroad, indiscriminate application of funding freeze orders upon *all* federal grants to *all* so-called sanctuary jurisdictions, including the plaintiffs.  *See id.*  Each of the proposed plaintiffs claims to have been adversely affected by these provisions of the challenged Executive Orders and resulting agency directives and seeks relief from those adverse effects.  In that sense, their claims arise out of the same transaction or occurrence.

11

1  The defendants contend that resolving the plaintiffs' claims will require assessing each of
2  the individual plaintiff's budgets to determine what percentage of their budget consists of federal
3  funds. Oppo. 10. They analogize this case to *State v. Dep't of Justice*, where the Second Circuit,
4  in holding that certain immigration related conditions on Byrne Memorial Justice Assistance Grant
5  ("JAG") Program grants were not unlawful, considered what percentage of the plaintiffs' funding
6  came from Byrne JAG grants. 951 F.3d 84, 92-93 (2d Cir. 2020). What distinguishes this case
7  from that one is that, again, here the plaintiffs do not challenge conditions on a particular fund or
8  grant. They challenge the broad condition that the challenged Executive Orders level upon *all*
9  federal funds that the plaintiffs, as sanctuary jurisdictions, receive. *See* Order Clarifying
10 Preliminary Injunction ("Clarifying Order") [Dkt. No. 136] 2 ("[t]he Government is entitled to
11 identify particular grants and funding programs that it believes should be conditioned upon
12 compliance with immigration-related objectives, and to litigate its position. The Preliminary
13 Injunction does not . . . prohibit efforts to enforce a condition regarding . . . specific programs with
14 a plausible nexus to 'sanctuary' policies."); Order Regarding Disputes Over Propriety of Standard
15 Conditions on Federal Grants ("Propriety Order") [Dkt. No. 147] 5 (observing, in the context of
16 determining whether DHS and DOT Standard Terms violated the Preliminary Injunction, that
17 "[l]itigation may be necessary to determine whether . . . challenged immigration conditions are
18 appropriate to [specific] grant program[s], and nothing in the Preliminary Injunction Order
19 precludes defendants from trying to impose them on an individual basis."). The constitutionality
20 of such a condition does not call for the same particularized analysis in which the Second Circuit
21 engaged in *State*. The distinction applies to the other cases defendants cite that also concerned
22 specific grant programs. Oppo. 10 (citing *Chippewa Cree Tribe of Rocky Boy's Rsrv., Montana v.*
23 *U.S. Dep't of Interior*, 900 F.3d 1152, 1161 (9th Cir. 2018)).

24 The defendants compare this case to others where courts have chosen to sever certain
25 plaintiffs' claims under Rule 21. These cases are distinguishable on their facts. For example, in
26 *Hernandez v. City of San Jose*, fourteen plaintiffs initially asserted twenty-eight claims for relief
27 against six named defendants in a police brutality action. No. 16-CV-03957-LHK, 2017 WL
28 2081236 (N.D. Cal. May 15, 2017). Some of the defendants were related to the City of San Jose

1    and some were private citizens. The City of San Jose filed a Rule 21 motion to sever claims; the
2    Hon. Lucy Koh rejected the City's proposed severance for reasons specific to the case and the
3    court's limited jurisdiction in light of a pending interlocutory appeal and instead severed claims on
4    her own motion, as allowed by Rule 21. Fed. R. Civ. P. Rule 21 (under Rule 21, "[o]n motion or
5    on its own, the court may at any time, on just terms, add or drop a party. The court may also sever
6    any claim against a party.").

7    Judge Koh severed the claims against individual private citizen defendants both (1) from
8    each other and (2) from claims against the City defendants. After two rounds of motions to
9    dismiss, she concluded that the plaintiffs' claims against the City defendants "relate[d] only to the
10   actions of individual police officers on the night of [the incident] after the police officers allegedly
11   realized that their crowd-control plan was placing Plaintiffs in danger," whereas the plaintiffs' 39
12   causes of action against private citizen defendants related to 11 "discreet and separate" alleged
13   violent incidents against individual plaintiffs or groups of plaintiffs. *Hernandez*, at *6-7. Judge
14   Koh detailed all 11 incidents, including who was involved, where the incidents occurred, and what
15   followed. *Id.*, at *7-8. She explained that "[t]hese 11 separate incidents do not arise out of the
16   same 'transaction or occurrence'" because "[e]ach of these incidents involved different Plaintiffs
17   (20 in total) and different Defendants (17 in total), with the exception that [two individual police
18   officer defendants] were both allegedly involved in the incident involving Plaintiff Casey and the
19   incident involving Plaintiff Jones. Although these incidents occurred on the same evening in
20   downtown San Jose, the circumstances of each incident, as alleged in the FAC, are very different."
21   *Id.* In that way, Judge Koh explained, *Hernandez* was similar to *Coughlin*, another case the
22   defendants in this case cite to support their Rule 21 misjoinder argument. In *Coughlin*, the Ninth
23   Circuit upheld an order severing the claims of 49 different plaintiffs, each of whom alleged that
24   their immigration-related applications were substantially delayed. 130 F.3d at 1349. The court
25   noted that there were differences between the plaintiffs' claims, including "the length of delay, the
26   reasons for the delay, and whether the defendants disputed the delay." *Id.*

27   This case is not like *Hernandez* or *Coughlin*. Here, the plaintiffs' claims are identical in
28   that they challenge the constitutionality of Executive Orders threatening *all* their federal funding

13

upon pain of conforming to federal immigration policy. The reasons for their injury are common. The source of their injury arose at the same time for each of them.

This leads to the second factor courts consider. Rule 20 does not require that all questions of law or fact be identical. There are "some question[s] of law or fact" that are common to all plaintiffs, present and proposed. To be sure, there may be variances in the impact of the challenged Executive Orders on each plaintiff. But this prong of Rule 20 asks whether there are "shared issues that will collectively advance the prosecution of multiple claims in a joint proceeding." *Russo v. Fed. Med. Servs., Inc.*, 756 F. Supp. 3d 748, 754 (N.D. Cal. 2024) (quoting *Campbell v. City of LA*, 903 F.3d 1090, 1115 (9th Cir. 2018)). This is a case where the issues facing the plaintiffs as so-called "sanctuary" jurisdictions (some of whom appeared on the list published and then shortly thereafter taken down by the DHS) are common and the resolution of those common issues will "advance the prosecution of multiple claims in a joint proceeding." *Russo*, 756 F. Supp. 3d at 754. The allegedly unlawful conduct has been done to all the plaintiffs; they have all, as "sanctuary" jurisdictions, been subject to the challenged Executive Orders and agency-wide directives.[8] I can address any distinctions in treatment later in the litigation.

### ii. "Judicial economy"

Defendants also assert that "permitting 34 additional cities and counties to join this action would result in unwieldy, behemoth, and never-ending litigation." Oppo. 11. They compare the potential impact of allowing the new proposed cities and counties into this litigation to the potential impact of letting the (already rejected) intervenor non-profits into the litigation and argue that the negative impact upon the court's capacity to control this case would be the same.

That is an inapt comparison. The intervenors were not so-called "sanctuary jurisdictions"; they did not directly receive federal funds nor plan city-wide budgets around those federal funds. They were not similarly positioned to the Cities and Counties. The asserted harm they suffered from the challenged Executive Orders was different from the harm alleged by the Cities and

---

[8] *See* SAC ¶¶ 204–07, 209, 212, 215, 218, 220, 222, 224, 225, 228–30, 233, 237, 240, 242–43, 247, 249, 252, 256, 260, 265, 268, 270, 274, 278, 280, 282, 284–85, 288, 293–94, 299, 304–05, 311, 315, 318–19, 323.

14

1   Counties. In contrast, the 34 proposed additional plaintiffs are all similar entities and are subject
2   to the same Executive Orders and resulting agency directives.
3       At least at this stage, allowing 34 more jurisdictions to enter this case and two new
4   defendants will not unduly delay it or render it unwieldy. Of course, there may be circumstances
5   during this litigation that will make me rethink how the case should best proceed. That is true in
6   any case. But this matter appears far less complicated to manage than, for example, mass tort
7   multi district litigation or complex class action cases. It would appear, instead, that judicial
8   economy will be enhanced by their joinder—if all the plaintiffs were severed, there would be
9   numerous district courts engaged in the same analysis around the country while the parties on each
10  side utilized a "whack a mole" strategy to protect their interests. The defendants' argument runs
11  counter the Federal Rule of Civil Procedure 1's admonition to construe, administer and employ the
12  rules of procedure "to secure the just, speedy and inexpensive determination of every action and
13  proceeding."
14      In sum, amendment would not be futile. Nor would it cause prejudice, as discussed further
15  below.

## III.   PREJUDICE

17      Not all the *Foman* factors are afforded equal weight. *See Eminence Cap., LLC v. Aspeon,*
18  *Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003). As the Ninth Circuit and other courts have held,
19  "prejudice to the opposing party . . . carries the greatest weight." *Id*. "Prejudice is the touchstone
20  of the inquiry under Rule 15(a)." *Id*. (internal citations and quotation marks omitted); *see also*
21  *Howey v. United States*, 481 F.2d 1187, 1190 (9th Cir. 1973) (stating that "the crucial factor is the
22  resulting prejudice to the opposing party").
23      Defendants argue that proposed amendments would be prejudicial because "because they
24  seek to add 34 localities that [the plaintiffs] knew or should have known to add to their original or
25  FAC and the addition of these plaintiffs will transform this case into complex litigation that is
26  burdensome on Defendants to manage and litigate." Oppo. 12. Defendants offer no deeper insight
27  (nor precedential support) for how the additional parties will prejudice them other than to contend
28  that it will create more work. They worry that "[d]ue to the preemptive, amorphous nature of

United States District Court
Northern District of California

1  Plaintiffs' challenge, Defendants must articulate statutory authority and nexus for each and every
2  one of its funding programs in which each agency or subagency intends to impose immigration
3  conditions simply to avoid Plaintiffs prematurely filing yet another emergency preliminary
4  injunction, motion to enforce or modify a prior preliminary injunction, or dispute letter." Oppo.
5  14.

6  That is not prejudice. Identifying statutory authority and nexus when implementing grant
7  conditions is the work that presumably is happening (or should be happening) in every agency to
8  ensure that it is following the law. And, as discussed above and throughout my prior Orders, the
9  Preliminary Injunction does not reach those individualized considerations with respect to specific
10 grants—it does reach the wholesale, coercive implementation of the Executive Orders' directive to
11 eliminate or suspend federal funding for sanctuary jurisdictions.[9]

## MOTION TO EXPEDITE

The plaintiffs have also filed a Second Motion for Preliminary Injunction ("Second PI Motion") [Dkt. No. 177], through which they seek to extend the preliminary relief already entered in this case to the prospective 34 plaintiffs named in the SAC, and a related Motion to Expedite (Dkt. No. 178), seeking an accelerated briefing and hearing schedule for the Second PI Motion. They highlight an impending August 16, 2025, regulatory deadline that some of the new plaintiffs face to submit "consolidated action plans" that are a pre-requisite to receiving some HUD grants. HUD has stated that it will impose conditions consistent with EO 14,218 upon those grants and has thus far challenged one of the prospective plaintiff's plans as inconsistent with EO 14,218. *See* Ltr. of C. Fernandez to Council of State Community Dev. Agencies and Nat'l Community Dev. Assoc., June 5, 2025, at p. 3 ("HUD Ltr."), available at https://perma.cc/4A3P-ZKHD (noting deadline); *see also* Declaration of Brian Cochran [Dkt. No. 177-37] (declaration from

---

[9] Defendants also speculate that if there were more plaintiffs to join after these 34, this case would morph into a nationwide injunction, the likes of which the Supreme Court has recently condemned in *Trump v. CASA, Inc.*, 606 U.S. --, No. 24A884, 2025 WL 1773631, at *4, 15 (June 27, 2025). I do not read *CASA, Inc.* the same way. There, the Court criticized nationwide relief covering non-parties to litigation. *CASA, Inc.* does not address injunctive relief provided to multiple plaintiffs that are spread out across the country.

16

Assistant Manager of the City of Petaluma, one of the 34 new plaintiffs, stating that "[o]n July 1, 2025, at 5:00 p.m., HUD staff member Nicholas D. Nordahl sent an email to Petaluma Housing staff questioning the accuracy of Petaluma's certification that CDBG funds described in the City's 2025 Consolidated Action Plan would be administered in conformity with applicable laws, including Executive Orders," and that "failure to address HUD's concerns could result in HUD determining that the Petaluma certification is inaccurate or unsatisfactory, which would result in disapproval of the Action Plan."). The June 5 HUD letter "encouraged" grant recipients to "review the White House Executive Orders as they develop their consolidated plan and annual action plans," and stated that, after HUD reviewed the submitted plans, "the [Fiscal Year 2025] grant agreement will . . . emphasize conformity with applicable Administration priorities and executive orders," including "any applicable requirements that HUD, the Attorney General, or the U.S. Citizenship and Immigration Services may establish from time to time to comply with . . . Executive Order 14218." HUD Ltr. at pp. 2–3.

Defendants opposed the expedited briefing schedule, largely on the grounds that it is unreasonable because the Motion for Leave to File a SAC was still pending. Dkt. No. 179. This Order, which grants the plaintiffs leave to file the SAC, moots that concern.

Defendants also invoke various cases where courts around this Circuit have looked poorly on requests for expedited relief because they deprive the court of an opportunity to thoroughly analyze arguments made and render a decision. *See e.g. Mission Power Eng'g Co. v. Continental Cas. Co.*, 883 F. Supp. 488, 492 (C.D. Cal. 1995); *Cardoza v. Bloomin' Brands, Inc.*, 141 F. Supp. 3d 1137, 1141 (D. Nev. 2015). I agree with that concern. Of course, I have already issued a Preliminary Injunction in this case and explained it in some detail. My brief review of the Second PI Motion reveals that it does not raise new issues; it asks me to consider whether the existing Preliminary Injunction should be extended to cover the new plaintiffs. And I have received briefing on the HUD Continuum of Care grants, which may raise similar issues as the "consolidated action plans" about which the plaintiffs are concerned.

In this context, I want to ensure that the exigencies identified in the motion to expedite are considered while allowing defendants sufficient time to address the merits of the Second PI

1   Motion.  Therefore, I will treat the Second PI Motion as including a request for a Temporary

2   Restraining Order and require a response by **Monday, August 11, 2025**.  The defendants should

3   focus on the exigencies identified by plaintiffs.  I will hold a hearing on **August 13, 2025**, via

4   Zoom videoconference.  After that argument, I will discuss a schedule with counsel that allows the

5   defendants a sufficient time to respond to the Second PI Motion in greater detail if they so choose,

6   while protecting the interests of plaintiffs.

## CONCLUSION

For the foregoing reasons, the Motion for Leave to file the SAC is GRANTED.  The Motion to Expedite is also GRANTED as modified in the preceding paragraph.

**IT IS SO ORDERED.**

Dated: August 5, 2025



William H. Orrick
United States District Judge