DAVID CHIU, SBN 189542
City Attorney
YVONNE R. MERÉ, SBN 175394
Chief Deputy City Attorney
MOLLIE M. LEE, SBN 251404
Chief of Strategic Advocacy
SARA J. EISENBERG, SBN 269303
Chief of Complex and Affirmative Litigation
NANCY E. HARRIS, SBN 197042
KARUN A. TILAK, SBN 323939
Deputy City Attorneys
Fox Plaza
1390 Market Street, 7th Floor
San Francisco, CA  94102-5408
Telephone:     (415) 355-3308
Facsimile:     (415) 437-4644
E-Mail:         karun.tilak@sfcityatty.org

Attorneys for Plaintiff
CITY AND COUNTY OF SAN FRANCISCO

TONY LOPRESTI, SBN 289269
County Counsel
KAVITA NARAYAN, SBN 264191
Chief Assistant County Counsel
MEREDITH A. JOHNSON, SBN 291018
Lead Deputy County Counsel
STEFANIE L. WILSON, SBN 314899
RAJIV NARAYAN, SBN 334511
Deputy County Counsels
BILL NGUYEN, SBN 333671
Litigation Fellow
70 W. Hedding Street, East Wing, 9th Floor
San José, CA 95110
Telephone:     (408) 299-5900
Facsimile:     (408) 292-7240
E-Mail:         bill.nguyen@cco.sccgov.org

Attorneys for Plaintiff
COUNTY OF SANTA CLARA

*[additional counsel on signature page]*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO, COUNTY OF SANTA CLARA, CITY OF PORTLAND, MARTIN LUTHER KING, JR. COUNTY, CITY OF NEW HAVEN, CITY OF OAKLAND, CITY OF EMERYVILLE, CITY OF SAN JOSÉ, CITY OF SAN DIEGO, CITY OF SACRAMENTO, CITY OF SANTA CRUZ, COUNTY OF MONTEREY, CITY OF SEATTLE, CITY OF MINNEAPOLIS, CITY OF ST. PAUL, CITY OF SANTA FE, COUNTY OF ALAMEDA, CITY OF ALBANY, CITY OF ALBUQUERQUE, COUNTY OF ALLEGHENY, CITY OF BALTIMORE, CITY OF BEND, CITY OF BENICIA, CITY OF BERKELEY, CITY OF BOSTON, CITY OF CAMBRIDGE, CITY OF CATHEDRAL CITY, CITY OF CHICAGO, CITY OF COLUMBUS, CITY OF CULVER CITY, COUNTY OF DANE, CITY AND COUNTY OF DENVER, CITY OF HEALDSBURG, COUNTY OF HENNEPIN, CITY OF LOS ANGELES, COUNTY OF MARIN, CITY OF MENLO PARK, MULTNOMAH COUNTY, CITY OF PACIFICA, CITY OF PALO ALTO, CITY OF PETALUMA, PIERCE COUNTY, CITY OF RICHMOND, CITY OF ROCHESTER, CITY OF ROHNERT PARK, COUNTY OF SAN | Case No. 25-CV-01350-WHO<br><br>**SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

n:\cxlit\li2025\250739\01860447.docx

1  MATEO, CITY OF SANTA ROSA, COUNTY
   OF SONOMA, CITY OF WATSONVILLE,
2  CITY OF WILSONVILLE,

3          Plaintiffs,

4          vs.

5  DONALD J. TRUMP, President of the United
   States, UNITED STATES OF AMERICA,
6  PAMELA BONDI, Attorney General of the
   United States, EMIL BOVE, Acting Deputy
7  Attorney General, UNITED STATES
   DEPARTMENT OF JUSTICE, KRISTI NOEM,
8  Secretary of United States Department of
   Homeland Security, UNITED STATES
9  DEPARTMENT OF HOMELAND SECURITY,
   RUSSELL VOUGHT, Director of United States
10 Office of Management and Budget, UNITED
   STATES OFFICE OF MANAGEMENT AND
11 BUDGET, DOES 1-100,

12         Defendants.

## INTRODUCTION

14    1.    Defendant President Donald J. Trump is intent on ignoring the rule of law and

punishing all who would disagree with him. In his new Administration, the President is again

trampling established law limiting the extent of federal power over state and local governments. He

appears emboldened to do what the courts thwarted him from doing before and penalize "sanctuary

jurisdictions" that do not bend to his will. This action seeks to check this abuse of power.

19    2.    During his first term in office, President Trump sought to force local authorities to carry

out federal civil immigration efforts. In January 2017, he issued Executive Order 13,768, which

directed his Administration to withhold funds from and pursue enforcement actions against so-called

"sanctuary jurisdictions" that limit local entanglement with federal immigration authorities. Federal

courts, including this Court and the Ninth Circuit, roundly rejected these efforts as a blatantly

unconstitutional usurpation of legislative authority. *See, e.g.*, *Cnty. of Santa Clara v. Trump*, 250 F.

Supp. 3d 497 (N.D. Cal. Apr. 25, 2017); *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225 (9th Cir. 2018).

President Trump's Department of Justice ("DOJ") also tried to condition various DOJ funds on local

jurisdictions' agreement to enforce federal immigration law. Again, federal courts, including this

Court and the Ninth Circuit, struck down these funding restrictions. *See City & Cnty. of S.F. v.*

*Sessions*, 349 F. Supp. 3d 924 (N.D. Cal. 2018); *City & Cnty. of S.F. v. Barr*, 965 F.3d 753 (9th Cir. 2020).

3.      Undaunted by court rulings holding these efforts blatantly illegal, President Trump renewed his assault on these jurisdictions immediately upon taking office for a second term. On the same day he was inaugurated, he issued an Executive Order that purports to reinstate Executive Order 13,768. He then underscored his intent to punish jurisdictions that do not enforce his immigration policy priorities by issuing a second Executive Order, No. 14,159. That order returns to his 2017 playbook by directing Defendant Attorney General Pam Bondi and Defendant Department of Homeland Security ("DHS") Secretary Kristi Noem to withhold all federal funds from jurisdictions that refuse to use their local resources to carry out his immigration agenda. Even since the filing of this lawsuit, President Trump has issued two more punitive Executive Orders: No. 14,218, which targets such jurisdictions by directing all executive departments and agencies to ensure that "Federal payments to States and localities do not . . . abet so-called 'sanctuary' policies," and No. 14,287, which directs all executive departments and agencies "in coordination with the Director of the Office of Management and Budget" to "identify appropriate Federal funds to sanctuary jurisdictions, including grants and contracts, for suspension or termination."

4.      His administration has doubled down on these tactics, with Defendant Bondi issuing a memo on February 5, 2025 ("Bondi Directive"), stating DOJ's position that "State and local jurisdictions must comply with applicable immigration-related federal laws" and "state and local actors may not . . . fail to comply with lawful immigration-related directives." The Bondi Directive threatens not only termination of funding but also civil and criminal prosecution of any jurisdiction that refuses to comply.

5.      Bondi and DOJ have made good on these threats, filing lawsuits against states and localities with policies limiting local cooperation with federal immigration enforcement and asserting an unprecedented and unlawful interpretation of the federal government's authority to commandeer local government resources.

6.      Defendant Noem has followed suit, issuing a memo on February 19, 2025 ("Noem Directive"), directing components of DHS to "cease providing federal funding to sanctuary

jurisdictions" and to make criminal referrals to DOJ. The Federal Emergency Management Agency ("FEMA"), a component of DHS, subsequently recommended that "conditions or restrictions" related to "sanctuary" jurisdictions be placed on "all <u>open</u> and <u>future</u> awards" for several grant programs that fund critical emergency-preparedness activities. Secretary Noem approved that recommendation on March 25, 2025.

7.    DHS has further affirmed this Administration's commitment to ending "sanctuary" jurisdictions by issuing terms and conditions that target them ("DHS Standard Terms"). The DHS Standard Terms, issued on March 27, 2025, and then most recently updated on April 18, 2025, and applicable to "all new federal awards" for Fiscal Year 2025, mandate that award recipients agree to almost a full page of immigration enforcement–related conditions, including that they will "honor requests for cooperation, such as participation in joint operations, sharing of information, or requests for short term detention of an alien pursuant to a valid detainer" and will "provide access to detainees" in local custody.

8.    In flagrant disregard of the law, President Trump seeks once again to punish those who disagree with him, coerce local authorities, and commandeer them into carrying out his agenda. President Trump is aided in these efforts by Defendants DOJ, DHS, Bondi, Bove, and Noem.

9.    His actions fly in the face of foundational constitutional principles. They violate plain statutory language and numerous court orders. And they force local governments that have made deliberate decisions about how to make their communities safer and where to spend their own resources into an impossible choice—to relinquish their autonomy and independence and abandon their valid laws and policies, or face the sudden and devastating loss of federal funding and civil and criminal enforcement actions.

10.   By this action, Plaintiffs challenge each of these related Executive actions. President Trump's Executive Orders 14,159, 14,218, and 14,287; the Bondi Directive; and the Noem Directive violate the Tenth Amendment, Separation of Powers, the Spending Clause, and the Due Process Clause. The Bondi Directive and the Noem Directive are additionally unlawful because they are arbitrary and capricious, contrary to constitutional rights, and issued in excess of DOJ's and DHS's statutory jurisdiction.

11.     Plaintiffs are cities and counties spread across the country that are collectively home to close to 29 million residents. Plaintiffs have diverse populations and vibrant immigrant communities. Plaintiffs have each made the choice, protected by the Tenth Amendment to the United States Constitution, to ensure that their local resources are dedicated to serving all residents of their communities, and that these services can be accessed by all residents without fear of immigration consequences. To achieve these goals, Plaintiffs have enacted laws and policies that limit the use of local resources to enforce or administer federal civil immigration law.

12.     Plaintiffs are not going to stand in the way of lawful federal immigration enforcement. But neither are they going to be bullied into abandoning their laws that have made their communities safer or doing what the federal government cannot compel them to do—actively assist the federal government in enforcing federal immigration laws.

13.     For all of these reasons, as detailed below, Plaintiffs respectfully request the court to declare that these Executive actions are unlawful and to enjoin Defendants from enforcing the challenged provisions of the Executive Orders, the Bondi Directive, the Noem Directive, and actions taken to implement those provisions and memos.

## JURISDICTION AND VENUE

14.     The Court has jurisdiction under 28 U.S.C. §§ 1331 and 1346. This Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202 *et seq.*

15.     Venue properly lies within the Northern District of California because Plaintiffs City & County of San Francisco and County of Santa Clara reside in this judicial district and a substantial part of the events or omissions giving rise to this action occurred in this district. 28 U.S.C. §1391(e)(1).

## INTRA-DISTRICT ASSIGNMENT

16.     Assignment to the San Francisco Division of this District is proper pursuant to Civil Local Rule 3-2(c)-(d) because a substantial part of the acts or omissions that give rise to this action occurred in the City and County of San Francisco.

1

**PARTIES**

2      17.     Plaintiff the City and County of San Francisco ("San Francisco") is a municipal

3    corporation organized and existing under and by virtue of the laws of the State of California, and is a

4    charter city and county.

5      18.     Plaintiff the County of Santa Clara ("Santa Clara") is a charter county and political

6    subdivision of the State of California.

7      19.     Plaintiff the City of Portland ("Portland") is a municipal corporation of the State of

8    Oregon duly organized and existing under the laws of the State of Oregon.

9      20.     Plaintiff Martin Luther King, Jr. County ("King County") is a home rule charter county

10   organized and existing under and by virtue of the constitution and laws of the State of Washington.

11     21.     Plaintiff the City of New Haven ("New Haven") is a municipal corporation organized

12   and existing under the laws of the State of Connecticut.

13     22.     Plaintiff the City of Oakland ("Oakland") is a municipal corporation organized and

14   existing under and by virtue of the laws of the State of California, and is a charter city.

15     23.     Plaintiff the City of Emeryville ("Emeryville") is a municipal corporation organized

16   and existing under and by virtue of the laws of the State of California. It is a general law city except

17   for municipal revenue purposes, including taxation and assessment, for which it has charter city

18   authority.

19     24.     Plaintiff the City of San José ("San José") is a municipal corporation organized and

20   existing under and by virtue of the laws of the State of California, and is a charter city.

21     25.     Plaintiff the City of San Diego ("San Diego") is a municipal corporation organized and

22   existing under and by virtue of the laws of the State of California, and is a charter city.

23     26.     Plaintiff the City of Sacramento ("Sacramento") is a municipal corporation organized

24   and existing under and by virtue of the laws of the State of California, and is a charter city.

25     27.     Plaintiff the City of Santa Cruz ("Santa Cruz") is a municipal corporation organized

26   and existing under and by virtue of the laws of the State of California, and is a charter city.

27     28.     Plaintiff the County of Monterey ("Monterey") is a general law county and political

28   subdivision of the State of California.

29.     Plaintiff the City of Seattle ("Seattle") is a municipal corporation and first-class charter city organized and existing under the laws of the State of Washington.

30.     Plaintiff the City of Minneapolis ("Minneapolis") is a municipal corporation organized and existing under and by virtue of the laws of the State of Minnesota. It is a home rule charter city.

31.     Plaintiff the City of Saint Paul ("Saint Paul") is a municipal corporation organized and existing under and by virtue of the laws of the State of Minnesota. It is a charter city.

32.     Plaintiff the City of Santa Fe ("Santa Fe") is a municipal corporation and charter city organized under the laws of the State of New Mexico.

33.     Plaintiff the County of Alameda ("Alameda County") is a charter county and political subdivision of the State of California.

34.     Plaintiff the City of Albany ("Albany") is a municipal corporation incorporated and acting according to the laws of the State of New York.

35.     Plaintiff the City of Albuquerque ("Albuquerque") is a municipal corporation and charter city organized under the laws of the State of New Mexico.

36.     Plaintiff the County of Allegheny ("Allegheny County") is a home rule charter county organized under the laws of the Commonwealth of Pennsylvania.

37.     Plaintiff the City of Baltimore ("Baltimore") is a home rule jurisdiction created under the laws of the State of Maryland.

38.     Plaintiff the City of Benicia ("Benicia") is a municipal corporation, general law city, organized under the laws of the State of California.

39.     Plaintiff the City of Bend ("Bend") is a municipal corporation with a home-rule all-powers charter under the laws of the State of Oregon.

40.     Plaintiff the City of Berkeley ("Berkeley") is a municipal corporation and charter city organized and existing under the laws of the State of California.

41.     Plaintiff the City of Boston ("Boston") is a municipal corporation organized under the laws of the Commonwealth of Massachusetts.

42.     Plaintiff the City of Cambridge ("Cambridge") is a municipal corporation organized and existing under the laws of the Commonwealth of Massachusetts.

43.     Plaintiff the City of Cathedral City ("Cathedral City") is a municipal corporation and home rule charter city organized and existing under the laws of the State of California.

44.     Plaintiff the City of Chicago ("Chicago") is a municipal corporation and home rule unit organized and existing under the constitution and laws of the State of Illinois.

45.     Plaintiff the City of Columbus ("Columbus") is a municipal corporation and home rule charter city organized under the laws of the State of Ohio.

46.     Plaintiff Culver City is a charter city and a municipal corporation organized and existing under the Constitution and laws of the State of California.

47.     Plaintiff the County of Dane ("Dane County") is a quasi-municipal corporation organized and operating under the laws of the State of Wisconsin.

48.     Plaintiff the City and County of Denver ("Denver") is a home rule city and county organized pursuant to the laws of the State of Colorado.

49.     Plaintiff the City of Healdsburg ("Healdsburg") is a municipal corporation and general law city organized under the laws of the State of California.

50.     Plaintiff the County of Hennepin ("Hennepin County") is a political subdivision of the State of Minnesota.

51.     Plaintiff the City of Los Angeles is a municipal corporation and charter city organized and existing under the Constitution and laws of the State of California.

52.     Plaintiff the County of Marin ("Marin County") is a general law county and political subdivision of the State of California organized under the laws of the State of California.

53.     Plaintiff the City of Menlo Park ("Menlo Park") is a municipal corporation and general law city organized under the laws of the State of California.

54.     Plaintiff Multnomah County is a political subdivision of the State of Oregon and a home rule county organized under the laws of the State of Oregon.

55.     Plaintiff the City of Pacifica ("Pacifica") is a municipal corporation and general law city organized under the laws of the State of California.

56.     Plaintiff the City of Palo Alto ("Palo Alto") is a municipal corporation and charter city organized under the laws of the State of California.

57.   Plaintiff the City of Petaluma ("Petaluma") is a municipal corporation and charter city existing under the laws of the State of California.

58.   Plaintiff Pierce County ("Pierce County") is a home rule charter county organized and existing under and by virtue of the constitution and laws of the State of Washington.

59.   Plaintiff the City of Richmond ("Richmond") is a charter city and municipal corporation organized and existing under and by virtue of the laws of the State of California.

60.   Plaintiff the City of Rochester ("Rochester") is a municipal entity organized and existing under and by virtue of the laws of the State of New York.

61.   Plaintiff the City of Rohnert Park ("Rohnert Park") is a municipal corporation and general law city organized and existing under and by virtue of the laws of the State of California.

62.   Plaintiff the County of San Mateo ("San Mateo County") is a charter county and a political subdivision of the State of California.

63.   Plaintiff the City of Santa Rosa ("Santa Rosa") is a municipal corporation and charter city organized under the laws of the State of California.

64.   Plaintiff the County of Sonoma ("Sonoma County") is a general law county and a political subdivision of the State of California, organized under the laws of the State of California.

65.   Plaintiff the City of Watsonville ("Watsonville") is a municipal corporation and general law city organized under and by virtue of the laws of the State of California.

66.   Plaintiff the City of Wilsonville ("Wilsonville") is a municipal corporation of the State of Oregon organized under the laws of the State of Oregon.

67.   Defendant Donald J. Trump is the President of the United States. He is sued in his official capacity.

68.   Defendant United States of America is sued under 28 U.S.C. § 1346.

69.   Defendant United States Department of Justice ("DOJ") is an executive department of the United States federal government. 28 U.S.C. § 501. DOJ is responsible for the governmental actions at issue in this lawsuit.

70.     Defendant Pamela Bondi is the Attorney General of the United States, the highest-ranking official in DOJ, and is responsible for the decisions of DOJ. She is sued in her official capacity.

71.     Defendant Emil Bove is the Acting Deputy Attorney General, the second-ranking official within DOJ, and is therefore responsible for the decisions of DOJ. He is sued in his official capacity.

72.     Defendant United States Department of Homeland Security ("DHS") is an executive department of the United States federal government. 6 U.S.C. § 111. DHS is responsible for enacting some of the governmental actions at issue in this lawsuit.

73.     Defendant Kristi Noem is the Secretary of Homeland Security, the highest-ranking official in DHS, and is responsible for the decisions of DHS. She is sued in her official capacity.

74.     Defendant United States Office of Management and Budget ("OMB") is an executive office of the United States federal government. 31 U.S.C. § 501. OMB is responsible for enacting some of the governmental actions at issue in this lawsuit.

75.     Defendant Russell Vought is the Director of OMB, the highest-ranking official in OMB, and is responsible for the decisions of OMB. He is sued in his official capacity.

76.     Doe 1 through Doe 100 are sued under fictitious names. Plaintiffs do not now know the true names or capacities of said Defendants, who were responsible for the alleged violations, but pray that the same may be alleged in this complaint when ascertained.

## FACTUAL ALLEGATIONS

### I.     Plaintiffs' Laws and Policies

77.     Plaintiffs have each made the lawful decision to limit the use of their local resources to assist with federal civil immigration enforcement. In general, these laws and policies limit cooperation with U.S. Immigration & Customs Enforcement ("ICE") and other immigration enforcement authorities with respect to civil immigration detainer requests and administrative warrants, the sharing of confidential personal information (such as contact information) of individuals served by local officials, the sharing with ICE of release dates of individuals in local custody, and the collection of immigration or citizenship information about communities served by local officials.

78.    These local policy choices are not designed to, and do not, interfere with federal law enforcement, but instead ensure that all residents of Plaintiffs' communities—regardless of immigration status—feel safe reporting crimes, going to schools, seeking medical care, and accessing critical public services.

79.    These local policies also preserve scarce local resources. For example, a civil immigration detainer request is distinct from a criminal warrant, which Plaintiffs honor. A detainer request is not issued by a judge based on a finding of probable cause. It is simply a request by ICE that a state or local law enforcement agency hold individuals after their release date to provide ICE agents extra time to decide whether to take those individuals into federal custody and then deport them. Complying with detainer requests requires municipalities to commit scarce law enforcement personnel and resources to track and respond to requests, detain individuals in holding cells, and supervise and feed individuals during the prolonged detention. And the federal government has made clear that the local agency bears the financial burden of the detention, providing that "[n]o detainer issued as a result of a determination made under this chapter . . . shall incur any fiscal obligation on the part of the Department." 8 C.F.R. § 287.7(e).

80.    Further, courts have held that complying with civil immigration detainer requests, in the absence of a probable cause determination, violates the Fourth Amendment to the United States Constitution and could subject Plaintiffs to civil liability. *See Hernandez v. United States*, 939 F.3d 191, 200–01 (2nd Cir. 2019); *Morales v. Chadbourne*, 793 F.3d 208, 217 (1st Cir. 2015); *Miranda-Olivares v. Clackamas Cnty.*, No. 12-cv-02317-ST, 2014 WL 1414305, at *9 (D. Or. Apr. 11, 2014); *see also Melendres v. Arpaio*, 695 F.3d 990, 1000–01 (9th Cir. 2012) (applying the Fourth Amendment to immigration arrests).

81.    While "sanctuary" is not a legally defined term—and several Plaintiffs do not use the term "sanctuary" to describe their policies or consider themselves to be "sanctuary jurisdictions"—Defendants have characterized all jurisdictions with policies like those adopted by Plaintiffs to be so-called "sanctuary jurisdictions."

1    **A.    San Francisco**

2    82.    San Francisco has designated itself a Sanctuary City since 1989. In the 1980s,

3    thousands of Central American refugees fled their countries in the midst of violent civil wars to seek

4    legal protection in the United States. Against the backdrop of this humanitarian crisis, San Francisco

5    began enacting the ordinances that, as later amended, make up San Francisco's Sanctuary City laws.

6    83.    Today, San Francisco's body of Sanctuary City law is contained in two chapters of San

7    Francisco's Administrative Code: Chapters 12H and 12I. Importantly, these chapters do not shield

8    criminals or prevent individuals from being prosecuted for illegal acts. Instead, they protect children

9    by ensuring that their parents feel safe taking them to playgrounds, to schools, and to hospitals. They

10    support family stability and community engagement. And they protect the safety and health of all

11    residents of San Francisco by helping to ensure that everyone, including undocumented immigrants,

12    feels safe reporting crimes, cooperating with police investigations, and seeking medical care.

13    84.    San Francisco Administrative Code Chapter 12H prohibits San Francisco departments,

14    agencies, commissions, officers, and employees from using San Francisco funds or resources to assist

15    in the enforcement of Federal immigration law or to gather or disseminate information regarding the

16    release status, or other confidential identifying information, of an individual unless such assistance is

17    required by Federal or state law.

18    85.    San Francisco Administrative Code Chapter 12I prohibits San Francisco law

19    enforcement officials from detaining an individual who is otherwise eligible for release from custody

20    on the basis of a civil immigration detainer request issued by the Federal government.

21    86.    Chapter 12I also prohibits San Francisco law enforcement officials from responding to

22    a federal immigration officer's request for advance notification of the date and time an individual in

23    San Francisco's custody is being released, unless the individual in question meets certain criteria. *See*

24    S.F. Admin. Code § 12I.3(c), (d).

25    87.    Finally, as relevant here, Chapter 12I provides that "[l]aw enforcement officials shall

26    not arrest or detain an individual, or provide any individual's personal information to a federal

27    immigration officer, on the basis of an administrative warrant, prior deportation order, or other civil

28    immigration document based solely on alleged violations of the civil provisions of immigration laws."

1     *See* Section 12I.3(e). "Personal information" is defined as "any confidential, identifying information

2     about an individual, including, but not limited to, home or work contact information, and family or

3     emergency contact information." *See* Section 12I.2.

4         88.     San Francisco's Sanctuary City laws arise from San Francisco's commitment and

5     responsibility to ensure public safety and welfare. The Board of Supervisors, as San Francisco's

6     legislative body, found that public safety is "founded on trust and cooperation of community residents

7     and local law enforcement." Section 12I.1. Citing a study by the University of Illinois, which found

8     that at least 40% of Latinos surveyed were less likely to provide information to police because they

9     feared exposing themselves, family, or friends to a risk of deportation, the Board stated that "civil

10     immigration detainers and notifications regarding release undermine community trust of law

11     enforcement by instilling fear in immigrant communities of coming forward to report crimes and

12     cooperate with local law enforcement agencies." *Id.*; *see also id*. ("The City has enacted numerous

13     laws and policies to strengthen communities and to build trust between communities and local law

14     enforcement. Local cooperation and assistance with civil immigration enforcement undermines

15     community policing strategies.").

16         89.     The legislative findings set forth in Chapter 12I evidence the legitimate local purpose of

17     San Francisco's Sanctuary City laws. For example, the Board declared:

18         Fostering a relationship of trust, respect, and open communication between
         City employees and City residents is essential to the City's core mission of
19         ensuring public health, safety, and welfare, and serving the needs of
         everyone in the community, including immigrants. The purpose of this
20         Chapter 12I, as well as of Administrative Code Chapter 12H, is to foster
         respect and trust between law enforcement and residents, to protect limited
21         local resources, to encourage cooperation between residents and City
         officials, including especially law enforcement and public health officers
22         and employees, and to ensure community security, and due process for all.
         (*See* Section 12I.2.)
23

24         90.     The Board of Supervisors also had a public health purpose for its decision to restrict

25     disclosure of confidential information: "To carry out public health programs, the City must be able to

26     reliably collect confidential information from all residents . . . . Information gathering and cooperation

27     may be jeopardized if release of personal information results in a person being taken into immigration

28     custody." Section 12I.1.

91.     Finally, the Board of Supervisors determined that enforcing immigration detainer requests would require San Francisco to redirect scarce local law enforcement personnel and resources—noting that the costs of "responding to a civil immigration detainer can include, but [are] not limited to, extended detention time, the administrative costs of tracking and responding to detainers, and the legal liability for erroneously holding an individual who is not subject to a civil immigration detainer." Section 12I.1. In short, the Board of Supervisors concluded that "[c]ompliance with civil immigration detainers and involvement in civil immigration enforcement diverts limited local resources from programs that are beneficial to the City." *Id*.

92.     San Francisco departments have adopted and implemented policies consistent with Chapters 12H and 12I.

**B.     Santa Clara**

93.     Plaintiff Santa Clara is home to one of the largest and most diverse populations in the United States. With nearly two million residents, Santa Clara is the sixth largest county in California and more populous than twelve states. More than 40 percent—numbering upwards of 750,000—of Santa Clara's residents are foreign-born. This is the highest percentage of any county in California and one of the highest of any county nationally. Santa Clara's foreign-born population includes naturalized citizens; lawful permanent residents; refugees, asylees, student- and work-visa holders; victims of human trafficking or other crimes who have assisted law enforcement and hold T or U visas; and residents who lack lawful immigration status.

94.     Santa Clara is governed by an elected Board of Supervisors, which has repeatedly expressed its position that fostering a relationship of trust, respect, and open communication between and among Santa Clara officials and community members is critical to successfully achieving Santa Clara's mission of protecting community health and wellbeing and ensuring public safety.

95.     Santa Clara's elected Sheriff and District Attorney echo the same sentiment in their roles as Santa Clara's top law enforcement officials, expressing and instructing their employees that to encourage the reporting of crime and cooperation in criminal investigations, *all* community members, regardless of their immigration status, must feel safe and secure when contacting members of local public safety agencies; and must not fear that making contact will lead to an immigration inquiry or

proceeding against them or a loved one. Their leaders have stated publicly many times not only that their crime prevention, prosecution, and investigation services are available to all, but that the full participation of the community as victims and witnesses—buoyed by Santa Clara's policies of separation from federal civil immigration enforcement and the confidence and trust they engender—has been critical to solving specific crimes.

96.    Santa Clara employees do not impede or prevent ICE officials from carrying out their own enforcement activities relating to federal civil immigration laws. However, under Santa Clara's longstanding policies, employees do not use Santa Clara's *own* facilities, resources, or staff time to assist.

97.    Santa Clara's policy of not expending local law enforcement resources to assist with federal civil immigration enforcement is set forth in Board of Supervisors Policy 3.54 ("Board Policy 3.54"). Board Policy 3.54 prohibits jail administration from honoring ICE civil detainer requests; provides that the Sheriff may, in their discretion, facilitate transfers of incarcerated individuals to ICE custody *only* under the auspices of a signed judicial warrant or court order; and prohibits Santa Clara staff from using local resources or local facilities to support civil immigration enforcement activities, including by "communicating with ICE regarding individuals' incarceration status or release dates." Board Policy 3.54, by its express terms, does not in any way hamper local law enforcement officers' cooperation with other agencies in any *criminal* law enforcement activities. In full, Board Policy 3.54 states:

> It is the policy of the County of Santa Clara that County officials and employees may cooperate with United States Immigration and Customs Enforcement (ICE) only as follows:
>
> (A)    Consistent with longstanding County policy, the California Values Act (Gov. Code, §§ 7284-7284.12)[1], and the Fourth Amendment to the United States Constitution, the County does not, under any circumstances, honor civil detainer requests from ICE by holding inmates on ICE's behalf for additional time after they would otherwise be released from County custody.

---

[1] The California Values Act ("SB 54") defines narrow circumstances in which California state and local law enforcement agencies may take specific actions related to immigration enforcement. However, SB 54 does not restrict local jurisdictions from adopting their own policies further narrowing the scope of actions permitted within those local jurisdictions, and many California localities have enacted local laws and policies that govern their own employees' conduct.

(B)    It is the policy of the County that the Sheriff may exercise discretion to facilitate the transfer of an adult inmate to ICE custody if an ICE agent presents a valid arrest warrant signed by a federal or state judicial officer, or other signed writ or order from a federal or state judicial officer authorizing ICE's arrest of the inmate. An administrative warrant signed by an agent or official of ICE or of the Department of Homeland Security (such as a Form I-200) is not a judicial warrant and will not be honored. The Sheriff and Chief of Correction shall jointly develop transfer procedures to implement this paragraph.

(C)    Except as permitted by this Policy, the County shall not provide assistance or cooperation to ICE in its civil immigration enforcement efforts, including by giving ICE agents access to individuals or allowing them to use County facilities for investigative interviews or other purposes, expending County time or resources responding to ICE inquiries or communicating with ICE regarding individuals' incarceration status or release dates, or otherwise participating in any civil immigration enforcement activities. This Policy does not limit or prohibit giving assistance with the investigative activities of any local, state, or federal law enforcement agency relating to suspected violations of criminal laws.

98.    The requirements of subsections (A) and (C) of Board Policy 3.54 have been in place since 2011, and subsection (B) was added when the Board of Supervisors amended the policy in 2019.

**C.    Portland**

99.    In 1987, the Oregon State Legislature passed legislation prohibiting the use of state and local law enforcement resources to detect or apprehend persons whose only violation was being in the country without documentation. The bipartisan bill passed nearly unanimously and was codified in ORS 181A.820. In the years since, the state has added to the policy, and, in 2017, Portland adopted a resolution affirming its commitment to those state laws. These laws are instrumental in promoting a relationship of trust between law enforcement and immigrant communities, ensuring that victims report crimes to law enforcement so that perpetrators are apprehended before harming others.

100.    The current iteration of the Oregon Law is codified in ORS 180.805 and ORS 181A.820-829. ORS 180.805 provides, in relevant part, that:

a.    Except as required by state or federal law, a public body may not disclose, for the purpose of enforcement of federal immigration laws," a person's address, workplace or hours of work, school or school hours, contact information, known associates or relatives, or the date and time of a person's hearings or other proceedings with a public body.

b.    Except as required by state or federal law, or as necessary to determine eligibility for a benefit a person is seeking, a public body may not

inquire about or request information concerning a person's citizenship or immigration status.

c.  If a public body collects information concerning a person's citizenship or immigration status, the public body shall decline to disclose the information unless disclosure is required by" State or federal law, a court order, or a warrant authorized by a court.

d.  The above may be enforced through a civil action.

101.  ORS 181A.820-829 provide, in relevant part, that:

a.  Law enforcement agencies may not use agency money, equipment or personnel to enforce federal immigration law and may not enter into immigration-related detention agreements with federal immigration authorities.

b.  Public facilities, property, moneys, equipment, technology or personnel may not be used for the purpose of investigating, detecting, apprehending, arresting, detaining or holding individuals for immigration enforcement.

c.  Violations of these provisions may be reported through a formal reporting process and may be enforced through civil action.

102.  Portland's Resolution No. 37277 expresses the city's commitment to adhering to federal and state law. As such, in relevant part, it prohibits the city from using city resources to enforce federal immigration law except where required to do so by state or federal law, prohibits the Portland Police Bureau from cooperating with ICE except as expressly required by federal law, and resolves to take other action that support the city's immigrant community.

103.  In 2017 and 2018, the first Trump Administration attempted to require Oregon and Portland to cooperate with federal authorities on enforcement of federal immigration law as a condition of receiving funds awarded under the Byrne JAG formula grant program. A federal district court held that the Attorney General lacked the authority to impose these conditions and issued a permanent injunction, *Oregon v. Trump*, 406 F. Supp. 3d 940, 963 (D. Or. 2019). The Ninth Circuit affirmed this ruling. *City & Cnty. of S.F. v. Garland*, 42 F.4th 1078, 1084 (9th Cir. 2022).

### D.  King County

104.  King County is the largest county in Washington and the twelfth most populous county in the nation. More than 25% of King County residents are foreign-born and contribute to making it a vibrant center for aerospace manufacturing, technological innovation, cutting-edge medical research, education, agriculture, and other industries.

105.     King County is subject to state and local laws that make the county a welcoming place for immigrants. Washington law prohibits discriminatory treatment by state and local government based on immigration or citizenship status unless specifically authorized by federal or state law, regulation, or government contract. Wash. Rev. Code §§ 49.60.010, .030, .215. The Washington State Legislature has determined that it is neither state nor local law enforcement's primary purpose to enforce civil federal immigration law, and that a person's immigration status, presence in the country, or employment alone "is not a matter for police action." *See* Wash. Rev. Code § 10.93.160. The Keep Washington Working Act (KWW) prohibits components of local governments in the state from voluntarily assisting or participating in federal civil immigration enforcement efforts. *Id.* KWW therefore furthers Washington's "compelling interest in ensuring the state of Washington remains a place where the rights and dignity of all residents are maintained and protected in order to keep Washington working." 2019 Wash. Sess. Laws, ch. 440, § 1(3).

106.     Under KWW, state and local law enforcement officers may not "[i]nquire into or collect information about an individual's immigration or citizenship status, or place of birth unless there is a connection between such information and an investigation into a violation of state or local criminal law," or take or hold individuals in custody solely for the purpose of determining immigration status or based solely on civil immigration warrants or detainers, unless accompanied by a judicial warrant. Wash. Rev. Code § 10.93.160(4)(a), (8). KWW also prohibits local law enforcement from providing "information pursuant to notification requests from federal immigration authorities for the purposes of civil immigration enforcement, except as required by law." RCW 10.93.160(4)(b). To that end, KWW expressly provides that such limitations do not apply to information requests for citizenship or immigration status made pursuant to 8 U.S.C. § 1373, and does not prevent state or local officials from "[c]omplying with any other state of federal law." 2019 Wash. Sess. Laws, ch. 440, § 8(1)-(2).

107.     Under King County Code (KCC) 2.15.010, county officials are generally precluded from inquiring about immigration status or using county resources to assist with enforcement of federal immigration laws. In particular, "[a]n agent of King County or a county employee shall not expend any time, moneys or other resources on facilitating the civil enforcement of federal

immigration law or participating in civil immigration enforcement operations, except where state or federal law, regulation, or court order shall so require." KCC 2.15.010.

108.    King County has remained steadfast in its compliance with KWW and KCC 2.15. The King County Executive, Dow Constantine, directed King County's 16,000+ work force on February 4, 2024 that "[w]e remain committed to enforcing state law and local ordinances protecting the rights of immigrants." Policies in effect from various King County Departments, including the King County Sheriff and the Department of Adult and Juvenile Detention, reflect the county's determination to follow state and local law.

**E.    New Haven**

109.    New Haven is a racially and ethnically diverse city. This diversity contributes to New Haven's economy and cultural richness.

110.    New Haven's Administration is committed to promoting the health and safety of all its residents, without regard to their immigration status.

111.    The Mayor of the City of New Haven issued a Welcoming City Executive Order on July 23, 2020. That Order limits the City's entanglement with federal civil immigration enforcement as part of New Haven's "commitment to promoting the safety of all who live here and in recognition of the fact that all persons need to feel comfortable in their interactions with City officials."

112.    Pursuant to the Order:

    a.  New Haven City employees and local law enforcement may not ask about a person's immigration status unless required to do so by state or federal law;

    b.  New Haven officers and City employees may not use public resources to assist in the enforcement of any federal program requiring registration of individuals on the basis of race, gender, sexual orientation, religion, or national or ethnic origin;

    c.  New Haven officers and City employees may not disclose confidential information absent written consent or unless required by law, or if necessary to apprehend an individual suspected of terrorism or criminal activity. Confidential information is defined as a social security number and information relating to sexual orientation;

status as a victim of domestic violence, crime witness, or recipient of public assistance; or immigration status; and

d. Local law enforcement may not detain a person solely on the belief that they have committed a civil immigration violation nor detain or arrest a person based solely on a civil detainer request or administrative warrant issued by ICE.

113. The policies set out in the Order aim to build strong community relations and enhance public safety by facilitating trust between local law enforcement and the immigrant community.

**F.    Oakland**

114. The City of Oakland is a multicultural city of more than 400,000 people. Roughly a quarter of Oakland's population was born outside of the United States. Over the years, Oakland has repeatedly reaffirmed its commitment to respecting the civil and human rights of all its residents, regardless of their immigration status.

115. In 1986, in the face of thousands of individuals fleeing their countries of origin to avoid persecution, the Oakland City Council first declared Oakland to be a "City of Refuge" for immigrants.

116. In January 2019, the City Council enacted Ordinance No. 13515, strengthening Oakland's longstanding commitment to remaining a sanctuary jurisdiction. Under that ordinance, Oakland Police Department employees are prohibited from providing "enforcement assistance, including traffic support, to ICE, including any subdivision of ICE, in any capacity except to respond to a public safety emergency related to an ICE action or where assistance is required by Federal or State statute, regulation or court decision."

117. Ordinance No. 13515 remains in effect and governs the Oakland Police Department's relationship with ICE.

**G.    Emeryville**

118. In 2017, the Emeryville City Council adopted Resolution No. 17-08, "Resolution of the City Council of the City of Emeryville Declaring the City of Emeryville a Welcoming and Sanctuary City" (the "Welcoming and Sanctuary Resolution"). The Welcoming and Sanctuary Resolution contains the following relevant provisions:

a. Emeryville is a Welcoming and Sanctuary City;

b.  Emeryville employees serve all residents, and city services are accessible to all residents regardless of immigration status;

c.  Emeryville employees do not inquire about a person's immigration status in either the provision of municipal services or in the course of law enforcement;

d.  Emeryville refuses any requests that are an extension of any federal immigration policy enforcement actions;

e.  Emeryville does not enter into any agreements to carry out such federal enforcement actions; and

f.  Emeryville does not dedicate any City time or resources to such enforcement, but leaves such actions to federal authorities.

119.    The Welcoming and Sanctuary Resolution does not shield anyone from criminal prosecution, nor does the Resolution interfere with the federal government's immigration enforcement role.

120.    The Resolution protects all Emeryville residents by fostering an environment of inclusion and ensuring local resources are reserved for local government functions. It also promotes public safety by reducing barriers to reporting crimes, cooperating with police investigations, and seeking medical care.

**H.    San José**

121.    San José is the third most populous city in California, and the largest city in Silicon Valley, a region in the Southern San Francisco Bay Area of Northern California. It is the oldest city in California, developing from a Spanish pueblo established in 1777.

122.    Silicon Valley is a global center of high technology, innovation, and social media; and home to many of the world's largest technology companies. Commercial, retail, professional, high-tech manufacturing, electronic assembly, and service businesses all have a presence in San José.

123.    San José is centrally located in a region that has attracted significant foreign investments from all over the world, and is a gateway for many immigrants who come to the United States to work and study here.

124.    San José is one of the most diverse cities in the United States, with nearly 410,000

residents who are foreign-born. Sixty percent of children residing in San José have at least one immigrant parent. San José's foreign-born population includes naturalized citizens; lawful permanent residents; refugees, asylees, student- and work-visa holders; victims of human trafficking or other crimes who hold T or U visas; and residents who lack lawful immigration status.

125.    In 2007, the City Council adopted Resolution No. 73677 to support public safety and immigrants by creating an environment where immigrants are not afraid to report crimes and interact with the police, fire department, or other City departments to obtain critical services.

126.    In September 2015, the City Council adopted Resolution No. 77517 identifying the City of San José as a "Welcoming City", and affirming its commitment to build a community that recognized the contributions of all residents to enhance its economic growth, global competitiveness and overall prosperity. San José was certified as a welcoming city by the nonprofit Welcoming America, a formal designation for local governments that have created policies and programs that demonstrate a commitment to immigrant inclusion in all areas of civic, social, and economic life.

127.    In February 2025, the City Council adopted Resolution No. 2025-19 and affirmed its commitment from 2007 to preserve the safety and integrity of all its residents, regardless of national origin or legal status.

128.    In 2018, San José updated the San José Police Duty Manual (L7911) to comply with state and federal law. The San José Police Duty Manual contains the policies, rules, and procedures for the Police Department and all its members, sets forth the Police Department structure, and how to conduct its various law enforcement duties. The manual acknowledged "the responsibility of enforcement of civil immigration law rests with the U.S. Immigration and Customs Enforcement."

129.    The San José Police Department can cooperate with the U.S. Immigration and Customs Enforcement in matters involving serious crimes, the protection of public safety, and as required by statute, federal regulations, or court decisions.

130.    Based on city policy and state law, San José does not detain or question people based solely on a person's citizenship or status under civil immigration laws, nor for the purpose of discovering that status or citizenship.

131.    It is the official policy of San José to ensure that residents do not fear arrest or

deportation for coming forward to report a crime as a victim or a witness.

132.    Consistent with state law, San José determined that it can best protect the public safety of the entire community by not eroding the trust of its residents, and thereby discouraging the reporting of crimes or cooperation in prosecution of these crimes.

133.    For this reason, San José's limited resources are directed to serve the local public safety priorities including the investigation and prosecution of state and local crimes.

**I.    San Diego**

134.    San Diego is home to roughly 1.4 million residents.

135.    The City's boundary in the south is the international border with Mexico, and as a result San Diego has a significant immigrant population. Approximately one in four San Diego residents is foreign-born, having arrived from one of at least 115 countries. And approximately 41% of the San Diego population speaks a language other than English. Immigration has been and continues to be a major contributor to San Diego's ethnic and cultural diversity. Being a multicultural melting pot positions San Diego's labor force for success in the global economy.

136.    San Diego adheres to federal and state law, including SB 54.

137.    San Diego has no provision in its Charter relating to immigration or citizenship status and City employees, including its police force, have no additional restrictions under its Charter or Municipal Code beyond that of state law.

138.    Resolution No. 313834, adopted December 17, 2017, declares that San Diego is a "welcoming city that respects the dignity of all people and promotes programs and policies to foster inclusion for all." It does not describe itself as a "sanctuary city" nor does it place any obstacles on federal officials seeking to enforce federal immigration laws within its boundaries.

139.    This resolution affirmed that it welcomes all persons, regardless of immigration status, race, ethnicity, place of origin, English language proficiency, religion, income, gender, sexual orientation, differing abilities, age, and other factors—to enhance San Diego's health, economic prosperity, and well-being for current and future generations.

**J.      Sacramento**

140.    Sacramento has a long history of welcoming individuals of diverse racial, ethnic, and religious backgrounds, making it one of the most integrated and diverse cities in the United States, a reputation it embraces.

141.    As one of the nation's most integrated and diverse cities, Sacramento prioritizes community trust in the delivery of government services as well as its use of law enforcement authority.

142.    Sacramento has long prioritized the inclusion and cooperation of all residents, including its immigration population, in every aspect of providing government services.

143.    The city encourages residents of all backgrounds to contact the city on all variety of matters, including code enforcement, building and fire safety concerns, and transportation and housing needs, and to participate in city-offered programs such as vocational training, internships and workforce development, and assistance for residents experiencing homelessness.

144.    In some of these situations, maintaining confidentiality or offering the option are essential to the delivery of services. For example, confidentiality protects code enforcement complainants from unwarranted retaliation that might otherwise be borne upon them by the subject code violator; it reduces the spread of stigma for people experiencing homelessness; and it reduces the risks associated with survivors of domestic violence being found by their aggressor. Similarly, assurance of confidentiality increases the likelihood that an immigrant contacts code enforcement, participates in housing programs that reduce homelessness, and otherwise engages with City services for problems that might otherwise persist in their neighborhoods.

145.    Elected by the residents of Sacramento, the City Council is authorized by law to make decisions and set policy regarding the deployment of city resources to try and meet all community needs.

146.    In full exercise of their authority, the Sacramento City Council passed Resolution 2017-0158 to clarify how and why the city declines to be entangled in federal civil immigration enforcement.

147.    As Resolution 2017-0158 states, "to carry out public housing programs, the City must be able to reliably collect confidential information from applicants" for temporary and permanent

housing. Release of such confidential information for "unintended purposes …. could hinder collection of information vital to those significant city programs. To solve code enforcement violations that can detrimentally impact families and neighborhoods, residents and community members must be encouraged to contact the City's Code Enforcement divisions." Resolution 2017-0158 further states that "to protect the public from crime and violence" requires "encouraging all persons who are victims of or witnesses to crimes, or who otherwise can give evidence in a criminal investigation, to cooperate with the criminal justice system" knowing that the City's employees are disentangled from immigration enforcement.

148.    To achieve these goals, Resolution 2017-058 provides in relevant part that city resources shall not be used to:

      a.  Ask about or investigate immigration status, except as necessary to comply with 18 USC § 922(d)(5), to certify an individual who has been identified as a potential crime or trafficking victim, with consent, or as required by federal or state laws;

      b.  Absent a judicial warrant, arrest or detain an individual solely on the basis of alleged violation of civil immigration law;

      c.  Detain someone solely on the belief that they may be violating civil immigration law or on the basis of a detainer or administrative warrant based in civil immigration law;

      d.  Notify the federal government about the release date of a person alleged to have violated civil immigration law;

      e.  Absent consent, provide confidential information about an individual on the basis of alleged violation of civil immigration law, where "confidential information" is defined as "including, but not limited to, information about the individual's home address; work address; person's status as a victim of domestic abuse or sexual assault; sexual orientation; or disability.

149.    An express exemption for Sections 1373 and 1644 provides that city officials and employees may send to, or receive from, federal immigration authorities, information regarding the citizenship or immigration status, lawful or unlawful, of a person.

150.    Sacramento has a number of policies and systems aimed at promoting cooperation between local law enforcement and the diverse immigrant communities that have long flourished in Sacramento.

151.    One such policy is the Sacramento Police Department's General Order 523.07, which establishes procedures for contacts with foreign nationals, including as victims or suspects of crimes or infractions, witnesses in investigations, or subjects involved in accidents. The policy provides that SPD will provide equal enforcement of the law and equal service to all members of the public regardless of an individual's immigration status and will not initiate police action based solely on an individual's immigration status.

152.    Developing this trust is essential to ensuring that crimes are reported and that victims and witnesses participate in the process. This helps local police enforce the laws against serious offenders who threaten public safety.

153.    Consuming scarce city resources to assist federal civil immigration activities does not advance the interests or needs of the city, and could actually work to thwart other important work performed by law enforcement. This includes a recently formed cooperative partnership between the Sacramento Police Department and the Sacramento County District Attorney to address human trafficking.

154.    Sacramento officials and employees do not interfere with federal immigration enforcement officers carrying out their duties in Sacramento.

155.    The Sanctuary City Resolution is instead intended to direct and prevent Sacramento officials and employees from expending scarce local resources on federal civil immigration enforcement efforts to the detriment of Sacramento's core mission of ensuring public health, safety, and welfare for all those that live, work, and visit Sacramento.

**K.    Santa Cruz**

156.    The residents of Santa Cruz have a long history of and deep commitment to welcoming immigrants, refugees, and those in exile.

157.    In 1986, Santa Cruz established its first "Sanctuary City" policy, declaring itself a "refuge for Salvadoran and Guatemalan refugees until these refugees can safely return to their

homelands or until they are granted federally recognized residency status, temporary or permanent."
*See* City Council Resolution No. 16,876.

158.    Since then, the Santa Cruz City Council has taken legislative actions to expand its sanctuary policies in an effort to create a safe haven for all immigrants who live and work in the city.

159.    Pursuant to City Council Resolution No. NS-30,438, Santa Cruz restricts city agencies, departments, officers, employees, and agents from taking the following actions:

a.    … enforc[ing] Federal civil immigration laws, request[ing] or maintain[ing] information concerning a person's immigration status, or us[ing] City monies, resources, or personnel to investigate, question, detect, apprehend, or question a person on the basis of his or her immigration status …;
b.    … disclos[ing] information about a person's immigration status …; and
c.    … us[ing] City funds, resources, facilities, property, equipment, or personnel … to assist in the enforcement of federal immigration law …

*See also* City Council Ordinance No. 2017-06; City Council Resolutions Nos. 27,504, 29,187.

160.    However, Santa Cruz provides exceptions to its restrictions on supporting federal immigration authorities when necessary to comply with and respond to a lawfully issued judicial warrant or subpoena; when information is provided consensually; when necessary to provide a city service or prevent an imminent threat to public health or safety; or as otherwise required by state or federal law or judicial decision. *See* City Council Resolution No. NS-30,438; *see also* City Council Ordinance No. 2017-06.

161.    In setting forth its restrictions on supporting federal immigration authorities, Santa Cruz declared its intent to abide by state and federal law. *See* City Council Resolution No. NS-30,438.

162.    Santa Cruz City Council created these policies after finding that, in the interest of promoting public safety, it is important to create an environment in which people feel comfortable interacting with law enforcement, and not erode that trust by permitting local police officers to assist federal immigration enforcement.

163.    Santa Cruz City Council also has found that these policies are supported by studies proving that jurisdictions that provide protections for immigrants are safer and economically more prosperous compared to other jurisdictions – including a 2017 report by the Center for American Progress, which shows that, on average, there are 35.5 fewer crimes committed per 10,000 people

annually in these jurisdictions, the average annual income is $4,353 higher, the poverty rate is 2.3%

lower, and unemployment is 1.1% lower. *See* City Council Resolution No. NS-30,438.

### L.     Monterey

164.     Monterey was built largely by immigrants. Like many other political subdivisions of

California, Monterey boasts rich demographic and cultural diversity that reflects its tradition of

attracting people from all over the world who come to the county in search of employment

opportunities and a better life. An estimated 29% of Monterey County residents were born in a

different country.

165.     The County's democratically elected officials necessarily serve the interests of these

and all other residents, who share a common interest in maintaining a community built on

quintessentially American ideals of diversity, tolerance, and inclusion.

166.     In both 2017 and 2025, the Monterey Board of Supervisors acted swiftly to establish

and re-establish the locality as a "Welcoming County for Immigrants and Refugees" and to declare the

"County a Place of Trust and Safety for Immigrants." Board of Supervisors Res. No. 17-042, 25-004.

Among other things, the Board's legislative actions recognized that:

> a.  A relationship of trust between California's immigrant residents and our
>     local agencies, including law enforcement, schools and hospitals, is
>     essential to carrying out basic local functions; and that trust is threatened
>     when local agencies are involved in immigration enforcement; and
> b.  [N]o County resources shall be used to assist in the enforcement of
>     federal immigration law, participate in any immigration enforcement
>     operation or joint operation involving any federal immigration agent for
>     the purpose of enforcing federal immigration law, unless such
>     assistance is required by federal or state statute, regulation or court
>     decision.

167.     Monterey County recently issued guidance regarding county employees' legal

obligations when responding to federal immigration enforcement activity. The guidance dutifully

balanced local directives, state law, and federal law. It advises that "county employees may not in the

course of their employment give their consent to federal immigration enforcement activities," subject

to the requirements of 8 U.S.C. § 1373 and the Fourth Amendment of the U.S. Constitution.

168.     The Monterey County Sheriff's Office likewise maintains policies limiting inquiry into

immigration status and limiting immigration detainers in a manner that explicitly honors federal legal

1   requirements while adhering to state law.

2       169.    Monterey's policies reflect local prerogatives, and afford every measure of respect and

3   deference to federal immigration prerogatives that is required by long-established principles of

4   federalism.

5       **M.    Seattle**

6       170.    Seattle's laws, policies, and programs make it a Welcoming City that serves all

7   residents.

8       171.    In 2003, the Seattle City Council unanimously adopted Ordinance 121063, which

9   provides that, unless otherwise required by law or by court order, "no Seattle City officer or employee

10  shall inquire into the immigration status of any person, or engage in activities designed to ascertain the

11  immigration status of any person." Seattle Mun. Code § 4.08.015(A).

12      172.    Ordinance 121063 includes one exemption for police officers where officers have a

13  reason to believe that a person: (1) has previously been deported from the United States; (2) is again

14  present in the United States; and (3) is committing or has committed a felony criminal-law violation.

15  Seattle Mun. Code § 4.18.015(B).

16      173.    Ordinance 121063 recognized that Seattle is home to immigrants from around the

17  world who contribute to the city's cultural richness and economic vitality. Seattle enacted Ordinance

18  121063 with the intent to "guide city officials and employees to adhere to federal law while helping to

19  protect the safety and health of all members of [the] community."

20      174.    Alongside its commitment to protect all members of the community, Seattle complies

21  with 8 U.S.C. § 1373 and other federal laws. Ordinance 121063 directs that it shall not "be construed

22  to prohibit any Seattle City officer or employee from cooperating with federal immigration authorities

23  as required by law." Seattle Mun. Code § 4.18.035. Another longstanding provision of the Municipal

24  Code, which has been in effect since 1986, provides that "[c]ity officers and employees are directed to

25  cooperate with, and not hinder, enforcement of federal immigration laws." Seattle Mun. Code

26  § 4.18.010.

27      175.    Consistent with the Municipal Code, the Seattle Police Department Manual provides:

28

It is the Seattle Police Department's intent to foster trust and cooperation with all people served by the Department, including immigrant and refugee residents. The Department encourages any person who wishes to communicate with Seattle Police officers to do so without fear of inquiry regarding their immigration status. . . .

The Department recognizes that local law enforcement has no role in immigration enforcement. "Unlawful presence" in the country is a civil matter and not within the department's jurisdiction.

Employees Will Not Inquire About Any Person's Citizenship or Immigration Status. . . . Employees Will Not Request Specific Documents for the Sole Purpose of Determining a Person's Immigration Status . . . Employees Will Not Initiate, Maintain, or Participate in any Police Action Based on an Individual's Immigration Status.

Seattle Police Department Manual, Sect. 6.020, https://public.powerdms.com/Sea4550/tree/documents/2042882.

176.    Seattle's Resolution 31730 reaffirms its commitment to being a Welcoming City. It states that the City will not withhold services based on ancestry, race, ethnicity, national origin, color, age, sex, sexual orientation, gender identity, marital status, physical or mental disability, religion, or immigration status. *See also* Seattle Resolution 30672 (2004), Seattle Resolution 31775 (2017).

177.    Seattle coordinates programs and services for immigrants and refugees through the Office of Immigrant and Refugee Affairs ("OIRA"). *See* Seattle Mun. Code § 3.14.505. The mission of OIRA is to improve the lives of Seattle's immigrant and refugee communities through policies, programs, services, and community engagement. Examples of OIRA programs include: assistance with the naturalization process (including workshops, clinics, legal support, and outreach to people with disabilities); public safety interventions for children of immigrants and young immigrants; victim and family support services; job training and English language skills; and translating City services into more languages to broaden access.

178.    In 2017 Seattle and Portland filed a joint lawsuit against the first Trump Administration challenging Executive Order 13,768. A federal district court determined that the Administration would likely consider Seattle to be a "sanctuary city" and issued declaratory relief, holding that it would be unconstitutional for Executive Branch agencies to withhold funds that Congress had not tied to compliance with 8 U.S.C. § 1373 from Seattle and Portland. *City of Seattle v. Trump, et al*., Civil Case

No. C17-497-RAJ (W.D. Wash. Oct. 24, 2018); *City of Seattle v. Trump*, No. 17-497-RAJ, 2017 WL 4700144, at *8 (W.D. Wash. Oct. 19, 2017).

### N.    Minneapolis

179.    Minneapolis is the largest city in Minnesota and one of its most diverse. Minneapolis is home to immigrants and refugee residents with varying immigration statuses, from naturalized citizens to those without lawful immigration status.

180.    Minneapolis's immigrant community is a valued and important part of the City's social milieu.

181.    Minneapolis's immigrant community is also a critical piece of the City's crime prevention efforts. The Minneapolis Chief of Police, Brian O'Hara, has stated that "[t]he police department can only be effective when community tells us what's going on, when community is willing to tell us when they've been victimized, when they need help…."

182.    For over two decades, Minneapolis has formally prioritized using its finite resources to advance the health and safety of all of the Minneapolis community.

183.    In 2003, the City of Minneapolis enacted an ordinance in Chapter 19 of its Code of Ordinances, entitled "Employee Authority in Immigration Matters." This ordinance, commonly referred to as the "Separation Ordinance," "clarifies the communication and enforcement relationship between the city and the United States Department of Homeland Security and other federal agencies with respect to the enforcement of civil immigration laws." Minneapolis Municipal Code of Ordinances ("M.C.O.") § 19.10.

184.    Section 19.10 further provides that "[t]he city works cooperatively with the Homeland Security [Department], as it does with all state and federal agencies, but the city does not operate its programs for the purpose of enforcing federal immigration laws. The Homeland Security [Department] has the legal authority to enforce immigration laws in the United States, in Minnesota and in the city."

185.    If Minneapolis personnel were to enforce federal immigration laws for the federal government, it would squander limited municipal resources, have deleterious effects on public safety, and have a chilling effect on immigrant populations' willingness to report crime and cooperate with the City's public safety efforts.

186.     Minneapolis's Separation Ordinance states that to the extent permitted by law, public safety officials may "not undertake any law enforcement action for the purpose of detecting the presence of undocumented persons, or to verify immigration status." M.C.O. § 19.30(1).

187.     In addition, Minneapolis public safety officials may not "question, arrest or detain any person for violations of federal civil immigration laws except when immigration status is an element of a crime." M.C.O. § 19.30(3).

188.     Nothing in the Separation Ordinance, however, "prohibits public safety personnel from assisting federal law enforcement officers in the investigation of criminal activity involving individuals present in the United States who may also be in violation of federal civil immigration laws. M.C.O. § 19.30(4).

189.     The Minneapolis Separation Ordinance makes an exemption to the prohibition on the use of City resources for immigration-related investigation and enforcement when City personnel are complying with "lawful subpoenas" or "any properly issued subpoena." M.C.O. §§ 19.20 & 19.50.

190.     Under the Separation Ordinance, City employees generally may "only solicit immigration information or inquire about immigration status when specifically required to do so by law or program guidelines as a condition of eligibility for the service sought." M.C.O. § 19.20(a)(2).

191.     City of Minneapolis departments and staff do not operate for the purpose of enforcing federal immigration law, but rather to provide municipal services to the Minneapolis community, regardless of immigration status.

**O.    St. Paul**

192.     Saint Paul is the county seat of Ramsey County, and the second most populous city in Minnesota. The City is highly racially diverse, with a population which is only about 51% White (non-Hispanic). 18.6% of the residents of Saint Paul are foreign-born, a much higher percentage than the State of Minnesota (8.4%) or United States (13.6%) as a whole. Non-U.S. citizens represent 8.1% of the population of the City, again a larger percentage than the state (6.5%) or the nation (6.5%) as a whole.

193.     Saint Paul has the largest Hmong population of any city in the United States.

194.     Given the diversity of its population, the City has a longstanding commitment to serving and welcoming immigrants in the community. Among other things, the City offers immigrants access to a host of public and private assistance programs, many of which are operated by the City itself, on its website at https://www.stpaul.gov/immigration-resources. The Saint Paul City Attorney's office employs a full-time attorney dedicated to assisting with immigration-related issues, and operates an Immigrant and Refugee Program which assists immigrants within the City.

195.     In 2004, Saint Paul enacted a separation ordinance at Chapter 44 of its Administrative Code, entitled "Employee Authority in Immigration Matters." The ordinance was intended to allow all residents full access to city services, regardless of their immigration status.

196.     The ordinance provides, among other things, that:

   a.  City employees cannot ask residents about their immigration status, except when required by law;

   b.  the City does not use its programs to enforce federal immigration laws; and

   c.  City public safety officials cannot use law enforcement authority solely to find undocumented persons or check immigration status.

197.     Chapter 44 is not intended as a sanctuary policy, but is likely to be interpreted by the Trump Administration as rendering Saint Paul a "sanctuary" jurisdiction within the meaning of the Executive Orders, the Bondi Directive, and the Noem Directive.

**P.     Santa Fe**

198.     Santa Fe is an over 400-year-old-city and is the capital city of New Mexico. It is home to approximately 90,000 residents and annually hosts approximately 4,000,000 tourists. The city has long been renowned for its rich cultures, traditions, arts, and history. UNESCO designated Santa Fe as the United States' first "Creative City" twenty years ago. Approximately fifteen percent of the City's population are foreign-born and over thirty percent of the population speaks a language other than English at home.

199.     Santa Fe adopted Welcoming Community resolutions in 1999 and 2017.

200.     In 1999, Santa Fe adopted Resolution 1999-6, which declared a policy of non-discrimination based on a person's national origin and equal treatment for all persons, with respect and

dignity, regardless of immigration status. It prohibited use of municipal resources to identify or apprehend non-citizen residents on the sole basis of immigration status, unless otherwise lawfully required to do so.

201.    In 2017, Santa Fe adopted Resolution 2017-19, reaffirming its immigrant-friendly status and commitment to the established rule of law. The resolution:

      a.   Prohibits employees of the City of Santa Fe from making or initiating any inquiry regarding the immigration status of any person, except as required by law, including, without limitation, to determine eligibility for City employment or for a federal benefit or program administered by the City.

      b.   Generally prohibits employees of the City of Santa Fe from disclosing to any person or agency outside city government any sensitive information about any person that comes into the employee's possession during the course and scope of that employee's work for the City of Santa Fe, subject to certain exceptions. Sensitive information includes confidential identifying information such as social security numbers or individual tax identification numbers, a person's place and date of birth, a person's status as a recipient of public assistance or as a crime victim, and a person's sexual orientation, physical or mental disability, immigration status or national origin.

      c.   Requires City elected and appointed officials and employees to refuse access to all non-public areas of City property by federal immigration agents for the purposes of enforcing federal immigration laws unless they present a warrant issued by a federal court specifically requiring such access.

      d.   Requires City departments and employees to accept driving authorization cards and non Real-ID compliant identification cards issued by the New Mexico Motor Vehicle Division (MVD) for all of the purposes for which they would accept Real-ID-compliant drivers' licenses and identification cards issued by the MVD.

      e.   Prohibits City departments' use of the voluntary federal e-verify system to investigate or determine the work eligibility of applicants for city employment

unless required by law for the purposes of administering a federal benefit or program.

202.   Santa Fe departments and employees operate to deliver city services to Sante Fe residents. Diverting limited municipal resources to enforce federal immigration law would limit the City's ability to deliver public safety resources, including but not limited to traffic safety, response to emergency calls, services to the unhoused population, criminal investigations, criminal prosecutions, animal services, and code enforcement.

### Q.   Alameda County

203.   With more than 1.6 million residents, Alameda County is the seventh most populous county in California and is characterized by its rich diversity and culture. Approximately one third of Alameda County's residents—over 560,000 people—were born outside of the United States.

204.   Alameda County's Board of Supervisors has long held and repeatedly expressed the position that achieving the County's core missions to ensure public safety and serve residents' needs requires respect, trust, and open communication among all members of the community. To that end, in 2013, the Board adopted Resolution 2013-142, titled "Resolution Regarding Civil Immigration Detainer Requests." In that Resolution, the Board discouraged Alameda County's Sheriff from honoring ICE holds or other detention requests for suspected violations of civil federal immigration law. The Resolution further discouraged the use of County resources for "responding to ICE inquiries or communicating with ICE regarding individuals' incarceration status or release dates," absent a criminal warrant or a "legitimate law enforcement purpose that is not related to the enforcement of immigration laws."

205.   The Board reiterated those positions in 2016, when it first adopted Resolution 2016-274, titled "Resolution Regarding Upholding Due Process and Protecting Civil Rights of Immigrant Residents." In Resolution 2016-274, the Board of Supervisors again stated its opposition to using County resources to assist in enforcing federal civil immigration law, including by honoring ICE civil detainer requests; giving ICE access to individuals or County facilities without a judicial warrant; arresting individuals for actual or suspected civil violations of federal immigration law; and communicating with ICE regarding individuals' release dates, among other information. About a week

later, the Board also adopted Resolution 2016-303, titled "A Resolution Designating Alameda County a Welcoming County for Immigrants and Refugees," which reiterated the County's commitment to building a welcoming community for all County residents.

206.    Consistent with the Board's longstanding positions, and California law, including SB 54 and the TRUST and TRUTH Acts, several County departments have taken steps to keep local resources separate from federal civil immigration enforcement. For example, Alameda County Sheriff's Office policy precludes officers from (1) detaining, arresting or contacting individuals based solely on their actual or suspected immigration status; (2) entering into agreements with federal immigration authorities to enforce federal immigration laws; (3) using County resources to assist or facilitate federal immigration enforcement operations, except in cases of critical or emergency requests from other law enforcement agencies; (4) honoring civil immigration detainers, absent a "criminal warrant signed by a judge"; (5) inquiring about an individual's immigration status, unless the information is necessary to a criminal investigation of a violation of California law; (6) using immigration authorities as interpreters; (7) initiating contact with ICE to provide information about individuals in the Sheriff's Office's custody who are suspected of violating federal immigration laws; or (8) participating in "sweeps to locate and detain undocumented residents." *See* Alameda County Sheriff's Office General Order 1.24.

### R.    Albany

207.    The City of Albany was established in 1614 by foreign-born residents. Incorporated in 1686, it is the oldest continuously chartered municipality in the United States. For more than four centuries, the City of Albany has benefited from the social and economic contributions of foreign-born residents and visitors.

208.    Albany is home to just over 100,000 people, at least 15,000 of whom were born outside of the United States. Ensuring public safety in Albany requires that City of Albany officials and law enforcement maintain open lines of communication with foreign-born city residents and visitors. This cooperation is possible only when foreign-born residents can interact with law enforcement without fear of deportation or the deportation of friends and family members.

209.    As a result, in 2017, Albany's Mayor issued Executive Order 1-17, "City of Albany Policy Regarding Community Policing and Protecting Immigrants." Pursuant to Executive Order 1-17, Albany Police Department officers are not permitted (1) to inquire into an individual's immigration status "unless necessary to investigate criminal activity by that individual"; (2) to stop individuals based on suspected citizenship status, ICE detainers, or administrative warrants; (3) to respond to ICE requests for non-public information other than as required to comply with 8 U.S.C. § 1373; or (4) to otherwise enforce federal immigration law. In addition, the order (5) bars City employees from asking about immigration status unless required to do so by the applicable program or by law, and (6) affirms all residents' access to city services for which they are eligible by law.

**S.    Albuquerque**

210.    Albuquerque, the largest municipality in the State of New Mexico, is a vibrant and diverse city, serving more than 560,000 residents. Albuquerque values immigrants as an important part of its community, workforce, and culture.

211.    Albuquerque has been a welcoming city since 2000, when the Albuquerque City Council passed its first immigrant-friendly city resolution and memorialized it as Section 3-1-11 of the Albuquerque Code of Resolutions. Section 3-1-11, among other directives, states that municipal resources cannot be used to apprehend individuals solely on the basis of their immigration status, unless required by law.

212.    In 2018, in an effort to promote public safety; safeguard the civil rights, safety, and dignity of Albuquerque's residents; and facilitate victims' reporting of violent crime, the Council reaffirmed its commitment to Section 3-1-11 and strengthened Albuquerque's status as an immigrant-friendly city by enacting Resolution 18-7. Among other provisions, Resolution 18-7 prohibits the use of City resources to assist in the enforcement of federal immigration law, including by arresting or detaining a person based solely on his or her immigration status or a suspected violation of federal immigration law; arresting or detaining a person due to a federal administrative warrant or an immigration detainer based solely on a violation of federal immigration law; permitting access to non-public areas of City facilities for federal immigration law enforcement, absent a judicial warrant; or

gathering or disclosing confidential identifying information of an individual unless such assistance is required by law.

**T.    Allegheny County**

213.    Allegheny County is the second most populous County in Pennsylvania, containing the City of Pittsburgh and numerous other municipalities. Allegheny County is home to many businesses, including legacy manufacturing industries such as steel and aluminum, as well information technology, robotics, and biotechnology. Allegheny County is also home to a number of universities, including the University of Pittsburgh and Carnegie Mellon, as well as two well-regarded health systems that provide advanced medical treatment.

214.    Allegheny County has a diverse population and is home to immigrants drawn to the County's opportunities in higher education and employment. Allegheny County also has historically appealed to immigrants from around the world who have joined their families and communities here, including refugees. Allegheny County's immigrant community is a valued and important part of the County's economic success and rich culture.

215.    The County and its staff do not operate for the purpose of enforcing federal immigration law, but rather to provide municipal services to the residents of the County, irrespective of immigration status. To that end, Allegheny County has taken steps to safeguard its municipal resources, protect public safety, and encourage immigrant populations' willingness to report crime and cooperate with the County's public safety efforts by adopting a policy at the Allegheny County Jail that the facility will not detain an individual, or delay their release, solely based on an immigration detainer request or administrative warrant received from ICE. *See* Allegheny County Bureau of Corrections Policy No. 220.

**U.    Baltimore**

216.    Baltimore City is the 30th most populous city in the country, with a population exceeding 568,000 people. Approximately 10% of the population is foreign-born.

217.    Baltimore City considers its diversity to be one of its greatest strengths and is a welcoming city that strives to protect the rights, dignity, and wellbeing of all of its residents, including immigrants.

218.     To that end, and to encourage crime reporting and cooperation with law enforcement by individuals who might otherwise fear an immigration inquiry, Baltimore Police Department ("BPD") policy generally prohibits officers from inquiring into the immigration status of an individual and limits BPD support to federal immigration enforcement efforts except as legally required. Baltimore Police Department Policy 1021. Under Baltimore Police Department Policy 1021, members of the department shall not (1) take law enforcement action, including initiating an investigation or conducting an arrest, based on actual or perceived immigration status; (2) make inquiries into immigration status except as otherwise authorized by BPD policy; or (3) engage in, assist, or support immigration enforcement, with limited exceptions such as those required by 8 U.S.C. § 1373, among other restrictions.

**V.     Bend**

219.     The City of Bend recognizes that fostering a welcoming environment and treating all individuals with compassion and respect, regardless of citizenship status, enhances Bend's cultural fabric, economic growth, global competitiveness, and overall prosperity. In order to foster such a welcoming environment, and to promote trust between local law enforcement and members of the community, Bend adheres to Oregon state law, which prohibits Bend from cooperating with federal immigration enforcement beyond what federal law requires. *See* ORS 180.805–810, 181A.820–829.

220.     Under these state laws, the City and/or its law enforcement agency may not (1) share numerous categories of sensitive personal information with federal immigration authorities beyond what is required by law; (2) collect information about an individual's immigration or citizenship status, except as required by law; (3) use funds, equipment, or personnel "for the purpose of detecting or apprehending persons" or "for the purpose of enforcing [civil] federal immigration laws," absent a judicial warrant; (4) "enter into a formal or informal agreement with a federal immigration authority relating to the detention of [such] a person"; or (5) use public resources to investigate, arrest, or detain individuals for immigrant enforcement, including by granting federal immigration agents access to nonpublic areas or otherwise supporting or assisting federal agencies in immigration enforcement in specified situations. *Id.*

221.    These state laws have been found to be not in conflict with federal law. *See City & Cnty. of San Francisco v. Garland*, 42 F.4th 1078, 1085–86 (9th Cir. 2022) (addressing ORS 180.805 and 181A.820).

222.    In addition to being bound by these laws as a city in Oregon, Bend has affirmed its commitment to following the laws and has developed policies and procedures to comply with them. For example, in 2017, the Bend City Council unanimously adopted a resolution titled "A Resolution to Declare Bend a *Welcoming City* and Affirm Membership in the National Welcoming America Initiative." Resolution No. 3068. That resolution states, in part, that, "in alignment with Oregon State laws, the City will continue to refrain from the use of City funds, personnel and equipment from enforcing federal immigration laws and detaining people solely on their immigration status." *Id.* The Bend Police Department ("BPD") also has policies governing its compliance with these state laws, including by specifying that the BPD "does not participate in routine immigration investigation and enforcement activities." *See* BPD Policy 413.

### W.    Benicia

223.    Benicia is an ethnically, racially, and religiously diverse city located in Solano County, California, and has a population of almost 28,000 residents. The City has long derived its strength and prosperity from its diverse community. The City recognizes that cooperation among all members of that diverse community is essential to creating a safe and welcoming community, and advances the City's mission of delivering efficient public services in partnership with the community, which ensures public safety, a prosperous economic environment, opportunities for the City's youth, and a high quality of life for all residents.

224.    To realize that mission, and to further compliance with state laws like SB 54, protect limited local resources, encourage cooperation between residents and law enforcement, and ensure public safety for all, in 2017, Benicia's City Council adopted Resolution 17-13, a "Resolution Declaring the City of Benicia's Commitment of Being a Welcoming, Inclusive, Tolerant and Safe Community for Everyone." Resolution 17-13 recognized that California law limits cooperating with federal immigration enforcement; clarified that use of the City's limited resources should be aligned

with state law; and prohibited contacting, detaining, or arresting an individual based solely on their immigration status.

## X.    Berkeley

225.    Berkeley is a multicultural city of more than 125,000 people, with roughly a quarter of that population born outside of the United States. Berkeley has been the home of the modern sanctuary movement since the 1980s, when the City Council declared Berkeley to be a "City of Refuge" for immigrants. Berkeley has repeatedly reaffirmed its commitment to protecting the civil and human rights of all its residents, regardless of their immigration status.

226.    Berkeley's current sanctuary policy, which is consistent with state law such as SB 54, is contained in City Council Resolution No. 71,658-N.S., entitled "Reaffirming Berkeley as a Sanctuary City." Under the resolution, City employees are prohibited from, among other things, "us[ing] any City funds or resources to assist in the enforcement of Federal immigration law or to gather or disseminate information on the status of individuals in the City of Berkeley unless required by federal law."

## Y.    Boston

227.    Boston is the largest city in Massachusetts and one of its most diverse. Boston is home to immigrants and refugee residents with varying immigration statuses, from naturalized citizens to those without lawful immigration status. Boston's immigrant community is a valued and important part of the City's cultural landscape, and the City's departments and law enforcement personnel focus on providing municipal services to the entire Boston community, regardless of immigration status.

228.    In 2014, the City of Boston passed the Boston Trust Act, which outlines the Boston Police Department's role in interacting with federal immigration enforcement agencies. Boston City Code Section 11-1.9.

229.    Section 11-1.9 prohibits Boston law enforcement officers from (1) detaining an individual solely on the basis of a civil immigration detainer request or an ICE administrative warrant, in the absence of a criminal judicial warrant, and (2) using local resources to interrogate, detain, or arrest persons for immigration enforcement purposes that are otherwise the responsibility of ICE. *See* City of Boston Code, Section 11-1.9(D)(1).

230.    Section 11-1.9 works to protect limited municipal resources and promote public safety, and supports immigrant populations' willingness to report crimes and to cooperate with the City's public safety efforts. It is also consistent with state law, as articulated by the Massachusetts Supreme Judicial Court, the Commonwealth's highest court: "Massachusetts Law provides no authority for Massachusetts court officers to arrest and hold an individual solely on the basis of a Federal civil immigration detainer, beyond the time that the individual would otherwise be entitled to be released from State custody." *See Lunn v. Commonwealth*, 477 Mass. 517, 537 (2017).

**Z.    Cambridge**

231.    Cambridge is one of the most populous and ethnically diverse cities in Massachusetts. As of 2023, Cambridge's population totaled just over 118,000 people, 28% of whom were foreign born.

232.    Cambridge initially designated itself a sanctuary city in 1985. The Cambridge City Council reaffirmed this designation as recently as 2024, by declaring in a resolution that "Cambridge is a city proud of its diversity, immigrant population, and its role as a welcoming community to people from around the world," and "[n]on-Citizen residents of Cambridge are integral members of our community, contributing as workers, taxpayers, caregivers, students, and law-abiding neighbors." The 2024 resolution further stated that "Cambridge has a deep and unwavering commitment to diversity and inclusivity, ensuring that all individuals, regardless of immigration status, can live in peace, safety, and dignity, while and being protected from physical and emotional abuse, intimidation and discrimination," and "[t]hat the Cambridge City Council go[es] on record reaffirming its commitment to being a Sanctuary City and a welcoming community to immigrants from around the world, and encouraging residents of Cambridge, as well as people across the United States, to treat one another with kindness and respect, and to value the diversity that strengthens both Cambridge and the nation."

233.    The animating goals of Cambridge's sanctuary policies are to declare that all are welcome in the City and to increase public confidence in the City's government by establishing limits on the City's voluntary involvement with federal immigration enforcement. *See* Cambridge Mun. Code, Sec. 2.129.010. Specifically, under its Welcoming Community Ordinance, passed in 2020, Cambridge municipal code provides that "[i]t is not within the purview nor mandate of the City of

Cambridge to enforce federal immigration law or seek the detention, transfer or deportation of Cambridge residents for civil immigration purposes, nor should the City's resources be expended toward that end." *Id.* Under the ordinance, City staff and/or law enforcement officers may not, among other limits, (1) inquire about immigration status except as required by 8 U.S.C. § 1373; (2) take law enforcement action, including arrest, on the sole basis of actual or perceived immigration status; (3) perform the functions of an immigration officer except as required by law; (4) arrest or detain an individual solely on the basis of an ICE detainer or ICE administrative warrant; or (5) provide ICE agents access to individuals in custody except in response to a judicial warrant or other court order. *Id.*

### AA.   Cathedral City

234.   Cathedral City is a diverse city in eastern Riverside County, in the heart of the Coachella Valley. With a diverse population of almost 52,000, based on the 2020 Census, Cathedral City is the second-largest city in the Coachella Valley with residents and families of varying immigration statuses, from naturalized citizens to those without lawful immigration status.

235.   Cathedral City has declared that fostering a relationship of trust, respect, and open communication between City officials and residents is essential to the City's mission of delivering efficient public services, which in turn ensures public safety, a prosperous economic environment, increased opportunities for Cathedral City's youth, and a high quality of life for residents.

236.   Cathedral City is committed to ensuring that all persons, regardless of immigration status, feel free to contact law enforcement if they witness a reportable crime being committed or a have a medical emergency without the fear of being detained solely due to their immigration status. The City is also committed to preserving its limited municipal resources.

237.   As such, in 2017, Cathedral City declared itself as a place where all families can live without the fear of local law enforcement seeking their immigration or citizenship status by enacting City Resolution No. 2017-19, which declares that the City is a sanctuary city and prohibits City employees and officials from using City funds or resources to enforce federal civil immigration laws. The sanctuary resolution is consistent with California law, which also binds Cathedral City, and which limits the use of state and local resources in civil federal immigration enforcement. *See* Cal. Gov. Code Title 1, Div 7, Chapters 17.2, 17.25.

1

**BB.**    **Chicago**

2         238.    Chicago is the third largest city in the country and has more than 560,000 foreign-born

3 residents living and working within its communities. Chicago prizes this vibrant and diverse

4 population, which contributes to Chicago's social and cultural fabric, as well as to its economy.

5         239.    For decades, Chicago has adhered to a "Welcoming City" policy that prioritizes local

6 crimefighting and community engagement rather than federal civil immigration enforcement. That

7 policy promotes cooperation between local law enforcement and the diverse immigrant communities

8 that have long flourished in Chicago.

9         240.    Chicago passed a Welcoming City Ordinance, codified at Chapter 2-173 of the

10 Municipal Code, which limits Chicago's cooperation with federal immigration enforcement efforts.

11 Specifically, Chicago's ordinance requires that "agent[s]" and "agenc[ies]" do not (1) detain

12 individuals based on ICE detainers, (2) permit ICE agents to interrogate individuals in Chicago's

13 custody, and (3) use city resources to communicate with ICE about custody release dates.

14

**CC.**    **Columbus**

15         241.    Columbus is the capital of Ohio, the state's largest city, and the fifteenth largest city in

16 the country, with a population of over 905,000 people, according to the 2020 Census, over 155,000 of

17 whom were born in other countries, including scores of refugees. Columbus's immigrant community

18 consists of hundreds of business owners and thousands of students, and more than 100 languages are

19 spoken in the City.

20         242.    In early 2017, Columbus's Mayor issued Executive Order 2017-01, titled "Reinforcing

21 and Expanding City Immigration Policy for All Columbus Residents." The Order was issued with the

22 purpose of instituting policies that respect the rights of all individuals, regardless of national origin or

23 immigration status, preserving limited public resources, and promoting strong police-community

24 relations. Pursuant to the Order, and among other directives, (1) no City department or employee is

25 permitted to use city resources for the sole purpose of detecting or apprehending an individual based

26 on suspected immigration status, unless in response to a court order; (2) City offices and employees

27 are limited in their ability to inquire into immigration status for the purpose of providing city services;

28

and (3) the City announced a policy to "vigorously oppose any effort to require the use of local

taxpayer resources for the enforcement of federal immigration policy."

243.    Several months later, the Columbus City Council passed Ordinance 1304-2017, which

enacted Columbus Code Section 161.10. Section 161.10 in large part codified Executive Order 2017-

01 and imposed additional limits on City employees' and officials' ability to inquire into or investigate

a person's immigration status, in the absence of a warrant, a reported criminal violation, or an arrest.

Columbus has never declared itself to be a sanctuary city.

**DD.    Culver City**

244.    Culver City is a diverse city of approximately 40,000 residents (as of the 2020 Census)

located in Los Angeles County and mostly surrounded by the City of Los Angeles.

245.    Culver City is bound by the requirements of the California Values Act, also known as

SB 54, which limits California state and local law enforcement agencies from using their resources to

support federal immigration enforcement.

246.    In addition, in 2017, Culver City's City Council adopted Resolution No. 2017-R025,

declaring Culver City to be a sanctuary city for all of its residents regardless of immigration status. By

passing the Resolution, the City Council intended to demonstrate its commitment to fostering trust

between City officials and the public; to protect the safety, well-being, and constitutional rights of its

residents; and to direct the City's limited resources to matters of greatest concern to the City.

247.    Under the Resolution, City officials will, among other directives, (1) require a judicial

warrant before detaining an individual or prolonging a detention at the request of federal immigration

authorities, or before arresting, detaining, or transporting an individual solely on the basis of an

immigration detainer or other administrative document; (2) generally not allow access to persons in

City custody for enforcing civil immigration law; (3) generally not inquire into immigration status

unless required to do so by law or for a law enforcement purpose other than enforcing civil

immigration law; (4) not release personally identifiable information to federal immigration authorities

unless for a law enforcement purpose other than enforcing civil immigration law; and (5) not use City

resources to assist in the enforcement of federal immigration law unless otherwise required.

### EE.    Dane County

248.    Dane County is the second largest county in Wisconsin with a population of almost 600,000, which includes the state capital of Madison and the University of Wisconsin. Dane County has a diverse population and is home to immigrants and refugee residents with varying immigration statuses, from naturalized citizens to those without lawful immigration status.

249.    The Dane County Sheriff's Office adheres to the protections guaranteed by the Fourth Amendment to the United States Constitution, which prohibits unreasonable searches and seizures. In accordance with that constitutional mandate, it is the policy of the Dane County Sheriff's Office, per the Sheriff's Office Booking Manual, not to detain individuals solely on the basis of an ICE detainer or administrative warrant.

### FF.    Denver

250.    Denver is the capital city of Colorado and the state's largest city and county, with a population of 715,522 people, per the 2020 Census. Denver is a welcoming, diverse city that is home to nearly 100,000 immigrants and refugees.

251.    In 2017, Denver's Mayor issued Executive Order 142, titled "Standing with Immigrants and Refugees: A Safe and Welcoming City for All of Denver's People," in order to establish the City's priorities for interacting with Denver's immigrant communities. Under the Order, Denver made explicit that it would foster respect and trust between community members and all City officials, including law enforcement, and enhance communication and collaboration between community members and City officials, by ensuring that all community members enjoyed the rights and liberties guaranteed to them by the Constitutions of the United States and the State of Colorado.

252.    Also in 2017, Denver's City Council passed the "Public Safety Enforcement Priorities Act," which limits the use of city funds and resources in furtherance of federal civil immigration enforcement—by, for example, assisting with investigations, detentions, or arrests related to federal civil immigration enforcement, or inquiring into immigration or citizenship status—except as required by law or where necessary for public safety. *See* Denver Revised Municipal Code, Art. VIII, Sec. 28-250, *et. seq.* The Act, for example, also (1) limits federal immigration authorities' access to secure areas of City-owned law enforcement facilities for the purpose of federal immigration enforcement, in

the absence of a judicial warrant, and (2) prohibits City law enforcement officers from detaining an inmate who is otherwise eligible for release from custody on a civil detainer request by federal immigration authorities, absent a judicial warrant. *Id.*

253.    While Denver permits some coordination with federal law enforcement authorities, including by permitting law enforcement officers to notify federal law enforcement authorities of detainees' release dates, Denver's welcoming city policies and balanced approach to immigration enforcement allow Denver city employees to dedicate their time and resources to providing city services to all residents of Denver.

**GG.    Healdsburg**

254.    Healdsburg is an ethnically, racially, and culturally diverse city located in Sonoma County, California, with a population of approximately 11,340 residents, per the 2020 Census.

255.    Healdsburg adheres to California state law, including SB 54, which limits use of local resources for federal immigration enforcement. *See* Cal. Gov. Code Title 1, Div. 7, Chapters 17.2, 17.25.

256.    In 2017, Healdsburg's City Council also adopted Resolution No. 15-2017, "acknowledging and embracing the community's diversity, and expressing the City's commitment to non-discrimination and inclusivity and enhancing and protecting the quality of life of our residents." Among other things, Resolution 15-2017 states that the City strives to welcome all members of its community, regardless of immigration status. Resolution 15-2017 also states that the Healdsburg Police Department's mission is to protect all community members, regardless of immigration status, and as such, officers do not affirmatively request immigration status.

**HH.    Hennepin County**

257.    Hennepin County is home to over 1.2 million people, making it the most populous county in the state of Minnesota and its most diverse.

258.    Hennepin County is governed by a Board of Commissioners, which has consistently emphasized the County's priority of ensuring that all County residents thrive. Hennepin County's Sheriff has reiterated this shared goal.

259.    Hennepin County does not describe, and has not described, itself as a "Sanctuary County," and does not interfere with federal officials enforcing federal immigration law. It has no ordinances relating to immigration or citizenship status, and County employees—including its Sheriff Office staff—are instructed and expected to comply with all federal, state, and local law.

260.    Since 2021, the Hennepin County Sheriff's Office has implemented its Administrative Directive 21-02, a policy under which the Sheriff's Office will not hold individuals in custody based solely on an administrative warrant, including a DHS or ICE detainer. In addition, under the policy, the Sheriff's Office does not notify ICE of the admittance or release of any individual based on such detainers. This policy is consistent with 8 U.S.C. § 1373, the Fourth Amendment of the U.S. Constitution, all other applicable federal immigration law, and the Minnesota Government Data Practices Act.

## II.    Los Angeles

261.    Since its founding, Los Angeles has always been a city of immigrants. The very first Angelenos—Los Pobladores—arrived here 236 years ago, a small band of settlers who traced their ancestry from all over the world, including to the native people of this region, and saw opportunity where the mountains meet the sea. In the centuries since, Los Angeles has grown into the most diverse city on the face of the earth—a city that champions inclusiveness and tolerance, and welcomes everyone who seeks to realize their dreams and build their families there.

262.    Today, more than 1.5 million residents of the City are foreign-born, and nearly two of every three Angelenos are either immigrants or children of immigrants. The City's immigrants are the engine of the Los Angeles economy, representing 47% of the employed workforce in the City and more than half of the self-employed workforce—entrepreneurship that generated $3.5 billion in income in 2014 alone. More than that, the City's immigrants have woven the social, cultural, and civic fabric of Los Angeles, from its educational institutions to artistic stages, from the halls of government to community activism, from the City's vibrant culinary scene to its fields of play.

263.    Because of the City's immigrant history, for nearly half a century, the Los Angeles Police Department ("LAPD") has implemented policies and practices designed to promote the public safety of the residents of Los Angeles by engendering cooperation and trust between its law

enforcement agencies and officers on the one hand, and members of the City's many immigrant communities on the other. The fundamental goal of these local policies and practices has been to encourage crime victims and witnesses of criminal conduct to cooperate with LAPD, irrespective of their immigration status.

264. For example, in 1979, LAPD began a policy known as "Special Order 40," which (1) restricted an LAPD officer from initiating a police action with the objective of discovering a person's immigration status, and (2) prohibited arrests based solely on that status.

265. In 2024, the Los Angeles City Council formally codified these immigration policies into the City's Municipal Code and expanded the local prohibition on the use of City resources for federal immigration enforcement, with which the City already adhered due to California state law, from the LAPD to all City personnel. *See* Los Angeles Municipal Code Sec. 19.190 *et seq*.

## JJ. Marin County

266. Marin County is home to approximately 260,000 people of diverse racial, ethnic, and national backgrounds, including a large immigrant population from countries around the world. The County of Marin celebrates the rich tapestry of diversity that makes its communities strong and vibrant, and recognizes that the County's strength comes from the contributions of individuals from all walks of life whose experiences, talents, and resilience enrich the County.

267. In 2020, to celebrate its immigrant community and to further foster trust between residents and law enforcement, the Marin County Board of Supervisors adopted Resolution 2020-97, which, among other directives, reaffirmed the County's support for California's SB 54, which limits the use of local resources for federal immigration enforcement. As a community bound by California law, Marin County continues to comply with SB 54.

268. Further, the Marin County Sheriff's Office maintains policies limiting inquiry into immigration status and limiting immigration detainers in a manner consistent with federal and state law. The Sheriff's Office's Immigration Violations Policy ("Policy 414") establishes clear limits on local involvement in federal immigration enforcement: (1) Deputies are prohibited from inquiring into an individual's immigration status for enforcement purposes and may not detain or arrest anyone solely based on immigration status or a civil immigration warrant. (2) They are also barred from

accessing or using Department of Motor Vehicles records for immigration enforcement. (3) Individuals cannot be held solely based on an immigration detainer. (4) Transfers to immigration authorities are permitted only in specific circumstances, such as when the individual has a qualifying felony conviction or is subject to a judicial warrant or outstanding federal felony warrant. (5) And, in the event ICE is notified of a release, the individual and their attorney or designated contact must also be notified.

**KK.    Menlo Park**

269.    Menlo Park is a diverse city located in San Mateo County with a population of almost 33,780 residents, based on the 2020 Census, a significant number of whom were born outside of the United States. The City has long derived its strength and prosperity from its diverse community.

270.    In 2017, the City adopted City of Menlo Park Municipal Code Chapter 2.60, in part to create a community free from fear, in which individuals are assured that they can access the full range of City services, including law enforcement services, without risking that City officials would collect "sensitive information" like immigration or citizenship status, among other categories. Chapter 2.60, among other requirements, prohibits the use of City resources to gather such "sensitive information" in certain circumstances, or to "detain, relocate or intern" a person on the basis of such information, consistent with state and federal law.

271.    Menlo Park also limits the use of local resources for civil federal immigration enforcement consistent with California law. *See* Cal. Gov. Code Title 1, Div 7, Chapters 17.2, 17.25.

**LL.    Multnomah County**

272.    Multnomah County is the largest county in the state of Oregon; includes Portland, Oregon's largest city; and boasts one of Oregon's most diverse communities, including a significant immigrant population made up of immigrants and refugee residents with varying immigration statuses.

273.    Since 1987, Oregon has prohibited any law enforcement agency of any political subdivision from using its resources for the purpose of detecting or apprehending persons whose only violation of law is being a person of foreign citizenship residing in the United States. *See, e.g.*, ORS 181.820. Multnomah County's Sheriff's Office is a law enforcement agency under the State of Oregon and is bound by that state law.

274.     More recently, Oregon has enacted additional laws that govern political subdivisions like Multnomah County that limit or prohibit assistance to federal immigration authorities. For example, law enforcement agencies in Oregon may neither expend resources for detecting or apprehending persons for the purpose of enforcing federal immigration laws, nor may they enter into agreements with federal immigration authorities to do so. *See* ORS 181A.820(2). Oregon law also prohibits law enforcement agencies from inquiring into or collecting information, in most cases, about an individual's immigration or citizenship status or country of birth. *See* ORS 181A.823. Oregon law also prohibits any use of public resources for the purpose of investigating, detecting, apprehending, arresting, detaining, or holding individuals for immigration enforcement, *see* ORS 181A.826(1), and directs public bodies like Multnomah County to decline federal requests relating to immigration enforcement, in the absence of judicial process. *See* ORS 181A.826(3). Oregon law prohibits civil arrests of any individual without a judicial warrant or order within a court facility, and prohibits civil arrests of any party or witness who is going to, attending, or leaving a court proceeding at the facility; in Multnomah County, Sheriff's Office deputies and other county officers ensure compliance with this law in courts. *See* ORS 181A.828(1); ORS 181.828(2). Multnomah County is bound by these and other similar state laws.

275.     Consistent with these laws, in 2016, Multnomah County's Board of County Commissioners issued Resolution 2016-132, which declares that Multnomah County is a sanctuary jurisdiction. The resolution affirms the County's commitment to ensuring that all community members have access to County resources and services for which they are eligible, irrespective of immigration status.

**MM.  Pacifica**

276.     Pacifica is a diverse city located in San Mateo County with a population of almost 38,640 residents, per the 2020 Census. Pacifica values its immigrant residents as essential members of the community, who contribute to the City's vibrant culture and power its economic engine. Pacifica is committed to providing the public with equal access to City services, regardless of immigration status.

277.     Pacifica has determined that fostering a relationship of trust, respect, and open communication between City officials and residents is essential to its goal of delivering efficient

public services. For example, Pacifica is committed to ensuring that all persons, regardless of immigration status, feel free to contact law enforcement if they are a victim of a crime, witness a reportable crime being committed, or have a medical emergency, without the fear of being detained solely due to their immigration status.

278.    To foster that trust, and to prioritize use of its limited resources for local public services, in 2017, the City adopted City of Pacifica Municipal Code Title 4, Chapter 17, which, among other things, declares that the City is a sanctuary city and prohibits the use of City resources and personnel for immigration enforcement, including by prohibiting the Pacifica Police Department from participating with federal immigration law enforcement. Specifically, under Title 4, local law enforcement may not use local resources to (1) inquire into an individual's immigration status; (2) detain an individual on the basis of an ICE detainer; (3) make arrests based on civil administrative warrants except in limited circumstances; (4) give federal immigration agents access to interview persons in local custody for immigration enforcement purposes; or (5) otherwise perform the functions of a federal immigration officer. *See* Pacifica Municipal Code Section 4-17.03. City employees also may not condition access to City services on immigration status unless required by law, *id.* § 4-17.04, and generally are prohibited from releasing sensitive personal information, including release dates, and home and work addresses, absent a judicial warrant or court order or circumstances relevant to public safety, *id.* § 4-17.05. Pacifica also complies with state law, including SB 54.

**NN.    Palo Alto**

279.    Palo Alto is one of the principal cities of Silicon Valley. It has served as the headquarters or founding location of many of the world's largest and most influential tech companies. It is also home to Stanford University, a private research university that attracts students and academics from across the globe. The City also attracts many other foreign-born residents with varying immigration statuses. Palo Alto's immigrant community is a valued and important part of the City's social and cultural environment, and fostering cooperation and trust with Palo Alto's immigrant community plays a critical role in the City's crime-prevention efforts.

280.    While Palo Alto does not have a municipal provision related to immigration or citizenship status, the City adheres to California state law, including SB 54, which limits the use of

local resources for federal immigration enforcement. *See* Cal. Gov. Code Title 1, Div 7, Chapters 17.2, 17.25. Consistent with state law, Palo Alto departments and staff do not operate for the purpose of enforcing federal immigration law, but rather to provide municipal services to the Palo Alto community, regardless of immigration status.

### OO.    Petaluma

281.    Petaluma is the second largest city in Sonoma County, California, with approximately 60,000 residents. Based on the most recent census, 15.1% of Petaluma's population is made up of foreign-born residents with varying immigration statuses, from naturalized citizens to those without lawful immigration status. Since Petaluma's incorporation in 1858, the City's immigrant community has been an essential part of Petaluma's culture, from the Chinese immigrants who labored to straighten the Petaluma River, to the immigrant families who built Petaluma's reputation as a leading producer of agricultural products in the nineteenth century, a sector that remains crucial in Petaluma today. The City's immigrant community continues to play a key role in that sector, as well as in all sectors of the local economy and community life.

282.    On February 23, 2025, the Petaluma City Council adopted Resolution no. 2025-019 N.C.S., "A Resolution of the City Council of the City of Petaluma Reaffirming the City's Commitment to Immigrants, Inclusivity, and Compliance with California Law, Including Senate Bill 54." The Resolution declared that Petaluma's immigrant residents are valued members of the Petaluma community who contribute to the City's strength and vibrancy, reaffirmed the City's right to limit the use of local resources for immigration enforcement consistent with SB 54 and other laws, and condemned threats by the federal government to coerce or intimidate local jurisdictions into acting inconsistently with their legal obligations and values with respect to immigration enforcement. The Resolution provided that the City would continue to support policies and practices that strengthen trust and cooperation between local government, law enforcement, and immigrant communities, including compliance with SB 54, which "ensure[s] local resources are used to promote community trust and safety while protecting immigrant communities," so as to promote public safety and wellbeing, and the overall strength of the Petaluma community.

**PP.    Pierce County**

283.    Pierce County, home of Tacoma, is the second largest county in Washington and the fifty-ninth most populous county in the United States. Pierce County strives to be an inclusive community with policies and programs that serve all of its residents.

284.    Pierce County is subject to state and local laws that make the county a welcoming place for immigrants. Under the "Keep Washington Working Act" ("KWW"), Laws of 2019 ch. 440, E2SB 5497 (May 21, 2019), all local governments in the state are precluded from using local resources to assist in federal immigration enforcement efforts. *See id.* Sec. 1. Under KWW, state and local law enforcement officers may not (1) "[i]nquire into or collect information about an individual's immigration or citizenship status, or place of birth unless there is a connection between such information and an investigation into a violation of state or local criminal law" or (2) "[p]rovide information pursuant to notification requests from federal immigration authorities for the purposes of civil immigration enforcement, except as required by law." RCW 10.93.160. KWW similarly prevents local jurisdictions from honoring immigration detainers unless accompanied by a judicial warrant. *Id.*

285.    Pierce County has remained steadfast in its compliance with KWW. On April 29, 2025, the Pierce County Council passed Resolution R2025-139s, which affirmed the County's commitment to "public safety, equity, and inclusive access to county services for immigrants, refugees and all residents." Resolution R2025-139s also affirmed the County's commitment to complying with KWW and ensuring that all residents can fully participate in economic and civic life without fear or discrimination.

**QQ.    Richmond**

286.    Richmond is located in the nine-county San Francisco Bay Area in West Contra Costa County. It is known for its unique history and its role in the World War II home front effort. During World War II, tens of thousands of workers from all over the country came to Richmond to support the wartime industries. Richmond was home to four Kaiser shipyards that housed the most productive wartime shipbuilding operations of World War II. It was also home to approximately five war-related industries, more than any other city of its size in the country. It is currently home to the Rosie the Riveter/World War II Home Front National Historical Park.

287.    Richmond has a population of approximately 115,000 people and is home to people of diverse racial, ethnic, and national backgrounds, including a large immigrant population—34.5% of Richmond's residents are foreign-born. Richmond recognizes that immigrants are valuable and essential members of the Richmond community, and has found that a relationship of trust between Richmond's immigrant community and Richmond, its departments, programs, and personnel is central to the public safety of Richmond residents. As such, Richmond has a history of fostering an atmosphere of trust and cooperation with its residents, including immigrant communities.

288.    As far back as 1990, Richmond has limited local cooperation with federal immigration enforcement, due to considerations such as "the possible disruption and inconvenience that may be experienced by the immigrant and refugee community in the City of Richmond." *See* Ordinance 29-90 N.S. More recently, in March 2025, Richmond adopted Ordinance 08-25 N.S., which added Chapter 2.30 to Article II of the Richmond Municipal Code ("RMC"). Richmond adopted RMC 2.30 to maintain the relationship of trust between Richmond and its residents, including its immigrant communities; protect the safety, well-being, and constitutional rights of Richmond residents; ensure effective policing; and direct Richmond's limited resources to matters of greatest concern. To achieve those goals, RMC 2.30 builds upon Richmond's prior legislation by providing clear limits on the use of City resources to assist with federal immigration efforts. Under Chapter 2.30, (1) no city resources can be utilized to assist in the enforcement of federal immigration law; (2) city resources shall not be used to gather or disseminate release dates or personal information unless required by law; in addition, consistent with California's SB 54—with which Richmond complies—Richmond Police Department officials (3) shall not detain an individual based on an ICE detainer request; (4) shall not arrest based on civil immigration warrants; (5) shall not perform the functions of an immigration officer; (6) generally shall not transfer an individual to civil immigration custody; and (7) generally shall not provide facilities for civil immigration enforcement purposes. *See* Richmond Municipal Code Section 2.30.030 – .060.

**RR.    Rochester**

289.    Rochester is New York's third largest city and it is home to a diverse population, including many immigrants and refugees. Rochester's support for immigrants and refugees—for all

those who flee violence and persecution—stretches back over 200 years. An integral component of the underground railroad and the adopted home of Frederick Douglass, Rochester first codified its support for the vulnerable and dispossessed on May 15, 1986, when the Rochester City Council established Rochester as a "City of Sanctuaries." *See* Council Resolution 86-29 ("the 1986 Resolution").

290. The 1986 Resolution recognized that the regulation of immigration is a matter of federal jurisdiction, and it is the responsibility of federal officials to implement federal immigration and refugee policy. *Id.* With the proviso that City personnel will not violate any federal laws or interfere with law enforcement efforts, City personnel were directed to "exclude refugee status as a consideration in their daily activities and routine dealings with the public." *Id.* The 1986 Resolution recognized that many faith-based groups in the City provided services to refugees and others fleeing persecution. The 1986 Resolution reassured those faith communities, and those in their care, that they could freely access City services without concern for refugee status.

291. Similarly, the City of Rochester Code ("Code"), Chapter 63, enshrines Rochester's "long tradition of tolerance and openness as a community." Ch. 63 Transmittal. Code Chapter 63 prohibits human rights violations, including discrimination on the basis of national origin. Code § 63-1. In enacting Code Chapter 63, the Council determined that Rochester was responsible for ensuring that

> "every individual within this City is afforded an equal opportunity to enjoy a full and productive life and that failure to provide such equal opportunity, whether because of discrimination, prejudice or intolerance in . . . public accommodations . . . based upon [*inter alia*] national origin . . . not only threatens the rights and proper privileges of its inhabitants but menaces the institutions and foundation of a free democratic state and threatens the peace, order, health, safety, and general welfare of the City and its inhabitants." *Id.*

292. Code Chapter 63 defines national origin protections to include "persons not citizens." Code § 63-2. Moreover, pursuant to Code Chapter 63, the City is bound "not to discriminate" in the provision of any City programs or services. Code § 63-7. That Code prohibition against discrimination includes the provision of public safety and law enforcement services by the Rochester Police Department ("RPD").

293.     In the wake of the 2016 Presidential election and President Trump's January 25, 2017 executive order directing the Attorney General of the United States to scrutinize the actions of cities with sanctuary policies, the Council determined to enact a policy which would further assure immigrants and refugees that they are free to contact RPD or any other Rochester agency without fear of adverse immigration consequences. *See* Council Resolution 2017-5 ("the 2017 Resolution"). The 2017 Resolution enhanced public safety and neighborhood conditions for all Rochester residents, not just immigrants and refugees. *Id.*

294.     Subject to federal law and the Constitution of the United States of America, the 2017 Resolution requires that: (1) RPD "shall not engage in certain activities solely for the purpose of enforcing federal immigration laws, including not inquiring about the immigration status of an individual," except where necessary to investigate criminal activity; (2) "[Rochester] personnel shall not inquire about or request proof of immigration status or citizenship when providing services or benefits," except where required by law; and (3) Rochester funds and personnel shall not be used to "enforce or to assist in the enforcement of Federal immigration policies," except as required by law or in limited circumstances implicating public safety. *Id.* But the 2017 Resolution explicitly notes that it does not preclude Rochester personnel from communicating with immigration authorities. Likewise, RPD officials are authorized to assist federal immigration officials to execute judicial warrants or to investigate criminal activity.

295.     Thus, for nearly 40 years, Rochester has formally prioritized the use of its finite resources to ensure public safety while ensuring equal access to Rochester's services, including by immigrants and refugees. And these policies represent a proud tradition dating back centuries.

296.     Were federal immigration authorities to conscript Rochester officials into their immigration enforcement efforts—as they have done as recently as March 24, 2025, and continue to try to do as demonstrated in the allegations made by the U.S. government in the pending matter of *United States v. City of Rochester, et al.*, 25-cv-6226 (W.D.N.Y.)—it would pose a direct threat to the safety of Rochester's residents and guests because it would chill the willingness of Rochester's residents to report crime to RPD. It would also eat away at precious Rochester resources.

297.     Rochester is focused on upholding its core sovereign duty, to ensure the health and safety of Rochestarians—no matter where they come from. Immigration enforcement is the federal government's prerogative with which Rochester does not involve itself.

**SS.     Rohnert Park**

298.     Rohnert Park is a diverse city located in Sonoma County with a population of almost 44,390 residents, per the 2020 Census.

299.     Rohnert Park complies with state law, specifically SB 54, which limits the use of state and local resources in civil federal immigration enforcement. *See* Cal. Gov. Code Title 1, Div 7, Chapters 17.2, 17.25. The City's compliance with SB 54 does not obstruct federal law enforcement operation.

300.     Rohnert Park has limited resources and prioritizes those resources for local public services. Entangling local law enforcement with federal immigration enforcement diverts already limited resources and blurs lines of accountability between local and federal government.

**TT.     San Mateo County**

301.     San Mateo County is one of the nine counties that comprise the San Francisco Bay Area and is the fifteenth most populous county in California. The County occupies 455 square miles and contains 20 diverse cities that are home to immigrants and refugee residents with varying immigration statuses. San Mateo County's immigrant community is a valued and important part of the County's fabric and economic engine.

302.     San Mateo County's immigrant community is also a critical component of the County's crime prevention and public health and safety efforts. To effectively ensure the health and safety of the community, it is important that the community be willing to come forward when they are victims of crime or need health or other services that affect the community, without fear of being detained by immigration authorities.

303.     San Mateo County has formally prioritized using its finite resources to advance the health and safety of all members of the San Mateo County community by, among other things, certifying as a "Welcoming" place with Welcoming America, an organization that supports the proposition that our communities are stronger, safer, and more prosperous when immigrant neighbors

are included, valued, and listened to, and by enshrining principles of equity and inclusion into its ordinance code.

304.    For example, in addition to being bound by California law SB 54, in 2023, San Mateo County enacted an ordinance codified at Chapter 2.4 of its Ordinance Code entitled "Non-Cooperation with Immigration Authorities." This ordinance clarifies how County resources may be used in interacting with federal immigration agents. Specifically, the Ordinance restricts County personnel's ability to use County resources to assist federal authorities with civil immigration enforcement, limits certain information sharing, and restricts access to non-public areas of County facilities. *See* San Mateo County Ordinance Code § 2.48.010(a).

305.    In addition, the San Mateo County Sheriff's Office has adopted a policy of not aiding ICE in detaining and transferring residents without a valid judicial warrant.

306.    These policies further San Mateo County personnel's ability to focus on service provision to the San Mateo County community, regardless of immigration status, and not on immigration enforcement, which is within the province of the federal government.

**UU.    Santa Rosa**

307.    The City of Santa Rosa has a diverse population of approximately 178,000 residents, both native born and immigrants, whose collective cultures, religions, backgrounds, orientations, abilities, and viewpoints join to form a highly pluralistic community that prides itself on being a place that welcomes persons and families of all walks of life.

308.    Since 2013, the Santa Rosa Police Department has had a policy prohibiting members of the Department from (a) assisting federal agencies with the investigation, detention, or arrest of individuals solely for violation of federal immigration laws; (b) contacting, questioning, detaining, or arresting individuals based solely on their undocumented immigration status; or (c) seeking to discover the immigration status of any individual except as needed to protect public safety such as apprehending violent crime offenders. *See* Santa Rosa Police Department Policy 420.4.

309.    In 2017, the Santa Rosa City Council adopted Resolution RES-2017-017 declaring itself an "Indivisible City." The resolution prohibits all City employees, including members of the Santa Rosa Police Department, from "enforc[ing] Federal civil immigration laws" or "us[ing] city

monies, resources or personnel to investigate, question, detect, detain or apprehend persons solely on the basis of a possible violation of immigration law."

310.    In adopting the resolution, the Council declared that "Santa Rosa is a safe place for everyone, including, but not limited to, immigrants from all countries." The Council also found that local civil immigration enforcement would undermine "trust and cooperation with immigrant communities, increasing the risk of civil liability . . . and detracting from the core mission of the Santa Rosa Police Department to create safe communities." The Council further expressed the City's desire to "foster trust and cooperation as between the City, its police department, and its immigrant communities," and to "encourage immigrants to report crime and speak to the police without fear of being arrested or detained by, or reported to," federal immigration authorities.

311.    Thus, under established City policies, and consistent with SB 54, Santa Rosa does not use its own resources or staff to assist the federal government with enforcement of federal civil immigration laws. Instead, the City reserves its limited resources for critical local services. By doing so, Santa Rosa promotes public health and safety for its community by encouraging residents and visitors of all backgrounds to contact the City on a variety of safety issues, including reporting crimes, code enforcement and building and safety concerns, and seeking lifesaving first responder medical care, transportation, housing and homeless service needs.

**VV.    Sonoma County**

312.    Sonoma County has a population of approximately 500,000 people, and is home to persons of diverse racial, ethnic, and national backgrounds, including a large immigrant population. All Sonoma County immigrant residents, whether they are U.S. citizens, permanent residents, undocumented residents, refugees, or residents with any other immigration status, are valued and integral members of the County's social, cultural, and economic fabric. Sonoma County endeavors to safeguard the public health and safety of all of its residents, a goal that depends on an environment of trust and cooperation between all residents and local law enforcement.

313.    Sonoma County complies with California law—the TRUST Act, the TRUTH Act, and SB 54, the California Values Act—that limits the circumstances under which local law enforcement, including the Sonoma County Sheriff's Office, may use funds or personnel to support immigration

CASE NO. 25-CV-01350-WHO

1   enforcement or to detain individuals on behalf of federal immigration authorities. *See, e.g.*, Cal. Gov.

2   Code Title 1, Div. 7, Chapters 17.2, 17.25.

3       314.    On January 10, 2025, the Sonoma County Board of Supervisors also adopted a

4   "Resolution of the Board of Supervisors to Uphold the Civil Rights, Dignity, Health and Safety of Our

5   Immigrant Population and All Sonoma County Residents." In doing so, the Board stated that it wanted

6   the Sonoma County community to know that interacting with local government should not put any

7   resident at risk, regardless of immigration status. *See* Resolution No. 25-0015.

8       315.    Through the Resolution, the Board declared that the County "decline[d] to participate in

9   federal efforts to enforce" immigration law, and directed that, except as required by law, all County

10  personnel are prohibited from using County resources to (1) investigate, interrogate, detain, detect, or

11  arrest persons only for immigration enforcement purposes, or (2) communicate with ICE regarding an

12  individual's immigration status, except as required by 8 U.S.C. § 1373 or other federal law. *Id.*

13  **WW.   Watsonville**

14      316.    Watsonville is a diverse city located in Santa Cruz County with a population of almost

15  52,590 residents, based on the 2020 Census. Watsonville has for 150 years welcomed individuals of

16  diverse racial, ethnic, religious, and cultural backgrounds, including a large immigrant population. The

17  City embraces, honors, and respects the contributions of all of its residents, regardless of their

18  immigration status. Immigrants and their families in Watsonville contribute to the economic and social

19  fabric of the City by establishing and patronizing businesses, working for both growers and food

20  processors in the Pájaro Valley, participating in the arts and culture, and achieving significant

21  educational accomplishments.

22      317.    Watsonville has declared that fostering a relationship of trust, respect, and open

23  communication between City officials and residents is essential to the City's mission of delivering

24  efficient public services in partnership with the community, which ensures improved public safety, a

25  prosperous economic environment, opportunities for the City's youth, and a high quality of life for

26  residents. Furthermore, Watsonville has limited resources and prioritizes those resources for local

27  public service.

28

318.    In 2007, the City adopted Resolution No. 98-07 designating the City as a Sanctuary City. That same year, the City also affirmed its commitment to equity and inclusion by adopting Ordinance No. 1353-17 ("Sanctuary Ordinance"). The Sanctuary Ordinance reaffirms Watsonville's status as a Sanctuary City and establishes the City's procedures regarding immigration status and enforcement of federal civil immigration laws. The Sanctuary Ordinance is consistent with California law, SB 54, which limits the use of State and local resources in civil federal immigration enforcement. *See* Cal. Gov. Code Title 1, Div. 7, Chapters 17.2, 17.25; Watsonville Ordinance No. 1353-17.

319.    Notably, Section 3 of the Sanctuary Ordinance prohibits City officials and employees from enforcing federal civil immigration laws or using City resources to investigate, question, detect, or apprehend a person on the basis of their immigration status, except as allowed by the Ordinance. And Section 5 of the Sanctuary Ordinance, among other directives, limits using City resources to investigate or detain a person solely on the basis of their immigration status, or an immigration detainer or administrative warrant based solely on a violation of immigration law, or to disclose release dates for immigration enforcement purposes, except as required by law or otherwise permitted by the Ordinance. *See* Watsonville Ordinance No. 1353-17.

320.    In January 2025, the City reaffirmed its commitment to the protections of the Sanctuary Ordinance, and enacted other provisions protecting its immigrant community, by adopting Resolution 21-25 ("Sanctuary Resolution"), which provides that the City is a welcoming and inclusive community for all.

**XX.    Wilsonville**

321.    Wilsonville is a City in Clackamas and Washington counties, Oregon, with a population of approximately 26,000 people, as of the 2020 Census. Wilsonville declares itself a welcoming and inclusive city, which prohibits the use of local funds, personnel, or equipment for the enforcement of federal immigration laws, consistent with federal and state law. *See* Resolution No. 2626.

322.    Specifically, Oregon state law precludes the use of local law enforcement resources to detect or apprehend persons whose only violation was being in the country without documentation, and Wilsonville complies with that law. *See* ORS 181A.820 - .829.

323.     In addition, in 2017, the Wilsonville City Council adopted Resolution No. 2626 declaring the City of Wilsonville to be a welcoming and inclusive city. Resolution No. 2626 states, "The City will continue, in a manner consistent with the laws of the United States of America, the State of Oregon, and the City of Wilsonville, to prohibit the use of City funds, personnel, and/or equipment for the enforcement of federal immigration laws. This Resolution shall be interpreted and executed in a manner consistent with ORS 181A.820 and with 8 U.S.C. §§ 1373 and 1644." The Resolution further states, in relevant part, "The City of Wilsonville will ensure all City services are provided regardless of immigration status. Further, City staff will not ask for or otherwise seek out an individual's immigration status as a condition of providing City services, unless the provision of such services has a legal requirement to obtain such information." Wilsonville Resolution No. 2626.

## II.    Defendants' Efforts to Defund and Threaten "Sanctuary" Jurisdictions
### A.    President Trump's Executive Orders
#### 1.    The First Trump Administration's Unsuccessful Efforts to Defund "Sanctuary" Jurisdictions

324.     President Trump's efforts to threaten and coerce municipalities like Plaintiffs that limit cooperation with federal civil immigration enforcement is not new. Days into his first term in January 2017, he issued Executive Order 13,768. 82 Fed. Reg. 8799 (Jan. 25, 2017). That Executive Order declared that "sanctuary" jurisdictions were jurisdictions that "willfully violate Federal law in an attempt to shield aliens from removal from the United States," and declared it the policy of the executive branch to ensure that "sanctuary" jurisdictions "that fail to comply with applicable Federal law do not receive Federal funds, except as mandated by law." *Id.*

325.     To effectuate this policy, the Executive Order directed the Attorney General and Secretary of Homeland Security that any jurisdictions "that willfully refuse to comply with 8 U.S.C. § 1373 (sanctuary jurisdictions) are not eligible to receive Federal grants, except as deemed necessary for law enforcement purposes by the Attorney General or the Secretary." 82 Fed. Reg. at 8801.

326.     The Attorney General was further directed to "take appropriate enforcement action against any entity that violates 8 U.S.C. § 1373, or which has in effect a statute, policy, or practice that prevents or hinders the enforcement of Federal law." *Id.*

327.    With Executive Order 13,768, President Trump and his administration sought to coerce states, counties, and cities to go against their considered judgments about how best to use their own law enforcement resources to serve their communities, and abandon their policies of non-cooperation with federal civil immigration enforcement. In some cases, the threat had its desired effect, with local governments like Miami-Dade County quickly announcing they were letting go of their policies in order to keep their federally funded programs and services.

328.    Plaintiffs City and County of San Francisco and County of Santa Clara challenged Executive Order 13,768 as unconstitutional. This Court granted San Francisco and Santa Clara's motion for preliminary injunction, *Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497 (N.D. Cal. 2017), and later granted their motion for summary judgment, issuing a permanent injunction enjoining enforcement of Executive Order 13,768, *Cnty. of Santa Clara v. Trump*, 267 F. Supp. 3d 1201 (N.D. Cal. 2017). The Ninth Circuit affirmed this Court's ruling that the Executive Order was unconstitutional. *City & Cnty. of S.F.,* 897 F.3d at 1235. This Court then entered a final judgment and order enjoining the Trump Administration from enforcing the relevant section of Executive Order No. 13,768 within the State of California. *See* Stipulation and Final Judgment and Order, ECF No. 235, *City & Cnty. of S.F. v. Trump*, No. 17-cv-00485 (N.D. Cal. Aug. 15, 2019).

329.    The first Trump Administration then tried another approach to cut funds to jurisdictions that the administration considered "sanctuary jurisdictions." DOJ tried to condition funding under the Edward Byrne Memorial Justice Assistance Grant Program ("Byrne JAG") on local cooperation with federal civil immigration enforcement priorities. Those conditions too were swiftly and successfully challenged, including before this Court and the Ninth Circuit. *See, e.g.*, *City & Cnty. of S.F. v. Sessions*, 349 F. Supp. 3d 924 (N.D. Cal. 2018); *City & Cnty. of S.F. v. Sessions*, 372 F. Supp. 3d 928 (N.D. Cal. 2019); *Oregon v. Trump*, 406 F. Supp. 3d 940, 963 (D. Or. 2019); *City and Cnty. of S.F. v. Barr*, 965 F.3d 753, 757 (9th Cir. 2020); *City & Cnty. of S.F. v. Garland*, 42 F.4th 1078, 1084 (9th Cir. 2022). Those lawsuits resulted in injunctions here and elsewhere prohibiting DOJ from withholding Byrne JAG funds based on the challenged immigration-related conditions. Notably, the United States District Court for the Northern District of Illinois issued an order that "applie[d] to the Attorney General's imposition of the Challenged Conditions *and any materially identical conditions on the*

*Byrne JAG grant program in FY 2018 and all future grant years*." Am. Final Judgment & Order at 3, ECF No. 183, *City of Chicago v. Garland*, No. 18-cv-06859 (N.D. Ill. Mar. 8, 2022) (emphasis added). The court also specified that the order's "effects run to the benefit of all Byrne JAG applicants and recipients and are not limited to the City of Chicago and its sub-grantees." *Id*.

330.    Ultimately, when President Joseph R. Biden took office, he issued Executive Order 13,993, which rescinded President Trump's Executive Order 13,768. *See* 86 Fed. Reg. 7051 (Jan. 20, 2021).

### 2.    President Trump Renews Efforts to Unlawfully Target "Sanctuary" Jurisdictions by Issuing Executive Orders 14,159, 14,218, and 14,287

331.    Immediately upon taking office for his second term on January 20, 2025, President Trump issued a slew of Executive Orders vilifying immigrants and renewing his efforts to target "sanctuary" jurisdictions.

332.    First, the President issued Executive Order 14,148, entitled "Initial Rescissions of Harmful Executive Orders and Actions." 90 Fed. Reg. 8237 (Jan. 20, 2025). In relevant part, Executive Order 14,148 revoked Executive Order 13,993—and purported to reverse the revocation of President Trump's Executive Order 13,768. 90 Fed. Reg. at 8237.

333.     Second, the President doubled down on his efforts to compel sanctuary jurisdictions to do his bidding by issuing Executive Order 14,159, entitled "Protecting the American People Against Invasion." 90 Fed. Reg. 8443 (Jan. 20, 2025) (Exhibit A). Executive Order 14,159 repeats the xenophobic rhetoric common to this Administration, asserting without factual basis that "[m]any . . . aliens unlawfully within the United States present significant threats to national security and public safety, committing vile and heinous acts against innocent Americans," are "engaged in hostile activities, including espionage, economic espionage, and preparations for terror-related activities," and "have abused the generosity of the American people." 90 Fed. Reg. at 8443.

334.    Section 17 of Executive Order 14,159 provides as follows:

> *Sanctuary Jurisdictions*. The Attorney General and the Secretary of Homeland Security shall, to the maximum extent possible under law, evaluate and undertake any lawful actions to ensure that so-called "sanctuary" jurisdictions, which seek to interfere with the lawful exercise

of Federal law enforcement operations, do not receive access to Federal funds. Further, the Attorney General and the Secretary of Homeland Security shall evaluate and undertake any other lawful actions, criminal or civil, that they deem warranted based on any such jurisdiction's practices that interfere with the enforcement of Federal law. 90 Fed. Reg. at 8446.

335.    Like Executive Order 13,768 before it, Executive Order 14,159 contains both a restriction on funding (contained in sentence one) and an enforcement directive (contained in sentence two) against jurisdictions they deem "sanctuary jurisdictions."

336.    The funding restriction in the Order requires the Attorney General and DHS Secretary to withhold all "Federal funds" from "sanctuary" jurisdictions "to the maximum extent permissible by law." 90 Fed. Reg. at 8446.

337.    The enforcement directive in the Executive Order directs the Attorney General and DHS Secretary to evaluate and pursue "criminal or civil" legal action against any sanctuary jurisdiction based on any practices deemed to "interfere with the enforcement of Federal law." *Id.*

338.    Notably, the Administration's definition of "sanctuary jurisdictions" is even broader than under Executive Order 13,768. Where Executive Order 13,768 defined sanctuary jurisdictions by reference to compliance with 8 U.S.C. § 1373, Executive Order 14,159 simply defines sanctuary jurisdictions as those "seek[ing] to interfere with the lawful exercise of Federal law enforcement operations" in the Administration's view. *Id.*

339.    Executive Order 14,159 is an attempt to circumvent this Court's permanent injunction entered against Section 9 of Executive Order 13,768. In substance, both orders are the same—each directs the Attorney General or the Secretary of Homeland Security to withhold federal funds from sanctuary jurisdictions. Executive Order 14,159 fails to cabin its reach to any subset of federal funds, and so, on its face, it is as expansive as Executive Order 13,768. Neither order attempts to advance a clear definition of what constitutes a "sanctuary" jurisdiction, nor is there any semblance of congressional authority to support either order.

340.    In an interview on January 22, 2025—two days after issuing Executive Order 14,159—President Trump publicly expressed his intent to "get rid of" and "end" sanctuary jurisdictions, and confirmed that withholding federal funds is one of the ways the Administration aims to achieve this

goal.[2]

341.    In a further effort to weaponize federal funding to coerce local jurisdictions, on February 19, 2025, President Trump issued Executive Order 14,218, entitled "Ending Taxpayer Subsidization of Open Borders." 90 Fed. Reg. 10581 (Exhibit B). Section 2(a)(ii) of that Executive Order directs every federal agency to "ensure, consistent with applicable law, that Federal payments to States and localities do not, by design or effect, facilitate the subsidization or promotion of illegal immigration, or abet so-called 'sanctuary' policies that seek to shield illegal aliens from deportation." 90 Fed. Reg. at 10581. The asserted purpose of this directive is to "prevent taxpayer resources from acting as a magnet and fueling illegal immigration to the United States" and to ensure that "no taxpayer-funded benefits go to unqualified aliens." *Id.*

342.    Executive Order 14,218 does not define "sanctuary" policies or "Federal payments," or clarify what it means for federal payments to "abet" sanctuary policies. Nor does the Executive Order provide an explanation for why funding to localities with "sanctuary" policies "fuel[s] illegal immigration" or results in taxpayer-benefits to "unqualified aliens."

343.    Tripling down on his threat to defund "sanctuary" jurisdictions, on April 28, 2025, President Trump issued Executive Order 14,287, entitled "Protecting American Communities from Criminal Aliens." 90 Fed. Reg. 18761 (Exhibit E). Section 2 of Executive Order 14,287 instructs the Attorney General and the Secretary of Homeland Security to "publish a list of States and local jurisdictions that obstruct the enforcement of Federal immigration laws (sanctuary jurisdictions)" and to notify each "sanctuary jurisdiction regarding its defiance of Federal immigration law enforcement and any potential violations of Federal criminal law." *Id.* Like Executive Orders 14,159 and 14,218, Executive Order 14,287 does not define what criteria the Attorney General and the Secretary of Homeland Security must use in classifying a locality as a "sanctuary jurisdiction."

344.    Section 3(a) of Executive Order 14,287 further directs "each executive department or agency . . . in coordination with the Director of the Office of Management and Budget and as

---

[2] Tr. of Interview Between President Donald J. Trump and Sean Hannity (Fox News broadcast Jan. 22, 2025), available at https://rollcall.com/factbase/trump/transcript/donald-trump-interview-sean-hannity-fox-news-january-22-2025/.

permitted by law" to "identify appropriate Federal funds to sanctuary jurisdictions, including grants and contracts, for suspension or termination, as appropriate." *Id.* Section 3(b) of EO 14,287 directs that the Attorney General and the Secretary of Homeland Security "shall pursue all necessary legal remedies and enforcement measures" against "sanctuary" jurisdictions. *Id.* Finally, Section 4 of EO 14,287 threatens additional mechanisms "to ensure appropriate eligibility verification is conducted for individuals receiving Federal public benefits" in "sanctuary" jurisdictions. *Id.*

345.    The White House also issued a "Fact Sheet" accompanying Executive Order 14,287. The "Fact Sheet" makes clear that the Executive Order "follow[s] through on [President Trump's] promise to rid the United States of sanctuary cities." It also includes the following quote from President Trump: "No more Sanctuary Cities! They protect the Criminals, not the Victims. They are disgracing our Country, and are being mocked all over the World. Working on papers to withhold all Federal Funding for any City or State that allows these Death Traps to exist!!!"

346.    Other Trump administration officials have also publicly confirmed the Administration's intent to go after localities they deem to be "sanctuary" jurisdictions. For example:

        a.    On January 22, 2025, Stephen Miller, President Trump's Deputy Chief of Staff for Policy claimed that the Administration would pursue "civil and, if necessary, criminal charges against anybody who shelters or harbors criminal aliens," including individuals in sanctuary cities who he claimed were "harboring violent and dangerous criminals from federal law enforcement."[3]

        b.    On January 31, 2025, Defendant Noem appeared for an interview on Fox News during which she was asked whether the Administration would take action against sanctuary city officials. She confirmed that "of course we will," and stated that she would follow President Trump's direction on "how we are going

---

[3] Adam Shaw, *Trump's ICE racks up hundreds of arrests, including illegal immigrants arrested for horror crimes*, Fox News (Jan. 22, 2025), https://www.foxnews.com/politics/trumps-ice-racks-up-hundreds-arrests-including-illegal-immigrants-arrested-for-horror-crimes

1         to go after these individuals."[4]

2      c.   On February 3, 2025, Tom Homan, the acting director of ICE, told Fox News

3         that President Trump "will end sanctuary cities" and that "we're going to sue

4         'em."[5]

5      d.   On February 6, 2025, Homan confirmed to reporters at the White House that the

6         Administration plans to "hold [sanctuary cities] accountable and take them to

7         court."[6]

8      e.   On March 14, 2025, Defendant Bondi went on national TV and made clear that

9         the Trump administration is targeting "sanctuary" jurisdictions, stating that "we

10        will continue to pull their federal funding until they comply" with Defendants'

11       sweeping and improper assertion of federal control over local affairs.[7]

12      f.   On March 19, 2025, DOJ told the media that "[t]he Department of Justice has

13        made it crystal clear" that so-called "sanctuary" jurisdictions "will be sued and

14        stripped of federal funding."[8]

15      g.   On March 27, 2025, the President declared that he would "end sanctuary cities"

16        through potential further Executive action.[9]

17      h.   On May 29, 2025, DHS issued a press release that "Exposes Sanctuary

18        Jurisdictions" for "protect[ing] dangerous criminal illegal aliens from facing

19

---

20     [4] "Trump is 'restoring law and sovereignty' with mass deportations, Stephen Miller says," Fox News (Jan. 22, 2025), available at https://www.foxnews.com/video/6368025256112.

21     [5] "Trump 'border czar' Tom Homan: We have a great team and 'will not fail this president,'" Fox News (Feb. 3, 2025), available at https://www.foxnews.com/video/6368227422112.

22

23     [6] Bernd Debusmann Jr., *Trump administration sues Chicago over 'sanctuary city' laws*, BBC News (Feb. 6, 2025), https://www.bbc.com/news/articles/c8r585ndey4o.

24     [7] Interview between Attorney General Pam Bondi and Maria Bartiromo, at 3:30–4:30, "AG Pam Bondi says 'America will be transparent again' on politics, justice," Fox Business (Mar. 14, 2025), https://www.foxbusiness.com/video/6370020686112.

25

26     [8] Wisdom Howell, *'Sanctuary' jurisdictions seek injunction against Trump administration's funding freeze*, Daily Journal (Mar. 19, 2025), https://perma.cc/44YQ-FD8P.

27     [9] Michael Lee, *Trump anti-sanctuary city executive order could target federal funding, says expert*, Fox News (Mar. 27, 2025), https://perma.cc/3UXA-VV72.

28

consequences and put[ting] law enforcement in grave danger" and includes this quote from Defendant Noem: "*Sanctuary politicians are on notice: comply with federal law.*"[10]

## B.    DOJ Implements President Trump's Executive Orders

### 1.    DOJ Implements Executive Order 14,159

347.    On January 21, 2025, a day after Executive Order 14,159 was issued, Defendant Acting Deputy Attorney General Bove issued a memorandum to all DOJ employees entitled "Interim Policy Changes Regarding Charging, Sentencing, And Immigration Enforcement" ("Bove Directive") (Exhibit C).

348.    The Bove Directive implements Executive Order 14,159, including the enforcement directive related to sanctuary jurisdictions. Ex. C at p.3. The memo states the position of DOJ that "[t]he Supremacy Clause and other authorities require state and local actors to comply with the Executive Branch's immigration enforcement initiatives." *Id.* Immigration enforcement initiatives are not defined. On information and belief, Defendants seek to unlawfully compel localities across the country, including Plaintiffs, and in contravention of court orders and precedent, to participate and assist with aggressive immigration enforcement measures announced by the Trump Administration.

349.    The Bove Directive further states DOJ's view that state and local actors violate federal law if they "fail[] to comply with lawful immigration-related commands and requests" pursuant to a non-exhaustive and vague list of authorities, including the President's "extensive Article II authority with respect to foreign affairs and national security, the Immigration and Nationality Act, and the Alien Enemies Act." *Id.*

350.    The Bove Directive also concludes that jurisdictions with laws that "prohibit[] disclosures of information to federal authorities engaged in immigration-enforcement activities" "threaten to impede Executive Branch immigration initiatives" and "threaten public safety and national security." *Id.*

---

[10] "DHS Exposes Sanctuary Jurisdictions Defying Federal Immigration Law," U.S. Department of Homeland Security (May 29, 2025), https://www.dhs.gov/news/2025/05/29/dhs-exposes-sanctuary-jurisdictions-defying-federal-immigration-law.

351.    The scope of immigration-related "commands" and "requests" is not defined, nor does the Bove Directive describe what information must be disclosed to immigration authorities. In fact, Defendants appear to interpret federal law to require that local jurisdictions comply with civil detainer requests, notification requests, civil administrative warrants, and request for personal information (including contact information and release dates) about undocumented residents in Plaintiffs' jurisdictions, despite court orders and precedent foreclosing Defendants' understanding of federal law. See Part II.C, infra.

352.    The Bove Directive directs U.S. Attorney's Offices to investigate incidents of local actors failing to comply with immigration enforcement initiatives, commands, or requests for prosecution under 18 U.S.C. § 371, 8 U.S.C. § 1324, and 8 U.S.C. § 1373.

353.    Plaintiffs' decision to decline to participate in federal immigration enforcement efforts is not a crime under any of the cited statutes. 8 U.S.C. § 1324 makes it a felony to, *inter alia*, knowingly or recklessly conceal, harbor, or shield an undocumented immigrant from detection or encourage or induce an undocumented immigrant to come to, enter, or reside in the United States. *See* 8 U.S.C. § 1324(a)(1)(A)(iii), (iv). A violation of these provisions, without any aggravating circumstances, is subject to fines and a sentence of up to five years in prison for each person involved. *Id.* § 1324(a)(1)(B).

354.    Declining to provide local resources to assist with all federal immigration initiatives, commands, and requests does not constitute a violation of § 1324. As discussed above, and consistent with Ninth Circuit precedent, Plaintiffs' laws do not and are not intended to interfere with federal law enforcement or shield or conceal undocumented immigrants from federal immigration authorities, but are instead a lawful exercise of authority to preserve scarce local resources to address matters of local concern and to build trust between government and the local community.

355.    8 U.S.C. § 1373 makes it unlawful for any jurisdiction to "prohibit, or in any way restrict," any government entity or official from sending "citizenship or immigration status" information about an individual to federal immigration authorities, or receiving such information from immigration authorities.

356.     This Court and the Ninth Circuit have held that § 1373 does not require jurisdictions to share non-immigration-status information (such as custody status, release date, and contact information) with immigration authorities. *See City & Cnty. of S.F. v. Sessions*, 349 F. Supp. 3d 924, 969 (N.D. Cal. 2018); *United States v. California*, 921 F.3d 865, 891–93 (9th Cir. 2019); *City & Cnty. of S.F. v. Barr*, 965 F.3d 753 (9th Cir. 2020). Any interpretation of § 1373 that would require assistance more broadly squarely conflicts with this precedent.

357.     18 U.S.C. § 371 makes it a crime to conspire to commit an offense against or defraud the United States. If the underlying offense is a felony, a violation of this provision is subject to financial penalties and/or a sentence of up to five years in prison. For the reasons stated above, Plaintiffs do not believe that their policies violate federal law or constitute an offense against the United States.

358.     In addition to threatening prosecution under these statutes, the Bove Directive announces that a newly established "Sanctuary Cities Enforcement Working Group" will "identify state and local laws, policies, and activities that are inconsistent with Executive Branch immigration initiatives" and take legal action to challenge these laws. Ex. C at p.3.

359.     In the context of other contemporaneous actions taken by the Administration, Defendants' directive that local actors must "comply" with immigration-related "initiatives" and "requests" under threat of prosecution is extraordinarily vague and could effectively require local jurisdictions in every state to administer federal immigration laws, in contravention of the text of federal statutes, constitutional principles, and precedent foreclosing such a view.

360.     For example, on January 23, 2025, the then-acting DHS Secretary issued an order entitled "Finding of Mass Influx of Aliens" ("DHS Order"). In that Order, the acting Secretary invoked his authority under the INA and 28 C.F.R. § 65.83 to "request assistance from a State or local government in the administration of the immigration laws of the United States," *inter alia*, when "there exist circumstances involving the administration of the immigration laws of the United States that endanger the lives, property, safety, or welfare of the residents of a State or locality," including an "actual or imminent mass influx of aliens" arriving at the border. 28 C.F.R. § 65.83(b), (d)(1).

361.    Citing various statistics about the number of undocumented immigrants crossing the southern border, the acting DHS Secretary concluded there was "an actual or imminent mass influx of aliens" at the southern border and that this "influx" threatens all 50 states.

362.    On this account, the acting DHS Secretary formally invoked his authority under the INA and implementing regulations to "request the assistance of State and local governments in all 50 States" to administer federal immigration law.

363.    While the DHS Order is phrased as a "request," the Bove Directive provides that states and local jurisdictions are *required* to comply with the Executive Branch's "initiatives" and "requests."

### 2.    DOJ Announces Pause of Federal Funding for "Sanctuary" Jurisdictions and Orders Investigations and Prosecutions of These Jurisdictions

364.    On January 27, 2025, the Office of Management and Budget ("OMB") issued Memo 25-13 ("OMB Memo") announcing a pause on "all Federal financial assistance" in order to review and implement the funding conditions in several of President Trump's Executive Orders, including the Funding Restriction in Executive Order 14,159.

365.    The OMB Memo was immediately challenged in at least two cases. *See Nat'l Council of Nonprofits v. Office of Mgmt. & Budget*, No. 25-239 (D.D.C. filed Jan. 28, 2025); *New York v. Trump*, No. 25-CV-39 (D.R.I. filed Jan. 28, 2025). DOJ and the then Acting Attorney General were named in the *New York* lawsuit. The federal court in that case issued a Temporary Restraining Order directing that the defendants (including DOJ) may not "pause, freeze, impede, block, cancel, or terminate" federal financial assistance to the States as directed by the OMB Memo "except on the basis of the applicable authorizing statutes, regulations, and terms." TRO at 11, ECF No. 50, *New York* (Jan. 31, 2025). Defendants were further enjoined from "giving effect to the OMB Directive under any other name or title or through any other Defendants." *Id.* at 12.

366.    On February 5, 2025, Defendant Attorney General Bondi issued the Bondi Directive to all DOJ employees entitled "Sanctuary Jurisdiction Directives" (Exhibit D).

367.    Consistent with the direction of Executive Order 14,159, the Bondi Directive states that DOJ announced its own funding restriction to "ensure that, consistent with law, 'sanctuary

jurisdictions' do not receive access to Federal funds from the Department." Ex. D at p.1.

368.    The Attorney General also proscribes that "[s]anctuary jurisdictions should not receive access to federal grants administered by the Department of Justice." Ex. D at p.1. Rather than relying on the (enjoined) Funding Restriction in Executive Order 14,159, the Attorney General purports to invoke DOJ's "own authority to impose any conditions of funding that do not violate applicable constitutional or statutory limitations." *Id.* The memo further states that certain DOJ grants will be conditioned on compliance with 8 U.S.C. § 1373, and that future grants may be tailored "to promote a lawful system of immigration" and to "reduce efforts by state or local jurisdictions to undermine a lawful system of immigration." *Id.* at 2.

369.    To effectuate this unlawful order, the Attorney General directs that the Department of Justice "shall pause the distribution of all funds until a review has been completed, terminate any agreements that are in violation of law or are the source of waste, fraud, or abuse, and initiate clawback or recoupment procedures, where appropriate." Ex. D at p.1. The Attorney General purports to justify this measure as "[c]onsistent with applicable statutes, regulations, court orders, and terms." *Id.*

370.    The Bondi Directive defines a "sanctuary jurisdiction" as "includ[ing]" any jurisdiction that refuses to comply with 8 U.S.C. § 1373 or "willfully fail[s] to comply with other applicable federal immigration laws." *Id.* at p.2.

371.    Contrary to law and express precedent, Defendants interpret § 1373 to preclude local jurisdictions from preventing their employees from asking individuals about citizenship or immigration status information or limiting sharing of non-immigration status information (such as custody status, release date, and contact information) with immigration authorities.

372.    Consistent with the enforcement directive in Executive Order 14,159 and the Bove Directive, the Bondi Directive provides that state and local actors "may not" "fail to comply with lawful immigration-related directives." Ex. D at p.3. It also states that jurisdictions with policies that "impede lawful federal immigration operations" will be challenged. efforts to enforce immigration law." *Id.*

373.    The Memo then repeats the instruction to DOJ staff to investigate and prosecute such conduct under 18 U.S.C. § 371 and 8 U.S.C. §§ 1324 and 1373, and for the Sanctuary Cities Enforcement Working Group to bring legal actions challenging sanctuary policies. *Id.*

### 3.    DOJ Takes Enforcement Action Against Sanctuary Jurisdictions

374.    The enforcement directive in Executive Order 14,159, and the Bove and Bondi Directives, are not idle threats.

375.    On February 6, 2025, the United States filed a lawsuit against the State of Illinois, Plaintiff Chicago, Cook County, and various local officials alleging that these jurisdictions' laws violated federal law. Compl., *United States v. State of Illinois*, ECF No. 1, No. 25-cv-01285 (N.D. Ill.) (*Illinois* Compl.). The lawsuit explicitly invokes Executive Order 14,159. *Illinois* Compl. ¶ 1.

376.    The lawsuit reveals the sheer breadth of power that Defendants claim they can assert over state and local policies, despite court orders and precedent to the contrary.

377.    The federal government's complaint challenges provisions of the Illinois jurisdictions' laws that prohibit state and local officials from (1) detaining an individual on the basis of a detainer or civil administrative warrant, *Illinois* Compl. ¶ 42, 48, 54; (2) assisting with federal civil immigration enforcement or detaining individual for federal civil immigration violations, *id.* ¶ 43; (3) inquiring about the citizenship or immigration status of any individual, *id.* ¶ 44; (4) providing immigration authorities access to individuals in local custody for investigative interviews, *id.* ¶ 48; and (5) providing immigration authorities with information regarding an individual's release date, *id.* ¶ 48; *see generally id.* ¶¶ 8–10.

378.    The federal government asserts that such provisions violate 8 U.S.C. § 1373 because, *inter alia*, they (1) prevent state and local actors from expending resources to respond to immigration enforcement inquiries about "custody status, release date, or contact information," and (2) preclude local officials from requesting or maintaining the immigration status of any individual. *Id.* ¶ 66.

379.    The government further asserts that provisions of these jurisdictions' laws violate federal law, including the Supremacy Clause, by limiting compliance with immigration detainers or civil administrative warrants, limiting access to individuals in local custody, and limiting the sharing of personal and release date information with immigration authorities. *Id.* ¶¶ 68–70.

380.    Less than a week after filing the *Illinois* lawsuit, DOJ then filed a second lawsuit against the State of New York and New York state officials. *See* Compl., ECF No. 1, *United States v. New York et al.*, No. 1:25-cv-00205 (N.D.N.Y, filed Feb. 12, 2025) ("*New York* Compl.").

381.    In the *New York* lawsuit, DOJ doubled down on its unprecedented and illegal interpretation of federal law, asserting that the Supremacy Clause and 8 U.S.C. § 1373 prevent the State of New York from*, inter alia*, limiting the sharing of records—including home and work addresses—with immigration authorities simply because the federal government deems this information "relevant" to immigration-related determinations. *See, e.g.*, *New York* Compl. ¶¶ 37–38, 44–45.

382.    In announcing the *New York* lawsuit, Defendant Bondi reiterated DOJ's intent to pursue enforcement actions against any jurisdiction that fails to fall in line with Defendants' sweeping assertion of power over local authorities, stating: "If you don't comply with federal law, we will hold you accountable . . . We did it to Illinois, strike one. Strike two is New York. And if you are a state not complying with federal law, you're next. Get ready."[11]

383.    Defendant Bondi followed through on this threat, and has pursued litigation against other so-called "sanctuary" jurisdictions, including Plaintiffs Rochester, Denver, and Los Angeles, for their policies limiting cooperation with federal immigration officials. *See United States v. City of Rochester*, 25-cv-06226 (W.D.N.Y. filed Apr. 24, 2025); *United States v. State of Colorado*, 25-cv-01391 (D. Colo. filed May 2, 2025); *United States v. City of Los Angeles*, 25-cv-05917 (C.D. Cal. filed June 30, 2025); *see also, e.g.*, *United States v. Newark*, 25-cv-05081 (D.N.J. filed May 22, 2025); *United States v. State of New York*, 25-cv-00744 (N.D.N.Y. filed June 12, 2025).

384.    As discussed above, Plaintiffs have many of the same policies that the federal government claims to be illegal or unconstitutional. *See* Part I, *supra*.

_____

[11] Andrew Goudsward and Sarah N. Lynch, *US sues New York officials over immigration enforcement*, Reuters (Feb. 12, 2025), https://www.reuters.com/world/us/us-sues-new-york-state-officials-over-immigration-enforcement-attorney-general-2025-02-12/.

**C.    DHS and Other Agencies Continue Implementing the Executive Orders Against "Sanctuary" Jurisdictions**

**1.    Secretary Noem Directs DHS Components, Including FEMA, to Cease Providing Federal Funding to "Sanctuary" Jurisdictions**

385.    On February 19, 2025, Defendant Noem issued the Noem Directive, a memorandum entitled "Restricting Grant Funding for Sanctuary Jurisdictions" (Exhibit F).

386.    The Noem Directive implements Executive Order 14,159 by directing components of DHS not just to review federal assistance awards but to "cease providing federal funding to sanctuary jurisdictions" and to "make appropriate criminal referrals to the Department of Justice." Ex. F at p. 2.

387.    Like Executive Order 14,159, the Noem Directive fails to meaningfully define "sanctuary jurisdiction," instead broadly asserting that the term "include[s]" localities, like many Plaintiffs, that may decline to "honor requests for cooperation, such as participation in joint operations, sharing of information, or requests for short term detention of alien pursuant to a valid detainer," or that do not "provide access to detainees" in local custody. *Id.* at pp. 1–2*.*

388.    On March 25, 2025, Defendant Noem approved recommendations to restrict FEMA funding ("FEMA Memo") (Exhibit G), "[i]n compliance with" the Noem Directive. Ex. G at p. 1.

389.    The FEMA Memo proposes the following methodology for restricting FEMA funding: Grant programs that "go to a sanctuary jurisdiction as designated by" ICE and "where the purpose of the grant has a nexus to immigration activities, law enforcement, or national security; or, where statute does not limit how FEMA implements the program" should be subject to "conditions or restrictions." *Id.* at p. 2.

390.    On this basis, the FEMA Memo recommends that "conditions or restrictions" related to "sanctuary" jurisdictions be placed on "all open and future awards" for twelve grant programs that fund critical emergency-preparedness activities: the Case Management Pilot Program, the Emergency Management Performance Grant, Operation Stonegarden, the State Homeland Security Program, the Urban Area Security Initiative, the Homeland Security National Training Program – Continuing Training Grants, the Port Security Grant Program, the Presidential Residence Protection Assistance Program, the Regional Catastrophic Preparedness Grant Program, the Shelter and Services Program, the Targeted Violence and Terrorism Prevention Grant Program, and the Transit Security Grant

Program. *Id.* at pp. 2–3. A FEMA official has since indicated that FEMA may still apply "sanctuary" conditions on five of these grants—the Emergency Management Performance Grant, the State Homeland Security Program, the Urban Area Security Initiative, the Port Security Grant Program, and the Presidential Residence Protection Assistance Program—but that FEMA has determined not to apply "sanctuary" conditions to the remaining grants identified in the FEMA Memo.

391.    These grants have nothing to do with civil immigration enforcement, as the language of the FEMA Memo itself makes clear. *See id.* at pp. 21–23 (describing the purpose of each grant, including preparing for "all phases of emergency management," "responding to acts of terrorism," and "encouraging innovative regional solutions to issues related to catastrophic incidents"). Many Plaintiffs rely on these grant programs to prepare for and respond to natural disasters, terrorist attacks, and other emergencies. For example:

  a. Santa Clara uses (1) the State Homeland Security Grant Program to fund community-wide exercises to test responses to catastrophic events, train first responders on terrorism response, create plans to ensure it can meet the needs of residents with disabilities during disasters, and purchase critical equipment for hazard response; (2) the Emergency Management Grant Program to distribute emergency planning materials, stock emergency supply points, provide specialized earthquake-response training, and support volunteer Community Emergency Response Teams; and (3) the Urban Areas Security Initiative Grant Program to purchase software that allows police agencies to combine and analyze data from multiple sources, generate leads, and share investigatory data securely.

  b. King County uses (1) the Urban Areas Security Initiative Grant Program to fund aircrew aviation training, joint agency drills, small unmanned aerial systems that detect activity where there is no ambient light, and portable X-ray machines that allow law enforcement in mass-transit locations to X-ray and see suspicious items, and (2) the State Homeland Security Grant Program to fund planning efforts, training, equipment acquisition, and exercise programs.

c.  Monterey uses the Homeland Security Grant Program to fund explosive ordnance bomb-squad and Special Weapons and Tactics training and equipment.

d.  San José uses (1) the Urban Areas Security Initiative Grant Program to fund items that are shared by regional agencies for police work, such as APX NEXT radios, Medvac Bearcat, Mobile Barricades, and Long Range Acoustic Devices, and (2) the State Homeland Security Grant Program to fund equipment and training to protect against, prevent, respond to, and recover from terrorist acts and other emergencies or disasters.

392.    A district court has concluded that the Noem Directive—and FEMA's implementation thereof—effectuates Executive Order 14,159. Mem. & Order, *New York v. Trump*, No. 1:25-cv-00039-JJM-PAS (D.R.I. Apr. 4, 2025), at 12–13.

### 2.    DHS and Other Agencies Issue Standard Terms and Conditions That Target "Sanctuary" Jurisdictions

393.    DHS issued the DHS Standard Terms on March 27, 2025 (Exhibit H), and most recently updated them on April 18, 2025 (Exhibit I). The DHS Standard Terms are applicable to "all new federal awards" for Fiscal Year 2025. These terms specifically target "sanctuary" jurisdictions by mandating, *inter alia*, that award recipients certify under penalty of perjury, and require any subgrantees to likewise certify under penalty of perjury, their compliance with five different immigration conditions in Section IX, including that they will "honor requests for cooperation, such as participation in joint operations, sharing of information, or requests for short term detention of an alien pursuant to a valid detainer"; will "provide access to detainees" in custody; and will broadly "comply with other relevant laws related to immigration." Ex. I § IX(1). These conditions closely mirror language in the Noem Directive. Section XVII of the DHS Standard Terms also broadly requires grant recipients to certify that they do not "operate any program that benefits illegal immigrants or incentivizes illegal immigration." The DHS Standard Terms do not define what it means to "benefit" illegal immigrants or "incentivize" illegal immigration, but appear to mirror Executive Order 14,218's language identifying "sanctuary" jurisdictions as "fueling illegal immigration to the United States" and

"facilitat[ing] the subsidization or promotion of illegal immigration." The terms further state that grantees must "comply with the requirements of Presidential Executive Orders related to grants (also known as federal assistance and financial assistance), the full text of which are [*sic*] incorporated by reference." *Id.* § XXXI.

394.    On May 29, 2025, pursuant to Section 2 of Executive Order 14,287, DHS published a list of over 500 states, cities, and counties that it claimed "are deliberately … obstructing the enforcement of federal immigration laws endangering American citizens." The press release accompanying the list stated that "[e]ach jurisdiction listed will receive formal notification of its non-compliance and all potential violations of federal criminal statutes. DHS demands that these jurisdictions immediately review and revise their policies to align with federal immigration laws and renew their obligation to protect American citizens, not dangerous illegal aliens." DHS removed the list from its website on June 1, 2025, without explanation.[12] The import of the removal is unclear. In an interview with Fox News on June 1, 2025, Defendant Noem stated that the "list is absolutely continuing to be used and it is going to be identifying those cities and those jurisdictions that aren't honoring law and justice."

395.    Other agencies, too, have implemented the Executive Orders. For example, far from just "evaluating" federal funding, the U.S. Department of Housing and Urban Development ("HUD") has issued immigration-related grant conditions for its Continuum of Care program (Exhibit J), which funds services to end homelessness for individuals and families, including persons fleeing domestic violence and sexual assault. These conditions mandate compliance with Executive Order 14,218 and its amorphous directive that federal payments not "abet[] so-called 'sanctuary' policies" "by design or effect." Ex. J at p. 5.

396.    HUD has also emailed notices "questioning the accuracy" of localities' certification that Community Development Block Grant funds "will be administered in conformity with applicable laws, including Executive Orders." Like the HUD Continuum of Care conditions, these notices require

---

[12] An archived version of the list is available at
https://web.archive.org/web/20250529215954/https://www.dhs.gov/sanctuary-jurisdictions.

grantees to "provide assurance" that they will comply with Executive Order 14,218 and its amorphous directive that federal payments not "abet[] so-called 'sanctuary' policies" "by design or effect."

397.    Similarly, DOT has implemented the challenged Executive Orders to condition funds to "sanctuary" jurisdictions. On April 24, 2025, Secretary of Transportation Sean Duffy issued a letter labeled "Follow the Law Letter to Applicants" ("Duffy Letter") (Exhibit K) announcing the department's policy of providing federal funding only to recipients that cooperate with Federal officials "in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law." A press release accompanying the letter specifically referenced and linked to Executive Order 14,159.[13]

398.    Pursuant to this policy, DOT has included the precise language from the Duffy Letter in standard terms and template grant agreements for the Federal Transit Administration ("FTA") Master Agreement (Apr. 25, 2025) § 12(m) (Exhibit L), the Federal Railroad Administration ("FRA") General Terms and Conditions (Apr. 16, 2025) § 20.2 (Exhibit M), the Federal Aviation Administration ("FAA") FY25 Grant Agreement Template § 32 (Exhibit N), and the Federal Highway Administration ("FHWA") Competitive Grant Program General Terms and Conditions (Apr. 22, 2025) § 18.2 (Exhibit O) (collectively "DOT Standard Terms").

399.    These standard terms—including immigration-specific terms—have in turn been incorporated into specific grant programs and grant agreements that some Plaintiffs have received, including grants that support transportation infrastructure and accessibility, like the FHWA Safe Streets for All Grant and the Better Utilizing Infrastructure to Leverage Development Grant.[14]

400.    On June 3, 2025, Judge Barbara J. Rothstein of the United States District Court for the Western District of Washington preliminarily enjoined the federal government, in relevant part, from "imposing or enforcing the CoC Grant Conditions"—including the condition reciting Executive Order

---

[13] Trump's Transportation Secretary Sean P. Duffy: Follow the Law, U.S. Department of Transportation (Apr. 24, 2025), https://www.transportation.gov/briefing-room/trumpstransportation-secretary-sean-p-duffy-follow-law.

[14] Some of the plaintiffs in this litigation are also plaintiffs in *King County v. Turner*, Case No. 2:25-cv-00814 (W.D. Wash.), a case challenging the legality of HUD and DOT grant conditions.

14,218's directive that federal payments not "abet[] so-called 'sanctuary' policies" "by design or effect"—"with respect to any CoC funds awarded to the HUD Plaintiffs or members of their Continuums." Order Granting Plaintiffs' First and Second Motions for Preliminary Injunction, *King County v. Turner*, No. 2:25-cv-00814 (W.D. Wash. June 3, 2025), at 46, 12. The court also preliminarily enjoined the federal government, in relevant part, from "imposing or enforcing the DOT Grant Conditions"—including the condition in the FTA Master Agreement reciting the Duffy Letter's directive that grant recipients "cooperate with Federal officials in the enforcement of Federal law, including . . . the enforcement of Federal immigration law"—"to any DOT funds awarded, directly or indirectly, to the DOT Plaintiffs or their subrecipients." *Id.* at 47, 13. The court held that both the challenged HUD conditions and the challenged DOT conditions likely "violat[e] the Separation of Powers principle" and so are "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" under the Administrative Procedure Act, and that those conditions are likely "arbitrary and capricious" under the Administrative Procedure Act. *Id.* at 33, 38.

## III.   Defendants' Actions are Blatantly Unconstitutional and Violate Federal Law

### A.    Tenth Amendment

401.    The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

402.    This provision prohibits the federal government from "commandeering" state and local officials to help enforce federal law. *See Printz v. United States*, 521 U.S. 898 (1997); *New York v. United States*, 505 U.S. 144 (1992). This doctrine recognizes that the federal government has limited enumerated powers, and does not have "the power to issue direct orders to the governments of the States." *N.J. Thoroughbred Horsemen's Ass'n v. NCAA*, 584 U.S. 453, 471 (2018).

403.    Under the anti-commandeering doctrine, "the Federal Government may not compel the States to implement, by legislation or executive action, federal regulatory programs." *Printz*, 521 U.S. at 925. Otherwise, the federal government could invade the sovereign power reserved to the states and simply "shift[] the costs of regulation to the States." *N.J. Thoroughbred Horsemen's Ass'n*, 584 U.S. at 474.

404.    Executive Orders 14,159, 14,218, and 14,287 and the Bondi and Noem Directives' restrictions on federal funding and threats of civil and criminal enforcement violate the anti-commandeering principle inherent in the Tenth Amendment by effectively coercing state and local governments to administer and enforce federal law.

405.    First, as discussed further below, Executive Orders 14,159, 14,218, and 14,287 and the Bondi and Noem Directives commandeer state and local governments by attempting to use the Spending Power to coerce them into acting as arms of the federal government.

406.    Second, Executive Order 14,159, Executive Order 14,287, and the Bondi and Noem Directives compel state and local jurisdictions to administer federal immigration law, on penalty of civil and criminal enforcement.

407.    Executive Order 14,159 directs the Attorney General and DHS to undertake civil and criminal enforcement actions against any jurisdiction for practices that they deem, in their discretion, to "interfere with the enforcement of Federal law."

408.     The Bove Directive, which implements Executive Order 14,159, states that "prohibiting disclosures of information to federal authorities engaged in immigration-enforcement activities" "impede[s] Executive Branch immigration initiatives" and directs the Sanctuary Cities Enforcement Working Group to take legal action to challenge "state and local laws, policies, and activities that are inconsistent with Executive Branch immigration initiatives." It also states that local officials who fail to comply with "lawful immigration related commands and requests" violate federal law. The memo directs that DOJ employees investigate "incidents involving such misconduct" for criminal prosecution under 8 U.S.C. § 371 and 18 U.S.C. §§ 1324 and 1373.

409.  Executive Order 14,287 similarly directs the Attorney General and DHS to take all necessary legal remedies and enforcement measures against any jurisdiction they determine in their discretion to be a "sanctuary" jurisdiction.

410.    The Bondi and Noem Directives further affirm Defendants' view that local jurisdictions that fail to respond to immigration-related "directives" or "requests for cooperation" violate federal law and impede federal immigration operations and reiterates Defendants' commitment to seek criminal and civil legal sanction against such jurisdictions.

411.    As the federal government's *Illinois*, *New York*, *Rochester*, *Colorado*, and *Los Angeles* lawsuits demonstrate, Defendants seek to compel localities, including Plaintiffs, to enforce federal immigration laws—including using local resources to hold individuals pursuant to civil immigration detainers and administrative warrants and to share confidential personal information, such as contact information and release dates for individuals in custody, with immigration authorities.

412.    By limiting the use of local resources in aiding the execution of federal civil immigration enforcement, Plaintiffs have exercised lawful authority reserved to them under the Tenth Amendment. Defendants' actions—compelling state and local governments to enforce and administer federal immigration law at the behest of the federal government under threat of civil and criminal punishment and the withholding of critical funding—violates the Tenth Amendment.

413.    The Ninth Circuit has held that nothing in the Supremacy Clause or in any federal statute imposes an obligation on state or local governments to enforce federal immigration laws, and that to hold otherwise would violate the Tenth Amendment. *See United States v. California*, 921 F.3d at 890–91 (involving a challenge to SB 54, a California law that limits cooperation with immigration enforcement). In direct response to Defendants' assertions that limiting local cooperation with immigration enforcement may frustrate the federal government's immigration enforcement, the Ninth Circuit held:

> SB 54 may well frustrate the federal government's immigration enforcement efforts. However, whatever the wisdom of the underlying policy adopted by California, that frustration is permissible, because California has the right, pursuant to the anticommandeering rule, to refrain from assisting with federal efforts. The United States stresses that, in crafting the INA, Congress expected cooperation between states and federal immigration authorities. That is likely the case. But when questions of federalism are involved, we must distinguish between expectations and requirements. In this context, the federal government was free to expect as much as it wanted, but it could not *require* California's cooperation without running afoul of the Tenth Amendment. *Id.*

**B.    Separation of Powers**

414.    By purporting to restrict funds to sanctuary jurisdictions, Executive Orders 14,159, 14,218, and 14,287 and the Bondi and Noem Directives seek to exercise spending power that Article I, Section 8 of the Constitution grants exclusively to Congress.

415.    The Executive Orders violate the separation of powers by creating a penalty for limiting cooperation with immigration enforcement that Congress did not authorize, without regard to statutory rules on grant programs put in place by Congress.

416.    The Bondi Directive violates the separation of powers by conditioning federal funding administered by DOJ on compliance with "applicable federal immigration law," without regard to statutory rules on DOJ grant programs enacted by Congress.

417.    The Noem Directive similarly violates the separation of powers by conditioning federal funding administered by DHS on compliance with a variety of immigration-related conditions, including requiring that jurisdictions "honor requests for cooperation, such as participating in joint operations, sharing of information, or requests for short term detention of alien[s] pursuant to a valid detainer," and "provide access to detainees" in local custody. FEMA has recommended, and Defendant Noem has approved, the inclusion of these conditions on FEMA grants that support critical emergency preparedness functions and lack statutory authorization for immigration-related conditions.

418.    Through the Executive Orders and the Bondi and Noem Directives, Defendants also effectively legislate a new sanction for failing to comply with the Executive Branch's immigration enforcement priorities. The unilateral imposition of this new sanction and condition on spending is not supported by the INA, or any other act of Congress, or by the Constitution.

419.    Defendants may not unilaterally impose new restrictions on jurisdictions' eligibility for federal funding. Any restriction on eligibility for federal funds must be imposed—clearly, unambiguously, and in advance—by Congress. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). When Congress has not imposed such a restriction by statute, the President may not do so by fiat. The President does not have "unilateral power to change the text of duly enacted statutes." *Clinton v. City of New York*, 524 U.S. 417, 447 (1998).

420.    Congress has consistently and repeatedly rejected the imposition of funding restrictions

for sanctuary jurisdictions that limit cooperation with federal civil immigration enforcement. *See City & Cnty. of S.F.*, 897 F.3d at 1234 n.4 (listing numerous failed Congressional bills to withhold funds from sanctuary jurisdictions); *see also* No Bailout for Sanctuary Cities Act, H.R. 5717, 118th Cong. (2024); Stop Dangerous Sanctuary Cities Act, S. 3452, 117th Cong. (2021); Mobilizing Against Sanctuary Cities Act, H.R. 94, 117th Cong. (2021); No Tax Breaks for Sanctuary Cities Act, H.R. 894, 117th Cong. (2021); Ending Sanctuary Cities Act of 2021, H.R. 3195, 117th Cong. (2021). Where the President "takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring).

421.   By imposing conditions or limitations on federal spending without express statutory authority, the Executive Orders and the Bondi and Noem Directives also unlawfully exceed the President's powers under other provisions of the Constitution that establish the separation of powers among the branches of our government, including: (i) the President's obligation to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, cl. 5 (Take Care Clause), (ii) the limitation that Congressional enactments must "be presented to the President of the United States," who then may sign that enactment or veto it, but has no power to merely revise it, either upon presentment or after enactment, U.S. Const. art. I, § 7, cls. 2-3 (Presentment Clause); and (iii) Congress's authority to levy taxes, to finance government operations through appropriations, and to set the terms and conditions on the use of those appropriations. U.S. Const. art. I, § 9, cl. 7 (Appropriations Clause).

422.   The Ninth Circuit has held that the President violates the constitutional separation of powers by attempting to withhold federal funds from jurisdictions that limit cooperation with ICE where Congress has not tied such funding to compliance with immigration enforcement or delegated authority to the Executive to impose such conditions. *See City & Cnty. of S.F.*, 897 F.3d at 1234–35 (upholding injunction against Executive Order 13,768 on separation-of-powers grounds).

**C.   Spending Clause**

423.   Further, Executive Orders 14,159, 14,218, and 14,287 and the Bondi and Noem Directives purport to exercise spending power in ways that even Congress could not.

424.   First, Defendants' actions violate the Spending Clause by imposing vague new funding

conditions on existing appropriations of federal funds. "[I]f Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously," in advance. *Pennhurst*, 451 U.S. at 17. "The legitimacy of Congress' power to legislate under the spending power . . . rests on whether the State voluntarily and knowingly accepts" Congress's conditions. *Id.* "There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it." *Id.* Once a State has accepted funds pursuant to a federal spending program, the Federal government cannot alter the conditions attached to those funds so significantly as to "accomplish[ ] a shift in kind, not merely degree." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 584 (2012).

425.    Defendants' actions also violate the Spending Clause by imposing funding conditions that are not germane to the purpose of the funds. "[T]he imposition of conditions under the spending power" must be "germane" or "related" to the purpose of federal funding. *South Dakota v. Dole*, 483 U.S. 203, 208-09 & n.3 (1987); *see also Massachusetts v. United States*, 435 U.S. 444, 461 (1978). Here, Defendants have conditioned eligibility for federal funding on compliance with Defendants' immigration enforcement priorities and efforts, without regard to whether that purpose is germane to any federal funds at issue.

426.    In addition, Defendants' actions impose conditions so severe that they "cross[] the line distinguishing encouragement from coercion." *Sebelius*, 567 U.S. at 579 (opinion of Roberts, C.J.); *New York*, 505 U.S. at 175. Executive Order 14,159's conditioning of all funding on compliance with the federal government's demands regarding cooperation with its civil immigration enforcement efforts "is much more than 'relatively mild encouragement'—it is a gun to the head." *Sebelius*, 567 U.S. at 581 (opinion of Roberts, C.J.). *See* Part IV.B, *infra.* Executive Order 14,218 does not define "Federal payments," creating the potential risk that the Executive Branch will interpret the provision broadly to encompass large swathes of federal funds. President Trump made clear in statements accompanying Executive Order 14,287 that he intends to "withhold all Federal Funding" from "sanctuary jurisdictions." Through the Bondi Directive and Noem Directive, DOJ and DHS likewise seek to withhold essential funds from Plaintiffs in order to coerce them into immigration enforcement. Threats of this magnitude, and to such critical programs, constitute "economic dragooning that leaves the States with no real option but to acquiesce" to federal dictates. *Id.* at 582.

427.    Finally, by compelling state and local jurisdictions to enforce immigration laws, Defendants seek to impose conditions that would require Plaintiffs to act unconstitutionally. Under the Fourth Amendment, generally, detention of an individual must be supported by a determination of probable cause. *See Morales*, 793 F.3d at 215–17; *Miranda-Olivares*, 2014 WL 1414305. Requiring state and local governments to establish blanket policies of compliance with immigration detainers could thus cause them to violate the Fourth Amendment. But Congress's spending power "may not be used to induce the States to engage in activities that would themselves be unconstitutional." *Dole*, 483 U.S. at 210. And state and local governments generally lack authority to make warrantless arrests under the Federal government's civil immigration laws. *See Arizona v. United States*, 567 U.S. 387, 408 (2012).

**D.    Due Process**

428.    The Fifth Amendment protects against federal laws that are so vague they fail to provide fair notice of what is prohibited or so standardless that they permit discriminatory enforcement. *United States v. Williams*, 553 U.S. 285, 304 (2008).

429.    Under the Fifth Amendment, the federal government may not work a deprivation of money or property without due process of law.

430.    Executive Orders 14,159, 14,218, and 14,287 and the Bondi and Noem Directives fail to meaningfully define key terms underlying their enforcement, including "sanctuary jurisdictions," "'sanctuary' policies," "joint requests for cooperation," "benefit[ing] illegal immigrants," "incentiviz[ing] illegal immigration," "Federal funds," "Federal payments," "practices that interfere with the lawful exercise of Federal law," or "abet[ting] sanctuary policies." Having such a "practice" subjects a jurisdiction to "criminal or civil" enforcement action, yet what such a practice might be is left undefined, and therefore subject to executive whim.

431.    Similarly, Executive Orders 14,159, 14,218, and 14,287 and the Bondi and Noem Directives deny procedural due process because they grant the Executive Branch unfettered, undefined, and standardless discretion to withhold funds from "sanctuary jurisdictions" in which those jurisdictions have a cognizable property interest.

432.     The lack of definition, notice, or procedures associated with designation as a "sanctuary jurisdiction" and the withholding of funding pose obvious constitutional infirmities, especially in an environment in which DOJ is now prosecuting jurisdictions for their non-cooperation ordinances and policies.

### E.     Administrative Procedure Act

433.     The Administrative Procedure Act ("APA") governs the process of federal agency decision-making. Defendants DOJ and DHS are "agencies" as defined in the APA, 5 U.S.C. § 551(1), and the Bondi and Noem Directives are therefore agency actions subject to review under the APA. Defendant DOJ's action in promulgating the Bondi Directive and Defendant DHS's actions in promulgating the Noem Directive violate the APA in numerous respects.

434.     As discussed above, Defendant DOJ's and Defendant DHS's actions are in excess of statutory authority and contrary to fundamental constitutional principles. *See* 5 U.S.C. § 706(2)(B), (C). Further, Defendants DOJ's and DHS's actions are also in excess of statutory authority because they violate the well-established constitutional and statutory appropriations laws discussed below.

435.     In addition, the APA prohibits agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The Bondi and Noem Directives are an abuse of discretion and are not in accordance with law because they are unsupported by constitutional or statutory authority.

436.     In addition, the Bondi and Noem Directives are arbitrary and capricious because they fail entirely to offer a reasonable explanation for the breadth of funding withheld or conditioned to "sanctuary" jurisdictions. For example, the Bondi and Noem Directives fail to consider the lack of statutory authority or basis for withholding already appropriated funds, and fail entirely to address the reasonable and inevitable reliance by Plaintiffs on DOJ and DHS funds for critical public safety and emergency preparedness activities, and the need for clarity by local governments about funding streams to provide day-to-day services relied on by their residents.

### F.     Appropriations Law

437.     A framework of statutes structures how Congress utilizes its appropriation power to authorize federal funding. To start, Congress acts through legislation to make funds available for

financial obligations that will result in immediate or future disbursements of federal funds from the United States Treasury. *See* 2 U.S.C. § 622(2)(A)(i). An "obligation" is a "definite commitment that creates a legal liability of the government for the payment of goods and services ordered or received, or a legal duty on the part of the United States that could mature into" such a liability; an "expenditure," also known as a "disbursement," is the actual spending of federal funds. U.S. Gov't Accountability Off., *A Glossary of Terms Used in the Federal Budget Process*, GAO-05-734SP, at 45, 48, 70 (Sept. 2005), https://www.gao.gov/assets/gao-05-734sp.pdf ("Budget Glossary").

438.    Further, "[a]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law," 31 U.S.C. § 1301(a)—in other words, appropriations may only be used for those purposes which *Congress* has designated. Federal officers and employees cannot obligate or spend funds absent congressional appropriation. 31 U.S.C. § 1341(a)(1)(A).

439.    Because the Constitution limits the authority of the Executive Branch to impound funds on its own initiative absent congressional authorization, the President must seek approval from Congress before deferring or rescinding federal funds.

440.    The Impoundment Control Act of 1974, 2 U.S.C. §§ 681 *et seq*. ("ICA"), requires the President to transmit to both houses of Congress a message indicating his request to rescind budget authority (i.e., cancel a federal payment) or defer budget authority (i.e., pause a federal payment). The President can request to defer budget authority in only three circumstances: "(1) to provide for contingencies; (2) to achieve savings made possible by or through changes in requirements or greater efficiency of operations; or (3) as specifically provided by law." 2 U.S.C. § 684(b). Beyond these three reasons, "[n]o officer or employee of the United States may defer any budget authority for any other purpose." *Id*.

441.    Among other requirements, the President's message to Congress must indicate the amount of the budget authority, the likely impact of the rescission or deferral, and the justification for the rescission or deferral. 2 U.S.C. §§ 683, 684. This message must be delivered to both houses of Congress, to the Comptroller General, and to the Federal Register. 2. U.S.C. §§ 685. Upon receipt, both houses of Congress are given an opportunity to act on the proposed rescission or deferral. 2

1  U.S.C. § 688. If both houses of Congress do not approve a rescission proposal within 45 days, the

2  withheld funds must be made available for obligation. 2 U.S.C. § 683(b).

3      442.    Executive Orders 14,159, 14,218, and 14,287 and the Bondi and Noem Directives

4  violate these well-established appropriations laws by purporting to unilaterally withhold already-

5  appropriated federal funding to Plaintiffs.

6  **IV.    Plaintiffs Face Serious Harm from Defendants' Unconstitutional and Unlawful Actions**

7      **A.    Plaintiffs Each Have Laws and Policies That Defendants Consider "Sanctuary" Policies**

8      443.    Executive Order 14,159 defines a "sanctuary" jurisdiction as any jurisdiction that

9  "seek[s] to interfere with the lawful exercise of Federal law enforcement operations."

10     444.    The Bove Directive concludes that limiting compliance with federal "immigration

11  enforcement initiatives" and "requests," and "prohibiting disclosures of information" to immigration

12  authorities, impedes federal civil immigration enforcement and violates federal law.

13     445.    The Bondi Directive defines "sanctuary" jurisdictions as any jurisdictions that "refuse

14  to comply with 8 U.S.C. § 1373" or other "applicable federal immigration laws." It concludes that

15  jurisdictions must comply with applicable "immigration-related directives."

16     446.    The Noem Directive defines "sanctuary" jurisdictions as "includ[ing]" localities that

17  may decline to "honor requests for cooperation, such as participation in joint operations, sharing of

18  information, or requests for short term detention of alien pursuant to a valid detainer," or that fail to

19  "provide access to detainees" in local custody.

20     447.    The *Illinois* lawsuit makes clear that for purposes of Executive Order 14,159, and

21  consistent with the Bove and Bondi Directives, Defendants have concluded that jurisdictions violate

22  federal law, including 8 U.S.C. § 1373, and interfere with federal immigration enforcement operations,

23  if they limit or prohibit officials from: (1) detaining an individual on the basis of a detainer or civil

24  administrative warrant, *Illinois* Compl. ¶¶ 42, 48, 54; (2) assisting with federal civil immigration

25  enforcement or detaining an individual for federal civil immigration violations, *id.* ¶ 43; (3) inquiring

26  about the citizenship or immigration status of any individual, *id.* ¶ 44; (4) providing immigration

27  authorities access to individuals in local custody for investigative interviews, *id.* ¶ 48; and (5)

28

providing immigration authorities with information, including contact information or an individual's

release date, *id.* ¶ 48; *see generally id.* ¶¶ 8-10.

448.    The *New York* lawsuit likewise suggests that Defendants take the position, contrary to

existing precedent, that the Supremacy Clause and 8 U.S.C. § 1373 require that local jurisdictions

share broad, undefined categories of sensitive information—including home and work addresses—as

long as the federal government deems this information "relevant" to immigration-related

determinations. *New York* Compl. ¶ 37; *see also id.* ¶¶ 38, 44–45.

449.    The *Rochester*, *Colorado*, and *Los Angeles* complaints further underscore Defendants'

position that policies limiting immigration cooperation are unlawful "sanctuary" policies.

450.    Executive Order 14,218 refers to "sanctuary policies" "that seek to shield illegal aliens

from deportation." Based on Defendants' public statements, the Bove and Bondi Directives, and

DOJ's position in the *Illinois* and *New York* lawsuit, it appears that Defendants view jurisdictions that

limit cooperation with civil immigration efforts as somehow shielding undocumented immigrants from

deportation—even where these policies are actually aimed at improving public safety and public

services for all residents and are not intended to shield or harbor undocumented immigrants.

451.    Executive Order 14,287 instructs the Attorney General and the Secretary of Homeland

Security to "publish a list of States and local jurisdictions that obstruct the enforcement of Federal

immigration laws (sanctuary jurisdictions)" and to notify each "sanctuary jurisdiction regarding its

defiance of Federal immigration law enforcement and any potential violations of Federal criminal

law." Like Executive Orders 14,159 and 14,218, Executive Order 14,287 does not define what criteria

the Attorney General and the Secretary of Homeland Security must use in classifying a locality as a

"sanctuary jurisdiction." However, almost all Plaintiffs were named on DHS's May 29 list of

"sanctuary" jurisdictions.[15] DHS removed that list on June 1, 2025, without explanation. The import of

that removal and the status of the list remain unclear.

---

[15] All Plaintiffs but Bend, Marin County, Palo Alto, and Wilsonville appeared on the May 29 list, an archived version of which is available at
https://web.archive.org/web/20250529215954/https://www.dhs.gov/sanctuary-jurisdictions. However, the States of Oregon and California are included on that list, and as alleged above, Bend and Wilsonville follow Oregon state law—and Marin County and Palo Alto follow California state law—limiting the use of local resources for federal civil immigration enforcement.

452.    Plaintiffs have the kinds of laws and policies that Defendants have deemed unlawful "sanctuary" policies.

453.    For example, Plaintiffs generally prohibit the use of their localities' resources to assist in federal civil immigration enforcement and limit the ability of local law enforcement to inquire about immigration status or detain individuals for purely civil immigration violations. Many of Plaintiffs laws and policies also limit compliance with civil immigration detainer requests or administrative warrants, restrict the disclosure to immigration authorities of personal information (including contact information) about any individual, and/or limit compliance with a notification request for the release date of someone in custody, subject to certain exceptions—such as for judicial warrants, lawful subpoenas, or as otherwise required by federal law.

**B.    Plaintiffs Face Devastating Budgetary Injury**

454.    The Bondi Directive expressly threatens Plaintiffs with the loss of federal funds that they use to provide essential services for supporting children and families, law enforcement activities and agencies, and victims of violent crimes in their communities. The Noem Directive further threatens Plaintiffs with the loss of federal funds that they use to prevent, respond to, and recover from acts of terrorism, disasters, and other emergency events. The threatened cuts are unrelated to immigration enforcement and run counter to the goals of public safety sought to be advanced by the Administration and would have far reaching consequences. Plaintiffs face immediate injury from DOJ's and DHS's freezing of federal funds and their withholding and conditioning of federal funding on local cooperation with federal immigration policies.

455.    Executive Order 14,159's threatened withholding of all federal funding—and Executive Orders 14,218 and 14,287's threats with respect to undefined categories of federal payments and funds—would have far-reaching impacts on Plaintiffs, which rely on federal funding as a significant portion of their budgets, and would cripple Plaintiffs' ability to deliver critical services to their communities.

### 1.    San Francisco

456.    In Fiscal Year 2024-25, San Francisco received at least $8.7 million in funds administered by DOJ, either directly or through state pass-through funding. These funds support a myriad of critical public safety and other services, including:

a.    San Francisco's District Attorney's Office Victim Witness Program from the Department of Justice, Office for Victims of Crimes pursuant to the Victims of Crime Act of 1984, 34 U.S.C. § 20103(a) and (b), that supports San Francisco in providing comprehensive services to victims and survivors of all types of violent crime;

b.    The San Francisco Police Department Regional Vehicle Interdiction Desk Project, a multijurisdictional project to combat carjacking. The law enforcement activities funded by this grant include tactical casework in support of carjacking investigations and prosecutions and use of carjacking vehicles in organized crime;

c.    Law Enforcement Assisted Diversion, an innovative approach that seeks to accomplish the goals of reduced criminal behavior and improved public safety by connecting appropriate low-level drug offenders with services;

d.    Focused Drug Deterrence, short-and-long term proactive activities including targeted investigations and enforcement and social network analysis to increase the identification of individuals involved in high-level drug markets;

e.    Drug Court Prosecution, which seeks to connect criminal defendants who suffer from a substantial substance abuse problem to treatment services in the community in order to enhance public safety, reduce recidivism, and to find appropriate dispositions to the criminal charges;

f.    Targeted Drug Treatment for Underserved Populations, a treatment intervention conducted by the Sheriff's Department for individuals in custody;

g.    Intensive Probation Supervision, a targeted caseload of probationers with substance abuse and/or mental health issues;

h. Reentry Social Work through the Public Defender's Office, which provides legal and wraparound support to help indigent clients charged with felony drug cases and other felony offenses successfully exit the criminal justice system;

i. Citywide Justice-Involved Youth Planning, which examines current criminal justice trends impacting youth and young adults and strengthens partnerships and collaboration at various levels to create a continuum of support for youth and young adults.

457. These programs are funded by grants that are statutorily authorized by Congress, which did not impose immigration-related conditions upon the award or use of the funds. See e.g., 42 U.S.C. § 3752(a)(5)(D) (Byrne JAG provisions directing that recipients simply must use funds for a program or activity that falls within one of the several statutory purposes, and certify that they will "comply with all provisions of this [statutory] part and all other applicable Federal laws." ); see also Victims of Crime Act authorizing Victim Witness Program grants 34 U.S.C. § 20103 ("Subject to the availability of money in the Fund, the Director shall make an annual grant from any portion of the Fund made available...")

458. San Francisco currently faces a significant budget deficit for FY 2026 and 2027 and the Mayor has directed City departments to propose ongoing cuts of 15% from their general fund budgets. The federal funds frozen by the Bondi Directive and subject to unlawful immigration-related conditions are funds that are currently anticipated and relied upon by San Francisco. The expectation for these funds is part of San Francisco's currently approved budget and even if it were to immediately cease all activities by laying off staff and notifying contractors to stop work, San Francisco would still be obligated to pay for work done, adding to its current budget shortfall. If San Francisco were deprived of its DOJ funding, it would be forced to make difficult choices on sustaining the DOJ-funded programs that serve children, crime victims, and critical law enforcement services through local funding sources or cutting these or other critical services.

459. The Executive Orders threaten an even greater impact on San Francisco's fiscal situation. San Francisco's current budget includes nearly $3.1 billion in federal funds for a myriad of critical services such as health care reimbursement, housing, capital projects, emergency services, and

1   public infrastructure. Losing all, or even a fraction, of that amount would trigger a fiscal crisis that
2   would require drastic reductions in critical municipal services.

3           **2.      Santa Clara**

4           460.    Upon information or belief, Santa Clara estimates that it receives $6 to $7 million in
5   grants that originate with DOJ, either directly or passed through the State of California. This DOJ
6   funding supports a range of important programs and services provided by Santa Clara's Office of the
7   Sheriff, Office of the District Attorney, Probation Department, and other departments and agencies to
8   crime victims, child abuse survivors, justice-involved youth, and the entire Santa Clara County
9   community. These programs and services include, but are not limited to:

10          a.  Direct services to trafficking survivors and other victims of crime;

11          b.  The Psychiatric Emergency Response Team, which is a joint effort among Santa
12              Clara's Behavioral Health Services Department and law enforcement agencies in
13              which multidisciplinary law enforcement and clinician teams respond to 911 calls
14              that involve both a mental health crisis and a law enforcement issue;

15          c.  Data analysts for the Office of the District Attorney's Gun Related Intelligence
16              Program, which uses ballistic evidence to link shootings and solve gun crimes,
17              through DOJ's Crime Gun Intelligence Center grant;

18          d.  Services of Santa Clara's Crime Laboratory, an internationally accredited forensic
19              laboratory that handles controlled substance analysis, firearms examination, latent
20              fingerprint processing, digital evidence, fire debris and explosives analysis, DNA
21              and toxicology analysis, and more, through DOJ's Paul Coverdell Forensic Science
22              Improvement Grants Program, which supports improvements in forensic science;
23              and DOJ's DNA Capacity Enhancement for Backlog Reduction Program, which
24              aims to increase the capacity of government-run forensic laboratories to process
25              DNA samples and reduce backlogs that delay justice;

26          e.  Through DOJ's Improving the Investigation and Prosecution of Child Abuse and
27              the Regional and Local Children's Advocacy Centers Program, efforts to improve
28              techniques for investigating and prosecuting child abuse; to enhance coordination

among community-based providers and law enforcement, child welfare, and medical and mental health professionals involved in investigation, prosecution, intervention, and prevention work; and to serve child abuse victims and their non-offending family members through Santa Clara's Children's Advocacy Center; and

f.  Services to improve public safety and reach youth involved in serious violent or weapons-related crimes, as well as youth at risk of justice involvement—including a collaboration with the University of Cincinnati Corrections Institute to implement a phased process of youth-centered design and programming enhancements at the Probation Department's a rehabilitative youth facility, with associated training and coaching for Probation staff.

461.    Not a single one of these programs relates to immigration enforcement or any community member's immigration status. Instead, they relate more broadly to protecting the entire Santa Clara County community—including vulnerable children, trafficking victims, and sexual assault survivors—from harm; and enhancing the ability of local police agencies and prosecutors to do their core work of preventing and addressing crime.

462.    Santa Clara, like entities across California and the nation, is facing a budget deficit. To meet Santa Clara's obligation to deliver a balanced budget, Santa Clara's departments, agencies, and executive leadership made very difficult choices in the most recent fiscal year to close a $250 million budget deficit while maintaining critical services for the community. If Santa Clara were deprived of its DOJ funding, it would struggle to sustain its DOJ-funded programs that serve children, crime victims, and vitally important forensic and law enforcement services through local funding sources. It would be forced to make impossible choices about cutting either these programs, or the other safety-net programs that Santa Clara provides.

463.    Beyond the millions of dollars of funding immediately threatened by the Bondi Directive, the Executive Orders, which are not expressly limited to DOJ grant dollars, threaten the approximately $3.5 billion in total federal funding that Santa Clara received or will receive in the current fiscal year. In total, federal funding comprises 31 percent of Santa Clara's revenue.

464.    These funds support healthcare, safety-net programs and social services for children and families, and other essential government functions, such as public health, infrastructure, emergency response and public safety. Many of the programs supported by federal funds require Santa Clara to advance the cost of services before seeking reimbursement from the federal government. Without these federal funds, Santa Clara would be forced to make extraordinary cuts to critical services—and in some cases totally eliminate key services and functions. The elimination, or even reduction, of federal funding would require Santa Clara to fundamentally and globally reallocate funds and services.

465.    Because Santa Clara is continuing to operate federally funded programs on a daily basis, it needs to know whether to (1) continue incurring hundreds of millions of dollars in costs that may never be reimbursed by the federal government, (2) discontinue basic safety-net services delivered to its most vulnerable residents, or (3) in an attempt to avoid either of these outcomes, be effectively conscripted into using local law enforcement and other resources to assist the federal government in its immigration enforcement efforts.

### 3.    Portland

466.    Today, the City of Portland has over $10 million in 12 active grants from different Department of Justice grant programs. This funding has already been awarded to Portland, but most of it has not yet been disbursed. Among these threatened grants are funding for essential services under the Byrne JAG program and the National Sexual Assault Kit Initiative (SAKI) – which is supporting Portland's effort to tackle its backlog of rape kits for victims of sexual assault. This funding is critical to maintaining public safety.

467.    In total, Portland currently has over $340 million in awarded federal grants which may be implicated by the Executive Orders' broad sweeping scope.

468.    In addition, Portland faces a potential $100 million budget shortfall for fiscal year 2025-2026. The Mayor and City Council are actively working to budget during these very difficult financial times. As city leaders and employees work to ensure essential services continue for its residents, even a temporary pause could cause untold harm. The federal government's threats to not

only limit future funding, but to stop funding or renegotiate hundreds of millions of dollars in grants that the city has already been awarded only exacerbates the already serious budget crisis.

### 4.    King County

469.    The 2025 King County operating budget includes roughly $200 million in federal funding for operations. An additional $500 million is allocated to multi-year capital projects. Federal grants and appropriations fund numerous critical public safety projects and include ear-marked funds designated by congress for anti-terrorism counter measures related to the 2026 World Cup. The loss of this funding based on King County's decision to limit cooperation with federal civil immigration enforcement would have a devastating impact on public safety and emergency preparedness.

470.    Defendant Bondi's purported freeze on DOJ funds directly impacts King County. Currently, the county has approximately $20 million in direct and indirect funding from DOJ and DHS, including over $9 million in funding for local law enforcement initiatives and approximately $9.5 million in disaster planning and wildfire prevention funding. King County also has plans to seek future DOJ and DHS grants to enhance both public safety and officer safety. DOJ's actions in freezing existing grant funds and precluding King County from future grants are especially impactful in the current budget cycle, where King County is facing a substantial short fall in its general fund. DOJ's actions, if allowed to proceed, will directly and negatively impact public safety by decreasing resources precisely when they are needed the most.

### 5.    New Haven

471.    New Haven relies heavily on federal funding to deliver public services.

472.    Over the last few years, New Haven has received approximately $104,222,265 in direct federal grants.

473.    New Haven is scheduled to receive approximately $30,000,000 in federal funds in the fiscal year starting July 1, 2025. Loss of some or all of this funding would have a significant adverse impact on the finances of the City.

474.    New Haven currently has 85 employees in positions doing critical work, whose salaries are paid for by $6.5 million in federal grants.

475.    A $2.1 million federal grant provides services for overdose prevention and harm reduction.

476.    The city and 20 partner organizations use $20 million in federal funding designed to mitigate climate change, build resiliency, and reduce pollution in New Haven.

477.    New Haven also relies specifically on funding from DOJ, with $6,409,071 in DOJ federal grants awarded over the last few years. These funds support critical public safety needs, cover the costs of mental health professionals to work with police officers in crisis response, pay for the purchase and installation of public safety technology and safety gear for police protection, and financially support other public-safety related initiatives.

478.    New Haven's Office of Violence Prevention is funded with a $2 million DOJ grant.

479.    Another $2 million DOJ grant funds the Elm City C.O.M.P.A.S.S. program providing crisis intervention for individuals with mental illness or substance addiction problems.

480.    The freezing and withholding of these funds based on New Haven's decision to limit local involvement in federal civil immigration enforcement would have a significant impact on New Haven's ability to keep its residents safe.

481.    Should New Haven lose these federal funds, the City would be forced to choose between ending the programs or backfilling the lost funds through a combination of increased taxes and position eliminations.

482.    Given that 56.8% of property within New Haven is tax exempt, New Haven's property tax rates are already well over state and national averages. Therefore, the loss of federal funding would very likely require cutting some of these programs.

483.    New Haven's budget planning process for FY25-FY26, beginning July 1, 2025, is underway. On March 1, 2025, New Haven's Mayor submitted a recommended budget and tax rate to the Board of Alders, New Haven's legislative body.

484.    The Board of Alders holds public hearings and department workshops on the proposed budget and was required to approve a balanced budget by June 30, 2025.

485.    The federal government's threat of loss of federal funding creates uncertainty for New Haven's budgeting process, making it extremely difficult to plan a budget that allows for continuing

staffing levels, programs, and services that are dependent on federal grant funding. If these grant funds are cut after the budget is passed, the stability of the City's finances would be threatened by the need to deviate from the approved budget to either reallocate funds or terminate programs and staff positions. If the Federal Directives to freeze, deny or eliminate federal grants are put into effect after March 1, when the Mayor needs to submit the proposed budget to the legislative body, the City would likely need to consider cutting back services, or increasing the taxation rate, which would stress City residents who are already financially strapped by inflation and rising prices. Given that 56.8% of property within New Haven is tax exempt, homeowners would bear a significant burden in making up for lost grants by increased property taxes. Further, increased taxes also would adversely impact the rental housing market.

486.    In addition to significantly impacting existing grants, the loss of federal funds would have a grave impact on future public safety efforts. New Haven has relied heavily on federal funding over many years to implement important programs that keep the community safe. DOJ funds alone have been vital to the City's ability to provide critical support to a police department that already faces significant challenges. For example, over the last few years, New Haven has been awarded over $6,000,000 in DOJ federal grants. These funds support critical public safety needs, including various violence prevention programs, improved training and equipment for police officers, mental health professionals to work with police officers in crisis response, purchase and installation of public safety technology and safety gear for police protection, and other public-safety related initiatives. Should New Haven lose the ability to apply for and receive federal grants such as these in the future, the City would be severely limited in its ability to support its police department with the many technological, staffing and other related public safety needs with the result being that the community would be less safe.

### 6.    Oakland

487.    As part of funding cycles including the 2025 calendar year, the City of Oakland was awarded approximately $8 million in grants from DOJ. That funding allows for critical public safety services including:

            a.    The hiring of 15 additional police officers;

b.   Decreasing the backlog of biological evidence;

c.   Expanding Oakland Ceasefire Strategy efforts intended to address and reduce gun violence in Oakland;

d.   Funding training equipment and helicopter maintenance for the police department;

e.   Funding laboratory firearms work and training;

f.   Funding workshops to repair and strengthen the Oakland Police Department's relationship with the Oakland Community; and

g.   Enhancing school violence intervention and prevention teams for the Oakland Unified School District.

488.    The City of Oakland is facing budget shortfalls. Already the City has had to initiate layoffs of several dozen employees in addition to cutting spending across the city. Oakland is continuing to work to ensure the long-term financial viability of its budget. Maintaining DOJ funding is thus essential for the Oakland Police Department. Without these funds, the Oakland Police Department would have to scale back critical initiatives and/or reduce staffing, thus undermining the city's public safety objectives.

489.    Including the DOJ funding immediately under threat, Oakland received approximately $170 million in federal funds and awards for 2024. These federal funds go to support emergency services, housing within the city, outreach to homeless persons, early childhood development services, violence prevention, and ecological projects among other things.

490.    The threatened withdrawal of federal funding only makes the budgeting process for Oakland more daunting and puts Oakland at risk of having to guess as to whether it can afford to count on those funds or if it needs to cut programs, spending, and potentially staff to be able to withstand that loss of funding.

**7.    Emeryville**

491.    Federal grants have often supported the City's community services. For example, Emeryville has previously received Community Development Block Grant funds from HUD through Alameda County, as part of the Urban County program supporting Meals on Wheels and minor home repairs.

492.    Emeryville has also been granted two Community Project Funding grants, which it is scheduled to receive pending the execution of an agreement with HUD. Those grants total $500,000 and $2 million, respectively, and will support an intergenerational affordable housing project and the design of a new Corporation Yard.

493.    Emeryville has received a draft agreement from HUD for $850,000 in funding for construction of the 40th Street Multimodal Project to improve transportation safety, reduce congestion, and enhance multimodal access on 40th Street in Emeryville.

494.    Emeryville relies on federal funding from DOJ to support its police department. The Emeryville Police Department ("EPD") receives approximately $10,000 to $12,000 annually in DOJ funding through the Edward Byrne Memorial Justice Assistance Grant Program.

495.    EPD uses this funding to pay for police equipment, including body-worn cameras, computer monitors used for trainings, tasers, radio upgrades, and early intervention software. This equipment makes EPD more effective, responsive, and transparent. Radio upgrades, for example, have improved officers' ability to communicate with officers across the Bay Area during a crisis, and early intervention software enables EPD to remedy gaps in training causing officer errors.

496.    EPD receives, on average, approximately $10,000 annually in DOJ funding through the Patrick Leahy Bulletproof Vest Partnership Program. This funding allows for the regular replacement of outdated body armor. Newer body armor is lighter and stronger; it also distributes the weight of officers' equipment more evenly around their bodies to reduce injury and increase longevity in the field.

497.    EPD also relies on federal funding passed through the California state government. For example, it receives approximately $50,000 to $100,000 annually through the Highway Safety Grants Program. EPD uses these funds to increase traffic enforcement and offer safe driving education to the community. EPD also uses California's state-run 911 service, which is partially funded through federal grants.

498.    The loss of federal funding would require Emeryville to either cut back on essential equipment and services, which would put officers at risk and compromise public safety, or cover these costs from its general fund.

499.    Emeryville currently faces an $11 million budget deficit following a downturn in economic activity during the COVID pandemic and reduced development due to high interest rates.

500.    Emeryville will budget the anticipated federal funds as it does in the ordinary course of preparing its annual budget. If these funds are not allocated by the federal government, the city's budget would become out of balance and the city would then have to decide whether to backfill the loss in revenue with General Fund money or not move forward with the project(s) the federal funds were intended to support.

**8.    San José**

501.    The Fiscal Year 2024-2025 San José budget included nearly $187 million in federal funding ($98.1 million for operations, and $88.6 million for capital projects).

502.    An additional $162 million is anticipated for the 2025-2029 adopted capital improvement program. The City has budgeted and has or will expend in reliance on the funding awarded. Most of these funds are disbursed on a reimbursement basis.

503.    The Executive Orders could impact funding that supports many critical programs ranging from essential programs such as workforce development, low-income and interim housing, law enforcement, the airport, and public safety services.

504.    In many instances, San José receives federal funding through formula grants (grants that are noncompetitive and allocated to grantees based on distribution formulas) and has built programs around the continuing nature of these funds.

505.    From DOJ, San José has been awarded $8.6 million, of which $6.4 million are claimed on reimbursement. The City relies on the DOJ funds to:

    a.    Cover the costs of inventorying, DNA testing, tracking and reporting DNA analysis of sexual assault kits inclusive of training, investigation and victim engagement and support activities (National Sexual Assault Kit Initiative);

    b.    Pay for addition and upgrading of police department equipment, police training, and community outreach (Edward Byrne Memorial Justice Assistance Grant); and

    c.    Support the investigation of hate incidents and community education to prevent hate crimes.

506.    None of the programs or services funded by DOJ focuses on immigration or include any element of immigration enforcement. These funds are used for local law enforcement, criminal investigation, and harm reduction.

507.    As of December 2024, San José's preliminary ongoing budget shortfall is estimated at approximately $60 million for 2025-2026, followed by an additional $30 million shortfall in 2026-2027. These shortfalls do not reflect the full budget challenges including services currently funded on a one-time basis of approximately $8.5 million.

508.    The City is facing difficult decisions to cut costs and still maintain essential services to our residents. The loss of federal funds, even on a temporary basis, could lead to the elimination of programs that serve our most vulnerable residents.

509.    The City begins its budgeting process in February to identify priorities, followed by public study sessions and hearings in April and May, with the final adoption of the budget in June for the next fiscal year. Uncertainty about the loss of federal funds, including from DOJ, impacts how the City should plan and what services can reliably be funded in the coming year.

**9.    San Diego**

510.    San Diego has over $8 million in fifteen active grants from at least four different programs administered by DOJ, either directly or passed through the State of California. This federal funding was awarded to the City over the span of several years and generally funds critical law enforcement services to protect the health, safety, and welfare of the entire San Diego community.

511.    The grants at stake are the following:

a.   the Edward Byrne Justice Assistance Program, which funds the City's initiatives to control crime and strengthen the criminal justice system with respect to law enforcement and crime prevention programs;

b.   the DNA Capacity Enhancement for Backlog Reduction Program, which increases San Diego Police Department's (SDPD) capacity to process, record, and analyze forensic DNA at its crime labs;

c.   the Internet Crimes Against Children Task Force Program, which funds forensic and investigative components as well as training to develop an effective response to

internet crimes targeting children and technology-facilitated child sexual exploitation; and

d. the Paul Coverdell Forensic Science Improvement Grants Program, which provides funding to acquire and maintain accreditation for SDPD's crime labs, reduce backlogs, and improve the quality and timeliness of forensic science.

512.   These grants are critical for local law enforcement to maintain public safety in San Diego. And none of these grants relate to immigration enforcement or any community member's immigration status.

513.   All of the above-mentioned DOJ grant programs are set up to reimburse San Diego for eligible costs. In short, these grants require the expenditure of San Diego's own funds first with the expectation of federal reimbursement later. Already, San Diego has expended significant expenditures in eligible costs that have not yet been reimbursed.

514.   In total, San Diego has approximately $530 million in awarded federal grants. This includes approximately $104 million from DHS, $229 million from HUD, $135 million from DOT, and $8 million from DOJ. These federal grants and appropriations fund many essential services for San Diego's residents, including housing, emergency relief, infrastructure, public safety, and much more.

515.   Currently, San Diego faces a massive budget deficit of $258 million for fiscal year 2026 and a projected deficit of approximately $1 billion for the next five years.

516.   The Mayor has ordered a hiring freeze, along with restrictions on non-essential funding, a reassessment of San Diego's leases and contracts, and other potential cuts. With limited staff, money and resources, the threat of prosecution further hinders the City's ability to provide essential services to its San Diego residents

517.   San Diego is making difficult decisions on cutting back essential services, projects and programs impacting the region. Losing federal funds now will cause irreparable harm, taking an enormous toll on a city that is already struggling to balance its budget sheet.

518.   The loss of federal funding would also have a detrimental impact on San Diego's ability to keep its residents safe, negatively impacting public safety and emergency preparedness.

Thus, the federal government's directives to stop funding or pause millions of dollars in federal grants that the City has already been awarded harms public safety, public health, and local law enforcement's ability to protect all San Diego residents.

519. Recent actions by the Trump Administration are impacting the budget outlook for San Diego.

520. Due to the uncertainty involving a pause and/or termination of federal grants, San Diego has no choice but to use its own general fund, diverting money as well as resources from vital services and programs that residents depend upon. It also makes it nearly impossible for the City to maintain an accurate outlook in planning its future budgets.

### 10. Sacramento

521. Sacramento currently is expecting approximately $175 million in outstanding federal reimbursements that support public works, public safety, and medical services. For comparison, the City's annual budget is approximately $1.6 billion.

522. Sacramento has more than $1.6 million in grants from DOJ grant programs. Active DOJ grant programs include the COPS hiring program, Byrne JAG, and National Public Safety Partnership Capacity Building. Sacramento uses these DOJ grants to fund:

    a.   Additional police officer positions;

    b.   An acoustic gunfire detection system for gun violence prevention and investigation efforts;

    c.   SPD's Digital Forensics Unit; and

    d.   Improving crime mapping.

523. In addition, the Sacramento Police Department is also the grantee of the Urban Area Security Initiative (UASI) grant, a federal Department of Homeland Security grant program focused on preventing terrorism and improving the public safety infrastructure throughout the Sacramento region.

524. Sacramento also receives approximately $450 million in total federal funding annually. This includes $26.7 million from HUD, $50 million from FHWA, and $7 million from DHS.

525.    Sacramento would suffer substantial harm if deprived of the funding it receives from the federal government or from DOJ.

526.    Sacramento would suffer significant harm if forced to alter its Sanctuary policy that preserves local resources for building "community safety and security, support for youth and education, economic development, and financial stability." Resolution 2017-0158, Sec. 1.

**11.    Santa Cruz**

527.    To build its current fiscal year budget, the City of Santa Cruz anticipated receiving approximately $107.5 million from federal grants, including $26,813 from DOJ for its Bulletproof Vest Partnership Grant. Of the approximately $107.5 million in federal funds awarded, Santa Cruz has only received approximately $27.9 million. This leaves approximately $79.6 million in federal funds that have been awarded to Santa Cruz and yet remain uncollected.

528.    The remaining uncollected funds are intended to support programs across seven Santa Cruz departments: the Department of Economic Development and Housing; the City Manager's Office; the Police Department; the Fire Department; the Parks and Recreation Department; the Public Works Department; and the Water Department.

529.    If the federal government withholds Santa Cruz's nearly $80 million of awarded but uncollected federal funds, Santa Cruz faces a dire financial situation.

530.    Santa Cruz will struggle to provide essential public services, including emergency assistance, food, and shelter, which its residents rely on, and which Santa Cruz has already promised to deliver. In addition, Santa Cruz's ongoing projects, including critical water infrastructure, critical affordable housing development, and hazard mitigation construction, all risk significant delays or outright incompletion.

531.    The federal government's threats to withhold federal funds expose Santa Cruz to unprecedented budgetary uncertainty, making it nearly impossible to plan for and commit to future projects and expenditures.

532.    The federal government's threats put Santa Cruz in a position where it may need to pause or cancel ongoing contracts, exposing the city to potential litigation from partners, contractors, and developers. Furthermore, the ongoing budgetary uncertainty may require Santa Cruz to reconsider

its staffing, including by considering layoffs of employees across all departments. Losing these employees will drain Santa Cruz of a workforce full of faithful community members who have accumulated decades of crucial knowledge and experience as to how to serve and operate the city most effectively. Should Santa Cruz lose federal funding and later regain it, the city will struggle to rebuild this faithful, dedicated workforce because any employees let go will need to obtain new jobs to pay their rent, mortgages, utility bills, grocery bills, and support their families.

### 12.     Monterey

533.     Monterey County also depends on the ongoing and proper provision of federal funding. The County incorporates significant federal allocations and grants into its service provision efforts, including for the provision of basic public goods such as healthcare, disaster relief, and public safety. The County estimates that it has budgeted for some $480 million in direct federal funding over the last two years, representing roughly 13% of all money budgeted.

534.     Federal funding to Monterey County includes several million dollars in funding specifically from DOJ. Grants originating from DOJ supply funding to the Monterey County District Attorney and Sheriff's Offices. JustGrants and Edward Byrne Memorial Justice Assistance Grants are used by the County to reduce and solve violent crime; they provide for the prosecution of cold cases, the purchase of body worn cameras, and other tools to ensure that law enforcement officers, local officials, and the community can work together to keep Monterey safe.

535.     Monterey County is currently working through its annual budgeting process and operates federally funded programs on a daily basis. Threats from the federal executive to arbitrarily cut funding to localities such as Monterey cast doubt over the County's ongoing ability to provide basic services to its residents without significant disruption.

### 13.     Seattle

536.     Seattle relies heavily on federal funding. During the year beginning January 1, 2025, Seattle has legal and appropriations authority to spend up to $370 million in federal grant funds. Among other priorities, these federal dollars provide services for vulnerable residents needing access to food, medical care, shelter, and other housing assistance. If that funding were eliminated, harms would be felt immediately.

537.    Seattle's federal funding also supports survivors of domestic violence and sexual assault in Seattle; without it, they would not receive important services.

538.    These grants will allow Seattle to make critical seismic upgrades in a high-risk earthquake-impact area. If that funding were lost, it would leave Seattle less protected from a potential earthquake.

539.    The Seattle Police Department is responsible for preventing crime, enforcing the law, and supporting quality public safety by delivering respectful, professional and dependable police services. In the coming year, the Police Department anticipates spending approximately $4 million in DOJ grant funds. The Seattle Police Department will use these funds to:

   a.   Employ a full-time investigator for domestic violence prosecutions;

   b.   Fund three Crime Prevention Coordinator police officer positions for 80% of each year;

   c.   Lead the Northwest Regional Internet Crimes Against Children Task Force;

   d.   Participate in a regional Human Trafficking Task Force through which the Seattle Police Department can seek justice and connect trafficking survivors to services; and

   e.   Fund investigative tools such as advanced DNA analysis to pursue unsolved sexual assault cases.

540.    Loss of DOJ funds would negatively impact not just Seattle, but the surrounding communities. For example, Seattle submits a joint application, on behalf of Seattle and more than 10 surrounding jurisdictions, for the DOJ Edward Byrne Memorial Justice Assistance Grant Program ("Byrne JAG"). These DOJ Byrne JAG grant funds allow participating jurisdictions to preserve and support a variety of law enforcement programs aimed at preventing and reducing crime, providing services to victims, purchasing much needed law enforcement and investigative equipment, enhancing law enforcement training and officer safety, implementing community-based programs, providing law enforcement overtime, and improving technology systems.

541.    The Seattle Police Department also receives substantial federal funding from DHS that supports essential public safety initiatives and programs. These funds allow the Department to buy

emergency response equipment and conduct preparedness activities that help it plan for, protect against, and respond to terrorist attacks and other hazards. The Seattle Police Department's 2025 Budget reflects $8 million in funds from the Department of Homeland Security, almost $4 million of which will likely be spent in 2025.

### 14.    Minneapolis

542.    Federal grants play an important role in funding the City's public safety and other operations. In 2024, direct and pass-through DOJ funds financed almost $1,800,000 of Minneapolis's expenditures. The City used DOJ funds to:

    a.  Fund recruitment of community members and college-aged candidates to pursue careers in the Minneapolis Police Department (Police Recruitment Through Pathways Encouraging Active Community Engagement);

    b.  Fund the inventorying, DNA testing, tracking and reporting DNA analysis of sexual assault kits inclusive of training, investigation and victim engagement and support activities (National Sexual Assault Kit Initiative);

    c.  Pay the salary and fringe benefits of an attorney who serves as a direct legal advisor to Minneapolis Police Department officers in police precincts, fund the addition and upgrading of police department equipment, and pay overtime costs for officers to address emerging or special enforcement (Edward Byrne Memorial Justice Assistance Grant); and

    d.  Fund an opioid addiction treatment program including medication, clinical care, and wrap-around services (Comprehensive Opioid, Stimulant, and Substance Abuse Program).

543.    None of the programs or services funded by DOJ dollars focus on immigration or include any element of immigration enforcement. These funds are used for local law enforcement, criminal investigation, harm reduction, and prosecution costs.

544.    The impact of the Executive Orders, which purports to impact not just DOJ funding but all federal funding, is even more significant.

545.    Annually, federal funding from federal agencies finances approximately $60 million in 2024 dollars Minneapolis's programs and services, including essential programs like critical infrastructure improvements, creation and preservation of low-income housing, emergency shelter assistance for unhoused individuals, household radon, mold, lead, and pest mitigation, developing public health infrastructure and workforce, and provision of public safety services.

546.    In some cases, Minneapolis receives federal funding through formula grants (grants that are noncompetitive and allocated to grantees based on distribution formulas) and has built programs around the continuing nature of these funds. Minneapolis has largely obligated federal funding awarded to it in previous years. The City is relying on the federal government satisfying its contractual funding commitments to meet these obligations.

547.    Minneapolis is already facing difficult budgetary decisions and large projected tax levy increases because of decreasing commercial property values and the rising costs of providing municipal services. The loss of its anticipated federal grant funding would force the City to choose between cuts to municipal services or imposition of a historically large tax levy on its residents.

548.    The threat of loss of federal funds also creates confusion and uncertainty in the budget planning for Minneapolis.

549.    The City is currently planning its budget for 2026. Departments are now determining whether grant supported positions will be supported by grants in 2026. The Mayor must deliver a proposed budget to the City Council by August 2025. Without knowing whether certain federal funds will be available for those positions will create significant uncertainty about those positions and the work those positions perform for the communities the City serves.

### 15.    St. Paul

550.    The Executive Orders and the Bondi Directive threaten the City with the loss of federal funds. The threatened cuts are unrelated to immigration enforcement, and would have dramatic, far-reaching consequences for Saint Paul.

551.    Saint Paul has $192.2 million in federal funds currently under contract. The majority of these funds, roughly $139.4 million, is tied to one-time projects, largely capital investments. The

remainder, approximately $52.7 million, consists of operational funding supporting ongoing programs and departments. Saint Paul receives significant funding from EPA, HUD, and DOT.

552.    In addition to the foregoing amounts, Saint Paul has been awarded $66.8 million in federal funds, and in the post-award phase of establishing work plans and executing contracts. The City has applied for additional amounts of federal grants totaling approximately $66.1 million.

553.    Last year, Saint Paul received $5,250,996 in funds from DHS and $7,108,957 in funds from DOJ. These DOJ funds were used for, among other things, the partial funding of 15 full-time peace officer positions, a dedicated domestic violence investigator, overtime for community engagement and the investigation of serious crimes, and the Familiar Faces program, which engages frequent users of emergency and shelter services.

554.    If Saint Paul lost federal funding pursuant to the Executive Orders and/or the Bondi Directive, the impact would be substantial, put the full burden of infrastructure investments on local and state resources, and cause delays to pending projects. The ripple effect associated with this impact would last for decades.

555.    Examples of these effects include the following:

   a.   Loss of 15 police officers the City plans to hire through the COPS Hiring Program.

   b.   Loss of police academy training program and other pathways programs.

   c.   Cuts to public safety programs supporting victims of violence and sexual assault, reduction in domestic violence, DWI enforcement, drug trafficking unit, traffic enforcement, and equipment for gathering evidence at crime scenes.

   a.   An indefinite interruption in the ten-year plan to replace the 26,000 lead service lines to households in the City, including, most immediately, low-income households in Saint Paul's East and North Side neighborhoods

556.    The foregoing examples are not exclusive. Because Saint Paul relies on federal funds for its ongoing operations across many subject matter areas, and for many different purposes, it is not possible to identify each and every area in which the City would suffer significantly, were it to lose out on federal funds by operation of the Executive Orders. The effect of a complete loss of federal funds would be devastating for Saint Paul, its employees, and its residents.

### 16.    Santa Fe

557.    Santa Fe's budget relies on federal funding; in fiscal year 2024, it included over $14.5 million in federal funds. The federal funds included $5.9 million to support transit programs, $1.8 million for an airport capital improvement project, and $1.5 million to support affordable housing programming.

558.    Federal grant revenue is the main funding source or a significant supplemental funding source for some city programs.

559.    Santa Fe's budget for the current fiscal year includes $15.5 million in budgeted federal grant revenue. The impact of federal grants varies by program, with programs such as Transit, Seniors, and Affordable Housing particularly dependent on federal funding. In these programs, federal funding enables important projects that would not otherwise be possible. Interruptions in federal funding may cause disruptions to planned timelines and the delivery of essential services to the public.

560.    Santa Fe is highly concerned about the implications of the federal funding directives. Santa Fe, and many of its nonprofit partners, relies on federal grants to support critical services and infrastructure projects. Any delays could disrupt operations and adversely impact the community.

561.    In January 2025, Santa Fe entered into an agreement for $300,000 in DOJ funding from the Byrne Discretionary Grants Program. With this funding, Santa Fe will purchase needed equipment and training for the Fire Department's Mobile Integrated Health Team, a specialized unit that identifies, connects with, and provides case management to individuals in the community who frequently require emergency services. The program allows Santa Fe to connect these individuals with resources to address their underlying needs and achieve healthier, more stable living situations.

562.    Without DOJ funding, the Mobile Integrated Health Team would not be able to replace and improve the technology and vehicles it uses to serve the community. The team currently relies on laptop computers that are worn from several years of heavy use. Likewise, the vehicles the team currently uses are older models not conducive to the needs of the team. Without the funding, the team would have limited and delayed capacity to provide services, and it would serve fewer persons per day.

17.    **Alameda County**

563.    In Fiscal Year 2024-2025, Alameda County received approximately $590 million in direct federal funding, totaling nearly 13% of the County's budget. Alameda County also received about that same amount in indirect federal funding, including funds that passed through the State of California, bringing the County's total federal funding for the Fiscal Year to approximately $1.1 billion. Those numbers are estimated to grow in Fiscal Year 2025-2026. The County relies on these funds to support vital safety net programs, social services, public health functions, infrastructure maintenance and development, and other essential government services that are unrelated to immigration enforcement.

564.    Breaking these figures down, Alameda County received approximately $517 million from DHS, $345 million from HHS, $70 million from the U.S. Department of the Treasury ("Treasury"), and $45 million from the U.S. Department of Agriculture ("USDA"). In addition, the County received approximately $8.5 million in grants that originated with DOJ. The County distributes approximately $1.5 million of those DOJ funds to other local agencies in Alameda County. This DOJ funding supports critical public safety efforts and other important services provided by the Sheriff's Office, the District Attorney's Office, the Probation Department, and other departments and agencies, including to victims of abuse and other crimes, young people in the justice system, and the broader community. For example, DOJ grants help fund (1) efforts in Alameda County's crime laboratory to process DNA evidence crucial to exonerating wrongfully accused or convicted individuals and to identifying true perpetrators; (2) reentry and job training programs aimed at reducing recidivism rates; and (3) efforts to prevent and prosecute hate crimes. The County also administers federal grants that fund programs and services provided by other local law enforcement agencies in Alameda County.

565.    In developing the proposed budget for Fiscal Year 2025-26, Alameda County struggled to close a $105 million budget deficit. Closing this gap while maintaining funding for vital community services required difficult decisions that have left the County financially vulnerable if circumstances were to change—including if the federal government withholds or seeks to rescind federal funds. Without federal funds, Alameda County will have to make drastic cuts, potentially eliminating crucial

lifelines for children, families, and the homeless, among other of the County's most vulnerable residents.

566.    The impacts would not be limited to programs directly funded by federal aid. Losing federal funding would require the County to shift non-federal funds to other programs in an effort to fill some of the gaps—creating a ripple effect that would severely limit the County's ability to provide essential government services. Those cuts will be particularly severe if they happen mid-year, as threatened by the Executive Orders and other federal agency directives, given that the County would have to rush to develop new budget proposals in an effort to backfill federal funding where possible, resulting in yet more drastic reductions to County services.

### 18.    Albany

567.    Federal grant funding plays an important role in Albany's efforts to maintain public safety and protect public health and welfare. In 2023, Albany received roughly $12 million in federal funding, including $216,871 from the Department of Justice, nearly $1.4 million from DHS, and funding from HUD, DOT, and the Department of Labor ("DOL"). This federal funding is used to support the Albany Police Department's organized drug crime task force, Port of Albany security, and K9 explosives detection programs. It is also used to support youth employment, home ownership support, and street improvement programs. None of the programs or services funded with this money are related to immigration enforcement; all are threatened by the challenged Executive Orders and agency directives.

568.    Losing this funding would result in a significant budgetary deficit that would have to be borne by Albany taxpayers in the form of reduced services or an increased tax levy. As a result, Albany now faces the threat of having to change its laws or to present a budget for 2026 with an enormous degree of uncertainty as to what federal funds will be available. And Albany has already felt the pain of that choice, as Albany residents who previously felt protected by Albany's municipal code withdraw from civil society, and Albany personnel fear retaliation by the federal government simply for doing their jobs.

### 19.    Albuquerque

569.    Albuquerque's budget relies heavily on federal funding. Albuquerque's budget for

Fiscal Year 2026, beginning July 1, 2025, includes over $21 million in current year federal funds, covering federal awards for police equipment and special police programs, Early Head Start, the AmeriCorps Senior Programs, HUD grants, and funds for transit equipment and facilities, among other programs.

570.    In addition to the federal funds allocated in the annual operating budget, Albuquerque expects to receive an additional $75.4 million in federal multi-year grants budgeted in prior years, largely for public infrastructure projects such as affordable housing, transitional housing, rapid rehousing, social service contracts, park development, HUD grants, FEMA grants, and investments in programs to address homelessness and affordable housing. This funding also accounts for a large fraction of the Albuquerque Police Department's budget—upwards of $17 million—which includes paying dozens of officers' salaries, providing needed equipment, processing sexual assault and other evidence kit backlogs, and more. Albuquerque's 2026 budget also includes $563,500 in DHS funding.

### 20.    Allegheny County

571.    Allegheny County received $53 million in federal funding in Fiscal Year 2025, amounting to nearly 5% of the County's budget. This funding included nearly $850,000 in DOJ funds that the County uses to fund its Police Department, sexual assault kit processing, violence prosecution and prevention, and opioid addiction treatment.

572.    The bulk of the County's funding comes from HUD, HHS, DOL, and DOT. These moneys fund essential programs for hazardous materials training, training and support of the County's medical examiner's office, critical infrastructure improvements, developing public health infrastructure and workforce for the County, and the provision of public safety services, all of which are unrelated to immigration enforcement. Allegheny County has established programs, contracted with vendors, and staffed jobs in reliance on this previously stable federal funding.

573.    In its 2025 budget, the County increased its tax levy to address revenue decreases due in part to its county seat, the City of Pittsburgh, suffering decreasing commercial property values. As a result of this already difficult budget process, a loss of federal funding would force the County to make deep cuts to governmental services, and risk further tax increases on its residents who are already struggling.

574.    The County is currently planning its budget for 2026. Departments are now determining whether grant supported positions will be supported by federal grants in 2026. The County Executive's Office must deliver a proposed budget to the County Council in October 2025 and is now at work on developing that budget. The threatened of loss of federal funds in the Executive Orders and other federal government directives has created significant uncertainty in that budget planning process as to whether federal funds will be available and what services the County can realistically plan to provide for its residents.

### 21.    Baltimore

575.    As an economically disadvantaged city with a higher than average poverty rate, Baltimore relies on federal money to improve the health, safety, and welfare of its citizens. For Fiscal Year 2026, Baltimore expects to receive approximately $216 million in operating dollars and $65 million in capital dollars from the federal government, accounting for about 6.1% of Baltimore's annual budget. Baltimore currently also has $32.9 million in open DOJ grants, and open grants from the Environmental Protection Agency totaling $690 million, $514 million from HUD, $399.7 million from HHS, and $184 million from DOT.

576.    Some of the important programs that are funded by federal dollars include: serving over 11,000 people in Baltimore living with HIV/AIDS with case management and care services, including health treatment, transportation, and housing assistance; programs dedicated to improving maternal health and reducing infant mortality; assisting 4,500 households with housing needs, including the creation of new homes, rehabilitation of existing buildings, critical repairs, and lead paint remediation; aiding the unhoused population of approximately 2,000 with outreach, services, and rental assistance, along with providing assistance to thousands more vulnerable citizens during times of extreme heat and cold; preparing and training emergency management teams, firefighters, and police in handling wide scale emergencies, disasters, and terrorist attacks; community violence reduction initiatives and aiding victims of violence, including those who have experienced intimate partner violence; providing assistance for economically challenged households with water, electric and gas utilities, and rent; and serving 759 children and families through the Head Start program, providing early childhood education and development.

577.    In addition to the above programs, the Baltimore Police Department also relies on federal funds to support officers' effective enforcement of criminal laws and to provide important services to crime victims. For example, a number of positions in the Baltimore Police Department are funded by federal grants, including four forensic scientists, thirteen victim coordinators (who assist with victims of domestic violence and sexual assault, families of homicide victims, and translation services), a fiscal technician, two crime analysts, court staff, housing code enforcement officers, and a violence prevention program educator.

578.    A loss of funding for these programs would have a devastating effect on the population of Baltimore by cutting off important avenues to necessary services for the City's most vulnerable populations. For example, the Baltimore Police Department is already significantly understaffed, with a current shortage of approximately 500 officers, and is currently grossly overbudget. A loss of federal funding would significantly hamper the Baltimore Police Department's crime reduction efforts and create a risk to public safety, including by requiring the elimination of the above federal-funded positions as well as more than a dozen other federal-funded positions at various Baltimore public safety agencies. While Baltimore has recently seen a historic reduction in violent crimes and homicides, a loss of federal funds would tax the City's already overburdened resources and threaten the progress Baltimore has made.

579.    Baltimore is currently in the process of finalizing its budget for the next fiscal year, and the legal confusion around the federal government's funding elimination threats—which imperil *every* federal dollar Baltimore receives—has created difficulty in knowing what funds will actually be available, making for an incredibly uncertain budgeting process.

### 22.    Bend

580.    Bend relies on federal grants, direct funding, and indirect funding to support City services. Bend has been awarded more than $90 million in active federal grants for current and future years.

581.    For example, Bend has been awarded more than $1 million in federal funds administered by DOJ, DHS, and the Executive Office of the President, for law enforcement programs such as those covered by the Byrne JAG and High Intensity Drug Trafficking Area programs; traffic

safety services and equipment purchases; emergency management staffing and equipment purchases under the State Homeland Security grant program; and cybersecurity programs. Bend has also been awarded more than $47 million in federal funds from DOT, $14.5 million from EPA, and almost $5 million from HUD for critical services related to housing development, airport safety and infrastructure, pedestrian and vehicular safety, clean water infrastructure, emergency services, and roadway infrastructure. While this funding has already been awarded to Bend, most of it has not yet been disbursed, leaving the funds under threat from the recent Executive Orders, despite the fact that the grants do not implicate immigration enforcement.

582.    Losing all, or even a fraction, of these federal funds would likely require drastic reductions in critical municipal services. That is particularly true now, given the difficult budget climate Bend faces: Property tax rates in Oregon are constrained by the state constitution, and Bend cannot raise property taxes to pay for infrastructure improvements. Further, Bend's annual operating revenues are projected to increase by 12% ($63 million), while expenses are forecast to rise by 19% ($181 million), creating a $118 million gap. Reserves and one-time revenues, such as grants and asset sales, will close most of this gap. But Bend does not have additional reserves or one-time revenues to fill gaps that would be created by the loss of federal funding.

583.    Thus, if federal agencies prevent Bend from accessing some or all of the federal funding described above, Bend would likely be forced to eliminate or curtail important programs that serve all of Bend's residents, including critical law enforcement services; and public infrastructure programs for maintenance and construction of Bend's roads, bridges, railroads, sewer systems, and Bend's airport. Bend would also be required to evaluate alternatives for paying those employee salaries that are currently funded, at least in part, by federal grants.

584.    In addition, all or most of these federally funded programs operate on a reimbursement basis, meaning Bend has had to expend its own resources to pay costs and then is reimbursed by the federal government—if the federal government releases the promised funding. Also, Bend has agreed to complete projects in reliance on its anticipated receipt of federal funding, but will have to complete the projects whether or not that funding materializes. For example, Bend has agreed to complete work on its airport's taxiways and runway with the expectation of receiving millions in FAA funding for the

project, and Bend will now have to complete that project regardless of whether those grant monies are paid—jeopardizing the City's ability to pay for other critical services

585.    The federal government has presented the City of Bend with an untenable choice: violate state law and the City's policies, or lose access to $90 million or more in funding that is critical to the public health, safety, and welfare of the community of Bend. It is challenging to engage in a complete and thorough budget process with uncertainty over millions of dollars in already-awarded federal grant money. Given the active federal grants and the timing of the City's fiscal year, the uncertainty created by the Executive Orders threatening funding, as well as the administration's actions advancing these orders, presents a major risk to Bend's budget and creates uncertainty for the delivery of critical city services. Thus, while the City adopted its 2025-2027 budget on June 18, 2025, that uncertainty played a significant role—the budget is more financially constrained, omitting new positions requested to meet department needs, as a precaution in this uncertain climate. If funding recissions were to materialize, yet more drastic cuts would be required, jeopardizing public safety and the community's wellbeing.

### 23.    Benicia

586.    Federal grants play an important role in funding Benicia's public safety and other operations. This fiscal year, Benicia has been pledged more than $5.7 million in funding from federal agencies, including FEMA, the National Oceanic and Atmospheric Administration ("NOAA"), FHWA, the Institute of Museum and Library Services, and DOJ. These federal dollars support the City's programs and services, including de-escalation training for police officers, water transmission infrastructure, transportation infrastructure, and library services. None of these grants are for immigration enforcement. While Benicia does not currently receive DOJ grants, Benicia is applying for a maximum grant of $450,000.00.

587.    Benicia has also acted in reliance on receipt of these federal funds. For example, the City is programmed to receive over $4 million in federal funding from FEMA, as reimbursements for the City's recovery from damage caused by storms in 2023 that resulted in a rupture of the City's sole raw water sewer line. Because the City can only receive these funds after it submits documentation showing it has completed qualifying projects, the City has funded this recovery with the expectation

that it would be repaid by FEMA—an expectation imperiled by the challenged Executive Orders.

588.    Following significant disruption to fiscal planning caused by the challenged Executive Orders, on June 17, 2025, the City Council approved a budget for Fiscal Year 2025-2026 based on the assumption that the City would receive federal funding. Yet budgetary uncertainty remains: The loss of these federal funds would impair core public services in the areas of delivering reliable clean water, public safety, transportation, and community enrichment. Without federal funding, Benicia may have to cancel contracts that ensure public safety, create jobs, and improve roads and other necessary infrastructure, causing lasting operational damage and a breakdown in the trust between the City and its community.

### 24.    Berkeley

589.    Berkeley's budget relies on significant federal funds administered by agencies including DOJ, FEMA, HUD, USDA, HSS, and FTA. The City currently has open federal funding contracts totaling more than $60 million. These critical funds support a variety of programs, including infrastructure projects, health and housing services like nutrition programs, and emergency and permanent supportive housing services.

590.    A relatively large portion of the budget for Berkeley's Health, Housing & Community Services Department ("HHCS") comes from the federal government. Approximately half of Berkeley's contracted federal funds go to HHCS's critical health and housing programs. For example, the City has a $3.5 million formula contract to provide special mental health services to vulnerable populations. It also receives about $14 million from HUD for supportive housing for people experiencing chronic homelessness. In addition, every year, HHCS provides about 90,000 delivered meals to home-bound seniors and 20,000 meals to low-income seniors at its senior centers, leveraging hundreds of thousands of federal dollars. If the City were to lose even a portion of this funding, services provided to underserved residents with severe mental health conditions would have to be reduced or eliminated, hundreds of formerly homeless families could be displaced, and hundreds of low-income seniors could lose critical nutrition services.

591.    Other City departments that receive substantial federal funds include the Fire Department, the Public Works Department, the Parks Recreation & Waterfront Department, the

Planning Department, and the Police Department. For example, Berkeley's Police Department has been awarded more than $600,000 in key public safety grants, including by DOJ, and FEMA awarded the City $7.5 million dollars for critical fire and emergency response services. If FEMA were to cut off these funds, the Fire Department could lose nine firefighters it hired to staff up three of its busiest engine companies.

592.    In addition, across its departments, the City currently has approximately 95 employees carrying out critical work whose salaries are funded by federal dollars, and whose positions could be in jeopardy if the challenged Executive Orders were implemented.

593.    As these examples illustrate, if the federal government were to withhold any substantial funds, the City would face a dire situation, particularly now when it already faces a budget deficit of approximately $27 million. Berkeley would struggle to provide essential city services, and crucial services likely would have to be reduced or eliminated, severely undermining public health and safety in Berkeley.

594.    Indeed, Berkeley is already feeling the impact of these threatened cuts: Due to the uncertainty around federal funding availability, as well as the existing budget deficit, the City Manager instituted a hiring freeze on April 18, 2025. Loss of substantial federal funds may force Berkeley to reduce staffing levels or consider layoffs of employees. Also, departments' budget processes have been complicated by the uncertainty as they complete the budget-appropriations process for Fiscal Year 2026 without a clear idea of what funding will be available to them.

### 25.    Boston

595.    In city Fiscal Year 2024, Boston received $238 million in federal funding. Funding from the U.S. Department of Education ("DOE"), USDA, HUD, and HHS supported essential programs such as services for students with disabilities and English language learners, and providing school meals at Boston Public Schools; affordable housing development, homeownership programs, and services for people experiencing homelessness; and supports for older adults. Boston received $89.8 million from DOE, $74.4 million from HUD, and $34.6 million from USDA. Boston also received $1.7 million in DOJ funding and $27 million in DHS funding, which supported police, fire, emergency management, and other critical work.

596. This federal funding played an important role in funding the City's public safety programs and operations. For example, the City used DOJ funds to, among other things: fund a full-time domestic violence advocate as well as overtime pay for civilian domestic violence advocates; fund the purchase of essential equipment for Boston Police Department officers; pay the salary and fringe benefits for three full-time employees; and supplement Boston Police Department DNA testing capacity by funding contracts with external labs. Similarly, the City used DHS funding to, among other things: support the salaries of Boston Fire Department firefighters; fund personnel, equipment, and training costs for radiation detection; support equipment, planning, training, and operational needs of the Metro Boston Homeland Security Region; and fund planning and design activities for hazard mitigation and climate resilience along the waterfront of the Dorchester and South Boston neighborhoods. None of these programs or services focus on immigration or include any element of immigration enforcement in Boston. Instead, the funds are used for local law enforcement, criminal investigation, harm reduction, prosecution, counterterrorism, public safety, and emergency preparedness costs.

597. The threatened of loss of federal funds has created confusion and uncertainty in the budget planning process for Boston. The City has adopted a Fiscal Year 2026 budget. Departments are now determining whether grant supported programs and services will be supported by grants in Fiscal Year 2026, which began July 1, 2025. The Mayor has delivered a proposed budget to the City Council, and the City Council has made decisions regarding the budget. Not knowing whether certain federal funds will be available for those programs and services will create significant uncertainty about the continued viability of all of those programs and services.

598. More than that, the federal government's threats have generated significant fear and uncertainty in Boston, affecting the City's ability to deliver critical information, resources, and services to immigrant communities. Despite consistent City efforts to communicate City policies, including that BPD does not enforce federal immigration law, members of the Boston community have expressed confusion, uncertainty, and fear given federal actions.

### 26.    Cambridge

599. In Fiscal Year 2025, Cambridge expects to receive $23.4 million in federal grants,

directly and indirectly through the Commonwealth of Massachusetts, including $12.4 million from HUD, $5.3 million from DOE, $1.9 million from HHS, $2.95 million from USDA, $64,535 from DOJ, and $61,600 from DHS. These federal funds support critical City programs, such as community development, housing opportunities, public safety programs, substance addiction care, and the provision of school meals in the City, as well as the salaries of a number of City employees.

600.    If Cambridge were to be deprived of some or all of the funding from the federal grants it regularly receives, it would face a potential fiscal and public services crisis. Numerous City departments would be forced to eliminate the programs, services, and positions funded by federal grants or reallocate City funds to fund them, risking the reduction or elimination of City-funded programs, services, and positions, inflicting harm on all Cambridge residents, but in particular, its most vulnerable populations.

601.    For example, the Cambridge Department of Human Service Programs ("DHSP") relies on HUD grants to supplement Cambridge's efforts to support low-income households, including those who are experiencing homelessness, housing instability, domestic violence, food insecurity, and other challenges. As a result of the challenged Executive Orders, DHSP is currently experiencing budgetary uncertainty due to new terms and conditions that have, in effect, been added to the Continuum of Care ("CoC") Program grant agreements, and due to the anticipation that similar terms and conditions will be added to other HUD grants, such as Community Development Block Grants (which support food pantries, homeless services, services for teen residents of public housing, and legal services for domestic violence victims) and Emergency Solutions Grants (which support homeless shelters, homeless street outreach programs, homelessness prevention, and rapid rehousing services), on which the City relies. Given this uncertainty, DHSP plans to expend its own resources to ensure continuation of these services during the first quarter of Fiscal Year 2026. But Cambridge will not be able to afford to use its funds as a long-term solution to provide these services. In the absence of the approximately $7 million of annual HUD funding used for these programs, the programs likely will be forced to shut down or significantly reduced, positions likely will be eliminated, and the populations who rely on these services will suffer.

602.    These budgetary uncertainties afflict departments across Cambridge government, in

addition to DHSP, creating significant administrative burdens as the departments work to navigate the frequently changing landscape related to affected federal grants and the budgetary, administrative, and programmatic changes that may result from the threatened funding elimination.

### 27.    Cathedral City

603.    Federal grants play a substantial role in funding Cathedral City's public safety efforts and other operations. This fiscal year, direct and pass-through federal funding amounts to $14 million of Cathedral City's total budget for public safety initiatives, infrastructure improvements, disaster relief, planning, and violence prevention initiatives, of which approximately $7 million came from HUD, DHS, and DOT, and another $32,000 came from DOJ. In addition, FEMA has authorized reimbursements of nearly $9 million in qualifying expenses for the City's recovery efforts during Tropical Storm Hillary, an unprecedented storm system that caused millions of dollars in damages to public property. None of these programs or services funded by federal dollars focus on immigration enforcement.

604.    Cathedral City is already facing difficult budgetary decisions following Tropical Storm Hillary and the rising costs of providing municipal services. While the City has spent over $7 million on recovery efforts, with the understanding that these funds would be reimbursed by FEMA after the City submitted the appropriate paperwork, the City has only received $135,507.92 in reimbursement from FEMA, despite expensing $5,395,661.86. Cathedral City is relying on the federal government to satisfy its funding commitments in order for the City to recover from the unprecedented storm system. Deprivation of funds for unrelated issues concerning immigration enforcement would be devastating, forcing the City to choose between cuts to municipal services or recovery efforts following an unprecedented storm system.

605.    The threatened loss of federal funds also creates confusion and uncertainty in the budget planning process for Cathedral City. Because the City has adopted its biennial budget for Fiscal Years 2025–2026 and 2026–2027 based on the assumption that the City would receive federal funding, significant uncertainty remains. This uncertainty forces Cathedral City to divert limited resources to contingency planning and emergency measures and threatens significant disruption to the City's ability to provide services if anticipated federal funds were withheld.

### 28.    Chicago

606.    Federal grants make up a significant portion of Chicago's overall budget. For Fiscal Year 2025, federal grant revenues are estimated to be approximately $3.5 billion, or 20% of the City's total budget, including $2.4 billion in carryover balances from current federal grants and $1.1 billion in new federal grants. These funds include $116.5 million in federal funds from DOJ and $157.4 million from DHS, $1.8 billion from DOT, $668.9 million from HHS, and $329.8 million from HUD. These grants support critical public safety initiatives, such as law enforcement, fire suppression and prevention, emergency medical services, anti-terrorism, emergency management, and cyber security programs, among others.

607.    For example, for Fiscal Year 2025, Chicago has been awarded over $17 million under the Byrne JAG program, over $13 million under the Office of Community Oriented Policing Services ("COPS") Hiring Program, and $75 million associated with hosting the Democratic National Convention in 2024. This funding is essential to sustaining Chicago's law enforcement services and maintaining public safety. Chicago uses Byrne JAG funds to support projects ranging from purchasing critical law enforcement equipment—including the purchase of nearly 1,000 police vehicles over the past two decades—and overtime, to community policing outreach and engagement. Another Byrne JAG project, the Force for Good program, has since 2011, supported services such as emergency shelter and clothing; youth mentoring and safe, structured activities; and job training and placement. The Chicago Police Department ("CPD") further uses Byrne JAG funds to purchase technology upgrades, fund officer safety and resiliency programming, conduct post homicide canvassing and home visit pilot programs, and for certification and capability building training for different CPD units. Without Byrne JAG funds, Chicago would have to restrict or shut down some or all of these programs, or else divert funds from other policing objectives to sustain them. Crucially, these DOJ grants are reimbursement grants, which means that Chicago has already spent many of the federal dollars awarded, based on the federal government's promise to reimburse Chicago for appropriately used dollars.

608.    As mentioned above, for Fiscal Year 2025, Chicago estimates receipt of over $150 million in DHS grants, including direct grants and pass-through funding from the State of Illinois.

Chicago currently has $127,282,000 in active grants from the Urban Area Security Initiative ("UASI"), which supports training and equipment purchases needed to build, sustain, and deliver capabilities necessary to prevent, prepare for, protect against, respond to, and recover from terrorism threats in high-threat, high-density urban areas like Chicago. The Chicago Fire Department ("CFD") has also received UASI awards through Fiscal Year 2024 totaling $27.8 million. These funds have been critical to the development, sustainment, and improvement of CFD's anti-terrorism response, mitigation, and recovery capabilities, by supporting the equipment and training needs of CFD Special Operations personnel.

609.    Chicago would suffer serious negative impacts if it were to lose its DOJ and DHS funding as a result of the challenged Executive Orders. Chicago has already spent or taken steps in reliance on much of the funding allocated in Fiscal Years 2024 and 2025, including entering into agreements with subcontractors to purchase equipment and perform work. Chicago would have to lay off staff, notify its subcontractors to immediately stop work, and likely end many of the crucial safety programs listed above. Even with these actions, Chicago would still suffer budgetary deficits for costs already incurred that would no longer be reimbursed.

610.    The Executive Orders threaten not just DOJ and DHS funding, however, but all federal funding the City receives—including the $3.5 billion to which the City anticipates having access in Fiscal Year 2025. These federal funds support essential infrastructure projects, transportation, and public health, housing, and emergency services, to name just a few crucial services. Given that Chicago is already facing a budget deficit of $1.1 million for Fiscal Year 2026 and a projected deficit of approximately $1.3 billion by Fiscal Year 2027, the loss of even some of these federal funds could result in fiscal upheaval and require drastic reductions in municipal services as well as layoffs.

611.    The threatened loss of federal funds has thus created significant confusion and uncertainty in Chicago's budget planning for Fiscal Year 2026, which is already underway. Departments must determine whether ongoing positions and programs will be supported by federal grants. The Mayor must deliver a proposed budget to the City Council by October 2025. Thus, Chicago is put in an impossible position of trying to plan and pay for essential services for the communities it serves while not knowing whether the funds it relies on for these services will be

1    available.

2        **29.    Columbus**

3        612.    In Fiscal Year 2025, Columbus will receive $163.8 million in federal funding, to

4    support the provision of essential programs and services, such as critical infrastructure improvements;

5    creation and preservation of low-income housing; emergency shelter assistance for unhoused

6    individuals; household radon, mold, lead, and pest mitigation; developing Columbus's public health

7    infrastructure and workforce; and providing public safety services.

8        613.    Of those funds, Columbus has been awarded approximately $4.1 million in grants from

9    DOJ to, among other things, fund crime-reduction initiatives; support domestic violence survivors,

10    investigator trainings, and prosecutions; pay for DNA testing to address Columbus's testing backlog

11    and support for other testing services, and fund programs assisting those struggling with addiction.

12        614.    Columbus also has been awarded approximately $7 million in federal grants, both

13    directly and as pass-through grants, from DHS, to support the City's counterterrorism response and for

14    the City's BioWatch air monitoring program, which tests for biological agents, among other programs.

15        615.    None of these programs or services focus on immigration or include any element of

16    immigration enforcement. These funds are used for local law enforcement, criminal investigation,

17    harm reduction, prosecution costs, and counterterror responses, among other public safety programs.

18        616.    The impact of the Executive Orders, which purport to impact all federal funding, has

19    injected significant uncertainty into Columbus's planning and budget process, which is underway for

20    Fiscal Year 2026. Columbus is already facing difficult budgetary decisions, and the loss of anticipated

21    federal grant funding would force the city to choose between cuts to municipal services and imposition

22    of a historically large tax levy on its residents.

23        617.    Columbus has also built programs around federal grant funding it has received for

24    years, and spent money in reliance on the federal government reimbursing the City for the expenses it

25    has incurred under its awarded grants. Whether Columbus will be punished for that reliance is now an

26    open question.

27        **30.    Culver City**

28        618.    Culver City has been awarded approximately $5.5 million in federal grant funds for

Fiscal Year 2025-2026, including approximately $231,970 from DOJ; $78,332 from DHS; $2.8 million from DOT (with additional funds appropriated through 2028); $1.4 million from HUD; and nearly $1 million from EPA. Looking beyond just the Fiscal Year 2025-2026, the City also has approximately $47.5 million in selected, allocated, or awarded grant funding from federal grant sources.

619.    These funds support critical City services and operational needs, including, but not limited to, transportation infrastructure projects and bus purchases, the purchase of public safety equipment like bullet proof vests, police officer wellness programs, tactical emergency medical services, purchasing community emergency response team supplies, housing assistance payments, curb ramp improvements in compliance with Americans with Disabilities Act, and stormwater filtration projects.

620.    Culver City is in a structural deficit and requires certainty as to whether it can continue to rely on federal funds already awarded. In most cases, there are no alternative funding sources available to the City to replace this threatened loss of significant grant funding; therefore, loss of funding would result in a detrimental impact to services and programs.

### 31.    Dane County

621.    The 2024 Dane County operating budget included roughly $60 million in federal funding for operations, not including Medicaid administration and eligibility. That Fiscal Year, Dane County received funds from DOJ, through the Edward Byrne Memorial JAG Program, to support critical law enforcement and public safety services. It also received FEMA grants from DHS, HUD funding for affordable and low-income housing projects, and public health and Medicaid funding from HHS. In addition to that funding, in 2024, the Dane County Regional Airport received $15 million in federal funding, primarily from DOT. None of the programs or services supported by these funds involves immigration or include any element of immigration enforcement.

622.    To date, in 2025, the County has relied on federal funding from many federal agencies, including DOJ, DHS, HUD, HHS, and DOT, to finance essential county programs and services, including law enforcement and criminal justice programs; emergency management programs; critical infrastructure improvements; creation and preservation of low-income housing; emergency shelter

assistance for unhoused individuals; household radon, mold, lead, and pest mitigation; and developing Dane County's public health infrastructure and workforce.

623.    The threatened loss of federal funds by the Executive Orders has created confusion and uncertainty in the budget planning process for Dane County, which has just started for Fiscal year 2025. For example, Dane County has entered into numerous contracts to provide needed services to county residents that are funded with federal grants. If the federal funding is terminated mid-year, many of those contracts will be terminated. Dane County is also already facing difficult budgetary decisions because of decreasing revenue and the rising costs of providing government services. The County Executive has recently issued budget guidance to all county departments requiring a 4% cut in department budget requests. The loss of anticipated federal grant funding would force even more significant reductions in the County's budget, potentially requiring the County to cut essential government services, lay off county employees, and terminate contracts for services.

### 32.    Denver

624.    Denver anticipates expending approximately $250 million in federal grant funding in 2025, both through direct grants and as a subrecipient of the State of Colorado. This includes $1,543,595 in DOJ pass-through funds. These combined funds support approximately 200 full-time equivalent positions and numerous contracts across multiple core departments and functions, including public health and environment, economic development, transportation, aviation, and other essential City functions.

625.    Because Denver is already facing a budget shortfall due to decreasing tax revenues, local funds are insufficient to maintain current programs and cover the threatened loss in federal funding. Indeed, Denver has already instituted a hiring freeze and ordered employees to take furlough days as a result of the unstable budget situation. Given that, loss of federal funding would negatively impact programs and reduce or even potentially eliminate services, including essential healthcare services, workforce development and training, and construction of major infrastructure projects.

626.    The uncertainty over whether Denver will actually receive its anticipated federal funding may require the City to cut back on essential services, end grant-funded projects, and otherwise reduce spending, including terminating grant-funded positions in the City workforce. This,

in turn, would impact public health and safety, and cause additional economic instability in Denver and the greater metropolitan area. And, such short-term cuts in services or delays in projects would likely result in long-term effects that reduce the efficacy of services and increase the total cost of any delayed projects, even if the funding were later replaced.

### 33. Healdsburg

627.    This fiscal year, Healdsburg has received approximately $861,820 in DOT funds for projects improving City streets. These projects contribute to the safety and well-being of drivers and pedestrians who live in and visit the City.

628.    The city also anticipates receiving approximately $14 million in DOT funds to help fund two large projects upgrading streets throughout the City. These projects contribute to the infrastructure and character of the City's community, in addition to improving the safety and public health of its community members; and without these funds, the City will not be able to complete these projects. Design is actively underway for its Grove Street streetscape project. The project includes numerous safety improvements, including a complex, multi-agency plan to underground utilities to address wildfire risks. Elimination of this funding would cause all work to stop and threaten several years of work by Healdsburg and local utility providers.

629.    Healdsburg is in the process of applying for a DHS FEMA Hazard Mitigation grant to fund an aquifer storage and recovery project that would help ensure adequate water supplies for the community. Healdsburg has another pending FEMA grant application for replacement of breathing apparatuses for first responders.

630.    Federal grants also play a particularly important role at the Healdsburg Municipal Airport. The City regularly receives grant funding for maintenance and improvements at the airport, which is used for private aviation, as well as for staging, landing, and take off by firefighters and other emergency personnel for emergency events in all of Sonoma County. In 2017, the airport played a critical role in allowing CalFire to fight the Tubbs Fire, which burned through Sonoma County and necessitated the full evacuation of Healdsburg. The City has submitted grant applications for nearly $600,000 for projects at the airport, funding the City needs to support critical improvements and rehabilitation of the airport's runways.

631.    The challenged Executive Orders pose a significant threat to Healdsburg's ability to maintain critical services for its community, including ensuring the safety and wellbeing of its residents and visitors. For example, Healdsburg has largely obligated the federal funding awarded to it in previous years, and the City is relying on the federal government to satisfy those funding commitments. In addition, on June 3, 2024, the City Council approved a budget for Fiscal Year 2025-2026 based on the assumption that the City will receive federal funding. The threatened loss of federal funds creates significant uncertainty. That uncertainty, by turn, undermines the accuracy of the City's budget, disrupts the City's fiscal planning, and jeopardizes the City's ability to protect jobs and vital programs.

### 34.     Hennepin County

632.    Hennepin County's 2025 budget anticipates $271 million in federal funding received directly from the federal government. This figure does not include additional federal funding received through grants administered by the State of Minnesota and its political subdivisions.

633.    The 2025 budget includes $1.5 million from DHS, $3.3 million from DOJ, $24.5 million from the Department of Agriculture, $205.7 million from HHS, $16.8 million from HUD, and $15.8 million from DOT.

634.    Hennepin County's budgeting process for 2026 is well underway, with a statutory deadline of September 30, 2025 to determine the amount of revenue the County must raise through property taxes in 2026. Uncertainty surrounding the availability of federal funding makes this budgeting process extremely challenging.

635.    If Hennepin County's federal funding is delayed or reduced, the County will be forced to make difficult decisions regarding its ability to support the current level of public services provided to Hennepin County residents.

### 35.     Los Angeles

636.    Federal grants play a critical role in funding Los Angeles's core services.  Over the course of the next fiscal year, the City expects to receive over $704 million in federal dollars, over $277 million of which come in the form of formula grants.  These dollars are written into the Fiscal Year 2025-2026 budget, which was adopted by the Los Angeles City Council and Mayor just a few

weeks ago.

637.    The federal funds support emergency response programs; police officer hiring; crime prevention and victim assistance programs, including supportive services for domestic violence victims and gang reduction and youth development programs; rape kit processing; homeless services, including provision of emergency shelter; development and management of affordable housing and permanent supporting housing; water recycling programs; brownfield cleanups; infrastructure support, such as sewer connection and maintenance throughout the City and local transit assistance; security upgrades for the Port of Los Angeles; services for senior residents in the City, including nutrition programs, senior centers, and transportation assistance; arts and cultural programs for residents and visitors to the City; and disaster recovery money related to recent wildfires and winter storms. None of these federally funded programs involve immigration or include any element of immigration enforcement.

638.    Any loss in funding would have a devastating impact on the City's adopted budget and overall finances.  In June, the Los Angeles City Council declared a fiscal emergency, due to the continued risk of elevated tariffs and their impact on global trade and tourism and revenue in the City, volatile market conditions, economic uncertainty, the cost of recovering from the January 2025 wildfires, and the threatened loss of federal funding by targeted action resulting from the Executive Orders.

639.    The loss of federal funding would lead to drastic service cuts that directly impact the residents of Los Angeles.  Public safety cuts would result from the loss of nearly $1 million earmarked for the Fire Department and over $6 million for the Police Department, $3 million of which is for hiring police officers. The public safety of those who live, work, and visit the Los Angeles area would also suffer from the withholding of over $2 million for criminal victim witness services and hundreds of thousands of dollars budgeted for police investigation of child sex crimes. In the wake of the devastating economic consequences of the January 2025 wildfires, the City depends more than ever on federal funding for economic development and job creation; those efforts would be crippled by the withholding of over $63 million expected for that purpose this year. The City is also counting on over $9 million in federal disaster relief grants to fund its ongoing relief efforts. Housing and services for

the City's most vulnerable residents would also be impacted, including by the loss of $84 million in expected federal housing and community development grants. The City would suffer similarly devastating cuts to programs supporting transit infrastructure maintenance (over $28 million in potential losses that would directly impact residents' ability to transit the City), airport modernization and maintenance ($162 million in potential losses), and rail and Port improvements (over $9 million in potential losses). Simply put, federal funds have been awarded to the City in support of a wide variety of core public functions that the City will not be able to provide as expected should the funding be withheld.

640.    FEMA disaster assistance is on a reimbursement basis. For example, the $9,709,007 in the FEMA reimbursements the City expects in 2025-2026 are reimbursements from prior disasters. The City has not started submitting reimbursements for the January Wildfires.  The City has only submitted the FEMA public assistance need, which is estimated at $310 million.

641.    The funding uncertainty has prompted the City to devote CAO staff time to tracking all federal actions to assess their impact to City grant funding. To address anticipated changes in City funding, City staff will need to update quarterly financial status reports, and all such changes will need to be reflected in the Fiscal Year 2026-2027 budget development process.

### 36.    Marin County

642.    For Fiscal Year 2023–2024, federal funding accounted for 13% of Marin County's $783 million budget.

643.    These funds were used for a range of purposes, including emergency assistance, healthcare access, and supporting housing access. Specifically, the County's Department of Health and Human Services received approximately $45 million from HHS to support the delivery of essential governmental services aimed at promoting the health, well-being, self-sufficiency, and safety of all Marin County residents. The County's Community Development Agency relied on approximately $20 million in HUD funding to advance the agency's mission of promoting sustainable development, increasing affordable housing, and enhancing the quality of life for all Marin residents. The County's Office of Emergency Management received tens of thousands of dollars from FEMA to reimburse County expenses for purchases such as hazard response equipment and cybersecurity technology. And

the County's Department of Public Works relied on approximately $4 million in funding from DOT to support highway maintenance, roadwork, and traffic safety measures. The County received $1.75 million in federal funds from DOJ to support the County's District Attorney and Sheriff's Offices.

644.    The County's budget for Fiscal Year 2025–2026 was recently approved by the Board of Supervisors. Given the fact that the County relied on the availability of federal funds when crafting the budget, a disruption in federal funding would severely impact the County's operations and service delivery throughout the upcoming fiscal year. The loss of federal funding for health and safety programs, in particular, would place residents at immediate risk and lead to serious disruptions in critical services.

### 37.    Menlo Park

645.    This fiscal year, Menlo Park anticipates receiving $21 million in direct and pass-through federal funding. That amount includes $5 million from DHS in FEMA funds, to replace outdated infrastructure with three new pumps to protect the City against a 100-year flood event and future sea level rise. Notably, flooding in Menlo Park is one of the greatest disaster risks to the City, and chronic lowland flooding in the area has caused millions of dollars in damage to public and private property. Menlo Park also receives significant funding from DOT, HHS, and the Department of the Interior, which combined make up $12 million of the City's funding, to support City infrastructure improvements and other essential services, such as bicycle and pedestrian safety improvements, charging stations for electric vehicles, and support for childhood development. None of the programs or services funded by federal dollars focus on immigration or include any element of immigration enforcement.

646.    On June 24, 2025, the City Council approved a budget for Fiscal Year 2025–2026 based on the assumption that the City would receive federal funding. The threatened loss of federal funds creates significant uncertainty that disrupts the City's fiscal planning and jeopardizes jobs and vital programs. In addition, Menlo Park has largely obligated the federal funding awarded to it in previous years, and is thus relying on the federal government to satisfy its funding commitments. The anticipated loss of federal funding for Menlo Park's large infrastructure projects, that span multiple years from design to construction completion, may require the City to cover contracted or incurred

expenses, depending on the stage of the project, or cancel the project entirely if alternate funding sources are not available.  Similarly, a loss of federal funding for services, such as programming offered at the Belle Haven Child Development Center, will require Menlo Park to identify alternate funding sources and consider the use of reserves to cover funding loss during the fiscal year. Delaying or cancelling projects due to loss of federal funding will lead to the work being more expensive as more time goes on and costs increase. Further, delaying or deferring the construction of Menlo Park's infrastructure projects will put critical systems for flood control and other utilities at further risk of deterioration.

### 38.   Multnomah County

647.    In Fiscal Year 2025, Multnomah County's budget included more than $100 million in direct and pass-through federal grant funding.

648.    That amount includes approximately $9 million from DOJ to support the County's Department of Community Justice, Health, Local Public Safety Coordinating Counsel, Sheriff's Office, as well as funding to the Multnomah County District Attorney; approximately $1 million from DHS; and approximately $42.5 million from HHS to support the County Health Department's public health programming, including primary care and specialized services such as HIV/AIDS services, school-based and early childhood mental health, addiction medicine and outreach, public health and epidemiology, and healthy family initiatives. The amount also includes $38.8 million from HUD, the Department of Energy, the Department of Education, HHS, the Department of Veterans Affairs, and Treasury to support critical community programs through the County's Department of Human Services, such as community school programs and youth advocacy, housing programs and homelessness prevention services, nutrition and health programs, case management, and outreach. The amount also includes $18.9 million in HUD and Treasury/American Rescue Plan funding for the County's Department of Homeless Services programs and $12.4 million in DOT funding for infrastructure improvements.

649.    Multnomah County's Fiscal Year 2026 began July 1, 2025. The loss of federal funding, both in Fiscal Year 2026 and in future years, would have a tremendous impact on Multnomah County's ability to provide these services to the community, and to staff departments with any degree

of certainty with regard to ongoing grant funding.

### 39. Pacifica

650.    In this fiscal year, direct and pass-through federal funding amounts to over $12 million of Pacifica's total budget. This includes more than $2 million from DHS and DOT, to support infrastructure improvements, traffic safety, and storm recovery efforts. Pacifica has also received over $500,000 from HHS to support services such as senior transportation, Meals on Wheels, and childcare support. And Pacifica has received $110,000 in DOT funding to support City programs and services related to traffic control and public safety. None of these programs or services focus on immigration or include any element of immigration enforcement.

651.    These funds operate on a reimbursement model, and the City is relying on the federal government to satisfy its funding commitments to repay these costs. Pacifica is also currently applying for a $3.5 million grant from DOT to support key planning and infrastructure to prevent death and serious injury on roads and streets. The Executive Orders threaten the City's ability to apply for and receive these and other future federal funding for critical public safety and infrastructure projects.

652.    Pacifica is already facing difficult budgetary decisions in the Fiscal Year 2025-2026 budget, with the $53 million budget projected to run $3.2 million deficit. The loss of anticipated federal grant funding would cause significant additional financial harm, and the mere threat of the loss has created confusion and uncertainty in Pacifica's budget planning, which is now in its final stages. Pacifica is currently considering how to navigate the threat of lost funds. If there is a reduction in revenue, Pacifica will need to suspend childcare and senior services and abandon critical infrastructure and disaster recovery projects. It will also need to reduce staffing that supports those services.

### 40. Palo Alto

653.    Palo Alto receives or plans to receive over $87 million in grants from the federal government over the next three years, including approximately $1.7 million from DHS and $185,000 from DOJ. These grants include funds for the construction of infrastructure; support of critical infrastructure such as aviation, water, and natural gas distribution; funds to house the unhoused; the purchase of public safety equipment; and aid for disaster relief. Palo Alto also receives $16.5 million from Department of Transportation, $12.8 million from the Department of the Interior, $1.2 million

from the Environmental Protection Agency, and $1.2 million from HUD.

654.    On June 16, 2025, Palo Alto adopted a Fiscal Year 2026 budget that reasonably relies on receipt of expected federal grants. Sudden and unanticipated cuts, such as the withdrawal of already budgeted and accounted-for federal funds, could lead to immediate service cuts, layoffs, and cancellation of contracts and associated penalties. The threat of losing federal funds under the Executive Orders and other federal directives creates significant uncertainty in Palo Alto's budget process, making it unclear whether federal funds will be available and what services and infrastructure the City can realistically plan to provide for its residents.

### 41.    Petaluma

655.    Federal grants play a critical role in funding Petaluma programs for: disaster mitigation and resiliency; energy efficiency and conservation; emergency operations; public safety equipment replacement, accreditation, and mobile crisis response; traffic safety and DUI operations; bulletproof vest replacement, and purchase of mobile vehicle barriers; storm drain trash capture, flood reduction, and recycled water expansion; water main replacement; wetlands restoration and other environmental protections; climate change response; airport improvements; road safety improvements; transit facility improvements; paratransit vehicles and operations; fixed route vehicles; community development services; and planning services. Outstanding Petaluma grant funding from the DOJ currently equals or exceeds $743,594, and supports public safety equipment replacement, accreditation, mobile crisis response, and bulletproof vest replacement. Outstanding grant funding from DHS totals $47,018. The total outstanding grant awards from a variety of federal agencies to Petaluma in all of these categories currently equals or exceeds $29 million, or nearly 10% of the city's budget.

656.    The threatened loss of nearly 10% of the city's budget would present the City Council with very difficult choices regarding how to maintain such critical programs as providing adequate safety equipment for law enforcement officials, maintaining essential disaster preparedness, protections for the environment and response to climate change, transit services for community members, including disabled community members, safety improvements on city rights of way, safety improvements at the municipal airport, housing services and critical non-profit service support, and other essential services and programs. The resulting program and service gaps would impact basic

services essential for Petaluma's most vulnerable community members.

### 42.    Pierce County

657.    The Fiscal Year 2024–2025 Pierce County biennial budget includes roughly $187 million in federal direct and pass-through funding, or about 6% of Pierce County's operating budget. About $15.5 million of this funding is from DHS, and about $2.5 million is from DOJ. Pierce County uses federal funding to support many of the County's core functions, including aging and disability resources, homeless services, public safety, emergency management, home weatherization programs, urban search and rescue task force readiness and deployment, and infrastructure and capital improvement projects.

658.    Pierce County is already facing considerable economic uncertainty due to inflation, elevated interest rates which will likely lead to slower growth in local revenues, and the uncertainty that tariffs have wrought. The threat of the loss of federal funding has compounded the county's already daunting financial situation, and losing federal grant funds could lead to the loss of critical services.

659.    Similarly, Defendants' threats to prosecute employees of so-called sanctuary jurisdictions have caused considerable distress and consternation within the Pierce County work force. Pierce County has limited resources to create and adopt new protocols to mitigate the federal threat to frontline workers while continuing to comply with state law that precludes localities from assisting federal immigration enforcement efforts.

### 43.    Richmond

660.    Richmond relies on federal funding to deliver public services. During Fiscal Year 2024–2025, Richmond received or was awarded approximately $37.8 million in direct and pass-through federal grants. Most of its funding came from HUD, DOT, and DOL. It also received $150,000 in Edward Byrne Memorial JAG Grants administered through DOJ.

661.    Federal grants fund many essential services and programs for Richmond's residents, including police services and safety; housing through the Richmond Housing Authority; housing for unsheltered and low-income residents; infrastructure improvements to the port, housing, community centers, libraries, parks, and streets, including bicycle, pedestrian, and traffic safety; and job training

and educational services for youths and adults.

662.    Richmond has already started its budgeting process for Fiscal Year 2025–2026. The uncertainty involving a pause and/or termination of federal grants makes it impossible for Richmond to maintain an accurate outlook in planning its future budgets. Losing federal funds will have a detrimental impact on Richmond's ability to continue to provide services to its residents.

## 44.    Rochester

663.    A significant portion of Rochester's budget is derived from federal funds, which Rochester uses to deliver critical resources to some of its most at-risk community members. Those federal dollars deliver critical resources to some of the most at-risk members of our community.

664.    For example, in Fiscal Year 2023-2024, Rochester's total expenditure of federal funds was $81,024,661. These funds pay for crucial City services such as housing assistance and services to low-income persons with AIDS, the development of rental housing and housing rehabilitation to assist first-time homebuyers, personal protective equipment and hazmat equipment for firefighters, as well as funding for community development activities and public safety initiatives. Over $4 million of this amount also goes to directly support City employee salary and benefits, affecting the employment of approximately 50 City employees.

665.    Rochester is already facing tough budget decisions and the loss of such a significant—and acutely important—set of funds would force Rochester to implement cuts to municipal services and staff. Indeed, the profound uncertainty that the mere threat of that funding loss has already created damaging confusion and uncertainty. Rochester officials are unsure what the future holds, and city residents are likewise extremely concerned, as they have frequently communicated to municipal leaders.

## 45.    Rohnert Park

666.    Federal grants play an important role in funding the Rohnert Park's public safety efforts, infrastructure improvements, and other essential operations. This fiscal year, more than $4 million of the City's total budget consists of direct and pass-through federal funding. A significant portion of that funding—nearly $3.5 million—comes from FHWA grants for public safety and infrastructure improvements related to pedestrian and cyclist safety. For example, the grants fund the

City's Highway 101 Bicycle and Pedestrian Overcrossing Project. Notably, the U.S. 101 freeway is a major barrier to east-west travel in Rohnert Park, particularly for cyclists and pedestrians, and creates gaps in the City's active transportation network. Although it is possible to travel between the east and west sides of the City using the underpass at Rohnert Park Expressway, these crossings present safety concerns by requiring cyclists and pedestrians to navigate freeway on and off ramps, large intersections, and heavy traffic. Federal funding is helping the City address this critical safety issue.

667.    Another large portion of the City's federal funding—$880,725—is from FEMA for mitigation activities to reduce risk to life and property from natural hazards, including earthquakes and wildfires, such as funding for the Autonomous Firewatch Camera Systems to combat wildfires; a project to seismically retrofit seven water tanks and six water well sites within the City; the construction of an off-channel stormwater detention basin to protect against a 10-year storm event; and other associated maintenance for sediment removal near the City's Copeland Creek. Rohnert Park also received $75,714 from DOJ this fiscal year. None of these projects are related to immigration enforcement.

668.    On June 10, 2025, the City Council approved an annual budget for Fiscal Year 2025-2026 based on the assumption that the City will receive federal funding. The threatened loss of federal funds creates significant uncertainty. For example, the City is relying on FHWA to fulfill its commitment to provide $3.35 million in already-awarded funds for the Highway 101 Bicycle and Pedestrian Overcrossing Project. This funding is essential to complete environmental clearance and design. Without the funding, the project, already years in the making, would be delayed indefinitely, and residents, particularly ones in vulnerable and underserved communities, would face prolonged exposure to hazardous road conditions.

### 46.    San Mateo County

669.    In Fiscal Year 2025–2026, direct and pass-through federal funds are anticipated to account for approximately $1 billion—or 20%—of the County's $4.9 billion in revenue.

670.    These funds are used to support essential County operations. For example, the County's health system relies on over $500 million in annual federal funding, and the County's Human Services Agency—which provides safety net and protective services to children, families, and adults in need of

assistance—is anticipated to receive approximately $90 million in federal funding for Fiscal Year 2025–2026, or almost one-quarter of its $363 million budget.

671.    San Mateo County has received or will receive at least $2.6 million from DOJ and $14.2 million from DHS that it expects to draw down from in Fiscal Year 2025-2026. Federal funding from HUD, HHS, DOL, and DOT annually finances over $650 million of San Mateo County's programs and services, including essential programs like critical infrastructure improvements, creation and preservation of low-income housing, and emergency shelter assistance for unhoused individuals. Similarly, San Mateo County has received or will receive tens of millions in funding from DOJ and DHS, to support such critical law enforcement services as first responder crisis intervention training; County Crime Laboratory staff training; salary costs for the officers addressing drug trafficking; costs for the victim services division of the District Attorney's Office and the County child advocacy center, which serves child crime victims and aids in the prosecution of sex crimes and other crimes against children.

672.    San Mateo County is already facing difficult budgetary decisions because of decreased state funding and the rising costs of providing public safety and safety net services. Particularly given the already difficult budget situation, critically important services would be jeopardized by a loss of federal funding emanating from the Executive Orders. Moreover, the mere threat of loss of federal funds has created confusion and uncertainty in the budget planning for San Mateo County and as to the County's continued ability to provide essential services.

### 47.    Santa Rosa

673.    The Fiscal Year 2025-2026 budget adopted by the Santa Rosa City Council on June 17, 2025 totals approximately $518 million, for all City operations. The budget is based on the assumption that Santa Rosa will receive approximately $218 million in awarded or anticipated federal grant funding.

674.    Of these funds, Santa Rosa receives approximately $47 million in grants from DHS, with the majority of those grants coming from FEMA. This funding includes, for example, $2.93 million annually from a FEMA Staffing for Adequate Fire and Emergency Response ("SAFER") grant, which pays for 12 firefighter paramedics. Losing these funds would significantly reduce the

City's ability to respond to wildfire risks and other emergency incidents. Santa Rosa also has also been awarded approximately $14.2 million in FEMA Hazard Mitigation Grant Program funds for the City's Laguna Treatment Plant Flood protection project, which is intended to decrease the risk of flooding during a 100-year event and improve resiliency of this critical regional sewage treatment plant. Without these funds, the project could not be completed and there is a significant risk that flooding at the site could lead to regional public health and water quality issues.

675.    Santa Rosa also receives approximately $44.5 million in DOT grants, including direct FTA and FHWA grants used to maintain City streets, replace the City's aging buses, and fund transit employee positions. Without these funds, Santa Rosa would experience increased maintenance costs due to the prolonged use of outdated vehicles, infrastructure challenges, and reductions in transit staffing that would increase disruptions and reduce transit services.

676.    Santa Rosa also intends to request new federal grants for use in Fiscal Year 2025-2026. These federal grant requests include, but are not limited to, DOJ's COPS Hiring program and Edward Byrne Memorial JAG grants. Santa Rosa has been awarded these DOJ grants in the past and the Santa Rosa Police Department used the funds for critical updated law enforcement technology, such as automated license plate readers, unmanned aerial devices, forensic and surveillance technology, body worn cameras, gunshot detection software, and updated records management systems. Without this funding, the City's ability to provide safe and effective public safety services to the community will substantially diminish.

677.    Based on declining revenue projections, with expenditures exceeding revenues, Santa Rosa projected a nearly $20 million deficit when developing its Fiscal Year 2025-2026 budget.  To reduce the deficit, the budget the City Council adopted in June 2025 includes roughly $12 million in expenditure reductions citywide, including but not limited to, elimination of 30 employee positions and cuts to service delivery citywide. Loss of the above and future federal grant funds would result in a further dramatic decline in projected revenue and the City would be required to further deplete emergency reserves set aside for future disasters (such as the devasting wildfires Santa Rosa has experienced since 2017), leaving Santa Rosa with greater exposure to disaster. If federal funds were cut suddenly, outside normal funding cycles, the City likely would also be required to make drastic

additional expenditure reductions including potentially further layoffs and cuts to critical basic municipal services. Losing these grant funds would cause irreparable harm to the City and the community it serves.

### 48. Sonoma County

678.    In Fiscal Year 2023-2024, Sonoma County received $289 million in federal funds, including $134 million from HHS, $65 million from HUD, $2.4 million from DOJ, and almost $11 million from DHS. Sonoma County's Department of Health Services, Department of Public Infrastructure, Human Services Department, and Department of Emergency Management, among others, rely on this funding to support essential programs like critical infrastructure improvements, creation and preservation of low-income housing, emergency shelter assistance for unhoused individuals, developing public health infrastructure and workforce, disaster preparedness and response, and provision of public safety services.

679.    The threatened loss of federal funds creates confusion and uncertainty in the budget planning for Sonoma County. Lack of certainty regarding federal funds has created significant uncertainty about the future viability or continuity of programs and services.

680.    The County is already facing difficult budgetary decisions. If federal grant funding is lost or reduced, the County will be forced to dramatically cut County services. The threatened loss of federal funds also creates confusion and uncertainty in Sonoma County's budget planning process: The County recently adopted its budget for Fiscal Year 2025-2026. Without knowing whether certain federal funds will be available for County programs and services, described above, the County is unable to plan with any certainty whether it will be able to maintain the viability and continuity of programs and services otherwise planned for in that budget.

### 49. Watsonville

681.    In Fiscal Year 2025-2026, Watsonville anticipates receiving over $19 million in direct and pass-through federal funding, providing critical support for public safety, infrastructure, planning, and transportation projects.

682.    In Fiscal Year 2024-2025, Watsonville's federal funding included receipt of $334,660 in DHS funding through FEMA for disaster relief, approximately $25,000 in DOJ Edward Byrne

Memorial JAG grants, $1.3 million in HUD Community Development Block Grants, $1 million in DOT infrastructure and safety grants, and $1 million in HHS grants for low-income household water assistance. The City used its DOJ funds to combat hate crimes, promote public trust between the community and criminal justice agencies, reduce violent crime, conduct community violence intervention, address COVID-19 criminal justice challenges and sustain innovations, and crime analysis and investigation.

683.    Watsonville is also relying on a $17 million FEMA grant to design, build, and install a new Main Electrical Facility within the existing Watsonville Wastewater Treatment Facility. This project is intended to increase the level of flood protection in the City to above the 500-year flood hazard event level and to increase the level of seismic protection to a 2,475-year return interval event.

684.    On June 24, 2025, the City Council approved a budget for Fiscal Year 2025-2026 based on the assumption that Watsonville will receive expected federal funding. The threatened loss of federal funds has created significant uncertainty around this process because the City depends on federal grants to maintain critical public services, including public safety and infrastructure improvements. Without the certainty of continued funding, Watsonville is unable to dependably finalize its 2025 budget. This uncertainty disrupts the City's fiscal planning, and jeopardizes jobs and vital programs. The loss of anticipated funding would result in lasting operational damage and a breakdown in the trust between the City and its diverse community.

### 50.    Wilsonville

685.    Wilsonville generally receives over $1 million annually in federal grant funds, either directly or through state pass-through funds.

686.    Wilsonville utilizes its various federal funds primarily for transit capital investments and providing meals to Wilsonville's senior residents. For example, in Fiscal Year 2024–2025, Wilsonville relied on over $1 million in DOT funds for bus preventative maintenance, software, security equipment, and operator safety materials. Wilsonville was also awarded pass-through funds of $135,320 for Fiscal Year 2024-2025, and a total award of $254,520 through Fiscal Year 2026–2027 from HHS to provide services for its senior residents.

687.    The loss of these funds would force Wilsonville to extend bus life spans beyond their

useful life, causing a significant decline in the quality and quantity of buses, decreasing the level of service, and diminishing the value and appeal of public transit in the Wilsonville community. Loss of funds would also force Wilsonville to no longer provide meals to some of its most vulnerable community members—seniors—many of whom are on fixed incomes, are unable to leave their homes, and lack resources and services. And the mere threat of loss of this funding has, as a result, injected significant uncertainty into Wilsonville's budgeting and planning processes.

### C.  Plaintiffs Face Operational Harms in Serving Their Communities

688.    Despite court orders and precedent foreclosing Defendants' understanding of the law, Defendants' actions have fostered an atmosphere of fear and distrust between undocumented immigrants and local government officials in Plaintiffs' jurisdictions. The threats of criminal and civil prosecution leveled at local officials, combined with recent ICE activity in Plaintiffs' communities, and compounded by the Trump Administration's statements about immigration enforcement, have also generated a maelstrom of fear and confusion and have left local agencies unsure of whether efforts to serve the undocumented community will be treated as grounds for prosecution.

689.    By heightening undocumented immigrants' concerns that any interaction with local officials will lead to their information being turned over to ICE, the Executive Orders and Bondi and Noem Directives discourage undocumented immigrants from reporting crimes, seeking public health services, and otherwise engaging with programs and services provided by Plaintiffs. This threat harms public safety, public health, and Plaintiffs' ability to act in what they have determined to be the best interest of their residents, consistent with federal and state law.

690.    The Executive Orders and Bondi and Noem Directives undermine Plaintiffs' ability to provide critical services not just to undocumented immigrants, but to all residents. When witnesses and crime victims will not talk to the police, law enforcement suffers and the entire community is less safe. When children are not vaccinated or the sick are not treated for communicable diseases, illness spreads throughout the community.

691.    At the same time, the repeated threats of criminal and civil prosecution, in Executive Order 14,159; in the Bove, Bondi, and Noem Directives; and in repeated statements from Trump

Administration officials, have left local officials fearful that complying with Plaintiffs' laws and serving undocumented residents will subject them to civil or criminal prosecution.

692.    These threats and fears fall disproportionately on public servants on the front lines of providing critical public safety and public health needs for residents of Plaintiffs' jurisdictions. For example, the Executive Orders and the Bondi Directive have already started to cause confusion and harm to Portland. Portland and its employees are required to follow both Oregon and federal law. Threats of prosecution impact front-line workers—police officers, firefighters, front desk staff at community centers—who will be required to make decisions in an interaction with immigration-enforcement officers that is consistent with all those laws. Threats of prosecution by DOJ do nothing to resolve the legal and policy disputes between local leaders and the federal government. Instead, they instill fear and uncertainty in public servants—employees simply trying to do their jobs consistent with the laws.

693.    Portland has been forced to consider ways to protect and assist such employees, promulgate additional guidance, and manage confusion surrounding the Executive Orders and the Bondi Directive.

694.    Similarly, Defendants' threats to prosecute employees of so-called "sanctuary" jurisdictions has caused considerable distress and consternation within the King County work force. King County has been forced to dedicate resources toward creating and adopting new protocols to mitigate the federal threat to frontline workers while continuing to enforce KWW and KCC 2.15. King County has expended sums placing a federal criminal defense attorney on retainer in anticipation of a federal prosecution.

695.    In Minneapolis, the federal government's threats have generated significant fear and uncertainty and affected the City's ability to deliver critical information and connections to resources and services to immigrant and refugee communities. Despite consistent City efforts to communicate City policies, including that the Minneapolis Police Department does not enforce federal immigration law, members of the Minneapolis community have expressed confusion, uncertainty, and fear about interacting with government. For example, anecdotal reports indicate that residents are afraid to appear at scheduled court hearings with City prosecutors due to fear of immigration detention at the county

courthouse in Minneapolis. The dynamic of uncertainty created by the executive orders and announcements from the federal government that cities perceived as "sanctuary" cities will face enhanced enforcement also extends to City employees. Threats from the federal government have created concern among City employees and officials that they may face legal challenge including criminal prosecution for doing their jobs, despite the fact that their conduct is lawful.

696.    These operational concerns are further exacerbated by the federal government's *Illinois*, *New York*, *Rochester*, *Colorado*, and *Los Angeles* lawsuits challenging many of the very same requirements that officials in Plaintiffs' jurisdictions are required to comply with under applicable local laws.

**CAUSES OF ACTION**

**COUNT ONE**

**TENTH AMENDMENT**

697.    Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs as if fully set forth herein.

698.    The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const., amend X. This provision prohibits the federal government from "commandeering" state and local officials to help enforce federal law. *See Printz*, 521 U.S. at 925 ("the Federal Government may not compel the States to implement, by legislation or executive action, federal regulatory programs.").

699.    Neither the Supremacy Clause, the INA, nor any federal statute displaces Plaintiffs' Tenth Amendment interest in refraining from deploying local resources to enforce federal immigration law. *United States v. California*, 921 F.3d at 890–91.

700.    As described above and in the Third Cause of Action below, Defendants violate the Tenth Amendment and seek to commandeer Plaintiffs because Executive Orders 14,159, 14,218, and 14,287, and the Bondi and Noem Directives attempt to use the spending power to coerce them into acting as arms of the federal government.

701.    Executive Order 14,159, Executive Order 14,287, and the Bondi and Noem Directives

1    also require Plaintiffs to enforce federal immigration law—including using local resources to hold

2    individuals pursuant to civil immigration detainers and administrative warrants and share confidential

3    personal information, including release dates for individuals in custody, with immigration

4    authorities—on penalty of civil or criminal prosecution.

5         702.    By restricting funding and directing enforcement against Plaintiffs for limiting

6    cooperation with federal immigration authorities, Defendants seek to commandeer Plaintiffs in

7    furtherance of a federal regulatory program in violation of the Tenth Amendment to the United States

8    Constitution.

### COUNT TWO
### SEPARATION OF POWERS

11        703.    Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs as

12   if fully set forth herein.

13        704.    The Constitution vests Congress with legislative powers, *see* U.S. Const. art. 1, § 1, the

14   spending power, *see* U.S. Const. art. 1, § 8, cl. 1, and the appropriation power, *see* U.S. Const. art. 1, §

15   9, cl. 7. Absent a statutory provision or an express delegation, only Congress is entitled to attach

16   conditions to federal funds.

17        705.    "The Framers viewed the legislative power as a special threat to individual liberty, so

18   they divided that power to ensure that 'differences of opinion' and the 'jarrings of parties' would

19   'promote deliberation and circumspection' and 'check excesses in the majority.'" *Seila Law LLC v.*

20   *Consumer Fin. Prot. Bureau*, 591 U.S. 197, 223 (2020) (quoting The Federalist No. 70, at 475 (A.

21   Hamilton) and citing *id.*, No. 51, at 350).

22        706.    "As Chief Justice Marshall put it, this means that 'important subjects . . . must be

23   entirely regulated by the legislature itself,' even if Congress may leave the Executive 'to act under

24   such general provisions to fill up the details.'" *West Virginia v. EPA*, 597 U.S. 697, 737 (2022)

25   (Gorsuch, J., concurring) (quoting *Wayman v. Southard*, 10 Wheat. 1, 42–43, 6 L.Ed. 253 (1825)).

26        707.    The separation of powers doctrine thus represents perhaps the central tenet of our

27   constitution, *see, e.g.*, *Trump v. United States*, 603 U.S. 593, 637–38 (2024); *West Virginia v. EPA*,

28   597 U.S. at 723–24, *Seila Law LLC*, 591 U.S. at 227, and consistent with these principles, the

executive acts at the lowest ebb of his constitutional authority and power when he acts contrary to the express or implied will of Congress. *Youngstown Sheet & Tube Co.*, 343 U.S. at 637 (Jackson, J., concurring).

708.    Pursuant to the separation of powers doctrine, the Executive Branch may not "claim[] for itself Congress's exclusive spending power, . . . [or] coopt Congress's power to legislate." *City & Cnty. of S.F.*, 897 F.3d at 1234.

709.    Congress has not conditioned the provision of federal funding on compliance with Defendants' immigration enforcement policies and requests.

710.    Congress has not delegated to Defendants the authority to impose immigration-enforcement conditions on federal funds.

711.    Through Executive Orders 14,159, 14,218, and 14,287 and the Bondi and Noem Directives, Defendants are unilaterally imposing new conditions on federal funding without authorization from Congress.

712.    In addition, through these actions, Defendants are legislating new sanctions for failure to comply with immigration enforcement authorities that are unsupported by any act of Congress, including under the INA, or by the Constitution.

713.    For these reasons, Defendants' conditioning of federal funding on local governments' cooperation with immigration enforcement violates principles of separation of powers.

## COUNT THREE

## SPENDING CLAUSE

714.    Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs as if fully set forth herein.

715.    The Spending Clause of the U.S. Constitution provides that "Congress"—not the Executive—"shall have Power to lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States . . . ." U.S. Const. art. I,§ 8, cl. 1.

716.    As described above, Defendants violate separation of powers principles because the funding restrictions in Executive Orders 14,159, 14,218, and 14,287 and the Bondi and Noem

Directives are not authorized by Congress, expressly or impliedly, and therefore violate the Spending

Clause as well.

717. Even if Congress had delegated its authority to impose conditions on federal funds, the

funding restrictions in Executive Orders 14,159, 14,218, and 14,287 and the Bondi and Noem

Directives would violate the Spending Clause by:

a. imposing conditions that are ambiguous, *see Pennhurst*, 451 U.S. at 17 ("The

legitimacy of Congress' power to legislate under the spending power…rests on whether

the State voluntarily and knowingly accepts [Congress' conditions]…  There can, of

course, be no knowing acceptance if a State is unaware of the conditions or is unable to

ascertain what is expected of it…[I]f Congress intends to impose a condition on the

grant of federal moneys, it must do so unambiguously.");

b. imposing conditions that are not germane to the stated purpose of the [program name]

funds, *see Dole*, 483 U.S. at 207 ("[C]onditions on federal grants might be illegitimate

if they are unrelated 'to the federal interest in particular national projects or

programs.'");

c. imposing conditions that are so severe as to coerce Plaintiffs, *see Sebelius*, 567 U.S. at

579 (opinion of Roberts, C.J.) (Congress may not impose conditions so severe that they

"cross[] the line distinguishing encouragement from coercion."); and

d. imposing conditions that would require Plaintiffs to act unconstitutionally by detaining

individuals based on civil detainers without a finding of probable cause, *Dole*, 483 U.S.

at 210 (Congress's spending power "may not be used to induce the States to engage in

activities that would themselves be unconstitutional.").

### COUNT FOUR

### FIFTH AMENDMENT DUE PROCESS: VOID FOR VAGUENESS

718. Under the Fifth Amendment to the United States Constitution, a federal law is

unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is

prohibited, or is so standardless that it authorizes or encourages seriously discriminatory

enforcement." *Williams*, 553 U.S. at 304.

719.    The constitutional vagueness standard applies with full force to executive orders. *See United States v. Soussi*, 316 F.3d 1095, 1101 (10th Cir. 2002). When an executive order contains terms that are not "susceptible of a clear meaning," nor "mitigate the vagueness of the term by supplying any definition," then the provision "lends itself to subjective interpretation" and is unconstitutional. *Humanitarian Law Project v. U.S. Dep't of Treasury*, 463 F. Supp. 2d 1049, 1070 (C.D. Cal. 2006).

720.    Section 17 of Executive Order 14,159, which refers to "sanctuary jurisdictions," fails to meaningfully define key terms, such as "sanctuary jurisdictions," "Federal funds," or "practices that interfere with the lawful exercise of Federal law." 90 Fed. Reg. at 8446. Nonetheless, having such a "practice" subjects a jurisdiction to "criminal or civil" actions, which could be draconian in nature. *Id.* What such a practice might be is left undefined, and subject to the Executive Branch's unbridled discretion.

721.    Section 2(a)(ii) of Executive Order 14,218, which refers to "sanctuary" policies, fails to meaningfully define key terms, such as "sanctuary policies" or "Federal payments," or what constitutes "seek[ing] to shield illegal aliens from deportation" or "abet[ting] sanctuary policies," instead leaving these terms subject to the Executive Branch's unbridled discretion.

722.    While court orders and precedent clearly define the limits of what the federal government can demand, the Executive Branch has already demonstrated its eagerness to exercise this unbridled discretion to reach into states and local jurisdictions to interfere with their ordinances, operations, and processes. Such a vast, standardless, and overbroad power invites arbitrary, subjective, and discriminatory enforcement.

723.    Executive Order 14,159 and Executive Order 14,287 purport to grant the Attorney General and the Secretary of Homeland Security unfettered discretion to decide which states or local governments are "sanctuary jurisdictions" that are now subject to criminal or civil action, and will have their funding paused, terminated, and/or clawed back.

724.    Other portions of Executive Order 14,159 are equally vague. Section 8, for example, requires assessment of "fines and penalties" against "aliens unlawfully present in the United States" but also anyone who "facilitate[s] such aliens' presence in the United States." 90 Fed. Reg. at 8445. It is unclear what Defendants understand "facilitate" to mean in this context, and the Order could be read

to apply to employees of Plaintiffs who provide undocumented persons with basic, safety-net services, or landlords, employers, friends, family, churches or non-profit organizations that assist undocumented persons. Not only does this standardless provision exceed the President's authority by legislating through executive order, but it also encourages and sanctions arbitrary, subjective, and discriminatory enforcement.

725.    Executive Order 14,218 is likewise vague and leaves it to the Executive Branch's discretion to determine what constitutes a "sanctuary" policy, what "federal payments" may be withheld, and what it means for a federal payment to "abet" sanctuary policies.

726.    Executive Order 14,287 is also vague and imposes no meaningful limits on what "Federal funds" are "appropriate" to suspend or terminate, instead defining this category broadly to include grants and contracts from *all* federal agencies.

727.    The DOJ and DHS memos are equally vague and lean into the unfettered discretion purportedly granted to them by the Executive Order. The Bove Directive directs "the newly established Sanctuary Cities Enforcement Working Group … to identify state and local laws, policies, and activities that are inconsistent with Executive Branch immigration initiatives," but does not define what would be encompassed within the expansive phrase "inconsistent with Executive Branch immigration initiatives."

728.    The Bondi Directive purports to define "[s]o-called 'sanctuary jurisdictions'" to "include state or local jurisdictions that refuse to comply with 8 U.S.C. § 1373, refuse to certify compliance with § 1373, or willfully fail to comply with other applicable federal immigration laws." Similarly, the Noem Directive purports to define "sanctuary jurisdictions" to "include" [j]urisdictions that decline to "comply with the information sharing requirements of 8 U.S.C. §§ 1373 and 1644," that decline to "honor requests for cooperation, such as participation in joint operations, sharing of information, or requests for short term detention of alien pursuant to a valid detainer," or that do not "provide access to detainees" in local custody. But these definitions are circular and fail to provide any more "fair notice of what is prohibited" than Executive Order 14,159 does. *Williams*, 553 U.S. at 304. Crucially, the Directives "do[] not make clear what conduct might subject a state or local jurisdiction to defunding or enforcement action, making it impossible for jurisdictions to determine how to modify

1  their conduct, if at all, to avoid . . . penalties." *Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d at 535.

2  Furthermore, use of the word "include" suggests that even a jurisdiction that does comply with Section

3  1373 could still be considered a "sanctuary jurisdiction" subject to defunding and prosecution under

4  Executive Order 14,159 and the Bondi and Noem Directives.

5      729.    The lack of notice or procedure for how a local government is to be designated a

6  "sanctuary jurisdiction" is particularly problematic when DOJ appears to have very recently taken on

7  an expansive reinterpretation of 8 U.S.C. § 1373 that is likely contrary to how courts have interpreted

8  the law. In other words, DOJ is now prosecuting jurisdictions for their ordinances and policies, when

9  courts have previously held similar ordinances to be lawful and *not* in conflict with federal

10 immigration enforcement laws. *See United States v. State of Illinois*, No. 1:25-cv-1285 (N.D. Ill. filed

11 Feb. 6, 2025); *United States v. New York*, No. 1:25-cv-00205 (N.D.N.Y. filed Feb. 12, 2025); *compare

12 Barr*, 965 F.3d at 764 ("Plaintiffs' respective sanctuary laws comply with 8 U.S.C. § 1373."); *Steinle

13 v. City & Cnty. of S.F.*, 919 F.3d 1154, 1164 (9th Cir. 2019) (local policy not to share release date

14 information of an inmate who is also an alien not preempted under the plain language of 8 U.S.C. §

15 1373); *United States v. California*, 921 F.3d at 891 (state law restricting information sharing with

16 federal immigration enforcement officials did not conflict with 8 U.S.C. § 1373); *see also Garland*, 42

17 F.4th at 1085–86 (Oregon's laws conserving use of state resources from being used to enforce federal

18 immigration laws did not conflict with 8 U.S.C. § 1373). DHS's issuance, then rapid removal, of a list

19 of supposed sanctuary jurisdictions—with no explanation of the import of the removal, or indication of

20 whether the list may be reissued—further compounds the problem, especially when paired with its

21 statement regarding expanded enforcement and targeting actions. With the publication of the list, DHS

22 "demand[ed]" that any jurisdictions on the list "immediately review and revise their policies to align

23 with federal immigration laws and renew their obligation to protect American citizens, not dangerous

24 illegal aliens." These vague commands, devoid of a legal basis but framed in mandatory language,

25 create unacceptable uncertainty for Plaintiffs and jurisdictions with similar policies.

26     730.    The reversal of prior policy that is effectuated by the Bondi and Noem Directives,

27 without explanation, and without heed to the fact that it is *not* the province of the Executive Branch to

28 say what the law is, *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 388–89 (2024), also violates fair

notice requirements of the Fifth Amendment. *See FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 254 (2012).

### COUNT FIVE

### FIFTH AMENDMENT DUE PROCESS: PROCEDURAL DUE PROCESS

731.    Under the Fifth Amendment to the United States Constitution, the federal government may not deprive Plaintiffs of money or property without "due process of law."

732.    Plaintiffs each have a constitutionally protectable property interest in the federal funds they rely on to provide essential services to their residents. Plaintiffs' property interest in those federal funds is established and governed by rules and mutually explicit understandings with the federal government.

733.    Section 17 of Executive Order 14,159 and the Bondi Directive deprive the Plaintiffs of their procedural due process rights under the Fifth Amendment because they grant the Attorney General, DOJ, and the DHS Secretary unfettered discretion to "ensure that" so-called "'sanctuary jurisdictions'" "do not receive access to Federal funds from the Department."

734.    The Noem Directive deprives the Plaintiffs of their procedural due process rights under the Fifth Amendment because it appears to grant DHS unfettered discretion to "cease providing federal funding to sanctuary jurisdictions."

735.    Section 2(a)(ii) of Executive Order 14,218 deprives the Plaintiffs of their procedural due process rights under the Fifth Amendment because it appears to grant Executive Branch agencies unfettered discretion to condition or withhold "Federal payments" that they deem to "abet" "sanctuary" policies.

736.    Section 3(a) of Executive Order 14,287 deprives the Plaintiffs of their procedural due process rights under the Fifth Amendment because it appears to grant Executive Branch agencies unfettered discretion to "identify appropriate Federal funds to sanctuary jurisdictions, including grants and contracts, for suspension or termination."

737.    The Bondi Directive's thin reference that DOJ, when terminating or clawing back funds from awardees it has deemed to be sanctuary jurisdictions, "shall comply with any notice and procedural requirements in the award, agreement, or other instrument" does not insulate the

Directive's defunding threats from a Fifth Amendment challenge. Notwithstanding any notice or procedures pursuant to terms of awarded funding that this sentence refers to, local jurisdictions have no way to know if or when they have been designated by DOJ a "sanctuary jurisdiction" in the first place, or have an opportunity to be heard to dispute that designation prior to initiation of proceedings against a jurisdiction's funding or against the jurisdiction itself. *See Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d at 536.

738.    Moreover, the Bondi Directive's directive to "[a]ll litigating components of the Department of Justice and each U.S. Attorneys' Office" to take action against local governments, as well as the Noem Directive's directive to "[a]ll components" of DHS to "make appropriate criminal referrals to the Department of Justice," appear designed to chill lawful ordinances and policies that limit the use of local resources to assist with federal immigration enforcement, and to coerce jurisdictions into abandoning those policies. The Bondi and Noem Directives provide no mechanism by which a state or local government may review, challenge, or even obtain notice that it has been designated a "sanctuary jurisdiction."

739.    The Bondi and Noem Directives' self-serving statements that the defunding and enforcement actions contemplated will be "consistent with" the law do not shield the Administration from the Fifth Amendment. *See Doe v. Harris*, 772 F.3d 563, 580–81 (9th Cir. 2014); *see also United States v. Stevens*, 559 U.S. 460, 480 (2010) ("We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly."); *City & Cty. of S.F. v. Trump*, 897 F.3d at 1240 ("If 'consistent with law' precludes a court from examining whether the Executive Order is consistent with law, judicial review is a meaningless exercise, precluding resolution of the critical legal issues."). These statements are also likely illusory, given the several actions that the Administration has taken, particularly with respect to federal funding, since January 20, 2025 that have already been held to be unconstitutional by courts across the country. *See, e.g.*, Mem. Op. & Order, ECF No. 30, *Nat'l Council of Nonprofits* (D.D.C. Feb. 3, 2025) (TRO against OMB directive); ECF No. 50, *New York* (D.R.I. filed Jan. 28, 2025) (same); Preliminary Injunction, ECF No. 114, *State of Washington v. Trump*, No. 25-cv-00127 (W.D. Wash. Feb. 6, 2025) (granting preliminary injunction against Executive Order ending birthright citizenship for children born to certain noncitizen parents).

740.    Because the Executive Orders and the Bondi and Noem Directives deprive the Plaintiffs of a cognizable property interest while providing no notice, no pre-deprivation opportunity to be heard, and no post-deprivation opportunity to be heard, they violate the Fifth Amendment's due process clause.

### COUNT SIX

### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)

### (ARBITRARY AND CAPRICIOUS)

741.    Plaintiffs repeat and incorporate by reference each of the allegations of the prior paragraphs as if fully set forth herein.

742.    Defendants DOJ and DHS are "agencies" as defined in the APA, 5 U.S.C. § 551(1), and the Bondi and Noem Directives are agency actions subject to review under the APA.

743.    Final agency actions (1) "mark the 'consummation' of the agency's decision-making process" and (2) are ones "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 178 (1997).

744.    The Bondi and Noem Directives are final agency actions because they announce a final decision to condition or withhold federal funding and thus mark the consummation of DOJ's and DHS's decision-making processes.

745.    Further, the Bondi and Noem Directives are actions determining rights or obligations or from which legal consequences will flow because they exercise a purported authority held by DOJ and DHS to stop funding directed by Congress that would otherwise be provided, and add conditions that Congress has not authorized.

746.    Under the APA, a "court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

747.    "An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'" *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). A court must therefore "ensure, among other things, that the agency has offered 'a satisfactory explanation for its action[,] including a rational connection between

the facts found and the choice made.'" *Id.* (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983)). "[A]n agency cannot simply ignore 'an important aspect of the problem'" addressed by its action. *Id.* at 293.

748.    As described above, the Bondi and Noem Directives provide no reasoned explanation for the extreme breadth of the withholding or conditioning of funding to Plaintiffs.

749.    The Bondi and Noem Directives provide no reasoned basis for withholding or conditioning funds Congress appropriated for disbursement, including via formula grants, except to the extent they make clear that the Executive Order enacts the President's policy desires in place of Congress's intent.

750.    The Bondi and Noem Directives also ignore essential aspects of the "problem" it purports to address, including the lack of statutory authority or basis for withholding already appropriated funds, Plaintiffs' inevitable reliance on DOJ and DHS funds for critical public safety and emergency preparedness activities, and the need for clarity by local governments about funding streams to provide day-to-day services relied on by their residents.

751.    Plaintiffs therefore ask the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that the Bondi and Noem Directives violate the APA because they are arbitrary and capricious; vacate the Bondi and Noem Directives under 5 U.S.C. § 706; provide preliminary relief under 5 U.S.C. § 705; and preliminary and permanently enjoin Defendants from implementing or enforcing the Bondi and Noem Directives.

## COUNT SEVEN

## VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)

### (CONTRARY TO CONSTITUTION)

752.    Plaintiffs repeat and incorporate by reference each of the allegations of the prior paragraphs as if fully set forth herein.

753.    Under the APA, a "court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

754.    As described above, the Bondi and Noem Directives violate bedrock constitutional provisions and principles, including the separation of powers between the President and Congress, the Spending Clause, the Take Care Clause, the Presentment Clause, the Appropriations Clause, and the Tenth Amendment.

755.    Plaintiffs therefore ask the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that the Bondi and Noem Directives violate the APA because they are contrary to constitutional rights, powers, privileges, or immunities; vacate the Bondi and Noem Directives under 5 U.S.C. § 706; provide preliminary relief under 5 U.S.C. § 705; and preliminary and permanently enjoin Defendants from implementing or enforcing the Bondi and Noem Directives.

## COUNT EIGHT

### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)(C)

(IN EXCESS OF STATUTORY AUTHORITY)

756.    Plaintiffs repeat and incorporate by reference each of the allegations of the prior paragraphs as if fully set forth herein.

757.    Under the APA, a "court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

758.    Defendants may exercise only authority granted to them by statute.

759.    No law or provision of the Constitution authorizes DOJ to withdraw properly obligated federal funds or to impose extra-statutory conditions not authorized by Congress. Defendants exceed the statutory authority of several laws which do concern federal payments.

760.    First, "[a]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law," 31 U.S.C. § 1301(a). Federal agencies necessarily lack the authority to freeze funds immediately, categorically, and indefinitely, particularly where the stated purpose of that freeze is to pause, cancel, or reallocate funding to sources which do not align with the purpose for which those funds were appropriated by Congress.

761.    No appropriations act authorizes Defendants to unilaterally pause, withhold, or conditions federal payments without congressional authorization. *See, e.g.*, Inflation Reduction Act of

2022, Public Law 117-169; Infrastructure Investment and Jobs Act, Public Law 117-58; Consolidated Appropriations and Extensions Act of 2024, Public Law 118-42; Consolidated Appropriations and Extensions Act of 2025, Public Law 118-83.

762.    Second, the Impoundment Control Act of 1974 requires the President to notify and request authority from Congress to rescind or defer funds *before* acting to withhold or pause federal payments. 2 U.S.C. §§ 681 *et seq*. The President has not done so.

763.    Defendants have no authority to withhold funding from Plaintiffs without considering the statutes, regulations, and terms governing each source of funding. The blanket freeze of DOJ funding is blatantly illegal.

764.    Plaintiffs therefore ask the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that the Bondi and Noem Directives violate the APA because they are in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; vacate the Bondi and Noem Directives under 5 U.S.C. § 706; provide preliminary relief under 5 U.S.C. § 705; and preliminary and permanently enjoin Defendants from implementing or enforcing the Bondi and Noem Directives.

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs pray that the Court grant the following relief:

1.    A declaration that Section 17 of Executive Order 14,159 is unconstitutional and invalid on its face;

2.    A declaration that Section 17 of Executive Order 14,159 is unconstitutional and invalid as applied to the local laws and policies identified in this complaint;

3.    A declaration that the portion of Section 2(a)(ii) of Executive Order 14,218 relating to "sanctuary" policies is unconstitutional and invalid on its face;

4.    A declaration that the portion of Section 2(a)(ii) of Executive Order 14,218 relating to "sanctuary" policies is unconstitutional and invalid as applied to the local laws and policies identified in this complaint;

5.    A declaration that Section 3(a) of Executive Order 14,287 is unconstitutional and invalid on its face;

6.      A declaration that Section 3(a) of Executive Order 14,287 is unconstitutional and invalid as applied to the local laws and policies identified in this complaint;

7.      A declaration that local laws and policies that limit (1) the honoring of civil immigration detainer requests; (2) cooperation with administrative warrants for purposes of immigration enforcement; (3) sharing of information with federal immigration authorities other than immigration or citizenship status; (4) the use of local law enforcement to arrest or detain individuals solely for civil immigration violations; or (5) the use of local resources to assist with immigration enforcement activities, do not violate federal law, including 8 U.S.C. § 1373 and 8 U.S.C. § 1324;

8.      A preliminary and permanent injunction enjoining Defendants from enforcing Section 17 of Executive Order 14,159, or taking any other action in furtherance of any pausing, freezing, terminating, withholding, or conditioning of federal funds based on Section 17 of Executive Order 14,159 or taking enforcement actions against Plaintiffs based on the laws and policies identified in this complaint;

9.      A preliminary and permanent injunction enjoining Defendants from enforcing the portion of Section 2(a)(ii) of Executive Order 14,218 relating to "sanctuary" policies, or taking any other action in furtherance of any pausing, freezing, terminating, withholding, or conditioning of federal payments based on that portion of Section 2(a)(ii) of Executive Order 14,218;

10.     A preliminary and permanent injunction enjoining Defendants from enforcing Section 3(a) of Executive Order 14,287, or taking any other action in furtherance of any pausing, freezing, terminating, withholding, or conditioning of federal funds based on Section 3(a);

11.     A preliminary and permanent injunction enjoining Defendants from implementing the funding pause or the unlawful funding conditions directed by the Bondi Directive, the Noem Directive, and materially similar agency actions, or taking enforcement action against Plaintiffs based on the laws and policies identified in this complaint;

12.     Issue all necessary and appropriate process to postpone the effective date of the Bondi Directive, the Noem Directive, and materially similar agency actions, or to preserve the status and rights of Plaintiffs pending conclusion of the review proceedings, pursuant to 5 U.S.C. § 705;

13.     An order holding unlawful and setting aside the Bondi Directive, the Noem Directive, and materially similar agency actions pursuant to 5 U.S.C. § 706;

14.     Award Plaintiffs reasonable costs and attorneys' fees; and

15.     Grant any other further relief that the Court deems fit and proper.


Dated:  August 7, 2025                          DAVID CHIU
                                                City Attorney
                                                YVONNE R. MERÉ
                                                Chief Deputy City Attorney
                                                MOLLIE M. LEE
                                                Chief of Strategic Advocacy
                                                SARA J. EISENBERG
                                                Chief of Complex and Affirmative Litigation
                                                NANCY E. HARRIS
                                                KARUN A. TILAK
                                                Deputy City Attorneys

                                          By:   /s/ David Chiu
                                                DAVID CHIU
                                                City Attorney

                                                Attorneys for Plaintiff
                                                CITY AND COUNTY OF SAN FRANCISCO


                                                TONY LOPRESTI
                                                County Counsel
                                                KAVITA NARAYAN
                                                Chief Assistant County Counsel
                                                MEREDITH A. JOHNSON
                                                Lead Deputy County Counsel
                                                STEFANIE L. WILSON
                                                RAJIV NARAYAN
                                                Deputy County Counsels
                                                BILL NGUYEN
                                                Litigation Fellow

                                          By:   /s/ Tony LoPresti
                                                TONY LOPRESTI
                                                County Counsel

                                                Attorneys for Plaintiff
                                                COUNTY OF SANTA CLARA

1

ROBERT TAYLOR
Portland City Attorney

2

By: /s/ Naomi Sheffield

3

NAOMI SHEFFIELD*
Chief Deputy City Attorney

4

1221 SW Fourth Avenue, Room 430
Portland, OR 97204

5

Tel: (503) 823-4047
Fax: (503) 823-3089

6

Naomi.Sheffield@portlandoregon.gov

7

*Admitted pro hac vice

8

Attorneys for Plaintiff
CITY OF PORTLAND

9

10

SHANNON BRADDOCK
King County Executive

11

By: /s/ David J. Hackett

12

DAVID J. HACKETT*
General Counsel to King County

13

Executive
Chinook Building

14

401 5th Avenue, Suite 800
Seattle, Washington, 98104

15

(206) 477-9483
David.hackett@kingcounty.gov

16

PAUL J. LAWRENCE*
Pacifica Law Group

17

1191 2nd Avenue, Suite 2000
Seattle, WA 98101-3404

18

(206) 245-1708
Paul.Lawrence@pacificalawgroup.com

19

20

*Admitted pro hac vice

21

Attorneys for Plaintiff
MARTIN LUTHER KING, JR. COUNTY

22

23

24

25

26

27

28

1
2

PATRICIA KING
New Haven Corporation Counsel

3

By:  /s/ Patricia King

4

PATRICIA KING*
Office of the Corporation Counsel
City of New Haven
165 Church Street-4th Floor
New Haven, CT 06510
Tel:   203-946-7951
Cell: 203-668-9282
Fax:  203-946-7942
pking@newhavenct.gov

5
6
7
8

*Admitted pro hac vice

9

Attorney for Plaintiff
CITY OF NEW HAVEN

10
11
12

RYAN RICHARDSON
Oakland City Attorney

13

By:  /s/ Ryan Richardson

14

RYAN RICHARDSON
City Attorney
MARIA BEE
Chief Assistant City Attorney
JAMIE HULING DELAYE
Supervising City Attorney
H. LUKE EDWARDS
Deputy City Attorney
One Frank H. Ogawa Plaza, 6th Floor
Oakland, CA 94612
Tel: (510) 238-6629
Fax: (510) 238-6500
Email: RRichardson@OaklandCityAttorney.org

15
16
17
18
19
20
21
22

Attorneys for Plaintiff
CITY OF OAKLAND

23
24
25
26
27
28

JOHN I. KENNEDY
City Attorney

By: /s/ John I. Kennedy
JOHN I. KENNEDY, City Attorney
1333 Park Ave, Emeryville, CA 94608-3517
Phone: 510-596-4381
Fax: 510-596-3724
Email: John.Kennedy@emeryville.org

Attorney for Plaintiff
CITY OF EMERYVILLE


NORA FRIMANN
City Attorney

By: /s/ Nora Frimann
NORA FRIMANN, City Attorney
ELISA TOLENTINO, Chief Deputy City Attorney
200 E Santa Clara St
San José, CA 95113-1905
Tel: 408-535-1900
Fax: 408-998-3131
cao.main@sanjoseca.gov

Attorneys for Plaintiff
CITY OF SAN JOSÉ


HEATHER FERBERT
City Attorney

By: /s/ Mark Ankcorn
MARK ANKCORN, Senior Chief Deputy City Attorney
JULIE RAU, Deputy City Attorney
1200 Third Avenue, Suite 1100
San Diego, California 92101-4100
Tel: (619) 533-5800

Attorneys for Plaintiff
CITY OF SAN DIEGO

1

2

SUSANA ALCALA WOOD
City Attorney

3

By: /s/ Andrea Velasquez
ANDREA VELASQUEZ, Supervising Deputy City
Attorney
915 I St Fl 4, Sacramento, CA 95814-2621
Tel: 916-808-5346
Fax: 916-808-7455
Email: AVelasquez@cityofsacramento.org

4

5

6

7

Attorneys for Plaintiff
CITY OF SACRAMENTO

8

9

By: /s/ Anthony P. Condotti
Anthony P. Condotti, City Attorney
Catherine M. Bronson, Assistant City Attorney
Claire Hard, Deputy City Attorney
PO Box 481
Santa Cruz, CA 95061
Tel: 831-423-8383
Email: tcondotti@abc-law.com
chard@abc-law.com
cbronson@abc-law.com

10

11

12

13

14

15

Attorneys for Plaintiff
CITY OF SANTA CRUZ

16

17

SUSAN K. BLITCH
County Counsel

18

19

By: /s/ Susan K. Blitch
SUSAN K. BLITCH, County Counsel
HENRY BLUESTONE SMITH, Deputy County Counsel
168 W Alisal St Fl 3rd
Salinas, CA 93901-2439
Tel: 831-755-5045
Fax: 831-755-5283
Email: SmithHB@countyofmonterey.gov

20

21

22

23

Attorneys for Plaintiff
COUNTY OF MONTEREY

24

25

26

27

28

ANN DAVISON
Seattle City Attorney

By: /s/ Kerala Cowart
    Kerala Cowart, Assistant City Attorney*
    Ann Davison, Seattle City Attorney*
    Dallas LePierre, Assistant City Attorney*
    Rebecca Widen, Assistant City Attorney*
    Seattle City Attorney's Office
    701 Fifth Avenue, Suite 2050
    Seattle, WA 98104
    Tel: (206) 684-8200
    E-mail: Kerala.Cowart@seattle.gov

    *Admitted *pro hac vice*

    Attorneys for Plaintiff
    CITY OF SEATTLE


KRISTYN ANDERSON
City Attorney

By: /s/ Kristyn Anderson
    KRISTYN ANDERSON (MN Lic. 0267752)*
    SARA J. LATHROP, Assistant City Attorney (MN Lic. 0310232)*
    SHARDA ENSLIN, Assistant City Attorney (MN Lic. 0389370)*
    350 South Fifth Street
    Minneapolis, MN 55415
    Tel: 612-673-3000
    Email: kristyn.anderson@minneapolismn.gov
    sara.lathrop@minneapolismn.gov
    sharda.enslin@minneapolismn.gov

    *Admitted *pro hac vice*

    Attorneys for Plaintiff
    CITY OF MINNEAPOLIS

1
2

LYNDSEY OLSON
City Attorney

3

By: */s/ Lyndsey Olson*
LYNDSEY OLSON, City Attorney (MN Lic. #
0332288)*

4

ANTHONY G. EDWARDS, Assistant City Attorney
(MN Lic. # 0342555)*

5
6

400 City Hall and Courthouse
15 Kellogg Boulevard West

7

Saint Paul, Minnesota 55102
Tel: 651-266-8710

8

Fax: 651-298-5619
Email: Anthony.Edwards@ci.stpaul.mn.us

9

*Admitted *pro hac vice*

10

Attorneys for Plaintiff

11

CITY OF ST. PAUL

12
13

ERIN K. McSHERRY
City Attorney

14

By: */s/ Erin K. McSherry*
ERIN K. McSHERRY, City Attorney*

15

200 Lincoln Avenue
Post Office Box 909

16

Santa Fe, NM 87504-0909
(505) 955-6967

17

Email: mdmartinez@santafenm.gov

18

*Admitted *pro hac vice*

19

Attorney for Plaintiff

20

CITY OF SANTA FE

21
22
23
24
25
26
27
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

By: /s/ Erin Monju
ERIN MONJU*
KATHERINE COURTNEY (CA Bar No. 341165)
NAOMI TSU**
JILL HABIG (CA Bar No. 268770)
Public Rights Project
490 43rd Street, Unit #115
Oakland, CA 94609
Tel: (510) 738-6788
erin@publicrightsproject.org
katiec@publicrightsproject.org
jill@publicrightsproject.org
naomi@publicrightsproject.org

* Admitted pro hac vice; practicing under supervision of
D.C. Bar member pursuant to Local Rule 49(c)(8) while
application to the D.C. Bar is pending
** Admitted *pro hac vice*

Attorneys for Plaintiffs
CITIES OF MINNEAPOLIS, NEW HAVEN,
PORTLAND, ST. PAUL, SANTA FE, SEATTLE,
ALBANY, ALBUQUERQUE, BEND, BOSTON,
CAMBRIDGE, CHICAGO, COLUMBUS, CULVER
CITY, DENVER, ROCHESTER, and WILSONVILLE
and COUNTIES OF ALLEGHENY, DANE,
HENNEPIN, MULTNOMAH, and PIERCE


DONNA R. ZIEGLER
County Counsel, County of Alameda

By: /s/ Jason M. Allen
K. SCOTT DICKEY
Assistant County Counsel
JASON M. ALLEN
Senior Deputy County Counsel
1221 Oak Street, Suite 450
Oakland, California 94612
Telephone: (510) 272-6700
E-mails: scott.dickey@acgov.org
          jason.allen@acgov.org

Attorneys for Plaintiff
COUNTY OF ALAMEDA

ROBERT MAGEE*
Corporation Counsel

By:  */s/ Robert Magee*
    City Hall, Room 106
    24 Eagle St
    Albany, NY 12207
    Tel: 518-434-5050
    Email: rmagee@albanyny.gov

    *Admitted *pro hac vice*

    Attorney for Plaintiff
    CITY OF ALBANY


By:  */s/ Lauren Keefe*
    LAUREN KEEFE, City Attorney (NM Lic. 14664)*
    DEVON P. KING, Deputy City Attorney (NM Lic. 148108)*
    One Civic Plaza NW
    PO Box 2248
    Albuquerque, NM 87103
    Telephone: 505-768-4500
    lkeefe@cabq.gov
    dking@cabq.gov

    *Application for admission *pro hac vice* forthcoming

    Attorneys for Plaintiff
    CITY OF ALBUQUERQUE


    EBONY M. THOMPSON
    Baltimore City Solicitor

By:  */s/ Christopher Sousa*
    Christopher Sousa (264874)
    Baltimore City Department of Law
    100 N. Holliday Street
    Baltimore, Maryland 21202
    410.396.3947
    christopher.sousa@baltimorecity.gov

    Attorneys for Plaintiff
    CITY OF BALTIMORE

1

2

OFFICE OF THE CITY ATTORNEY FOR
THE CITY OF BEND

3

4

5

6

7

8

9

10

By:  */s/ Ian M. Leitheiser*
    Ian M. Leitheiser (OSB #993106)*
    *City Attorney*
    Elizabeth Oshel (OSB #104705)*
    *Senior Assistant City Attorney*
    Michael J. Gaffney (OSB #251680)*
    *Senior Assistant City Attorney*
    City of Bend
    PO Box 431
    Bend, OR 97709
    (541) 693-2128
    ileitheiser@bendoregon.gov
    eoshel@bendoregon.gov
    mgaffney@bendoregon.gov

11

12

    *Application for admission *pro hac vice* forthcoming

13

    Attorneys for Plaintiff
    CITY OF BEND

14

15

16

17

18

19

20

By:  */s/ Benjamin L. Stock*
    Benjamin L. Stock (SBN 208774)
    Stephen A. McEwen (SBN 186512)
    Eileen L. Ollivier (SBN 345880)
    BURKE, WILLIAMS & SORENSEN, LLP
    1999 Harrison Street, Suite 1650
    Oakland, California 94612-3520
    Tel:  510.273.8780    Fax:  510.839.9104
    bstock@bwslaw.com
    smcewen@bwslaw.com
    eollivier@bwslaw.com

21

    Attorneys for Plaintiff
    CITY OF BENICIA

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

By: */s/ Farimah F. Brown*
    Farimah F. Brown, City Attorney, SBN 201227
    Katrina L. Eiland, Deputy City Attorney, SBN 275701
    Laura Iris Mattes, Deputy City Attorney, SBN 310594
    Stephen A. Hylas, Deputy City Attorney, SBN 319833
    BERKELEY CITY ATTORNEY'S OFFICE
    2180 Milvia Street, Fourth Floor
    Berkeley, CA 94704
    Telephone: (510) 981-6998
    Facsimile: (510) 981-6960
    keiland@berkeleyca.gov
    lmattes@berkeleyca.gov
    shylas@berkeleyca.gov

    Attorneys for Plaintiff
    CITY OF BERKELEY


    ADAM CEDERBAUM
    Corporation Counsel

By: */s/ Samuel Dinning*
    SAMUEL DINNING (MA BBO# 704304)*
    Chief of Staff & Policy
    KATHERINE AUBUCHON-JONES (MA BBO# 705490)*
    Senior Assistant Corporation Counsel
    City of Boston Law Department
    1 City Hall Plaza, Room 615
    Boston, MA 02201
    Telephone: 617-635-4034
    samuel.dinning@boston.gov
    katherine.jones@boston.gov

    *Application for admission *pro hac vice* forthcoming

    Attorneys for Plaintiff
    CITY OF BOSTON

CITY OF CAMBRIDGE, LAW DEPARTMENT
MEGAN B. BAYER, CITY SOLICITOR

By: */s/ Megan B. Bayer*
    Megan B. Bayer (MA BBO No. 669494)*
    *City Solicitor*
    Sean M. McKendry (MA BBO No. 678844)*
    *Assistant City Solicitor*
    Sydney M. Wright (MA BBO No. 698565)**
    *Assistant City Solicitor*
    Cambridge City Hall, 3rd Floor
    795 Massachusetts Avenue
    Cambridge, MA 02139
    (617) 349-4121
    mbayer@cambridgema.gov
    smckendry@cambridgema.gov
    swright@cambridgema.gov

    *Admitted *pro hac vice*
    **Application for admission *pro hac vice* forthcoming

    Attorneys for Plaintiff
    CITY OF CAMBRIDGE


By: */s/ Stephen A. McEwen*
    Stephen A. McEwen (SBN 186512)
    Eileen L. Ollivier (SBN 345880)
    BURKE, WILLIAMS & SORENSEN, LLP
    1770 Iowa Avenue, Suite 240
    Riverside, CA  92507-2479
    Tel:  951.788.0100     Fax:  951.788.5785
    smcewen@bwslaw.com
    eollivier@bwslaw.com

    Attorneys for Plaintiff
    CITY OF CATHEDRAL CITY

1                    MARY B. RICHARDSON-LOWRY

2                    Corporation Counsel of the City of Chicago

3         By: */s/ Rebecca Hirsch*

4                    Rebecca Hirsch (rebecca.hirsch2@cityofchicago.org)
City of Chicago Department of Law

5                    121 North LaSalle Street, Room 600
Chicago, Illinois 60602

6                    Tel: (313) 744-8143

7                    Attorneys for Plaintiff
CITY OF CHICAGO

9                    CITY OF COLUMBUS, DEPARTMENT OF LAW
ZACH KLEIN, CITY ATTORNEY

10

11        By: */s/ Richard N. Coglianese*
                    Richard N. Coglianese (0066830)

12                    Assistant City Attorney
77 N. Front Street, 4th Floor
Columbus, Ohio 43215

13                    (614) 645-0818 Phone
(614) 645-6949 Fax

14                    rncoglianese@columbus.gov

15                    Attorneys for Plaintiff
CITY OF COLUMBUS

OFFICE OF THE CORPORATION COUNSEL FOR
DANE COUNTY

By: */s/ Carlos A. Pabellon*
    Carlos A. Pabellon (WSB # 1046945)*
    *Corporation Counsel*
    David R. Gault (WSB # 1016374)*
    *Deputy Corporation Counsel*
    County of Dane
    City-County Building, Room 419
    210 Martin Luther King, Jr. Blvd.
    Madison, WI 53703
    (608) 266-4355
    pabellon.carlos@danecounty.gov
    gault@danecounty.gov

    *Admitted *pro hac vice*

    Attorneys for Plaintiff
    COUNTY OF DANE


    ASHLEY M. KELLIHER
    Assistant City Attorney

By: */s/ Ashley M. Kelliher*
    Ashley M. Kelliher (CO Bar No. 40220)*
    Assistant City Attorney
    Denver City Attorney's Office
    201 West Colfax Avenue Denver, Colorado 80202
    720-913-3137 (phone)
    720-913-3190 (fax)
    ashley.kelliher@denvergov.org

    *Application for admission *pro hac vice* forthcoming

    Attorney for Plaintiff
    CITY AND COUNTY OF DENVER

1

By: /s/ Samantha W. Zutler
Samantha W. Zutler (SBN 238514)
2   Eileen L. Ollivier (SBN 345880)
BURKE, WILLIAMS & SORENSEN, LLP
3   1 California Street, Suite 3050
San Francisco, CA 94111-5432
4   Tel: 415.655.8100    Fax: 415.655.8099
szutler@bwslaw.com
5   eollivier@bwslaw.com

6   Attorneys for Plaintiffs
CITIES OF HEALDSBURG and WATSONVILLE
7

8   MARY F. MORIARTY
Hennepin County Attorney
9

10  By: /s/ Rebecca Holschuh
Rebecca L.S. Holschuh (MN Lic. #0392251)*
11  Brittany K. McCormick (MN Lic. #0395175)*
Assistant County Attorneys
12  300 South Sixth Street
Minneapolis, MN 55487
13  Tel: 612-673-3000
Rebecca.Holschuh@hennepin.us
14  Brittany.McCormick@hennepin.us

15  *Admitted pro hac vice

16  Attorneys for Plaintiff
COUNTY OF HENNEPIN
17

18  HYDEE FELDSTEIN SOTO
City Attorney of the City of Los Angeles
19

20  By: /s/ Michael J. Dundas
Michael J. Dundas (CA Bar No. 226930)
21  Joshua M. Templet (CA Bar No. 267098)
Office of the Los Angeles City Attorney
22  200 North Main Street, Room 800
Los Angeles, California 90012
23  Tel: (213) 978-8100
mike.dundas@lacity.org
24  joshua.templet@lacity.org

25  Attorneys for Plaintiff
CITY OF LOS ANGELES
26

27

28

BRIAN E. WASHINGTON
County Counsel

By: */s/ Edward F. Sears*
Kate K. Stanford, Deputy County Counsel
Edward F. Sears, Deputy County Counsel
3501 Civic Center Drive, Suite 275
San Rafael, CA 94903
Tel: (415) 473-6117
kate.stanford@marincounty.gov
ned.sears@marincounty.gov

Attorneys for Plaintiff
COUNTY OF MARIN


By: */s/ Nira F. Doherty*
Nira F. Doherty (SBN 254523)
Stephen A. McEwen (SBN 186512)
Eileen L. Ollivier (SBN 345880)
BURKE, WILLIAMS & SORENSEN, LLP
1999 Harrison Street, Suite 1650
Oakland, California 94612-3520
Tel:  510.273.8780    Fax:  510.839.9104
ndoherty@bwslaw.com
smcewen@bwslaw.com
eollivier@bwslaw.com

Attorneys for Plaintiff
CITY OF MENLO PARK


By: */s/ B. Andrew Jones*
B. Andrew Jones*
Deputy County Attorney, Oregon State Bar No. 091786
Multnomah County Attorneys Office
501 SE Hawthorne Blvd, Suite 500
Portland, OR, 97214
Phone: (503)-988-3138
Mobile: (971)-678-7526
Fax: (503)-988-3377
Email: andy.jones@multco.us

*Application for admission *pro hac vice* forthcoming

Attorney for Plaintiff
MULTNOMAH COUNTY

1

By: */s/ Michelle Marchetta Kenyon*
Michelle Marchetta Kenyon (SBN 127969), City

2

Attorney
Stephen A. McEwen (SBN 186512)

3

Eileen L. Ollivier (SBN 345880)
BURKE, WILLIAMS & SORENSEN, LLP

4

1999 Harrison Street, Suite 1650
Oakland, California 94612-3520

5

Tel:  510.273.8780    Fax:  510.839.9104
mkenyon@bwslaw.com

6

smcewen@bwslaw.com

7

eollivier@bwslaw.com

8

Attorneys for Plaintiffs
CITIES OF PACIFICA and ROHNERT PARK

9

10

By: */s/ Molly S. Stump*
Molly S. Stump, City Attorney SBN 177165

11

Caio A. Arellano, Chief Assistant City Attorney SBN
262168

12

Mark J. Vanni, Assistant City Attorney SBN 267892
City Of Palo Alto

13

250 Hamilton Ave., 8th Floor

14

Palo Alto, CA 94301
Telephone: (650) 329-2171

15

Facsimile: (650) 320-2646
Email: Molly.Stump@PaloAlto.gov

16

Caio.Arellano@PaloAlto.gov
Mark.Vanni@PaloAlto.gov

17

18

Attorneys for Plaintiff
CITY OF PALO ALTO

19

20

By: */s/ Eric Danly*
Eric Danly

21

City Attorney
City of Petaluma

22

11 English St, Petaluma, CA 94952-2610
Telephone: 707-778-4402

23

E-Mail: EDanly@cityofpetaluma.org

24

Attorney for Plaintiff
CITY OF PETALUMA

25

26

27

28

1

2

MARY E. ROBNETT
Pierce County Prosecuting Attorney

3

By: */s/ Kristal M. Cowger*
KRISTAL M. COWGER, WSBA # 43079*
JONATHAN R. SALAMAS, WSBA # 39781*
Deputy Prosecuting Attorneys / Civil
930 Tacoma Avenue South, Suite 946
Tacoma, WA  98402-2102
Ph: 253-798-7400 / Fax: 253-798-6713
kristal.cowger@piercecountywa.gov
jonathan.salamas@piercecountywa.gov

4

5

6

7

8

*Admitted *pro hac vice*

9

Attorneys for Plaintiff
PIERCE COUNTY

10

11

DAVID ALESHIRE
City Attorney

12

13

By: */s/ Kimberly Y. Chin*
SHANNON MOORE, Chief Assistant City Attorney
KIMBERLY Y. CHIN, Senior Assistant City Attorney
450 Civic Center Plaza
Richmond, CA  94804-1630
Tel: 510-620-6509
Fax: 510-620-6518
Email: Shannon_Moore@ci.richmond.ca.us
Email: Kimberly_Chin@ci.richmond.ca.us

14

15

16

17

18

Attorneys for Plaintiff
CITY OF RICHMOND

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

By: /s/ John D. Nibbelin
JOHN D. NIBBELIN, County Counsel (SBN 184603)
Rebecca M. Archer, Chief Deputy Counsel (SBN 202743)
Lauren F. Carroll, Deputy County Counsel (SNB 333446)
500 County Center, 4th Floor
Redwood City, CA 94063
Telephone: 650-363-4757
jnibbelin@smcgov.org
rmarcher@smcgov.org
lcarroll@smcgov.org

Attorneys for Plaintiff
COUNTY OF SAN MATEO


By: /s/ Teresa L. Stricker
TERESA L. STRICKER, City Attorney (CA Lic. 160601)
AUTUMN LUNA, Chief Assistant City Attorney (CA Lic. 288506)
ADAM S. ABEL, Assistant City Attorney (CA Lic. 148210)
HANNAH E. FORD-STILLE, Deputy City Attorney (CA Lic. 335113)
100 Santa Rosa Ave, Room 8
Santa Rosa, CA 95404
Telephone: (707) 543-3040
tstricker@srcity.org
aluna@srcity.org
aabel@srcity.org
hfordstille@srcity.org

Attorneys for Plaintiff
CITY OF SANTA ROSA


By: /s/ Joshua A. Myers
Robert H. Pittman, County Counsel (SBN 172154)
Joshua A. Meyers, Chief Deputy County Counsel (SBN 250988)
575 Administration Drive, Room 105A
Santa Rosa, California 95403
Telephone: (707) 565-2421
Joshua.Myers@sonoma-county.org

Attorneys for Plaintiff
COUNTY OF SONOMA

1

2                             By: */s/ Amanda Guile-Hinman*
                                Amanda R. Guile-Hinman, OSB #093706*

3                                29799 SW Town Center Loop E
                                Wilsonville, OR 97070

4                                guile@wilsonvilleoregon.gov
                                (503) 570-1509

5                                *Admitted *pro hac vice*

6                                Attorney for Plaintiff
                                CITY OF WILSONVILLE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FILER'S ATTESTATION**

I, DAVID CHIU, am the ECF user whose identification and password are being used to file this SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF. Pursuant to Civil Local Rule 5-1(i)(3), I hereby attest that the other above-named signatories concur in this filing.