1  BRETT SHUMATE
   Assistant Attorney General
2  Civil Division
   YAAKOV ROTH
3  Principal Deputy Assistant Attorney General
   DREW C. ENSIGN
4  Deputy Assistant Attorney General
   ELIANIS PEREZ
5  Assistant Director
   LAUREN FASCETT
6  Senior Litigation Counsel
   LINDSAY ZIMLIKI
7  ANGEL FLEMING
   VICTORIA TURCIOS
8  CAROLINE MCGUIRE
   *Trial Attorneys*
9  U.S. Department of Justice
   Office of Immigration Litigation
10 General Litigation and Appeals Section
   P.O. Box 868, Ben Franklin Station
11 Washington, DC 20044
   *Attorneys for Defendants*
12

13

14

15              UNITED STATES DISTRICT COURT

16              NORTHERN DISTRICT OF CALIFORNIA

17

18 CITY AND COUNTY OF                    )  CASE NO. 3:25-CV-1350 (WHO)
   SAN FRANCISCO, *et al.*,              )
19                                       )  **NOTICE OF MOTION AND DEFENDANTS'**
              Plaintiffs,                )  **MOTION TO DISMISS THE SECOND**
20                                       )  **AMENDED COMPLAINT**
       v.                               )
21                                       )
   DONALD J. TRUMP, *et al.*,            )
22                                       )  Hearing Date: October 22, 2025
                                         )  Time:          2:00 P.M. PST
23            Defendants.                )  Honorable William H. Orrick III
                                         )
24 _____ )

25

26

27

28

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on October 22, 2025, at 2 P.M., or as soon thereafter as may be heard before the Honorable William H. Orrick III in Courtroom 2 of the United States District Court for the Northern District of California, 450 Golden Gate Avenue, San Francisco, CA 94102, Defendants will, and hereby do, move this Court pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) to dismiss the Second Amended Complaint (SAC) in its entirety.

This case involves 50 Plaintiffs—various cities, counties, municipalities and charters—who seek declaratory and injunctive relief against the Government as a whole alleging that it has withheld already appropriated federal funds by issuing Executive Orders and agency memoranda. But the Court must dismiss their SAC in its entirety because the challenged Executive Orders and agency directives merely instruct agencies to assess federal grant programs to determine where they can lawfully add immigration related conditions. Plaintiffs' SAC asserts eight causes of action. They all fail. Plaintiffs lack pre-enforcement standing to bring their constitutional claims and their Fifth Amendment claim is not ripe. Thus, the Court should dismiss them under Federal Rule of Civil Procedure 12(b)(1). Alternatively, Plaintiffs constitutional and Administrative Procedure Act claims must be dismissed under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

This motion is based on the Memorandum of Points and Authorities and Exhibits attached hereto; all pleadings, papers, and files in this cause of action; and such oral argument as may be presented at a hearing on the Motion.

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ...................................................................................................................1

BACKGROUND ...................................................................................................................2

I.      Subject Matter Jurisdiction Under Rule 12(b)(1) ...............................................3

II.     Failure to State a Claim Under Rule 12(b)(6)......................................................4

ARGUMENT ........................................................................................................................4

III.    The Court Should Dismiss the SAC Under Rule 12(b)(1) For Lack of Jurisdiction Because Plaintiffs Fail to Establish Article III Standing. ..............................................4

        A.      Plaintiffs fail to establish injury-in-fact. ................................................4

        B.      Plaintiffs SAC fails to establish pre-enforcement standing. ...................5

        C.      Plaintiffs' Fifth Amendment claim that the Executive Orders are unconstitutionally vague and deprives them of money or property without due process is unripe for review. ................................................................8

IV.     The Court Should Dismiss the SAC Under Rule 12(b)(6) for Failure to State a Claim Upon Which Relief Can be Granted. ......................................................................9

        A.      Plaintiffs fail to plead that the Executive Orders are facially unconstitutional. ................9

        B.      Plaintiffs fail to plead that the Executive Orders violate the doctrine of Separation of Powers and the Spending Clause................................................11

        C.      Plaintiffs fail to plead that the Executive Orders violate the Tenth Amendment................................................................................................18

        D.      Plaintiffs fail to state a claim under the APA for which the Court can grant relief. ................................................................................................20

CONCLUSION........................................................................................................................25

i

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abbott Laboratories v. Gardner*,
  387 U.S. 136 (1967)...................................................................................................22

*Alan Guttmacher Inst. v. McPherson*,
  597 F. Supp. 1530 (S.D.N.Y. 1984).........................................................................24

*Amica Ctr. for Immigrant Rights, et al. v. U.S. Dep't of Justice*,
  No. 25-298 (RDM), 2025 WL 1852762 (D.D.C. July 6, 2025)...............................24

*Arizona v. United States*,
  567 U.S. 387 (2012)...................................................................................................20

*Babbitt v. United Farm Workers National Union, etc., et al.*,
  442 U.S. 289 (1979).....................................................................................................5

*Balistreri v. Pacifica Police Dep't*,
  901 F.2d 696 (9th Cir. 1988) ......................................................................................4

*Bennett v. Ky. Dep't of Educ.*,
  470 U.S. 656 (1985)...................................................................................................16

*Bennett v. Spear*,
  520 U.S. 154 (1997)...................................................................................................20

*Biden v. Missouri*,
  595 U.S. 87 (2022).....................................................................................................16

*Biden v. Sierra Club*,
  ⸺ U.S. ⸺, 142 S. Ct. 46 (2021)............................................................................13

*Bldg. Constr. Trades Dep't, AFL-CIO v. Allbaugh*,
  295 F.3d 28 (D.C. Cir. 2002) ...............................................................10, 11, 14, 15

*Chafin v. Chafin*,
  568 U.S. 165 (2013).....................................................................................................3

*Charles C. Steward Mach. Co. v. Davis*,
    301 U.S. 548 (1937) ................................................................................................................ 18

*City & Cnty. of S.F.*,
    897 F.3d ....................................................................................................................... 5, 6, 8

*City & Cnty. of San Francisco*,
    2025 WL 1282637 .............................................................................................................. 16, 21

*City & Cty. of San Francisco v. Barr*,
    965 F.3d 753 (9th Cir. 2020) ........................................................................................................ 7

*City of Fall River*,
    507 F.3d ............................................................................................................................ 22

*City of Los Angeles v. Barr*,
    929 F.3d 1163 (9th Cir. 2019) .................................................................................................... 10

*City of Los Angeles v. McLaughlin*,
    865 F.2d 1084 (9th Cir. 1989) ...................................................................................................... 8

*City of Philadelphia v. Sessions*,
    280 F. Supp. 3d 579 (E.D. Penn. 2017) ..................................................................................... 21, 24

*City of Santa Clara, Cal. v. Andrus*,
    572 F.2d 660 (9th Cir. 1978) ........................................................................................................ 8

*Cmty. Action of Laramie Cnty., Inc. v. Bowen*,
    866 F.2d 347 (10th Cir. 1989) .................................................................................................... 24

*Cnty. Credit Union v. Citizens Equity First Credit Union*,
    65 F.4th 1012 (9th Cir. 2023) ....................................................................................................... 3

*Common Cause v. Trump*,
    506 F. Supp. 3d 39 (D.D.C. 2020) ............................................................................................... 15

*Commonwealth v. Am. Booksellers Ass'n, Inc.*,
    236 Va. 168 (1988) ..................................................................................................................... 6

*Daimler Chrysler v. Cuno*,
    547 U.S. 332 (2006) .................................................................................................................... 4

*Dalton v. Specter,*
   511 U.S. 462 (1994).................................................................................................... 1, 12

*Daniels-Hall v. Nat'l Educ. Ass'n,*
   629 F.3d 992 (9th Cir. 2010) .......................................................................................... 14

*DeVillier v. Texas,*
   601 U.S. 285 (2024) ........................................................................................................ 13

*Easyriders Freedom F.I.G.H.T. v. Hannigan,*
   92 F.3d 1486 (9th Cir. 1996) ............................................................................................ 9

*Envtl. Def. Ctr., Inc. v. EPA,*
   344 F.3d 832 (9th Cir. 2003) .......................................................................................... 20

*Franklin v. Massachusetts,*
   505 U.S. 788 (1992)................................................................................................... passim

*Freedom to Travel Campaign v. Newcomb,*
   82 F.3d 1431 (9th Cir. 1996) ............................................................................................ 9

*FTC v. Standard Oil Co.,*
   449 U.S. 232 (1980)................................................................................................... 21, 22

*Glob. Health Council v. Trump,*
   No. 25-5097, 2025 WL 2326021 (D.C. Cir. Aug. 13, 2025)....................................... 12, 13

*Heckler v. Chaney,*
   470 U.S. 821 (1985)........................................................................................................ 24

*Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Donovan,*
   746 F.2d 855 (D.C. Cir. 1984) ........................................................................................ 24

*Johnson v. Riverside Healthcare System, LP,*
   534 F.3d 1116 (9th Cir. 2008) .......................................................................................... 4

*Khoja v. Orexigen Therapeutics, Inc.,*
   899 F.3d 988 (9th Cir. 2018) ............................................................................................ 4

*Lewis v. Continental Bank Corp.,*
   494 U.S. 472 (1990)........................................................................................................... 3

*Lincoln v. Vigil,*
  508 U.S. 182 (1993)................................................................................................ 23, 24, 25

*Los Angeles v. Lyons*,
  461 U.S. 95 (1983)............................................................................................................ 7

*Louisiana v. Biden*,
  64 F.4th 674 (5th Cir. 2023) ............................................................................................ 4

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555(1992)........................................................................................................... 4

*Medina v. Planned Parenthood S. Atl.*,
  —— U.S. ——, 145 S. Ct. 2219 (2025)........................................................................ 12

*Milk Train, Inc. v. Veneman*,
  310 F.3d 747 (D.C. Cir. 2002) ...................................................................................... 24

*Murphy Co. v. Biden*,
  65 F.4th 1122 (9th Cir. 2023) ........................................................................................ 13

*Myers v. United States*,
  272 U.S. 52 (1926).......................................................................................................... 11

*National Federation of Independent Business v. Sebelius*,
  567 U.S. 519 (U.S., 2012)........................................................................................ 18, 19

*New Jersey Hosp. Ass'n. v. United States*,
  23 F. Supp. 2d 497 (D.N.J. 1998) ................................................................................. 21

*New York v. United States*,
  505 U.S. 144 (1992).............................................................................................. 8, 16, 19

*Maywathers v. Newland*,
  314 F.3d 1062 (9th Cir. 2002) ....................................................................................... 16

*Oregon Natural Desert Ass'n. v. U.S. Forest Service*,
  465 F.3d 977 (9th Cir. 2006) ......................................................................................... 22

*Pimentel v. Dreyfus*,
  670 F.3d 1096 (9th Cir. 2012) ....................................................................................... 18

*Policy & Rsch., LLC* v. *U.S. Dep't of Health & Human Servs.*,

   313 F. Supp. 3d 62 (D.D.C. 2018) ................................................................................... 24

*Reno v. Flores*,

   507 U.S. 292 (1993) ........................................................................................... 10, 15

*Santa Clara v. Trump, et al.*,

   250 F. Supp. 3d 497 (N.D. Cal. Apr. 25, 2017) .................................................... 6

*Seattle Pac. Univ. v. Ferguson*,

   104 F.4th 50 (9th Cir. 2024) ..................................................................................... 7

*Seila Law LLC v. CFPB*,

   591 U.S. 197 (2020) ................................................................................................ 11

*Sierra Club v. Trump*,

   929 F.3d 670 (9th Cir. 2019) .................................................................................. 13

*South Carolina v. Katzenbach*,

   383 U.S. 301, (1966) ................................................................................................. 8

*South Dakota v. Dole*,

   483 U.S. 203 (1987) ................................................................................. 8, 16, 17, 19

*Spokeo, Inc. v. Robins*,

   578 U.S. 330 (2016) ............................................................................................. 3, 4

*State ex rel. Becerra v. Sessions*,

   284 F. Supp. 3d 1015 (N.D. Cal. 2018) ..................................................... 7, 16, 21

*State v. DOJ*,

   951 F.3d 84 (2d Cir. 2020) ...................................................................................... 19

*Steel Co. v. Citizens for a Better Env't*,

   523 U.S. 83 (1998) ................................................................................................... 4

*Steffel v. Thompson*,

   415 U.S. 452 (1974) .............................................................................................. 5, 6

*Texas v. United States*,

   523 U.S. 296 (1998) ............................................................................................. 5, 22

*Trump v. New York*,

    592 U.S. 125 (2020) ................................................................................................ 7, 8

*U.S. Term Limits, Inc. v. Thornton*,

    514 U.S. 779 (1995) ................................................................................................... 19

*Ukiah Valley Med. Ctr. v. Fed. Trade Comm'n*,

    911 F.2d 261 (9th Cir. 1990) ................................................................................... 22

*United States v. Alabama*,

    691 F.3d 1269 (11th Cir. 2012) ............................................................................... 20

*United States v. Mazurie*,

    419 U.S. 544 (1975) ..................................................................................................... 9

*United States v. Pickard*,

    100 F. Supp. 3d 981 (E.D. Cal. 2015) ................................................................... 20

*United States v. Salerno*,

    481 U.S. 739 (1987) ..................................................................................................... 9

*United States v. South Carolina*,

    720 F.3d 518 (4th Cir. 2013) ................................................................................... 20

*United States v. Thoms*,

    684 F.3d 893 (9th Cir. 2012) ..................................................................................... 8

*Urban v. Tesla, Inc.*,

    698 F. Supp. 3d 1124 (N.D. Cal. 2023) ................................................................... 3

*Virginia v. American Booksellers, Inc.*,

    484 U.S. 383 (1988) ................................................................................................. 5, 6

*Warren v. Fox Fam. Worldwide, Inc.*,

    328 F.3d 1136 (9th Cir. 2003) ................................................................................... 3

*Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*,

    5 F.4th 997 (9th Cir. 2021) ..................................................................................... 21

**Statutes**

2 U.S.C. § 681 *et seq.* .................................................................................................. 11, 12

5 U.S.C. 701(a)(2) ................................................................................................... 22, 23, 25

5 U.S.C. § 704 ......................................................................................................... 20, 22

6 U.S.C. § 112(b)(2) ..................................................................................................... 23

8 U.S.C. § 1373 ...................................................................................................... 6, 21

8 U.S.C. § 1373(a) ................................................................................................... 14, 17

8 U.S.C. § 1601 ........................................................................................................... 18

8 U.S.C. § 1601(2)(A) ................................................................................................. 17

8 U.S.C. § 1601(3) ....................................................................................................... 17

8 U.S.C. § 1611(c)(1)(A) ............................................................................................. 23

42 U.S.C. § 11386(b)(8) .............................................................................................. 23

42 U.S.C. § 3752(a)(5)(D) ........................................................................................... 15

49 U.S.C. § 5334(a)(1) ................................................................................................. 23

**Rules**

Fed. R. Evid. 201 ......................................................................................................... 14

**Other Authorities**

Proclamation No. 13,768,

   82 Fed. Reg. 8799 (Jan. 25, 2017) ......................................................................... 6

Proclamation No. 14,218

   90 Fed. Reg. 8443 (Jan. 20, 2025) .................................................................. passim

Proclamation No. 14,169

   90 Fed. Reg. 8619 (Jan. 30, 2025) ....................................................................... 12

Proclamation No. 14,159

   90 Fed. Reg. 10518 (Feb. 19, 2025) ................................................................ passim

1

2

## MEMORANDUM OF POINTS AND AUTHORITIES[1]

## INTRODUCTION

3

4

5

6

7

8

9

Here, 50 Plaintiffs seek declaratory and injunctive relief against the Government alleging that it withheld already appropriated federal funds by issuing Executive Orders and agency memoranda that instruct agencies to assess their federal grant programs to determine where they can lawfully add immigration related conditions. Plaintiffs claim that specific sections of these Executive directives are unconstitutional, both facially and as applied, and violate the Administrative Procedure Act (APA). Plaintiffs do not challenge any specific grant program, nor do they allege that they have been denied funding due to the addition of an immigration condition to a grant for which they applied.

10

11

12

13

14

15

16

17

18

Plaintiffs' Second Amended Complaint (SAC) should be dismissed for lack of jurisdiction. First, Plaintiffs fail to establish standing because they fail to plead an injury in fact, as they do not allege any specific funding loss. Absent this, Plaintiffs must establish pre-enforcement standing, which they also fail to do because the challenged Executive Orders do not proscribe conduct that implicates a constitutional interest. Second, as local governments, Plaintiffs lack standing to bring a Fifth Amendment Due Process challenge. Third, because their claim that the Executive directives are facially void for vagueness under the Fifth Amendment's Due Process Clause and because this claim does not implicate First Amendment rights, it must be examined in light of the facts of the case. But the claim is based on facts that have yet to occur. Thus, their facially void for vagueness challenge is not ripe for review.

19

20

21

22

23

24

25

26

Alternatively, the SAC should be dismissed for failure to state a claim upon which relief can be granted. First, their claim that the Executive Orders are facially unconstitutional fail because Plaintiffs do not, and cannot, establish that the Orders would be unconstitutional in all their applications. Second, Plaintiffs' independent Separation of Powers and Spending Clause claims are foreclosed by the Supreme Court's holding in *Dalton v. Specter*, 511 U.S. 462 (1994), where the claims are actually statutory violation claims—the President violated the Impound Control Act of 1972 (ICA) when he issued the challenged Executive Orders that (they allege) will result in the impoundment of already appropriated funds. Third, Plaintiffs' Separation of Powers claim fails because the text of the challenged Executive Orders does not

27

28

---

[1] Defendants herein refer to the original page numbers listed at the bottom center of Plaintiffs' SAC.

freeze or withhold funds from Plaintiffs but instead instructs agencies to assess their grant programs to determine where immigration related conditions can be lawfully implemented. Further, Congress has frequently authorized agencies administering certain grant programs to impose discretionary conditions on their receipt. Fourth, Plaintiffs' Tenth Amendment claim fails because Plaintiffs have not and cannot plead facts necessary for the Court to determine a possible commandeering where the actual conditions imposed and the amount of money in question is critical to the analysis. Plaintiffs speculate that every federal grant that they may apply for is implicated and that they will face enforcement actions arising from the Executive directives. Their claims are speculative and contrary to the facts, especially where they have not had to change their policies, or lost funds or faced any enforcement actions.

Likewise, Plaintiffs fail to state plausible claims for relief under the Administrative Procedure Act (APA) where Plaintiffs fail to identify a final agency action. The challenged agency directives provide guidance to executive agencies as to how they should review and evaluate funding and do not mark the end of the decisionmaking phase for the agencies. Further, the Executive directives do not immediately affect the Plaintiffs. Lastly, Plaintiffs' challenge to the agencies' implementation of the Executive Orders at issue must also be dismissed, where the allocation of funds across various grant programs is an administrative decision firmly committed to agency discretion.

## BACKGROUND

Five locality Plaintiffs filed this lawsuit on February 7, 2025, alleging that the February 5th Bondi Memo and Executive Order 14,159 violated the Separation of Powers, the Spending Clause, Due Process, the Tenth Amendment, and the Administrative Procedure Act (APA). Dkt. No. 1. On February 27, 2025, Plaintiffs filed a First Amended Complaint (FAC), asserting the same eight counts as the initial Complaint, challenging the legality of Executive Order 14,218, and adding eleven new cities and counties as Plaintiffs. Dkt. No. 22 at 4–5 (Parties), 75–86 (Count I–XIII). On March 17, 2025, Plaintiffs filed a motion for preliminary injunction. Dkt. No. 61 at 1. The Court granted the preliminary injunction on April 24, 2025. Dkt. No. 111.[2] On May 9, 2025, the Court issued an order clarifying its preliminary injunction and explained that "the Government is entitled to identify particular grants and funding programs that it

---

[2] The injunction did not apply to Defendant President Donald J. Trump "with respect to the 'performance of his official duties.'" Dkt. No. 111 (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 802–03 (1992)).

2

believes should be conditioned upon compliance with immigration-related objectives, and to litigate its position." Dkt. No. 126 at 2. The Court further stated that if the Government "identifi[ed] the funds the Government believes are at issue … following an evaluation of the type of funding involved to determine if there is a nexus between the funding stream, the jurisdiction's policies, and the desired immigration-related conditions," doing so "may resolve some of the problems" identified. *Id.* at 6.

On July 8, 2025, Plaintiffs filed a Motion for Leave to File a SAC and on July 29, 2025, filed a Motion for a Second Preliminary Injunction. Dkt. Nos. 151, 177, 178. The Court permitted Plaintiffs to file a SAC. Dkt. Nos. 186, 193. In the SAC, Plaintiffs added thirty-four (34) new localities as plaintiffs, two new defendants (Office of Management and Budget and its director, Russell Vought), and factual developments since the FAC. *Id.* Plaintiffs did not seek to add new claims. *Id.* On August 23, 2025, the Court granted Plaintiffs' Motion for a Second Preliminary Injunction, which extended the Court's first preliminary injunction to the new Plaintiffs and new Defendants added to the SAC. Dkt. No. 225.

## **STANDARDS OF REVIEW**

### I. Subject Matter Jurisdiction Under Rule 12(b)(1)

"[T]o invoke the jurisdiction of a federal court, a litigant must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (quoting *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477 (1990)). Courts "may not decide questions that cannot affect the rights of litigants in the case before them or give opinions advising what the law would be upon a hypothetical state of facts." *Id.* (internal quotation omitted). Rule 12(b)(1) governs motions to dismiss for lack of standing, which pertains to subject matter jurisdiction. *Urban v. Tesla, Inc.*, 698 F. Supp. 3d 1124, 1131 (N.D. Cal. 2023). Jurisdictional attacks under Rule 12(b)(1) may be "either facial or factual." *Cnty. Credit Union v. Citizens Equity First Credit Union*, 65 F.4th 1012, 1028 (9th Cir. 2023). "In ruling on a 12(b)(1) jurisdictional challenge, a court may look beyond the complaint and consider extrinsic evidence." *Warren v. Fox Fam. Worldwide, Inc.*, 328 F.3d 1136, 1141 n.5 (9th Cir. 2003). "The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements," and "must clearly ... allege facts demonstrating each element." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citation omitted).

1    **II.      Failure to State a Claim Under Rule 12(b)(6)**

2            Dismissal under Rule 12(b)(6) is proper where there is either a "lack of a cognizable legal theory"

3    or "the absence of sufficient facts alleged under a cognizable legal theory." *Johnson v. Riverside*

4    *Healthcare System, LP*, 534 F.3d 1116, 1121 (9th Cir. 2008) (quoting *Balistreri v. Pacifica Police Dep't*,

5    901 F.2d 696, 699 (9th Cir. 1988)). A court may consider documents attached or incorporated by reference

6    to the complaint or "matters of which the court may take judicial notice." *Khoja v. Orexigen Therapeutics,*

7    *Inc*., 899 F.3d 988, 998 (9th Cir. 2018).

8                                              **ARGUMENT**

9    **III.     The Court Should Dismiss the SAC Under Rule 12(b)(1) For Lack of Jurisdiction Because**
10   **Plaintiffs Fail to Establish Article III Standing.**

11           Plaintiffs have not established Article III jurisdiction where they have not established a

12   particularized or concrete injury or a pre-enforcement injury for purposes of standing.

13           **A.      Plaintiffs fail to establish injury-in-fact.**

14           Plaintiffs must establish an injury that is concrete, particularized, and imminent rather than

15   "conjectural or hypothetical," *Spokeo,* 578 U.S. at 339 (citations omitted), and must do so for each claim

16   and each form of relief they seek, *Daimler Chrysler v. Cuno*, 547 U.S. 332, 352 (2006). And for each

17   claim, Plaintiffs must show that relief will in fact redress their injury. *Steel Co. v. Citizens for a Better*

18   *Env't*, 523 U.S. 83, 103 (1998). That is, it is "likely" and not "merely speculative" that the plaintiff's

19   injury will be remedied by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561(1992).

20           The Court previously held that Plaintiffs failed to establish an injury in their FAC. *See* Dkt. 126 at

21   32 ("the Cities and Counties have not yet suffered a loss of funds or other enforcement action under the

22   2025 Executive Orders, . . . ."). The same remains true of the SAC. The Executive Orders did not terminate

23   any particular fund or program; rather, they merely provided policy directives to federal agencies. Any

24   alleged future harm necessarily depends on future action by the agencies and Plaintiffs have not adequately

25   alleged any such action has impacted them. *See Louisiana v. Biden*, 64 F.4th 674, 681 (5th Cir. 2023)

26   (plaintiffs lacked standing to challenge an executive order that required agencies to "exercise discretion

27   in conducting their cost-benefit analyses and []… use the Interim Estimates as 'appropriate and consistent

28   with applicable law,'" because "the mere 'possibility of regulation' fails to satisfy injury in fact").

                                                    4

1    Moreover, Plaintiffs' claims are contingent upon many layers of hypothetical and contradictory

2    future actions. Plaintiffs allege that agencies will take actions solely because of the Executive Orders'

3    directives to do so but also ignore their clear directive to stay within the confines of the law. These

4    "contingent future events ... may not occur as anticipated, or indeed may not occur at all," rendering

5    Plaintiffs' claims unripe for review. *Texas v. United States*, 523 U.S. 296, 300 (1998) (citation omitted).

6    As such, Plaintiffs' SAC fails to establish an injury in fact.

7        **B.    Plaintiffs SAC fails to establish pre-enforcement standing.**

8        Plaintiffs' SAC fails to establish pre-enforcement standing[3] because the challenged Executive

9    Orders do not proscribe conduct, let alone conduct with an arguably constitutional interest. A plaintiff

10   may demonstrate pre-enforcement standing by showing "an intention to engage in a course of conduct

11   arguably affected with a constitutional interest, *but proscribed by a statute*, and [that] there exists a

12   credible threat of prosecution thereunder." *Babbitt v. United Farm Workers National Union, etc., et al.*,

13   442 U.S. 289, 298 (1979) (emphasis added).

14       Pre-enforcement standing is inapplicable here because the Executive Orders merely constitute

15   instructions and do not *proscribe* conduct. This case is materially distinct from Supreme Court cases which

16   found pre-enforcement standing existed. For example, in *Babbit*, the Supreme Court found pre-

17   enforcement standing existed for certain claims challenging the Arizona Legislature's enactment of "a

18   comprehensive scheme for the regulation of agricultural employment relations[.]" 442 U.S. at 292. The

19   challenged Arizona statute proscribed conduct related to, *inter alia*, election of bargaining representatives

20   and consumer publicity, and imposed criminal penalties for violations. *Id.* at 297. In *Steffel v. Thompson*,

21   a petitioner was threatened with criminal trespass if he did not stop distributing anti-Vietnam handbills.

22   415 U.S. 452, 454–55 (1974). There, the Court found the petitioner established pre-enforcement standing

23   to challenge the constitutionality of the Georgia trespassing statute where petitioner had "been twice

24   warned to stop handbilling...told by the police that if he again handbills at the shopping center and disobeys

25

26   ─────────────────
     [3] Despite Plaintiffs' failure to allege an injury in fact, this Court determined Plaintiffs had pre-enforcement
27   standing for purposes of a preliminary injunction. *See* Dkt. No. 126 at 43 (stating the Cities and Counties
     can establish standing by demonstrating a "well-founded fear that the law will be enforced against them.")
28   (citing *City & Cnty. of S.F.*, 897 F.3d at 1236, quoting *American Booksellers*, 484 U.S. at 392). The Court
     should revisit this finding because the SAC fails to establish pre-enforcement standing.

1    a warning to stop he will likely be prosecuted." *Id.* at 459. In *Virginia v. American Booksellers, Inc.*, the

2    Court similarly found the booksellers had pre-enforcement standing to bring a constitutional challenge of

3    a statute prohibiting the display of sexually explicit material to juveniles where the law was "aimed

4    directly at plaintiffs, who, if their interpretation of the statute is correct, will have to take significant and

5    costly compliance measures or risk criminal prosecution." 484 U.S. 383, 392, *certified question answered*

6    *sub nom. Commonwealth v. Am. Booksellers Ass'n, Inc.*, 236 Va. 168, 372 S.E.2d 618 (1988).

7        Although the relevant constitutional questions in *Babbit*, *Steffel*, and *American Booksellers*, are

8    varied, they all involved challenges to the constitutionality of laws or statutes proscribing specific conduct.

9    This element of pre-enforcement standing is missing from Plaintiffs' case here. The Executive Orders do

10    not *proscribe* any conduct. Instead, the Executive Orders direct agencies to engage in deliberative

11    processes regarding their authority to add conditions to the disbursement of federal funds. Indeed, in the

12    months that have followed Plaintiffs' initial preliminary injunction, the Government continues those

13    deliberative processes. For this reason, Plaintiffs have failed to establish pre-enforcement standing and

14    their SAC continues to premise their purported injury on budgetary uncertainty, as opposed to funding

15    impact. This demonstrates that funding decisions are still in flux and that the Executive Orders do not

16    have any *proscriptive* effect.

17        Moreover, the fact that this Court previously found similarly situated plaintiffs, in prior litigation—

18    *County of Santa Clara v. Trump, et al.*, 250 F. Supp. 3d 497 (N.D. Cal. Apr. 25, 2017) (Preliminary

19    Injunction Order), *aff'd*, 897 F.3d 1225 (9th Cir. 2018)—established pre-enforcement standing is not

20    controlling because the Executive Orders at issue here are distinct from those previously considered. Such

21    previous litigation was predicated on Executive Order 13,768, which is distinguishable from the executive

22    directives at issue now. *Compare* Proclamation No. 13,768, 82 Fed. Reg. 8799 (Jan. 25, 2017) *with*

23    Presidential Proclamation 14,218, 90 Fed. Reg. 8443 (Jan. 20, 2025). In that case, Executive Order 13,768

24    specifically ordered that funding be withheld unless a locality agreed to comply with 8 U.S.C. § 1373. *See*

25    82 Fed. Reg. at 8800 ("the Attorney General and the Secretary, in their discretion and to the extent

26    consistent with law, shall ensure that jurisdictions that willfully refuse to comply with 8 U.S.C. 1373

27    (sanctuary jurisdictions) are not eligible to receive Federal grants..."). Sanctuary jurisdictions knew early

28    on whether they could certify compliance with 8 U.S.C. § 1373, and filed suit based on their purported

6

inability to do so. *See, e.g., City & Cty. of San Francisco v. Barr*, 965 F.3d 753, 761 (9th Cir. 2020); *State ex rel. Becerra v. Sessions*, 284 F. Supp. 3d 1015, 1019 (N.D. Cal. 2018).

Here however, Executive Order 14,218 at Section 2 (i) and (ii) and Executive Order 14,159 at Section 17 leave the evaluation of federal funding decisions open-ended. *See e.g.* 90 Fed. Reg. at 8447 ("Immediately review and, if appropriate, audit all contracts, grants, or other agreements providing Federal funding to non-governmental organizations supporting or providing services, either directly or indirectly, to removable or illegal aliens, to ensure…that they do not promote or facilitate violations of our immigration laws."); Proclamation No. 14,218, 90 Fed. Reg. 10518 (Feb. 25, 2025) ("ensure, consistent with applicable law, that Federal payments to States and localities do not, by design or effect, facilitate the subsidization or promotion of illegal immigration, or abet so-called 'sanctuary' policies that seek to shield illegal aliens from deportation…"). Because the underlying facts here support that the Executive Orders call for a deliberative process of government funding review, which is taking place, Plaintiffs have not established pre-enforcement standing.

Additionally, while the Executive Orders direct agencies to evaluate federal funding of certain localities, the "when" and "how" of the Executive Branch implementing this general directive, and how it will affect each Plaintiff remains "no more than conjecture." *Trump v. New York*, 592 U.S. 125, 131 (2020) (citing *Los Angeles v. Lyons*, 461 U.S. 95, 108 (1983)), *cf. Seattle Pac. Univ. v. Ferguson*, 104 F.4th 50, 59 (9th Cir. 2024) ("Some of our precedents suggest that pre-enforcement standing requires the 'when, to whom, where, or under what circumstances' the plaintiff plans to violate the law."). This is because the Executive Orders both call for a review and contain a savings clause that all action be taken "*consistent with applicable law*[.]" E.O. 14,218 § 2(a)(ii) (emphasis added); 90 Fed. Reg. at 10518; *see also* E.O. 14,159 § 19; 90 Fed. Reg. at 8447. The Bondi Memo and Noem Memos provide no more of a "concrete" injury than the Orders. For instance, the Bondi Memo directs the Associate Attorney General to create a report identifying grants that may be conditioned upon compliance with immigration laws. Bondi Memo at 2. The Noem Memo similarly directs components to review federal financial assistance awards to determine if Department funds are going to sanctuary jurisdictions and, to the extent consistent with relevant legal authorities and applicable terms and conditions of each award, cease providing federal funding to sanctuary jurisdictions. Noem Memo at 3. The federal government is permitted to internally

evaluate its funding decisions, regardless of whether it publicly announces that an evaluation process is happening. *See* Dkt. No. 136 at 8 ("The Preliminary Injunction is not intended to hamstring the Government's lawful evaluation of federal funds to States and localities that have sanctuary policies.").

Lastly, any future Executive action "will reflect both legal and practical constraints," as any action will be lawful, "making any prediction about future injury [is] just that—a prediction." *Trump*, 592 U.S. at 133. Missing from Plaintiffs' equation is the identification of any funding that has decreased solely because of an Executive Order. No meaningful analysis can occur without such funding details. *See e.g.*, *City and Cnty of San Franscico v. Trump*, 897 F.3d 1225, 1234 (9th Cir. 2018) (examining whether Congress tied withholding of funding to compliance when assessing whether an Executive Order violated Separation of Powers); *see also New York v. United States*, 505 U.S. 144, 167 (1992) (evaluating the relationship between the conditions and the purpose of the federal spending to determine if such conditions violated Spending Clause); *South Dakota v. Dole*, 483 U.S. 203, 206–07 (1987) (same).

### C. Plaintiffs' Fifth Amendment claim that the Executive Orders are unconstitutionally vague and deprives them of money or property without due process is unripe for review.[4]

Plaintiffs allege that the Executive Orders are void for vagueness, arguing both that they are unconstitutionally vague in every possible application, *see* Dkt. No. 193 at Prayer for Relief at ¶¶ 1, 3, 5, and as they apply to Plaintiffs *id.* at ¶¶ 2, 4, 6; ¶¶ 430-432. Specifically, Plaintiffs contend that the Executive directives "work a deprivation of money or property without due process" because they are "so vague they fail to provide fair notice of what is prohibited[.]" Dkt. No. 193 at ¶¶ 428, 429. Courts, however, analyze vagueness challenges to statutes or laws as they are applied, rather than on their face,

---

[4] Initially, Plaintiffs, who are all cities, counties, and municipalities, have failed to establish that they have standing to bring a Due Process claim under the Fifth Amendment. *See City of Los Angeles v. McLaughlin*, 865 F.2d 1084, 1087 (9th Cir. 1989) ("We have not ruled on whether a city has standing to sue on behalf of its citizens under the due process clause."); *City of Santa Clara, Cal. v. Andrus*, 572 F.2d 660, 675–77 (9th Cir. 1978) (the court specifically declined to decide whether Santa Clara was a "person" entitled to due process protection under the Fifth Amendment and disposed of the case on other grounds), *cert. denied,* 439 U.S. 859 (1978); *South Carolina v. Katzenbach*, 383 U.S. 301, 323–24, (1966) ("The word 'person' in the context of the Due Process Clause of the Fifth Amendment cannot, by any reasonable mode of interpretation, be expanded to encompass the States of the Union, and to our knowledge this has never been done by any court."); *United States v. Thoms*, 684 F.3d 893, 899 n.4 (9th Cir. 2012) (quoting *Katzenbach*, 383 U.S. at 323, 86 S. Ct. 803); (States are not proper party plaintiffs to make claims under the Due Process Clause, because they are simply not "persons" protected by the Fifth Amendment).

*unless* First Amendment concerns are implicated. *See United States v. Mazurie*, 419 U.S. 544, 550 (1975) ("It is well established that vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand."). Here, Plaintiffs do not allege any First Amendment rights. Plaintiffs are, thus, limited to an argument that the Executive directives are vague as applied to them. But Plaintiffs' fears that a yet-to-be-taken action by the Executive *might* be arbitrary and/or *might* lack fair notice is inherently speculative, and therefore not ripe for review. Where there are insufficient facts to determine the vagueness of a law as applied, the issue is not ripe for adjudication. *See Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1495 (9th Cir. 1996) (citing *Freedom to Travel Campaign v. Newcomb*, 82 F.3d 1431, 1441 (9th Cir. 1996) (concluding that vagueness of one provision of a regulation was not ripe for review due to insufficient facts). Here, Plaintiffs simply speculate as to what funding may be impacted, SAC ¶¶ 454–687, in what amount, *id.*, and in what jurisdiction, *id.* Thus, an "as applied" vagueness challenge is premature and not ripe for review. As such, the Court should dismiss their Fifth Amendment Due Process claim.

## IV.     The Court Should Dismiss the SAC Under Rule 12(b)(6) for Failure to State a Claim Upon Which Relief Can be Granted.

### A.     Plaintiffs fail to plead that the Executive Orders are facially unconstitutional.

In their Prayer for Relief, Plaintiffs ask this Court to declare that portions of each of the challenged Executive Orders relating to "sanctuary" policies are unconstitutional and invalid on its face. Dkt. No. 193 at 161. To succeed on a facial challenge to the Executive Orders, Plaintiffs would have to establish that the Orders would be unconstitutional in all applications. *See United States v. Salerno*, 481 U.S. 739, 745 (1987) (explaining that a facial challenge must establish that "no set of circumstances exists under which the [enactment] would be valid"). Plaintiffs cannot make such a showing here.

By their own terms, the Executive Orders provide that when an agency takes steps to implement them, it must only do so via appropriate lawful actions. Section 17 of E.O. 14,159 directs the Attorney General and the Secretary of Homeland Security to "evaluate and undertake any *lawful actions* to ensure that so-called 'sanctuary' jurisdictions, which seek to interfere with the lawful exercise of Federal law enforcement operations, do not receive access to Federal funds." E.O. 14,159 at § 17 (emphasis added). Section 2(a)(ii) of E.O. 14,218 provides that, to prevent taxpayer resources from supporting illegal

immigration and to ensure taxpayer funded benefits do not go to illegal aliens, the head of each agency should "ensure, *consistent with applicable law*, that Federal payments to States and localities do not, by design or effect, facilitate the subsidization or promotion of illegal immigration, or abet so-called 'sanctuary' policies that seek to shield illegal aliens from deportation[,]" E.O. 14,218 § 2(a)(ii) (emphasis added). And Section 3 of E.O. 14,287 directs the Attorney General and the Secretary of Homeland Security to publish a list of jurisdictions that obstruct the enforcement of Federal immigration laws and pursue legal remedies as appropriate.

Plaintiffs wholly ignore that the challenged Executive Orders specify that agencies should undertake "lawful actions," E.O. 14,159, or those that are "consistent with applicable law," E.O. 14,218 § 2. Indeed, as the D.C. Circuit recognized, when "the Executive Order itself instructs the agency to follow the law," "[t]he mere possibility that some agency might make a legally suspect decision to award a contract or to deny funding for a project does not justify an injunction against enforcement of a policy that . . . is above suspicion in the ordinary course of administration." *Bldg. Constr. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002) (citing *Reno v. Flores*, 507 U.S. 292, 301 (1993)). And Plaintiffs cannot obtain their requested relief foreclosing agencies from relying on or implementing the President's Executive Orders because they have not demonstrated that an agency could *never* permissibly rely on the Executive Orders to condition or withhold funding.

The standard is especially hard to meet here because Congress frequently authorizes the Executive to impose discretionary conditions on the receipt of federal grants. Plaintiffs do not even attempt to make the required showing of blanket unconstitutionality across every grant program administered by the defendant agencies. *See, e.g.*, *City of Los Angeles v. Barr*, 929 F.3d 1163, 1181 (9th Cir. 2019) ("We conclude that DOJ did not exceed its statutory authority in including two scoring factors related to illegal immigration as part of its implementation of the [COPS] grant program."). As a Judge on the Fourth Circuit recently observed in a similar case, there are "serious questions about the ripeness of this lawsuit and plaintiffs' standing to bring it" to the extent that plaintiffs are challenging an overall Executive Order rather than "any particular agency action implementing the Executive Order[.]" Order Staying Preliminary Injunction at 9, *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 25-1189 (4th Cir. Mar.

10

14, 2025) (Doc. 29) (Rushing, J., concurring). That is equally true here, where Plaintiffs seek to preclude *any* implementation of the Executive Orders regardless of the agency or grant program at issue.

Ultimately, the Executive Orders represent the President instructing subordinate agencies to evaluate certain funding, to the extent they have legal authority to do so, and to the extent such funding implicates the President's immigration policies. Such Presidential instructions to subordinate agencies are plainly lawful. "Under our Constitution, the 'executive Power'—all of it—is 'vested in a President,' who must 'take Care that the laws be faithfully executed.'" *Seila Law LLC v. CFPB*, 591 U.S. 197, 203 (2020) (quoting U.S. CONST. art. II, § 1, cl. 1; *id.*, § 3). "Because no single person could fulfill that responsibility alone, the Framers expected that the President would rely on subordinate officers for assistance." *Id.* at 203-04. To that end, the President has authority to exercise "'general administrative control of those executing the laws,' throughout the Executive Branch of government, of which he is the head." *Allbaugh*, 295 F.3d at 32 (quoting *Myers v. United States*, 272 U.S. 52, 164 (1926)). Therefore, the Court should dismiss the claim that the Executive Orders are facially unconstitutional.

**B.     Plaintiffs fail to plead that the Executive Orders violate the doctrine of Separation of Powers and the Spending Clause.**

Plaintiffs' SAC fails to state a claim that the Executive Orders and directives violate the Separation of Powers doctrine. SAC ¶¶703–713. Plaintiffs' SAC alleges that "Defendants' conditioning of federal funding on local governments' cooperation with immigration enforcement violates principles of separation of powers[,]" specifically "Congress's exclusive spending power" and "power to legislate[.]" Dkt. No. 193 at ¶¶ 713 and 708, respectively. Plaintiffs' SAC further alleges that "the funding restrictions in the challenged Executive Orders, and the Bondi and Noem Directives are not authorized by Congress and therefore violate the Spending Clause as well." *Id.* at ¶ 716. Plaintiffs further claim that the President violated the Impoundment Control Act of 1974 (IAC) because he failed to "notify and request authority from Congress to rescind or defer funds *before* acting to withhold or pause federal payments." *Id.* at ¶ 762 (citing 2 U.S.C. §§ 681 *et seq.*).

1.  **The Supreme Court's decision in *Dalton v. Specter* precludes Plaintiffs' independent Separation of Powers and Spending Clause claims when their claims are based on the allegation that the President violated the Impound Control Act.[5]**

Article I of the Constitution confers on Congress the authority to "lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. CONST. Art. I, § 8, cl. 1. Thus, Congress "may raise and appropriate money to advance the general welfare." *Medina v. Planned Parenthood S. Atl.*, ⸺ U.S. ⸺, 145 S. Ct. 2219 (2025) (citation modified). The Constitution further mandates that "[n]o money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const., art. I, § 9, cl. 7. The Take Care Clause, however, "charges the Executive Branch with enforcing federal law," including spending-power laws. *Medina*, 145 S. Ct. at 2229 (citing U.S. Const., art. II, § 3). Here, Plaintiffs claim that the President violated such spending-power laws encoded in the ICA when he issued the challenged Executive Orders because they effectively withhold funds appropriated by Congress by requiring agencies to place immigration-related conditions on the receipt of said funds. Dkt. No. 196 at ¶¶ 441-42 (citing provisions of ICA), 762.

Recently, however, the D.C. Circuit held in a very similar case that grantees are foreclosed by *Dalton v. Specter*, 511 U.S. 462 (1994), from asserting a non-statutory right to vindicate separation-of-powers principles. *Glob. Health Council*, 2025 WL 2326021, at *6. In *Dalton*, the Supreme Court rejected the notion that "every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." *Id.*, 511 U.S. at 472. "[C]laims simply alleging that the President exceeded his statutory authority are not constitutional claims, subject to judicial review under the exception recognized in *Franklin v. Massachusetts,* 505 U.S. 788, 799 (1992)  (holding that there is no review of presidential action under the APA, but there can be judicial review of presidential action to determine whether it violates the Constitution). In *Global Health Council*, recipients of foreign-assistance funds sued to enjoin various agencies from implementing Executive Order 14,169, which temporarily suspended all foreign aid. 2025 WL 2326021. The grantees brought a constitutional claim that the Government violated separation-of-powers principles by impounding funds in violation of the 2024

---

[5] Additionally, Plaintiffs are precluded from bringing an APA claim, at least during the period in which statutory processes of the Impoundment Control Act (ICA), 2 U.S.C.A. § 681 *et seq.* run their course. *See Glob. Health Council v. Trump*, No. 25-5097, 2025 WL 2326021, at *11 (D.C. Cir. Aug. 13, 2025).

Appropriations Act, the ICA and the Anti-Deficiency Act. *Id.*, 2025 WL 2326021, at *5. The D.C. Circuit noted that "[c]onstitutional rights do not typically come with a built-in cause of action to allow for private enforcement in courts[, but i]nstead, . . . are generally invoked defensively in cases arising under other sources of law, or asserted offensively pursuant to an independent cause of action designed for that purpose." *Id.* at *6 (D.C. Cir. Aug. 13, 2025) (quoting *DeVillier v. Texas*, 601 U.S. 285, 291 (2024). Because the ICA provides a mechanism for the President to act on impoundment, the panel found that the plaintiffs lacked a constitutional cause of action.[6] *Id.*, 2025 WL 2326021, at *8. Similarly, Plaintiffs' claim is a statutory one: The President is said to have violated the terms of the ICA by issuing Executive Orders that—according to Plaintiffs—in effect withhold already appropriated federal funds without following the procedures set forth in the ICA. Thus, their separation-of-powers and spending clause claims cannot be brought as independent constitutional claims.

### 2. Alternatively, the Executive Orders do not violate the doctrine of Separation of Powers or the Spending Clause.

Even if this Court finds that Plaintiffs' separation of powers claim can be brought as an independent constitutional claim, Plaintiffs still fail to state a claim upon which relief can be granted because the Executive directives do not freeze or withhold the distribution of already-appropriated funds or unilaterally impose conditions on all federal funds without Congressional authorization. For example, section 17 of EO 14,159 instructs that a deliberative process take place, and for the Executive to undertake any *lawful actions* to ensure that "sanctuary" jurisdictions do not receive access to Federal funds. Executive Order 14,159 applies only to programs administered by the Departments of Justice and DHS, and even within those Departments, federal funds are evaluated on a grant-by-grant or program-by-program basis, rather than in a blanket or categorical fashion. This reality is evidenced by the publicly available information on DHS' website THE DEPARTMENT OF HOMELAND SECURITY, *DHS Standard Terms and Conditions*, https://www.dhs.gov/publication/dhs-standard-terms-and-conditions, (last visited on Aug. 26, 2025) (stating "Not all of DHS's Standard Terms and Conditions apply to every DHS grant

---

[6] The panel recognized that the Ninth Circuit, in *Murphy Co. v. Biden,* 65 F.4th 1122, 1130 (9th Cir. 2023), took a more expansive view of *Dalton*." *Glob. Health*, 2025 WL 2326021, at *9, n. 15. But it also noted that the *Murphy Co.* holding relied upon *Sierra Club v. Trump*, 929 F.3d 670 (9th Cir. 2019), which the Supreme in later vacated in *Biden v. Sierra Club*, ── U.S. ──, 142 S. Ct. 46 (2021).

programs. DHS directs individuals to review the program's NOFO and/or FEMA-State Agreement to determine which Terms and Conditions apply to a particular grant.").[7] Indeed, in Plaintiffs' SAC at ¶¶ 388-389, references the March 20, 2025 FEMA Memo from Cameron Hamilton to the DHS Secretary. In that Memo, FEMA only *recommended* that immigration-related conditions could be applied to 12 FEMA non-disaster preparedness programs "where the purpose of the grant has a nexus to immigration activities, law enforcement or national security" or "where the statute does not limit how FEMA implements the program." *Id*. at 3; Dkt. No. 151-10 (Exhibit G). It further stated that dozens more programs will *not* be subject to any such restriction, in addition to a blanket exemption for disaster grants and non-disaster mitigation grants, grants to fire departments and national search and rescue organizations. *Id*.

Related, Section 2(b) of EO 14,218 asks certain federal agencies to identify sources of funding for illegal aliens and recommend additional agency action to align federal spending with the Order. The Bondi Memo makes clear that all action will be done "consistent with law[.]" Bondi Memo at 1. The same is true of the Noem Memo. Noem Memo at 3 ("To the extent consistent with relevant legal authorities and the applicable terms and conditions of each award…"). Regarding any grants, the Bondi Memo confirms that DOJ will require compliance with 8 U.S.C. § 1373(a) as a condition of grant eligibility only where "consistent with statutory authority and past practice." *Id*. at 2. The same is true of the Noem Memo, which directs components to cease funding sanctuary jurisdictions "to the extent consistent with relevant legal authorities and applicable terms and conditions of each award[.]" Noem Memo at 2. Nothing in these directives would violate any applicable constitutional or statutory limitation. *See Bldg. Constr. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002) (rejecting separation of powers challenge to Executive Order where the President is merely exercising his "supervisory authority over the Executive Branch" when he "directs his subordinates" to take certain action "but only '[t]o the extent permitted by law'" (alteration in original) (citation omitted)). All this qualifying language would be meaningless if the Government's goal was to universally withhold all funding, without an individualized evaluation.

---

[7] The Court may take judicial notice of the government websites cited herein. *See* Fed. R. Evid. 201; *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 999 (9th Cir. 2010) (information on government websites is subject to judicial notice).

Moreover, even if DOJ imposes conditions on future grants, Plaintiffs fail to state a claim that the Executive Orders violate the separation of powers doctrine. In fact, Congress has frequently authorized agencies administering certain grant programs to impose discretionary conditions on their receipt. Those statutory authorizations have taken a variety of forms, including authorizing an agency to ensure that a grant recipient complies "with all provisions of . . . applicable Federal laws," *see* 42 U.S.C. § 3752(a)(5)(D) (governing DOJ grant program), or allowing an agency to "plac[e] special conditions" on certain grants under appropriate circumstances. *See id.* § 3712(a).

Courts have also long recognized instances where the Executive may—consistent with new policy directives—terminate or add conditions on contracts and funds without violating the separation of powers. The D.C. Circuit's decision in *Allbaugh* is instructive. There, the plaintiffs challenged an executive order that provided that "to the extent permitted by law," no federal agency and no entity that receives federal assistance for a construction product could require or prohibit bidders or contractors from entering into a project labor agreement. *Allbaugh*, 295 F.3d at 29. Plaintiffs sued, claiming that the executive order exceeded the President's constitutional authority. *See id.* at 31-32. The D.C. Circuit rejected this argument, highlighting that the executive order "directs [agencies] how to proceed in administering federally funded projects, but only '[t]o the extent permitted by law.'" *Id.* at 33. "Thus, if an executive agency, such as the FEMA, may lawfully implement the Executive Order, then it must do so; if the agency is prohibited, by statute or other law, from implementing the Executive Order, then the Executive Order itself instructs the agency to follow the law." *Id.* The court concluded that "[t]he mere possibility that some agency might make a legally suspect decision to award a contract or to deny funding for a project does not justify an injunction against enforcement of a policy that ... is above suspicion in the ordinary course of administration." *Id.* (citing *Reno v. Flores*, 507 U.S. 292, 301 (1993)); *see also Common Cause v. Trump*, 506 F. Supp. 3d 39, 47 (D.D.C. 2020) ("We cannot ignore these repeated and unambiguous qualifiers imposing lawfulness and feasibility constraints on implementing the memorandum.").

Plaintiffs similarly fail to articulate a claim that the executive directives violate the Spending Clause such that this claim survives the pleadings stage. U.S. CONST. art. I, § 8, cl. 1. "Congress may attach conditions on the receipt of federal funds, and has repeatedly employed the power to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal

statutory and administrative directives." *Dole*, 483 U.S. at 206 (quotation marks omitted). In *Dole,* the Supreme Court held that "[e]ven if Congress [] . . . might lack the power to impose directly a national minimum drinking age, [] . . ., [23 U.S.C.] § 158's indirect encouragement of state action to obtain uniformity in the States' drinking age is a valid use of the spending power." The Court outlined certain limitations that "the exercise of the spending power must be in pursuit of 'the general welfare'" and conditions on the receipt of federal funds must be stated "unambiguously" so that recipients can "exercise their choice knowingly, cognizant of the consequences of their participation." *Id.* at 207. But the *Dole* Court noted this "nexus" concept—"that conditions on federal grants might be illegitimate if they are unrelated 'to the federal interest in particular national projects or programs'"—had only been "suggested (without significant elaboration)" in prior cases. *Id.* at 208; *see State ex rel. Becerra v. Sessions*, 284 F.Supp.3d 1015 at 1034 (N.D. CA 2018) citing *Maywathers v. Newland*, 314 F.3d 1062, 1067 (9th Cir. 2002) (discussing nexus as a "low-threshold relatedness inquiry").

Supreme Court precedent (and long practice) makes clear that agencies have power to set grant criteria on their own accord, while subject to Congressional direction if such direction has been given. For example, the Supreme Court upheld agency-imposed conditions on the Medicare and Medicaid programs in *Biden v. Missouri*, 595 U.S. 87, 90, 94 (2022) (per curiam) (finding that a new condition of participation in Medicare and Medicaid requiring facilities to ensure that staff are vaccinated against COVID-19 did not exceed applicable statutory authority); *see also Bennett v. Ky. Dep't of Educ.,* 470 U.S. 656, 669 (1985) (stating that Congress cannot "prospectively resolve every possible ambiguity concerning particular applications of the requirements"). Moreover, the Supreme Court has made clear that, even where the Federal Government may not be able to *compel* them to do a particular activity, it may *encourage* States and municipalities to implement federal regulatory programs. *See New York*, 505 U.S. at 149.

In granting the preliminary injunction, this Court held that Plaintiffs were likely to show that the executive directives violate the Spending Clause because they purport to reach all federal funding, past and present, and impose conditions without any nexus to the conditioned funds. *City & Cnty. of San Francisco*, 2025 WL 1282637, at **30–31. However, the executive directives do not apply to retroactively impact funding, because the language in those materials is forward looking. For example, the Bondi Memo language discusses conditions on future grants, *i.e.*, "the Department will require any jurisdiction that

*applies* for certain Department grants to be compliant with 8 U.S.C. § 1373(a)" and "the Department *may seek* to tailor *future* grants. . . ." *Id.* (emphasis added). Therefore, potential grantees are already on notice of the revised terms prior to requesting funding, and will be able to exercise their choice knowingly, cognizant of the consequences of their participation in grant programs that include any such conditions. *Dole*, 483 U.S. at 207. Likewise, the executive directives do not apply to all funding. *Id.* at 26, 61. This fact is evidenced by the conditional language used throughout these executive directives. *See, e.g.*, Bondi Memo at 2 ("Consistent with statutory authority and past practice, the Department will require any jurisdiction that applies for *certain* Department grants to be compliant with 8 U.S.C. § 1373(a).") (emphasis added); Noem Memo at 5 ("To the extent consistent with relevant legal authorities and the applicable terms and conditions *of each award*, each component must cease providing federal funding to sanctuary jurisdictions.") (emphasis added). Indeed, these materials do not purport to form the basis for immigration-related conditions, but to guide agency decision-making in crafting the same. Thus, any specific funding conditions are not imposed via the Executive Orders themselves but rather from the relevant agencies' determination—on a program-by-program basis—what individual grant conditions should apply. And any challenge regarding whether agency-specific grant conditions satisfy Spending Clause requirements cannot be reviewed in this lawsuit only challenging the Executive Orders generally.

Further, any conditions arguably derived from the Executive Orders stem from references to specific statutory authority. For example, Executive Order 14,218 seeks to implement the requirements Congress imposed 30 years ago in PRWORA.[8] Those requirements, indicating that federal public benefits,

---

[8] Nearly 30 years ago, Congress enacted the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA). In that statute, Congress enacted a "national policy with respect to welfare and immigration" specifying that "aliens within the Nation's borders [should] not depend on public resources to meet their needs." 8 U.S.C. § 1601(2)(A). The statute noted that, notwithstanding that policy, "aliens have been applying for and receiving public benefits from Federal, State, and local governments at increasing rates" and explained that "[i]t is a compelling government interest to remove the incentive for illegal immigration provided by the availability of public benefits." 8 U.S.C. § 1601(3), (6). Under PRWORA, with certain exceptions, "an alien who is not a qualified alien … is not eligible for any Federal public benefit." 8 U.S.C.§ 1611(a). In general, an alien is not qualified if he or she is not lawfully admitted to the United States. *Id.* at § 1641(b). "Federal public benefits" include "any … welfare, health, disability, public or assisted housing … food assistance … or any other similar benefit for which payments or assistance are provided to an individual, household, or family eligibility unit by an agency of the United States or by appropriated funds of the United States." *Id.* at § 1611(c)(1). Under that definition, such payments are governed by PRWORA's restrictions "even if administered by a state or local agency" or

17

even when administered through a State or locality, should not be provided to aliens unlawfully present in the United States, are clearly set forth in federal law. In PRWORA, Congress recognized that a restriction on federal public benefits to unlawful aliens is part of the "national policy with respect to welfare and immigration," 8 U.S.C. § 1601, and the Executive Order 14,218 simply reaffirms and reinforces existing policy and accompanying federal statutory restrictions.

Plaintiffs contend that the contested terms here impose conditions so severe as to "cross the line" into coercion, citing to *National Federation of Independent Business v. Sebelius*, 567 U.S. 519, 579 (U.S., 2012) (*NFIB*). SAC ¶¶ 426, 717. Under the Plaintiffs' overbroad reading of *NFIB*, all widely imposed conditions would be unconstitutionally coercive, simply because so much of local governments' funding derives from the Federal Government. But that is not the law. To the contrary, *NFIB* stressed (and as Justice Ginsburg's concurrence in the judgment observed) that this coercion arose from the unexpected imposition on the states to accept a dramatically broadened, independent grant program at the risk of losing all federal assistance of longstanding Medicaid coverage. *NFIB*, 567 U.S. at 579-81; *id.* at 624-25 (Ginsburg, J., concurring in judgment, dissenting in reasoning). The Court held that the combination of the nature and size of the threatened funding loss distinguished that case from *Dole*. *Id.*

As explained in *NFIB*, the Court has not "'fix[ed] the outermost line' where persuasion gives way to coercion." 567 U.S. at 585 (quoting *Charles C. Steward Mach. Co. v. Davis*, 301 U.S. 548, 591 (1937)). That point has not been passed here. While, for the reasons stated above, the scope of grants affected by the challenged directives remains unclear, any particular grant on its own will represent a far smaller percentage of a city's overall budget. Thus, the facts of this case fall in the range of the inducements considered acceptable in *Dole*, rather than the threat of a loss of all Medicaid funds considered in *NFIB*. Therefore, Plaintiffs cannot state a claim that the executive directives violate the Spending Clause, and for the same reasons, their claim should not survive the pleadings stage.

### C.    Plaintiffs fail to plead that the Executive Orders violate the Tenth Amendment.

Plaintiffs fail to state a claim that the Executive directives violate the Tenth Amendment to survive the pleadings stage. The Tenth Amendment embodies the principle that the "pre-existing sovereign States"

are made through "a joint federal-state cooperative partnership." *Pimentel v. Dreyfus*, 670 F.3d 1096, 1099 n.4 (9th Cir. 2012) (per curiam).

1   (and their subdivisions) retain their sovereignty under the Constitution and that the Federal Government

2   may not encroach upon that sovereignty. *See U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 801 (1995);

3   *New York,* 505 U.S. at 156. Congress may use its Spending Clause power "to grant federal funds to the

4   States, and may condition such a grant upon the States taking certain actions that Congress could not

5   require them to take." *NFIB*, 567 U.S. at 576 (plurality opinion). It may, for example, make certain federal

6   funds available only to localities that enact a given regulatory regime. *Dole*, 483 U.S. at 205–08 (upholding

7   federal statute conditioning state receipt of federal highway funds on state adoption of minimum drinking

8   age of twenty-one). But even where those conditions otherwise comply with Spending Clause

9   requirements, if "pressure turns into compulsion," those conditions may "run[] contrary to our system of

10  federalism" and violate the Tenth Amendment. *NFIB*, 567 U.S. at 577–78. To do so, the conditions must

11  be extreme: "weapon[s] of coercion, destroying or impairing the autonomy of the states," putting a

12  proverbial "gun to the head." *Id.* at 579, 581. Plaintiffs argue that "[b]y restricting funding and directing

13  enforcement against Plaintiffs for limiting cooperation with federal immigration authorities, Defendants

14  seek to commandeer Plaintiffs in furtherance of a federal regulatory program." SAC ¶ 702. However, in

15  order to determine whether commandeering is present here, the amount of money in question is critical to

16  the analysis. *State v. DOJ*, 951 F.3d 84, 116 (2d Cir. 2020) (analyzing what percentage of a local

17  government budget may be impacted by federal withholding to evaluate plaintiffs' Tenth Amendment

18  commandeering claims). Plaintiffs describe generally the amount of federal funds they receive or expect

19  to receive, and speculate what funding *may* be impacted, but cannot establish that any funds have been

20  actually impacted. And at this point in the litigation, it is untenable to argue that *all* of their federal funding

21  will be impacted. For example, the FEMA memo underscores this very point, because it evidences that

22  the agency is evaluating each grant individually to determine whether funding conditions would be

23  appropriate. To this end, DHS (through FEMA) identified only twelve programs to which immigration-

24  related conditions may apply and exempted many more programs from that condition. *See* Dkt. No. 151-

25  10 at 3. Those twelve programs represent a small portion of all FEMA grants. Thus, refusal to comply

26  with an immigration-related condition may affect the funds available for that particular program, but it

27  would not "threat[en] to terminate other … grants" to which the immigration-related condition does not

28  apply. *NFIB*, 567 U.S. at 580 (plurality opinion).

Moreover, Plaintiffs fail to state a claim for relief where they only speculate that enforcement actions may arise from the executive directives. *See Envtl. Def. Ctr., Inc. v. EPA*, 344 F.3d 832, 847 (9th Cir. 2003) ("[A]s long as the alternative to implementing a federal regulatory program does not offend the Constitution's guarantees of federalism, the fact that the alternative is difficult, expensive or otherwise unappealing is insufficient to establish a Tenth Amendment violation.") (internal quotation marks omitted). *Cf. United States v. Pickard*, 100 F. Supp. 3d 981, 1011 (E.D. Cal. 2015) (rejecting a Tenth Amendment challenge to a statement of agency policy on the grounds that a policy statement "is a very different creature from a statute" in that it does not bind States as would a statute). Despite Plaintiffs' complaints about affirmative litigation, *see* SAC ¶ 375-82, 411, there is always a possibility that the Federal Government may sue a State or local government alleging that their laws or policies are constitutionally preempted. *See Arizona v. United States*, 567 U.S. 387 (2012); *United States v. South Carolina*, 720 F.3d 518 (4th Cir. 2013); *United States v. Alabama*, 691 F.3d 1269 (11th Cir. 2012). This authority exists entirely independent of the Executive Orders. *Id*. And if such action were to occur, the affected jurisdiction would have an opportunity at that time to challenge its propriety and merits. As such, Plaintiffs fail to state a claim that the executive directives violate the Tenth Amendment.

### D.    Plaintiffs fail to state a claim under the APA for which the Court can grant relief.

### 1.    Plaintiffs fail to identify a final agency action

Presidential actions are not agency actions reviewable under the APA. Thus, Plaintiffs cannot challenge the Executive Orders on that basis. Dkt. No. 111 at 5, n.5; *see, e.g., Franklin v. Massachusetts*, 505 U.S. at 801. As to other directives, Plaintiffs have not identified final agency action for review. *See* 5 U.S.C. § 704 (APA review requires final agency action). Agency action is final only if (1) it marks "the consummation of the agency's decision-making process"—it must not be merely tentative or interlocutory in nature, and (2) the "action must be one by which rights or obligations have been determined, or from which legal consequences flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations omitted). Both conditions must be satisfied for agency action to be "final" under the APA. *Id*. at 175.

The Bondi Memo calls for an assessment to be implemented over time after analysis and deliberation is completed by agency components. Dkt. No. 22 at 111-113 (Exhibit D). Cases finding final agency action have involved some concrete act in excess of an announcement of such an assessment or

20

plan. *See, e.g.*, *State ex rel Becerra*, 284 F. Supp. 3d at 1015 (finding final agency action when funding was in fact dependent on the certification condition on the Byrne JAG program); *City of Philadelphia v. Sessions*, 280 F. Supp. 3d 579 (E.D. Penn. 2017) (finding final agency action when the Attorney General conditioned funding Byrne JAG on applicants certifying compliance with 8 U.S.C. § 1373).

Further, the memo instructs the Associate Attorney General, in coordination with components that provide Department grants, to "report to the Attorney General the grants to which [compliance with 8 U.S.C. § 1373] applies." Dkt. No. 22 at 112 (Ex. D). Absent a discrete and final agency action, federal courts cannot review an on-going program or policy. *See Franklin*, 505 U.S. at 797 ("The core question is whether the agency has completed its decision-making process, and whether the result of that process is one that will directly affect the parties."). The purpose of the report is for the agency to engage in decision-making—decisions that have not yet been made. Plaintiffs' funding has not been impacted, and their suit, thus, aims at anticipated, programmatic changes, which are squarely precluded from APA review. *Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*, 5 F.4th 997, 1011 (9th Cir. 2021).

Lastly, the Bondi memo states, "to the extent consistent with applicable statutes, regulations, and terms, the Department *may seek to tailor future grants* to promote a lawful system of immigration, and to reduce efforts by state or local jurisdictions to undermine a lawful system of immigration." Dkt. No. 22 at 111 (Ex. D). The applicable portions are framed in future tense, indicating they are not "definitive statement[s] of position", but rather "a threshold determination that further inquiry is warranted…." *See FTC v. Standard Oil Co.*, 449 U.S. 232, 241 (1980); *Franklin*, 505 U.S. at 798 (no final agency action where "the Secretary's report to the President carries no direct consequences" but "serves more like a tentative recommendation than a final and binding determination."); *New Jersey Hosp. Ass'n. v. United States*, 23 F. Supp. 2d 497, 499 (D.N.J. 1998) (no final agency action where settlement letters to hospitals "merely indicate a belief by the DOJ that plaintiff's member hospitals may have violated" the law).[9]

---

[9] Notwithstanding, this Court previously found that the Bondi Memo constitutes final agency action because it instructs that the DOJ to "pause the distribution of all funds." *City & Cnty. of San Francisco v. Trump*, 2025 WL 1282637, at **34–35. Under the same reasoning, the Court found that the Bondi Memo was arbitrary and capricious because it "fails to offer a reasonable explanation of the breadth of funding withheld or the basis for withholding funds that Congress has already appropriated." *Id.* at *36. As Defendants asserted at oral argument and continue to preserve that any pause on federal funding applies to Section II of the memo, which applies to "Non-Governmental Organizations"—*not* to Plaintiffs. This

The same is true of grant conditions from HUD, April 4, 2025 Letter from Secretary Turner to Grantees and Stakeholders, Dkt. No. 95-1 at 90 ("*going forward*, grant agreements will include language that will require compliance with Executive Order 14218") (emphasis added), and the Department of Homeland Security, Dkt. No. 151-9 at 2-3 ("apply to all *new* federal awards" for fiscal year 2025) (emphasis added). Indeed, Plaintiffs' speculation about what funding may be impacted, SAC ¶¶ 454–687, in what amount, *id.*, and in what jurisdiction, *id.*, confirms that no final agency action has taken place.[10]

In sum, these agency documents merely call for internal evaluation of federal funding decisions. *Ukiah Valley Med. Ctr. v. Fed. Trade Comm'n*, 911 F.2d 261, 264 (9th Cir. 1990) ("The general rule is that administrative orders are not final and reviewable 'unless and until they impose an obligation, deny a right, or fix some legal relationship as a consummation of the administrative process.'") (citations omitted). Courts have interpreted the "finality" element with an eye toward pragmatism. *See FTC v. Standard Oil Co.*, 449 U.S. 232, 239 (1980) (citing *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149 (1967). To determine whether an action is "final," courts "look to whether the action 'amounts to a definitive statement of the agency's position' or 'has a direct and immediate effect on the day-to-day operations' of the subject party, or if 'immediate compliance [with the terms] is expected.'" *Oregon Natural Desert Ass'n. v. U.S. Forest Service*, 465 F.3d 977, 982 (9th Cir. 2006) (citation omitted). Neither of these factors is present here and thus Plaintiffs fail to state a claim under the APA. 5 U.S.C. § 704.

### 2. Allocation of discretionary grant funding is committed to agency discretion and is, thus, precluded from APA review.

Because the allocation of discretionary grant funding is committed to agency review and because some of the grant programs managed by the agency are discretionary, Plaintiffs' APA claim is precluded from APA review under 5 U.S.C. 701(a)(2). Again, Plaintiffs challenge the agency directives, which call for an assessment of federal grant programs to see where immigration conditions may lawfully be

---

conclusion is further supported by the fact that Plaintiffs' second preliminary injunction motion continued to be supported by declarations complaining of budgetary uncertainty, *not* a pause of all DOJ funding.

[10]  This is also indicative that Plaintiffs' APA claim is not ripe, as the uncertainty of future harm does not justify litigation now. *See Texas*, 523 U.S. at 300 (A claim is not ripe "if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all."); *see also City of Fall River*, 507 F.3d at 6 (review of agency's conditional project approval was unripe).

imposed. And at least some of the grant programs managed by the agencies are discretionary. For these grants, Congress has not directed that a specific amount of funding must be directed to recipients who meet all applicable criteria, terms, and conditions. Instead, Congress has simply appropriated funding for the program generally, for the agency to in turn distribute as appropriate. *See e.g.,* 6 U.S.C. § 112(b)(2) (Congress has given DHS "the authority to make contracts, grants, and cooperative agreements . . . as may be necessary and proper to carry out the Secretary's responsibilities under this chapter or otherwise provided by law…."). DOT has discretion to "prescribe terms" for the projects it funds with grants. *See* 49 U.S.C. § 5334(a)(1) ("In carrying out this chapter, the Secretary of Transportation may--(1) prescribe terms for a project that receives Federal financial assistance under this chapter (except terms the Secretary of Labor prescribes under section 5333(b) of this title."). HUD has discretion to establish "other terms and conditions" to "carry out [the program] in an effective and efficient manner." 42 U.S. Code § 11386(b)(8). HUD simply seeks to bring its funding conditions in line with federal law, as 8 U.S.C. § 1611(c)(1)(A) provides "an alien who is not a qualified alien . . . is not eligible for any Federal public benefit" which includes "any grant . . . provided by an agency of the United States or by appropriated funds of the United States." The APA does not permit judicial review of such discretionary agency action. 5 U.S.C. § 701(a)(2). Agencies have broad discretion in creating, awarding, and terminating specific grants, and thus review of the terms and conditions set by agencies, as contemplated by Congress, is outside of the jurisdiction of the Court. At a minimum, the discretionary grants at issue in this case and the discretionary determination as to the conditions of those grants are unreviewable under the APA.

In *Lincoln v. Vigil*, the Supreme Court held that the Indian Health Service's decision to discontinue a program it had previously funded and to instead reallocate those funds to other programs was committed to agency discretion and not reviewable under the APA's reasoned decision-making standards. 508 U.S. 182, 185-88 (1993). The Court stated that the "allocation of funds from a lump-sum appropriation is" an "administrative decision traditionally regarded as committed to agency discretion," because the "very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Id*. at 192.

Indeed, "an agency's allocation of funds from a lump-sum appropriation requires 'a complicated balancing of a number of factors which are peculiarly within its expertise': whether its 'resources are best

spent' on one program or another; whether it 'is likely to succeed' in fulfilling its statutory mandate; whether a [ ] program 'best fits the agency's overall policies'; and, 'indeed, whether the agency has enough resources' to fund a program 'at all.'" *Id.* at 193 (quoting *Heckler v. Chaney*, 470 U.S. 821, 831 (1985)); *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Donovan*, 746 F.2d 855, 861 (D.C. Cir. 1984) (Scalia, J.) ("A lump-sum appropriation leaves it to the recipient agency (as a matter of law, at least) to distribute the funds among some or all of the permissible objects as it sees fit.").

Although *Lincoln* involved lump-sum appropriations, its logic extends to funding programs that leave to the agency "the decision about how the moneys" for a particular program "could best be distributed consistent with" the statute. *Milk Train, Inc.* v. *Veneman*, 310 F.3d 747, 751 (D.C. Cir. 2002). Such decisions "clearly require[] 'a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise.'" *Id.* at 752 (citation omitted); *see Policy & Rsch., LLC* v. *U.S. Dep't of Health & Human Servs.*, 313 F. Supp. 3d 62, 75-76 (D.D.C. 2018) (Jackson, J.); *Cmty. Action of Laramie Cnty., Inc. v. Bowen*, 866 F.2d 347, 354 (10th Cir. 1989) ("Funding determinations are 'notoriously unsuitable for judicial review, for they involve the inherently subjective weighing of the large number of varied priorities which combine to dictate the wisest dissemination of an agency's limited budget.'") (quoting *Alan Guttmacher Inst. v. McPherson*, 597 F. Supp. 1530, 1536-37 (S.D.N.Y. 1984)). Although an agency "is required to use earmarked funds for their specified purpose, an agency may still exercise discretion *within* the earmark." *Amica Ctr. for Immigrant Rights, et al. v. U.S. Dep't of Justice*, No. 25-298 (RDM), 2025 WL 1852762, at *14 (D.D.C. July 6, 2025) (emphasis in original) (agency decision to terminate certain grant programs not subject to judicial review under APA).

This case primarily involves discretionary grants that fit within *Lincoln*'s analytical framework for agency discretion. Many of the grants at issue are authorized through annual appropriations that give little guidance to the Agency beyond allocating funding. *See, e.g.*, Pub. L. 118-47, 138 Stat 460, 608 (Mar. 23, 2024) ("$10,800,000 for Regional Catastrophic Preparedness Grants."); *id.* at 594 ("For necessary expenses of the Office of the Secretary and for executive management for Federal assistance through grants . . . of which $18,000,000 shall be for targeted violence and terrorism prevention grants . . . ."). For such discretionary grants, not only did Congress expressly provide for significant discretion by the executive branch, but it did not provide any "meaningful standard against which to judge the agency's

exercise of discretion." *See Lincoln*, 508 U.S. at 191. Accordingly, these grant allocation decisions are precluded from APA review. 5 U.S.C. § 701(a)(2).

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Second Amended Complaint with prejudice.

Dated: August 26, 2025                    Respectfully submitted,

                                          BRETT A. SHUMATE
                                          Assistant Attorney General
                                          Civil Division
                                          YAAKOV ROTH
                                          Principal Deputy Assistant Attorney General
                                          DREW C. ENSIGN
                                          Deputy Assistant Attorney General

                                          LAUREN E. FASCETT
                                          Senior Litigation Counsel
                                          LINDSAY ZIMLIKI
                                          CAROLINE MCGUIRE
                                          ANGEL FLEMING
                                          Trial Attorneys

                                          */s/ Victoria Turcios*
                                          VICTORIA TURCIOS
                                          Trial Attorney
                                          United States Department of Justice
                                          Civil Division
                                          Office of Immigration Litigation
                                          General Litigation and Appeals Section
                                          450 5th Street, NW
                                          Washington, D.C. 20530
                                          202-451-7661
                                          Victoria.E.Turcios2@usdoj.gov

                                          *Attorney for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 26th day of August 2025, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which provided an electronic notice and electronic link of the same to all attorneys of record through the Court's CM/ECF system.

*/s/ Victoria Turcios*
VICTORIA TURCIOS
Trial Attorney
United States Department of Justice
Office of Immigration Litigation
General Litigation and Appeals Section
*Attorney for Defendants*

A