1  DAVID CHIU, SBN 189542
   City Attorney
2  YVONNE R. MERÉ, SBN 175394
   Chief Deputy City Attorney
3  MOLLIE M. LEE, SBN 251404
   Chief of Strategic Advocacy
4  SARA J. EISENBERG, SBN 269303
   Chief of Complex and Affirmative Litigation
5  NANCY E. HARRIS, SBN 197042
   KARUN A. TILAK, SBN 323939
6  Deputy City Attorneys
   Fox Plaza
7  1390 Market Street, 7th Floor
   San Francisco, CA  94102-5408
8  Telephone:      (415) 355-3308
   Facsimile:      (415) 437-4644
9  E-Mail:         karun.tilak@sfcityatty.org

10 Attorneys for Plaintiff
   CITY AND COUNTY OF SAN FRANCISCO
11

TONY LOPRESTI, SBN 289269
County Counsel
KAVITA NARAYAN, SBN 264191
Chief Assistant County Counsel
MEREDITH A. JOHNSON, SBN 291018
Lead Deputy County Counsel
STEFANIE L. WILSON, SBN 314899
RAJIV NARAYAN, SBN 334511
Deputy County Counsels
BILL NGUYEN, SBN 333671
Litigation Fellow
70 W. Hedding Street, East Wing, 9th Floor
San José, CA 95110
Telephone:      (408) 299-5900
Facsimile:      (408) 292-7240
E-Mail:         bill.nguyen@cco.sccgov.org

Attorneys for Plaintiff
COUNTY OF SANTA CLARA

*[additional counsel on signature page]*

12              UNITED STATES DISTRICT COURT

13             NORTHERN DISTRICT OF CALIFORNIA

14

15 | CITY AND COUNTY OF SAN FRANCISCO,
16 | COUNTY OF SANTA CLARA, CITY OF
   | PORTLAND, MARTIN LUTHER KING, JR.
17 | COUNTY, CITY OF NEW HAVEN, CITY OF
   | OAKLAND, CITY OF EMERYVILLE, CITY
18 | OF SAN JOSÉ, CITY OF SAN DIEGO, CITY
   | OF SACRAMENTO, CITY OF SANTA CRUZ,
19 | COUNTY OF MONTEREY, CITY OF
   | SEATTLE, CITY OF MINNEAPOLIS, CITY
20 | OF ST. PAUL, CITY OF SANTA FE, COUNTY
   | OF ALAMEDA, CITY OF ALBANY, CITY OF
21 | ALBUQUERQUE, COUNTY OF
   | ALLEGHENY, CITY OF BALTIMORE, CITY
22 | OF BEND, CITY OF BENICIA, CITY OF
   | BERKELEY, CITY OF BOSTON, CITY OF
23 | CAMBRIDGE, CITY OF CATHEDRAL CITY,
   | CITY OF CHICAGO, CITY OF COLUMBUS,
24 | CITY OF CULVER CITY, COUNTY OF
   | DANE, CITY AND COUNTY OF DENVER,
25 | CITY OF HEALDSBURG, COUNTY OF
   | HENNEPIN, CITY OF LOS ANGELES,
26 | COUNTY OF MARIN, CITY OF MENLO
   | PARK, MULTNOMAH COUNTY, CITY OF
27 | PACIFICA, CITY OF PALO ALTO, CITY OF
   | PETALUMA, PIERCE COUNTY, CITY OF
28 | RICHMOND, CITY OF ROCHESTER, CITY
   | OF ROHNERT PARK, COUNTY OF SAN

Case No. 25-CV-01350-WHO

**EXHIBITS A – O TO SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

n:\exlit\li2025\250739\01871369.docx

1  MATEO, CITY OF SANTA ROSA, COUNTY
   OF SONOMA, CITY OF WATSONVILLE,
2  CITY OF WILSONVILLE,

3          Plaintiffs,

4          vs.

5  DONALD J. TRUMP, President of the United
   States, UNITED STATES OF AMERICA,
6  PAMELA BONDI, Attorney General of the
   United States, EMIL BOVE, Acting Deputy
7  Attorney General, UNITED STATES
   DEPARTMENT OF JUSTICE, KRISTI NOEM,
8  Secretary of United States Department of
   Homeland Security, UNITED STATES
9  DEPARTMENT OF HOMELAND SECURITY,
   RUSSELL VOUGHT, Director of United States
10 Office of Management and Budget, UNITED
   STATES OFFICE OF MANAGEMENT AND
11 BUDGET, DOES 1-100,

12         Defendants.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

Dated:  September 25, 2025                    DAVID CHIU
                                             City Attorney
2                                            YVONNE R. MERÉ
                                             Chief Deputy City Attorney
3                                            MOLLIE M. LEE
                                             Chief of Strategic Advocacy
4                                            SARA J. EISENBERG
                                             Chief of Complex and Affirmative Litigation
5                                            NANCY E. HARRIS
                                             KARUN A. TILAK
6                                            Deputy City Attorneys

7                                     By:  /s/ David Chiu
                                             DAVID CHIU
8                                            City Attorney

9                                            Attorneys for Plaintiff
                                             CITY AND COUNTY OF SAN FRANCISCO
10

11                                           TONY LOPRESTI
12                                           County Counsel
                                             KAVITA NARAYAN
13                                           Chief Assistant County Counsel
                                             MEREDITH A. JOHNSON
14                                           Lead Deputy County Counsel
                                             STEFANIE L. WILSON
15                                           RAJIV NARAYAN
                                             Deputy County Counsels
16                                           BILL NGUYEN
                                             Litigation Fellow
17

18                                    By:  /s/ Tony LoPresti
                                             TONY LOPRESTI
19                                           County Counsel

20                                           Attorneys for Plaintiff
                                             COUNTY OF SANTA CLARA
21

22

23

24

25

26

27

28

ROBERT TAYLOR
Portland City Attorney

By: */s/ Naomi Sheffield*
     NAOMI SHEFFIELD*
     Chief Deputy City Attorney
     1221 SW Fourth Avenue, Room 430
     Portland, OR 97204
     Tel: (503) 823-4047
     Fax: (503) 823-3089
     Naomi.Sheffield@portlandoregon.gov

     *Admitted *pro hac vice*

     Attorneys for Plaintiff
     CITY OF PORTLAND


     SHANNON BRADDOCK
     King County Executive

By: */s/ David J. Hackett*
     DAVID J. HACKETT*
     General Counsel to King County
     Executive
     Chinook Building
     401 5th Avenue, Suite 800
     Seattle, Washington, 98104
     (206) 477-9483
     David.hackett@kingcounty.gov
     PAUL J. LAWRENCE*
     Pacifica Law Group
     1191 2nd Avenue, Suite 2000
     Seattle, WA 98101-3404
     (206) 245-1708
     Paul.Lawrence@pacificalawgroup.com

     *Admitted *pro hac vice*

     Attorneys for Plaintiff
     MARTIN LUTHER KING, JR. COUNTY

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PATRICIA KING
New Haven Corporation Counsel

By: /s/ Patricia King
PATRICIA KING*
Office of the Corporation Counsel
City of New Haven
165 Church Street-4th Floor
New Haven, CT 06510
Tel:  203-946-7951
Cell: 203-668-9282
Fax:  203-946-7942
pking@newhavenct.gov

*Admitted pro hac vice

Attorney for Plaintiff
CITY OF NEW HAVEN


RYAN RICHARDSON
Oakland City Attorney

By: /s/ Ryan Richardson
RYAN RICHARDSON
City Attorney
MARIA BEE
Chief Assistant City Attorney
JAMIE HULING DELAYE
Supervising City Attorney
H. LUKE EDWARDS
Deputy City Attorney
One Frank H. Ogawa Plaza, 6th Floor
Oakland, CA 94612
Tel: (510) 238-6629
Fax: (510) 238-6500
Email: RRichardson@OaklandCityAttorney.org

Attorneys for Plaintiff
CITY OF OAKLAND

1

2

JOHN I. KENNEDY
City Attorney

3    By: */s/ John I. Kennedy*
JOHN I. KENNEDY, City Attorney

4    1333 Park Ave, Emeryville, CA 94608-3517
Phone: 510-596-4381

5    Fax: 510-596-3724
Email: John.Kennedy@emeryville.org

6

7    Attorney for Plaintiff
CITY OF EMERYVILLE

8

9    NORA FRIMANN
City Attorney

10   By: */s/ Nora Frimann*
NORA FRIMANN, City Attorney

11   ELISA TOLENTINO, Chief Deputy City Attorney

12   200 E Santa Clara St
San José, CA 95113-1905

13   Tel: 408-535-1900
Fax: 408-998-3131

14   cao.main@sanjoseca.gov

15   Attorneys for Plaintiff
CITY OF SAN JOSÉ

16

17

18   HEATHER FERBERT
City Attorney

19   By: */s/ Mark Ankcorn*
MARK ANKCORN, Senior Chief Deputy City Attorney

20   JULIE RAU, Deputy City Attorney

21   1200 Third Avenue, Suite 1100
San Diego, California 92101-4100

22   Tel: (619) 533-5800

23   Attorneys for Plaintiff
CITY OF SAN DIEGO

24

25

26

27

28

1

2

SUSANA ALCALA WOOD
City Attorney

3

By: */s/ Andrea Velasquez*
ANDREA VELASQUEZ, Supervising Deputy City

4

Attorney
915 I St Fl 4, Sacramento, CA 95814-2621

5

Tel: 916-808-5346
Fax: 916-808-7455

6

Email: AVelasquez@cityofsacramento.org

7

Attorneys for Plaintiff
CITY OF SACRAMENTO

8

9

By: */s/ Anthony P. Condotti*

10

Anthony P. Condotti, City Attorney
Catherine M. Bronson, Assistant City Attorney

11

Claire Hard, Deputy City Attorney
PO Box 481

12

Santa Cruz, CA 95061
Tel: 831-423-8383

13

Email: tcondotti@abc-law.com
chard@abc-law.com

14

cbronson@abc-law.com

15

Attorneys for Plaintiff
CITY OF SANTA CRUZ

16

17

SUSAN K. BLITCH
County Counsel

18

19

By: */s/ Susan K. Blitch*
SUSAN K. BLITCH, County Counsel

20

HENRY BLUESTONE SMITH, Deputy County Counsel
168 W Alisal St Fl 3rd

21

Salinas, CA 93901-2439
Tel: 831-755-5045

22

Fax: 831-755-5283
Email: SmithHB@countyofmonterey.gov

23

24

Attorneys for Plaintiff
COUNTY OF MONTEREY

25

26

27

28

1

2

ANN DAVISON
Seattle City Attorney

3

By: /s/ Kerala Cowart
Kerala Cowart, Assistant City Attorney*

4

Ann Davison, Seattle City Attorney*
Dallas LePierre, Assistant City Attorney*

5

Rebecca Widen, Assistant City Attorney*
Seattle City Attorney's Office

6

701 Fifth Avenue, Suite 2050
Seattle, WA 98104

7

Tel: (206) 684-8200
E-mail: Kerala.Cowart@seattle.gov

8

*Admitted *pro hac vice*

9

Attorneys for Plaintiff
CITY OF SEATTLE

10

11

KRISTYN ANDERSON
City Attorney

12

13

By: /s/ Kristyn Anderson
KRISTYN ANDERSON (MN Lic. 0267752)*

14

SARA J. LATHROP, Assistant City Attorney (MN Lic. 0310232)*

15

SHARDA ENSLIN, Assistant City Attorney (MN Lic. 0389370)*

16

350 South Fifth Street
Minneapolis, MN 55415

17

Tel: 612-673-3000
Email: kristyn.anderson@minneapolismn.gov

18

sara.lathrop@minneapolismn.gov
sharda.enslin@minneapolismn.gov

19

20

*Admitted *pro hac vice*

21

Attorneys for Plaintiff
CITY OF MINNEAPOLIS

22

23

24

25

26

27

28

1

2

LYNDSEY OLSON
City Attorney

3

By: */s/ Lyndsey Olson*

4

LYNDSEY OLSON, City Attorney (MN Lic. #
0332288)*
ANTHONY G. EDWARDS, Assistant City Attorney

5

(MN Lic. # 0342555)*

6

400 City Hall and Courthouse
15 Kellogg Boulevard West

7

Saint Paul, Minnesota 55102
Tel: 651-266-8710

8

Fax: 651-298-5619
Email: Anthony.Edwards@ci.stpaul.mn.us

9

*Admitted *pro hac vice*

10

Attorneys for Plaintiff

11

CITY OF ST. PAUL

12

ERIN K. McSHERRY

13

City Attorney

14

By: */s/ Erin K. McSherry*

15

ERIN K. McSHERRY, City Attorney*
200 Lincoln Avenue

16

Post Office Box 909
Santa Fe, NM 87504-0909

17

(505) 955-6967
Email: mdmartinez@santafenm.gov

18

*Admitted *pro hac vice*

19

Attorney for Plaintiff

20

CITY OF SANTA FE

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

By: /s/ Erin Monju
ERIN MONJU*
KATHERINE COURTNEY (CA Bar No. 341165)
NAOMI TSU**
JILL HABIG (CA Bar No. 268770)
Public Rights Project
490 43rd Street, Unit #115
Oakland, CA 94609
Tel: (510) 738-6788
erin@publicrightsproject.org
katiec@publicrightsproject.org
jill@publicrightsproject.org
naomi@publicrightsproject.org

* Admitted pro hac vice; practicing under supervision of
D.C. Bar member pursuant to Local Rule 49(c)(8) while
application to the D.C. Bar is pending
** Admitted pro hac vice

Attorneys for Plaintiffs
CITIES OF MINNEAPOLIS, NEW HAVEN,
PORTLAND, ST. PAUL, SANTA FE, SEATTLE,
ALBANY, ALBUQUERQUE, BEND, BOSTON,
CAMBRIDGE, CHICAGO, COLUMBUS, CULVER
CITY, DENVER, ROCHESTER, and WILSONVILLE
and COUNTIES OF ALLEGHENY, DANE,
HENNEPIN, MULTNOMAH, and PIERCE


DONNA R. ZIEGLER
County Counsel, County of Alameda

By: /s/ Jason M. Allen
K. SCOTT DICKEY
Assistant County Counsel
JASON M. ALLEN
Senior Deputy County Counsel
1221 Oak Street, Suite 450
Oakland, California 94612
Telephone: (510) 272-6700
E-mails: scott.dickey@acgov.org
    jason.allen@acgov.org

Attorneys for Plaintiff
COUNTY OF ALAMEDA

ROBERT MAGEE*
Corporation Counsel

By: */s/ Robert Magee*
City Hall, Room 106
24 Eagle St
Albany, NY 12207
Tel: 518-434-5050
Email: rmagee@albanyny.gov

*Admitted *pro hac vice*

Attorney for Plaintiff
CITY OF ALBANY


By: */s/ Lauren Keefe*
LAUREN KEEFE, City Attorney (NM Lic. 14664)*
DEVON P. KING, Deputy City Attorney (NM Lic. 148108)*
One Civic Plaza NW
PO Box 2248
Albuquerque, NM 87103
Telephone: 505-768-4500
lkeefe@cabq.gov
dking@cabq.gov

*Application for admission *pro hac vice* forthcoming

Attorneys for Plaintiff
CITY OF ALBUQUERQUE


EBONY M. THOMPSON
Baltimore City Solicitor

By: */s/ Christopher Sousa*
Christopher Sousa (264874)
Baltimore City Department of Law
100 N. Holliday Street
Baltimore, Maryland 21202
410.396.3947
christopher.sousa@baltimorecity.gov

Attorneys for Plaintiff
CITY OF BALTIMORE

OFFICE OF THE CITY ATTORNEY FOR
THE CITY OF BEND

By: /s/ Ian M. Leitheiser
     Ian M. Leitheiser (OSB #993106)*
     *City Attorney*
     Elizabeth Oshel (OSB #104705)*
     *Senior Assistant City Attorney*
     Michael J. Gaffney (OSB #251680)*
     *Senior Assistant City Attorney*
     City of Bend
     PO Box 431
     Bend, OR 97709
     (541) 693-2128
     ileitheiser@bendoregon.gov
     eoshel@bendoregon.gov
     mgaffney@bendoregon.gov

     *Application for admission *pro hac vice* forthcoming

     Attorneys for Plaintiff
     CITY OF BEND

By: /s/ Benjamin L. Stock
     Benjamin L. Stock (SBN 208774)
     Stephen A. McEwen (SBN 186512)
     Eileen L. Ollivier (SBN 345880)
     BURKE, WILLIAMS & SORENSEN, LLP
     1999 Harrison Street, Suite 1650
     Oakland, California 94612-3520
     Tel:  510.273.8780    Fax:  510.839.9104
     bstock@bwslaw.com
     smcewen@bwslaw.com
     eollivier@bwslaw.com

     Attorneys for Plaintiff
     CITY OF BENICIA

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

By: */s/ Farimah F. Brown*
    Farimah F. Brown, City Attorney, SBN 201227
    Katrina L. Eiland, Deputy City Attorney, SBN 275701
    Laura Iris Mattes, Deputy City Attorney, SBN 310594
    Stephen A. Hylas, Deputy City Attorney, SBN 319833
    BERKELEY CITY ATTORNEY'S OFFICE
    2180 Milvia Street, Fourth Floor
    Berkeley, CA 94704
    Telephone: (510) 981-6998
    Facsimile: (510) 981-6960
    keiland@berkeleyca.gov
    lmattes@berkeleyca.gov
    shylas@berkeleyca.gov

    Attorneys for Plaintiff
    CITY OF BERKELEY


    ADAM CEDERBAUM
    Corporation Counsel

By: */s/ Samuel Dinning*
    SAMUEL DINNING (MA BBO# 704304)*
    Chief of Staff & Policy
    KATHERINE AUBUCHON-JONES (MA BBO# 705490)*
    Senior Assistant Corporation Counsel
    City of Boston Law Department
    1 City Hall Plaza, Room 615
    Boston, MA 02201
    Telephone: 617-635-4034
    samuel.dinning@boston.gov
    katherine.jones@boston.gov

    *Application for admission *pro hac vice* forthcoming

    Attorneys for Plaintiff
    CITY OF BOSTON

1

2

CITY OF CAMBRIDGE, LAW DEPARTMENT
MEGAN B. BAYER, CITY SOLICITOR

3

By: */s/ Megan B. Bayer*
Megan B. Bayer (MA BBO No. 669494)*

4

*City Solicitor*
Sean M. McKendry (MA BBO No. 678844)*

5

*Assistant City Solicitor*
Sydney M. Wright (MA BBO No. 698565)**

6

*Assistant City Solicitor*
Cambridge City Hall, 3rd Floor

7

795 Massachusetts Avenue
Cambridge, MA 02139

8

(617) 349-4121
mbayer@cambridgema.gov

9

smckendry@cambridgema.gov
swright@cambridgema.gov

10

11

*Admitted *pro hac vice*

12

**Application for admission *pro hac vice* forthcoming

13

Attorneys for Plaintiff
CITY OF CAMBRIDGE

14

15

By: */s/ Stephen A. McEwen*

16

Stephen A. McEwen (SBN 186512)
Eileen L. Ollivier (SBN 345880)

17

BURKE, WILLIAMS & SORENSEN, LLP
1770 Iowa Avenue, Suite 240

18

Riverside, CA  92507-2479

19

Tel:  951.788.0100    Fax:  951.788.5785
smcewen@bwslaw.com

20

eollivier@bwslaw.com

21

Attorneys for Plaintiff
CITY OF CATHEDRAL CITY

22

23

24

25

26

27

28

1

2

MARY B. RICHARDSON-LOWRY
Corporation Counsel of the City of Chicago

3

4

5

6

By: */s/ Rebecca Hirsch*
Rebecca Hirsch (rebecca.hirsch2@cityofchicago.org)
City of Chicago Department of Law
121 North LaSalle Street, Room 600
Chicago, Illinois 60602
Tel: (313) 744-8143

7

8

Attorneys for Plaintiff
CITY OF CHICAGO

9

10

CITY OF COLUMBUS, DEPARTMENT OF LAW
ZACH KLEIN, CITY ATTORNEY

11

12

13

14

By: */s/ Richard N. Coglianese*
Richard N. Coglianese (0066830)
Assistant City Attorney
77 N. Front Street, 4th Floor
Columbus, Ohio 43215
(614) 645-0818 Phone
(614) 645-6949 Fax
rncoglianese@columbus.gov

15

16

Attorneys for Plaintiff
CITY OF COLUMBUS

17

18

OFFICE OF THE CORPORATION COUNSEL FOR
DANE COUNTY

19

20

21

22

23

24

By: */s/ Carlos A. Pabellon*
Carlos A. Pabellon (WSB # 1046945)*
*Corporation Counsel*
David R. Gault (WSB # 1016374)*
*Deputy Corporation Counsel*
County of Dane
City-County Building, Room 419
210 Martin Luther King, Jr. Blvd.
Madison, WI 53703
(608) 266-4355
pabellon.carlos@danecounty.gov
gault@danecounty.gov

25

26

*Admitted *pro hac vice*

27

Attorneys for Plaintiff
COUNTY OF DANE

28

1

2

ASHLEY M. KELLIHER
Assistant City Attorney

By: */s/ Ashley M. Kelliher*
3        Ashley M. Kelliher (CO Bar No. 40220)*
         Assistant City Attorney
4        Denver City Attorney's Office
         201 West Colfax Avenue Denver, Colorado 80202
5        720-913-3137 (phone)
         720-913-3190 (fax)
6        ashley.kelliher@denvergov.org

7
         *Application for admission *pro hac vice* forthcoming
8
         Attorney for Plaintiff
9        CITY AND COUNTY OF DENVER

10

11  By: */s/ Samantha W. Zutler*
         Samantha W. Zutler (SBN 238514)
12       Eileen L. Ollivier (SBN 345880)
         BURKE, WILLIAMS & SORENSEN, LLP
13       1 California Street, Suite 3050
         San Francisco, CA 94111-5432
14       Tel:  415.655.8100    Fax:  415.655.8099
         szutler@bwslaw.com
15       eollivier@bwslaw.com

16
         Attorneys for Plaintiffs
17       CITIES OF HEALDSBURG and WATSONVILLE

18       MARY F. MORIARTY
         Hennepin County Attorney
19
     By: */s/ Rebecca Holschuh*
20       Rebecca L.S. Holschuh (MN Lic. #0392251)*
         Brittany K. McCormick (MN Lic. #0395175)*
21       Assistant County Attorneys
         300 South Sixth Street
22       Minneapolis, MN 55487
         Tel: 612-673-3000
23       Rebecca.Holschuh@hennepin.us
         Brittany.McCormick@hennepin.us
24
25       *Admitted *pro hac vice*

26       Attorneys for Plaintiff
         COUNTY OF HENNEPIN

27

28

1

2

HYDEE FELDSTEIN SOTO
City Attorney of the City of Los Angeles

3

By: */s/ Michael J. Dundas*
Michael J. Dundas (CA Bar No. 226930)

4

Joshua M. Templet (CA Bar No. 267098)
Office of the Los Angeles City Attorney

5

200 North Main Street, Room 800
Los Angeles, California 90012

6

Tel: (213) 978-8100
mike.dundas@lacity.org

7

joshua.templet@lacity.org

8

Attorneys for Plaintiff
CITY OF LOS ANGELES

9

10

BRIAN E. WASHINGTON
County Counsel

11

12

By: */s/ Edward F. Sears*
Kate K. Stanford, Deputy County Counsel

13

Edward F. Sears, Deputy County Counsel
3501 Civic Center Drive, Suite 275

14

San Rafael, CA 94903
Tel: (415) 473-6117

15

kate.stanford@marincounty.gov
ned.sears@marincounty.gov

16

17

Attorneys for Plaintiff
COUNTY OF MARIN

18

19

By: */s/ Nira F. Doherty*
Nira F. Doherty (SBN 254523)

20

Stephen A. McEwen (SBN 186512)
Eileen L. Ollivier (SBN 345880)

21

BURKE, WILLIAMS & SORENSEN, LLP
1999 Harrison Street, Suite 1650

22

Oakland, California 94612-3520
Tel:  510.273.8780    Fax:  510.839.9104

23

ndoherty@bwslaw.com
smcewen@bwslaw.com

24

eollivier@bwslaw.com

25

26

Attorneys for Plaintiff
CITY OF MENLO PARK

27

28

By: /s/ B. Andrew Jones
   B. Andrew Jones*
   Deputy County Attorney, Oregon State Bar No. 091786
   Multnomah County Attorneys Office
   501 SE Hawthorne Blvd, Suite 500
   Portland, OR, 97214
   Phone: (503)-988-3138
   Mobile: (971)-678-7526
   Fax: (503)-988-3377
   Email: andy.jones@multco.us

   *Application for admission *pro hac vice* forthcoming

   Attorney for Plaintiff
   MULTNOMAH COUNTY


By: /s/ Michelle Marchetta Kenyon
   Michelle Marchetta Kenyon (SBN 127969), City
   Attorney
   Stephen A. McEwen (SBN 186512)
   Eileen L. Ollivier (SBN 345880)
   BURKE, WILLIAMS & SORENSEN, LLP
   1999 Harrison Street, Suite 1650
   Oakland, California 94612-3520
   Tel:  510.273.8780    Fax:  510.839.9104
   mkenyon@bwslaw.com
   smcewen@bwslaw.com
   eollivier@bwslaw.com

   Attorneys for Plaintiffs
   CITIES OF PACIFICA and ROHNERT PARK

By: /s/ Molly S. Stump
   Molly S. Stump, City Attorney SBN 177165
   Caio A. Arellano, Chief Assistant City Attorney SBN
   262168
   Mark J. Vanni, Assistant City Attorney SBN 267892
   City Of Palo Alto
   250 Hamilton Ave., 8th Floor
   Palo Alto, CA 94301
   Telephone: (650) 329-2171
   Facsimile: (650) 320-2646
   Email: Molly.Stump@PaloAlto.gov
   Caio.Arellano@PaloAlto.gov
   Mark.Vanni@PaloAlto.gov

   Attorneys for Plaintiff
   CITY OF PALO ALTO

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

By: */s/ Eric Danly*
    Eric Danly
    City Attorney
    City of Petaluma
    11 English St, Petaluma, CA 94952-2610
    Telephone: 707-778-4402
    E-Mail: EDanly@cityofpetaluma.org

    Attorney for Plaintiff
    CITY OF PETALUMA


    MARY E. ROBNETT
    Pierce County Prosecuting Attorney

By: */s/ Kristal M. Cowger*
    KRISTAL M. COWGER, WSBA # 43079*
    JONATHAN R. SALAMAS, WSBA # 39781*
    Deputy Prosecuting Attorneys / Civil
    930 Tacoma Avenue South, Suite 946
    Tacoma, WA  98402-2102
    Ph: 253-798-7400 / Fax: 253-798-6713
    kristal.cowger@piercecountywa.gov
    jonathan.salamas@piercecountywa.gov

    *Admitted *pro hac vice*

    Attorneys for Plaintiff
    PIERCE COUNTY


    DAVID ALESHIRE
    City Attorney

By: */s/ Kimberly Y. Chin*
    SHANNON MOORE, Chief Assistant City Attorney
    KIMBERLY Y. CHIN, Senior Assistant City Attorney
    450 Civic Center Plaza
    Richmond, CA  94804-1630
    Tel: 510-620-6509
    Fax: 510-620-6518
    Email: Shannon_Moore@ci.richmond.ca.us
    Email: Kimberly_Chin@ci.richmond.ca.us

    Attorneys for Plaintiff
    CITY OF RICHMOND

1

By: */s/ John D. Nibbelin*
JOHN D. NIBBELIN, County Counsel, SBN 184603
Rebecca M. Archer, Chief Deputy Counsel, SBN 202743
Lauren F. Carroll, Deputy County Counsel, SBN 333446
500 County Center, 4th Floor
Redwood City, CA 94063
Telephone: 650-363-4757
jnibbelin@smcgov.org
rmarcher@smcgov.org
lcarroll@smcgov.org

Attorneys for Plaintiff
COUNTY OF SAN MATEO

By: */s/ Teresa L. Stricker*
TERESA L. STRICKER, City Attorney (CA Lic. 160601)
AUTUMN LUNA, Chief Assistant City Attorney (CA Lic. 288506)
ADAM S. ABEL, Assistant City Attorney (CA Lic. 148210)
HANNAH E. FORD-STILLE, Deputy City Attorney (CA Lic. 335113)
100 Santa Rosa Ave, Room 8
Santa Rosa, CA 95404
Telephone: (707) 543-3040
tstricker@srcity.org
aluna@srcity.org
aabel@srcity.org
hfordstille@srcity.org

Attorneys for Plaintiff
CITY OF SANTA ROSA

By: */s/ Joshua A. Myers*
Robert H. Pittman, County Counsel (SBN 172154)
Joshua A. Meyers, Chief Deputy County Counsel (SBN 250988)
575 Administration Drive, Room 105A
Santa Rosa, California 95403
Telephone: (707) 565-2421
Joshua.Myers@sonoma-county.org

Attorneys for Plaintiff
COUNTY OF SONOMA

By: /s/ Amanda Guile-Hinman
Amanda R. Guile-Hinman, OSB #093706*
29799 SW Town Center Loop E
Wilsonville, OR 97070
guile@wilsonvilleoregon.gov
(503) 570-1509

*Admitted pro hac vice

Attorney for Plaintiff
CITY OF WILSONVILLE

**FILER'S ATTESTATION**

I, DAVID CHIU, am the ECF user whose identification and password are being used to file this <u>EXHIBITS A – O</u> TO SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF. Pursuant to Civil Local Rule 5-1(i)(3), I hereby attest that the other above-named signatories concur in this filing.

# Exhibit A


Federal Register / Vol. 90, No. 18 / Wednesday, January 29, 2025 / Presidential Documents 8443

# Presidential Documents

Executive Order 14159 of January 20, 2025

## Protecting the American People Against Invasion

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Immigration and Nationality Act (INA) (8 U.S.C. 1101 *et seq.*) and section 301 of title 3, United States Code, it is hereby ordered:

**Section 1**. *Purpose.* Over the last 4 years, the prior administration invited, administered, and oversaw an unprecedented flood of illegal immigration into the United States. Millions of illegal aliens crossed our borders or were permitted to fly directly into the United States on commercial flights and allowed to settle in American communities, in violation of longstanding Federal laws.

Many of these aliens unlawfully within the United States present significant threats to national security and public safety, committing vile and heinous acts against innocent Americans. Others are engaged in hostile activities, including espionage, economic espionage, and preparations for terror-related activities. Many have abused the generosity of the American people, and their presence in the United States has cost taxpayers billions of dollars at the Federal, State, and local levels.

Enforcing our Nation's immigration laws is critically important to the national security and public safety of the United States. The American people deserve a Federal Government that puts their interests first and a Government that understands its sacred obligation to prioritize the safety, security, and financial and economic well-being of Americans.

This order ensures that the Federal Government protects the American people by faithfully executing the immigration laws of the United States.

**Sec. 2**. *Policy.* It is the policy of the United States to faithfully execute the immigration laws against all inadmissible and removable aliens, particularly those aliens who threaten the safety or security of the American people. Further, it is the policy of the United States to achieve the total and efficient enforcement of those laws, including through lawful incentives and detention capabilities.

**Sec. 3**. *Faithful Execution of the Immigration Laws.* In furtherance of the policies described in section 2 of this order:

(a) Executive Order 13993 of January 20, 2021 (Revision of Civil Immigration Enforcement Policies and Priorities), Executive Order 14010 of February 2, 2021 (Creating a Comprehensive Regional Framework To Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border), Executive Order 14011 of February 2, 2021 (Establishment of Interagency Task Force on the Reunification of Families), and Executive Order 14012 of February 2, 2021 (Restoring Faith in Our Legal Immigration Systems and Strengthening Integration and Inclusion Efforts for New Americans) are hereby revoked; and

(b) Executive departments and agencies (agencies) shall take all appropriate action to promptly revoke all memoranda, guidance, or other policies based on the Executive Orders revoked in section 3(a) of this order and shall employ all lawful means to ensure the faithful execution of the immigration laws of the United States against all inadmissible and removable aliens.

**Sec. 4**. *Civil Enforcement Priorities.* The Secretary of Homeland Security shall take all appropriate action to enable the Director of U.S. Immigration and Customs Enforcement, the Commissioner of U.S. Customs and Border Protection, and the Director of U.S. Citizenship and Immigration Services to set priorities for their agencies that protect the public safety and national security interests of the American people, including by ensuring the successful enforcement of final orders of removal. Further, the Secretary of Homeland Security shall ensure that the primary mission of U.S. Immigration and Customs Enforcement's Homeland Security Investigations division is the enforcement of the provisions of the INA and other Federal laws related to the illegal entry and unlawful presence of aliens in the United States and the enforcement of the purposes of this order.

**Sec. 5**. *Criminal Enforcement Priorities.* The Attorney General, in coordination with the Secretary of State and the Secretary of Homeland Security, shall take all appropriate action to prioritize the prosecution of criminal offenses related to the unauthorized entry or continued unauthorized presence of aliens in the United States.

**Sec. 6**. *Federal Homeland Security Task Forces.* (a) The Attorney General and the Secretary of Homeland Security shall take all appropriate action to jointly establish Homeland Security Task Forces (HSTFs) in all States nationwide.

(b) The composition of each HSTF shall be subject to the direction of the Attorney General and the Secretary of Homeland Security, but shall include representation from any other Federal agencies with law enforcement officers, or agencies with the ability to provide logistics, intelligence, and operational support to the HSTFs, and shall also include representation from relevant State and local law enforcement agencies. The heads of all Federal agencies shall take all appropriate action to provide support to the Attorney General and the Secretary of Homeland Security to ensure that the HSTFs fulfill the objectives in subsection (c) of this section, and any other lawful purpose that fulfills the policy objectives of this order.

(c) The objective of each HSTF is to end the presence of criminal cartels, foreign gangs, and transnational criminal organizations throughout the United States, dismantle cross-border human smuggling and trafficking networks, end the scourge of human smuggling and trafficking, with a particular focus on such offenses involving children, and ensure the use of all available law enforcement tools to faithfully execute the immigration laws of the United States.

(d) The Attorney General and the Secretary of Homeland Security shall take all appropriate action to provide an operational command center to coordinate the activities of the HSTFs and provide such support as they may require, and shall also take all appropriate action to provide supervisory direction to their activities as may be required.

**Sec. 7**. *Identification of Unregistered Illegal Aliens.* The Secretary of Homeland Security, in coordination with the Secretary of State and the Attorney General, shall take all appropriate action to:

(a) Immediately announce and publicize information about the legal obligation of all previously unregistered aliens in the United States to comply with the requirements of part VII of subchapter II of chapter 12 of title 8, United States Code;

(b) Ensure that all previously unregistered aliens in the United States comply with the requirements of part VII of subchapter II of chapter 12 of title 8, United States Code; and

(c) Ensure that failure to comply with the legal obligations of part VII of subchapter II of chapter 12 of title 8, United States Code, is treated as a civil and criminal enforcement priority.

**Sec. 8**. *Civil Fines and Penalties.* (a) The Secretary of Homeland Security, in coordination with the Secretary of Treasury, shall take all appropriate action to ensure the assessment and collection of all fines and penalties

that the Secretary of Homeland Security is authorized by law to assess and collect from aliens unlawfully present in the United States, including aliens who unlawfully entered or unlawfully attempted to enter the United States, and from those who facilitate such aliens' presence in the United States.

(b) Within 90 days of the date of this order, the Secretary of the Treasury and the Secretary of Homeland Security shall submit a report to the President regarding their progress implementing the requirements of this section and recommending any additional actions that may need to be taken to achieve its objectives.

**Sec. 9.** *Efficient Removals of Recent Entrants and Other Aliens.* The Secretary of Homeland Security shall take all appropriate action, pursuant to section 235(b)(1)(A)(iii)(I) of the INA (8 U.S.C. 1225(b)(1)(A)(iii)(I)), to apply, in her sole and unreviewable discretion, the provisions of section 235(b)(1)(A)(i) and (ii) of the INA to the aliens designated under section 235(b)(1)(A)(iii)(II). Further, the Secretary of Homeland Security shall promptly take appropriate action to use all other provisions of the immigration laws or any other Federal law, including, but not limited to sections 238 and 240(d) of the INA (8 U.S.C. 1228 and 1229a(d)), to ensure the efficient and expedited removal of aliens from the United States.

**Sec. 10.** *Detention Facilities.* The Secretary of Homeland Security shall promptly take all appropriate action and allocate all legally available resources or establish contracts to construct, operate, control, or use facilities to detain removable aliens. The Secretary of Homeland Security, further, shall take all appropriate actions to ensure the detention of aliens apprehended for violations of immigration law pending the outcome of their removal proceedings or their removal from the country, to the extent permitted by law.

**Sec. 11.** *Federal-State Agreements.* To ensure State and local law enforcement agencies across the United States can assist with the protection of the American people, the Secretary of Homeland Security shall, to the maximum extent permitted by law, and with the consent of State or local officials as appropriate, take appropriate action, through agreements under section 287(g) of the INA (8 U.S.C. 1357(g)) or otherwise, to authorize State and local law enforcement officials, as the Secretary of Homeland Security determines are qualified and appropriate, to perform the functions of immigration officers in relation to the investigation, apprehension, or detention of aliens in the United States under the direction and the supervision of the Secretary of Homeland Security. Such authorization shall be in addition to, rather than in place of, Federal performance of these duties. To the extent permitted by law, the Secretary of Homeland Security may structure each agreement under section 287(g) of the INA (8 U.S.C. 1357(g)) in the manner that provides the most effective model for enforcing Federal immigration laws in that jurisdiction.

**Sec. 12.** *Encouraging Voluntary Compliance with the Law.* The Secretary of Homeland Security shall take all appropriate action, in coordination with the Secretary of State and the Attorney General, and subject to adequate safeguards, assurances, bonds, and any other lawful measure, to adopt policies and procedures to encourage aliens unlawfully in the United States to voluntarily depart as soon as possible, including through enhanced usage of the provisions of section 240B of the INA (8 U.S.C. 1229c), international agreements or assistance, or any other measures that encourage aliens unlawfully in the United States to depart as promptly as possible, including through removals of aliens as provided by section 250 of the INA (8 U.S.C. 1260).

**Sec. 13.** *Recalcitrant Countries.* The Secretary of State and the Secretary of Homeland Security shall take all appropriate action to:

(a) Cooperate and effectively implement, as appropriate, the sanctions provided by section 243(d) of the INA (8 U.S.C. 1253(d)), with the Secretary of State, to the maximum extent permitted by law, ensuring that diplomatic

efforts and negotiations with foreign states include the foreign states' acceptance of their nationals who are subject to removal from the United States; and

(b) Eliminate all documentary barriers, dilatory tactics, or other restrictions that prevent the prompt repatriation of aliens to any foreign state. Any failure or delay by a foreign state to verify the identity of a national of that state shall be considered in carrying out subsection (a) this section, and shall also be considered regarding the issuance of any other sanctions that may be available to the United States.

**Sec. 14.** *Visa Bonds.* The Secretary of Treasury shall take all appropriate action, in coordination with the Secretary of State and the Secretary of Homeland Security, to establish a system to facilitate the administration of all bonds that the Secretary of State or the Secretary of Homeland Security may lawfully require to administer the provisions of the INA.

**Sec. 15.** *Reestablishment of the VOICE Office and Addressing Victims of Crimes Committed by Removable Aliens.* The Secretary of Homeland Security shall direct the Director of U.S. Immigration and Customs Enforcement (ICE) to take all appropriate and lawful action to reestablish within ICE an office to provide proactive, timely, adequate, and professional services to victims of crimes committed by removable aliens, and those victims' family members. The Attorney General shall also ensure that the provisions of 18 U.S.C. 3771 are followed in all Federal prosecutions involving crimes committed by removable aliens.

**Sec. 16.** *Addressing Actions by the Previous Administration.* The Secretary of State, the Attorney General, and the Secretary of Homeland Security shall promptly take all appropriate action, consistent with law, to rescind the policy decisions of the previous administration that led to the increased or continued presence of illegal aliens in the United States, and align any and all departmental activities with the policies set out by this order and the immigration laws. Such action should include, but is not limited to:

(a) ensuring that the parole authority under section 212(d)(5) of the INA (8 U.S.C. 1182(d)(5)) is exercised on only a case-by-case basis in accordance with the plain language of the statute, and in all circumstances only when an individual alien demonstrates urgent humanitarian reasons or a significant public benefit derived from their particular continued presence in the United States arising from such parole;

(b) ensuring that designations of Temporary Protected Status are consistent with the provisions of section 244 of the INA (8 U.S.C. 1254a), and that such designations are appropriately limited in scope and made for only so long as may be necessary to fulfill the textual requirements of that statute; and

(c) ensuring that employment authorization is provided in a manner consistent with section 274A of the INA (8 U.S.C. 1324a), and that employment authorization is not provided to any unauthorized alien in the United States.

**Sec. 17.** *Sanctuary Jurisdictions.* The Attorney General and the Secretary of Homeland Security shall, to the maximum extent possible under law, evaluate and undertake any lawful actions to ensure that so-called "sanctuary" jurisdictions, which seek to interfere with the lawful exercise of Federal law enforcement operations, do not receive access to Federal funds. Further, the Attorney General and the Secretary of Homeland Security shall evaluate and undertake any other lawful actions, criminal or civil, that they deem warranted based on any such jurisdiction's practices that interfere with the enforcement of Federal law.

**Sec. 18.** *Information Sharing.* (a) The Secretary of Homeland Security shall promptly issue guidance to ensure maximum compliance by Department of Homeland Security personnel with the provisions of 8 U.S.C. 1373 and 8 U.S.C. 1644 and ensure that State and local governments are provided with the information necessary to fulfill law enforcement, citizenship, or immigration status verification requirements authorized by law; and

(b) The Attorney General, the Secretary of Health and Human Services, and the Secretary of Homeland Security shall take all appropriate action to stop the trafficking and smuggling of alien children into the United States, including through the sharing of any information necessary to assist in the achievement of that objective.

**Sec. 19.** *Funding Review.* The Attorney General and the Secretary of Homeland Security shall:

(a) Immediately review and, if appropriate, audit all contracts, grants, or other agreements providing Federal funding to non-governmental organizations supporting or providing services, either directly or indirectly, to removable or illegal aliens, to ensure that such agreements conform to applicable law and are free of waste, fraud, and abuse, and that they do not promote or facilitate violations of our immigration laws;

(b) Pause distribution of all further funds pursuant to such agreements pending the results of the review in subsection (a) of this section;

(c) Terminate all such agreements determined to be in violation of law or to be sources of waste, fraud, or abuse and prohibit any such future agreements;

(d) Coordinate with the Director of the Office of Management and Budget to ensure that no funding for agreements described in subsection (c) of this section is included in any appropriations request for the Department of Justice or the Department of Homeland Security; and

(e) Initiate clawback or recoupment procedures, if appropriate, for any agreements described in subsection (c) of this section.

**Sec. 20.** *Denial of Public Benefits to Illegal Aliens.* The Director of the Office of Management and Budget shall take all appropriate action to ensure that all agencies identify and stop the provision of any public benefits to any illegal alien not authorized to receive them under the provisions of the INA or other relevant statutory provisions.

**Sec. 21.** *Hiring More Agents and Officers.* Subject to available appropriations, the Secretary of Homeland Security, through the Commissioner of U.S. Customs and Border Protection and the Director of U.S. Immigration and Customs Enforcement, shall take all appropriate action to significantly increase the number of agents and officers available to perform the duties of immigration officers.

**Sec. 22.** *Severability.* It is the policy of the United States to enforce this order to the maximum extent possible to advance the interests of the United States. Accordingly:

(a) If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this order and the application of its other provisions to any other persons or circumstances shall not be affected thereby; and

(b) If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid because of the failure to follow certain procedures, the relevant executive branch officials shall implement those procedural requirements to conform with existing law and with any applicable court orders.

**Sec. 23.** *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party

against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*January 20, 2025.*

[FR Doc. 2025–02006
Filed 1–28–25; 11:15 am]
Billing code 3395–F4–P

# Exhibit B



# Presidential Documents

Executive Order 14218 of February 19, 2025

## Ending Taxpayer Subsidization of Open Borders

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

**Section 1**. *Purpose*. The plain text of Federal law, including the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (Public Law 104–193) (PRWORA), generally prohibits illegal aliens from obtaining most taxpayer-funded benefits. Title IV of the PRWORA states that it is national policy that ''aliens within the Nation's borders not depend on public resources to meet their needs,'' and that ''[i]t is a compelling government interest to remove the incentive for illegal immigration provided by the availability of public benefits.'' But in the decades since the passage of the PRWORA, numerous administrations have acted to undermine the principles and limitations directed by the Congress through that law. Over the last 4 years, in particular, the prior administration repeatedly undercut the goals of that law, resulting in the improper expenditure of significant taxpayer resources. My Administration will uphold the rule of law, defend against the waste of hard-earned taxpayer resources, and protect benefits for American citizens in need, including individuals with disabilities and veterans.

**Sec. 2**. *Preserving Federal Public Benefits*. (a) To prevent taxpayer resources from acting as a magnet and fueling illegal immigration to the United States, and to ensure, to the maximum extent permitted by law, that no taxpayer-funded benefits go to unqualified aliens, the head of each executive department or agency (agency) shall:

(i) identify all federally funded programs administered by the agency that currently permit illegal aliens to obtain any cash or non-cash public benefit, and, consistent with applicable law, take all appropriate actions to align such programs with the purposes of this order and the requirements of applicable Federal law, including the PRWORA;

(ii) ensure, consistent with applicable law, that Federal payments to States and localities do not, by design or effect, facilitate the subsidization or promotion of illegal immigration, or abet so-called ''sanctuary'' policies that seek to shield illegal aliens from deportation; and

(iii) enhance eligibility verification systems, to the maximum extent possible, to ensure that taxpayer-funded benefits exclude any ineligible alien who entered the United States illegally or is otherwise unlawfully present in the United States.

(b) Within 30 days of the date of this order, the Director of the Office of Management and Budget and the Administrator of the United States DOGE Service, in coordination with the Assistant to the President for Domestic Policy, shall further:

(i) identify all other sources of Federal funding for illegal aliens; and

(ii) recommend additional agency actions to align Federal spending with the purposes of this order, and, where relevant, enhance eligibility verification systems.

(c) Agencies shall refer any improper receipt or use of Federal benefits to the Department of Justice and the Department of Homeland Security for appropriate action.

**Sec. 3**. *General Provisions*. (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*February 19, 2025.*

[FR Doc. 2025–03137
Filed 2–24–25; 8:45 am]
Billing code 3395–F4–P

# Exhibit C



**U.S. Department of Justice**

Office of the Deputy Attorney General

*Washington, DC 20530*

January 21, 2025

MEMORANDUM FOR ALL DEPARTMENT EMPLOYEES

FROM:            THE ACTING DEPUTY ATTORNEY GENERAL ᚴᛒᚴ

SUBJECT:         Interim Policy Changes Regarding Charging, Sentencing, And
                 Immigration Enforcement

     Following President Trump's second inauguration yesterday, I write regarding interim decisions and policy changes pending confirmation of the Attorney General.[1]  These interim changes are necessary as an initial response to Executive Orders that President Trump issued yesterday, critical to the Justice Department's mission, and part of the response to three of the most serious threats facing the American people.  First, Cartels and other Transnational Criminal Organizations, such as Tren de Aragua (TdA) and La Mara Salvatrucha (MS-13), are a scourge on society resulting in an unstable and unsafe border and huge flows of illegal immigration in violation of U.S. law.  Second, brutal and intolerable violent crime by members of these organizations and illegal aliens is escalating rapidly across the country.  Third, the fentanyl crisis and opioid epidemic are poisoning our communities and have inflicted an unprecedented toll of addiction, suffering, and death.

     The Justice Department must, and will, work to eradicate these threats.  Indeed, it is the responsibility of the Justice Department to defend the Constitution and, accordingly, to lawfully execute the policies that the American people elected President Trump to implement.  The Justice Department's responsibility, proudly shouldered by each of its employees, includes aggressive enforcement of laws enacted by Congress, as well as vigorous defense of the President's actions on behalf of the United States against legal challenges.  The Department's personnel must come together in the offices that taxpayers have funded to do this vitally important work.

## I.   Core Principle: Pursuing The Most Serious, Readily Provable Offense

     Interim changes to the Justice Department's policy regarding charging and sentencing are necessary in order to implement policies articulated in President Trump's January 20, 2025 Executive Orders relating to the elimination of Cartels and other Transnational Criminal Organizations, and securing our borders against illegal immigration and drug trafficking.  Therefore, effective today, the Justice Department's interim policy regarding charging and

---

[1] This interim guidance is not intended to, does not, and may not be relied upon to create, any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

Case 3:25-cv-01350-WHO    Document 230    Filed 09/25/25    Page 35 of 130

Memorandum from the Acting Deputy Attorney General                                                    Page 2
Subject: Interim Policy Changes Regarding Charging, Sentencing, And Immigration Enforcement

sentencing is set forth in the May 10, 2017 Memorandum entitled, "Department Charging and Sentencing Policy," which applies to all charging decisions at the Department of Justice and the U.S. Attorney's Offices. Any inconsistent previous policy of the Department of Justice relating to charging and sentencing policy is rescinded, effective today.[2]

Specifically, in the absence of unusual facts, prosecutorial discretion at the Department of Justice and the U.S. Attorney's Offices is bounded by the core principle that prosecutors should charge and pursue the most serious, readily provable offenses. The most serious offenses are those punishable by death where applicable, and offenses with the most significant mandatory minimum sentences (including under the Armed Career Criminal Act and 21 U.S.C. § 851) and the most substantial recommendation under the Sentencing Guidelines.

Each United States Attorney and Assistant Attorney General is responsible for ensuring that this interim policy is implemented and followed. Any deviations from the interim policy's core principle require significant extenuating circumstances, shall be carefully considered, and must be approved consistent with the process described in the May 10, 2017 Memorandum.

## II.    Faithful Execution of the Immigration Laws

Consistent with President Trump's January 20, 2025 Executive Order entitled, "Protecting The American People Against Invasion," the Department of Justice will take all steps necessary to protect the public and secure the American border by removing illegal aliens from the Country and prosecuting illegal aliens for crimes committed within U.S. jurisdiction. These steps shall include, but not be limited to, the following:

Consistent with the core principle of pursuing the most serious, readily provable offense, U.S. Attorney's Offices and the other components shall pursue charges relating to criminal immigration-related violations when such violations are presented by federal, state, or local law enforcement or the Intelligence Community. *See, e.g.*, 8 U.S.C. §§ 1324(c), 1252c (authorizing certain immigration-related arrests by State and local law enforcement officials). This includes, where supported by evidence, prosecutions for violations of 8 U.S.C. §§ 1304, 1306, 1324-1328, 1373 and 18 U.S.C. § 922(g)(5). Each U.S. Attorney's Office shall coordinate as appropriate with the federal courts to inform the courts of this interim policy and develop processes for handling the increased number of prosecutions that will result. Declination decisions relating to immigration-related conduct shall be disclosed as Urgent Reports pursuant to Justice Manual § 1-13.130. On a quarterly basis, the U.S. Attorney's Offices shall report statistics to EOUSA, broken down by law enforcement agency, regarding the number of immigration-related cases referred to the Office, the number of pending immigration-related investigations and prosecutions, the number of immigration-related convictions, and the resulting sentences and removals.

---

[2] The previous policies and guidance rescinded include: "General Department Policies Regarding Charging, Pleas, and Sentencing" (December 16, 2022); "Interim Guidance on Prosecutorial Discretion, Charging, and Sentencing" (January 29, 2021); "Department Policy on Charging Mandatory Minimum Sentences and Recidivist Enhancements in Certain Drug Cases" (August 12, 2013); and "Guidance Regarding § 851 Enhancements in Plea Negotiations" (September 24, 2014).

Case 3:25-cv-01350-WHO   Document 230   Filed 09/25/25   Page 36 of 130

Memorandum from the Acting Deputy Attorney General                                                    Page 3
Subject: Interim Policy Changes Regarding Charging, Sentencing, And Immigration Enforcement

The Organized Crime Drug Enforcement Task Force (OCDETF) and the Project Safe Neighborhoods (PSN) program shall establish national initiatives to provide focused resources and attention to immigration-related prosecutions at the federal, state, and local levels. OCDETF and PSN will focus on facilitating access by U.S. Attorney's Offices to existing structures in which the Justice Department participates, such as Joint Task Force Vulcan, which targets MS-13 and will be expanded to target TdA, and Joint Task Force Alpha, which targets human trafficking. The regional OCDETF Strike Forces shall prioritize the investigation and prosecution of immigration offenses, including by requiring OCDETF-funded AUSAs to devote significant time and attention to the investigation and prosecution of these crimes. The new OCDETF and PSN national initiatives shall also prioritize enhanced statistical tracking of these efforts.

Pending implementation of the Homeland Security Task Forces announced by President Trump on January 20, 2025, the FBI's Joint Terrorism Task Forces are directed to coordinate with DHS, as well as state and local members, to assist in the execution of President Trump's immigration-related initiatives. The FBI, DEA, ATF, USMS, and BOP shall review their files for identifying information and/or biometric data relating to non-citizens located illegally in the United States. All such information and data shall be disclosed to DHS, for the sole purpose of facilitating appropriate removals, enforcement actions, and immigration-related investigations and prosecutions, unless the agency possessing the information and data determines that a particular disclosure would compromise a significant law enforcement investigation and the U.S. Attorney's Office participating in the investigation concurs in writing with the agency's non-disclosure determination. The agencies' reviews and disclosures shall be completed in 60 days. Concurrences by U.S. Attorney's Offices in non-disclosure determinations shall be disclosed as Urgent Reports pursuant to Justice Manual § 1-13.130.

The Supremacy Clause and other authorities require state and local actors to comply with the Executive Branch's immigration enforcement initiatives. Federal law prohibits state and local actors from resisting, obstructing, and otherwise failing to comply with lawful immigration-related commands and requests pursuant to, for example, the President's extensive Article II authority with respect to foreign affairs and national security, the Immigration and Nationality Act, and the Alien Enemies Act. The U.S. Attorney's Offices and litigating components of the Department of Justice shall investigate incidents involving any such misconduct for potential prosecution, including for obstructing federal functions in violation of 18 U.S.C. § 371, and violations of other statutes, such as 8 U.S.C. §§ 1324, 1373. Declination decisions with respect to resistance, obstruction, or other non-compliance with lawful immigration-related commands and requests from federal authorities shall be disclosed as Urgent Reports pursuant to Justice Manual § 1-13.130.

Finally, laws and actions that threaten to impede Executive Branch immigration initiatives, including by prohibiting disclosures of information to federal authorities engaged in immigration-enforcement activities, threaten public safety and national security. The Civil Division shall work with the newly established Sanctuary Cities Enforcement Working Group, within the Office of the Associate Attorney General, to identify state and local laws, policies, and activities that are inconsistent with Executive Branch immigration initiatives and, where appropriate, to take legal action to challenge such laws.

# Exhibit D



𝕺𝖋𝖋𝖎𝖈𝖊 𝖔𝖋 𝖙𝖍𝖊 𝕬𝖙𝖙𝖔𝖗𝖓𝖊𝖞 𝕲𝖊𝖓𝖊𝖗𝖆𝖑
𝖂𝖆𝖘𝖍𝖎𝖓𝖌𝖙𝖔𝖓, 𝕯. 𝕮. 20530

February 5, 2025

MEMORANDUM FOR ALL DEPARTMENT EMPLOYEES

FROM:              THE ATTORNEY GENERAL

SUBJECT:           SANCTUARY JURISDICTION DIRECTIVES[1]

      Unlawful border crossings and illegal migration into the United States have reached record levels, resulting in a substantial and unacceptable threat to our national security and public safety. To protect the American people from the effects of unlawful mass migration, President Trump has prioritized securing our Nation's borders and enforcing federal immigration laws. In furtherance of that objective, the Department of Justice will ensure that, consistent with law, "sanctuary jurisdictions" do not receive access to Federal funds from the Department. Consistent with applicable statutes, regulations, court orders, and terms, the Department of Justice shall pause the distribution of all funds until a review has been completed, terminate any agreements that are in violation of law or are the source of waste, fraud, or abuse, and initiate clawback or recoupment procedures, where appropriate.[2] In carrying out this directive, each component shall comply with any notice and procedural requirements in the award, agreement, or other instrument.

**I.    End Funding to State and Local Jurisdictions That Unlawfully Interfere with Federal Law Enforcement Operations**

      Sanctuary jurisdictions should not receive access to federal grants administered by the Department of Justice. The Department will exercise its own authority to impose any conditions of funding that do not violate applicable constitutional or statutory limitations. *See New York v. Dep't of Justice*, 951 F.3d 84, 111 (2d Cir. 2020) ("Because 8 U.S.C. § 1373 is a law applicable to all plaintiffs in this action, the Attorney General was authorized to impose the challenged Certification Condition and did not violate either the APA or separation of powers by doing so.").

      Federal law provides that state and local jurisdictions "may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [federal immigration officers] information regarding the citizenship or immigration status, lawful or unlawful, of any

---

[1] This guidance is not intended to, does not, and may not be relied upon to create, any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

[2] This memorandum rescinds, effective today, any inconsistent previous memoranda, policies, or guidance documents of the Department of Justice.

individual." 8 U.S.C. § 1373(a).  So-called "sanctuary jurisdictions" include state or local jurisdictions that refuse to comply with 8 U.S.C. § 1373, refuse to certify compliance with § 1373, or willfully fail to comply with other applicable federal immigration laws.  Consistent with statutory authority and past practice, the Department will require any jurisdiction that applies for certain Department grants to be compliant with 8 U.S.C. § 1373(a).  Within 30 days, the Associate Attorney General, in coordination with components that provide Department grants, will report to the Attorney General the grants to which this requirement applies.

Additionally, to the extent consistent with applicable statutes, regulations, and terms, the Department may seek to tailor future grants to promote a lawful system of immigration, and to reduce efforts by state or local jurisdictions to undermine a lawful system of immigration.  The Department will also seek to take any appropriate enforcement action where state or local practices violate federal laws, regulations, or grant conditions.

## II.    Identify and Evaluate All Funding Agreements with Non-Governmental Organizations That Provide Support to Illegal Aliens

All Department components that provide federal funding to non-governmental organizations shall immediately identify all contracts, grants, or other agreements with organizations that support or provide services to removable or illegal aliens.  For any such agreement, each component shall, to the extent consistent with applicable statutes, regulations, court orders, and terms:

(1) Pause any further distribution of funds for 60 days after complying with any notice and procedural requirements.

(2) Identify non-governmental organization(s) receiving funding from the Department and describe the support or services provided.  The component shall direct each organization to report whether the disbursed funds: (a) were provided in accordance with applicable laws; (b) resulted in the provision of any funds or services to removable or illegal aliens; (c) resulted in or were the subject of waste, fraud, or abuse; and (d) promoted or facilitated violations of our immigration laws.  The component shall further direct each organization to certify that it will not use any remaining funds to promote or facilitate the violation of Federal immigration law.

(3) Compile information set forth at (2) above and submit it to the Associate Attorney General within 45 days of this memorandum.

Upon completion of this process, the Associate Attorney General, in consultation with the Deputy Attorney General, shall determine which (if any) agreements to terminate and whether to resume funding of any remaining agreements, consistent with applicable statutes, regulations, and terms.

Effective immediately, consistent with applicable law, the Department of Justice shall not enter into any new contract, grant, or other agreement to provide Federal funding to non-

governmental organizations that support or provide services, either directly or indirectly (*e.g.*, through sub-contracting or other arrangements), to removable or illegal aliens.

### III.    Pursue Enforcement Actions Against Jurisdictions That Facilitate Violations of Federal Immigration Laws or Impede Lawful Federal Immigration Operations

Actions that impede federal efforts to enforce immigration law threaten public safety and national security.  State and local jurisdictions must comply with applicable immigration-related federal laws.  State and local actors may not impede, obstruct, or otherwise fail to comply with lawful immigration-related directives pursuant to the President's Article II authority to ensure national security, the Immigration and Nationality Act, or other authorities.

All litigating components of the Department of Justice and each U.S. Attorney's Office shall investigate incidents involving any such misconduct and shall, where supported by the evidence, prosecute violations of federal laws such as 18 U.S.C. § 371 and 8 U.S.C. §§ 1324 and 1373.  All declination decisions with respect to any effort to obstruct or fail to comply with a lawful immigration-related directive from the Executive Branch shall be promptly reported pursuant to Justice Manual § 1-13.130.

The Civil Division shall, in coordination with the Sanctuary Cities Enforcement Working Group, identify state and local laws, policies, and practices that facilitate violations of federal immigration laws or impede lawful federal immigration operations.  Where appropriate, the Civil Division shall take legal action to challenge such laws, policies, or practices.  Attorneys tasked to the Sanctuary Cities Enforcement Working Group shall regularly report to the Associate Attorney General and the Deputy Attorney General their progress regarding the review of state and local laws, policies, and practices, and shall promptly report any decisions not to pursue enforcement actions against state and local jurisdictions found to be facilitating violations of federal immigration laws or impeding lawful federal immigration operations.

# Exhibit E

## Presidential Documents

Executive Order 14287 of April 28, 2025

## Protecting American Communities From Criminal Aliens

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

**Section 1.** *Purpose and Policy.* Federal supremacy with respect to immigration, national security, and foreign policy is axiomatic. The Constitution provides the Federal Government with plenary authority regarding immigration to protect the sovereignty of our Nation and to conduct relations with other nations, who must be able to deal with one national Government on such matters. This power is sometimes contained in specific constitutional provisions: Article II of the Constitution vests the power to protect national security and conduct foreign policy in the President of the United States, and Article IV, Section 4, requires the Federal Government to ''protect each of [the States] against Invasion.'' This Federal power over immigration is also an inherent element of national sovereignty.

The prior administration allowed unchecked millions of aliens to illegally enter the United States. The resulting public safety and national security risks are exacerbated by the presence of, and control of territory by, international cartels and other transnational criminal organizations along the southern border, as well as terrorists and other malign actors who intend to harm the United States and the American people. This invasion at the southern border requires the Federal Government to take measures to fulfill its obligation to the States.

Yet some State and local officials nevertheless continue to use their authority to violate, obstruct, and defy the enforcement of Federal immigration laws. This is a lawless insurrection against the supremacy of Federal law and the Federal Government's obligation to defend the territorial sovereignty of the United States. Beyond the intolerable national security risks, such nullification efforts often violate Federal criminal laws, including those prohibiting obstruction of justice (18 U.S.C. 1501 *et seq.*), unlawfully harboring or hiring illegal aliens (8 U.S.C. 1324), conspiracy against the United States (18 U.S.C. 371), and conspiracy to impede Federal law enforcement (18 U.S.C. 372). Assisting aliens in violating Federal immigration law could also violate the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. 1961 *et seq.*). Some measures to assist illegal aliens also necessarily violate Federal laws prohibiting discrimination against Americans in favor of illegal aliens and protecting Americans' civil rights.

It is imperative that the Federal Government restore the enforcement of United States law.

**Sec. 2.** *Designation of ''Sanctuary'' Jurisdictions.* (a) Within 30 days of the date of this order, the Attorney General, in coordination with the Secretary of Homeland Security, shall publish a list of States and local jurisdictions that obstruct the enforcement of Federal immigration laws (sanctuary jurisdictions). After this initial publication, the Attorney General and the Secretary of Homeland Security shall update this list as necessary.

(b) Immediately following each publication under subsection (a) of this section, the Attorney General and the Secretary of Homeland Security shall notify each sanctuary jurisdiction regarding its defiance of Federal immigration law enforcement and any potential violations of Federal criminal law.

**Sec. 3.** *Consequences for Sanctuary Jurisdiction Status.* (a) With respect to sanctuary jurisdictions that are designated under section 2(a) of this

order, the head of each executive department or agency (agency), in coordination with the Director of the Office of Management and Budget and as permitted by law, shall identify appropriate Federal funds to sanctuary jurisdictions, including grants and contracts, for suspension or termination, as appropriate.

(b) With respect to jurisdictions that remain sanctuary jurisdictions after State or local officials are provided notice of such status under section 2(b) of this order and yet remain in defiance of Federal law, the Attorney General and the Secretary of Homeland Security shall pursue all necessary legal remedies and enforcement measures to end these violations and bring such jurisdictions into compliance with the laws of the United States.

Sec. 4. *Preventing Federal Benefits for Aliens in Sanctuary Jurisdictions.* The Secretary of Homeland Security, in coordination with the Attorney General, shall develop guidance, rules, or other appropriate mechanisms to ensure appropriate eligibility verification is conducted for individuals receiving Federal public benefits within the meaning of 8 U.S.C. 1611(c) from private entities in a sanctuary jurisdiction, whether such verification is conducted by the private entity or by a governmental entity on its behalf.

Sec. 5. *Equal Treatment of Americans.* The Attorney General, in consultation with the Secretary of Homeland Security and appropriate agency heads, shall identify and take appropriate action to stop the enforcement of State and local laws, regulations, policies, and practices favoring aliens over any groups of American citizens that are unlawful, preempted by Federal law, or otherwise unenforceable, including State laws that provide in-State higher education tuition to aliens but not to out-of-State American citizens that may violate 8 U.S.C. 1623 or that favor aliens in criminal charges or sentencing.

Sec. 6. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

(d) The Department of Justice shall provide funding for this order's publication in the *Federal Register.*

THE WHITE HOUSE,
*April 28, 2025.*

[FR Doc. 2025–07789
Filed 5–1–25; 8:45 am]
Billing code 4410–CW–P

# Exhibit F



Secretary

**U.S. Department of Homeland Security**
Washington, DC 20528

February 19, 2025

MEMORANDUM FOR ALL AGENCIES AND OFFICES

FROM:     Kristi Noem
          Secretary

SUBJECT:  **Restricting Grant Funding for Sanctuary Jurisdictions**

---

Following the horrific attacks on this country on September 11, 2001, the American people trusted their leaders to make sure it would never happen again. Among the circumstances that led to those attacks was the failure to treat immigration as a national security issue. The 9/11 Commission Report, for example, recognized that "the institutions charged with protecting our borders . . . did not understand how grave th[e] threat could be." 9/11 Commission Report at xvi. The Commission also specifically noted that there were, at that time, "9 million people . . . in the United States outside the legal immigration system." *Id.* at 390. A second factor recognized by the Commission was the failure of different law enforcement entities to share information. The Report recognized "pervasive problems of managing and sharing information across a large and unwieldy government." *Id.* at xvi.

The year after those terrible attacks, President George W. Bush signed into the law the Homeland Security Act of 2002. The Act created the Department of Homeland Security (DHS), and it transferred into that new agency a number of important national security components, including those responsible for immigration enforcement. Congress expressly found that "State and local personnel have capabilities and opportunities to gather information on suspicious activities and terrorist threats not possessed by Federal agencies." 6 U.S.C. § 481(b)(8). Congress also found that "[t]he Federal Government relies on State and local personnel to protect against terrorist attack." *Id.* § 481(b)(2).

The bottom line is that partnership is an essential element of our national security and public safety mission. And that mission undoubtedly includes immigration enforcement. State and local governments that refuse to cooperate with, refuse to share information with, or even actively obstruct federal immigration enforcement reject these ideals and the history we share in common as Americans. If any government entity chooses to thumb its nose at the Department of Homeland Security's national security and public safety mission, it should not receive a single dollar of the Department's money unless Congress has specifically required it.

For purposes of this memorandum, "sanctuary jurisdictions" include the following:

- Jurisdictions that fail to comply with the information sharing requirements of 8 U.S.C. §§ 1373 and 1644.

Prohibiting Grant Funding for Sanctuary Jurisdictions
Page 2

- Jurisdictions that violate other relevant laws, including prohibitions on encouraging or inducing an alien to come to, enter, or reside in the United States in violation of law, 8 U.S.C. § 1324(a)(1)(A)(iv), prohibitions on transporting or moving illegal aliens, *id.* § 1324(a)(1)(A)(ii), prohibitions on harboring, concealing, or shielding from detection illegal aliens, *id.* § 1324(a)(1)(A)(iii), and any applicable conspiracy, aiding or abetting, or attempt liability respecting these statutes.

- Jurisdictions that fail to honor requests for cooperation, such as participation in joint operations, sharing of information, or requests for short term detention of alien pursuant to a valid detainer. A jurisdiction, however, is not a sanctuary jurisdiction merely because it lacks the necessary resources to assist in a particular instance.

- Any jurisdiction that fails to provide access to detainees, such as when an immigration officer seeks to interview a person who might be a removable alien.

- Any jurisdiction that leaks the existence of an enforcement operation.

All components are to review all federal financial assistance awards to determine if Department funds, directly or indirectly, are going to sanctuary jurisdictions. To the extent consistent with relevant legal authorities and the applicable terms and conditions of each award, each component must cease providing federal funding to sanctuary jurisdictions. Components should also make appropriate criminal referrals to the Department of Justice where illegal conduct is discovered.

For questions regarding applicable legal authorities, components must consult with the General Counsel or his designee. For questions regarding whether a particular jurisdiction is a sanctuary jurisdiction, components must consult with the Director of Immigration and Customs Enforcement and the Commissioner of Customs and Border Protection or their designees.

Within 30 days, each component shall provide a report to the Undersecretary for Management with a summary of actions taken to comply with this memorandum.

# Exhibit G

U.S. Department of Homeland Security
Washington, DC 20472

 FEMA

March 20, 2025

**DECISION**

MEMORANDUM FOR:   Kristi Noem
                 Secretary of the Department of Homeland Security

FROM:            Cameron Hamilton
                 Senior Official Performing the Duties of the Administrator
                 Federal Emergency Management Agency

SUBJECT:         **Approval of FEMA-Administered Grant Disbursements**

---

**Purpose:** To seek approval on the review process and parameters of grant programs administered by the Federal Emergency Management Agency (FEMA) to align with Administration and Secretary priorities on non-governmental organizations, immigration, and sanctuary jurisdictions.

**Background:** On Jan. 28, 2025, the Secretary of the Department of Homeland Security (DHS) issued a memo to components and agency heads entitled *"Direction on Grants to Non-governmental Organizations,"* which required the development and implementation of a process to review payments and obligations for grants that *"(1) go to non-profit organizations or for which non-profit organizations are eligible and (2) touch in any way on immigration."* In accordance with this instruction, FEMA is recommending the implementation of additional processes to review certain grants prior to releasing funds, as outlined in this memo.

The Secretary also issued a memo on Feb. 19, 2025, *"Restricting Grant Funding for Sanctuary Jurisdictions,"* instructing all components to "review all federal financial assistance awards to determine if Department funds, directly or indirectly, are going to sanctuary jurisdictions." In compliance with this memo, FEMA is providing recommendations for which grant programs sanctuary jurisdiction conditions should apply.

**Appendix A** provides a programmatic overview of all FEMA programs.

<u>**Action: FEMA Recommendations for Approval**</u>

1. The grant programs for which sanctuary jurisdiction conditions or restrictions should be applied;
2. The methodology FEMA will use to assess disaster and non-disaster grant programs in accordance with the Secretary's direction on non-governmental organizations (NGOs) and immigration; and
3. FEMA's recommended determinations for each grant program.

1

**Action Item 1: FEMA Proposed Sanctuary Jurisdiction Programs and Applicability**

FEMA recommends applying conditions or restrictions on FEMA administered non-disaster preparedness grant programs that go to a sanctuary jurisdiction as designated by U.S. Immigration and Customs Enforcement (ICE) and:

   a. where the purpose of the grant has a nexus to immigration activities, law enforcement, or national security; or,
   b. where statute does not limit how FEMA implements the program.

Based on the criteria above, FEMA recommends the conditions or restrictions be placed on all open and future awards for the following 12 programs[1]:

   1. Case Management Pilot Program (CMPP);
   2. Emergency Management Performance Grant (EMPG);
   3. Homeland Security Grant Program – Operation Stonegarden (OPSG);
   4. Homeland Security Grant Program – State Homeland Security Program (SHSP);
   5. Homeland Security Grant Program – Urban Area Security Initiative;
   6. Homeland Security National Training Program - Continuing Training Grants - Competitive (HSNTP-CTG);
   7. Port Security Grant Program (PSGP);
   8. Presidential Residence Protection Assistance Grant Program (PRPA);
   9. Regional Catastrophic Preparedness Grant Program (RCPGP);
   10. Shelter and Services Program (SSP);
   11. Targeted Violence and Terrorism Prevention Grant Program (TVTP); and
   12. Transit Security Grant Program (TSGP); and

As noted above, application of conditions or restrictions will vary based on the structure or authority of each respective program.[2] FEMA will assess each grant and submit proposed program implementation recommendations to the General Counsel for a legal determination as appropriate. These program implementation recommendations will include how the conditions or restrictions apply to prime awards, sub-awards, and existing awards and payments.

FEMA recommends conditions or restrictions on sanctuary jurisdictions not apply to disaster grants, non-disaster mitigation grants, and grants to fire departments and organizations that comprise the National Urban Search and Rescue Response System.

To implement guidance from the Secretary's memo, *"Restricting Grant Funding for Sanctuary Jurisdictions,"* FEMA has categorized disaster and non-disaster programs into two risk profiles using the above criteria. FEMA recommends approval of the proposed methodology:

---

1 While the Tribal Homeland Security Grant Program meets the criteria outlined above, FEMA did not include it for sanctuary jurisdiction conditions or restrictions due to Tribal sovereignty.
[2] See Appendix A for additional information on program eligibility.

**Image A: Proposed Sanctuary Jurisdictions Risk Methodology**

| Sanctuary Jurisdiction Does Not Apply | Sanctuary Jurisdiction Applies |
|---|---|
| • Grant programs that:<br>  • Do not go to sanctuary jurisdiction; or<br>  • Are disaster or non-disaster mitigation grants; or<br>  • Are non-disaster grants with no nexus to immigration activities, law enforcement, or national security; or<br>  • Are limited by statute.<br>• These programs/projects should move forward without additional review. | • Grant programs that:<br>  • Go to a designated sanctuary jurisdiction; or<br>  • Are non-disaster grants; and<br>  • Have a nexus to immigration activities, law enforcement, or national security; or<br>  • Are not limited by statute.<br>• These programs/projects require additional review by DHS review. |
| Clears through existing program controls and review processes | Project identified as meeting S1 criteria, requires DHS review |

Approve/date _[signature]_ 3-25-25    Disapprove/date _____

Modify/date _____    Needs discussion/date _____

**Action Item 2: FEMA Proposed NGO/Immigration Grant Risk Assessment Methodology**

To implement guidance from the Secretary's memo, *"Direction on Grants to Non-governmental Organizations,"* FEMA has categorized all disaster and non-disaster grant programs into three risk profiles. In considering the risk level, FEMA will evaluate whether the intent and primary purpose of the grant relates to the nexus of immigration. The intent is to ensure that FEMA's grant programs do not encourage or induce illegal immigration or illegal harboring of illegal aliens or any other unlawful activity. This information will lead to the determination of their risk profile as outlined in Image B. FEMA recommends approval of the proposed methodology:

**Image B: Proposed NGO/Immigration Risk Assessment Methodology**

| Low Risk | Medium Risk | High Risk |
|---|---|---|
| • Low likelihood that grant disbursements (1) go to NGOs, and (2) touch in any way on immigration.<br>• These programs/projects should move forward without additional review. | • Further analysis required to determine likelihood. Indeterminate risk that grant disbursements (1) go to NGOs, and (2) touch in any way on immigration.<br>• These programs/projects are pending review by FEMA to assess low or high risk, with concurrence from DHS. | • High likelihood that grant disbursements (1) go to NGOs, and (2) touch in any way on immigration.<br>• These programs/projects require additional review by DHS. |
| Clears through existing program controls and review processes | Requires FEMA review to assess high or low risk, with concurrence from DHS | Project identified as meeting S1 criteria, requires DHS review |

Approve/date _____ Disapprove/date_____

3-25-25

Modify/date _____ Needs discussion/date_____

## Action Item 3: Approval of FEMA's Recommended Determinations

In accordance with the above methodologies for non-disaster and disaster grants, FEMA recommends approval of the determinations by grant program as outlined in the table below. The recommended determinations are:

- **Green:** Cleared by FEMA to undergo the existing program controls and review processes. Programs have been identified to have a low likelihood of grant disbursements to NGOs **and** low likelihood of a nexus to immigration, and the sanctuary jurisdiction restriction do not apply. Grants with a "green" assessment are approved to move forward with payment consistent with FEMA's existing processes without additional review by DHS.

- **Yellow:** Pending review by FEMA to conduct additional analysis on the projects and awards to determine likelihood of grant disbursements to NGOs with an immigration nexus. Sanctuary jurisdiction restrictions do not apply. As FEMA completes the analysis, FEMA will submit decision memos to DHS to recommend a grant program be moved to green or red status. FEMA will also submit yellow payments weekly for DHS consideration and approval if payment can move forward.

- **Red:** For DHS review and approval of payment requests or evaluation for termination of grant program. Programs have been identified to have a high likelihood of grant disbursements to NGOs and immigration nexus, and/or meets the sanctuary jurisdiction restrictions. FEMA will conduct an assessment and provide recommendations to DHS on whether payments should be denied or approved. In the recommendation, FEMA will review the sanctuary jurisdictions identified by U.S. Immigration and Customs Enforcement (ICE) and specifically notate the jurisdictional restrictions. The recommendation will consider, among other things, the purpose and intent of the grant, the benefits to the DHS mission and risks, and the context of which organization is receiving the award. For example, is the individual grant award going to a county government who is not on the ICE sanctuary jurisdiction list, but the state is on the list. FEMA will also provide recommendations on if programs and/or individual grant awards should be terminated based on the Secretary's guidance.

Approve/date _____ Disapprove/date_____

3-25-25

Modify/date _____ Needs discussion/date_____

**TABLE A: All FEMA Grant Programs and Recommended Review**

| AFT | Program | # of Open Awards | ULO Balance* | Risk of NGO / Immigration | Apply Sanctuary Jurisdiction | Recommended Determination |
|---|---|---|---|---|---|---|
| DRF | Community Disaster Loans (CDL) | 44 | $93,791,763 | Low | No | Cleared by FEMA |
| DRF | Disaster Unemployment Assistance (DUA) | 18 | $49,847,337 | Low | No | Cleared by FEMA |
| DRF | Fire Management Assistance Grants (FMAG) – previously included as part of Public Assistance – Grants to State & Local | 124 | $52,479,916 | Low | No | Cleared by FEMA |
| DRF | Hazard Mitigation Grant Program (HMGP) | 386 | $4,414,617,261 | Low | No | Cleared by FEMA |
| DRF | Hazard Mitigation Grant Program Post Fire (HMGP Post Fire) | 269 | $58,007,937 | Low | No | Cleared by FEMA |
| DRF | Individual and Households Program (IHP) | N/A | $380,898,640 | Low | No | Cleared by FEMA |
| DRF | Public Assistance – Grants to State & Local | 44,266 | $73,241,454,318 | Low | No | Cleared by FEMA |
| DRF | Urban Search and Rescue (US&R) | NA | $141,254,817 | Low | No | Cleared by FEMA |
| FA | Alliance for System Safety of Unmanned Aircraft Systems through Research Excellence (ASSURE) | 4 | $4,669,770 | Low | No | Cleared by FEMA |
| FA | Assistance to Firefighter Grants (AFG) | 3801 | $464,132,184 | Low | No | Cleared by FEMA |
| FA | Building Resilient Infrastructure and Communities (BRIC) | 1365 | $1,154,059,629** | Low | No | Cleared by FEMA |
| FA | Chemical Stockpile Emergency Preparedness Program (CSEPP) | 9 | $26,180,310 | Low | No | Cleared by FEMA |
| FA | Community Assistance Program State Support Services Element (CAP-SSSE) | 76 | $11,587,984 | Low | No | Cleared by FEMA |

| AFT | Program | # of Open Awards | ULO Balance* | Risk of NGO / Immigration | Apply Sanctuary Jurisdiction | Recommended Determination |
|---|---|---|---|---|---|---|
| FA | Cooperating Technical Partners (CTP) | 480** | $239,537,976** | Low | No | Cleared by FEMA |
| FA | Emergency Management Baseline Assessments Grant (EMBAG) | 3** | $127,416** | Low | No | Cleared by FEMA |
| FA | Emergency Operations Center (EOC) | 95 | $228,725,861 | Low | No | Cleared by FEMA |
| FA | Fire Prevention and Safety (FP&S) | 373 | $80,643,658 | Low | No | Cleared by FEMA |
| FA | Flood Mitigation Assistance (FMA) | 473 | $909,252,393 | Low | No | Cleared by FEMA |
| FA | Flood Mitigation Assistance Swift Current (FMA Swift) | 14 | $0** | Low | No | Cleared by FEMA |
| FA | Homeland Security Preparedness Technical Assistance Program (HSPTAP) | 4 | $406,557 | Low | No | Cleared by FEMA |
| FA | Homeland Security National Training Program (HSNTP) - National Domestic Preparedness Consortium (NDPC) | 17 | $134,067,348 | Low | No | Cleared by FEMA |
| FA | HSNTP– National Cybersecurity Preparedness Consortium | 5 | $16,906,852 | Low | No | Cleared by FEMA |
| FA | Intercity Bus Security Grant Program (IBSGP) | 59 | $2,905,029 | Low | No | Cleared by FEMA |
| FA | National Dam Safety Program and Rehabilitation of High Hazard Potential Dams Grant Program (HHPD) | 207 | $244,022,266 | Low | No | Cleared by FEMA |
| FA | National Earthquake Hazards Reduction Program (NEHRP) and Multi-State and National Earthquake Assistance (MSNEA) Grant Program | 62 | $4,876,775 | Low | No | Cleared by FEMA |
| FA | National Fire Academy Training Assistance (NFATA) | 10 | $1,446,388 | Low | No | Cleared by FEMA |

| AFT | Program | # of Open Awards | ULO Balance* | Risk of NGO / Immigration | Apply Sanctuary Jurisdiction | Recommended Determination |
|-----|---------|------------------|--------------|---------------------------|------------------------------|----------------------------|
| FA | National Incident Management System (NIMS) | 3 | $2,208,411** | Low | No | Cleared by FEMA |
| FA | National Urban Search and Rescue (US&R) | 153 | $66,105,406 | Low | No | Cleared by FEMA |
| FA | Next Generation Warning System Grant Program (NGWSGP)[1] | 3 | $134,196,015 | Low | No | Cleared by FEMA |
| FA | Pre-Disaster Mitigation (PDM) | 99 | $504,369,174 | Low | No | Cleared by FEMA |
| FA | Safeguarding Tomorrow Revolving Loan Fund/Safeguarding Tomorrow through Ongoing Risk Mitigation Act (STORM) | 9 | $51,397,697 | Low | No | Cleared by FEMA |
| FA | Staffing For Adequate Fire and Emergency Response (SAFER) | 1125 | $1,148,541,961** | Low | No | Cleared by FEMA |
| FA | State and Local Cybersecurity Grant Program (SLCGP) | 161 | $760,367,208 | Low | No | Cleared by FEMA |
| FA | State Fire Training Systems Grants (SFT) | 59 | $876,377 | Low | No | Cleared by FEMA |
| FA | Tribal Cybersecurity Grant Program (TCGP) | 31 | $17,620,204 | Low | No | Cleared by FEMA |
| FA | Tribal Homeland Security Grant Program (THSGP) | 77 | $42,539,321 | Low | No | Cleared by FEMA |
| DRF | Crisis Counseling Program (CCP) | 63 | $53,020,947 | Medium | No | Pending Review |

[1] The Corporation for Public Broadcasting has filed a lawsuit in the District of Columbia District Court on March 13, 2025, contending that FEMA's manual payment review process for NGWSGP awards was arbitrary and capricious in violation of the Administrative Procedures Act. If FEMA's recommended approach to categorizing the NGWSGP as "Cleared by FEMA" is approved, FEMA will make appropriate payments to the CPB using the manual payment review process.

| AFT | Program | # of Open Awards | ULO Balance* | Risk of NGO / Immigration | Apply Sanctuary Jurisdiction | Recommended Determination |
|-----|---------|------------------|--------------|---------------------------|------------------------------|---------------------------|
| DRF | Disaster Case Management (DCM) | 44 | $182,577,136 | Medium | No | Pending Review |
| DRF | Disaster Legal Services (DLS) | 11 | $95,000 | Medium | No | Pending Review |
| DRF | Public Assistance – NGOs | 7,234 | $8,498,374,550 | Medium | No | Pending Review |
| DRF | Public Assistance – Non-Congregate Sheltering | 284 | $1,297,129,208 | Medium | No | Pending Review |
| FA | Emergency Food and Shelter Program (EFSP) | 12 | $251,590,333 | Medium | No | Pending Review |
| FA | Nonprofit Security Grant Program (NSGP)[2] | 400 | $943,940,157 | Medium | No | Pending Review |
| FA | Emergency Management Performance Grant (EMPG) | 206 | $476,990,846 | Low | Yes | DHS Review |
| FA | Homeland Security Grant Program – Operation Stonegarden (OPSG) | 87 | $170,946,880 | Low | Yes | DHS Review |
| FA | Homeland Security Grant Program – State Homeland Security Program (SHSP) | 203 | $761,745,900 | Low | Yes | DHS Review |
| FA | Homeland Security Grant Program – Urban Area Security Initiative (UASI) | 104 | $1,919,725,009 | Low | Yes | DHS Review |
| FA | Homeland Security National Training Program (HSNTP) - Continuing Training Grants Program - Competitive (CTG) | 15 | $15,525,591 | Low | Yes | DHS Review |
| FA | Port Security Grant Program (PSGP) | 787 | $266,441,010 | Low | Yes | DHS Review |
| FA | Presidential Residence Protection Assistance (PRPA) | 2 | $2,241,788** | Low | Yes | DHS Review |
| FA | Regional Catastrophic Preparedness Grant Program (RCPGP) | 41 | $36,087,421 | Low | Yes | DHS Review |

[2] While State Administrative Agencies (SAA) are the direct recipients of NSGP funding, awards are passed through to nonprofit organizations that are not subject to the sanctuary jurisdiction conditions or restrictions as described in the criteria above. Management and Administration costs are allowable under this grant program and may be retained by SAAs.

| AFT | Program | # of Open Awards | ULO Balance* | Risk of NGO / Immigration | Apply Sanctuary Jurisdiction | Recommended Determination |
|-----|---------|------------------|--------------|---------------------------|------------------------------|---------------------------|
| FA | Targeted Violence and Terrorism Prevention Grant Program (TVTP) | 122 | $34,939,702 | Medium | Yes | DHS Review |
| FA | Transit Security Grant Program (TSGP) / Intercity Passenger Rail (IPR)*** | 84 | $283,147,532 | Low | Yes | DHS Review |
| FA | Case Management Pilot Program (CMPP) | 4 | $47,201,306 | High | Yes | DHS Review for Termination |
| FA | Emergency Food and Shelter Program – Humanitarian (EFSP-H)[3] | 3** | $46,050,064** | High | No | DHS Review for Termination |
| FA | Shelter and Services Program (SSP) | 156** | $887,107,461 | High | Yes | DHS Review for Termination |
| **TOTAL** | | | **$100.859B** | | | |

\* ULOs are as of Jan. 28, 2025.

\*\* Chart updated with revised figures. After further review, inaccuracies were identified in previous data that have now been corrected.[4] Previous FMA Swift Current number reflected unobligated amount rather than unliquidated.

\*\*\* Sanctuary jurisdiction conditions would apply to Transit Security Grant Program (TSGP) and not Intercity Passenger Rail (IPR).

---

[3] For EFSP-H, all spending periods for subawards have expired and the provision of services under the sunset program has ended. The remaining amount is funding reserved for management and administration (approximately $4 million) for the grantee and funds returned by the board.

**TABLE B: Summary of Unliquidated Obligation (ULO) by Recommended Risk Determination**

FEMA is  reviewing all grants at a programmatic level, and also at the individual grant award level to understand the existing information available, and where additional research within the system can be conducted or where information from recipients will need to be collected. As the policy decisions and process are under development, FEMA has begun and will continue the individual grant award manual payment review process in preparation for the approach and methodology being approved. This manual review process requires significant staff time, but once the backlog is cleared, the process will operate on a much shorter processing time.

| Risk Determination | Disaster Grants ULO | Non-Disaster Grant ULO | Total | Backlog Processing Time* |
|---|---|---|---|---|
| Cleared by FEMA | $78,432,351,989 | $6,251,770,170 | $84,684,122,159 | 45 days |
| Pending FEMA Review | $10,031,196,841 | $1,195,530,490 | $11,226,727,331 | 90 days |
| Recommend DHS Review | N/A | $3,967,791,679 | $3,967,791,679 | 60 days |
| Recommended Terminated Programs | N/A | $980,358,831 | $980,358,831 | 60 days |
| **Total** | **$88,463,548,830** | **$12,395,451,170** | **$100.859B** | |

*This estimate includes the approximately 1,450 payment requests already submitted in FEMA grants systems only. It is not inclusive of the total ULO because payment requests will continue to be submitted for these programs as the work is completed throughout the period of performance, which for some programs may be up to three years.

**Appendix A**
**Federal Emergency Management Agency Grant Programs Overview**
**Background/Purpose**

On Feb. 19, 2025, Secretary Noem issued a memorandum *Restricting Grant Funding for Sanctuary Jurisdictions* and directed all components to review all federal financial assistance awards to determine if Department funds, directly or indirectly, are going to sanctuary jurisdictions (hereinafter "S1 Memo"). Appendix A below provides an overview of each FEMA administered grant program, to include the purpose of each grant program and the award criteria (i.e. whether the award criteria are discretionary or governed by statutory or regulatory competition, allocation, or eligibility criteria).

<div style="background-color:green"><strong>Recommended Determination: Cleared by FEMA</strong></div>

1. **Community Disaster Loans (42 U.S.C. §§ 5121, et seq.)**

   <u>Purpose</u>: Provides funding for local governments to operate their essential community services after substantial revenue loss caused by a disaster.

   <u>Award Criteria</u>: Statutory and regulatory eligibility criteria.

2. **Disaster Unemployment Assistance (42 U.S.C. §§ 5121, et seq.)**

   <u>Purpose</u>: Assistance to individuals unemployed as a result of a major disaster administered through a grant to the declared state or tribe.

   <u>Award Criteria</u>: Statutory and regulatory eligibility criteria.

3. **Fire Management Assistance Grants (42 U.S.C. §§ 5121, et seq.)**

   <u>Purpose</u>: The mitigation, management, and control of any fire on public or private forest land or grassland that threatens such destruction as would constitute a major disaster.

   <u>Award Criteria</u>: Statutory and regulatory eligibility criteria.

4. **Hazard Mitigation Grant Program (42 U.S.C. § 5170c)**

   <u>Purpose</u>: To help communities implement hazard mitigation measures, such as elevation, acquisition, and flood control projects, to reduce or eliminate long-term risk to people and property from natural hazards following a presidential major disaster declaration under the Stafford Act.

   <u>Award Criteria</u>: Statutory and regulatory eligibility criteria.

5. **Hazard Mitigation Grant Program – Post Fire (42 U.S.C. § 5170c(a); 42 U.S.C. § 5187(d))**

Purpose: Makes assistance available to help communities implement hazard mitigation measures after wildfire disasters.

Award Criteria: Statutory and regulatory eligibility criteria. States, federally recognized tribes and territories affected by fires resulting in a Fire Management Assistance Grant (FMAG) declaration on or after Oct. 5, 2018, are eligible to apply.

6. **Individual and Households Programs (IHP) (42 U.S.C. §§ 5121, et seq.)**

Purpose: Provides financial and direct services to eligible individuals and households affected by a disaster, who have uninsured or under-insured necessary expenses and serious needs. IHP assistance is not a substitute for insurance and cannot compensate for all losses caused by a disaster. The assistance is intended to meet your basic needs and supplement disaster recovery efforts.

Award Criteria: Statutory and regulatory eligibility criteria.

7. **Urban Search & Rescue (US&R) (42 U.S.C. §§ 5121, et seq)**

Purpose: Provides reimbursement for lifesaving rescue operations that were performed by Federal Urban Search and Rescue teams during declared disaster.

Award Criteria: Statutory and regulatory eligibility criteria.

8. **Public Assistance – State and Local (42 U.S.C. §§ 5121, et seq.)**

Purpose: Financial assistance to states, tribal, territorial, and local governments for debris removal, for emergency work to support public safety, and for the repair, restoration, reconstruction, or replacement of a public facility damaged or destroyed by a major disaster.

Award Criteria: Noncompetitive, but with statutory and regulatory eligibility criteria.

9. **Homeland Security National Training Program (HSNTP) – Alliance for System Safety of Unmanned Aircraft Systems through Research Alliance (Title III of the Department of Homeland Security Appropriations Act, 2024, (Pub. L. No. 118-47); Joint Explanatory Statement accompanying the Department of Homeland Security Appropriations Act, 2024)**

Purpose: Provides funding for Mississippi State University's Federal Aviation Administration Center of Excellence for Unmanned Aircraft Systems (ASSURE) to support and target training solutions for state, local, tribal and territorial partners, which supports the objective of the National Preparedness System to facilitate an integrated, whole community, risk-informed, capabilities-based approach to preparedness.

Award Criteria: Discretionary, limited statutory award criteria. Award goes to Mississippi State University's Federal Aviation Administration Center of Excellence for Unmanned Aircraft Systems.

## 10. Assistance to Firefighters (15 U.S.C. § 2229)

Purpose: Financial assistance to fire departments, EMS organizations, and state fire training academies to enhance their ability to protect the health and safety of the public, as well as that of firefighting and EMS personnel against fire, fire-related, and other hazards.

Award Criteria: Competitive award with statutorily mandated criteria and peer review and statutory allocation requirements.

## 11. Building Resilient Infrastructure and Communities (42 U.S.C. §§ 5133, 5136)

Purpose: Makes federal funds available to states, the District of Columbia, U.S. territories, federally recognized Tribal governments, and local governments for hazard mitigation activities. BRIC aims to shift the focus of federal investments away from reactive, post-disaster spending and toward research-supported, proactive investments in community resilience. These investments aim to reduce future disaster losses, including loss of life and property as well as future spending from the Disaster Relief Fund (DRF). BRIC focuses on cost-effective mitigation measures including protecting public infrastructure so that critical services can withstand or more rapidly recover from future disasters, as well as other projects and activities to increase resilience throughout the nation.

Award Criteria: For the FY23 NOFO, there was a State/Territory allocation, a Tribal Set-Aside, and a National Competition with the remaining funds that are not awarded from the State/Territory Allocation and Tribal Set-Aside.

## 12. Chemical Stockpile Emergency Preparedness Program (50 U.S.C. § 1521)

Purpose: To assist state, local, and tribal governments in carrying out functions related to emergency preparedness and response in connection with the disposal of the lethal chemical agents and munitions in the United States' lethal chemical agents and munitions that existed on Nov. 8, 1985.

Award Criteria: Eligibility limited to communities in close proximity to military installations storing chemical weapons. FEMA currently awards a cooperative agreement to Kentucky who in turn pass-through subawards to local governments.

## 13. Community Assistance Program – State Support Services Element (CAP-SSSE) (42 U.S.C. §§ 4101, 4102)

Purpose: CAP-SSSE is a cooperative agreement which provides funding to state National Flood Insurance Program (NFIP) Coordinators to monitor community adoption and enforcement of the minimum floodplain management standards required for participation in the NFIP. CAP-SSSE funding is used to provide technical assistance to NFIP communities, evaluate community performance in implementing floodplain management activities, and conduct community assistance contacts and visits to ensure communities are compliant with NFIP minimum requirements and flood insurance remains available for sale within the communities.

Award Criteria: Discretionary, non-competitive award to State NFIP Coordinators, which may subaward funding to local or municipal floodplain management authorities.

### 14. Cooperating Technical Partners (CTP) Program (42 U.S.C. § 4101)

Purpose: To provide assistance to state, local, tribal, university, and nonprofit organizations to increase local involvement in and ownership of flood hazard identification and assessment programs. Recipients assist in the development and maintenance of flood risk data, which is used to develop or amend Flood Insurance Rate Maps and provide the baseline for communities to prepare for and mitigate against flood risks.

Award Criteria: Discretionary. No statutory criteria.

### 15. Emergency Management Baseline Assessment Grant (6 U.S.C. § 112 (b)(2))

Purpose: To assist the updating and enhancement of a set of standards for emergency preparedness and response and a related assessment methodology for the evaluation of state, local, and territorial emergency management operations.

Award Criteria: Discretionary, no statutory award criteria.

### 16. Emergency Operations Center Grant Program (42 U.S.C. § 5196c)

Purpose: Grants made available to State Administrative Agencies (SAAs) for equipping, upgrading, and constructing state, local, and tribal emergency operations centers.

Award Criteria: Eligible Emergency Operations Center projects identified in the Joint Explanatory Statement.

### 17. Fire Prevention and Safety (15 U.S.C. § 2229)

Purpose: Financial assistance to fire prevention programs and support for firefighter health and safety research and development.

Award Criteria: Competitive award with statutorily mandated criteria and peer review and statutory allocation requirements.

18. **Flood Mitigation Assistance (42 U.S.C. § 4104c)**

Purpose: To fund mitigation projects such as elevation, acquisition, floodproofing, and planning that reduces or eliminates long-term risk of flood damage to structures insured under the NFIP.

Award Criteria: Statutory eligibility criteria. Award determinations and funding allocations among eligible jurisdictions are made on a competitive basis with discretion to add criteria.

19. **Flood Mitigation Assistance – Swift Current (42 U.S.C. § 4104c)**

Purpose: Provides funding to mitigate buildings insured through the National Flood Insurance Program (NFIP) after a major disaster declaration following a flood-related disaster event to reduce risk against future flood damage. Funds are made available to states, territories, and federally recognized tribal governments that receive a major disaster declaration following a flood-related disaster event and meet all other eligibility criteria.

Award Criteria: Funding is only available to property owners that have a current flood insurance policy under the National Flood Insurance Program (NFIP) and a history of repetitive or substantial damage from flooding.

20. **Homeland Security Preparedness Technical Assistance Program (6 U.S.C. § 112 (b)(2))**

Purpose: To help private organization recipients to conduct planning, coordination, and training activities related to emergency management and preparedness.

Award Criteria: Discretionary, no statutory award criteria.

21. **Homeland Security National Training Program (HSNTP) - National Domestic Preparedness Consortium (NDPC) (6 U.S.C. §§ 1102 and 112 (b)(2))**

Purpose: To assist statutorily designated National Domestic Preparedness Consortium members to identify, develop, test, and deliver training to state, local, and tribal emergency response providers; provide on-site and mobile training; and facilitate delivery of training.

Award Criteria: Discretionary, limited statutory award criteria. Awards may only go to one of the six non-Federal members of the National Domestic Preparedness Consortium named in statute, which consist of five state universities and one private entity.

22. **National Cyber Security Preparedness Consortium (National Cybersecurity Preparedness Consortium Act, 2021 (Pub. L. No. 117-122))**

Purpose: Delivers over 40 training courses for more than 1,000 SLTT emergency managers, cyber network managers, and critical infrastructure professionals, annually to strengthen local, state, and national cyber and information systems and defend against and recover from cyber-attacks including attacks with cascading physical consequences.

Award Criteria: Awards may only go to one of the six non-federal members of the National Domestic Preparedness Consortium named in statute, which consist of five state universities and one private entity.

**23. Intercity Bus Security Grant Program (6 U.S.C. § 1182)**

Purpose: To make awards to eligible private operators providing transportation by an over-the-road bus for security improvements.

Award Criteria: Discretionary, competitive award based on statutory criteria that require funding decisions to prioritize security risks. The eligible applicants are private bus operators and not states or local governments.

**24. National Dam Safety Program (33 U.S.C. § 467f)**

Purpose: To enable states to increase dam safety through increased inspections, emergency action planning, improved state and federal coordination, training and workshops, and purchasing of equipment.

Award Criteria: Awards are based on eligibility criteria that are set by statute with funding allocations based on a statutory formula.

**25. Rehabilitation of High Hazard Potential Dam Program (33 U.S.C. § 467f-2)**

Purpose: Provide technical, planning, design, and construction assistance in the form of grants for rehabilitation, repair, and removal of eligible high hazard potential dams.

Award Criteria: For FY 2024, FEMA made funding available in allocations for 32 states and one territory.

**26. National Earthquake Hazards Reduction Program – Multi-State and National Earthquake Assistance (MSNEA) (42 U.S.C. § 7704(a)(2)(B), (b)(2)(A)(i))**

Purpose: The National Earthquake Hazards Reduction Program (NEHRP) Multi-State and National Earthquake Assistance (MSNEA) grant program makes funds available to nonprofit organizations and institutions of higher education that possess the critical skills necessary to develop and implement regional (multi-state) and/or national earthquake risk mitigation activities.

Award Criteria: Discretionary. The program's authorizing statutes do not prescribe specific criteria for recipients. FEMA awards competitive grants to nonprofit organizations and institutions of higher education that possess the critical skills necessary to develop and implement regional (multi-state) and/or national earthquake risk mitigation activities, on behalf of states and territories participating in the FEMA NEHRP State Assistance program.

**27. National Earthquake Hazards Reduction Program – Individual State Earthquake Assistance (ISEA) (42 U.S.C. § 7704(b)(2)(A)(ix) and 42 U.S.C. § 7704(b) (2)(B))**

Purpose: FEMA awards non-competitive grants to eligible states and territories with high to very high seismic risks to fund one or more of the following allowable activities. The purpose is to support the establishment of earthquake hazards reduction programming and the implementation of earthquake safety, mitigation, and resilience activities at the state and local level.

Award Criteria: Statutory and regulatory eligibility criteria. Eligibility is limited to states and territories that have been determined to have a high or very high risk of earthquakes. Eligibility is further limited to those states and territories who can provide the statutory 25% non-federal cost share.

**28. National Fire Academy Training Assistance (Section 7 of the Federal Fire prevention and Control Act 15 U.S.C. 2206 (i)(1))**

Purpose: Provides travel stipends (air or mileage) to SLTT fire and EMS personnel who attend resident classes at the National Fire Academy.

Award Criteria: Assistance to individuals reimbursing for part of cost to attend trainings in Emmitsburg, MD

**29. National Incident Management System (NIMS) / Emergency Management Assistance Compact Program (EMAC) Program (6 U.S.C. § 761)**

Purpose: To assist the administrator of the Emergency Management Assistance Compact (EMAC) to administer EMAC operations, to implement NIMS, and to continue coordination with FEMA and state, local, and tribal governments.

Award Criteria: Eligibility limited to administration of the Emergency Management Assistance Compact (EMAC).

**30. National Urban Search and Rescue (US&R) Response System (42 U.S.C. § 5165f, 6 U.S.C. § 722)**

Purpose: The purpose of these Readiness Cooperative Agreements is to support the continued development and maintenance of a national urban search and rescue capability among the 28 task forces within the National Urban Search and Rescue Response System.

Award Criteria: Statutory and regulatory eligibility criteria. Only the 28 sponsoring agencies currently designated by FEMA as members of the National Urban Search and Rescue Response System are eligible for readiness and response cooperative agreements.

**31. Next Generation Warning System (Annual DHS Appropriations Acts)**

Purpose: Enables public television broadcasters to upgrade to the Advanced Television Systems Committee broadcast standard (ATSC 3.0) that enables public projects that improve the ability of remote rural areas to receive alerts and warnings.

Award Criteria: The Corporation for Public Broadcasting is the only awardee of the grant. Per the FY24 NOFO, the awardee will then manage a competitive process to solicit sub-grant applications from eligible subrecipients to use these funds in accordance with the requirements and priorities set forth in the NOFO.

### 32. Pre-Disaster Mitigation (42 U.S.C. § 5133)

Purpose: Makes federal funds available to state, local, tribal, and territorial governments to plan for and implement sustainable cost-effective measures designed to reduce the risk to individuals and property from future natural hazards, while also reducing reliance on federal funding from future disasters.

Award Criteria: The FY 2024 PDM Grant Program provided funding to projects identified in the 2024 DHS Appropriations Act's Joint Explanatory Statement (JES) in the table starting on page 59 entitled "Homeland Security Community Project Funding/Congressionally Directed Spending."

### 33. Safeguarding Tomorrow Through Ongoing Risk Mitigation Loan Fund Program (42 U.S.C. § 5135)

Purpose: Provides capitalization grants to states, eligible federally recognized tribal governments, territories and the District of Columbia to establish revolving loan funds that provide hazard mitigation assistance for local governments to reduce risks from natural hazards and disasters.

Award Criteria: Awards are based on eligibility criteria that are set by statute with funding allocations based on a statutory formula.

### 34. Staffing for Adequate Fire and Emergency Response (15 U.S.C. § 2229a)

Purpose: Financial assistance for increasing the number of firefighters to help communities meet industry standards and attain 24-hour staffing to provide adequate protection from fire and fire-related hazards.

Award Criteria: Competitive award program with statutorily mandated minimum application criteria and peer review.

### 35. State and Local Cybersecurity Grant Program (6 U.S.C. § 665g)

Purpose: To assist state, local, and territorial governments with managing and reducing systemic cyber risk.

Award Criteria: Mandatory, allocations to each state and territory based on statutory formula with the remainder to the states based on population.

**36. State Fire Training Systems Grants (15 U.S.C. § 2206(f))**

Purpose: To assist state fire service systems in providing training programs.

Award Criteria: Discretionary, no statutory award criteria.

**37. Tribal Cybersecurity Grant Program (6 U.S.C. § 665g)**

Purpose: To assist tribal governments with managing and reducing systemic cyber risk.

Award Criteria: Statutory requirement that the Secretary of DHS shall consult with the Secretary of the Interior and tribal governments in determining whether the grant would be competitive or allocated equally among the tribal governments of the federally recognized tribal nations.

**38. Tribal Homeland Security Grant Program (6 U.S.C. § 606)**

Purpose: Financial assistance to tribal governments to build and sustain capabilities related to preventing, preparing for, protecting against, and responding to acts of terrorism.

Award Criteria: Competitive award based on statutory criteria.

**39. Intercity Passenger Rail (6 U.S.C. § 1163)**

Purpose: To assist Amtrak in protecting critical surface transportation infrastructure and the traveling public from acts of terrorism and to increase the resilience of the Amtrak rail system.

Award Criteria: Sole source award to Amtrak. No funding is granted to states or local governments.

**Recommended Determination: Pending Review**

**1. Crisis Counseling Program (42 U.S.C. §§ 5121, et seq.)**

Purpose: Assistance to provide professional counseling services or training of disaster workers to survivors of major disasters to relieve mental health problems caused or aggravated by major disasters or their aftermath.

Award Criteria: Statutory and regulatory eligibility criteria.

**2. Disaster Case Management (42 U.S.C. §§ 5121, et seq.)**

Purpose: Case management services to survivors of major disasters to identify and address unmet needs.

Award Criteria: Statutory and regulatory eligibility criteria.

3. **Disaster Legal Services (DLS) (42 U.S.C. §§ 5121, et seq.)**

   <u>Purpose</u>: Provides confidential, free legal assistance to survivors who need legal help due to a major disaster, but who do not have the means to secure adequate legal services. For individuals seeking DLS, there is no formal application process. Individuals can access these services by contacting the phone number designated for the specific major disaster, which is established once the program has been authorized. In addition to this phone number, individuals can visit FEMA Disaster Recovery Centers where DLS attorneys may be physically located.

   <u>Award Criteria</u>: Statutory and regulatory eligibility criteria.

4. **Public Assistance – Non-Governmental Organizations (42 U.S.C. §§ 5121, et seq.)**

   <u>Purpose</u>: Financial Assistance to NGOs that perform essential community services for emergency work to ensure public safety, and for the repair, restoration, reconstruction, or replacement of an eligible facility damaged or destroyed by a major disaster.

   <u>Award Criteria</u>: Statutory and regulatory eligibility criteria.

5. **Public Assistance – Non-Congregate Sheltering (42 U.S.C. §§ 5121, et seq.)**

   <u>Purpose</u>: Financial Assistance to state, local, tribal and territorial governments for eligible sheltering expenses caused by a disaster.

   <u>Award Criteria</u>: Statutory and regulatory eligibility criteria.

6. **Emergency Food and Shelter Program (42 U.S.C. §§ 11331-11346)**

   <u>Purpose</u>: To supplement and expand ongoing efforts to provide shelter, food and supportive services for hungry and homeless people across the nation.

   <u>Award Criteria</u>: Mandatory, subaward determinations made by external board based on statutory criteria.

7. **Nonprofit Security Grant Program (6 U.S.C. § 609a)**

   <u>Purpose</u>: To assist non-profit organizations in target hardening and other physical security enhancements and activities.

   <u>Award Criteria</u>: By statute, only nonprofits that are located within a FEMA designated Urban Area for purposes of the Urban Area Security Initiative (UASI) program are eligible to apply for funding. The criteria for competitive award include a risk prioritization that is statutorily required, providing limited discretion to add grant conditions. There is no discernible connection between an award for a nonprofit organization and 8 U.S.C. §§ 1324(a)(1)(A)(ii)-(iv), 1373, and 1644 and the other criteria established in the S1 Memo.

**Recommended Determination: DHS Review**

1. **Emergency Management Performance Grant (6 U.S.C. § 762)**

   <u>Purpose</u>: To assist state, local, tribal, and territorial governments "in preparing for all hazards" and all phases of emergency management.

   <u>Award Criteria</u>: Mandatory, allocations to each state based on a statutory formula.

2. **State Homeland Security Grant Program (6 U.S.C. §§ 601 – 613)**

   <u>Purpose</u>: Assists states and local and tribal governments in building and sustaining capabilities related to preventing, preparing for, protecting against, and responding to acts of terrorism.

   <u>Award Criteria</u>: Statutory minimum allocation for each state with remaining awarded based on risk calculated using statutory criteria.

3. **Urban Area Security Initiative (6 U.S.C. §§ 601 – 613, DHS Appropriations Acts)**

   <u>Purpose</u>: Financial assistance to high-risk urban areas in building and sustaining capabilities related to preventing, preparing for, protecting against, and responding to acts of terrorism.

   <u>Award Criteria</u>: Awards based on risk calculated using statutorily required criteria. Discretion in determining how many high-risk urban areas shall receive funding through a State, but that discretion is often limited or guided by Congress through the annual appropriations process.

4. **Operation Stonegarden (6 U.S.C. §§ 601 – 613, DHS Appropriations Acts)**

   <u>Purpose</u>: Operation Stonegarden funds target expenditure by local governments for the purpose of border protection and border security.

   <u>Award Criteria</u>: Discretionary, competitive awards to states with 100% of funds sub-awarded to local law enforcement. The Department adopts the requirement for competition and criteria for award that is provided for in the legislative history of the appropriations act funding the program.

5. **Homeland Security National Training Program - Continuing Training Grants – Competitive (Annual DHS Appropriations Acts)**

   <u>Purpose</u>: To help training partners develop and deliver training to prepare whole communities to prevent, protect against, mitigate, respond to, and recover from acts of terrorism and natural, man-made, and technological hazards.

   <u>Award Criteria</u>: Discretionary, no statutory award criteria. Per the FY24 NOFO, the Joint Explanatory Statement accompanying the FY 2024 DHS Appropriations Act (Pub. L. No.

118-47) directs Continuing Training Grants to be competitively awarded for FEMA-certified rural and tribal training.

**6. Port Security Grant Program (46 U.S.C. § 70107)**

Purpose: Assistance to port authorities, facility operators, and state and local governments for maritime transportation infrastructure security.

Award Criteria: Statute requires that funds be allocated based on risk, but otherwise discretionary.

**7. Presidential Residence Protection Assistance Program (Annual DHS Appropriations Acts)**

Purpose: Provides funds to reimburse state and local enforcement agencies (LEAs) and emergency management agencies (EMAs) for extraordinary law enforcement or other emergency personnel costs incurred while protecting any non-governmental residence of the President that is designated or identified to be secured by the U.S. Secret Service.

**8. Regional Catastrophic Preparedness Grant Program. (Annual DHS Appropriations Acts)**

Purpose: Supports the building of core capabilities essential to achieving the National Preparedness Goal of a secure and resilient nation by providing resources to close known capability gaps in Housing and Logistics and Supply Chain Management, encouraging innovative regional solutions to issues related to catastrophic incidents, and building on existing regional efforts.

Award Criteria: Discretionary program with no statutory award criteria. This program is administered through a competitive selection process.

**9. Targeted Violence and Terrorism Prevention (6 U.S.C. § 112 (b)(2); Annual DHS Appropriations Acts)**

Purpose: To help prepare for, prevent and respond to emergent threats from violent extremism through planning, developing, implementing, or expanding educational outreach, community engagement, social service programs, training and exercises.

Award Criteria: Discretionary program with no statutory award criteria. This program is administered through a competitive selection process.

**10. Transit Security Grant Program (6 U.S.C. § 1135)**

Purpose: The purpose of the grant is to build and sustain transit agency security capabilities that protect national security.

Award Criteria: Discretionary, competitive awards based on statutory criteria that require prioritization of funding based on risk.

**Recommended Determination: DHS Review for Termination**

1. **Case Management Pilot Program (Annual DHS Appropriation Acts)**

   <u>Purpose:</u> Makes funds available to local governments and/or nonprofits to provide voluntary case management and other services to aliens in immigration removal proceedings.

   <u>Award Criteria:</u> Discretionary; the CMPP National Board makes funds available to local governments and/or nonprofits (subrecipients) to provide case management and culturally, trauma-informed, and linguistically responsive services to eligible noncitizens who affirmatively volunteer to participate in the program.

2. **Emergency Food and Shelter Program – Humanitarian (42 U.S.C. §§ 11331-11346)**

   <u>Purpose:</u> To provide shelter and other services to families and individuals encountered by the Department of Homeland Security.

   <u>Award Criteria</u>: Mandatory, subaward determinations made by external board based on statutory criteria.

3. **Shelter and Services Program. (Annual DHS Appropriations Acts)**

   <u>Purpose:</u> To provide funds to non-federal entities for sheltering and related activities to aliens following their release from DHS. The intent is to support Customs and Border Protection in the safe, orderly, and humane release of aliens from short-term holding facilities.

   <u>Award Criteria:</u> SSP-Competitive: Competitive grants made available to local governments, federally recognized tribal governments, nonprofit organizations, and states that serve aliens recently released from DHS custody to provide shelter, food, transportation, acute medical care, personal hygiene supplies, and case management services and to increase the non-federal entities capacity to shelter aliens recently released from DHS custody, including renovations and modifications to existing facilities.

   SSP-Allocated: Funding in the FY24 NOFO is allocated to eligible applicants listed in a table in the NOFO. The allocations were based on release and destination data received from CBP over the time period of July 1, 2023, to Dec. 31, 2023, along with operational information available to CBP.

# Exhibit H

# FY 2025 DHS STANDARD TERMS AND CONDITIONS

The Fiscal Year (FY) 2025 Department of Homeland Security (DHS) Standard Terms and Conditions apply to all new federal awards of federal financial assistance (federal awards) for which the federal award date occurs in FY 2025 and flow down to subrecipients unless a term or condition specifically indicates otherwise. For federal continuation awards made in subsequent FYs, the FY 2025 DHS Standard Terms and Conditions apply unless otherwise specified in the terms and conditions of the continuation awards. The United States has the right to seek judicial enforcement of these terms and conditions.

All legislation and digital resources are referenced with no digital links. These FY 2025 DHS Standard Terms and Conditions are maintained on the DHS website at https://www.dhs.gov/publication/dhs-standard-terms-and-conditions.

**A. <u>Assurance, Administrative Requirements, Cost Principles, Representations, and Certifications</u>**

    I.    Recipients must complete either the Office of Management and Budget (OMB) Standard Form 424B Assurances – Non- Construction Programs, or OMB Standard Form 424D Assurances – Construction Programs, as applicable. Certain assurances in these documents may not be applicable to your program and the DHS financial assistance office (DHS FAO) may require applicants to certify additional assurances. Applicants are required to fill out the assurances, as instructed.

**B. <u>General Acknowledgements and Assurances Recipients are required to follow the applicable provisions of the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards in effect as of the federal award date and located in Title 2, Code of Federal Regulations, Part 200 and adopted by DHS at 2 C.F.R. § 3002.10.</u>**

All recipients and subrecipients must acknowledge and agree to provide DHS access to records, accounts, documents, information, facilities, and staff pursuant to 2 C.F.R. § 200.337.

    I.    Recipients must cooperate with any DHS compliance reviews or compliance investigations.

    II.    Recipients must give DHS access to examine and copy records, accounts, and other documents and sources of information related to the federal award and permit access to facilities and personnel.

    III.    Recipients must submit timely, complete, and accurate reports to the appropriate DHS officials and maintain appropriate backup documentation to support the reports.

    IV.    Recipients must comply with all other special reporting, data collection, and evaluation requirements required by law, federal regulation, Notice of Funding Opportunity, federal award specific terms and conditions, and/or DHS Component program guidance. Organization costs related to data and evaluation are allowable. The definition of data and evaluation costs is in 2 C.F.R. § 200.455(c), the full text of which is incorporated by reference.

    V.    Recipients must complete DHS Form 3095 within 60 days of receipt of the Notice of Award for the first award under which this term applies. For further instructions and to access the form, please visit: https://www.dhs.gov/civil-rights-resources-recipients-dhs-financial-assistance.

**C. <u>Standard Terms & Conditions</u>**

    I.    <u>Acknowledgement of Federal Funding from DHS</u>

        Recipients must acknowledge their use of federal award funding when issuing statements, press releases, requests for proposal, bid invitations, and other documents describing projects or programs funded in whole or in part with federal

# FY 2025 DHS STANDARD TERMS AND CONDITIONS

award funds.

II.    <u>Activities Conducted Abroad</u>

Recipients must coordinate with appropriate government authorities when performing project activities outside the United States obtain all appropriate licenses, permits, or approvals.

III.    <u>*Age Discrimination Act of 1975*</u>

Recipients must comply with the requirements of the *Age Discrimination Act of 1975*, Pub. L. No. 94-135 (codified as amended at Title 42, U.S. Code § 6101 *et seq*.), which prohibits discrimination on the basis of age in any program or activity receiving federal financial assistance.

IV.    <u>*Americans with Disabilities Act of 1990*</u>

Recipients must comply with the requirements of Titles I, II, and III of the *Americans with Disabilities Act*, Pub. L. No. 101-336 (1990) (codified as amended at 42 U.S.C. §§ 12101– 12213), which prohibits recipients from discriminating on the basis of disability in the operation of public entities, public and private transportation systems, places of public accommodation, and certain testing entities.

V.    <u>Best Practices for Collection and Use of Personally Identifiable Information</u>

(1) Recipients who collect personally identifiable information (PII) as part of carrying out the scope of work under a federal award are required to have a publicly available privacy policy that describes standards on the usage and maintenance of the PII they collect.

(2) Definition. DHS defines "PII" as any information that permits the identity of an individual to be directly or indirectly inferred, including any information that is linked or linkable to that individual. Recipients may also find the DHS Privacy Impact Assessments: Privacy Guidance and Privacy Template as useful resources respectively.

VI.    <u>*CHIPS and Science Act of 2022*, Public Law 117-167 CHIPS</u>

(1) Recipients of DHS research and development (R&D) awards must report to the DHS Component research program office any finding or determination of sex-based and sexual harassment and/or an administrative or disciplinary action taken against principal investigators or co-investigators to be completed by an authorized organizational representative (AOR) at the recipient institution.

(2) Notification. An AOR must disclose the following information to agencies within 10 days of the date/the finding is made, or 10 days from when a recipient imposes an administrative action on the reported individual, whichever is sooner. Reports should include:

(a) Award number,

(b) Name of PI or Co-PI being reported,

(c) Awardee name,

(d) Awardee address,

(e) AOR name, title, phone, and email address,

(f) Indication of the report type:

# FY 2025 DHS STANDARD TERMS AND CONDITIONS

(i)   Finding or determination has been made that the reported individual violated awardee policies or codes of conduct, statutes, or regulations related to sexual harassment, sexual assault, or other forms of harassment, including the date that the finding was made.

(ii)   Imposition of an administrative or disciplinary action by the recipient on the reporting individual related to a finding/determination or an investigation of an alleged violation of recipient policy or codes of conduct, statutes, or regulations, or other forms of harassment.

(iii)   The date and nature of the administrative/disciplinary action, including a basic explanation or description of the event, which should not disclose personally identifiable information regarding any complaints or individuals involved. Any description provided must be consistent with the *Family Educational Rights in Privacy Act*.

(3)   Definitions.

(a)   An "authorized organizational representative (AOR)" is an administrative official who, on behalf of the proposing institution, is empowered to make certifications and representations and can commit the institution to the conduct of a project that an agency is being asked to support as well as adhere to various agency policies and award requirements.

(b)   "Principal investigators and co-principal investigators" are award personnel supported by a grant, cooperative agreement, or contract under Federal law.

(c)   A "reported individual" refers to recipient personnel who have been reported to a federal agency for potential sexual harassment violations.

(d)   "Sex based harassment" means a form of sex discrimination and includes harassment based on sex, sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity.

(e)   "Sexual harassment" means unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when this conduct explicitly or implicitly affects an individual's employment, unreasonably interferes with an individual's work performance, or creates an intimidating, hostile, or offensive work environment, whether such activity is carried out by a supervisor or by a co-worker, volunteer, or contractor.

VII.   *Civil Rights Act of 1964 – Title VI*

Recipients must comply with the requirements of Title VI of the *Civil Rights Act of 1964*, Pub. L. No. 88-352 (codified as amended at 42 U.S.C. § 2000d *et seq.*), which provides that no person in the United States will, on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance. DHS implementing regulations for the Act are found at 6 C.F.R. Part 21. Recipients of a federal award from the Federal Emergency Management Agency (FEMA) must also comply with FEMA's implementing regulations at 44 C.F.R. Part 7.

VIII.   *Civil Rights Act of 1968*

Recipients must comply with Title VIII of the *Civil Rights Act of 1968*, Pub. L. No. 90-284 (codified as amended at 42 U.S.C. § 3601 *et seq.*)  which prohibits recipients from discriminating in the sale, rental, financing, and advertising of dwellings, or in the provision of services in connection. therewith, on the basis of race, color, national

# FY 2025 DHS STANDARD TERMS AND CONDITIONS

origin, religion, disability, familial status, and sex, as implemented by the U.S. Department of Housing and Urban Development at 24 C.F.R. Part 100. The prohibition on disability discrimination includes the requirement that new multifamily housing with four or more dwelling units— i.e., the public and common use areas and individual apartment units (all units in buildings with elevators and ground-floor units in buildings without elevators)—be designed and constructed with certain accessible features. (See 24 C.F.R. Part 100, Subpart D.)

IX.   <u>Communication and Cooperation with the Department of Homeland Security and Immigration Officials</u>

(1)  All recipients and other recipients of funds under this award must agree that they will comply with the following requirements related to coordination and cooperation with the Department of Homeland Security and immigration officials:

(a)  They must comply with the requirements of 8 U.S.C. §§ 1373 and 1644. These statutes prohibit restrictions on information sharing by state and local government entities with DHS regarding the citizenship or immigration status, lawful or unlawful, of any individual. Additionally, 8 U.S.C. § 1373 prohibits any person or agency from prohibiting, or in any way restricting, a Federal, State, or local government entity from doing any of the following with respect to information regarding the immigration status of any individual: 1) sending such information to, or requesting or receiving such information from, Federal immigration officials; 2) maintaining such information; or 3) exchanging such information with any other Federal, State, or local government entity;

(b)  They must comply with other relevant laws related to immigration, including prohibitions on encouraging or inducing an alien to come to, enter, or reside in the United States in violation of law, 8 U.S.C. § 1324(a)(1)(A)(iv), prohibitions on transporting or moving illegal aliens, 8 U.S.C. § 1324(a)(1)(A)(ii), prohibitions on harboring, concealing, or shielding from detection illegal aliens, 8 U.S.C. § 1324(a)(1)(A)(iii), and any applicable conspiracy, aiding or abetting, or attempt liability regarding these statutes;

(c)  That they will honor requests for cooperation, such as participation in joint operations, sharing of information, or requests for short term detention of an alien pursuant to a valid detainer. A jurisdiction does not fail to comply with this requirement merely because it lacks the necessary resources to assist in a particular instance;

(d)  That they will provide access to detainees, such as when an immigration officer seeks to interview a person who might be a removable alien; and

(e)  That they will not leak or otherwise publicize the existence of an immigration enforcement operation.

(2)  The recipient must certify under penalty of perjury pursuant to 28 U.S.C. § 1746 and using a form that is acceptable to DHS, that it will comply with the requirements of this term. Additionally, the recipient agrees that it will require any subrecipients or contractors to certify in the same manner that they will comply with this term prior to providing them with any funding under this award.

(3)  The recipient agrees that compliance with this term is material to the Government's decision to make or continue with this award and that the Department of homeland Security may terminate this grant, or take any other allowable enforcement action, if the recipient fails to comply with this term.

# FY 2025 DHS STANDARD TERMS AND CONDITIONS

X.    Copyright

Recipients must affix the applicable copyright notices of 17 U.S.C. §§ 401 or 402 to any work first produced under federal awards and also include an acknowledgement that the work was produced under a federal award (including the federal award number and federal awarding agency). As detailed in 2 C.F.R. § 200.315, a federal awarding agency reserves a royalty-free, nonexclusive, and irrevocable right to reproduce, publish, or otherwise use the work for federal purposes and to authorize others to do so.

XI.    Debarment and Suspension

Recipients must comply with the non-procurement debarment and suspension regulations implementing Executive Orders 12549 and 12689 set forth at 2 C.F.R. Part 180 as implemented by DHS at 2 C.F.R. Part 3000.  These regulations prohibit recipients from entering into covered transactions (such as subawards and contracts) with certain parties that are debarred, suspended, or otherwise excluded from or ineligible for participation in federal assistance programs or activities.

XII.    Drug-Free Workplace Regulations

Recipients must comply with drug-free workplace requirements in Subpart B (or Subpart C, if the recipient is an individual) of 2 C.F.R. Part 3001, which adopts the Government- wide implementation (2 C.F.R. Part 182) of the *Drug-Free Workplace Act of 1988* (41 U.S.C. §§ 8101-8106).

XIII.    Duplicative Costs

Recipients are prohibited from charging any cost to this federal award that will be included as a cost or used to meet cost sharing requirements of any other federal award in either the current or a prior budget period. See 2 C.F.R. § 200.403(f). However, recipients may shift costs that are allowable under two or more federal awards where otherwise permitted by federal statutes, regulations, or the federal award terms and conditions.

XIV.    Education Amendments of 1972 (*Equal Opportunity in Education Act*) – Title IX

Recipients must comply with the requirements of Title IX of the Education Amendments of 1972, Pub. L. No. 92-318 (codified as amended at 20 U.S.C. § 1681 *et seq.*), which provide that no person in the United States will, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving federal financial assistance.  DHS implementing regulations are codified at 6 C.F.R. Part 17. Recipients of a federal award from the Federal Emergency Management Agency (FEMA) must also comply with FEMA's implementing regulations at 44 C.F.R. Part 19.

XV.    *Energy Policy and Conservation Act*

Recipients must comply with the requirements of the *Energy Policy and Conservation Act*, Pub. L. No. 94-163 (1975) (codified as amended at 42 U.S.C. § 6201 *et seq.*), which contain policies relating to energy efficiency that are defined in the state energy conservation plan issued in compliance with this Act.

XVI.    Equal Treatment of Faith-Based Organizations

It is DHS policy to ensure the equal treatment of faith-based organizations in social service programs administered or supported by DHS or its component agencies, enabling those organizations to participate in providing important social services to beneficiaries.

Recipients must comply with the equal treatment policies and requirements contained in 6 C.F.R. Part 19 and other applicable statutes, regulations, and guidance governing the participations of faith-based organizations in individual DHS programs.

# FY 2025 DHS STANDARD TERMS AND CONDITIONS

XVII.    Anti-Discrimination

Recipients must comply with all applicable Federal anti-discrimination laws material to the government's payment decisions for purposes of 31 U.S.C. § 372(b)(4).

(1) Definitions. As used in this clause –

(a) DEI means "diversity, equity, and inclusion."

(b) DEIA means "diversity, equity, inclusion, and accessibility."

(c) Discriminatory equity ideology has the meaning set forth in Section 2(b) of Executive Order 14190 of January 29, 2025.

(d) Discriminatory prohibited boycott means refusing to deal, cutting commercial relations, or otherwise limiting commercial relations specifically with Israeli companies or with companies doing business in or with Israel or authorized by, licensed by, or organized under the laws of Israel to do business.

(e) Federal anti-discrimination laws means Federal civil rights law that protect individual Americans from discrimination on the basis of race, color, sex, religion, and national origin.

(2)  Grant award certification.

(a)  By accepting the grant award, recipients are certifying that:

(i)    They do not, and will not during the term of this financial assistance award, operate any programs that advance or promote DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws; and

(ii)   They do not engage in, and will not during the term of this award engage in, a discriminatory prohibited boycott.

(3) DHS reserves the right to terminate financial assistance awards and claw back all funds if the recipients, during the term of this award, operate any program in violation of Federal anti-discriminatory laws or engages in a discriminatory prohibited boycott.

XVIII.    *False Claims Act* and Program Fraud Civil Remedies

Recipients must comply with the requirements of the *False Claims Act*, 31 U.S.C. §§ 3729- 3733, which prohibit the submission of false or fraudulent claims for payment to the Federal Government.  (See 31 U.S.C. §§ 3801-3812, which details the administrative remedies for false claims and statements made.)

XIX.    Federal Debt Status

All recipients are required to be non-delinquent in their repayment of any federal debt. Examples of relevant debt include delinquent payroll and other taxes, audit disallowances, and benefit overpayments. See OMB Circular A-129.

XX.    Federal Leadership on Reducing Text Messaging While Driving

Recipients are encouraged to adopt and enforce policies that ban text messaging while driving recipient-owned, recipient-rented, or privately owned vehicles when on official government business or when performing any work for or on behalf of the Federal Government. Recipients are also encouraged to conduct the initiatives of the type described in Section 3(a) of Executive Order 13513.

XXI.    *Fly America Act of 1974*

Recipients must comply with Preference for U.S. Flag Air Carriers (a list of certified air carriers can be found at: Certificated Air Carriers List | US Department of Transportation, https://www.transportation.gov/policy/aviation-policy/certificated-air-carriers-list)for international air transportation of people and property to the extent that such service is available, in accordance with the *International Air Transportation*

# FY 2025 DHS STANDARD TERMS AND CONDITIONS

*Fair Competitive Practices Act of 1974*, 49 U.S.C. § 40118, and the interpretative guidelines issued by the Comptroller General of the United States in the March 31, 1981, amendment to Comptroller General Decision B-138942.

XXII.   *Hotel and Motel Fire Safety Act of 1990*

Recipients must ensure that all conference, meeting, convention, or training space funded entirely or in part by federal award funds complies with the fire prevention and control guidelines of Section 6 of the *Hotel and Motel Fire Safety Act of 1990*, 15 U.S.C. § 2225a.

XXIII.   *John S. McCain National Defense Authorization Act of Fiscal Year 2019*

Recipients, subrecipients, and their contractors and subcontractors are subject to the prohibitions described in section 889 of the *John S. McCain National Defense Authorization Act for Fiscal Year 2019*, Pub. L. No. 115-232 (2018) and 2 C.F.R. §§ 200.216, 200.327, 200.471, and Appendix II to 2 C.F.R. Part 200. The statute – as it applies to DHS recipients, subrecipients, and their contractors and subcontractors – prohibits obligating or expending federal award funds on certain telecommunications and video surveillance products and contracting with certain entities for national security reasons.

XXIV.   Limited English Proficiency (*Civil Rights Act of 1964, Title VI*)

Recipients must comply with Title VI of the *Civil Rights Act of 1964* (42 U.S.C. § 2000d *et seq.*) prohibition against discrimination on the basis of national origin, which requires that recipients of federal financial assistance take reasonable steps to provide meaningful access to persons with limited English proficiency (LEP) to their programs and services. For additional assistance and information regarding language access obligations, please refer to the DHS Recipient Guidance: https://www.dhs.gov/guidance-published-help- department-supported-organizations-provide-meaningful-access-people-limited and additional resources on http://www.lep.gov.

XXV.   Lobbying Prohibitions

Recipients must comply with 31 U.S.C. § 1352 and 6 C.F.R. Part 9, which provide that none of the funds provided under a federal award may be expended by the recipient to pay any person to influence, or attempt to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with any federal action related to a federal award or contract, including any extension, continuation, renewal, amendment, or modification. Per 6 C.F.R. Part 9, recipients must file a lobbying certification form as described in Appendix A to 6 C.F.R. Part 9 or available on Grants.gov as the Grants.gov Lobbying Form and file a lobbying disclosure form as described in Appendix B to 6 C.F.R. Part 9 or available on Grants.gov as the Disclosure of Lobbying Activities (SF-LLL).

XXVI.   *National Environmental Policy Act*

Recipients must comply with the requirements of the *National Environmental Policy Act of 1969*, Pub. L. No. 91-190 (1970) (codified as amended at 42 U.S.C. § 4321 *et seq.*) (NEPA) and the Council on Environmental Quality (CEQ) Regulations for Implementing the Procedural Provisions of NEPA, which require recipients to use all practicable means within their authority, and consistent with other essential considerations of national policy, to create and maintain conditions under which people and nature can exist in productive harmony and fulfill the social, economic, and other needs of present and future generations of Americans.

XXVII.   National Security Presidential Memorandum-33 (NSPM-33) and provisions of the CHIPS and

# FY 2025 DHS STANDARD TERMS AND CONDITIONS

Science Act of 2022, Pub. L. 117-167, Section 10254

(1) Recipient research institutions ("covered institutions") must comply with the requirements in NSPM-33 and provisions of Pub. L.117-167, Section 10254 (codified at 42 U.S.C. § 18951) certifying that the institution has established and operates a research security program that includes elements relating to:

    (a) cybersecurity;

    (b) foreign travel security;

    (c) research security training; and

    (d) export control training, as appropriate.

(2) Definition. "Covered institutions" means recipient research institutions receiving federal Research and Development (R&D) science and engineering support "in excess of $50 million per year."

XXVIII.    Non-Supplanting Requirement

Recipients of federal awards under programs that prohibit supplanting by law must ensure that federal funds supplement but do not supplant non-federal funds that, in the absence of such federal funds, would otherwise have been made available for the same purpose.

XXIX.    Notice of Funding Opportunity Requirements

All the instructions, guidance, limitations, scope of work, and other conditions set forth in the Notice of Funding Opportunity (NOFO) for this federal award are incorporated by reference. All recipients must comply with any such requirements set forth in the NOFO. If a condition of the NOFO is inconsistent with these terms and conditions and any such terms of the federal award, the condition in the NOFO shall be invalid to the extent of the inconsistency. The remainder of that condition and all other conditions set forth in the NOFO shall remain in effect.

XXX.    Patents and Intellectual Property Rights

Recipients are subject to the *Bayh-Dole Act*, 35 U.S.C. § 200 *et seq*. and applicable regulations governing inventions and patents, including the regulations issued by the Department of Commerce at 37 C.F.R. Part 401 (Rights to Inventions Made by Nonprofit Organizations and Small Business Firms under Government Awards, Contracts, and Cooperative Agreements) and the standard patent rights clause set forth at 37 C.F.R. § 401.14.

XXXI.    Presidential Executive Orders

Recipients must comply with the requirements of Presidential Executive Orders related to grants (also known as federal assistance and financial assistance), the full text of which are incorporated by reference.

XXXII.    Procurement of Recovered Materials

States, political subdivisions of states, and their contractors must comply with Section 6002 of the *Solid Waste Disposal Act*, Pub. L. No. 89-272 (1965) (codified as amended by the *Resource Conservation and Recovery Act* at 42 U.S.C. § 6962) and 2 C.F.R. § 200.323. The requirements of Section 6002 include procuring only items designated in guidelines of the Environmental Protection Agency (EPA) at 40 C.F.R. Part 247 that contain the highest percentage of recovered materials practicable, consistent with maintaining a satisfactory level of competition.

XXXIII.    *Rehabilitation Act of 1973*

Recipients must comply with the requirements of Section 504 of the *Rehabilitation Act of 1973*, Pub. L. No. 93-112 (codified as amended at 29 U.S.C. § 794), which provides that no otherwise qualified handicapped individuals in the United States

# FY 2025 DHS STANDARD TERMS AND CONDITIONS

will, solely by reason of the handicap, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance.

XXXIV.    <u>Reporting Recipient Integrity and Performance Matters</u>

If the total value of any currently active grants, cooperative agreements, and procurement contracts from all federal awarding agencies exceeds $10,000,000 for any period of time during the period of performance of the federal award, then the recipient must comply with the requirements set forth in the government-wide federal award term and condition for Recipient Integrity and Performance Matters is in 2 C.F.R. Part 200, Appendix XII, the full text of which is incorporated by reference.

XXXV.    <u>Reporting Subawards and Executive Compensation</u>

For federal awards that total or exceed $30,000, recipients are required to comply with the requirements set forth in the government-wide federal award term and condition on Reporting Subawards and Executive Compensation set forth at 2 C.F.R. Part 170, Appendix A, the full text of which is incorporated by reference.

XXXVI.    <u>Required Use of American Iron, Steel, Manufactured Products, and Construction Materials</u>

(1) Recipients of a federal award from a financial assistance program that provides funding for infrastructure are hereby notified that none of the funds provided under this federal award may be used for a project for infrastructure unless:

(a) all iron and steel used in the project are produced in the United States—this means all manufacturing processes, from the initial melting stage through the application of coatings, occurred in the United States;

(b) all manufactured products used in the project are produced in the United States—this means the manufactured product was manufactured in the United States; and the cost of the components of the manufactured product that are mined, produced, or manufactured in the United States is greater than 55 percent of the total cost of all components of the manufactured product, unless another standard for determining the minimum amount of domestic content of the manufactured product has been established under applicable law or regulation; and

(c) all construction materials are manufactured in the United States—this means that all manufacturing processes for the construction material occurred in the United States.

(2) The Buy America preference only applies to articles, materials, and supplies that are consumed in, incorporated into, or affixed to an infrastructure project. As such, it does not apply to tools, equipment, and supplies, such as temporary scaffolding, brought to the construction site and removed at or before the completion of the infrastructure project. Nor does a Buy America preference apply to equipment and furnishings, such as movable chairs, desks, and portable computer equipment, that are used at or within the finished infrastructure project but are not an integral part of the structure or permanently affixed to the infrastructure project.

(3) *Waivers*

When necessary, recipients may apply for, and the agency may grant, a waiver from these requirements. The agency should notify the recipient for information on the process for requesting a waiver from these requirements.

# FY 2025 DHS STANDARD TERMS AND CONDITIONS

(a) When the Federal agency has determined that one of the following exceptions applies, the federal awarding official may waive the application of the domestic content procurement preference in any case in which the agency determines that:

   (i) applying the domestic content procurement preference would be inconsistent with the public interest;

   (ii) the types of iron, steel, manufactured products, or construction materials are not produced in the United States in sufficient and reasonably available quantities or of a satisfactory quality; or

   (iii) the inclusion of iron, steel, manufactured products, or construction materials produced in the United States will increase the cost of the overall project by more than 25 percent.

(b) A request to waive the application of the domestic content procurement preference must be in writing. The agency will provide instructions on the format, contents, and supporting materials required for any waiver request. Waiver requests are subject to public comment periods of no less than 15 days and must be reviewed by the Made in America Office.

(c) There may be instances where a federal award qualifies, in whole or in part, for an existing waiver described at "Buy America" Preference in FEMA Financial Assistance Programs for Infrastructure | FEMA.gov.

(4) *Definitions*. The definitions applicable to this term are set forth at 2 C.F.R. § 184.3, the full text of which is incorporated by reference.

XXXVII. <u>SAFECOM</u>

Recipients receiving federal awards made under programs that provide emergency communication equipment and its related activities must comply with the SAFECOM Guidance for Emergency Communication Grants, including provisions on technical standards that ensure and enhance interoperable communications. The SAFECOM Guidance is updated annually and can be found at Funding and Sustainment | CISA.

XXXVIII. <u>Subrecipient Monitoring and Management</u>

Pass-through entities must comply with the requirements for subrecipient monitoring and management as set forth in 2 C.F.R. §§ 200.331-333.

XXXIX. <u>System for Award Management and Unique Entity Identifier Requirements</u>

Recipients are required to comply with the requirements set forth in the government-wide federal award term and condition regarding the System for Award Management and Unique Entity Identifier Requirements in 2 C.F.R. Part 25, Appendix A, the full text of which is incorporated reference.

XL. <u>Termination of a Federal Award</u>

(1) By DHS. DHS may terminate a federal award, in whole or in part, for the following reasons:

   (a) If the recipient fails to comply with the terms and conditions of the federal award;

   (b) With the consent of the recipient, in which case the parties must agree

# FY 2025 DHS STANDARD TERMS AND CONDITIONS

upon the termination conditions, including the effective date, and in the case of partial termination, the portion to be terminated; or

(c) Pursuant to the terms and conditions of the federal award, including, to the extent authorized by law, if the federal award no longer effectuates the program goals or agency priorities.

(3) By the Recipient. The recipient may terminate the federal award, in whole or in part, by sending written notification to DHS stating the reasons for such termination, the effective date, and in the case of partial termination, the portion to be terminated. However, if DHS determines that the remaining portion of the federal award will not accomplish the purposes for which the federal award was made, DHS may terminate the federal award in its entirety.

(4) Notice. Either party will provide written notice of intent to terminate for any reason to the other party no less than 30 calendar days prior to the effective date of the termination.

(5) Compliance with Closeout Requirements for Terminated Awards. The recipient must continue to comply with closeout requirements in 2 C.F.R. §§ 200.344-200.345 after an award is terminated.

XLI.    <u>Terrorist Financing</u>

Recipients must comply with Executive Order 13224 and applicable statutory prohibitions on transactions with, and the provisions of resources and support to, individuals and organizations associated with terrorism. Recipients are legally responsible for ensuring compliance with the Executive Order and laws.

XLII.    <u>Trafficking Victims Protection Act of 2000(TVPA)</u>

Recipients must comply with the requirements of the government-wide federal award term and condition which implements Trafficking Victims Protection Act of 2000, Pub. L. No. 106-386, § 106 (codified as amended at 22 U.S.C. § 7104). The federal award term and condition is in 2 C.F.R. § 175.105, the full text of which is incorporated by reference.

XLIII.    *<u>Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT) Act of 2001, Pub. L. 107-56</u>*

Recipients must comply with the requirements of Pub. L. 107-56, Section 817 of the USA PATRIOT Act, which amends 18 U.S.C. §§ 175–175c.

XLIV.    <u>Use of DHS Seal, Logo and Flags</u>

Recipients must obtain written permission from DHS prior to using the DHS seals, logos, crests, or reproductions of flags, or likenesses of DHS agency officials. This includes use of DHS component (e.g., FEMA, CISA, etc.) seals, logos, crests, or reproductions of flags, or likenesses of component officials.

XLV.    *<u>Whistleblower Protection Act</u>*

Recipients must comply with the statutory requirements for whistleblower protections in 10 U.S.C § 470141 U.S.C. § 4712.

# Exhibit I

# FY 2025 DHS STANDARD TERMS AND CONDITIONS

The Fiscal Year (FY) 2025 Department of Homeland Security (DHS) Standard Terms and Conditions apply to all new federal awards of federal financial assistance (federal awards) for which the federal award date occurs in FY 2025 and flow down to subrecipients unless a term or condition specifically indicates otherwise. For federal continuation awards made in subsequent FYs, the FY 2025 DHS Standard Terms and Conditions apply unless otherwise specified in the terms and conditions of the continuation awards. The United States has the right to seek judicial enforcement of these terms and conditions.

All legislation and digital resources are referenced with no digital links. These FY 2025 DHS Standard Terms and Conditions are maintained on the DHS website at https://www.dhs.gov/publication/dhs-standard-terms-and-conditions.

**A. Assurance, Administrative Requirements, Cost Principles, Representations, and Certifications**

    I.    Recipients must complete either the Office of Management and Budget (OMB) Standard Form 424B Assurances – Non- Construction Programs, or OMB Standard Form 424D Assurances – Construction Programs, as applicable. Certain assurances in these documents may not be applicable to your program and the DHS financial assistance office (DHS FAO) may require applicants to certify additional assurances. Applicants are required to fill out the assurances, as instructed.

**B. General Acknowledgements and Assurances Recipients are required to follow the applicable provisions of the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards in effect as of the federal award date and located in Title 2, Code of Federal Regulations, Part 200 and adopted by DHS at 2 C.F.R. § 3002.10.**

All recipients and subrecipients must acknowledge and agree to provide DHS access to records, accounts, documents, information, facilities, and staff pursuant to 2 C.F.R. § 200.337.

    I.    Recipients must cooperate with any DHS compliance reviews or compliance investigations.

    II.    Recipients must give DHS access to examine and copy records, accounts, and other documents and sources of information related to the federal award and permit access to facilities and personnel.

    III.    Recipients must submit timely, complete, and accurate reports to the appropriate DHS officials and maintain appropriate backup documentation to support the reports.

    IV.    Recipients must comply with all other special reporting, data collection, and evaluation requirements required by law, federal regulation, Notice of Funding Opportunity, federal award specific terms and conditions, and/or DHS Component program guidance. Organization costs related to data and evaluation are allowable. The definition of data and evaluation costs is in 2 C.F.R. § 200.455(c), the full text of which is incorporated by reference.

    V.    Recipients must complete DHS Form 3095 within 60 days of receipt of the Notice of Award for the first award under which this term applies. For further instructions and to access the form, please visit: https://www.dhs.gov/civil-rightsresources-recipients-dhs-financial-assistance.

# FY 2025 DHS STANDARD TERMS AND CONDITIONS

C. <u>Standard Terms & Conditions</u>

    I.   <u>Acknowledgement of Federal Funding from DHS</u>

       Recipients must acknowledge their use of federal award funding when issuing statements, press releases, requests for proposal, bid invitations, and other documents describing projects or programs funded in whole or in part with federal award funds.

    II.   <u>Activities Conducted Abroad</u>

       Recipients must coordinate with appropriate government authorities when performing project activities outside the United States obtain all appropriate licenses, permits, or approvals.

    III.   <u>*Age Discrimination Act of 1975*</u>

       Recipients must comply with the requirements of the *Age Discrimination Act of 1975*, Pub. L. No. 94-135 (codified as amended at Title 42, U.S. Code § 6101 *et seq.*), which prohibits discrimination on the basis of age in any program or activity receiving federal financial assistance.

    IV.   <u>*Americans with Disabilities Act of 1990*</u>

       Recipients must comply with the requirements of Titles I, II, and III of the *Americans with Disabilities Act*, Pub. L. No. 101-336 (1990) (codified as amended at 42 U.S.C. §§ 12101– 12213), which prohibits recipients from discriminating on the basis of disability in the operation of public entities, public and private transportation systems, places of public accommodation, and certain testing entities.

    V.   <u>Best Practices for Collection and Use of Personally Identifiable Information</u>

       (1)  Recipients who collect personally identifiable information (PII) as part of carrying out the scope of work under a federal award are required to have a publicly available privacy policy that describes standards on the usage and maintenance of the PII they collect.

       (2)  Definition. DHS defines "PII" as any information that permits the identity of an individual to be directly or indirectly inferred, including any information that is linked or linkable to that individual. Recipients may also find the DHS Privacy Impact Assessments: Privacy Guidance and Privacy Template as useful resources respectively.

    VI.   <u>*CHIPS and Science Act of 2022*, Public Law 117-167 CHIPS</u>

       (1)  Recipients of DHS research and development (R&D) awards must report to the DHS Component research program office any finding or determination of sex based and sexual harassment and/or an administrative or disciplinary action taken against principal investigators or co-investigators to be completed by an authorized organizational representative (AOR) at the recipient institution.

       (2)  Notification. An AOR must disclose the following information to agencies within 10 days of the date/the finding is made, or 10 days from when a recipient imposes an administrative action on the reported individual, whichever is sooner. Reports should include:

          (a)  Award number,

          (b)  Name of PI or Co-PI being reported,

# FY 2025 DHS STANDARD TERMS AND CONDITIONS

(c) Awardee name,

(d) Awardee address,

(e) AOR name, title, phone, and email address,

(f) Indication of the report type:
  (i) Finding or determination has been made that the reported individual violated awardee policies or codes of conduct, statutes, or regulations related to sexual harassment, sexual assault, or other forms of harassment, including the date that the finding was made.

  (ii) Imposition of an administrative or disciplinary action by the recipient on the reporting individual related to a finding/determination or an investigation of an alleged violation of recipient policy or codes of conduct, statutes, or regulations, or other forms of harassment.

  (iii) The date and nature of the administrative/disciplinary action, including a basic explanation or description of the event, which should not disclose personally identifiable information regarding any complaints or individuals involved. Any description provided must be consistent with the *Family Educational Rights in Privacy Act*.

(3) Definitions.

(a) An "authorized organizational representative (AOR)" is an administrative official who, on behalf of the proposing institution, is empowered to make certifications and representations and can commit the institution to the conduct of a project that an agency is being asked to support as well as adhere to various agency policies and award requirements.

(b) "Principal investigators and co-principal investigators" are award personnel supported by a grant, cooperative agreement, or contract under Federal law.

(c) A "reported individual" refers to recipient personnel who have been reported to a federal agency for potential sexual harassment violations.

(d) "Sex based harassment" means a form of sex discrimination and includes harassment based on sex, sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity.

(e) "Sexual harassment" means unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when this conduct explicitly or implicitly affects an individual's employment, unreasonably interferes with an individual's work performance, or creates an intimidating, hostile, or offensive work environment, whether such activity is carried out by a supervisor or by a co-worker, volunteer, or contractor.

VII. _Civil Rights Act of 1964 – Title VI_

Recipients must comply with the requirements of Title VI of the *Civil Rights Act of 1964*, Pub. L. No. 88-352 (codified as amended at 42 U.S.C. § 2000d *et seq.*), which provides that no person in the United States will, on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance. DHS

# FY 2025 DHS STANDARD TERMS AND CONDITIONS

implementing regulations for the Act are found at 6 C.F.R. Part 21. Recipients of a federal award from the Federal Emergency Management Agency (FEMA) must also comply with FEMA's implementing regulations at 44 C.F.R. Part 7.

VIII.    <u>Civil Rights Act of 1968</u>

Recipients must comply with Title VIII of the *Civil Rights Act of 1968*, Pub. L. No. 90284 (codified as amended at 42 U.S.C. § 3601 *et seq.*) which prohibits recipients from discriminating in the sale, rental, financing, and advertising of dwellings, or in the provision of services in connection. therewith, on the basis of race, color, national origin, religion, disability, familial status, and sex, as implemented by the U.S. Department of Housing and Urban Development at 24 C.F.R. Part 100. The prohibition on disability discrimination includes the requirement that new multifamily housing with four or more dwelling units— i.e., the public and common use areas and individual apartment units (all units in buildings with elevators and ground-floor units in buildings without elevators)—be designed and constructed with certain accessible features. (See 24 C.F.R. Part 100, Subpart D.)

IX.    <u>Communication and Cooperation with the Department of Homeland Security and Immigration Officials</u>

(1)    All recipients and other recipients of funds under this award must agree that they will comply with the following requirements related to coordination and cooperation with the Department of Homeland Security and immigration officials:

(a)    They must comply with the requirements of 8 U.S.C. §§ 1373 and 1644. These statutes prohibit restrictions on information sharing by state and local government entities with DHS regarding the citizenship or immigration status, lawful or unlawful, of any individual. Additionally, 8 U.S.C. § 1373 prohibits any person or agency from prohibiting, or in any way restricting, a Federal, State, or local government entity from doing any of the following with respect to information regarding the immigration status of any individual: 1) sending such information to, or requesting or receiving such information from, Federal immigration officials; 2) maintaining such information; or 3) exchanging such information with any other Federal, State, or local government entity;

(b)    They must comply with other relevant laws related to immigration, including prohibitions on encouraging or inducing an alien to come to, enter, or reside in the United States in violation of law, 8 U.S.C. § 1324(a)(1)(A)(iv), prohibitions on transporting or moving illegal aliens, 8 U.S.C. § 1324(a)(1)(A)(ii), prohibitions on harboring, concealing, or shielding from detection illegal aliens, 8 U.S.C. § 1324(a)(1)(A)(iii), and any applicable conspiracy, aiding or abetting, or attempt liability regarding these statutes;

(c)    That they will honor requests for cooperation, such as participation in joint operations, sharing of information, or requests for short term detention of an alien pursuant to a valid detainer. A jurisdiction does not fail to comply with this requirement merely because it lacks the necessary resources to assist in a particular instance;

(d)    That they will provide access to detainees, such as when an immigration officer seeks to interview a person who might be a removable alien; and

(e)    That they will not leak or otherwise publicize the existence of an immigration enforcement operation.

# FY 2025 DHS STANDARD TERMS AND CONDITIONS

(2) The recipient must certify under penalty of perjury pursuant to 28 U.S.C. § 1746 and using a form that is acceptable to DHS, that it will comply with the requirements of this term. Additionally, the recipient agrees that it will require any subrecipients or contractors to certify in the same manner that they will comply with this term prior to providing them with any funding under this award.

(3) The recipient agrees that compliance with this term is material to the Government's decision to make or continue with this award and that the Department of homeland Security may terminate this grant, or take any other allowable enforcement action, if the recipient fails to comply with this term.

X. <u>Copyright</u>

Recipients must affix the applicable copyright notices of 17 U.S.C. §§ 401 or 402 to any work first produced under federal awards and also include an acknowledgement that the work was produced under a federal award (including the federal award number and federal awarding agency). As detailed in 2 C.F.R. § 200.315, a federal awarding agency reserves a royalty-free, nonexclusive, and irrevocable right to reproduce, publish, or otherwise use the work for federal purposes and to authorize others to do so.

XI. <u>Debarment and Suspension</u>

Recipients must comply with the non-procurement debarment and suspension regulations implementing Executive Orders 12549 and 12689 set forth at 2 C.F.R. Part 180 as implemented by DHS at 2 C.F.R. Part 3000. These regulations prohibit recipients from entering into covered transactions (such as subawards and contracts) with certain parties that are debarred, suspended, or otherwise excluded from or ineligible for participation in federal assistance programs or activities.

XII. <u>Drug-Free Workplace Regulations</u>

Recipients must comply with drug-free workplace requirements in Subpart B (or Subpart C, if the recipient is an individual) of 2 C.F.R. Part 3001, which adopts the Government- wide implementation (2 C.F.R. Part 182) of the *Drug-Free Workplace Act of 1988* (41 U.S.C. §§ 8101-8106).

XIII. <u>Duplicative Costs</u>

Recipients are prohibited from charging any cost to this federal award that will be included as a cost or used to meet cost sharing requirements of any other federal award in either the current or a prior budget period. See 2 C.F.R. § 200.403(f). However, recipients may shift costs that are allowable under two or more federal awards where otherwise permitted by federal statutes, regulations, or the federal award terms and conditions.

XIV. <u>Education Amendments of 1972 (*Equal Opportunity in Education Act*) – Title IX</u>

Recipients must comply with the requirements of Title IX of the Education Amendments of 1972, Pub. L. No. 92-318 (codified as amended at 20 U.S.C. § 1681 *et seq.*), which provide that no person in the United States will, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving federal financial assistance. DHS implementing regulations are codified at 6 C.F.R. Part 17. Recipients of a federal award from the Federal Emergency Management Agency (FEMA) must also comply with FEMA's implementing regulations at 44 C.F.R. Part 19.

# FY 2025 DHS STANDARD TERMS AND CONDITIONS

XV.   *Energy Policy and Conservation Act*

Recipients must comply with the requirements of the *Energy Policy and Conservation Act*, Pub. L. No. 94-163 (1975) (codified as amended at 42 U.S.C. § 6201 *et seq.*), which contain policies relating to energy efficiency that are defined in the state energy conservation plan issued in compliance with this Act.

XVI.   Equal Treatment of Faith-Based Organizations

It is DHS policy to ensure the equal treatment of faith-based organizations in social service programs administered or supported by DHS or its component agencies, enabling those organizations to participate in providing important social services to beneficiaries.

Recipients must comply with the equal treatment policies and requirements contained in 6 C.F.R. Part 19 and other applicable statutes, regulations, and guidance governing the participations of faith-based organizations in individual DHS programs.

XVII.   Anti-Discrimination

Recipients must comply with all applicable Federal anti-discrimination laws material to the government's payment decisions for purposes of 31 U.S.C. § 372(b)(4).

(1)  Definitions. As used in this clause –

  (a)  DEI means "diversity, equity, and inclusion."

  (b)  DEIA means "diversity, equity, inclusion, and accessibility."

  (c)  Discriminatory equity ideology has the meaning set forth in Section 2(b) of Executive Order 14190 of January 29, 2025.

  (d)  Discriminatory prohibited boycott means refusing to deal, cutting commercial relations, or otherwise limiting commercial relations specifically with Israeli companies or with companies doing business in or with Israel or authorized by, licensed by, or organized under the laws of Israel to do business.

  (e)  Federal anti-discrimination laws mean Federal civil rights law that protect individual Americans from discrimination on the basis of race, color, sex, religion, and national origin.

  (f)  Illegal immigrant means any alien, as defined in 8 U.S.C. § 1101(a)(3), who has no lawful immigration status in the United States.

(2)  Grant award certification.

  (a)  By accepting the grant award, recipients are certifying that:

    (i)  They do not, and will not during the term of this financial assistance award, operate any programs that advance or promote DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws; and

    (ii)  They do not engage in and will not during the term of this award engage in, a discriminatory prohibited boycott.

    (iii)  They do not, and will not during the term of this award, operate any program that benefits illegal immigrants or incentivizes illegal immigration.

(3)  DHS reserves the right to suspend payments in whole or in part and/or terminate financial assistance awards if the Secretary of Homeland Security or her designee determines that the recipient has violated any provision of subsection (2)..

# FY 2025 DHS STANDARD TERMS AND CONDITIONS

(4) Upon suspension or termination under subsection (3), all funds received by the recipient shall be deemed to be in excess of the amount that the recipient is determined to be entitled to under the Federal award for purposes of 2 C.F.R. § 200.346. As such, all amounts received will constitute a debt to the Federal Government that may be pursued to the maximum extent permitted by law.

XVIII.    _False Claims Act_ and Program Fraud Civil Remedies

Recipients must comply with the requirements of the _False Claims Act_, 31 U.S.C. §§ 3729- 3733, which prohibit the submission of false or fraudulent claims for payment to the Federal Government. (See 31 U.S.C. §§ 3801-3812, which details the administrative remedies for false claims and statements made.)

XIX.    Federal Debt Status

All recipients are required to be non-delinquent in their repayment of any federal debt. Examples of relevant debt include delinquent payroll and other taxes, audit disallowances, and benefit overpayments. See OMB Circular A-129.

XX.    Federal Leadership on Reducing Text Messaging While Driving

Recipients are encouraged to adopt and enforce policies that ban text messaging while driving recipient-owned, recipient-rented, or privately owned vehicles when on official government business or when performing any work for or on behalf of the Federal Government. Recipients are also encouraged to conduct the initiatives of the type described in Section 3(a) of Executive Order 13513.

XXI.    _Fly America Act of 1974_

Recipients must comply with Preference for U.S. Flag Air Carriers (a list of certified air carriers can be found at: Certificated Air Carriers List | US Department of Transportation,    https://www.transportation.gov/policy/aviation-policy/certificated-aircarriers-list)for international air transportation of people and property to the extent that such service is available, in accordance with the _International Air Transportation Fair Competitive Practices Act of 1974_, 49 U.S.C. § 40118, and the interpretative guidelines issued by the Comptroller General of the United States in the March 31, 1981, amendment to Comptroller General Decision B-138942.

XXII.    _Hotel and Motel Fire Safety Act of 1990_

Recipients must ensure that all conference, meeting, convention, or training space funded entirely or in part by federal award funds complies with the fire prevention and control guidelines of Section 6 of the _Hotel and Motel Fire Safety Act of 1990_, 15 U.S.C. § 2225a.

XXIII.    _John S. McCain National Defense Authorization Act of Fiscal Year 2019_

Recipients, subrecipients, and their contractors and subcontractors are subject to the prohibitions described in section 889 of the _John S. McCain National Defense Authorization Act for Fiscal Year 2019_, Pub. L. No. 115-232 (2018) and 2 C.F.R. §§ 200.216, 200.327, 200.471, and Appendix II to 2 C.F.R. Part 200. The statute – as it applies to DHS recipients, subrecipients, and their contractors and subcontractors – prohibits obligating or expending federal award funds on certain telecommunications and video surveillance products and contracting with certain entities for national security reasons.

XXIV.    Limited English Proficiency (_Civil Rights Act of 1964, Title VI_)

Recipients must comply with Title VI of the _Civil Rights Act of 1964_ (42 U.S.C. § 2000d _et seq._) prohibition against discrimination on the basis of national origin, which requires that recipients of federal financial assistance take reasonable steps

# FY 2025 DHS STANDARD TERMS AND CONDITIONS

to provide meaningful access to persons with limited English proficiency (LEP) to their programs and services. For additional assistance and information regarding language access obligations, please refer to the DHS Recipient Guidance: https://www.dhs.gov/guidance-published-help- department-supported-organizationsprovide-meaningful-access-people-limited and additional resources on http://www.lep.gov.

XXV.   Lobbying Prohibitions

Recipients must comply with 31 U.S.C. § 1352 and 6 C.F.R. Part 9, which provide that none of the funds provided under a federal award may be expended by the recipient to pay any person to influence, or attempt to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with any federal action related to a federal award or contract, including any extension, continuation, renewal, amendment, or modification. Per 6 C.F.R. Part 9, recipients must file a lobbying certification form as described in Appendix A to 6 C.F.R. Part 9 or available on Grants.gov as the Grants.gov Lobbying Form and file a lobbying disclosure form as described in Appendix B to 6 C.F.R. Part 9 or available on Grants.gov as the Disclosure of Lobbying Activities (SF-LLL).

XXVI.   *National Environmental Policy Act*

Recipients must comply with the requirements of the *National Environmental Policy Act of 1969*, Pub. L. No. 91-190 (1970) (codified as amended at 42 U.S.C. § 4321 *et seq.*) (NEPA) and the Council on Environmental Quality (CEQ) Regulations for Implementing the Procedural Provisions of NEPA, which require recipients to use all practicable means within their authority, and consistent with other essential considerations of national policy, to create and maintain conditions under which people and nature can exist in productive harmony and fulfill the social, economic, and other needs of present and future generations of Americans.

XXVII.   National Security Presidential Memorandum-33 (NSPM-33) and provisions of the CHIPS and Science Act of 2022, Pub. L. 117-167, Section 10254

(1)   Recipient research institutions ("covered institutions") must comply with the requirements in NSPM-33 and provisions of Pub. L.117-167, Section 10254 (codified at 42 U.S.C. § 18951) certifying that the institution has established and operates a research security program that includes elements relating to:

   (a)   cybersecurity;

   (b)   foreign travel security;

   (c)   research security training; and

   (d)   export control training, as appropriate.

(2)   Definition. "Covered institutions" means recipient research institutions receiving federal Research and Development (R&D) science and engineering support "in excess of $50 million per year."

XXVIII.   Non-Supplanting Requirement

Recipients of federal awards under programs that prohibit supplanting by law must ensure that federal funds supplement but do not supplant non-federal funds that, in the absence of such federal funds, would otherwise have been made available for the same purpose.

XXIX.   Notice of Funding Opportunity Requirements

All the instructions, guidance, limitations, scope of work, and other conditions set forth in the Notice of Funding Opportunity (NOFO) for this federal award are incorporated

# FY 2025 DHS STANDARD TERMS AND CONDITIONS

by reference. All recipients must comply with any such requirements set forth in the NOFO. If a condition of the NOFO is inconsistent with these terms and conditions and any such terms of the federal award, the condition in the NOFO shall be invalid to the extent of the inconsistency. The remainder of that condition and all other conditions set forth in the NOFO shall remain in effect.

XXX.    Patents and Intellectual Property Rights

Recipients are subject to the *Bayh-Dole Act*, 35 U.S.C. § 200 *et seq*. and applicable regulations governing inventions and patents, including the regulations issued by the Department of Commerce at 37 C.F.R. Part 401 (Rights to Inventions Made by Nonprofit Organizations and Small Business Firms under Government Awards, Contracts, and Cooperative Agreements) and the standard patent rights clause set forth at 37 C.F.R. § 401.14.

XXXI.    Presidential Executive Orders

Recipients must comply with the requirements of Presidential Executive Orders related to grants (also known as federal assistance and financial assistance), the full text of which are incorporated by reference.

XXXII.    Procurement of Recovered Materials

States, political subdivisions of states, and their contractors must comply with Section 6002 of the *Solid Waste Disposal Act*, Pub. L. No. 89-272 (1965) (codified as amended by the *Resource Conservation and Recovery Act* at 42 U.S.C. § 6962) and 2 C.F.R. § 200.323. The requirements of Section 6002 include procuring only items designated in guidelines of the Environmental Protection Agency (EPA) at 40 C.F.R. Part 247 that contain the highest percentage of recovered materials practicable, consistent with maintaining a satisfactory level of competition.

*XXXIII.*    *Rehabilitation Act of 1973*

Recipients must comply with the requirements of Section 504 of the *Rehabilitation Act of 1973*, Pub. L. No. 93-112 (codified as amended at 29 U.S.C. § 794), which provides that no otherwise qualified handicapped individuals in the United States will, solely by reason of the handicap, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance.

XXXIV.    Reporting Recipient Integrity and Performance Matters

If the total value of any currently active grants, cooperative agreements, and procurement contracts from all federal awarding agencies exceeds $10,000,000 for any period of time during the period of performance of the federal award, then the recipient must comply with the requirements set forth in the government-wide federal award term and condition for Recipient Integrity and Performance Matters is in 2 C.F.R. Part 200, Appendix XII, the full text of which is incorporated by reference.

XXXV.    Reporting Subawards and Executive Compensation

For federal awards that total or exceed $30,000, recipients are required to comply with the requirements set forth in the government-wide federal award term and condition on Reporting Subawards and Executive Compensation set forth at 2 C.F.R. Part 170, Appendix A, the full text of which is incorporated by reference.

XXXVI.    Required Use of American Iron, Steel, Manufactured Products, and Construction Materials

(1)  Recipients of a federal award from a financial assistance program that provides funding for infrastructure are hereby notified that none of the funds provided under this federal award may be used for a project for infrastructure unless:

# FY 2025 DHS STANDARD TERMS AND CONDITIONS

(a) all iron and steel used in the project are produced in the United States—this means all manufacturing processes, from the initial melting stage through the application of coatings, occurred in the United States;

(b) all manufactured products used in the project are produced in the United States—this means the manufactured product was manufactured in the United States; and the cost of the components of the manufactured product that are mined, produced, or manufactured in the United States is greater than 55 percent of the total cost of all components of the manufactured product, unless another standard for determining the minimum amount of domestic content of the manufactured product has been established under applicable law or regulation; and

(c) all construction materials are manufactured in the United States—this means that all manufacturing processes for the construction material occurred in the United States.

(2) The Buy America preference only applies to articles, materials, and supplies that are consumed in, incorporated into, or affixed to an infrastructure project. As such, it does not apply to tools, equipment, and supplies, such as temporary scaffolding, brought to the construction site and removed at or before the completion of the infrastructure project. Nor does a Buy America preference apply to equipment and furnishings, such as movable chairs, desks, and portable computer equipment, that are used at or within the finished infrastructure project but are not an integral part of the structure or permanently affixed to the infrastructure project.

(3) *Waivers*

When necessary, recipients may apply for, and the agency may grant, a waiver from these requirements. The agency should notify the recipient for information on the process for requesting a waiver from these requirements.

(a) When the Federal agency has determined that one of the following exceptions applies, the federal awarding official may waive the application of the domestic content procurement preference in any case in which the agency determines that:

(i) applying the domestic content procurement preference would be inconsistent with the public interest;

(ii) the types of iron, steel, manufactured products, or construction materials are not produced in the United States in sufficient and reasonably available quantities or of a satisfactory quality; or

(iii) the inclusion of iron, steel, manufactured products, or construction materials produced in the United States will increase the cost of the overall project by more than 25 percent.

(b) A request to waive the application of the domestic content procurement preference must be in writing. The agency will provide instructions on the format, contents, and supporting materials required for any waiver request. Waiver requests are subject to public comment periods of no less than 15 days and must be reviewed by the Made in America Office.

(c) There may be instances where a federal award qualifies, in whole or in part, for an existing waiver described at "Buy America" Preference in FEMA Financial Assistance Programs for Infrastructure | FEMA.gov.

# FY 2025 DHS STANDARD TERMS AND CONDITIONS

(4) *Definitions*. The definitions applicable to this term are set forth at 2 C.F.R. § 184.3, the full text of which is incorporated by reference.

XXXVII.    SAFECOM

Recipients receiving federal awards made under programs that provide emergency communication equipment and its related activities must comply with the SAFECOM Guidance for Emergency Communication Grants, including provisions on technical standards that ensure and enhance interoperable communications. The SAFECOM Guidance is updated annually and can be found at Funding and Sustainment | CISA.

XXXVIII.    Subrecipient Monitoring and Management

Pass-through entities must comply with the requirements for subrecipient monitoring and management as set forth in 2 C.F.R. §§ 200.331-333.

XXXIX.    System for Award Management and Unique Entity Identifier Requirements

Recipients are required to comply with the requirements set forth in the governmentwide federal award term and condition regarding the System for Award Management and Unique Entity Identifier Requirements in 2 C.F.R. Part 25, Appendix A, the full text of which is incorporated reference.

XL.    Termination of a Federal Award

(1) By DHS. DHS may terminate a federal award, in whole or in part, for the following reasons:

    (a) If the recipient fails to comply with the terms and conditions of the federal award;

    (b) With the consent of the recipient, in which case the parties must agree upon the termination conditions, including the effective date, and in the case of partial termination, the portion to be terminated; or

    (c) Pursuant to the terms and conditions of the federal award, including, to the extent authorized by law, if the federal award no longer effectuates the program goals or agency priorities.

(3) By the Recipient. The recipient may terminate the federal award, in whole or in part, by sending written notification to DHS stating the reasons for such termination, the effective date, and in the case of partial termination, the portion to be terminated. However, if DHS determines that the remaining portion of the federal award will not accomplish the purposes for which the federal award was made, DHS may terminate the federal award in its entirety.

(4) Notice. Either party will provide written notice of intent to terminate for any reason to the other party no less than 30 calendar days prior to the effective date of the termination.

(5) Compliance with Closeout Requirements for Terminated Awards. The recipient must continue to comply with closeout requirements in 2 C.F.R. §§ 200.344200.345 after an award is terminated.

# FY 2025 DHS STANDARD TERMS AND CONDITIONS

XLI.  *Terrorist Financing*

Recipients must comply with Executive Order 13224 and applicable statutory prohibitions on transactions with, and the provisions of resources and support to, individuals and organizations associated with terrorism. Recipients are legally responsible for ensuring compliance with the Executive Order and laws.

XLII.  *Trafficking Victims Protection Act of 2000(TVPA)*

Recipients must comply with the requirements of the government-wide federal award term and condition which implements Trafficking Victims Protection Act of 2000, Pub. L. No. 106-386, § 106 (codified as amended at 22 U.S.C. § 7104). The federal award term and condition is in 2 C.F.R. § 175.105, the full text of which is incorporated by reference.

XLIII.  *Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT) Act of 2001*, Pub. L. 107-56

Recipients must comply with the requirements of Pub. L. 107-56, Section 817 of the USA PATRIOT Act, which amends 18 U.S.C. §§ 175–175c.

XLIV.  *Use of DHS Seal, Logo and Flags*

Recipients must obtain written permission from DHS prior to using the DHS seals, logos, crests, or reproductions of flags, or likenesses of DHS agency officials. This includes use of DHS component (e.g., FEMA, CISA, etc.) seals, logos, crests, or reproductions of flags, or likenesses of component officials.

XLV.  *Whistleblower Protection Act*

Recipients must comply with the statutory requirements for whistleblower protections in 10 U.S.C § 470141 U.S.C. § 4712.

# Exhibit J

**Grant Number/FAIN:**
**Recipient Name:**
**Tax ID No.:**
**Unique Entity Identifier (UEI) Number:**


## CONTINUUM OF CARE PROGRAM (Assistance Listing# 14.267)
## GRANT AGREEMENT


This Grant Agreement ("this Agreement") is made by and between the United States Department of Housing and Urban Development ("HUD") and _____ (the "Recipient").

This Agreement, the Recipient's use of funds provided under this Agreement (the "Grant" or "Grant Funds"), and the Recipient's operation of projects assisted with Grant Funds are governed by

1. The Consolidated Appropriations Act, 2024 (Public Law 118-42, approved March 9, 2024);

2. title IV of the McKinney-Vento Homeless Assistance Act 42 U.S.C. 11301 et seq. (the "Act");

3. the Continuum of Care Program rule at 24 CFR part 578 (the "Rule"), as amended from time to time;

4. the Notice of Funding Opportunity for FY 2024 and FY 2025 Continuum of Care Competition and Renewal or Replacement of Youth Homeless Demonstration Program (NOFO), except for references in the NOFO to Executive Orders that have since been repealed;

5. all current Executive Orders; and

6. the Recipient's application submissions on the basis of which these Grant Funds were approved by HUD, including the certifications, assurances, technical submission documents, and any information or documentation required to meet any grant award condition (collectively, the "Application").

The Application is incorporated herein as part of this Agreement, except that only the project (those projects) listed below are funded by this Agreement. In the event of any conflict between any application provision and any provision contained in this Agreement, this Agreement shall control. Capitalized terms that are not defined in this agreement shall have the meanings given in the Rule.

(5) Notwithstanding anything in the NOFO or Application, this Grant shall not be governed by Executive Orders revoked by E.O. 14154, including E.O. 14008, or NOFO requirements implementing Executive Orders that have been revoked.

The recipient must administer its grant in accordance with all applicable immigration restrictions and requirements, including the eligibility and verification requirements that apply under title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, as amended (8 U.S.C. 1601-1646) (PRWORA) and any applicable requirements that HUD, the Attorney General, or the U.S. Center for Immigration Services may establish from time to time to comply with PRWORA, Executive Order 14218, or other Executive Orders or immigration laws.

No state or unit of general local government that receives funding under this grant may use that funding in a manner that by design or effect facilitates the subsidization or promotion of illegal immigration or abets policies that seek to shield illegal aliens from deportation.

Subject to the exceptions provided by PRWORA, the recipient must use SAVE, or an equivalent verification system approved by the Federal government, to prevent any Federal public benefit from being provided to an ineligible alien who entered the United States illegally or is otherwise unlawfully present in the United States.

HUD will not enforce provisions of the Grant Agreement to the extent that they require the project to use a housing first program model.

As stated in Section III.A.2 of the NOFO, Faith-based organizations may be recipients or subrecipients for funds under this agreement on the same basis as any other organization. Recipients may not, in the selection of subrecipients, discriminate against an organization based on the organization's religious character, affiliation, or exercise.

If any new projects funded under this Agreement are for project-based rental assistance for a term of fifteen (15) years, the funding provided under this Agreement is for the performance period stated herein only. Additional funding is subject to the availability of annual appropriations.

The budget period and performance period of renewal projects funded by this Agreement will begin immediately at the end of the budget period and performance period of the grant being renewed. Eligible costs incurred between the end of Recipient's budget period and performance period under the grant being renewed and the date this Agreement is executed by both parties may be reimbursed with Grants Funds from this Agreement. No Grant Funds for renewal projects may be drawn down by Recipient before the end date of the project's budget period and performance period under the grant that has been renewed.

For any transition project funded under this Agreement the budget period and performance period of the transition project(s) will begin immediately at the end of the Recipient's final

5

# Exhibit K



**THE SECRETARY OF TRANSPORTATION**
WASHINGTON, DC 20590

April 24, 2025

To All Recipients of U.S. Department of Transportation Funding:

The U.S. Department of Transportation (Department or DOT) distributes substantial Federal financial assistance for thousands of projects, programs, and activities operated or initiated by diverse entities, including but not limited to State and local governments. The Department administers this Federal financial assistance to support the development and maintenance of the Nation's transportation infrastructure, pursuant to statutory authority and in accordance with binding contractual agreements in the form of Federal financial assistance agreements, usually grants, cooperative agreements, and loans. Accordingly, I write to clarify and reaffirm pertinent legal requirements, to outline the Department's expectations, and to provide a reminder of your responsibilities and the consequences of noncompliance with Federal law and the terms of your financial assistance agreements. It is the policy of the Department to award and to continue to provide Federal financial assistance only to those recipients who comply with their legal obligations.

As recipients of such DOT funds, you have entered into legally enforceable agreements with the United States Government and are obligated to comply fully with all applicable Federal laws and regulations. These laws and regulations include the United States Constitution, Federal statutes, applicable rules, and public policy requirements, including, among others, those protecting free speech and religious liberty and those prohibiting discrimination and enforcing controls on illegal immigration. As Secretary of Transportation, I am responsible for ensuring recipients of DOT financial assistance are aware of and comply with all applicable legal obligations.

The Equal Protection principles of the Constitution prohibit State and Federal governmental entities from discriminating on the basis of protected characteristics, including race. Indeed, as the Supreme Court declared in *Students for Fair Admission, Inc. v. Harvard (SFFA)*, 600 U.S. 181, 206 (2023), "[t]he clear and central purpose of the Fourteenth Amendment was to eliminate all official state sources of invidious racial discrimination in the States." The Court further noted that "[o]ne of the principal reasons race is treated as a forbidden classification is that it demeans the dignity and worth of a person to be judged by ancestry instead of by his or her own merit and essential qualities." *Id.* at 220. In ruling that race-based admissions programs at universities violated the Equal Protection Clause, the Court made clear that discrimination based on race is, has been, and will continue to be unlawful, except in rare circumstances. *Id.* at 220-21. Similarly, sex-based classifications violate the Equal Protection Clause absent "exceedingly persuasive" justification. *See United States v. Virginia*, 518 U.S. 515, 533 (1996).

These constitutional principles are reinforced by the Civil Rights Act of 1964, which prohibits discrimination based on protected characteristics in the Federal funding and employment contexts in Title VI (42 U.S.C. § 2000d *et seq*.) and Title VII (42 U.S.C. § 2000e-2), as well as the applicable non-discrimination clauses in the Federal Aid Highway Act of 1973 (23 U.S.C. §§ 140 and 324 *et seq*.), the Airport and Airway Improvement Act of 1982, (49 U.S.C. § 47123), and Title IX of the Education Amendments of 1972, as amended (20 U.S.C. § 1681 *et seq*.).

Based on binding Supreme Court precedent and these Federal laws, DOT is prohibited from discriminating based on race, color, national origin, sex, or religion in any of its programs or activities. Moreover, because DOT may not establish, induce, or endorse prohibited discrimination indirectly,[1] it must ensure that discrimination based on race, color, national origin, sex, or religion does not exist in the programs or activities it funds or financially assists.

These same principles apply to recipients of Federal financial assistance from DOT, as both a matter of Federal law and by virtue of contractual provisions governing receipt of DOT funding. Accordingly, DOT recipients are prohibited from engaging in discriminatory actions in their own policies, programs, and activities, including in administering contracts, and their employment practices.

Whether or not described in neutral terms, any policy, program, or activity that is premised on a prohibited classification, including discriminatory policies or practices designed to achieve so-called "diversity, equity, and inclusion," or "DEI," goals, presumptively violates Federal law. Recipients of DOT financial assistance must ensure that the personnel practices (including hiring, promotions, and terminations) within their organizations are merit-based and do not discriminate based on prohibited categories. Recipients are also precluded from allocating money received under DOT awards—such as through contracts or the provision of other benefits—based on suspect classifications. Any discriminatory actions in your policies, programs, and activities based on prohibited categories constitute a clear violation of Federal law and the terms of your grant agreements.

In addition, your legal obligations require cooperation generally with Federal authorities in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law. DOT has noted reported instances where some recipients of Federal financial assistance have declined to cooperate with ICE investigations, have issued driver's licenses to individuals present in the United States in violation of Federal immigration law, or have otherwise acted in a manner that impedes Federal law enforcement. Such actions undermine Federal sovereignty in the enforcement of immigration law, compromise the safety and security of the transportation systems supported by DOT

---

[1] *See SFFA*, 600 U.S. at 230; Norwood v. Harrison, 413 U.S. 455, 465 (1973).

financial assistance, and prioritize illegal aliens over the safety and welfare of the American people whose Federal taxes fund DOT's financial assistance programs.

Under the Constitution, Federal law is "the supreme Law of the Land." U.S. Const. Art. VI. That means that where Federal and State legal requirements conflict, States and State entities must follow Federal law. Declining to cooperate with the enforcement of Federal immigration law or otherwise taking action intended to shield illegal aliens from ICE detection contravenes Federal law and may give rise to civil and criminal liability. *See* 8 U.S.C. § 1324 and 8 U.S.C. § 1373. Accordingly, DOT expects its recipients to comply with Federal law enforcement directives and to cooperate with Federal officials in the enforcement of Federal immigration law. The Department also expects its recipients to ensure that the Federal financial assistance they receive from DOT is provided only to subrecipients, businesses, or service providers that are U.S. Citizens or U.S. Nationals and Lawful Permanent Residents (LPRs) or legal entities allowed to do business in the U.S. and which do not employ illegal aliens.

This letter provides notice of the Department's existing interpretation of Federal law. The Department will vigorously enforce the law on equal terms as to all its recipients and intends to take appropriate measures to assess their compliance based on the interpretation of Federal law set forth in this letter. Adherence to your legal obligations is a prerequisite for receipt of DOT financial assistance. Noncompliance with applicable Federal laws, or failure to cooperate generally with Federal authorities in the enforcement of Federal law, will jeopardize your continued receipt of Federal financial assistance from DOT and could lead to a loss of Federal funding from DOT.

The Department retains authority, pursuant to its oversight responsibilities and the terms of your agreements, to initiate enforcement actions, such as comprehensive audits and possible recovery of funds expended in a manner contrary to the terms of the funding agreement. DOT may also terminate funding in response to substantiated breaches of the terms of the agreement, or if DOT determines that continued funding is no longer in the public interest. These steps, within DOT's discretion, are intended to ensure accountability and protect the integrity of Federal programs.

To assist grant recipients in meeting their legal obligations, DOT offers technical guidance and support through its program offices. Should you require clarification regarding your obligations, you are encouraged to contact your designated DOT representative promptly. Proactive engagement is strongly advised to prevent inadvertent noncompliance.

DOT remains committed to advancing a transportation system that serves the public interest effi-
ciently and unleashes economic prosperity and a superior quality of life for American families.
This mission depends upon your strict adherence to the legal framework governing our partner-
ship, and I trust you will take all necessary steps to comply with Federal law and satisfy your le-
gal obligations.

Sincerely,

Sean P. Duffy

# Exhibit L

# UNITED STATES OF AMERICA
# DEPARTMENT OF TRANSPORTATION
# FEDERAL TRANSIT ADMINISTRATION

# MASTER AGREEMENT

**For Federal Transit Administration Agreements authorized by
49 U.S.C. chapter 53 and Title 23, United States Code (Highways), as amended by
the Infrastructure Investment and Jobs Act of 2021 (IIJA), the Fixing America's Surface
Transportation (FAST) Act, the Moving Ahead for Progress in the 21st Century Act
(MAP-21), the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy
for Users (SAFETEA-LU), the SAFETEA-LU Technical Corrections Act of 2008, or other
federal laws that FTA administers.**

**FTA MA(33)**
**April 25, 2025**

http://www.transit.dot.gov

# UNITED STATES DEPARTMENT OF TRANSPORTATION
# FEDERAL TRANSIT ADMINISTRATION

## MASTER AGREEMENT

## PREFACE

### Statutory Authorities

This is the official Federal Transit Administration (FTA) Master Agreement that applies to each Underlying Agreement (Grant Agreement, Cooperative Agreement, Loan Agreement, Loan Guarantee Agreement, or Line of Credit Agreement) for a specific Award authorized by:

(a)     Federal transit laws, 49 U.S.C. chapter 53, as amended, including the following:

  (1)     The Infrastructure Investment and Jobs Act of 2021 (IIJA), Public Law No. 117-58, November 15, 2021, and other authorizing legislation that may be enacted;

  (2)     The Fixing America's Surface Transportation (FAST) Act, Public Law No. 114-94, December 4, 2015;

  (3)     The Moving Ahead for Progress in the 21st Century Act (MAP-21), Public Law No. 112- 141, July 6, 2012, as amended by the Surface Transportation and Veterans Health Care Choice Improvement Act of 2015, Public Law No. 114-41, July 31, 2015; and

  (4)     The Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users (SAFETEA-LU), Public Law No. 109-59, August 10, 2005, as amended by the SAFETEA-LU Technical Corrections Act of 2008, Public Law No 110-244, June 6, 2008.

(b)     Continuing Resolutions or Other Appropriations Resolutions or Acts funding the Department of Transportation during Fiscal Year 2025.

(c)     Title 23, United States Code (Highways).

(d)     Other federal legislation that FTA administers, as FTA so determines.

### Purpose of this Master Agreement

This FTA Master Agreement contains the standard terms and conditions that apply to the Underlying Agreement with the Recipient, which Underlying Agreement may take the form of an:

(a)    FTA Grant Agreement, including an FTA Grant Agreement for an award of federal assistance under the Tribal Transit Program;

(b)    FTA Cooperative Agreement; or

(c)    Transportation Infrastructure Finance Innovation Act (TIFIA) or Railroad Rehabilitation and Improvement Financing (RRIF) Loan, Loan Guarantee, Line of Credit, Master Credit Agreement for a Project overseen by FTA, or State Infrastructure Bank (SIB) Cooperative Agreement.

THEREFORE, in consideration of the mutual covenants, promises, and representations herein, FTA and the Recipient agree as follows:

**GENERALLY APPLICABLE PROVISIONS**

**Section 1.     Terms of this Master Agreement and Compliance.**

(a)     The Recipient must comply with all applicable federal laws, regulations, and requirements, and should follow applicable federal guidance, except as FTA determines otherwise in writing.

(b)     To assure compliance with federal laws, regulations, and requirements, the Recipient must take measures to assure that other participants in its Underlying Agreements (e.g., Third Party Participants) comply with applicable federal laws, regulations, and requirements, and follow applicable federal guidance, except as FTA determines otherwise in writing.

(c)     FTA may take enforcement action if the Recipient or a Third Party Participant violates an applicable federal law, regulation, or requirement, or does not follow applicable federal guidance.

(d)     FTA and the Recipient agree that not every provision of this Master Agreement will apply to every Recipient or Underlying Agreement.

    (1)     FTA has divided this Master Agreement into the "Preface," "Generally Applicable Provisions," and "Special Provisions for Specific Programs."

    (2)     This Master Agreement has an Appendix A illustrating the specific provisions of this Master Agreement that apply to the Tribal Transit Programs.

    (3)     Criteria determining which federal laws, regulations, requirements, and guidance apply include the type of Award, the federal law authorizing federal assistance for the Award, the federal law, regulations, or requirements governing how the Award must be implemented, the federal guidance pertaining to the Award, and the Recipient's legal status as a "state," "state instrumentality," a "local government," a federally recognized Indian Tribe (Indian Tribe), a "private nonprofit entity," a "private for-profit entity," or an individual.

(e)     As provided in federal laws, regulations, requirements, and guidance, FTA will enforce only those federal laws, regulations, requirements, and guidance that apply to the specific FTA Recipient, its Third Party Participants, or to any Project and related activities encompassed in the Award, the accompanying Underlying Agreement, and any Amendments thereto.

3

(d)     *Uniform Administrative Requirements.* These termination rights are in addition to and in no way limit the Federal Government's rights to terminate described in 2 CFR § 200.340.

**Section 12.    Civil Rights.**

(a)     *Civil Rights Requirements.* The Recipient agrees that it must comply with applicable federal civil rights laws, regulations, and requirements, and follow applicable federal guidance, except as the Federal Government determines otherwise in writing. Therefore, unless a Recipient or a federal program, including the Indian Tribe Recipient or the Tribal Transit Program, is specifically exempted from a civil rights statute, FTA requires compliance with each civil rights statute, including compliance with equity in service requirements.

(b)     *Nondiscrimination in Federal Public Transportation Programs.* The Recipient agrees to, and assures that it and each Third Party Participant will:

    (1)     Prohibit discrimination based on race, color, religion, national origin, sex (including sexual orientation), disability, or age.

    (2)     Prohibit the:

        (i)     Exclusion from participation in employment or a business opportunity for reasons identified in 49 U.S.C. § 5332;

        (ii)    Denial of program benefits in employment or a business opportunity identified in 49 U.S.C. § 5332; or

        (iii)   Discrimination identified in 49 U.S.C. § 5332, including discrimination in employment or a business opportunity identified in 49 U.S.C. § 5332.

    (3)     Follow:

        (i)     The most recent edition of FTA Circular 4702.1, "Title VI Requirements and Guidelines for Federal Transit Administration Recipients," to the extent consistent with applicable federal laws, regulations, requirements, and guidance; but

        (ii)    FTA does not require an Indian Tribe to comply with FTA program-specific guidelines for Title VI when administering its Underlying Agreement supported with federal assistance under the Tribal Transit Program.

(c)     *Nondiscrimination – Title VI of the Civil Rights Act*. The Recipient agrees to, and assures that each Third Party Participant will:

     (1)     Prohibit discrimination based on race, color, or national origin,

     (2)     Comply with:

         (i)     Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000d, et seq.;

         (ii)     U.S. DOT regulations, "Nondiscrimination in Federally-Assisted Programs of the Department of Transportation – Effectuation of Title VI of the Civil Rights Act of 1964," 49 CFR Part 21, including any amendments thereto; and

         (iii)     Federal transit law, specifically 49 U.S.C. § 5332; and

     (3)     Follow:

         (i)     The most recent edition of FTA Circular 4702.1, "Title VI Requirements and Guidelines for Federal Transit Administration Recipients," to the extent consistent with applicable federal laws, regulations, requirements, and guidance;

         (ii)     U.S. DOJ, "Guidelines for the enforcement of Title VI, Civil Rights Act of 1964," 28 C.F.R. § 50.3; and

         (iii)     All other applicable federal guidance that may be issued.

(d)     *Equal Employment Opportunity*.

     (1)     *Federal Requirements and Guidance*. The Recipient agrees to, and assures that each Third Party Participant will, prohibit discrimination based on race, color, religion, sex, sexual orientation, or national origin, and:

         (i)     Comply with Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq.;

         (ii)     Comply with Title I of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12101, et seq.;

         (iii)     Comply with federal transit law, specifically 49 U.S.C. § 5332, as provided in section 12 of this Master Agreement;

(iv)    FTA Circular 4704.1 "Equal Employment Opportunity (EEO) Requirements and Guidelines for Federal Transit Administration Recipients;" and

(v)    Follow other federal guidance pertaining to EEO laws, regulations, and requirements.

(2)    *Indian Tribes*. The Recipient agrees to, and assures that each Third Party Participant will recognize that Title VII of the Civil Rights Act of 1964, as amended, exempts Indian Tribes under the definition of "Employer".

(e)    *Disadvantaged Business Enterprise*. To the extent authorized by applicable federal laws, regulations, or requirements, the Recipient agrees to facilitate, and assures that each Third Party Participant will facilitate, participation by small business concerns owned and controlled by socially and economically disadvantaged individuals, also referred to as "Disadvantaged Business Enterprises" (DBEs), in the Underlying Agreement as follows:

(1)    *Statutory and Regulatory Requirements*. The Recipient agrees to comply with:

(i)    Section 11101(e) of IIJA;

(ii)    U.S. DOT regulations, "Participation by Disadvantaged Business Enterprises in Department of Transportation Financial Assistance Programs," 49 CFR Part 26, including any amendments thereto; and

(iii)    Federal transit law, specifically 49 U.S.C. § 5332, as provided in section 12 of this Master Agreement.

(2)    *Special Requirements for a Transit Vehicle Manufacturer (TVM)*. The Recipient agrees that:

(i)    *TVM Certification*. Each TVM, as a condition of being authorized to bid or propose on FTA-assisted transit vehicle procurements, must certify that it has complied with the requirements of 49 CFR Part 26, including any amendments thereto; and

(ii)    *Reporting TVM Awards*. Within 30 days of any third party contract award for a transit vehicle purchase, the Recipient must submit to FTA the name of the TVM contractor and the total dollar value of the third party contract using the Transit Vehicle Award Reporting Form on FTA's website. The Recipient must also submit additional

notifications if options are exercised in subsequent years to ensure that the TVM is still in good standing.

(3)    *Assurance*. As required by 49 C.F.R. § 26.13(a):

(i)    *Recipient Assurance*. The Recipient agrees and assures that:

(A)    It must not discriminate based on race, color, national origin, or sex in the award and performance of any FTA or U.S. DOT-assisted contract, or in the administration of its DBE program or the requirements of 49 CFR Part 26;

(B)    It must take all necessary and reasonable steps under 49 CFR Part 26 to ensure nondiscrimination in the award and administration of U.S. DOT-assisted contracts;

(C)    Its DBE program, as required under 49 CFR Part 26 and as approved by U.S. DOT, is incorporated by reference and made part of the Underlying Agreement; and

(D)    Implementation of its DBE program approved by U.S. DOT is a legal obligation and failure to carry out its terms shall be treated as a violation of this Master Agreement.

(ii)    *Subrecipient/Third Party Contractor/Third Party Subcontractor Assurance*. The Recipient agrees and assures that it will include the following assurance in each subagreement and third party contract it signs with a Subrecipient or Third Party Contractor and agrees to obtain the agreement of each of its Subrecipients, Third Party Contractors, and Third Party Subcontractors to include the following assurance in every subagreement and third party contract it signs:

(A)    The Subrecipient, each Third Party Contractor, and each Third Party Subcontractor must not discriminate based on race, color, national origin, or sex in the award and performance of any FTA or U.S. DOT-assisted subagreement, third party contract, and third party subcontract, as applicable, and the administration of its DBE program or the requirements of 49 CFR Part 26;

(B)    The Subrecipient, each Third Party Contractor, and each Third Party Subcontractor must take all necessary and reasonable steps under 49 CFR Part 26 to ensure nondiscrimination in the award and administration of U.S. DOT-assisted

54

subagreements, third party contracts, and third party subcontracts, as applicable;

(C)    Failure by the Subrecipient and any of its Third Party Contractors or Third Party Subcontractors to carry out the requirements of this subparagraph 12.e(4)(ii) is a material breach of this subagreement, third party contract, or third party subcontract, as applicable; and

(D)    The following remedies, or such other remedy as the Recipient deems appropriate, include, but are not limited to, withholding monthly progress payments, assessing sanctions, liquidated damages, and/or disqualifying the Subrecipient, Third Party Contractor, or Third Party Subcontractor from future bidding as non-responsible.

(4)    *Remedies*. Upon notification to the Recipient of its failure to carry out its approved program, FTA or U.S. DOT may impose sanctions as provided for under 49 CFR Part 26, and, in appropriate cases, refer the matter for enforcement under either or both 18 U.S.C. § 1001, and/or the Program Fraud Civil Remedies Act of 1986, 31 U.S.C. § 3801, et seq.

(f)    *Nondiscrimination on the Basis of Sex*. The Recipient agrees to comply with federal prohibitions against discrimination based on sex, including:

(1)    Title IX of the Education Amendments of 1972, as amended, 20 U.S.C. § 1681, et seq.;

(2)    U.S. DOT regulations, "Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance," 49 CFR Part 25; and

(3)    Federal transit law, specifically 49 U.S.C. § 5332.

(g)    *Nondiscrimination on the Basis of Age*. The Recipient agrees to comply with federal prohibitions against discrimination based on age, including:

(1)    The Age Discrimination in Employment Act, 29 U.S.C. §§ 621 – 634, which prohibits discrimination based on age;

(2)    U.S. Equal Employment Opportunity Commission (U.S. EEOC) regulations, "Age Discrimination in Employment Act," 29 CFR Part 1625;

(3)    The Age Discrimination Act of 1975, as amended, 42 U.S.C. § 6101, et seq., which prohibits discrimination against individuals based on age in the

administration of Programs, Projects, and related activities receiving federal assistance;

(4)    U.S. Health and Human Services regulations, "Nondiscrimination on the Basis of Age in Programs or Activities Receiving Federal Financial Assistance," 45 CFR Part 90; and

(5)    Federal transit law, specifically 49 U.S.C. § 5332.

(h)    *Nondiscrimination on the Basis of Disability.* The Recipient agrees to comply with the following federal prohibitions against discrimination based on disability:

(1)    Federal laws, including:

(i)    Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794, which prohibits discrimination based on disability in the administration of federally assisted Programs, Projects, or activities;

(ii)    The Americans with Disabilities Act of 1990 (ADA), as amended, 42 U.S.C. § 12101, et seq., which requires that accessible facilities and services be made available to individuals with disabilities:

(A)    For FTA Recipients generally, Titles I, II, and III of the ADA apply; but

(B)    For Indian Tribes, Titles II and III of the ADA apply, but Title I of the ADA does not apply because it exempts Indian Tribes from the definition of "employer;"

(iii)    The Architectural Barriers Act of 1968, as amended, 42 U.S.C. § 4151, et seq., which requires that buildings and public accommodations be accessible to individuals with disabilities;

(iv)    Federal transit law, specifically 49 U.S.C. § 5332, which now includes disability as a prohibited basis for discrimination; and

(v)    Other applicable federal laws, regulations, and requirements pertaining to access for seniors or individuals with disabilities.

(2)    Federal regulations and guidance, including:

(i)    U.S. DOT regulations, "Transportation Services for Individuals with Disabilities (ADA)," 49 CFR Part 37;

(ii) U.S. DOT regulations, "Nondiscrimination on the Basis of Disability in Programs and Activities Receiving or Benefiting from Federal Financial Assistance," 49 CFR Part 27;

(iii) Joint U.S. Architectural and Transportation Barriers Compliance Board (U.S. ATBCB) and U.S. DOT regulations, "Americans With Disabilities (ADA) Accessibility Specifications for Transportation Vehicles," 49 CFR Part 38;

(iv) U.S. DOT regulations, "Transportation for Individuals with Disabilities: Passenger Vessels," 49 CFR Part 39;

(v) U.S. DOJ regulations, "Nondiscrimination on the Basis of Disability in State and Local Government Services," 28 CFR Part 35;

(vi) U.S. DOJ regulations, "Nondiscrimination on the Basis of Disability by Public Accommodations and in Commercial Facilities," 28 CFR Part 36;

(vii) U.S. EEOC, "Regulations to Implement the Equal Employment Provisions of the Americans with Disabilities Act," 29 CFR Part 1630;

(viii) U.S. Federal Communications Commission regulations, "Telecommunications Relay Services and Related Customer Premises Equipment for Persons with Disabilities," 47 CFR Part 64, subpart F;

(ix) U.S. ATBCB regulations, "Electronic and Information Technology Accessibility Standards," 36 CFR Part 1194;

(x) FTA regulations, "Transportation for Elderly and Handicapped Persons," 49 CFR Part 609;

(xi) FTA Circular 4710.1, "Americans with Disabilities Act: Guidance;" and

(xii) Other applicable federal civil rights and nondiscrimination regulations and guidance.

(i) *Drug or Alcohol Abuse – Confidentiality and Other Civil Rights Protections*. The Recipient agrees to comply with the confidentiality and civil rights protections of:

(1) The Drug Abuse Office and Treatment Act of 1972, as amended, 21 U.S.C. § 1101, et seq.;

(2)    The Comprehensive Alcohol Abuse and Alcoholism Prevention, Treatment and Rehabilitation Act of 1970, as amended, 42 U.S.C. § 4541, et seq.; and

(3)    The Public Health Service Act, as amended, 42 U.S.C. §§ 290dd – 290dd-2.

(j)    *Access to Services for Persons with Limited English Proficiency*. The Recipient agrees to provide meaningful access to public transportation services to persons with limited understanding of English to comply with Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000d, *et seq.*, and its implementing regulation at 28 CFR § 42.405(d), and appliable U.S. Department of Justice guidance.

(k)    *Other Nondiscrimination Laws, Regulations, Requirements, and Guidance*. The Recipient agrees to comply with other applicable federal nondiscrimination laws, regulations, and requirements, and follow federal guidance prohibiting discrimination.

(l)    *Remedies*. Remedies for failure to comply with applicable federal Civil Rights laws, regulations, and requirements, and failure to follow guidance may be enforced as provided in those federal laws, regulations, requirements, or guidance.

(m)    *Federal Law and Public Policy Requirements*. The Recipient shall ensure that Federal funding is expended in full accordance with the U.S. Constitution, Federal Law, and statutory and public policy requirements: including, but not limited to, those protecting free speech, religious liberty, public welfare, the environment, and prohibiting discrimination; and the Recipient will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law.

(n)    *Federal Anti-Discrimination*.

(1)    Pursuant to section (3)(b)(iv)(A), Executive Order 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, the Recipient agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code.

(2)    Pursuant to section (3)(b)(iv)(B), Executive Order 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, by entering into this Agreement, the Recipient certifies that it does not operate any programs promoting diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal anti-discrimination laws.

# Exhibit M

**U.S. Department of Transportation**
**Federal Railroad Administration**

---

## Attachment 1

---

# GENERAL TERMS AND CONDITIONS

Revision Date: April 16, 2025

U.S. Department of Transportation
**Federal Railroad Administration**

# ATTACHMENT 1

This Grant Agreement (Agreement) is between the Federal Railroad Administration (FRA) and the Recipient identified in Attachment 2: Project-Specific Terms and Conditions. This Agreement, including the Agreement cover sheet, this Attachment 1, Attachment 2, and Exhibits A–C, constitutes the entire Agreement between FRA and the Recipient regarding the Project as defined in Attachment 2. All prior discussions and understandings concerning the scope and subject matter of this agreement are superseded by this Agreement.

This Agreement is governed by and subject to 2 C.F.R. part 200, Uniform Administrative Requirements, Cost Principles and Audit Requirements for Federal Awards, and the U.S. Department of Transportation (USDOT) implementing regulations at 2 C.F.R. part 1201.

# ARTICLE 1:  TERMS AND CONDITIONS

**1.1    General Terms and Conditions**

This Attachment 1: General Terms and Conditions, is part of the Agreement between FRA and the Recipient. This Attachment 1 contains the standard terms and conditions governing the administration of this Agreement and the execution of the Project. The General Terms and Conditions incorporate by reference the information contained in Attachment 2 and the Exhibits to this Agreement.

**1.2    Project-Specific Terms and Conditions**

Attachment 2: Project-Specific Terms and Conditions, is part of the Agreement between FRA and the Recipient. Attachment 2 contains Project-Specific Terms and Conditions, which may include special terms and conditions.

**1.3    Program-Specific Clauses**

Article 26 of this Attachment 1 contains the applicable program-specific clauses. The Recipient will comply with the program-specific clauses below that are associated with the grant program identified in Attachment 2 of this Agreement. In the event that the Recipient's grant is not authorized under a program listed below, Article 26 does not apply.

(a)  For Projects funded under the Interstate Rail Compacts program (49 U.S.C. § 22910), the Recipient will comply with the program-specific clauses in Article 26.1.

(b)  For Projects funded under the Railroad Crossing Elimination program (49 U.S.C. § 22909), the Recipient will comply with the program-specific clauses in Article 26.2.

(c)  For Projects funded under the Consolidated Rail Infrastructure and Safety Improvements program (49 U.S.C. § 22907), the Recipient will comply with the program-specific clauses in Article 26.3.

(d)  For Projects funded under the Restoration and Enhancement program (49 U.S.C. § 22908), the Recipient will comply with the program-specific clauses in Article 26.4.

U.S. Department of Transportation
**Federal Railroad Administration**

## ARTICLE 19:  CRITICAL INFRASTRUCTURE SECURITY AND RESILIENCE

**19.1    Critical Infrastructure Security and Resilience**

(a)  Consistent with the National Security Presidential Memorandum on Improving Cybersecurity for Critical Infrastructure Control Systems (July 28, 2021) and the National Security Memorandum on Critical Infrastructure Security and Resilience (April 30, 2024), the Recipient will consider physical and cyber security and resilience in planning, design, and oversight of the Project.

(b)  If the Security Risk Designation in Section 1.3 of Attachment 2 of this Agreement is "Elevated," then not later that than two years after the date of this Agreement the Recipient will submit to FRA a report that:

(1)  identifies a cybersecurity point of contact for the transportation infrastructure being improved in the Project;

(2)  summarizes or contains a cybersecurity incident reporting plan for the transportation infrastructure being improved in the Project;

(3)  summarizes or contains a cybersecurity incident response plan for the transportation infrastructure being improved in the Project;

(4)  documents the results of a self-assessment of the Recipient's cybersecurity posture and capabilities; and

(5)  describes any additional actions that the Recipient has taken to consider or address cybersecurity risk of the transportation infrastructure being improved in the Project.

## ARTICLE 20:  FEDERAL FINANCIAL ASSISTANCE, ADMINISTRATIVE, AND NATIONAL POLICY REQUIREMENTS

**20.1    Uniform Administrative Requirements for Federal Awards**

The Recipient will comply, and will ensure that other entities receiving funding under this agreement will comply, with the obligations on non-Federal entities under 2 C.F.R. parts 200 and 1201, regardless of whether the Recipient or other entity receiving funding under this agreement is a Non-Federal entity as defined in 2 C.F.R. § 200.1, except that subpart F of part 200 does not apply if the Recipient or Subrecipient is a for-profit entity.

**20.2    Federal Law and Public Policy Requirements**

(a)  The Recipient will ensure that Federal funding is expended in full accordance with the United States Constitution, Federal law, and statutory and public policy requirements: including but not limited to, those protecting free speech, religious liberty, public welfare, the environment, and prohibiting discrimination and the Recipient will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not

**U.S. Department of Transportation**
**Federal Railroad Administration**

impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in and the enforcement of Federal immigration law.

(b) Pursuant to Section 3(b)(iv)(A) of Executive Order 14173, Ending Illegal Discrimination And Restoring Merit-Based Opportunity, the Recipient agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code.

(c) Pursuant to Section 3(b)(iv)(B) of Executive Order 14173, Ending Illegal Discrimination And Restoring Merit-Based Opportunity, by entering into this agreement, the Recipient certifies that it does not operate any programs promoting diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal anti-discrimination laws.

(d)  The failure of this Agreement to expressly identify Federal law applicable to the Recipient or activities under this Agreement does not make that law inapplicable.

**20.3    Federal Freedom of Information Act**

(a)  FRA is subject to the Freedom of Information Act (FOIA), 5 U.S.C. § 552.

(b)  The Recipient acknowledges that the Application and materials submitted to FRA by the Recipient related to this Agreement will become FRA records that may be subject to public release under 5 U.S.C. § 552. If the Recipient submits any materials to FRA related to this Agreement that the Recipient considers to include trade secret or confidential commercial or financial information, the Recipient should note that the submission contains confidential business information, mark each affected page, and highlight or otherwise denote the portions of the submission that contain confidential business information.

**20.4    History of Performance**

Under 2 C.F.R. § 200.206, any Federal awarding agency may consider the Recipient's performance under this Agreement, when assessing the risks of making a future Federal financial assistance award to the Recipient.

**20.5    Whistleblower Protection**

(a)  The Recipient acknowledges that it is a "Recipient" within the scope of 41 U.S.C. § 4712, which prohibits the Recipient from taking certain actions against an employee for certain disclosures of information that the employee reasonably believes are evidence of gross mismanagement of this award, gross waste of Federal funds, or a violation of Federal law related this this award.

(b)  The Recipient will inform its employees in writing of the rights and remedies provided under 41 U.S.C. § 4712, in the predominant native language of the workforce.

# Exhibit N

**U.S. Department
of Transportation
Federal Aviation
Administration**

## FY 2025 AIRPORT INFRASTRUCTURE GRANT
### *TEMPLATE ONLY ** GRANT AGREEMENT ** TEMPLATE ONLY*
### Part I - Offer

Federal Award Offer Date

{{DateTime_es_:signer1:calc(now()):format(date," mmmm d, yyyy")}}

Airport/Planning Area

[Selection Criteria: Airport Name or Planning Area]

Airport Infrastructure Grant
Number

[Selection Criteria: Grant Number Formatted]

Unique Entity Identifier

[Selection Criteria: DUNS Number]

TO:   [Selection Criteria: Sponsor Name]

**(herein called the "Sponsor") (For Co-Sponsors, list all Co-Sponsor names. The word "Sponsor" in this Grant Agreement also applies to a Co-Sponsor.)**

[Please Enter Co-Sponsor Name(s)]

FROM:   **The United States of America** (acting through the Federal Aviation Administration, herein called the "FAA")

**WHEREAS**, the Sponsor has submitted to the FAA a Project Application dated [Selection Criteria: Project Application Date], for a grant of Federal funds for a project at or associated with the [Selection Criteria: Airport Name or Planning Area], which is included as part of this Grant Agreement; and

**WHEREAS**, the FAA has approved a project for the [Selection Criteria: Airport Name or Planning Area] (herein called the "Project") consisting of the following:

[Selection Criteria: Project Description]

which is more fully described in the Project Application.

**NOW THEREFORE**, Pursuant to and for the purpose of carrying out the Infrastructure Investment and Jobs Act (IIJA) (Public Law number (P.L.) 117-58) of 2021; FAA Reauthorization Act of 2024 (P.L. 118-63); and the representations contained in the Project Application; and in consideration of: (a) the Sponsor's adoption and ratification of the attached Grant Assurances dated April 2025, interpreted, and applied consistent with the FAA Reauthorization Act of 2024; (b) the Sponsor's acceptance of this Offer; and (c) the benefits to accrue to the United States and the public from the accomplishment of the Project and compliance with the Grant Assurance and conditions as herein provided;

1

certain telecommunications and video surveillance services or equipment in compliance with the National Defense Authorization Act [P.L. 115-232 § 889(f)] and 2 CFR § 200.216.

28. **Critical Infrastructure Security and Resilience.** The State or Sponsor, as applicable, acknowledges that it has considered and addressed physical and cybersecurity and resilience in its project planning, design, and oversight, as determined by the DOT and the Department of Homeland Security (DHS). For airports that do not have specific DOT or DHS cybersecurity requirements, the FAA encourages the voluntary adoption of the cybersecurity requirements from the Transportation Security Administration and Federal Security Director identified for security risk Category X airports.

29. **Title VI of the Civil Rights Act.** As a condition of a grant award, the Sponsor shall demonstrate that it complies with the provisions of Title VI of the Civil Rights Act of 1964 (42 U.S.C. §§ 2000 et seq) and implementing regulations (49 CFR part 21), the Airport and Airway Improvement Act of 1982 (49 U.S.C. § 47123), the Age Discrimination Act of 1975 (42 U.S.C. 6101 et seq.), Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794 et seq.), the Americans with Disabilities Act of 1990 (42 U.S.C. § 12101 et seq.), U.S. Department of Transportation and Federal Aviation Administration (FAA) Assurances, and other relevant civil rights statutes, regulations, or authorities, including any amendments or updates thereto. This may include, as applicable, providing a current Title VI Program Plan to the FAA for approval, in the format and according to the timeline required by the FAA, and other information about the communities that will be benefited and impacted by the project. A completed FAA Title VI Pre-Grant Award Checklist is required for every grant application, unless excused by the FAA. The Sponsor shall affirmatively ensure that when carrying out any project supported by this grant that it complies with all federal nondiscrimination and civil rights laws based on race, color, national origin, sex, creed, age, disability, genetic information, in consideration for federal financial assistance. The Department's and FAA's Office of Civil Rights may provide resources and technical assistance to recipients to ensure full and sustainable compliance with Federal civil rights requirements. Failure to comply with civil rights requirements will be considered a violation of the agreement or contract and be subject to any enforcement action as authorized by law.

30. **FAA Reauthorization Act of 2024.** This grant agreement is subject to the terms and conditions contained herein including the terms known as the Grant Assurances as they were published in the Federal Register in April 2025. On May 16, 2024, the FAA Reauthorization Act of 2024 made certain amendments to 49 U.S.C. chapter 471. The Reauthorization Act will require the FAA to make certain amendments to the assurances in order to best achieve consistency with the statute. Federal law requires that the FAA publish any amendments to the assurances in the Federal Register along with an opportunity to comment. In order not to delay the offer of this grant, the existing assurances are attached herein; however, the FAA shall interpret and apply these assurances consistent with the Reauthorization Act. To the extent there is a conflict between the assurances and Federal statutes, the statutes shall apply. The full text of the FAA Reauthorization Act of 2024 is at: https://www.congress.gov/bill/118th-congress/house-bill/3935/text

31. **Applicable Federal Anti-Discrimination Laws.** Pursuant to Section (3)b)(iv), Executive Order 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, the sponsor:

   a. Agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of 31 U.S.C. 3729(b)(4); and

10

b. certifies that it does not operate any programs promoting diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal anti-discrimination laws.

32. **Federal Law and Public Policy Requirements.** The Sponsor shall ensure that Federal funding is expended in full accordance with the United States Constitution, Federal law, and statutory and public policy requirements: including but not limited to, those protecting free speech, religious liberty, public welfare, the environment, and prohibiting discrimination; and the Sponsor will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in and the enforcement of Federal immigration law.

33. **National Airspace System Requirements.**

   (a) The Sponsor shall cooperate with FAA activities installing, maintaining, replacing, improving, or operating equipment and facilities in or supporting the National Airspace System, including waiving permitting requirements and other restrictions affecting those activities to the maximum extent possible, and assisting the FAA in securing waivers of permitting or other restrictions from other authorities. The Sponsor shall not take actions that frustrate or prevent the FAA from installing, maintaining, replacing, improving, or operating equipment and facilities in or supporting the National Airspace System.

   (b) If the FAA determines that the Sponsor has violated subsection (a), the FAA may impose a remedy, including:

   1) additional conditions on the award;
   2) consistent with 49 U.S.C. chapter 471, any remedy permitted under 2 CFR 200.339–200.340, including withholding of payments; disallowance of previously reimbursed costs; requiring refunds from the Recipient to the DOT; suspension or termination of the award; or suspension and debarment under 2 CFR part 180; or
   3) any other remedy legally available.

   (c) In imposing a remedy under this condition, the FAA may elect to consider the interests of only the FAA.

   (d) The Sponsor acknowledges that amounts that the FAA requires the Sponsor to refund to the FAA due to a remedy under this condition constitute a debt to the Federal Government that the FAA may collect under 2 CFR 200.346 and the Federal Claims Collection Standards (31 CFR parts 900–904).

34. **Signage Costs for Construction Projects.** The Sponsor agrees that it will require the prime contractor of a Federally assisted airport improvement project to post signs consistent with a DOT/FAA-prescribed format, as may be requested by the DOT/FAA, and further agrees to remove any signs posted in response to FAA requests received prior to February 1, 2025.

35. **Title 8 - U.S.C., Chapter 12, Subchapter II - Immigration.** The sponsor will follow applicable federal laws pertaining to Subchapter 12, and be subject to the penalties set forth in 8 U.S.C. § 1324, Bringing in and harboring certain aliens, and 8 U.S.C. § 1327, Aiding or assisting certain aliens to enter.

11

# Exhibit O

**FEDERAL HIGHWAY ADMINISTRATION**

**COMPETITIVE GRANT PROGRAM GENERAL TERMS AND CONDITIONS**

**Date: April 22, 2025**

**GENERAL TERMS AND CONDITIONS**

These General Terms and Conditions are incorporated by reference in this grant agreement under the Grant Program. The term "Recipient" is defined in this grant agreement. This grant agreement includes schedules A through H. The grant agreement may include special terms and conditions in grant agreement articles or schedules.

**ARTICLE 1**
**PURPOSE**

1.1    **Purpose.** The purpose of this award is to fund the eligible project defined in this grant agreement that has been selected to receive an award for the Grant Program. The parties will accomplish that purpose by achieving the following objectives:

    (1)    timely completing the Project; and

    (2)    ensuring that this award does not substitute for non-Federal investment in the Project, except as proposed in the Technical Application, as modified by schedule E.

**ARTICLE 2**
**FHWA ROLE**

2.1    **Federal Highway Administration (FHWA) Responsibilities.**

(a)    The FHWA is the operating administration under the United States Department of Transportation ("USDOT") responsible for the administration of the Grant Program, the approval and execution of this grant agreement, and any modifications to this grant agreement under section 15.1.

**ARTICLE 3**
**RECIPIENT ROLE**

3.1    **Statements on the Project.** The Recipient states that:

    (1)    all material statements of fact in the Technical Application were accurate when that application was submitted; and

    (2)    schedule E documents all material changes in the information contained in that application.

3.2    **Statements on Authority and Capacity.** The Recipient states that:

(4)     documents the results of a self-assessment of the Recipient's cybersecurity posture and capabilities; and

(5)     describes any additional actions that the Recipient has taken to consider or address cybersecurity risk of the transportation infrastructure being improved in the Project.

## ARTICLE 18
## FEDERAL FINANCIAL ASSISTANCE, ADMINISTRATIVE, AND NATIONAL POLICY REQUIREMENTS

**18.1     Uniform Administrative Requirements for Federal Awards.** The Recipient shall comply with the obligations on non-Federal entities under 2 C.F.R. parts 200 and 1201.

**18.2     Federal Law and Public Policy Requirements.**

(a) The Recipient shall ensure that Federal funding is expended in full accordance with the United States Constitution, Federal law, and statutory and public policy requirements: including but not limited to, those protecting free speech, religious liberty, public welfare, the environment, and prohibiting discrimination; and the Recipient will cooperate with Federal officials in the enforcement of Federal law, including cooperating with and not impeding U.S. Immigration and Customs Enforcement (ICE) and other Federal offices and components of the Department of Homeland Security in the enforcement of Federal immigration law.

(b) The failure of this grant agreement to expressly identify Federal law applicable to the Recipient or activities under this grant agreement does not make that law inapplicable.

**18.3     Implementation of Executive Order 14025.** Consistent with Executive Order 14025, "Worker Organizing and Empowerment" (Apr. 26, 2021), Schedule H, Labor and Work, documents the consideration of job quality and labor rights, standards, and protections related to the Project.

**18.4     Implementation of Executive Order 14173**

(a) Pursuant to Section (3)(b)(iv)(A), Executive Order 14173, Ending Illegal Discrimination And Restoring Merit-Based Opportunity, the Recipient agrees that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code.

(b) Pursuant to Section (3)(b)(iv)(B), Executive Order 14173, Ending Illegal Discrimination And Restoring Merit-Based Opportunity, by entering into this agreement, the Recipient certifies that it does not operate any programs promoting diversity, equity, and inclusion (DEI) initiatives that violate any applicable Federal