# EXHIBIT 1

| | | |
|---|---|---|
| 1 | TONY LOPRESTI, SBN 289269<br>County Counsel | DAVID CHIU, SBN 189542<br>City Attorney |
| 2 | KAVITA NARAYAN, SBN 264191<br>Chief Assistant County Counsel | YVONNE R. MERÉ, SBN 175394<br>Chief Deputy City Attorney |
| 3 | MEREDITH A. JOHNSON, SBN 291018<br>Lead Deputy County Counsel | MOLLIE M. LEE, SBN 251404<br>Chief of Strategic Advocacy |
| 4 | RAPHAEL N. RAJENDRA, SBN 255096<br>HANNAH M. GODBEY, SBN 334475 | SARA J. EISENBERG, SBN 269303<br>Chief of Complex and Affirmative Litigation |
| 5 | Deputy County Counsels<br>70 West Hedding Street, East Wing, Ninth Floor | DAVID S. LOUK, SBN 304654<br>STEVEN A. MILLS, SBN 328016 |
| 6 | San José, California 95110-1770<br>Telephone: (408) 299-5900 | Deputy City Attorneys<br>Fox Plaza |
| 7 | E-Mail:       Raphael.Rajendra@cco.sccgov.org<br>                  Hannah.Godbey@cco.sccgov.org | 1390 Market Street, 7th Floor<br>San Francisco, CA 94102-5408 |
| 8 | | Telephone: (415) 355-3308<br>E-Mail:       David.Louk@sfcityatty.org |
| 9 | |                  Steven.Mills@sfcityatty.org |
| 10 | *Attorneys for Plaintiff*<br>*County of Santa Clara* | *Attorneys for Plaintiff*<br>*City and County of San Francisco* |
| 11 | *[additional counsel on signature page]* | |

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| 15 | COUNTY OF SANTA CLARA; CITY AND<br>COUNTY OF SAN FRANCISCO; CITY OF<br>ALAMEDA; CITY OF BELLINGHAM; CITY | No. 25-8330 |
| 16 | OF BERKELEY; CITY OF CULVER CITY;<br>CITY OF LOS ANGELES; COUNTY OF LOS | **COMPLAINT FOR DECLARATORY AND**<br>**INJUNCTIVE RELIEF** |
| 17 | ANGELES; LOS ANGELES COUNTY<br>CONSOLIDATED FIRE PROTECTION | |
| 18 | DISTRICT; MARTIN LUTHER KING, JR.<br>COUNTY; COUNTY OF MARIN; CITY OF | |
| 19 | OAKLAND; CITY OF PALO ALTO; CITY OF<br>PASADENA; CITY OF PETALUMA; PIERCE | |
| 20 | COUNTY; CITY OF SACRAMENTO; CITY OF<br>SAN DIEGO; COUNTY OF SAN DIEGO; CITY | |
| 21 | OF SAN JOSÉ; COUNTY OF SAN MATEO;<br>CITY OF SANTA MONICA; CITY OF SANTA | |
| 22 | ROSA; SNOHOMISH COUNTY; COUNTY OF<br>SONOMA; SONOMA COUNTY | |
| 23 | COMMUNITY DEVELOPMENT<br>COMMISSION; SONOMA COUNTY WATER | |
| 24 | AGENCY; SONOMA VALLEY COUNTY<br>SANITATION DISTRICT; and CITY OF | |
| 25 | TUCSON, | |
| 26 |                  Plaintiffs, | |
| 27 |                  v. | |
| 28 | KRISTI NOEM, in her official capacity as<br>Secretary of Homeland Security; UNITED | |

STATES DEPARTMENT OF HOMELAND
SECURITY; DAVID RICHARDSON, in his
official capacity as Senior Official Performing the
Duties of FEMA Administrator; and FEDERAL
EMERGENCY MANAGEMENT AGENCY,

                    Defendants.

## INTRODUCTION

1.      For three quarters of a century, it has been "the intent of the Congress . . . to provide
an orderly and continuing means of assistance by the Federal Government to State and local
governments in carrying out their responsibilities to alleviate the suffering and damage" resulting
from disasters.  42 U.S.C. § 5121(b); Federal Disaster Relief Act of 1950, Pub. L. No. 81-875, § 1,
64 Stat. 1109.  As a result, Congress has long directed the federal government to provide funding to
help States and local governments prepare for, reduce the risk of, and recover from "loss of life,
human suffering, loss of income, and property loss and damage" from disasters, as well as the
"disrupt[ion] [of] the normal functioning of governments and communities" and severe adverse
effects on "individuals and families" disasters cause.  42 U.S.C. § 5121(a); *see generally* Robert T.
Stafford Disaster Relief and Emergency Assistance Act, as amended, 42 U.S.C. ch. 68.

2.      Pursuant to these and related authorities, Congress has established the framework for
a complex, multi-layered emergency-management infrastructure to prepare for, mitigate, and recover
from the harms caused by unpredictable disasters and emergencies; encouraged States and local
governments to co-create that infrastructure with the federal government; and directed the federal
government to collaborate with willing States and local governments in that undertaking.

3.      In support of that system, Congress appropriates billions of dollars each year to grant
programs that financially support state and local governments in preparing for, responding to, and
recovering from disasters.  State and local governments rely heavily on this grant funding to perform
a wide array of functions essential to the safety of the residents and communities they serve—from
supporting first responders' salaries and training, purchasing hazmat equipment, and preparing for
and mitigating the risks of earthquakes, floods, and fires, to training public employees on how to
serve the public during natural disasters, funding search and rescue efforts, and strengthening

1    computer systems with cybersecurity tools.  In short, Congress has made federal funding of state and

2    local governments' emergency-management operations an essential linchpin in the systems that

3    secure the Nation.  Without that funding, people across the country will face greater risk of suffering

4    and death from disasters; homes and businesses will face greater risk of destruction; and state and

5    local governments will suffer significant economic consequences to their budgets and workforces, as

6    well as their ability to best address their communities' unique needs.

7         4.    Congress has largely assigned the duty to distribute these federal funds to the

8    Department of Homeland Security (DHS) and the Federal Emergency Management Agency

9    (FEMA), a component agency of DHS.  While DHS and FEMA retain limited discretion over the

10   allocation of some of that funding, much of the funding is allocated to state and local governments

11   by formulas Congress has set out by statute.

12        5.    Plaintiffs in this case are local government entities that are collectively responsible

13   for the safety and well-being of tens of millions of residents.  To carry out that responsibility,

14   Plaintiffs must prepare for and respond to potential disasters and emergencies, from wildfires,

15   earthquakes, floods, severe weather events, infectious diseases, and invasive agricultural pests, to

16   mass shootings, acts of terrorism, or threats of physical attacks.  Plaintiffs use the congressionally

17   appropriated funds from DHS to support a wide range of activities to prevent and respond to these

18   threats, including providing emergency management training, enhancing the technology on which

19   emergency operation centers operate, building out public-alert communications systems, and

20   purchasing equipment on which first-responders and other emergency response operations rely.

21        6.    For the first time in the 75-year history of Congress's financial support for state and

22   local governments' disaster preparedness, mitigation, and recovery, the Executive Branch has now

23   determined to use this critical federal funding as a cudgel, threatening to hamstring state and local

24   governments' emergency-management functions unless they acquiesce to unrelated Executive

25   domestic policy goals.  Specifically, DHS has adopted unlawful new conditions in its "Standard

26   Terms and Conditions" that require adherence to the Executive Branch's domestic political agenda

27   and imposed those new conditions as barriers to Plaintiffs' acceptance of a range of grants

28   administered by DHS and FEMA.

7.      As relevant here, the new conditions require grant recipients and subrecipients to agree to and certify compliance with an interpretation of antidiscrimination law that is contrary to statutory and decisional law (the "Discrimination Condition," described in paragraph 171 below); agree to use their limited resources to cooperate with Immigration and Customs Enforcement (ICE) and other federal immigration enforcement activities and certify that use (the "Immigration Conditions," described in paragraph 172 below); and agree in advance to comply with all executive orders the President has issued *and* might in the future issue to advance and impose his domestic political agenda on them (the "EO Condition," described in paragraph 173 below) (together, the "Challenged DHS Conditions").

8.      Conditioning funding on new, unrelated, policy-driven conditions corrupts the purposes for which Congress established and appropriates funding to these grant programs in the first place: strengthening community resiliency and alleviating the suffering and damage caused by natural and human-made disasters.  Indeed, the Executive's imposition of the Challenged DHS Conditions will diminish emergency-management capacity across the country, threatening to exacerbate rather than alleviate the suffering and damage that result from disasters.  What is more, the Challenged DHS Conditions are inscrutably vague, subjective, and overbroad, and the Executive's imposition of the conditions on Plaintiffs' grants upsets the separation of powers, exceeds the federal government's authority to place conditions on federal funding, and flouts bedrock limits on how federal agencies must consider, reach, and implement their decisions.  Neither the Constitution nor Congress empowers the Executive to hold federal emergency-management funding hostage to the Administration's political agenda by adopting and imposing the Challenged DHS Conditions on the grants at issue in this action.

9.      The result is that local governments in line to receive federal funding from DHS for emergency-management activities now face a choice that is not only untenable and unlawful, but also urgent: either accept conditions that are unconstitutional and contrary to law, or lose millions of dollars in federal grant funding used to keep their residents safe and ensure continuity of government.  That quandary is itself unconstitutional, and it inflicts substantial budget uncertainty on Plaintiffs in this action, which must now choose between acceding to these unlawful and

Complaint for Declaratory and Injunctive Relief                                                25-8330

1  unconstitutional conditions and losing hundreds of millions of dollars in critical federal disaster

2  funding.

3       10.    Plaintiffs bring this suit to challenge the imposition of the Challenged DHS

4  Conditions on their DHS- and FEMA-administered grants.  Plaintiffs seek and are entitled to a

5  declaratory judgment that Defendants' adoption and application of the Challenged DHS Conditions

6  are unlawful, as well as injunctive relief barring Defendants from applying or enforcing the

7  Challenged DHS Conditions or any materially similar conditions in connection with Plaintiffs' DHS

8  grants.

9  **JURISDICTION AND VENUE**

10       11.    This Court has jurisdiction under 28 U.S.C. § 1331 because this is a civil action

11  arising under the Constitution and other laws of the United States.

12       12.    In addition to its other remedial authorities, this Court has authority to issue

13  declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02.

14       13.    Venue properly lies within the Northern District of California under 28 U.S.C.

15  §§ 1391(b)(2) and 1391(e)(1) because Plaintiffs County of Santa Clara, City and County of San

16  Francisco, City of Alameda, City of Berkeley, County of Marin, City of Oakland, City of Palo Alto,

17  City of Petaluma, City of San José, County of San Mateo, City of Santa Rosa, County of Sonoma,

18  Sonoma County Community Development Commission, Sonoma County Water Agency, and

19  Sonoma Valley County Sanitation District are in this judicial district; no real property is involved in

20  this action; and a substantial part of the events or omissions giving rise to this action occurred in this

21  District.

22  **DIVISIONAL ASSIGNMENT**

23       14.    Assignment to the San Francisco Division of this District is proper under Civil

24  L.R. 3-2(c)-(d) because the San Francisco Division is the Division serving San Francisco, which is

25  where a substantial part of the events or omissions giving rise to the claims asserted below occurred,

26  and is therefore where this action arises.

27  / / /

28  / / /

**PARTIES**

A.      **Plaintiffs**

15.      Plaintiff County of Santa Clara ("Santa Clara") is a charter county and political subdivision of the State of California.

16.      Plaintiff City and County of San Francisco ("San Francisco") is a municipal corporation organized and existing under and by virtue of the laws of the State of California, and is a charter city and county.

17.      Plaintiff City of Alameda ("Alameda") is a chartered municipal corporation organized and existing under the laws of the State of California.

18.      Plaintiff City of Bellingham ("Bellingham") is a municipal corporation organized and existing under the laws of the State of Washington.

19.      Plaintiff the City of Berkeley ("Berkeley") is a municipal corporation and charter city organized and existing under the laws of the State of California.

20.      Plaintiff City of Culver City ("Culver City") is a municipal corporation and charter city organized and existing under the laws of the State of California.

21.      Plaintiff the City of Los Angeles ("LA City") is a municipal corporation and charter city organized and existing under the laws of the State of California and the Los Angeles City Charter.

22.      Plaintiff the County of Los Angeles ("LA County") is a subdivision of the State of California.

23.      Plaintiff Los Angeles County Consolidated Fire Protection District ("LA County Fire") is a special district organized and existing under the laws of the State of California.

24.      Plaintiff Martin Luther King, Jr. County ("King County") is a home rule charter county organized and existing under and by virtue of the constitution and laws of the State of Washington.

25.      Plaintiff the County of Marin ("Marin County") is a general law county and political subdivision of the State of California.

/ / /

26.     Plaintiff the City of Oakland ("Oakland") is a charter city organized and existing under and by virtue of the laws of the State of California.

27.     Plaintiff City of Palo Alto ("Palo Alto") is a chartered municipal corporation existing under the laws of the State of California.

28.     Plaintiff City of Pasadena ("Pasadena") is a home rule charter city organized and existing under the laws of the State of California.

29.     Plaintiff City of Petaluma ("Petaluma") is a municipal corporation and charter city organized and existing under the constitution and laws of the State of California.

30.     Plaintiff Pierce County is a home rule charter county organized and existing under and by virtue of the constitution and laws of the State of Washington.

31.     Plaintiff City of Sacramento ("Sacramento") is a municipal corporation organized and existing under and by virtue of the laws of the State of California and is a charter city.

32.     Plaintiff City of San Diego ("San Diego City") is a municipal corporation and charter city organized and existing under and by virtue of the laws of the State of California

33.     Plaintiff County of San Diego ("San Diego County") is a subdivision of the State of California.

34.     Plaintiff City of San José ("San José") is a municipal corporation organized and existing under and by virtue of the laws of the State of California and is a charter city.

35.     Plaintiff County of San Mateo ("San Mateo County") is a charter county and political subdivision of the State of California.

36.     Plaintiff City of Santa Monica ("Santa Monica") is a municipal corporation organized and existing under the laws of the State of California.

37.     Plaintiff the City of Santa Rosa ("Santa Rosa") is a municipal corporation organized and existing under and by virtue of the laws of the State of California and is a charter city.

38.     Plaintiff Snohomish County ("Snohomish County") is a political subdivision of the State of Washington.

39.     Plaintiff the County of Sonoma ("Sonoma County") is a political subdivision of the State of California.

40.     Plaintiff Sonoma County Community Development Commission (SCCDC) is a public entity, formed pursuant to California Health and Safety Code section 34110, *et seq*., which provides affordable housing and community infrastructure projects and supports nonprofit organizations that serve low-income populations in Sonoma County.

41.     Plaintiff Sonoma County Water Agency ("Sonoma Water") was created as a special district in 1949 by the California Legislature to provide flood protection and water supply services to over 600,000 residents throughout Sonoma and northern Marin Counties.

42.     Plaintiff Sonoma Valley County Sanitation District (SVCSD) is a sanitation district, existing under California state law, that provides public wastewater collection and treatment for the City of Sonoma and numerous unincorporated communities within the Sonoma Valley.

43.     Plaintiff Sonoma County Water Agency ("Sonoma Water") was created as a special district in 1949 by the California Legislature to provide flood protection and water supply services to over 600,000 residents throughout Sonoma and northern Marin Counties.  Sonoma Water has held responsibility for managing SVCD since 1995.

44.     Plaintiff City of Tucson ("Tucson") is a municipal corporation organized and existing under the laws of the State of Arizona.

45.     Plaintiffs are aggrieved and have standing to bring this action because Defendants' adoption and imposition of the Challenged DHS Conditions has injured, is injuring, and will continue to injure Plaintiffs unless and until application and enforcement of the Challenged DHS Conditions is permanently enjoined.

**B.     Defendants**

46.     Defendant Kristi Noem is the Secretary of Homeland Security.  She is sued in her official capacity, in which capacity she is responsible for overseeing and administering all duties and programs of DHS, and in which capacity she executed a document purporting to delegate to Defendant David Richardson all functions and duties of the FEMA Administrator except to the extent such functions and duties are nondelegable by law.  Congress has prohibited the Secretary of Homeland Security from changing FEMA's mission, including by "substantially or significantly reduc[ing] . . . the authorities, responsibilities, or functions of [FEMA] or the capability of [FEMA]

1    to perform those missions, authorities, [or] responsibilities," except to the extent Congress expressly

2    authorizes the Secretary to do so.  6 U.S.C. § 316(c)(1).

3         47.    Defendant United States Department of Homeland Security (DHS) is an agency and

4    executive department of the United States government.  DHS has responsibility for implementing the

5    federal grant programs at issue in this action, including through FEMA.  DHS is an "agency" within

6    the meaning of the Administrative Procedure Act (APA), 5 U.S.C. § 701(b)(1).

7         48.    Defendant David Richardson is the Senior Official Performing the Duties of the

8    FEMA Administrator.  He is sued in his official capacity, in which capacity he claims to be

9    responsible for overseeing and administering all duties and programs of FEMA, except to the extent

10   the functions and duties of the FEMA Administrator are nondelegable by law.

11        49.    Defendant Federal Emergency Management Agency (FEMA) is an agency of the

12   federal government within DHS.  FEMA coordinates operational and logistical disaster relief and

13   oversees the administration of most of the federal grant programs at issue in this action.  Congress

14   has directed that FEMA is and must "be maintained as a distinct entity within" DHS.  6 U.S.C.

15   § 316(a).  FEMA is an "agency" within the meaning of the APA, 5 U.S.C. § 701(b)(1).

## ALLEGATIONS

**A.    Federal Funding for Disaster Preparedness, Mitigation, and Recovery**

18        50.    Plaintiffs are the sites of major population centers and are collectively responsible for

19   the safety and well-being of tens of millions of residents.  Plaintiffs meet that responsibility in part

20   by preparing for potential disasters and responding to emergencies in an almost untold number of

21   scenarios, from wildfires, floods, earthquakes, severe weather events, infectious diseases, and

22   invasive agricultural pests, to mass shootings, acts of terrorism, or threats of physical attacks at busy

23   international airports, mass-transit systems, large-scale special events like the Super Bowl, ports

24   where large ships load and unload goods critical to the national economy, and myriad other

25   situations.

26        51.    Each year Congress appropriates billions of dollars for DHS, and primarily FEMA, to

27   distribute as grants to state and local governments to support such disaster preparedness, mitigation,

28   and recovery efforts throughout the Nation.

Complaint for Declaratory and Injunctive Relief                                                    25-8330

52.     Plaintiffs, like virtually every state and local government across the country, rely on these federal grants to support their emergency-management functions.  Plaintiffs variously receive this grant funding directly, by executing grant agreements with FEMA or other components of DHS, and indirectly, as subgrantees of funding from the States.

53.     Specifically, while FEMA makes some of its emergency-management grant funding available directly to local governments, it disburses most of the funding to the States, which are then authorized or required to execute subgrants to distribute the funding to local governments.  This is known as "pass-through" grant funding.  When it distributes such funding to States, FEMA typically disburses funds to the agencies within each State that FEMA refers to as the State Administrative Agency, or "SAA," or the State Emergency Management Agency, or "EMA."  FEMA grants contemplate this multi-layered, pass-through structure.

54.     The SAA and EMA for California is the California Governor's Office of Emergency Services (referred to herein as "CalOES").  The SAA and EMA for Washington State is the Emergency Management Division of the Washington State Military Department (referred to herein as "WashEMD").  The SAA for Arizona is the Arizona Department of Homeland Security (referred to herein as "AZDOHS"), and the EMA for Arizona is the Arizona Department of Emergency and Military Affairs (referred to herein as "AZ-DEMA").

55.     Once this federal funding is distributed to Plaintiffs, whether directly or indirectly, Plaintiffs use the funding for a wide range of activities that directly advance the purposes for which Congress established the grant programs at issue in this action, from emergency management training and enhancing the technology on which emergency operation centers operate, and building out public-alert communications systems and supporting community preparedness, to purchasing equipment—like portable generators and medical technology, satellite phones, bomb squad hazmat suits and bomb-defusing equipment, thermal binoculars, and temporary barriers—on which first responders and other emergency response operations rely.

56.     Moreover, the programs are far more valuable to Plaintiffs and their communities than just the dollar value of their grants.  Under longstanding multi-jurisdictional agreements and by daily practice, Plaintiffs realize the benefits, savings, and force multiplication of mutual aid and

1  protection.  For instance, when Santa Clara uses federal funding to maintain and enhance the

2  capabilities of its Sheriff's Office's bomb squad, other nearby jurisdictions also benefit because the

3  Sheriff's Office can and does deploy that squad to address bomb threats in those other jurisdictions.

4  This cooperative arrangement permits other jurisdictions to use their funding for other purposes,

5  avoiding unnecessary duplication of effort and allowing all jurisdictions to use federal funding for

6  personnel, activities, and equipment that benefit the entire region, and not only an individual grantee

7  or subgrantee.  This is particularly so for regional, large-scale events like the Super Bowl, where

8  visitors attending those events will travel and stay across multiple jurisdictions.

9       57.     Indeed, Plaintiffs within California have been parties to a Disaster and Civil Defense

10  Master Mutual Aid Agreement since 1950,[1] and the State now has a robust and multilayered mutual-

11  aid arrangement.  *See generally* Cal. Gov't Code §§ 8615-8619.5.  Plaintiffs within Washington

12  State are likewise part of the Washington Intrastate Mutual Aid System.  *See generally* Wash. Rev.

13  Code Ann. ch. 38.56; *id.* § 38.52.091.[2]  Plaintiff Tucson is part of the Arizona Mutual Aid Compact

14  between and among the State of Arizona and numerous localities within Arizona.[3]  And Plaintiffs'

15  respective States are themselves members of the Emergency Management Assistance Compact

16  (EMAC), which is an interstate compact ratified by Congress that provides for mutual assistance

17  between and among the States and mutual cooperation in emergency-related exercises, testing, and

18  training activities.[4]

19       58.     Funding from the federal government has gone lengths in supporting the critical work

20

---

21  [1] *See* CalOES, California Disaster and Civil Defense Master Mutual Aid Agreement (Nov. 15,
22  1950), https://www.caloes.ca.gov/wp-content/uploads/Preparedness/Documents/CAMasterMutAidAgreement.pdf [archived at
23  https://perma.cc/W8V7-75ZV].

[2] *See also* WashEMD, Washington Mutual Aid System (WAMAS) (last accessed Sept. 30, 2025),
24  https://mil.wa.gov/washington-mutual-aid-system-wamas [archived at https://perma.cc/YU2Z-D2PP].

25  [3] *See* Arizona Mutual Aid Compact, https://dema.az.gov/sites/default/files/2023-
26  10/2024_AZMAC.pdf.

[4] *See* Emergency Management Assistance Compact, https://www.emacweb.org (last accessed
27  Sept. 30, 2025); *see also* H.R. J. Res. 193, 104th Cong. (1996), Pub. L. No. 104-321, 110 Stat. 3877
(consenting to compact); Cal. Gov't Code §§ 179-179.9 (ratifying and approving EMAC); Wash.
28  Rev. Code Ann. § 38.10.010 (enacting and entering EMAC); Ariz. Rev. Stats. § 26-402 (authorizing
governor to enter into EMAC on behalf of the State).

1   accomplished through this inter-connected system.  Plaintiffs have collectively received hundreds of

2   millions of dollars from the DHS grant programs at issue in this action in recent years, and have

3   applied for and expect to receive hundreds of millions of dollars under Fiscal Year 2025 DHS grant

4   programs, both directly from DHS and also indirectly as subgrantees of their States.

5   **B.      Plaintiffs Have Received and Expect to Receive Federal Funding from Many DHS**
    **         Grant Programs**

6

7          59.      Within California, CalOES is the SAA and EMA designated by FEMA and is the

8   agency primarily responsible for receiving, using, and distributing FEMA grant funding.  Emergency

9   management in California is organized into geographic units called operational areas, and state law

10  designates each county and all political subdivisions within it as an operational area.  Each

11  operational area has a designated lead agency, which holds primary responsibility and authority

12  within the area for communication and coordination related to emergency management, including

13  with local, state, and federal officials, community organizations, and individuals.  Cal. Gov't Code

14  §§ 8559(b), 8605.

15         60.      Santa Clara is the lead agency for the Santa Clara County Operational Area, which

16  also includes Plaintiffs Palo Alto and San José.  San Francisco is the lead agency for the San

17  Francisco Operational Area.  LA County is the lead agency for the County of Los Angeles

18  Operational Area, which also includes Plaintiffs LA City, Culver City, Pasadena, and Santa Monica.

19  San Diego County is the lead agency for the San Diego County Operational Area, which also

20  includes San Diego City.  Sonoma County is the lead agency for the Sonoma County Operational

21  Area, which also includes Plaintiffs Santa Rosa and Petaluma.  Non-party County of Alameda is the

22  lead agency for the Alameda County Operational Area, which includes Plaintiffs Alameda City,

23  Berkeley, and Oakland.  Non-party County of Sacramento is the lead agency for the Sacramento

24  County Operational Area, which includes Plaintiff Sacramento City.  San Mateo County is the lead

25  agency for the San Mateo Operational Area.  Marin County is the lead agency for the Marin County

26  Operational Area.

27         61.      Within Washington State, WashEMD is the SAA and EMA designated by FEMA and

28  is the agency that leads and coordinates mitigation, preparedness, response, and recovery in

Complaint for Declaratory and Injunctive Relief                                              25-8330

Washington State to minimize the impact of disasters and emergencies on the people, property, environment, and economy. Emergency management in Washington State is organized into local emergency management organizations, which are responsible for developing and keeping updated a comprehensive emergency management plan that sets out plans and policies to mitigate, prepare for, respond to, and recover from emergencies and disasters. All political subdivisions of the State must establish or join a local emergency management organization. Wash. Rev. Code Ann. chs. 38.52, 118-30; *id.* § 38.52.070.

62. King County, Pierce County, and Snohomish County have each established a local emergency management organization and adopted a comprehensive emergency management plan under state law.

63. Within Arizona, AZDOHS is the SAA and AZ-DEMA is the EMA. AZ-DEMA leads and coordinates emergency preparedness, response, recovery, and mitigation efforts to reduce the impact of emergencies and disasters on people and property. AZDOHS administers and manages federal homeland security grants related to prevention of terrorism and other critical hazards that affect the safety and well-being of its residents. Counties and incorporated cities and towns within Arizona must establish and provide for emergency management within their jurisdictions, and may enter into mutual aid agreements among themselves to provide aid during an emergency. Ariz. Rev. Stat. §§ 26-308, 26-309.

64. Tucson handles planning and response for local emergencies and disasters in coordination with Pima County, which has promulgated an Emergency Operations Plan and established an Emergency Management Organization impacting multiple jurisdictions within the County.

65. Plaintiffs have received or been awarded, or anticipate receiving or being awarded, grants or subgrants under one or more of the following grant programs administered by FEMA:

    a.    Emergency Management Performance Grant Program (EMPG)

    b.    Homeland Security Grant Program (HSGP), including the following two components of that program: State Homeland Security Program (SHSP) and Urban Areas Security Initiative (UASI)

1    c.    Assistance to Firefighters Grant Program (AFG)

2    d.    Hazard Mitigation Grant Program (HMGP)

3    e.    Port Security Grant Program (PSGP)

4    f.    Staffing for Adequate Fire and Emergency Response (SAFER)

5    g.    Fire Prevention and Safety Grants (FP&S)

6    h.    Transit Security Grant Program (TSGP)

7    i.    National Urban Search and Rescue (US&R)

8    66.    Plaintiff LA City has received, and anticipates receiving, grants under the Securing

9    the Cities Grant Program (STC), which is administered by an office within DHS called the

10    Countering Weapons of Mass Destruction Office.  All of the grant programs described in

11    paragraph 65 and the STC are referred to collectively herein as the "Subject Grant Programs."

12    **i.    Emergency Management Performance Grant Program (EMPG)**

13    67.    The Emergency Management Performance Grant Program (EMPG) provides federal

14    funding, passed through the States, to assist state, local, tribal, and territorial emergency

15    management agencies in implementing FEMA's National Preparedness System (a systematic

16    process for developing national preparedness), including by building continuity-of-government

17    capabilities to ensure essential functions in a catastrophic disaster and otherwise working toward the

18    National Preparedness Goal (which FEMA has articulated as "[a] secure and resilient nation with the

19    capabilities required across the whole community to prevent, protect against, mitigate, respond to,

20    and recover from the threats and hazards that pose the greatest risk").

21    68.    EMPG funding supports States and local governments in developing or enhancing

22    emergency management planning activities, emergency operations plans, public alerts and warning

23    systems, emergency response coordination among agencies, mutual aid systems, shelter and

24    evacuation preparedness, and disaster recovery.  EMPG funding also supports the purchase of

25    certain forms of equipment, as well as day-to-day activities in support of emergency management.

26    69.    EMPG funds have been made available to States since an initial appropriation for the

27    program in 2003.  *See* Pub. L. No. 108-7, 117 Stat. 11, 516.  Congress has since made the program

28    permanent and codified it at 6 U.S.C. § 762.

Complaint for Declaratory and Injunctive Relief                                    25-8330

70. FEMA's allocation of EMPG funds among the States is set by statutory formula. For each year's apportioned amount of EMPG funding, FEMA must allocate to certain territories a baseline amount of 0.25 percent of the appropriated funds and to the States a baseline amount of 0.75 percent of the appropriated funds. 6 U.S.C. § 762(d)(1). FEMA must apportion the remaining amount among the States on a population-share basis. *Id.* § 762(d)(2).

71. The EMPG permits States to allow subrecipients to apply for a share of the EMPG funding that they receive from FEMA. Plaintiffs Santa Clara, San Francisco, Bellingham, King County, Marin County, LA City, LA County, San Diego County, Pierce County, and Snohomish County (the "EMPG Plaintiffs") have received or been awarded, or anticipate receiving or being awarded, FY 2025 EMPG pass-through funding. Numerous Plaintiffs also anticipate applying for future EMPG pass-through funding.

72. Local governments use EMPG funding for a wide range of emergency response programming. For instance, EMPG dollars fund the salaries of EMPG Plaintiffs' employees, including emergency managers, who lead coordination efforts to prepare for and respond to natural disasters or mass casualty events.

73. The EMPG program also funds communications and facilities for EMPG Plaintiffs' emergency response; training programs for staff members playing central roles in disaster response; and costs for software that is critical to the proper functioning of Plaintiffs' emergency operations centers, which are physical and electronic locations from which Plaintiffs often conduct their responsibilities as lead agencies for their operational areas in the event of a disaster or public health emergency.

74. EMPG funds allow the EMPG Plaintiffs to advance their emergency management preparedness in ways they otherwise could not. The EMPG Plaintiffs would otherwise not be able to employ or train the emergency management staff funded by EMPG funds, severely diminishing the EMPG Plaintiffs' ability to coordinate emergency response and disaster relief and recovery.

75. For example, Santa Clara uses EMPG funding to support County and city staff throughout the Santa Clara County Operational Area in receiving training to build their expertise in emergency management and homeland security protection work, including specialized training in

1  crisis communications and emergency planning for schools; to purchase computers and other vital

2  equipment for local Emergency Operations Centers; and to support connecting local community- and

3  faith-based organizations to regional emergency response activities to keep the community better

4  informed and connected.

5  76.     EMPG grant performance periods also often remain open for two or more years,

6  meaning that an award in one fiscal year usually allows receiving Plaintiffs to continue to support

7  program activities beyond the fiscal year in which the funding is awarded.

8  77.     In its FY 2025 EMPG Notice of Funding Opportunity (NOFO) published on July 28,

9  2025, FEMA announced that it allocated California $24,392,241, Washington State $6,835,572, and

10  Arizona $6,625,941; directed applicants to apply for funding by August 11, 2025; and stated that the

11  award date would be no later than September 30, 2025.[5]  The NOFO states that recipients of EMPG

12  funding "must comply with the DHS Standard Terms and Conditions in effect as of the date of the

13  federal award," which include the Challenged DHS Conditions.

14  78.     CalOES and WashEMD timely applied to FEMA for FY 2025 EMPG funding.  The

15  EMPG Plaintiffs have timely applied or expect to timely apply to CalOES and WashEMD,

16  respectively, for a share of their State's EMPG funding, or have applied or will timely apply for

17  pass-through funding from a state subrecipient.

18  79.     On August 8, 2025, CalOES issued Grants Management Memorandum (GMM) 2025-

19  07, which states that, of California's FY 2025 EMPG funding, CalOES will allocate $451,385 to the

20  Santa Clara County Operational Area; $267,970 to the San Francisco Operational Area; $1,802,009

21  to the County of Los Angeles Operational Area; $690,432 to the San Diego County Operational

22  Area; $252,062 to the San Mateo Operational Area; $206,984 to the Sonoma County Operational

23  / / /

24  / / /

25  / / /

26

27  _____

28  [5] FEMA, NOFO: FY 2025 Emergency Management Performance Grant Program (Jul. 28, 2025),
https://www.fema.gov/grants/preparedness/emergency-management-performance/fy-25-nofo
[archived at https://perma.cc/L2ZD-C7GD].

1   Area; $168,221 to the Marin County Operational Area, and $407,277 to the Alameda County

2   Operational Area.[6]

3       80.     By September 30, 2025, FEMA had awarded FY 2025 EMPG funding to California

4   and Washington.

5       **ii.    Homeland Security Grant Program (HSGP)**

6       81.     FEMA's Homeland Security Grant Program (HSGP) comprises several discrete

7   subprograms, including two through which Plaintiffs have historically received grant funding and

8   expect to apply for and receive grant funding in the current fiscal year: the State Homeland Security

9   Program (HSGP-SHSP) and the Urban Area Security Initiative (HSGP-UASI) grant program.

10      82.     FEMA issues a single consolidated NOFO for all of the programs that comprise the

11  Homeland Security Grant Program.

12      83.     In its FY 2025 HSGP NOFO published on July 28, 2025 and updated on August 1,

13  2025, FEMA announced that it allocated a total of $1.008 billion in HSGP funding, including

14  $373.5 million in HSGP-SHSP funding and $553.5 million in HSGP-UASI funding; and that of

15  those amounts, FEMA allocated to California $55,863,486 in SHSP funding and a total of

16  $109,325,268 in HSGP-UASI funding, of which FEMA allocated $32,451,685 to the San Francisco-

17  San José-Oakland Urban Area, $38,664,255 to the Los Angeles/Long Beach Urban Area, $4,516,008

18  to the Sacramento-Roseville-Folsom Urban Area, $17,716,678 to the San Diego-Chula Vista-

19  Carlsbad, CA Urban Area, and $12,713,580 to the Seattle-Tacoma-Bellevue Urban Area.  The

20  FEMA NOFO directed applicants to apply for funding by August 15, 2025.[7]

21      84.     The NOFO states that recipients of Homeland Security Grant Program funding,

22  including under the HSGP-SHSP and HSGP-UASI programs, "must comply with the DHS Standard

23  / / /

24

25

---

26  [6] CalOES, GMM 2025-07, *Fiscal Year (FY) 2025 EMPG Allocations* (Aug. 8, 2025), https://www.caloes.ca.gov/wp-content/uploads/Grants/Documents/GMM-2025-07-FY-2025-EMPG-Allocations.pdf [archived at https://perma.cc/P6T8-98TT].

27  [7] FEMA, NOFO: FY 2025 Homeland Security Grant Program (Jul. 28, 2025, rev. Aug. 1, 2025),

28  https://www.fema.gov/grants/preparedness/homeland-security/fy-25-nofo [archived at https://perma.cc/9793-JHYE].

1    Terms and Conditions in effect as of the date of the federal award," which include the Challenged

2    DHS Conditions.

3        85.    CalOES timely applied to FEMA for FY 2025 HSGP funding.  On August 26, 2025,

4    CalOES issued Grants Management Memorandum (GMM) 2025-08, which describes how CalOES

5    will allocate among local governments within California, including Plaintiffs, the HSGP funding that

6    FEMA's HSGP NOFO stated would be allocated to California.[8] WashEMD and AZDOHS similarly

7    timely applied to FEMA for FY 2025 HSGP funding.

8        86.    By September 30, 2025, FEMA had issued grant awards for HSGP funding to

9    California, Washington, and Arizona.[9]

10            *a.    State Homeland Security Program (SHSP) Grant Program*

11       87.    Within the Homeland Security Grant Program, State Homeland Security Program

12   (HSGP-SHSP) grants exist to provide federal funding to States—and, through them, to local

13   governments—to build the necessary capacity to prevent, prepare for, protect against, and respond to

14   acts of terrorism.

15       88.    HSGP-SHSP funds have been available to States—and, through them, to local

16   governments—since the first version of the program was created by the USA PATRIOT Act in

17   2001.  Congress codified the program at 6 U.S.C. §§ 603, 605-09.

18       89.    Congress has directed FEMA to allocate HSGP-SHSP funds pursuant to a risk

19   assessment, which determines the relative threat, vulnerability, and consequences to each State from

20   acts of terrorism, considering factors such as population density and history of threats.  *Id.*

21   § 608(a)(1).  Recipients may then use HSGP-SHSP funds for uses permitted by statute, such as

22   enhancing homeland security, conducting training exercises, upgrading equipment, or paying

23   salaries.  *Id.* § 609(a).

24   ───────────────

25   [8] CalOES, GMM 2025-08, *Fiscal Year (FY) 2025 HSGP Application Updates, Guidance, and
     Allocations* (Aug. 26, 2025), https://www.caloes.ca.gov/wp-
26   content/uploads/Grants/Documents/GMM-2025-08-FY25-HSGP-Application-Updates-and-
     Allocations.pdf [archived at https://perma.cc/4CMX-WTBT].
27
     [9] *See* Pls.' Emergency Mot for TRO, at 8, *Illinois v. Noem*, No. 1:25-cv-495 (D.R.I. filed Sept. 29,
28   2025) (ECF No. 3); Compl. at ¶ 111, *Illinois v. Noem*, No. 1:25-cv-495 (D.R.I. filed Sept. 29, 2025)
     (ECF No. 1).

90.  Because HSGP-SHSP grants are formula grants based on a statutory risk formula, not competitive grants, each State is entitled to a minimum and specific allocation based on the risk assessment whenever a notice of funding opportunity is posted.

91.  Congress has directed that the FEMA Administrator "shall ensure" that each State receives no less than an amount equal to 0.35 percent of the total funds Congress appropriated for HSGP-SHSP grants. *Id.* § 605(e)(1)(A)(v).

92.  Congress appropriates, and FEMA distributes, hundreds of millions of dollars per year in HSGP-SHSP grants to the States. In each of the three fiscal years prior to FY 2025, FEMA awarded well over $50 million to California, over $5 million to Washington, and over $4 million to Arizona. These States then subgrant substantial HSGP-SHSP grant funding to local governments, including Plaintiffs.

93.  Plaintiffs Santa Clara, San Francisco, Culver City, King County, San Mateo County, Marin County, Oakland, LA City, LA County, LA Fire, Pasadena, Pierce County, Petaluma, San Diego County, San José, Santa Monica, Sonoma County, Snohomish County, and Tucson (the "HSGP-SHSP Plaintiffs") have received or been awarded, or anticipate receiving or being awarded, FY 2025 HSGP-SHSP pass-through funding. Numerous Plaintiffs also anticipate applying for future HSGP-SHSP pass-through funding.

94.  The HSGP-SHSP Plaintiffs use these funds for myriad counterterrorism and emergency response purposes, including, but not limited to, funding special operations command teams as well as mutual aid networks of police departments, fire departments, emergency services, and public works departments, in order to mobilize first responders from outside an immediate jurisdiction in the event of a disaster.

95.  HSGP-SHSP funds allow the HSGP-SHSP Plaintiffs to advance counterterrorism and emergency management purposes in ways they otherwise could not.

96.  For example, Santa Clara uses its HSGP-SHSP grants to fund positions throughout the Santa Clara County Operational Area that focus on counterterrorism and emergency planning— including a full-time All-Hazards Coordinator position dedicated to ensuring that fire departments throughout the Operational Area are adequately equipped and trained to respond to terrorist or all-

1  hazards events; a Domestic Violent Extremism Liaison to coordinate across all law enforcement

2  agencies in the Operational Area; and a contracted Community Resilience Coordinator to engage the

3  local community in the emergency planning process.  In addition, Santa Clara's HSGP-SHSP

4  funding goes toward the purchase of critical equipment such as security systems for County election

5  sites, law enforcement information-sharing systems, rapid DNA technology for terrorist interdiction

6  and criminal investigations, and mobile equipment such as portable ventilators to deploy in mass

7  casualty events.  Finally, Santa Clara's HSGP-SHSP funding also supports services such as

8  conducting a comprehensive cybersecurity assessment of County information technology

9  infrastructure.

10      97.      San Diego County's HSGP-SHSP funding is used for salaries and training for

11  emergency response personnel, including staff to operate its Emergency Operations Center and

12  regional alert and warning systems; operation of emergency communication systems that deliver

13  critical information to the public during times of emergency; procurement of response equipment for

14  fire, law enforcement, emergency medical services, and hazardous materials teams; joint trainings

15  and exercises to strengthen regional coordination and response capabilities; cybersecurity personnel,

16  equipment and resources; the development of regional emergency response plans to ensure

17  operational readiness; and other capabilities necessary to safeguard life, property, and the region's

18  resilience against evolving threats.

19      98.      Because each HSGP-SHSP grant typically remains open for three years, an award in

20  one fiscal year usually allows grantees and subgrantees to continue to support program activities in

21  subsequent years.  For instance, several HSGP-SHSP Plaintiffs are currently relying on funding from

22  the HSGP-SHSP awards for Federal Fiscal Years 2021 through 2024.

23      99.      Of the amount of HSGP-SHSP funding that FEMA's HSGP NOFO states would be

24  allocated to California CalOES GMM 2025-08 states the amount that CalOES anticipates allocating

25  to each Operational Are, including, as relevant here, $1,852,295 to the Santa Clara County

26  Operational Area, $853,526 to the San Francisco Operational Area, $9,206,964 to the County of Los

27  Angeles Operational Area, $3,154,001 to the San Diego County Operational Area, $766,903 to the

28  San Mateo Operational Area, $521,435 to the Sonoma County Operational Area, $310,353 to the

Complaint for Declaratory and Injunctive Relief                                              25-8330

1    Marin County Operational Area, and $1,612,108 to the Alameda County Operational Area.[10]

2                    **b.      Urban Areas Security Initiative (UASI)**

3          100.    Within the Homeland Security Grant Program, Urban Areas Security Initiative

4    (HSGP-UASI) grants serve a similar purpose to HSGP-SHSP grants.  They are used to ensure

5    States—and, through them, local government entities serving high-risk urban areas—build and

6    maintain the capacity to prevent, prepare for, protect against, and respond to acts of terrorism.

7          101.    HSGP-UASI funds have been available to States—and, through them, local

8    government entities serving high-risk urban areas—since an initial version of the program was

9    created by appropriations statute in 2003.  *See* Pub. L. No. 108-90, 117 Stats. 1137, 1146.  The

10   program is codified at 6 U.S.C. §§ 603-04, 606-09.

11         102.    Each year, FEMA must conduct a risk assessment based on a list of factors specified

12   by statute to determine the relative threat, vulnerability, and consequences "eligible metropolitan

13   areas"—meaning the top one hundred most populous metropolitan statistical areas in the United

14   States—would face from an act of terrorism.  *Id.* §§ 601(5), 604(b)(2)(A)(i), 608(a)(1).  Based on

15   that risk assessment, FEMA must designate a list of high-risk urban areas that may submit

16   applications for HSGP-UASI grants.  *Id.* § 604(b)(3).  FEMA must also rely on the same set of

17   factors—including but not limited to population density and whether the given metropolitan area

18   was targeted by a past act of terrorism—to allocate funding to the States and high-risk urban areas

19   that apply for grants.  *Id.* § 608(a).

20         103.    Put another way, HSGP-UASI grants are grants based on a risk assessment formula

21   that Congress has directed FEMA to refine, establish, and use to allocate HSGP-UASI funding.

22   Each State is entitled to a specific allocation—based on FEMA's risk assessment and tied to the

23   FEMA-designated high-risk urban area or areas in that State—whenever a notice of funding

24   opportunity is posted.

25

26   _____

27   [10] CalOES, GMM 2025-08, *Fiscal Year (FY) 2025 HSGP Application Updates, Guidance, and
     Allocations* (Aug. 26, 2025), https://www.caloes.ca.gov/wp-

28   content/uploads/Grants/Documents/GMM-2025-08-FY25-HSGP-Application-Updates-and-
     Allocations.pdf [archived at https://perma.cc/4CMX-WTBT].

104.    Recipients of HSGP-UASI grant funding must use the funds for permitted purposes, including enhancing homeland security, conducting training exercises, upgrading equipment, or paying salaries. *Id.* § 609(a).

105.    States that receive HSGP-UASI funds must provide the eligible urban area or areas in that State with at least 80% of the grant funds. *Id.* § 604(d)(2)(A). Any funds retained by the State must be expended on items, services, or activities that benefit the high-risk urban area or areas. *Id.*

106.    States collectively receive hundreds of millions of dollars per year in HSGP-UASI grants, passing most of these funds along to the high-risk urban areas. States and the local government entities they pass these funds to use HSGP-UASI funds for myriad counterterrorism and emergency response purposes, including support for urban fusion centers (hubs for sharing threat-related information across government and private sector partners), SWAT teams, canine units, and bomb squads.

107.    HSGP-UASI funds allow States and local government entities to advance counterterrorism and emergency response purposes in ways they otherwise could not.

108.    For example, Santa Clara used its most recent HSGP-UASI grant award to support the purchase of an armored vehicle for its Office of the Sheriff's Emergency Response Team, enhancing its capabilities in hostage and barricade situations; and to purchase equipment for its Sheriff's Tactical Command Vehicle, which is used as a mobile hub for communications, intelligence, and logistics at major crime and attack scenes.

109.    FEMA distributes HSGP-UASI funding to the States and also determines what portion of each State's UASI funding must be allocated to particular urban areas within that State.

110.    For example, FEMA's FY 2025 HSGP NOFO allocated a portion of California's HSGP-UASI funding to the San Francisco-San José-Oakland Urban Area, which is covered by the Bay Area Urban Area Security Initiative (BAUASI). BAUASI's area extends to over 100 incorporated cities with a combined total population exceeding 8.2 million people. It is one of the most culturally and geographically diverse areas in the nation, and is home to critical infrastructure, a concentration of banking, Fortune 500 and technology companies, light and heavy industry, and iconic sites and destinations. Because of these and other factors, DHS ranks the Bay Area the fifth

1    highest urban area in terms of risk and threat in the country.

2        111.    San Francisco acts as the fiscal agent for BAUASI.  As fiscal agent, San Francisco

3    applies to CalOES for HSGP-UASI funding for BAUASI.  San Francisco is authorized and

4    responsible for issuing HSGP-UASI subgrants to other entities that participate in the BAUASI and

5    for which the BAUASI approval authority has approved grant funding.  Plaintiffs Santa Clara,

6    Oakland, San José, Marin County, San Mateo County, and Sonoma County participate in BAUASI.

7        112.    Similarly, a portion of California's HSGP-UASI funds are allocated to the LA-Long

8    Beach-Glendale Urban Area, which includes Plaintiffs LA City and LA County. Through its

9    Mayor's Office of Public Safety, LA City serves as the administrative and fiscal agent, and submits

10   all grant applications and related documents on behalf of the LA-Long Beach-Glendale Urban Area

11   jurisdictions.

12       113.    Plaintiff Sacramento is the fiscal agent for the Sacramento-Roseville-Folsome Urban

13   Area.  A portion of California's HSGP-UASI funding is allocated to this Urban Area as well.

14       114.    Plaintiff San Diego City is the fiscal agent for the San Diego-Chula Vista-Carlsbad

15   Urban Area.  A portion of California's HSGP-UASI funding is allocated to this Urban Area as well.

16       115.    CalOES GMM 2025-08 states that, of the amount of UASI funding that FEMA's

17   HSGP NOFO stated was allocated to California, CalOES would allocate $26,837,543 to BAUASI,

18   $31,975,339 for the Los Angeles/Long Beach Urban Area, $3,734,739 for the Sacramento Urban

19   Area, and $14,651,693 for the San Diego Urban Area.[11]

20       116.    San Francisco has timely applied, or will timely apply, to CalOES for BAUASI's

21   allocation of FY 2025 HSGP-UASI funding, and has timely submitted or will timely submit all other

22   documents, if any, necessary to complete its application.

23       117.    In Washington, King County,  Pierce County, and Snohomish County are among the

24   core members of the applicable HSGP-UASI Urban Area Working Group. Each of these counties is

25

26   _____

27   [11] CalOES, GMM 2025-08, *Fiscal Year (FY) 2025 HSGP Application Updates, Guidance, and Allocations* (Aug. 26, 2025), https://www.caloes.ca.gov/wp-
28   content/uploads/Grants/Documents/GMM-2025-08-FY25-HSGP-Application-Updates-and-Allocations.pdf [archived at https://perma.cc/4CMX-WTBT].

1   the subrecipient of HSGP-UASI grant funding for projects to benefit the entire HSGP-UASI region,

2   including one another.  Each of these counties also receives their own jurisdiction-specific UASI

3   funding.

4        118.    Plaintiffs Santa Clara, San Francisco, Culver City, Oakland, San José, San Mateo

5   County, Marin County, LA City, LA County, LA Fire, Pasadena, Sacramento, San Diego County,

6   Santa Monica, Sonoma County, King County, Pierce County, and Snohomish County (the "HSGP-

7   UASI Plaintiffs") have timely applied or intend to apply to their respective urban area working

8   groups for FY 2025 allocations of the HSGP-UASI funding dedicated to their respective urban area.

9        **iii.    Hazard Mitigation Grant Program (HMGP)**

10        119.    The Stafford Act provides that the federal government may contribute "up to

11   75 percent of the cost of hazard mitigation measures" that "substantially reduce the risk of, or

12   increase resilience to, future damage, hardship, loss, or suffering in any area affected by a major

13   disaster."  42 U.S.C. § 5170c(a).

14        120.    The Hazard Mitigation Grant Program (HMGP) provides federal funding to state,

15   local, tribal, and territorial governments to develop hazard mitigation plans and rebuild their

16   communities after a Presidential major disaster declaration in ways that reduce or mitigate future

17   disaster losses.

18        121.    Eligible risk reduction projects include, but are not limited to, retrofitting facilities to

19   make them more resistant to floods, earthquakes, wind, wildfires, and other natural disasters;

20   installing permanent barriers to prevent floodwater from entering homes or businesses; building safe

21   rooms for communities in hurricane- or tornado-prone areas; stabilizing slopes to prevent structural

22   losses; and developing or improving warning systems.

23        122.    For instance, Santa Clara has applied for $750,000 in HMGP funding for wildfire

24   detection equipment that would provide verified, real-time alerts across Santa Clara County's

25   highest-risk "wildland-urban interface" areas—that is, areas where human development meets

26   undeveloped wildlands.  These fire sensors would close critical fire detection gaps—especially

27   overnight when direct observation and public reporting are limited—in areas where conditions can

28   quickly drive explosive fire behavior, and minutes lost in detection can mean the difference between

1    containment and catastrophe.

2         123.    HMGP funding and funding applications do not necessarily operate neatly on a

3    predicable, fiscal-year basis.  Instead, HMGP funding often follows the occurrence of disasters,

4    emergencies, and other events and Presidential declarations.  States can apply for HMGP funding

5    from FEMA after the President declares a major disaster.  The amount of HMGP funds available to a

6    State in connection with a declared disaster is a function of the level of disaster assistance provided.

7    The State also administers a process to identify and select local project plans for FEMA approval

8    and funding.  In this process, local jurisdictions submit their applications to the State, which selects

9    projects to then submit to FEMA for approval within 15 months of the date of disaster declaration.

10   *See generally* 44 C.F.R. §§ 206.430-440.  Some approved mitigation projects can span several years,

11   since many contain structural renovation components.

12        124.    Plaintiffs Santa Clara, San Francisco, Alameda, Berkeley, Marin County, Pasadena,

13   San José, Santa Monica, Santa Rosa, Sonoma County, Sonoma Water, SVCSD, Palo Alto, and

14   Pierce County (the "HMGP Plaintiffs") have applied for, and anticipate receiving or being awarded,

15   HMGP pass-through funding for FY2025 or later to support various hazard mitigation projects.

16   SCCDC has a pending project application for flood mitigation funding to support an approved

17   HMGP project.  Numerous Plaintiffs anticipate applying for HMGP pass-through funding in the

18   coming year.

19        **iv.    Transit Security Grant Program (TSGP)**

20        125.    The Transit Security Grant Program (TSGP) provides funding to transit agencies "for

21   security improvements," 6 U.S.C. § 1135(a)(1), and more specifically to protect critical

22   transportation infrastructure and the travelling public from terrorism, and to increase infrastructure

23   resilience in our nation's public transportation systems.

24        126.    Eligible public transportation agencies—including those operating ferries, intra-city

25   bus systems, and all forms of passenger rail—may apply for TSGP funds, *id.* § 1135(a)(2), and DHS

26   must "select the recipients of grants based solely on risk," *id.* § 1135(c)(2).

27        127.    In its FY 2025 TSGP NOFO, FEMA announced that it had targeted allocation of

28   $1,486,472 in TSGP funding to the San Francisco Municipal Railway (MUNI), which is operated by

1 the San Francisco Municipal Transportation Agency (SFMTA), a component of San Francisco.  The

2 TSGP NOFO directed applicants to apply for funding by August 15, 2025, and stated that the award

3 date would be no later than September 30, 2025.[12]

4     128.    FEMA determined its target allocations, including for San Francisco, based on daily

5 unlinked passenger trips for transit systems in high-risk urban areas historically eligible for UASI

6 funding.[13]

7     129.    San Francisco timely applied to FEMA for funding under the TSGP.  In its

8 application, San Francisco stated it would use the funds to support personnel costs for 14 employees

9 (a lieutenant, two sergeants, and 11 sworn officers with K-9 specialty) to be deployed from the San

10 Francisco Police Department's Special Operations Unit for large-scale events, including the 2026

11 Super Bowl.

12     130.    On September 26, 2025, FEMA awarded San Francisco $3,066,376 in TSGP funding.

13     131.    San Francisco and other Plaintiffs also expect to apply for TSGP funds in the next

14 Fiscal Year.

15     **v.**    **Staffing for Adequate Fire and Emergency Response (SAFER) Program**

16     132.    Congress established the Staffing for Adequate Fire and Emergency Response

17 (SAFER) Program to provide funding directly to local fire departments (among other entities) to

18 help them increase or maintain the number of trained, front-line firefighters available to serve their

19 communities.

20     133.    The goal of SAFER grants is to enhance local fire departments' abilities to comply

21 with staffing, response, and operational standards established by the National Fire Protection

22 Association, including assisting fire departments with "attain[ing] 24-hour staffing to provide

23 adequate protection from fire and fire-related hazards."  15 U.S.C. § 2229a(a)(1)(A).  SAFER grants

24 are "awarded on a competitive basis through a neutral peer review process."  *Id.* § 2229a(a)(1)(G).

25

26

---

27 [12] FEMA Transit Security Grant Program FY 2025 NOFO,
https://www.fema.gov/grants/preparedness/transit-security/fy-25-nofo [archived at

28 https://perma.cc/G3LA-2369].
[13] *Id.* at § 2(A)(2).

134.     The current NOFO for the SAFER Program, which is from FY 2024 but which governs awards that FEMA will make through September 30, 2025 based on applications received by July 3, 2025, states that "[g]rant funds are obligated upon [FEMA's issuance of] the offer of grant award in the FEMA GO system," and that recipients of SAFER funds must "comply with DHS Standard Terms and Conditions in effect at the time the award is issued."[14]

135.     Plaintiffs San Francisco, LA City, Palo Alto, Alameda, Oakland, and Tucson (the "SAFER Plaintiffs") have received or been awarded, or anticipate receiving or being awarded, SAFER funding pursuant to the FY2024 NOFO.  Numerous Plaintiffs expect to apply for SAFER funding in the next Fiscal Year.

136.     For instance, San Francisco timely applied for $18,126,288 in SAFER grant funding to fund 36 entry-level firefighters over the three-year grant period. Oakland timely applied for nearly $19 million in SAFER grant funding to fund hiring 20 additional firefighters.

137.     During federal Fiscal Year 2025, FEMA awarded SAFER grant funding pursuant to the FY 2024 NOFO in the amount of $4,204,414.04 to LA City.

**vi.     Assistance to Firefighters Grant (AFG)**

138.     Congress's primary goal in creating the Assistance to Firefighters Grant (AFG) was to ensure that firefighters and other first responders can obtain critical equipment, training, and other resources necessary to protect the public and emergency personnel from fire and fire-related hazards. Eligible fire departments can apply for AFG funding, 15 U.S.C. § 2229(b)(1)(A), (c), (e), which is awarded on a competitive basis, in consultation with the chief executives of the States in which the recipients are located, with the amount of grant funding capped based on statutory standards related to population size, *id.* § 2229(c)(1), (2).

139.     FEMA awards AFG grants on a rolling basis.  The current NOFO for the AFG program, which is from FY 2024 but which governs awards that FEMA will make through

---

[14] FEMA, Notice of Funding Opportunity (NOFO): FY 24 Staffing for Adequate Fire and Emergency Response (SAFER) Grant Program, https://www.fema.gov/sites/default/files/documents/fema_gpd_safer-nofo_fy24.pdf [archived at https://perma.cc/K9HR-5TYM].

1   September 30, 2025, states that recipients of AFG funds must "comply with the DHS Standard

2   Terms and Conditions in effect as of the date of the federal award.".[15]

3        140.    Plaintiffs San Francisco, Alameda, Berkeley, San Diego City, San José, LA Fire,

4   Pasadena, Sacramento, Santa Monica, Palo Alto, Tucson, and Bellingham (the "AFG Plaintiffs")

5   have received or been awarded, or anticipate receiving or being awarded, AFG funding pursuant to

6   the FY 2024 NOFO. Numerous Plaintiffs anticipate applying for AFG funding in the next Fiscal

7   Year.

8        141.    For example, San Francisco timely applied for a total of $2,998,700 in AFG grant

9   funding to fund $1,500,000 to procure a new heavy rescue vehicle that will allow San Francisco to

10   increase its emergency response capabilities, as well as $1,488,700 to replace Automated External

11   Defibrillators that no longer comply with federal safety standards, and to procure new cardiac

12   monitors, defibrillators, video laryngoscopes, power gurneys, and stair chairs, all of which increase

13   safety to first responders and the public.

14        142.    To take another example, Santa Monica timely applied for $205,962 in AFG grant

15   funding to fund a firefighter wellness and fitness program.

16        143.    By September 30, 2025, FEMA had awarded AFG grant funding pursuant to the

17   FY 2024 NOFO in the amounts of $119,056.36 to Santa Monica and $1,147,348.14 to Tucson.

18        144.    The deadline for Santa Monica to execute the grant agreement to accept the award is

19   October 24, 2025.

20        **vii.**    **Fire Prevention and Safety (FP&S) Grants**

21        145.    Congress created Fire Prevention and Safety (FP&S) Grants to "assist[] fire

22   prevention programs and support[] firefighter health and safety research and development."

23   15 U.S.C. § 2229(d)(1). Eligible fire departments can apply for funding, which is awarded on a

24   competitive basis. *Id.* § 2229(d)(1)(A), (e). Funding may be used to, among other things, support

25

26

---

27  [15] FEMA, Notice of Funding Opportunity (NOFO): FY 24 Assistance to Firefighters Grant Program, https://files.simpler.grants.gov/opportunities/ab253b7e-83d1-40b5-9d92-

28  f550ee51ba74/attachments/d04af45f-2c82-492c-a791-cf3fce90ab1d/FY_2024_AFG_NOFO.pdf [archived at https://perma.cc/A2KE-3D4M].

1  public education campaigns, enforce fire codes, and promote compliance with fire safety standards.

2  *Id.* § 2229(d)(3).

3      146.    FEMA awards FP&S grants on a rolling basis. The current NOFO for the FP&S

4  program, which is from FY 2024 but which governs awards that FEMA will make through

5  September 30, 2025, states that recipients of AFG funds must "comply with the DHS Standard

6  Terms and Conditions in effect as of the date of the federal award."[16]

7      147.    San Francisco has received or been awarded, or anticipates receiving or being

8  awarded, FY 2025 FP&S funding.

9      148.    San Francisco timely applied for $671,808 in FP&S grant funding to fund residential

10  sprinkler code enforcement and awareness that mitigates the risk and spread of residential fires in

11  San Francisco's dense urban environment.

12      **viii.    Port Security Grant Program (PSGP)**

13      149.    The Port Security Grant Program (PSGP) provides federal funding to state, local,

14  territorial, and private-sector partners to help protect critical port infrastructure from terrorism and

15  other emergencies, enhance maritime domain awareness, improve port-wide maritime security risk

16  management, and maintain or reestablish maritime security mitigation protocols that enhance port

17  recovery and resiliency capabilities.

18      150.    PSGP funds have been available to eligible entities since the program was created by

19  the Maritime Transportation Security Act of 2002. The program is codified at 46 U.S.C. § 70107.

20      151.    Eligible entities such as port authorities and local government agencies may apply for

21  funding, which is awarded on a competitive basis. *Id.* § 70107(g). Funding can be used for

22  planning, operational activities, equipment and capital projects, training and awareness campaigns,

23  and maintenance and sustainment.

24      152.    Plaintiffs San Francisco, Oakland, San Diego City, LA City, and LA County (the

25  / / /

26

27  ───────────────

[16] FEMA, Notice of Funding Opportunity (NOFO): FY 24 Fire Prevention and Safety (FP&S) Grant

28  Program, https://www.fema.gov/sites/default/files/documents/fema_gpd_fps-nofo_fy24.pdf
[archived at https://perma.cc/JK8K-S656].

1    "PSGP Plaintiffs") have received or been awarded, or anticipate receiving or being awarded,

2    FY 2025 PSGP funding.

3         153.    LA County anticipates using PSGP funding to help maintain its watercraft fleet and to

4    fund personnel who conduct specialized trainings for chemical, biological, radiological, nuclear, and

5    explosive ship screening and enforcement.

6         154.    FEMA's FY 2025 PSGP NOFO directed applicants to apply for funding by

7    August 15, 2025, and stated that the award date would be no later than September 30, 2025.[17]  The

8    NOFO states that recipients of PSGP funding "must comply with the DHS Standard Terms and

9    Conditions in effect as of the date of the federal award."

10        155.    By September 30, 2025, FEMA had awarded FY 2025 PSGP grant funding in the

11   amount of $277,500 to LA City, $18,000 to Oakland, and $259,813 to San Francisco.

12        **ix.    Securing the Cities (STC)**[18]

13        156.    Congress established the Securing the Cities (STC) program to "enhance the ability of

14   the United States to detect and prevent terrorist attacks and other high-consequence events utilizing

15   nuclear or other radiological materials that pose a high risk to homeland security in high-risk urban

16   areas."  6 U.S.C. § 596b(a).

17        157.    The STC program supports "State, local, Tribal, and territorial governments in

18   designing and implementing, or enhancing existing, architectures for coordinated and integrated

19   detection and interdiction of nuclear or other radiological materials that are out of regulatory

20   control."  *Id.* § 596b(b)(1).

21   / / /

22   / / /

23   / / /

24   _____

25   [17] FEMA, FY 2025 PSGP NOFO (Aug. 13, 2025),.
     https://files.simpler.grants.gov/opportunities/b90b5e63-27e6-497c-9872-
26   0e2a89a4dac7/attachments/69c6d261-1758-4906-924d-
     fabbddf77b30/FY_2025_PSGP_NOFO_08_06_25_508-ed.pdf [archived at https://perma.cc/RY5R-
27   8TP5]

28   [18] San Francisco does not challenge or seek relief with respect to the FY 2025 Securing the Cities
     grant program or any funding thereunder.

158.     Originally launched as a pilot program, the STC program was codified by Congress as part of the Countering Weapons of Mass Destruction Act of 2018.  6 U.S.C. § 596b.[19]

159.     On September 12, 2025, FEMA awarded FY 2025 STC grant funding of over $6 million to LA City, which LA City will not be able to access if LA City does not accept conditions of the award.

**x.     National Urban Search and Rescue (US&R)**

160.     The National Urban Search and Rescue (US&R) Response System provides funding to ensure adequate management, training, exercise, procurement (vehicle and equipment), and storage and maintenance for the 28 national task forces staffed and equipped to assist States and local governments, tribes, and territories to conduct around-the-clock search-and-rescue operations following a Presidentially declared major disaster or emergency under the Stafford Act.

161.     FEMA issued a NOFO for the FY 2025 US&R grant program on or about July 28, 2025.[20]

162.     Plaintiffs Alameda, Oakland, San Diego City, LA City, LA County, LA Fire, Sacramento, and Pierce County (the "US&R Plaintiffs") have received or been awarded, or anticipate receiving or being awarded, FY 2025 US&R direct or pass-through funding.

163.     In September 2025, FEMA awarded FY 2025 US&R grant funding in the amount of $1,393,311.00 to LA City, $1,488,311.00 to LA County, $1,378,311.00 to Oakland, $1,497,311.00 to Sacramento, $1,378,311.00 to San Diego City, and $1,378,311.00 to Pierce County.

/ / /

/ / /

---

[19] STC recipients enter into "cooperative agreements" with DHS. Unlike grant agreements, cooperative agreements are used when the federal agency will be "substantial[ly] involve[d]" in "carrying out the activity contemplated in the agreement." 31 U.S.C. § 6305. For ease of reference, Plaintiffs describe LA City's STC agreement as a grant agreement herein.

[20] FEMA, US&R FY25 NOFO, https://files.simpler.grants.gov/opportunities/6464682c-05eb-450e-8c69-ce3a3aa38125/attachments/e8f483d4-2e67-4e9a-87f1-e7702ba2bc1a/FY2025-USR-NOFO-Final.pdf [archived at https://perma.cc/7C7H-NTNV].

**C.** **DHS Introduces and Imposes New Terms and Conditions for Federal Funding That Are Unrelated to Emergency Management but Advance the Administration's Political Agenda**

    **i.** **The Executive Branch's Efforts to Impose Its Political Agenda Through Federal Grant Funding**

164. Since his first day in office, President Trump has issued executive orders that have initiated, and directed federal agencies to participate in, a coordinated effort to impose his political agenda on state and local governments and other grantees across the country. That effort has included actions to recast American civil rights laws as prohibiting policies that the President and federal agencies have generally and non-specifically described as "promot[ing]" or "advanc[ing]" what his orders have described as "diversity, equity, and inclusion" (DEI), "diversity, equity, inclusion, and accessibility" (DEIA), and "gender ideology,"[21] even though many such policies are lawful under existing federal laws and regulations.

165. Administration officials have taken up the President's instructions. For example, in a July 29, 2025 memorandum titled "Guidance for Recipients of Federal Funding Regarding Unlawful

---

[21] *See, e.g.*, Exec. Order No. 14332 of August 7, 2025, § 4(b), 90 Fed. Reg. 38,929, 38,931 ("Improving Oversight of Federal Grantmaking") (requiring federal officials to ensure discretionary grants "demonstrably advance the President's policy priorities" and prohibiting them from awarding discretionary grants that "fund, promote, encourage, subsidize, or facilitate . . . denial by the grant recipient of the sex binary in humans or the notion that sex is a chosen or mutable characteristic" or "promote anti-American values"); Exec. Order No. 14190 of Jan. 29, 2025, §§ 1-3, 90 Fed. Reg. 8,853, 8,853-55 ("Ending Radical Indoctrination in K-12 Schooling") (asserting that "schools indoctrinate their children in radical, anti-American ideologies" but should instead "instill a patriotic admiration for our incredible Nation and the values for which we stand," and requiring development of an "Ending Indoctrination Strategy" to eradicate federal support for "the instruction, advancement, or promotion of gender ideology or discriminatory equity ideology," as defined); Exec. Order No. 14173 of Jan. 21, 2025, § 1, 90 Fed. Reg. 8,633 ("Ending Illegal Discrimination and Restoring Merit-Based Opportunity") (criticizing, without substantively defining, DEI and DEIA policies as "undermin[ing] national unity" and embodying "dangerous, demeaning, and immoral race- and sex-based preferences"); Exec. Order No. 14151 of Jan. 20, 2025, § 2(b), 90 Fed. Reg. 8,339, 8,340 ("Ending Radical and Wasteful Government DEI Programs and Preferencing") (directing all federal agency heads to terminate "all . . . 'equity-related' grants or contracts[] and all DEI or DEIA performance requirements for employees, contractors, or grantees," without substantively defining DEI or DEIA); Exec. Order No. 14168 of Jan. 20, 2025, § 3, 90 Fed. Reg. 8,615, 8,616 ("Defending Women From Gender Ideology Extremism And Restoring Biological Truth To The Federal Government") (directing that "Federal funds shall not be used to promote gender ideology," as defined to include the recognition of "self-assessed gender identity" and the distinction between sex and gender); Exec. Order No. 14148 of Jan. 20, 2025, 90 Fed. Reg. 8,237 ("Initial Rescission of Harmful Executive Orders and Actions") (revoking President Biden executive orders relating to, among other topics, diversity, equity, gender identity, and sexual orientation).

Discrimination" (the "Discrimination Guidance Memo"), Attorney General Pamela Bondi promoted the Administration's skewed view of DEI and DEIA programs by purporting to provide "guidance" concerning various practices that would be viewed as constituting unlawful discrimination. Despite court decisions holding exactly to the contrary, that so-called "guidance" states that "allow[ing] males, including those self-identifying as 'women,' to access single-sex spaces designed for females . . . undermine[s] the privacy, safety, and equal opportunity of women and girls," and directs federal funding recipients to "affirm sex-based boundaries rooted in biological differences" in order to "ensure compliance with federal law."[22]  Thereafter, in a notice that FEMA distributed widely by email on September 3, 2025, FEMA stated that it "advises recipients and subrecipients to review and adhere to the Attorney General's" Discrimination Guidance Memo.

166.  President Trump and the current federal Administration have also undertaken several executive actions constituting a coordinated effort to force state and local governments to assist Immigration and Customs Enforcement (ICE) in carrying out federal civil immigration enforcement efforts,[23] notwithstanding laws and policies through which these state and local governments have exercised their rights under the Tenth Amendment to dedicate their law enforcement efforts elsewhere.  Administration officials across agencies, including within DHS, have taken up the President's instructions.[24]

---

[22] Att'y Gen'l, Guidance for Recipients of Federal Funding Regarding Unlawful Discrimination (Jul. 29, 2025), https://www.justice.gov/ag/media/1409486/dl [archived at https://perma.cc/UG5N-TJ25]; *see also* Deputy Att'y Gen'l, Civil Rights Fraud Initiative (May 19, 2025), https://www.justice.gov/dag/media/1400826/dl [archived at https://perma.cc/MFC5-YDGU]; Att'y Gen'l, Endling Illegal DEI and DEIA Discrimination and Preferences (Feb. 5, 2025), https://www.justice.gov/ag/media/1388501/dl [archived at https://perma.cc/B4JZ-PQXZ].

[23] *See, e.g.*, Exec. Order No. 14287 of April 28, 2025, 90 Fed. Reg. 18,761 ("Protecting American Communities From Criminal Aliens"); Exec. Order No. 14218 of February 19, 2025, 90 Fed. Reg. 10,581 ("Ending Taxpayer Subsidization of Open Borders"); Exec. Order No. 14159 of January 20, 2025, 90 Fed. Reg. 8,443 ("Protecting the American People Against Invasion"); *see generally City & Cnty. of San Francisco v. Trump*, No. 25-CV-01350-WHO, 2025 WL 1282637 (N.D. Cal. May 3, 2025) (preliminarily enjoining enforcement of executive orders and Attorney General directive mandating withholding of federal funding based on plaintiffs' policies limiting or prohibiting cooperation with ICE), *appeal pending*, No. 25-3889 (9th Cir. filed June 23, 2025).

[24] E.g., Att'y Gen'l, Sanctuary Jurisdiction Directives (Feb. 5, 2025), https://www.justice.gov/ag/media/1388531/dl [archived at https://perma.cc/Q2F6-YYEB]; Acting Deputy Att'y Gen'l, Interim Policy Changes Regarding Charging, Sentencing And Immigration Enforcement (Jan. 21, 2025), https://www.fd.org/sites/default/files/public/News/memorandum-from-

167.     More broadly, the President has used executive orders as a forum to direct Administration officials to take steps to embed his political agenda into the federal government's grant agreements, service agreements, and other contracts across subject-matter areas and around the country.  In the first eight months of his current Term, President Trump has already issued more than 200 executive orders, many of them purporting to leverage federal contracts to achieve political ends, including related to the subject matters of the Discrimination Condition and Immigration Conditions in the Challenged DHS Conditions.[25]  There is no way to know whether, how frequently, and when the President will issue additional executive orders, the subject matters of those executive orders, or the extent to which they would purport to direct Executive Branch officials to take actions related to federal grants and contracts.  Based on the President's practice to date, however, it appears exceedingly likely that he will continue to issue executive orders that could be described as "related to grants."

---

the-acting-deputy-attorney-general-01-21-2025.pdf [archived at https://perma.cc/S3UT-PDXE]; Sec'y of Homeland Security, Restricting Grant Funding for Sanctuary Jurisdictions (Feb. 19, 2025), Att. C to Parties' Letter Brief, *City & Cnty. of San Francisco v. Trump*, No. 25-CV-01350-WHO (N.D. Cal. filed June 13, 2025) (ECF No. 143), *available at* https://storage.courtlistener.com/recap/gov.uscourts.cand.444175/gov.uscourts.cand.444175.143.0.pdf#page=35 [archived at https://perma.cc/2A3U-WUA3].

[25] See the executive orders cited in footnotes 21 and 23 above.  In one additional and notable set of examples, the President issued a series of executive orders (and other directives) this Spring that direct agency heads to require federal government contractors "to disclose any business they do with" law firms the President himself opposes and then terminate those contracts.  Exec. Order No. 14263 of April 15, 2025, at § 3, 90 Fed. Reg. 15,615, 15,615-16 ("Addressing Risks from Susman Godfrey"); Exec. Order No. 14250 of March 27, 2025, at § 3, 90 Fed. Reg. 14,549, 14,550 ("Addressing Risks from WilmerHale"); Exec. Order No. 14246 of March 25, 2025, at § 3, 90 Fed. Reg. 13,997, 13,997-98 ("Addressing Risks From Jenner & Block"); Exec. Order No. 14237 of March 20, 2025, at § 3, 90 Fed. Reg. 13,039, 13,040 ("Addressing Risks From Paul Weiss"), *rescinded*, Exec. Order No. 14244 of March 21, 2025 ("Addressing Remedial Action by Paul Weiss") (rescinding executive order threatening Paul Weiss based on law firm's "remarkable change of course"); Exec. Order No. 14230 of March 6, 2025, at § 3, 90 Fed. Reg. 11,781, 11,781-82 ("Addressing Risks From Perkins Coie LLP").

Courts assessing challenges to those executive orders have ruled uniformly that they are unconstitutional.  *Susman Godfrey LLP v. Exec. Off. of President*, --- F.Supp.3d. ----, 2025 WL 1779830 (D.D.C. June 27, 2025), *appeal pending*, No. 25-5310 (D.C. Cir. filed Aug. 26, 2025); *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President*, 784 F.Supp.3d 127 (D.D.C. 2025), *amended*, No. CV 25-917 (RJL), 2025 WL 2105262 (D.D.C. June 26, 2025), *appeal pending*, No. 25-5277 (D.C. Cir. filed Jul. 28, 2025); *Jenner & Block LLP v. U.S. Dep't of Just.*, 784 F.Supp.3d 76 (D.D.C. 2025), *appeal pending*, No. 25-5265 (D.C. Cir. filed Jul. 21, 2025); *Perkins Coie LLP v. U.S. Dep't of Just.*, 783 F.Supp.3d 105 (D.D.C. 2025), *appeal pending*, No. 25-5241 (D.C. Cir. filed Jul. 2, 2025).

ii. **Defendants Adopt and Incorporate the Challenged DHS Conditions Into the Agency's Standard Terms and Conditions for Fiscal Year 2025**

168. Consistent with the agenda and directions laid out in the President's executive orders thus far, DHS revised the standard terms and conditions applicable to Fiscal Year 2025 grants, cooperative agreements, fixed amount awards, and other types of federal financial assistance. These revisions have attempted to implement the current federal Administration's efforts to compel grantees to abandon policies and programs that encourage diversity, equity, inclusion, and accessibility despite clear statutory and decisional law that many such programs are lawful; policies that, consistent with the Tenth Amendment, limit cooperation with federal civil immigration enforcement; and other activities that do not match the federal Administration's views or political agenda.

169. Specifically, DHS had adopted and issued a document it called "FY 2025 DHS Terms and Conditions Version 3 Dated April 18, 2025,"[26] which is referred to herein as the "Standard DHS Terms" and is attached hereto as Exhibit A.[27]

170. The Standard DHS Terms contain three sets of conditions that did not exist in any version of the DHS Terms and Conditions issued before January 20, 2025: the Discrimination Condition described in paragraph 171, the Immigration Conditions described in paragraph 172, and the EO Condition described in paragraph 173 (together, the "Challenged DHS Conditions").

---

[26] DHS, FY 2025 DHS Terms and Conditions Version 3 Dated April 18, 2025, https://www.dhs.gov/sites/default/files/2025-08/2025_0418_fy2025_dhs_terms_and_conditions_version_3.pdf [archived at https://perma.cc/NTU7-D6ES].

[27] In early August 2025, DHS modified the Discrimination Condition in its Terms and Conditions to remove a definition of the term "discriminatory prohibited boycott" that had referred specifically, only, and narrowly to "commercial relations specifically with Israeli companies or with companies doing business in or with Israel or authorized by, licensed by, or organized under the laws of Israel to do business." *Compare* ¶ 171 *with* https://web.archive.org/web/20250708201331/https://www.dhs.gov/sites/default/files/2025-04/2025_0418_fy2025_dhs_terms_and_conditions_version_3.pdf [https://perma.cc/F4KL-LXLA], at Section C.XVII(1)(d) (Version 3 as DHS had uploaded it in April 2025); A. Rubin, *DHS denies tying FEMA funds to Israel stance*, Axios (Aug. 4, 2025), https://www.axios.com/2025/08/04/trump-dhs-fema-relief-israel-boycotts [archived at https://perma.cc/2RGQ-7NY3]. DHS did not document this change and withdrew from public access the version of the Terms and Conditions that had contained the definition.

171.  *The Discrimination Condition*.  The terms referred to herein as the "Discrimination Condition" is all of Section C.XVII of the Standard DHS Terms, entitled "Anti-Discrimination," except for Subsection C.XVII(2)(a)(iii) of that Section, which is instead one of the Immigration Conditions described in paragraph 172.  *See* Ex. A at 6-7.  Specifically, the following conditions are collectively referred to herein as the "Discrimination Condition":

> Recipients must comply with all applicable Federal anti-discrimination laws material to the government's payment decisions for purposes of 31 U.S.C. § 372(b)(4).[28]
>
> (1)  Definitions. As used in this clause –
>
>  (a)  DEI means "diversity, equity, and inclusion."
>
>  (b)  DEIA means "diversity, equity, inclusion, and accessibility."
>
>  (c)  Discriminatory equity ideology has the meaning set forth in Section 2(b) of Executive Order 14190 of January 29, 2025.
>
>  (d)  Federal anti-discrimination laws mean Federal civil rights law that protect individual Americans from discrimination on the basis of race, color, sex, religion, and national origin.
>
>  (e)  Illegal immigrant means any alien, as defined in 8 U.S.C. § 1101(a)(3), who has no lawful immigration status in the United States.
>
> (2)  Grant award certification.
>
>  (a)  By accepting the grant award, recipients are certifying that:
>
>   (i)  They do not, and will not during the term of this financial assistance award, operate any programs that advance or promote DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws; and
>
>   (ii)  They do not engage in and will not during the term of this award engage in, a discriminatory prohibited boycott.

---

[28] There is no section 372 in title 31 of the United States Code.  Plaintiffs understand DHS to intend this provision to refer to 31 U.S.C. § 3729(b)(4), which defines the term "material" for purposes of the False Claims Act.  Notably, this exact typographical error recurs in very similar, sometimes identical, grant conditions newly added after January 20, 2025 by several other federal agencies, including the Department of Housing and Urban Development.  *See Martin Luther King, Jr. Cnty. v. Turner*, No. 2:25-CV-814, 2025 WL 2322763 (W.D. Wash. Aug. 12, 2025) (granting plaintiffs' third motion for preliminary injunction barring enforcement of HUD, HHS, and DOT grant conditions, including conditions materially similar to the Immigration Conditions and Discrimination Condition at issue in this action).

(iii) [*provision omitted here and included within Immigration Conditions described in paragraph 172*]

    (3) DHS reserves the right to suspend payments in whole or in part and/or terminate financial assistance awards if the Secretary of Homeland Security or her designee determines that the recipient has violated any provision of subsection (2).

    (4) Upon suspension or termination under subsection (3), all funds received by the recipient shall be deemed to be in excess of the amount that the recipient is determined to be entitled to under the Federal award for purposes of 2 C.F.R. § 200.346. As such, all amounts received will constitute a debt to the Federal Government that may be pursued to the maximum extent permitted by law.

    172.   *The Immigration Conditions*. The terms referred to herein as the "Immigration Conditions" include the entirety of Section C.IX of the Standard DHS Terms, entitled "Communication and Cooperation with the Department of Homeland Security and Immigration Officials," as well as Subsection C.XVII(2)(a)(iii) of the Standard DHS Terms. *See* Ex. A at 4-5, 6. Specifically, the following conditions are collectively referred to herein as the "Immigration Conditions":

    a.   *The Information Sharing Condition* (§ C.IX.1.a): Grant recipients and subrecipients "must comply with the requirements of 8 U.S.C. §§ 1373 and 1644," which "prohibit restrictions on information sharing by state and local government entities with DHS regarding the citizenship or immigration status, lawful or unlawful, of any individual."

    b.   *The Compliance Condition* (§ C.IX.1.b): Grant recipients and subrecipients "must comply with other relevant laws related to immigration, including prohibitions on encouraging or inducing an alien to come to, enter, or reside in the United States in violation of law, 8 U.S.C. § 1324(a)(1)(A)(iv), prohibitions on transporting or moving illegal aliens, 8 U.S.C. § 1324(a)(1)(A)(ii), prohibitions on harboring, concealing, or shielding from detection illegal aliens, 8 U.S.C. § 1324(a)(1)(A)(iii), and any applicable conspiracy, aiding or abetting, or attempt liability regarding these statutes."

c. *The Cooperation Condition* (§ C.IX.1.c): Grant recipients and subrecipients must "honor requests for cooperation, such as participation in joint operations, sharing of information, or requests for short term detention of an alien pursuant to a valid detainer."

d. *The Access Condition* (§ C.IX.1.d): Grant recipients and subrecipients must "provide access to detainees, such as when an immigration officer seeks to interview a person who might be a removable alien."

e. *The Publicization Condition* (§ C.IX.1.e): Grant recipients and subrecipients must "not leak or otherwise publicize the existence of an immigration enforcement operation."

f. *The Certification Condition* (§ C.IX.2): Grant recipients "must certify under penalty of perjury pursuant to 28 U.S.C. § 1746 and using a form that is acceptable to DHS, that [they] will comply with the requirements of this term," meaning all of Section C.IX, and must also "require any subrecipients or contractors to certify in the same manner that they will comply with this term prior to providing them with any funding under this award."

g. *The Materiality Condition* (§ C.IX.3): Grant recipients must "agree[] that compliance with this term is material to the Government's decision to make or continue with this award and that the Department of [H]omeland Security may terminate this grant, or take any other allowable enforcement action, if the recipient fails to comply with this term."

h. *The Non-Incentivizing Condition* (§ C.XVII(2)(a)(iii)): "By accepting the grant award, recipients are certifying that: . . . They do not, and will not during the term of this award, operate any program that benefits illegal immigrants or incentivizes illegal immigration,"[29] and agree that DHS has "the right to

---

[29] The Non-Incentivizing Condition relies on the Discrimination Condition's definition of the term "illegal immigrant" to "mean[] any alien, as defined in 8 U.S.C. § 1101(a)(3), who has no lawful immigration status in the United States."

1    suspend payments in whole or in part and/or terminate financial assistance

2    awards if the Secretary of Homeland Security or her designee determines that

3    the recipient has violated" this certification.

4    173.    *The EO Condition*.  Section C.XXXI of the Standard DHS Terms, entitled

"Presidential Executive Orders" and referred to herein as the "EO Condition," provides as follows:

"Recipients must comply with the requirements of Presidential Executive Orders related to grants

(also known as federal assistance and financial assistance), the full text of which are incorporated by

reference." *See* Ex. A at 9.

174.    Separate and apart from the Challenged DHS Conditions, DHS's standard terms and

conditions have long contained several provisions that require recipients of grant funding to comply

with certain specified civil rights and antidiscrimination laws and cite the specific law at issue.

These provisions appear in the Standard DHS Terms, just as they have appeared in prior years' terms

and conditions.  These provisions are referred to collectively herein as the "Civil Rights Conditions"

and are as follows:

    a.    Section C.III, entitled "Age Discrimination Act of 1975," requires recipients
to "comply with the requirements of the Age Discrimination Act of 1975,
Pub. L. No. 94-135 (codified as amended at Title 42, U.S. Code § 6101 *et
seq*.)."

    b.    Section C.IV, entitled "Americans with Disabilities Act of 1990," states that
"Recipients must comply with the requirements of Titles I, II, and III of the
Americans with Disabilities Act, Pub. L. No. 101-336 (1990) (codified as
amended at 42 U.S.C. §§ 12101– 12213)."

    c.    Section C.VII, entitled "Civil Rights Act of 1964 – Title VI," requires
recipients to "comply with the requirements of Title VI of the Civil Rights Act
of 1964, Pub. L. No. 88-352 (codified as amended at 42 U.S.C. § 2000d
*et seq*.)," including "DHS implementing regulations for the Act [that] are
found at 6 C.F.R. Part 21" and, as applicable, "FEMA's implementing
regulations at 44 C.F.R. Part 7."

Complaint for Declaratory and Injunctive Relief                                                      25-8330

d.   Section C.VIII, entitled "Civil Rights Act of 1968," requires recipients to "comply with Title VIII of the Civil Rights Act of 1968, Pub. L. No. 90284 (codified as amended at 42 U.S.C. § 3601 *et seq.*), . . . as implemented by the U.S. Department of Housing and Urban Development at 24 C.F.R. Part 100," including with respect to "new multifamily housing with four or more dwelling units" as described in "24 C.F.R. Part 100, Subpart D."

e.   Section C.XIV, entitled "Education Amendments of 1972 (Equal Opportunity in Education Act) – Title IX," requires recipients to "comply with the requirements of Title IX of the Education Amendments of 1972, Pub. L. No. 92-318 (codified as amended at 20 U.S.C. § 1681 *et seq.*)," including "DHS implementing regulations [that] are codified at 6 C.F.R. Part 17" and, as applicable, "FEMA's implementing regulations at 44 C.F.R. Part 19."

f.   Section C.XVI, entitled "Equal Treatment of Faith-Based Organizations," states: "It is DHS policy to ensure the equal treatment of faith-based organizations in social service programs administered or supported by DHS or its component agencies, enabling those organizations to participate in providing important social services to beneficiaries. Recipients must comply with the equal treatment policies and requirements contained in 6 C.F.R. Part 19 and other applicable statutes, regulations, and guidance governing the participations of faith-based organizations in individual DHS programs."

g.   Section C.XXIV, entitled "Limited English Proficiency (Civil Rights Act of 1964, Title VI)," states: "Recipients must comply with Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d *et seq.*) prohibition against discrimination on the basis of national origin, which requires that recipients of federal financial assistance take reasonable steps to provide meaningful access to persons with limited English proficiency (LEP) to their programs and services.  For additional assistance and information regarding language access obligations, please refer to the DHS Recipient Guidance:

https://www.dhs.gov/guidance-published-help-department-supported-

organizations-provide-meaningful-access-people-limited and additional

resources on http://www.lep.gov."

    h.    Section C.XXXIII, entitled "Rehabilitation Act of 1973," states: "Recipients

must comply with the requirements of Section 504 of the Rehabilitation Act of

1973, Pub. L. No. 93-112 (codified as amended at 29 U.S.C. § 794)."

**iii.    Defendants Adopt, Attach, and Impose Additional Requirements That Repeat or Implement the Challenged DHS Conditions**

175.    Plaintiffs' challenge to the Challenged DHS Conditions is intended to reach all documents or other requirements of any kind that Defendants have adopted, attached, or otherwise imposed, whatever their location, to the extent they purport to impose the same or materially similar obligations as the Challenged DHS Conditions and also to the extent that Defendants would leverage them to repeat, advance, or implement the Challenged DHS Conditions with respect to DHS funding.  This includes, but is not limited to, the Challenged Grants Manual Requirements described in paragraph 179 below and the FEMA Hazard Mitigation Assistance Program and Policy Guide described in paragraph 180 below.

176.    On or about August 20, 2025, Defendants adopted and published the FEMA Preparedness Grants Manual, FM-207-23-001 (the "Grants Manual").  The Grants Manual includes a variety of requirements that are made binding on grantees, including subrecipients, of FEMA's preparedness grant programs by the plain terms of the Grants Manual itself, and also by the NOFOs for each grant program, which FEMA incorporates by reference into grant awards and which in turn state that grantees must comply with the Grants Manual.

177.    The Grants Manual states that several of its sections "received new or refreshed content for Fiscal Year (FY) 2025, mainly to align with updated standard language included across FEMA's FY 2025 NOFOs."

178.    The Grants Manual states that grant recipients "must comply with the DHS Standard Terms and Conditions in effect as of the date of the federal award" (Section 4) and reiterates the EO Condition verbatim (Section 4.1).

179.    In another section, referred to herein as the "Challenged Grants Manual Disclosure Requirements," the Grants Manual requires grantees to disclose certain information about subrecipients with every reimbursement request the grantee submits.  FEMA may withhold requested payments if the grantee fails to disclose the required information.  The Challenged Grants Manual Disclosure Requirements purport to be binding on grantees in and of themselves, and they also appear to implement the Challenged DHS Conditions and facilitate FEMA's enforcement of those Conditions.  Specifically, the Challenged Grants Manual Disclosure Requirements, located at paragraph 4 of Subsection 6.11.3 of the Grants Manual, require disclosure of the following information about each subgrantee:

a.    *The Mission Disclosure Requirement*: "The name, mission statement, and purpose of each subrecipient receiving funds, along with the amount allocated and the specific role or activity being reimbursed."

b.    *The Global Support Disclosure Requirement*: "Whether the subrecipient's work or mission involves supporting aliens, regardless of whether FEMA funds support such activities."

c.    *The Funded Support Disclosure Requirement*: "Whether the payment request includes an activity involving support to aliens."

d.    *The DEI Disclosure Requirement*: "Whether the subrecipient has any diversity, equity, and inclusion practices."

180.    Other DHS documents likewise contain provisions that could be construed to advance or implement one or more of the Challenged DHS Conditions.  For example, the FEMA Hazard Mitigation Assistance Program and Policy Guide states that it "outline[s] the policy and procedure requirements" related to HMGP and other hazard mitigation grant programs, and states, among other things, that "[h]azard mitigation activities must adhere to all relevant statutes, regulations and requirements," including, expressly, all "applicable federal . . . laws[,] implementing regulations[,]

and executive orders."[30]  In addition, Defendants have inserted new terms that purport to impose requirements materially similar to the Immigration Conditions, as described in paragraphs 186-189 below.

### iv.   Defendants Unlawfully Impose the Challenged DHS Conditions and Other Requirements that Adopt, Attach, Impose, and/or Implement those Conditions

### a.   Defendants Attach the Challenged DHS Conditions

181.   Defendants have attached the Discrimination Condition and the EO Condition to all of their grant awards, thereby conditioning disbursement of grant funding to all direct grantees and subgrantees on their agreement to those conditions.  Defendants' application of the Discrimination Condition and the EO Condition across the board, to all grants, is consistent with the plain language of the Standard DHS Terms themselves, which state that they apply to all federal awards issued during Fiscal Year 2025 unless a specific provision says otherwise.

182.   Defendants have subjected all costs charged to all of FEMA's Preparedness Grants, including HSGP-SHSP, HSGP-UASI, TSGP, PSGP, and EMPG, to the Challenged Grants Manual Disclosure Requirements.

183.   Defendants have represented that they will not apply the Immigration Conditions in the Standard DHS Terms to every grant award, but those representations have proven unreliable.  On March 25, 2025, Defendant Noem endorsed the recommendation of Cameron Hamilton, the former Senior Official Performing the Duties of FEMA Administrator, to attach the Immigration Conditions related to cooperation with ICE to all open and future awards under 12 grant programs, including but not limited to EMPG, HSGP-SHSP, HSGP-UASI, PSGP, and TSGP; not to attach those conditions to awards under several other grant programs; and to reserve the possibility of attaching those conditions to yet more other grant programs.  Defendant Noem endorsed the recommendation even though Mr. Hamilton's memorandum had identified no authority to support its categorization.  Yet

---

[30] FEMA, *FEMA Hazard Mitigation Assistance Program and Policy Guide*, Version 2.1, FEA No. FP-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, at v, 555-557 (Jan. 20, 2025), available at https://www.fema.gov/sites/default/files/documents/fema_hma-guide-v2.1_2025.pdf (last accessed Sept. 30, 2025).

1    when DHS adopted the Standard DHS Terms (including the Immigration Conditions related to

2    cooperation with ICE) several weeks later, they stated that they would apply to "all new federal

3    awards," without excluding the programs identified in the memorandum.

4        184.    Then, on June 9, 2025, during litigation brought by several States related to FEMA's

5    and DHS's imposition of the Immigration Conditions, Defendant Richardson—who in May had

6    replaced Mr. Hamilton as the Senior Official Performing the Duties of FEMA Administrator—

7    attested in a sworn declaration that, notwithstanding the plain language of the Standard DHS Terms,

8    DHS "will not apply immigration enforcement provisions across the board to all its programs" and

9    confirmed that DHS and FEMA had made final determinations that immigration restrictions related

10    to cooperation with ICE would not apply to a significant number of grants administered by FEMA.[31]

11    If it had been implemented, this representation would have removed many disaster preparedness,

12    relief, and mitigation grants from the cross-hairs of the immigration restrictions President Trump has

13    directed agencies to impose, including SAFER, AFG, FP&S, and US&R grants.  Defendant

14    Richardson also represented that DHS was still considering the application of the Immigration

15    Conditions to EMPG, HSGP-SHSP, HSGP-UASI, PSGP, and TSGP grants.[32]

16        185.    Subsequently, on June 23, 2025, one court preliminarily enjoined DHS from

17    imposing the Immigration Conditions on emergency preparedness grants, and on September 24,

18    2025, another court vacated and permanently enjoined imposition of the Immigration Conditions.[33]

19

---

20    [31] Decl. of David Richardson, at ¶¶ 6, 14, *Illinois v. FEMA*, No. 1:25-cv-206-WES-PAS (D.R.I. filed June 6, 2025) (ECF No. 50-1); *id.* at ¶ 6 (affirming accuracy of memorandum attached as exhibit to

21    complaint); DHS, Approval of FEMA-Administered Grant Disbursements (Mar. 20, 2025), Exhibit B to Complaint at 6-9, *Illinois v. FEMA*, No. 1:25-cv-206-WES-PAS (D.R.I. filed May 13, 2025)

22    (ECF No. 1-2) (listing grant programs as to which FEMA recommended not to apply the Immigration Conditions).

23    [32] *Id.* at ¶ 6 (affirming accuracy of memorandum attached as exhibit to complaint); DHS, Approval

24    of FEMA-Administered Grant Disbursements (Mar. 20, 2025), Exhibit B to Complaint at 6-9, *Illinois v. FEMA*, No. 1:25-cv-206-WES-PAS (D.R.I. filed May 13, 2025) (ECF No. 1-2) (listing

25    grant programs as to which FEMA recommended not to apply the Immigration Conditions).

26    [33] The district court in *Illinois v. FEMA*, --- F.Supp.3d ----, 2025 WL 2716277, No. 1:25-cv-00206 (D.R.I. Sept. 24, 2025) vacated the Immigration Conditions and enjoined their application.  The

27    district court in *City and County of San Francisco v. Trump* held that application of the Immigration Conditions to DHS grants "used for emergency preparedness, which has no nexus to immigration

28    enforcement," violated the preliminary injunction in that case, which prohibited the government from "taking any action to withhold, freeze, or condition federal funds" from the plaintiffs based on

Complaint for Declaratory and Injunctive Relief                        25-8330

**b.** **The Sanctuary Certification Condition and Temporary, Limited Carveouts**

186.    Despite Defendant Richardson's representations and the injunctions and vacatur, Defendants have nonetheless purported to include and impose the Immigration Conditions on Plaintiffs' receipt of almost *all* DHS funding (whether directly or indirectly, through subgrants).  For a subset of those awards, Defendants have also included an additional condition, referred to herein as the "Sanctuary Certification Condition" and described in paragraph 187 below, that reiterates and re-imposes terms materially similar to the Immigration Conditions. Defendants have also included language that purports to *temporarily* excuse the plaintiffs in *San Francisco v. Trump* (which includes some but not all Plaintiffs in this action) and the plaintiffs in *Illinois v. FEMA* (which does not include any Plaintiffs in this action) from compliance with the Immigration Conditions and Sanctuary Certification Condition while the injunctions are in effect, and further states that the Sanctuary Certification Condition will immediately become effective as to those parties upon their respective injunction ceasing to be in effect.

187.    Specifically, on many grant awards Defendants have issued to Plaintiffs and to the States through which Plaintiffs obtain subgrants, Defendants have adopted, attached, and imposed an additional term that reiterates the Immigration Conditions related to cooperation with ICE, affirmatively prohibits any grantee that Defendants or the Department of Justice unilaterally designate as a "Sanctuary Jurisdiction" from making financial obligations under grants or subgrants, and affirmatively prohibits grantees from issuing subgrants or payments under subgrants to any other unilaterally designated "Sanctuary Jurisdiction."  That term, referred to herein as the "Sanctuary Certification Condition," reads as follows:

**Compliance with Federal Immigration Law**

1. Prohibition

---

executive orders mandating the defunding of jurisdictions that limit or prohibit cooperation with ICE.  2025 WL 1738675, No. 3:25-cv-01350-WHO (N.D. Cal. June 23, 2025).  Plaintiffs Santa Clara, San Francisco, Berkeley, Culver City, LA City, King County, Marin County, Oakland, Palo Alto, Petaluma, Pierce County, Sacramento, San Diego City, San José, San Mateo County, Santa Rosa, and Sonoma County are plaintiffs in that action.

a. The state, territorial, or local government recipient is prohibited from being designated by the Department of Homeland Security or Department of Justice as a sanctuary jurisdiction. If the Department of Homeland Security or Department of Justice designates the state, territory, or local government as a sanctuary jurisdiction after the Department of Homeland Security has made the grant award, the state, territorial, or local government recipient is prohibited from making any financial obligations under the grant award on or after the date of designation until the Department of Homeland Security or Department of Justice removes that designation. The Department of Homeland Security will suspend the grant award and not make payments to the state, local, or territorial recipient on or after the date of designation until the Department of Homeland Security or Department of Justice removes that designation.

b. The state, local, or territorial recipient is prohibited from making subawards to a state, local, or territorial government that the Department of Homeland Security or Department of Justice has designated as sanctuary jurisdiction. If the Department of Homeland Security or Department of Justice designates a state, local, or territorial government as a sanctuary jurisdiction after the recipient makes a subaward, the recipient must suspend the subaward, the recipient must not make any additional payments to the subrecipient, and the subrecipient is prohibited from making any financial obligations under the subaward on and after the date of designation until the Department of Homeland Security or Department of Justice removes that designation. c. The Department of Homeland Security designates a state, local, or territorial government as a sanctuary jurisdiction if it fails to comply with the requirements set forth in paragraphs 2.a.i to v of this term and condition.

2. Certification

a. The state, territorial, or local government recipient and all state, territorial, and local government subrecipients must certify under penalty of perjury pursuant to 28 U.S.C. § 1746, and using a form that is acceptable to the Department of Homeland Security, that they will comply with the following requirements related to coordination and cooperation with the Department of Homeland Security and immigration officials:

i. They will comply with the requirements of 8 U.S.C. §§ 1373 and 1644. These statutes prohibit restrictions on information sharing by state and local government entities with the Department of Homeland Security regarding the citizenship or immigration status, lawful or unlawful, of any individual. Additionally, 8 U.S.C. § 1373 prohibits any person or agency from prohibiting, or in any way restricting, a Federal, state, or local government entity from doing any of the following with respect to information regarding

46

the immigration status of any individual:

(1) sending such information to, or requesting or receiving such information from, Federal immigration officials;

(2) maintaining such information; or

(3) exchanging such information with any other federal, state, or local government entity.

ii.   They will comply with other relevant laws related to immigration, including prohibitions on encouraging or inducing an alien to come to, enter, or reside in the United States in violation of law, 8 U.S.C. § 1324(a)(1)(A)(iv), prohibitions on transporting or moving illegal aliens, 8 U.S.C. § 1324(a)(1)(A)(ii), prohibitions on harboring, concealing, or shielding from detection illegal aliens, 8 U.S.C. § 1324(a)(1)(A)(iii), and any applicable conspiracy, aiding or abetting, or attempt liability regarding these statutes.

iii.   They will honor requests for cooperation, such as participating in joint operations, sharing of information, or requests for short term detention of an alien pursuant to a valid detainer. A jurisdiction does not fail to comply with this requirement merely because it lacks the necessary resources to assist in a particular instance.

iv.   They will provide access to detainees, such as when an immigration officer seeks to interview a person who might be a removable alien.

v.   They will not leak or otherwise publicize the existence of an immigration enforcement operation.

b.   The state, local, or territorial recipient must require a state, local, or territorial subrecipient to make the certification above before providing them with any funding under the subaward.

3.   Materiality and Remedies for Noncompliance

This term and condition is material to the Department of Homeland Security's decision to make this grant award and the Department of Homeland Security may take any remedy for noncompliance, including termination, if the state, territorial, or local government recipient or any state, territorial, or local government subrecipient fails to comply with this term and condition.[34]

188.   Similarly, on many grant awards Defendants have issued to Plaintiffs and to the

---

[34] Although the Sanctuary Certification Condition includes all the subsection numbering in text, Defendants have inserted it into grant awards as a single unbroken string of text.  Plaintiffs have inserted paragraph breaks for ease of readability.

States through which Plaintiffs obtain subgrants, Defendants have adopted, attached, and imposed

two additional terms, referred to herein individually as the "*SF v. Trump* Carveout" and "*Illinois v.*

*FEMA* Carveout" and collectively as the "Temporary, Limited Injunction Carveouts," that

acknowledge and purport to comply with the injunctions issued in *City and County of San Francisco*

*v. Trump* and *Illinois v. FEMA* and described in paragraph 185 above.  The Temporary, Limited

Injunction Carveouts read as follows:

> **Impact of San Francisco v. Trump Preliminary Injunction**
>
> Pursuant to the preliminary injunction order issued on August 22, 2025, in
> City and County of San Francisco, et al. v. Trump, et al., No. 3:25-cv-01350
> (N.D. Cal.), the following terms and conditions do not apply to awards or
> subawards issued to any of the plaintiffs subject to the preliminary injunction
> order while the order remains in effect: [the Immigration Conditions, as
> described in paragraph 172 above, and the Sanctuary Certification Condition,
> as described in paragraph 187 above]. If the preliminary injunction is stayed,
> vacated, or extinguished, the [Sanctuary Certification Condition] will
> immediately become effective.
>
> **Impact of State of Illinois v. FEMA Injunction**
>
> Pursuant to the memorandum and order issued on September 24, 2025, in
> State of Illinois, et al. v. Federal Emergency Management Agency, et. al,
> No.25-206 (D. R.I.), the following terms and conditions do not apply to
> awards or subawards issued to any of the plaintiffs subject to the injunction
> order while the order remains in effect: [the Immigration Conditions, as
> described in paragraph 172 above, and the Sanctuary Certification Condition,
> as described in paragraph 187 above]. If the injunction is stayed, vacated, or
> extinguished, the [Sanctuary Certification Condition] will immediately
> become effective.

189.     To date, the Immigration Conditions are included within the Standard DHS Terms

that have been imposed on all of the grant agreements Defendants have issued to date to Plaintiffs as

direct grantees, which include the AFG, SAFER, PSGP, TSGP, US&R, and STC grant programs.

Defendants' US&R, AFG, and SAFER awards issued to Plaintiffs include the Immigration

Conditions but state that the Immigration Conditions do not apply to those grant awards.  With

respect to LA City's STC award, Defendants have required that LA City agree to the Immigration

Condition with a statement that that Condition does not apply "to the extent their application is

1    limited by the injunction in *San Francisco v. Trump*, No. 3:25-cv-01350 (N.D. Cal.), or any other

2    litigation, so long as that injunction is in force." With respect to TSGP and PSGP, Defendants have

3    imposed both the Sanctuary Certification Condition and the Temporary, Limited Injunction

4    Carveout. Plaintiffs have not yet received grant agreements for EMPG, SHSP, UASI, or HMPG

5    awards, and expect that the Immigration Conditions and/or the Sanctuary Certification Condition

6    will likely be included in at least several of these programs in light of Defendant Richardson's

7    affidavit in *Illinois v. FEMA*, as described in paragraph 184 above.

8        *c.*    **Defendants Lack Authority to Impose the Challenged DHS Conditions or**
              **Sanctuary Certification Condition**

9

10        190.    Defendants' adoption of an across-the-board policy to impose the Discrimination

11    Condition and EO Condition is *ultra vires*, arbitrary and capricious, contrary to law and the

12    Constitution, and in excess of even Congress's legislative power to impose conditions on federal

13    funding. The same is true for Defendants' attachment of the Discrimination Condition, the EO

14    Condition, and the Immigration Conditions to particular award packages for the DHS funding

15    Plaintiffs receive through direct grants or indirectly via pass-through subgrants.

16        191.    No statute confers upon any of the Defendants the power to require grantees and

17    subgrantees to agree to any of the Challenged DHS Conditions or Sanctuary Certification Condition

18    in order to obtain the federal funds at issue. Indeed, many of the authorizing statutes expressly

19    forbid the Executive Branch from withholding the grant funding at issue. *See, e.g.*, 6 U.S.C.

20    § 605(e)(1)(A)(v) (FEMA administrator "shall ensure" that each State receive a minimum allocation

21    of SHSP funds); *id.* § 762(d) (FEMA administrator "shall first apportion" a baseline amount of each

22    year's apportionment of EMPG funds to States and "shall apportion" the remainder of such amounts

23    on a population-share basis). The Challenged DHS Conditions and Sanctuary Certification

24    Condition thus disregard Congress's carefully designed statutory schemes for each grant program.

25    Nor does Article II of the Constitution grant the Executive Branch any power of its own to impose

26    spending conditions unilaterally, because that is a legislative power reserved to Congress under

27    Article I.

28        192.    In short, Defendants have no authority whatsoever to adopt the Challenged DHS

1    Conditions or Sanctuary Certification Condition or attach those conditions to Plaintiffs' grant and

2    subgrant funding.  Yet that is precisely what they have done.

3        **v.**    **The Challenged DHS Conditions Express Incorrect Views of the Law, Are**
     **Ambiguous and Unascertainable, and Require Grantees to Violate the**
4                   **Constitution**

5            **a.**    **Defendants Express Incorrect Views of the Law**

6        193.    In the President's executive orders, agency memoranda issued in light of those

7    executive orders, and in the Discrimination Condition and the EO Condition themselves, the

8    Administration is attempting to rewrite federal antidiscrimination law rather than apply the law as it

9    has long been understood and interpreted by the courts.  For example, the Attorney General's

10   guidance states that organizations must "affirm sex-based boundaries rooted in biological

11   differences," even though the Administration's insistence on "the sex binary" and its refusal to

12   recognize the reality of gender identity is inconsistent with governing law.  *Bostock v. Clayton Cnty.,*

13   *Georgia*, 590 U.S. 644, 662, 669 (2020) ("For an employer to discriminate against employees for

14   being homosexual or transgender, the employer must intentionally discriminate against individual

15   men and women in part because of sex.  That has always been prohibited by Title VII's plain

16   terms[.] . . . [D]iscrimination based on homosexuality or transgender status necessarily entails

17   discrimination based on sex.").

18       194.    Moreover, neither the text of Title VI, nor any other federal antidiscrimination statute

19   or other condition enacted by Congress, supports the Trump Administration's insistence that it is

20   unlawful to accord concern and attention to issues of diversity, equity, or inclusion, let alone that the

21   federal government can bar recipients of federal funding from doing so.  The Supreme Court has

22   never interpreted Title VI to prohibit diversity, equity, and inclusion programs.  Indeed, existing case

23   law firmly rejects the Trump Administration's unmoored assertions regarding antidiscrimination law

24   with respect to DEI, and instead holds that neither the Constitution nor federal antidiscrimination

25   laws prohibit affinity groups and DEI trainings and initiatives, whether by governmental or

26   nongovernmental entities.  *E.g.*, *Diemert v. City of Seattle*, 776 F.Supp.3d 922, 939-40 (W.D. Wash.

27   2025) (although "D.E.I. initiatives" and conversations about race, sex, and other matters "may

28   prompt discomfort or spark debate, they do not necessarily violate anti-discrimination laws.

1   Multiple courts in recent years have reached the same conclusion. . . . Quite the opposite, many

2   courts have held that anti-discrimination trainings play a vital role in preventing workplace

3   discrimination. . . . D.E.I. and anti-discrimination trainings are not per se unlawful.") (collecting

4   cases); *see also City of Fresno v. Turner*, No. 25-CV-07070-RS, 2025 WL 2721390, at *16-18 (N.D.

5   Cal. Sept. 23, 2025) (preliminarily enjoining application or enforcement of grant condition

6   materially similar to Discrimination Condition); *Martin Luther King, Jr. Cnty. v. Turner*, No. 2:25-

7   CV-814, 2025 WL 2322763, at *12-13, *22-23 (W.D. Wash. Aug. 12, 2025) (same).

8        195.    The Trump Administration's assertions about immigration laws are just as flawed and

9   inconsistent with authoritative judicial analysis.  Indeed, the Administration's assertions about so-

10  called "sanctuary" cities and the reach of federal immigration law—including Defendant Noem's

11  February 19, 2025 memorandum purporting to define such jurisdictions[35]—are contradicted by

12  judicial analysis.  *United States v. Illinois*, --- F.Supp.3d. ---, No. 25 CV 1285, 2025 WL 2098688, at

13  *13 (N.D. Ill. July 25, 2025) (holding that state and local governments have the right under the

14  Tenth Amendment to adopt policies of noncooperation with ICE, and dismissing for failing to state a

15  claim United States' lawsuit alleging that such policies violate the Immigration and Nationality Act).

16  The current federal Administration's views about the legality of noncooperation policies fly directly

17  in the face of "settled constitutional law."  *Galarza v. Szalczyk*, 745 F.3d 634, 643 (3d Cir. 2014);

18  *United States v. California*, 921 F.3d 865, 886-93 (9th Cir. 2019); *McHenry Cnty. v. Raoul*, 44 F.4th

19  581 (7th Cir. 2022); *Cnty. of Santa Clara v. Trump*, 250 F.Supp.3d 497, 533 (N.D. Cal. 2017).

20       196.    The EO Condition is similarly misguided because executive orders express general

21  policy and/or are addressed to the Executive Branch; they do not by their terms apply to, or impose

22  any requirements on, federal grant recipients.  Nonetheless, several executive orders that could be

23  described as "related to grants" have broad and ambiguous language that could be read to impose

24  conditions materially similar to the Immigration Conditions and Discrimination Condition.  Those

25  include the executive orders cited in paragraphs 164 and 166 above.  One could be read as

26

27  ───────────────

28  [35] *See* Sec'y of Homeland Security, Restricting Grant Funding for Sanctuary Jurisdictions (Feb. 19, 2025), *supra* note 24.

1  purporting to require grantees' and subgrantees' agreement that compliance with requirements

2  similar to or even broader than the Discrimination Condition is material for purposes of the False

3  Claims Act. Exec. Order No. 14173 of Jan. 21, 2025, § 3(b)(iv)(A), 90 Fed. Reg. 8,633, 8,634.

4  Another could be read as purporting to force grantees and subgrantees to accede to the legal

5  interpretations of President Trump and the Attorney General, even when those interpretations

6  contravene settled law. Exec. Order No. 14215 of Feb. 18, 2025, § 7, 90 Fed. Reg. 10,447, 10,448

7  ("Ensuring Accountability for All Agencies") ("The President and the Attorney General, subject to

8  the President's supervision and control, shall provide authoritative interpretations of law for the

9  executive branch. The President and the Attorney General's opinions on questions of law are

10  controlling on all employees in the conduct of their official duties."). There is also no limiting

11  principle to this condition: it could be read to require compliance with executive orders even after

12  they have been enjoined as unlawful, as well as acquiescence *in advance* to policy positions,

13  requirements, and legal interpretations that the President has not yet announced, even though there is

14  no way to know whether or when the President may issue additional executive orders and what those

15  orders might say or purport to require.

16                ***b.***     **The Challenged DHS Conditions are Ambiguous**

17       197.    A corollary of the Challenged DHS Conditions' and Sanctuary Certification

18  Condition's incompatibility with existing law—as made by Congress and interpreted by the

19  judiciary—is that the Conditions are so ambiguous as to have no fixed or fixable meaning.

20       198.    The Immigration Conditions and Sanctuary Certification Condition are vague and

21  ambiguous because they fail to define or provide meaningful contours on the scope of terms

22  including "cooperation," "requests for cooperation," "joint operations," "sharing of information,"

23  "valid detainer," "access to detainees," and "immigration enforcement operation," or the terms

24  "benefit" with respect to "illegal immigrants" or "incentivize" with respect to "illegal immigration."

25       199.    The Discrimination Condition is vague and ambiguous because it fails to make clear

26  to a reasonable person in the position of a grantee what conduct is prohibited and also fails to specify

27  clear standards for enforcement or for determination by the Secretary of Homeland Security or her

28  designee that grantees' activities violate the Discrimination Condition's prohibitions, which

1   determination the Discrimination Condition treats as conclusive.  The Discrimination Condition is

2   also vague and ambiguous because it does not define the terms "DEI" and "DEIA" (other than by

3   listing the words that each letter in each acronym represents); the term "operate" with respect to

4   "program"; the terms "advance" and "promote" with respect to DEI, DEIA, and discriminatory

5   equity ideology; the term "discriminatory prohibited boycott"; or the term "engage" with respect to

6   "discriminatory prohibited boycott."

7       200.    Worse, the terms DEI and DEIA are capacious and reasonably understood to include

8   conduct and speech that are lawful under the First Amendment and settled and longstanding

9   understandings of civil rights law.  Likewise, the Discrimination Condition's definition of

10  "discriminatory equity ideology"—that is, "an ideology that treats individuals as members of

11  preferred or disfavored groups, rather than as individuals, and minimizes agency, merit, and

12  capability in favor of immoral generalizations"[36]—establishes a false dichotomy between group and

13  individual characteristics that is itself at odds with settled and longstanding understandings of civil

14  rights law.  And the term "prohibited discriminatory boycott" is *entirely* undefined.  Indeed, DHS

15  actually *increased* the uncertainty, ambiguity, and potential breadth of the term when it revised the

16  Discrimination Condition in early August 2025 to remove a provision that had specifically and

17  narrowly defined that term by reference to the State of Israel.  *See* paragraph 169.

18      201.    That the Discrimination Condition purports to prohibit "programs that advance or

19  promote DEI, DEIA, or discriminatory equity ideology *in violation of Federal anti-discrimination*

20  *laws*" only exacerbates its ambiguity and uncertain reach.  It is reasonable to read the Condition as

21  positing that *all* such programs violate Federal antidiscrimination laws.  Yet the Supreme Court has

22  made clear that not all discussions of how race affects a person's life, "be it through discrimination,

23  inspiration, or otherwise," are unlawful.  *Students for Fair Admissions, Inc. v. President & Fellows*

24  *of Harvard Coll.*, 600 U.S. 181, 230-31 (2023).

25

26  ─────────────────────

27  [36] The Discrimination Condition adopts the definition of the term "discriminatory equity ideology"
    from Executive Order 14190, entitled "Ending Radical Indoctrination in K-12 Schooling," which is
    quoted in text and is itself capacious, vague, and ambiguous.  *See* Executive Order 14190, at § 2(b),
28  90 Fed. Reg. 8853 (Jan. 29, 2025) (providing definition quoted in text and providing non-exhaustive
    list of examples of "immoral generalizations").

202.     Even otherwise, this savings clause is purely theoretical, offers no method or standard for invoking it, and leaves the Administration with unfettered discretion to decide for itself what is or is not unlawful.  Indeed, the clause underscores rather than limits the Discrimination Condition's uncertainty and ambiguity because Administration attorneys have been unable or unwilling in closely related contexts to articulate clearly or unambiguously what forms or aspects of DEI, DEIA, or "discriminatory equity ideology," could be said to "violat[e] Federal anti-discrimination laws," and in other contexts have asserted views squarely at odds with governing law.  *See, e.g.*, *San Francisco Unified Sch. Dist. v. AmeriCorps*, --- F.Supp.3d ----, No. 25-CV-02425-EMC, 2025 WL 1713360, at *18-22 (N.D. Cal. June 18, 2025) (inability to define or describe terms in AmeriCorps grant condition); *Nat'l Educ. Ass'n v. United States Dep't of Educ.*, 779 F. Supp. 3d 149, 187 (D.N.H. 2025) (similar for Department of Education "Dear Colleague Letter"); *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, 767 F. Supp. 3d 243, 258, 282 (D. Md. 2025) [hereinafter "*NADOHE I*"] ("Indeed, when the Court asked the government during the hearing a series of questions regarding hypothetical implementation of DEI by federal contractors and grantees, the government refused to even attempt to clarify what the Certification Provision means, or whether these hypothetical scenarios are legal."), *op. clarified*, 769 F. Supp. 3d 465 (D. Md. 2025) [hereinafter "*NADOHE II*"]; *Martin Luther King, Jr. Cnty. v. Turner*, No. 2:25-CV-814, 2025 WL 2322763, at *12-13 (W.D. Wash. Aug. 12, 2025) (Attorney General's view that grantees cannot use facially neutral criteria correlated with protected characteristics "is inconsistent with Supreme Court precedent," Deputy Attorney General's assertion about transgender persons' access to bathrooms "contradicts the decisions of multiple appellate courts that have held that federal law forbids discrimination based on transgender status," and Secretary of Transportation's assertion about DEIA "is inconsistent with well-established federal precedent" regarding reasonable accommodations for disabled persons).

203.     In any event, the structure of the Discrimination Condition exacerbates the ambiguity of its terms because it affords unfettered discretion to the Secretary of Homeland Security or designee to determine, based on their subjective interpretation, whether (a) "any programs" the grantee operates—not just the activities supported by grant funding—"advance or promote DEI,

Complaint for Declaratory and Injunctive Relief                                                          25-8330

1  DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws" or (b) any

2  activity the grantee undertakes—whether or not supported by grant funding—constitutes "a

3  discriminatory prohibited boycott." *Compare NADOHE I*, 767 F.Supp.3d at 278, 281 ("the express

4  language of the Certification Provision demands that federal contractors and grantees essentially

5  certify that there is no 'DEI' (whatever the executive branch decides that means) in any aspect of

6  their functioning, regardless of whether the DEI-related activities occur outside the scope of the

7  federal funding," and the lack of clarity on meaning of DEI, DEIA, and equity "makes unavoidable

8  that agency decisionmakers will 'shap[e] a vague [order's] contours though their enforcement

9  decisions'" (quoting *Sessions v. Dimaya*, 584 U.S. 148, 182 (2018) (Gorsuch, J., concurring)));

10  *Tennessee Educ. Ass'n*, 732 F.Supp.3d at 808-09 ("The government cannot simply tell people to 'be

11  good' and leave it up to the enforcers to decide what 'good' is. . . . By vesting interpretive authority

12  regarding such open-ended terms in the Commissioner, the Act does not so much forbid teachers

13  from suggesting that, for example, Americans are not created equal, so much as it forbids teachers

14  from suggesting that Americans are not created equal *as the Commissioner understands that*

15  *concept*—an understanding that the Commissioner does not have to share with the public until after"

16  initiating an enforcement action.).

17      204.    In addition, the Discrimination Condition and EO Condition are ambiguous insofar as

18  they reflect an attempt by the Executive Branch to wield the judicial power to say what the law is.

19  The Discrimination Condition demands that grantees agree to comply with *the Secretary's view* of

20  what the law should be, and to be bound by the Secretary's view of whether grantees comply with it,

21  regardless of whether the Secretary's views comport with authoritative judicial pronouncements.

22  And the EO Condition seemingly purports to bind grantees to an executive order asserting the

23  authoritativeness of the President's and the Attorney General's pronouncements on questions of law,

24  Exec. Order No. 14215 of Feb. 18, 2025, § 7, 90 Fed. Reg. 10,447, 10,448 ("Ensuring

25  Accountability for All Agencies").  That Executive Order, in turn, could be read to include the

26  Attorney General's Discrimination Guidance Memo, even though that memo is in some important

27  ways at odds with judicial interpretation.

28      205.    The Executive Branch's seeming arrogation of the judicial power to say what the law

Complaint for Declaratory and Injunctive Relief                                                    25-8330

1   is generates uncertainty and ambiguity as to what it means for grant recipients to agree to comply

2   with civil rights laws, and as a result, suffuses ambiguity into many other provisions of the Standard

3   DHS Terms that might otherwise seem clear—including the Civil Rights Conditions described in

4   paragraph 174 above.  What on its face may seem clear and unobjectionable, like a requirement to

5   comply with Title VI of the Civil Rights Act of 1964, becomes entirely unascertainable when the

6   President and Attorney General have put forth interpretations of that statute untethered to judicial

7   interpretations, and announced that their pronouncements on questions of law will be authoritative.

8   This is true for all of the Civil Rights Conditions.

9       206.    Thus, the arrogation underlying the Discrimination and EO Conditions casts doubt on

10  Plaintiffs' understanding of the Civil Rights Conditions themselves, and suggests, contrary to the

11  text of those provisions, that the Conditions imply grantees' acquiescence to the Executive Branch's

12  interpretation of the law.  To remedy that particular harm, any relief related to the Discrimination

13  and EO Conditions must also clarify that the references to statutes in the Civil Rights Conditions

14  mean those statutes *as enacted by Congress and interpreted by the judiciary*, such that it would not

15  be a breach of those conditions for a grantee to take actions that comply with the law as interpreted

16  by the courts, even if those actions run counter to the Executive's view of those laws.

17      207.    The EO Condition is vague and ambiguous because it fails to define or provide

18  meaningful contours on the scope of the term "related to grants."  The condition is also vague and

19  ambiguous in purporting to incorporate and require grantees and subgrantees to "comply" with all

20  "Presidential Executive Orders related to grants," because executive orders are the President's

21  directives to federal agencies or expressions of general policy and do not by their terms apply to

22  federal grant recipients or other entities outside the Executive Branch.

23      208.    Even if executive orders could be said to "apply" directly to grantees and directly

24  regulate grantee behavior, the EO Condition compounds ambiguities atop ambiguities because

25  many, if not virtually all, executive orders that might be said to "relate[] to grants" are themselves

26  replete with broad, ambiguous, and unascertainable terms whose meanings exist nowhere other than

27  in the eye of the beholder—such as what it means to "demonstrably advance the President's policy

28  priorities" or to "promote," "encourage," or "facilitate" "racial preferences," "denial . . . of the sex

56

1  binary . . . or the notion that sex is a chosen or mutable characteristic," "illegal immigration," or

2  "initiatives that compromise public safety or promote anti-American values";[37] to "instill a patriotic

3  admiration for our incredible Nation and the values for which we stand" or to engage in "the

4  instruction, advancement, or promotion of gender ideology or discriminatory equity ideology";[38] to

5  advocate or advance "immoral race- and sex-based preferences";[39] to conduct activities that are

6  "equity-related" or contain "DEI or DEIA performance requirements";[40] or "to promote gender

7  ideology."[41]

8       209.    The scope and meaning of the EO Condition is also incapable of being ascertained

9  because it purports to obtain grantees' acquiescence in advance to conditions that may come into

10  existence in the future, if and to the extent the President subsequently issues or amends executive

11  orders related to grants.  Those future conditions would also violate the spending power for the

12  additional, independent reason that they would be a surprise and would be imposed post-acceptance.

13  This is an exceedingly likely scenario, inasmuch as President Trump has already signed well over

14  twice as many executive orders in the first eight months of the current presidential Term than any

15  President in the last seventy years has issued in any one full calendar year.  Indeed, the President

16  issued an expansive executive order on August 7, 2025—well after DHS published terms and

17  conditions containing the EO Condition—that appears to be "related to grants" and purports to

18  require federal officials to ensure that discretionary grants "demonstrably advance the President's

19  policy priorities" and do not "fund, promote, encourage, subsidize, or facilitate . . . denial by the

20  grant recipient of the sex binary in humans or the notion that sex is a chosen or mutable

---

[37] Exec. Order No. 14332 of August 7, 2025, § 4(b), 90 Fed. Reg. 38,929, 38,931 ("Improving Oversight of Federal Grantmaking").

[38] Exec. Order No. 14190 of Jan. 29, 2025, §§ 1-3, 90 Fed. Reg. 8,853, 8,853-55 ("Ending Radical Indoctrination in K-12 Schooling").

[39] Exec. Order No. 14173 of Jan. 21, 2025, § 1, 90 Fed. Reg. 8,633 ("Ending Illegal Discrimination and Restoring Merit-Based Opportunity").

[40] Exec. Order No. 14151 of Jan. 20, 2025, § 2(b), 90 Fed. Reg. 8,339, 8,340 ("Ending Radical and Wasteful Government DEI Programs and Preferencing").

[41] Exec. Order No. 14168 dated Jan. 20, 2025, § 3, 90 Fed. Reg. 8,615, 8,616 ("Defending Women From Gender Ideology Extremism And Restoring Biological Truth To The Federal Government").

1   characteristic" or "promote anti-American values."  Exec. Order No. 14332 of August 7, 2025,

2   § 4(b), 90 Fed. Reg. 38,929, 38,931 ("Improving Oversight of Federal Grantmaking").  This

3   executive order would dramatically revise the rules and considerations agency officials should use

4   when issuing discretionary awards; might itself violate the separation of powers, the First

5   Amendment, or other constitutional principles; and purports to establish criteria that are broad,

6   vague, subjective, and value-laden and reserve to the President the ultimate prerogative to determine

7   compliance by defining, redefining, or refining his own "policy priorities."

8            *c.*      **The Challenged DHS Conditions Require Grantees to Violate the**
                       **Constitution**
9

10       210.    The Challenged DHS Conditions' and Sanctuary Certification Condition's

11   inconsistency with existing law and ambiguity also give rise to yet another problem: reasonably

12   read, they require grantees to violate the Constitution in at least three different ways.

13       211.    By conditioning federal funds on grantees' advance and categorical agreement to

14   honor ICE civil detainers, the Immigration Conditions and Sanctuary Certification Condition—

15   including, at a minimum, the Cooperation Condition—require grantees and subgrantees to violate

16   the Fourth Amendment.

17       212.    ICE detainers are requests from ICE to officials of a state or local jurisdiction to

18   continue to detain a person after they would otherwise be released from that jurisdiction's custody.

19   When a person's detention is continued based on the ICE detainer, they have been subjected to a

20   new arrest, which the Fourth Amendment requires be independently supported by new probable

21   cause.

22       213.    ICE civil detainer requests are administratively issued documents that are not

23   reviewed by a neutral judicial officer to determine if they present or are supported by probable

24   cause.

25       214.    ICE civil detainer requests are not judicial warrants and are not accompanied by

26   judicial warrants or otherwise judicially authorized or ordered.

27       215.    In most, if not virtually all, instances, ICE's civil detainers are not supported by

28   probable cause, or, at a minimum, are not accompanied by evidence that would allow the recipient to

1   independently verify whether the detainer request is supported by probable cause.

2   216.    Because the Immigration Conditions and Sanctuary Certification Condition require

3   grantees to honor ICE detainers even when they are not accompanied by a judicial warrant

4   demonstrating that a neutral magistrate has determined that there is probable cause to detain the

5   subject of the detainer, they necessarily require grantees and subgrantees to violate the Fourth

6   Amendment rights of the subjects of those detainers.

7   217.    To the extent the EO Condition does or could in the future impose a requirement

8   materially similar to the Immigration Conditions or Sanctuary Certification Condition, the EO

9   Condition is unlawful for the same reasons as those described in paragraphs 211-216.

10  218.    The Discrimination Condition and the EO Condition require grantees and subgrantees

11  to violate the First Amendment.

12  219.    As used in the Discrimination Condition and many executive orders the EO Condition

13  imposes on grantees, the terms DEI, DEIA, discriminatory equity ideology, and prohibited

14  discriminatory boycott embody and advance a specific set of viewpoints of the current federal

15  Administration.  The same is true of several executive orders related to grants that are made binding

16  on grantees under the EO Condition.  *See* paragraphs 164 and 207-209 above.

17  220.    Plaintiffs take no position on the extent to which the federal Administration has a

18  right to focus its *own* statements on any particular viewpoint.  *See, e.g.*, *Am. Council of Learned*

19  *Societies v. McDonald*, No. 25 CIV. 3657 (CM) (BCM), 2025 WL 2097738, at *32 (S.D.N.Y.

20  July 25, 2025) ("Far be it from this Court to deny the right of the Administration to focus NEH

21  priorities on American history and exceptionalism as the year of our semiquincentennial approaches.

22  Such refocusing is ordinarily a matter of agency discretion.").

23  221.    But the Challenged DHS Conditions and Sanctuary Certification Condition do

24  something more: they impose the Administration's preferred phrases, concepts, and viewpoints on

25  grantees and subgrantees through funding conditions—for example, conditions that purport to bar

26  grantees and subgrantees from operating programs that "promote" DEIA concepts, and conditions

27  that require grantees and subgrantees to comply with an Executive Order purporting to refuse to

28  allow them to "promote" or recognize individual gender identity.  In other words, the Discrimination

59

1    Condition and EO Condition require grantees broadly not to operate any programs that advance a

2    viewpoint different from the viewpoints of the current federal Administration.  In so doing, the

3    Discrimination Condition and EO Condition not only seek to regulate grantees' speech outside the

4    contours of the federally funded program, *see* paragraph 264 below, but also require grantees and

5    subgrantees to engage in unconstitutional content-based and viewpoint discrimination with respect to

6    private actors' speech.

7        222.    First, when providing financial support or entering into service agreements with third

8    parties, the Discrimination Condition and EO Condition could be read to require grantees and

9    subgrantees to select among potential contractual partners based on those third parties' viewpoints

10   and speech on political matters and other matters of public concern, and to then police those third

11   parties' viewpoints and speech on matters of public concern.  Such activities squarely violate the

12   First Amendment.  *E.g.*, *Velazquez v. Legal Servs. Corp.*, 164 F.3d 757, 747-71 (2d Cir. 1999), *aff'd*,

13   531 U.S. 533.

14       223.    Second, when policing the content of speech permitted in otherwise public spaces that

15   grantees own, operate, or manage, the Discrimination Condition and EO Condition could be read to

16   require grantees and subgrantees to review and prohibit and remove postings on property owned or

17   managed by grantees that is otherwise open to the public, and prohibit entry or forcibly remove

18   individuals or groups from such property, based on the viewpoints expressed by the postings,

19   individuals and groups, lest the federal Administration believe that a grantee's failure to prohibit and

20   remove postings, and prohibit, remove, and suppress individuals or groups, is or could constitute the

21   grantee's "operation" of a "program" that "advance[s] or promote[s]" prohibited viewpoints.  Such

22   activities squarely violate the First Amendment.  *E.g.*, *Rosenberger v. Rector & Visitors of Univ. of*

23   *Virginia*, 515 U.S. 819, 829-832 (1995).

24       224.    The likelihood of the Administration insisting on an overbroad, unconstitutional view

25   that the Discrimination Condition and EO Condition require grantees to engage in viewpoint

26   discrimination continues to increase.  Indeed, in the week of September 23, 2025, FEMA widely

27   distributed an email announcement bulletin that federal funding recipients will be prohibited from

28   / / /

1  "empower[ing] radical organizations with unseemly ties that don't serve the interest of the

2  American people," no phrase of which is further defined.[42]

3      225.    The Discrimination Condition and EO Condition also require funding recipients to

4  violate fundamental separation of powers principles.  As noted in paragraphs 204-205 above, each of

5  these two conditions arrogate to the Executive Branch the judicial power to say what the law is, and

6  in so doing, suffuse otherwise apparently clear terms with ambiguity and uncertainty.  Each

7  Condition requires grantees to acquiesce to the Executive Branch's views of antidiscrimination law,

8  and thus to displace authoritative judicial interpretation with the views of the President and Attorney

9  General themselves, expressed by fiat.  In the name of antidiscrimination laws, the Discrimination

10  and EO Conditions would prohibit what the judiciary has said those laws permit, and could require

11  what the judiciary has said those laws forbid.

12      226.    Constitutional principles prohibit grantees from disregarding judicial interpretation in

13  favor of the Executive Branch's views.  "Article III of the Constitution assigns to the Federal

14  Judiciary the responsibility and power to adjudicate 'Cases' and 'Controversies'—concrete disputes

15  with consequences for the parties involved." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 384

16  (2024).  Indeed, "Chief Justice Marshall famously declared that '[i]t is emphatically the province and

17  duty of the judicial department to say what the law is.'"  *Id.* at 385 (quoting *Marbury v. Madison*, 1

18  Cranch 137, 177 (1803)).  As a corollary, "[t]he views of the Executive Branch could inform the

19  judgment of the Judiciary, but [can] not supersede it," *id.*, and courts "'certainly would not be bound

20  to adopt the construction given by the head of a department.'"  *Id.* (quoting *Decatur v. Paulding*, 14

21  Pet. 497, 515 (1840)).

22      227.    The rule that the Discrimination and EO Conditions would impose on grantees—to

23  acquiesce to executive rather than judicial interpretation of antidiscrimination laws, including those

24  cited in the Civil Rights Conditions—is incompatible with the "basic constitutional propositions" of

25  the separation of powers and the governmental structure it establishes, including Congress's

26

27  _____

28  [42] FEMA Bulletin for Week of September 23, 2025,
    https://content.govdelivery.com/accounts/USDHSFEMA/bulletins/3f4027a [archived at
    https://perma.cc/4T29-FYEE].

1  monopoly on the power to make law and the supremacy of judicial interpretation of that law.

2  *Cooper v. Aaron*, 358 U.S. 1, 17 (1958); *see also Youngstown Sheet & Tube Co.*, 343 U.S. at 654

3  (Jackson, J., concurring) ( "The essence of our free Government is 'leave to live by no man's leave,

4  underneath the law'—to be governed by those impersonal forces which we call law.").

5       228.    Thus, the arrogation underlying the Discrimination and EO Conditions casts doubt on

6  Plaintiffs' understanding of the Civil Rights Conditions themselves, and suggests, contrary to the

7  text of those provisions, that the Conditions imply grantees' acquiescence to the Executive Branch's

8  interpretation of the law.  To remedy this constitutional harm, and prevent further violation of the

9  independent constitutional bar, any relief related to the Discrimination and EO Conditions must also

10  clarify that the references to statutes in the Civil Rights Conditions mean those statutes *as enacted by*

11  *Congress and interpreted by the judiciary*, such that it would not be a breach of those conditions for

12  a grantee to take actions that comply with the law as interpreted by the courts, even if those actions

13  run counter to the Executive's view of those laws.

14  **D.**    **Plaintiffs Face the Impossible Choice of Accepting Unlawful Conditions or Forgoing**
**Federal Grant Funding for Critical Programs and Services**

15  

16       229.    Defendants now insist for the first time that Plaintiffs are not entitled to these funds

17  unless they acquiesce to the federal Administration's domestic political agenda.  There is no legal

18  basis for Defendants' adoption and imposition of the Discrimination Condition and EO Condition

19  across the board as a policy matter, or to attach those conditions to all of Plaintiffs' grant funding.

20  Nor is there any lawful basis for Defendants' attachment of the Immigration Conditions on

21  Plaintiffs' grant agreements.

22       230.    Nonetheless, the sweeping imposition of the Challenged DHS Conditions and

23  Sanctuary Certification Condition on the receipt of federal funds now imperils hundreds of millions

24  of dollars in DHS and FEMA grant funding to Plaintiffs—and billions to local governments across

25  the country.  Plaintiffs have received these grants and subgrants for many years—and often

26  annually—and rely on such funding for critical disaster preparedness, mitigation, and relief efforts.

27  Further, Congress has intended and directed that the funds Defendants are now holding hostage be

28  / / /

Complaint for Declaratory and Injunctive Relief           25-8330

1  spent to fund disaster preparedness, mitigation, and recovery—including emergency response,

2  antiterrorism, and more.

3    231.    The grant conditions that Defendants seek to impose leave Plaintiffs with the

4  Hobson's choice of accepting illegal conditions that are without authority, contrary to the

5  Constitution, and accompanied by heightened risk of False Claims Act claims, or forgoing the

6  benefit of hundreds of millions of dollars in grant funds that fund crucial local planning, preparation,

7  mitigation, deployment, and recovery activities essential to keeping their residents safe and saving

8  lives.

9    232.    The uncertainty caused by these illegal conditions has impeded Plaintiffs' ability to

10 budget and plan for services anticipated to be covered by the grants.  Indeed, because of the lag

11 between the start of many Plaintiffs' fiscal years in July and the Federal fiscal year in October, and

12 due to the annual and routine granting of these awards to Plaintiffs, Plaintiffs have often built their

13 current fiscal year budgets anticipating receiving funding from federal grants administered by DHS,

14 including FEMA.

15    233.    Ongoing budgetary uncertainty will require many Plaintiffs to reconsider their

16 staffing, including by considering layoffs of employees across departments.  Such losses would drain

17 Plaintiffs of employees with decades of accumulated knowledge and experience crucial to

18 effectively and efficiently serving their residents.  The losses would also substantially reduce the

19 ability of Plaintiffs to provide critical basic public services due to their depleted workforces.  Should

20 Plaintiffs' communities experience a new disaster (like a wildfire, earthquake, or flood), Plaintiffs

21 will be in an untenable position of needing to provide immediate, costly emergency response and

22 disaster relief with uncertainty about whether any FEMA reimbursement will ever come.

23    234.    Even if Plaintiffs ultimately obtain funding, the interim uncertainty and resulting loss

24 of employees would impose irreparable harms: these Plaintiffs would struggle to rebuild their

25 workforces, since employees lost in the interim may well obtain new jobs to pay their rent,

26 mortgages, utility bills, and grocery bills, and otherwise support their families.  *Compare AFGE v.*

27 *Trump*, 784 F.Supp.3d 1316, 1356 (N.D. Cal.) ("widespread termination of salaries and benefits for

28 individuals, families, and communities" would cause "irreparable harm" because "agencies will not

1   easily return to their prior level of operations," even if ordered by a court to rehire), *stayed on other*

2   *grounds sub nom.*, *Trump v. AFGE*, 606 U.S. ___, 145 S. Ct. 2635 (2025).

3       235.    The impact of this uncertainty has a domino effect on public safety and community

4   preparedness across Plaintiffs' entire regions because of the deeply interconnected framework within

5   which emergency management is carried out.  For example, in the Santa Clara County Operational

6   Area, Plaintiff Santa Clara subgrants EMPG and HSGP-SHSP funds to cities and special districts.

7   Earlier this year, Santa Clara notified these other public entities that because of the great degree of

8   uncertainty in FEMA funding streams and the heightened risk that EMPG and/or HSGP-SHSP

9   funding could be withheld or terminated, Santa Clara could not guarantee reimbursement for its

10  subgrantees' planned grant-funded projects, and so the cost for any services or equipment purchases

11  may need to be borne by the subgrantees—some of which are small public agencies with

12  correspondingly small budgets—themselves, if the projects could be carried out at all.

13      236.    The Hobson's choice currently facing Plaintiffs is especially and particularly acute in

14  present circumstances because Defendants have intentionally crafted the conditions to expose

15  grantees to liability under the False Claims Act based on actions that are lawful under the judiciary's

16  authoritative interpretation of federal antidiscrimination law.  It is invariably harmful for *any* entity

17  to face unwarranted threats of criminal investigation or prosecution or lawsuits that could have such

18  significant economic consequences.  That is all the more true here, where the threat is tangible,

19  concrete, and imminent, and where the federal Administration itself is proactively moving to

20  substantially increase the risks and stakes.

21      237.    DOJ has formed a nationwide task force specifically to target grantees that sign these

22  certifications, has described potential liability under the False Claims Act as a "weapon" it will

23  deploy, and has "strongly encouraged" private parties to bring civil suits.  Todd Blanche, the Deputy

24  Attorney General, called the False Claims Act the DOJ's "primary weapon" in this fight.  He

25  announced on May 19, 2025 that the Department of Justice (DOJ) would set up a "Civil Rights

26  Fraud Initiative"—co-led by DOJ's Civil Fraud Section and Civil Rights Division—that will "utilize

27  the False Claims Act to investigate and, as appropriate, pursue claims against any recipient of federal

28  funds that knowingly violates civil rights laws"—or, more accurately, the Administration's

Complaint for Declaratory and Injunctive Relief                                         25-8330

1    reimagining thereof.  The announcement asserts that the False Claims Act "is implicated whenever

2    federal-funding recipients or contractors certify compliance with civil rights laws while knowingly

3    engaging in racist preferences, mandates, policies, programs, and activities, including through

4    diversity, equity, and inclusion (DEI) programs that assign benefits or burdens on race, ethnicity, or

5    national origin."  It further states that "[t]he Civil Fraud Section and the Civil Rights Division will

6    also engage with the Criminal Division, as well as with other federal agencies that enforce civil

7    rights requirements for federal funding recipients" and that DOJ "strongly encourages" private

8    lawsuits under the Federal Claims Act.[43]  The DOJ reaffirmed this threat on June 11, when Assistant

9    Attorney General Brett Shumate announced his intent to dedicate "all available resources" of the

10   DOJ Civil Division "to pursue affirmative litigation combatting unlawful discriminatory practices"

11   and to "aggressively investigate and, as appropriate, pursue False Claims Act violations against

12   recipients of federal funds that knowingly violate civil rights laws."[44]

13       238.    The False Claims Act imposes substantial civil liability on "any person who . . .

14   knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."

15   31 U.S.C. § 3729(a).  As noted, both the federal government and any private citizen may sue a

16   recipient of federal funds for False Claims Act violations.  *Id.* § 3730.  If found liable, a funding

17   recipient faces potential treble damages, which could easily result in a judgment far exceeding the

18   amount of federal funds the recipient had received from the federal government in the first place.

19   What is more, the same conduct—presentation of a false or fraudulent claim material to the federal

20   government's issuance of payment—may also give rise to *criminal* liability, including up to five

21   years imprisonment.  18 U.S.C. § 287.

22       239.    The materiality requirements in the Challenged DHS Conditions magnify the risk

23   those Conditions pose.  *First*, when a grant recipient cannot even understand what the conditions

24   require of them, they cannot possibly have "actual knowledge," "act in deliberate ignorance," or

25

26   _____

     [43] Deputy Att'y Gen'l, Civil Rights Fraud Initiative, *supra* note 22.

27   [44] Asst. Att'y Gen'l, Civil Division Enforcement Priorities (June 11, 2025),
     https://www.justice.gov/civil/media/1404046/dl [archived at https://perma.cc/QL7T-33TH].
28

1    "act[] in reckless disregard" of their certification of compliance, a necessary element of the False

2    Claims Act. *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 191-92 (2016). The

3    hopeless ambiguity and breadth of the conditions make a laughingstock of the notion that the

4    materiality standard is "demanding," because their wildly open-ended obligations leave no way of

5    discerning "garden-variety breaches" from substantial ones. *Id.* at 194.

6         240.    *Second*, the requirement that grantees acquiescence to materiality elevates the federal

7    Administration's evolving view of what the conditions require and what the law should be above

8    settled and authoritative pronouncements of what the law is—including a unanimous Supreme

9    Court's recognition that contract language alone *cannot* definitively establish that any given

10   condition is material for purposes of the False Claims Act, and that the False Claims Act's

11   materiality requirement is "rigorous" and "demanding." *Id.* at 192-95. But that is precisely what the

12   Immigration Conditions seek to accomplish: they purport to extract every grantee's advance waiver

13   of any argument against the materiality of its supposed noncompliance with the Administration's

14   ever-evolving, contra-indicated, and ill-defined views of the underlying law. "The False Claims Act

15   does not adopt such an extraordinarily expansive view." *Id.* at 196.

16        241.    *Third*, treating a grantee's representations about its compliance with *any* of the

17   Challenged DHS Conditions or Sanctuary Certification Condition as "material" under the False

18   Claims Act would unmoor the Act's reach from any limitations whatsoever. The Challenged DHS

19   Conditions and Sanctuary Certification Condition have nothing to do with these emergency

20   management grant programs, and their subject matters are mentioned nowhere in any of the

21   governing statutes for the Subject Grant Programs, so representations about those conditions simply

22   *cannot* go "to the very essence of the bargain," as the Supreme Court requires. *Id.* at 194 n.5

23   (internal quotation omitted). And they seek to shift the burden in any False Claims Act lawsuit—

24   from the government or relator, which must prove materiality, onto the defendant, which under the

25   Challenged DHS Conditions would need to disprove it. *Compare, e.g.*, *United States ex rel. Purcell*

26   *v. MWI Corp.*, 807 F.3d 281, 287 (D.C. Cir. 2015) ("Of course, the government as plaintiff has the

27   burden of proving each element of the FCA").

28        242.    Nonetheless, and more perverse still, the purported waiver of materiality provides

1  ammunition with which the Administration could promptly arm the "weapon" it has already

2  announced is pointed back at recipients of federal funding.  And it would do so not only for the False

3  Claims Act itself, but also for purposes of *criminal* liability for false and fraudulent claims, for

4  which "[t]he 'demanding' materiality requirement" likewise "substantially narrows the universe of

5  actionable misrepresentations.'"  *Kousisis v. United States*, 145 S. Ct. 1382, 1398 (2025) (quoting

6  *Universal Health Servs.*, 579 U.S. at 194).

**FIRST CAUSE OF ACTION**

**The Challenged DHS Conditions, Sanctuary Certification Condition, and Challenged Grants**

**Manual Disclosure Requirements Violate the Separation of Powers**

***Against All Defendants***

11  243.    Plaintiffs reallege and incorporate by reference the allegations of the preceding

12  paragraphs.

13  244.    The Constitution vests Congress—not the Executive—with "[a]ll" of the federal

14  government's "legislative Powers," which includes the power to spend and appropriate federal

15  funds.  U.S. Const. art. 1, § 1; *id.* § 8, cl. 1 (spending power); *id.* § 9, cl. 7 (Appropriations Clause).

16  245.    The Constitution "exclusively grants the power of the purse to Congress, not the

17  President."  *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018).  "Congress's power

18  to spend is directly linked to its power to legislate.  Incident to the spending power, Congress may

19  attach conditions on the receipt of federal funds."  *Id.* at 1232.

20  246.    The "executive Power" vested in the President does not include the power to attach

21  conditions on the receipt of federal funds.  To the contrary, "[t]here is no provision in the

22  Constitution that authorizes the President to enact, to amend, or to repeal statutes."  *Id.* (alteration in

23  original) (quoting *Clinton v. City of New York*, 524 U.S. 417, 438 (1998)).

24  247.    The Executive Branch may not "claim[] for itself Congress's exclusive spending

25  power, . . . [or] coopt Congress's power to legislate."  *Id.* at 1234.

26  248.    Accordingly, absent an express delegation, only Congress, not the Executive Branch,

27  is entitled to attach conditions to federal funds.

28  249.    The separation of the legislative, executive, and judicial powers among the three

67

1 branches is a central and core tenet of our Constitution. *See, e.g.*, *Trump v. United States*, 603 U.S.

2 593, 637-38 (2024) (the separation of powers "doctrine is undoubtedly carved into the Constitution's

3 text by its three articles separating powers"); *West Virginia v. EPA*, 597 U.S. 697, 737 (2022)

4 (Gorsuch, J., concurring) ("the Constitution's rule vesting federal legislative power in Congress is

5 'vital to the integrity and maintenance of the system of government ordained by the Constitution.'"

6 (quoting *Marshall Field & Co. v. Clark*, 143 U.S. 649, 692 (1892))).

7  250. Consistent with these principles, the Executive Branch acts at the "lowest ebb" of its

8 constitutional power when it "takes measures incompatible with the express or implied will of

9 Congress." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J.,

10 concurring).

11  251. In leveraging its spending power under the Constitution, Congress has not

12 conditioned the provision of funding for DHS and FEMA grant programs on compliance with a

13 prohibition on all forms of DEI policies and initiatives, participation in the federal Administration's

14 aggressive civil immigration enforcement agenda, refusal to recognize transgender people, or any of

15 the other terms, provisions, or principles set forth in the Challenged DHS Conditions (i.e., the

16 Immigration Conditions, the Discrimination Condition, and the EO Condition) or the Sanctuary

17 Certification Condition. Nor has Congress delegated to Defendants the authority to attach any of the

18 Challenged DHS Conditions or Sanctuary Certification Condition unilaterally.

19  252. By imposing the Challenged DHS Conditions and Sanctuary Certification Condition

20 on grant recipients, Defendants are unilaterally attaching new conditions to federal funding without

21 constitutional authorization from Congress and in the absence of statutory authority to do so.

22  253. For these reasons, Defendants' conditioning of Plaintiffs' DHS grants on compliance

23 with the Challenged DHS Conditions and/or Sanctuary Certification Condition violates the

24 constitutional separation of powers.

25  254. Defendants' violations have caused harm and will continue to cause harm to Plaintiffs

26 for which no remedy other than an injunction is adequate.

27 / / /

28 / / /

**SECOND CAUSE OF ACTION**

**The Challenged DHS Conditions, Sanctuary Certification Condition, and Challenged Grants**

**Manual Disclosure Requirements Violate the Spending Power**

***Against All Defendants***

255. Plaintiffs reallege and incorporate by reference the allegations of the preceding paragraphs.

256. Congress's power to attach conditions to federal funding "is of course not unlimited, but is instead subject to several general restrictions." *S. Dakota v. Dole*, 483 U.S. 203, 207 (1987). The Challenged DHS Conditions violate at least three of the Constitution's "general restrictions" on the spending power.

257. First, the spending power requires recipients to have fair and advance notice of conditions that apply to federal funds so that recipients can "voluntarily and knowingly" decide whether to accept the funds. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17, 25 (1981). The grant conditions must be set forth "unambiguously," because recipients "cannot knowingly accept conditions of which they are 'unaware' or which they are 'unable to ascertain.'" *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (quoting *Pennhurst*, 451 U.S. at 17). As a corollary, the spending power prohibits the federal government from "surprising" grantees "with post acceptance or 'retroactive' conditions." *Pennhurst*, 451 U.S. at 25.

258. Second, the government may only impose conditions on federal funding that are reasonably related to the federal interest in the project and the project's objectives. *Dole*, 483 U.S. at 207, 208; *Massachusetts v. United States*, 435 U.S. 444, 461 (1978); *accord New York v. United States*, 505 U.S. 144, 167 (1992).

259. Third, under the "independent constitutional bar," the spending power "may not be used to induce [grantees] to engage in activities that would themselves be unconstitutional." *Dole*, 483 U.S. at 210.

260. Even if Congress had delegated authority to Defendants or the Executive to condition DHS grant funding on recipients' agreement to terms prohibiting all forms of DEI policies and initiatives as conceived by the Administration, requiring participation in enforcement of federal

69

immigration laws, or mandating compliance with current and future executive orders, the Challenged

DHS Conditions and Sanctuary Certification Condition would nonetheless be unlawful and

unenforceable because, in contravention of the spending power, they are ambiguous, purport to bind

grantees to post-acceptance and retroactive conditions, are not germane to the purposes of the

statutes that authorize DHS's and FEMA's grant programs, and would require recipients to engage

in actions that are themselves unconstitutional. Each of these flaws applies to each of the

Challenged DHS Conditions and Sanctuary Certification Condition.

### a. Ambiguity

261. The Challenged DHS Conditions and Sanctuary Certification Condition are

ambiguous and unascertainable, and preclude any reasonable grantee, including Plaintiffs, from

understanding their the scope and meaning and, therefore, from knowingly accepting the conditions.

The Challenged Grants Manual Disclosure Requirements are ambiguous and unascertainable for

many of the same reasons, and Plaintiffs therefore cannot ascertain their meaning or knowingly

accept those conditions either. *See* paragraphs 197-209 above.

### b. Germaneness

262. None of the Challenged DHS Conditions, Sanctuary Certification Condition, or

Challenged Grants Manual Disclosure Requirements are germane to the purposes of the grant

programs at issue here, the statutes that authorize those grant programs, or the federal interest in the

projects funded by the grant programs, which pertain to disaster preparedness, mitigation, and

recovery at the regional and local level.

263. The lack of any reasonable relationship between the grants at issue and the

Challenged DHS Conditions, Sanctuary Certification Condition, and Challenged Grants Manual

Disclosure Requirements is further underscored by the facially unlimited reach of the conditions,

most which apply to *all* activities and actions of each grantee and subgrantee and are not limited to

the programs funded by the grants.

264. That the Challenged DHS Conditions and Sanctuary Certification Condition apply

well beyond the activities funded by the grant programs also demonstrates that the Challenged DHS

Conditions and Sanctuary Certification Condition independently exceed the government's spending

Complaint for Declaratory and Injunctive Relief                                                     25-8330

power because, on their face, the "conditions . . . seek to leverage funding to regulate speech outside the contours of the program itself" and "outside the scope of the federally funded program." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 215-16 (2013).

### c. Independent Constitutional Bar

265. The Challenged DHS Conditions and Sanctuary Certification Condition require Plaintiffs and other recipients of DHS federal funding to violate the Constitution in at least three ways: they require Plaintiffs and other governmental recipients to violate the Fourth Amendment rights of the subjects of ICE detainer requests; to violate the First Amendment by selecting parties to contract with and policing speech by members of the public based on their viewpoints; and to violate the separation of powers by acceding to the primacy of the Executive Branch's view of the law to the exclusion and derogation of the judiciary's authoritative interpretations. *See* paragraphs 210-228 above.

266. Defendants' violations have caused harm and will continue to cause harm to Plaintiffs for which no remedy other than an injunction is adequate.

**THIRD CAUSE OF ACTION**

**The Challenged DHS Conditions, Sanctuary Certification Condition, and Challenged Grants Manual Disclosure Requirements Are Arbitrary and Capricious in Violation of the Administrative Procedure Act**

***Against DHS and FEMA***

267. Plaintiffs reallege and incorporate by reference the allegations of the preceding paragraphs.

268. Under the APA, a "court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

269. "An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'" *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). A court must therefore "ensure, among other things, that the agency has offered 'a satisfactory explanation for its action[,] including a rational connection

1   between the facts found and the choice made.'" *Id.* (quoting *Motor Vehicle Mfrs. Assn. of United*

2   *States, Inc. v. State Farm Mut. Automobile Ins. Co.,* 463 U.S. 29, 43 (1983)).  "[A]n agency cannot

3   simply ignore 'an important aspect of the problem'" addressed by its action.  *Id.* at 293.

4         270.    Defendants' adoption of the Discrimination Condition in the Standard DHS Terms is

5   a final agency action.  Defendants' adoption of the EO Condition in the Standard DHS Terms is a

6   final agency action.  Defendants' adoption of the Grants Manual is a final agency action.  Separately,

7   and in addition, Defendants' incorporation of each of the three Challenged DHS Conditions in the

8   Standard DHS Terms, the Sanctuary Certification Condition, and the Challenged Grants Manual

9   Disclosure Requirements, into each grant program, grant award, and grant agreement is a final

10  agency action.

11        271.    Under the APA, a "court shall . . . hold unlawful and set aside agency actions,

12  findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise

13  not in accordance with law."  5 U.S.C. § 706(2)(A).

14        272.    Defendants have provided no reasoned explanation or basis for their decision to

15  impose the Challenged DHS Conditions and Sanctuary Certification Condition on funds that

16  Congress has appropriated for grant programs that have no reasonable connection to or nexus with

17  those issues.

18        273.    Defendants have provided no reasoned explanation or basis for withholding funds

19  Congress appropriated for disbursement.

20        274.    Defendants have ignored essential aspects of the "problem" they purport to address

21  by taking the final agency actions described in paragraph 270, including by failing to (a) assess the

22  extent to which the Challenged DHS Conditions and Sanctuary Certification Condition are lawful

23  and consistent with statutes and the Constitution, (b) consider Plaintiffs' reasonable and inevitable

24  reliance on now at-risk funds, and (c) consider the potential impacts on safety and emergency

25  management of withholding the funding appropriated by Congress.

26        275.    Plaintiffs therefore ask the Court to declare under 5 U.S.C. § 706 and 28 U.S.C.

27  § 2201 that each and all of the final agency actions described in paragraph 270 violate the APA

28  because they are arbitrary and capricious; to provide preliminary relief under 5 U.S.C. § 705; and to

Complaint for Declaratory and Injunctive Relief                                    25-8330

1    temporarily restrain, and preliminarily and permanently enjoin, Defendants from imposing the

2    Challenged DHS Conditions, Sanctuary Certification Condition, and Grants Manual Disclosure

3    Requirements without complying with the APA.

4        276.    Defendants' violations have caused harm and will continue to cause harm to Plaintiffs

5    for which no remedy other than an injunction is adequate.

6                        **FOURTH CAUSE OF ACTION**

7    **The Challenged DHS Conditions, Sanctuary Certification Condition, and Challenged Grants**

8    **Manual Disclosure Requirements Are Contrary to the Constitution in Violation of the**

9                       **Administrative Procedure Act**

10                         ***Against DHS and FEMA***

11        277.    Plaintiffs reallege and incorporate by reference the allegations of the preceding

12    paragraphs.

13        278.    Under the APA, a "court shall . . . hold unlawful and set aside agency action,

14    findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or

15    immunity." 5 U.S.C. § 706(2)(B).

16        279.    As described above, the Challenged DHS Conditions, Sanctuary Certification

17    Condition, and Challenged Grants Manual Disclosure Requirements violate bedrock constitutional

18    provisions and principles including both the spending power and the separation of constitutional

19    powers between and among the President, Congress, and judiciary.

20        280.    Plaintiffs therefore ask the Court to declare under 5 U.S.C. § 706 and 28 U.S.C.

21    § 2201 that each and all of the final agency actions described in paragraph 270 violate the APA

22    because they are contrary to constitutional rights, powers, privileges, or immunities; provide

23    preliminary relief under 5 U.S.C. § 705; and temporarily restrain, and preliminarily and permanently

24    enjoin, Defendants from imposing the Challenged DHS Conditions, Sanctuary Certification

25    Condition, and Grants Manual Disclosure Requirements without complying with the APA.

26        281.    Defendants' violations have caused harm and will continue to cause harm to Plaintiffs

27    for which no remedy other than an injunction is adequate.

28    / / /

**FIFTH CAUSE OF ACTION**

**The Challenged DHS Conditions, Sanctuary Certification Condition, and Challenged Grants**

**Manual Disclosure Requirements Are Not In Accordance with Law and Are In Excess of**

**Statutory Authority in Violation of the Administrative Procedure Act**

***Against DHS and FEMA***

282.     Plaintiffs reallege and incorporate by reference the allegations of the preceding paragraphs.

283.     Under the APA, a "court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law … [or] in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(A), (C).

284.     Defendants may exercise only authority granted to them by statute or the Constitution.

285.     No law or provision of the Constitution authorizes Defendants to impose extra-statutory conditions not authorized by Congress on congressionally appropriated funds.  The Challenged DHS Conditions are not authorized by any statute under which any of the grant programs at issue exist, nor under any other statute.

286.     Plaintiffs therefore ask the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that each and all of the final agency actions described in paragraph 270 violate the APA because they are in excess of Defendants' statutory jurisdiction, authority, or limitations, or short of statutory right; provide preliminary relief under 5 U.S.C. § 705; and preliminarily and permanently enjoin Defendants from imposing the Challenged DHS Conditions and the Grants Manual Disclosure Requirements without complying with the APA.

287.     Defendants' violations have caused harm and will continue to cause harm to Plaintiffs for which no remedy other than an injunction is adequate.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that the Court grant the following relief:

1.     A declaration that the Discrimination Condition and the EO Condition are unconstitutional, are not authorized by statute, violate the APA, and are otherwise unlawful;

2.      A declaration that Defendants' attachment or incorporation of the Discrimination Condition, the EO Condition, and the Challenged Grant Manual Disclosure Requirements to Plaintiffs' grant funding is unconstitutional, is not authorized by statute, violates the APA, and is otherwise unlawful;

3.      A declaration that Defendants' attachment or incorporation of the Immigration Conditions and Sanctuary Certification Condition to Plaintiffs' grant funding under the Subject Grant Programs is unconstitutional, is not authorized by statute, violates the APA, and is otherwise unlawful;

4.      An order temporarily restraining, and preliminarily and permanently enjoining, Defendants from attaching, incorporating, imposing, or enforcing:

      a.      the Discrimination Condition, the EO Condition, the Challenged Grant Manual Disclosure Requirements, or any materially similar terms or conditions, with respect to any applications submitted by Plaintiffs, and any funds awarded to or received by Plaintiffs, whether directly or indirectly;

      b.      the Immigration Conditions and Sanctuary Certification Condition, or any materially similar terms or conditions, with respect to any applications submitted by Plaintiffs, and any funds awarded to or received by Plaintiffs, whether directly or indirectly, under the Subject Grant Programs;

      c.      any interpretation of the Civil Rights Conditions as requiring anything other than compliance with the statutes cited in the Civil Rights Conditions as they have been enacted by Congress and interpreted by the judiciary.

5.      An order pursuant to 5 U.S.C. § 705 that postpones the effective date of any action by any Defendants to adopt, issue, or enforce the Discrimination Condition, EO Condition, and Challenged Grants Manual Disclosure Requirements pending conclusion of this litigation; declares the Challenged DHS Conditions, Sanctuary Certification Condition, and Challenged Grants Manual Disclosure Requirements void and unenforceable with respect to any application, award, agreement, or other document executed by Plaintiffs that is related to the Subject Grant Programs; and declares that the Civil Rights Conditions require compliance with the statutes cited therein as those statutes

have been enacted by Congress and interpreted by the judiciary;

6. An order under 5 U.S.C. § 706 holding unlawful, setting aside, and vacating all actions taken by Defendants to:

    a. adopt, issue, or implement the Discrimination Condition, the EO Condition, or the Challenged Grant Manual Disclosure Requirements;

    b. require, attach, incorporate, implement, or enforce the Discrimination Condition, EO Condition, or Challenged Grant Manual Disclosure Requirements with respect to any grant application, agreement or subagreement, or other document, transaction, or activity, executed by Plaintiffs, or funding received by Plaintiffs;

    c. require, attach, incorporate, implement, or enforce the Immigration Conditions or the Sanctuary Certification Condition with respect to any grant application, agreement or subagreement, or other document, transaction, or activity, executed by Plaintiffs, or funding received by Plaintiffs, under the Subject Grant Programs;

    d. construe the Civil Rights Conditions to require anything other than compliance with the statutes cited in the Civil Rights Conditions as they have been enacted by Congress and interpreted by the judiciary.

7. Orders preliminarily and permanently enjoining Defendants from retaliating against any Plaintiff for participating in this lawsuit or taking any adverse action based on any Plaintiff's participation in this lawsuit, including but not limited to reducing the amount of a grant award to that Plaintiff or to any state agency through which Plaintiff may receive grant funding; refusing to issue, process, sign, or approve grant applications, grant agreements, or subgrant agreements; and refusing to issue, process, sign, or approve any invoice or request for payment, or reducing the amount of such approval or payment;

8. An award to Plaintiffs of their reasonable attorneys' fees, costs, and other expenses; and;

9. Any other and further relief that this Court may deem just and proper.

1   Dated: September 30, 2025

                                 TONY LOPRESTI
County Counsel
KAVITA NARAYAN
Chief Assistant County Counsel
MEREDITH A. JOHNSON
Lead Deputy County Counsel
RAPHAEL N. RAJENDRA
HANNAH M. GODBEY
Deputy County Counsels

By: */s/* Tony LoPresti
TONY LOPRESTI
County Counsel

Attorneys for Plaintiff
COUNTY OF SANTA CLARA

DAVID CHIU
City Attorney
YVONNE R. MERÉ
Chief Deputy City Attorney
MOLLIE M. LEE
Chief of Strategic Advocacy
SARA J. EISENBERG
Chief of Complex and Affirmative Litigation
DAVID S. LOUK
STEVEN A. MILLS
Deputy City Attorneys

*/s/* David Chiu
By: DAVID CHIU
City Attorney

Attorneys for Plaintiff
CITY AND COUNTY OF SAN FRANCISCO

By: /s/ Sharanya Mohan
SHARANYA (SAI) MOHAN (SBN 350675)
ERIN MONJU*
NAOMI TSU*
TOBY MERRILL*
PUBLIC RIGHTS PROJECT
490 43rd Street, Unit #115
Oakland, CA 94609
Tel: (510) 738-6788
sai@publicrightsproject.org
erin@publicrightsproject.org
naomi@publicrightsproject.org
toby@publicrightsproject.org

Attorneys for Plaintiffs
CITY OF ALAMEDA, CITY OF BELLINGHAM,
CITY OF BERKELEY, CITY OF CULVER, KING
COUNTY, COUNTY OF LOS ANGELES, COUNTY
OF MARIN, CITY OF OAKLAND, CITY OF PALO
ALTO, CITY OF PASADENA, CITY OF
PETALUMA, PIERCE COUNTY, CITY OF
SACRAMENTO, CITY OF SAN DIEGO, SAN DIEGO
COUNTY, CITY OF SAN JOSE, COUNTY OF SAN
MATEO, CITY OF SANTA MONICA, CITY OF
SANTA ROSA, COUNTY OF SONOMA, SONOMA
COUNTY WATER AGENCY, SONOMA VALLEY
COUNTY SANITATION DISTRICT, SONOMA
COUNTY COMMUNITY DEVELOPMENT
COMMISSION, SNOHOMISH COUNTY, CITY OF
TUCSON

YIBIN SHEN
Alameda City Attorney

By: /s/ Yibin Shen
YIBIN SHEN (SBN 233545)
CARA SILVER (SBN 136992), Special Counsel
DANIEL J. TURNER (SBN 336499), Deputy City
Attorney
2263 Santa Clara Avenue, Rm 280
Alameda, CA 94501
Tel: (510) 747-4750
yshen@alamedaca.gov
csilver@alamedaca.gov
dturner@alamedaca.gov

Attorneys for Plaintiff
CITY OF ALAMEDA

FARIMAH F. BROWN
Berkeley City Attorney


By: /s/ Farimah F. Brown
    FARIMAH F. BROWN (SBN 201227), City Attorney
    KATRINA L. EILAND (SBN 275701), Deputy City
    Attorney
    STEPHEN A. HYLAS (SBN 319833), Deputy City
    Attorney
    2180 Milvia Street, Fourth Floor
    Berkeley, CA 94704
    Tel: (510) 981-6998
    Fax: (510) 981-6960
    fbrown@berkeleyca.gov
    keiland@berkeleyca.gov
    shylas@berkeleyca.gov

    Attorneys for Plaintiff
    CITY OF BERKELEY


    KING COUNTY PROSECUTING ATTORNEY
    LEESA MANION

By: /s/ David J. Hackett
    DAVID J. HACKETT*
    Executive General Counsel
    ALISON HOLCOMB*
    Deputy Executive General Counsel
    Special Deputy Prosecuting Attorneys
    Chinook Building
    401 5th Avenue, Suite 800
    Seattle, WA 98104
    Tel: (206) 477-2720
    David.Hackett@kingcounty.gov
    aholcomb@kingcounty.gov

    Attorneys for Plaintiff
    MARTIN LUTHER KING, JR. COUNTY

    HYDEE FELDSTEIN SOTO
    City Attorney of the City of Los Angeles

By: /s/ Michael J. Dundas
    MICHAEL J. DUNDAS (SBN 226930), Chief Assistant
    City Attorney

1   JOSHUA M. TEMPLET (SBN 267098), Deputy City
    Attorney
2   Office of the Los Angeles City Attorney
    200 North Main Street, Room 800
3   Los Angeles, California 90012
    Tel: (213) 978-8100
4   mike.dundas@lacity.org
5   joshua.templet@lacity.org

6   Attorneys for Plaintiff
    CITY OF LOS ANGELES
7

8   By: /s/ Thomas J. Faughnan
    THOMAS J. FAUGHNAN (SBN 155238), Senior
9   Assistant County Counsel
    BRIGIT GREESON ALVAREZ (SBN 237301), Deputy
10  County Counsel
    Office of the County Counsel
11  648 Kenneth Hahn Hall of Administration
    500 West Temple Street Los Angeles,
12  California 90012-2713
13  Tfaughnan@counsel.lacounty.gov
    Bgreesonalvarez@counsel.lacounty.gov
14  Tel: (213) 681-0408

15  Counsel for Plaintiffs
16  COUNTY OF LOS ANGELES and
    LOS ANGELES COUNTY CONSOLIDATED FIRE
17  PROTECTION DISTRICT

18  BRIAN E. WASHINGTON
19  County Counsel

20  By: /s/ Kate K. Stanford
    KATE K. STANFORD (SBN 302825), Deputy County
21  Counsel
    EDWARD F. SEARS (SBN 297775), Deputy County
22  Counsel
    3501 Civic Center Drive, Suite 275
23  San Rafael, CA 94903
    Tel: (415) 473-6117
24  kate.stanford@marincounty.gov
25

26  Attorneys for Plaintiff
    COUNTY OF MARIN
27

28

Complaint for Declaratory and Injunctive Relief                    25-8330

1    RYAN RICHARDSON
     City Attorney

2

3    By: /s/ Ryan Richardson
        RYAN RICHARDSON (SBN 223548), City Attorney

4       MARIA BEE (SBN 167716), Chief Assistant City
        Attorney

5       JAIME HULING DELAYE (SBN 270784), Supervising
        City Attorney

6       H. LUKE EDWARDS (SBN 313756), Deputy City
        Attorney

7       DIVYA MUSINIPALLY (SBN 316114), Deputy City
        Attorney

8       One Frank H. Ogawa Plaza, 6th Floor

9       Oakland, California 94612
        Tel: (510) 238-3836

10      Fax: (510) 238-6500

11      ledwards@oaklandcityattorney.org

12      Attorneys for Plaintiff
        CITY OF OAKLAND

13

14      MOLLY S. STUMP
        City Attorney

15

16   By: /s/ Mark Vanni
        MOLLY S. STUMP (SBN 177165), City Attorney

17      CAIO A. ARELLANO (SBN 262168), Chief Assistant
        City Attorney

18      MARK J. VANNI (SBN 267892), Assistant City
        Attorney

19      CITY OF PALO ALTO
        250 Hamilton Ave., 8th Floor

20      Palo Alto, CA 94301
        Tel: (650) 329-2171

21      Fax: (650) 320-2646

22      Molly.Stump@PaloAlto.gov
        Caio.Arellano@PaloAlto.gov

23      Mark.Vanni@PaloAlto.gov

24      Attorneys for Plaintiff
        CITY OF PALO ALTO

25

26

27

28

81

1    ERIC DANLY
     City Attorney
2

3    By:  /s/ Eric Danly
     ERIC DANLY (SBN 201621), City Attorney
4    11 English Street
     Petaluma, CA 94952
5    Tel: (707) 778-4362
     EDanly@cityofpetaluma.org
6

7    Attorney for Plaintiff
     CITY OF PETALUMA
8

9    MARY E. ROBNETT
     Pierce County Prosecuting Attorney
10

11   By:  /s/ Jonathan R. Salamas
     JONATHAN R. SALAMAS (WSBA # 39781), Deputy
     Prosecuting Attorney / Civil*
12   930 Tacoma Avenue South, Suite 946
     Tacoma, WA  98402-2102
13   Tel: 253-798-4862
     Fax: 253-798-6713
14   jonathan.salamas@piercecountywa.gov
15

16   Attorney for Plaintiff
     PIERCE COUNTY
17
     SUSANA ALCALA WOOD
18   City Attorney

19   By:  /s/ Andrea Velasquez
     ANDREA VELASQUEZ (SBN 249210), Supervising
20   Deputy City Attorney
     KATHERINE UNDERWOOD (SBN 249308), Senior
21   Deputy City Attorney
     915 I St Fl 4, Sacramento, CA 95814-2621
22   Tel: 916-808-5346
     Fax: 916-808-7455
23   AVelasquez@cityofsacramento.org
     KUnderwood@cityofsacramento.org
24

25   Attorneys for Plaintiff
     CITY OF SACRAMENTO
26

27   HEATHER FERBERT
     City Attorney
28

Complaint for Declaratory and Injunctive Relief                                    25-8330

1

By: /s/ Mark Ankcorn
MARK ANKCORN (SBN 166871), Senior Chief
Deputy City Attorney

2

JULIE RAU (SBN 317658), Deputy City Attorney

3

1200 Third Avenue, Suite 1100
San Diego, California 92101-4100

4

Tel: (619) 533-5800

5

6

Attorneys for Plaintiff
CITY OF SAN DIEGO

7

8

HEATHER FERBERT
City Attorney

9

By: /s/ Nora Frimann
NORA FRIMANN (SBN 93249), City Attorney

10

ELISA TOLENTINO (SBN 245962), Chief Deputy City
Attorney

11

200 E Santa Clara St., 16th Floor

12

San José, CA 95113-1905
Tel: 408-535-1900

13

Fax: 408-998-3131

14

cao.main@sanjoseca.gov

15

Attorneys for Plaintiff
CITY OF SAN JOSÉ

16

17

JOHN D. NIBBELIN
County Counsel

18

By: /s/ John D. Nibbelin
John D. Nibbelin (SBN 184603), County Counsel

19

Rebecca M. Archer (SBN 202743), Chief Deputy

20

Lauren F. Carroll (SBN 333446), Deputy
Savannah Eldridge (SBN 357723), Deputy

21

500 County Center, 4th Floor
Redwood City, CA 94063

22

Tel: (650) 363-4250

23

jnibbelin@smcgov.org
rmarcher@smcgov.org

24

lcarroll@smcgov.org
seldridge@smcgov.org

25

26

Attorneys for Plaintiff
COUNTY OF SAN MATEO

27

28

Complaint for Declaratory and Injunctive Relief                                            25-8330

TERESA L. STRICKER
City Attorney

By: /s/ Teresa L. Stricker
TERESA L. STRICKER (SBN 160601), City Attorney
AUTUMN LUNA (SBN 288506), Chief Assistant City
Attorney HANNAH E. FORD-STILLE (SBN 335113),
Deputy City Attorney
100 Santa Rosa Ave, Room 8
Santa Rosa, CA 95404
Tel: (707) 543-3040
tstricker@srcity.org
aluna@srcity.org
hfordstille@srcity.org

Attorneys for Plaintiff
CITY OF SANTA ROSA

JASON J. CUMMINGS
Snohomish County Prosecuting Attorney

By: /s/ Bridget E. Casey
BRIDGET E. CASEY*
REBECCA J. GUADAMUD*
REBECCA E. WENDLING*
Snohomish County Prosecuting Attorney's Office
3000 Rockefeller Avenue, M/S 504
Everett, WA 98201-4046
(425) 388-6392
bcasey@snoco.org
rebecca.guadamud@co.snohomish.wa.us
rwendling@snoco.org

Attorneys for Plaintiff
SNOHOMISH COUNTY

ROBERT H. PITTMAN
County Counsel

By: /s/ Joshua A. Myers
JOSHUA A. MYERS (SBN 250988), Chief Deputy
County Counsel
County of Sonoma
575 Administration Drive, Room 105A
Santa Rosa, California 95403
Telephone: (707) 565-2421
Facsimile: (707) 565-2624
joshua.myers@sonomacounty.gov

1

2
Attorney for Plaintiff
COUNTY OF SONOMA

3
ROBERT H. PITTMAN

4
County Counsel

5
By: /s/ Joshua A. Myers

6
JOSHUA A. MYERS (SBN 250988), Chief Deputy
County Counsel

7
County of Sonoma
575 Administration Drive, Room 105A

8
Santa Rosa, California 95403
Telephone: (707) 565-2421

9
Facsimile: (707) 565-2624

10
joshua.myers@sonomacounty.gov

11
Attorney for Plaintiffs
SONOMA COUNTY WATER AGENCY, SONOMA

12
VALLEY COUNTY SANITATION DISTRICT,
SONOMA COUNTY COMMUNITY

13
DEVELOPMENT COMMISSION

14
*Application for Admission Pro Hac Vice Forthcoming*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Complaint for Declaratory and Injunctive Relief                                      25-8330

1

2                          **FILER'S ATTESTATION**

3          I, Tony LoPresti, am the ECF user whose identification and password are being used to file

4   this Complaint for Declaratory and Injunctive Relief.  Pursuant to Civil Local Rule 5-1(i)(3), I

5   hereby attest that the other above-named signatories concur in this filing.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Complaint for Declaratory and Injunctive Relief                                    25-8330

# EXHIBIT A

# FY 2025 DHS STANDARD TERMS AND CONDITIONS

The Fiscal Year (FY) 2025 Department of Homeland Security (DHS) Standard Terms and Conditions apply to all new federal awards of federal financial assistance (federal awards) for which the federal award date occurs in FY 2025 and flow down to subrecipients unless a term or condition specifically indicates otherwise. For federal continuation awards made in subsequent FYs, the FY 2025 DHS Standard Terms and Conditions apply unless otherwise specified in the terms and conditions of the continuation awards. The United States has the right to seek judicial enforcement of these terms and conditions.

All legislation and digital resources are referenced with no digital links. These FY 2025 DHS Standard Terms and Conditions are maintained on the DHS website at https://www.dhs.gov/publication/dhs-standard-terms-and-conditions.

## A. **Assurance, Administrative Requirements, Cost Principles, Representations, and Certifications**

I.      Recipients must complete either the Office of Management and Budget (OMB) Standard Form 424B Assurances – Non- Construction Programs, or OMB Standard Form 424D Assurances – Construction Programs, as applicable. Certain assurances in these documents may not be applicable to your program and the DHS financial assistance office (DHS FAO) may require applicants to certify additional assurances. Applicants are required to fill out the assurances, as instructed.

## B. **General Acknowledgements and Assurances Recipients are required to follow the applicable provisions of the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards in effect as of the federal award date and located in Title 2, Code of Federal Regulations, Part 200 and adopted by DHS at 2 C.F.R. § 3002.10.**

All recipients and subrecipients must acknowledge and agree to provide DHS access to records, accounts, documents, information, facilities, and staff pursuant to 2 C.F.R. § 200.337.

I.      Recipients must cooperate with any DHS compliance reviews or compliance investigations.

II.     Recipients must give DHS access to examine and copy records, accounts, and other documents and sources of information related to the federal award and permit access to facilities and personnel.

III.    Recipients must submit timely, complete, and accurate reports to the appropriate DHS officials and maintain appropriate backup documentation to support the reports.

IV.     Recipients must comply with all other special reporting, data collection, and evaluation requirements required by law, federal regulation, Notice of Funding Opportunity, federal award specific terms and conditions, and/or DHS Component program guidance. Organization costs related to data and evaluation are allowable. The definition of data and evaluation costs is in 2 C.F.R. § 200.455(c), the full text of which is incorporated by reference.

V.      Recipients must complete DHS Form 3095 within 60 days of receipt of the Notice of Award for the first award under which this term applies. For further instructions and to access the form, please visit: https://www.dhs.gov/civil-rightsresources-recipients-dhs-financial-assistance.

# FY 2025 DHS STANDARD TERMS AND CONDITIONS

**C.  Standard Terms & Conditions**

I.  Acknowledgement of Federal Funding from DHS

Recipients must acknowledge their use of federal award funding when issuing statements, press releases, requests for proposal, bid invitations, and other documents describing projects or programs funded in whole or in part with federal award funds.

II.  Activities Conducted Abroad

Recipients must coordinate with appropriate government authorities when performing project activities outside the United States obtain all appropriate licenses, permits, or approvals.

III.  *Age Discrimination Act of 1975*

Recipients must comply with the requirements of the *Age Discrimination Act of 1975*, Pub. L. No. 94-135 (codified as amended at Title 42, U.S. Code § 6101 *et seq.*), which prohibits discrimination on the basis of age in any program or activity receiving federal financial assistance.

IV.  *Americans with Disabilities Act of 1990*

Recipients must comply with the requirements of Titles I, II, and III of the *Americans with Disabilities Act*, Pub. L. No. 101-336 (1990) (codified as amended at 42 U.S.C. §§ 12101– 12213), which prohibits recipients from discriminating on the basis of disability in the operation of public entities, public and private transportation systems, places of public accommodation, and certain testing entities.

V.  Best Practices for Collection and Use of Personally Identifiable Information

(1)  Recipients who collect personally identifiable information (PII) as part of carrying out the scope of work under a federal award are required to have a publicly available privacy policy that describes standards on the usage and maintenance of the PII they collect.

(2)  Definition. DHS defines "PII" as any information that permits the identity of an individual to be directly or indirectly inferred, including any information that is linked or linkable to that individual. Recipients may also find the DHS Privacy Impact Assessments: Privacy Guidance and Privacy Template as useful resources respectively.

VI.  *CHIPS and Science Act of 2022*, Public Law 117-167 CHIPS

(1)  Recipients of DHS research and development (R&D) awards must report to the DHS Component research program office any finding or determination of sex based and sexual harassment and/or an administrative or disciplinary action taken against principal investigators or co-investigators to be completed by an authorized organizational representative (AOR) at the recipient institution.

(2)  Notification. An AOR must disclose the following information to agencies within 10 days of the date/the finding is made, or 10 days from when a recipient imposes an administrative action on the reported individual, whichever is sooner. Reports should include:

(a)  Award number,

(b)  Name of PI or Co-PI being reported,

# FY 2025 DHS STANDARD TERMS AND CONDITIONS

(c) Awardee name,

(d) Awardee address,

(e) AOR name, title, phone, and email address,

(f) Indication of the report type:
  (i) Finding or determination has been made that the reported individual violated awardee policies or codes of conduct, statutes, or regulations related to sexual harassment, sexual assault, or other forms of harassment, including the date that the finding was made.

  (ii) Imposition of an administrative or disciplinary action by the recipient on the reporting individual related to a finding/determination or an investigation of an alleged violation of recipient policy or codes of conduct, statutes, or regulations, or other forms of harassment.

  (iii) The date and nature of the administrative/disciplinary action, including a basic explanation or description of the event, which should not disclose personally identifiable information regarding any complaints or individuals involved. Any description provided must be consistent with the *Family Educational Rights in Privacy Act*.

(3) Definitions.

  (a) An "authorized organizational representative (AOR)" is an administrative official who, on behalf of the proposing institution, is empowered to make certifications and representations and can commit the institution to the conduct of a project that an agency is being asked to support as well as adhere to various agency policies and award requirements.

  (b) "Principal investigators and co-principal investigators" are award personnel supported by a grant, cooperative agreement, or contract under Federal law.

  (c) A "reported individual" refers to recipient personnel who have been reported to a federal agency for potential sexual harassment violations.

  (d) "Sex based harassment" means a form of sex discrimination and includes harassment based on sex, sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity.

  (e) "Sexual harassment" means unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when this conduct explicitly or implicitly affects an individual's employment, unreasonably interferes with an individual's work performance, or creates an intimidating, hostile, or offensive work environment, whether such activity is carried out by a supervisor or by a co-worker, volunteer, or contractor.

VII. <u>*Civil Rights Act of 1964 – Title VI*</u>

Recipients must comply with the requirements of Title VI of the *Civil Rights Act of 1964*, Pub. L. No. 88-352 (codified as amended at 42 U.S.C. § 2000d *et seq.*), which provides that no person in the United States will, on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance. DHS

# FY 2025 DHS STANDARD TERMS AND CONDITIONS

implementing regulations for the Act are found at 6 C.F.R. Part 21. Recipients of a federal award from the Federal Emergency Management Agency (FEMA) must also comply with FEMA's implementing regulations at 44 C.F.R. Part 7.

VIII.  *Civil Rights Act of 1968*

Recipients must comply with Title VIII of the *Civil Rights Act of 1968*, Pub. L. No. 90284 (codified as amended at 42 U.S.C. § 3601 *et seq.*) which prohibits recipients from discriminating in the sale, rental, financing, and advertising of dwellings, or in the provision of services in connection. therewith, on the basis of race, color, national origin, religion, disability, familial status, and sex, as implemented by the U.S. Department of Housing and Urban Development at 24 C.F.R. Part 100. The prohibition on disability discrimination includes the requirement that new multifamily housing with four or more dwelling units— i.e., the public and common use areas and individual apartment units (all units in buildings with elevators and ground-floor units in buildings without elevators)—be designed and constructed with certain accessible features. (See 24 C.F.R. Part 100, Subpart D.)

IX.  Communication and Cooperation with the Department of Homeland Security and Immigration Officials

(1) All recipients and other recipients of funds under this award must agree that they will comply with the following requirements related to coordination and cooperation with the Department of Homeland Security and immigration officials:

(a) They must comply with the requirements of 8 U.S.C. §§ 1373 and 1644. These statutes prohibit restrictions on information sharing by state and local government entities with DHS regarding the citizenship or immigration status, lawful or unlawful, of any individual. Additionally, 8 U.S.C. § 1373 prohibits any person or agency from prohibiting, or in any way restricting, a Federal, State, or local government entity from doing any of the following with respect to information regarding the immigration status of any individual: 1) sending such information to, or requesting or receiving such information from, Federal immigration officials; 2) maintaining such information; or 3) exchanging such information with any other Federal, State, or local government entity;

(b) They must comply with other relevant laws related to immigration, including prohibitions on encouraging or inducing an alien to come to, enter, or reside in the United States in violation of law, 8 U.S.C. § 1324(a)(1)(A)(iv), prohibitions on transporting or moving illegal aliens, 8 U.S.C. § 1324(a)(1)(A)(ii), prohibitions on harboring, concealing, or shielding from detection illegal aliens, 8 U.S.C. § 1324(a)(1)(A)(iii), and any applicable conspiracy, aiding or abetting, or attempt liability regarding these statutes;

(c) That they will honor requests for cooperation, such as participation in joint operations, sharing of information, or requests for short term detention of an alien pursuant to a valid detainer. A jurisdiction does not fail to comply with this requirement merely because it lacks the necessary resources to assist in a particular instance;

(d) That they will provide access to detainees, such as when an immigration officer seeks to interview a person who might be a removable alien; and

(e) That they will not leak or otherwise publicize the existence of an immigration enforcement operation.

# FY 2025 DHS STANDARD TERMS AND CONDITIONS

(2) The recipient must certify under penalty of perjury pursuant to 28 U.S.C. § 1746 and using a form that is acceptable to DHS, that it will comply with the requirements of this term. Additionally, the recipient agrees that it will require any subrecipients or contractors to certify in the same manner that they will comply with this term prior to providing them with any funding under this award.

(3) The recipient agrees that compliance with this term is material to the Government's decision to make or continue with this award and that the Department of homeland Security may terminate this grant, or take any other allowable enforcement action, if the recipient fails to comply with this term.

X. <u>Copyright</u>

Recipients must affix the applicable copyright notices of 17 U.S.C. §§ 401 or 402 to any work first produced under federal awards and also include an acknowledgement that the work was produced under a federal award (including the federal award number and federal awarding agency). As detailed in 2 C.F.R. § 200.315, a federal awarding agency reserves a royalty-free, nonexclusive, and irrevocable right to reproduce, publish, or otherwise use the work for federal purposes and to authorize others to do so.

XI. <u>Debarment and Suspension</u>

Recipients must comply with the non-procurement debarment and suspension regulations implementing Executive Orders 12549 and 12689 set forth at 2 C.F.R. Part 180 as implemented by DHS at 2 C.F.R. Part 3000. These regulations prohibit recipients from entering into covered transactions (such as subawards and contracts) with certain parties that are debarred, suspended, or otherwise excluded from or ineligible for participation in federal assistance programs or activities.

XII. <u>Drug-Free Workplace Regulations</u>

Recipients must comply with drug-free workplace requirements in Subpart B (or Subpart C, if the recipient is an individual) of 2 C.F.R. Part 3001, which adopts the Government- wide implementation (2 C.F.R. Part 182) of the *Drug-Free Workplace Act of 1988* (41 U.S.C. §§ 8101-8106).

XIII. <u>Duplicative Costs</u>

Recipients are prohibited from charging any cost to this federal award that will be included as a cost or used to meet cost sharing requirements of any other federal award in either the current or a prior budget period. See 2 C.F.R. § 200.403(f). However, recipients may shift costs that are allowable under two or more federal awards where otherwise permitted by federal statutes, regulations, or the federal award terms and conditions.

XIV. <u>Education Amendments of 1972 (*Equal Opportunity in Education Act*) – Title IX</u>

Recipients must comply with the requirements of Title IX of the Education Amendments of 1972, Pub. L. No. 92-318 (codified as amended at 20 U.S.C. § 1681 *et seq.*), which provide that no person in the United States will, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving federal financial assistance. DHS implementing regulations are codified at 6 C.F.R. Part 17. Recipients of a federal award from the Federal Emergency Management Agency (FEMA) must also comply with FEMA's implementing regulations at 44 C.F.R. Part 19.

# FY 2025 DHS STANDARD TERMS AND CONDITIONS

XV. *Energy Policy and Conservation Act*

Recipients must comply with the requirements of the *Energy Policy and Conservation Act*, Pub. L. No. 94-163 (1975) (codified as amended at 42 U.S.C. § 6201 *et seq.*), which contain policies relating to energy efficiency that are defined in the state energy conservation plan issued in compliance with this Act.

XVI. Equal Treatment of Faith-Based Organizations

It is DHS policy to ensure the equal treatment of faith-based organizations in social service programs administered or supported by DHS or its component agencies, enabling those organizations to participate in providing important social services to beneficiaries.

Recipients must comply with the equal treatment policies and requirements contained in 6 C.F.R. Part 19 and other applicable statutes, regulations, and guidance governing the participations of faith-based organizations in individual DHS programs.

XVII. Anti-Discrimination

Recipients must comply with all applicable Federal anti-discrimination laws material to the government's payment decisions for purposes of 31 U.S.C. § 372(b)(4).

(1) Definitions. As used in this clause –

(a) DEI means "diversity, equity, and inclusion."

(b) DEIA means "diversity, equity, inclusion, and accessibility."

(c) Discriminatory equity ideology has the meaning set forth in Section 2(b) of Executive Order 14190 of January 29, 2025.

(d) Federal anti-discrimination laws mean Federal civil rights law that protect individual Americans from discrimination on the basis of race, color, sex, religion, and national origin.

(e) Illegal immigrant means any alien, as defined in 8 U.S.C. § 1101(a)(3), who has no lawful immigration status in the United States.

(2) Grant award certification.

(a) By accepting the grant award, recipients are certifying that:

(i) They do not, and will not during the term of this financial assistance award, operate any programs that advance or promote DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws; and

(ii) They do not engage in and will not during the term of this award engage in, a discriminatory prohibited boycott.

(iii) They do not, and will not during the term of this award, operate any program that benefits illegal immigrants or incentivizes illegal immigration.

(3) DHS reserves the right to suspend payments in whole or in part and/or terminate financial assistance awards if the Secretary of Homeland Security or her designee determines that the recipient has violated any provision of subsection (2)..

# FY 2025 DHS STANDARD TERMS AND CONDITIONS

(4) Upon suspension or termination under subsection (3), all funds received by the recipient shall be deemed to be in excess of the amount that the recipient is determined to be entitled to under the Federal award for purposes of 2 C.F.R. § 200.346. As such, all amounts received will constitute a debt to the Federal Government that may be pursued to the maximum extent permitted by law.

XVIII.   *False Claims Act* and Program Fraud Civil Remedies

Recipients must comply with the requirements of the *False Claims Act*, 31 U.S.C. §§ 3729- 3733, which prohibit the submission of false or fraudulent claims for payment to the Federal Government. (See 31 U.S.C. §§ 3801-3812, which details the administrative remedies for false claims and statements made.)

XIX.   Federal Debt Status

All recipients are required to be non-delinquent in their repayment of any federal debt. Examples of relevant debt include delinquent payroll and other taxes, audit disallowances, and benefit overpayments. See OMB Circular A-129.

XX.   Federal Leadership on Reducing Text Messaging While Driving

Recipients are encouraged to adopt and enforce policies that ban text messaging while driving recipient-owned, recipient-rented, or privately owned vehicles when on official government business or when performing any work for or on behalf of the Federal Government. Recipients are also encouraged to conduct the initiatives of the type described in Section 3(a) of Executive Order 13513.

XXI.   *Fly America Act of 1974*

Recipients must comply with Preference for U.S. Flag Air Carriers (a list of certified air carriers can be found at: Certificated Air Carriers List | US Department of Transportation, https://www.transportation.gov/policy/aviation-policy/certificated-aircarriers-list)for international air transportation of people and property to the extent that such service is available, in accordance with the *International Air Transportation Fair Competitive Practices Act of 1974*, 49 U.S.C. § 40118, and the interpretative guidelines issued by the Comptroller General of the United States in the March 31, 1981, amendment to Comptroller General Decision B-138942.

XXII.   *Hotel and Motel Fire Safety Act of 1990*

Recipients must ensure that all conference, meeting, convention, or training space funded entirely or in part by federal award funds complies with the fire prevention and control guidelines of Section 6 of the *Hotel and Motel Fire Safety Act of 1990*, 15 U.S.C. § 2225a.

XXIII.   *John S. McCain National Defense Authorization Act of Fiscal Year 2019*

Recipients, subrecipients, and their contractors and subcontractors are subject to the prohibitions described in section 889 of the *John S. McCain National Defense Authorization Act for Fiscal Year 2019*, Pub. L. No. 115-232 (2018) and 2 C.F.R. §§ 200.216, 200.327, 200.471, and Appendix II to 2 C.F.R. Part 200. The statute – as it applies to DHS recipients, subrecipients, and their contractors and subcontractors – prohibits obligating or expending federal award funds on certain telecommunications and video surveillance products and contracting with certain entities for national security reasons.

XXIV.   Limited English Proficiency (*Civil Rights Act of 1964, Title VI*)

Recipients must comply with Title VI of the *Civil Rights Act of 1964* (42 U.S.C. § 2000d *et seq.*) prohibition against discrimination on the basis of national origin, which requires that recipients of federal financial assistance take reasonable steps

# FY 2025 DHS STANDARD TERMS AND CONDITIONS

to provide meaningful access to persons with limited English proficiency (LEP) to their programs and services. For additional assistance and information regarding language access obligations, please refer to the DHS Recipient Guidance: https://www.dhs.gov/guidance-published-help- department-supported-organizationsprovide-meaningful-access-people-limited and additional resources on http://www.lep.gov.

XXV. <u>Lobbying Prohibitions</u>

Recipients must comply with 31 U.S.C. § 1352 and 6 C.F.R. Part 9, which provide that none of the funds provided under a federal award may be expended by the recipient to pay any person to influence, or attempt to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with any federal action related to a federal award or contract, including any extension, continuation, renewal, amendment, or modification. Per 6 C.F.R. Part 9, recipients must file a lobbying certification form as described in Appendix A to 6 C.F.R. Part 9 or available on Grants.gov as the Grants.gov Lobbying Form and file a lobbying disclosure form as described in Appendix B to 6 C.F.R. Part 9 or available on Grants.gov as the Disclosure of Lobbying Activities (SF-LLL).

XXVI. *National Environmental Policy Act*

Recipients must comply with the requirements of the *National Environmental Policy Act of 1969*,  Pub. L. No. 91-190 (1970) (codified as amended at 42 U.S.C. § 4321 *et seq.*) (NEPA) and the Council on Environmental Quality (CEQ) Regulations for Implementing the Procedural Provisions of NEPA, which require recipients to use all practicable means within their authority, and consistent with other essential considerations of national policy, to create and maintain conditions under which people and nature can exist in productive harmony and fulfill the social, economic, and other needs of present and future generations of Americans.

XXVII. <u>National Security Presidential Memorandum-33 (NSPM-33) and provisions of the CHIPS and Science Act of 2022, Pub. L. 117-167, Section 10254</u>

(1) Recipient research institutions ("covered institutions") must comply with the requirements in NSPM-33 and provisions of Pub. L.117-167, Section 10254 (codified at 42 U.S.C. § 18951) certifying that the institution has established and operates a research security program that includes elements relating to:

    (a) cybersecurity;

    (b) foreign travel security;

    (c) research security training; and

    (d) export control training, as appropriate.

(2) Definition. "Covered institutions" means recipient research institutions receiving federal Research and Development (R&D) science and engineering support "in excess of $50 million per year."

XXVIII. <u>Non-Supplanting Requirement</u>

Recipients of federal awards under programs that prohibit supplanting by law must ensure that federal funds supplement but do not supplant non-federal funds that, in the absence of such federal funds, would otherwise have been made available for the same purpose.

XXIX. <u>Notice of Funding Opportunity Requirements</u>

All the instructions, guidance, limitations, scope of work, and other conditions set forth in the Notice of Funding Opportunity (NOFO) for this federal award are incorporated

# FY 2025 DHS STANDARD TERMS AND CONDITIONS

by reference. All recipients must comply with any such requirements set forth in the NOFO. If a condition of the NOFO is inconsistent with these terms and conditions and any such terms of the federal award, the condition in the NOFO shall be invalid to the extent of the inconsistency. The remainder of that condition and all other conditions set forth in the NOFO shall remain in effect.

XXX. <u>Patents and Intellectual Property Rights</u>

Recipients are subject to the *Bayh-Dole Act*, 35 U.S.C. § 200 *et seq.* and applicable regulations governing inventions and patents, including the regulations issued by the Department of Commerce at 37 C.F.R. Part 401 (Rights to Inventions Made by Nonprofit Organizations and Small Business Firms under Government Awards, Contracts, and Cooperative Agreements) and the standard patent rights clause set forth at 37 C.F.R. § 401.14.

XXXI. <u>Presidential Executive Orders</u>

Recipients must comply with the requirements of Presidential Executive Orders related to grants (also known as federal assistance and financial assistance), the full text of which are incorporated by reference.

XXXII. <u>Procurement of Recovered Materials</u>

States, political subdivisions of states, and their contractors must comply with Section 6002 of the *Solid Waste Disposal Act*, Pub. L. No. 89-272 (1965) (codified as amended by the *Resource Conservation and Recovery Act* at 42 U.S.C. § 6962) and 2 C.F.R. § 200.323. The requirements of Section 6002 include procuring only items designated in guidelines of the Environmental Protection Agency (EPA) at 40 C.F.R. Part 247 that contain the highest percentage of recovered materials practicable, consistent with maintaining a satisfactory level of competition.

XXXIII. *Rehabilitation Act of 1973*

Recipients must comply with the requirements of Section 504 of the *Rehabilitation Act of 1973*, Pub. L. No. 93-112 (codified as amended at 29 U.S.C. § 794), which provides that no otherwise qualified handicapped individuals in the United States will, solely by reason of the handicap, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance.

XXXIV. <u>Reporting Recipient Integrity and Performance Matters</u>

If the total value of any currently active grants, cooperative agreements, and procurement contracts from all federal awarding agencies exceeds $10,000,000 for any period of time during the period of performance of the federal award, then the recipient must comply with the requirements set forth in the government-wide federal award term and condition for Recipient Integrity and Performance Matters is in 2 C.F.R. Part 200, Appendix XII, the full text of which is incorporated by reference.

XXXV. <u>Reporting Subawards and Executive Compensation</u>

For federal awards that total or exceed $30,000, recipients are required to comply with the requirements set forth in the government-wide federal award term and condition on Reporting Subawards and Executive Compensation set forth at 2 C.F.R. Part 170, Appendix A, the full text of which is incorporated by reference.

XXXVI. <u>Required Use of American Iron, Steel, Manufactured Products, and Construction Materials</u>

(1) Recipients of a federal award from a financial assistance program that provides funding for infrastructure are hereby notified that none of the funds provided under this federal award may be used for a project for infrastructure unless:

# FY 2025 DHS STANDARD TERMS AND CONDITIONS

(a) all iron and steel used in the project are produced in the United States—this means all manufacturing processes, from the initial melting stage through the application of coatings, occurred in the United States;

(b) all manufactured products used in the project are produced in the United States—this means the manufactured product was manufactured in the United States; and the cost of the components of the manufactured product that are mined, produced, or manufactured in the United States is greater than 55 percent of the total cost of all components of the manufactured product, unless another standard for determining the minimum amount of domestic content of the manufactured product has been established under applicable law or regulation; and

(c) all construction materials are manufactured in the United States—this means that all manufacturing processes for the construction material occurred in the United States.

(2) The Buy America preference only applies to articles, materials, and supplies that are consumed in, incorporated into, or affixed to an infrastructure project. As such, it does not apply to tools, equipment, and supplies, such as temporary scaffolding, brought to the construction site and removed at or before the completion of the infrastructure project. Nor does a Buy America preference apply to equipment and furnishings, such as movable chairs, desks, and portable computer equipment, that are used at or within the finished infrastructure project but are not an integral part of the structure or permanently affixed to the infrastructure project.

(3) *Waivers*

When necessary, recipients may apply for, and the agency may grant, a waiver from these requirements. The agency should notify the recipient for information on the process for requesting a waiver from these requirements.

(a) When the Federal agency has determined that one of the following exceptions applies, the federal awarding official may waive the application of the domestic content procurement preference in any case in which the agency determines that:

(i) applying the domestic content procurement preference would be inconsistent with the public interest;

(ii) the types of iron, steel, manufactured products, or construction materials are not produced in the United States in sufficient and reasonably available quantities or of a satisfactory quality; or

(iii) the inclusion of iron, steel, manufactured products, or construction materials produced in the United States will increase the cost of the overall project by more than 25 percent.

(b) A request to waive the application of the domestic content procurement preference must be in writing. The agency will provide instructions on the format, contents, and supporting materials required for any waiver request. Waiver requests are subject to public comment periods of no less than 15 days and must be reviewed by the Made in America Office.

(c) There may be instances where a federal award qualifies, in whole or in part, for an existing waiver described at "Buy America" Preference in FEMA Financial Assistance Programs for Infrastructure | FEMA.gov.

# FY 2025 DHS STANDARD TERMS AND CONDITIONS

(4) *Definitions.* The definitions applicable to this term are set forth at 2 C.F.R. § 184.3, the full text of which is incorporated by reference.

XXXVII.   SAFECOM

Recipients receiving federal awards made under programs that provide emergency communication equipment and its related activities must comply with the SAFECOM Guidance for Emergency Communication Grants, including provisions on technical standards that ensure and enhance interoperable communications. The SAFECOM Guidance is updated annually and can be found at Funding and Sustainment | CISA.

XXXVIII.   Subrecipient Monitoring and Management

Pass-through entities must comply with the requirements for subrecipient monitoring and management as set forth in 2 C.F.R. §§ 200.331-333.

XXXIX.   System for Award Management and Unique Entity Identifier Requirements

Recipients are required to comply with the requirements set forth in the governmentwide federal award term and condition regarding the System for Award Management and Unique Entity Identifier Requirements in 2 C.F.R. Part 25, Appendix A, the full text of which is incorporated reference.

XL.   Termination of a Federal Award

(1) By DHS. DHS may terminate a federal award, in whole or in part, for the following reasons:

(a) If the recipient fails to comply with the terms and conditions of the federal award;

(b) With the consent of the recipient, in which case the parties must agree upon the termination conditions, including the effective date, and in the case of partial termination, the portion to be terminated; or

(c) Pursuant to the terms and conditions of the federal award, including, to the extent authorized by law, if the federal award no longer effectuates the program goals or agency priorities.

(3) By the Recipient. The recipient may terminate the federal award, in whole or in part, by sending written notification to DHS stating the reasons for such termination, the effective date, and in the case of partial termination, the portion to be terminated. However, if DHS determines that the remaining portion of the federal award will not accomplish the purposes for which the federal award was made, DHS may terminate the federal award in its entirety.

(4) Notice. Either party will provide written notice of intent to terminate for any reason to the other party no less than 30 calendar days prior to the effective date of the termination.

(5) Compliance with Closeout Requirements for Terminated Awards. The recipient must continue to comply with closeout requirements in 2 C.F.R. §§ 200.344200.345 after an award is terminated.

# FY 2025 DHS STANDARD TERMS AND CONDITIONS

XLI.  **Terrorist Financing**

Recipients must comply with Executive Order 13224 and applicable statutory prohibitions on transactions with, and the provisions of resources and support to, individuals and organizations associated with terrorism. Recipients are legally responsible for ensuring compliance with the Executive Order and laws.

XLII.  **Trafficking Victims Protection Act of 2000(TVPA)**

Recipients must comply with the requirements of the government-wide federal award term and condition which implements Trafficking Victims Protection Act of 2000, Pub. L. No. 106-386, § 106 (codified as amended at 22 U.S.C. § 7104). The federal award term and condition is in 2 C.F.R. § 175.105, the full text of which is incorporated by reference.

XLIII.  *Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT) Act of 2001*, Pub. L. 107-56

Recipients must comply with the requirements of Pub. L. 107-56, Section 817 of the USA PATRIOT Act, which amends 18 U.S.C. §§ 175–175c.

XLIV.  **Use of DHS Seal, Logo and Flags**

Recipients must obtain written permission from DHS prior to using the DHS seals, logos, crests, or reproductions of flags, or likenesses of DHS agency officials. This includes use of DHS component (e.g., FEMA, CISA, etc.) seals, logos, crests, or reproductions of flags, or likenesses of component officials.

XLV.  *Whistleblower Protection Act*

Recipients must comply with the statutory requirements for whistleblower protections in 10 U.S.C § 470141 U.S.C. § 4712.