1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ELIZABETH B. WYDRA (BAR NO. 218200)
BRIANNE J. GOROD
BRIAN R. FRAZELLE
MIRIAM BECKER-COHEN
NINA HENRY
CONSTITUTIONAL ACCOUNTABILITY CENTER
1730 Rhode Island Ave. NW, Suite 1200
Washington, D.C. 20036
(202) 296-6889
elizabeth@theusconstitution.org

*Counsel for Amicus Curiae*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA**

CITY AND COUNTY OF SAN FRANCISCO, *et al.*,

Plaintiffs,

v.

PRESIDENT DONALD TRUMP, *et al.*,

Defendants.

Case No. 3:25-cv-1350-WHO

**BRIEF OF CONSTITUTIONAL ACCOUNTABILITY CENTER AS *AMICUS CURIAE* IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Hearing Date: November 5, 2025
Time: 2:00 p.m. PST
Place: Courtroom 2
Judge: Honorable William H. Orrick

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................... ii

INTEREST OF *AMICUS CURIAE* ......................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ......................................... 1

I.    The Constitution's Separation of Powers Prohibits the Executive Branch from Unilaterally Withholding Appropriated Funds ........................................... 5

    A.   The Text, Structure, and History of the Appropriations and Spending Clauses Demonstrate that Congress Has Exclusive Power over Funding Decisions ........................................................................... 6

    B.   All Three Branches of Government Have Consistently Interpreted the Constitution as Barring the Executive Branch from Unilaterally Withholding Appropriated Funds ............................................... 9

II.   Plaintiffs' Separation-of-Powers and Spending Clause Claims Are Reviewable as Freestanding Constitutional Claims Under *Dalton v. Specter* ......................... 12

    A.   Defendants Overread *Dalton v. Specter* .................................................. 12

    B.   Defendants Contort Plaintiffs' Separation-of-Powers and Spending Clause Claims .......................................................................... 17

CONCLUSION ....................................................................................................... 19

i

# TABLE OF AUTHORITIES

**Page(s)**

*Armstrong v. Exceptional Child Ctr., Inc.*,
    575 U.S. 320 (2015) ................................................................... 14

*Biden v. Sierra Club*,
    142 S. Ct. 46 (2021) ................................................................... 16

*Campaign Clean Water, Inc. v. Ruckelshaus*,
    361 F. Supp. 689 (E.D. Va. 1973) ............................................. 10

*CFPB v. Cmty. Fin. Servs. Ass'n of Am.*,
    601 U.S. 416 (2024) ................................................................... 3, 6

*Cincinnati Soap Co. v. United States*,
    301 U.S. 308 (1937) ................................................................... 7

*City & County of San Francisco v. Trump*,
    897 F.3d 1225 (9th Cir. 2018) ................................................... 3, 5, 8

*City of New Haven v. United States*,
    809 F.2d 900 (D.C. Cir. 1987) ................................................... 9

*Clinton v. City of New York*,
    524 U.S. 417 (1998) ................................................................... 1, 3, 11

*Cmty. Action Programs Exec. Dirs. Ass'n of N.J. v. Ash*,
    365 F. Supp. 1355 (D.N.J. 1973) ............................................... 10

*Dakota Cent. Tele. Co. v. South Dakota ex rel. Payne*,
    250 U.S. 163 (1919) ................................................................... 5, 13

*Dalton v. Specter*,
    511 U.S. 462 (1994) ................................................... 2, 4, 5, 12-14, 17

*Dames & Moore v. Regan*,
    453 U.S. 654 (1981) ................................................................... 14, 15

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992) ................................................................... 15

*Freytag v. Comm'r*,
    501 U.S. 868 (1991) ................................................................... 19

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

*Glob. Health Council v. Trump*,
　No. 25-5097, 2025 WL 2480618 (D.C. Cir. Aug. 28, 2025) ............................... 18

*Guadamuz v. Ash*,
　368 F. Supp. 1233 (D.D.C. 1973) ........................ 10

*In re Aiken County*,
　725 F.3d 255 (D.C. Cir. 2013) .......................... 8, 12

*Kendall v. United States ex rel. Stokes*,
　37 U.S. 524 (1838) ............................. 3, 10

*Louisiana ex rel. Guste v. Brinegar*,
　388 F. Supp. 1319 (D.D.C. 1975) ..................... 10

*Murphy Co. v. Biden*,
　65 F.4th 1122 (9th Cir. 2023) ..................... 2, 15, 16

*Murphy Co. v. Biden*,
　144 S. Ct. 1111 (2024) ......................... 2, 16

*Pennsylvania v. Weinberger*,
　367 F. Supp. 1378 (D.D.C. 1973) ..................... 10

*Reeside v. Walker*,
　52 U.S. (11 How.) 272 (1850) ...................... 7

*Sierra Club v. Trump*,
　929 F.3d 670 (9th Cir. 2019) ..................... 5, 16, 17

*Sierra Club v. Trump*,
　963 F.3d 874 (9th Cir. 2020) ..................... 16

*Train v. City of New York*,
　420 U.S. 35 (1975) ......................... 11

*United States v. McIntosh*,
　833 F.3d 1163 (9th Cir. 2016) ..................... 7

*U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*,
　665 F.3d 1339 (D.C. Cir. 2012) ..................... 5

iii

**TABLE OF AUTHORITIES – cont'd**

Page(s)

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ........................................................................... 1, 5, 13, 14

CONSTITUTIONAL PROVISIONS

Articles of Confederation of 1781, art. IX, para. 6 ..................................... 7

Del. Const. of 1776, art. VII ...................................................................... 6

Mass. Const. of 1780, ch. 2, § 1, art. XI ................................................... 6

U.S. Const. art. I, § 8, cl. 1 ....................................................................... 3, 7

U.S. Const. art. I, § 9, cl. 7 ....................................................................... 3, 7

U.S. Const. art. II, § 3 ............................................................................... 8

STATUTES AND LEGISLATIVE MATERIALS

120 Cong. Rec. (1974) .............................................................................. 9

Impoundment Control Act, Pub. L. No. 93-344, tit. X, 88 Stat. 297 (1974) ............ 9

S. Rep. No. 93-688 (1974) ......................................................................... 9, 18

2 U.S.C. § 683 ........................................................................................... 9

2 U.S.C. § 684 ........................................................................................... 9

OTHER AUTHORITIES

Josh Chafetz, *Congress's Constitution: Legislative Authority and the Separation
    of Powers* (2017) ................................................................................... 8

*The Debates in the Several State Conventions on the Adoption of the Federal
    Constitution* (Jonathan Elliot ed., 1836)............................................... 2, 8

Exec. Order No. 14,159, *Protecting the American People Against Invasion*,
    90 Fed. Reg. 8443 (Jan. 20, 2025)......................................................... 1

1

## TABLE OF AUTHORITIES – cont'd

2

**Page(s)**

3

Exec. Order No. 14,218, *Ending Taxpayer Subsidization of Open Borders*,
90 Fed. Reg. 10581 (Feb. 19, 2025)......................................................... 1

4

5

Exec. Order No. 14,287, *Protecting American Communities from Criminal Aliens*,
90 Fed. Reg. 18761 (Apr. 28, 2025)......................................................... 1, 2

6

*The Federalist No. 30* (Alexander Hamilton) (Clinton Rossiter ed., 1961) .............. 3, 7

7

*The Federalist No. 78* (Alexander Hamilton) (Clinton Rossiter ed., 1961) .............. 7

8

9

Paul F. Figley & Jay Tidmarsh, *The Appropriations Power and Sovereign Immunity*,
107 Mich. L. Rev. 1207 (2009) ............................................... 6

10

11

Alexander Hamilton, *Report on the Subject of Manufactures* (1791) ....................... 7

12

F.W. Maitland, *The Constitutional History of England* (1908)................................ 6

13

*Presidential Authority to Impound Funds Appropriated for Assistance to Federally Impacted Schools*,
1 Supp. Op. O.L.C. 303 (1969) ............................................... 4, 11

14

15

16

*The President's Veto Power*,
12 Op. O.L.C. 128 (1988) .................................................. 12

17

*The Records of the Federal Convention of 1787* (Max Farrand ed., 1911)............... 6

18

19

John G. Roberts, Jr., *Memorandum for Fred F. Fielding Re: Impoundment Authority*
(Aug. 15, 1985) ............................................................. 11

20

Joseph Story, *Commentaries on the Constitution of the United States* (1833).......... 8

21

22

23

24

25

26

27

28

1

## INTEREST OF *AMICUS CURIAE*[1]

Constitutional Accountability Center (CAC) is a think tank and public interest law firm dedicated to fulfilling the progressive promise of the Constitution's text and history.  CAC works in our courts, through our government, and with legal scholars to improve understanding of the Constitution and preserve the rights, freedoms, and structural safeguards that it guarantees, and accordingly has an interest in this case.

## INTRODUCTION AND SUMMARY OF ARGUMENT

This case at its core is about whether our Constitution, which commits the power of the purse to the people's representatives in Congress, allows the President to unilaterally withhold federal funding from jurisdictions that decline to implement his immigration agenda.  The answer is no.  As the Supreme Court has made clear, "[t]here is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998).  That principle applies with special force here, in the context of spending and appropriations, where the President enjoys none of "his own constitutional powers." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring).

In defiance of these limitations on presidential power, shortly after taking office, President Trump issued a series of executive orders instructing agencies to cut off all federal funding to sanctuary jurisdictions.  *See* Exec. Order No. 14,159, *Protecting the American People Against Invasion*, 90 Fed. Reg. 8443, 8446 (Jan. 20, 2025); Exec. Order No. 14,218, *Ending Taxpayer Subsidization of Open Borders*, 90 Fed. Reg. 10581, 10581 (Feb. 19, 2025); Exec.

---

[1] No person or entity other than *amicus* and its counsel assisted in or made a monetary contribution to the preparation or submission of this brief.  Plaintiffs consent to the filing of this brief, and Defendants take no position.

1

Order No. 14,287, *Protecting American Communities from Criminal Aliens*, 90 Fed. Reg. 18761, 18761 (Apr. 28, 2025). The President made clear that this threatened withdrawal of funding was designed to force localities like Plaintiffs to assist with federal civil immigration enforcement. *See* Dkt. No. 193 (SAC) ¶¶ 345-46. Federal agencies took steps to implement these executive orders through agencywide directives to cancel federal funding and impose new grant conditions. *See, e.g.*, *id.* ¶¶ 367-68, 390-93, 395-99.

This Court promptly enjoined those unlawful actions, and now Defendants all but concede that they may not "unilaterally impose conditions on all federal funds without Congressional authorization," Dkt. No. 227 (MTD), at 13. Instead, to escape liability, they seek to recast Plaintiffs' constitutional claims as purely statutory and barred by the Supreme Court's decision in *Dalton v. Specter*, 511 U.S. 462 (1994). Dkt. No. 227 (MTD), at 12-13. But Defendants—and the outlier D.C. Circuit decision upon which they rely—get *Dalton* wrong at every turn. Plaintiffs' claim that the executive branch usurped Congress's power of the purse plainly falls within the "expansive . . . constitutional category of claims" that are still "reviewable" in the wake of *Dalton*, as the Ninth Circuit has recognized. *Murphy Co. v. Biden*, 65 F.4th 1122, 1130 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 1111 (2024).

**I.** The Framers of our Constitution were intimately familiar with the monumental struggle in England—marked by civil war and regicide—arising from the consolidation of the powers of the sword and the purse. When they gathered to write the Constitution, perhaps no tenet was more central to the preservation of liberty than the need to separate those powers. As Alexander Hamilton put it, "neither one [branch of government] nor the other shall have both, because this would destroy that division of powers on which political liberty is founded, and would furnish one body with all the means of tyranny." 2 *The Debates in the Several State*

2

*Conventions on the Adoption of the Federal Constitution* 348-49 (Jonathan Elliot ed., 1836) ["*Elliot's Debates*"].

Thus, the choice to vest Congress with control over appropriations and spending was "uncontroversial" at the Founding. *CFPB v. Cmty. Fin. Servs. Ass'n of Am.*, 601 U.S. 416, 431 (2024). Congress's "Power . . . to pay the Debts and provide for the common Defence and general Welfare of the United States," U.S. Const. art. I, § 8, cl. 1, was deemed "indispensable" to the federal government's ability to do its job, *The Federalist No. 30*, at 188 (Alexander Hamilton) (Clinton Rossiter ed., 1961). At the same time, the Appropriations Clause evinced a clear limitation on executive authority: "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7.

These provisions, coupled with structural separation-of-powers principles, mean that the executive has no power to unilaterally withhold federal funding to further his own policies. As the Ninth Circuit has succinctly put it: "the President is without authority to thwart congressional will by canceling appropriations passed by Congress.'" *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1232 (9th Cir. 2018).

The Supreme Court first made this clear in 1838, unanimously rejecting the authority of the Postmaster General to withhold appropriated funding for a contract he claimed was tainted by political favoritism. *Kendall v. United States ex rel. Stokes*, 37 U.S. 524 (1838). The issue came to a head again during the 1970s when "President Nixon, the Mahatma Gandhi of all impounders, asserted . . . that his constitutional right to impound appropriated funds was absolutely clear." *Clinton*, 524 U.S. at 468 (Scalia, J., concurring in part and dissenting in part) (quotation marks omitted). A slew of decisions "proved him wrong." *Id.*

Both Congress and the executive branch have expressed the same view—Congress through passage of the Impoundment Control Act of 1974, and the executive branch through a series of memoranda, including ones authored by future Chief Justices Rehnquist and Roberts. As Rehnquist put it while leading the Justice Department's Office of Legal Counsel (OLC), it is "*extremely difficult* to formulate a constitutional theory to justify a refusal by the President to comply with a congressional directive to spend." *Presidential Authority to Impound Funds Appropriated for Assistance to Federally Impacted Schools*, 1 Supp. Op. O.L.C. 303, 310 (1969) ["Rehnquist Memo"] (emphasis added).

**II.** Rather than face up to these principles, Defendants seek to avoid them, claiming that under *Dalton v. Specter*, Plaintiffs' separation-of-powers and Spending Clause claims are just dressed-up statutory claims alleging a violation of the Impoundment Control Act's procedures. This argument is premised on an overreading of *Dalton* and a fundamental misunderstanding of the nature of these claims.

In *Dalton*, the Supreme Court grappled with a claim that the President had exceeded his statutorily delegated discretion in closing a naval shipyard. In concluding that the statute granted unbridled discretion to the President and accordingly rejecting the plaintiffs' separation-of-powers claim, the Court clarified that "*all* executive actions in excess of statutory authority" are not "*ipso facto* unconstitutional." *Dalton*, 511 U.S. at 472 (emphasis added).

Defendants would read that language to mean that *no* executive action in excess of statutory authority is *ever* unconstitutional. But that is not what *Dalton* says. Indeed, *Dalton* makes clear that certain executive actions in excess of statutory authority *do* give rise to actionable constitutional claims, including when the President "act[s] in violation of the Constitution," *id.* at 474, by exercising a power not delegated to him, or one expressly delegated

4

to another branch, *id.* at 473.  In such instances, there is "a want of [Presidential] power," as opposed to "a mere excess or abuse of discretion in exerting a power given."  *Id.* at 474 (alteration in original) (quoting *Dakota Cent. Tele. Co. v. South Dakota ex rel. Payne*, 250 U.S. 163, 184 (1919)).

Plaintiffs' separation-of-powers and Spending Clause claims fit this bill.  Plaintiffs do not "*simply* alleg[e] that the President has exceeded his statutory authority," *Sierra Club v. Trump*, 929 F.3d 670, 696 (9th Cir. 2019) ("*Sierra Club I*") (emphasis in original) (quoting *Dalton*, 511 U.S. at 472), by failing to comply with the Impoundment Control Act's prescribed procedures. Rather, Plaintiffs allege that by threatening the unilateral rescission of funding to sanctuary jurisdictions, the President has arrogated a power that belongs exclusively to Congress—the power of the purse—without *any* statutory or constitutional authorization.  That makes this case like *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), the archetypal separation-of-powers case, and makes Plaintiffs' claim "fundamentally a constitutional one," *Sierra Club I*, 929 F.3d at 696-97.

For this reason, and those stated in Plaintiffs' brief, this Court should deny Defendants' motion to dismiss.

## ARGUMENT

## I.     The Constitution's Separation of Powers Prohibits the Executive Branch from Unilaterally Withholding Appropriated Funds.

Under the Constitution, the power of the purse is "exclusive" to Congress.  *U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1346 (D.C. Cir. 2012) (Kavanaugh, J.).  Thus, "[a]bsent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals."  *City & County of San Francisco*, 897 F.3d at 1235.  Plaintiffs' separation-of-powers and Spending Clause claims seek

to enforce that principle.  It challenges the executive branch's unilateral effort to withhold duly appropriated funds from sanctuary jurisdictions, in contravention of constitutional text, structure, and history, as well as longstanding interpretations of that text, structure, and history by all three branches of government.

**A.  The Text, Structure, and History of the Appropriations and Spending Clauses Demonstrate that Congress Has Exclusive Power over Funding Decisions.**

"By the time of the Constitutional Convention, the principle of legislative supremacy over fiscal matters engendered little debate and created no disagreement," as the Founders were intimately familiar with the struggles in England over the purse strings and sought to avoid a repeat of that saga.  *CFPB*, 601 U.S. at 427-31.  In the seventeenth century, British kings used their royal prerogatives to tax and spend without the approval of Parliament, *see id.*, antagonizing the legislature and blurring the distinction between the monarch's pocket money and the national treasury, F.W. Maitland, *The Constitutional History of England* 431-33 (1908). Only after the Glorious Revolution were royal attempts to seize the purse finally squelched.  *See, e.g.*, *id.* at 433 ("Since the Revolution the practice has [been,] . . . in granting money to the crown, parliament has appropriated the supply to particular purposes more or less narrowly defined."); Paul F. Figley & Jay Tidmarsh, *The Appropriations Power and Sovereign Immunity*, 107 Mich. L. Rev. 1207, 1229 (2009) (describing Parliament's elimination of the King's prerogative to determine how the "civil list"—the domestic budget—would be spent).

In "defining the Executive powers" of the new federal government, the American Founders firmly rejected the historic "Prerogatives of the British Monarch."  1 *The Records of the Federal Convention of 1787*, at 65 (Max Farrand ed., 1911) (James Wilson).  Indeed, almost every post-Independence state constitution vested spending and appropriations authority in a legislative body.  *See, e.g.*, Del. Const. of 1776, art. VII; Mass. Const. of 1780, ch. 2, § 1, art. XI.

6

Even the Articles of Confederation, despite leaving the federal government without the power to raise revenue through taxation, granted the appropriations power to the Confederation Congress. Articles of Confederation of 1781, art. IX, para. 6.

Against that backdrop, when the Framers drafted the new Constitution, there was no question that Congress would be granted the exclusive powers to raise, spend, and appropriate funds. Congress's authority "to pay the Debts and provide for the common Defence and general Welfare of the United States," U.S. Const. art. I, § 8, cl. 1, was deemed "indispensable" to the federal government's ability to do its job, *The Federalist No. 30*, *supra*, at 188 (Alexander Hamilton). The language of this Clause was as "comprehensive as any that could have been used," Alexander Hamilton, *Report on the Subject of Manufactures* 54 (1791), and the Founders were resolute in their conviction that such sweeping power should be granted to the people's representatives in Congress—the branch that "not only commands the purse but prescribes the rules by which the duties and rights of every citizen are to be regulated," *The Federalist No. 78*, *supra*, at 465 (Alexander Hamilton).

At the same time that they empowered Congress, the Framers limited executive authority over finances: "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. Because the Appropriations Clause is phrased as a limitation, it means that "no money can be paid out of the Treasury unless it has been appropriated by an act of Congress." *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937) (citing *Reeside v. Walker*, 52 U.S. (11 How.) 272, 291 (1850)). In this manner, "[t]he Appropriations Clause plays a critical role in the Constitution's separation of powers among the three branches of government and the checks and balances between them." *United States v. McIntosh*, 833 F.3d 1163, 1175 (9th Cir. 2016).

7

Indeed, the Clause's simple and uncontroversial command was repeatedly invoked during the ratification debates to assuage "Anti-Federalist fears of a tyrannical president." Josh Chafetz, *Congress's Constitution: Legislative Authority and the Separation of Powers* 57 (2017). As Charles Pinckney put it, "[w]ith this powerful influence of the purse, [Congress] will be always able to restrain the usurpations of the other departments." 4 *Elliot's Debates* 330. Or in Edmund Randolph's words, the President "can handle no part of the public money except what is given him by law." 3 *id.* at 201; *see also, e.g.*, 2 *id.* at 349 (Alexander Hamilton); 3 *id.* at 17 (George Nicholas); 3 *id.* at 201 (James Madison). These statements reflect the fundamental rule embodied in the Appropriations Clause: the President has no power over federal funds except that which is expressly delegated by statute.

A critical corollary to this rule is that the President has no constitutional authority to, for "policy reasons, . . . spend less than the full amount appropriated by Congress for a particular project or program." *In re Aiken County*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (Kavanaugh, J.). Such authority would give the President, not Congress, the ultimate "power to decide[] how and when any money should be applied for these purposes." 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1342, at 213 (1833). And the President's duty to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, further prohibits the executive branch from "redistribut[ing] or withhold[ing] properly appropriated funds in order to effectuate its own policy goals." *City & County of San Francisco*, 897 F.3d at 1235. Failure to execute appropriations laws in accordance with their terms thus amounts to the effective repeal of those laws through usurpation of Congress's spending power, which "is directly linked to its power to legislate." *Id.* at 1231.

**B. All Three Branches of Government Have Consistently Interpreted the Constitution as Barring the Executive Branch from Unilaterally Withholding Appropriated Funds.**

**1.** Congress manifested its understanding of Congress's exclusive power over federal funding through the passage of the Impoundment Control Act (ICA) in 1974, Pub. L. No. 93-344, tit. X, 88 Stat. 297, 332.  Passed in the wake of Nixon's attempt to unilaterally cut billions of dollars from federal programs he disfavored, the Act prohibited the President from deferring or rescinding appropriated funds without sending a "special message" to Congress justifying the decision.  2 U.S.C. §§ 683-84.  Deferrals may not be made for policy reasons, *id.* § 684(b), and rescissions must be approved by Congress, *id.* § 683.

Notably, although the Act's procedures facilitating communication between the executive branch and Congress were new, its basic principles were merely a "reassert[ion]" of Congress's "control over the budgetary process" under the Appropriations Clause, the Spending Clause, and longstanding separation-of-powers principles.  *City of New Haven v. United States*, 809 F.2d 900, 906 (D.C. Cir. 1987).  The ICA codified the constitutional rule that the President may not withhold or condition appropriated funds without congressional approval.  *See, e.g.*, S. Rep. No. 93-688, at 73-74 (1974) (cataloging pre-ICA cases rejecting impoundments as unconstitutional, and explaining that the ICA is "consistent" with them in its rejection of the idea that federal funds can be withheld "for fiscal policy purposes").  As one Representative put it, the ICA would "return to the Congress the basic powers of budgeting that were originally intended by the Founding Fathers in the Constitution."  120 Cong. Rec. 19668 (1974) (Rep. Albert Ullman); *see also, e.g.*, *id.* at 20464 (Sen. Samuel Ervin, Jr.) (The bill "is based on the assumption that the President has no power under the Constitution to impound lawfully appropriated funds in the absence of a delegation of such authority by the Congress.").

**2.** Federal courts have also consistently construed the Constitution's separation of powers to bar the executive branch from unilaterally rescinding appropriated funds. In *Kendall v. United States ex rel. Stokes*, 37 U.S. 524 (1838), the Supreme Court unanimously rejected Postmaster General Amos Kendall's claim that he could withhold money that Congress had required him to spend. The Justices balked at the Attorney General's defense that the President possessed some inherent constitutional authority to rescind statutorily mandated funds, which he had in turn delegated to Kendall, remarking that "[t]o contend that the obligation imposed on the President to see the laws faithfully executed, implies a power to forbid their execution, is a novel construction of the constitution, and entirely inadmissible." *Id.* at 613. Sanctioning such a theory would be, according to the Court, "asserting a principle, which, if carried out in its results, to all cases falling within it, would be clothing the President with a power entirely to control the legislation of congress." *Id.*

During the Nixon years and prior to the passage of the ICA, many of Nixon's impoundments were also tested in district courts across the country, where the administration argued it had "'inherent power' to impound congressionally appropriated funds," premised on Article II's Vesting and Take Care Clauses. *Guadamuz v. Ash*, 368 F. Supp. 1233, 1243 (D.D.C. 1973). This claim was soundly rejected. Court after court held that the Appropriations Clause, Spending Clause, and broader separation-of-powers principles bar the executive from "refus[ing] to spend . . . appropriations." *Id.* at 1244; *see, e.g.*, *Louisiana ex rel. Guste v. Brinegar*, 388 F. Supp. 1319, 1324-25 (D.D.C. 1975); *Pennsylvania v. Weinberger*, 367 F. Supp. 1378, 1381 (D.D.C. 1973); *Campaign Clean Water, Inc. v. Ruckelshaus*, 361 F. Supp. 689, 696 (E.D. Va. 1973); *Cmty. Action Programs Exec. Dirs. Ass'n of N.J. v. Ash*, 365 F. Supp. 1355, 1360 (D.N.J. 1973).

10

By the time one of these cases made it to the Supreme Court, the Nixon administration had abandoned its constitutional argument. *See Train v. City of New York*, 420 U.S. 35, 42-49 (1975). As Justice Scalia later summarized it, "our decision . . . in *Train* . . . proved [President Nixon] wrong" in his claim to a "constitutional right to impound appropriated funds." *Clinton*, 524 U.S. at 468 (Scalia, J., concurring in part and dissenting in part) (quotation marks omitted).

**3.** Even the executive branch has acknowledged that the Constitution prohibits it from withholding appropriated funds to further the President's policies. Future Chief Justice William Rehnquist, writing in 1969 as the head of the OLC, explained that "[w]ith respect to the suggestion that the President has a constitutional power to decline to spend appropriated funds, we must conclude that existence of such a broad power is supported by neither reason nor precedent." Rehnquist Memo 309. Rehnquist wrote that although "[i]t may be argued that the spending of money is inherently an executive function, . . . the execution of any law is, by definition, an executive function, and it seems an anomalous proposition that because the Executive branch is bound to execute the laws, it is free to decline to execute them." *Id.* at 310.

Fifteen years later, future Chief Justice John Roberts reached a similar conclusion for the Reagan administration Office of White House Counsel. He wrote a memo seeking to "dampen any hopes that inherent constitutional impoundment authority may be invoked to achieve budget goals," warning that "[o]ur institutional vigilance with respect to the constitutional prerogatives of the presidency requires appropriate deference to the constitutional prerogatives of the other branches, and no area seems more clearly the province of Congress than the power of the purse." John G. Roberts, Jr., *Memorandum for Fred F. Fielding Re: Impoundment Authority* 1 (Aug. 15, 1985). The Reagan administration OLC later adopted Roberts's position in a formal advisory

11

opinion, declaring that "[t]here is no textual source in the Constitution for any inherent authority to impound." *The President's Veto Power*, 12 Op. O.L.C. 128, 167 (1988).

## II.  Plaintiffs' Separation-of-Powers and Spending Clause Claims Are Reviewable as Freestanding Constitutional Claims Under *Dalton v. Specter*.

As the above discussion makes clear, the Constitution's text, structure, and history all demonstrate that the executive branch has no constitutional power to unilaterally rescind appropriated funds in furtherance of the President's policy agenda.  These are "settled, bedrock principles of constitutional law."  *In re Aiken County*, 725 F.3d at 259 (Kavanaugh, J.).  And they are the core of Plaintiffs' separation-of-powers and Spending Clause claims.  Defendants' assertion that these claims "cannot be brought as independent constitutional claims" simply because the President's actions *also* violate the ICA, Dkt. No. 227 (MTD), at 13, misconstrues both the language from *Dalton v. Specter* upon which they rely and the nature of Plaintiffs' constitutional claims.

### A.  Defendants Overread *Dalton v. Specter*.

In *Dalton v. Specter*, a group of plaintiffs challenged the President's decision to close the Philadelphia Naval Shipyard pursuant to a 1990 statute governing base closures, asserting that the President "violated the terms of the [governing statute] by accepting procedurally flawed recommendations" from other executive branch officials regarding the shipyard's closure.  511 U.S. at 474.  The Court rejected the plaintiffs' effort to convert this alleged statutory violation into a constitutional violation.  It reasoned that the plaintiffs' constitutional claim was really just a challenge to the President's "exercise [of] discretion Congress ha[d] granted him" through the governing law.  *Id.* at 476.  And critically, that law did "not *at all* limit the President's discretion."  *Id.* (emphasis added).

12

In rejecting the plaintiffs' constitutional claim, the Supreme Court corrected a misperception by the court below: "[o]ur cases do not support the proposition that *every* action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." *Id.* at 472 (emphasis added). The Court noted that its prior decisions would not have distinguished between statutory and constitutional claims "[i]f *all* executive actions in excess of statutory authority were *ipso facto* unconstitutional." *Id.* (emphasis added). But the Court never suggested that *no* action by the President in excess of his statutory authority may *ever* violate the Constitution. And the Court's repeated inclusion of "*ipso facto*" and "necessarily" in its formulations demonstrate that this was intentional.

Indeed, *Dalton* makes clear that some executive actions in excess of statutory authority *do* give rise to actionable constitutional claims, including whenever the President "act[s] in violation of the Constitution," *id.* at 474, such as when he exercises a power not delegated to him, or one expressly delegated to another branch, *id.* at 473. In such instances, there is "a want of [Presidential] power," as opposed to "a mere excess or abuse of discretion in exerting a power given." *Id.* at 474 (alteration in original) (quoting *Dakota Cent. Tele. Co.*, 250 U.S. at 184).

Of course, a "want of [Presidential] power," *id.*, may exist when the President violates both the Constitution *and* a statute. The President's authority to act "must stem either from an act of Congress or from the Constitution itself," *Youngstown*, 343 U.S. at 585, so it is hardly surprising that separation-of-powers claims challenging presidential actions often require inquiry into statutory provisions to ascertain whether they authorize or foreclose those actions. But if *Dalton* means that equitable review of constitutional claims is unavailable whenever a plaintiff argues that statutory violations by executive officials implicate the separation of powers, it is difficult to see how plaintiffs could *ever* bring a separation-of-powers claim when a President

13

usurps a core congressional power and, in so doing, commits both statutory and constitutional violations. *Cf. Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324-29, 331-32 (2015) (holding that a law foreclosed review of statutory violations but still considering whether litigants could bring a viable constitutional claim).

To be sure, *Youngstown* was the rare case in which "no statutory authority was claimed" by the executive, as the Court noted in *Dalton*. *Dalton*, 511 U.S. at 473. Rather, the President claimed only constitutional authority to seize the country's steel mills in the face of a nationwide strike. *Youngstown*, 343 U.S. at 585-86. Given the conceded absence of any statutory authority in *Youngstown*, that decision—as the Court explained in *Dalton*—could not stand for the proposition "that an action taken by the President in excess of his statutory authority *necessarily* violates the Constitution." *Dalton*, 511 U.S. at 473 (emphasis added).

At the same time, *Youngstown* explicitly contemplated courts' adjudication of separation-of-powers claims alongside analysis of statutory violations arising out of the same set of facts. Indeed, in *Youngstown* itself, Justice Jackson analyzed the text of several relevant federal condemnation statutes and concluded that their policies were "inconsistent" with President Truman's seizure of the steel mills, putting the President's power at its lowest ebb. *Youngstown*, 343 U.S. at 639-40. Thus, by Defendants' account, the very claim in *Youngstown* would not be actionable as a constitutional claim.

Since *Youngstown*, the Supreme Court has confirmed that allegations of statutory violations do not foreclose review of separation-of-powers claims. For instance, in *Dames & Moore v. Regan*, 453 U.S. 654 (1981), the Court resolved the merits of a claim that the President and the Treasury Secretary went "beyond their statutory and constitutional powers." *Id.* at 667. Unlike in *Youngstown*, in *Dames & Moore* the President "purported to act under authority of"

14

two federal statutes, *id.* at 675, which the Court had to interpret to resolve the separation-of-powers claim, *id.* at 670-74. The presence of the statutory dispute did not, however, nullify the plaintiffs' freestanding constitutional claim. Although the Court ultimately resolved both the statutory dispute and the constitutional question in favor of the President, there was no question that the plaintiffs' separation-of-powers claim was judicially reviewable—the plaintiffs just lost on the merits. *Id.* at 674.

Likewise, in *Franklin v. Massachusetts*, 505 U.S. 788 (1992), the plaintiffs challenged the executive branch's method of counting overseas federal employees for the census, bringing claims "under both the APA and the Constitution." *Id.* at 796. The Court held that the APA claims were not viable, *id.* at 796-801, but also made explicit that this "d[id] not dispose of [the plaintiffs'] constitutional claims," *id.* at 801. Although the executive branch relied entirely on statutory authority, *id.* at 791-94, the Court resolved "[o]n the merits" the plaintiffs' claim "that the Secretary [of Commerce]'s allocation of overseas federal employees . . . violated the command of Article I, § 2, cl. 3." *Id.* at 803. Concluding that the Secretary's action was "consonant with . . . the text and history of the Constitution," the Court held that the "constitutional challenge fails on the merits." *Id.* at 806. Once again, reliance on statutory authority did not foreclose judicial review of a claim that the executive violated the Constitution.

The Ninth Circuit has also made clear that the presence of statutory violations does not foreclose review of constitutional claims challenging presidential usurpation of Congress's power. For instance, in *Murphy Co. v. Biden*, 65 F.4th 1122 (9th Cir. 2023), the Court held that where "the core of [the plaintiff's] claim—that the President violated separation of powers by directing the Secretary to act in contravention of a duly enacted law—could be considered constitutional," there was no ground for dismissal under *Dalton*. *Id.* at 1130; *see also Murphy*

15

*Co. v. Biden*, 144 S. Ct. 1111 (2024) (denying certiorari). Even more analogous, in a case involving the President's misuse of funds in violation of Congress's appropriations power and the governing appropriation statute, the Ninth Circuit held that *Dalton* did not foreclose a separation-of-powers claim, reasoning that "to the extent Defendants did not have statutory authority to reprogram the funds, they acted in violation of constitutional separation of powers principles because Defendants lack any background constitutional authority to appropriate funds." *Sierra Club I*, 929 F.3d at 696-97; *see also Sierra Club v. Trump*, 963 F.3d 874, 889-90 (9th Cir. 2020) ("*Sierra Club II*") (allegations that executive branch defendants "not only exceeded their delegated authority, but also violated an express constitutional prohibition" contained in the Appropriations Clause amounted to a reviewable constitutional claim), *vacated and remanded sub nom. Biden v. Sierra Club*, 142 S. Ct. 46 (2021).[2] Defendants barely mention these binding precedents, choosing instead to fixate on a non-binding D.C. Circuit decision.

Defendants' reading of *Dalton* boils down to an assertion that a plaintiff may only bring a constitutional claim if the President violates the Constitution without engaging in any arguable statutory violation. That borders on the absurd: the President could escape liability for a constitutional claim simply by pointing to some statutory provision that dubiously authorized his conduct, or by emphasizing Plaintiffs' allegations of a concurrent statutory violation arising out of the same conduct that also violated the Constitution. Indeed, that is precisely what Defendants attempt to do here—bootstrap the alleged statutory violation into a defense to the constitutional violation.

---

[2] The panel's decision in *Sierra Club II* was vacated by the Supreme Court after the change in administration, but the Court did not address the merits of the Ninth Circuit opinion. *See* 142 S. Ct. at 46 ("Motion of petitioners to vacate the judgment granted.").

16

**B. Defendants Contort Plaintiffs' Separation-of-Powers and Spending Clause Claims.**

Not only do Defendants misconstrue *Dalton*, but they also misunderstand the nature of Plaintiffs' separation-of-powers and Spending Clause claims. Unlike in *Dalton*, the claims here are not premised on the President exceeding some delegated discretionary authority. Rather, Plaintiffs allege that Defendants usurped Congress's power of the purse by threatening to withhold appropriated funds from jurisdictions that refuse to implement the President's immigration agenda.

To be sure, Congress *could* pass an appropriations statute that used explicit language to delegate authority to the executive branch to condition funding in the manner that President Trump has attempted here. But Congress has not done so, and Defendants—to their credit—do not even suggest as much. Thus, *Youngstown*, not *Dalton*, is the closer comparison to this case. Like *Youngstown*, this case "involve[s] the conceded *absence* of *any* statutory authority" to undertake the challenged action. *Dalton*, 511 U.S. at 473 (emphases in original) (describing *Youngstown*). Where Plaintiffs allege that Defendants "did not have statutory authority" *or* "background constitutional authority" to condition federal funding on implementation of President Trump's immigration agenda, Plaintiffs' claim is "fundamentally a constitutional one." *Sierra Club I*, 929 F.3d at 696-97.

Defendants' invocation of the ICA does not help their argument. Essentially, Defendants seem to assert that they cannot be held liable under the Constitution for usurping Congress's spending power because the same conduct *also* gives rise to allegations that they violated the ICA. *See* Dkt. No. 227 (MTD), at 13. That is fundamentally wrong, and to the extent that the D.C. Circuit's divided decision in *Global Health Council* could be read to suggest otherwise, it is wrong too. *See Glob. Health Council v. Trump*, No. 25-5097, 2025 WL 2480618, at *29 (D.C.

17

Cir. Aug. 28, 2025) (Pan, J., dissenting) (explaining that "the Impoundment Control Act [was] a sideshow" to the plaintiffs' freestanding separation-of-powers claim).

Plaintiffs' separation-of-powers and Spending Clause claims in this case are not premised on an ICA violation. Plaintiffs do allege as part of their Administrative Procedure Act (APA) claim that Defendants violated the ICA by threatening to impound federal funds without following the ICA's procedures. *See* Dkt. No. 193 (SAC) ¶ 762. But Plaintiffs' separation-of-powers and Spending Clause claims are different—they assert that Defendants usurped Congress's power of the purse by threatening to unilaterally withhold congressionally appropriated funds. Those claims could be brought even if the ICA had never been enacted. As discussed above, although the ICA implemented procedures to "control" impoundments, the principle that unilateral executive impoundments violate the separation of powers pre-dated the ICA by over a century.

To the extent that Defendants suggest that Plaintiffs' separation-of-powers and Spending Clause claims are merely claims that Defendants acted *in excess* of some impoundment authority delegated by the ICA, that is equally wrong. The ICA does not delegate *any* impoundment authority to the President. The law was enacted to "control"—not facilitate—impoundment of funds. The ICA aimed to reduce litigation over impoundments by creating a procedure for the President to ask Congress to rescind appropriations, but it did not leave harmed parties in a worse position than before its enactment—*i.e.*, without a remedy if the President violates the Constitution by unilaterally impounding funds. *See, e.g.*, S. Rep. No. 93-688, at 73 (ICA is "consistent with recent decisions by federal courts").

Put simply, Plaintiffs allege that by seizing the authority to make spending decisions for himself, President Trump has encroached on Congress's exclusive power of the purse. Such

18

encroachment is precisely what the separation of powers guards against—"the danger of one branch's aggrandizing its power at the expense of another branch." *Freytag v. Comm'r*, 501 U.S. 868, 878 (1991). That the executive branch may have simultaneously engaged in statutory violations as part of this brazen power grab does not make Plaintiffs' separation-of-powers and Spending Clause claims any less constitutional ones, and it certainly does not make them unreviewable. Defendants—not *Dalton*—concocted that rule.

## CONCLUSION

For the foregoing reasons, this Court should deny Defendants' Motion to Dismiss.

Dated:  October 7, 2025                Respectfully submitted,

*/s/ Elizabeth B. Wydra*
Elizabeth B. Wydra (Bar No. 218200)
Brianne J. Gorod
Brian R. Frazelle
Miriam Becker-Cohen
Nina Henry
Constitutional Accountability Center
1730 Rhode Island Ave. NW, Suite 1200
Washington, D.C. 20036
(202) 296-6889
elizabeth@theusconstitution.org

*Counsel for Amicus Curiae*