1

2

3

4

5                    UNITED STATES DISTRICT COURT

6                  NORTHERN DISTRICT OF CALIFORNIA

7

8   CITY AND COUNTY OF SAN              Case No.  25-cv-01350-WHO
    FRANCISCO, et al.,
9
                    Plaintiffs,
10                                      **ORDER DENYING DEFENDANTS'**
          v.                            **MOTION TO DISMISS**
11
    DONALD J. TRUMP, et al.,             Re: Dkt. Nos. 227, 231, 238, 240
12
                    Defendants.
13

14        Defendants[1] move to dismiss plaintiffs'[2] Second Amended Complaint ("SAC") pursuant to

15   _____

16   [1] Defendants are Donald J. Trump ("Trump"), the United States of America, Pamela Bondi
     ("Bondi"), Emil Bove ("Bove"), the United States Department of Justice, Kristi Noem ("Noem"),
17   the Department of Homeland Security ("DHS"), Russell Vought ("Vought"), and the United
     States Office of Management and Budget ("OMB").
18
     [2] Plaintiffs are City and County of San Francisco ("San Francisco"), County of Santa Clara
19   ("Santa Clara"), City of Portland ("Portland"), Martin Luther King, Jr. County ("King County"),
     City of New Haven ("New Haven"), City of Oakland ("Oakland"), City of Emeryville
20   ("Emeryville"), City of San Jose ("San Jose"), City of San Diego ("San Diego"), City of
     Sacramento ("Sacramento"), City of Santa Cruz ("Santa Cruz"), County of Monterey
21   ("Monterey"), City of Seattle ("Seattle"), City of Minneapolis ("Minneapolis"), City of St. Paul
     ("St. Paul"), City of Santa Fe ("Santa Fe"), County of Alameda ("Alameda County"), City of
22   Albany ("Albany"), City of Albuquerque ("Albuquerque"), County of Allegheny ("Allegheny
     County"), City of Baltimore ("Baltimore"), City of Bend ("Bend"), City of Benicia ("Benicia"),
23   City of Berkeley ("Berkeley"), City of Boston ("Boston"), City of Cambridge ("Cambridge"), City
     of Cathedral City ("Cathedral City"), City of Chicago ("Chicago"), City of Columbus
24   ("Columbus"), City of Culver City ("Culver City"), County of Dane ("Dane County"), City and
     County of Denver ("Denver"), City of Healdsburg ("Healdsburg"), County of Hennepin
25   ("Hennepin County"), City of Los Angeles ("Los Angeles"), County of Marin ("Marin County"),
     City of Menlo Park ("Menlo Park"), Multnomah County, County of Pacifica ("Pacifica"), City of
26   Palo Alto ("Palo Alto"), City of Petaluma ("Petaluma"), Pierce County, City of Richmond
     ("Richmond"), City of Rochester ("Rochester"), City of Rohnert Park ("Rohnert Park"), County of
27   San Mateo ("San Mateo County"), City of Santa Rosa ("Santa Rosa"), County of Sonoma
     ("Sonoma County"), City of Watsonville ("Watsonville"), and City of Wilsonville
28   ("Wilsonville").

Federal Rules of Civil Procedure 12(b)(1) and (6).  Their motion raises two issues.  First, defendants challenge plaintiffs' standing and the ripeness of their claims.  I rejected these arguments when granting plaintiffs' motion for preliminary injunction; defendants provide no additional basis to suggest this position should change.[3]  Second, defendants maintain that plaintiffs have failed to adequately plead their separation of powers, Spending Clause, Fifth Amendment vagueness, and Administrative Procedure Act ("APA") claims.  Those claims are well supported in the SAC.  For the additional reasons set forth below, defendants' motion to dismiss is DENIED.

## BACKGROUND

My prior orders describe the background of this case and the facts on which the claims are based.  I will only add here the procedural history of the pending motion.

On July 8, 2025, plaintiffs filed a motion for leave to file a Second Amended Complaint ("SAC").  *See* Plaintiffs' Notice of Motion and Motion for Leave [Dkt. No. 151].  The purpose of the SAC was to "name[] additional plaintiffs, add[] allegations as to those plaintiffs, add[] two defendants, and add[] allegations regarding Defendants' actions since the First Amended Complaint."  *Id.* at 1.  I granted plaintiffs' request to amend on August 5, 2025.  *See* Order on Motion to Amend and Motion to Expedite [Dkt. No. 186].  Plaintiffs filed their SAC two days later.  *See* Second Amended Complaint ("SAC") [Dkt. No. 193].

On August 26, 2025, defendants moved to dismiss plaintiffs' SAC.  *See* Motion to Dismiss the Second Amended Complaint ("SAC") [Dkt. No. 227].  Plaintiffs filed an opposition on September 30, 2025.  *See* Opposition to Defendants' Motion to Dismiss ("Oppo.") [Dkt. No. 231].

---

[3] I refer throughout the Order to previous findings I made when granting plaintiffs' motions for preliminary injunction on May 3, 2025, *see* Dkt. No. 126, and August 22, 2025, *see* Dkt. No. 225.  While the standards for granting a motion to dismiss and a motion for preliminary injunction are different, the "standard for demonstrating a 'likelihood of success on the merits,' let alone a 'clear or substantial' showing of such entitlement, is far more demanding than the plausibility standard applied to survive dismissal for the failure to state a claim at the pleading stage."  *Benitez v. King*, 298 F. Supp. 3d 530, 536 (W.D.N.Y. 2018).  Accordingly, to the extent I previously found that certain claims survived the heightened preliminary injunction standard, I rely on that analysis in concluding that plaintiffs' SAC is adequately pleaded, unless defendants provide an argument that suggests otherwise.

United States District Court
Northern District of California

On October 7, 2025, the Constitutional Accountability Center ("CAC") filed a motion for leave to file an *amicus curiae* in opposition to defendants' motion to dismiss. *See* Motion of Constitutional Accountability Center for Leave to File *Amicus Curiae* Brief ("CAC Brief") [Dkt. No. 238].[4] Defendants filed their reply on October 16, 2025. *See* Reply in Support of Motion to Dismiss ("Repl.") [Dkt. No. 240]. I did not hold oral argument on this matter pursuant to Civil Local Rule 7-1(b). *See* Dkt. No. 241.

## LEGAL STANDARD

**12(b)(1)**

A motion to dismiss filed pursuant to Rule 12(b)(1) is a challenge to the court's subject matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1). "Federal courts are courts of limited jurisdiction," and it is "presumed that a cause lies outside this limited jurisdiction." *Kokkonen v. Guardian Life Ins. of Am.*, 511 U.S. 375, 377 (1994). The party invoking the jurisdiction of the federal court bears the burden of establishing that the court has the requisite subject matter jurisdiction to grant the relief requested. *Id.*

A challenge pursuant to Rule 12(b)(1) may be facial or factual. *See Safe Air Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). In a facial attack, the jurisdictional challenge is confined to the allegations pled in the complaint. *See Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004). The challenger asserts that the allegations in the complaint are insufficient "on their face" to invoke federal jurisdiction. *See Safe Air*, 373 F.3d at 1039. To resolve this challenge, the court assumes that the allegations in the complaint are true and draws all reasonable inference in favor of the party opposing dismissal. *See Wolfe*, 392 F.3d at 362.

"By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Safe Air*, 373 F.3d at 1039. To resolve this challenge, the court "need not presume the truthfulness of the plaintiff's allegations." *Id.*

---

[4] The CAC's motion for leave is GRANTED. District courts may "exercise[] great liberality" in admitting *amicus* briefs. *See Woodfin Suite Hotels, LLC v. City of Emeryville*, No. 06-1254, 2007 WL 81911, at *3 (N.D. Cal. Jan. 9, 2007). I agree with the CAC that its brief is "useful or otherwise desirable to the court," particularly with respect to discussing the government's concerns regarding the separation of powers doctrine. *Id.*

United States District Court
Northern District of California

United States District Court
Northern District of California

1    (citation omitted).  Instead, the court "may review evidence beyond the complaint without

2    converting the motion to dismiss into a motion for summary judgment." *Id.* (citations omitted).

3    "Once the moving party has converted the motion to dismiss into a factual motion by presenting

4    affidavits or other evidence properly brought before the court, the party opposing the motion must

5    furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter

6    jurisdiction." *Id.* (quoting *Savage v. Glendale Union High Sch. Dist. No. 205*, 343 F.3d 1036,

7    1040 n.2 (9th Cir. 2003)).

8    **12(b)(6)**

9            Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint

10    if it fails to state a claim upon which relief can be granted.  To survive a Rule 12(b)(6) motion to

11    dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its

12    face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible when

13    the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant

14    is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation

15    omitted).  There must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.*

16    While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts

17    sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570.

18            In deciding whether the plaintiff has stated a claim upon which relief can be granted, the

19    Court accepts the plaintiff's allegations as true and draws all reasonable inferences in favor of the

20    plaintiff. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987).  However, the court

21    is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of

22    fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir.

23    2008).

24            If the court dismisses the complaint, it "should grant leave to amend even if no request to

25    amend the pleading was made, unless it determines that the pleading could not possibly be cured

26    by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000).  In making

27    this determination, the court should consider factors such as "the presence or absence of undue

28    delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous amendments,

1    undue prejudice to the opposing party and futility of the proposed amendment." *Moore v. Kayport*

2    *Package Express*, 885 F.2d 531, 538 (9th Cir. 1989).

3                                    **DISCUSSION**

4    **I.      ARTICLE III JUSTICIABILITY**

5            Defendants first move to dismiss plaintiffs' SAC under Federal Rule 12(b)(1), asserting

6    that plaintiffs' claims are non-justiciable.  Specifically, they argue that plaintiffs (1) have not

7    established an injury-in-fact; (2) lack pre-enforcement standing; and (3) cannot state a Fifth

8    Amendment claim because it is not ripe.  I disagree.

9            **A.      Injury-in-Fact**

10           Plaintiffs have standing under Article III of the United States Constitution if (1) they have

11   suffered an injury-in-fact or face an imminent injury; (2) their injury is fairly traceable to the

12   defendant's conduct; and (3) a favorable decision would likely redress the injury.  *Lujan v.*

13   *Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  An injury-in-fact must be concrete,

14   particularized, and imminent.  *Spokeo, Inc. v. Robins*, 517 U.S. 330, 339 (2016). An injury is

15   concrete when it has a "close relationship" to a harm "traditionally" recognized as providing a

16   basis for suit. *TransUnion LLC v. Ramirez*, 514 U.S. 413, 417 (2021).  An injury is particularized

17   if it affects the plaintiff in a "personal and individual way." *Spokeo*, 578 U.S. at 339 (internal

18   citation omitted).  And an injury is actual or imminent if it has already occurred or there is a

19   substantial risk that it will occur.  *See Los Angeles v. Lyons*, 461 U.S. 95, 105-06 (1983).

20   Plaintiffs must make a separate showing for each form of relief requested.  *Id.* at 111.

21           Defendants claim that I previously found plaintiffs "failed to establish an injury in their

22   FAC," and that the same issue remains in the SAC.  *See* Mot. at 4; *see also* Further Order

23   Regarding Preliminary Injunction ("May 3 Order") [Dkt. No. 126] at 32 ("the Cities and Counties

24   have not yet suffered a loss of funds or other enforcement action under the 2025 Executive Orders,

25   . . .").  That is incorrect.  My prior Order concluded that they did, in fact, establish an injury-in-

26   fact in their FAC—plaintiffs showed that a directive to halt federal funds to sanctuary jurisdictions

27   would "irreparably harm their budgets and, by extension, their abilities to govern and provide

28

United States District Court
Northern District of California

1    services to the public." *See id.* at 40.[5]   That is the same injury plaintiffs assert in their SAC. *See*

2    SAC ¶¶ 454–687 (outlining the budgetary harms each plaintiff faces).

3           Even so, defendants' remaining injury-in-fact arguments are futile.  Defendants assert that

4    the Executive Orders "merely provide[] policy directives to federal agencies," which does not

5    constitute the type of "future [agency] action" necessary to establish an imminent injury-in-fact.

6    *See* Mot. at 4.  My May 3 Order addressed and refuted this argument, concluding that the

7    "uncertainty about whether [the policy directives] *will* be enforced" was enough to establish an

8    injury-in-fact.  *See* May 3 Order at 41 (emphasis in original).  Here, plaintiffs' injuries are not

9    "contingent upon many layers of hypothetical and contradictory future actions" as defendants

10   suggest.  Mot at 5.  Instead, the "text of the challenged provisions . . . requires compliance" and

11   "unambiguously command[s] action."  May 3 Order at 35, 43 (quoting *City & Cnty. of S.F. v.*

12   *Trump*, 897 F.3d 1225, 1239 (9th Cir. 2018)).  Because their alleged injuries are concrete,

13   particularized, and imminent, plaintiffs have established an injury-in-fact for purposes of Article

14   III standing.  *See Spokeo*, 517 U.S. at 339.

15          **B.    Pre-Enforcement Standing**

16          Defendants also encourage me to revisit my previous Order concluding that plaintiffs

17   established pre-enforcement standing as, in their view, the "challenged Executive Orders do not

18   proscribe conduct, let alone conduct with an arguably constitutional interest."  Mot. at 5 n.3; *see*

19   May 3 Order at 32–43 (discussing pre-enforcement standing).  Instead, defendants believe that the

20   Executive Orders "direct agencies to engage in deliberative processes regarding their authority to

21   add conditions to the disbursement of federal funds," which they argue is factually distinguishable

22   from prior Supreme Court precedent in *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S.

23   289, 298 (1979); *Steffel v. Thompson*, 415 U.S. 415, 454–55 (1974); *Virginia v. Am. Booksellers,*

24   *Inc.*, 484 U.S. 383, 392 (1988).

25          My mind is unchanged.  Defendants have not provided any new arguments showing that

26   the SAC is materially different from the original complaint regarding pre-enforcement standing:

27   _____

28   [5] The sentence defendants cite in the May 3 Order misconstrues what I wrote, which set up a
     discussion of defendants' pre-enforcement standing arguments.  *See* May 3 Order at 32.

United States District Court
Northern District of California

they merely assert that the SAC "continues to premise their purported injury on budgetary uncertainty, as opposed to funding impact," an argument both I and the Ninth Circuit have rejected in previous cases. Mot. at 16; *see* May 3 Order at 41 ("The 2025 Executive Orders need not even be actively enforced to cause the Cities and Counties irreparable harm. Uncertainty about whether they *will* be enforced is already harming them."); *City and Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1235–36 (9th Cir. 2018) ("Counties [with] policies in place that arguably would qualify for grant withdrawal under the Executive Order, with potentially devastating financial consequences . . . demonstrate a likely 'loss of funds promised under federal law'" to establish standing).

Defendants' reference to Supreme Court precedent also falls flat. Defendants cite to *Babbit*, *Steffel*, and *American Booksellers* "to distinguish this case from those which involved instances of *proscribing* specific conduct . . . [and to show that this] proscription element of pre-enforcement standing is missing from Plaintiffs' case." Repl. at 2 (emphasis in original). But as I previously noted in granting plaintiffs' preliminary injunction, where "it is not fully clear what conduct is proscribed by a statute, a well-founded fear of enforcement may be based in part on a plaintiff's reasonable interpretation of what conduct is proscribed . . . even if a narrower reading of the statute is available." May 3 Order at 32 (citing *Am Booksellers Ass'n*, 484 U.S. at 392, 397). Here, as was the case at the preliminary injunction stage, "[t]he Cities and Counties' interpretation of the 2025 Executive Orders as proscribing their policies is reasonable." *Id.* at 32–33. Plaintiffs articulate that President Trump tried throughout his first term to "threaten and coerce municipalities like Plaintiffs that limit cooperation with federal civil immigration enforcement." SAC ¶¶ 324–30. They then list numerous instances where "Trump administration officials have . . . publicly confirmed the Administration's intent to go after localities they deem to be 'sanctuary' jurisdictions" during President Trump's second term. *Id.* ¶ 346. These facts plausibly suggest that plaintiffs have a "well-founded fear of enforcement" that confers upon them pre-enforcement standing. *See* May 3 Order at 32.[6]

---

[6] As described in detail in Section II.D, *supra*, plaintiffs also establish constitutional injury under the Tenth Amendment. As plaintiffs correctly suggest, the SAC is rife with allegations that the Executive Orders violate the Tenth Amendment by coercing plaintiffs to "abandon their local policies limiting cooperation with federal civil immigration enforcement." Oppo. at 8; SAC ¶¶

United States District Court
Northern District of California

1     Defendants' attempt to distinguish the Ninth Circuit's holding on pre-enforcement

2 standing in *City and County of San Francisco* is similarly unpersuasive. *See* 897 F.3d 1325–26

3 (discussing standing). Defendants maintain that the Executive Orders in this case are

4 fundamentally "distinct from those previously considered," as the government now "leave[s] the

5 evaluation of federal funding decisions open-ended" and at agency discretion. *See* Mot. at 6–7. In

6 their view, unlike the 2017 Executive Order—which expressly conditioned federal funding on

7 compliance with 8 U.S.C. § 1373 and thus made plaintiffs' inability to comply readily apparent—

8 the 2025 Executive Orders do not explicitly tie funding to § 1373. *See id.* From this, defendants

9 conclude that plaintiffs lack the knowledge and fear of enforcement they had in 2017 to support

10 standing. *See id.* But given the administration's conduct during the past year, this argument is

11 particularly hard to credit. *See* Oppo. at 8-9. Indeed, "[a]dditional agency directives, and

12 communications from the Executive Branch, make it clear that the term ["sanctuary" jurisdiction]

13 is meant to encompass jurisdictions, like the Cities and Counties, that limit the use of local

14 resources to assist in federal immigration enforcement. This is consistent with how the term was

15 understood in 2017." May 3 Order at 3; *see* SAC ¶¶ 443–53. I find no reason to depart from this

16 logic; defendants have not provided a sufficient argument to suggest otherwise. *See* May 3 Order

17 at 42 (finding the Ninth Circuit has "already ruled that an Executive Order that is nearly identical

18 to those challenged today, accompanied by fewer credible threats of enforcement, created a

19 sufficient threat of irreparable [budgetary] harm to satisfy pre-enforcement standing

20 requirements.") (citing *City & Cnty. of S.F.*, 897 F.3d at 1225).

21     Defendants' reference to the savings clauses in the Executive Orders and Bondi and Noem

22 Directives also does not vitiate plaintiffs' pre-enforcement standing. *See* Repl. at 2. As I describe

23 in detail below, that the Executive Orders and Directives call for agency review and that all action

24 be taken "consistent with applicable law" is immaterial. The savings clauses in question "do[] not

25 insulate [the Executive Orders] from judicial review any more than the inclusion of the phrase

26 'consistent with law' in EO 13,768 [in 2017] insulated *it* from judicial review." May 3 Order at

27

28 401–13. This certainly also raises support for pre-enforcement standing.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    47–48 (citing *City & Cnty. of S.F.*, 897 F.3d at 1239–40).  Nor is it persuasive that the agencies

2    purport to have the ability to review.  As plaintiffs correctly argue, such argument "misses the

3    point of *pre*-enforcement standing [and] fails to account for the fact that some Plaintiffs may have

4    been deterred from applying for certain grants prior to the Court's preliminary injunction."  Oppo.

5    at 9 (emphasis in original).

6    Nothing has meaningfully changed in defendants' standing arguments since I last decided

7    the question of pre-enforcement standing.  I decline to depart from my previous holdings and

8    conclude that plaintiffs have sufficiently alleged pre-enforcement standing for purposes of Article

9    III jurisdiction.

10    **C.    Ripeness**

11    Finally, defendants challenge the ripeness of plaintiffs' Fifth Amendment vagueness claim,

12    as they believe "there are insufficient facts [in the SAC] to determine the vagueness of a law as

13    applied."  Mot. at 8–9.  They argue that because plaintiffs allege no deprivation of First

14    Amendment rights, they are limited to an as-applied vagueness challenge.  *Id.*  And because

15    plaintiffs "simply speculate as to what funding may be impacted, SAC ¶¶ 454–687, in what

16    amount, *id.*, and in what jurisdiction, *id.*," defendants conclude any vagueness challenge is

17    "inherently speculative, and therefore not ripe for review."  *Id.* at 9; Repl. at 3.

18    I disagree.  Plaintiffs plausibly allege that they have a viable Fifth Amendment due process

19    claim that may proceed as a facial challenge.  As explained in detail in Section II.A, *supra*, the

20    2025 Executive Orders and the Bondi and Noem Directives encompass the kind of "expansive,

21    standardless language" that "creates huge potential for arbitrary and discriminatory enforcement."

22    *United States v. Williams*, 553 U.S. 285, 304 (2008); May 3 Order at 55.  The lack of clarity of

23    key terms in the Executive Orders and the Directives, as well as how these Orders may be applied

24    against plaintiffs or *any* jurisdiction that may run against these policies, certainly seems to me to

25    raise concerns that appear viable for a facial vagueness challenge.

26    My inquiry does not end there.  Plaintiffs also raise as-applied challenges to the Executive

27    Orders.  Those claims are certainly ripe.  As I have discussed in the May 3 Order, plaintiffs have

28    alleged facts identifying the actual and concrete sovereign injuries arising from the 2025

9

Executive Orders and Directives because "their implementation is causing present budgetary uncertainty." May 3 Order at 45. Plaintiffs have shown palpable fear of loss of federal funding for being a "sanctuary" jurisdiction, despite the Executive Orders and Directives failing to provide clear, objective standards for compliance. *See* Oppo. at 10. They have also shown a "genuine" concern of prosecution or enforcement of the Executive Orders. *See* May 3 Order at 44; *City & Cnty. of S.F.*, 897 F.3d at 1236–37. Such potential for harm and high likelihood of enforcement certainly make plaintiffs' Fifth Amendment claim ripe for review.

## II.    MERITS OF PLAINTIFFS' CLAIMS

### A.    Facial Challenge

Defendants argue that the SAC must be dismissed because plaintiffs failed to plead that the Executive Orders are facially unconstitutional. *See* Mot. at 9–11. Their central argument is that each Executive Order contains a savings clause directing the targeted agencies to take only "appropriate lawful actions," and those words by themselves suggest that the Orders are not unconstitutional "in all applications." *Id.* at 9–10 (citing *United States v. Salerno*, 481 U.S. 739, 745 (1987)). Additionally, they contend that the plaintiffs "attempt to make the required showing of blanket unconstitutionality across every grant program administered by the defendant agencies." *Id.* at 10. Defendants claim that the Executive Orders "represent the President instructing subordinate agencies to evaluate certain funding, to the extent they have legal authority to do so," which is "plainly lawful." *Id.* at 11.

I am skeptical. First, the Ninth Circuit has clarified in *Guerrero v. Whitaker*, 908 F.3d 541 (9th Cir. 2018), that the *Salerno* test no longer applies in this context. Prior to *Guerrero*, plaintiffs bringing a facial challenge for vagueness were required to "establish that *no* set of circumstances exist[ed] under which the statute would be valid." *Salerno*, 481 U.S. at 745 (emphasis added); *see Helicopter for Agriculture v. Cnty. of Napa*, 384 F. Supp. 3d 1035, 1039 (N.D. Cal. 2019) (Alsup, J.). In other words, under the *Salerno* test, defendants could raise *any* plausibly legal application of a statute—even if that were not how the statute would conceivably be interpreted—to defeat a facial vagueness challenge. *Id.* In *Guerrero*, the Ninth Circuit expressly rejected this "no set of circumstances" test in the void for vagueness context. *See* 908 F.3d at 544; *Helicopter for*

United States District Court
Northern District of California

United States District Court
Northern District of California

*Agriculture*, 384 F. Supp. 3d at 1039.  The court expressed concern that the *Salerno* test allowed for some clearly vague statutes to "survive[] a facial vagueness challenge merely because some conduct clearly falls within the statute's scope."  *Guerrero*, 908 F.3d at 544 (citing *Sessions v. Dimaya*, 584 U.S. 148 (2018)); *see Helicopters for Agriculture*, 384 F. Supp. 3d at 1039 ("Our court of appeals [in *Guerrero*] lowered the burden for parties, like plaintiffs, that bring facial void for vagueness challenges as the government cannot defeat challenges by simply offering a single example where a law could be clearly applied.").  Accordingly, to adequately plead a facial vagueness challenge, plaintiffs need not show that the law is invalid in *every* single application to survive.

Defendants also rely heavily on *Building and Construction Trades Department, AFL-CIO v. Allbaugh*, 295 F.3d 28 (D.C. Cir. 2002), to support its claim that the SAC is inadequately pleaded.  That reliance is misplaced.  In *Allbaugh*, the D.C. Circuit considered whether Executive Order 13,202—which provided that "[t]o the extent permitted by law," no federal agency or construction manager could "[r]equire or prohibit bidders, offerors, contractors, or subcontractors to enter into or adhere to agreements with one or more labor organizations, on the same or other related project(s)"—was valid.  *Id.* at 30.  Plaintiffs challenged the Order, claiming that an agency may ultimately "try to give effect to the Executive Order when to do so is inconsistent with the relevant funding statute."  *Id.* at 33.  The court concluded that the "mere possibility that some agency might make a legally suspect decision to award a contract or to deny funding for a project does not justify an injunction against enforcement of a policy that, so far as the present record reveals, is above suspicion in the ordinary course of administration."  *Id.*

This case is different.  Unlike in *Allbaugh*, where the Order merely prevented agencies from "[r]equir[ing] or prohibit[ing]" the labor agreements, here, plaintiffs allege that the Executive Orders in question "compel" sanctuary jurisdictions into allegedly unlawful actions.  *Id.* at 30; *see* SAC ¶¶ 333–34, 348.  And, as explained in previous orders, *Allbaugh* is distinguishable because the plaintiffs "merely speculated that an agency 'may' try to give it effect, when to do so would be unlawful."  *See* May 3 Order at 48.  In this case, plaintiffs' fears are not speculative and reasonably stem from the language of the orders as well as the government's "actions and

1    statements since their issuance." *Id.* That the Executive Orders contain savings clauses "does not

2    insulate them from judicial review" in cases like this, where the "clear and specific language" of

3    the Order "override[s]" them. *Id.* at 47–48; *see City & Cnty. of S.F.*, 897 F.3d at 1239–40.

4          Turning to first principles, plaintiffs have adequately pleaded a facial challenge to the

5    Executive Orders. As *Guerrero* suggests, that the Executive Orders contain savings clauses

6    limiting them to "lawful" applications does not insulate the government from a facial vagueness

7    challenge. 908 F.3d at 544; *see* May 3 Order at 47–48. That argument has been squarely rejected

8    in similar contexts by the Ninth Circuit. *See City & Cnty. of S.F.*, 897 F.3d at 1239–40 (finding

9    that the phrase "consistent with law" in Executive Order 13,768 did not preclude it from judicial

10   review).[7] And, as I explain in further detail below, plaintiffs have sufficiently alleged that the

11   Executive Orders—"reinforced by the Government's actions and statements since their

12   issuance"—demonstrate the government's intent to withhold all funds from those cities and

13   counties deemed "sanctuary" jurisdictions. May 3 Order at 48. That is enough for plaintiffs'

14   claims to survive at this stage. Their facial vagueness challenges may proceed.

15         **B.**      **Separation of Powers**

16         "Under the principle of the Separation of Powers . . . the Executive Branch may not refuse

17   to disperse federal grants already allocated by Congress to sanctuary jurisdictions without

18   authorization by Congress." May 3 Order at 46 (citing *Cnty. of Santa Clara v. Trump*, 250 F.

19   Supp. 3d 497, 530–31 (N.D. Cal. 2017); *South Dakota v. Dole*, 483 U.S. 203, 206 (1987)). The

20   President also may not "repeal[] or amend[] parts of duly enacted statutes" after they become law.

21   *Clinton v. City of New York*, 524 U.S. 417, 439 (1998). Once a bill becomes law, the President

22   becomes obligated to "take Care that the Law be faithfully executed." U.S. Const. art. II, § 3, cl.

23   5. "Where Congress has failed to give the President discretion in allocating funds, the President

United States District Court

Northern District of California

---

24

25   [7] Defendants resist the analogy between the "consistent with law" savings clause in *City and County of San Francisco* and the "appropriate lawful actions" clause in this case. *See* Repl. at 7.

26   In their view, the former orders "directly ordered agency heads to take action that the Court found could never be found to be in accordance with law"; here, however, the Executive Orders do *not*

27   make such orders and instead "ask the agency heads to engage in deliberative processes regarding their authority to add conditions to the disbursement of federal funds." *Id.* I have rejected this

28   argument in my previous orders, *see* May 3 Order at 57, 58 n.10, and I decline to deviate from my original conclusion. Defendants have made no argument suggesting this analogy is erroneous.

1    has no constitutional authority to withhold such funds and violates his obligation to faithfully

2    execute the laws duly enacted by Congress if he does so." May 3 Order at 46 (citing *City of New*

3    *York*, 524 U.S. at 439; U.S. Const. art. I, § 8, cl. 1).

4          Defendants maintain that the SAC fails to adequately state a claim that the Executive

5    Orders and Directives violate the separation of powers doctrine. Mot. at 11. To that end, they

6    make two arguments. First, they argue that Supreme Court precedent precludes any independent

7    separation of powers claims when rooted in allegations that the President violated the

8    Impoundment Control Act of 1974 ("ICA"). *Id.* at 12–13. Second, even if the separation of

9    powers claims can be brought as an independent constitutional claim, defendants argue that

10   plaintiffs fail to show how the Directives freeze the distribution of already-appropriated funds or

11   unilaterally impose conditions on all federal funds without Congressional authorization. *Id.* at 13–

12   18. I address and reject each argument in turn.

13                    **1.      *Dalton v. Specter***

14         Defendants first contend that the Supreme Court's decision in *Dalton v. Specter*, 511 U.S.

15   462 (1994), renders plaintiffs' separation of powers claims inadmissible. Mot. at 12. In *Dalton*,

16   the plaintiffs "sought to enjoin the Sectary of Defense . . . from carrying out a decision by the

17   President to close the Philadelphia Naval Shipyard" pursuant to the Defense Base Closure and

18   Realignment Act of 1990. 511 U.S. at 464. The plaintiffs sought relief under the APA, alleging

19   that the Secretary "violated substantive and procedural requirements of the 1990 Act in

20   recommending closure of the . . . [s]hipyard." *Id.* at 466. The Third Circuit found that "judicial

21   review of the decision was available to ensure that various participants in the selection process had

22   complied with procedural mandates specified by Congress." *Id.* at 464. The Supreme Court

23   disagreed, holding that "claims simply alleging that the President has exceeded his statutory

24   authority are not 'constitutional' claims, subject to judicial review." *Id.* at 473. In other words,

25   where a "statute, such as the 1990 Act, commits decisionmaking to the discretion of the President,

26   judicial review of the President's decision is not available." *Id.* at 477.

27         Defendants also point out that a recent D.C. Circuit opinion, *Global Health Council v.*

28   *Trump*, reaffirms the principle that plaintiffs are "foreclosed by *Dalton* . . . from asserting a non-

United States District Court
Northern District of California

13

statutory right to vindicate separation-of-powers principles."  Mot. at 12; *see* No. 25-5097, 2025

WL 2326021 (D.C. Cir. Aug. 13, 2025), *amended and superseded*, 2025 WL 2480618 (D.C. Cir.

Aug. 28, 2025).  *Global Health Council* concerned President Trump's executive order that

directed the "State Department and U.S. Agency for International Development (USAID) to freeze

foreign aid spending," a similar question about the scope of Presidential authority.  2025 WL

2326021 at *1.  Aid grantees and associations sued under the APA and the U.S. Constitution.  *Id.*

Applying *Dalton*, the court concluded that the grantees "lacked a cause of action" to press their

non-statutoryclaims, as APA review was precluded by the ICA.  *Id.* at *9 n.15.

Analogizing to *Dalton* and *Global Health Council*, defendants argue that plaintiffs' claim

"is a statutory one: The President is said to have violated the terms of the ICA by issuing

Executive Orders that—according to Plaintiffs—in effect withhold already appropriated federal

funds without following the procedures set forth in the ICA."  Mot. at 13.  Defendants conclude

that the "separation-of-powers and spending clause claims cannot be brought as independent

constitutional claims."  *Id.*

Plaintiffs respond that defendants "misconstrue [their] claims," and even so, "ignore

controlling Ninth Circuit precedent."  Oppo. at 12.  To start, they maintain that *Dalton* and *Global*

*Health Council* are inapposite, as their separation of powers and spending clause claims "do not

turn on whether Defendants complied with the procedures of the ICA."  *Id.*  "Indeed," they argue,

"Congress has enacted no statute that would permit Defendants to do what they have done here—

threaten wholesale defunding of 'sanctuary' jurisdictions if those jurisdictions do not abandon

their local policies."  *Id.* at 13.  Rather, plaintiffs claim that the Executive Orders violated

separation of powers principles by "purporting to legislate categorical immigration enforcement

conditions on federal funding in the absence of any Congressional authorization for such

conditions."  *Id.* (citing SAC ¶¶ 419–21, 703–13).

Additionally, plaintiffs claim that defendants ignore controlling Ninth Circuit authority

regarding *Dalton* and separation of powers claims.  Plaintiffs cite *Murphy Company v. Biden*, 65

F.4th 1122, 1130 (9th Cir. 2013), for the proposition that the Ninth Circuit applies an "expansive

view of the constitutional category of claims highlighted in *Dalton*."  Oppo. at 14.  In *Murphy Co.*,

14

timber business plaintiffs challenged an Executive Order issued by President Obama expanding

the Cascade-Siskiyou National Monument in southwestern Oregon as a violation of the

Antiquities Act and the Oregon and California Railroad and Coos Bay Wagon Road Grant Lands

Act. *Id.* at 1124–25.  In considering the justiciability of the plaintiffs' claims, the court recognized

that "[w]hile an action taken by the President in excess of his statutory authority does not

necessarily violate the Constitution, specific allegations regarding separation of powers may

suffice." *Id.* (cleaned up).  Applying this finding, the court concluded that a claim that "the

President violated separation of powers by directing the Secretary to act in contravention of a duly

enacted law . . . could be considered constitutional and therefore reviewable." *Id.*  Plaintiffs rely

on this authority to conclude that their separation of power arguments do not rely on the ICA, are

constitutional in nature, and are not precluded by *Dalton* and its progeny.  *See* Oppo. at 13–15.

I agree with plaintiffs that *Murphy Co.*, not *Global Health Council*, controls this case, and

that an "expansive view of the constitutional category of claims highlighted in *Dalton*" applies.

*See* 65 F.4th at 1130.  While defendants muse in detail about how the D.C. Circuit "did not find

*Murphy* persuasive because it relied on *Sierra Club v. Trump*, 929 F.3d 670 (9th Cir. 2019),"[8] I am

bound by Ninth Circuit precedent, not the D.C. Circuit.[9]  *See* Repl. at 6; *Rodriguez v. AT&T*

*Mobility Servs. LLC*, 728 F.3d 975, 979 (9th Cir. 2013) (finding that a Ninth Circuit opinion is

---

[8] In *Sierra Club v. Trump*, 929 F.3d 670 (9th Cir. 2019), the Ninth Circuit declined to issue an injunction preventing the government from reprogramming Department of Defense funds for border wall construction.  The Supreme Court later issued a stay, finding the government made "a sufficient showing at this stage that the plaintiffs have no cause of action."  *Trump v. Sierra Club*, S.Ct. 1 (2019) (mem.).

[9] Defendants also cite to a recent Supreme Court order in *Department of State v. AIDS Vaccine Advocacy Coalition*, No. 25A269, 606 U.S. ----, 2025 WL 2740571 (U.S. Sept. 26, 2025), which they believe further supports the holding of *Global Health*.  In *AIDS Vaccine Advocacy Coalition*, the Court issued a one-page decision staying a district court's injunction barring federal agencies from freezing foreign aid funding, as the government "made a sufficient showing that the Impoundment Control Act precludes respondents' suit, brought pursuant to the Administrative Procedure Act, to enforce the appropriations at issue here."  *Id.* at *1.  The Court recognized that the "order should not be read as a final determination on the merits," and did not explain why the ICA may preclude plaintiffs' suit.  *Id.*; *City of Chicago v. U.S. Dep't of Homeland Sec.*, No. 25 C 5463, 2025 WL 3043528, at *21 (N.D. Ill. Oct. 31, 2025).  In light of this conclusion, I cannot agree with defendants that the Court's order "clearly indicate[s] its agreement with the holding in *Global Health*."  Repl. at 6; *see also City of Chicago*, 2025 WL 3043528, at *21 (reaching a similar conclusion).

controlling unless intervening Supreme Court authority is "clearly irreconcilable"); *Doe v. Trump*, 284 F. Supp. 3d 1182, 1185 (W.D. Wash. 2018) (district court "is not at liberty to simply ignore binding Ninth Circuit precedent based on Defendants' divination of what the Supreme Court was thinking when it issued . . . stay orders"). Even so, defendants acknowledge that *Murphy*'s reliance upon *Sierra* only "makes it less persuasive in light of the Supreme Court's treatment of it," not that it is bad law. *See* Repl. at 6. I am obligated to follow *Murphy Co.* and proceed with an "expansive view" and understanding of what claims may be considered "constitutional," rather than statutory, in nature.

Applying *Murphy Co.*, it seems clear to me that plaintiffs have plausibly alleged that their separation of powers claim is a constitutional argument. The SAC alleges:

> By imposing conditions or limitations on federal spending without express statutory authority, the Executive Orders and Bondi and Noem Directives also unlawfully exceed the President's powers under other provisions of the Constitution that establish the separation of powers among the branches of government, including: (i) the President's obligation to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, cl. 5 (Take Care Clause), (ii) the limitation that Congressional enactments must "be presented to the President of the United States," who then may sign that enactment or veto it, but has no power to merely revise it, either upon presentment or after enactment, U.S. Const. art. I, § 7, cls. 2–3 (Presentment Clause); and (iii) Congress's authority to levy taxes, to finance government operations through appropriations, and to set the terms and conditions on the use of those appropriations. U.S. Const. art. I, § 9, cl. 7 (Appropriations Clause).

SAC ¶ 421. Construed liberally, the SAC indicates that the separation of powers claim does not rely on the ICA to survive; rather, it alleges that there is a separate, independent constitutional argument rooted in the Executive Branch's interference with Congress's Article I powers. This is enough to plausibly infer that this is not simply a claim "alleging that the President exceeded his statutory authority," thus being precluded from judicial review. *Dalton*, 511 U.S. at 473 (citing *Franklin v. Massachusetts*, 505 U.S. 788, 799 (1992)).

### 2. Plaintiffs Have Adequately Alleged Separation of Powers Violations

Defendants also maintain that plaintiffs' separation of powers argument fails to state a claim upon which relief can be granted because "the Executive directives do not freeze or withhold the distribution of already-appropriated funds or unilaterally impose conditions on all

federal funds without Congressional authorization." Mot. at 13. To this point, they rehash a few arguments I already rejected. First, defendants suggest that the savings clauses in the Executive Orders only allow the Executive to undertake "lawful actions" to ensure that "sanctuary" jurisdictions do not receive federal funding. *Id.* But, as described in detail above, plaintiffs have plausibly alleged that the savings clauses do not override the other provisions in the Executive Orders that categorically withhold funding from "sanctuary" jurisdictions. Defendants also suggest that the agencies charged with effectuating the Executive Orders "evaluate[] [federal funding] on a grant-by-grant or program-by-program basis, rather than in a blanket or categorical fashion." *Id.* As explained in detail in Section II.E.2, *supra*, this argument appears to misconstrue plaintiffs' claims. Plaintiffs do not challenge individual grants and funding decisions; rather, they challenge defendants' "decision to impose the Challenged Conditions in the first place." *City of Chicago & City of Saint Paul v. U.S. Dep't of Just.*, No. 25 C 13863, 2026 WL 114294, at *9 (N.D. Ill. Jan. 15, 2026).[10] Similarly, the government's remaining arguments that the Executive may utilize savings clauses to "terminate or add conditions on contracts and funds without violating the separation of powers" miss the mark, as it references case law I have found inapplicable and ignores the Ninth Circuit's findings on this very issue. Mot. at 15 (citing *Allbaugh*, 295 F.3d at 29-33; *Common Cause*, 506 F. Supp. 3d at 47); *see City & Cnty. of S.F.*, 897 F.3d at 1240 ("If 'consistent with law' precludes a court from examining whether [an] Executive Order is consistent with law, judicial review [would be] a meaningless exercise,

---

[10] Defendants also point to Paragraphs 388 and 389 of the SAC, which references a memorandum issued by Cameron Hamilton to the Secretary of the DHS (the "FEMA Memo"), as evidence that agencies maintained the discretion to review and condition funding for "sanctuary" jurisdictions. *See* Mot. at 14. Plaintiffs allege that the FEMA Memo identified twelve grants that "have nothing to do with civil immigration enforcement." SAC ¶ 391. Defendants disagree, arguing that "FEMA only *recommended* that immigration-related conditions could be applied to 12 FEMA non-disaster preparedness programs 'where the purpose of the grant has a nexus to immigration activities, law enforcement or national security' or 'where the statute does not limit how FEMA implements the program.'" Mot. at 14 (emphasis added) (citing FEMA Memo at 3). They also suggest that it "stated that dozens more programs will not be subject to any such restriction, in addition to a blanket exemption for disaster grants and non-disaster mitigation grants, grants to fire departments and national search and rescue organizations." *Id.* While the interpretation of the FEMA Memo may present a question of fact to be resolved as this case progresses, plaintiffs have met their burden in plausibly alleging that the memorandum indicates a categorical restriction being imposed on non-immigration-related grants and programs.

United States District Court
Northern District of California

1    precluding resolution of the critical legal issues" and leading courts into "an intellectual cul-de-

2    sac.").

3          On this ground, plaintiffs have sufficiently pleaded a violation of the separation of powers

4    doctrine.  Defendants' motion to dismiss this claim is DENIED.

5          **C.      Spending Clause**

6          Many of plaintiffs' separation of powers claims also implicate their Spending Clause

7    claims.  The United States Constitution provides that "Congress shall have Power To lay and not

8    collect Taxes, Duties, Imports and Excises, [and] to pay the Debts and provide for the common

9    Defence and general Welfare of the United States."  U.S. Const. art. I, § 8, cl. 1.  "[W]hen

10   Congress imposes conditions on federal funds, it must do so unambiguously so that jurisdictions

11   can plan accordingly."  May 3 Order at 50 (citing *Cnty. of Santa Clara*, 250 F. Supp. 3d at 532;

12   *Dole*, 483 U.S. at 203).  "Because states must opt-in to a federal program willingly, fully aware of

13   the associated conditions, Congress cannot implement new conditions after-the-fact."  *Cnty. of*

14   *Santa Clara*, 250 F. Supp. 3d at 532; *Nat'l Fed. Of Indep. Bus. v. Sebelius* ("*NFIB*"), 567 U.S. 519

15   (2012).

16         In granting a preliminary injunction for plaintiffs, I noted that plaintiffs were likely to

17   prevail on their Spending Clause claims as the "challenged orders and DOJ directive purport to

18   apply to all federal funds, both apportioned and future."  May 3 Order at 50.  The government now

19   takes issue with this characterization, finding that the Directives are "forward looking" and "do

20   not apply to retroactively impact funding."  Mot. at 16.  With respect to the Bondi Directive, the

21   government points to language showing that jurisdictions must "*appl*[*y*]" for grants, and that the

22   DOJ "may *seek* to tailor *future* grants," indicating that the potential grantees are "already on notice

23   of the revised terms prior to requesting funding, and will be able to exercise their choice

24   knowingly."  *Id.* at 16–17 (citing Bondi Memo) (emphasis in original).  They also point to

25   language in the Directives suggesting that only *some* grants are impacted.  *See id.*; Bondi Memo at

26   2 ("Consistent with statutory authority and past practice, the Department will require any

27   jurisdiction that applies for *certain* Department grants to be compliant with 8 U.S.C. § 1373(a).")

28   (emphasis added); Noem Memo at 5 ("To the extent consistent with relevant legal authorities and

United States District Court
Northern District of California

United States District Court
Northern District of California

1    the applicable terms and conditions *of each award*, each component must cease providing federal

2    funding to sanctuary jurisdictions.") (emphasis added).

3        Plaintiffs paint a different picture.  Their SAC alleges that the language in these Directives

4    apply both retroactively and to future grants.  *See, e.g.*, SAC ¶ 367 ("Consistent with the direction

5    of Executive Order 14,159, the Bondi Directive states that DOJ announced its own funding

6    restriction to 'ensure that, consistent with law, 'sanctuary jurisdictions' to not receive access to

7    Federal funds from the Department.'"); Noem Directive at 2 (instructing components to "review

8    *all* federal financial assistance awards" and instructing them to "cease providing federal funding to

9    sanctuary jurisdictions") (emphasis added).  While I recognize the parties have fundamentally

10    different interpretations of this language, at this stage, plaintiffs have plausibly alleged that should

11    the Executive Orders and Directives take effect, funding both present and future would be

12    conditioned upon compliance with the Executive's "sanctuary" jurisdictions policies.

13        Plaintiffs also plausibly allege a lack of nexus between the conditions and the affected

14    funds.  Conditions placed on congressional spending "must have some nexus with the purpose of

15    the implicated funds."  May 3 Order at 50–51 (citing *Cnty. of Santa Clara*, 250 F. Supp. 3d at 532;

16    *New York*, 505 U.S. at 172)).  Here, plaintiffs' SAC alleges that the Directives violate the

17    Spending Clause by "imposing conditions that are ambiguous," "imposing conditions that are not

18    germane to the stated purpose of the [program] funds," "imposing conditions that are so severe as

19    to coerce Plaintiffs," and "imposing conditions that would require Plaintiffs to act

20    unconstitutionally by detaining individuals based on civil detainers without a finding of probable

21    cause."  SAC ¶ 717.  Each of these claims have merit.

22        With respect to ambiguity, plaintiffs plausibly suggest that various terms in the

23    Directives—including "sanctuary jurisdictions," "sanctuary policies," "abet[ting] sanctuary

24    policies," "cooperating with and not impeding" immigration enforcement, and "joint requests for

25    cooperation"—are sufficiently vague and may be utilized in a way to retaliate against plaintiffs.

26    *See, e.g.*, SAC ¶¶ 430–31, 720–29.  In their reply, defendants argue that because plaintiffs define

27    themselves as "sanctuary jurisdictions," any claim of vagueness is "inconsistent with their own

28    assertions and arguments."  Repl. at 8.  This does nothing to support their argument.  While

plaintiffs may describe themselves as "sanctuary jurisdictions" and argue that "all jurisdictions with policies like those adopted by Plaintiffs" are sanctuary jurisdictions, that does not meaningfully suggest that this definition complies with the government's view of such jurisdictions.  *See id.*; SAC ¶ 81.  That is exactly what plaintiffs are arguing in their SAC—that the government provides no meaningful, consistent definition of a "sanctuary jurisdiction" to provide them with sufficient notice to comply with the Orders.  *See* SAC ¶¶ 718–30.

Similarly, plaintiffs sufficiently allege that the Directives "impos[e] conditions that are not germane to the stated purpose of the [agency] funds."  *Id.* ¶ 717.  Plaintiffs allege that the Directives are being applied in a categorical manner, and that many grant programs that lack a meaningful connection to civil immigration enforcement may (or will) be conditioned on compliance with the Directives.  *See id.* ¶ 391.  This is sufficient to state a claim for a Spending Clause violation to survive a 12(b)(6) motion to dismiss.  Defendants attempt to refute this argument by pointing to Executive Order 14,218, which "references . . . the requirements Congress imposed 30 years ago" in the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("PRWORA") as evidence of a sufficient nexus.  Mot. at 17.  Under PRWORA, noncitizens are precluded from accessing "any Federal public benefit," including "any . . . welfare, health, disability, public or assisted housing," and similar forms of assistance.  8 U.S.C. §§ 1611(a), (c)(1).  However, as I have previously explained, "nowhere does the text [of PRWORA] suggest giving the federal Government the authority to condition the receipt of federal funds on the requirement that states and local jurisdictions actively assist in enforcing federal immigration laws."  Order Granting Second Motion for Preliminary Injunction ("August 22 Order") at 10 (internal quotations and citations omitted).[11]  PRWORA does not absolve defendants

---

[11] In their reply, defendants claim that they rely upon PWRORA as "one example of valid statutory authority for placing immigration related conditions on grants."  Repl. at 8.  In their view, because the SAC is "premature, speculative, and fails to identify specific grants programs, it is impossible for [them] to list every possible statutory authority in existence."  *Id.* at 8–9.  Further, because agencies "have not yet completed reviewing grants upon which they can lawfully impose immigration related conditions, [plaintiffs] have similarly not yet identified every possible valid statutory authority."  *Id.* at 9.  While the specific statutory authority may be uncovered as this case progresses, I do not find this a compelling reason to reject plaintiffs' Spending Clause argument.  Plaintiffs need only "raise a right to relief above the speculative level" to survive a motion to dismiss, a burden they have met at this stage.  *Twombly*, 550 U.S. at 570.

United States District Court
Northern District of California

from any potential liability under the Spending Clause.

The parties also dispute how to apply the holding of *NFIB*.  Defendants correctly point out that the *NFIB* Court recognized that it has not "fix[ed] the outermost line" for determining "where persuasion gives way to coercion."  567 U.S. at 585 (quoting *Charles C. Steward Mach. Co. v. Davis*, 301 U.S. 548, 591 (1937)); Mot. at 18.  They are also correct that courts look to the nature and size of a threatened funding loss to determine when such a line is crossed.  *See id.*; Repl. at 9.  But plaintiffs have sufficiently alleged that defendants' conduct did, in fact, "cross the line" into impermissible coercion in violation of the Spending Clause.  *See NFIB*, 567 U.S. at 579; SAC ¶ 455 ("Executive Order 14,159's threatened withholding of all federal funding—and Executive Orders 14,218 and 14,287's threats with respect to undefined categories of federal payments and funds—would have far-reaching impacts on Plaintiffs, which rely on federal funding as a significant portion of their budgets, and would cripple Plaintiffs' ability to deliver critical services to their communities"); *id.* ¶ 3 (Executive Order 14,159 directs Bondi and Noem "to withhold all federal funds from jurisdictions that refuse to use their local resources to carry out [President Trump's] immigration agenda"); *id.* ¶ 426 ("President Trump made clear in statements accompanying Executive Order 14,287 that he intends to 'withhold all Federal Funding' from 'sanctuary jurisdictions'"); *id.* ("Through the Bondi Directive and Noem Directive, DOJ and DHS likewise seek to withhold essential funds from Plaintiffs in order to coerce them into immigration enforcement.").  Plaintiffs' characterization of the Orders and Directives reasonably suggests that they constitute "economic dragooning that leaves the States with no real option but to acquiesce" to their mandates.  SAC ¶ 426 (citing *NFIB*, 567 U.S. at 582).

Defendants provide no meaningful argument indicating that plaintiffs have failed to state a claim for violations of the Spending Clause.  Their motion to dismiss this claim lacks merit.

### D.    Tenth Amendment

Defendants' argument that plaintiffs' Tenth Amendment claim should be dismissed fares no better.  The Tenth Amendment prohibits the federal government from commandeering state and local officials to help enforce federal law.  *Printz v. United States*, 521 U.S. 898 (1997).  Under the "anti-commandeering" doctrine, the federal government may not compel states to enact or

United States District Court
Northern District of California

1 administer a federal regulatory program. *New York*, 505 U.S. at 188. This is true regardless of

2 whether it "directly commands" a state to regulate or "indirectly coerces" a state to adopt a federal

3 regulatory system as its own. *NFIB*, 567 U.S. at 578.

4       Defendants first argue that plaintiffs do not specifically describe the "amount of federal

5 funds they receive or expect to receive, and [merely] speculatory what funding *may* be impacted."

6 Mot. at 19 (emphasis in original). "[A]t this point in the litigation," they conclude, "it is untenable

7 to argue that *all* of [plaintiffs'] federal funding will be impacted" by the Executive Orders. *Id.*

8 (emphasis in original). As an example, defendants point to the fact that the FEMA Memo

9 "identified only twelve programs to which immigration-related conditions may apply," which

10 constitute a "small portion of all FEMA grants." *Id.* The FEMA Memo also "exempted many

11 more programs from [the immigration] condition[s]." *Id.* Therefore, in their view, "refusal to

12 comply with an immigration-related condition may affect the funds available for [one] particular

13 program, but it would not 'threat[en] to terminate other . . . grants' to which the immigration-

14 related condition does not apply." *Id.* (quoting *NFIB*, 567 U.S. at 580 (plurality opinion)).

15       I disagree. Plaintiffs repeatedly state that this federal funding comprises of a significant

16 portion of their budgets. *See, e.g.*, SAC ¶¶ 455, 459, 463, 469, 563, 575, 606, 636, 642, 655, 657,

17 669. Defendants argue that while plaintiffs "allege the maximum amount of federal funding they

18 depend upon, only a handful state what percentage of their annual operating budget consists of

19 federal funds," which range from 6% to 31%. Repl. at 10. "While perhaps a plaintiff could make

20 a case that losing 30% of its budget could impose some harm," defendants muse, "it would be

21 much more difficult for a plaintiff to do so when it makes up only 6% of the budget." *Id.* This

22 argument appears to misconstrue the requirement that plaintiffs must meet at this stage—alleging

23 "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

24 True, many courts find coercion more plausible when plaintiffs plead a higher percentage of

25 federal funding being impacted. *See NFIB*, 567 U.S. at 581 (finding coercion when the federal

26 government threatened to withhold "over 20 percent of the average State's total budget"). *Cf.*

27 *Dole*, 483 U.S. at 211 (finding no coercion when the federal funds at stake constituted less than

28 one half of one percent of a State's budget). But the exact threshold for when withholding funding

1    becomes a "gun to the head" been routinely questioned by courts.  *See NFIB*, 567 U.S. at 581; *id.*

2    at 642 n.24 (Ginsburg, J., concurring) ("But how is a court to judge whether only 6.6% of all state

3    expenditures is an amount States could or would do without?") (cleaned up).  As alleged in the

4    SAC, plaintiffs have plausibly suggested that the funding in question comprises a "significant

5    portion of their budgets," and that a lack of this funding would "cripple [their] ability to deliver

6    critical services to their communities."  SAC ¶ 455.

7          Additionally, defendants argue that plaintiffs' Tenth Amendment claim fails because it

8    "only speculate[s] that enforcement actions may arise from the executive directives."  Mot. at 20

9    (citing *Envtl. Def. Ctr., Inc. v. EPA*, 344 F.3d 832, 847 (9th Cir. 2003) ("[A]s long as the

10   alternative to implementing a federal regulatory program does not offend the Constitution's

11   guarantees of federalism, the fact that the alternative is difficult, expensive or otherwise

12   unappealing is insufficient to establish a Tenth Amendment violation.") (internal quotation marks

13   omitted).  While defendants maintain that there is "always a possibility that the Federal

14   Government may sue a State or local government alleging that their laws or policies are

15   constitutionally preempted," this belies the argument made by plaintiffs in their SAC.  *See id.*

16   Plaintiffs assert that the "enforcement directive in Executive Order 14,159, and the Bove and

17   Bondi Directives," are being weaponized against jurisdictions who purportedly fail to comply with

18   the Executive's orders.  *See* SAC ¶¶ 374–84.  The SAC then lists a number of cases that plaintiffs

19   allege "reveal[] the sheer breadth of power that Defendants claim they canassert over state and

20   local policies, despite court orders and precedent to the contrary."  *Id.*[12]  It is plausible that the

21   federal government's repeated litigation against those deemed "sanctuary" jurisdictions constitutes

22   another means by which States and local municipalities may feel compelled to adhere to the

23   Executive Orders and Directives.  On its face, these claims survive Rule 12(b)(6).

---

[12] *See United States v. State of Illinois*, No. 25-cv-01285 (N.D. Ill.); *United States v. New York et al.*, No. 1:25-cv-00205 (N.D.N.Y., filed Feb. 12, 2025); *United States v. City of Rochester*, No. 25-cv-06226 (W.D.N.Y., filed Apr. 24, 2025); *United States v. State of Colorado*, No. 25-cv-01391 (D. Colo., filed May 2, 2025); *United States v. City of Los Angeles*, No. 25-cv-05917 (C.D. Cal., filed June 30, 2025); *see also, e.g.*, *United States v. Newark*, No. 25-cv-05081 (D.N.J., filed May 22, 2025); *United States v. State of New York*, No. 25-cv-00744 (N.D.N.Y., filed June 12, 2025).

United States District Court
Northern District of California

United States District Court
Northern District of California

### E.    Administrative Procedure Act

#### 1.    Final Agency Action

Plaintiffs challenge the Bondi and Noem Directives as violating the APA.  *See* SAC ¶¶ 433–36, 741–64.[13]  Defendants now seek to dismiss these claims, arguing that plaintiffs have not identified final agency action for review.  Mot. at 20.  I disagree.

The APA allows judicial review of "final agency action for which there is no adequate remedy in a court."  5 U.S.C. § 704.  An agency action is final if: (1) the agency action marks "the consummation of the agency's decision-making process" and (2) the "action . . . [is] one by which rights or obligations have been determined or from which legal consequences flow."  *Bennett v. Spear*, 520 U.S. 154 (1997).  To determine whether an action is "final," courts "look to whether the action 'amounts to a definitive statement of the agency's position' or 'has a direct and immediate effect on the day-to-day operations of the subject party, or if 'immediate compliance [with the terms of the agency action] is expected."  *Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982–83 (9th Cir. 2006).  Finality "must be interpreted in a pragmatic and flexible manner."  *Id.* at 982 (cleaned up).

Plaintiffs' allegations meet the first prong of *Bennett.*  "Where an agency establishes conditions on grant eligibility, the agency has taken action that 'mark[s] the 'consummation' of the agency's decisionmaking process.'"  *S.F. Unified Sch. Dist. v. AmeriCorps*, 789 F. Supp. 3d 716, 740 (citing *Bennett*, 520 U.S. at 177–78).  As I have previously discussed, the Bondi Directive commands action in that it provides "the Department of Justice will ensure, consistent with law, 'sanctuary jurisdictions' do not receive access to Federal funds from the Department" and that the DOJ "shall pause the distribution of all funds."  May 3 Order at 58; Tilak Decl. Ex. 3 (Bondi Directive).  Similarly, the Noem Directive commands action by directing the DHS to review financial assistance awards to "determine if [DHS] funds, directly or indirectly, are going to sanctuary jurisdictions," and then, "to the extent consistent with relevant legal authorities,"

---

[13] Neither party disputes that the Executive Orders cannot be challenged under the APA.  *See* Mot. at 20; Oppo. at 19 n.5; *Franklin v. Massachusetts*, 505 U.S. 801.

"cease providing federal funding to sanctuary jurisdictions."[14]  Supp. Nguyen Decl. Ex. 1 (Noem Declaration) at 2.  Such directives have been similarly found to consummate final action for purposes of alleging a violation of the APA.  *See New York v. Trump*, 769 F. Supp. 3d 119, 136–37 (D.R.I. 2025); *City & Cnty. of S.F.*, 783 F. Supp. 3d at 1198–99; *Cnty. of Santa Clara v. Noem*, No. 25-cv-08330-WHO, 2025 WL 3251660, at *40 (N.D. Cal. Nov. 21, 2025).

The government now argues that plaintiffs "erroneously fixate on the general preamble paragraphs [of the Directives] but ignore the specific and important language that follows."  Repl. at 12.  For example, they point out that the Bondi Directive defines sanctuary jurisdictions as "state or local jurisdictions that refuse to comply with 8 U.S.C. § 1373, refuse to certify compliance with § 1373, or willfully fail to comply with other applicable immigration laws."  Repl. at 11 (citing Bondi Directive at 111–12).  Additionally, the Bondi Directive explains that "[c]onsistent with statutory authority and past practice, the Department will require any jurisdiction that applies for certain Department grants to be compliant with 8 U.S.C. § 1373(a)" and instructs that "the Associate Attorney General, in coordination with components that provide Department grants, to report to the Attorney General the grants to which these requirements apply."  *Id.*  Finally, the Bondi Directive states that "to the extent consistent with applicable statutes, regulations, and terms, the Department may seek to tailor future grants to promote a lawful system of immigration . . ."  *Id.*[15]

In the government's view, applying principles of statutory construction, the "specific and important language" highlighted above absolves them of any final agency action, as I "cannot

---

[14] Plaintiffs maintain that the defendants did "not dispute the finality of the Noem Directive, and therefore waive[d] any such argument."  Oppo. at 19.  But defendants plausibly challenged the Noem Memo in their original motion to dismiss.  *See* Repl. at 11 n.4 (citing Mot. at 30 ("As to other directives, Plaintiffs have not identified final agency action for review."); Mot. at 32 ("The same is true of . . . [] the Department of Homeland Security . . .").  Accordingly, I will consider defendants' arguments regarding the Noem Directive in deciding their motion to dismiss.

[15] The Noem Directive is similarly structured: it defines sanctuary jurisdictions as those that "fail to comply with the information sharing requirements of 8 U.S.C. §§ 1373 and 1644," and that "[a]ll components are to review all federal financial assistance awards" and after said review, the components "must cease providing federal funding to sanctuary jurisdictions" only "to the extent consistent with relevant legal authorities and the applicable terms and conditions of each award."  Repl. at 12.

United States District Court
Northern District of California

1    disregard the specific words outlining a review process and only calling for possible funding

2    conditions consistent with legal and statutory authority."  Repl. at 12 (citing *California v. Azar*,

3    911 F.3d 558, 569 (9th Cir. 2018); *City and Cnty. of S.F.*, 897 F.3d at 1239 ("It is commonplace of

4    statutory construction that the specific governs the general.") (internal quotation marks and

5    citations omitted)).  Not so.  That the Directives contain savings clauses "does not insulate it from

6    judicial review any more than do the savings clauses in the 2025 Executive Orders."  May 3 Order

7    at 58 n.10.  Nor does the government's invocation of the canons of construction change my view,

8    as even if I were to accept their interpretations of the Directives, those questions seem more

9    focused on the merits of plaintiffs' APA claim.  At this stage, plaintiffs have plausibly alleged that

10   the Directives "announce a final decision to condition or withhold federal funding and thus mark

11   the consummation of DOJ's and DHS's decision-making process."  SAC ¶ 744.

12          Plaintiffs' SAC also sufficiently alleges the second prong of *Bennett*—that the "action . . .

13   [is] one by which rights or obligations have been determined or from which legal consequences

14   flow."  520 U.S. at 154.  The Bondi and Noem Directives' command to the DOJ and DHS to

15   "ensure, consistent with law, 'sanctuary jurisdictions' do not receive access to Federal funds from

16   the Derpartment[s]" is a statement from which legal consequences will flow.  *See* May 3 Order at

17   58–59; *U.S. Forest Serv.*, 465 F.3d at 982–83.

18          The government offers several cases to support its conclusion that the Bondi and Noem

19   Directives are not final agency action, but none is on point.  First, defendants cite *Common Cause*

20   *v. Trump*, 506 F. Supp. 3d 39, 47 (D.D.C. 2020), for the proposition that a district court "cannot

21   ignore . . . repeated and unambiguous qualifiers imposing lawfulness and feasibility constraints on

22   implementing" an Executive Order or Directive.  My decision does not ignore the savings clauses;

23   it recognizes the government's arguments regarding them as a "disingenuous interpretation" of the

24   Directives and what they purport to do.  *See* May 3 Order at 58.  The government's reliance on

25   *League of United Latin American Citizens v. Executive Office of the President*, 780 F. Supp. 3d

26   135, 176 (D.D.C. 2025), also fails for the same reason.  Plaintiffs have sufficiently pleaded final

27   agency action for their APA claim to be presumptively reviewable.

28

2.    **Agency Discretion**

Defendants offer an additional argument for dismissing plaintiff's APA claims: that the challenged Directives are committed to agency discretion under 5 U.S.C. § 701(a)(2). The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. When interpreting the APA, courts have read Section 702 as embodying a "basic presumption of judicial review." *Abbott Labs. v. Gardner*, 387 U.S. 136, 140 (1967). But Section 701(a)(2) carves out "agency action [that] is committed to agency discretion by law" from being subject to judicial review. 5 U.S.C. § 701(a)(2). The Supreme Court has clarified that courts should "read the exception in § 701(a)(2) quite narrowly" such that it should apply only in "rare circumstances." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018) (quoting *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993)). The question in this case is whether the Bondi and Noem Directives constitute "rare circumstances" where an Article III court lacks jurisdiction to review a plaintiff's claim. *See id.*

The government argues that "at least some of the grant programs managed by the agencies" that would be impacted by the Directives are "discretionary." Mot. at 23. "For these grants," they maintain, "Congress has not directed that a specific amount of funding must be directed to recipients who meet all applicable criteria, terms, and conditions." *Id.* Instead, Congress has "simply appropriated funding for the program generally, for the agency to in turn distribute as appropriate." *Id.* Citing to various statutes granting agencies discretion to carry out the grant programs to the extent necessary, the government concludes that these agencies have "broad discretion in creating, awarding, and terminating specific grants"—decisions unreviewable under the APA and outside of this Court's jurisdiction. *Id.*[16]

---

[16] *See* 6 U.S.C. § 112(b)(2) (Congress has given DHS "the authority to make contracts, grants, and cooperative agreements . . . as may be necessary and proper to carry out the Secretary's responsibilities under this chapter or otherwise provided by law . . ."); 49 U.S.C. § 5334(a)(1) (providing the Secretary of Transportation the ability to "prescribe terms for a project that receives Federal financial assistance under this chapter (except terms the Secretary of Labor prescribes under section 5333(b) of this title."); 42 U.S.C. § 13386(b)(8) (providing the Department of Housing and Urban Development the discretion to establish "other terms and conditions" to "carry out [its programs] in an effective and efficient manner.").

United States District Court
Northern District of California

At this juncture, plaintiffs have plausibly alleged that the Directives do not commit the decision to withhold federal funding to "sanctuary" jurisdictions to agencies. With respect to the Bondi Directive, plaintiffs establish in the SAC that Bondi "proscribes that '[s]anctuary jurisdictions should not receive access to federal grants administered by the Department of Justice.'" SAC ¶ 368 (citing Bondi Memo at 1). The SAC then alleges that the Bondi Directive provided that "state and local actors 'may not' 'fail to comply with lawful immigration-related directives,'" consistent with the "enforcement directive in Executive Order 14,159." *Id.* ¶ 372. It then provides that "jurisdictions with policies that 'impede lawful federal immigration operations' will be challenged," *see id.*, then "repeats the instruction to DOJ staff to investigate and prosecute such conduct under 18 U.S.C. § 371 and 8 U.S.C. §§ 1324 and 1373." *Id.* ¶ 373. Later, when describing the conduct they see as violating the APA, plaintiffs allege that the Bondi Directive provided "no reasoned basis for withholding or conditioning funds Congress appropriated for disbursement, including via formula grants, except to the extent they make clear that the Executive Order enacts the President's policy desires in place of Congress's intent." *Id.* ¶ 749. When reading the SAC liberally, plaintiffs plausibly allege that the Bondi Directive imposes a "freeze on *all federal funding* to sanctuary jurisdictions and a freeze on *all DOJ* funding to the same," and that the Directive merely "parrot[s]" Executive Orders issued by President Trump. *See* May 3 Order at 49; August 22 Order at 3-4.

The Noem Directive (and subsequently, the FEMA Memo) similarly passes the 12(b)(6) pleading threshold. Plaintiffs establish that the Noem Directive was issued to "implement[] Executive Order 14,159 by directing components of DHS not just to review federal assistance awards but to 'cease providing federal funding to sanctuary jurisdictions' and to 'make appropriate criminal referrals to the Department of Justice.'" SAC ¶ 386. It then goes on to suggest that DHS was not engaged in any exercise of discretion, as the Directive "fail[ed] to meaningfully define" terms such as "sanctuary jurisdiction," *see id.* ¶ 387, recommended "conditions or restrictions" on grant programs that "have nothing to do with civil immigration enforcement," *see id.* ¶¶ 390-91, and noted that other district courts concluded that the "Directive—and FEMA's implementation thereof—effectuate[d] Executive Order 14,159." *Id.* ¶ 392. Like the Bondi Directive, these facts

28

1    plausibly suggest that the DHS was not engaged in "discretionary" or reasoned agency decision-

2    making but rather were complying with a mandate from the President to target "sanctuary"

3    jurisdictions.

4           The government suggests that *Lincoln v. Vigil*, 508 U.S. 182 (1993), is an apt analogy to

5    this case.  In *Lincoln*, the Supreme Court considered an APA challenge to the Indian Health

6    Service's ("INS") decision to reallocate healthcare resources from Native children in the

7    Southwest to a "nationwide effort to assist such children." *Id.* at 184.  The INS received "yearly

8    lump-sum appropriations from Congress" to be expended under the Snyder Act and Indian Health

9    Care Improvement Act. *Id.* at 185.  Those laws provided that the INS could "expend such moneys

10   as Congress may from time to time appropriate, for the benefit, care, and assistance of the Indians"

11   for the "relief of distress and conservation of health." *Id.*  The Court found that the INS's decision

12   to reallocate this funding was "committed to agency discretion by law" and therefore not subject

13   to judicial review. *Id.*  The Court noted that the "allocation of funds from a lump-sum

14   appropriation is [an] administrative decision traditionally regarded as committed to agency

15   discretion," as "the very point of a lump-sum appropriation is to give an agency the capacity to

16   adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most

17   effective or desirable way." *Id.* at 192.  Specifically, allocating funds from a lump-sum

18   appropriation requires "a complicated balancing of a number of facts which are peculiarity within

19   [an agency's] expertise," such as "whether its 'resources are best spent' on one program or

20   another; whether it is 'likely to succeed' in fulfilling its statutory mandate; whether a [] program

21   'best fits the agency's overall policies'; and 'indeed, whether the agency has enough resources' to

22   fund a program 'at all.'" *Id.* at 193 (quoting *Heckler v. Chaney*, 470 U.S. 821, 831 (1985)).

23          While the government acknowledges that lump-sum appropriations are not involved in this

24   case, they nonetheless argue an analogy could be made to *Lincoln*, as "its logic extends to funding

25   programs that leave to the agency 'the decision about how the moneys' for a particular program

26   'could best be distributed consistent with' the statute."  Mot. at 24 (citing *Milk Train, Inc. v.

27   Veneman*, 310 F.3d 747, 751 (D.C. Cir. 2002)).  But plaintiffs do not challenge how agencies are

28   distributing individual grants.  *See* Oppo. at 21.  Rather, they attack what they describe as

United States District Court
Northern District of California

1  "agencywide categorical polic[ies]" that condition federal funding on jurisdictions committing to

2  not being "sanctuary" jurisdictions.  *See id.*; *see also* SAC ¶¶ 390-91 (alleging that non-

3  immigration-related programs are being conditioned on compliance with the Directives and

4  Executive Orders regarding "sanctuary" jurisdictions).

5          *City of Fresno v. Turner*, No. 25-cv-07070-RS, 2025 WL 2721390 (N.D. Cal. Sept. 3,

6  2025) (Seeborg, C.J.), is a more appropriate analogy to the facts of this case.  In *City of Fresno*,

7  the Hon. Richard Seeborg considered a challenge to various Executive Orders that conditioned

8  federal grants on jurisdictions not promoting "DEI activities," "gender ideology," "elective

9  abortion," as well as complying with federal immigration enforcement.  *Id.* at *1–2.  In

10  considering plaintiffs' APA claim, Judge Seeborg found *Lincoln* inapposite, as the plaintiffs did

11  not "challenge singular agency grant decisions made while weighing various factors 'peculiarly in

12  [Defendant agencies'] expertise.'  *Id.* at *7 (quoting *Heckler*, 470 U.S. at 831).  Rather, plaintiffs

13  challenged "Defendant agencies' unilateral imposition of the Grant Conditions, which [we]re not

14  germane to Defendants' expertise and were imposed not in the spirit of Defendants' statutory

15  mandates but rather to vindicate the Executive's agenda."  *Id.*  Additionally, Judge Seeborg

16  recognized that "Defendants' public statements," combined with the lack of evidence showing the

17  conditions were "imposed to further statutory aims," shows that these grants were not an instance

18  of an agency "allocat[ing] funds . . . to meet *permissible statutory objectives*."  *Id.* (quoting

19  *Lincoln*, 508 U.S. at 193) (cleaned up) (emphasis added).  Considering these findings, Judge

20  Seeborg held that such conditions were not agency action committed to agency discretion by law.

21  *See id.*; *see also City of Chicago & City of Saint Paul*, 2026 WL 114294, at *9 (distinguishing

22  *Lincoln* when plaintiffs' case did not challenge individual grants but rather defendant agencies'

23  "decision to impose the Challenged Conditions in the first place.").

24          As described above, plaintiffs sufficiently identify that their challenge rests not on any one

25  grant, but rather the ability for defendants to impose such conditions at all.  *See* Oppo. at 20; SAC

26  ¶¶ 390–91.  The facts of this case are more akin to *City of Fresno* than *Lincoln*.  Plaintiffs have

27  met their burden in showing that the Directives are not agency action committed to agency

28  discretion by law.  Defendants' motion to dismiss plaintiffs' APA claim is DENIED.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

## CONCLUSION

For the foregoing reasons, defendants motion to dismiss is DENIED.

**IT IS SO ORDERED.**

Dated: January 20, 2026



William H. Orrick
United States District Judge

31